# Timeline of Electoral Policy Activities, Issues, and Litigation
## Pennsylvania, Michigan, Wisconsin, Georgia, Arizona, and Nevada
### August 2003 to November 2020



*"Complex Problems Solved Well"*

| | August 19, 2003 | December 19, 2003 | September 15, 2005 | March 12, 2019 | October 31, 2019 |
|---|---|---|---|---|---|
| **PA** | | | Pennsylvania State Legislature adopts the Pennsylvania State HAVA Plan.<br><br>Hava State Plan as Amended | | **Legislation: Act 77 2019** provides a $90 million bond and cost share to counties for upgrading voting apparatuses to ensure a verifiable paper trail, and a fixed compensation range between $75 and $200 for District Election Officers.<br><br>Pennsylvania Election Reform Act 77 ACLU Summary<br>Pennsylvania Election Reform Act as of October 31, 2019, P.L.552, No. 77<br>Pennsylvania Consolidated Statutes Title 25 Elections (2020 Edition) |
| **MI** | | Michigan State Legislature adopts the Michigan State HAVA Plan.<br><br>Michigan Hava State Plan | | | |
| **WI** | Wisconsin State Legislature adopts the Wisconsin State HAVA Plan.<br><br>Wisconsin Hava State Plan | | | Statutorily required **Voter Fraud Report** from the Wisconsin Election Commission (WEC) to Wisconsin legislature on voting violations and irregularities.<br><br>WEC Fraud Referral Letter<br>WEC DA Fraud Report | |
| **GA** | | | | | **LEGEND** |

I APP. 1

| | | | | | Government Action | CTCL | CEIR |
|---|---|---|---|---|---|---|---|
| AZ | | | | | | | |
| NV | | | | | Rock the Vote | Court or Legal Action | Technology |

| | **November 27, 2019** | **September 24, 2019** | **December 30, 2019** | **January 2020** | **January 17, 2020** |
|---|---|---|---|---|---|
| PA | **Pennsylvania Act 94 2019** - Two articles in Act 94 are amendments to Act 77. Amendments in Act 94 are codified in Title 25 of the Pennsylvania Elections Consolidated Statutes. [Pennsylvania Consolidated Statutes Title 25 Elections (2020 Edition)](#) | | Summary of the Pennsylvania Department of **State HAVA State Uniform Registry of Electors (SURE) Audit** - The auditor general was not able to independently verify the accuracy of SURE system records, the adequacy of SURE security or protocols, or the sufficiency of external controls. [Pennsylvania SURE Audit](#) | Rock the Vote– In Rock the Vote's 2018 annual report, they report that RTV has been *"connected to our system, making the process of registering through their online programs…"* Kathy Boockvar, PA SOS. [Boockvar Praises Online Registration](#) | |
| MI | | | Michigan Bureau of Elections audit by Michigan State Auditor indicates radical departure from HAVA plans and objectives. [State Audit- Bureau of Elections](#) | | |
| WI | | Voter fraud referral list to the Wisconsin district attorney demonstrates trends in Racine, Milwaukee, and other jurisdictions. [WEC DA Fraud Status Report](#) | | | Wisconsin certifies modemless Dominion DS200 voting machines for use in electoral processes. [EAC DS200 Correspondence](#) |
| GA | | | | Georgia Secretary of State, Brad Raffensperger, partnered with CEIR on cybersecurity (2019-2020). [Georgia Partners with CEIR](#) | |

I APP. 2

| | | | | | |
|---|---|---|---|---|---|
| AZ | | | | | |
| NV | | | | Clark County Nevada (Las Vegas) did not receive CTCL money.<br>NWClarkNews.com | |

| | March 11, 2020 | March 16, 2020 | March 23, 2020 | March 24, 2020 | March 27, 2020 | March 29, 2020 |
|---|---|---|---|---|---|---|
| PA | Secretary Boockvar issues polling place guidance for voter privacy.<br>Boockvar Guidance Voter Privacy 3.11.20.pdf | | | | Pennsylvania Act 12 is a collection of omnibus amendments to the act of June 3, 1937 (P.L. 1333, No. 320, Pennsylvania Election Code). Many amendment provisions are found in Pennsylvania Act 77 2019.<br>Pennsylvania Act 77<br>Pennsylvania Consolidated Statutes Title 25 Elections (2020) | |
| MI | | | | | | |
| WI | | Resolution 48-20, introduced by Mayor Antaramian of Kenosha, grants authority to Kenosha City Clerk to relocate polling places due to COVID-19.<br>City of Kenosha Resolution 48-20 | Madison City Council adopts the Mayor's action to close fourteen polling places, with the potential of closing an additional 21 polling places. Concurrent backlog of 15,000 absentee ballot requests. Closure of polling places raises questions as to the authority of | Wisconsin Governor Evers Issues "Safer at Home" Health Order # 12. The stay at home order inhibited candidates running for public offices from campaigning, raising funds, or participating in various public offices and seats.<br>Stay at Home Health Order # 12 | Using COVID-19 as justification, Green Bay County Clerk Teske files a lawsuit against the Wisconsin Election Commission, the Wisconsin Governor, and the Wisconsin Health Department requesting cancellation of April 7 election, procedural modifications, and transition to mail-in balloting. Lawsuit dismissed by | The WEC *Indefinitely Confined* policy memo relaxed the Wisconsin Photo Identification standard by enabling COVID concerned voters to claim *Indefinitely Confined* status. This enabled Wisconsin voters who previously would have to vote in person to claim *Indefinitely* |

| | | | | |
|---|---|---|---|---|
| | | the Madison Mayor to enact policy, truncating the adopted State HAVA Plan.<br>City Council Minutes | | Federal District Judge William Greisbach for lack of federal Jurisdiction.<br>Green Bay County Clerk sues WEC | *Confined* status. This action also raises questions as to how many of those voters who now claim *Indefinitely Confined* status remain on the voter rolls.<br>WEC Memo Indefinitely Confined |
| GA | | | | |
| AZ | | | | |
| NV | | | | |

| | March 31, 2020 | April 6, 2020 | April 7, 2020 | April 16, 2020 | April 20, 2020 |
|---|---|---|---|---|---|
| PA | | | | | |
| MI | | | | | Gov. Whitmer's administrator enters into contract with Every Action (a firm linked to NGP Van) for contract tracing with personal Democratic ties.<br>Whitmer contracts with Every Action |
| WI | **Litigation**: Milwaukee, WI. Jefferson v. Dane County Wisconsin. Order clarifying errors by Scott McDonell, the Dane County Clerk. Clerk McDonell was ordered to remove a | Using COVID 19 as justification, Wisconsin Governor Evers issues Executive Order 74 suspending in person voting until June 9, 2020.<br>Wisconsin Executive Order 74 | Green Bay, WI - Mayor Erin Genrich declines assistance from Wisconsin National Guard and closes 29 of the 31 of primary electoral polling stations. The Mayor is on record apprizing the | Madison, WI - **Resolution 60266** and the public record demonstrating that Madison Voters were negatively affected by State and local Executive actions brought about by closure of 26 | |

I APP. 4

| | | | | |
|---|---|---|---|---|
| | March 25, 2020 Facebook post in which he wrote that all Dane County voters could declare themselves to be "Indefinitely Confined" due to illness using the Wisconsin Department of Health Services Emergency Order #12. This action promotes negation of the statutory legal standard to present proof of identification when requesting an absentee ballot. <br><br> Jefferson v. Dane County | | Green Bay City Council that coronavirus fears dropped poll worker numbers from 270 to 17, while in the same time period he declines no-cost support from the Wisconsin National Guard to man polls during the primary election. <br><br> Green Bay declines National Guard Help | polling stations. Of the 87,890 absentee ballots issued by the Madison clerk's office, 69,437 were returned as undeliverable. Hundreds of instances of voters having difficulty with online voting system were reported. <br><br> Madison WI Resolution 60266 | |
| GA | | | | |
| AZ | | | | |
| NV | | | | |

| | April 21, 2020 | May 5, 2020 | May 19, 2020 | May 21, 2020 | May 28, 2020 |
|---|---|---|---|---|---|
| PA | | | | | |
| MI | | | Michigan Secretary of State Benson uses CARES Act funds to send absentee ballot applications to every voter listed in the Michigan qualified voter file. | | |

| | | | | | |
|---|---|---|---|---|---|
| **WI** | <u>Madison, WI</u> - **Resolution 60266** documents engagement of untrained volunteers, cab drivers, city personnel and various other groups to label ballots, print envelopes, pull and stuff ballots, and assist with early absentee and curbside voting. Notably, the training necessary for these volunteers as required by Wisconsin State Plan, p.15211, is in question.<br><u>Madison Resolution 60266</u> | <u>Racine, WI</u> - Common Council Action approving mailing of absentee ballots to all registered Racine voters in time for the August 11, 2020 election.<br><u>Racine CTCL Grant Acceptance and Ballot Actions File 0242-20</u> | | <u>Kenosha, WI</u> - Common Council Action - changing polling places for August and November elections. **Resolution 82-20** was introduced and signed by Kenosha Mayor John Antaramian.<br><u>Kenosha Changes Polling Places Res 82-20</u> | <u>Racine, WI</u> - CTCL Grant Transmittal Letter to Mayor Mason - $100,000 grant to Racine for "*election planning and administration,*" and redistribution of $10,000 each to the cities of Green Bay, Kenosha, Madison, and Milwaukee. Grant was conditioned upon development of June 15, 2020 Wisconsin Safe Voting Plan, which occurred two weeks later.<br><u>Racine CTCL Grant Agreement</u> |
| **GA** | | | | | |
| **AZ** | | | | | |
| **NV** | | | | | |

| | **June 1, 2020** | **June 2, 2020** | **June 15, 2020** | **June 18, 2020** | **July 6, 2020** |
|---|---|---|---|---|---|
| **PA** | Pennsylvania Governor Wolf's **Executive Order 2020-02** which extended by seven days the deadline for election officials in only 6 counties to receive absentee and mail-in ballots. No similar preferences were granted to voters in the remaining counties across the Commonwealth, resulting in inequitable electoral policies across the state.<br><u>Governor Wolf EO 2020-2</u> | | | Pennsylvania receives $14,155,505 in CARES and HAVA funding, leaving an unused CARES fund balance of $10,734,427.<br><u>Pennsylvania Hava Cares Funds</u> | |

| | | | | | |
|---|---|---|---|---|---|
| MI | | | Michigan Secretary of State announces an API agreement with Rock the Vote to access the state voter registration system for upload of voter registrations. <br><br> Michigan SOS Shares API | | |
| WI | | Racine WI - Common Council Action approving application for CTCL Grant and redistribution to other cities as explicitly noted in the grant for "*coordinated election planning*." <br><br> CTCL Grant Transmittal to Racine Mayor 052820 | Racine, Madison, Milwaukee, Kenosha, and Green Bay, WI - *Wisconsin Safe Voting Plan*: Appointment of "Voter Navigators" - WSVP presents a detailed, specific election funding and operations plan on per-city basis and adds positions that conflict with the duties of elected officials already responsible to oversee electoral processes. <br><br> Wisconsin Safe Voting Plan | | Mayors of Green Bay, Kenosha, Madison, Milwaukee, and Racine announce a $6.3M total grant from CTCL. <br><br> Milwaukee -$2,154,500 <br> Green Bay - $1,093,400 <br> Racine - $942,100 <br> Madison - $1,271,788 <br> Kenosha - $862,779 <br><br> -Early in-person voting/mail: $2.5M <br> -Poll workers: $1.8M <br> -Administration of election day: $876M <br> -Expanded voter education: $1M <br> Wisconsin Five State receive $6.3M |
| GA | | | | | |
| AZ | | | | | |
| NV | | | | | |

| | July 8, 2020 | July 14, 2020 | July 17, 2020 | July 21, 2020 | July 23, 2020 | July 24, 2020 |
|---|---|---|---|---|---|---|
| PA | | | | | | |

I APP. 7

| | | | | | |
|---|---|---|---|---|---|
| **MI** | | Ann Arbor, Michigan - Twenty absentee counting boards and fifteen receiving boards were added by the City of Ann Arbor. The **addition of absentee ballot boards has changed the manner which elections are to be conducted.** The increase in the volume of ballots to be canvassed provides an increased opportunity for errors and fraud.<br><br>Absentee Ballot Boards | | | |
| **WI** | Racine, Wisconsin - Common Council consent agenda action authorized the mayor and city clerk to accept a CTCL grant in the amount of $942,100 for administration of the *Wisconsin Safe Voting Plan*.<br><br>Racine CTCL Grant Resolution | Madison, Wisconsin - Common Council Action authorizing acceptance of CTCL funding from Racine, and delegating authority to accept private funding for electoral administration. **Resolution 61255** authorizes the city clerk to accept CTCL funding in the amount of $1,271,788, and amends the clerk's 2020 budget by $1,272,788.<br><br>City of Madison Meeting Minutes for July 14, 2020 (Legislative File 61124, Page 7) | Milwaukee and Green Bay, Wisconsin - Common Council Action authorizing acceptance of CTCL funding for poll worker database and scheduling equipment from US Digital Response; $150,000 RFP for outside service to focus on unregistered voter contact.<br><br>Green Bay - $1,093,400 CTCL Grant | Wisconsin receives $4,114,320 in HAVA and CARES Act funding for 2020 leaving $1,952,692 HAVA CARES Act funds available.<br><br>Wisconsin Cares Funding | Racine, Wisconsin - Common Council Action approving $942,100 in CTCL grants and authorizing Mayor Mason to receive funding.<br><br>Racine Consent Agenda File 491-20 |
| **GA** | | | DeKalb County, Georgia voted to hire new staff and update processing…but did not announce grantor funding. Allowed ACLU to help at the polls.<br><br>ACLU Helps Dekalb/Fulton at Polls | | |
| **AZ** | | | | | |
| **NV** | | | | | |

| July 28, 2020 | August 3, 2020 | August 5, 2020 | August 19, 2020 | August 21, 2020 |
|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| **PA** | | Pennsylvania Secretary of State Boockvar announces funding for stamps for all mail in ballots. In 2019 PA passed no-excuse vote-by-mail. | | Delaware County, PA - Delaware County Council Action - Acceptance of a $2,172,858 **CTCL grant** for election administration.<br><br>Minutes acceptance of grant<br><br>https://delcopa.gov/publicrelations/releases/2020/safeelectionsgrant.html | Philadelphia, PA - **CTCL Grant** Agreement Transmittal to Philadelphia Grants Officer Del Bianco including purchase of high-speed voting equipment not approved through the legislature. $10,016,074<br><br>Philadelphia Grant Agreement_CTLC Signed August 21, 2020 |
| **MI** | | | | | |
| **WI** | Milwaukee, Wisconsin - Common Council Action accepting a **CTCL grant** of a $2,154.500 for election administration.<br><br>Milwaukee City Council Acceptance of CTCL Grant | | Racine, Wisconsin - Racine passed **Resolution 0492-20** allowing the Mayor and City Clerk to spend up to $250,000 of the CTCL funding for a recreational vehicle without going through public procurement processes. This transaction was not mentioned in the CTCL grant agreement.<br><br>Racine 0492-20 Resolution | | |
| **GA** | | | | | |
| **AZ** | | | | | |
| **NV** | | In August, the Nevada **legislature** passed a bill to allow universal mail-in ballots and ballot harvesting (collection of ballots by non-family members.) This action was questioned using the possibility of election fraud.<br><br>News Article | | | |

| August 24, 2020 | August 26, 2020 | August 30, 2020 | September 1, 2020 |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **PA** | | CTCL grant to Philadelphia $10M for 15 in-person election offices, 15 drop boxes, tabulators, and poll worker pay. $5.5M is earmarked for "ballot processing equipment." $2.2M is earmarked for Delaware County.<br><br>This deal was negotiated by the CTCL and the three city commissioners who run elections.<br><br>Philadelphia CTCL Grant | |
| **MI** | State of Michigan receives $11,247,753 in HAVA and CARES funding for 2020, leaving an **unused HAVA CARES Act** balance of $4,612,009.<br><br>Michigan CARES Act Progress Narrative Report | | |
| **WI** | | | Pleasant Prairie, Wisconsin - Voter Jay Stone files sworn complaint against CTCL with the Federal Elections Commission (FEC).<br><br>Jay Stone FEC Complaint 083020 | Racine, Wisconsin - Common Council authorizes Mayor Mason and City Clerk to accept $657,000 in **CTCL funding** for absentee ballot coordination, ballot collection and processing, and other electoral administrative needs.<br><br>9.1.20 Racine Supplemental CTCL Grant Final (Draft).pdf |
| **GA** | | | | |
| **AZ** | | | | |
| **NV** | | | | |

| | September 2, 2020 | September 4, 2020 | September 8, 2020 | September 10, 2020 |
|---|---|---|---|---|

| PA | | | | |
|---|---|---|---|---|
| MI | Detroit Clerk Janice Winfrey & Michigan Secretary of State announced a **partnership with Wayne County and CTCL**. Funds were used for training and recruitment of election workers, opening of 14 satellite clerk offices (21 total), use of pro sports teams to promote *Get Out the Vote*, and 30 drop boxes. Detroit had four major sports teams promoting voter registration and engagement.<br><br>Email Correspondence Detroit City Louise Jones to Belinda Groner 092820<br>https://www.michigan.gov/som/0,4669,7-192-47796-538528--,00.html<br>Press Release Detroit Clerk Winfrey and Secretary Benson Elections Collaboration 090220.pdf | Lansing, Michigan - City Clerk Chris Swope announces award of a $443,742  **CTCL grant** for administration during the November 3rd election.<br><br>City of Lansing Press Release CTLC Grant Announcement 090420 | Pontiac, Michigan – City Clerk receives a **CTCL grant** of $405,564  to support the City of Pontiac Safe Voting Plan.<br><br>Pontiac Michigan Receives Grant<br><br>East Lansing, Michigan - Council Action (Item 3.13)  approving an Agenda Item Report to use a $35,350  CTCL grant to purchase of an Image Cast high-speed scanning system from Dominion.<br><br>East Lansing MI Council Minutes Scanner Purchase 090820.pdfCity of East Lansing Minutes | Flint, Michigan - Council Action, approval and **resolution** for City of Flint Safe Voting Plan funding. **CTCL Grant** and Agreement Transmittal Letter to Inez Brown for $475,625.<br><br>CTLC Grant Transmittal to Flint City Clerk 091020<br>City of Flint MI Resolution 200391 Accept CTLC Funding 091420.pdf |
| WI | | | | |
| GA | | | Fulton County, Georgia accepts **CTCL grant** of $6,309,436  to increase voting locations to a total of 240.  The new locations avoided churches and schools. Additional locations included a comedy club, Georgia Tech basketball arena, and a wedding reception venue. Funds were  also used for high-speed tabulators and voting equipment to handle the high volume.<br><br>Fulton County Receives CTCL Grant | |
| AZ | | | | |
| NV | | | | |

| **September 15, 2020** | **September 16, 2020** | **September 17, 2020** | **September 21, 2020** |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| PA | | | PA Supreme Court Opinion and Order regarding election questions. Court found that Secretary Boockvar had exceeded her authority in elections.<br><br>Democratic Party v. Boockvar 091720.pdf | . |
| MI | Saginaw, Michigan – City Council Resolution recommended by City Manager Timothy Morales in **Council Communication CC-28**, accepts $405,564 in **CTCL grant** funding.<br><br>Saginaw Accepts CTCL Grant<br><br>Flint, Michigan receives a **CTCL grant** of $475,625 and passes **resolution** to accept the grant for safe elections.<br><br>Flint CTCL Grant<br><br>Pontiac, Michigan receives a **CTCL grant** for a safe voting plan to conduct the election. A large portion of the grant was used to hire staff. $405,564<br><br>Pontiac MI CTCL Grant | Muskegon, Michigan - $433,580 CTCL grant agreement transmittal.<br><br>CTLC Grant Transmittal to Muskegon Clerk Meisch Signed 091620.pdf | Michigan Secretary of State admits 400 military ballots were sent out without Vice President Pence's name, and instead listed Jeremy Cohen as President Trump's running mate. Explanation for the error includes a "computer glitch" and personnel error.<br><br>Michigan 9.17.20 Pence Missing 400<br><br>Muskegon, Michigan - CTCL grant is to be used for drive through voting, satellite election offices, voter education, PPE, cost associated with poll workers, and voting equipment and supplies.<br><br>Muskegon Michigan CTCL 433580 09.16.20 | Kalamazoo, Michigan - City Council Action approving expansion of voter registration plan using CTCL grant of $56,626.<br><br>Resolution Approving the Expansion of Voting and Registration Access for the November 3, 2020 Election |
| WI | Green Bay, Wisconsin - **CTCL Supplemental Grant** Transmittal Letter; Draft CTCL approval letter - $522,200; 46 Laptop computers and printers, hand carts, 46 EZ carts, and 2 lift trucks.<br><br>CTCL Grant Approval Epps-Johnson Email With Green Bay Clerk Teske 091420<br><br>Green Bay CTLC Application Supplement 091420 | | | |
| GA | | | | |
| AZ | | | | |
| NV | | | | |

| September 22, 2020 | September 23, 2020 | September 24, 2020 | September 28, 2020 | September 29, 2020 |
|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| **PA** | <u>Centre County, Pennsylvania</u> – County Elections Council Action - Approving CTCL funding application for a COVID 19 response grant. Agreement with Election Systems & Software (ES&S) for the purchase of 20 Model DS200s (Includes scanner, internal backup battery, plastic ballot box with steel door and e-bin, paper roll, and one (1) standard 4GB memory device). Agreement totals $102,650.00 and is paid for 100% by grant funds through the CTCL grant award.<br><br><u>Centre Count PA Grant Minutes</u> | Many Pennsylvania cities and counties returned ballots to various drop box locations. State policy requires ballots to be returned to the County Board of Elections in the precinct where the voter resides, raising policy conflicts.<br><br><u>Philadelphia 17 Satellite Offices</u><br><br><u>Litigation: Boockvar v Saylor</u> - Signature rules. The court found county boards of elections are prohibited from rejecting absentee or mail-in ballots based on signature comparisons by county election officials or from third-party challenges based on signature analysis and comparisons.<br><br><u>Boockvar v Saylor</u> | <u>Centre County, Pennsylvania</u> – **CTCL grant** of $863,828.50 to Centre County, PA for absentee and mail-in ballot production, processing equipment, early vote site and ballot drop-off options, in-person voting, and ballot drop boxes.<br><br><u>CTCL Minutes of BOC</u> | Pennsylvania Secretary Boockvar issues guidance on civilian absentee and mail-In ballot procedures.<br><br><u>Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures</u>. | |
| **MI** | <u>Pontiac, Michigan</u> - City Council Action authorizing approval of **CTCL funding** of $405,564 for electoral administration.<br><br><u>City of Pontiac MI Resolution 20428 Accept CTLC Funding 092220.pdf</u> | | <u>Saginaw, Michigan</u> - City Council Action authorizing approval of **CTCL funding** of $402,878 for electoral administration.<br><br><u>Saginaw CTCL Grant</u> | | <u>Grand Rapids, Michigan</u> - **CTCL grant** for staffing, training, and equipment in the amount of **$280,582.**<br><br><u>Grand Rapids Minutes</u> |
| **WI** | | | | | |
| **GA** | | | | | |
| **AZ** | | | | | |
| **NV** | | | | | |
| | **September 30, 2020** | **October 1, 2020** | **October 6, 2020** | **October 7, 2020** | **October 9, 2020** |

I APP. 13

| | | | | |
|---|---|---|---|---|
| PA | Federal Elections Commission (EAC) **reports a $9,577,386 surplus in HAVA funds** for Pennsylvania, negating the need for private funding of state electoral processes.<br><br>Pennsylvania Federal Report | <u>Center County, Pennsylvania</u> approves 13 temporary elections employees. County approves purchase of 2 vehicles with CTCL funds although the CTCL contract does not indicate vehicles as allowable expenditures.<br><br>Centre County Misuse of Funds | Advocacy group **Judicial Watch files litigation** in Pennsylvania for failing to remove inactive voters under the National Voters Registration Act (NVRA).<br><br>JW Sues Over Colorado Voter List | |
| MI | Federal Elections Commission (EAC) **reports a $10,406,377 surplus in HAVA funds** for Michigan, negating the need for private funding of state electoral processes.<br><br>Michigan Federal Report | | | |
| WI | Federal Elections Commission (EAC) **reports $4,316,403 surplus HAVA funds** for Wisconsin, negating the need for private funding of state electoral processes<br><br>Wisconsin Federal Report | | | | Affidavits and declarations provided by officials from the cities of Green Bay, Kenosha, Madison, Milwaukee, and Racine in the lawsuit of Wisconsin Voters Alliance, et al. v. City of Racine, et al. CV No. 1:20-cv-01487.  None of the affiants or declarants mention the receipt of **CTCL grants** redistributed by the City of Racine or subsequent grants.<br><br>City Official Affidavits. |
| GA | | | | DeKalb County, Georgia receives a $4.8M **CTCL grant** for election related workers, processing equipment, and early voting locations.<br><br>DeKalb CTCL Info | |
| AZ | | | | | |
| NV | | | | | |

| | October 11, 2020 | October 13, 2020 | October 16, 2020 | October 20, 2020 | October 21, 2020 |
|---|---|---|---|---|---|
| PA | | Allegheny County, Pennsylvania discovers a **ballot printing and mailing error** which has impacted 28,879 voters in the County. The error occurred in the ballot image mapping of absentee and mail-in ballot files 3 and 4. Ballots were printed by Midwest.<br><br>Allegheny Ballot Errors | Allegheny County, Pennsylvania ~372,000 ballot applications were rejected, mostly due to duplications. The mail in ballot process is new, and Allegheny County was not prepared to manage the process.<br><br>372,000 Ballot Rejections | | Secretary Boockvar issues amended Provisional Voting Guidance which exceeded her authority and bypassed the legislature.<br><br>Boockvar Guidance |
| MI | "Nonpartisan" Michigan Center for Election Law & Administration (MCELA) joined MI SOS and announces partnership thanks to **grant from CEIR**. Grant is earmarked for combating misinformation, airing TV ads, direct mailings, and text messaging those who have never/recently voted. | An affidavit filed by the Chief Deputy City Clerk for the City of Lansing, Michigan, Bryan P. Jackson, declared that, among other things, Secretary of State Benson sent an email to the City Clerk's Office and municipal election officials throughout the state advising them of the CTCL grant program and encouraging election officials to apply for private CTCL funding.<br><br>MI Declaration of B.Jackson<br><br>Flint, Michigan City Clerk, Inez M. Brown, filed an affidavit which supports correspondence from Michigan Secretary of State Benson advising on the CTCL grant program and encouraging election officials to apply for funding. | | Advocacy group *Judicial Watch* releases a study regarding registered voters that concluded there were more votes cast than registered voters in several Michigan counties.<br><br>Judicial Watch Report | |
| WI | | Milwaukee, Wisconsin Common Council Minutes - The heads and managers of departments are directed to recruit individuals from within their departments who wish to be assigned to work for the Election Commission during the November 2020 Election. There was no mention of training as required in Wisconsin.<br><br>Election Workers | | | |
| GA | | | | | |
| AZ | | | | | |
| NV | | | | | |

| | October 23, 2020 | October 26, 2020 | October 28, 2020 | October 31, 2020 | November 1, 2020 | November 2, 2020 |
|---|---|---|---|---|---|---|
| PA | **Litigation** - Pennsylvania Supreme Court grants Secretary Boockvar's complaint, and prohibits electoral boards from rejecting absentee and mail-in ballots based upon signature or a third-party challenge. | U.S. District Court for the Western District of Pennsylvania Consent Order in Parnell, et al. v. Allegheny County, et al. related to 28,789 incorrect ballots issued in Allegheny County.<br><br>Parnell V Allegheny | Pennsylvania Secretary Boockvar issues Guidance for Mail-In and Absentee Ballots received from the USPS after 8:00 p.m. on Tuesday, November 3, 2020.<br><br>10.28.20 Absentee Ballots | Montgomery County, Pennsylvania - Email from Francis Dean, Director of Mail-In Elections with instructions to election officials permitting electors to alter previously received absentee and mail-in ballot envelopes in an effort to "cure" defects, including naked ballots.<br><br>Francis Dean Email | Pennsylvania Secretary Boockvar issues Guidance on Canvassing **Segregated Mail-In and Civilian Absentee Ballots** received after 8:00 p.m. on Election Day through 5:00 p.m. November 6, 2020.<br><br>Boockvar Guidance Canvassing | Correspondence by Deputy Secretary Jonathan Marks permitting election officers to communicate with voters who might have had ballots rejected, issue provisional ballots, and to update the SURE system.<br><br>Deputy Marks Correspondence |
| MI | | | | | | |
| WI | | | 243,900 Wisconsin voters registered as "Indefinitely Confined" compared to 72,000 last year and are exempt from traditional state voter law.<br><br>Wisconsin Indefinitely Confined | | | |
| GA | | | | | | |
| AZ | | | | | | |
| NV | | | | | | |

| | November 3, 2020 | November 4, 2020 | November 5, 2020 | November 12, 2020 | November 25, 2020 |
|---|---|---|---|---|---|
| PA | Critical Election Analysis indicating voter fraud.<br><br>TMS with State Election Results Analysis. | Montgomery County, Pennsylvania - Lee Soltysiak, Chief Clerk of the Board of Elections, testified of numerous violations of the Election Code by the Montgomery County's Board of Elections.<br><br>Soltysiak Testimony | | Court Order granting Application for Special Relief in the form of a Preliminary Injunction for all counties in the Commonwealth in Hamm, et al. v. Boockvar.<br><br>Hamm v Boockvar Order<br>In Trump, et al. v. Boockvar, the Court concluded Secretary Boockvar, lacked statutory authority to issue the November 1, 2020 Guidance to respondent's County Boards of Elections.<br><br>Trump V. Boockvar Order | |
| MI | Critical Election Analysis indicating voter fraud.<br><br>TMS with State Election Results Analysis | | Michigan SURE Audit Notations regarding past electoral issues.<br><br>SURE Audit Notations | | Michigan Democrat Representative Warren is a paid Lobbyist in at least two other states, presenting a conflict of interest.<br><br>Warren paid as Lobbyist |
| WI | Critical Election Analysis indicating voter fraud.<br>TMS with State Election Results Analysis<br><br>Milwaukee County – From August 20 to November 3, 2020, the number of registered voters in the county increased by (a record setting) 36,633 voters.<br><br>Milwaukee Voter Totals | | Wisconsin WEC allowed 234,000 names to remain on the voter files that should have been removed. The names are flagged by the multi-state Electronic Registration Information Center (ERIC) database.<br><br>WEC Voter File Incorrect | | |
| GA | Critical Election Analysis indicating voter fraud.<br><br>TMS with State Election Results Analysis | | | | Chief cyber security engineer makes declaration about the ease of manipulation of Dominion Voting Systems.<br><br>Dominion Easy to Manipulate |
| AZ | Critical Election Analysis indicating voter fraud.<br><br>TMS with State Election Results Analysis | | | | |
| NV | Critical Election Analysis indicating voter fraud.<br><br>TMS with State Election Results Analysis | | | | |

| | Electoral College White Paper | Dominion Contract | Hart Inter-Civic Contract | Non Profit Affiliates |
|---|---|---|---|---|
| PA | Urban counties such as Allegheny, Philadelphia, and Delaware received over $10 million in private funding that imposed conditions on the conduct of elections. These contracts lack legislative approval, and likely violate state laws prohibiting the use of private money for federal elections.<br><br>Electoral College White Paper | | | Rock the Vote<br>Pennsylvania Voice<br>Democracy Works (Turbo Vote) |
| MI | Michigan Secretary of State Benson approved direct access to the state's voter files by activist organizations.<br><br>Electoral College White Paper | Original Contract was $20,600,000. Four Change Orders were completed and some without legislative approval.<br><br>Dominion Contract | Original Contract was $14,400,000. Change Orders were issued without legislative approval. A total of five change orders were made from March 1, 2017 until August 13, 2020.<br>Hart InterCivic Contract | Michigan Voice<br>Rock the Vote |
| WI | The Wisconsin Election Commission violates state law by allowing voters to claim "Indefinite Confinement" as a means of avoiding the requirement to provide a photo ID when requesting an absentee ballot.<br>Electoral College White Paper | | | Wisconsin Voice<br>Rock the Vote |
| GA | Fulton County officials illegitimately accept more than $6 million in private grant funding that imposes conditions on electoral processes. The public record is silent on whether county officials attempted to seek legislative approval.<br>Electoral College White Paper | | | ProGeorgia<br>ACLU<br>Rock the Vote<br>New Georgia Project<br>America Votes<br>Vote Forward |
| AZ | State officers and Maricopa County Officials fail to enforce state law against private companies that direct federal election administration, accepting millions of dollars in private grants that gave some voters advantages unavailable to other jurisdictions across the state.<br>Electoral College White Paper | | | Rock the Vote<br>League of Women Voters |
| NV | | | | Rock the Vote<br>Democracy Movement US<br>League of Women Voters |

I APP. 18

|  | Voting Equipment | Voting Methods | State Guidance for Ballot Curing | Voting Result Analysis |
|---|---|---|---|---|
| PA | The State of Pennsylvania maintained guidelines for counties and cities regarding voting equipment.  Any equipment with modems or open internet are not state approved.<br>Dominion Democracy Suite<br><br>PA Voting Systems | - 30 days residency<br>- Provisional ballots<br>- No same day registration<br>- Signature verification<br>- Online registration<br>- Absentee Ballot-Declaration<br>- Felons regain right to vote upon release<br>- Voting Status will be changed to inactive if you receive a notice and do not respond within 30 day.<br>- *ERIC Member*<br>PA Voting Methods | There is no state policy for curing ballots. If the signature is missing, the ballot is not to be counted.<br><br>Curing Ballots | Thomas More Society with State Election Results Analysis.<br><br>TMS Analysis |
| MI | The State of Michigan granted contracts to only three vendors:<br>1) Dominion Democracy Suite<br>2) Hart InterCivic<br>3) Election System and Software<br><br>MI Voting Systems | - 30 days residency<br>- Absentee ballots<br>- Signature verification<br>- Same Day Registration<br>- Provisional ballots<br>- Felons in Jail cannot vote<br>- Online voter registration<br>- Absentee ballots<br>- Signature verification<br>- Provisional ballots<br>- Felons in Jail cannot vote<br>- Inactive voters stay in the voter file for two federal elections<br>- *ERIC Member*<br>*Due to COVID, Absentee Ballots were sent out to everyone in the voter file.<br>MI Voting Methods | There is no state policy for curing ballots.<br><br>Curing Ballots | Thomas More Society with State Election Results Analysis.<br><br>TMS Analysis |
| WI | ES&S DS 200<br>Sequoia Voting System<br>ES&S Express Votes<br>ES&S Auto Mark<br>Clear Access 2.01<br>Dominion<br>WI Voting Systems | - 10-day residency<br>- Same day registration<br>- Online voter registrations<br>- Absentee ballots (*Anyone can return*)<br>- Signature verification<br>- Provisional ballots<br>- Felons regain right to vote upon release<br>- *ERIC Member*<br>WI Voting Methods | State policy for curing ballots states the election officials are to *contact* the elector and mail a ballot with a second envelope, which requires the elector and a witness to sign.  Witness must provide address.  If signature or address is missing the ballot is not to be counted.<br>Curing Ballots | Thomas More Society with State Election Results Analysis.<br><br>TMS Analysis |

I APP. 19

| | Voting Equipment | Voting Methods | State Guidance for Ballot Curing | Voting Result Analysis |
|---|---|---|---|---|
| GA | The Secretary of State in Georgia contracted with Dominion to use electronic voting system throughout the state.<br><br>GA Voting Systems | - No set time for residency<br>- No same day registration<br>- Online voter registrations<br>- Absentee ballots/Oath<br>- Signature verification<br>- Provisional ballots<br>- Felons restored after completing sentence including parole.<br>- Inactive Voters stay in the voter file for 5 years.<br>GA Voting Methods | State policy for curing ballots states the election official attempt to contact the elector. The time allowed to cure the ballot is the same number of days for the provisional ballots to be accepted.<br><br>Curing Ballots | Thomas More Society with State Election Results Analysis.<br><br>TMS Analysis |
| AZ | Dominion Democracy Suite 5.5.1.8<br>ImageCast<br>ImageCast X Marking Device<br>HP LaserJet Pro M402dne<br>Interscan HiPro 821<br>ICC Cannon DR-G1130<br>Elections Systems and Software<br>DS200<br>Express Vote (BMD) DS450<br>AZ Voting Systems | - 29 Days to establish residency<br>- No same day registration<br>- Online voter verification only<br>- Absentee ballots/ affidavit attached<br>- Signature verification<br>- Provisional ballots<br>- Felons cannot vote until cleared<br>- *ERIC Member*<br>AZ Voting Methods | State policy for curing ballots states the election official must make a reasonable attempt to contact the elector for ballot curing. A total of 5 days after the election is allowed on Federal elections and 3 days after other elections.<br><br>Curing Ballots | Thomas More Society with State Election Results Analysis.<br><br>TMS Analysis |
| NV | *Dominion Democracy Suite 5.12*<br>- Election Day (ICX)<br>- Early Voting (ICX)<br>- Absent Ballots (ICC)<br>- Mailing Precinct (ICC)<br>- ADA (ICX)<br>*Election Systems and Software 6.1.0.0*<br>- Election Day (ExpressVote-BMD, DS200)<br>- Early Voting (ExpressVote-BMD, DS200)<br>- Absent Ballots (DS450)<br>- Mailing Precinct (DS450)<br>- ADA (ExpressVote-BMD)<br>NV Voting Systems | - 30 days to establish residency<br>- Same Day Registration<br>- Online voter registration<br>- Absentee ballots<br>- Signature verification<br>- Provisional ballots<br>- Felons regain rights upon release<br>- Voter file keeps inactive voters for two consecutive general elections (8 years)<br>- *ERIC Member*<br>NV Voting Methods | Nevada had no method in place to cure ballots.<br><br>Curing Ballots | Thomas More Society with State Election Results Analysis.<br><br>TMS Analysis |

*Stillwater Technical Solutions*

*"Complex Problems Solved Well"*



October 9, 2020

Mr. Phill Kline                                  Mr. Erick Kaardal
Thomas More Society                              Mohrman, Kaardal and Erickson PA
309 West Washington Street, Suite 1250           150 South Fifth Street, Suite 3100
Chicago, IL 60606                                Minneapolis, MN 55402

Re: The Legitimacy and Effect of Private Funding in State and Federal Electoral Processes

Dear Mr. Kline:

*Introduction -*

Thank you for retaining Stillwater Technical Solutions (STS) to survey the impact of public/private partnership funding on state certified Help America Vote Act (HAVA) implementation plans, and state electoral administrative processes. STS is a non-partisan, for-profit research and public-policy advisory firm specializing in federal and local government administrative procedures, land and natural resource policymaking, local governmental relations, and program management.

Thomas Moore Society (TMS) has retained STS to analyze whether grants from private, non-profit organizations that are independent of state certified HAVA implementation plans and legislative appropriations processes may legitimately be integrated with public funding by local governments for electoral administration. Our brief response, expanded throughout this briefing paper, is that there is no statutory or administrative basis or history for local jurisdictions to solicit or receive private funding outside of state plans or legislative and congressional appropriation processes.

STS was specifically requested to brief TMS on the following questions:

1) Whether state certified HAVA implementation plans or state legislative prerogatives are compromised through the injection of private grants from the Center for Technology and Civic Life (CTCL) into local elections offices;

2) If existing appropriations from federal, state or local sources are sufficient to execute the 2020 elections, making funding from public/private partnerships unnecessary;

3) How the reporting and claw back provisions in CTCL agreements with local governments represent an ongoing liability for local governments, skews state legislative budgeting, and result in inaccurate federal and state audits required for HAVA programs;[1]

4) How injection of CTCL funds in discrete jurisdictions distorts legislative appropriation formulas, resulting in an inequitable distribution of funding throughout the state, contrary to HAVA and state implementation plans.

---

[1] 41 CFR Part 105-71. *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments.*

*The Legitimacy and Effect of Private Funding*
*in Federal Electoral Processes*
*Page 2*

*Approach -*

For this survey, STS analyzed the requirements from the U.S. Elections Assistance Commission (EAC) and provisions in CTCL agreements in the context of the state certified HAVA implementation plans for the states of Wisconsin,[2] Minnesota[3,4] Michigan,[5] and Pennsylvania.[6] These four states were selected because of an early emphasis and focused collaboration between CTCL and large municipalities, as well as the timing of CTCL grants, beginning in late spring 2020. A chronology of the CTCL and local governmental transactions, previously reported by STS, was also integrated in this analysis.[7]

Through assessment of the administrative responsibilities of state electoral commissions, as codified in state HAVA implementation plans, and documentation of vast unaccessed federal appropriations through HAVA and the Coronavirus Aid Relief and Economic Security (CARES) Act,[8] STS was able to demonstrate that there is no deficit of governmental funding available to the states or local jurisdictions for administration of the 2020 elections.

One question that emerges is the history, influence, and impact that private funding could have on the long-term *culture* of state and federal elections. Because large amounts of onshore and offshore funding into non-profit foundations has been documented to influence federal agencies and U.S. policymaking,[9] the potential negative effect of funding on state HAVA implementation programs and local elections is of national import, and beyond the scope of this briefing letter.

*Background; Situation Appraisal -*

The responsibility to administer state and federal elections is the sole prerogative of the Wisconsin, Minnesota, Michigan, Pennsylvania and remaining state legislatures.[10] Those legislatures maintain responsibility for appropriations and delegation of authority to state electoral commissions, who in turn administrate elections on a statewide basis. The state elections commissions enact administrative policies, support county and municipal officials in their individual precincts, and are responsible to administer and report HAVA expenditures in accordance with certified implementation plans approved by the state legislatures and the EAC.

---

[2] Certified Wisconsin HAVA State Plan of 2002.  WI Elections Board.  FR Vol. 69 No. 57 March 24 2004.
[3] Certified Minnesota HAVA State Plan of 2002.  Mary Kiffmeyer Secretary.  FR Vol. 69 No. 57 March 24 2004.
[4] Publication of States Plan Pursuant to the Help America Vote Act. Federal Register Vol. 74, No 237 Friday December 11, 2009.
[5] Certified Michigan HAVA State Plan of 2002.  Terri Lynn Land Secretary.  FR Vol. 69 No. 57 March 24 2004.
[6] Certified Pennsylvania HAVA State Plan of 2002. Edward Rendell Governor, P.A. Cortes Secretary FR Vol. 69 No. 57 March 24 2004.
[7] *CTCL Grant Awards History, Chronology, and Issues.  Stillwater Technical Solutions. October 2020.*
[8] Federal Election Assistance Commission.  *Post Primary CARES Act Expenditure Report. September 22, 2020.*
[9] *The Chain of Command.  How Billionaires and Foundations Control Environmental Movement.  US Senate Report July 30 2014.*
[10] U.S. Const. Art. I, § 4.

*The Legitimacy and Effect of Private Funding*
*in Federal Electoral Processes*
*Page 3*

With promulgation of HAVA on October 29, 2002 and assistance from the EAC, individual state legislatures are provided a conduit for federal funding and assistance for reform and administration of electoral programs. At the federal level, auditing is the responsibility of the Office of the Inspector General and any necessary prosecutorial actions are undertaken by the U.S. Attorney General.

Access to federal HAVA funding requires participating state legislatures to prepare and certify detailed state implementation plans that ensure election integrity, provide for security, assure privacy, improve voter access, and provide for reporting and auditing. The state HAVA implementation plans provide measures to upgrade voter systems, standards for database integrity, methods of voter communication, requirements for recruitment and training of poll workers, and many other policies to be implemented by electoral officials at the local level.

Preparation and revision of HAVA implementation plans are governed by the administrative procedure statutes of the individual states.  State administrative procedures and other executive branch policies typically impose public notification, opportunity for public comment, and other protective, procedural constraints on executive commissions and agencies before HAVA implementation plans may legitimately be modified.

The ongoing availability of HAVA appropriations to state legislatures is dependent upon compliance with state implementation plans and annual reporting to the EAC.  All state certified HAVA elections plans must meet the federal audit standards under the *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments* at 41 CFR Part 105-71.

The CARES Act, signed into law on March 27, 2020, provides an additional $400 million to the EAC, the states, the District of Columbia, and U.S. Territories "*to prevent, prepare for, and respond to coronavirus, domestically or internationally, for the 2020 Federal election cycle*." The CARES Act requires state agencies to coordinate with the Pandemic Response Accountability Committee, and dissemination of CARES Act funding takes place through the existing HAVA state implementation planning process.

It is important to note that large amounts of the CARES Act relief funding appropriated by the EAC to Wisconsin, Minnesota, Michigan, Pennsylvania and the other states for electoral administration is unspent and remains available to municipalities and counties.[11] Because large amounts of federal funding continue to be available, the need for augmentation from the private sector is both unjustified and unwarranted.

In Wisconsin, as of July 10, 2020, the EAC reported that only 60% of the $7,362,345 CARES funding has been spent.[12,13] This makes solicitation of CTCL funding by Racine Mayor Mason for redistribution to the cities of Madison, Milwaukee, Green Bay, and Kenosha unnecessary and outside of the protocols of the Wisconsin HAVA implementation plan for electoral administration.[14]

---

[11] Federal Election Assistance Commission.  Post Primary CARES Act Expenditure Report.  September 22, 2020.
[12] Elections Assistance Commission. CARES Act Quarterly Report to the Pandemic Response Committee.  July 10, 2020.
[13] Federal Election Assistance Commission.  Post Primary CARES Act Expenditure Report.  September 22, 2020.
[14] Ibid. Stillwater Technical Solutions Chronology Matrix.  October 2020.

*The Legitimacy and Effect of Private Funding*
*in Federal Electoral Processes*
*Page 4*

Public funding for administration of local elections has also been made available at the individual state level.  In Wisconsin, the state legislature sponsored and funded an aid program called *Wisconsin Routes to Recovery*.[15] The *Routes to Recovery* program reimburses local governments for unbudgeted expenditures necessary to respond to the COVID-19 public health emergency.

The CTCL grant program has the appearance of being initiated after the EAC and Congress appropriated HAVA and CARES Act funding, with the range of funded programs being similar to those already provided for in HAVA state implementation plans.[16]  Remarkably, the CTCL grant program is being administered at the local level *independent* of the EAC, delegated state commissions, or state HAVA implementation plans.  This approach distorts local and state budgeting processes, circumvents mandated funding formulas that provide for uniform and equitable distribution of funding, and bypasses public notification, public comment, and other administrative processes that ensure the public can hold government accountable.

---

[15] Guidance. Wisconsin Routes to Recovery Reimbursement Program. September 25 2020.
[16] Elections Assistance Commission. Plans for Use of CARES Act Funds. Report to Pandemic Response Committee.

*Conflict Summary -*

**I. Injection of private funding into county and municipal elections circumvents State and Federal appropriations processes, violates protocols in HAVA state implementation plans, and results in inaccurate reporting under HAVA 254(a)(5):**

    a.   The Help America Vote Act (HAVA) prescribes an intergovernmental administrative process that includes the U.S. Election Assistance Commission (EAC), state legislatures, and delegated state commissions.

    b.   The mechanism and authority for administration of HAVA mandates for both HAVA and CARES Act appropriation funding is prescribed in Wisconsin, Minnesota, Michigan, and Pennsylvania[17] state certified HAVA plans.

    c.   The individual state HAVA implementation plans incorporate detailed planning requirements for 13 HAVA categories, including election security protocols; standards for voter systems; equipment procurement requirements; voter and electoral official training procedures; provisional voting and balloting processes; provisions to improve voting access; mail-in voter registration requirements; voter complaint resolution protocols; and appropriations monitoring, auditing and reporting protocols.

    d.   The claw back and reporting provisions in CTCL contracts with local counties and municipalities, if exercised, will result in skewed recordkeeping and state reporting under HAVA 254(a)(5) and the Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments at 41 CFR Part 105-71.

    e.   The claw back language in the CTCL agreements represents a contingent, ongoing, and long-term liability for local counties and municipalities who access the CTCL grants. The public record already records instances of local governments voting to incorporate CTCL funds in their general budget.

    f.   Scaled up across the 15 states of known CTCL activity, inaccuracies in state/federal HAVA Title II reporting and auditing resulting from unreported funding and claw back provisions is substantial.

    g.   The appropriate mechanism for charitable donations to electoral processes is through donations earmarked into the general fund of the individual state legislatures. There is no state or federal statutory authority or mechanism for counties, municipalities, or other local electoral jurisdictions to solicit, receive, or appropriate private funding for administration of public elections beyond the authority of state HAVA implementation plans.

---

[17] Notice. *Publication of State Plans Pursuant to the Help America Vote Act*. Federal Register Volume 69, No. 57. Wednesday, March 24, 2004.

II. **HAVA, CARES, and state appropriations for local elections in Michigan, Wisconsin, Pennsylvania, and Minnesota remain sufficient for the 2020 election cycle, rendering CTCL funding unnecessary:**

a. Public appropriations for federal elections through the U.S. Election Assistance Commission (EAC), state matching funds, and other public moneys are the appropriate funding sources for administration of U.S. elections. State-level funding formulas provide for proportional and equitable distribution of funds, ensuring resources are evenly allocated to serve the voting public. State and federal mandates require funding recipients to report how election funding was spent within their jurisdictions.

b. For the 2020 election cycle, federal and state appropriations for administration of local elections have been substantially augmented to address the COVID-19 pandemic by additional funding through the CARES Act and other legislation.

c. Additional COVID-19 pandemic response funding for election administration has been made available through state appropriations and other allocations of public funds. As example, the State of Wisconsin used CARES Act funding and state matches for its *Routes to Recovery Program.*

d. The combination of the HAVA election security and CARES Act funding, along with any state matches, remains adequate to facilitate election operations, upgrade of election-specific hardware and software, cybersecurity, training for voter and elections officials, and COVID-19 specific needs. Publicly sourced funding remains sufficient without any private contributions.

e. Local electoral officials in Michigan who performed due diligence on CTCL grants have observed the sufficiency of CARES Act funding and remarked as to the non-necessity of CTCL grants. Michigan's Oakland County Clerk Lisa Brown decided not to seek CTCL funding because "*We already had an opportunity through the CARES Act to get extra equipment and things we would need at the county level. It seemed to me that they were offering up the same sort of thing.*" [18]

f. The 2019 HAVA Title II 251 Report to the EAC from Michigan Secretary Jocelyn Benson documents an unexpended HAVA surplus for administration of statewide elections of $1,285,975.[19] The public record indicates that Secretary Benson was aware of the availability of adequate public funding for dissemination to Ann Arbor, Flint, Lansing, East Lansing, Muskegon, Pontiac, Romulus, Kalamazoo, and Saginaw – jurisdictions currently seeking CTCL funds. This contrasts with Secretary Bensons public promotion of CTCL funding for administration of elections in Michigan.

g. Concerns with CTCL funding include lack of public accountability, no state legislative or EAC oversight, and agreements that require reporting of electoral information from government back to a non-governmental organization.

---

[18] *Benson accused of letting 'partisan operatives' influence election.* Detroit News. October 6, 2020.
[19] Michigan HAVA 251 Funds Report. December 2019.

*The Legitimacy and Effect of Private Funding*
*in Federal Electoral Processes*
*Page 7*

| Table 1 - HAVA and CARES Funding Plus State Matching Funds for 2020 Elections[20] | | | | | | |
|---|---|---|---|---|---|---|
| | **2019 HAVA Carryover** | **Election Security** | **Match** | **CARES** | **Match** | **Total** |
| **MI** | $6,635,744 | $12,053,705 | $2,410,741 | $11,299,561 | $2,259,912 | $34,689,663 |
| **MN** | $6,548,440 | $7,418,672 | $1,483,734 | $6,958,233 | $1,391,647 | $23,800,726 |
| **PA** | $3,531,998 | $15,175,567 | $3,035,113 | $14,233,603 | $2,844,721 | $38,821,002 |
| **WI** | $4,316,403 | $7,850,124 | $1,570,025 | $7,362,345 | $1,472,469 | $22,531,366 |

| Table 2 - Estimated CARES Act Expenditures 20 Days Post Primary Election[21] | | | | |
|---|---|---|---|---|
| | **Amount Appropriated** | **State Match** | **Initial Total Available** | **Estimated Expenditure** | **Available Funds** |
| **MI** | $11,299,561 | $2,249,551 | $13,549,112 | $6,821,392 | $6,727,720 49% |
| **MN** | $6,958,233 | $1,386,122 | $8,344,355 | $363,867 | $7,980,488 92% |
| **PA** | $14,233,603 | $2,831,101 | $17,064,704 | $3,511,525 | $13,553,179 79% |
| **WI** | $7,362,345 | $1,472,469 | $8,834,814 | $3,228,484 | $5,303,330 60% |

| Table 3 – Government Funding and CTCL Grant Funding | | |
|---|---|---|
| | **2020 HAVA + CARES Funding[22]** | **2020 CTCL Grants[23, 24]** |
| **MI** | $28,023,919 | $6,369,753   (22.7%) |
| **MN** | $17,252,286 | $2,297,342   (13.3%) |
| **PA** | $35,289,004 | $15,824,895   (44.8%) |
| **WI** | $18,254,963 | $6,946,767   (38.1%) |

    h.  Because of the COVID-19 pandemic, Congress provided additional elections funding through the CARES Act that nearly doubled the funding levels already provided in the annual HAVA funding. Much of the remaining CARES funding has not yet been expended. The CTCL grant funding is predicated on assisting local election offices in meeting unexpected election expenses resulting from the effects of the COVID-19 pandemic. Because adequate provision for meeting those expenses has already been provided though public sources, the CTCL grants are excess to needs.

---

[20] *Election Assistance Commission—Election Security Grant Funding Chart July 16, 2020* and *Election Assistance Commission—CARES Grant Funding Chart July 22, 2020*

[21] *ESTIMATED CARES Act Expenditures As Reported in 20 Day Post Primary Reports (September 22, 2020 Update)*

[22] Includes federal funding + state matching funds; does not include 2019 carryover.

[23] CTCL grant dollar amount accompanied with size as a percentage of total government funding for the state.

[24] CTCL grant values must be viewed as approximate because the numbers reported by news sources and local governments vary, and grant awards continue.

### III. When evaluated in context of the 2016 presidential election, CTCL grant funding patterns demonstrate partisanship in grant funding awards:

a. A review of data for 2020 CTCL grant-making in Michigan, Minnesota, Pennsylvania, and Wisconsin, and incorporation of 2016 presidential election voting records for jurisdictions receiving CTCL grants, reveals a pattern of greater funding being awarded to jurisdictions where candidate Hillary Clinton won versus grant-receiving jurisdictions where candidate Donald Trump won. While CTCL maintains that it is a non-partisan organization and its grants are available to all local jurisdictions, the grant pattern can be understood to have a clear color of partisanship. Attachment A contains charts, graphs and a table supporting this conclusion.

b. **Michigan -** At the time of this survey, CTCL had awarded eleven grants in Michigan. Recipient cities were Detroit ($3,512,000), Lansing ($443,742), East Lansing ($43,850), Flint ($475,625), Ann Arbor ($417,000), Muskegon ($433,580), Pontiac ($405,564), Romulus ($16,645), Kalamazoo ($218,869), and Saginaw ($402,878). In the 2016 election, only Saginaw was won by candidate Donald Trump; the remainder were won by candidate Hillary Clinton. In total, $9,451,235 (95.7%) was awarded to the ten jurisdictions where candidate Clinton won and only $402,878 (4.3%) where candidate Trump won.

c. **Minnesota -** At the time of this survey, the only Minnesota jurisdiction that had been awarded a CTCL grant was Minneapolis, in the amount of $2,297,342. Candidate Hillary Clinton won the 2016 presidential vote in the jurisdiction.

d. **Pennsylvania -** At the time of this survey, CTCL had awarded seven grants in Pennsylvania. Three of these grants were awarded to the cities of Philadelphia ($10,016,074), Erie ($148,729), and Lancaster ($474,202). Five were awarded to counties: Wayne County ($25,000), Northumberland County ($44,811), Center County ($863,828), Delaware County ($2,200,000), and Allegheny County ($2,052,251). A total of $13,063,828 (94.7%) went to jurisdictions where candidate Hillary Clinton won in the 2016 presidential election; only $692,742 (5.3%) went to jurisdictions where candidate Donald Trump won.

e. **Wisconsin -** At the time of this survey, CTCL had awarded multiple grants to five Wisconsin cities: Milwaukee - two for a total of $2,164,500; Madison - two for a total of $1,281,788; Green Bay - two for a total of $1,625,600; Racine - two for a total of $1,002,100; and, Kenosha - two for a total of $872,779. The $60,000 grant to Racine is what remained of a $100,000 CTCL grant to that municipality that included a stipulation that Racine would distribute a $10,000 sub-grant to each of the other four cities. This appears to place Racine in the position of being an agent acting on behalf of CTCL for the purpose of distributing grant moneys along with CTCL instruction. Candidate Hillary Clinton won handily in all five jurisdictions. [25]

---

[25] Wisconsin Safe Voting Plan. June 15, 2020.

*The Legitimacy and Effect of Private Funding*
*in Federal Electoral Processes*
*Page 9*

*Concluding Remarks and Opinions -*

Despite wars, depressions, onshore attacks, and other national traumas, the United States, throughout its 224-year history, has been able to successfully navigate electoral processes with reasonable normalcy.  The current pandemic, though real, is neither exceptional nor reason to alter longstanding processes or timing of electoral administration.

The national and state governments provide public funding to carry out elections because funding from private sources could subject electoral officials to coercion, manipulation, and corruption.  Private funding into local elections, over time and if allowed, will change the culture of how county clerks and municipalities view and access public funding.

With respect to the CTCL grant program itself, injection of funding into local jurisdictions circumvents longstanding administrative processes that protect voters from disenfranchisement, fraud, or an inequitable statewide distribution of funding across the electoral precincts.  This condition could foreseeably and negatively affect rural voters or in-person voters.

Based upon the information in this Briefing Paper, STS offers the following actions or activities for consideration by TMS:

1. Administrative, judicial or informational actions aimed at local governments or municipalities receiving CTCL grants;

2. Provision of information to State Attorneys General who are responsible for oversight of nonprofit organizations within their respective states;

3. Provide support and information to local citizenry of CTCL grant receiving counties and municipalities such that they may inform, disagree with, or even formally challenge grant decisions by local commissions.

Please feel free to contact me as you have questions or comments on the enclosed.

Regards,

J.R. Carlson
Managing Partner
Stillwater Technical Solutions

**Attachment A**

Charts, Graphs and Tables

**Note:** Variations in grant amounts were reported by editors, the press and in meeting minutes from local governments. These variations might result in perceived inaccuracies in the dollar amounts of some CTCL grants. Because CTCL continues to make grants, source information in these calculations will outdate. The data presented is sufficient and reliable to conclude clear political trends in CTCL grant awarding patterns.

Except where noted, individual grant amounts are linked to source information.

*Stillwater Technical Solutions* 

"*Complex Problems Solved Well*"

October 27, 2020

Mr. Phill Kline
Thomas More Society
309 West Washington Street, Suite 1250
Chicago, IL 60606

Re:  Voter Suppression and Disenfranchisement Through Executive and Administrative
Actions - Pennsylvania

Dear Mr. Kline:

Thank you for retaining Stillwater Technical Solutions (STS) to survey how state gubernatorial and administrative actions are eroding voter confidence, contributing to voter suppression, and are having a material impact on electoral processes in the Commonwealth of Pennsylvania.

For this work, we survey how Executive Order 2020-02,[1] *Extension of Deadline for Receipt of Absentee and Mail-In Ballots in Certain Counties,* issued under state emergency management statutes to extend balloting timeframes in six jurisdictions lacks authority to regulate elections, and how disaggregated policy decisions by local electoral authorities are inconsistent with the Pennsylvania state plan governing uniform administration of elections.

By citing decisions from recent Pennsylvania court cases and through a recounting of the public record in the context of electoral history, we raise salient issues as to how executive actions by Governor Wolf are resulting in a diminution of adopted state plans governing the administration of State elections, and resulting in regional electoral disparities.

Using history and the public record as a platform, we demonstrate that the combination of emergency management executive orders, improper and disaggregated policy decisions by electoral boards, and decisions by state agencies are resulting in inequities among election districts, resulting in a discernible and material impact on the electorate of the Pennsylvania.

*Policy Questions; Approach -*

1. Do the emergency management statutes of Pennsylvania delegate to the governor the authority to inequitably postpone or delay primary or general election balloting dates?

2. To what extent does the legislatively adopted Help America Vote Act (HAVA) State Plan for governing administration of elections grant authority to local election boards, chief election officers, and/or election district chairs to establish non-uniform policies for mail-in voting, addition or elimination of polling places, alterations in postmarking requirements, and/or changes in standards granting time extensions for civilian absentee and mail-in ballots?

---

[1] Pennsylvania Executive Order 2020-02 — *Extension of Deadline for Receipt of Absentee and Mail-In Ballots in Certain Counties*

*Mr. Phill Kline - Voter Suppression and Disenfranchisement -*
*Pennsylvania*
*Page 2*

3. Are electoral policy decisions that depart from the prescriptive HAVA
State Plan by Allegheny, Dauphin, Delaware, Erie, Montgomery, and
Philadelphia counties having a material or disparate impact on legislative
campaigns or voters in other jurisdictions that do not enjoy access to the
same privileges?

## I.  Statutory and Administrative Context: Electoral Authorities, Executive Order 2020-02, and Recent Case Law -

Following enactment of the HAVA in 2002, the Pennsylvania General Assembly
adopted its HAVA state elections plan, codifying statewide uniform electoral
procedures, and establishing standards consistent with recommendations by the
Federal Elections Assistance Commission (EAC).[2]

The HAVA state elections plan prescribes the Secretary of the Commonwealth as the
custodian, chief elections officer, and central authority for administration of the
legislatively adopted HAVA state elections plan.  As the chief elections officer,
Secretary Kathy Boockvara is explicitly responsible to ensure statewide uniformity
of electoral procedures, elections officer training, cybersecurity protocols, funding
formulas, reporting, federal auditing, balloting, and that other standards prescribed in
the adopted HAVA state plan are carried out.  This responsibility includes advising
the governor and local electoral jurisdictions on electoral policies that could result in
non-uniform, fragmented, or inequitable electoral decisions.

In 2019 and 2020 the Pennsylvania General Assembly significantly reformed the
state's body of election law through enactment of 2019 Act 77,[3] 2019 Act 94,[4] and
2020 Act 12.[5] The 2019 acts have been codified into Pennsylvania Title 25 C.S.,[6] and
the 2020 act is incorporated in Pennsylvania Title 25 P.S:[7]

- Pennsylvania Election Code.
- Pennsylvania Certified State Plan.[8]
- Pennsylvania 2019 Act 77.[9]
- Pennsylvania 2019 Act 94.[10]
- Pennsylvania 2020 Act 12.[11]
- Pierce v. Allegheny County Bd. of Elections, 324 F. Supp. 2d 684, 698-699 (W.D. Pa. 2003).[12]
- Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000)[13] at 103.

---

[2] Certified Pennsylvania HAVA State Plan of 2002. Edward Rendell Governor, P.A. Cortes Secretary FR Vol. 69 No. 57 March 24 2004

[3] 2019 Act 77

[4] 2019 Act 94

[5] 2020 Act 12

[6] Pennsylvania Consolidated Statutes Title 25 Elections Part II to Part IX)

[7] Pennsylvania Preliminary Statutes Title 25 Elections and Electoral Districts (to Chapter 17)

[8] *Commonwealth of Pennsylvania State Plan As Amended, September 15, 2005*

[9] Pennsylvania 2019 Act 77 *Pennsylvania Election Code — Omnibus Amendments*

[10] Pennsylvania 2019 Act 94 *Pennsylvania Election Code — Omnibus Amendments*

[11] Pennsylvania 2020 Act 12 *Pennsylvania Election Code — Omnibus Amendments*

[12] Pierce v. Allegheny County Bd. Of Elections, 324 F. Supp. 3d 684, 698-699 (W.D. Pa. 2003)

[13] Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) at 103

- Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed..2d 821 (1963)[14] at 379-381.

*Mr. Phill Kline - Voter Suppression and Disenfranchisement -*
*Pennsylvania*
*Page 3*

On March 6, 2020, during the early stage of the COVID-19 pandemic, Pennsylvania Governor Wolf issued a 90-day disaster emergency proclamation.[15] On May 30, 2020 Governor Wolf issued a second emergency proclamation in response to civil unrest in the aftermath of the George Floyd death in Minnesota.  On June 1, 2020, Governor Wolf issued Executive Order 2020-02, *Extension of Deadline for Receipt of Absentee and Mail-in Ballots in Certain Counties.*

For its part, Executive Order 2020-02 extended by seven days the deadline for election officials in Allegheny, Dauphin, Delaware, Erie, Montgomery, and Philadelphia counties to receive absentee and mail-in ballots for the June 2, 2020 primary election.  The criteria used by Governor Wolf and Secretary Boockvara to decide ballot timeline extensions was not explained in Executive Order 2020-02, and it is noteworthy that even though Lancaster County was experiencing civil unrest, it was not incorporated in with the other Pennsylvania counties who were granted a ballot time extension.[16]

On August 6, 2020 Governor Wolf issued a proclamation terminating the disaster emergency for the civil unrest, and on August 31, 2020 he issued an amendment to the COVID-19 proclamation, extending the timeframe for that emergency another 90 days.

## II.  History of Elections During Pandemics, Cataclysmic Events, and Civil Unrest -

The United States has a long history of successfully conducting elections during epidemics, in the aftermath of natural disasters, during time of war,[17] and amidst civil unrest.  Viewed in a national context alongside pandemics, natural or human-caused disasters, and periods of civil unrest, Executive Order 2020-02[18] lacks meaningful justification and displays an extraordinary lack of deference for the prerogatives of the Pennsylvania General Assembly.  Executive Order 2020-02 also neglects uniform standards for electoral administration in statute and the adopted Pennsylvania HAVA state plan:

- During the Great Influenza pandemic of 1918, the US general election was conducted as scheduled with few complications.  Many poll workers and voters did wear masks, and masks were mandated in some jurisdictions.[19] In Idaho, the creation of a polling place for a local teachers' college was challenged in court, resulting in the overturning of an election for a local probate judge.  Although the local county commissioners were involved in approving the new polling place, normal public processes and notifications

---

[14] Gray v. Sanders, 372 U.S. 69/, 83 S.Ct. 9 L.Ed,2d 821 (1963) at 379-381
[15] March 6 2020 *Proclamation of Disaster Emergency.*
[16] *Arrests in Lancaster as Riots Spread Across Pennsylvania After Gov. Wolf Pleads with State to 'Stay Calm'* Breitbart, May 31, 2020.
[17] *Safeguarding Federal Elections from Possible Terrorist Attack: Issues and Options for Congress.* Congressional Research Service, October 27, 2004. pps CRS - 19.
[18] Pennsylvania Executive Order 2020-02 — *Extension of Deadline for Receipt of Absentee and Mail-In Ballots in Certain Counties*
[19] Jason Marisam. Election Law Journal: Rules, Politics, and Policy. Jun 2010.141 http://doi.org/10.1089/elj.2009.0052.

were not followed and the court ruled against changes in the polling location.[20]

*Mr. Phill Kline - Voter Suppression and Disenfranchisement -*
*Pennsylvania*
*Page 4*

- The 1968 US general election was conducted during the Hong Kong Flu pandemic, a global health emergency that had become well-entrenched in the United States a few months prior to the election. No extraordinary policy measures were imposed, and national elections were conducted without significant impact from that disease.

- The only modern example of a cataclysmic event affecting postponement of a US election occurred in 2018. When the Commonwealth of the Northern Mariana Islands was struck by super typhoon Yutu ten days before a federal election, Governor Torres postponed the election of a Delegate to the US House of Representatives.[21]

- Civil unrest is a localized condition that can lead to debate over whether to delay elections or modify electoral processes. Decisions to delay elections for civil unrest remain the prerogative of the legislative branch of state governments or the Congress.

- Throughout the history of the United States, including the civil war,[22,23] voting has successfully taken place alongside of civil unrest. A positive example of navigating the perceived threat of civil unrest occurred in Philadelphia during the June 2, 2020 primary. That jurisdiction, being under a 6:00 p.m. curfew, simply decided to extend the *onset* of curfew to 8:30 pm to allow Philadelphia electors time to vote and return home before the onset of curfew.[24]

- The public record is silent as to wholesale voter disenfranchisement arising from civil unrest, and so its use as a justification to delay elections is highly questionable.

- The 1968 election took place alongside of significant civil unrest associated with opposition to the Viet Nam war. Demonstrations, marches, and rallies in Chicago during the Democratic National Convention became increasingly widespread and radicalized. Conflicts between law enforcement and rioters did not materially affect elections or disenfranchise voters.

### III. Survey of Issues Impacting Elections in Pennsylvania -

STS identified three areas where Executive Order 2020-02 and related COVID-19 directives by the Secretary of Health have impacted the 2020 elections:

1) Governor Wolf's Executive Order 2020-02 exhibited preferential treatment of voters in six designated Pennsylvania counties. However, Lancaster County, which also experienced civil unrest, was not afforded the opportunity for ballot time extension. The justification for distinguishing which counties were to be included in Executive Order 2020-02 was not

---

[20] *Harper v. Dotson, 32 Idaho 616, 187 P. 270 (1920).*
[21] *Disrupted Federal Elections: Policy Issues for Congress.* Congressional Research Service. March 26, 2020
[22] *Executive Branch Power to Postpone Elections.* Congressional Research Service July 14, 2004
[23] *Safeguarding Federal Elections from Possible Terrorist Attack: Issues and Options for Congress.* Congressional Research Service, October 27, 2004
[24] *Philadelphia's city-wide curfew extended Tuesday due to primary elections.*

included in the Executive Order, and the public record is silent as to how Lancaster County voters have correspondingly been disenfranchised thorough lack of the ballot time extension afforded other commonwealth counties.

*Mr. Phill Kline - Voter Suppression and Disenfranchisement -*
*Pennsylvania*
*Page 5*

2) The addition of polling places and designated ballot return sites in some - but not all - jurisdictions has resulted in disparate accommodation to voters in different voting jurisdictions. Designated ballot return sites in locations other than each county's board of election office appears to violate 25 Pa. P.S. § 3150.16(a).

3) In **County of Butler, et al, v. Thomas W. Wolf, et al** the Plaintiffs alleged restrictions imposed through executive orders and administrative directives violated their First Amendment right to assemble, encroached upon free speech and due process, and violated the equal protection clause of the Fourteenth Amendment. Four of the plaintiffs are incumbent elected officials, and one is a sitting member of the U.S. House of Representatives. All are currently running for reelection. The Federal District Court entered judgement in favor of those plaintiffs and the case is out on appeal.

## IV. Executive Order 2020-02 - Extension of Deadline for Receipt of Absentee and Mail-In Ballots in Certain Counties -

Governor Wolf's EO 2020-02 and administrative actions during 2020 by elections officials in at least Allegheny, Dauphin, Delaware, Erie, Montgomery, and Philadelphia counties have departed from the uniform and equitable standards in Pennsylvania statutes and the HAVA state plan governing elections.

Departures from administrative policy include:

1) Use of poorly monitored mail-in voting;
2) Relaxation of long-established postmarking requirements;
3) Relaxation of signature-matching standards;
4) Relaxation of ballot acquisition standards;
5) Time extensions for civilian absentee and mail-in ballots to be received at county board of election offices; and,
6) Relaxation of polling place standards and addition of polling places.

In designating only six counties for special privilege, EO 2020-02 inequitably neglects to extend the same opportunity to voters in the remaining counties throughout the Commonwealth of Pennsylvania. Governor Wolfs' decision to not include Lancaster County, a county simultaneously experiencing civil unrest,[25] brings into question the criteria and justification for how counties were selected to receive balloting time extension privileges.

The additional time afforded urban voters in Allegheny, Dauphin, Delaware, Erie, Montgomery, and Philadelphia counties to turn in absentee and mail-in ballots raises substantive questions as to how voters in rural districts been disenfranchised for want of an additional seven days to turn in ballots.

Beyond the clear and inequitable decision to grant a balloting time extension to the six electoral jurisdictions, the more foundational question is whether Governor Wolf

---

[25] *Riots, Looting Hit Pennsylvania After Cop Shoots Minority Man. Suspect Charged at Cop With Knife, Video Shows.* The Daily Wire, September 14, 2020

has been delegated the authority by the Pennsylvania legislature under the emergency management statutes to issue balloting time extensions whatsoever.

*Mr. Phill Kline - Voter Suppression and Disenfranchisement -*
*Pennsylvania*
*Page 6*

## V.   Addition of Polling Places; Designated Ballot Return Sites -

Pennsylvania 25 C.S. § 3511 distinguishes between statutory protections for receipt and counting of overseas military ballots and those of onshore civilian electoral processes.[26]   With respect to civilian ballots, the General Rule prescribes <u>that no civilian absentee or mail-in ballot shall be counted if it is received by the county board of elections after 8:00 p.m. prevailing time on the day of the election</u>.[27]

The addition of polling places and the addition of designated ballot return sites in several Pennsylvania electoral jurisdictions raises material conflicts with the general statute because a plain reading of the Pennsylvania code prescribes that ballots are to <u>either to be mailed or delivered in person to the county board of elections</u>.[28]  The time constrained General Rule also does not contemplate drop off of elector ballots at sites that are physically separated, nor not under the direct control of the county board of elections offices.

> <u>Example 1</u>: Dauphin County is offering extended hours. In addition, the county has added the Dauphin Human Services Center in Elizabethville as a ballot return site, a violation of 25 Pa.  P.S. § 3150.16(a).

> <u>Example 2</u>: In Philadelphia, all seventeen of the county's satellite election offices will be open, with only the five newest locations serving as designated mail-in ballot return sites, which is a violation of 25 Pa. P.S. § 3150.16(a).

On May 7, 2020, Congressman Mike Kelly and State Representatives Daryl Metcalf, Marci Mustello, and Tim Bonner filed a civil action against Governor Wolf and Secretary of Health Rachel Levine, alleging violation of their First Amendment right to assemble, free speech, violation of their Fourteenth Amendment right to due process, and deprivation of equal protection.  All four plaintiffs are incumbent office holders who are running for re-election, and their ongoing employment as publicly elected officials remains dependent upon their ability to win their respective election bids.

On September 14, 2020, a Federal District Court ruled that Executive Order 2020-02 and the health secretaries' directives have unconstitutionally violated the rights of Congressman Mike Kelly and State Representatives Daryl Metcalf, Marci Mustello, and Tim Bonner.  These elected officials have been impaired in their ability to host campaign gatherings, fundraisers, town halls, and other political events.  This means that not only has the Pennsylvania electorate been disenfranchised by Executive Order 2020-02 and the health secretaries' directives, but the campaigns of elected officials have been disrupted as well.

---

[26] References to "Except as provided under 25 Pa C.S. 3511 …" in 25 P.S. §§ 3146.6(c) and 1308(g)(1)(ii) refer to voted military-overseas ballots only at <u>25 Pa. C.S. § 3511</u>.
[27] <u>County of Butler, et al, Plaintiffs, v. Thomas Wolf, et al, Defendants. Civil Action No. 2:20-cv-677 (United States District Court for the Western District of Pennsylvania)</u>
[28] <u>25 Pa. Ucons. Stat. § 3150.16(a) General Rule</u>

In its decision the Federal District Court noted that while the state's actions appeared to be undertaken with the good intent, actions by the Governor clearly crossed constitutional boundaries:

*Mr. Phill Kline - Voter Suppression and Disenfranchisement -*
*Pennsylvania*
*Page 7*

> *"... even in an emergency, the authority of government is not unfettered. The liberties protected by the Constitution are not fair-weather freedoms —in place when times are good but able to be cast aside in times of trouble. There is no question that this Country has faced, and will face, emergencies of every sort. But the solution to a national crisis can never be permitted to supersede the foundation of the American experiment. The Constitution cannot accept the concept of a "new normal" where the basic liberties of the people can be subordinated to open-ended emergency mitigation measures. Rather, the Constitution sets certain lines that may not be crossed, even in an emergency. Actions taken by Defendants crossed those lines. It is the duty of the Court to declare those actions unconstitutional. Thus, for the reasons set forth above, the Court will enter judgement in favor of Plaintiffs."*

## VI. Other Issues Affecting Electoral Processes in Pennsylvania -

In a recent policy paper addressing the Legitimacy and Effect of Private Funding in State and Federal Elections,[29] Stillwater Technical Solutions documented how elections in swing states - including in Pennsylvania - are being compromised by vast and unnecessary funding from private grant sources.  STS concluded that because funding from private sources subjects electoral officials to coercion, manipulation, and corruption, funding into local elections from private sources threatens to alter the entire culture of how county clerks and municipalities view and access public funding.

## VII.   Proposed Actions -

2019 Act 77 § 1302.3(c)[30] prescribes that no less than five days preceding an election the chief clerk shall prepare a list for each election district showing the names and post office addresses of all voting residents in the district to whom absentee or mail-in ballots have been issued for the election and sign it no less than four days before the election. The list must be posted in a conspicuous place within the polling place and upon written request the clerk must provide a copy to any candidate or party county chairman.

Because of the findings in this survey and the likelihood of a contested state election in Pennsylvania, STS recommends that the party chairman or other officials in all potentially contested jurisdictions obtain a complete and certified list of all voters who have received absentee or mail-in ballots for the general election.

Please feel free to contact me as you have questions or comments on the enclosed.

Regards,

James R. Carlson

---

[29] The Legitimacy and Effect of Private Funding in State and Federal Electoral Processes.  Stillwater Technical Solutions.  October 9, 2020.
[30] 2019 Act 77 § 1302.3(c)

Managing Partner
Stillwater Technical Solutions

DECLARATION OF A.J. Jaghori

I, A.J. Jaghori, declare as follows:

1.  I am a technology executive, with an extensive background across all aspects of the tech industry, and with a specialized knowledge of Artificial Intelligence. I have personal knowledge of the contents of this Declaration and if called as a witness I could and would testify competently as to their truth.

2.  I am an entrepreneur, a data scientist, patent holder, Forbs Magazine most influential people in business 40 under 40 nominee, and a distinguished TED 2016 speaker. I have founded over five successful startups later acquired by Google, Verizon and Facebook, among other large businesses and served as Chief Data Scientist for DHS and numerous prominent positions in the commercial sector, including CTO for L3. I hold numerous patents on cutting edge blockchain and Artificial Intelligence (AI) technology.

3.  I am an expert in the fields of blockchain AI he was nominated by the Bi-Partisan Policy Center (BPC) to serve as an industry expert on the AI Center of Excellence board and subsequently appointed by the committee. The AI Center of Excellence was created by a bi-partisan bill co-sponsored by Rep. Meadows titled the AI in Government Act of 2019.

4.  Technology has evolved to the point where we are able to conduct signature verification using Image Recognition, Machine Learning (ML) and Artificial Intelligence (AI) tools to analyze the signatures. Thanks to algorithms such as Speeded Up Robust Features (SURF)

we will be able to analyze a large number of signatures to determine if features within a signature are similar among a large number of samples to determine if signatures were made by the same person(s) rather than the individual whose name is associated with the ballot.

5.  Using a sample size of 500,000 signatures it is possible to process and analyze the signatures in a matter of days with accurate results where a benchmark of 70% confidence of accuracy is considered to be accurate although it is possible to achieve confidence levels around 90% thanks to the latest developments in technology.

6.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

EXECUTED ON: November 10, 2020          By:     /s/ A.J, Jaghori

21394 Ashburn Run Pl.
Ashburn, VA 20147
(703) 362-5002 | https://www.aj-jaghori.com/ai
aj.jaghori@gmail.com

## AJ JAGHORI – TECHNOLOGY SUBJECT MATTER EXPERT

**BACKGROUND**

AJ Jaghori is a Serial Entrepreneur having founded over four successful companies, two later acquired by FaceBook and Google. Mr. Jaghori is also a Data Scientist, Inventor (*owning over a dozen patents in Machine Learning, Artificial Intelligence & Blockchain*), TED Speaker, Early Blockchain Pioneer, Founder of the MIT Social Genome Project, and a Fortune Magazine Most Influential People in Technology - 40 under 40 nominee.

**INNOVATION ACHIEVEMENTS**

**DEVELOPED** ADVANCED COMPUTER VISION TECHNOLOGY

**PATENTED** KIA REINFORCED DEEP-LEARNING ALGORYTHM

**DEVELOPED** PRESCRIPTIVE MODELING AND QUANTUM AI (DATA MINING, MACHINE LEARNING AND PATTERN OPTIMIZATION TECHNOLOGY

**DEVELOPED COGNATIVE COMPUTING DATA PLATFORM TECHNOLOGY**

**PATENTED** SELF-LEARNING ENGINE

**DEVELOPED** 1ST GENERATION NEURAL NETWORK MODELLING (PERCEPTIONS PROBABILLSTIC)

**WORK HISTORY**

**HELLOWGOV**, **BOARD ADVISOR (2016 – PRESENT)**

**CHELFIE, CO-FOUNDER & CHIEF EXECUTIVE OFFICER (2015 – 2019)**

**OPEN TECHNOLOGY CENTER, CHIEF INFORMATION OFFICER (2011 – 2019)**

**L-3 COMMUNICATIONS, CHIEF TECHNOLOGY OFFICER (2011 – 2019)**

**THE SOCIAL GENEOME PROJECT, CHIEF TECHNOLOGY OFFICER (2008 – 2011)**

**DOCEBIT.AI, CO-FOUNDER & CHIEF EXECUTIVE OFFICER (2006 – 2009)**

**OHA ANDRIOID/GOOGLE, PRINCIPAL (2005 – 2007)**

**DEPARTMENT OF HOMELAND SECURITY (DHS), CHIEF DATA SCIENTIST (2005 – 2006)**

**OPC/VERIZON, PRINCIPAL (2001 – 2005)**

**EDUCATION**

**SF, MASSACHUSETTS INSTITUTE OF TECHNOLOGY (MIT), MA**

**B.S., COMPUTER ENGINEERING, GEORGE MASON UNIVERSITY, VA**

<u>DECLARATION OF Anthony J. Cochenour</u>

I, Anthony J. Cochenour, declare as follows:

1. With respect to the 2020 Presidential Election, I am providing expert witness testimony on voting machine software, hardware, and network digital forensic analysis.  I have personal knowledge of the contents of this Declaration and if called as a witness I could and would testify competently as to their truth.

2. I am a professional Digital Forensics Analyst and Expert Witness in the areas of software, hardware, networks, and telecommunications systems.

3. DEFINITIONS

   a. The following are definitions of the terms used in these interrogatories and requests for production.  Please read these definitions carefully as some of the words used in these discovery requests may be more expansive than those terms are given in common usage.

   b. "You" and "your" shall refer to and include the party to whom these discovery requests are directed as well as current and former attorneys, agents, investigators, consultants, accountants, officers, directors and employees.

   c. "Person" or "entity" means any natural person, firm, corporation, partnership, proprietorship, joint venture, organization, group of natural persons or other association separately identifiable, whether or not such association has a separate juristic existence in its own right.

   d. "Document" or "media" means recorded material in any form, including the original and all non-identical copies (whether different from the originals by reason of any notation made on such copies or otherwise), including, without limitation, correspondence, memoranda, notes, desk calendar, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, invoices, statements, receipts, returns, warranties, guaranties,

summaries, pamphlets, books, interoffice and intraoffice communications, offers, notations of any sort of conversations, telephone calls, voice mails, chat rooms, meetings or other communications, bulletins, bulletin boards, magazines, publications, printed matter, photographs, video, computer stored or generated information, teletypes, telefax, invoices, worksheets and all drafts, alterations, modifications, changes and amendments of any of the foregoing, tapes, tape recording transcripts, graphic or aural records or representations of any kind, of which you have knowledge or which are or were formally in your actual or constructive possession, custody, or control.

e. "Possession, custody or control" includes the joint or several possession, custody or control not only by the person to whom these interrogatories and requests are addressed, but also the joint or several possession, custody or control by each or any other person or entity acting or purporting to act on behalf of the person, whether as employee, attorney, accountant, agent, sponsor, spokesman or otherwise.

f. The terms "relate to", "relating to", "pertain to", and "pertaining to" are used in the broadest sense and mean to refer to, discuss, involve, reflect, deal with, consist of, represent, constitute, emanate from, directed at, support, evidence, describe or mention.

g. "Describe" means to state every material fact and circumstance specifically and completely (including, but not limited to, date, time, location and the identity of all participants) and whether each such fact or circumstance is stated on knowledge, information, or belief, or is alleged without foundation.

h. "Computer" shall include, but is not limited to, microcomputers (also known as personal computers or desktops), laptop computers, portable computers, mobile computing devices, cloud computing, utility computing, and Third-Party online service, minicomputers and mainframe computers.

i.  "Electronic data" means all information stored in a digital format.  Electronic data includes, but is not limited to, electronic mail messages and attachments, contacts, journal entries, calendar entries, word processing documents, spreadsheets, databases including all records and fields and structural information, charts, graphs, and any and all miscellaneous files responsive to the following requests.  The responding party is expected to search for any and all information stored on hard disks, floppy disks, CDs, DVDs, USB devices, Cloud-based Data Storage, any Third-Party Data Storage, Smart Phones andTablets, and in any other vehicle for digital data storage and/or transmittal.  The term electronic data also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with the information described above.

j.  "Evidentiary Image" means a true bit-stream copy of the data requested.  "Deleted File" means any electronic data file that has been erased or deleted from the electronic media on which it resided.

k.  "Cryptographic Hash Values" refers to mathematical algorithms that map data of arbitrary size (often called the "message", or "file") to a bit array of a fixed size (the "hash value", "hash", or "message digest"). It is a one-way function, that is, a function which is practically infeasible to invert.  Cryptographic Hash Values are used to confirm the integrity of a digital file, and copies thereof.

l.  Throughout these discovery requests language should be read in light of the context in which it is used.  Consequently, the singular includes the plural and the plural includes the singular, where appropriate.  Furthermore, the masculine is intended to also refer to the feminine, where appropriate and vice versa.

4.  My assigned task is to provide technical guidance on the evidentiary elements required to assess, to confirm, and reproduce the operation, and behavior of technology components,

including hardware, software, networks, removable data storage, and related maintenance practices used for in-person voting.

5.  I assert that physical access to voting machines used in the 2020 Presidential election, or at minimum, physically identical voting machine units as defined by the manufacturer, are a requirement to perform adequate forensic analysis to assess the accuracy, and integrity of the same.  Production, and documentation of such physical hardware components, information, and related processes should be such that any qualified professional could adequately reproduce, and independently confirm prior claims of accuracy, normative operation, and integrity of results derived from any voting machine hardware that may be in question.

6.  I assert that access to software, and operating system source code, and binaries used in voting machines used in the 2020 Presidential election, or at minimum, copies of such as defined by the manufacturer, are a requirement to perform adequate forensic analysis to assess the accuracy, and integrity of the same.  Production, and documentation of such software, and operating system source code, software binaries, and related processes should be such that any qualified professional could adequately reproduce, and independently confirm prior claims of accuracy, normative operation, and integrity of results derived from any voting machine software that may be in question.

7.  I assert that access to voting machine hardware maintenance logs, software update logs, software configuration, voting machine operating system and application logs, and all metadata of voting machines used in the 2020 Presidential election are required to perform adequate forensic analysis to assess the accuracy, and integrity of the same.  Production of

such voting machine hardware maintenance logs, software update logs, software configuration, voting machine operating system and application logs, and all metadata and related processes should be such that any qualified professional could adequately reproduce, and independently confirm prior claims of accuracy, normative operation, and integrity of results derived from any voting machine results that may be in question.

8.  I assert that access to network, telecommunications systems, underlying software and operations logs used to support configuration, management, monitoring, and real-time or batch-based collection of votes, and other such communications that may occur between voting machines, and related management systems used in the 2020 Presidential election would be required to perform adequate forensic analysis to assess the accuracy, and integrity of the same.   Production of such network, telecommunications systems, underlying software and operations logs should be such that any qualified professional could adequately reproduce, and independently confirm prior claims of accuracy, normative operation, and integrity of results derived from any voting machine results that may be in question.

9.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

EXECUTED ON: November  9,  2020          By:     /s/ Anthony J. Cochenour

# ANTHONY COCHENOUR

### Cybersecurity



Anthony Cochenour is a Partner at Siege International. Mr. Cochenour has over 25 years of Information Security and Digital Forensics experience that spans telecommunications, software development and global-scale SaaS operations.

He has received numerous awards including Cisco's coveted Engineer of the Year in 2011. He is an active member of the FBI's InfraGard program, the DHS Automated Indicator Sharing (AIS) program, and volunteers to help educate students, and families on topics such as online safety, and cyber bullying.

In 2014, Anthony founded Hoplite Industries, a mission-driven cyber security, and intelligence company headquartered in Bozeman, MT. Through the use of Hoplite's patented Artificial Intelligence and Machine Learning software, the team has provided critical intelligence, and support to affect hundreds of arrests and takedowns. Under Anthony's leadership, Hoplite continues to support US and allied interests abroad.

In 2013, Anthony helped to create a unique privately-funded Fiber Optic transport provider, Bozeman Fiber, to help stimulate education, economic development, and healthcare services. By 2017, Bozeman Fiber was fully funded, built, and operating 30-miles of high-capacity fiber in the Bozeman, MT area.

In 2008, he served as a senior engineering role with Cisco Systems to help guide Security, and Data Center technologies.

In 2004, he took on the challenge of modernizing, and expanding global data center operations for RightNow Technologies in support of their award-winning platforms. In his tenure at RightNow, he led efforts to deploy seven data centers, and over a dozen international voice Points of Presence which have since served billions of customer interactions globally.

Between 1997 and 2004, Anthony co-founded two successful telecommunications companies in the Pacific Northwest, serving as CTO, and engineering lead at PrimeMedia and BridgeBand Communications.

Anthony holds a BS in Information Systems, and actively maintains a number of top-tier Security, and IT industry certifications. For the past eighteen years, he has maintained his status as a certified, court-recognized digital forensics expert specializing in Internet, fraud, and child exploitation cases.

https://www.linkedin.com/in/acochenour

DECLARATION OF Gregory Moulthrop

I, Gregory Moulthrop, declare as follows:

1.  I am a technology executive, and have been the founder and CEO of a company that specializes in supply chain track and trace via bar codes.  I have two decades of experience working with bar code reading systems. I have personal knowledge of the contents of this Declaration and if called as a witness I could and would testify competently as to their truth.

2.  I am currently Vice President of Global Public Sector for rfXcel, Inc., which is a leading global provider of track and trace technology, based upon bar code reading. I am based in Reston, VA.

3.  The two dimensional or 2D Barcodes on ballot envelopes are capable of holding a significant amount of "unreadable" information, meaning information that is unreadable to the human eye and only by a scanner capable of decoding the barcode.

4.  The envelopes containing election ballots contained many barcodes and a combination of one- and two-dimensional barcodes. Some were for use by the postal service such as the Intelligent Mail Barcode (IMB) others were purportedly used for "vendor quality."  Stated uses for the 2D barcodes were to track the "extract" (e.g., Military, Residential, Main), envelop count and registration number. However, much more information than the stated use can be contained and encrypted on a 2D Data Matrix barcode and must be verified.

5.  Fortunately, 1D & 2D barcodes can be decrypted rapidly.  On average a handheld scanner can read and write to a database in sub-second speed times. The average handheld USB laser

can scan more than 30 barcodes per second.  As such, 500,000 envelopes can be scanned in about 4 hours to verify the data contained on an envelope to ensure the barcodes were used per their stated purpose.

6. In order for proper decoding we will need to be provided the format to write data to a database connected to the computer that will run the software operating the scanner.  For example, if the barcode contains the type of extract, envelope count and file number (in that order) we will need to know the format is XXYYYYYZZZZZ in order to populate the fields.

7. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

EXECUTED ON: November  10,  2020          By:      /s/ Gregory Moulthrop

# GREGORY J. MOULTHROP MCIPS, CPSM

24962 HALITE DR STONE RIDGE VIRGINIA 20105
PHONE: # (703) 615-6655   EMAIL: GMOULTHROP@ATT.NET

## Summary

- Acquisitions, Business Development, eCommerce, Economist, eProcurement, Entrepreneur, Enterprise Resource Planning (ERP), Executive Advisor
- Healthcare, Health IT, Lean Enterprise, M&A, Negotiations, Pharmacy, Pharmaceuticals, Private Equity, Operations
- Strategy, Strategic Procurement, Supply Chain Management (SCM), Information Technology (IT)

▶ Attained successful results as a Supply Chain leader in senior management and C-Level positions spanning multiple industries (Public & Commercial sector, agribusiness, healthcare, pharmaceuticals & biotechnology) and as a trusted advisor to elected officials & CEOs.

▶ Accomplished in sophisticated, innovative change management initiatives to develop strategy and execute end-to-end supply chain network optimization to achieve best-in-class total product cost and turnaround of multi-division organizations. Recognized for sound key performance metrics and operational management, strategic alignment resulting in enhanced efficiency, reduced costs and added-value.

▶ Strong team-building, leadership, motivation and communication skills coupled with insights into emerging opportunities, trends, issues and challenges in the global digital economy.

## Employment History

**InfiniTrak LLC**                                    **August 2013 – Present**
**Chief Executive Officer**

Corporate officer accountable for the design, development and launch of InfiniTrak, a web-based compliance solution for stakeholders in the pharmaceutical industry to comply with new track & trace regulations.

- Leads business strategic direction with 100% Year-over-Year (YoY) growth in revenue.
- Raised 2.5MM start-up capital for company while protecting business interest and member equity
- Established Board of Managers and Board of Advisors and accountability boards
- Engaged officials at the Department of Health & Human Services (HHS), Executive office of the President, Office of the Director of National Drug Control Policy (ODNDCP) and other federal departments to drive policy decisions
- Engaged elected officials and public-sector departments in 21 states to develop new revenue channels and drive state drug control policy
- Developed and executed new strategic revenue streams to enter the public sector & secure the controlled substances supply chain (i.e., Opioids) to achieve more than 500% gains in EBITDA
- Established contracts with 24 state pharmacy associations to leverage as channel partners to distribute our software and directs distributor model to drive sales growth
- Positioned InfiniTrak as a thought leader to sell Continuing Education (CE) training on the law (Drug Supply Chain Security Act) as a value add-on

**Booz Allen Hamilton**                                    **November 2006 – July 2014**
**Lead Associate**

Recognized as a leader in the civil public-sector market as a Supply Chain Management expert. Recruited by leadership for unique skills in IT, Supply Chain Management, broad knowledge of e-procurement and ERP systems and the healthcare market.

- Led the research and strategic growth into the FDA market through the Center for Drug Evaluation and Research (CDER) with a focus on opportunities stemming from the Drug Supply Chain and Security Act (DSCSA) implementation (Drug Track and Trace).
- Respected as a strategy architect / "Go-To Guy" for procurement & supply chain operational execution, achieving objectives by executing as **"hands-on"** leader of sustainable results.
- Conducted market research and an alternatives analysis assisting the client with the procurement of a new electronic contract management system that saved the agency 5M annually over 5 years.

Gregory J. Moulthrop                                    Email: gmoulthrop@att.net

- Served as the Project Manager, for the National Heart, Lung, and Blood Institute (NHLBI), Acquisition Support and Automation Project at the National Institutes of Health (NIH) growing business by 2M following completion of 18-month e-procurement alternatives analysis and pilot of Compusearch's PRISM.
- Reorganized functions to "end-to-end" or "procure to pay" supply chain model: S&OP, strategic sourcing, project management, quality/development, capital equipment, and logistics/distribution under the Deputy Chief Management Officer (DCMO) throughout 12 DoD pilot/test sites.
- Developed and led a Pilot of PRISM, a COTS e-procurement system that resulted in optimizing over 168 improvement areas identified during the pilot.
- Applied the Agile Methodology to the project during the software design, configuration, and implementation and testing phases of the project reducing the lead time for non-R&D acquisitions from 6 weeks to 7 days.
- During process improvement working group sessions applied Lean Six Sigma techniques to gather, evaluate and make recommendations for improvement the acquisition processes.

**Compusearch Software Systems**                          **July 2005- November 2006**
**Technical Service Consultant**
- Provided subject matter expertise in Federal and State procurement and contract management
- Served as a liaison between the client and developers to provide technical solutions to agency problems
- Facilitated joint requirements planning (JRP) sessions
- Facilitated joint application development (JAD) sessions
- Performed data mapping between interfacing systems
- Created test plans, test scenarios and test scripts
- Created technical design documents for developers. Including process flows and spec's to guide the development.
- Led development teams by gathering requirements from team supervisor and clients for product enhancements and saw them through the entire design process
- Led team meetings to ensure work is completed on time, within budget and met quality standards
- Provided research on state and local procurement systems for entering a new market

**ASM Research Inc. Fairfax VA**                              **July 2002- July 2005**
**Functional Analyst/Project Control Specialist**
- Examined budget requirements, fiscal regulations and contract requirements for performance-based contracts producing deliverables to support the overall objectives of the project plan.
- Provided consulting support to Federal clients in the development and implementation for software applications in support to the Office of the Surgeon General
- Assisted with implementing Capability Maturity Modeling (CMM) level 3 for application development to include management of an Issue Tracker Database
- Proficient in utilizing database systems to produce formatted reports for data analysis, experienced with concepts of IS for competitive advantage, data as a resource, IS and IT planning, interpreting data sets for Army Medical Readiness Support Systems, and analyzing existing fiscal and procedural policies
- Conducted trend analysis for individual requirements on deployed soldiers in reporting readiness capability to the Office of the Surgeon General (OTSG)
- Interpreted data sets and quality of data for Army Medical Readiness Support Systems.

## Education

| | | |
|---|---|---|
| **Master of Science** | Supply Chain Management, University of San Diego | San Diego, California |
| **Bachelor of Science** | Economics/Public Administration, Longwood University | Farmville, Virginia |

## Certifications

| | |
|---|---|
| **Certifications** | Certified Professional in Supply Management (**CPSM**) issued by the Institute of Supply Management (ISM), United States (Issued 2012) |
| | Member of the Chartered Institute of Purchasing and Supply (**MCIPS**) issued by the Chartered Institute of Purchasing and Supply (CIPS), United Kingdom, UK (Issued 2011) |

I APP. 51

**EXPERT REPORT OF DENNIS
NATHAN CAIN**

## I.      INTRODUCTION

I have been retained as an expert witness on behalf of Petitioners  in the above captioned proceeding.  I expect to testify on the following subject matters:  (i)  application of the federal law's maximum-acceptable error rate of one in 500,000 ballot positions, or, alternatively, one in 125,000 ballots to the November 3, 2020 election for the selection of Presidential Electors in the State of Wisconsin ("State"); (ii) render opinions regarding whether the maximum-acceptable error rate was exceeded based on government data and Braynard's and Zhang's analysis relating to the November 3, 2020 election for the selection of Presidential Electors in the State; and (iii) render opinions regarding whether the error rate of the November 3, 2020 election for the selection of Presidential Electors in the State so exceeded the federal law's maximum-acceptable error rate that State certification is legally unauthorized.

This is a statement of my relevant opinions and an outline of the factual basis for these opinions.  The opinions and facts contained herein are based on the information made available to me in this case prior to preparation of this report, as well as my professional experience as an election data analyst.

I reserve the right to supplement or amend this statement on the basis of further information obtained prior to the time of trial or in order to clarify or correct the information contained herein.

## II.     DOCUMENTS REVIEWED

I reviewed the following documents in arriving at my opinions.

1.      Matt Braynard's declaration (attached as Exhibit 1)

2.      Qianying (Jennie) Zhang's declaration (attached as Exhibit 2)

In addition, I discussed the facts of this matter with Petitioner's attorney Erick G. Kaardal and members of his legal team.

## III.    PROFESSIONAL QUALIFICATIONS

My name is Dennis Nathan Cain. I am a resident of Berkley County, West Virginia. I am a Cybersecurity Subject Matter Expert with a combined 23 years experience in information assurance, risk management, vulnerability assessment, systems engineering, and systems certification assessment and authorization.

 I currently maintain and have held a TOP SECRET clearance with a Single Scope Background Investigation (SSBI) for 22 years.

I hold credentials as a Certified Information Systems Security Professional (CISSP) #420251 since April 30, 2012 and as Navy Qualified Validator (NQV) and have worked for Army, Navy, Marine Corps, DISA, FBI, and others.

I was trained in NSA's CYBERCORE program at PHNX II and was a member of the MARFORCYBER Cyber Protection Team (CPT) National Mission, whose core responsibility was protecting national critical infrastructure against cyber-attack by domestic and foreign adversaries. I currently am employed with cleared defense contractor Assett, Inc

as a Senior Cybersecurity Engineer and provide systems cybersecurity assessment as a NQV

for US NAVY, NAVSEA, TSUBCYBER for their Submarine program.

My work consists of consulting as a Subject Matter Expert trusted agent, validating

Navy information and weapon systems for compliance with NIST Special Publication 800

series, specifically the NIST SP 800-53rev4 Security Controls and various ISO standards.

These same standards are cited as requirements for certification of all electronic

voting systems under both Help America Vote Act (HAVA) under the Federal Election

Commission (FEC) Voting Systems Standards (VSS), Volume I and the Federal Information

Security Modernization Act (FISMA).

I was brought together with a team of experts in various fields related to election

operations, process, and cybersecurity, due to my expertise and knowledge of government

IT systems cybersecurity certification requirements. During my examination of HAVA, the

FEC VSS, FISMA, NIST SP 800-53rev4 Security Controls, I discovered several

inconsistencies with stated maximum error requirements in these federal laws and standards.

## IV.    COMPENSATION

I have been retained as an expert witness for Petitioners.  I am not being

compensated.

## V.    PRIOR TESTIMONY

I have not provided testimony as an expert either at trial or in deposition in the last

four years.

## VI.   STATEMENT OF OPINIONS

As set forth above, I have been engaged to provide expert opinions regarding analysis in the November 3, 2020 election of Presidential electors in the State.  Based on my review of the documents set forth above, my discussions with statisticians and analysts working with me and at my direction, my discussions with the attorneys representing the Petitioners, I have the following opinions:

1. It is my opinion, to a reasonable degree of scientific certainty, that the State's data and Braynard's and Zhang's analysis show that the November 3, 2020 election error rate exceeded the federal law's maximum-acceptable error rate of one in 500,000 ballot positions, or, alternatively, one in 125,000 ballots to the November 3, 2020 election.

2. It is my opinion, to a reasonable degree of scientific certainty, that in the State, the November 3, 2020 election error rate exceeded the federal law's maximum-acceptable error rate of one in 500,000 ballot positions, or, alternatively, one in 125,000 ballots to the November 3, 2020 election.

3. It is my opinion, to a reasonable degree of scientific certainty, that the State's certification of the November 3, 2020 election for the selection of Presidential Electors in the State is legally unauthorized because the error rate of the election exceeded the federal law's maximum-acceptable error rate.

## VII.   BASIS AND REASONS SUPPORTING OPINIONS.

It is my opinion that based on government data and the analysis of Braynard and Zhang, and due to the lax controls on absentee voting in the November 3, 2020 election in the State, that the State's election error rate for the November 3, 2020 election exceeds the federal law's maximum-acceptable error rate.  As a result, it is my opinion that the State's election results should not be certified.

First, the error rate of the State's election far exceeds the federal law's maximum-acceptable error rates. The maximum-acceptable error rate under federal law is one in 500,000 ballot positions, or, alternatively one in 125,000 ballots.

Section 3.2.1 of the voting systems standards issued by the FEC which were in effect on the date of the enactment of HAVA provides that the voting system shall achieve a maximum acceptable error rate in the test process of one in 500,000 ballot positions. A ballot position is every possible selection on the ballot, to include empty spaces. As stated in the voting systems standards, "[t]his rate is set at a sufficiently stringent level such that the likelihood of voting system errors affecting the outcome of an election is exceptionally remote even in the closest of elections." An update to the FEC VSS was made by the Election Assistance Commission (EAC) in the Voluntary Voting Systems Standards to enhance the FEC VSS standard, which the State has adopted by law. The FEC VSS standard provides for an error rate of one in 125,000 ballots as an alternative to the one and 500,000 ballot positions to make it easier to calculate said error rate. The FEC standards, which are incorporated into HAVA § 301(a)(5), require that all systems be tested in order to certify that they meet the maximum error rate set by federal law.

When the federal law's maximum-acceptable error rates are applied to the State's absentee ballot error rates, the State's presidential Elector results are uncertifiable. Applying the federal law's maximum-acceptable error rate to the State's total vote of about 3,300,000 comes to about 26 votes. So, under federal law, the maximum-acceptable error rate would be violated if the combination of illegal votes counted and illegal votes not counted exceeded 26 votes.

The following chart, based on government data and Braynard's and Zhang's analysis, shows estimate of illegal votes counted and legal votes not counted to exceed 150,000 ballots.

**Wisconsin Presidential Election Contest**
**Total vote about 3,300,000**
**Margin +20,608 votes**

| Type* | Description | Votes |
|---|---|---|
| 1)  Illegal Votes Counted | Estimate of ballots requested in the name of a registered by someone other than that person | 15,423 |
| 2)  Legal Votes Not Counted | Estimate of ballots that the requester returned but were not counted | 13,826 |
| 3)  Illegal Votes Counted | Electors voted where they did not reside. | 26,673 |
| 4)  Illegal Votes Counted | Electors who avoided Wisconsin Voter ID laws by voting absentee as an "indefinitely confined" elector and were not indefinitely confined | 96,437 |
| 5)  Illegal Votes Counted | Out of State Residents Voting in State | 6,966 |
| 6)  Illegal Votes Counted | Double Votes | 234 |
| **TOTAL 1 & 2** | | 29,249 |
| **TOTAL** | | 159,559 |

*may include overlap

Any certification of the State's November 3 election results is not legally authorized because of the State's violation of the federal law's maximum-acceptable error rate.

## VIII.   EXHIBITS TO BE USED AT TRIAL TO SUMMARIZE OR EXPLAIN OPINIONS

At the present time, I intend to rely on the documents produced set forth above as possible exhibits.

REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

SIGNATURE PAGE TO FOLLOW

Electronically signed by /s/ Dennis Nathan Cain

Dated: December 3, 2020

_____

Dennis Nathan Cain

**[insert caption]**

---

**EXPERT REPORT OF DENNIS
NATHAN CAIN**

---

## I.      INTRODUCTION

I have been retained as an expert witness on behalf of Petitioners  in the above captioned proceeding.  I expect to testify on the following subject matters:  (i)  application of the federal law's maximum-acceptable error rate of one in 500,000 ballot positions, or, alternatively, one in 125,000 ballots to the November 3, 2020 election for the selection of Presidential Electors in the State ("State"); (ii) render opinions regarding whether the maximum-acceptable error rate was exceeded based on government data and Braynard's and Zhang's analysis relating to the November 3, 2020 election for the selection of Presidential Electors in the State; and (iii) render opinions regarding whether the error rate of the November 3, 2020 election for the selection of Presidential Electors in the State so exceeded the federal law's maximum-acceptable error rate that State certification is legally unauthorized.

This is a statement of my relevant opinions and an outline of the factual basis for these opinions.  The opinions and facts contained herein are based on the information made available to me in this case prior to preparation of this report, as well as my professional experience as an election data analyst.

I reserve the right to supplement or amend this statement on the basis of further information obtained prior to the time of trial or in order to clarify or correct the information contained herein.

## II.     DOCUMENTS REVIEWED

I reviewed the following documents in arriving at my opinions.

1.      Matt Braynard's declaration (attached as Exhibit 1)

2.      Qianying (Jennie) Zhang's declaration (attached as Exhibit 2)

In addition, I discussed the facts of this matter with Petitioner's attorney Erick G. Kaardal and members of his legal team.

## III.    PROFESSIONAL QUALIFICATIONS

My name is Dennis Nathan Cain. I am a resident of Berkley County, West Virginia. I am a Cybersecurity Subject Matter Expert with a combined 23 years experience in information assurance, risk management, vulnerability assessment, systems engineering, and systems certification assessment and authorization.

I currently maintain and have held a TOP SECRET clearance with a Single Scope Background Investigation (SSBI) for 22 years.

I hold credentials as a Certified Information Systems Security Professional (CISSP) #420251 since April 30, 2012 and as Navy Qualified Validator (NQV) and have worked for Army, Navy, Marine Corps, DISA, FBI, and others.

I was trained in NSA's CYBERCORE program at PHNX II and was a member of the MARFORCYBER Cyber Protection Team (CPT) National Mission, whose core responsibility was protecting national critical infrastructure against cyber-attack by domestic and foreign adversaries. I currently am employed with cleared defense contractor Assett, Inc

as a Senior Cybersecurity Engineer and provide systems cybersecurity assessment as a NQV

for US NAVY, NAVSEA, TSUBCYBER for their Submarine program.

My work consists of consulting as a Subject Matter Expert trusted agent, validating

Navy information and weapon systems for compliance with NIST Special Publication 800

series, specifically the NIST SP 800-53rev4 Security Controls and various ISO standards.

These same standards are cited as requirements for certification of all electronic

voting systems under both Help America Vote Act (HAVA) under the Federal Election

Commission (FEC) Voting Systems Standards (VSS), Volume I and the Federal Information

Security Modernization Act (FISMA).

I was brought together with a team of experts in various fields related to election

operations, process, and cybersecurity, due to my expertise and knowledge of government

IT systems cybersecurity certification requirements. During my examination of HAVA, the

FEC VSS, FISMA, NIST SP 800-53rev4 Security Controls, I discovered several

inconsistencies with stated maximum error requirements in these federal laws and standards.

## IV.   COMPENSATION

I have been retained as an expert witness for Petitioners.  I am not being

compensated.

## V.   PRIOR TESTIMONY

I have not provided testimony as an expert either at trial or in deposition in the last

four years.

## VI.    REQUEST FOR FURTHER INFORMATION

As set forth above, I have been engaged to provide expert opinions regarding analysis in the November 3, 2020 election of Presidential electors in the State.  Based on my review of the documents set forth above, my discussions with statisticians and analysts working with me and at my direction, my discussions with the attorneys representing the Petitioners, I request the following additional information for assisting me in my investigation.

1. Documents regarding mobile drop boxes.  Logs maintained regarding the drop boxes including, but not limited to, when drop box ballots were collected and delivered, the log of persons who collected drop boxes or delivered ballots from drop boxes and who had access to drop box keys and when that access was obtained.

2. Documents or logs maintained on the delivery of ballots to central counting facilities used in major metropolitan areas including the identity of each and every person involved in delivering the ballots.

3. Documents or logs maintained identifying the persons who tabulated the ballots are any central counting facility including, but not limited to, logs of who was tabulating ballots and at what time.

4. Documents maintained regarding each and every local official involved in handling ballots and how those individuals were paid.  As you know, a lawsuit has been filed asserting that an organization called the Center for Technology and Civic Life (CTCL), Center for Election Innovation and Research (CEIR), and Electronic Registration Information Center (ERIC), organizations funded by FaceBook billionaire Mark Zuckerberg, who paid millions of dollars to pay the salaries of local officials to count the votes.

5. The pollbooks, voter files and final tallies at each election site in large cities over 250,000 people.

6. Documents regarding challenged ballots including how many ballots were challenged, how many challenged ballots were cast and why such ballots were cast despite being challenged.

7. Documents regarding why republicans were not allowed to sign the seals at the polling places both prior to voting on Monday and on Wednesday before ballot boxes were documented, closed, and locked

8. Documents showing that information placed was directly into the Qualified Voter Files in the AVCBs.

9. Documents showing how many voter birthdates were altered in the pollbooks.

10. Documents showing how many ballots were counted at central counting which were not reflected in the electronic pollbook or paper supplemental list.

11. Documents showing the verifications of the same day registrations in on November 3 including the verifications used to verify that these persons could vote.

12. Documents regarding "Rock the Vote" including, but not limited to, why this highly partisan organization was given access in real time through data feeds, internet hookups and API access to voters' private information including their social security numbers, birthdays, drivers licenses numbers, address, and eye color.

13. Documents related to persons who did not vote in the county in which they resided, voted and then moved out of the State or voted in more than one state.

14. Documents regarding ballots cast with the names of citizens who did not do the voting.

15. Documents regarding ballots cast by individuals who are deceased.

16. Documents regarding ballots cast by felons or the criminally insane.

17. Documents regarding election officials who either ignored or refused to record valid election challenges.

18. Documents regarding the back dating of absentee ballots.

19. Documents regarding sending multiple absentee ballots to the same address.

20. Documents regarding credentialed challengers being locked out of the vote counting rooms.

21. Documents regarding duplication of ballots.

22. Documents regarding election workers who encouraged or coerced voters to vote in a certain manner.

23. Documents regarding those counties that had more registered voters than citizens of legal voting age.

24. Documents regarding the disregard of voter secrecy or use of privacy sleeves.

25. Documents regarding the different treatment applied to military or veterans ballots.

26. Documents regarding ballots received after the statutory deadline.

27. Documents regarding people added to the voters rolls (QVF) after the statutory deadline.

28. Documents regarding tabulator computers connected to the internet including why this was allowed and how it was conducted.

29. Documents regarding adjudicator computers connected to the internet including why this was allowed and how it was conducted.

30. Documents regarding the use of counting board computers hosting the electronic poll books connected to the internet including why this was allowed and how it was conducted.

31. Documents regarding "stage" computers used by Election Officials connected to the internet including why this was allowed and how it was conducted.

32. Documents identifying all Wi-Fi networks used at central counting locations.

33. Documents regarding the hacking of computers used in the election process.

34. Documents regarding how vote tallies were reported to both to the State and the media.

35. Documents regarding how many ballots/AVCBs were processed through paper pollbooks, electronic pollbooks including those processed through QVF.

36. Documents regarding where and when ballots were processed through the QVF including now this was verified and whether poll challengers were allowed and able to observe this process.

37. Documents regarding any investigation into why AVCBs which tallied zero ballots, yet the corresponding lock boxes had ballots inside the lock box.

38. Each and every chain of custody log for each lock box containing ballots.

39. Documents regarding how chain of custody was kept for ballots between worker shift changes.

40. Documents regarding which lock boxes were locked between shift changes

41. Documents regarding why any lock boxes left open during shift changes.

42. Documents regarding the process when the ballot's number didn't match the pollbook.

43. Documents regarding ballot stub numbers which were manually altered in the electronic pollbooks to match the ballot number on the paper ballot received including what would happen if the original ballot was later received.

44. Documents regarding how many ballot stub numbers were manually changed in pollbooks.

45. Documents regarding under what circumstances would it be appropriate to alter voter birthdates including how many birthdates were altered and how many voter QVF's showed voters who were born in the year 1900 or earlier.

46. Documents regarding the residents registered for same-day registration including how these ballots were processed and verified against a pollbook.

47. Documents regarding the use of an "unrestricted list" including why it was used and how it was used and the list itself.

48. Documents regarding absentee ballots requested but never returned.

49. Documents regarding what happened to unsolicited absentee ballots that were sent but never returned.

50. Documents regarding private funding of the election including, but not limited to, CTCL money and "walking around" money used near polling places.

51. Stored memory of the official vote count and ballot images for audit trail in the DRE machines.

52. Digital audit records generated for each component of the electronic voting system.

53. All Windows event logs (System, Application, Security, Setup, etc.) for each component of the electronic voting system.

54. A copy of the Windows System wide registry and all individual User Registry files for each component of the electronic voting system.

55. A list of all User Accounts for each component of the electronic voting system.

56. Full directory listing of all files with metadata for each component of the electronic voting system.

57. A full credentialed Nessus vulnerability scan for every component of the electronic voting system along with the mandated vulnerability scan performed as part of the approved and certified baseline for each component of the electronic voting system.

58. A list of all software, versions, and dates of installation for each component of the electronic voting system.

59. A WLAN report (netsh wlan show) for each component of the electronic voting system.

Electronically signed by /s/ Dennis Nathan Cain

Dated: December 3, 2020

_____

Dennis Nathan Cain

# EXPERT REPORT OF HARRY HAURY

## I.   INTRODUCTION

I have been retained as an expert witness to provide an expert report on the security of the election system used in the State of Georgia ("State") in November 3, 2020 general election including evaluating the security of the processes for ensuring voter identity, the security of the processes for ensuring the proper collection and tabulation of ballots and the security of the processes for that the election results can be properly audited.  I expect to testify on the following subject matters:  (i) background regarding security for work flow in elections including election machines, (ii) government requirements for certifying that election machines are secure and accurately counted the vote; (iii) how the State failed to comply with security requirements for 2020 general election; (iv) how that failure resulted in an inaccurate tabulation of the votes and (v) that the election results for the Presidential electors in the State cannot be "certified" if the word "certified" is used to describe both the accuracy of the vote totals for the Presidential candidates and describe the security of the election processes in the State. Simply put, given the current difference of _____ votes separating Vice President Biden and President Trump, given the numerous errors and lack of security over the ballots and vote casting machines, it is impossible to "certify" Vice President Biden received a majority of the ballots cast for President in the State on November 3, 2020.

This is a statement of my relevant opinions and an outline of the factual basis for these opinions.  The opinions and facts contained herein are based on the information

made available to me in this case, prior to preparation of this report, as well as my professional experience

I reserve the right to supplement or amend this statement on the basis of further information and deposition testimony obtained prior to the time of trial, or in order to clarify or correct the information contained herein.

## II.     DOCUMENTS REVIEWED

I reviewed the following documents in arriving at my opinions.

1.     The expert report of Matthew Braynard;

2.     The data documents Matthew Braynard relied on in preparing his expert opinion;

3.     The expert report of Qianying Jennie Zhang;

4.     The expert report of Dennis Nathan Cain;

5.     Affidavits or Declarations filed in this case; and

6.     The pleadings filed in this case.

In addition, I discussed the facts of this matter with attorney William F. Mohrman and members of his legal team.

## III.    PROFESSIONAL QUALIFICATIONS

I graduated from Washington University in St. Louis in 1978 with a B.S. degree in chemical engineering and in 1979 with a Masters in Business Administration with a systems science subspecialty.

During the last 25 years, I have primarily been engaged in the development of work flow automation software and security software working through my own businesses.  The

primary purpose of such software is information assurance, or "cyber security," and high

volume, secure workfIow automation.  In conjunction with my work in this field, I have

been hired by U.S. government agencies, banks, financial industry participants and large

industrial companies. These U.S. government agencies include the National Security

Agency, the Central Intelligence Agency, the Department of Defense, Department of

Homeland Security, the Department of Justice, the Comptroller of the Currency, Naval

Reconnaissance Office ("NRO"), National Geospatial Intelligence Agency ("NGIA"),

Special Operations Command ("SOCOM"), Indo Pacific Command ("PACOM"), Sandia

National Laboratories and many other governmental agencies.  The companies and banks

who have hired either me or the companies I work for include American Express, VISA,

MasterCard and 16 of the 25 largest US banks.  I have also consulted extensively in work

to redesign election systems in St. Louis County, Missouri helping to redesign election

control and workflow in that County to achieve more efficiency and reliability in the

County's election system. In this capacity I worked closely with the County's Election

Commissioner and many supervisors to understand the workflow and legal requirements.

As a result of this work we dramatically improved both efficiency and election security.  I

am an expert in operations research, reliable communications, workflow automation,

information assurance, cyber security and distributed trust in work flow systems

including, but not limited to, election systems.

During this time I also have functioned as a systems architect designing and

consulting on the Integrated Public Alert and Warning System, revisions to the Permissive

Action Link in the nuclear command and control network, continuity of government

communications, White House communications systems, various information fusion and gathering systems, information warfare, C4ISR as well as other less significant systems. I have also designed a number of systems capable of securely routing and managing 30 billion workflow object transactions per hour. During much of this time I held Top Secret clearances with program related escalations.

With respect to publications, I have not authored any publications in the last ten years.

## IV.    COMPENSATION

I have been retained as an expert witness for Petitioners.  I am not being compensated.

## V.    PRIOR TESTIMONY

I have not provided testimony as an expert either at trial or in deposition in the last four years.

## VI.    STATEMENT OF OPINIONS

As set forth above, I have been engaged to provide expert opinions regarding the election systems the State used in the November 3, 2020 election of Presidential electors. I have reviewed the documents identified above.  My opinions are predicated on the assumption that the facts and analysis provided in those documents are accurate.

1. Election Systems Must Provide Secure Systems – Both Physical and Computer – To Ensure an Accurate Count of all Legally Cast Ballots.  Trust, enforced trust, provenance,[1] and boundary protections (e.g., ensuring only eligible voters are allowed into polling places) are at the center of protecting an election

---

[1] "Provenance" indicates the data's origins and pedigree.  Data provenance and security are symbiotic. Good security leads to accurate, timely, and detailed provenance, and good provenance lets systems and users make good security decisions.

system.  These protections include protecting provenance systems, data and raw inputs of ballots, logs, security envelopes, registers, and batch control tickets.

2.  <u>The State's Election System Failed to Accurately Count Ballots</u>.  The State's election system failed to accurately count ballots based on numerous failures in the election system as set forth below.

3.  <u>Any Computers Or Machines Used to Tabulate or Count Votes Must Meet Federal Standards</u>.  The Help America Vote Act ("HAVA"), and the State's adoption of the standards under HAVA, require that any voting machines or computers used in the election meet certain minimum standards.  As set forth below, these standards include, but are not limited to, ensuring the use of software which can protect against manipulation of the vote count through data or internet intrusion, protecting against a very low error rate, ensuring certification of the machines prior to the election, ensuring security of the machines after pre-election certification in order to ensure accurate counting, tabulation and auditing of the results.

4.  <u>The "Dominion" Voting Systems The State Used Do Not Comply With Federal Standards</u>.  As set forth below, the State used the infamous Dominion Voting Systems.  Dominion first developed voting systems for use by Hugo Chavez in Venezuela's notoriously corrupt elections.  The Dominium System used by the State fails the federal standards as set forth below.  For example, and perhaps most problematically, Dominion software systems used a Windows 7 operating system. This system is so old that ***Microsoft no longer provides security patches or updated virus protection for this software.***  As a result, it is not difficult to either "hack" into these machines, if connected to the internet, or have someone connect other memory devices into the machine during the election process allowing vote manipulation at massive scale.  In addition, after certification of the machines prior to the election, the "seals" used to secure the opening to the machine's hard drive were broken in several situations, violating legal requirements.

5.  <u>The Error Rate on the "Dominion" Voting Systems in the State Renders Any Vote Counts From Those Machines as "Uncertifiable."</u>  As set forth below, the maximum error rate a voting machine, such as the Dominion machines the State used, which are allowed under HAVA as adopted in the State is 1/125,000 or 0.0008%.  The records produced thus far by the State show that there were errors in the magnitude of _____ %.  Such a voting machine system cannot be considered compliant with federal and state law.  It is difficult to audit the State's voting system, as required by law, since it appears that provenance was broken.  Finally, the voting results obtained from such

machines cannot be "certified" if certification means "compliant" with requirements or "accurate."

6. The State's Absentee Voting System Allows for the Introduction of Ineligible Ballots. The State's absentee ballot system allows for the introduction of absentee ballots which are not from eligible voters.  In systems language, this breaks "provenance guards."  As set forth in Braynard's and Zhang's analysis, between 20,431 and 30,347 of the absentee ballots the State issued were not requested by an eligible State voter and between 43,688 and 55,621 of the absentee ballots the State issued and did not count were returned to the State by an eligible State voter.  The voting results of a voting system which allowed this massive number of illegal ballots into the system could not be "certified" if that term is used to in anyway prove or validate the election results.

7. The State's Failure to Secure Early or Absentee Ballot Drop Boxes.  The State's use of drop boxes was highly problematic in order to ensure that only legitimate ballots were cast from those deposited in the drop boxes because of the lack of security over the drop boxes and the retrieval of the ballots.

8. Fulton County's Stopping the Count, Removing Republican Observers from Central Count, and Then Restarting Counting After Removal of Republicans, Violates The Legal Requirements For Effective Or Material Observation By Both Parties Of The Execution Of The Election, a Central Norm of Secure Election Processes – Bi-Partisan Observation of the Count.  On election night, Fulton County not only stopped the vote count, Fulton County officials removed Republicans from the counting area.  After the Republicans were removed, Fulton County officials then re-continued the count.  Stopping the count allows individuals to manage the voting process, and possibly manipulate the process illegally, outside the view of neutral observers.  In addition, if the voting machines are shut down, the voting machine software reboots.  During the rebooting process, the person rebooting the machine can override the system settings to, among other things, eliminate any machine settings for the bar code verification process in the Dominion system.

9. Not Allowing Observers In the Adjudication Area Opened Up an Enormous Opportunity for the Introduction of Illegal Votes.  In the area where ballot disputes were adjudicated in Fulton County, Republican observers were not allowed to adequately observe this process.  During this adjudication phase, the ability to manipulate vote results in the Dominion machines is very easy because you have full edit rights.

10. No Effort to Reduce the Risk of Introducing Fraudulent Ballots in Adjudication.  In the adjudication system, when the Dominion system was

open to full edit rights, there was no security for the introduction of physical devices, such as memory sticks, into the adjudication area.  Such memory sticks could contain scans and counts of illegal ballots which are contained on the memory sticks and easily "uploaded" into the Dominion machines in the adjudication process.

11. <u>Dominion's Software Must Be Forensically Reviewed to Determine What Was Counted</u>.  In order to accurately determine the vote on November 3, the Dominion machines from Fulton County must be forensically reconciled with the paper ballots.

## VII.   BASIS AND REASONS SUPPORTING OPINIONS.

The basis and reasons supporting my opinions are set forth below.

First, it is important to understand that computerized voting systems which involve the counting of votes on ballots, either by hand or by machine, involve "workflow management" concepts.  When the nation was founded, workflow management in elections in the late 18th century was fairly simple.  For instance, 15 citizens in the town showed up at townhall to vote.  Everyone in the town knew one another so everyone knew who was eligible to vote.  In addition, prior to voting, the ballot box was open for all 15 citizens to look inside and observe that no ballots were in the box prior to voting.  After the voting, the ballot box was opened and the ballots taken out in front of the 15 citizens to ensure that only 15 ballots were in the box.  Next, the votes on the ballots were tabulated in front of the 15 citizens so that everyone was ensured of the results of the election.  Finally, the 15 citizens could recount the ballots and votes if necessary and the town clerk would preserve the ballots so that anyone in the future could count the ballots to ensure the integrity of the election.

As populations increased, the towns were divided into very small "precincts" for purposes of distributing and counting of ballots.  The purpose of small precincts was to once again make an effort that everyone who lived in the precinct would know one another as a mechanism to prevent an ineligible voter casting a ballot and to separate voters according to common jurisdictions.

Today, in large cities in various states in America, the state or local authorities have reduced the concept of using small (in terms of population) precincts to cast and count ballots and replaced that system with counting centers and voting places with more than one precinct as well as system wide counting facility, such as that used in Fulton County, and the prodigious use of absentee ballots.  The use of such system wide counting facilities are at complete odds with the traditional concepts of not only voting, but also counting the vote, in the United States because of (i) the lack of verifying voter identity and (ii) the lack of security over the casting and counting of ballots.  In order for such systems to work, the work flow processes must be absolutely secure:  i.e., any machines used to count ballots must be protected, and verified as protected, against any manipulation and all aspects of the process must be observed by the two contesting sides in the election.

1.  <u>Election Systems Must Provide Secure Systems – Both Physical and Computer –
    To Ensure an Accurate Count of all Legally Cast Ballots.</u>

With respect to opinion No. 1, the citizen's trust in the election system is a foundational requirement in our democracy. In order to ensure that trust, it was critical for the State to create in every level of the election system physical boundaries (i.e., no one

allowed into a polling place who is not allowed to vote) and trust guards (i.e., placing literal physical seals, such as those a clothing store puts on clothing to prevent theft, on the door to a voting machine's hard drive to ensure that no one accesses the hard drive during the election). Trust guards function to control the entry and exit of data, authorized personnel, ballots, voters and anything that could alter the results of the election. By proving anything or anyone entering the system is trusted to do so, the election results are protected from being damaged inadvertently or on purpose. Trust guards exist throughout the system by using chain of custody, policy, observers and voter verification to make sure all things are being done properly. It is a double guard system designed, on purpose, to implement guarding functions by both major parties, the Democrats and Republicans, throughout the voting process. This allows both parties to assure the accuracy of the process and make sure nothing damages the accuracy and honesty of the vote.

If these systems are not in place, the following can happen:

a. ballots being destroyed or altered improperly,
b. voters voting repeatedly,
c. unauthorized voters voting,
d. fraudulent voters voting,
e. illegal ballots being injected into the collection and counting system,
f. fraudulent ballots being submitted,
g. voter rolls containing fraudulent, moved, dead, unqualified and other illegal voter types,
h. ballots being damaged beyond recognition so that they are incapable of auditing after the election,
i. improper or inaccurate adjudication or curing of ballots,
j. improperly filled-in ballots being tallied,
k. ballots registering improperly in scanning or tabulation equipment being tallied,
l. ballots which are "missing",
m. memory cards on the voting machine which are missing,
n. improper batch control of each batch of ballots cast and inputted into the machine,
o. accidental or intentional double counting of ballots,

p.  data injection – i.e., inputting votes into the machine electronically which were
    never cast,

q.  improper control over tallying the vote result,

r.  ballots damaged in transit, and

s.  broken seals on computer machines.

I have reviewed the documents identified above regarding the State's conduct of the election, both by State and local officials.  As detailed below, those documents reveal numerous violations of provenance, failure to properly control ballots entering the system, improper curation, improper voter validation, comingling of ballots with both proper and improper validation, improper adjudication of ballots, failure to have guards or judges from both parties observe the process,[2] lack of control of incoming mail-in ballots, failed control of custody transfer, interference with legally required bipartisan meaningful observation, and failure to separate ballots by date of mailing. In other words, ballots entered the counting system improperly and were changed improperly in the process.

While these procedural lapses may be able to be quantified, it is impossible to cure after provenance is destroyed when the security envelope is separated. Illegal and legal ballots are then mixed irreversibly. This spoils provenance for an entire batch of ballots in which they are mixed. It may, however, be possible to identify some significant protion of fraudulent ballots based on forensic examination of mailing envelopes, security envelopes, and physical ballots. To do this, these items would have to be physically examined and compared to the vote.

---

[2] Most egregiously, Republican guards and observers were removed from areas where ballots were being counted on election day and the day after election day in Democratic strongholds such as Fulton County.

The certification of the voting system includes compliance with applicable standards and laws regarding the election process. After reviewing the legal standards applicable to this election it is clear there were massive violations of those standards, invalidating the election as it now stands. The system the State used in this election was not the one mandated by certificate and law.  The system did not comply with the procedures spelled out in law or the system certificate of conformity.

It may be possible to resurrect the vote, depending on the quantity of ballots with spoiled provenance. This would also require a detailed comprehensive audit of all logs, security envelopes, batch control records, physical ballots, memory cards, and audit logs. Because of spoiled provenance the results would produce a range of possible outcomes. If the margin of error and uncertainty is larger than the margin of victory under such circumstances the election cannot be certified to comply with legal requirements.

2. The State's Election System Failed to Accurately Count Ballots.  The State's election system failed to accurately count ballots based on numerous failures in the election system as set forth below.

As set forth in Braynard and Zhang's expert report, tens of thousands of ballots were ineligible.  The very existence of a difference in ballots cast and total votes counted exceeds 1/125,000.  As a result, under HAVA, and the State's use of the Election Assistance Commission, the State's voting system exceeded HAVA's standard for accuracy and cannot be certified.  Further, Braynard and Zhang's analysis shows a very large number of illegal votes from persons who do not reside in the State or who had died prior to the ballots being cast.  Many more verifications should have been run in the State, such as signature verifications, which were ignored.  These failures demonstrate

that the State's election system did not accurately count the total legal votes cast and cannot be certified under the legal requirements.

3.  <u>Any Computers Or Machines Used to Tabulate or Count Votes Must Meet Federal Standards</u>.

As set forth in the Cain Expert Report, voting machines and systems must meet several federal and state standards under, among other laws and standards, HAVA.

4.  <u>The "Dominion" Voting Systems The State Used Do Not Comply With Federal Standards</u>.

The Dominion voting machines the State used did not comply with federal standards because (i) the voting machine used an ancient operating system no longer updated for security and virus protection, (ii) failed to provide data protection, (iii) the "seals" were broken, (iv) the Dominion machines were connected to the internet during the counting process violating the certification boundaries (i.e., once connected to the internet, the voting results on Dominion machines could be easily "manipulated" by persons on the internet); and (v) machines were not recertified when changes were made to hardware or software to ensure against, for instance, the ability of the machines to be manipulated by unauthorized persons.

5.  <u>The Error Rate on the "Dominion" Voting Systems in the State Renders Any Vote Counts From Those Machines as "Uncertifiable."</u>

The maximum error rate a voting machine, such as the Dominion machines the State used, which are allowed under HAVA as adopted in the State is 1/125,000 or 0.0008%. The records produced thus far by the State show that there were errors in the magnitude of _____ %. Such a voting machine system cannot be considered compliant

with federal and state law.  In addition, it will be difficult to audit the State's vote

because of the violation of provenance.  Detailed examination by an audit needs to be

done to determine whether manipulation occurred.  Therefore, the voting results obtained

from such machines cannot be "certified" if certification means "compliant" with

requirements or "accurate."

      6.  <u>The State's Absentee Voting System Allows for the Introduction of Ineligible Ballots</u>.

The State's absentee ballot system allows for the introduction of absentee ballots

which are not from eligible voters.  In systems language, this breaks "provenance

guards."  As set forth in Braynard's and Zhang's analysis, between 20,431 and 30,347 of

the absentee ballots the State issued were not requested by an eligible State voter and

between 43,688 and 55,621 of the absentee ballots the State issued and did not count

were returned to the State by an eligible State voter.  The voting results of a voting

system which allowed this massive number of illegal ballots into the system could not be

"certified" if that term is used to in anyway prove or validate the election results.  In

addition, there is no dispute that there was no reconciliation of the number ballots issued

to the number of votes cast.  This discrepancy cannot exist beyond the 1/125,000 error

rate under HAVA.  For instance, attached as Exhibit 1 is a New York Times November

19, 2020 article detailing the number of discrepancies in the vote count by hand count

and by machine vote.  This report shows 4,790 ballots out of approximately 5,000,000.

This is an error rate of 1/1,000.  What Georgia's hand recount revealed is that its known

error rate was over 117 times the error rate allowed under HAVA.  The only conclusion

one can draw from this hand recount is that the voting system Georgia used cannot be

"certified" if certification means accurate.  For instance, which result was accurate – the

original count or the hand recount?  The only way to know if the hand recount is accurate

as compared to the machine recount is if Georgia explains why and how the discrepancy

happened.  Absent such an explanation, the only conclusion one can arrive is that the

system failed.  There is no indication that the hand recount in Georgia was accurate.

When I conduct audits, these audits must get down to zero otherwise you cannot confirm

that the result audited is accurate.

This method of checking mail in and absentee ballots was simply not adequate to

protect the data as required by law.  The statistics prove the failure.  The reason is simple.

Fulton County chose a very loose mechanism for voter verification and control.  Use of

things such as date of birth, address, phone, NCOA data is easily found on the internet.

His makes extremely easy to create a fraudulent ballot for a fraudulent voter and to

introduce these ballots into the system.  The system should not have allowed weak

verification methods that can be easily forged by teenagers over the internet working

from Romania.

7. <u>The State's Failure to Secure Early or Absentee Ballot Drop Boxes.</u>

The State's use of drop boxes was highly problematic in order to ensure that only

legitimate ballots were deposited in the drop boxes.  The drop boxes were not guarded at

all times.  This lack of security allows for illegal ballot harvesting and injection of

fraudulent votes.  Second, although Fulton County assured that the drop boxes were

monitored, these videos have not been made available.  This is of course absurd because

the whole reason for video monitoring is to review the videos ***before the election*** in order to ensure that illegal ballots were not deposited. Moreover, the videos have also not been made available after the election to review whether illegal votes were deposited.

The drop boxes are limited in the number of ballots that can be allowed in the boxes.  There are no logs or documents to show if the maximum number of ballots were exceeded for any particular drop box.  In fact there apparently was no count at all. Normally, when retrieving such information, the number of ballots are counted and logged, deposited into a secure container and only opened at the delivery location and once again the ballots are counted and logged.

The retrieval of the ballots should have been observed by Republican observers. Fulton County did not allow this.  Rather, Fulton County hired third party contractors to perform this work.  Fulton County did not adequately make logs of the ballots retrieved. For instance, there was no effort to determine if these ballots were legally deposited.

Moreover, these drop box ballots were then commingled with election day ballots. When mixed with the rest of the votes, this act makes any audit of the drop box ballots difficult.

Finally, and incredibly, the rate of rejection for absentee and early votes was historically low from previous elections.  This makes no sense given that the number of absentee ballots increased substantially from previous years.

8. <u>Fulton County's Stopping the Count, Removing Republican Observers from Central Count, and Then Restarting Counting After Removal of Republicans, Violates The Legal Requirements For Effective Or Material Observation By Both Parties Of The Execution Of The Election, a Central Norm of Secure Election Processes – Bi-Partisan Observation of the Count.</u>

On election night, Fulton County not only stopped the vote count, Fulton County officials removed Republicans from the counting area.  After the Republicans were removed, Fulton County officials then re-continued the count.  Removing neutral observers is done for only one reason – to prevent voting fraud.  That is the sole reason that the observers are there – to protect the integrity of the voting system.  There is ample evidence that there were problems with the vote and in Fulton County they removed the observers who are there to ensure the integrity of the count.  Once the observers are removed, the vote the system arrived at cannot be certified.

Fulton County officials stopping the count allows individuals to manage the voting process, and possibly manipulate the process illegally, outside the view of neutral observers.  In addition, if the voting machines are shut down, the voting machine software reboots.  During the rebooting process, the person rebooting the machine can override the system settings to, among other things, eliminate any machine settings for the bar code verification process in the Dominion system.

9.  Not Allowing Observers In the Adjudication Area Opened Up an Enormous Opportunity for the Introduction of Illegal Votes.

In the area where ballot disputes were adjudicated in Fulton County, Republican observers were not allowed to adequately observe this process.  Adjudication areas are areas in a central count facility such as Fulton County used where unresolved or defective ballots are addressed.  In these adjudication areas, there are Dominion voting machines which will be used to count unresolved or defective ballots if it is determined that such

ballots should be counted.  Persons counting ballots in other areas of central count will bring these disputed ballots and memory sticks of those ballots to the adjudication area. Because the data on the memory stick may need to be changed as a result of the adjudication, the editing function is opened up on the Dominion voting machines in the adjudication area.  The opening up of the editing function, coupled with the delivery of numerous batches of ballots, means that additional avenues to manipulate votes can occur in the adjudication area as opposed to the normal counting areas.  It is therefore, absolutely imperative that partisan observers from both parties are able to view the adjudication and subsequent casting or non-casting of the adjudicated ballots.  Very few Republican observers were allowed in the adjudication area, at times the Republican observers were removed from the adjudication areas, and, when allowed in the area, the Republican observers were not allowed close enough to the Dominion voting machines to be able to see the screen on the machine to see how the person manipulating the machine's data was manipulating the data.  These failures by Fulton County are not acceptable for certification under HAVA.  Observers are required under HAVA if the observers show up.  In Fulton County, the Republican observers showed up but were not able to observe what they needed to observe – the manipulation of the Dominion voting machines.

10. No Effort to Reduce the Risk of Introducing Fraudulent Ballots in Adjudication.

In the adjudication system, when the Dominion system was open to full edit rights, there was no security for the introduction of physical devices, such as memory sticks, into

the adjudication area.  In addition to the observation issues set forth above, there was no security to search individuals coming into the adjudication area.  For instance, if one wanted to insert data from a memory stick of ballots cast for Joe Biden, which data was loaded onto the memory stick from scans of illegal or fraudulent ballots made in a clandestine location many weeks prior to the election, Fulton County had no security in place in the adjudication area to prevent someone from fraudulently bringing such a memory stick into the area and having another person, wittingly or unwittingly, insert the memory stick into the machine and count the illegal ballots.

Moreover, in order to determine if illegal ballots were cast, we need to examine the physical ballots cast in Fulton County and the absentee envelopes containing ballots cast in Fulton County.  In addition, Fulton County must produce each and every Dominion voting machine to have an actual forensic analysis of the hardware and software of the machines used in Fulton County.

11. Dominion's Software Must Be Forensically Reviewed to Determine What Was Counted.

For the reasons set forth above, in order to accurately determine the vote on November 3, the Dominion machines from Fulton County must be forensically reconciled with the paper ballots.

## VIII.  EXHIBITS TO BE USED AT TRIAL TO SUMMARIZE OR EXPLAIN OPINIONS

At the present time, I intend to rely on the documents produced set forth above as possible exhibits.

**REMAINDER OF PAGE LEFT INTENTIONALLY BLANK**
**SIGNATURE PAGE TO FOLLOW**

**/s/ Harry Robert Haury**

Dated: _____          _____

Harry Robert Haury, III

I, Jovan Hutton Pulitizer, make the following declaration under 28 U.S.C. §1746:

1. I am the creator of the Q code app on which I obtained a patent.  I have several hundred patents domestically and patents in 189 countries globally.  My "*Scan-To-Connect*" "*Scan Commerce.*" Patents are now licensed to all global mobile device manufactures who have more than 12 billion devices utilizing this vast patent portfolio.  I am an expert in development of Q Codes and forensic analysis of paper.

2. Attached as Exhibit 1 is an analysis I prepared of information that can be gathered from a paper ballot and from a Q Code.

3. On the first page of Exhibit 1, I detailed what can be obtained from a non-processed pristine ballot. All absentee ballots should have kinetic markers as a result of being handled and folded many times prior to voting.  As a result, the actual ballot will have kinetic markers. Absentee ballots which were fraudulently manufactured and not mailed to an absentee voter would be devoid of these markers.  A physical examination of the ballot will determine whether these markers exist.

4. On the second page of Exhibit 1, I detail how Thin-Layer Chromatography to Determine Inferential Statistical Analysis can be used to determine whether the markings on an absentee ballot were filled in with a pen by human hand or by a machine.  Once again, a physical examination of the ballot is needed to conduct this analysis.

5. On the third page of Exhibit 1, I describe near duplicate image detection.  Persons casting numerous ballots fraudulently will often do so by copying one ballot several times.  On page 3, I detail how an analysis can be done of several ballots to determine whether the ballots are simply copies of one another voting for the same candidate.

6. On pages 4-12 of Exhibit 1, I detail the use of QR-Codes on ballots and absentee envelopes and how those codes can be used in detecting fraud.  The ballots and envelopes used in absentee elections often use a square scanner detection code known as a "Q Code."  Pages 4-12 detail (i) how the Q code is recorded into a machine during an election, (ii) the possible audit trails left when a Q code is used and (iii) how to audit the Q code.

7. Attached as Exhibit 2 is an analysis I prepared of how to detect whether ovals on a ballot were filled in by a human by pen or filled in by a machine or copied.

I affirm under penalty of perjury that the foregoing is true and correct. Executed on this 1st day of December, 2020.

*s/Jovan HuttonPulitzer*

Jovan Hutton Pulitzer

# Non-Processed Pristine Ballot

## Devoid of Kinematic Artifacts



Quickly duplicated ballots of a nefarious nature should be devoid of kinematic artifacts or markers. All mail in ballots should exclusively show the visual and forensic signs of markers created as a result of being dominated by the kinematics of the folding.

The "Bayesian Probability" applied to this visual evidence of ballots being Devoid of Kinematic Artifacts" is one defined as " *said ballot was only recently printed and fed "en masse" into voting systems and was not mailed out to a potential voter, nor was the ballot completed by a potential voter and mailed back in according to established voting procedures"*.

**NOTE:  Ballots even mailed once (to potential voters) would have a 100% forensic trace of Kinematic Artifacts.**

Bayesian probability is an interpretation of the concept of probability, in which, instead of frequency or propensity of some phenomenon, probability is interpreted as reasonable expectation representing a state of knowledge or as quantification of a personal belief.ro" applied here is the  Bayesian probability is an interpretation of the concept of probability, in which, instead of frequency or propensity of some phenomenon, probability is interpreted as reasonable expectation representing a state of knowledge or as quantification of a personal belief.

Exhibit 1

# Thin-Layer Chromatography to Determine Inferential Statistical Analysis

## Devoid of significant TlC variances

Both Thin-Layer Chromatography and Capillary Electrophoresis can determine IF any mail in ballot was filled in by human hand and with the use of a random writing instrument.

**NOTE:  If a ballot is to represent one individual registered voters legal vote (specifically from a mail-in ballot perspective) then each ballot would be subject to the random nature of two indisputable facts:**

- **the individual completing the ballot has a distinct handwriting style and rhythm and such would be evident in the marking of the ballot by hand, and;**
- **most of the ballots, however, voters are instructed to "use only a pencil or ink pen (black or blue) to mark your ballot.**



A statically probability can be determined on the basis of a ballot being filled in by hand, or was the ballot "machined completed".  The following are the TlC variances which would be present IF the ballots were complete by a random selection of voters at home:

The relevance of being devoid of TlC variances:  Sampling of any number of ballots (mail-in) submitted should have present characteristics of "random article of commerce" distribution and market share patterns. On other words, forensically the writing instrument used can be determined and that use of that instrument use should directly equate the manufacturers market share for a particular market. Conversely, IF a mechanical or systematically organized method of nefarious completion of ballots will reveal itself in the chemical patterns of the ballots. Examples being **(i)** if machine printed single run, the INK DOT will match the ink formulation used for ballot, or; **(ii)** if double run print the ink dot would be of a different ink BUT occur in succession or in propensity of the same "second ink" on the following ballots or majority of ballots, and finally; **(iii)** if traditional ball point pens were used to manufacture ballots then two patterns would emerge based on the following market fact: ***"Companies such as Bic, Pilot and Paper Mate keep their exact ink formulas well-guarded, but almost all ballpoint pen inks consist of one or more color pigments or dyes dissolved or suspended in a solvent" thus the chemical signature will show a systematic use of one type of pen in bulk OR, display a systematic swapping of pens in a measureable pattern of rotation.***

Exhibit 1                                                                                                                    I APP. 92          2

# Near-Duplicate Image Detection

Devoid of Random Fill, Form and  Artifacts



Machine duplicated ballots (printed with votes or subjected to systematic nefarious efforts) would be subject to fraud detection based on what is considered "near-duplicated image analysis"



SAMPLE: this image is a sample of a "mechanical completion" of a vote. If votes were mechanically inserted they would display a propensity for **(i) common placement** and **(ii) equidistant characteristics** - which are two different detection techniques).

Near-Duplicate Image Detection would catch possibly the same nefarious activities my mechanized means of that which Thin-Layer Chromatography and Capillary Electrophoresis would expose, but can be done on a faster basis en masse.

NOTE:  If an individual could handle a ballot and mark it individually, I estimate a **20 second process per ballot** (which with human variances for attention would actually extend the time) thus with **800,000 ballots it would take 9.2592593 continuous DAYS** to complete (formula is number of ballots x 20 seconds each).  If this was done on any scale for any voting area it would have to of had been mechanized in order to pull off and keep "safe from exposure".  Considering a 6 hour window if such things were created "after seeing votes come in" if it was a human manual effort this would of have taken **222.22 hours or 180 ballots completed by person per hour**. Considering a 6 hour window, this effort in human terms would take 93 people per 100k ballots - thus leaning towards mechanization to achieve.

EXHIBIT 4                                                                                           I APP. 93        3

# QR-Code Fraud Detection - BDM Irregularities
## Repetition and Frequency Fraud Detection - Dominion ImageCast



Voting systems which utilized QCodes as the encoding mechanism have build in tracking systems.  These identifiers begin tagged to the consisting of the:

- Official Ballot designation, the election title and date the party and the County name and seal, and;
- The ballot style, precinct number, and serial number (a numeric ID for the precinct), and;
- The Measured Response Identifier (who is being voted for), and;
- Encoding which identifies the voters selection IDs in the same order in which they are printed on the ballot, and;
- The QR code is used by the various tally systems to read and process the votes cast on the ballot

## These codes can be used to detect voter fraud and election fraud in several ways:

Exhibit 1

I APP. 94     4

# QR-Code Fraud Detection - BDM Irregularities
## Possible Irregularities and How To Identify Them

- **VERY IMPORTANT: As soon as printed ballots are delivered, conduct routine logic and accuracy testing on all ballot styles. This logic and accuracy test MUST be completed prior to mailing or issuing any ballots to voters.(most fail to run this check and in this case it was surely missed since so many were sent so far in advance - meaning they CANNOT and DID NOT CERTIFY they worked - this is auditable on server side and SHOULD allow access to the servers to VERIFY this PROTECTION STEP! KEY**

- Did the mail-in ballot have a CASS certification (postal barcode)? Showing it was actually mailed and received? (need envelope)

- Did the envelope Q Code match the Voting Ballot Q Code?

- **Was there repetition of the code in the system?**

  - Repetition of codes could denote "copied ballot" meaning copied on a copy machine and inserted into the system numerous times
    - Currently the various voting systems do NOT account for "duplicate codes" NOTE - all codes issued correspond to HOW and WHERE the voter votes. This makes the original unique code a NEW CODE by default.  Showing as a VOTE and WHO they voted for (remember the original code reflects NO vote, since the ballot is supposedly blank at the onset

- Repetition of the code can also be identified by the following:
  - Format frequency meaning a particular "selection of candidate format". Humans are inherently lazy thus if nefarious votes were human cast, they would tend to NOT vote anything other than PRESIDENT. Thus the "selection of candidates becomes a subsequent "readable pattern" in the system.  This means, the default pattern, when repeated in propensity, becomes an "identifying code itself".  This statistic, compared to a "global compare" (the comparison of all ballots cast) and "party compare (the comparison of all ballots compared within a party set) further creates a comparable pattern.  This can be applied local, state and nationwide.  The "format frequency" can reveal the election fraud

Exhibit 1                                                                                                                                          I APP. 95          5

# CONTINUED
## Possible Irregularities and How To Identify Them

- Did the codes issued and mailed, report back in greater than the system allocated for?
- Did the "frequency pattern" coincide with particular "Control Teams" or "Vote handlers"?
- Did the voters name on the outgoing voting envelope match the voters name on the submitted ballot?
- Another "often forgot" but auditable trail is the following "Election Commission" required step: "It is important to track the number of envelopes printed each day and balance that number to the number of voter records flagged in the voter file that were issued mail ballots on each day. Print a master listing of voter names issued absentee ballots as a part of your audit trail for each election. Each day that envelopes are printed, a master listing of voter names should also be printed and balanced to the number of envelopes printed, inserted, and delivered to the post office every day. This audit trail will also provide the necessary tool for your use in tracking and verifying your printed ballot inventory.
- Q Codes CAN show party affiliation IF the area selected to do so? IF such designate was opted for run the "voters who voted and their affiliation (global set) compared to Voters whos votes show different than party affiliation and show the "overall variances" this means if there was a trend for "x" to vote different party this time round but that "x" in certain areas shows itself as "xx or xxx" (local, state or national) then there is a distinct probability the systems are reading the "party affiliated designation) and changing votes "in system)
- Each ballot is coded for "return postage" and although individuals can manually delivery the ballots to a designated return area, during this time of COVID19 more should of have been returned by mail. The returning of ballots by mail (as normally conducted) can reveal a pattern of nefarious activities.  This is audited by comparing the total number of mail in ballots mailed and the "pre-paid" returned back in account.  Large discrepancies can point to fraud

Exhibit 1

# CONTINUED
## Possible Irregularities and How To Identify Them

- To search for "ballot irregularities" one should audit "mail in ballots received and counted" against those mailed, but numeric checked against the following audit factors at the elections office counts and logs the number of:
  - ballots returned by the Post Office
  - ballots received over the counter
  - ballots received from drop sites, if applicable
  - ballots forwarded to other counties
  - ballots returned undeliverable
- DATA ENTRY PROCESS - the following is the standard law regarding the mail in ballots. ""Data Entry of Returned Ballot Envelopes:
  - For all ballots that fall into the category of "signature and address match", the envelope is recorded as "returned" and data entry is completed. The number of envelopes in this category is recorded on a data entry log on a daily basis.
  - This number should balance to the number of envelopes stored and flagged as "ready to open and process"
  - IF there is a significant influx of ballots which did not get logged in at the USPO level, then this would be a significant indicator that such ballots circumvented the USPO logging process and came into the back door nefariously.
  - NOTE: at all drop off locations LOGGING in is required.  If nefariously rushed into the system, the log in process would of have been skipped and they would go directly to the 'voting system" processing thus leaving a discrepancy trail

Exhibit 1

# READING THE CODED INFORMATION

## Q Codes - if deployed leave an audit trail.  Codes, when read, show the following data signatures:

### CAN THE QR CODE BE AUDITED?

The QR code is a widely used, open format for encoding data in a resilient two-dimensional barcode. Because it is an open format, there are numerous applications, many of them free, that are publicly available for scanning and decoding a QR code, so that the contents may be read[1].   A voter could, therefore, use any QR code reader to decode the Vote Selections QR code on their ballot and verify that the selections encoded in the QR code are identical to the selections printed on the ballot.

As an example, when the Vote Selections QR code printed on the ballot shown in Figure 1 is scanned by a QR code reader, the following data will appear:

VER:A.SEL:4N/4E/H/J/3C/3K/35/4S/45/3Z/4A/X/3Q/3S/3U/3W/3Y/N/Y.
BMD:0000046.SIG:4R57D5C44QKEJRS3OBF33PL0Z6U9THBR74NTA1VVH
K09E6NFDH4DWXPY8Q9ZF6VD0LAQ1E6IY6AGQC1S4TG095N8NEN3AFOET12.

Exhibit 1

# READING THE CODED INFORMATION

Cross Checking the "data fields" and looking for systematic patterns is what will reveal the election fraud. The codes (in most systems) break down in a sequence similar to this:

This data is stored as a string of text organized in a key-value pair format designed for the BMD. The table in Figure 7 provides a breakdown and description of the key-value pairs in the example above.

| Key | Value | Description |
|-----|-------|-------------|
| VER | A | Version of the VSAP key-value format |
| SEL | 4N/4E/H/J/3C/3K/35/4S/45/3Z/4A/X/3Q/3S/3U/3W/3Y/N/Y | The vote selection IDs listed in the same order as those printed on the ballot |
| BMD | 0000046 | Device ID of the BMD |
| SIG | 4R57D5C44QKEJRS3OBF33PL0Z6U9TH BR74NTA1VVHK09E6NFDH4DWXPY8Q9ZF6VD 0LAQ1E6IY6AGQC1S4TG095N8NEN3AFOET12 | The digital signature applied to the data in the Ballot Activation and Vote Selection QR codes by the BMD security module |

Figure 7.  Description of key-value pairs encoded in the Vote Selections QR code.

To audit the QR code and verify that the correct vote selection IDs are being transmitted to the Tally system, the voter need only compare the SEL key values in the QR code (see text in red above) with the vote selection IDs printed on the ballot (see Figure 1).

**SURGE PATTERNS are the KEY looking for the election fraud.  Out of normal averages for "SEL" key, selection information AND DUPLICATION/REPETITION of "SIG" keys are where the patterns will first reveal at a top level.**

Exhibit 1

# READING THE CODED INFORMATION

## MACHINE FEEDING PATTERNS at "In-Person" and "Mail-In Ballots" reveal possible election fraud

**BATCH FEEDING PATTERNS - at poorly observed polling stations or system tally machines "batch feeding" can occur. Any of the Q codes (or any code for that matter) is not protected against "photocopying".  A photocopy is just as readable as the original.  The tally systems DO NOT POSSESS (to open knowledge) "Hey I have already seen this code" error correction.  This means any copied code can just be fed into the machine repeatedly, however it is in this repetion of the CODE combined with the Date/Time Stamp that such can be proven.**

**BATCH FEEDING will reveal itself at the following in both the machine and the remote tally systems ONE OF TWO WAYS: (1) same code used more than once in the system (could be attributed to accident) BUT, (2) to find the code used more than once in the system WITH repeated SQUENCIAL DATE TIME STAMPS shows INTENT**



VER:A.SEL:4N/4E/H/J/3C/3K/35/4S/45/3Z/4A/X/3Q/3S/3U/3W/3Y/N/Y.
BMD:0000046.SIG:4R57D5C44QKEJRS3OBF33PL0Z6U9THBR74NTA1VVH
K09E6NFDH4DWXPY8Q9ZF6VD0LAQ1E6IY6AGQC1S4TG095N8NEN3AFOET12.

Automated Timestamp Parsing

| Timestamp Format | Example |
|---|---|
| yyyy-MM-dd*HH:mm:ss:SSS | 2017-10-30*02:47:33:899 |
| yyyy-MM-dd*HH:mm:ss | 2017-07-04*13:23:55 |
| yy-MM-dd HH:mm:ss,SSS ZZZZ | 11-02-11 16:47:35,985 +0000 |
| yy-MM-dd HH:mm:ss,SSS | 10-06-26 02:31:29,573 |

Exhibit 1

# READING THE CODED INFORMATION

## DETECTABLE SEQUENCES CONTINUED



VER:A.SEL:4N/4E/H/J/3C/3K/35/4S/45/3Z/4A/X/3Q/3S/3U/3W/3Y/N/Y.
BMD:0000046.SIG:4R57D5C44QKEJRS3OBF33PL0Z6U9THBR74NTA1VVH
K09E6NFDH4DWXPY8Q9ZF6VD0LAQ1E6IY6AGQC1S4TG095N8NEN3AFOET12.

### Automated Timestamp Parsing

| Timestamp Format | Example |
| --- | --- |
| yyyy-MM-dd*HH:mm:ss:SSS | 2017-10-30*02:47:33:899 |
| yyyy-MM-dd*HH:mm:ss | 2017-07-04*13:23:55 |
| yy-MM-dd HH:mm:ss,SSS ZZZZ | 11-02-11 16:47:35,985 +0000 |
| yy-MM-dd HH:mm:ss,SSS | 10-06-26 02:31:29,573 |

In the instance of BATCH FEEDING there will be a systematic "rhythm" to the data. IF the SAME CODE shows up in a sequenced nature (insertion one after another in succession) then you show misuse and intent to change the results. These machines cannot help but log ALL transactions. This is the nature of all things electronic. Each item of transaction is recorded AND DATE/TIME STAMPED. It is in the subsequent stamps or codes added by the machine which can help show both fraud and intent.

Human nature in the creation of "illegal ballots" will create "XXXXX" numbers of ballots for the candidate they want to swing the election FOR and "X or XX" ballots for the opposing party because they want to attempt to HIDE the fraud by showing at least SOME votes for the opposing party. It is in the patterns of how those are FED into the system which will reveal the fraud. For example: the ballots would be separated. Thus they would feed XXX for pro and X for con at regular intervals. It is in this pattern that INTENT can be found. This would either be on one machine (one person being responsible) or split machine ONE doing BAD votes and ONE doing Opposition votes, but that two would reveal a HUMAN pattern between machines when measured. It is the rhythm and cadence of the submission which show the controlled efforts.

Exhibit 1                                                                      I APP. 101     11

# BALANCE OF PROBABILITIES

## JUDGES WHO ARE NOT TECHNICAL CANNOT SEE THE PATTERNS - THUS SHOW INTENT A DIFFERENT WAY

INTENT IS THE KEY - just as in how I have to prove "WILLFUL INFRINGEMENT" in my vast body of patent work, the key to this case is going to not just show fraud (which they will attribute to random individual acts) but not "malice" is we need to prove the overall intent to defraud.  We cannot expect the "non technical" to understand coding and such, but they can understand simple patterns.  Herein is HOW we prove intent.  IF we have any two of three of the above items which can be shown, it is the COMBINTATION of those events which PROVE WILLFUL INTENT"

**BALANCE OF PROBABILITIES: the standard of proof in civil cases, demanding that the case that is the more probable should succeed. This is the kind of decision represented by the scales of justice. The court weighs up the evidence and decides which version is most probably true.**

### Only takes very few instances to prove deception:

- **Devoid of Kinematic Artifacts**
- **Devoid of significant TIC variances**
- **Devoid of Random Fill, Form and  Artifacts**
- **QR-Code Fraud Detection - BDM Irregularities**
- **Repetition and Frequency Fraud Detection - Dominion ImageCast**
- **Surge Patterns**
- **Batch Feeding Patterns**

Exhibit 1     I APP. 102   12

# Computer Vision Detection of
# Mechanical Traits on Ballots
### Detecting Human Dynamics versus Machine Application

**When machines** perform and print documents they must operate within "**hard rules**", such as "where to print", "what flow/viscosity" and "fill to what tolerance (as with the oval space or square space allotted for human interaction). Thus machines can only operate within those "hard rules" as they duplicate documents.  Accordingly machine are programmed and manufactured with extreme exacting tolerance measures.

**When humans** perform manual functions (such as filling in a ballot) they inherently operate within "**soft rules**". Soft rules mean, they do not have an exacting mathematical measuring system to gauge and perform each function, they only have visual guidance systems which is only as good as the acuity of their individual eye sight.  This means the human element is wildly variable not not exact or consistent. Additionally, additional human dynamic artifacts are present in each and every transaction (more on this later).

<span style="color:red">**SUPPOSITION** if ballots had to be printed en mass during a relatively short window in order to "tip the scales" to a certain party, a few things would be present over and above the ballot being "devoid of kinematic artifacts", "code irregularities" and other nefarious inferences such as missing envelopes, surge patterns and batch feeding patterns.  These additional indicators would be within three areas which can be rapidly determined by traditional computer vision methods (feeding of ballot through an optics system). They are (1) the human dynamics of ink placement disbursement (disbursement defined as (i) proper disbursement (ii) surface energy (iii) Dwell time (iv) Print head, and; (iii) Pigment interactions (in human dynamics all variable/dynamic soft rules)  and (2) the machine dynamics of ink placement and disbursement (disbursement defined as (i) proper disbursement (ii) surface energy (iii) Dwell time (iv) Print head, and; (iii) Pigment interactions (in machines all fixed hard rules)</span></br>
<span style="color:red">ONE FIXED HUMAN RULE FOR BALLOTS: they are supposed to be one human executing one vote by hand in a manual process (mail-in ballots)</span>



Exhibit 2

I APP. 103

1

# Computer Vision Detection of
## Mechanical Traits on Ballots
### Detecting Human Dynamics versus Machine Application



### The Image to screen left shows a current 2020 ballot sample

The process of printing the ballot itself is a direct reflection of "hard rules" required by machines.  Just as all professional sports are played on courts or fields, the lines which make up those courts or fields are "hard rules".  Break the rules, such as going out of bounds - then the penalty is accessed.  The machines which printed 100% of the election ballots where subject to these rules and each and every ballot reflects mathematically these rules.  I am going to show you the mechanical rules of the ballots so you can understand the fraud detection principle going forward (note I am only going to show what the portion of the image I have captured reveals)



### Hard Coded Machine Rules of the Ballots

(a) the Presidential section is defined within 4 fixed boxes (**see 1-2-3-4**)
(b) Box 2 is in shaded relief (**see 5**)
(c) All boxes have bold type present (**see a,b,c,d**)
(d) All boxes are defined by FIXED - enclosing lines (**see blue arrows**)
NOTE: not all are marked but you get the picture.
NOTE: In the box to the left there are at least 25 individual HARD CODES in the mechanical process of "duplicating the ballots"
NOTE:IT is these "hard codes" which machines must obey, that can be used to triangulate, vector, map and reduce the ballot to a "computer vision coding system to detect machine versus human characteristics)



**A SIMPLE CAMERA - even one on a mobile phone can be taught to catch and intrepret machine versus human interactions on ballots.**

**A computer vision coding expert could code a camera to read this section of each ballot as code and then intrepret the results.  Would take the average coder of computer vision only about 6 hoours top to code and recognize**

Exhibit 2

I APP. 104                    2

# Computer Vision Detection of Mechanical Traits on Ballots

### Detecting Human Dynamics versus Machine Application

## What would a simple computer vision program see?  Everything the human eye cannot detect - even upon close inspection

**Camera vs Eyes: Differences Absolute versus subjective measuring of light**: Simply speaking, the human eye is a subjective device. This means that your eyes work in harmony with your brain to create the images you perceive: Your eyes are adjusting the focus (by bending the light through the lens in your eyeballs) and translating photons (light) into an electrical impulse your brain can process. From there onwards, it's all about your brain: It is continuously readjusting its color balance according to the lighting context. In other words, our eyes know what must be seen as red or white or black etc. A camera, on the other hand, is an absolute measurement device — It is measuring the light that hits a series of sensor, but the sensor is 'dumb', and the signals recorded need to be adjusted to suit the color temperature of the light illuminating the scene

| **EYE SUBJECTIVE VIEW** | **verus** | **COMPUTER VISION ANALYSIS** |
|---|---|---|



shown at relative scale

HUMAN Ball Point Pen - Black Ink - Circular Fill Pattern



dots are mechanical digital printing process



shown at relative scale

HUMAN Sharpie - Black Ink - Circular Fill Pattern NOTE Possibly not readable by systems - best access for audit



dots are mechanical digital printing process

Exhibit 2

I APP. 105

**EYE SUBJECTIVE VIEW**          **verus**          **COMPUTER VISION ANALYSIS**



HUMAN Ball Point Pen - Black Ink - Lateral Strokes Fill Pattern



Human Gel Roller Pen- Black Ink - Circular Strokes Fill Pattern



Exhibit 2                                                I APP. 106          4

**EYE SUBJECTIVE VIEW**          **verus**          **COMPUTER VISION ANALYSIS**



Mechanical
Printed
Black Ink -
Ovid



Mechanical
Printed
Black Ink -
Ovid -
Human
Mimic



Exhibit 2

I APP. 107          5

# Human Artifacts
## Soft Rules tell the tale



## Human Dynamics Visible - Ball Point Pen - Black Ink - Circular Stroke

Exhibit 2

# Human Artifacts
## Soft Rules tell the tale



**Human Dynamics Visible - Ball Point Pen -
Black Ink - Lateral Strokes**

# Human Artifacts
## Soft Rules tell the tale



## Human Dynamics Visible - Gel Roller Pen - Black Ink - Lateral Strokes

Exhibit 2                                                    I APP. 110        8

# Human Artifacts
## Soft Rules tell the tale



## Human Dynamics Visible - Sharpie - Black Ink - Lateral Strokes

Exhibit 2                                              I APP. 111        9

# Machine Artifacts

## Hard Rules tell the tale



**Machine Dynamics Visible (dots, frequency & patterns) - Machine Printed - Black Ink - Ovid Fill**

Exhibit 2

I APP. 112

# Machine Artifacts
## Hard Rules tell the tale



**Machine Dynamics Visible (dots, frequency & patterns) - Machine Printed - Black Ink - Attempt At Human Mimic**

**NOTE: unless they program 2 million or more individual images (not likely) all of these will appear in the very same HARD RULES stroke pattern and model**

Exhibit 2                                                                    I APP. 113          11

# NOTES

## As Fast Ballots Can Be Scanned, Images Can Be Analyzed

**Results would be auditable and can be cross verified.  Only tolerance which will change is the variances of print quality but upon first scan and map those tolerances (hard rules) would be identified and then remain consistent across ALL ballots**

This type of image reading has already been deployed and utilized in my medical patents based on computer vision, machine learning and artificial intelligence (can provide patents under separate cover if requested)

Exhibit 2

I APP. 114

# PULITZER PATENTS which Quantify the Image Analysis Claims

**20190384890** SYSTEM AND METHOD FOR DIGITAL REMOTE PRIMARY, SECONDARY, AND TERTIARY COLOR CALIBRATION VIA SMART DEVICE IN ANALYSIS OF MEDICAL TEST RESULTS

**20190376966** SYSTEM AND METHOD FOR REMOTE COLORIMETRY AND RATIOMETRIC COMPARISON AND QUANTIFICATION IN ANALYSIS OF MEDICAL TEST RESULTS

**20190343386** SYSTEM AND METHOD FOR IMAGE PROCESSING OF MEDICAL TEST RESULTS USING GENERALIZED CURVE FIELD TRANSFORM

**20190086409** MEDICAL APPARATUS FOR TESTING FOR MEDICAL CONDITIONS INCLUDING ZIKA, PREGNANCY, AND THE TORCH COMPLEX

**20190086408** MEDICAL APPARATUS FOR TESTING FOR MEDICAL CONDITIONS INCLUDING PREGNANCY AND THE TORCH COMPLEX

**20190086407** MEDICAL APPARATUS FOR TESTING FOR MEDICAL CONDITIONS INCLUDING ZIKA AND PREGNANCY

**20190035491** SYSTEM AND METHOD FOR REMOTE MAPPING OF AGENT-INDUCED MATERIAL SWAB

Exhibit 4 APP. 115 13

**20190027259** SYSTEM AND METHOD FOR REMOTE MAPPING OF GOLD CONJUGATES

**20190027258** SYSTEM AND METHOD FOR MAPPING A DIAGNOSTIC TEST TO AN INDIVIDUAL USER TO CREATE A UNIQUE PROFILE ON A REMOTE DATABASE

**20190027251** SYSTEM AND METHOD FOR MACHINE LEARNING APPLICATION FOR PROVIDING MEDICAL TEST RESULTS USING VISUAL INDICIA

**20190027250** SYSTEM AND METHOD FOR TRANSFORMING A BIOLOGIC INTO A NUMBER

**20180366230** SYSTEM AND METHOD FOR EPIDEMIC TRACKING ON MOBILE DEVICE

**NOTE: over 60 individual patents in this particular patent portfolio**

Exhibit 2

# FINAL NOTE:

The bulk of the commentary about Q Codes and the uses and limitations thereof are based on the fact I created the Q Code - Scanable Code Platform.  I have over 150 patents relating to that portfolio and that patent suite has been licensed to more than 400 companies, ranging from early-stage firms to Fortune 100 Industry Leaders such as eBay, IBM, AOL, Cisco, Google, Walgreen Co, TiVo Brocade Communications Systems, Inc.; Crate & Barrel Holdings, Inc.; F5 Networks, Inc.; Quick Logic Corporation; Rackspace Hosting, Inc.; Taiwan Semiconductor Manufacturing Company, Ltd.; Zynga Inc., Advanced Micro Devices, Inc., Avaya Inc., Ericsson AB, MobiTV, Inc., Nikon Corporation, Pioneer Corporation, NEC Corporation, Hitachi, Ltd., Novell, Inc.; Leap Wireless International Inc.; Barnes & Noble, Inc., Broadcom Corporation, Qualcomm Incorporated, Intel Corporation, Sony Corporation, HTC Corporation, LG Electronics Inc., Nokia Corporation, Samsung Electronics Co., Ltd., Best Buy Co, Inc., Fujitsu Limited, Intuit Inc., and Juniper Networks, Inc.

That particular portfolio (now how all of this is tracked) was initiated in the late 90's and was the basis of my 2020 nomination for the Medal for Technology and Innovation Award

Exhibit 2                                                                                            I APP. 117          15

The National Medal of Technology and Innovation (formerly the National Medal of Technology) is an honor granted by the President of the United States to American inventors and innovators who have made significant contributions to the development of new and important technology.

NOTE: COVID seemed to stop the awards this year, but they were passed out last during Obama's Administration.



**The National Medal of Technology and Innovation (NMTI) is the nation's highest honor for technological achievement, bestowed by the President of the United States on America's leading innovators.**

For your consideration we present Jovan Hutton Pulitzer, one of America's Leading Technology Innovators and Pioneers. Pulitzer's patents and technology are licensed across 11 billion mobile devices and in use globally.

The purpose of the National Medal of Technology and Innovation is to recognize those who have made lasting contributions to America's competitiveness, standard of living, and quality of life through technological innovation, and to recognize those who have made substantial contributions to strengthening the nation's technological workforce.

**Call for Nominations**

The National Medal of Technology and Innovation is awarded to individuals or companies for their outstanding contributions to the Nation's economic, environmental and social well-being through the development and commercialization of technological products, processes and concepts; technological innovation; and strengthening the Nation's technological workforce.

By highlighting the national importance of technological innovation, the medal is also meant to inspire future generations of Americans to prepare for and pursue technical careers to keep America at the forefront of global technology and economic leadership.

Presenting
**Jovan Hutton Pulitzer**







Exhibit 2

118            16

<u>DECLERATION OF DR. NAVID KESHAVARZ-NIA</u>

I, Navid Keshavarz-Nia, declare as follows:

1. I am 59 years old and have been a resident of Temecula, California for one year. Previously, I resided in the Washington DC metropolitan area for nearly forty years. I have personal knowledge of the contents of this Declaration and if called as a witness, I could and would testify competently as to their truth.

2. I have a Bachelor's degree in Electrical and Computer Engineering and a Master's degree in Electronics and Computer Engineering from George Mason University, a Ph.D. degree in Management of Engineering and Technology from CalSouthern University and a Doctoral (Ed.D) degree in Education from George Washington University. I have advanced training from the Defense Intelligence Agency (DIA), Central Intelligence Agency (CIA), National Security Agency (NSA), DHS office of Intelligence & Analysis (I&A) and Massachusetts Institute of Technology (MIT).

3. I am employed by a large defense contractor as a chief cyber security engineer and a subject-matter expert in cyber security. During my career, I have conducted security assessment, data analysis and security counterintelligence, and forensics investigations on hundreds of systems. My experience spans 35 years performing technical assessment, mathematical modeling, cyber-attack pattern analysis, and security counterintelligence linked to FIS operators, including China, Iran, North Korea, and Russia. I have worked as a consultant and subject-matter expert supporting the Department of Defense, FBI and US Intelligence Community (USIC) agencies such as the DIA, CIA, NSA, NGA, and the DHS I&A supporting counterintelligence, including supporting law enforcement investigations.

4. The USIC has developed the Hammer and Scorecard tools, which were released by Wiki Leaks and independently confirmed by Lt. Gen Thomas McInerney (USAF, retired), Kirk Wiebe, former NSA official and Dennis Montgomery, former CIA analyst). The Hammer and Scorecard capabilities are tradecrafts used by US intelligence analysts to conduct MITM attacks on foreign voting systems, including the

Dominion Voting System (DVS) Democracy Suite and Systems and Software (ES&S) voting machines without leaving an electronic fingerprint. As such, these tools are used by nefarious operators to influence voting systems by covertly accessing DVS and altering the results in real-time and without leaving an electronic fingerprint. The DVS Democracy Suite Election Management System (EMS) consists of a set of applications that perform pre-voting and post-voting activities.

5. I have conducted data collection and forensic analysis using a combination of signals intelligence (SIGINT), human intelligence (HUMINT) and open source intelligence (OSINT) data associated with Chinese and other Foreign Intelligence Service (FIS) operators targeting US critical infrastructures. In that capacity, I have also conducted ethical hacking to support USIC missions.

6. I have performed forensic analysis of electronic voting systems, including the DVS Democracy Suite, ES&S (acquired by DVS), Scytl/SOE Software, and the Smartmatic systems used in hundreds of precincts in key battleground states. I have previously discovered major exploitable vulnerabilities in DVS and ES&S that permit a nefarious operator to perform sensitive functions via its built-in covert backdoor. The backdoor enables an operator to access to perform system updates and testing via the Internet without detection. However, it can also be used to conduct illicit activities such as shifting votes, deleting votes, or adding votes in real-time (Source: DVS Democracy Suite EMS Manual, version 5.11-CO::7, P.43). These events can take place through the Internet and without leaving a trace.

7. During my career, I have studied network communication reports that show DVS data being transferred to Internet Protocol (IP) addresses registered to Scytl in Barcelona, Spain. The results showed that Scytl maintained its SOE Software servers in a Barcelona data center for disaster recovery and backup purposes. In 2020, the SOE Software data center was moved to Frankfurt Germany where I believe 2020 election data was transferred.

8. Dominion Voting Systems (DVS) Corporation was founded in 2003 in Toronto, Ontario, Canada, by John

hardware and software, including voting machines and tabulators, throughout the United States and other parts of the world. DVS reportedly had a strategic relationship with Venezuela's Bitza Corporation, which was 28% owned by the former President Chavez. Intelligence reports indicate that the DVS/Bitza software was co-developed in Venezuela to alter vote counts to ensure President Chavez (and later, President Maduro) were guaranteed to win an election. The combined DVS/Bitza software was used in numerous countries such as Bolivia and Philippines to forge election results to favor a specific candidate. Subsequently, DVS and its international partners, including Diebold/ES&S (later acquired by DVS), Scytl, SOE Software/eClarity and Smartmatic to establish a global monopoly.

9. Reports show that DVS is comprised of several companies which obfuscate its true organizational and ownership structures. The DVS companies include: 1) Dominion Voting Systems International Corporation, a Barbados corporation; 2) Dominion Voting Systems, Inc., a Delaware corporation; and 3) Dominion Voting Systems Corporation, a Canadian corporation. Similarly, Smartmatic is comprised of: 1) Smartmatic International Corporation, a Barbados corporation; 2) Smartmatic USA Corporation, a Delaware corporation; 3) Smartmatic International Holding B.V, a Netherlands corporation; and 4) Smartmatic TIM Corporation, a Philippines corporation. Based on my counterintelligence experience in USIC, I conclude that corporate structures were partially designed to obfuscate their complex relationships, especially with Venezuela, China and Cuba; and impede discovery by investigators.

10. According to NT Times, in April 2018, J. Alex Halderman from University of Michigan computer scientist demonstrated in a video how simple it is to rig a DVS machine. In the video, Dr. Halderman demonstrates how easy it is to rig the DVS machine. The name of the video is "I Hacked an Election. So Can the Russians." A caption next to the title read "It's time America's leaders got serious about voting security." (Source: https://www.c-span.org/video/?463480-4/washington-journal-j-alex-halderman

3

11. Despite DVS's constant denial about the flaws of its systems, the company's ImageCast Precinct optical scanner system was totally hacked in August 2019. This occurred during the largest and most notable hacker convention, called DEFCON Voting Machine Hacking Village in Nevada. The DVS ImageCast Precinct is an integrated hybrid voting equipment by combining an optical paper ballot and ballot marking device to allow accessibility for the visually impaired. The system runs the Busybox Linux 1.7.4 operating system, which has known medium to high level exploitable vulnerabilities to allow remote attackers to compromise the VDS. (J. Moss, H. Hurtsi, M. Blaze et al., Voting Village Report, DEFCON Village Report in association with and Georgetown University Law Studies; Online Source: https://media.defcon.org/DEF%20CON%2027/voting-village-report-defcon27.pdf). The report indicated that "many of the specific vulnerabilities reported over a decade earlier (in the California and Ohio studies, for example) are still present in these systems today (A. Padilla, Consolidated report by California Secretary of State, Top-to-Bottom Review summary and detailed report, Page 4 (Online Source: https://www.sos.ca.gov/elections/ovsta/frequently-requested-information/top-bottom-review)

12. In 2019, a computer laptop and several USB memory cards containing the cryptographic key to access DVS systems were stolen in Philadelphia. The company disputes the risks posed by lost USB memory cards containing the cryptographic key. However, according to the election security expert Eddie Perez of the nonpartisan OSET Institute states "it is very common that a USB memory card has a wealth of information that is related not only to the configuration of the election and its ballot — and the behavior of the voting device — but also internal system data used to validate the election." I have previously analyzed the contents of the DVS and other voting system cryptographic keys. I believe that USB memory cards were used to facilitate administrative access to the backdoor to disrupt polling operations

13. In 2018, NY Times conducted an investigation and concluded that DVS machines can be easily hacked.

Subsequently, security experts conducted comprehensive security testing on DVS in August 2019 and

discovered innumerable exploitable vulnerabilities that do not require extensive technical skill to

breach. The DEFCON report identified major exploitable security flaws in DVS that were shared with the

vendor. However, there is ample indication that these problems were not resolved. Moreover, DVS

maintains the position that its voting machines are fully secure. They continue to avoid transparency or

make their software codes to be analyzed by independent security investigators. In turn, December

2019, Senators Elizabeth Warren, Ron Wyden and Amy Klobuchar, along with Democratic

Representative Mark Pocan raised major concerns regarding security vulnerabilities in DVS machines.

14. In my expert opinion, the combination of DVS, Scytl/SOE Software/eClarity and Smartmatic are

vulnerable to data manipulation by unauthorized means. My judgment is based on conducting more

than a dozen experiments combined with analyzing the 2020 Election data sets. Additionally, a number

of investigators have examined DVS and reported their security findings (J. Schwartz, Scientific American

Journal, 2018; DEFCON 2019; L. Norden et. al, America's Voting Machines at Risk, Brennan Center for

Justice, NYU Law, 2014) confirming that electronic voting machines, including DVS have glaring security

weaknesses that have remained unresolved.

15. I have not been granted access to examine any of the systems used in the 2020 Election. However, I

have conducted detailed analysis of the NY Times data sets and have discovered significant anomalies

are caused by fraudulent manipulation of the results. In my expert judgment, the evidence is

widespread and throughout all battleground states I have studied. I conclude the following:

 a. The vote count distribution in PA, WI, MI, AZ, NV, and GA are not based on normal system

 operation. Instead, they are caused by fraudulent electronic manipulation of the targeted voting

b. On approximately 2:30 AM EST, TV broadcasts reported that PA, WI, AZ, NV and GA have decided

to cease vote counting operations and will continue the following day. The unanimous decision

to intentionally stop counting by all 5 battleground states is highly unusual, possibly

5

unprecedented and demonstrates prior coordination by election officials in battleground state.
There would be no legitimate reason battleground states need to pre-coordinate election
activities and stop on-going adjudication processes. However, is equally puzzling that the vote
counting did not stop, as reported. In fact, it continued behind closed doors in early hours of
November 4, 2020. This activity is highly unusually and demonstrates collusion to achieve
desired results without being monitored by watchers.

c. When analyzing the NT Times data for the 2020 election, I conclude that the software algorithm
manipulated votes counts forging between 1-2% of the precinct results to favor Vice President
Biden. The software performed data alteration in real-time in order to maintain close parity
among the candidates and without raising red flags. The specific software algorithm was
developed by Smartmatic and implemented in DVS machines to facilitate backdoor access by a
nefarious operator to manipulate live data, as desired.

d. The DVS Democracy Suite's ImageCast Central optical scanner failed to correctly verify and
validate absentee ballots, as described in its own literature. There is reported evidence that the
optical scanner accepted and adjudicated ballots that did not have signatures or other key
features that is required for ballot validation and verification. This indicates that the DVS system
configuration was modified to accept invalid ballots when they should have been rejected.

e. After the DVS ImageCast scanner validates a ballot, by design, it is required to tabulate and store
the results in a cast vote record along with a human-readable image of the ballot that has been

scanned. The AuditMark provides a code that is scanned then reflects that is verifiable.

However, media reports indicate that not only did the ImageCast fail to properly verify absentee

ballots; it also failed to maintain records of the AutitMark that would be necessary to conduct

an audit. The only way to alter this protocol is to alter the system configuration and prevent the

ImageCast scanner from rejecting illegal ballots; and reprogram AuditMark to store ballot image

6

that could be verified. This is evidence of fraud perpetrated to prevent investigators to discover

the number of invalid votes that were cast.

f. The cryptographic key store on DVS thumb drive (reported stolen in Philadelphia) was used alter

vote counts prior to up chain reporting. Since DVS uses the same cryptographic key for all its

voting systems in all battleground states, the key allowed a remote operator to conduct massive

attacks on all battleground state data set without being detected.

g. Beginning on approximately 4:30 AM EST on November 4, 2020, the vote counts favored Vice

President Biden by nearly 80% in many jurisdictions. The data distribution is statistically

congruent, even when considering a larger number of absentee ballots were collected for Vice

President Biden.

h. The data variance favoring Vice President continues to accelerate after 4:30 AM EST on

November 4, 2020 and continues until it momentum through November 9, 2020. This

abnormality in variance is evident by the unusually steep slope for Vice President Biden in all

battleground states on November 4, 2020. A sudden rise in slope is not normal and

demonstrates data manipulation by artificial means. For example in PA, President Trump's lead

of more than 700,000 count advantage was reduced to less than 300,000 in a few short hours,

which does not occur in the real world without an external influence. I conclude that manually

feeding more than 400,000 mostly absentee ballots cannot be accomplished in a short time

I APP. 125

from Wayne, Oakland, Washtenaw, Genesee, Jackson, Wexford, and Dickinson County, MI, Vice President Biden received more than 100% of the votes at 5:59 PM EST on November 4, 2020 and again he received 99.61% of the votes at 2:23 PM EST on November 5, 2020. These distributions are cause for concern and indicate fraud.

i. DVS has acknowledged that Chinese made parts are used in its voting machines. However, the company is unwilling to share details on its supply chains, foreign ownership, or its relationship

with China, Venezuela and Cuba. In particular, I have seen USIC intelligence reports showing China's espionage activities in the United States and efforts to infiltrate elections. Since these countries are our enemies, I conclude that FIS and other operators were involved to influence the outcome of the 2020 election.

j. A Man-in-the-Middle (MITM) cyber attack was carried out by covert operators using sophisticated tools, such as Hammer and Scorecard. The MITM attack occurred in two ways. Initially, remote operatives used USB memory cards containing cryptographic keys and access system backdoors to alter votes in battleground states. Subsequently, the results were forwarded to Scytl/SOE Software servers located in Frankfurt, Germany (previously, Barcelona, Spain). The MITM attack was structured to ensure sufficient data alteration had occurred prior to forwarding the tallied results to the Scytl/eClarity Software Electronic Night Reporting (ENR) system. The reason election data are forwarded overseas is to avoid detection and monitoring by the USIC to obfuscate the MITM.

k. In my expert opinion, the DVS Democracy Suite, Scytl/SOE Software/eClarity and Smartmatic have not produced auditable results in the 2020 election. It is evident that ballots were not properly validated, system records were not kept, and the system experience considerable instability even several days prior to November 4, 2020 that require DVS to implement software changes

November 4, 2020 indicates significant systemic anomalies that were widespread among all  battleground states. The evidence is both extensive and persuasive and indicates large-scale  fraud by remote operators.

16. I conclude that a combination of lost cryptographic key contained on stolen USB memory cards, serious exploitable system and software vulnerabilities and operating system backdoor in DVS, Scytl, SOE Software/eClarity and Smartmatic created the perfect environment to commit widespread fraud in all

8

states where these systems are installed. My analysis of the 2020 Election from NY Times data shows statistical anomalies across the battleground state votes. These failures are widespread and systemic - and sufficient to invalidate the vote counts.

17. I conclude with high confidence that the election 2020 data were altered in all battleground states resulting in a hundreds of thousands of votes that were cast for President Trump to be transferred to Vice President Biden. These alterations were the result of systemic and widespread exploitable vulnerabilities in DVS, Scytl/SOE Software and Smartmatic systems that enabled operators to achieve the desired results. In my view, the evidence is overwhelming and incontrovertible.

Pursuant to 28 U.S.S. 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

EXECUTED ON: November 25, 2020 By: Navid Keshavarz-Nia, Ph.D., Ed.D.

9