DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

### DECLARATION OF GREGORY STENSTROM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Gregory Stenstrom, hereby declare as follows under penalty of perjury:

1.      The following statements are based on my personal knowledge, and if called to testify I could swear competently thereto.

2.      I am at least 18 years old and of sound mind.

3.      I am a citizen of the United States and of the Commonwealth of Pennsylvania. I reside at 1541 Farmers Lane, Glenn Mills, PA 19342. I am an eligible Pennsylvania voter and am registered to vote in Delaware County.

4.      I voted in the November 3rd, 2020 general election.

5.      The Delaware County Republican Committee appointed me as the sole GOP poll watcher for 36 precincts (1-1 through 11-6), located in Chester City, Pennsylvania, of which I was able to inspect and observe 22 precincts.

6.       The Delaware County Board of Elections provided me with a certificate of appointment as a poll watcher.

7.      I carried my certificate of appointment with me when I presented at the polling locations in Chester City on Election Day and presented the certificate when requested to do so.

8.      I did not attempt to enter the enclosed space within any polling location, nor interfere in any way with the process of voting, nor mark or alter any official election record.

9.      On November 3rd, I observed poll workers in multiple assigned Chester City polling places, that included the 1-3, 1-4, 1-6, 2-1, 2-2, 2-3, 11-2, and several others, provide regular ballots, rather than provisional ballots, to voters who were told they had registered to

I APP. 129

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

vote by mail, without making them sign in the registration book. I challenged the practice in those precincts where I observed it, and while I was present, they then stopped the practice and began providing provisional ballots. I was informed at each polling location by their respective judge of elections that I was the only GOP poll watcher they had seen in this 2020 election, or any other election they could remember.

10.     On the evening of November 3rd, I went to the Delco Chester City counting center with my certified poll watcher certificate, to observe, on assignment as the sole poll watcher from the Tom Killion Campaign, as authorized and tasked to do so by Cody Bright, Mr. Killion's campaign manager, at approximately 6pm. Mr. Bright had been informed, and he informed me in turn, that there were "a dozen national level GOP poll watchers" at the counting center observing and monitoring, but he was apparently misinformed. I checked into the building observing their COVID-19 procedures, and took the elevator from the ground floor to the 1st floor counting room, was denied entry, surrounded by first four (4) Park Police, and then an additional five (5) joined them. I presented my poll watcher certificate, and refused to leave, and was threatened with physical removal and arrest, which I humorously stated would be agreeable to me, de-escalating the situation, at which point I was informed there was a separate list for "observers," and I had to somehow get on it. I asked if there were any GOP poll watchers in the building and was informed by Deputy Sheriff Donahue that there were two (2) inside. I asked to speak to them, and one man came out. I asked him how he got on the list and he stated he had volunteered via email and been told to go there, with no other explanation as to what he was supposed to do other than "watch," and that he was leaving shortly. I asked him if he knew what he was supposed to be "watching" and if he could see anything at all, and he stated he had

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

"no idea," and "couldn't see anything from behind the barriers." I went back to the ground floor

to figure out how to gain access and make calls.



Figure 1 - Entrance to DelCo Vote Counting Center from 1st Floor Elevator bank



Figure 2 - Inner Entrance to DelCo Vote Counting Center - Note DelCo County employee approaching to stop photo

I APP. 131

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

11.     While on the ground floor working on obtaining GOP assistance and authorized access, I witnessed organized chaos with rolling racks of mail-in ballots going in different directions with some going to the cafeteria, and some going to and from the main elevators, the separate garage loading dock elevators, and some to and from the back doors closest to the Delaware River, without any chain of custody.  There was no apparent process integrity, or obvious way for anyone to determine the origin of any mail-in ballot, or its ingestion, or egress into the system.  Some workers sat at cafeteria tables while others brought them boxes of mail-in ballots, while yet others collected and pushed the rolling racks around.  Joe Masalta took videos and photos of this operation, and has also completed an affidavit.



Figure 3 - Election Evening - Multiple Racks of Mail-In ballots in green trays of 500 were going in multiple directions from multiple points of entry up and down elevators that led from the garage loading dock to the top floor of the building.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION
09NOV2020

12.     After seeking legal assistance through multiple avenues, I obtained a lawyer, John

McBlain, after a call to the 501C Project Amistad organization, who arrived on site at

approximately 10pm, and we went back up to the 1st floor counting room.  We were met with

similar hostility to my earlier experience, and went back to the ground floor where Mr. McBlain

made multiple phone calls.  I learned he was a former Delaware County Solicitor and familiar to

some of Election Board staff.  I was subsequently added to the entry list and finally gained

access as an official "observer," along with Mr. Barron Rendel, one of several people I had asked

to accompany me, at approximately 11pm, five (5) hours after our arrival.

13.     We were the only GOP "observers" in the room, that was otherwise packed with

Democrat employees, volunteers, and poll watchers.

14.     I observed a counting room for ballots with counting machines. Trays of ballots

came in through three doors that appeared to lead from a back office, a second back office supply

room, and doors leading from an outside hallway with separate elevator access from the public

elevators and the garage loading dock elevators.



Figure 4 - The BlueCrest Sorting Machine Loading Tray section

I APP. 133

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

15.     I had no meaningful opportunity to observe any part of the count: the sorting appeared to have been done elsewhere, and the machines were too far away from the observation position to see any part of the mail-in envelopes or ballots. I observed opened ballots going out the second back office closest to the windows in red boxes after handling and sorting by volunteers, some being placed in green boxes, and ballots from the green boxes being placed in scanners by workers, similar to the scanner I had used to vote myself, but was too far away (30 feet) to be sure. I asked the sheriff where the ballots came from, and where the ones that were leaving the room went, and he said he did not know.

16.     I asked Ms. Lorraine Hagan, the elections official in charge of the operations, where the ballots where coming from and how they were being processed. She responded that I was only there to observe, and that I had no right to ask any questions. I said that I wanted to observe the activity in the sequestered room, but she denied my request, stating that the law prohibited access to that room by poll observers. I responded that there was no law denying access to observers, and she then said that it was "a COVID thing." I pointed out that I have a mask on, and so did the people visible through the door when it opened. She then informed me that she wanted to prevent us from "interfering." I responded that I was only there to observe and not to interfere, and to make a statement if I observed something wrong. Ms. Hagan said, "I assure you that everything's fine. There's no fraud going on."

17.     Shortly after this exchange with Ms. Hagan, workers – who appeared to be volunteers – started bringing in semi-opaque bins with blue folding tops that contained clear plastic bags, approximately 10" square, with each bag containing a scanner cartridge, a USB drive, and a paper tape, and they were brought to the computer tables which contained four (4) computer workstation towers on tables connected to four (4) wall mounted monitors, with one

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION
09NOV2020

workstation tower on the floor under the tables that was not connected to a monitor, for a total of

five (5) computers.  A flurry of workers started disassembling the bags and separating out the

USB sticks, cartridges, and paper tapes from the plastic bags, and dropping them in open

carboard boxes, with two workers sticking the USB drives into the computers to start the election

day counts.  I immediately objected, and demanded that Mr. McBlain challenge the process, and

he again retrieved Ms. Hagan to hear my objections.  I asked why the returned items had not

come with the sealed bags from the judges of elections, and she explained that they had been

taken out of the bags at the three (3) county election "processing centers" by the Sheriffs who

were collecting them for ease of transport, and I stated that that was a break in the chain of

custody, to which she shrugged her shoulders.  I then asked her why they were separating out the

USB drives from the cartridges and paper tapes, which was destroying any forensic auditability

and further corrupting chain of custody, and she said "that's how we have always done it," and

again stated I had no right to object, interfere, and was only permitted to observe, turned on her

heels and walked away.  I pleaded with Mr. McBlain to intervene and at least demand that the

USB drives remain with the cartridges and tapes in the plastic bags so we would not have to

reassemble them during tabulation, and he did nothing.

     18.     It is noteworthy that dozens of "volunteer" workers constantly streamed through

the counting area unaccosted, with no check of either ID's, or names, as the certified poll

watchers were, several still wearing "Voter Integrity" lanyards and badges that had been widely

distributed by Democrat poll watchers throughout the day, and they walked about unrestricted,

and unaccompanied without any scrutiny, many handling ballots.

     19.     After multiple, similarly caustic exchanges, elections officials continued to refuse

access to the back rooms and a line of sight to anything meaningful, and under threat of removal

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION
09NOV2020

by Park Police and Sheriffs we were stuck "observing" in a small box where we could essentially

see nothing, and I again conveyed to John McBlain that I wanted to pursue further legal recourse

to gain meaningful access, and he left the roped off area to seek Solicitor Manly.  At

approximately 2:30am he returned, and stated he had a conversation with the President of the

Board of Elections, and they had agreed to allow us access to the "back office" and "locked

"ballot room" at 9:30 AM the following morning.  By that time, and given that any other legal

recourse would have taken as long, or longer, and there was nothing meaningful to observe, I

objected, but reluctantly agreed and left. I believe counting continued through the night because

the count had increased, when I returned several hours later, the count on the tally screen was

approximately 140,000 for Biden, and 85,000 for President Trump, and with all Republican

candidates of all other races leading their opponents.

20.     As agreed only seven (7) hours previous with the Chairman of the Board of

Elections and Solicitor Manly, I returned with attorney John McBlain, and Leah Hoopes, an

official poll watcher for President Trump, at 9:30 AM. The elections officials ignored us for two

hours, and at 11:30 AM, Ms. Hagan informed us that she would give a tour of the Chester City

counting center to our group and a few Democrat poll watchers. I stated that I did not want a tour

of the facility, that I only wanted them to honor their agreement to allow direct access to the

sequestered counting room, and was ignored. Ms. Hagan, along with Ms. Maryann Jackson,

another elections official, did not allow us to enter the sequestered counting room. Instead they

walked us in an  approximate 20-foot circle  directly in front of the roped off area we had been

restricted to, discussing the basics of election balloting but provided no insight into the purpose

of the sequestered counting room.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION
09NOV2020

21.     One comment made by Ms. Hagan led me to think that "pre"-pre-canvasing
happened in the back room. The comment indicated that all ballots had been checked before
going downstairs to the ground floor cafeteria for pre-canvasing, before being brought back to
the 1st floor counting area, and entering the main counting room, for accuracy/sufficiency of
signature, date, and barcode label, and entry in the Commonwealth SURE system. I specifically
asked Ms. Hagan whether the names and signature were matched, and whether the dates and
barcode label were accurate. She replied in the affirmative. I then asked whether the names were
checked against the voter registration rolls, and she again answered in the affirmative, indicating
that people in the back room did the checking.

22.     From my vantage point, I observed approximately ten people in the back room
through the door when it was opened. Ms. Hagan confirmed that no ballots went through the
BlueCrest sorter (photo included herein) without first being checked for name, date, signature,
and barcode.

23.     I could see 4000-5000 ballots in bins on the racks next to the BlueCrest Sorter,
and I asked both Ms. Hagan and Ms. Jackson in front of the group "If all of the mail in ballot
envelopes are checked for completion, as you stated, then why are there multiple large bins of
ballots on the racks next us between the BlueCrest sorter and ballot extractors labeled "No
Name," "No date," and "No signature," on the bins?"  The election officials, red faced, declined
to answer. At this time, several Democrat observers, including Mr. Richard Schiffer,  conferred
with myself and Ms. Hoopes and stated that they were now not comfortable with the ballot
ingestion process, and the back room, being sequestered from all watcher's sight, and also
wanted to see the back room with us.  The bins mentioned above were removed shortly after.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

24.     At this time, Ms. Hagan and Ms. Maryann Jackson ended the "tour" to "take a phone call" upon the arrival, and demand of Solicitor Manley Parks, and the "tour" was abruptly ended. I asked Solicitor Parks when that phone call would be done so that we could see the back rooms as promised, and he said he did not know.  I asked him if he intended to grant us access as promised, and he simply turned around, and walked into the back room without further comment. Ms. Hagan, Ms. Jackson, and Solicitor Parks never returned, and we left after two (2) hours after having been denied access to the back room.

25.     Mr. McBlain, our attorney, went to court and obtained a court order providing access to the room, and texted me that the court order had been signed by Common Pleas Judge Capuzzi at 9:30 PM, and the court order required that observers receive only a five minute observation period in the sequestered room once every two hours.

26.     I returned the following morning at 8:30 AM with Ms. Hoopes and the sheriff again barred entry despite the court order.  I contacted Judge Capuzzi's chambers directly and explained to his secretary that the elections officials were not complying with his order. She suggested that I consult with my attorney to follow through, and that she could not discuss the matter further with me.

27.     When I returned to the main room, I saw that some areas had been cordoned off, and John McBlain unexpectedly came out from the back room and stated he had conferred with Solicitor Manley Parks and they had mutually agreed to bringing ballots in question out from the sequestered room to the main room so that I didn't have to go into the back room. Mr. McBlain told me that the elections officials were going to bring 4500 of the 6000 total ballots in the back room out to the main room, and leave the remaining 1500 spoiled ballots in the "spoilage room." I made Mr. McBlain confirm multiple times that the "universe" of remaining ballots in the back

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

room that remained to be processed was, in fact 6,000, and further made him affirm multiple times that he had personally sighted those ballots in the back rooms and storage rooms, and he re-affirmed this multiple times to me,

28.     Mr. McBlain stated that their new plan was to re-tabulate the 4500 ballots by re-filling them out with a pen so that they could be read by voting machines, so we could "see everything." I followed him out of the counting room, and continued to ask him if it was, in fact, legal under election law to cure ballots, and was unconvinced that this was the case, and thought we should challenge it, but he assured me it was "normal" procedure and got on the elevator and left. It was during this time that Leah Hoopes, who had remained behind in the counting room (see her Affidavit) observed Jim Savage, the Delaware County voting machine warehouse supervisor, walk in with about a dozen USB drives in a clear unsealed bag, and she showed me two photos she had been able to surreptitiously take (no photos or camera use was permitted anywhere in the counting rooms despite live streaming cameras throughout the room).

29.     I went back outside to see if I could retrieve Mr. McBlain, unsuccessfully, and upon my return to the counting room at approximately 11am, I observed Mr. Savage plugging USB drives into the vote tallying computers. The bag containing those drives was not sealed or secured, and the voting machine cartridges were not present with the drives, and he had no ballots at that time.

I APP. 139

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020



Figure 5 - Delco Voting Machine Warehouse Manager Jim Savage holding bag of USB drives Thursday morning

I APP. 140

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

30.     I immediately objected and challenged the uploading of votes from the unsecured drives, and retrieved Deputy Sheriff Mike Donahue with my objection, and he went to the back room to retrieve Ms.  Hagan. Ms. Hagan informed me that I could only observe the process but I could not make any comments or ask any questions while Mr. Savage was directly in front of us loading USB sticks, and the display monitors above the computers reflected that they were being updated. I responded that I was indeed observing a person plug USB sticks into the computer without any apparent chain of custody and without any oversight. No one stopped the upload, and Mr. Savage was permitted to continue this process and he was then allowed to walk out without any interference or examination by anyone.  I called and texted Mr. McBlain throughout the day without success to get him back to the counting center to address the USB issue, and what was now being reported to me by other GOP observers that there appeared to be more additional paper ballots in excess of the 6000 "universe" coming into the office administration area that McBlain had assured me of, to represent us and get us into the back office and storage room as ordered by the judge.  He would not return until approximately 5:30pm.

31.     **Approximately one hour after Savage had departed, at 1:06pm, the center published an update on the vote. The numbers moved dramatically as follows: from approximately 140,000 Biden and 85,000 Trump in the morning; to now approximately 180,000 Biden and 105,000 Trump after the 1:06 PM update. (At that 1:06 PM update, ALL Republican candidates who had previous leads were reversed and flipped).**

32.     Having seen the USB updates, and now seeing paper ballots in the back office, and other observers reporting that they had seen more ballots as well, I went outside and again called Judge Capuzzi's office and again spoke with his secretary and explained the situation, and the McBlain had departed and was nonresponsive to calls or texts, and she asked me what I

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

wanted the judge to do.  I stated that I wanted him to call to demand his order be enforced, and that I would gladly bring my phone back up and hand it to the Sheriff and Solicitor.  She stated she could not provide any legal advice, suggested I seek legal counsel, and hung up.  She did not realize she had not actually seated the phone in it's receiver and I heard loud laughter from her and a deeper toned laugh from a male before the line went dead, and I returned back inside to the counting floor.

33.      At 1:30 PM, Deputy Sheriff Donahue inexplicably informed me I would now be allowed to access the locked ballot room for exactly 5 minutes, after having been denied access despite all previous efforts.  We were met by Delaware County Solicitor William F. Martin, and I was joined by Democrat Observer Dr. Jonathan Brisken. On my way to the locked storage room, while passing through what was now referred to as the "back office," I counted 21 white USPS open letter boxes on two racks, on my immediate right after entering the room, labeled "500 ballots" per box. In addition, the approximately 16 cubicles for workers in the same room each contained one box also labeled "500 ballots," for a total of 31 boxes of 500 in that sequestered room.  This is the same room that McBlain had stated had 4,500 ballots in it earlier, most of which had been presumably moved to the front of the counting room (and later cured and copied to new ballots) and was supposed to be relatively empty with the exception of "several hundred ballots being processed by workers to update the Commonwealth's SURE system," according to McBlain.  This was a delta (difference) of approximately 16,500 ballots in just the "back office."

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020



Figure 6 - Table with 4,500 opened ballots that would reportedly not scan being sorted and cured.  Note approximate 10 foot distance from "observer" barrier

34.     Just after the two racks with the 21 boxes of 500 unopened ballots each, I

observed an open door to a 20'x30' storage room with dozens of semi opaque storage bins with

blue folding tops that appeared to have envelopes in them.  I could see through to another door

that led back into the counting room which was the same door I had seen workers bring red bins

full of "spoiled" ballots in the previous evening.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

35.     I also saw one shelf just to the left of the locked and secured "ballot room" with 4 sealed boxes. I lifted one box before Solicitor Martin objected that I could not touch anything, and it was heavy, and approximately 30-40 pounds. They appeared to match the description of the boxes described to me earlier by poll watcher Jim Driscoll and another observer with a first name of Paul. If those boxes contained ballots, I estimate that they were about two times the size of the 500-ballot containers, and if full, could have contained an additional 2,500 ballots per box for a total of 10,000.

36.     Ms. Hagan unlocked and opened the "ballot room" and Solicitor Hagan entered first and started the timer for 5 minutes, with Sheriff Donahue following us and closing the door behind us.  There were multiple racks filled with thousands of unopened mail-in ballots.  We were not allowed to take any photos, so I immediately started counting.  Labels on some boxes were visible, mostly with names of districts known to trend Republican, including Bethel and Brandywine. I took the following notes at the time:

    a.  5 boxes of 500 labeled 10-12

    b.  5 boxes of 500 labeled 18-20

    c.  1 box of 500 each, labeled 26-28, 50-52, and 58-60.

    d.  The remaining boxes did not have markings visible and we were not allowed to touch them to determine their origin.

    e.  Democratic poll watcher Dr. Jonathan Briskin also observed these boxes and confirmed the numbers of ballots, and that the total number of ballots was vastly greater than we had been led to believe earlier in the day.

    f.  I later observed Dr. Briskin working with a fellow female poll watcher drawing a diagram and detailing what he had seen after we were returned to

I APP. 144

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

the roped off area in the counting room, and noted it was quite detailed and corroborated what I had observed in the ballot room.

37.     In addition to the boxes of unopened mail-in ballots, I observed another shelf that was packed with open and ripped clear plastic bags with cartridges, green security ties, and a 16"x16"x28" carboard box  labeled "CHAIN OF CUSTODY RECEIPTS." In total, I estimated approximately 18,500 unopened mail-in ballots, which Dr. Briskin uncomfortably concurred with.

38.     So, after being told the "universe" of total remaining paper ballots to be counted was 6,000 by Mr. McBlain, the 1:30pm tour, on Thursday, two days after election, and 38 hours after being denied access, and having to obtain a court order, I sighted a total of:

    a.  16,500 unopened mail-in ballots in the "back office"

    b.  18,500 unopened mail-in ballots in the locked "ballot room"

    c.  Potentially 10,000 ballots in the sealed 30-40-pound boxes outside of the locked ballot room

    d.  4,500 ballots being "cured" in the counting room

    e.  *For a grand total of 49,500 unopened ballots*

*39.*     To my knowledge, and according to the tally monitor, and as reported on the web, 113,000 mail-in ballots had been requested, and 120,000 mail-in ballots had already been counted, with an approximate outcome of 18,000 for President Trump and 102,000 for Biden already recorded.

*40.*     At that time, I assumed that the approximately 49,500 unopened ballots would also be processed in the pending running of the sorter, envelope-ballot extractors, and scanners, adding those ballots to the overall total.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION
09NOV2020

41.     At 3:30 PM, I again re-entered the room, now accompanied by another Democrat

poll watcher who did not provide her name, and in addition to the boxes I previously observed

and described above, which remained undisturbed, I saw an additional  two racks had been

moved into the room, with another 16 additional, new boxes of 500 unopened mail-in ballots

with approximately 8000 more unopened mail in ballots labeled 5-2, 6-1, 6-2, and 7-2, with

some labels not visible from my position.  There were three red "spoiled" ballot boxes with

several shed ballots visible in one, and the others appeared to be empty, but I could not verify as

I was not allowed to touch anything or take any photos.  The 21 boxes in the "back office" were

still in place, so this brought the suspected unopened mail in ballot total to **57,500**.

42.     I asked Sheriff Donahue when the next machine run that would process the

unopened ballots was scheduled for, and was informed that election officials planned on a

4:00PM start, and I could see workers coming in and preparing.  I went outside to call GOP

officials to see if we could potentially either delay the run, or be permitted to get close enough to

the machines to see something, but was unsuccessful.

43.     When I returned at 5:30 PM for the next 5 minute tour, I was informed that a

Committeewoman, and Delco GOP representative, Val Biancaniello, had been taken in my place

by Solicitor Martin, and upon her return I asked her why she would do that, and what she had

observed.  She stated she had "not seen any fraud" and I again asked her specifically, if she had

seen boxes of unopened mail in ballots, and she said "oh, yes, lots of them," but could not recall

any further details.  When I pressed her for more details, she became very angry, and told me I

needed to "relax," and that she had "straightened everything out," and gotten more observers to

watch over the re-filling out of the 4,500 ballots that could not be scanned.

I APP. 146

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION
09NOV2020

44.     It is noteworthy that I was able to see the table of 4500 ballots being curated and

re-filled out, and those I was able to see were all for Biden without exception. I asked Joe

Driscoll if he had been able to see, and he said he had seen 15 for Biden and 1 for President

Trump, before election officials repositioned the barrier moving us back from being able to see.

45.     For the 7:30 5-minute inspection, Val vigorously objected to me going back into

the room, and demanded we send Attorney Britain Henry instead, who had been convinced to

come to the center by Leah Hoopes, and who I had been speaking with for the previous hour.

Val stated she had "got him down there," which was confusing to me, but I agreed it would be a

good idea for an attorney to corroborate my observations, and briefed him of the layout, previous

observations, and what to look for over Val's increasingly loud, and impatient objections.

46.     Attorney Henry returned from the tour and essentially corroborated my

observations, and my understanding is he is preparing a statement of what he observed.  I did not

understand, and could not reconcile at that time, why the election result counts had remained

roughly the same, while the sorters and envelope extraction machines had been running for

almost 4 hours, and presumably processing mail in ballots, and at that time attributed it to the

count not being updated on the monitor.

47.     In the presence of Ms. Biancaniello and Attorney Henry, I asked the now present

Mr. McBlain to explain how the USB drives had made their way to the center carried by Mr.

Savage.  He informed me that in his experience, some USB drives were typically left in voting

machines by judges of elections overnight in previous elections, and that Mr. Savage had simply

found them in the machines that had been returned from polling locations back to the warehouse,

including machines that still had all components in them (USB. Cartridge, and Paper Tape) and

that the next day he had transported approximately 24 USB sticks and an assortment of

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

cartridges and tapes from the warehouse to the counting center.   I pressed him to find out why there had been so many, and why there was no chain of custody, and why Mr. Savage would be involved in entering the USB drives into the computers without any other election officials present, particularly Ms. Hagan, who had overseen the process previously.   Mr. McBlain informed me that it had been explained to him that some judges of elections had left entire scanners – with cartridges, USB drives and tapes – and that the moving company had returned them to the warehouse, where Mr. Savage collected everything and put them in bags.   This explanation, in part, accounted for the 5 large election judge bags that I witnessed had been carried in by a Sheriff earlier, and I was able to take photos of them being removed from the building later.



Figure 7 – Presumed Cartridges, USB, Paper Tape from scanner, properly sealed with green lock tie, being brought into building on THURSDAY morning by Sheriff, having been allegedly returned to the warehouse WEDNESDAY morning.  They were opened without observers in off limits sequestered area

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION
09NOV2020



Figure 8 - Five (5) more bags from scanners that had been allegedly "left at polling locations"
and brought to counting center THURSDAY afternoon.  Sheriff Donahue is on left.

48.     I informed Mr. McBlain in the presence of Ms. Biancaniello that I had seen the

30,000 vote jump for Biden after Mr. Savage had plugged in the USB drives earlier, as described

above, and asked them both if that was "normal" for previous elections, and they did not

respond.

49.     Despite my multiple, strong and forceful objections, to the lack of transparency,

and what I perceived to be a significant break down in any chain of custody, I was routinely

ignored by election officials, and was met by mostly blank stares and shoulder shrugs by Mr.

McBlain. I could not understand how the mail-in ballot count remained essentially steady at

I APP. 149

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

120,000 when myself and multiple others described herein had sighted anywhere from 20,000 to 60,000 unopened mail in ballots AFTER the 120,000 count had already been completed and updated on the http://DelcoPA.Gov/Vote website.  I do not know where the 120,000 ballots went from the counting room after being counted, and was ignored by Ms. Hagan when I asked her where they were, and denied access to see them.   At the end of the day on Thursday, I observed the opaque blue lidded plastic boxes stacked against the wall next to the BlueCrest sorter with what appeared to be mail-in voter envelopes but was not permitted to go near them and find out if they were opened and empty, or still sealed with ballots, or still had ballots in them, and they disappeared from the room shortly after I took the photo below.



Figure 9 - Bins that had been moved from off limits "Office Space" storage room to another off limits area with what appeared to be envelopes inside to Receiving area near exit doors on Thursday evening - they were removed and gone shortly afterwards.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION
09NOV2020

50.     As a result of the election officials' acts, I was unable to fulfill my responsibilities

or exercise my rights as an official observer. I was continuously harassed, threatened, denied

access to the room and the ballots, and the election officials were openly hostile and refused to

answer questions, repeatedly defied a court order to provide access, and obstructed my ability to

observe the count in a way that would enable me to identify irregularities, which is the primary

purpose of the observer role.

_____

Gregory Stenstrom

09 November 2020

# Affidavit
# of Jesse Richard Morgan

Jesse Richard Morgan personally came and appeared before me, the undersigned investigator, who is a resident of York County, State of Pennsylvania, and is an employee of Roads 10 Express, a contracted company hauling mail for the United States Postal Service, who makes his statement, testimony, and affidavit under oath or affirmation, in good faith, and under penalty of perjury, of sincere belief and personal knowledge that the following matters and facts set forth are true and correct, to the best of his knowledge.

Smith: Today's date is November 20th, 2020. This is Dean Smith taking a recorded statement and affidavit from Jesse Morgan. Mr. Morgan, you're aware I am recording this conversation?

Morgan: Yes, I am.

Smith: And I have your permission?

Morgan: Yes, you do.

Smith: For the record, could you just state your full name? Date of birth?

Morgan: Jesse Richard Morgan. Uh, birthday 9/10/83.

Smith: And your current address.

Morgan: 1893 Ridgewood Road, York, PA 17406.

Smith: For the record, this is the address we are at presently taking this recorded statement. The scope of this interview/affidavit is to go over the events that took place on October 21st during your employment at Roads 10 Express. How long have you been employed at Rhodes 10 Express?

Initials: _____

I APP. 152

Morgan: 15, 16 months. 16 months.  Somewhere around there.

Smith: Your position there is a truck driver.

Morgan: Yes. Tractor trailers, I haul mail.

Morgan: I used to haul it out of Lancaster, uh, to Bethpage, New York. And also Philadelphia, used to also pick up at customs in Philadelphia. Then I switched over to just run in Bethpage, New York out of Lancaster. Um, at the end of September. I've been doing that ever since.

Smith:  When you say Roads 10 Express, you haul mail, is that for the U.S. Postal Service?

Morgan: United States Postal Service? Yes, it is.

Smith: That's the only thing you haul, yes? No other kind of packages?

Morgan: No, there's Amazon. Whatever the mail, whatever they're picking up whatever they're thrown on the trailer, I'll bring it. Amazon packages, that are being sent through the USPS

Smith: Through the USPS ?

Morgan: It's coming through U.S. Post Office.

Smith: You're not carrying for Walmart directly?

Morgan: Well, we actually…United States Postal Service just picked up a big contract through Walmart. So there's every now and then, you see some Walmart packages now.

Smith: I just want to clarify, but it's specific. You guys are specific for U.S. postal service.

Initials:

I APP. 153

Morgan: Yes, I'm shipping directly.

Smith: You're never going to a Walmart.

Morgan: No, no, no. I leave one post office and go straight to another post office. I don't go to Amazon's or Walmart's or anything like that.

Smith: That's what I need to clarify. And your normal work hours?

Morgan: I work Tuesday to Sunday. I usually go in around 11:30 at night, and I get to get in my truck. Um, about 12. Do pre trip usually log in between 12:15 and 12:40 and then I roll over to the post office, hook up to the trailer, and usually head off to  the post office by one o'clock in the morning.

Smith: Alright. Now, are you assigned the vehicle or truck?

Morgan: Yes, I'm assigned one.

Smith: Does anybody else have access or use that truck beside you?

Morgan: No, no one does.

Smith: How about a trailer? Are you assigned the trailer?

Morgan: Um, not assigned. The trailer, but I have been having the same trailer. I have had the same trailer.  It was, I got the trailer and I had it for a month. Continuous. Nothing wrong with it. Great trailer usually after that, if I would get a bad trailer, I'm not trying to jump too far forward here. But if I get a bad trailer, what I do is my door, that I pull that trailer, I'll put it in door 35 or 33. So that way they have to pull it, and then they'll put it over in the drop lot. And then whenever someone else will come back or whatever, then they'll move their trailer over to my section.

Smith: Is that the way it's done? You let them know, 'I do not want this trailer?'

Initials:

Page **3** of **28**

I APP. 154

Morgan: No, I don't say, it's just the way. It's how I figured out how it worked.

Smith: So how long have you had this trailer for?

Morgan: This one or the prior one? The prior one? I had it from the end of September, all the way up to October 21st.

Smith: All right, so let's talk about October 21st. And what happened that day.  You explained earlier that you go, pick your cab up at Lancaster. You park that where?

Morgan:  It's behind a car lot, but the car lot Auto One It's in Lancaster. I get the streets mixed up, it was either Mannheim or Harrisburg. But, um, so you pull in the parking lot and you'll see there's four of our trucks sitting there.

Smith: The name of the place is One Auto ?

Morgan: Auto One. Auto or Auto One. Something like that.

Smith: Is it a gated area where you park your tractor?

Morgan: They have a gate there, but it's always open.

Smith: Okay. And are there any video cameras or security cameras on the vehicles?

Morgan: On the trucks? That we do have cameras inside the trucks that face the road and also faced a driver? I can see not from the gated part, but I'm probably I mean, it's a car lot, so I'm pretty sure they have cameras somewhere on the outside of those I never looked for them, though.

Smith:  So you pick up your tractor. You do your pre-check, then you drive over to the post office. How far away is the post office?

Initials: _____

I APP 155

Morgan: 3-4 minutes away. It's not far.

Smith: And is it that Lancaster Post Office?  Is there only one Lancaster post office or more?

Morgan: I don't. This is a main distributor, so I don't know if they have little sister ones around or not.  This is the main distribution center yes.

Smith:  Printed out this map. There's a couple of different ones. Look at the names, addresses…

Morgan: It would be this one on 1400 Harrisburg Pike, so the car lot where I park the tractor would be on  Mannheim Pike.

Smith:  So, the car lot is on Mannheim Pike, where the truck is, and the trailer is kept at the post office on Harrisburg?

Morgan: Door 34 every night, every day when I come back and I pulled back in to door 34.

Smith: Tell me how that works as far as how to pick up your daily load.

Morgan: All right. So usually whenever I get there, this is the process is I pull in and I will back under the trailer. I will hook up all my lines, lift up the landing gear, put my four ways on. I put my four ways on this. A trick, okay. So, put four ways on, because then you can look at the back where the loading dock is And if you see both flashing against the building, then you know that you're working. If you do not see that, or you only see one, you know, one of your taillights are out. Alright, so you got to get that fixed.  Tell them 'Hey, I am not trying to get a fine,' and fines double if it is a tractor trailer. They either fix it or switch out trailers. I always have my badge, so they'll go and scan my badge and I know it was like they will assign it to my run, which my run is 611, 611 leaves out of Lancaster. Right. I will go over the trailer. If they are not done loading it, I will stand there and wait. And I always watch just so that way, I'm making sure that's loaded right. I do not want one side of the trailer loaded, heavy, one side loaded light. I don't want, you know; I want it spread out. If it is spread out, it benefits you two ways, okay? If it's, if you're heavy on one side, if you go around a bend, you have a higher chance of rolling. Alright, if it's spread out, it's a smooth ride. You put all the weight at the tail end of your trailer. Okay? One. You probably get a ticket if you go on a weight station, but it makes for the most miserable ride. Because your whole time you're just bouncing because you're going like your trailer is going like

Initials: _____

I APP. 156

this, you know? So, I always make sure they load it right. And then after they are done loading, I go and strap up. And then the guy who prints me out two tickets, I call them tickets. Some people might call him slips. I call them tickets because they look like a ticket. I might have a few here if you want to look. Look at one.

Smith: Do you have any from the 21st?

Morgan: No, I tried finding it.

Morgan: I do have the October 7 and 10 tickets. I took my car to the garage to get it worked on, and I cleared everything out of my car and threw it away.

Morgan: I could find these two. Alright, so I want you to see the dates. This is 10/10 and 10/7. So right here is the trailer 10R1440 So I had the trailer, those dates. Okay, so I just wanted to see like it. I mean, I have had this trailer continuous, you know, amount of time. But these are the tickets, so I'll explain it to you. So here's my route number. I'm always route 17091, then my trip.

Morgan: So this one, I was loaded when I left Bethpage. I was loaded. 100% leaving out when I left Lancaster to go to Bethpage, I was loaded at 34%. And then there's the van where it says van numbers, the trailer. Let's see here. There's my name. I think this is a time that I'm supposed to leave.

Smith: Okay, so these are really important. I'm just going to put them here.

Morgan: If you want to keep, you can.

Smith: Thank you, these could be important to the facts of this investigation.

Smith: If you pull up to a place without one of them, what are they going to do?

Morgan: I never did it before. I never, I never pulled up to a place without one. I mean, they are very important because that is what they use. They have scanners. Okay. And how they know. Everything is scanned. So, I'll pull up, they will scan the ticket, then they scan my badge. Then

Initials:

I APP. 157

they will go over to the trailer. So, the loading dock, they will scan the loading dock. Alright. Because the loading dock will have a barcode. And then they will scan the trailer, back of the trailer has a barcode. They will scan the seal on the door. That is a metal seal that must be cut off. So that way, everything matches up everything.

Smith: It is a chain of custody. So, you know that this truck was loaded by this person at this dock and this driver took the truck at this time and know where it was going.  This is standard procedure.

Smith: So on October 21, 2020, anything out of the ordinary?

Morgan: No. Nothing was out of the ordinary. Nothing. Everything was going well. They loaded up, strap myself in or strapped the pallets in, shut the door. They put the seal on, and off I rolled.

Smith: Did you notice what you were bringing that day? Do you know what, was in your trailer?

Morgan: Out of Lancaster? No, it was just, it's been such a normal thing. It's just packages, mail. I could, just normal stuff. That's what I always bring.

Smith: So you go on your way to Bethpage, New York?  How long did take you to get to Bethpage, New York?

Morgan:  I get to Bethpage in three hours and fifteen minutes. I've done it enough times. It is easy, I love going to New York, it's my kind of place. I'm not a city guy.  I would not want to live back in the city. But I love going there just to see it like, I mean, it's never a dull moment. There's always something, and it is New York, it's not all Jets and Giants fans. There are some Bills fans up there, too. So I like I like going up there and talking to the people and seeing stuff. And I mean, you could drive there, ah, 100 times and 100 different times. You could see something different.

Smith:  So, you get up there on the 21st, and you drop off, you pull into the same spot as you do every time you go to Bethpage, NY.

Morgan:  It is most of the time. So, um, Tuesday through Saturday. I would say I am always on either door 24, 25. Okay, one of those two doors, most of the time is 24 Sunday, though. Sometimes I'll end up in the door 27. I do not know why.

Initials:

I APP. 158

Smith: I'm just going to look to see what the date was October 21st.

Smith: October 21st was a Wednesday. So what door do you think you would have pulled into?

Morgan: Probably 24 or 25.

Smith: So when you get up there, who do you deal with? You, you have anybody you know by name up there that you deal with?

Morgan: No. Romeo, I've been dealing with him for a long time, Romeo. He's an expediter.

Smith: An expediter for the United States Post Office. He is an employee of them?

Morgan: When I get to Bethpage, I stop at the guard shack. I don't know his name, but he's really cool. He's from Jamaica, and he always talks with me because my last name's Morgan. He's like, 'Captain Morgan. You're here.' Then I proceed to the dock where I see Romeo

Smith:  Romeo. Do you know his last name?

Morgan: I do not know his last name.

Smith: What's he looks like?

Morgan: He's from Thailand or something, somewhere over in Thailand. Yeah, Thailand or Korea. One of those. But he is Asian. He does not sound Asian though. He grew up over there but moved over here. But he does not sound like he speaks really good English. He is in his fifties.

Smith: Has he been working there for a long time.

Morgan: I don't know how long he's been working there, but I take it he's probably been there for a while from the position here.

Initials:

I APP. 159

Smith:  How many expeditors do they have there in Bethpage, NY?

Morgan: Usually two. Sometimes three.  When you pull into the door, it's either 24 or 25 or 26. So you have two, maybe three expediters over here. Usually two and then down the other end, you might have one or two on the other end.

Morgan: I don't know their names at all. I only deal with them every now and then. But it's usually an Asian lady down there that's usually there whenever I come in.

Smith: Then you have Romeo. And is there anybody else?

Morgan: Then there is the lady that I dealt with on the 21st. I do not know her name. I have not seen her. I'm trying to get her name for you guys. I have not seen her, though. She hasn't been working or on vacation. I do not know if she took extended break. She is blonde, white female in her mid to late forties like 40, 45 around there. 47.

Smith: Have you seen her before?

Morgan: I've seen her there before.  She has blonde hair that keeps it kind of like, braided back.

Smith: So, she's the 13 expediter is the one that loads up the truck.

Morgan: No, expediters who I deal with, who I give my ticket to who scans everything, okay? So that's the person I see whenever I come to a place and it's the person I see when I leave the place.

Smith: Who determines what gets put on the truck?

Morgan: That I don't know, but they will assign a loader to unload and load you, alright? That day was weird.  Because when I went in, I saw her, and I was like, 'Hey, how are you doing?' I always talk to them Always. You don't want to piss them off, because then you end up sitting there for hours. So always be nice. Hey, how are you doing? You know, small talk and get on your way. And that day she was like, 'Hey, how are you?' I'm like, 'I'm doing pretty good. How are you?' She is like, 'Guess what? You got mail-in ballots today,' or you know, something in that line. And I was just, like, 'Really?' She's like, 'You're taking back a shipment of mail-in

Initials:

I APP. 160

ballots." I was like, 'Oh, that's cool.' You know, I was like, 'Whatever,' I thought it was pretty cool. I was like, 'Oh, that's neat.' Like I am doing something for the presidential race, you know. Like I was like, 'That's neat,' you know? So, I go over to the trailer and I'm, and I'm standing there, they're unloading me, they start bringing gaylords out. Two pallets for Lancaster that they put in the nose and they were tall, tall gaylords. Alright? The rest was for Harrisburg. There where about 24 bins of mail-in ballots. I call them A and B units. I don't know exact names for them but their own rollers there on like, aluminum rollers.

Smith: So, clarify this for me. Were they loading your trailer with only mail-in ballots that day? Or there was other mail mixed in?

Morgan: It was all mail-in ballots. Besides the two pallets they put in the nose of the trailer for Lancaster, what I normally bring.

Smith: How could you tell that?

Morgan:  Because well, you know, I can't really tell because it was it was a tall thing, but it just, I figured it was, well it looks like someone's shipping exhaust pipe or something. Like just a long, freaking thing in a cardboard box. Don't take me for 100%, alright?

Smith: So what your saying is you're not sure what was in the two large pallets in the nose of the truck for Lancaster?  You don't know if that was regular mail or mail-in ballots. The bins sizes are 4 feet by 4 feet?

Morgan: Yeah, they usually turn them sideways, alright? And it won't be four by four. Be like, they're bigger. It's like, four by five or something like that. Some weird dimension. But you turn it sideways because they have to put more on a trailer.

Smith: So you said you had about 24 large boxes of mail-in ballots?

Morgan: 24 I believe.

Smith: 24 gaylords four by five, filled with mail-in ballots coming from New York into Pennsylvania, heading to Harrisburg?

Initials:

I APP. 161

Morgan: Supposed to go to Harrisburg. They'll have tags on for Harrisburg tags or placards or a white piece of paper.

Smith: Just kind of tells him where they're going on the outside of the Gaylords?

Smith: But it's an indicator for that box where it's going to go.

Morgan: It's an indicator for that box where it's supposed to.

Smith: So you don't have to sort through the boxes. You could see clearly this is where it has got to go.  So is this the first time you ever hauled mail-in ballots?

Morgan: Yes.

Smith: So how did you know they where mail-in ballots being loaded into your trailer?

Morgan:  I could see they where mail in ballots that were already used, you could see the names in the return corner of the envelope and there was a strange blue marking on the envelope.

Smith: Blue. What do you mean?

Morgan: It's like some kind of blue mark.

Morgan: I want to say design, but kind of like a blob or something. Like towards the middle of the envelope kind of thing and then there was writing.

Smith:  Was it an insignia ? Was it something professional, or is there something somebody put a marker on?

Morgan: No, it was like, it looked kind of like how that they were all uniformed like that.

Initials: _____

I APP. 162

Smith: Were all the markings uniformed on the envelopes?

Morgan: I guess they all looked the same on all the envelopes.

Smith: Same spot on all these ballots? When you say you knew they were ballots, were there any names on the ballots?

Morgan: The envelopes had vote printed on it and there were names written in, in the corner.

Smith: In the return address area of the envelopes? So, they've already filled out by somebody?

Morgan: Yes, already filled out.

Smith: The return address where they written in by hand.

Morgan: Yeah, they were written in by hand.

Smith: So, you know, these are ballots that were already casted.

Morgan: Yes, I do not think they were blank ballots being shipped out. When I was looking at them, it didn't even dawn on me and I feel like such a klutz now, but it didn't even dawn on me. And then that's when she came over. And she is like, this one really wanted to make her their ballot count because they got their mail-in ballot registered mail. So, like you saw the big red stamp, it was a registered certified mail. So that way, they could track it to make sure it was going to go wherever it was going to go. And they put that on the trailer as well. And that was in a bin that they sat at the end of the trailer by the door. So that was on the trailer as well.

Smith: So that confirmed to you that the ballots in the boxes were already casted. They just needed to get to the polling station to be counted. Crazy question. Do you remember if you looked at those addresses of those envelopes that you saw? The ones with the blue marks and one with the red tag, could you tell if the return address were for the Pennsylvania addresses or New York addresses?

Initials:

I APP. 163

Morgan: I don't know, like, because they came by so fast. Like I wasn't like, whatever, I wasn't looking for anything, it didn't dawn on me. Really? You know, I really wish I would have looked at it harder. Part of me look, honestly, got a part of me, wants to sit here and be like, you know, that registered mail, like I looked at it and I saw Queens, New York. But then there's part of me that goes, I don't know if I saw Queens in New York. I don't know if that's just my head's saying that you saw Queens, New York. I don't understand. I don't want to say it if it's not, if I don't know 100%, you know?

Smith: I appreciate that. Because I know what I am asking you is, in hindsight, it's like you knew that this was going to be relevant at the time.

Morgan:  I called my mom that day I was so mad because my brother Ben just got into town, okay? And so that was Wednesday. My brother Ben got into town Monday at, like, eight o'clock at night, so I could not even see him Monday. Tuesday, I saw him a little bit. On Wednesday, I wanted to hang out with him because I have not seen him in two years, alright? And I was just like, I got held up in Harrisburg, but I was so pissed off and like so I called Ben and I talked to him, and I talked to my mom and I was like, 'Yeah, I was like, hauling mail-in ballots today.' I was like, 'Isn't that pretty cool?' You know, it was like 'What do you mean?' It was like, 'I took a whole trailer of mail-in ballots.' Ben's like, 'Wow'. Like, my mom was like, 'Why did you do that?' I was like, 'What do you mean?' Yeah, she was just like, 'Why did you take them? Why were there?' She was like, 'Why were you taking them out of New York into Pennsylvania?' I'm like,' I don't know' when I was like, 'I'm just doing what I'm told.' You know.

Smith: So there's at least 24 bins of ballots on the trailer?

Morgan: Yes. Look, I told them I suck at guessing how many bins or anything because what they do is they pile them on together. Okay, so you have not been there. They kind of the size, kind of go in. So that way you can stack them. Boom, boom, boom, boom.

Smith: I want to ask you a question, is there is any way you could estimate how many ballots wherein the 24 bins?

Morgan: No, I can't. I suck at that. There could be 250 or there could be 7,500, I can't.

Smith:  But, you know, it wasn't one or two ballots?

Initials: _____

I APP. 164

Morgan: No, I know it wasn't one or two. No, but we know there was a significant amount of mail-in ballots being shipped from Bethpage, New York.


Smith:  Who else did you know out there by name or description? That might be helpful. The three expediters, the Asian woman, Ramon, and the blonde woman and a security guard. You see anybody else out there?


Morgan: See, there's ah, another lady that I talked to. I don't know her name. She's heavyset. She's always, I refer to her as kind of sleepy because every time I ask her, 'How are you doing today?' 'I'm just so tired. I'm ready for bed.' And I'm like, I'm like, 'Okay,' you know, like every day, never fails. You know, 'I'm tired. I am just ready for bed.' I am like, 'Okay.' But like, so there is her, there's ah, Loader, I like talking with one loader. He is a Buffalo Bills fan, you know?  I do not know his name. He is, he is getting ready to retire. I know that. He looked like a white guy, he has a son that lives in Nevada or no, Las Vegas. He is going when he retires. He bought a house out in Vegas and he is going to be moving into the house, and his son lives out in Vegas. His son owns a T-shirt business. Really successful T-shirt company, apparently. He is excited because he is going out there on vacation, I believe so. This week or next week.


Smith: Wow, so any other loaders out there?


Morgan:  Now there is a another one. He is younger. He is kind of my age. I do not know his name. He, loaded me. Unloaded me maybe three times.


Smith: Do you know who loaded you that day, October 21, 2020?


Morgan: I believe it might have been the Buffalo Bill Guy.

Morgan: I wanna say 100% but, like I'm thinking it might have been the Buffalo Bill guy that might have loaded me that day .


Smith: So they load you up, you get on your way.


Morgan: Yeah, I get, I load up, I go on my way.

Initials: _____

I APP. 165

Smith: Hold on. Back up. They got to give you a ticket, right?

Morgan: Oh, yeah, I get my ticket. I check out, they seal me up.

Smith: When you say they seal you up, they put the code of the seal on the back. They scan all the barcodes from the dock, the truck, your badge and the seals all for matching, correct?

Morgan: And I started back to Harrisburg.

Smith:  What time do you think you got to Harrisburg?

Morgan:  I got to Harrisburg at 9:15 in the morning.

Morgan: I sat in the yard from 9:15AM to 3PM.

Smith: Is that normal?

Morgan: No, no, no. It's not normal. That's the first time that ever happened.

Morgan: Um, no, there has been two times before where I sat, but there was, like, a really long line. There were no docks, and I sat waiting for a dock. But it was never that long. It was like maybe three hours, but I was pissed. I was pissed because, like I said, my brother just came back. I am sitting here like no one's loading/unloading me.

Smith: Were there any docks open?

Morgan: Yeah, there were bays open. There's bays open that I could go to in the front and on the side. I'll try around the side and I'll dock. And now I walk in because I'm not doing that waiting bullshit ever again. Like never, even though, like they'll pay me for it. But I don't want to sit there like I literally sat there as long as it would have took me to drive from Lancaster to New York and New York to Harrisburg. I sat there that whole time, like waiting.

Initials:

I APP. 166

Smith: So you're there from 9:15AM to 3PM.

Morgan: Until three something in the afternoon.

Smith: You're talking six hours.

Morgan: Yep. I ran out of hours. I had to go in my 16 hour. Okay, so I'm all right. So, hours of regulation okay for driving truck. You can't just haul ass and keep driving all day. You know, you can't do it. So in one week, I can work 70 hours a week. Okay? And that's 70 hours a week. I can. I can work. I can be on duty for 14 hours of that. 14 hours. I can drive 11 of it. And now 11. Our time of driving. I have to take every eight hours, I have to take a 30 minute break in an eight hour in the eight hour span. Alright? So, literally, I went past my 14. How to go that you could do is once a week, especially so I'm not over the road. I go on a 16. 16 is I'm allowed to work. I'm allowed to be on duty. Worked for 16 hours that day. And I was just about out of time literally I had, like, an hour. And that's when I went inside and I was like, 'Dude, what the hell? I am about to expire. So what the hell is going on here?' I'm like, 'I'm on my 16.' I'm like, 'I'm just about out of time. What do you guys want me to do here?' I'm like, 'I'm running out of hours.' I was like, 'Do you want me to drop the trailer here?' I was like, because my thinking is only have two pallets for Lancaster.

Morgan: That makes more sense to drop the trailer there, since I have a whole trailer for Harrisburg. They have Lancaster trucks that go that will come in their mail trucks that they could put these two pallets on to ship them back. So I don't know. He goes, I don't know the guy's name and he was a younger black guy. I don't know his name, I haven't seen him here for a little bit either. I've been seeing the older gentleman lately.

Smith: So he goes and looks into it?

Morgan: Yeah, he goes, looks into it. And I'm standing there waiting, waiting, and then a transportation supervisor comes down. I don't know his name. He just referred to himself. He said, 'Hey, how's it going? I am the transportation supervisor.'

Smith:  Can you describe him?

Initials:

I APP. 167

Morgan:  Was a older white guy in his forties, with brownish, slicked back hair, then he had a button up shirt with a black denim or dress pants, dress shoes. I remember that because I just thought kind of weird having dress shoes in a warehouse.

Smith: How often is do you engage with transportation supervisor?

Morgan: Never, that was the very first time and the reason why it's weird. Because look, transportation supervisor for United States Postal Service, is a transportation supervisor for the United States Postal Service. We have a contract from the United States Postal Service, alright? So they are contracting us to move their mail. I have my own transportation supervisor. His name is Brian, alright? So that is who I deal with. This guy, he has his own fleet and is the transportation supervisor for them, the United States Postal Service. He sets up the routes that the United States Postal Service trucks and deliver their drivers what they're supposed to be doing, not what we're doing. So just a little weird, like when he came down. 'Hey, transportation supervisor' and I was like, I was kind of mad. So I'm like, 'whatever,' you know, like I was like, 'Look, I'm trying to get out of here' and he's just like, 'Well,' he's like, 'just take the trailer to Lancaster' and I'm just like, 'I can just drop this trailer here, it has mail in the front for Lancaster' and he's like, 'Just take the trailer to Lancaster.'

Smith: Does he know what was in the trailer?

Morgan: I don't know. Part of me wants to say maybe. But there's a part of me that says I don't know at the end of the day, all they have to do is on their scanner. Look up 611, 612, 611 coming in the Harrisburg 611 and it'll pull up. I don't know if it pulls up what I have, but I know it pulls up how much mail I have for them.

Smith: Did he give you a reason why you're waiting there for six hours?

Morgan: He did not give me a reason. And then he told the guy that was behind me to go to this new building that they just got, which was down the street. So, me and this other guy was sitting there waiting. He, the other guy, went down the street to this other building. I went to Lancaster. The other guy, I do not even know who he was. He was like an outside carrier.

Smith:  So in the 15 months you've been doing this, you've never had to sit for six hours and no justification.

Initials: _____

I APP. 168

Morgan: No, no. And then I went to leave, I said, 'Can I get a slip?'

Morgan: Because I gave him mine. I am sitting there. I am like, 'Here's my slip for you guys.' It was like, 'Can I get a slip?' He said, 'No, you cannot get a slip.' I said, 'What do you mean I cannot get a slip?' He said, 'Sorry you can't get a slip right now.' I was like, 'What?' It was like, 'Well, can I get a late slip?' He is like, 'No, you cannot get a late slip. You got to be on load, to get a late.' So I said, 'Well, I've been sitting here,' and he got an attitude, like, sarcastic. I got sarcastic back, but like, I was like, I was now I'm really mad because I'm like, 'No, I don't know. I'm not going to sit here for six hours and not be paid for it.'

Smith: So, he won't give you a slip.

Morgan: He will not give me a slip.

Morgan: It kind of pissed me off. So that's when I went out and got my cab, and I text my supervisor Brian, my transportation supervisor, and I said, I sent him, 'So they're telling me to leave and take the mail to Lancaster. But I am not getting a late slip. What am I supposed to do? I want to be paid for this crap.' That is exactly what I wrote. And he said, 'When you get back, just send me a text with the total hours for the day. Who is the expediter who is refusing to give you a late slip?' I said, 'That came from the transportation supervisor. He said I cannot get a late slip because they would need to unload me here, so I mean, but the same time told me to go Lancaster.' And then he said, uh, the other guy behind me, he has go into a new building. I am glad I saved the text that I sent to Brian. I am glad I wrote it, because never talked to transportation supervisor. Since then, I've never seen the guy since then.

I went to Lancaster. I put the trailer at door 34. If I am moving along too fast, let me know. I put the trailer in door 34, disconnected, moved out from it. Ran inside and I gave the Harrisburg slip to the Lancaster post office. It was for Harrisburg slip I had from Bethpage. I said, 'Here you go.' I said, 'The transportation supervisor told me to drop the trailer off here to you guys. He would not give me a slip for you. So, I have the Harrisburg slip.' And it was, uh, this black gentleman there I believe he has dreads or braids. I mean, this guy, we might have said two words the whole time. He goes, 'Okay.' I walked out, got in the truck, and drove off.

Smith: The transportation supervisor. He did not give you his name or anything?

Smith: Did you see your trailer being unloaded in Lancaster?

Initials: _____

I APP. 169

Morgan: I didn't see anything. I pulled in door 34. Lancaster, did not see anything.

Smith: Lets talk about the trailer.

Morgan: 10R140?

Smith: That's the only one you usually have.

Morgan: That was the one that had for a month, 10R140.

Smith: And that is the one you dropped off in Lancaster.

Morgan: Yes.

Smith: So at the end of the day on October 21, 2020, you drop the truck off at Auto One You lock up You're done, you go home?

Morgan: Yes

Morgan: I come in next day and I do not have my trailer number, 10R140.

Smith: You come in the next day, your trailer is gone.

Morgan: It was gone. I have not seen it since.

Smith: Did you ask anybody where did it go?

Morgan: No.  But it is weird. I do not know if the expediters would know, really.

Initials: _____

I APP. 170

Smith: Let's talk about what happened on Halloween when you got into your truck. Apparently, that was October 30th. Was there an issue with your login?


Morgan: Yeah. Alright. So, whenever I log into a truck…


Smith: Let me stop this one for a second before we go on that I want to ask you another question. Where do you think those ballots you dropped in Lancaster went?


Morgan: Alright, so I haven't seen the trailer, okay? And it's weird. I'm kind of just let me explain the whole thing. Okay, so I haven't seen the trailer. So there's four guys that drive out Lancaster, two of us goes to Bethpage, New York every day, every day. Alright? Six days of the week we go, Bethpage. We take the same trailer that we leave Lancaster, we take to Bethpage. We take that trailer, we get loaded and unloaded. We take the same trailer out of Bethpage and go to Harrisburg, get unloaded. And if there's anything there to get loaded, and drop it off, alright? The other two guys go out of Newark, New Jersey, and go from Lancaster to Newark, New Jersey. Same thing, same process. They have the same trailer that is loaded out of Lancaster. So I had trailer number 316487 which had a camera on it. This was the very first time I've ever had a trailer that had a camera in it. So I went into the transportation loading supervisor. I pointed out to him and asked him if he ever seen a trailer with a camera. And he said, 'No.' I asked Loader if she has ever seen a trailer with a camera, and she said, 'No.' And I asked the guy from Harrisburg if he ever seen a trailer with a camera, and he said, 'No, never, never seen a trailer or trailer with a camera in it.' And I took that trailer and I dropped it off this past Sunday.

(Video documentation provided and secured of this interaction).


Smith: Do you know what you were hauling that had to be under surveillance?


Morgan: I thought mail, but that is all I thought was mail. Like the date would have been the 15th of this month. So, and I dropped that trailer off Sunday in Lancaster on Wednesday of that week. So, the 18th, that trailer. Now, when I went back to work Tuesday, I didn't see that trailer anywhere in the yard and when I got back Wednesday morning after my run, I didn't see the trailer 10R140 anywhere.

 Wednesday is when I left out, and then I drove all the way up to Bethpage. I remember I docked my trailer in the door and I look up and I see trailer 10R140 rolling by me on the back of a jockey truck. And it's just weird to me that trailer 10R140 was at Bethpage because none of us drop trailers. Okay, so somehow that trailer got to Bethpage. Now we don't do dropping hooks anywhere we do dropping hooks at Philadelphia, and Washington D.C. So somewhere, someone took that trailer, okay, out of Lancaster, and I believe, I'm not 100% sure or certain, but this would be my logical thinking that someone brought that trailer to Philly and D.G. and dropped it

Initials: _____

*That*    *NDC*

off because we do the Philly and D.C. are huge. If you ever go there, you understand what I mean, huge, and we do a lot of dropping hooks there.  Just so you know, drop hook is where we drop a trailer off there and we pick up a trailer from there and roll out so that trailer could've been dropped off there. Someone from New York or New Jersey or wherever. Someone that's doing a turnaround dropped our trailer off. Pick that trailer up, brought back up to Bethpage.

Smith: But that is not the trailer that had the ballots?

Morgan: No, that's not the trailer that had the ballots. And the reason why that sparked interest in me is because you've asked me what I thought happened to that trailer and I said, 'I don't know.' My mom said something to me that really sparked, and made me think. And what she said was, 'It's really interesting how all of a sudden, Philadelphia just got a few 100,000 votes magically appear.' You know, it seemed like and she's right, and so I dropped that trailer off at Lancaster. I have not seen it since.

Smith: You're saying somebody probably drop hooked the trailer number 10R1440 on October 21st, 2020 from Lancaster.

Morgan:  I think that trailer 10R1440 with the ballots ended up going to Philadelphia.

Smith: Educate me on this, somebody would have a ticket for that. Correct?

Morgan: Well, apparently not if you send me out of Harrisburg without a ticket.

Smith: So they could not make up a ticket from Lancaster because it didn't originate there.

Morgan: It did not originate, I mean. You know, whenever I went because I used to go to Washington     D.C. and Philly, you really don't need a ticket to get in to Philly and D.C. because you do not even go on the dock. You talk to the people over the intercom, you go in, it looks secure, but it's not a secure place.

Smith: You feel, post office not secure.

Initials: _____

I APP. 172

Morgan: Philly and D.C. is not a secure place. Philly is on Byberry road, you go down the street, and the entrance is right off the street. So if you get more than two trucks that are trying to get in there, they're going to block the whole road up, okay? But, so you go up and there's an intercom, and you turn off your truck and talk over the intercom and you say who you are, Jesse Morgan. That's it. You could be like, you could use any slip. You could say anything. What run are you running, 623? What do you have? 50%? Then they'll say, 'What's your trailer number?' You tell the trailer number and they'll say, 'Okay, come on in.'

Smith: Could they be cross-referencing that? Would any data they have on a computer…

Morgan: I go in there and I see what they are doing because like, when I go in the office, you could go in there. And you see them talking on the phone? Usually when they're putting the in the computer. They're putting the computer system, and I don't see it cross-referencing. But when they're asking for trailer numbers, it's to put it in the lot. So that way they have that trailer now in the lot. You know what I'm saying?

Smith: So the post office should have some records of where that trailer was, the one with the camera.

Morgan: Now I have it on that trailer on. And then I saw that video I sent you.

Smith: Alright. So that's your, that's your synopsis or where you think trailer 10R1440 went.

Morgan: Yes. That's where I think it would have went, absolutely. I don't know who took it there. If anything, I think it would probably been an outside carrier, probably pulling our trailer illegally, which they do. I have seen that because I've seen it. I'll take a picture next time I'm driving out of Harrisburg of an outside carrier, pulling one of our trailers that the post office sent them out with that. Our company probably doesn't know that they're pulling it.

Smith: Because your company owns the trailers, but you are seeing the tractors are not Roads 10 Express.

Morgan: It's not a Roads 10. It will be like an outside. It will be like some guy. It'll be like an independent guy pulling a trailer for the United States Post Service.

Initials: _____

I APP. 173

Smith: Halloween night, October 30, 2020, let's go back to that day.

Morgan: That's weird because I always stay logged into my truck. Okay, so whenever I go, when I get out of my truck in the evenings or in the morning. When I get back, I go off duty. But I do not log out of the computer. I stay logged into the computer.

Smith: Why do you do that?

Morgan: It's my truck. No one uses it, just makes its just one less step I have do.

Morgan: So anyways, it's just one less step that I have to do when I log in the morning or in the evening. Time to go to work. So whenever I go in, I will actually send you a video that explains the process.

(Video explanation of the truck log in process was shown and secured).

Smith: My notes indicate that there were 11 illegal movements when you returned to your truck?

Morgan: Alright. So, whenever I log in or whenever I get to my truck, I'll start it up, and it will, it will show a screen that says, 'Is Jesse Morgan still driving? Yes or no?' I'll hit Yes, okay? And then it will have me put in my four digit passcode for the truck, alright? If you don't know that, or if you just drive off, it's gonna log me right out of the computer of that truck. Okay? It logs me right out.

Now it's on the screen here so that you see my name is very first, hold on. My name is very first right there, Jesse Morgan. And then there's the five prior drivers that drove that truck before me, before I got that truck. So the only way that my name can get erased from that truck is if there's six other drivers that come to that truck to use it, then my name will be out of that thing. And why that's important is because that day that I got to my truck on October 30, 2020, I start up like I normally would, and it goes to that screen where it has the six names on it, alright? So I'm sitting down looking at the screen like I didn't log out. Now if I would've logged out, it would have come up like that. But I didn't log out. So then I look at, I start the truck. I look at my fuel gauge and I looked at my miles and I had miles off. Not much, it was like 25 or 30 miles. Not much, okay, but it helps set me because my fuel gauge is lower. And I, like I count my fuel and I might have had enough to get to Bethpage, Harrisburg and back without fueling. But at that point, because I run it really tight that I would have been, like biting my nails, you know? And I'm not trying to be on the side of the highway out of fuel like, you look like an idiot, you know, having that guy come to fill you up. So now I am pissed, because now I have to stop to get fuel on the turnpike, which it takes forever on the turnpike.

Initials: _____

I APR 174

So I notice 11 different times that my truck was moved, which is crazy. And then they never logged into my in the computer, which you can't do that. That's illegal to drive a truck and not be logged in because if a state trooper will shut you down, and you have to sit there for 10 hours.

Smith: If there was 11? But you said there's only like, 25 miles.

Morgan: It was like 20. So he stopped and went, but he had to stop for a period, which it's just so, it's so baffling. Like I'm like, what? What was my truck doing?

Smith: Traveling 25 miles being turned on and off 11 times?

Morgan: Yeah, like it's just...

Smith: I mean, 25 miles is not a short distance.

Morgan: No but it's like a trip to Harrisburg. But it is not a trip to Harrisburg and back.

Smith: Right. So there's no explanation on who used the truck or where it went. Was that the only time that ever happened to you?

Morgan: Yes.

Morgan: You want me to talk about the time with the things I found in the truck?

Smith:  We could talk about that.

Smith: So before you go, did you report that to anybody saying, 'Hey, listen, somebody drove my truck for 25 miles and 11 unauthorized stops?'

Morgan: No, I don't report to anyone.

Initials: _____

I APP. 175

Smith: What would happen if you got pulled over that day. And the police just want to see your log?

Morgan: It wouldn't come up on my logs at one. That's because I wasn't logged in, so it logged when he drove away. It logged me out of that truck.

Smith: Is there a GPS tracker on the trailer?

Morgan: Yes, those units that I showed you, they have GPS in them, so they will show you where that truck has been.

Smith: So if we go back to Roads 10, they would have the records of the GPS ?

Morgan: I'm thinking for at least a year, because if you get audited, you have to have your stuff.

Smith: Why did you not report these 11 unauthorized usages?

Morgan:  I didn't. Because my thinking is look, I don't like talking to the office at all, right? And I figured if they if they wanted to ask me a question, they're gonna call me and ask me a question. If they're not going to ask the question, then they're not paying no mind to it on. I'm just gonna let it go. That was just my kind of thinking. This company got so big when it was, when I first started with the company, there was only a few of us. And now the company, the company that bought us out, it is a huge company . So my boss isn't even in Harrisburg. He's in Virginia. I don't even see the guy like, yeah, I don't even see him like he's just, you know, the name on the phone in a voice.

Smith:  We don't know where the truck went that day and the movements just unexplained. Very highly suspicious. There was another incident with your truck, correct?

Morgan: Yes someone was in the tractor it would been Sunday, so Sunday's 15th, because that's the day when I talked to you. November 15th, 2020.

Smith: So you went, you went to work.

Initials: _____

I APP. 176

Morgan: I went to work, alright? So when I get to work, it's dark out, alright? It's dark in the parking lot, and I carry in my book bag. And, I have, like, I usually have, like a gallon of water that will carry. I'll fill up and I'll drink it throughout the day and I like, I usually go in, and I'll set this stuff, my book bag on the ground. Usually, I throw the book bag up on the seat with my water and I'll set the book bag on the ground. I'll set the bottled water on the ground. Then I'll sit on the seat and then I'll go ok, and so whenever I left and I'm going and I get back, I'm logging off duty and everything. I'm getting all my stuff and I pick up my book bag and there's this, um, bubble wrap bag like that would hold like an electronic device. And I'm like, 'What? I've never seen this in my truck ever before,' right? And I've been in this truck, I'm basically leaving for the trip from my house. I'm in my truck, you know. It's nighttime. So I've never seen it before. And sitting on the floor of the truck, I pick it up, I'm looking at it like, 'What the heck,' and then, like, as I'm looking at the floor of the truck, I see what looks like ashes at first, and I'm like, 'What the heck?' I'm like, 'Why is there are all these ashes in my truck?' And I reached down, picked it up and it's plastic, and the piece I picked up it was like pigtailed like if someone took a drill and drilled into something and, uh, in plastic and the pigtail came out the That's why I picked up. And I'm like, 'what?' And so I'm looking around in the cab for, like, a drill, and I couldn't find anything. And then I looked like where my steering column is. I'm looking at my knee and I can see that, um, the plastic…so like you, underneath the steering wheel, the panel is like, pulled out a little bit. So, like I pulled on it and it just came almost like all the way out. And I noticed that some of the clips are broken, which it was never like that before and then like it. Really? I'm like, 'What the heck is going on here?' So I'm like, someone bugged my truck or something like that, like this is getting really crazy. Like I'm not trying to sound paranoid or anything like that. But it sounded really freaking crazy, like I never had this before. I have these plastic things in my cab, my truck when drove off by itself, apparently by you know when I was away from it and not like I have all this stuff. It's just, it's kind of like not adding it, isn't adding up. And then that day was the day that I'm unloading the trailer and look up and they have a camera in the trailer, the only camera in the yard, the only trailer with a camera on it. I have it and it's sitting. I'm sitting there looking at a camera.

Smith: Do you know what you where hauling that day, November 15th, 2020? Were they ballots?

Morgan: I don't think there's any ballots. I mean, if there was ballots and they hid him really well because…

Smith: That was the November 15th…

Morgan: I mean, yeah, but I mean, there was something they wanted to keep an eye on in that trailer?

Initials: _____

I APP. 177

Smith: Did you talk to anyone else regarding these concerns you have? Who else is aware that you talk to us about this? Besides your family members? Your brother? Obviously. Your mother...

Morgan: My mom. My stepdad. My brother Ben. My best friend, Mike.

Smith: No one at work?

Morgan: No, no one at work. No one at the post office. I have, I have these Republican people that keep messaging me and calling me, why they want me to come forward, apparently, somehow this Kurt Coca...

Smith: Ok. Is there anything we didn't talk about that you feel is relevant? That we missed?

Smith: Next time you go up to Bethpage, if you get the name of any one of these people, like Romeo's last name, that blonde girl's last name with Loader.

Morgan: I'll try to, but it's just, it's so weird. Like, because you've been that, I've been doing it so long like, yeah. Hey, what's your name? You know, like, hey...

Smith: Tell them you're doing Christmas cards.

Smith: Anything else we didn't cover, anything. We got it all.

Smith: Do you make the previous statement to be true and accurate to the best of your knowledge?

Morgan: Absolutely.

Initials: _____

Jesse R Morgan: _____
Date ___11/26/20_____

Dean Smith: _____
Date: __11-26-2020_____

Notary: _____
Date: _____

Sworn before me on: _____

## AFFIDAVIT OF ETHAN J. PEASE

## STATE OF WISCONSIN
## WAUKESHA COUNTY

Ethan J. Pease, being first duly sworn to oath, deposes and says as follows:

1. That I am an adult resident of the State of Wisconsin. That I am an individual who was hired through a temp agency, Strategic Resources, for employment at United Mailing Services (hereinafter referred to as "UMS") with an address of 3006 Progress Road, Madison, WI.

2. That I, began employment at UMS on August 26, 2020. That my job title was Route Driver and Box Truck Driver.

3. My duty was to pick up mail on a route and subsequently deliver said mail to UMS for sorting and metering. Once sorted and metered, I was to take the UMS sorted mail and deliver to the post office at 3902 Milwaukee Street, Madison, WI (hereinafter referred to as "USPS"). On one occasion when I was preparing my load for delivery, I realized I forgot to retrieve ballots for transportation. As a result, I was forced to backtrack and retrieve those ballots, in order to deliver the ballots to the post office. Following this event, I always made sure I had my ballots.

4. There came a time in approximately September or October of 2020 that I began to deliver mail-in ballots from UMS to the USPS as part of my evening delivery duties. I knew that this mail contained ballots, as the bins were marked, "ballots only". These bins would be put on a cart of mail labeled, "for ballots only."

5. On November 2, 2020 I recall only delivering one ballot in my bin to the USPS.

6. On November 3, 2020, I recall having no ballots in the bin for my evening run to the USPS.

7. On two separate occasions, two different employees spoke to me about ballots. Each stated that they had gathered up ballots from our partner companies, including the one that I work for. The first employee stated that the morning of November 4th, post office employees had been sent out to gather ballots. Later, the second

employee told me they had postmarked ballots that had been received on November 4th, to a postmark of November 3rd, in order to be able to turn those ballots into election officials.

8. On November 4, 2020 while in the course of my daily certified mail run delivery, I had a conversation with a senior post office employee of the USPS by the name of Montee.  Montee was known to be the lobby supervisor.  Montee is an African-American male, mid 40's, bald, and at least 6 foot tall.

9. I was asked by Montee on November 4, 2020, "did you forget any ballots the night before? An order came down from the Wisconsin/Illinois Chapter of the Postal Service that 100,000 ballots were missing." Montee further indicated that "our post office dispatched USPS employees looking for ballots, and only 7 or 8 ballots were found at UMS."

10. On November 4, 2020, Montee stated to me that the USPS dispatched employees "around 4 am" to collect forgotten ballots from their third-party partner companies in the area, including UMS.  Montee stated, that "7 or 8 ballots" were found at my work.  Montee stated that the "finding of the ballots came down as a direct order from the Wisconsin/Illinois postmaster."  Montee told me that someone had found ballots at UMS.  I knew this could not be true.  Based on my previous experience, I always double-checked to ensure I had obtained the ballots.

11.  At the time, I drove the final truck of mail to be delivered to USPS from UMS, all metered by UMS.  Montee asked, if I "had forgotten to bring ballots the previous night".  I replied, no, there were no ballots that I saw to take that night, and there was only one ballot to take the night before (Tuesday, November 2, 2020).  This entire conversation between Montee and I took place between 6:15 pm, and 6:50 pm on November 4th, in the lobby of the Milwaukee Street USPS location.

12. On November 5, 2020 I, in the course of my evening delivery to the USPS had a conversation with Rachel.  I stated to Rachel, "I'm not gonna get in trouble for those ballots the other night?"  Rachel replied, "No, you wouldn't.  As long as they were all postmarked for the 3rd. That's why they had us do that." I understood this to mean that the postal workers backdated the found ballots.

13.  I did not bring this to the attention of my supervisors because it appeared to be an anti-Trump atmosphere, due to comments I heard the week prior to November 3, 2020. I heard those same post office employees making jokes about taking mail in ballots for Trump and throwing them away.

Dated at Butler, Wisconsin this 28th day of November, 2020.

_Ethan Pease_

Ethan J. Pease

Subscribed and sworn to before me

This 28 day of _November_, 2020

_Larry Q. Warwick_

Notary Public, State of Wisconsin

My Commission expires 1/19/23

I APP. 182

STATE OF NEVADA

COUNTY OF CLARK

I, Ingmar Njus, declare as follows:

1.     I reside at 1455 Westwind Road, Las Vegas, Nevada 89146

2.     My education is: BS Secondary Education (Mathematics/Physics) University of Utah; MS (Physical Oceanography) United States Naval Postgraduate School, Monterey California; Graduated from United States Naval War College with Highest Distinction (Economics/Political Science)

3.     My professions have been:

(1) 27.5 years in the U. S. Navy (22.5 years as Commissioned Officer) – retired as Commander (O-5) October 1984.

(2) 25.5 years with the U. S. Postal Service. 2.5 years as a letter carrier, 23 years as Supervisor Customer Service in Delivery Operations. During the past 15 years had numerous intermittent details to the Nevada Sierra District, Carrier Route Inspection Teams. Retired March 31, 2020.

4.     Based on my experience I have personal knowledge of these aspects of the U.S. Postal System: mail processing and delivery at the Postal Station level and retail functions at the Station.

5.     First, I wish to give my opinions on the following events as presented to me by Jesse Morgan's affidavit.

I APP. 183

6.      In my opinion, postal truck driver Jesse Morgan's affidavit reveals a series of anomalies that completely break from his daily routine, which may reveal that postal workers realized that ballots arrived at the wrong place with the wrong driver and maybe at the wrong time.

7.      First, in my opinion, the following are many anomalies surrounding driver Jesse Morgan in October and November 2020:

1. Jesse was not allowed to immediately unload in Harrisburg
2. Jesse was forced to wait in the parking lot for 6 hours
3. A postal supervisor, who oversees a fleet of USPS vehicles, spoke to Jesse, an unusual occurrence for upper management to address a driver
4. The postal supervisor refused to provide a ticket verifying that Jesse was at Harrisburg
5. Jesse also asked for an overtime ticket and the postal supervisor refused
6. Jesse was told to go to Lancaster without unloading in Harrisburg
7. Jesse's trailer, which was assigned to him full time for weeks, is missing the next day
8. While unattended, Jesse's tractor showed 11 unauthorized movements on October 30
9. A camera and tracking equipment were surreptitiously installed in Jesse's truck on November 11

8.      This comparison chart reflects my opinion comparing Jesse's typical routine and the anomalies in October and November 2020:

| What should have happened | What actually happened |
| --- | --- |
| Jesse's trailer is immediately unloaded upon his arrival in Harrisburg | Jesse's trailer was not unloaded in Harrisburg |
| Jesse should have been quickly unloaded and able to proceed to Lancaster | Jesse was forced to wait in a parking lot for 6 hours without explanation |

| | |
|---|---|
| Jesse only exchanges pleasantries and small talk with low-level USPS employees | A transportation supervisor addressed Jesse when he complained about waiting so long |
| Jesse receives a ticket for unloading in Harrisburg | Jesse was not allowed to unload in Harrisburg, so he did not receive a ticket |
| Jesse receives a ticket for the extra time he spent waiting to unload | Jesse was refused a ticket because by the USPS supervisor when he requested it |
| Jesse unloads his trailer in Harrisburg before proceeding to Lancaster | Jesse was told to go to Lancaster without unloading in Harrisburg |
| Jesse offloads in Lancaster before parking his tractor-trailer at the end of his day | Jesse is told to leave his trailer without unloading it in Lancaster |
| Jesse leaves his trailer at the dock in Lancaster at the end of his shift and picks it up at the beginning of his next shift | Jesse's trailer was gone when he went to retrieve it for his next shift |
| Only Jesse drives his truck | The digital tracking system in Jesse's truck registered 11 unauthorized movements totaling about 25 miles on October 30 while Jesse was off-duty |
| Jesse's truck has no camera inside | Jesse detects that that someone entered his truck surreptitiously and installed both a camera and tracking equipment; plastic shavings and bubble wrap were left in the cab of his truck |

9.     Second, in my opinion, as it relates to post-dating absentee ballots, I can think of no reason that would happen in the U.S. Postal Service.

10.     Third, in my opinion, as it relates to destroying a Presidential candidate's campaign mailings instead of delivering them, I can think of no reason that would happen in the U.S. Postal Service.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Dated: DECEMBER 01, 2020

_Ingmar Njus_
Ingmar Njus

STATE OF ARIZONA

COUNTY OF MARICOPA

I, Leslie J. Brabandt, declare as follows:

1.     I reside at 966 E Melody Dr, Gilbert AZ 85234-2506.

2.     My education level is High School and some college.

3.     I retired from the USPS with 26 years of service. I was a letter carrier for 18 years. I also was a part time delivery and collections supervisor.  I transferred to the maintenance craft and worked at the Mesa Main Office for 8 years before retiring.

4.     I have personal knowledge of the delivery and collections aspect of the postal system.

5.     First, I wish to give my opinions on the following events as presented to me by Jesse Morgan's affidavit.

6.     It seems odd to me that Jesse Morgan was moving absentee ballots from New York to Pennsylvania.

7.     Normally absentee ballots for each state would be processed by the local Postal Delivery Center and delivered.

8.     And, mail is never left in a vehicle. Mail is NEVER delayed. The sanctity of the mail is MOST IMPORTANT.

9.     Only undeliverable bulk rate mail can be tossed.  All political mail is considered first class mail.

10.    First, in my opinion, the following are many anomalies surrounding driver Jesse Morgan in October and November 2020:

   1.   Jesse was not allowed to immediately unload in Harrisburg
   2.   Jesse was forced to wait in the parking lot for 6 hours
   3.   A postal supervisor, who oversees a fleet of USPS vehicles, spoke to Jesse, an unusual occurrence for upper management to address a driver

4. The postal supervisor refused to provide a ticket verifying that Jesse was at Harrisburg
5. Jesse also asked for an overtime ticket and the postal supervisor refused
6. Jesse was told to go to Lancaster without unloading in Harrisburg
7. Jesse's trailer, which was assigned to him full time for weeks, is missing the next day
8. While unattended, Jesse's tractor showed 11 unauthorized movements on October 30
9. A camera and tracking equipment were surreptitiously installed in Jesse's truck on November 11

11. This comparison chart reflects my opinion comparing Jesse's typical routine and the anomalies in October and November 2020:

| What should have happened | What actually happened |
|---|---|
| Jesse's trailer is immediately unloaded upon his arrival in Harrisburg | Jesse's trailer was not unloaded in Harrisburg |
| Jesse should have been quickly unloaded and able to proceed to Lancaster | Jesse was forced to wait in a parking lot for 6 hours without explanation |
| Jesse only exchanges pleasantries and small talk with low-level USPS employees | A transportation supervisor addressed Jesse when he complained about waiting so long |
| Jesse receives a ticket for unloading in Harrisburg | Jesse was not allowed to unload in Harrisburg, so he did not receive a ticket |
| Jesse receives a ticket for the extra time he spent waiting to unload | Jesse was refused a ticket because by the USPS supervisor when he requested it |
| Jesse unloads his trailer in Harrisburg before proceeding to Lancaster | Jesse was told to go to Lancaster without unloading in Harrisburg |
| Jesse offloads in Lancaster before parking his tractor-trailer at the end of his day | Jesse is told to leave his trailer without unloading it in Lancaster |
| Jesse leaves his trailer at the dock in Lancaster at the end of his shift and picks it | Jesse's trailer was gone when he went to |

| up at the beginning of his next shift | retrieve it for his next shift |
|---|---|
| Only Jesse drives his truck | The digital tracking system in Jesse's truck registered 11 unauthorized movements totaling about 25 miles on October 30 while Jesse was off-duty |
| Jesse's truck has no camera inside | Jesse detects that that someone entered his truck surreptitiously and installed both a camera and tracking equipment; plastic shavings and bubble wrap were left in the cab of his truck |

12.    Second, in my opinion, as it relates to post-dating absentee ballots, I can think of no reason that would happen in the U.S. Postal Service.

13.    Third, in my opinion, as it relates to destroying a Presidential candidate's campaign mailings instead of delivering them, I can think of no reason that would happen in the U.S. Postal Service.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Dated: _November 30  2020

Leslie J. Brabandt

STATE OF VIRGINIA

COUNTY OF FAIRFAX

I, Roland Smith , declare as follows:

1. I reside at 1350 Hunter Mill Road, Vienna, VA 22182

2. My education is through Freshman College with additional USPS provided accredited College Level Coursework in Technology, Analysis and Management

3. My 37+ year career in the Postal Service:

   a. First 7 yrs - Distribution Clerk, Maintenance Technician, Electronic Technician

   b. Next 15 yrs – Supervisor, MPE Maintenance, Postal Operations Specialist, Manager, Maintenance at increasingly larger facilities and higher levels of responsibility (Rockford, Madison, St. Paul GMF & St. Paul BMC

   c. Last 15 yrs – Switched to Operations and worked in Operations Analysis at increasingly higher levels of responsibility (Midwest Area, BMC Operations – HQ and Area Mail Processing – HQ

   d. Developmental and extended temporary assignments have included Manager, In-Plant Support – Detroit BMC, Manager, In-Plant Support – Dallas BMC and Lead Manager of Distribution Operations – Detroit BMC.

   e. Also have extensive team experience including: Operations Performance Reviews, Facility Reviews (Structure), Energy Performance Reviews, Inter-BMC Transportation Operation Studies, various Staffing Studies, new Mail

Processing Equipment development teams, new Operational Process flow studies, many Area Mail Processing Studies (read Consolidation Studies) and a Local Labor Negotiation Team.

f.   Drop Ship Coordinator during the peak Holiday Mailing Season, on-site at our Customer's plant – Swiss Colony, Monroe WI – for 3 yrs.

g.   Worked in 11 different offices across the country:

   i.   Royal Oak Main/SCF, Royal Oak Pioneer SCF/Annex, Saginaw SCF, Rockford SCF, Madison SCF, St.Paul GMF/SCF/P&DC, St. Paul/Mpls BMC – Eagan, Midwest Area HQ – St. Louis, Detroit BMC, Dallas BMC,  and USPS HQ – Wash DC

h.   Retired January 2010

4.   Based on my experience I have personal knowledge of these aspects of the U.S.

a.   Broad overview and understanding of end-to-end operations

b.   Detailed understanding of Facilities and its supporting technology.

c.   Good understanding of Mail Processing Operations with detailed knowledge in certain areas.

d.   Good understanding of Mail Processing Equipment with detailed knowledge in certain areas.

e.   General to good understanding of Transportation Operations with detailed knowledge in certain areas.

f.   It is now dated, but was very familiar with many reporting systems.

g.    It is now dated, but was highly skilled in data retrieval and analysis using many USPS Data Systems.

5. I wish to give my opinions on the following events as presented to me….

**<u>Trip from Lancaster, to Beth Page to Harrisburg and back to Lancaster:</u>**

Based upon Jesse Morgan's affidavit, other surrounding information and some individual research.

<u>In Summary, the Most Unusual Aspects of this narrative:</u>

1) That a USPS Facility in New York, would be sending processed and apparently completed ballots to Pennsylvania.

2) That Harrisburg as a USPS Processing Facility, would refuse to unload a trailer on an approved route to their facility. And then fail to properly ticket the trip.

<u>In more detail:</u>

1. In my opinion, postal truck driver Jesse Morgan's affidavit reveals a series of anomalies that completely break from his daily routine and standard USPS operating practices, which may reveal that postal workers realized that ballots arrived at the wrong place with the wrong driver and maybe at the wrong time.

2. In my opinion, there are several and more specific anomalies surrounding driver Jesse Morgan in October and November 2020:

1. Jesse was not allowed to immediately unload in Harrisburg

2. Jesse was told about contents of Registered Mail

3. Jesse was forced to wait in the parking lot for 6 hours, but was also slow to complain

3

I APP. 192

4.      A first line postal supervisor, who oversees USPS Transportation Operations, spoke to Jesse. In my experience, the Dock Supervisor would usually handle any disputes with a driver over such matters. Opening the trailer, checking it in, unloading and loading back out that trailer, is a Dock Operation, not a Transportation Operation. Yet the Dock Supervisor would seem to have no known part to play in this event. It is possible this may be handled differently in different facilities, however.

5.      The postal supervisor refused to provide a ticket verifying that Jesse was at Harrisburg

6.      Jesse also asked for an overtime ticket and the postal supervisor refused

7.      Jesse was told to go to Lancaster without unloading in Harrisburg

8.      Jesse's usual trailer, which had been regularly assigned to him for his trips for some time, was missing the next day. It was in good working order and there was no apparent reason for it to be taken out of rotation.

9.      While unattended, Jesse's tractor showed 11 unauthorized movements on October 30 – a week or so after the previous events. It was Halloween and mischief can happen during this Holiday. Still, it seems highly unusual.

10.    A camera and tracking equipment were surreptitiously installed in Jesse's truck on November 11. This does on the face of it, seem suspicious, given the previous events. But this is a private contractor's vehicle and not a USPS vehicle. Perhaps they have taken this action. Still, in light of previous events, it does seem unusual and suspicious.

3. This comparison chart reflects my opinion comparing Jesse's typical routine and the anomalies in October and November 2020:

| **What should have happened** | **What actually happened** |
|---|---|
| Jesse's trailer is immediately unloaded upon his arrival in Harrisburg | Jesse's trailer was not unloaded in Harrisburg |
| Jesse should have been quickly unloaded and able to proceed to Lancaster | Jesse was forced to wait at the dock unopened for 6 hours without explanation |
| Jesse only exchanges pleasantries and small talk with low-level USPS employees | A transportation supervisor addressed Jesse when he complained about waiting so long |
| Jesse receives a ticket for unloading in Harrisburg | Jesse was not allowed to unload in Harrisburg, so he did not receive a ticket |
| Jesse receives a ticket for the extra time he spent waiting to unload | Jesse was refused a Late Slip by the USPS supervisor when he requested it |
| Jesse unloads his trailer in Harrisburg before proceeding to Lancaster | Jesse was told to go to Lancaster without unloading in Harrisburg |
| Jesse leaves his trailer at the dock in Lancaster at the end of his shift and picks it up at the beginning of his next shift | Jesse's trailer was gone when he went to retrieve it for his next shift |

5

I APP. 194

| Only Jesse drives his truck/tractor (which is separate from the trailer) | The digital tracking system in Jesse's truck, registered 11 unauthorized movements totaling about 25 miles on October 30 while Jesse was off-duty |
|---|---|
| Jesse's truck has no camera inside | Jesse detects that someone entered his truck and apparently attempted to install surveillance gear, without his knowledge. Plastic shavings and bubble wrap were left in the cab of his truck and the bolster board (lower dash) had broken clips and was out of place. Jesse also was assigned to a trailer that had a camera in it while other trailers did not have them. |

4.  Finally, and based upon my 37+ years of experience with the U.S. Postal Service,

   a) I know of no circumstances where USPS Procedures would allow for the destruction of Mail of this type.

   b) I know of no circumstances where USPS Procedures would allow for the Post Dating of Postmarks.

As a supplement to this declaration, I am attaching a PowerPoint Story Board to illustrate my understanding of these events and the items I deemed to be strange or unusual.

   I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Dated: December 4, 2020

Roland F. Smith

# Beth Page – Harrisburg – Lancaster Story



I APP. 196

# Beth Page – Harrisburg – Lancaster Story

## Event Time-Line as Understood

➢ Driver Picks Load at Lancaster
- ➢ Location: Appears to be 1400 Harrisburg Pike
- ➢ Time: Oct 21 – just after midnight
- ➢ Trailer = 53'
- ➢ Load = 34% full, load for Beth Page

➢ Driver Unloads at Beth Page
- ➢ Location: Appears to be 288 Grumman Rd W

➢ Facility Loads Trailer at Beth Page
- ➢ 2 tall Gaylords (cardboard sleeves) at the nose for Lancaster – probably parcels off of parcel sorters. Driver couldn't see contents.
- ➢ 24 pcs of rolling stock – probably APCs/GPMCs based on description. Often used to transport processed letter trays.
- ➢ Loads out at 100%
- ➢ Clerk says 'Guess what? You got mail-in ballots today,'
- ➢ Driver saw load, noticed handwritten return addresses in corner of mail pieces, assumed they were executed ballots
- ➢ Registered mail also loaded  - single piece or small container.
- ➢ **Strange & Unusual:** 1) Executed Ballots for PA originate in NY (Very, very strange),  2) If Dest Phila, should have dropped in Phila on the way. 3) That Return Addresses and other markings would have been visible to driver. Trays may have been unsleeved. 4) That driver would be told contents of Registered mail. Usual kept secret.

Lancaster

Beth Page

Harrisburg

USPS Team



➢ Drives 210 – 250 miles to Harrisburg
- ➢ Note: Southern Route is fastest time-wise & very close to Phila (Ctrl-Click for map)
- ➢ Transit time estimate btwn 4 – 5 hrs
- ➢ Would likely hit scale coming into PA

APP. 197

# Beth Page – Harrisburg Routes



Click to Go Back

I APP. 198

# Beth Page – Harrisburg – Lancaster Story

## Event Time-Line as Understood



➤ Driver Arrives Harrisburg P&DC
  ➤ Time: Around 9:15am
  ➤ Driver brings-up Trailer to Dock Door
  ➤ Harrisburg dock does not even open trailer
  ➤ After 6 hours, Driver presses the issue beyond local dock personnel. Supv of Transportation from Harrisburg P&DC tells him to leave and go on to Lancaster.
  ➤ Trailer is never opened at Harrisburg
  ➤ Driver contacts his supervisor. Supervisor tells him to leave and go on to Lancaster (next stop)
  ➤ Driver leaves with full-load trailer with Harrisburg Mail on it, drives to Lancaster
  ➤ **// Strange & Unusual:** 1) Harrisburg Dock did not unload trailer. That's huge! 2) Driver waited 6 hrs before getting insistent. Contract drivers can turn into Cage Fighters if you don't start the unload right away once at the door, or take too long to unload, espec when they have another stop to hit before they are done. Unusual that he would wait this long to take action. Relatively new with company may contribute to this. 3) Supv Trans telling the Driver to leave with Harrisburg Mail still onboard is way out of character. Further, where was Dock Supv (Mail Processing) in all of this. It was their responsibility to unload. 4) Moving full-load trailer of nearly all Harrisburg Mail to Lancaster defies logic.



USPS Team

I APP. 199

# Beth Page – Harrisburg – Lancaster Story

## Event Time-Line as Understood

➢ Driver Arrives at Lancaster Unit
- ➢ Time: Unknown
- ➢ Driver brings up trailer to door, unhooks and leaves
- ➢ Driver returns next day to Lancaster to pickup trailer for next run and discovers trailer no longer there
- ➢ Trailer absence persists
- ➢ About a month later, notices his usual trailer being used in the yard at Beth Page

**// Strange & Unusual:** 1) That driver's usual trailer would not be available or even in the yard of his head-out office.

➢ Other Issues – a week and more later
- ➢ On Halloween, tractor is apparently entered and 11 start attempts are recorded.
- ➢ Approx 25 miles were added to the odometer during these events
- ➢ Apparent attempt to install surveillance gear in the tractor cab. Drill shavings, loosened bolster panel in dash with broken clips. Assigned trailer with camera.

**/ Strange & Unusual:** 1) These events by themselves seem strange and unusual – even suspicious. Given the evidence I have, I could only speculate as to any connection they may have with the events of Oct 21 at this time. This tractor was not USPS owned and instead, owned by contractor.





USPS Team

I APP. 200

# Wisconsin Voter Registration Application

Please complete legibly
Additional instructions on reverse

Please return your completed form to your municipal clerk

| | | |
|---|---|---|
| **Qualifications** <br><br> please check each box if **YOU**: | **1** | If you cannot check **every** box, do **NOT** complete this form <br><br> ☐ Are a citizen of the United States      ☐ Will be at least 18 years old on or before Election Day <br><br> ☐ Have resided at the address provided below for at least 28 consecutive days prior to the election and do not currently intend to move      ☐ Are not currently serving a sentence including incarceration, parole, probation, or extended supervision for a felony conviction |
| **Your Name** | **2** | Last _____ Suffix (Jr., II, etc.) _____ <br><br> First _____ Middle _____ |
| **About You** <br><br> phone number and email are **optional** | **3** | Date of Birth (MM/DD/YYYY) ___/___/___ <br><br> Phone Number ( ___ ) _____ <br><br> Email Address _____ |
| **The Address Where You Live** <br><br> your residential voting address, **which cannot be a P.O. Box** <br><br> if you do not have a street address, please use the map on the back of this form | **4** | Street Address _____ Apt/Room # _____ <br><br> City/Town/Village of _____ WI Zip _____ <br><br> Mailing Municipality (if different) _____ <br><br> Are you military or permanent overseas voter? ☐ Military ☐ Permanent Overseas |
| **Your Mailing Address** <br><br> if different from above | **5** | Street Address (or P.O. Box) _____ <br><br> City/State/Country/Zip _____ |
| **Prior Registration Information** <br><br> complete this field if you are updating your registration due to a change in name or address | **6** | Full Name on Previous Registration _____ <br><br> Full Address on Previous Registration (if known) _____ |
| **Identification** <br><br> (check the box that applies to you) <br><br> WI Driver License or ID number required if unexpired and valid. SSN required if DL/ID not valid or never issued | **7** | ☐ I have an unexpired and valid WI Driver License or WI DOT issued ID. Provide number and expiration date below <br><br> _ _ _ _ - _ _ _ _ - _ _ _ _    Expiration Date ___/___/___ <br><br> ☐ I do not have a valid WI Driver License or WI DOT issued ID <br>      Provide the last four digits of your Social Security Number    XXX-XX- _ _ _ _ <br><br> ☐ I have neither a valid WI Driver License/ID nor a Social Security Number (see back for more information and next steps) |
| **Proof of Residence** <br><br> military and permanent overseas voters are <u>not</u> required to provide proof of residence | **8** | ☐ Voters must provide a proof of residence document when registering to vote. Please check this box to affirm that you are providing a copy of a valid form of proof of residence with this application <br><br> Examples include: a copy of a valid and unexpired Wisconsin Driver License or ID Card, a utility bill, a paycheck/pay stub, or correspondence from a unit of government (see back of application for additional information and examples) |
| **Signature and Certification** | **9** | By signing below, I hereby certify that, to the best of my knowledge, **I am a qualified elector**, having resided at the above residential address for at least 28 consecutive days immediately preceding this election, that I have no present intent to move, and I have not voted in this election. I also certify that I am not otherwise disqualified from voting and that all statements on this form are true and correct. If I have provided false information, I may be subject to fine or imprisonment under State and Federal laws <br><br> X _____ <br> Voter Signature      Today's Date ___/___/___ |

Falsification of information on this form is punishable under Wisconsin law as a Class I felony

| | | |
|---|---|---|
| **Assistant** <br><br> if someone assisted you by signing this form, they must complete this section | **10** | X _____ <br> Assistant Signature      Assistant Address |

**This Section for Official Use Only**

| Proof of Residence Type | WI DL | WI ID | UTIL | BANK/CC | PYCK | STDNT ID | GOV DOC | LSE | GOV ID | EMPL ID | RES CARE | TAX | HMLSS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Proof of Residence Issuing Entity | Proof of Residence # | Date Complete/POR Received | Election Day Voter Number |
|---|---|---|---|
| | | ___/___/___ | |

WisVote ID # _____    ☐ Submitted by Mail

Confidential Elector ID # _____

X _____ <br> Official's Signature

| Ward | Sch. District | Alder | Cty. Supr. | Ct. Of App. | Assembly | Senate | Congress |
|---|---|---|---|---|---|---|---|

EL-131 (REV 2020-06)

I APP 201

Exhibit 1

| 1 | • If you did not check every box in this section, you are not eligible to vote in Wisconsin. **Do not complete this form.** |
|---|---|
| 2 | • Provide your current and complete name.  Please provide your name as it appears on your WI driver license or state-issued ID card (Box 7), if applicable, and the proof of residence document you provided in Box 8. |
| 3 | • Provide your month, day, and year of birth.<br>• Providing your phone number and/or email address is optional and is subject to open records requests.  This information may be used by your municipal clerk to contact you about your voter record or absentee ballot request. |
| 4 | • Provide your home address (legal voting residence) in Wisconsin.<br>• Provide your full street name, including the type (St, Ave, etc.) and any pre- and/or post-directional (N, S, etc.).<br>• <u>You may not enter a PO Box as a residential address.</u>  A rural route box without a number should not be used.<br>• A "military elector" is a person, or the spouse or dependent of a person who is a member of a uniformed service or merchant marine, a civilian officially attached to a uniformed service and serving outside the United States, or a Peace Corp volunteer.  Military electors are not required to register as a prerequisite to voting at any election.<br>• A "permanent overseas elector" is a US citizen, at least 18 years old, who does not qualify as a resident of this state, but who either last lived in this state, or whose parent last lived in this state immediately prior to the parent's departure from the United States, and who is not registered to vote in any other state. |

| | If you do not have a street number or address, please use this map to show where you live.<br>If you are a homeless voter and are registering to vote, please also provide a letter from an organization that provides services to the homeless that:<br>• Lists your name<br>• Describes the location designated as your residence for voting purposes | Example   N↑   • Library <br> Marmoset Drive <br> High School  •  X | N↑ |
|---|---|---|---|

| 5 | • If your mailing address is different from your home address, provide it here.  A PO Box is acceptable as a mailing address.<br>• Overseas electors should provide their complete overseas address here. |
|---|---|
| 6 | • Provide full previous name if changed and/or previous address if you have been registered to vote anywhere in the U.S. |
| 7 | • <u>If you have a valid and unexpired WI driver license or WI DOT ID</u>: provide that number.  If you do not know your number, please call (608) 266-2353 to get it.<br>• <u>If you have an expired, canceled, suspended, or revoked WI driver license or WI DOT ID</u>: you **must** provide the last four digits of your Social Security number.  In addition, you may also provide the number on your license or ID (optional).<br>• <u>If you have never been issued a WI driver license or WI DOT ID</u>: provide the last four digits of your Social Security number.<br>• <u>If you do not have a WI driver license or WI DOT ID nor a Social Security Number</u>: please check the appropriate box.<br><br>If you are registering to vote on Election Day and have been issued a WI driver license or ID, but are unable or unwilling to provide the number, your vote will not be counted unless you provide the number to the election inspectors by 8:00 p.m. on Election Day or to your municipal clerk by 4:00 p.m. the Friday following Election Day. |
| 8 | **All proof of residence documents must contain voter's current name and address.**<br>• A WI Driver License/ID Card, if not expired or canceled; may be used even if driving privileges have been revoked<br>• Any other official identification card or license issued by a Wisconsin governmental body or unit<br>• An employee ID card with a photograph, but not a business card<br>• A real property tax bill or receipt for the current year or the year preceding the date of the election<br>• A residential lease (does not count as proof of residence if elector submits form by mail)<br>• A picture ID from a university, college or technical college coupled with a fee receipt or an on-campus housing listing provided by the university, college or technical college<br>• A utility bill for the period commencing not earlier than 90 days before the day registration is made<br>• (Homeless voters only) A letter from an organization that provides services to the homeless that identifies the voter and describes the location designated as the person's residence for voting purposes<br>• A contract/intake document prepared by a residential care facility indicating that the occupant resides in the facility<br>• A bank/credit card statement<br>• A paycheck or pay stub<br>• A check or other document issued by a unit of government     **Proof of residence documents may be provided in an electronic format.** |
| 10 | **Assistant:** If you are unable to sign this form due to a physical disability, you may have an assistant do so on your behalf.  That assistant must provide his or her signature and address in the space provided.  By signing, the assistant certifies that he or she signed the form at your request. |

| Do you need any accommodations at your polling place (e.g., curbside voting)?  If so, please describe: | ☐ Please check if interested in being an Election Worker |
|---|---|

APP 202

Exhibit 1

# Wisconsin Application for Absentee Ballot

(Municipal Clerk) If in-person voter, check here: ☐

## Absentee ballots may also be requested at MyVote.wi.gov

| Confidential Elector ID# *(HINDI - sequential #) (Official Use Only)* | | WisVote ID # (Official Use Only) | | Ward No. |
|---|---|---|---|---|

**Instructions**

**Detailed instructions for completion are on the back of this form. Return this form to your municipal clerk when completed.**

- You must be registered to vote before you can receive an absentee ballot. You can confirm your voter registration at https://myvote.wi.gov

⚠️ **PHOTO ID REQUIRED**, unless you qualify for an exception. See instructions on back for exceptions.

## VOTER INFORMATION

**1** | Municipality ○ Town ○ Village ○ City | County

**2**
| Last Name | | First Name | |
| Middle Name | Suffix (e.g. Jr, II, etc.) | Date of Birth (MM/DD/YYYY) | |
| Phone | Fax | Email | |

**3**
| Residence Address: Street Number & Name | |
| Apt. Number | City | State & ZIP |

**4** | Fill in the appropriate circle – if applicable (see instructions for definitions): ○ Military ○ Permanent Overseas ○ Temporary Overseas

## I PREFER TO RECEIVE MY ABSENTEE BALLOT BY:

(Ballot will be mailed to the address above if no preference is indicated. Absentee ballots may not be forwarded.)

**5**

| ○ MAIL | Mailing Address: Street Number & Name | |
| ○ VOTE IN CLERK'S OFFICE | Apt. Number | City | State & ZIP |
| | Care Facility Name (if applicable) | |
| | C / O (if applicable) | |
| ○ FAX | Fax Number | *For Military and Overseas Voters Only* | Voter must have a computer and printer when receiving a ballot by fax or email. Voted ballots must be returned by mail. |
| ○ EMAIL | Email Address | *For Military and Overseas Voters Only* | |

## I REQUEST AN ABSENTEE BALLOT BE SENT TO ME FOR: (mark only one)

**6**

○ The election(s) on the following date(s): _____

○ All elections from today's date through the end of the current calendar year (ending 12/31).

○ **For indefinitely-confined voters only: I certify that I am indefinitely confined** because of age, illness, infirmity or disability and request absentee ballots be sent to me automatically until I am no longer confined, or I fail to return a ballot. *Anyone who makes false statements in order to obtain an absentee ballot may be fined not more than $1,000 or imprisoned not more than 6 months or both.* Wis. Stats. §§ 12.13(3)(i), 12.60(1)(b).

## TEMPORARILY HOSPITALIZED VOTERS ONLY (please fill in circle)

**7**

○ I certify that I cannot appear at the polling place on election day because I am hospitalized, and appoint the following person to serve as my agent, pursuant to Wis. Stat. § 6.86(3).

| Agent Last Name | Agent First Name | Agent Middle Name |

**AGENT:** I certify that I am the duly appointed agent of the hospitalized absentee elector, that the absentee ballot to be received by me is received solely for the benefit of the above named hospitalized elector, and that such ballot will be promptly transmitted by me to that elector and then returned to the municipal clerk or the proper polling place.

| Agent Signature X | Agent Address |

## ASSISTANT DECLARATION / CERTIFICATION (if required)

I certify that the application is made on request and by authorization of the named elector, who is unable to sign the application due to physical disability.

| Agent Signature X | Today's Date |

## VOTER DECLARATION / CERTIFICATION (required for all voters)

I certify that I am a qualified elector, a U.S. Citizen, at least 18 years old, having resided at the above residential address for at least 28 consecutive days immediately preceding this election, not currently serving a sentence including probation or parole for a felony conviction, and not otherwise disqualified from voting. **Please sign below to acknowledge that you have read and understand the above.**

| Voter Signature X | Today's Date |

APP 203

Exhibit 2

# Wisconsin Application for Absentee Ballot Instructions

**General Instructions:** This form should be submitted to your municipal clerk, unless directed otherwise.
- This form should only be completed by registered voters; if you are not a registered voter or military elector, please submit a Voter Registration Application (EL-131) with this form.

**Photo ID requirement:** If you will receive your absentee ballot by mail, and have not previously provided a copy of acceptable photo ID with a prior by-mail absentee ballot request, a copy of photo ID must accompany this application. You may submit your application and a copy of your ID by mail, fax or email. In-person voters must always show acceptable photo ID.

**The following documents are acceptable Photo ID** (For specific information regarding expired documents visit http://bringit.wi.gov.)

| | |
|---|---|
| State of WI driver license or ID card | Certificate of Naturalization |
| Military ID card issued by a U.S. uniformed service | WI DOT DL or ID card receipt |
| Photo ID issued by the federal Dept. of Veterans Affairs | Citation/Notice to revoke or suspend WI DL |
| University, college or tech college ID and enrollment verification | ID card issued by federally recognized WI tribe |
| U.S. passport booklet or card | |

**In lieu of photo ID,** the voters listed below may satisfy the voter ID requirement by the following means:
- Electors who are indefinitely confined (see Section 6) – the signature of a witness on the Absentee Certificate Envelope.
- Electors residing in care facilities served by Special Voting Deputies – the signatures of both people on the envelope.
- Electors residing in care facilities not served by Special Voting Deputies – the signature of an authorized representative of the facility. If the elector is also indefinitely confined, the elector does not need a representative of the facility to sign.
- Military, Permanent Overseas and Confidential Electors – Exempt from the photo ID requirement.

| | |
|---|---|
| **1** | • Indicate the municipality and county of residence. Use the municipality's formal name (for example: City of Ashland, Village of Greendale, or Town of Albion). |
| **2** | • Provide your name as you are registered to vote in Wisconsin. If applicable, please provide your suffix (Jr, Sr, etc.) and/or middle name. If your current name is different than how you are registered to vote, please submit a Voter Registration Application (EL-131) with this form to update your information.<br>• Provide your month, day and year of birth. Remember to use your birth year, not the current year. |
| **3** | • Provide your home address (legal voting residence) with full house number (including fractions, if any).<br>• Provide your full street name, including the type (eg., Ave.) and any pre– and/or post-directional (N, S, etc.).<br>• Provide the city name and ZIP code as it will appear on mail delivered to the home address.<br>• You may not enter a PO Box as a voting residence. A rural route box without a number may not be used. |
| **4** | • A "Military elector" is a person, or the spouse or dependent of a person who is a member of a uniformed service or the merchant marines, a civilian employee of the United States, a civilian officially attached to a uniformed service and serving outside the United States, or a Peace Corp volunteer. Military electors do not need to register to vote.<br>• A "Permanent Overseas elector" is a person who is a United States citizen, 18 years old or older, who resided in Wisconsin immediately prior to leaving the United States, who is now living outside the United States and has no present intent to return, who is not registered in any other location, or who is an adult child of a United States citizen who resided in this state prior to establishing residency abroad. Permanent Overseas electors will receive ballots for federal offices only and must be registered to vote prior to receiving a ballot.<br>• A "Temporary Overseas elector" is a person who is a United States citizen, 18 years of age or older, a resident of Wisconsin and is overseas for a temporary purpose and intends to return to their Wisconsin residence. |
| **5** | • Fill in the circle to indicate your preferred method of receiving your absentee ballot.<br>• Military and Permanent Overseas voters may request and access their ballot directly at https://myvote.wi.gov.<br>• If no preference is indicated, your absentee ballot will be mailed to your residence address listed in Box 3.<br>• You are encouraged to provide a physical mailing address as backup in case of electronic transmission difficulties. Please only fill the circle for your preferred means of transmission.<br>• If you are living in a care facility, please provide the name of the facility.<br>• If someone will be receiving the ballot on your behalf, please list them after C/O. Please note: The absentee elector is still required to vote their own ballot, although they may request assistance in physically marking the ballot. |
| **6** | • Select the first option if you would like to receive a ballot for a single election or a specific set of elections.<br>• Select the second option if you would like to have a standing absentee request for any and all elections that may occur in a calendar year (ending December 31).<br>• Select the third option **only if you are indefinitely confined due to age, illness, infirmity or disability** and wish to request absentee ballots for all elections until you are no longer confined or fail to return a ballot for an election. |
| **7** | • This section is only to be completed by an elector or the agent of an elector who is currently hospitalized.<br>• An agent completing this form for a hospitalized elector must provide his/her name, signature and address on this application. |

| **Assistant Signature:** | In the situation where the elector is unable to sign the Voter Declaration / Certification due to a physical disability, the elector may authorize another elector to sign on his or her behalf. Any elector signing an application on another elector's behalf shall attest to a statement that the application is made on request and by authorization of the named elector, who is unable to sign due to physical disability. |
|---|---|
| **Voter Signature:** | By signing and dating this form, you certify that you are a qualified elector, a U.S. citizen, at least 18 years old, having resided at your residential address for at least 28 consecutive days immediately preceding this election, not currently serving a sentence including probation or parole for a felony conviction, and not otherwise disqualified from voting. |

I APP. 204

Exhibit 2

## OFFICIAL ABSENTEE BALLOT APPLICATION/CERTIFICATION

*(Official Use Only) The voter has met or is exempt from the photo ID requirement.  Municipal or Deputy Clerk initial here: _____*

**Note:** *With certain exceptions, an elector who mails or personally delivers an absentee ballot to the municipal clerk at an election is not permitted to vote in person at the same election on Election Day. Wis. Stat. §6.86(6).*

**Voter:  Please complete steps** **1** **through** **5** **below, in the presence of your witness.**

**1**   Place your voted ballot inside the envelope and seal it.  Do not use tape or glue.

**2**   **Complete the section below if not completed by the clerk.**
**Provide your VOTING address.**

| Date of Election (month, day, year) | County |
|---|---|
| | |

**Municipality (check type and list name)**   Town ☐    Village ☐    City ☐   **of**

**Voter's Name** (Last, First, Middle) including suffix  *(Please print legibly)*

**Street Address**–Provide house number and street name or fire number and street name.  **OR**

If your rural address does not include a house number/fire number and street name, provide rural route number and  box no.

| City | WI | Zip Code |
|---|---|---|
| | | |

| *Official use only:* | Ward # | District (if applicable) | Voted in clerk's office ☐ |
|---|---|---|---|

**3**   **Sign and date this section.**

### CERTIFICATION OF VOTER *(Required)*

I certify, subject to the penalties for false statements of Wis. Stat. § 12.60(1)(b), that I am a resident of the ward of the municipality in the county of the state of Wisconsin indicated hereon, and am entitled to vote in the ward at the election indicated hereon; that I am not voting at any other location in this election; that I am unable or unwilling to appear at the polling place in the ward on election day, or I have changed my residence within the state from one ward to another later than 28 days before the election. I certify that I exhibited the enclosed ballot, unmarked, to the witness, that I then in the presence of the witness and in the presence of no other person marked the ballot and enclosed and sealed the ballot in this envelope in a manner that no one but myself and any person providing assistance under Wis. Stat. § 6.87(5), if I requested assistance, could know how I voted.  I further certify that I requested this ballot.

X _____   _____/_____/_____

    ▲ **Signature of Voter** ▲ *(All voters must sign.)*     **Today's Date**

**REQUIRED OF MILITARY AND OVERSEAS VOTER ONLY:**  I further certify my birth date is:
_____/_____/_____

**4**   **Have your witness sign and write their address below.**

### CERTIFICATION OF WITNESS *(signature and address of witness are required)*

I, the undersigned witness, subject to the penalties for false statements of Wis. Stat. § 12.60(1)(b), certify that I am an adult U.S. Citizen and that the above statements are true and the voting procedure was executed as stated. I am not a candidate for any office on the enclosed ballot (except in the case of an incumbent municipal clerk). I did not solicit or advise the voter to vote for or against any candidate or measure. I further certify that the name and address of the voter is correct as shown.

1. _____

    ▲ **Signature of ONE adult U.S. citizen witness**▲

2. _____

    ▲ *If witnesses are Special Voting Deputies, **both** must sign.* ▲

    ▼ **Address of witness or addresses of both SVDs** ▼

1. _____

2. _____

Provide house number and street name or fire number and street name, city, state and zip code.  **OR**
If your rural address does not include a house number/fire number and street name, provide rural route number and box number, city, state and zip code.

### CERTIFICATION OF ASSISTANT  *(if applicable)* - assistant may also be witness

I certify that the voter named on this certificate is unable to sign his/her name or make his/her mark due to a physical disability and that I signed the voter's name at the direction and request of the voter.

X _____

    ▲ **Signature of Assistant** ▲

**5**   **Mail back your ballot.  Allow 4-5 days for delivery to ensure your ballot is received by Election Day.  Ballots received after Election Day will NOT be counted.**

**EL-122** Absentee Certificate Envelope | (rev. 2020-08)

I APP. 205

Exhibit 3

**FROM**:

_____

**Name of Municipal Clerk**

_____

Name of Municipality (example: "Town of Smith")

_____

County, **WISCONSIN**

_____    _____    _____
Signature of Municipal Clerk          Date        Time of delivery to polling place
                                                   (indicate a.m. or p.m.)

> THIS ENVELOPE CONTAINS THE BALLOTS OF ABSENTEE ELECTORS AND MUST BE OPENED IN THE SAME ROOM WHERE VOTES ARE BEING CAST AT THE POLLS DURING POLLING HOURS ON ELECTION DAY OR,IN MUNICIPALITIES WHERE ABSENTEE BALLOTS ARE CANVASSED UNDER §.7.52, STATS., AT A MEETING OF THE MUNICIPAL BOARD OF ABSENTEE BALLOT CANVASSERS UNDER §.7.52, STATS.

**TO**:
**Chief Inspector** _____    _____    _____
                    (signature of chief inspector receiving absentee ballots   Date   Time ballots received at
                                                                                       polling place (indicate
                                                                                       a.m or p.m.)

_____, Wisconsin

Name of Municipality

_____

Name of Polling Place

_____

Address of Polling Place

Wards _____, Aldermanic District(s) _____

EL-125 | Rev 2008-08 | Wisconsin Elections Commission, P.O. Box 7984, Madison, WI 53707-7984
     608-266-8005 | web: elections.wi.gov | mail: elections@wi.gov

This certificate should be attached to any container which is used to transport absentee certificate envelopes to the polling place. The certificate may be made in the form of an envelope, or the certificate may be affixed to another container, such as a box, which may used to transport absentee certificate envelopes to the polling place.

I APP. 206

Exhibit 4

LISTEN LIVE       SEARCH       MENU       DONATE

CHICAGO'S [n p r] NEWS SOURCE

Politics

# 'Not Plan A': Charities Are Stepping Up To Pay For 2020 Elections

By Nicholas Riccardi/Associated Press

Sept. 18, 6 a.m. CT



After Congress failed to approve funding to help election officials adjust to an expected avalanche of mail ballots, philanthropy is stepping in. J. Scott Applewhite / Associated Press





After Congress failed to approve funding to help election officials adjust to an expected avalanche of mail ballots, philanthropy is stepping in. J. Scott Applewhite / Associated Press

Politics

# 'Not Plan A': Charities Are Stepping Up To Pay For 2020 Elections

By Nicholas Riccardi/Associated Press
Sept. 18, 6 a.m. CT

As Congress balks, well-funded nonprofits are donating hundreds of millions of dollars to help state and local officials run elections during the pandemic — a sudden infusion of private cash in what was once considered a core government function.

Facebook founder Mark Zuckerberg and his wife, Priscilla Chan, earlier this month announced they will donate $300 million to two nonpartisan nonprofits. The groups, the Center for Tech and Civic Life and Center for Election Innovation and Research, will funnel the money to local officials working "to ensure that everyone can vote and every vote can be counted," Zuckerberg said in announcing

  

Exhibit 5

The Center for Tech and Civic Life had already doled out more than $20 million from other donors — money that allowed the city of Philadelphia to double its election budget and quadruple its mail-ballot-processing capacity. In Milwaukee, its contribution is helping recruit as many as 1,000 new poll workers. In Fulton County, Georgia, the cash will help keep open more polling places after a June primary plagued by last-minute closures of polling places.

The nonprofits' involvement was welcomed by election officials who have been pleading with state and federal lawmakers for help paying for a raft of new equipment, protective gear and staff needed to adjust for the surge of mail-in voting expected this year. Congress sent money in March, largely to assist with primary elections. Republicans have blocked Democratic attempts to allocate more.

The direct infusion of millions of dollars marks a new level in private funding for a core public responsibility. The cash comes with a new set of questions about donor transparency, motivations and the influence of groups and figures that are not democratically accountable.



Sign up for The Rundown and be entered to win a Chicago mask.

Your email

SIGN ME UP!    NOT NOW

"This is not Plan A," said David Becker, head of the Center for Election Innovation and Research, which received $50 million from Zuckerberg and Chan. However, Becker said his group, which until this year normally raised about a million dollars a year, was trying to respond to what he considered an emergency caused by the pandemic.

With the election nearing, "failure is not an option," he said.

Charitable institutions have long played supportive roles in elections by

 

activity has picked up dramatically. Companies like Microsoft and Target have announced they'll give paid leave to employees who work the polls. Basketball teams have promised to turn sports arenas into polling centers at no cost.

But the amount of money and direct payments to public agencies that run elections mark a dramatic new level of mobilization. Election advocates say it was necessitated by Congress' failure to step in.

The CARES Act, passed in late March, allocated $400 million to election agencies to help update voting systems. The Brennan Center for Justice, a voting rights advocacy group, estimated it could cost $4 billion to prepare the election offices across the country.

SUPPORT FOR WBEZ COMES FROM

AND YOUR MEMBERSHIP

House Democrats in May approved a second coronavirus relief bill that included an additional $3.6 billion, but Senate Republicans didn't act on the measure. Instead, last week they proposed their own "skinny" bill that did not have any election money and that did not pass the Senate.

"Congress allocated $60 billion to the airlines and only $400 million to thousands of election offices across 50 states," said Amber McReynolds, whose nonprofit Vote from Home hopes to begin distributing small grants to help local offices pay for ballot drop boxes and electronic tracking of mail ballots.

The Chicago-based Center for Tech and Civic Life began doling out grants this summer. The organization was founded in 2012 by former staffers at the




bipartisan — its board includes Pam Anderson, a Republican former election administrator in suburban Denver. The group says its stated mission is using technology to modernize voting.

Federal records show it has typically raised about $1 million annually before this year. But donations have been flowing in as concern mounts over the ability of election officials to handle November. The Center gave $6.2 million to Wisconsin's five largest cities, $10 million to Philadelphia, and $6 million to Fulton County, which includes Atlanta. Zuckerberg and Chan then contributed an additional $250 million.

The CTCL declined to disclose its other donors for the year or itemize all its contributions to local offices.

The group says the money will go toward recruiting poll workers and implementing drive-up voting sites, while the money to the CEIR, the second, unrelated nonprofit, will go to public information campaigns explaining mail balloting procedures and logistics on pandemic voting.

Anderson, who is also on the board of CEIR, said nobody thinks the situation is ideal. "I hope it leads to a broader conversation about funding election administration — if we want it, let's fund it," she said.

Becker, who expects to have his share of the grant distributed as soon as the end of the month, said the money will be critical in ensuring the public has confidence in the election. But, he noted, it comes too late for most election offices to make major changes, like buying expensive mail-sorting machines or updating voting systems.

"What they could have done with billions in June is very different than what they can do now," Becker said. "Running an efficient election should be something government invests in."

The donation from Zuckerberg, who made his fortune creating a social media behemoth that is a center of false claims about the election and voting, has frustrated some who see it as a bid for good public relations.

 

the world, a donation in the final weeks of the election is too little, too late," said Tara McGowan, a Democratic digital strategist.

Conservatives note the Democratic origins of CTCL and that its donations have predominantly been in areas where Democrats depend on votes. The group has announced an upcoming series of grants to rural areas but hasn't provided specifics.

"I cannot believe people of such partisanship will put their partisanship aside while taking hundreds of millions of dollars and distributing it to election offices," said Scott Walter, head of the conservative Capital Research Center, which monitors nonprofits.

Still, Walter acknowledged, conservative-leaning nonprofits — and the GOP Senate — have not stepped in to help elections officials.

"Honestly, I wish the right would do it, not only so the election would be more balanced but so we could have an honest debate about whether [charities] should do this," Walter said.

Wearing a mask protects you from the virus, The Rundown newsletter protects you from misinformation.

**Sign up and get a chance to win a mask.**

Your email

SIGN ME UP!    NOT NOW

Top stories ——————————————————————————————

**CUB's 'Conflict': How A Utility Watchdog Got Millions From The Utilities It Watches**

   

**Washington Politics Could Be About To Enter A 'Post-Apocalyptic' Phase**

**After A Brutal Summer, Restaurants Worry About How Much Worse The Winter Will Be**

**Here's Why Chicagoland's Chinese Residents Are Anxious About The WeChat Ban**

**ABOUT US**

Careers

Staff

Contact Us

The Sounding Board

Radio Schedule

Board of Directors

Public & Financial Documents

**CONNECT**

Sign Up for our Newsletter

Volunteer

Events Calendar

Wait Wait … Don't Tell Me! Tickets





**SUPPORT**

Donate

Join our Giving Circles

Donate Your Car

Gifts of Securities

Planned Giving

Matching Gifts

Become a Sponsor

Manage Your Membership Account

© 2020 Chicago Public Media Inc.          Privacy Policy          Terms of Use          FCC Public Filing Info

Notice of FCC Applications

  

APP. 214

Exhibit 5

Wisconsin Voter Fraud 09.24.19

# DA Tracker - 2010 GENERAL ELECTION

| County | Stage | Date Notice Sent | DA REPORT | Status |
|--------|-------|------------------|-----------|--------|
| ASHLAND - 02 | 5 – Referred to DA | 11/20/2014 | | |
| BROWN - 05 | 5 – Referred to DA | 10/9/2014 | | |
| RACINE - 52 | 5 – Referred to DA | 11/20/2014 | | |
| RACINE - 52 | 5 – Referred to DA | 11/20/2014 | | |
| WAUKESHA - 68 | 5 – Referred to DA | 11/20/2014 | | |

# DA Tracker - 2011 SPRING ELECTION

| County | Stage | Date Notice Sent | DA REPORT | Status |
|--------|-------|------------------|-----------|--------|
| DANE - 13 | 5 – Referred to DA | 11/18/2014 | 2/13/2018 | Under investigation. |
| WAUKESHA - 68 | 5 – Referred to DA | 11/20/2014 | | |

# DA Tracker - 2012 PRES. PREFERENCE & SPRING

| County | Stage | Date Notice Sent | DA REPORT | Status |
|--------|-------|------------------|-----------|--------|
| MILWAUKEE - 41 | 5 – Referred to DA | 11/19/2014 | 8/25/2017 | Under investigation. |

# DA Tracker - 2012 JUNE 5 RECALL ELECTION

| County | Stage | Date Notice Sent | DA REPORT | Status |
|--------|-------|------------------|-----------|--------|
| DANE - 13 | 5 – Referred to DA | 11/18/2014 | 2/13/2018 | Under investigation. |
| DANE - 13 | 5 – Referred to DA | 11/17/2014 | 2/13/2018 | Under investigation |
| FOND DU LAC- 20 | 5 – Referred to DA | 10/15/2014 | 8/8/2017 | Under investigation. |
| LA CROSSE - 32 | 5 – Referred to DA | 11/18/2014 | | |
| MILWAUKEE - 41 | 5 – Referred to DA | 10/16/2014 | 8/16/2017 | Charges filed. |
| MILWAUKEE - 41 | 5 – Referred to DA | 10/16/2014 | 8/25/2017 | Under investigation. |
| OUTAGAMIE - 45 | 5 – Referred to DA | 10/16/2014 | | |
| RACINE - 52 | 5 – Referred to DA | 11/18/2014 | | |

# DA Tracker - 2012 PARTISAN PRIMARY

| County | Stage | Date Notice Sent | DA REPORT | Status |
|--------|-------|------------------|-----------|--------|
| FOND DU LAC - 20 | 5 – Referred to DA | 9/26/2014 | 8/8/2017 | Under investigation. |

# DA Tracker -2012 PRESIDENTIAL AND GENERAL

| County | Stage | Date Notice Sent | DA REPORT | Status |
|--------|-------|------------------|-----------|--------|
| DANE - 13 | 5 – Referred to DA | 4/9/2014 | 2/13/2018 | Under investigation. |
| LA CROSSE - 32 | 5 – Referred to DA | 4/9/2014 | | |
| MILWAUKEE - 41 | 5 – Referred to DA | 5/30/2014 | 8/25/2017 | Under investigation. |
| OUTAGAMIE - 45 | 5 - Referred to DA | 4/12/2014 | 4/12/2014 | Under investigation. |
| RACINE - 52 | 5 – Referred to DA | 4/9/2014 | | |
| RACINE - 52 | 5 – Referred to DA | 4/9/2014 | | |
| RACINE - 52 | 5 – Referred to DA | 4/9/2014 | | |
| RACINE - 52 | 5 – Referred to DA | 4/9/2014 | | |

# DA Tracker - 2014 SPRING ELECTION

| County | Stage | Date Notice Sent | DA REPORT | Status |
|--------|-------|------------------|-----------|--------|
| OUTAGAMIE COUNTY - 45 | 5 – Referred to DA | 7/17/2014 | | |

Exhibit 6

I APP. 215

# DA Tracker - 2014 GENERAL ELECTION

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| ASHLAND - 02 | 5 – Referred to DA | 3/31/2015 | | |
| DANE - 13 | 5 – Referred to DA | 3/31/2015 | 2/13/2018 | Under Investigation. |
| MILWAUKEE - 41 | 5 – Referred to DA | 4/2/2015 | 8/25/2017 | Under Investigation. |
| MILWAUKEE - 41 | 5 – Referred to DA | 3/31/2015 | 8/25/2017 | Under Investigation. |
| ONEIDA - 44 | 5 - Referred to DA | 4/1/2015 | | |
| OUTAGAMIE - 45 | 5 – Referred to DA | 3/31/2015 | | |
| OUTAGAMIE - 45 | 5 – Referred to DA | 3/31/2015 | | |
| OZAUKEE - 46 | 5 – Referred to DA | 4/2/2015 | | |
| RACINE - 52 | 5 – Referred to DA | 4/3/2015 | | |
| RACINE - 52 | 5 – Referred to DA | 4/2/2015 | | |
| RACINE - 52 | 5 – Referred to DA | 4/3/2015 | | |
| RACINE - 52 | 5 – Referred to DA | 3/31/2015 | | |
| RACINE - 52 | 5 – Referred to DA | 4/2/2015 | | |
| RACINE - 52 | 5 – Referred to DA | 4/3/2015 | | |
| RACINE - 52 | 5 – Referred to DA | 3/26/2015 | | |
| RACINE - 52 | 5 – Referred to DA | 4/3/2015 | | |
| RICHLAND - 53 | 5 – Referred to DA | 3/31/2015 | | |
| SHEBOYGAN - 60 | 5 – Referred to DA | 3/31/2015 | 8/8/2017 | Under Investigation. |
| WAUKESHA - 68 | 5 – Referred to DA | 3/31/2015 | | |
| WINNEBAGO - 71 | 5 – Referred to DA | 3/31/2015 | 7/26/2018 | Under Investigation. |

# DA Tracker - 2015 SPRING PRIMARY

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| DANE - 13 | 5 – Referred to DA | 4/3/2015 | 2/13/2018 | Under Investigation. |
| DOUGLAS- 16 | 5 – Referred to DA | 4/3/2015 | 8/19/2017 | Under Investigation. |
| VILAS - 64 | 5 – Referred to DA | 4/3/2015 | | |

# DA Tracker - 2015 SPRING ELECTION

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| ASHLAND - 02 | 5 - Referred to DA | 7/3/2015 | | |
| ASHLAND - 02 | 5 - Referred to DA | 7/3/2015 | | |
| JACKSON - 27 | 5 - Referred to DA | 7/3/2015 | | |
| LANGLADE - 34 | 5 - Referred to DA | 7/3/2015 | 8/17/2017 | Under Investigation. |
| MARATHON - 37 | 5 - Referred to DA | 7/3/2015 | | |

# DA Tracker - 2016 SPRING PRIMARY

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| ONEIDA - 44 | 5 - Referred to DA | 5/6/2016 | | |

# DA Tracker - 2016 SPRING ELECTION & PRES.

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| BROWN - 05 | 5 - Referred to DA | 8/9/2016 | | |
| BROWN - 05 | 5 - Referred to DA | 8/9/2016 | | |
| DANE - 13 | 5 - Referred to DA | 8/9/2016 | 2/13/2018 | Under investigation. |
| DANE - 13 | 5 - Referred to DA | 8/9/2016 | 2/13/2018 | Under Investigation. |
| DANE - 13 | 5 - Referred to DA | 8/9/2016 | 2/13/2018 | Under Investigation. |
| DANE - 13 | 5 - Referred to DA | 8/9/2016 | 2/13/2018 | Under investigation. |

Exhibit 6

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| MILWAUKEE - 41 | 5 - Referred to DA | 8/9/2016 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 8/9/2016 | 7/13/2017 | Charges Filed. |
| OUTAGAMIE - 45 | 5 - Referred to DA | 8/9/2016 | | |
| RACINE - 52 | 5 - Referred to DA | 8/9/2016 | | |
| SHEBOYGAN - 60 | 5 - Referred to DA | 8/9/2016 | 8/8/2017 | Under Investigation. |
| WALWORTH - 65 | 5 - Referred to DA | 8/9/2016 | | |
| WINNEBAGO - 71 | 5 - Referred to DA | 8/9/2016 | 7/26/2018 | Under Investigation. |
| WINNEBAGO - 71 | 5 - Referred to DA | 8/9/2016 | 7/26/2018 | Under Investigation. |

# DA Tracker - 2016 PARTISAN PRIMARY

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| DANE - 13 | 5 - Referred to DA | 11/21/2016 | 2/13/2018 | Under Investigation. |

# DA Tracker - 2016 PRESIDENTIAL AND GENERAL ELECTION

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| ADAMS - 01 | 5 - Referred to DA | 7/17/2017 | | |
| BROWN - 05 | 5 - Referred to DA | 7/14/2017 | | |
| BROWN - 05 | 5 - Referred to DA | 7/18/2017 | | |
| BUFFALO - 06 | 5 - Referred to DA | 7/19/2017 | | |
| DANE - 13 | 5 - Referred to DA | 7/14/2017 | 2/13/2018 | Under investigation. |
| DANE - 13 | 5 - Referred to DA | 7/14/2017 | 2/13/2018 | Under investigation. |
| DANE - 13 | 5 - Referred to DA | 7/14/2017 | 2/13/2018 | Under investigation. |
| DANE - 13 | 5 - Referred to DA | 7/18/2017 | 2/13/2018 | Under investigation. |
| DANE - 13 | 5 - Referred to DA | 7/14/2017 | 2/13/2018 | Under investigation. |
| DANE - 13 | 5 - Referred to DA | 7/14/2017 | 2/13/2018 | Under investigation. |
| DANE - 13 | 5 - Referred to DA | 7/19/2017 | 2/13/2018 | Under investigation. |
| DANE - 13 | 5 - Referred to DA | 7/14/2017 | 2/13/2018 | Under investigation. |
| DODGE - 14 | 5 - Referred to DA | 7/13/2017 | 10/25/2017 | Charges Filed. |
| DODGE - 14 | 5 - Referred to DA | 7/14/2017 | | |
| DOOR - 15 | 5 - Referred to DA | 7/17/2017 | | |
| DOUGLAS - 16 | 5 - Referred to DA | 7/17/2017 | 8/19/2016 | Under Investigation. |
| EAU CLAIRE - 18 | 5 - Referred to DA | 7/18/2017 | 11/21/2017 | Charges Filed. |
| JEFFERSON - 28 | 5 - Referred to DA | 7/14/2017 | 10/10/2017 | Under Investigation. |
| MENOMINEE - 40 | 5 - Referred to DA | 7/19/2017 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/14/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/14/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/17/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/14/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/14/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/14/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/14/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/14/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/14/2014 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/17/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/17/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/17/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/17/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/17/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/14/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |

Exhibit 6

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |
| MILWAUKEE - 41 | 5 - Referred to DA | 7/18/2017 | 8/25/2017 | Under Investigation |
| MONROE - 42 | 5 - Referred to DA | 7/19/2017 | | |
| ONEIDA - 44 | 5 - Referred to DA | 7/17/2017 | | |
| OUTAGAMIE - 45 | 5 - Referred to DA | 7/17/2017 | | |
| OUTAGAMIE - 45 | 5 - Referred to DA | 7/12/2017 | | |
| POLK - 49 | 5 - Referred to DA | 7/17/2017 | | |
| PORTAGE - 50 | 5 - Referred to DA | 7/17/2017 | | |
| RACINE - 52 | 5 - Referred to DA | 7/13/2017 | | |
| RACINE - 52 | 5 - Referred to DA | 7/17/2017 | | |
| RACINE - 52 | 5 -Referred to DA | 7/17/2017 | | |
| RACINE - 52 | 5 -Referred to DA | 7/17/2017 | | |
| RACINE - 52 | 5 - Referred to DA | 7/17/2017 | | |
| RACINE - 52 | 5 - Referred to DA | 7/19/2017 | | |
| RACINE - 52 | 5 - Referred to DA | 7/19/2017 | | |
| ROCK - 54 | 5 - Referred to DA | 7/14/2017 | | |
| ROCK - 54 | 5 - Referred to DA | 7/14/2017 | | |
| ST. CROIX - 56 | 5 - Referred to DA | 7/17/2017 | | |
| SAUK - 57 | 5 - Referred to DA | 7/17/2017 | | |
| SAWYER - 58 | 5 - Referred to DA | 7/19/2017 | 9/15/2017 | Under investigation. |
| SHEBOYGAN - 60 | 5 - Referred to DA | 7/17/2017 | 8/8/2017 | Under Investigation. |
| WOOD - 72 | 5 - Referred to DA | 7/19/2017 | | |

# DA Tracker - 2017 SPRING ELECTION

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| MARATHON - 37 | 5 - Referred to DA | 8/18/2017 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 8/18/2017 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 8/18/2017 | | |

# DA Tracker - 2018 SPRING ELECTION

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| KEWAUNEE - 31 | 5 - Referred to DA | 7/18/2018 | | |
| WAUKESHA - 68 | 5 - Referred to DA | 7/18/2018 | | |

# DA Tracker - 2018 PARTISAN PRIMARY

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| ASHLAND - 02 | 5 - Referred to DA | 2/15/2019 | | |
| BROWN - 05 | 5 - Referred to DA | 2/18/2019 | | |
| CRAWFORD - 12 | 5 - Referred to DA | 2/18/2019 | | |
| DANE - 13 | 5 - Referred to DA | 2/15/2019 | | |
| DUNN - 17 | 5 - Referred to DA | 2/15/2019 | | |
| MENOMINEE - 40 | 5 - Referred to DA | 2/18/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 2/15/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 2/15/2019 | | |

Exhibit 6

I APP. 218

# DA Tracker - 2018 GENERAL ELECTION

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| BROWN - 05 | 5 - Referred to DA | 6/3/2019 | | |
| BROWN - 05 | 5 - Referred to DA | 8/27/2019 | | |
| BROWN - 05 | 5 - Referred to DA | 6/3/2019 | | |
| DANE - 13 | 5 - Referred to DA | 6/3/2019 | | |
| DANE - 13 | 5 - Referred to DA | 6/4/2019 | | |
| DANE - 13 | 5 - Referred to DA | 6/3/2019 | | |
| DANE - 13 | 5 - Referred to DA | 6/3/2019 | | |
| DANE - 13 | 5 - Referred to DA | 6/3/2019 | | |
| DANE - 13 | 5 - Referred to DA | 9/9/2019 | | |
| DANE - 13 | 5 - Referred to DA | 6/5/2019 | | |
| EAU CLAIRE - 18 | 5 - Referred to DA | 6/3/2019 | | |
| GRANT - 22 | 5 - Referred to DA | 6/3/2019 | | |
| GREEN - 23 | 5 - Referred to DA | 9/9/2019 | | |
| JACKSON - 27 | 5 - Referred to DA | 9/9/2019 | | |
| KENOSHA - 30 | 5 -  Referred to DA | 6/3/2019 | | |
| KENOSHA - 30 | 5 - Referred to DA | 6/3/2019 | | |
| MARINETTE - 38 | 5 - Referred to DA | 8/27/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/4/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/4/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/4/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/4/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/4/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/4/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/4/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/5/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/5/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/5/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/4/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/5/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/5/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/5/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/5/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/5/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/4/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/4/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/6/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/5/2019 | | |
| MILWAUKEE - 41 | 5 - Referred to DA | 6/5/2019 | | |
| OCONTO - 43 | 5 - Referred to DA | 8/27/2019 | | |
| OUTAGAMIE - 45 | 5 - Referred to DA | 6/3/2019 | | |
| PORTAGE - 50 | 5 - Referred to DA | 8/27/2019 | | |
| PORTAGE - 50 | 5 - Referred to DA | 8/27/2019 | | |
| RACINE - 52 | 5 - Referred to DA | 8/27/2019 | | |
| ST. CROIX - 56 | 5 - Referred to DA | 8/27/2019 | | |
| SAUK - 57 | 5 - Referred to DA | 6/6/2019 | | |
| SAUK - 57 | 5 - Referred to DA | 6/6/2019 | | |
| SAWYER - 58 | 5 - Referred to DA | 8/27/2019 | | |
| SHEBOYGAN - 60 | 5 - Referred to DA | 8/27/2019 | | |
| WASHINGTON - 67 | 5 - Referred to DA | 8/27/2019 | | |
| WAUSHARA - 70 | 5 - Referred to DA | 8/27/2019 | | |

Exhibit 6

I APP. 219

| WINNEBAGO - 71 | 5 - Referred to DA | 6/3/2019 | | |
| WOOD - 72 | 5 - Referred to DA | 8/27/2019 | | |

## DA Tracker - 2019 SPRING PRIMARY

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| BROWN - 05 | 5 - Referred to DA | 9/9/2019 | | |
| VILAS - 64 | 5 - Referred to DA | 9/9/2019 | | |

## DA Tracker - 2019 SPRING ELECTION

| County | Stage | Date Notice Sent | DA REPORT | Status |
|---|---|---|---|---|
| KENOSHA - 30 | 3 - Assigned to Clerk | | | |
| MANITOWOC - 36 | 5 - Referred to DA | | | |
| MILWAUKEE - 41 | 3 - Assinged to Clerk | | | |
| WAUKESHA - 68 | 5 - Referred to DA | | | |

Exhibit 6

I APP. 220

Sign In

Legislative Information Center Home        Legislation        Meetings        Common Council

Boards, Commissions and Committees        Members

Details        Reports

| | | | |
|---|---|---|---|
| File #: | 60076   Version: 1 | Name: | Ratify all actions taken by the Mayor and City Attorneys related to Election Laws |
| Type: | Resolution | Status: | Passed |
| File created: | 3/23/2020 | In control: | Mayor's Office |
| On agenda: | 3/31/2020 | Final action: | 3/31/2020 |
| Enactment date: | 4/3/2020 | Enactment #: | RES-20-00232 |

Title: Allowing the Madison City Council to ratify all actions taken by the Mayor and City Attorneys related to elections law and allow the Mayor to exercise her sound judgment to make future decisions and to authorize the City Attorney to take further actions in litigation as may be necessary to fulfill the City's obligations to protect the voting rights of Madison's citizens.

Sponsors: Satya V. Rhodes-Conway

Attachments: 1. Proclamation of Emergency - 32320.pdf, 2. Emergency Proclamation Memo from Mayor 32320.pdf

History (2)        Text

Fiscal Note
No appropriation required.
Title
Allowing the Madison City Council to ratify all actions taken by the Mayor and City Attorneys related to elections law and allow the Mayor to exercise her sound judgment to make future decisions and to authorize the City Attorney to take further actions in litigation as may be necessary to fulfill the City's obligations to protect the voting rights of Madison's citizens.
Body
WHEREAS, the COVID-19 pandemic has disrupted the City of Madison and State of Wisconsin's efforts to prepare for and conduct the upcoming April 7 Spring election; and
WHEREAS, the efforts to mitigate the effects of the pandemic in our community and the disruption of the Spring election has the potential to severely impact the ability of voters to exercise their rights on April 7 due to the following factors beyond the City's control, to-wit: the closing of 14 polling places to date, the potential closing of an additional 21 polling places between now and the election, a backlog as of March 20, 2020 of more than 15,000 absentee ballot requests, a potentially significant shortage of poll workers, and the necessity to reduce in-person staff support in the clerk's office for health and safety reasons; and
WHEREAS, the availability of early voting locations has been severely hampered by the closing of the Madison public library system, and
WHEREAS, on March 20, 2020, Mayor Rhodes-Conway authorized the City Attorney to file an amicus brief in the pending federal court case of Democratic National Committee et al v. Bostelmann, et al, Case No. 3:20-cv-00249 (W.D. Wis), in which the plaintiffs request declaratory and injunctive relief to safeguard the constitutional rights of Wisconsin residents to vote in the spring election; and

I APP. 221

Exhibit 7

WHEREAS, the City of Madison may be invited to join as a party in a lawsuit brought by other municipalities seeking declaratory and injunctive relief to safeguard the constitutional rights of Wisconsin residents to vote ...

Click here for full text

I APP. 222

Exhibit 7

ADVERTISEMENT

8,609

[Add to Cart]

*Search Site*

by Ben Krumholz, FOX 11 News
Tuesday, April 7th 2020

AА

*Voters in Green Bay wait for hours in line April 7, 2020. (WLUK image)*

GREEN BAY, Wis. (WLUK) — With Green Bay voters saying they waited up to four hours to vote, FOX 11 has learned the city declined extra poll workers from the Wisconsin National Guard.

Brown County Clerk Sandy Juno says Allouez and Hobart also declined the help.

I APP. 223

Exhibit 8

ere the city's or                    41°        38°        41°    om the
                                                             didn't have eno

Last week, Mayor Eric Genrich told the city council that coronavirus fears dropped poll worker numbers from 270 to 17.



Juno says she called Genrich Sunday night to see if the city wanted any Wisconsin National Guard soldiers to help out, at no extra cost to the city.

"He specifically stated that they did not need them," said Juno.

Juno says she spread the 150 soldiers available to Brown County to the county's other 21 municipalities.

Juno says even before offering National Guard help, she expressed concern to Green Bay's clerk about the city only having two polling locations.

"We felt it wasn't sufficient," said Juno. "She (Green Bay City Clerk Kris Teske) stated that was their decision on what they had decided."

Green Bay among areas declining National Guard help despite poll worker shortage | WLUK

decision to de                                          e did

Genrich post

**Facebook.**)

In last week's council meeting, Genrich said community members also volunteered to work the polls.

"We very much appreciate that, but of course they haven't been trained, so that's an additional issue for our clerk's office to work through," Genrich told the council on April 1.

 *Search Site*                                                                          ay

voter. "If the National Guard is willing to provide their services, they definitely should be able to help."

"Does that make an ounce of sense to pack more people in a smaller area rather than spread people out?" said Dean Edict, a Green Bay voter. "Have less congestion, get people in and our from voting."

Juno says Green Bay was the only municipality in Brown County that she was aware of that had long wait times. She says Green Bay was the only municipality her office received complaints about.

Meanwhile, Republican Party of Brown County Chairman, James Fitzgerald, says he's disappointed:

> ❝ *I reached out to Mayor Genrich on March 30, imploring him to apply all the necessary resources to run a smooth election on April 7, and heard nothing. Today, we see the results of his inaction. While other large municipalities, including Madison, had no difficulties processing the vote today, Green Bay, fell short leaving long lines and frustrated voters. Mayor Genrich's refusal to use trained National Guard's men and women exhibited a classic failure in judgement and leadership. We applaud all the resilient poll workers who persevered the integrity of the ballot box.*

**MORE TO EXPLORE**

**Wrongful death lawsuit filed over Naya Rivera's drowning**

I APP. 225

Exhibit 8

LIVE

41° 38° 41°

**Gov. Evers, local bars react to judge blocking state's capacity order**

**Outagamie County voters react to close race**

*Search Site*

**How Amal Clooney Looks Without Makeup Is Tough To Handle**
Pay Day Ville

**Melissa Rauch Down Sized Her Bikini (Photos)**
Gloriousa

**What A 'Karen' Haircut Is - And How To Avoid It**
It's Rosy

Sponsored Links by Taboola

ADVERTISEMENT

8,609 Add to Cart

ADVERTISEMENT

**Wisconsin recount: Masks, plexiglas and lots of ballots**

I APP. 226


Exhibit 8



LIVE                                      41°      38°      41°     A A**A**



Search Site

*Boxes containing Milwaukee County ballots are seen in the Wisconsin Center in Milwaukee Nov. 19, 2020. (WLUK/Tom Campbell)*

MADISON, Wis. (AP) — Wisconsin on Friday will begin recounts of the presidential race in the state's two biggest and most Democratic counties. It's a longshot bid by President Donald Trump — who paid a required $3 million fee — to undo Joe Biden's victory. Trump, who lost by more than 20,600 votes in Wisconsin, has alleged "mistakes and fraud" in the two counties, though he has produced no evidence to back up his claims.

Some things to know about the recount:

WHY THESE TWO COUNTIES?

I APP. 227

Exhibit 8

Democrat-hea

y and discount

LIVE                                          41°      38°      41°

Milwaukee, the state's most racially diverse city, and Madison, the state Capitol and location of the University of Wisconsin's flagship campus. Combined, Biden won the counties by a more than 2-to-1 margin.

WILL THE RECOUNT BE SAFE?

The recount will bring together hundreds of people at a time when the coronavirus is ravaging Wisconsin, which has been one of the nation's worst COVID-19 hot spots for weeks. One in

Search Site                                                                    isk,

both counties are renting convention centers so that workers and observers can be properly distanced. In Milwaukee, where the recount will be conducted at the 186,000-square-foot Wisconsin Center, everyone inside will be required to wear a mask, pass a temperature screening and maintain appropriate social distancing. Anyone not following those requirements will be ejected.

The recounts must be finished by a Dec. 1 deadline. Milwaukee County expects to be finished the day before Thanksgiving, an event widely expected to hasten the spread of the virus. Dane County is planning 16-hour days and wasn't expected to finish before the holiday. Both plan to use machines to recount the ballots, although Dane County says it will do some hand-counting from randomly selected precincts for an audit, as required by law.

WHO DOES THE RECOUNT?

Both county clerks are Democrats and are in charge of the recounts. They are bringing in many of the same poll workers who counted the ballots on Election Day to process the recount. In Milwaukee, workers will be arranged in two-table "pods," with one worker at each table, and up to three observers allowed at each pod. The observers must stay 6 feet away, and plexiglass barriers will provide added protection. Four sheriff's deputies will provide security 24 hours a day until the recount is completed.

WHO CAN WATCH? AND WHAT ABOUT CHALLENGES?

Citizens can watch in person, although Dane County wasn't immediately sure how many would be allowed in because of the COVID-19 pandemic. Both counties said safety would be a priority;

Exhibit 8

will have to go t       41°    38°    41°  re

LIVE

Both counties also plan livestreams; Milwaukee County Clerk George Christenson said $400,000 was being spent on audiovisual equipment to make sure the recount is transparent.

As for challenges, representatives of both campaigns must be allowed to observe and challenge ballots, although they must "provide offers of evidence" to justify them. Disputed ballots are set aside to be considered by the canvassing board. Observers can also challenge the makeup of the board of canvassers and the procedures being followed.

Search Site

WILL THIS CHANGE THINGS?

Not likely. Wisconsin's 2016 recount, which was statewide and was requested by Green Party candidate Jill Stein, barely moved the needle on any candidate's totals, netting Trump an additional 131 votes.

More broadly, there's no precedent of a recount changing the outcome of an election in which the margin between the top two candidates is as large as the one Biden holds over Trump.

There have been at least 31 recounts in statewide elections in the U.S. since the most famous one in Florida's presidential election in 2000. The recounts changed the outcome of three races. All three were decided by hundreds of votes, not thousands.

Of those 31 recounts, the largest change in the margin between the top two candidates was 0.1 percentage point, which happened in the 2006 race for Vermont's auditor of accounts. The average shift in the margin between the top two candidates — whether the margin increased or decreased — was 0.019 percentage points.

Biden leads Trump by about 0.6 of a percentage point.

WHAT HAPPENS WHEN IT'S OVER?

Once the recount is complete, the chair of the Wisconsin Elections Commission is charged with certifying the results by Dec. 1. But a lot can happen before then, including expected legal challenges. Trump's legal challenges in other states have been unsuccessful, but Republican

I APP. 229

Exhibit 8  7/9

he may fare b                                              ive-

LIVE                                    41°      38°      41°

___

Glass reported from Minneapolis.

---

**MORE TO EXPLORE**

**Report: Kenosha officer who shot Blake subject of 5 investigations**

*Search Site*

**Republicans see 'grim' Senate map and edge away from Trump**

**No further search planned for missing hunter**

**SPONSORED CONTENT**

**What's the Most Popular Surname in Minnesota?**
Ancestry

**Maps That Show Us A New Perspective**
Explored Planet

**Kristy McNichol, 57, Is A Walking Talking Beauty**
BoredomTreatment

Sponsored Links by Taboola

ADVERTISEMENT

Among election night with log lines in Green Bay

LIVE

41˚　　38˚　　41˚

Loading ...

I APP. 231

Exhibit 8

15206

Federal Register / Vol. 69, No. 57 / Wednesday, March 24, 2004 / Notices

# $\mathbf{W}$isconsin

## State Plan

# Help America Vote Act of 2002

## Wisconsin State Elections Board
### Kevin J. Kennedy, Executive Director

17 W. Main St., Suite 310
P.O. Box 2973
Madison, WI 53701-2973
(608) 266-8005
http://elections.state.wi.us

State of Wisconsin\ Elections Board

## Certification

I, Kevin J. Kennedy, Executive Director of the Wisconsin State Elections Board, certify I am the chief State Election Official for the State of Wisconsin. Section 5.05 (1)(a), Wisconsin Statutes.

Pursuant to Section 253 (b) (1) of the Help America Vote Act of 2002, I certify the attached State Plan for the State of Wisconsin contains each of the elements described in Section 254 of the Help America Vote Act of 2002 with respect to federal fiscal year 3; the Plan has been developed in accordance with Section 255 of the Help America Vote Act of 2002 and meets the notice requirements of Section 256 of the Help America Vote Act of 2002.

Dated this 19th day of August, 2003.

_____
Kevin J. Kennedy, Executive Director
Wisconsin State Elections Board

## Introduction

Wisconsin has a rich history of citizen participation in the electoral process. Wisconsin has developed a series of political innovations to enable citizens to select their leaders as part of the democratic process. These innovations include the development of the open primary in 1903, the establishment of an independent state agency to administer elections in 1974 and the implementation of election day registration in 1976. A list of the nine citizens currently serving on the State Elections Board is set out in Appendix 1.

The Help America Vote Act of 2002 (HAVA) provides a unique opportunity to add to Wisconsin's electoral tradition and develop a strong partnership between state and local election officials. Elections in Wisconsin are conducted by municipal election officials. Local election officials recruit and train poll workers, maintain voter records, issue absentee ballots, and establish and equip polling places including acquiring voting equipment. County election officials are responsible for the preparation of ballots and notices for county, state and federal elections. They also provide a significant contribution in coordinating the work of local election officials to increase efficiency in the delivery of election services. The State Elections Board is responsible for providing leadership in election administration by establishing standards to ensure uniformity and safeguarding the vote of all electors.

The mission of the State Elections Board is to enhance representative democracy by ensuring the integrity of the electoral process. The Elections Board directs its energies toward providing for an informed electorate, both in regard to understanding the election system and to being aware of the activities and finances of candidates for public office. Under the auspices of HAVA, the State Elections Board, working in cooperation with county and municipal election officials, will ensure that Wisconsin elections continue to be administered through procedures that guarantee that the vote of each individual counts and that the will of the electorate prevails. The shared vision for all participants in Wisconsin's electoral process is that elections are open, fair, impartial and free from error.

Following the 2000 Presidential Election, the nation's voting process was the subject of numerous studies by legislators, scholars, citizen groups and election officials. Each study provided a different focus, but a consensus formed around key elements that were essential to the integrity of the election process. The State Elections Board has posted these studies on its website at: http://elections.state.wi.us/sebpage55.html.

Hundreds of pieces of legislation were introduced in Congress and state legislatures, including 25 separate bills in Wisconsin during the 2001-2002 legislative session, to change the way elections are administered. Members of the election community worked with Congress to secure passage of legislation that maintained state and local control over the administration of elections while establishing minimum standards to ensure public confidence in the integrity of the voting process.

The Help America Vote Act of 2002 (HAVA) was enacted by Congress to make sweeping reforms in the way elections are conducted. The Act addresses improvements to voting systems and voter access. It includes requirements for a centralized voter registration database, privacy and independence in the voting process, access for people with disabilities and voter outreach.

As a condition of receiving federal funding, each state is required to submit an implementation plan that meets the requirements of the Act.

In December 2002, the State Elections Board began the process of preparing a study for the state legislature to present a plan for designing, developing and implementing a statewide voter registration system. This was the initial step in preparing for the implementation of one of the key elements of HAVA that brings state and local officials together to improve accessibility for Wisconsin's voters. The report was given to the State Elections Board on May 15, 2003.

In January 2003, the Executive Director of the State Elections Board, Wisconsin's chief election official, appointed a State Plan Committee comprised of county and municipal election officials, representatives of advocacy groups and other citizens to assist in the HAVA planning process. The group has met three times to discuss the planning process and provide direction for the development of this plan.

This initial plan represents the collective input and recommendations of the State Plan Committee and numerous citizens, legislators and advocacy groups who have been following the plan development process. Members of the public were given the opportunity to comment on the preliminary plan in public hearings that were held in Brookfield on May 21, 2003, Madison on June 4, 2003, and Eau Claire on June 9, 2003. Written comments on the preliminary plan were also accepted for consideration through June 20, 2003. After the public comment process, the State Elections Board considered the public input in preparation of this plan for submission to the federal government.

Wisconsin is in a good position to implement the HAVA requirements. Many of the election reforms required by the Act are already addressed in current state laws and procedures. This initial state plan identifies the priorities and specific steps state and local election officials will take to meet the requirements of HAVA. It also discusses what additional improvements may be undertaken if there is remaining or additional federal funding after all of the requirements have been met.

The State Plan Committee is recommending the following activities as part of Wisconsin's response to HAVA:

- Design and implementation of a computerized statewide voter registration system that is the single database of all registered voters.

- Purchase and deployment of voting equipment that meets the standards established by HAVA.

- Increased access to the election process for people with disabilities through the use of specially designed voting systems, improvements to facilities, training of elections staff and enhanced public outreach. This will include an evaluation of every polling place in the state during the implementation of HAVA to identify barriers to accessibility and full voter participation.

- Implementation of a comprehensive program that informs voters about the election process in Wisconsin including where to obtain information on the voting process, how to

correct ballots, how to request replacement ballots and how to obtain relief for possible violations or irregularities in the administration of state and federal election procedures.

- Implementation of a toll-free telephone line that allows voters to check the status of their provisional ballots, determine whether or not their ballot was counted and enable electors to report possible voting fraud and voting rights violations.

- Training of all election officials including chief inspectors, municipal and county clerks, along with State Elections Board staff.

To receive federal funding, Wisconsin must certify that it has established a State Election Fund that is separate and distinct from the state General Fund. The state must also provide the federal Election Assistance Commission with a plan for the implementation of a uniform, nondiscriminatory administrative complaint procedure to resolve alleged HAVA Title III violations. Legislation to make those changes will be introduced in the 2003 Wisconsin Legislature. Once these changes are in place, the State Elections Board will certify to the federal government that it is eligible to receive HAVA funding.

While HAVA increases responsibility for election administration at the state level to achieve greater uniformity and consistency, municipal election officials are charged with the conduct of elections and are crucial to all aspects of the election process. As Wisconsin moves forward in carrying out this plan, the State Elections Board will continue to encourage coordination, cooperation, and collaboration between local and state officials on the innovations and technology that will be developed in response to HAVA.

Finally, this plan should be viewed as a living document that will need to be updated and refined over time to reflect the state's progress in implementing HAVA. The State Elections Board and the Election Administration Council will review the plan in January of each year in order to incorporate changes that reflect the state's progress in implementing HAVA and address new election-related challenges. Wisconsin welcomes the challenges of the Help America Vote Act and looks forward to receiving appropriate financial support from the federal government.

## Section 1 – Title III Requirements and Other Activities

*How the State will use the requirements payments to meet the requirements of Title III, and, if applicable under Section 251(a)(2), to carry out other activities to improve the administration of elections.*

The total amount of federal funding available as requirements payments under Section 254 of HAVA to Wisconsin is uncertain. Congress has not appropriated funds beyond federal fiscal year 3 (FFY 3). The initial appropriation provides an estimated $15.39 million in requirements payments. HAVA requires the state to match this payment by appropriating an amount equal to 5% of the total spent. In order to match the initial federal payment, the state must appropriate $810,000 in Fiscal Year 4.

The State Plan Committee has established the following priorities for the use of requirements payments and the corresponding state match:

I APP. 233

Exhibit 9

- Design, develop and implement a statewide voter registration system.
- Evaluate new voting systems and all polling places for HAVA Section 301 and disability access compliance.
- Develop an implementation and acquisition plan for compliant voting systems.
- Develop training and education programs for voters, election officials and poll workers.

HAVA establishes a number of requirements that all states must meet whether or not federal funds are accepted. The specific choices on the methods of complying with these requirements is left to the discretion of the state. HAVA Section 305. A brief description of the requirements and how Wisconsin will meet the requirements is set out below.

**Voting Systems Standards Requirements - HAVA Section 301 (a)**
*Deadline for Compliance: January 1, 2006; no waiver permitted.*

HAVA establishes standards for voting systems. The deadline for meeting these standards is January 1, 2006. Each voting system used in an election for Federal office shall meet the following requirements:

- In general, the voting system (including any lever voting system, optical scanning voting system, or direct recording electronic system) shall:

    - Permit the voter to verify in a private and independent manner the votes selected by the voter on the ballot before the ballot is cast and counted;

    - Provide the voter with the opportunity in a private and independent manner to change the ballot or correct any error before the ballot is cast and counted including the opportunity to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error; and

    - If the voter selects votes for more than one candidate for a single office:

        - notify the voter that the voter has selected more than one candidate for a single office on the ballot;

        - notify the voter before the ballot is cast and counted of the effect of casting multiple votes for the office; and

        - provide the voter with the opportunity to correct the ballot before the ballot is cast and counted.

A State or jurisdiction that uses a paper ballot voting system, a punch card voting system, or a central count voting system (including mail-in absentee ballots and mail-in ballots), may meet these requirements by establishing a voter education program specific to that voting system that notifies each voter of the effect of casting multiple votes for an office; and providing the voter with instructions on how to correct the ballot before it is cast and counted (including instructions on how to correct the error through the issuance of a

replacement ballot if the voter was otherwise unable to change the ballot or correct any error).

The voting system shall ensure that any notification preserves the privacy of the voter and the confidentiality of the ballot.

- The voting system shall produce a record with an audit capacity for the system. The record shall be a permanent paper record with a manual audit capacity. The voting system shall provide the voter with an opportunity to change the ballot or correct any error before the permanent paper record is produced. The paper record produced shall be available as an official record for any recount conducted with respect to any election in which the system is used.

- The voting system shall be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation, including privacy and independence as for other voters. This requirement can be satisfied through the use of at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place.

- The voting system shall provide alternative language accessibility pursuant to the requirements of the Voting Rights Act of 1965.

- The error rate of the voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under the voting systems standards issued by the Federal Election Commission.

- Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State.

There is no voting system approved for use in Wisconsin that meets each of these standards. Presently 87% of the state's voters use optical scan voting systems, 10% of the state's voters use paper ballots and 3% of the voters use lever voting machines. Wisconsin began the transition from punch card voting in 1993. Punch card voting was eliminated in Wisconsin following the 2001 spring elections.

The optical scan voting system meets the general requirements on privacy and independence. It also meets the audit capacity requirements. Because 13 counties use a central count tabulation system for optical scan ballots, state, county and municipal election officials will have to develop a voter education program. This is also the case for municipalities using paper ballot voting.

Where Wisconsin falls short on the federal standards is providing access for individuals with disabilities. The state will evaluate new voting systems' disability access compliance and develop an implementation and acquisition plan for compliant voting systems. This is one of the priority uses of the requirements payments.

I APP. 234

Exhibit 9

Wisconsin is not presently subject to the alternative language requirements of the Voting Rights Act of 1965. However, Wisconsin has a growing number of individuals whose participation in the political process would be enhanced by having voting information available in a language other than English. As part of the evaluation and acquisition of new voting systems, the State Elections Board will ensure that any new system has the capability to meet this requirement. The state will also develop voter information materials in alternative languages.

Wisconsin requires any electronic voting system to be qualified against the voting systems standards established by the Federal Election Commission before it can be used in the state. The qualification must be done by an independent testing laboratory approved by the National Association of State Election Directors (NASED). The State Elections Board recently directed that all new voting systems must meet the most current national standards. The State Elections Board has drafted legislation to require the Board to evaluate voting systems for compliance with the error rate requirements following each general election.

Current law establishes uniform standards of what constitutes a vote. S. 7.50, Wis. Stats. The Elections Board has drafted legislation to permit the agency to promulgate administrative rules to establish similar requirements for new voting systems that may be approved by the Elections Board.

### Provisional Voting Requirements - HAVA Section 302 (a)
*Deadline for Compliance: January 1, 2004; no waiver permitted.*

HAVA requires a state to provide an individual the opportunity to vote a provisional ballot if the individual asserts that he is registered, but the voter's name does not appear on the poll list or an election official asserts that the individual is not eligible to vote. The individual must complete a written affirmation that he is a registered voter in the jurisdiction and eligible to vote in that election. The individual is then permitted to vote a provisional ballot. The provisional ballot is not counted unless the municipal clerk can verify that the individual is a registered voter in the jurisdiction and eligible to vote in that election.

Wisconsin is exempt from this requirement because it has a system of election day registration that permits a voter whose name does not appear on the poll list to register at the polling place. Under current law, a voter must provide proof of residence or have the registration application corroborated by an elector of the municipality who has proof of residence.

### Voting Information Requirements - HAVA Section 302 (b)
*Deadline for Compliance: January 1, 2004; no waiver permitted.*

HAVA requires that specific information be posted at each polling place on election day. The required information is:

- A sample version of the ballot that will be used for that election;

- Information regarding the date of the election and the hours during which polling places will be open;

- Instructions on how to vote, including how to cast a vote and how to cast a provisional ballot;

- Instructions for mail-in registrants and first-time voters;

- General information on voting rights under applicable Federal and State laws, including information on the right of an individual to cast a provisional ballot and instructions on how to contact the appropriate officials if these rights are alleged to have been violated; and

- General information on federal and state laws regarding prohibitions on acts of fraud and misrepresentation.

Wisconsin law currently requires two sample ballots to be posted at the polling place along with instructions on how to vote, including how to cast a vote. S. 5.35 (6) Wis. Stats. The Elections Board has drafted legislation to add the required information to the current posting requirements.

### Voters Allowed to Vote After the Polls Close Pursuant to a Court Order - HAVA Section 302 (c)
*Deadline for Compliance: January 1, 2004; no waiver permitted.*

HAVA requires that any individual who votes after the polls close pursuant to a court order shall vote a provisional ballot. The ballot shall be separated and kept apart from other provisional ballots.

The Elections Board has drafted legislation that treats the ballot in a manner similar to a challenged ballot under S. 6.95 Wis. Stats. The ballot is marked with an indication that it is cast pursuant to a court order, but the voter's serial number is not included on the ballot. The ballot is counted, but if the court order is overturned, the ballot can be retrieved and the canvass results changed to reflect the court action.

### Computerized Statewide Voter Registration List Requirements - HAVA Section 303 (a)
*Deadline for Compliance: January 1, 2004; State can submit a certification stating "good cause" that will extend the deadline for compliance to January 1, 2006.*

HAVA requires the State, acting through the chief State election official, to implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State. HAVA requires the computerized list to have the following attributes:

- The computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the State.

- The computerized list contains the name and registration information of every legally registered voter in the State.

- Under the computerized list, a unique identifier is assigned to each legally registered voter in the State.

I APP. 235
Exhibit 9

- The computerized list shall be coordinated with other agency databases within the State.

- Any election official in the State, including any local election official, may obtain immediate electronic access to the information contained in the computerized list.

- All voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official.

- The chief State election official shall provide such support as may be required so that local election officials are able to electronically enter voter registration information into the computerized list on an expedited basis.

- The computerized list shall serve as the official voter registration list for the conduct of all elections for federal office in the State.

Under current law, voter registration is required in municipalities with a population of more than 5,000. S. 6.27 Wis. Stats. Only 320 of the state's 1,850 municipalities have voter registration. All voter registration records are maintained at the local level.

In December 2002, the Elections Board requested and received supplemental funding to conduct a study on the development and implementation of a statewide voter registration system (SVRS). The agency hired a consultant to conduct the study under the direction of the Elections Board staff. The primary deliverable of the study is a report for the legislature that describes an implementation plan and credible cost estimate for the development and implementation of a statewide voter registration system. The report was completed on May 15, 2003. It will be submitted to the legislature so that appropriate funding and authorization can be included in the Board's HAVA implementation legislation. A copy of the report is available from the State Elections Board.

The study included the development of business and functional requirements for the system in conjunction with local election officials and other users. A steering committee consisting of representatives of the Elections Board, the Department of Transportation, the Department of Corrections, the Department of Health and Family Services and the Department of Electronic Government is monitoring the project. A Request for Information (RFI) was solicited from the universe of potential vendors to assist in determining a credible cost estimate and perform a gap analysis on the business and functional requirements.

This project will be the focus of the initial use of the requirements payments. The Elections Board has established a timeline for rolling out the statewide voter registration system for the 2006 election cycle. The Elections Board has drafted legislation to implement this requirement. The Elections Board plans to apply for a waiver of the January 1, 2004 deadline.

**Requirements for Voters Who Register by Mail - HAVA Section 303 (b)**
*Deadline for Compliance: January 1, 2004; no waiver permitted.*

HAVA requires an individual who registers by mail and who has never voted in the state before registering by mail to provide specific identification before being permitted to vote. The identification specified in HAVA includes a current and valid photo identification or a current utility bill, bank statement, government check, paycheck or other government document that shows the name and address of the voter. If the voter does not provide the required identification, the individual must vote on a provisional ballot.

An absentee voter, subject to this requirement may provide a copy of the identification as part of the absentee voting process. Local election officials will have to track first-time voters and secure the required identification. This can be done after the voter registers and before election day.

Because Wisconsin has election day registration, it is exempt from using provisional ballots. However, the Elections Board has drafted legislation to implement this requirement. Election day registration provides voters with an enhanced opportunity to participate in the electoral process. It is expected that most individuals that are required to provide identification will be able to register at the polling place under the current election day registration provisions. S. 6.55 Wis. Stats.

## Section 2 – Distribution of Requirements Payment

*How the State will distribute and monitor the distribution of the requirements payment to units of local government or other entities in the State for carrying out the activities described in Section 1 of the State plan, including a description of the criteria to be used to determine the eligibility of such units or entities for receiving the payment; and the methods to be used by the State to monitor the performance of the units or entities to whom the payment is distributed, consistent with the performance goals and measures adopted under Section 8 of the State Plan.*

The state does not plan to distribute any of the initial requirements payments to local government. The state will provide infrastructure support to local government to implement the requirements of HAVA. The projected cost for development and implementation of the statewide voter registration system along with the acquisition of voting systems that comply with HAVA requirements will likely exceed the amount of federal funds available for requirements payments. Local government will have to share in the cost of HAVA compliance.

The state will provide and maintain a statewide voter registration system that will replace the systems currently used by municipalities with voter registration. The state will also use the requirements payments to acquire HAVA compliant voting systems. The state will provide voter information and election official training as part of the implementation of HAVA.

If the state uses the requirements payments for election administration infrastructure rather than distributing funds, local government does not have to expend additional resources monitoring compliance to ensure the integrity of the use of the funds. If the state makes the infrastructure investment with the requirements payments, it avoids using limited federal funds to monitor the performance of local government on the use of payments received from the state.

I APP. 236

Exhibit 9

### Section 3 – Voter Education, Election Official Education and Training, and Poll Worker Training

*How the State will provide for programs for voter education, election official education and training, and poll worker training which will assist the State in meeting the requirements of Title III.*

Training and education for voters and election officials is the foundation which provides for efficient and cost-effective elections. Informed voters and trained election officials are key elements in the integrity of the electoral process. The State Elections Board currently conducts regular education and training meetings at various locations in the state for county and municipal clerks and other election officials. Administrative meetings are designed to explain the election laws and the forms and rules of the Board, to promote uniform procedures and to assure that clerks and other officials are made aware of the integrity and importance of the vote of each citizen. S. 5.05(7), Wis. Stats. To enhance this process, State Elections Board personnel and resources will be supported by future federal funding. The State will also provide resources and work through election official user groups, including the Wisconsin County Clerks Association, the Wisconsin Municipal Clerks Association, the Wisconsin Towns Association and the League of Wisconsin Municipalities for education and training. The State Elections Board will also reach out to engage other citizen groups to provide voter information and education and stimulate interest in the democratic process.

The State Elections Board will implement the statutory requirement for chief inspector training and certification. The initial training and certification will consist of a comprehensive presentation to local election officials by a team of State Elections Board personnel and local election officials. These sessions will begin in 2003 and be held at several locations throughout the state. Continuing certification will be maintained through 6 hours of training over a two-year period. This additional training may include attendance at a presentation conducted by the Elections Board staff, training conducted by the municipal clerk that is approved by the Elections Board, or participation in a WisLine Teleconference session. The training program will be supplemented by a manual designed as a reference for use at the polling locations. The Elections Board is required to conduct regular training and administer examinations to ensure that individuals who are certified are knowledgeable concerning their authority and responsibilities. S. 7.31(5), Wis. Stats.

The State Elections Board has applied for HAVA Section 261 funds to promote disability access. Some of these funds will be used to train election officials, poll workers, and election volunteers on how best to promote the access and participation of individuals with the full range of disabilities in elections for federal office.

The State Elections Board plans to organize and present a series of on-site training seminars for local election officials, including poll workers. These sessions will be designed to present information to election officials, poll workers, and election volunteers on how best to promote access and participation for individuals with the full range of disabilities in elections. The information for these presentations will be developed in collaboration with representatives of groups of individuals with disabilities and local election officials.

The State Elections Board also plans to develop a training video based on the model developed by North Carolina to supplement the training seminars.

The State Elections Board plans to collaborate with representatives of groups of individuals with disabilities and local election officials to develop informational materials that promote participation in the voting process. The materials will provide information about the accessibility of polling places, voter registration and where to obtain information about candidates and issues.

The State Elections Board will acquire equipment and adapt its website to provide a source of access to information that promotes participation in the voting process for individuals with the full range of disabilities. This includes a TTY, instant messaging capabilities, voice recognition software and alternative formats for the materials developed in connection with Section 261 activities.

The State Elections Board will establish an education committee under the auspices of the Election Administration Council to evaluate the needs for voter education and election official training. Following identification of areas requiring education, the Elections Board and the Election Administration Council will determine training standards including delivery method, information updating, creation of methods to assure continued training and evaluations to assure objectives have been achieved. Outreach programs will be provided on the statewide voter registration system to access information, along with education on voter registration, the voting process, operation of voting mechanisms, locating polling places and contact information related to election participation. This will include development of training and outreach programs to expand understanding and assistance for people with disabilities in exercising their right to vote. Materials will be developed by the State Elections Board and will be provided to county and municipal clerks to supply to the public.

Postings on election day at polling locations will include a sample version of the ballot, information on the date of the election, the hours of the polling place, instructions on provisional ballots, instructions for mail-in registrants and first-time voters and general information on voter rights and laws prohibiting fraud and misrepresentation. These instructions will also be available on the State Elections Board website: http://elections.state.wi.us/ and in the form of brochures for citizens.

### Section 4 – Voting System Guidelines

*How the State will adopt voting system guidelines and processes which are consistent with the requirements of Section 301.*

Under current law, Wisconsin has established a set of standards for the approval of electronic voting systems. S. 5.91, Wis. Stats. The State Elections Board has drafted legislation that adds the HAVA voting system standards to the current statutory requirements. The Elections Board has also promulgated administrative rules detailing the process for approving electronic voting systems for use in Wisconsin. ElBd Ch. 7, Wis. Adm. Code.

Wisconsin requires any electronic voting system to be qualified against the voting systems standards established by the Federal Election Commission before it can be used in the state. The

Exhibit 9

15212

Federal Register / Vol. 69, No. 57 / Wednesday, March 24, 2004 / Notices

qualification must be done by an independent testing laboratory approved by the National Association of State Election Directors (NASED). The State Elections Board recently revoked the approval for any electronic voting system that has not been qualified to the most recent standards established by the Federal Election Commission in December 2002.

The agency action permits any municipality that currently uses an optical scan voting system to continue to use the system. All new equipment approved for use in Wisconsin will meet the most current federal standards. The State Elections Board will evaluate new voting systems for HAVA Section 301 and disability access compliance and develop an implementation and acquisition plan for compliant voting systems.

The State Elections Board plans to hold a series of vendor fairs in the Spring of 2004 in cooperation with the state's eight Independent Living Centers to enable citizens with disabilities and local election officials to observe the proposed changes in voting systems that will permit all citizens to vote in a private and independent manner. This will also enable vendors to receive direct feedback from the citizens that will be using the new voting equipment before it is submitted for approval in Wisconsin.

## Section 5 - HAVA Election Fund Management

*How the State will establish a separate election fund for purposes of administering the State's activities under this part, including information on fund management.*

The State Elections Board introduced legislation, 2003 Assembly Bill 123, that establishes the appropriate federal account to meet the HAVA requirement for a separate election fund for managing the receipt and distribution of HAVA payments and state matching funds. This legislation was passed by the legislature and signed into law by the governor on July 24, 2003. 2003 Wisconsin Act 35.

The State Elections Board has requested creation of one Full Time Equivalent (FTE) federally funded position to manage the fund and assure compliance with federal grant requirements. Agency staff has met with the State Controller's office to set up the fund and review the applicable administrative guidelines. The Legislative Audit Bureau will conduct a financial and compliance audit of the fund as part of the state's adherence to the federal Single Audit Act of 1984.

## Section 6 – Wisconsin's HAVA Budget

*The State's proposed budget for activities under this part, based on the State's best estimates of the costs of such activities and the amount of funds to be made available, including specific information on the costs of the activities required to be carried out to meet the requirements of Title III; the portion of the requirements payment which will be used to carry out activities to meet such requirements; and the portion of the requirements payment which will be used to carry out other activities.*

The total amount of federal funding available to Wisconsin under HAVA is uncertain. Congress has not appropriated funds beyond federal fiscal year 3 (FFY 3). Funds have been appropriated under HAVA Title I for activities to improve the administration of elections and replacement of

punch card or lever voting machines. Funds have also been appropriated under HAVA Title II to meet Title III requirements.

The State Elections Board has received payments under HAVA Section 101. The State Elections Board plans to use the funds to reimburse the agency for staff training costs associated with HAVA and agency costs associated with the preparation of the State Plan.

The agency also plans to use the payments to hire four Full Time Equivalent (FTE) agency staff to implement HAVA requirements. Title I payments will also be used to hire a consultant to design the Request for Proposal (RFP), select a vendor and project manage the implementation of the statewide voter registration system. The State Elections Board also plans to use a portion of the payments to work with local election officials and governing bodies to identify cost reduction applications as part of the pre-implementation efforts for the statewide voter registration system. The Governor's biennial budget provides for funding the chief election inspector training program with HAVA funds. This will be done with Title I payments.

Remaining Section 101 funds will be used for costs associated with the voter education, election official training and disability access requirements of HAVA. The use of Title I funds is subject to executive and legislative approval.

Wisconsin has also received HAVA Section 102 payments to be used as reimbursement for the acquisition of electronic voting systems that replace punch card voting systems and lever voting machines used at the November 2000 election. The three counties that used punch card voting systems and the 15 municipalities that used lever voting machines have not purchased replacement equipment that complies with HAVA Section 301. The State Elections Board will evaluate new voting systems for HAVA Section 301 and disability access compliance and develop an implementation and acquisition plan for compliant voting systems.

The State Elections Board applied for HAVA Section 261 funds to assure access to the election process for persons with disabilities. The payments will be used to fund activities in four areas: accessibility, privacy and independence, training and information. These funds should be available in September, 2003. The State Elections Board staff has worked with representatives of disability advocacy groups to develop a program of activities to carryout the objectives of the disability access grants.

The initial Title II appropriation provides approximately $15.39 million in requirements payments. HAVA requires the State to match this amount by appropriating an amount equal to 5% of the total amount spent. In order to match the initial federal payment, the State must appropriate $810,000 in Fiscal Year 4. The current state fiscal crisis has presented a challenge for the state to find the funding for the required match. The State Elections Board continues to work with the Governor's office, the legislature and local government organizations to identify funding sources to enable the state to leverage the available federal funding.

The State Plan Committee has established the following priorities for the use of Title II requirements payments and the corresponding state match.

- Design, develop and implement a statewide voter registration system.
- Evaluate new voting systems for HAVA Section 301 and disability access compliance.

- Develop an implementation and acquisition plan for compliant voting systems.
- Develop training and education programs for voters, election officials and poll workers.

If no additional federal funding is appropriated, Wisconsin will not be able to fund the requirements mandated by HAVA. Wisconsin must also appropriate the required 5% spending match. At this point only $333,000 of the $810,000 needed in FY 4 has been set aside by the Legislative Joint Committee on Finance.

Wisconsin's proposed implementation budget based on known and anticipated federal funding is set out in the accompanying tables. The proposal is subject to executive and legislative budget decisions.

### Estimated HAVA-Related Receipts

| Federal Fiscal Year | Total Federal Funds | Wisconsin Federal Share | 5% State Match Requirement* |
|---|---|---|---|
| **Early Payments** (Title I Funds HAVA Sections 101 and 102) | $650,000,000 (appropriated) | $7,002,800 | $0 |
| **2003** (Title II Funds HAVA Section 251) | $833,000,000 (appropriated) | $15,390,000 | $810,000 |
| **2003** (Title II Funds HAVA Section 261) | $13,000,000 | $184,400 | $0 |
| **2004** (Title II Funds) | $481,000,000 (President's Budget) | $8,887,000 | $468,000 |
| **2005** (Title II Funds) | $600,000,000 (authorized) | $11,085,000 | $583,000 |
| **Total** | **$2,577,000,000** | **$42,549,200** | **$1,861,000** |

Source: Federal Funds Information for States, Issue Brief 03-08, FY 2003 Election Reform Funding, March 5, 2003.

*5% State Match Requirement is calculated as 5% of the total of the combined state and federal portions of expenses. This calculation requires a multiplier of .0526 (i.e., 5/95 ~ .0526) of the federal funds. For FY 4, the $810,000 state match is 5.26% of the federal contribution of $15,390,000. Of the combined expenditure of $16,200,000 the state match of $810,000 is 5%.

The amounts listed for FFY 4 and FFY 5 are estimates based on information available at the time the plan was prepared. The state match had not been appropriated at the time the plan was prepared.

### Estimated HAVA-Related Expenditures

| HAVA | Total Cost | Section | Section | Section | Section | 5% State |
|---|---|---|---|---|---|---|

| Requirements | | 101 Funds | 102 Funds | 251 Funds | 261 Funds | Match |
|---|---|---|---|---|---|---|
| Statewide Voter Registration System | $26,295,000 | $4,182,000 | | $21,007,500 | | $1,105,500 |
| Voting System Standards – Acquire Accessible Voting Equipment | $16,418,800 | | $1,308,800 | $14,354,500 | | $755,500 |
| Voting Information Toll Free Access | $200,000 | $200,000 | | | | |
| Disability Access | $387,400 | $203,000 | | | $184,400 | |
| Voter Outreach and Election Official Training | $889,000 | $889,000 | | | | |
| State Plan Management | $220,000 | $220,000 | | | | |
| TOTAL | $44,410,200 | $5,694,000 | $1,308,800 | $35,362,000 | 184,400 | $1,861,000 |

The proposed expenditures are based on the assumption that the funding level set out in the chart detailing anticipated HAVA funding sources is available for use by the state.

Wisconsin is assuming that the costs of complying with HAVA will not end after federal appropriations have ceased. The State Elections Board plans on holding in the Election Fund any unspent federal funds remaining after all HAVA requirements have been met and using the interest earned from these funds to pay on-going maintenance and program costs at the state and local levels.

Based on these funding levels, the State HAVA budget is representative of the activities to implement and conduct operations and maintenance through June 30, 2007 (FY 7) for the HAVA Title III requirements and "other" activities. The budget will be revised over time based on the most current information available regarding federal funding.

The duration for the budget is based on HAVA deadlines and projected funding. The federal government has not appropriated the full funding authorized in HAVA. It is essential that the federal government follow through on its commitment to assist in the funding of the HAVA mandated changes. The lack of full federal funding will make implementation of HAVA virtually impossible.

The State is also concerned that beyond the three years of federal funding, the ongoing costs of operating and maintaining the statewide voter registration system and new voting equipment will be considerably higher than current local budgets for these efforts and any unspent money in the State Election Fund. The operation and maintenance of the new infrastructure will be a financial burden when HAVA funding is no longer available.

### Section 7 – Maintenance of Effort

I APP. 239
Exhibit 9

*How the State, in using the requirements payment, will maintain the expenditures of the State for activities funded by the payment at a level that is not less than the level of such expenditures maintained by the State for the fiscal year ending prior to November 2000.*

Wisconsin will maintain the level of state expenditures for HAVA requirements at the same or greater level as the State spent in the fiscal year (FY 2) ending before the November 2000 election. In that fiscal year, the State Elections Board spent no funds on activities related to HAVA requirements. The agency's election-related budget consisted of two Full Time Equivalent (FTE) elections specialists. These positions have been maintained despite a reduction in the agency staffing level as a result of the current fiscal crisis.

The positions will continue to be funded with state funds. All HAVA payments will be used to augment the preexisting level of state funding for election administration. Any payments distributed to local government will be conditioned on a continuing maintenance of effort to ensure that federal funds do not replace existing local government expenditures on election administration.

## Section 8 – HAVA Performance Goals and Measures

*How the State will adopt performance goals and measures that will be used by the State to determine its success and the success of units of local government in the State in carrying out the plan, including timetables for meeting each of the elements of the plan, descriptions of the criteria the State will use to measure performance and the process used to develop such criteria, and a description of which official is to be held responsible for ensuring that each performance goal is met.*

Performance goals and measures will be developed by the State Elections Board staff in consultation with the Election Administration Council. The performance goals will provide a high level description of the implementation elements of the State Plan. For each performance goal, a set of performance measures will be developed to measure the success of state and local election officials in meeting the described goal. The performance measures will include criteria for evaluating the scope, scheduling, resources, quality and risk management associated with each project.

Each performance goal will be part of a single or composite project activity designed to implement the elements of the State Plan. The projects will be under the general direction of the executive director of the State Elections Board. Each project will have a leader who will be responsible for ensuring that each performance goal is met.

The performance measures will be developed under the direction of each project leader. The criteria for the performance measures will be drawn in part from statutory requirements and the timetables established by HAVA and the state election calendar. The Election Administration Council and local election officials will assist agency staff in developing qualitative measures for determining the successful implementation of the elements of the State Plan. The executive director will assign a staff member to monitor the overall development of performance criteria and collect information that measures the progress toward meeting the established criteria.

The State Plan Committee has identified eight general project activities around which performance goals and measures will be developed. They are described below. The names and titles of current agency staff described in this section are set out in Appendix 2.

### Statewide Voter Registration System

The agency's Elections, Training and Information Technology Director is the project director for the design, development and implementation of the statewide voter registration system. The State Elections Board plans to hire a consultant to work with agency staff and a liaison from the Department of Electronic Government to develop the performance goals and measures associated with this project. This project is part of the implementation of Sections 1 and 3 of the State Plan.

### Voting Systems Standards

The State Elections Board plans to hire a staff member whose primary responsibility will be to evaluate new voting systems for HAVA Section 301 and disability access compliance and develop an implementation and acquisition plan for compliant voting systems. This individual will be a part of the agency elections team under the direction of the Elections, Training and Information Technology Director. The elections team will work with the Election Administration Council and local election officials to develop the performance goals and measures associated with this project. This project is part of the implementation of Section 1 of the State Plan.

### Accessibility to the Electoral Process

The State Elections Board plans to hire a staff member whose primary responsibility will be to promote increased access to the election process for people with disabilities through the use of specially designed voting systems, improvements to facilities, training of elections staff and enhanced public outreach. This individual will be a part of the agency elections team under the direction of the Elections, Training and Information Technology Director. The elections team will work with the Election Administration Council, representatives of groups of individuals with disabilities and local election officials to develop the performance goals and measures associated with this project. This project is part of the implementation of Sections 1 and 3 of the State Plan.

### Voter Education

The agency elections team under the direction of the Elections, Training and Information Technology Director will work with the Election Administration Council and local election officials to develop the performance goals and measures associated with this project. This project is part of the implementation of Sections 1 and 3 of the State Plan.

### Election Official Training

The agency elections team under the direction of the Elections, Training and Information Technology Director will work with the Election Administration Council and local election officials to develop the performance goals and measures associated with this project. The chief election inspector training and certification program is a significant element of this project. The

I APP. 240

Exhibit 9

implementation of the statewide voter registration system will also have a significant training component. This project is part of the implementation of Sections 1 and 3 of the State Plan.

Complaint Procedures

The administrative complaint procedure will be established by the proposed HAVA implementation legislation. The agency Legal Counsel will work with the Election Administration Council to develop the performance goals and measures associated with this project. This project is part of the implementation of Section 9 of the State Plan.

Budget and Fiscal Controls

The State Elections Board plans to hire a staff member whose primary responsibility is to manage the receipt and disbursement of HAVA payments. This individual will work under the direction of the Campaign Finance and Agency Operations Director, and serve as a member of the agency budget team. This individual is responsible for ensuring that all financial transactions are in compliance with applicable state and federal procurement requirements. This individual will also monitor the development of all project performance criteria and collect information that measures the progress toward meeting the established criteria. The agency budget team will develop the performance goals and measures associated with this project. This project is part of the implementation of Sections 1, 2, 5, 6, 7, 8 and 10 of the State Plan.

Plan Management

The Executive Director of the State Elections Board, will work with the Election Administration Council, agency staff and local election officials to manage the State Plan. The State Elections Board views the State Plan as a dynamic, living document. The Election Administration Council will continue to meet to revise and refine the State Plan to reflect the goals of HAVA and respond to legislative and executive direction. The State Elections Board and the Election Administration Council will review the plan in January of each year in order to incorporate changes that reflect the state's progress in implementing HAVA and addressing new election–related challenges.

The Executive Director will work with the Election Administration Council to develop the performance goals and measures associated with this project. The State Elections Board has drafted legislation that requires the Legislative Audit Bureau to conduct a program audit of the agency to evaluate the implementation of HAVA. This will enable an outside entity to review the management of the State Plan.

This project is part of the implementation of Sections 11, 12 and 13 of the State Plan.

## Section 9 – State-Based Administrative Complaint Procedures

*A description of the uniform, nondiscriminatory State-based administrative complaint procedures in effect under Section 402.*

The State Elections Board has drafted legislation that establishes an administrative complaint procedure to comply with HAVA Section 402. The draft procedure is consistent with current election complaint procedures set out in S. 5.06, Wis. Stats., and ElBd Ch. 10, Wis. Adm. Code. The current compliance review procedures meet the HAVA requirements for a uniform, nondiscriminatory State-based administrative complaint procedure.

Currently, an elector who believes that the action or inaction of an election official concerning nominations, qualification of candidates, voting qualifications, ward division and numbering, recall, ballot preparation, election administration, or the conduct of elections is contrary to law or that the actions or inactions of an election official with respect to any such matter constitute an abuse of discretion, may file a complaint with the State Elections Board and the agency may order appropriate relief. The decision of the Board may be appealed to the courts. Any elector who believes that an election official is acting in violation of the law may request the appropriate district attorney or, in some cases, the attorney general to petition a court for appropriate relief. However, the recount procedure is the exclusive judicial remedy for addressing any alleged irregularity, defect, or mistake committed during the voting or canvassing process.

The draft legislation creates another procedure for addressing alleged noncompliance with any provision of HAVA relating to voting system standards, provisional voting, voting information, registration procedure and administration, and voter identification. Whenever any person (whether an individual or another entity and whether inside or outside this State) believes that a violation of HAVA has occurred, is occurring, or is proposed to occur with respect to an election for national office in this State, that person may file a written, sworn complaint with the State Elections Board. The agency must grant the complainant a formal hearing upon request and must issue a decision on the complaint, together with an order for any appropriate relief, within 89 days. The relief may not include any order affecting the right of any person to hold an elective office or affecting the canvass of an election on or after the date of that election.

## Section 10 – Use of Title I Payments

*If the State received any payment under Title I, a description of how such payment will affect the activities proposed to be carried out under the plan, including the amount of funds available for such activities.*

The State Elections Board has received payments under HAVA Title I. The State Elections Board plans to use the HAVA Section 101 payments to reimburse the agency for staff training costs associated with HAVA and agency costs associated with the preparation of the State Plan. The payments will also be used to hire four FTE agency staff to implement HAVA requirements. Section 101 funds will also be used to hire a consultant to design the Request for Proposal (RFP), select a vendor and project manage the implementation of the statewide voter registration system. The Governor's biennial budget provides for funding the chief election inspector training program with HAVA funds. In the next biennium, these costs will also come from the Section 101 payments.

Section 101 funds may also be applied to the development of an election information management system for the State Elections Board. Remaining Section 101 payments will be used for costs associated with the voter education, election official training and disability access requirements of HAVA.

I APP. 241

Exhibit 9

The state has also received HAVA Section 102 payments to be used as reimbursement for the acquisition of electronic voting systems that replace punch card voting systems and lever voting machines used at the November 2000 election. The three counties that used punch card voting systems and the 15 municipalities that used lever voting machines have not purchased replacement equipment that complies with HAVA Section 301. The State Elections Board will evaluate new voting systems for HAVA Section 301 and disability access compliance and develop an implementation and acquisition plan for compliant voting systems. Section 102 payments will be part of the acquisition funds that apply to the voting equipment purchased for the qualifying counties and municipalities.

## Section 11 – State Plan Management

*How the State will conduct ongoing management of the plan.*

The State Elections Board has drafted legislation that establishes an Election Administration Council whose members are appointed by the chief State election official, the Board's executive director, consistent with the directions set out in HAVA Section 255 (a). The State Elections Board views the State Plan as a dynamic, living document. The Election Administration Council will continue to meet to revise and refine the State Plan to reflect goals of HAVA and respond to legislative and executive direction. The State Elections Board and the Election Administration Council will review the plan in January of each year in order to incorporate changes that reflect the state's progress in implementing HAVA and addressing new election–related challenges.

The State will not make any material change in the administration of the plan unless the change is developed and published in the Federal Register in accordance with HAVA Section 255 in the same manner as the original State Plan. Any modifications to this State Plan will be subject to public notice and comment in accordance with HAVA Section 256. The revised State Plan will take effect only after the expiration of the 30-day period which begins on the date the change is published in the Federal Register.

The State Elections Board has drafted legislation that requires the Legislative Audit Bureau to conduct a program audit of the agency to evaluate the implementation of HAVA. This will enable an outside entity to review the management of the State Plan.

## Section 12 – Changes to State Plan from Previous Fiscal Year

*In the case of a State with a State plan in effect under this subtitle during the previous fiscal year, a description of how the plan reflects changes from the State plan for the previous fiscal year and of how the State succeeded in carrying out the State plan for such previous fiscal year.*

This State Plan is the first State Plan required under the Help America Vote Act of 2002. This section will be updated in the next fiscal year, reflecting changes to the State Plan, as well as a summary of the 2003 successes.

## Section 13 – State Plan Committee

*A description of the committee which participated in the development of the State Plan in accordance with HAVA Section 255 and the procedures followed by the committee.*

The State Plan Committee was appointed in January 2003 by the Executive Director of the State Elections Board, Wisconsin's chief election official. S. 5.05 (1)(a), Wis. Stats. The committee consists of 17 Wisconsin citizens from throughout the State. There are nine local election officials, including the chief election officials for the City of Milwaukee and Milwaukee County. The committee has three representatives of groups of individuals with disabilities. A list of the committee members is attached to the State Plan as Appendix 3.

The committee held meetings in Madison on February 28, March 12 and April 24, 2003. Committee members also reviewed the draft legislation developed by the State Elections Board to implement HAVA and provided comments to the agency's executive director for inclusion in the draft legislation. Committee members also attended public hearings held on May 21, June 4 and June 9, 2003, as part of the opportunity for public comment on the Preliminary State Plan.

## Appendix 1 – State Elections Board Members 2003-2005

**KIRBY BRANT**
Madison

**SHANE FALK**
Madison

**DONALD R. GOLDBERG**
Milwaukee

**DAVID HALBROOKS**
Milwaukee

**PATRICK J. HODAN**
Brookfield

**MARTHA LOVE**
Milwaukee

**GORDON MYSE**
Sturgeon Bay

**JOHN P. SAVAGE**
Milwaukee

**JOHN C. SCHOBER**
New Berlin

Exhibit 9

Federal Register / Vol. 69, No. 57 / Wednesday, March 24, 2004 / Notices

**Appendix 2 – State Elections Board Staff**

**KEVIN J. KENNEDY**
Executive Director

**BARBARA A. HANSEN**
Elections, Training and Information Technology Director

**SHARRIE HAUGE**
Campaign Finance and Agency Operations Director

**GEORGE DUNST**
Legal Counsel

**Appendix 3 - State Plan Committee Members**

**LYNN BREEDLOVE**
Wisconsin Coalition for Advocacy

**CAROLYN CASTORE**
Citizen Action/League of Women Voters

**PAULA DORSEY**
Operation Big Vote

**FAITH ELFORD**
City Clerk, City of Fort Atkinson, Jefferson County

**DOUGLAS D. HAAG**
Commissioner, Milwaukee County Board of Election
Commissioners

**JULIETTA HENRY**
Executive Director, City of Milwaukee Board of
Election Commissioners

**PATRICK HODAN**
Member, State Elections Board

**MARCIA KELLY**
Town Clerk, Town of Dale, Outagamie County

**KEVIN J. KENNEDY**
Executive Director, State Elections Board

**NAN KOTTKE**
County Clerk, Marathon County

**MARK RICCOBONO**
National Federation of the Blind of Wisconsin

**AUDREY RUE**
Town Clerk, Town of Blooming Grove, Dane County
& Town Clerk, Town of Brigham, Iowa County

**HOWARD SEIFERT**
Wisconsin Council on Developmental Disabilities

**HELEN STEFFEN**
County Clerk, Burnett County

**JIM VILLIESSE**
City Clerk, City of New London, Outagamie &
Waupaca County

**SANDI WESOLOWSKI**
City Clerk, City of Franklin, Milwaukee County

**ALFONSO ZEPEDA-CAPISTRAN**
Latinos United for Change and Advancement
(LUChA)

I APP. 243

Exhibit 9



# City of Madison

City of Madison
Madison, WI  53703
www.cityofmadison.com

## Master

### File Number: 60266

| | | |
|---|---|---|
| **File ID:** 60266 | **File Type:** Resolution | **Status:** Council New Business |
| **Version:** 2 | **Reference:** | **Controlling Body:** COMMON COUNCIL |
| | | **File Created Date :** 04/16/2020 |
| **File Name:** Commending Clerk, others for their work on election | | **Final Action:** |

**Title:** SUBSTITUTE - Recognizing and commending the City Clerks' office, City Staff, volunteers, and organizations for their commitment to ensure that the City of Madison preserved the voting process.

**Notes:**

**Sponsors:** Sheri Carter, Keith Furman, Satya V. Rhodes-Conway, Shiva Bidar, Barbara Harrington-McKinney, Syed Abbas, Christian A. Albouras, Samba Baldeh, Tag Evers, Grant Foster, Patrick W. Heck, Zachary Henak, Rebecca Kemble, Lindsay Lemmer, Arvina Martin, Donna V. Moreland, Marsha A. Rummel, Michael J. Tierney, Michael E. Verveer and Paul E. Skidmore

**Effective Date:**

**Attachments:** 60266 v2.pdf

**Enactment Number:**

**Author:** Ald. Sheri Carter, District 14 & Ald. Keith Furman, District 19

**Hearing Date:**

**Entered by:** lveldran@cityofmadison.com

**Published Date:**

## Approval History

| Version | Date | Approver | Action |
|---------|------|----------|--------|
| 1 | | Laura Larsen | Approve |
| 2 | | Elizabeth York | Approve |

## History of Legislative File

| Version: | Acting Body: | Date: | Action: | Sent To: | Due Date: | Return Date: | Result: |
|----------|--------------|-------|---------|----------|-----------|--------------|---------|

I APP. 244

Exhibit 10

*Master Continued (60266)*

| 1 | Council Office | 04/16/2020 | RECOMMEND TO COUNCIL TO ADOPT UNDER SUSPENSION OF RULES 2.04, 2.05, 2.24, & 2.25 - MISC. ITEMS |
|---|---|---|---|

| **Action Text:** | This Resolution was RECOMMEND TO COUNCIL TO ADOPT UNDER SUSPENSION OF RULES 2.04, 2.05, 2.24, & 2.25 - MISC. ITEMS |
|---|---|
| **Notes:** | |

| 1 | COMMON COUNCIL | 04/21/2020 | |
|---|---|---|---|

**Text of Legislative File 60266**

Fiscal Note
No appropriation required.
Title
SUBSTITUTE - Recognizing and commending the City Clerks' office, City Staff, volunteers, and organizations for their commitment to ensure that the City of Madison preserved the voting process.
Body
WHEREAS, over 60 city staff from Building Inspection, Planning, Weights & Measures, the City Assessor, the Mayor's Office, the Council Office, and stagehands to the #TeamCity agencies, Dane County mail room, Dane County print shop, and County Clerk's Office, Traffic Engineering, Parks, Fire department, Finance, IT, City Attorney's office, the Emergency Operations Center, **Engineering-Sustainability,** Monona Terrace, and the libraries, Parking Utility cashiers assisted the clerks' office diligently to ensure the election of April 7, 2020 was safe for the residents and the poll workers, and,

WHEREAS, Parking Utility cashiers ~~who~~ helped count absentees at the 9-1/2 hour Board of Canvassers meeting, the **numerous** facilities ~~that~~ agreed to serve as polling locations in the midst of the pandemic, Badger Cab drivers ~~for~~ serv**ed** as absentee couriers on Election Day, and Union Cab ~~for~~ provid**ed** voters with free rides to the polls on Election Day; and,

WHEREAS, the city staff came from various department **along with volunteers** to the aid of the Clerk's **O**ffice to help with labeling, stuffing envelopes, pulling ballots, and stuffing ballots **, and assisting with early absentee and curbside voting** during the days and hours up to the election, and,

WHEREAS, the Clerk's **O**ffice was running close to empty on envelopes, and American Family stepped up to print 25,000 envelopes to keep the process going forward, and,

**WHEREAS, while processing voter registrations and absentee ballot requests, the Clerk's Office also assisted hundreds of residents per day who were struggling to navigate the online systems for uploading a voter ID and requesting an absentee ballot, and**,

WHEREAS, 4,828 individuals used curbside and in-office early in-person absentee voting with and extended hours to adjust for the demand, and,

WHEREAS, the clerk's office issued 87,890 absentee ballots, 69,437, were returned, and,

I APP. 245

Exhibit 10

WHEREAS, NewBridge, The Dane County Voter ID Coalition, and the League of Women Voters of Dane County assisted individuals who needed witness signatures on their absentee ballots, and,

WHEREAS, Engineering worked to ensure the safety of the poll workers during the election by building screens to protect them during the election, and,

WHEREAS, the 1,400 poll workers who made the tough decision to ~~volunteer~~ **dedicate** their time so our residents could vote, and 1,761 poll workers who understandably made the heart wrenching decision that they could not work at the polls, and together they all are our heroes today, and,

WHEREAS, the National Guard came to join the effort **so** that the election **would** go on until the last person cast their vote, and,

WHEREAS, despite efforts by the state legislators not acknowledging that the pandemic has created challenges to voting, residents of all ages, ethnicities, and genders came to the polls to exercise their right to vote, and,

WHEREAS, today April 21, 2020 we honor the Clerk's **O**ffice, City Staff, City Agencies, Engineering, Poll Workers, and all the volunteers,

NOW, THEREFORE, BE IT RESOLVED that City of Madison, the Mayor and the Madison Common Council do hereby recognize and commend the City Clerk**'**s **O**ffice, City Staff, volunteers, and organizations for their commitment to ensure that the City of Madison preserved the voting process by having 66 of the 92 polling locations open.

Exhibit 10