# Affidavit
# of Jesse Richard Morgan

Jesse Richard Morgan personally came and appeared before me, the undersigned investigator, who is a resident of York County, State of Pennsylvania, and is an employee of Roads 10 Express, a contracted company hauling mail for the United States Postal Service, who makes his statement, testimony, and affidavit under oath or affirmation, in good faith, and under penalty of perjury, of sincere belief and personal knowledge that the following matters and facts set forth are true and correct, to the best of his knowledge.

Smith: Today's date is November 20th, 2020. This is Dean Smith taking a recorded statement and affidavit from Jesse Morgan. Mr. Morgan, you're aware I am recording this conversation?

Morgan: Yes, I am.

Smith: And I have your permission?

Morgan: Yes, you do.

Smith: For the record, could you just state your full name? Date of birth?

Morgan: Jesse Richard Morgan. Uh, birthday 9/10/83.

Smith: And your current address.

Morgan: 1893 Ridgewood Road, York, PA 17406.

Smith: For the record, this is the address we are at presently taking this recorded statement. The scope of this interview/affidavit is to go over the events that took place on October 21st during your employment at Roads 10 Express. How long have you been employed at Rhodes 10 Express?

Initials: _____

I APP. 605

Morgan: 15, 16 months. 16 months.  Somewhere around there.

Smith: Your position there is a truck driver.

Morgan: Yes. Tractor trailers, I haul mail.

Morgan: I used to haul it out of Lancaster, uh, to Bethpage, New York. And also Philadelphia, used to also pick up at customs in Philadelphia. Then I switched over to just run in Bethpage, New York out of Lancaster. Um, at the end of September. I've been doing that ever since.

Smith:  When you say Roads 10 Express, you haul mail, is that for the U.S. Postal Service?

Morgan: United States Postal Service? Yes, it is.

Smith: That's the only thing you haul, yes? No other kind of packages?

Morgan: No, there's Amazon. Whatever the mail, whatever they're picking up whatever they're thrown on the trailer, I'll bring it. Amazon packages, that are being sent through the USPS

Smith: Through the USPS ?

Morgan: It's coming through U.S. Post Office.

Smith: You're not carrying for Walmart directly?

Morgan: Well, we actually…United States Postal Service just picked up a big contract through Walmart. So there's every now and then, you see some Walmart packages now.

Smith: I just want to clarify, but it's specific. You guys are specific for U.S. postal service.

Initials:

I APP. 606

Morgan: Yes, I'm shipping directly.

Smith: You're never going to a Walmart.

Morgan: No, no, no. I leave one post office and go straight to another post office. I don't go to Amazon's or Walmart's or anything like that.

Smith: That's what I need to clarify. And your normal work hours?

Morgan: I work Tuesday to Sunday. I usually go in around 11:30 at night, and I get to get in my truck. Um, about 12. Do pre trip usually log in between 12:15 and 12:40 and then I roll over to the post office, hook up to the trailer, and usually head off to the post office by one o'clock in the morning.

Smith: Alright. Now, are you assigned the vehicle or truck?

Morgan: Yes, I'm assigned one.

Smith: Does anybody else have access or use that truck beside you?

Morgan: No, no one does.

Smith: How about a trailer? Are you assigned the trailer?

Morgan: Um, not assigned. The trailer, but I have been having the same trailer. I have had the same trailer. It was, I got the trailer and I had it for a month. Continuous. Nothing wrong with it. Great trailer usually after that, if I would get a bad trailer, I'm not trying to jump too far forward here. But if I get a bad trailer, what I do is my door, that I pull that trailer, I'll put it in door 35 or 33. So that way they have to pull it, and then they'll put it over in the drop lot. And then whenever someone else will come back or whatever, then they'll move their trailer over to my section.

Smith: Is that the way it's done? You let them know, 'I do not want this trailer?'

Initials:

I APP. 607

Morgan: No, I don't say, it's just the way. It's how I figured out how it worked.

Smith: So how long have you had this trailer for?

Morgan: This one or the prior one? The prior one? I had it from the end of September, all the way up to October 21st.

Smith: All right, so let's talk about October 21st. And what happened that day. You explained earlier that you go, pick your cab up at Lancaster. You park that where?

Morgan: It's behind a car lot, but the car lot Auto One It's in Lancaster. I get the streets mixed up, it was either Mannheim or Harrisburg. But, um, so you pull in the parking lot and you'll see there's four of our trucks sitting there.

Smith: The name of the place is One Auto ?

Morgan: Auto One. Auto or Auto One. Something like that.

Smith: Is it a gated area where you park your tractor?

Morgan: They have a gate there, but it's always open.

Smith: Okay. And are there any video cameras or security cameras on the vehicles?

Morgan: On the trucks? That we do have cameras inside the trucks that face the road and also faced a driver? I can see not from the gated part, but I'm probably I mean, it's a car lot, so I'm pretty sure they have cameras somewhere on the outside of those I never looked for them, though.

Smith: So you pick up your tractor. You do your pre-check, then you drive over to the post office. How far away is the post office?

Initials: _____

I APP. 608

Morgan: 3-4 minutes away. It's not far.

Smith: And is it that Lancaster Post Office?  Is there only one Lancaster post office or more?

Morgan: I don't. This is a main distributor, so I don't know if they have little sister ones around or not.  This is the main distribution center yes.

Smith:  Printed out this map. There's a couple of different ones. Look at the names, addresses…

Morgan: It would be this one on 1400 Harrisburg Pike, so the car lot where I park the tractor would be on  Mannheim Pike.

Smith:  So, the car lot is on Mannheim Pike, where the truck is, and the trailer is kept at the post office on Harrisburg?

Morgan: Door 34 every night, every day when I come back and I pulled back in to door 34.

Smith: Tell me how that works as far as how to pick up your daily load.

Morgan: All right. So usually whenever I get there, this is the process is I pull in and I will back under the trailer. I will hook up all my lines, lift up the landing gear, put my four ways on. I put my four ways on this. A trick, okay. So, put four ways on, because then you can look at the back where the loading dock is And if you see both flashing against the building, then you know that you're working. If you do not see that, or you only see one, you know, one of your taillights are out. Alright, so you got to get that fixed.  Tell them 'Hey, I am not trying to get a fine,' and fines double if it is a tractor trailer. They either fix it or switch out trailers. I always have my badge, so they'll go and scan my badge and I know it was like they will assign it to my run, which my run is 611, 611 leaves out of Lancaster. Right. I will go over the trailer. If they are not done loading it, I will stand there and wait. And I always watch just so that way, I'm making sure that's loaded right. I do not want one side of the trailer loaded, heavy, one side loaded light. I don't want, you know; I want it spread out. If it is spread out, it benefits you two ways, okay? If it's, if you're heavy on one side, if you go around a bend, you have a higher chance of rolling. Alright, if it's spread out, it's a smooth ride. You put all the weight at the tail end of your trailer. Okay? One. You probably get a ticket if you go on a weight station, but it makes for the most miserable ride. Because your whole time you're just bouncing because you're going like your trailer is going like

Initials: _____

I APP. 609

this, you know? So, I always make sure they load it right. And then after they are done loading, I go and strap up. And then the guy who prints me out two tickets, I call them tickets. Some people might call him slips. I call them tickets because they look like a ticket. I might have a few here if you want to look. Look at one.

Smith: Do you have any from the 21st?

Morgan: No, I tried finding it.

Morgan: I do have the October 7 and 10 tickets. I took my car to the garage to get it worked on, and I cleared everything out of my car and threw it away.

Morgan: I could find these two. Alright, so I want you to see the dates. This is 10/10 and 10/7. So right here is the trailer 10R1440 So I had the trailer, those dates. Okay, so I just wanted to see like it. I mean, I have had this trailer continuous, you know, amount of time. But these are the tickets, so I'll explain it to you. So here's my route number. I'm always route 17091, then my trip.

Morgan: So this one, I was loaded when I left Bethpage. I was loaded. 100% leaving out when I left Lancaster to go to Bethpage, I was loaded at 34%. And then there's the van where it says van numbers, the trailer. Let's see here. There's my name. I think this is a time that I'm supposed to leave.

Smith: Okay, so these are really important. I'm just going to put them here.

Morgan: If you want to keep, you can.

Smith: Thank you, these could be important to the facts of this investigation.

Smith: If you pull up to a place without one of them, what are they going to do?

Morgan: I never did it before. I never, I never pulled up to a place without one. I mean, they are very important because that is what they use. They have scanners. Okay. And how they know. Everything is scanned. So, I'll pull up, they will scan the ticket, then they scan my badge. Then

Initials: 

I APP. 610

they will go over to the trailer. So, the loading dock, they will scan the loading dock. Alright. Because the loading dock will have a barcode. And then they will scan the trailer, back of the trailer has a barcode. They will scan the seal on the door. That is a metal seal that must be cut off. So that way, everything matches up everything.

Smith: It is a chain of custody. So, you know that this truck was loaded by this person at this dock and this driver took the truck at this time and know where it was going.  This is standard procedure.

Smith: So on October 21, 2020, anything out of the ordinary?

Morgan: No. Nothing was out of the ordinary. Nothing. Everything was going well. They loaded up, strap myself in or strapped the pallets in, shut the door. They put the seal on, and off I rolled.

Smith: Did you notice what you were bringing that day? Do you know what, was in your trailer?

Morgan: Out of Lancaster? No, it was just, it's been such a normal thing. It's just packages, mail. I could, just normal stuff. That's what I always bring.

Smith: So you go on your way to Bethpage, New York?  How long did take you to get to Bethpage, New York?

Morgan:  I get to Bethpage in three hours and fifteen minutes. I've done it enough times. It is easy, I love going to New York, it's my kind of place. I'm not a city guy.  I would not want to live back in the city. But I love going there just to see it like, I mean, it's never a dull moment. There's always something, and it is New York, it's not all Jets and Giants fans. There are some Bills fans up there, too. So I like I like going up there and talking to the people and seeing stuff. And I mean, you could just drive there, ah, 100 times and 100 different times. You could see something different.

Smith:  So, you get up there on the 21st, and you drop off, you pull into the same spot as you do every time you go to Bethpage, NY.

Morgan:  It is most of the time. So, um, Tuesday through Saturday. I would say I am always on either door 24, 25. Okay, one of those two doors, most of the time is 24 Sunday, though. Sometimes I'll end up in the door 27. I do not know why.

Initials: _____

I APP. 611

Smith: I'm just going to look to see what the date was October 21st.

Smith: October 21st was a Wednesday. So what door do you think you would have pulled into?

Morgan: Probably 24 or 25.

Smith: So when you get up there, who do you deal with? You, you have anybody you know by name up there that you deal with?

Morgan: No. Romeo, I've been dealing with him for a long time, Romeo. He's an expediter.

Smith: An expediter for the United States Post Office. He is an employee of them?

Morgan: When I get to Bethpage, I stop at the guard shack. I don't know his name, but he's really cool. He's from Jamaica, and he always talks with me because my last name's Morgan. He's like, 'Captain Morgan. You're here.' Then I proceed to the dock where I see Romeo

Smith:  Romeo. Do you know his last name?

Morgan: I do not know his last name.

Smith: What's he looks like?

Morgan: He's from Thailand or something, somewhere over in Thailand. Yeah, Thailand or Korea. One of those. But he is Asian. He does not sound Asian though. He grew up over there but moved over here. But he does not sound like he speaks really good English. He is in his fifties.

Smith: Has he been working there for a long time.

Morgan: I don't know how long he's been working there, but I take it he's probably been there for a while from the position here.

Initials:

Smith:  How many expeditors do they have there in Bethpage, NY?

Morgan: Usually two. Sometimes three.  When you pull into the door, it's either 24 or 25 or 26. So you have two, maybe three expediters over here. Usually two and then down the other end, you might have one or two on the other end.

Morgan: I don't know their names at all. I only deal with them every now and then. But it's usually an Asian lady down there that's usually there whenever I come in.

Smith: Then you have Romeo. And is there anybody else?

Morgan: Then there is the lady that I dealt with on the 21st. I do not know her name. I have not seen her. I'm trying to get her name for you guys. I have not seen her, though. She hasn't been working or on vacation. I do not know if she took extended break. She is blonde, white female in her mid to late forties like 40, 45 around there. 47.

Smith: Have you seen her before?

Morgan: I've seen her there before.  She has blonde hair that keeps it kind of like, braided back.

Smith: So, she's the 13 expediter is the one that loads up the truck.

Morgan: No, expediters who I deal with, who I give my ticket to who scans everything, okay? So that's the person I see whenever I come to a place and it's the person I see when I leave the place.

Smith: Who determines what gets put on the truck?

Morgan: That I don't know, but they will assign a loader to unload and load you, alright? That day was weird.  Because when I went in, I saw her, and I was like, 'Hey, how are you doing?' I always talk to them Always. You don't want to piss them off, because then you end up sitting there for hours. So always be nice. Hey, how are you doing? You know, small talk and get on your way. And that day she was like, 'Hey, how are you?' I'm like, 'I'm doing pretty good. How are you?' She is like, 'Guess what? You got mail-in ballots today,' or you know, something in that line. And I was just, like, 'Really?' She's like, 'You're taking back a shipment of mail-in

Initials: _____

I APP. 613

ballots." I was like, 'Oh, that's cool.' You know, I was like, 'Whatever,' I thought it was pretty cool. I was like, 'Oh, that's neat.' Like I am doing something for the presidential race, you know. Like I was like, 'That's neat,' you know? So, I go over to the trailer and I'm, and I'm standing there, they're unloading me, they start bringing gaylords out. Two pallets for Lancaster that they put in the nose and they were tall, tall gaylords. Alright? The rest was for Harrisburg. There where about 24 bins of mail-in ballots. I call them A and B units. I don't know exact names for them but their own rollers there on like, aluminum rollers.

Smith: So, clarify this for me. Were they loading your trailer with only mail-in ballots that day? Or there was other mail mixed in?

Morgan: It was all mail-in ballots. Besides the two pallets they put in the nose of the trailer for Lancaster, what I normally bring.

Smith: How could you tell that?

Morgan:  Because well, you know, I can't really tell because it was it was a tall thing, but it just, I figured it was, well it looks like someone's shipping exhaust pipe or something. Like just a long, freaking thing in a cardboard box. Don't take me for 100%, alright?

Smith: So what your saying is you're not sure what was in the two large pallets in the nose of the truck for Lancaster?  You don't know if that was regular mail or mail-in ballots. The bins sizes are 4 feet by 4 feet?

Morgan: Yeah, they usually turn them sideways, alright? And it won't be four by four. Be like, they're bigger. It's like, four by five or something like that. Some weird dimension. But you turn it sideways because they have to put more on a trailer.

Smith: So you said you had about 24 large boxes of mail-in ballots?

Morgan: 24 I believe.

Smith: 24 gaylords four by five, filled with mail-in ballots coming from New York into Pennsylvania, heading to Harrisburg?

Initials:

I APP. 614

Morgan: Supposed to go to Harrisburg. They'll have tags on for Harrisburg tags or placards or a white piece of paper.

Smith: Just kind of tells him where they're going on the outside of the Gaylords?

Smith: But it's an indicator for that box where it's going to go.

Morgan: It's an indicator for that box where it's supposed to.

Smith: So you don't have to sort through the boxes. You could see clearly this is where it has got to go. So is this the first time you ever hauled mail-in ballots?

Morgan: Yes.

Smith: So how did you know they where mail-in ballots being loaded into your trailer?

Morgan: I could see they where mail in ballots that were already used, you could see the names in the return corner of the envelope and there was a strange blue marking on the envelope.

Smith: Blue. What do you mean?

Morgan: It's like some kind of blue mark.

Morgan: I want to say design, but kind of like a blob or something. Like towards the middle of the envelope kind of thing and then there was writing.

Smith: Was it an insignia ? Was it something professional, or is there something somebody put a marker on?

Morgan: No, it was like, it looked kind of like how that they were all uniformed like that.

Initials: _____

Smith: Were all the markings uniformed on the envelopes?

Morgan: I guess they all looked the same on all the envelopes.

Smith:  Same spot on all these ballots? When you say you knew they were ballots, were there any names on the ballots?

Morgan: The envelopes had vote printed on it and there were names written in, in the corner.

Smith: In the return address area of the envelopes? So, they've already filled out by somebody?

Morgan: Yes, already filled out.

Smith:  The return address where they written in by hand.

Morgan: Yeah, they were written in by hand.

Smith: So, you know, these are ballots that were already casted.

Morgan: Yes, I do not think they were blank ballots being shipped out. When I was looking at them, it didn't even dawn on me and I feel like such a klutz now, but it didn't even dawn on me. And then that's when she came over. And she is like, this one really wanted to make her their ballot count because they got their mail-in ballot registered mail. So, like you saw the big red stamp, it was a registered certified mail. So that way, they could track it to make sure it was going to go wherever it was going to go. And they put that on the trailer as well. And that was in a bin that they sat at the end of the trailer by the door. So that was on the trailer as well.

Smith: So that confirmed to you that the ballots in the boxes were already casted. They just needed to get to the polling station to be counted. Crazy question. Do you remember if you looked at those addresses of those envelopes that you saw? The ones with the blue marks and one with the red tag, could you tell if the return address were for the Pennsylvania addresses or New York addresses?

Initials: _____

I APP. 616

Morgan: I don't know, like, because they came by so fast. Like I wasn't like, whatever, I wasn't looking for anything, it didn't dawn on me. Really? You know, I really wish I would have looked at it harder. Part of me look, honestly, got a part of me, wants to sit here and be like, you know, that registered mail, like I looked at it and I saw Queens, New York. But then there's part of me that goes, I don't know if I saw Queens in New York. I don't know if that's just my head's saying that you saw Queens, New York. I don't understand. I don't want to say it if it's not, if I don't know 100%, you know?

Smith: I appreciate that. Because I know what I am asking you is, in hindsight, it's like you knew that this was going to be relevant at the time.

Morgan:  I called my mom that day I was so mad because my brother Ben just got into town, okay? And so that was Wednesday. My brother Ben got into town Monday at, like, eight o'clock at night, so I could not even see him Monday. Tuesday, I saw him a little bit. On Wednesday, I wanted to hang out with him because I have not seen him in two years, alright? And I was just like, I got held up in Harrisburg, but I was so pissed off and like so I called Ben and I talked to him, and I talked to my mom and I was like, 'Yeah, I was like, hauling mail-in ballots today.' I was like, 'Isn't that pretty cool?' You know, it was like 'What do you mean?' It was like, 'I took a whole trailer of mail-in ballots.' Ben's like, 'Wow'. Like, my mom was like, 'Why did you do that?' I was like, 'What do you mean?' Yeah, she was just like, 'Why did you take them? Why were there?' She was like, 'Why were you taking them out of New York into Pennsylvania?' I'm like,' I don't know' when I was like, 'I'm just doing what I'm told.' You know.

Smith: So there's at least 24 bins of ballots on the trailer?

Morgan: Yes. Look, I told them I suck at guessing how many bins or anything because what they do is they pile them on together. Okay, so you have not been there. They kind of the size, kind of go in. So that way you can stack them. Boom, boom, boom, boom.

Smith: I want to ask you a question, is there any way you could estimate how many ballots wherein the 24 bins?

Morgan: No, I can't. I suck at that. There could be 250 or there could be 7,500, I can't.

Smith:  But, you know, it wasn't one or two ballots?

Initials: _____

I APP. 617

Morgan: No, I know it wasn't one or two. No, but we know there was a significant amount of mail-in ballots being shipped from Bethpage, New York.

Smith: Who else did you know out there by name or description? That might be helpful. The three expediters, the Asian woman, Ramon, and the blonde woman and a security guard. You see anybody else out there?

Morgan: See, there's ah, another lady that I talked to. I don't know her name. She's heavyset. She's always, I refer to her as kind of sleepy because every time I ask her, 'How are you doing today?' 'I'm just so tired. I'm ready for bed.' And I'm like, I'm like, 'Okay,' you know, like every day, never fails. You know, 'I'm tired. I am just ready for bed.' I am like, 'Okay.' But like, so there is her, there's ah, Loader, I like talking with one loader. He is a Buffalo Bills fan, you know? I do not know his name. He is, he is getting ready to retire. I know that. He looked like a white guy, he has a son that lives in Nevada or no, Las Vegas. He is going when he retires. He bought a house out in Vegas and he is going to be moving into the house, and his son lives out in Vegas. His son owns a T-shirt business. Really successful T-shirt company, apparently. He is excited because he is going out there on vacation, I believe so. This week or next week.

Smith: Wow, so any other loaders out there?

Morgan: Now there is a another one. He is younger. He is kind of my age. I do not know his name. He, loaded me. Unloaded me maybe three times.

Smith: Do you know who loaded you that day, October 21, 2020?

Morgan: I believe it might have been the Buffalo Bill Guy.

Morgan: I wanna say 100% but, like I'm thinking it might have been the Buffalo Bill guy that might have loaded me that day .

Smith: So they load you up, you get on your way.

Morgan: Yeah, I get, I load up, I go on my way.

Initials: _____

I APP. 618

Smith: Hold on. Back up. They got to give you a ticket, right?

Morgan: Oh, yeah, I get my ticket. I check out, they seal me up.

Smith: When you say they seal you up, they put the code of the seal on the back. They scan all the barcodes from the dock, the truck, your badge and the seals all for matching, correct?

Morgan: And I started back to Harrisburg.

Smith:  What time do you think you got to Harrisburg?

Morgan:  I got to Harrisburg at 9:15 in the morning.

Morgan: I sat in the yard from 9:15AM to 3PM.

Smith: Is that normal?

Morgan: No, no, no. It's not normal. That's the first time that ever happened.

Morgan: Um, no, there has been two times before where I sat, but there was, like, a really long line. There were no docks, and I sat waiting for a dock. But it was never that long. It was like maybe three hours, but I was pissed. I was pissed because, like I said, my brother just came back. I am sitting here like no one's loading/unloading me.

Smith: Were there any docks open?

Morgan: Yeah, there were bays open. There's bays open that I could go to in the front and on the side. I'll try around the side and I'll dock. And now I walk in because I'm not doing that waiting bullshit ever again. Like never, even though, like they'll pay me for it. But I don't want to sit there like I literally sat there as long as it would have took me to drive from Lancaster to New York and New York to Harrisburg. I sat there that whole time, like waiting.

Initials:

I APP. 619

Smith: So you're there from 9:15AM to 3PM.

Morgan: Until three something in the afternoon.

Smith: You're talking six hours.

Morgan: Yep. I ran out of hours. I had to go in my 16 hour. Okay, so I'm all right. So, hours of regulation okay for driving truck. You can't just haul ass and keep driving all day. You know, you can't do it. So in one week, I can work 70 hours a week. Okay? And that's 70 hours a week. I can. I can work. I can be on duty for 14 hours of that. 14 hours. I can drive 11 of it. And now 11. Our time of driving. I have to take every eight hours, I have to take a 30 minute break in an eight hour in the eight hour span. Alright? So, literally, I went past my 14. How to go that you could do is once a week, especially so I'm not over the road. I go on a 16. 16 is I'm allowed to work. I'm allowed to be on duty. Worked for 16 hours that day. And I was just about out of time literally I had, like, an hour. And that's when I went inside and I was like, 'Dude, what the hell? I am about to expire. So what the hell is going on here?' I'm like, 'I'm on my 16.' I'm like, 'I'm just about out of time. What do you guys want me to do here?' I'm like, 'I'm running out of hours.' I was like, 'Do you want me to drop the trailer here?' I was like, because my thinking is only have two pallets for Lancaster.

Morgan: That makes more sense to drop the trailer there, since I have a whole trailer for Harrisburg. They have Lancaster trucks that go that will come in their mail trucks that they could put these two pallets on to ship them back. So I don't know. He goes, I don't know the guy's name and he was a younger black guy. I don't know his name, I haven't seen him here for a little bit either. I've been seeing the older gentleman lately.

Smith: So he goes and looks into it?

Morgan: Yeah, he goes, looks into it. And I'm standing there waiting, waiting, and then a transportation supervisor comes down. I don't know his name. He just referred to himself. He said, 'Hey, how's it going? I am the transportation supervisor.'

Smith: Can you describe him?

Initials: _____

Morgan:  Was a older white guy in his forties, with brownish, slicked back hair, then he had a button up shirt with a black denim or dress pants, dress shoes. I remember that because I just thought kind of weird having dress shoes in a warehouse.

Smith: How often is do you engage with transportation supervisor?

Morgan: Never, that was the very first time and the reason why it's weird. Because look, transportation supervisor for United States Postal Service, is a transportation supervisor for the United States Postal Service. We have a contract from the United States Postal Service, alright? So they are contracting us to move their mail. I have my own transportation supervisor. His name is Brian, alright? So that is who I deal with. This guy, he has his own fleet and is the transportation supervisor for them, the United States Postal Service. He sets up the routes that the United States Postal Service trucks and deliver their drivers what they're supposed to be doing, not what we're doing. So just a little weird, like when he came down. 'Hey, transportation supervisor' and I was like, I was kind of mad. So I'm like, 'whatever,' you know, like I was like, 'Look, I'm trying to get out of here' and he's just like, 'Well,' he's like, 'just take the trailer to Lancaster' and I'm just like, 'I can just drop this trailer here, it has mail in the front for Lancaster' and he's like, 'Just take the trailer to Lancaster.'

Smith: Does he know what was in the trailer?

Morgan: I don't know. Part of me wants to say maybe. But there's a part of me that says I don't know at the end of the day, all they have to do is on their scanner. Look up 611, 612, 611 coming in the Harrisburg 611 and it'll pull up. I don't know if it pulls up what I have, but I know it pulls up how much mail I have for them.

Smith: Did he give you a reason why you're waiting there for six hours?

Morgan: He did not give me a reason. And then he told the guy that was behind me to go to this new building that they just got, which was down the street. So, me and this other guy was sitting there waiting. He, the other guy, went down the street to this other building. I went to Lancaster. The other guy, I do not even know who he was. He was like an outside carrier.

Smith: So in the 15 months you've been doing this, you've never had to sit for six hours and no justification.

Initials: _____

I APP. 621

Morgan: No, no. And then I went to leave, I said, 'Can I get a slip?'

Morgan: Because I gave him mine. I am sitting there. I am like, 'Here's my slip for you guys.' It was like, 'Can I get a slip?' He said, 'No, you cannot get a slip.' I said, 'What do you mean I cannot get a slip?' He said, 'Sorry you can't get a slip right now.' I was like, 'What?' It was like, 'Well, can I get a late slip?' He is like, 'No, you cannot get a late slip. You got to be on load, to get a late.' So I said, 'Well, I've been sitting here,' and he got an attitude, like, sarcastic. I got sarcastic back, but like, I was like, I was now I'm really mad because I'm like, 'No, I don't know. I'm not going to sit here for six hours and not be paid for it.'

Smith: So, he won't give you a slip.

Morgan: He will not give me a slip.

Morgan: It kind of pissed me off. So that's when I went out and got my cab, and I text my supervisor Brian, my transportation supervisor, and I said, I sent him, 'So they're telling me to leave and take the mail to Lancaster. But I am not getting a late slip. What am I supposed to do? I want to be paid for this crap.' That is exactly what I wrote. And he said, 'When you get back, just send me a text with the total hours for the day. Who is the expediter who is refusing to give you a late slip?' I said, 'That came from the transportation supervisor. He said I cannot get a late slip because they would need to unload me here, so I mean, but the same time told me to go Lancaster.' And then he said, uh, the other guy behind me, he has go into a new building. I am glad I saved the text that I sent to Brian. I am glad I wrote it, because never talked to transportation supervisor. Since then, I've never seen the guy since then.

 I went to Lancaster. I put the trailer at door 34. If I am moving along too fast, let me know. I put the trailer in door 34, disconnected, moved out from it. Ran inside and I gave the Harrisburg slip to the Lancaster post office. It was for Harrisburg slip I had from Bethpage. I said, 'Here you go.' I said, 'The transportation supervisor told me to drop the trailer off here to you guys. He would not give me a slip for you. So, I have the Harrisburg slip.' And it was, uh, this black gentleman there I believe he has dreads or braids. I mean, this guy, we might have said two words the whole time. He goes, 'Okay.' I walked out, got in the truck, and drove off.

Smith: The transportation supervisor. He did not give you his name or anything?

Smith: Did you see your trailer being unloaded in Lancaster?

Initials: _____

I APP. 622

Morgan: I didn't see anything. I pulled in door 34. Lancaster, did not see anything.

Smith: Lets talk about the trailer.

Morgan: 10R140?

Smith: That's the only one you usually have.

Morgan: That was the one that had for a month, 10R140.

Smith: And that is the one you dropped off in Lancaster.

Morgan: Yes.

Smith: So at the end of the day on October 21, 2020, you drop the truck off at Auto One You lock up You're done, you go home?

Morgan: Yes

Morgan: I come in next day and I do not have my trailer number, 10R140.

Smith: You come in the next day, your trailer is gone.

Morgan: It was gone. I have not seen it since.

Smith: Did you ask anybody where did it go?

Morgan: No.  But it is weird. I do not know if the expediters would know, really.

Initials:

I APP. 623

Smith: Let's talk about what happened on Halloween when you got into your truck. Apparently, that was October 30th. Was there an issue with your login?


Morgan: Yeah. Alright. So, whenever I log into a truck…


Smith: Let me stop this one for a second before we go on that I want to ask you another question. Where do you think those ballots you dropped in Lancaster went?


Morgan: Alright, so I haven't seen the trailer, okay? And it's weird. I'm kind of just let me explain the whole thing. Okay, so I haven't seen the trailer. So there's four guys that drive out Lancaster, two of us goes to Bethpage, New York every day, every day. Alright? Six days of the week we go, Bethpage. We take the same trailer that we leave Lancaster, we take to Bethpage. We take that trailer, we get loaded and unloaded. We take the same trailer out of Bethpage and go to Harrisburg, get unloaded. And if there's anything there to get loaded, and drop it off, alright? The other two guys go out of Newark, New Jersey, and go from Lancaster to Newark, New Jersey. Same thing, same process. They have the same trailer that is loaded out of Lancaster. So I had trailer number 316487 which had a camera on it. This was the very first time I've ever had a trailer that had a camera in it. So I went into the transportation loading supervisor. I pointed out to him and asked him if he ever seen a trailer with a camera. And he said, 'No.' I asked Loader if she has ever seen a trailer with a camera, and she said, 'No.' And I asked the guy from Harrisburg if he ever seen a trailer with a camera, and he said, 'No, never, never seen a trailer or trailer with a camera in it.' And I took that trailer and I dropped it off this past Sunday.

(Video documentation provided and secured of this interaction).


Smith: Do you know what you were hauling that had to be under surveillance?


Morgan: I thought mail, but that is all I thought was mail. Like the date would have been the 15th of this month. So, and I dropped that trailer off Sunday in Lancaster on Wednesday of that week. So, the 18th, that trailer. Now, when I went back to work Tuesday, I didn't see that trailer anywhere in the yard and when I got back Wednesday morning after my run, I didn't see the trailer 10R140 anywhere.

 Wednesday is when I left out, and then I drove all the way up to Bethpage. I remember I docked my trailer in the door and I look up and I see trailer 10R140 rolling by me on the back of a jockey truck. And it's just weird to me that trailer 10R140 was at Bethpage because none of us drop trailers. Okay, so somehow that trailer got to Bethpage. Now we don't do dropping hooks anywhere we do dropping hooks at Philadelphia, and Washington, D.C. So somewhere, someone took that trailer, okay, out of Lancaster, and I believe, I'm not 100% sure or certain, but this would be my logical thinking that someone brought that trailer to Philly and D.C. and dropped it

Initials:

*That    NDC*

off because we do the Philly ~~and D.C.~~ are huge. If you ever go there, you understand what I mean, huge, and we do a lot of dropping hooks there.  Just so you know, drop hook is where we drop a trailer off there and we pick up a trailer from there and roll out so that trailer could've been dropped off there. Someone from New York or New Jersey or wherever. Someone that's doing a turnaround dropped our trailer off. Pick that trailer up, brought back up to Bethpage.

Smith: But that is not the trailer that had the ballots?

Morgan: No, that's not the trailer that had the ballots. And the reason why that sparked interest in me is because you've asked me what I thought happened to that trailer and I said, 'I don't know.' My mom said something to me that really sparked, and made me think. And what she said was, 'It's really interesting how all of a sudden, Philadelphia just got a few 100,000 votes magically appear.' You know, it seemed like and she's right, and so I dropped that trailer off at Lancaster. I have not seen it since.

Smith: You're saying somebody probably drop hooked the trailer number 10R1440 on October 21st, 2020 from Lancaster.

Morgan:  I think that trailer 10R1440 with the ballots ended up going to Philadelphia.

Smith: Educate me on this, somebody would have a ticket for that. Correct?

Morgan: Well, apparently not if you send me out of Harrisburg without a ticket.

Smith: So they could not make up a ticket from Lancaster because it didn't originate there.

Morgan: It did not originate, I mean. You know, whenever I went because I used to go to Washington     D.C. and Philly, you really don't need a ticket to get in to Philly and D.C. because you do not even go on the dock. You talk to the people over the intercom, you go in, it looks secure, but it's not a secure place.

Smith: You feel, post office not secure.

Initials: _____

I APP. 625

Morgan: Philly and D.C. is not a secure place. Philly is on Byberry road, you go down the street, and the entrance is right off the street. So if you get more than two trucks that are trying to get in there, they're going to block the whole road up, okay? But, so you go up and there's an intercom, and you turn off your truck and talk over the intercom and you say who you are, Jesse Morgan. That's it. You could be like, you could use any slip. You could say anything. What run are you running, 623? What do you have? 50%? Then they'll say, 'What's your trailer number?' You tell the trailer number and they'll say, 'Okay, come on in.'

Smith: Could they be cross-referencing that? Would any data they have on a computer...

Morgan: I go in there and I see what they are doing because like, when I go in the office, you could go in there. And you see them talking on the phone? Usually when they're putting the in the computer. They're putting the computer system, and I don't see it cross-referencing. But when they're asking for trailer numbers, it's to put it in the lot. So that way they have that trailer now in the lot. You know what I'm saying?

Smith: So the post office should have some records of where that trailer was, the one with the camera.

Morgan: Now I have it on that trailer on. And then I saw that video I sent you.

Smith: Alright. So that's your, that's your synopsis or where you think trailer 10R1440 went.

Morgan: Yes. That's where I think it would have went, absolutely. I don't know who took it there. If anything, I think it would probably been an outside carrier, probably pulling our trailer illegally, which they do. I have seen that because I've seen it. I'll take a picture next time I'm driving out of Harrisburg of an outside carrier, pulling one of our trailers that the post office sent them out with that. Our company probably doesn't know that they're pulling it.

Smith: Because your company owns the trailers, but you are seeing the tractors are not Roads 10 Express.

Morgan: It's not a Roads 10. It will be like an outside. It will be like some guy. It'll be like an independent guy pulling a trailer for the United States Post Service.

Initials: _____

Smith: Halloween night, October 30, 2020, let's go back to that day.

Morgan: That's weird because I always stay logged into my truck. Okay, so whenever I go, when I get out of my truck in the evenings or in the morning. When I get back, I go off duty. But I do not log out of the computer. I stay logged into the computer.

Smith: Why do you do that?

Morgan: It's my truck. No one uses it, just makes its just one less step I have do.

Morgan:  So anyways, it's just one less step that I have to do when I log in the morning or in the evening. Time to go to work. So whenever I go in, I will actually send you a video that explains the process.

(Video explanation of the truck log in process was shown and secured).

Smith:  My notes indicate that there were 11 illegal movements when you returned to your truck?

Morgan: Alright. So, whenever I log in or whenever I get to my truck, I'll start it up, and it will, it will show a screen that says, 'Is Jesse Morgan still driving? Yes or no?' I'll hit Yes, okay? And then it will have me put in my four digit passcode for the truck, alright? If you don't know that, or if you just drive off, it's gonna log me right out of the computer of that truck. Okay? It logs me right out.

Now it's on the screen here so that you see my name is very first, hold on. My name is very first right there, Jesse Morgan. And then there's the five prior drivers that drove that truck before me, before I got that truck. So the only way that my name can get erased from that truck is if there's six other drivers that come to that truck to use it, then my name will be out of that thing. And why that's important is because that day that I got to my truck on October 30, 2020, I start up like I normally would, and it goes to that screen where it has the six names on it, alright? So I'm sitting down looking at the screen like I didn't log out. Now if I would've logged out, it would have come up like that. But I didn't log out. So then I look at, I start the truck. I look at my fuel gauge and I looked at my miles and I had miles off. Not much, it was like 25 or 30 miles. Not much, okay, but it helps set me because my fuel gauge is lower. And I, like I count my fuel and I might have had enough to get to Bethpage, Harrisburg and back without fueling. But at that point, because I run it really tight that I would have been, like biting my nails, you know? And I'm not trying to be on the side of the highway out of fuel like, you look like an idiot, you know, having that guy come to fill you up. So now I am pissed, because now I have to stop to get fuel on the turnpike, which it takes forever on the turnpike.

Initials: _____

So I notice 11 different times that my truck was moved, which is crazy. And then they never logged into my in the computer, which you can't do that. That's illegal to drive a truck and not be logged in because if a state trooper will shut you down, and you have to sit there for 10 hours.

Smith: If there was 11? But you said there's only like, 25 miles.

Morgan: It was like 20. So he stopped and went, but he had to stop for a period, which it's just so, it's so baffling. Like I'm like, what? What was my truck doing?

Smith: Traveling 25 miles being turned on and off 11 times?

Morgan: Yeah, like it's just…

Smith: I mean, 25 miles is not a short distance.

Morgan: No but it's like a trip to Harrisburg. But it is not a trip to Harrisburg and back.

Smith: Right. So there's no explanation on who used the truck or where it went. Was that the only time that ever happened to you?

Morgan: Yes.

Morgan: You want me to talk about the time with the things I found in the truck?

Smith:  We could talk about that.

Smith: So before you go, did you report that to anybody saying, 'Hey, listen, somebody drove my truck for 25 miles and 11 unauthorized stops?'

Morgan: No, I don't report to anyone.

Initials: _____

Smith: What would happen if you got pulled over that day. And the police just want to see your log?

Morgan: It wouldn't come up on my logs at one. That's because I wasn't logged in, so it logged when he drove away. It logged me out of that truck.

Smith: Is there a GPS tracker on the trailer?

Morgan: Yes, those units that I showed you, they have GPS in them, so they will show you where that truck has been.

Smith: So if we go back to Roads 10, they would have the records of the GPS ?

Morgan: I'm thinking for at least a year, because if you get audited, you have to have your stuff.

Smith: Why did you not report these 11 unauthorized usages?

Morgan: I didn't. Because my thinking is look, I don't like talking to the office at all, right? And I figured if they if they wanted to ask me a question, they're gonna call me and ask me a question. If they're not going to ask the question, then they're not paying no mind to it on. I'm just gonna let it go. That was just my kind of thinking. This company got so big when it was, when I first started with the company, there was only a few of us. And now the company, the company that bought us out, it is a huge company . So my boss isn't even in Harrisburg. He's in Virginia. I don't even see the guy like, yeah, I don't even see him like he's just, you know, the name on the phone in a voice.

Smith: We don't know where the truck went that day and the movements just unexplained. Very highly suspicious. There was another incident with your truck, correct?

Morgan: Yes someone was in the tractor it would been Sunday, so Sunday's 15th, because that's the day when I talked to you. November 15th, 2020.

Smith: So you went, you went to work.

Initials: _____

Morgan: I went to work, alright? So when I get to work, it's dark out, alright? It's dark in the parking lot, and I carry in my book bag. And, I have, like, I usually have, like a gallon of water that will carry. I'll fill up and I'll drink it throughout the day and I like, I usually go in, and I'll set this stuff, my book bag on the ground. Usually, I throw the book bag up on the seat with my water and I'll set the book bag on the ground. I'll set the bottled water on the ground. Then I'll sit on the seat and then I'll go ok, and so whenever I left and I'm going and I get back, I'm logging off duty and everything. I'm getting all my stuff and I pick up my book bag and there's this, um, bubble wrap bag like that would hold like an electronic device. And I'm like, 'What? I've never seen this in my truck ever before,' right? And I've been in this truck, I'm basically leaving for the trip from my house. I'm in my truck, you know. It's nighttime. So I've never seen it before. And sitting on the floor of the truck, I pick it up, I'm looking at it like, 'What the heck,' and then, like, as I'm looking at the floor of the truck, I see what looks like ashes at first, and I'm like, 'What the heck?' I'm like, 'Why is there are all these ashes in my truck?' And I reached down, picked it up and it's plastic, and the piece I picked up it was like pigtailed like if someone took a drill and drilled into something and, uh, in plastic and the pigtail came out the That's why I picked up. And I'm like, 'what?' And so I'm looking around in the cab for, like, a drill, and I couldn't find anything. And then I looked like where my steering column is. I'm looking at my knee and I can see that, um, the plastic...so like you, underneath the steering wheel, the panel is like, pulled out a little bit. So, like I pulled on it and it just came almost like all the way out. And I noticed that some of the clips are broken, which it was never like that before and then like it. Really? I'm like, 'What the heck is going on here?' So I'm like, someone bugged my truck or something like that, like this is getting really crazy. Like I'm not trying to sound paranoid or anything like that. But it sounded really freaking crazy, like I never had this before. I have these plastic things in my cab, my truck when drove off by itself, apparently by you know when I was away from it and not like I have all this stuff. It's just, it's kind of like not adding it, isn't adding up. And then that day was the day that I'm unloading the trailer and look up and they have a camera in the trailer, the only camera in the yard, the only trailer with a camera on it. I have it and it's sitting. I'm sitting there looking at a camera.

Smith: Do you know what you where hauling that day, November 15th, 2020? Were they ballots?

Morgan: I don't think there's any ballots. I mean, if there was ballots and they hid him really well because...

Smith: That was the November 15th...

Morgan: I mean, yeah, but I mean, there was something they wanted to keep an eye on in that trailer?

Initials: _____

I APP. 630

Smith: Did you talk to anyone else regarding these concerns you have? Who else is aware that you talk to us about this? Besides your family members? Your brother? Obviously. Your mother...

Morgan: My mom. My stepdad. My brother Ben. My best friend, Mike.

Smith: No one at work?

Morgan: No, no one at work. No one at the post office. I have, I have these Republican people that keep messaging me and calling me, why they want me to come forward, apparently, somehow this Kurt Coca...

Smith: Ok. Is there anything we didn't talk about that you feel is relevant? That we missed?

Smith: Next time you go up to Bethpage, if you get the name of any one of these people, like Romeo's last name, that blonde girl's last name with Loader.

Morgan: I'll try to, but it's just, it's so weird. Like, because you've been that, I've been doing it so long like, yeah. Hey, what's your name? You know, like, hey...

Smith: Tell them you're doing Christmas cards.

Smith: Anything else we didn't cover, anything. We got it all.

Smith:  Do you make the previous statement to be true and accurate to the best of your knowledge?

Morgan: Absolutely.

Initials: _____

Jesse R Morgan: _____

Date ___11/26/20___

Dean Smith: _____

Date: ___11-26-2020___

Notary: _____

Date: _____

Sworn before me on: _____

I APP. 632

STATE OF NEVADA

COUNTY OF CLARK

I, Ingmar Njus, declare as follows:

1.    I reside at 1455 Westwind Road, Las Vegas, Nevada 89146

2.    My education is: BS Secondary Education (Mathematics/Physics) University of Utah; MS (Physical Oceanography) United States Naval Postgraduate School, Monterey California; Graduated from United States Naval War College with Highest Distinction (Economics/Political Science)

3.    My professions have been:

(1) 27.5 years in the U. S. Navy (22.5 years as Commissioned Officer) – retired as Commander (O-5) October 1984.

(2) 25.5 years with the U. S. Postal Service. 2.5 years as a letter carrier, 23 years as Supervisor Customer Service in Delivery Operations. During the past 15 years had numerous intermittent details to the Nevada Sierra District, Carrier Route Inspection Teams. Retired March 31, 2020.

4.    Based on my experience I have personal knowledge of these aspects of the U.S. Postal System: mail processing and delivery at the Postal Station level and retail functions at the Station.

5.    First, I wish to give my opinions on the following events as presented to me by Jesse Morgan's affidavit.

I APP. 633

6.      In my opinion, postal truck driver Jesse Morgan's affidavit reveals a series of anomalies that completely break from his daily routine, which may reveal that postal workers realized that ballots arrived at the wrong place with the wrong driver and maybe at the wrong time.

7.      First, in my opinion, the following are many anomalies surrounding driver Jesse Morgan in October and November 2020:

1. Jesse was not allowed to immediately unload in Harrisburg
2. Jesse was forced to wait in the parking lot for 6 hours
3. A postal supervisor, who oversees a fleet of USPS vehicles, spoke to Jesse, an unusual occurrence for upper management to address a driver
4. The postal supervisor refused to provide a ticket verifying that Jesse was at Harrisburg
5. Jesse also asked for an overtime ticket and the postal supervisor refused
6. Jesse was told to go to Lancaster without unloading in Harrisburg
7. Jesse's trailer, which was assigned to him full time for weeks, is missing the next day
8. While unattended, Jesse's tractor showed 11 unauthorized movements on October 30
9. A camera and tracking equipment were surreptitiously installed in Jesse's truck on November 11

8.      This comparison chart reflects my opinion comparing Jesse's typical routine and the anomalies in October and November 2020:

| What should have happened | What actually happened |
|---|---|
| Jesse's trailer is immediately unloaded upon his arrival in Harrisburg | Jesse's trailer was not unloaded in Harrisburg |
| Jesse should have been quickly unloaded and able to proceed to Lancaster | Jesse was forced to wait in a parking lot for 6 hours without explanation |

| | |
|---|---|
| Jesse only exchanges pleasantries and small talk with low-level USPS employees | A transportation supervisor addressed Jesse when he complained about waiting so long |
| Jesse receives a ticket for unloading in Harrisburg | Jesse was not allowed to unload in Harrisburg, so he did not receive a ticket |
| Jesse receives a ticket for the extra time he spent waiting to unload | Jesse was refused a ticket because by the USPS supervisor when he requested it |
| Jesse unloads his trailer in Harrisburg before proceeding to Lancaster | Jesse was told to go to Lancaster without unloading in Harrisburg |
| Jesse offloads in Lancaster before parking his tractor-trailer at the end of his day | Jesse is told to leave his trailer without unloading it in Lancaster |
| Jesse leaves his trailer at the dock in Lancaster at the end of his shift and picks it up at the beginning of his next shift | Jesse's trailer was gone when he went to retrieve it for his next shift |
| Only Jesse drives his truck | The digital tracking system in Jesse's truck registered 11 unauthorized movements totaling about 25 miles on October 30 while Jesse was off-duty |
| Jesse's truck has no camera inside | Jesse detects that that someone entered his truck surreptitiously and installed both a camera and tracking equipment; plastic shavings and bubble wrap were left in the cab of his truck |

9.      Second, in my opinion, as it relates to post-dating absentee ballots, I can think of no reason that would happen in the U.S. Postal Service.

10.     Third, in my opinion, as it relates to destroying a Presidential candidate's campaign mailings instead of delivering them, I can think of no reason that would happen in the U.S. Postal Service.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Dated: DECEMBER 01, 2020

Ingmar Njus

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

**DECLARATION OF GREGORY STENSTROM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Gregory Stenstrom, hereby declare as follows under penalty of perjury:

1.      The following statements are based on my personal knowledge, and if called to testify I could swear competently thereto.

2.      I am at least 18 years old and of sound mind.

3.      I am a citizen of the United States and of the Commonwealth of Pennsylvania. I reside at 1541 Farmers Lane, Glenn Mills, PA 19342. I am an eligible Pennsylvania voter and am registered to vote in Delaware County.

4.      I voted in the November 3rd, 2020 general election.

5.      The Delaware County Republican Committee appointed me as the sole GOP poll watcher for 36 precincts (1-1 through 11-6), located in Chester City, Pennsylvania, of which I was able to inspect and observe 22 precincts.

6.       The Delaware County Board of Elections provided me with a certificate of appointment as a poll watcher.

7.      I carried my certificate of appointment with me when I presented at the polling locations in Chester City on Election Day and presented the certificate when requested to do so.

8.      I did not attempt to enter the enclosed space within any polling location, nor interfere in any way with the process of voting, nor mark or alter any official election record.

9.      On November 3rd, I observed poll workers in multiple assigned Chester City polling places, that included the 1-3, 1-4, 1-6, 2-1, 2-2, 2-3, 11-2, and several others, provide regular ballots, rather than provisional ballots, to voters who were told they had registered to

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

vote by mail, without making them sign in the registration book.  I challenged the practice in those precincts where I observed it, and while I was present, they then stopped the practice and began providing provisional ballots.  I was informed at each polling location by their respective judge of elections that I was the only GOP poll watcher they had seen in this 2020 election, or any other election they could remember.

10.     On the evening of November 3rd, I went to the Delco Chester City counting center with my certified poll watcher certificate, to observe, on assignment as the sole poll watcher from the Tom Killion Campaign, as authorized and tasked to do so by Cody Bright, Mr. Killion's campaign manager, at approximately 6pm.  Mr. Bright had been informed, and he informed me in turn, that there were "a dozen national level GOP poll watchers" at the counting center observing and monitoring, but he was apparently misinformed.  I checked into the building observing their COVID-19 procedures, and took the elevator from the ground floor to the 1st floor counting room, was denied entry, surrounded by first four (4) Park Police, and then an additional five (5) joined them.  I presented my poll watcher certificate, and refused to leave, and was threatened with physical removal and arrest, which I humorously stated would be agreeable to me, de-escalating the situation, at which point I was informed there was a separate list for "observers," and I had to somehow get on it.  I asked if there were any GOP poll watchers in the building and was informed by Deputy Sheriff Donahue that there were two (2) inside.  I asked to speak to them, and one man came out.  I asked him how he got on the list and he stated he had volunteered via email and been told to go there, with no other explanation as to what he was supposed to do other than "watch," and that he was leaving shortly.  I asked him if he knew what he was supposed to be "watching" and if he could see anything at all, and he stated he had

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

"no idea,"  and "couldn't see anything from behind the barriers."  I went back to the ground floor

to figure out how to gain access and make calls.



Figure 1 - Entrance to DelCo Vote Counting Center from 1st Floor Elevator bank



Figure 2 - Inner Entrance to DelCo Vote Counting Center - Note DelCo County employee
approaching to stop photo

Page **3** of **23**

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

11.     While on the ground floor working on obtaining GOP assistance and authorized access, I witnessed organized chaos with rolling racks of mail-in ballots going in different directions with some going to the cafeteria, and some going to and from the main elevators, the separate garage loading dock elevators, and some to and from the back doors closest to the Delaware River, without any chain of custody.  There was no apparent process integrity, or obvious way for anyone to determine the origin of any mail-in ballot, or its ingestion, or egress into the system.  Some workers sat at cafeteria tables while others brought them boxes of mail-in ballots, while yet others collected and pushed the rolling racks around.  Joe Masalta took videos and photos of this operation, and has also completed an affidavit.



Figure 3 - Election Evening - Multiple Racks of Mail-In ballots in green trays of 500 were going in multiple directions from multiple points of entry up and down elevators that led from the garage loading dock to the top floor of the building.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

12. After seeking legal assistance through multiple avenues, I obtained a lawyer, John McBlain, after a call to the 501C Project Amistad organization, who arrived on site at approximately 10pm, and we went back up to the 1st floor counting room. We were met with similar hostility to my earlier experience, and went back to the ground floor where Mr. McBlain made multiple phone calls. I learned he was a former Delaware County Solicitor and familiar to some of Election Board staff. I was subsequently added to the entry list and finally gained access as an official "observer," along with Mr. Barron Rendel, one of several people I had asked to accompany me, at approximately 11pm, five (5) hours after our arrival.

13. We were the only GOP "observers" in the room, that was otherwise packed with Democrat employees, volunteers, and poll watchers.

14. I observed a counting room for ballots with counting machines. Trays of ballots came in through three doors that appeared to lead from a back office, a second back office supply room, and doors leading from an outside hallway with separate elevator access from the public elevators and the garage loading dock elevators.



Figure 4 - The BlueCrest Sorting Machine Loading Tray section

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION
09NOV2020

15.    I had no meaningful opportunity to observe any part of the count: the sorting

appeared to have been done elsewhere, and the machines were too far away from the observation

position to see any part of the mail-in envelopes or ballots. I observed opened ballots going out

the second back office closest to the windows in red boxes after handling and sorting by

volunteers, some being placed in green boxes, and ballots from the green boxes being placed in

scanners by workers, similar to the scanner I had used to vote myself, but was too far away (30

feet) to be sure. I asked the sheriff where the ballots came from, and where the ones that were

leaving the room went, and he said he did not know.

16.    I asked Ms. Lorraine Hagan, the elections official in charge of the operations,

where the ballots where coming from and how they were being processed. She responded that I

was only there to observe, and that I had no right to ask any questions. I said that I wanted to

observe the activity in the sequestered room, but she denied my request, stating that the law

prohibited access to that room by poll observers. I responded that there was no law denying

access to observers, and she then said that it was "a COVID thing." I pointed out that I have a

mask on, and so did the people visible through the door when it opened. She then informed me

that she wanted to prevent us from "interfering." I responded that I was only there to observe and

not to interfere, and to make a statement if I observed something wrong. Ms. Hagan said, "I

assure you that everything's fine. There's no fraud going on."

17.    Shortly after this exchange with Ms. Hagan, workers – who appeared to be

volunteers – started bringing in semi-opaque bins with blue folding tops that contained clear

plastic bags, approximately 10" square, with each bag containing a scanner cartridge, a USB

drive, and a paper tape, and they were brought to the computer tables which contained four (4)

computer workstation towers on tables connected to four (4) wall mounted monitors, with one

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

workstation tower on the floor under the tables that was not connected to a monitor, for a total of five (5) computers.  A flurry of workers started disassembling the bags and separating out the USB sticks, cartridges, and paper tapes from the plastic bags, and dropping them in open carboard boxes, with two workers sticking the USB drives into the computers to start the election day counts.  I immediately objected, and demanded that Mr. McBlain challenge the process, and he again retrieved Ms. Hagan to hear my objections.  I asked why the returned items had not come with the sealed bags from the judges of elections, and she explained that they had been taken out of the bags at the three (3) county election "processing centers" by the Sheriffs who were collecting them for ease of transport, and I stated that that was a break in the chain of custody, to which she shrugged her shoulders.  I then asked her why they were separating out the USB drives from the cartridges and paper tapes, which was destroying any forensic auditability and further corrupting chain of custody, and she said "that's how we have always done it," and again stated I had no right to object, interfere, and was only permitted to observe, turned on her heels and walked away.  I pleaded with Mr. McBlain to intervene and at least demand that the USB drives remain with the cartridges and tapes in the plastic bags so we would not have to reassemble them during tabulation, and he did nothing.

18.     It is noteworthy that dozens of "volunteer" workers constantly streamed through the counting area unaccosted, with no check of either ID's, or names, as the certified poll watchers were, several still wearing "Voter Integrity" lanyards and badges that had been widely distributed by Democrat poll watchers throughout the day, and they walked about unrestricted, and unaccompanied without any scrutiny, many handling ballots.

19.     After multiple, similarly caustic exchanges, elections officials continued to refuse access to the back rooms and a line of sight to anything meaningful, and under threat of removal

I APP. 643

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

by Park Police and Sheriffs we were stuck "observing" in a small box where we could essentially see nothing, and I again conveyed to John McBlain that I wanted to pursue further legal recourse to gain meaningful access, and he left the roped off area to seek Solicitor Manly.  At approximately 2:30am he returned, and stated he had a conversation with the President of the Board of Elections, and they had agreed to allow us access to the "back office" and "locked "ballot room" at 9:30 AM the following morning.  By that time, and given that any other legal recourse would have taken as long, or longer, and there was nothing meaningful to observe, I objected, but reluctantly agreed and left. I believe counting continued through the night because the count had increased, when I returned several hours later, the count on the tally screen was approximately 140,000 for Biden, and 85,000 for President Trump, and with all Republican candidates of all other races leading their opponents.

20.    As agreed only seven (7) hours previous with the Chairman of the Board of Elections and Solicitor Manly, I returned with attorney John McBlain, and Leah Hoopes, an official poll watcher for President Trump, at 9:30 AM. The elections officials ignored us for two hours, and at 11:30 AM, Ms. Hagan informed us that she would give a tour of the Chester City counting center to our group and a few Democrat poll watchers. I stated that I did not want a tour of the facility, that I only wanted them to honor their agreement to allow direct access to the sequestered counting room, and was ignored. Ms. Hagan, along with Ms. Maryann Jackson, another elections official, did not allow us to enter the sequestered counting room. Instead they walked us in an  approximate 20-foot circle  directly in front of the roped off area we had been restricted to, discussing the basics of election balloting but provided no insight into the purpose of the sequestered counting room.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

21.     One comment made by Ms. Hagan led me to think that "pre"-pre-canvasing happened in the back room. The comment indicated that all ballots had been checked before going downstairs to the ground floor cafeteria for pre-canvasing, before being brought back to the 1st floor counting area, and entering the main counting room, for accuracy/sufficiency of signature, date, and barcode label, and entry in the Commonwealth SURE system. I specifically asked Ms. Hagan whether the names and signature were matched, and whether the dates and barcode label were accurate. She replied in the affirmative. I then asked whether the names were checked against the voter registration rolls, and she again answered in the affirmative, indicating that people in the back room did the checking.

22.     From my vantage point, I observed approximately ten people in the back room through the door when it was opened. Ms. Hagan confirmed that no ballots went through the BlueCrest sorter (photo included herein) without first being checked for name, date, signature, and barcode.

23.     I could see 4000-5000 ballots in bins on the racks next to the BlueCrest Sorter, and I asked both Ms. Hagan and Ms. Jackson in front of the group "If all of the mail in ballot envelopes are checked for completion, as you stated, then why are there multiple large bins of ballots on the racks next us between the BlueCrest sorter and ballot extractors labeled "No Name," "No date," and "No signature," on the bins?"  The election officials, red faced, declined to answer. At this time, several Democrat observers, including Mr. Richard Schiffer,  conferred with myself and Ms. Hoopes and stated that they were now not comfortable with the ballot ingestion process, and the back room, being sequestered from all watcher's sight, and also wanted to see the back room with us.  The bins mentioned above were removed shortly after.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

24.     At this time, Ms. Hagan and Ms. Maryann Jackson ended the "tour" to "take a phone call" upon the arrival, and demand of Solicitor Manley Parks, and the "tour" was abruptly ended. I asked Solicitor Parks when that phone call would be done so that we could see the back rooms as promised, and he said he did not know.  I asked him if he intended to grant us access as promised, and he simply turned around, and walked into the back room without further comment. Ms. Hagan, Ms. Jackson, and Solicitor Parks never returned, and we left after two (2) hours after having been denied access to the back room.

25.     Mr. McBlain, our attorney, went to court and obtained a court order providing access to the room, and texted me that the court order had been signed by Common Pleas Judge Capuzzi at 9:30 PM, and the court order required that observers receive only a five minute observation period in the sequestered room once every two hours.

26.     I returned the following morning at 8:30 AM with Ms. Hoopes and the sheriff again barred entry despite the court order.  I contacted Judge Capuzzi's chambers directly and explained to his secretary that the elections officials were not complying with his order. She suggested that I consult with my attorney to follow through, and that she could not discuss the matter further with me.

27.     When I returned to the main room, I saw that some areas had been cordoned off, and John McBlain unexpectedly came out from the back room and stated he had conferred with Solicitor Manley Parks and they had mutually agreed to bringing ballots in question out from the sequestered room to the main room so that I didn't have to go into the back room. Mr. McBlain told me that the elections officials were going to bring 4500 of the 6000 total ballots in the back room out to the main room, and leave the remaining 1500 spoiled ballots in the "spoilage room." I made Mr. McBlain confirm multiple times that the "universe" of remaining ballots in the back

I APP. 646

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

room that remained to be processed was, in fact 6,000, and further made him affirm multiple

times that he had personally sighted those ballots in the back rooms and storage rooms, and he

re-affirmed this multiple times to me,

28.     Mr. McBlain stated that their new plan was to re-tabulate the 4500 ballots by re-

filling them out with a pen so that they could be read by voting machines, so we could "see

everything."  I followed him out of the counting room, and continued to ask him if it was, in fact,

legal under election law to cure ballots, and was unconvinced that this was the case, and thought

we should challenge it, but he assured me it was "normal" procedure and got on the elevator and

left.  It was during this time that Leah Hoopes, who had remained behind in the counting room

(see her Affidavit) observed Jim Savage, the Delaware County voting machine warehouse

supervisor, walk in with about a dozen USB drives in a clear unsealed bag, and she showed me

two photos she had been able to surreptitiously take (no photos or camera use was permitted

anywhere in the counting rooms despite live streaming cameras throughout the room).

29.     I went back outside to see if I could retrieve Mr. McBlain, unsuccessfully, and

upon my return to the counting room at approximately 11am, I observed Mr. Savage plugging

USB drives into the vote tallying computers. The bag containing those drives was not sealed or

secured, and the voting machine cartridges were not present with the drives, and he had no

ballots at that time.

I APP. 647

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020



Figure 5 - Delco Voting Machine Warehouse Manager Jim Savage holding bag of USB drives Thursday morning

Page **12** of **23**

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

30.     I immediately objected and challenged the uploading of votes from the unsecured drives, and retrieved Deputy Sheriff Mike Donahue with my objection, and he went to the back room to retrieve Ms.  Hagan. Ms. Hagan informed me that I could only observe the process but I could not make any comments or ask any questions while Mr. Savage was directly in front of us loading USB sticks, and the display monitors above the computers reflected that they were being updated. I responded that I was indeed observing a person plug USB sticks into the computer without any apparent chain of custody and without any oversight. No one stopped the upload, and Mr. Savage was permitted to continue this process and he was then allowed to walk out without any interference or examination by anyone.  I called and texted Mr. McBlain throughout the day without success to get him back to the counting center to address the USB issue, and what was now being reported to me by other GOP observers that there appeared to be more additional paper ballots in excess of the 6000 "universe" coming into the office administration area that McBlain had assured me of, to represent us and get us into the back office and storage room as ordered by the judge.  He would not return until approximately 5:30pm.

**31.     Approximately one hour after Savage had departed, at 1:06pm, the center published an update on the vote. The numbers moved dramatically as follows: from approximately 140,000 Biden and 85,000 Trump in the morning; to now approximately 180,000 Biden and 105,000 Trump after the 1:06 PM update. (At that 1:06 PM update, ALL Republican candidates who had previous leads were reversed and flipped).**

32.     Having seen the USB updates, and now seeing paper ballots in the back office, and other observers reporting that they had seen more ballots as well, I went outside and again called Judge Capuzzi's office and again spoke with his secretary and explained the situation, and the McBlain had departed and was nonresponsive to calls or texts, and she asked me what I

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

wanted the judge to do.  I stated that I wanted him to call to demand his order be enforced, and that I would gladly bring my phone back up and hand it to the Sheriff and Solicitor.  She stated she could not provide any legal advice, suggested I seek legal counsel, and hung up.  She did not realize she had not actually seated the phone in it's receiver and I heard loud laughter from her and a deeper toned laugh from a male before the line went dead, and I returned back inside to the counting floor.

33.     At 1:30 PM, Deputy Sheriff Donahue inexplicably informed me I would now be allowed to access the locked ballot room for exactly 5 minutes, after having been denied access despite all previous efforts.  We were met by Delaware County Solicitor William F. Martin, and I was joined by Democrat Observer Dr. Jonathan Brisken. On my way to the locked storage room, while passing through what was now referred to as the "back office," I counted 21 white USPS open letter boxes on two racks, on my immediate right after entering the room, labeled "500 ballots" per box. In addition, the approximately 16 cubicles for workers in the same room each contained one box also labeled "500 ballots," for a total of 31 boxes of 500 in that sequestered room.  This is the same room that McBlain had stated had 4,500 ballots in it earlier, most of which had been presumably moved to the front of the counting room (and later cured and copied to new ballots) and was supposed to be relatively empty with the exception of "several hundred ballots being processed by workers to update the Commonwealth's SURE system," according to McBlain.  This was a delta (difference) of approximately 16,500 ballots in just the "back office."

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020



Figure 6 - Table with 4,500 opened ballots that would reportedly not scan being sorted and cured.  Note approximate 10 foot distance from "observer" barrier

34.    Just after the two racks with the 21 boxes of 500 unopened ballots each, I observed an open door to a 20'x30' storage room with dozens of semi opaque storage bins with blue folding tops that appeared to have envelopes in them.  I could see through to another door that led back into the counting room which was the same door I had seen workers bring red bins full of "spoiled" ballots in the previous evening.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

35.     I also saw one shelf just to the left of the locked and secured "ballot room" with 4 sealed boxes. I lifted one box before Solicitor Martin objected that I could not touch anything, and it was heavy, and approximately 30-40 pounds. They appeared to match the description of the boxes described to me earlier by poll watcher Jim Driscoll and another observer with a first name of Paul. If those boxes contained ballots, I estimate that they were about two times the size of the 500-ballot containers, and if full, could have contained an additional 2,500 ballots per box for a total of 10,000.

36.     Ms. Hagan unlocked and opened the "ballot room" and Solicitor Hagan entered first and started the timer for 5 minutes, with Sheriff Donahue following us and closing the door behind us.  There were multiple racks filled with thousands of unopened mail-in ballots.  We were not allowed to take any photos, so I immediately started counting.  Labels on some boxes were visible, mostly with names of districts known to trend Republican, including Bethel and Brandywine. I took the following notes at the time:

     a.   5 boxes of 500 labeled 10-12

     b.   5 boxes of 500 labeled 18-20

     c.   1 box of 500 each, labeled 26-28, 50-52, and 58-60.

     d.   The remaining boxes did not have markings visible and we were not allowed
        to touch them to determine their origin.

     e.   Democratic poll watcher Dr. Jonathan Briskin also observed these boxes and
        confirmed the numbers of ballots, and that the total number of ballots was
        vastly greater than we had been led to believe earlier in the day.

     f.   I later observed Dr. Briskin working with a fellow female poll watcher
        drawing a diagram and detailing what he had seen after we were returned to

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

the roped off area in the counting room, and noted it was quite detailed and corroborated what I had observed in the ballot room.

37.     In addition to the boxes of unopened mail-in ballots, I observed another shelf that was packed with open and ripped clear plastic bags with cartridges, green security ties, and a 16"x16"x28" carboard box  labeled "CHAIN OF CUSTODY RECEIPTS." In total, I estimated approximately 18,500 unopened mail-in ballots, which Dr. Briskin uncomfortably concurred with.

38.     So, after being told the "universe" of total remaining paper ballots to be counted was 6,000 by Mr. McBlain, the 1:30pm tour, on Thursday, two days after election, and 38 hours after being denied access, and having to obtain a court order, I sighted a total of:

   a.   16,500 unopened mail-in ballots in the "back office"

   b.   18,500 unopened mail-in ballots in the locked "ballot room"

   c.   Potentially 10,000 ballots in the sealed 30-40-pound boxes outside of the locked ballot room

   d.   4,500 ballots being "cured" in the counting room

   e.   *For a grand total of 49,500 unopened ballots*

39.     To my knowledge, and according to the tally monitor, and as reported on the web, 113,000 mail-in ballots had been requested, and 120,000 mail-in ballots had already been counted, with an approximate outcome of 18,000 for President Trump and 102,000 for Biden already recorded.

40.     At that time, I assumed that the approximately 49,500 unopened ballots would also be processed in the pending running of the sorter, envelope-ballot extractors, and scanners, adding those ballots to the overall total.

**Page 17 of 23**

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

41.     At 3:30 PM, I again re-entered the room, now accompanied by another Democrat poll watcher who did not provide her name, and in addition to the boxes I previously observed and described above, which remained undisturbed, I saw an additional  two racks had been moved into the room, with another 16 additional, new boxes of 500 unopened mail-in ballots with approximately 8000 more unopened mail in ballots labeled 5-2, 6-1, 6-2, and 7-2, with some labels not visible from my position.  There were three red "spoiled" ballot boxes with several shed ballots visible in one, and the others appeared to be empty, but I could not verify as I was not allowed to touch anything or take any photos.  The 21 boxes in the "back office" were still in place, so this brought the suspected unopened mail in ballot total to **57,500**.

42.     I asked Sheriff Donahue when the next machine run that would process the unopened ballots was scheduled for, and was informed that election officials planned on a 4:00PM start, and I could see workers coming in and preparing.  I went outside to call GOP officials to see if we could potentially either delay the run, or be permitted to get close enough to the machines to see something, but was unsuccessful.

43.     When I returned at 5:30 PM for the next 5 minute tour, I was informed that a Committeewoman, and Delco GOP representative, Val Biancaniello, had been taken in my place by Solicitor Martin, and upon her return I asked her why she would do that, and what she had observed.  She stated she had "not seen any fraud" and I again asked her specifically, if she had seen boxes of unopened mail in ballots, and she said "oh, yes, lots of them," but could not recall any further details.  When I pressed her for more details, she became very angry, and told me I needed to "relax," and that she had "straightened everything out," and gotten more observers to watch over the re-filling out of the 4,500 ballots that could not be scanned.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

44.     It is noteworthy that I was able to see the table of 4500 ballots being curated and re-filled out, and those I was able to see were all for Biden without exception. I asked Joe Driscoll if he had been able to see, and he said he had seen 15 for Biden and 1 for President Trump, before election officials repositioned the barrier moving us back from being able to see.

45.     For the 7:30 5-minute inspection, Val vigorously objected to me going back into the room, and demanded we send Attorney Britain Henry instead, who had been convinced to come to the center by Leah Hoopes, and who I had been speaking with for the previous hour. Val stated she had "got him down there," which was confusing to me, but I agreed it would be a good idea for an attorney to corroborate my observations, and briefed him of the layout, previous observations, and what to look for over Val's increasingly loud, and impatient objections.

46.     Attorney Henry returned from the tour and essentially corroborated my observations, and my understanding is he is preparing a statement of what he observed.  I did not understand, and could not reconcile at that time, why the election result counts had remained roughly the same, while the sorters and envelope extraction machines had been running for almost 4 hours, and presumably processing mail in ballots, and at that time attributed it to the count not being updated on the monitor.

47.     In the presence of Ms. Biancaniello and Attorney Henry, I asked the now present Mr. McBlain to explain how the USB drives had made their way to the center carried by Mr. Savage.  He informed me that in his experience, some USB drives were typically left in voting machines by judges of elections overnight in previous elections, and that Mr. Savage had simply found them in the machines that had been returned from polling locations back to the warehouse, including machines that still had all components in them (USB. Cartridge, and Paper Tape) and that the next day he had transported approximately 24 USB sticks and an assortment of

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION
09NOV2020

cartridges and tapes from the warehouse to the counting center.   I pressed him to find out why

there had been so many, and why there was no chain of custody, and why Mr. Savage would be

involved in entering the USB drives into the computers without any other election officials

present, particularly Ms. Hagan, who had overseen the process previously.  Mr. McBlain

informed me that it had been explained to him that some judges of elections had left entire

scanners – with cartridges, USB drives and tapes – and that the moving company had returned

them to the warehouse, where Mr. Savage collected everything and put them in bags.  This

explanation, in part, accounted for the 5 large election judge bags that I witnessed had been

carried in by a Sheriff earlier, and I was able to take photos of them being removed from the

building later.



Figure 7 – Presumed Cartridges, USB, Paper Tape from scanner, properly sealed with green lock
tie, being brought into building on THURSDAY morning by Sheriff, having been allegedly
returned to the warehouse WEDNESDAY morning.  They were opened without observers in off
limits sequestered area

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020



Figure 8 - Five (5) more bags from scanners that had been allegedly "left at polling locations" and brought to counting center THURSDAY afternoon.  Sheriff Donahue is on left.

48.     I informed Mr. McBlain in the presence of Ms. Biancaniello that I had seen the 30,000 vote jump for Biden after Mr. Savage had plugged in the USB drives earlier, as described above, and asked them both if that was "normal" for previous elections, and they did not respond.

49.     Despite my multiple, strong and forceful objections, to the lack of transparency, and what I perceived to be a significant break down in any chain of custody, I was routinely ignored by election officials, and was met by mostly blank stares and shoulder shrugs by Mr. McBlain. I could not understand how the mail-in ballot count remained essentially steady at

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION 09NOV2020

120,000 when myself and multiple others described herein had sighted anywhere from 20,000 to

60,000 unopened mail in ballots AFTER the 120,000 count had already been completed and

updated on the http://DelcoPA.Gov/Vote website.  I do not know where the 120,000 ballots went

from the counting room after being counted, and was ignored by Ms. Hagan when I asked her

where they were, and denied access to see them.   At the end of the day on Thursday, I observed

the opaque blue lidded plastic boxes stacked against the wall next to the BlueCrest sorter with

what appeared to be mail-in voter envelopes but was not permitted to go near them and find out

if they were opened and empty, or still sealed with ballots, or still had ballots in them, and they

disappeared from the room shortly after I took the photo below.



Figure 9 - Bins that had been moved from off limits "Office Space" storage room to another off
limits area with what appeared to be envelopes inside to Receiving area near exit doors on
Thursday evening - they were removed and gone shortly afterwards.

DECLARATION OF GREGORY STENSTROM RE DELAWARE COUNTY, PA, ELECTION
09NOV2020

50.     As a result of the election officials' acts, I was unable to fulfill my responsibilities

or exercise my rights as an official observer. I was continuously harassed, threatened, denied

access to the room and the ballots, and the election officials were openly hostile and refused to

answer questions, repeatedly defied a court order to provide access, and obstructed my ability to

observe the count in a way that would enable me to identify irregularities, which is the primary

purpose of the observer role.

_____

Gregory Stenstrom

09 November 2020

December 4, 2020

Congressman Scott Perry
1207 Longworth House Office
Building Washington, DC 20515

Congressman Perry;

The general election of 2020 in Pennsylvania was fraught with inconsistencies, documented irregularities and improprieties associated with mail-in balloting, pre-canvassing, and canvassing that the reliability of the mail-in votes in the Commonwealth of Pennsylvania is impossible to rely upon.

The above factors, when combined with the lack of the required associated internal control mechanisms to ensure legality, accountability, accuracy, and the trustworthiness of the results, effectively undermine the trustworthiness of the entire election process.

The House of Representatives of Pennsylvania determined, as a result, that the process by which the President of the United States was determined was so fraught with errors that the legislature introduced House Resolutions 1094 on November 30, 2020 to contest the selection of electors.

The analysis below substantially confirms that the mail-in ballot process in the Commonwealth of Pennsylvania in the 2020 General Election was so defective that it is essential to declare the selection of presidential electors for the Commonwealth to be in dispute.  The United States Congress is asked to declare the selection of presidential electors in this Commonwealth to be in dispute and to intervene in the selection of the electors for the Commonwealth of Pennsylvania for the 2020 General Election.

In any process control environment, the system of internal controls is designed to reasonably deter wrongdoing.

In the Sarbanes-Oxley type environment and the Committee on Sponsoring organizations process control environment, the control environment surrounding an election require that the processes utilized be capable of providing reasonable controls to ensure that the election results reflect the will of the voters.

I APP. 660

In that regard, the COSO standards (Committee on Sponsoring Organizations) prescribes processes of controls to ensure internal controls are adhered to, for instance, in this case, the accuracy of the election results.  COSO and SOX are built on the same model of the system of internal controls

The control environment includes:

1. *Control Environment*

- Exercise integrity and ethical values.
- Make a commitment to competence.
- Use the board of directors and audit committee.
- Facilitate management's philosophy and operating style.
- Create organizational structure.
- Issue assignment of authority and responsibility.
- Utilize human resources policies and procedures.

2. *Risk Assessment*

- Create companywide objectives.
- Incorporate process-level objectives.
- Perform risk identification and analysis.
- Manage change.

3. *Control Activities*

- Follow policies and procedures.
- Improve security (application and network).
- Conduct application change management.
- Plan business continuity/backups.
- Perform outsourcing.

4. *Information and Communication*

- Measure quality of information.
- Measure effectiveness of communication.

5. *Monitoring*

- Perform ongoing monitoring.
- Conduct separate evaluations.

In any system of internal controls, there are audits which would identify control deficiencies, significant deficiencies, and material weaknesses of the system of internal controls.  When there are such deficiencies of internal controls of the material weakness nature and/or significant deficiency nature than standards require that the results cannot be relied upon.  The accounting

profession has specific guidance on such control environment in AU-314, Understanding the Entity and Its Environment and Assessing the Risks of Material Misstatement.

In 2019, Rep. Ryan identified such concerns about the control environment in the Commonwealth and introduced House Bill 1053, Lean Government Operations, to uniformly implement lean operations and an effective system of internal controls.  The Governor indicated opposition to the bill and threatened to veto the bill.  In the State Government Committee the bill passed 20-5 when the Democrat members placed such significant amendments and opposition from the executive branch to preclude the bill from moving.

This pattern of obstruction to systems of internal controls reinforces the concerns that the control environment did not exist in Pennsylvania's executive branch to warrant confidence that there was any intent to establish an effective system of internal controls over the mail-in ballots in the Commonwealth.

In 2019, we identified such concerns about the control environment in the Commonwealth were identified and a bill to address these concerns was introduced.  and introduced House Bill 1053 was introduced to uniformly implement lean government operations in order to uniformly implement lean operations and an effective system of internal controls.  The Governor indicated opposition to the bill and threatened to veto the bill.  Additionally, Democrat members in the House State Government Committee cited the Governor's opposition to the bill as they sought to defeat the bill through the amendment process. In the State Government Committee the bill passed 20-5 when the Democrat members placed such significant amendments and opposition from the executive branch to preclude the bill from moving.

This pattern of obstruction to systems of internal controls reinforces the concerns that the control environment did not exist in Pennsylvania's executive branch to warrant confidence that there was any intent to establish an effective system of internal controls over the mail-in ballots in the Commonwealth.

In any audit committee the Audit Committee and with auditing standards, the question is always asked in the management representation letters: "Was management (read Executive Branch) able to override the system of internal controls?"  Should the answer to that question be YES, which in the instant case, it was, the CPA audit would immediately stop with NO audit opinion issued.  Nothing less can should be expected of our election process.

For the reasons below, it is believed that the system of controls over voting within the Commonwealth of Pennsylvania in the 2020 General Election were so flawed as to render the results of the mail-in ballot process incapable of being relied upon.  Specific potential remedies are available to include:

1. Revote of the mail in ballots in time to certify the electors for the presidential election.
2. Declare the process of mail in ballots so flawed that the Congress of the United States, as prescribed by the U. S. Constitution would select the PA electors for President.

The evidence of resistance to the implementation to election security safeguards, process flaws, inconsistencies, violations of PA election laws as written, include:

1. Documented objection by leaders of the Democrat Party to object to a study of the election process to preclude the problems that in fact did occur in the 2020 general election. The study was proposed as House Resolution 1032 of 2020 and was abandoned after gross public misrepresentations were made about the true nature of the intent of the resolution. due to public backlash due to the comments (An example of this can be found in the comments of Representative Malcolm Kenyatta.)

2. Actions from the PA Supreme Court which undermined the controls inherent in Act 77 of 2019. The "legislative" overreach by the Supreme Court is the basis of the impeachment articles against Justice Wecht. The controls which were undermined include:
   a. On September 17, 2020, less than seven weeks before the November 3, 2020 election, the partisan majority on the Supreme Court of the Commonwealth of Pennsylvania unlawfully and unilaterally extended the deadline for mail-in ballots to be received, mandated that ballots mailed without a postmark would be presumed to be received timely, and could be accepted without a verified voter signature.
   b. On October 23, 2020, less than two weeks before the November 3, 2020 election and upon a petition from the Secretary of the Commonwealth, the Supreme Court of the Commonwealth of Pennsylvania ruled that mail-in ballots need not authenticate signatures for mail-in ballots, thereby treating in-person and mail-in voters dissimilarly and eliminating a critical safeguard against potential election crime.
   c. Authorized the use of drop boxes for collecting votes with little to no controls proscribed to prevent ballot harvesting.

3. Actions by the Secretary of State which undermined the consistency and controls of the election process during the weeks preceding the General Election of November 3, 2020. The actions by the Secretary led to a House Resolution to prohibit object to the seating of electors calling the election to be in dispute. These include:
   a. On November 2, 2020, the night before the November 3, 2020 election and prior to the prescribed time for pre-canvassing mail-in ballots, the office of the Secretary of the Commonwealth encouraged certain counties to notify party and candidate representatives of mail-in voters whose ballots contained defects;
   b. Heavily Democrat counties permitted mail-in voters to cure ballot defects while heavily Republican counties followed the law and invalidated defective ballots;
   c. In certain counties in the Commonwealth, watchers were not allowed to meaningfully observe the pre-canvassing and canvassing activities relating to absentee and mail-in ballots;
   d. In other parts of the Commonwealth, watchers observed irregularities concerning the pre-canvassing and canvassing of absentee and mail-in ballots.

4. Prior attempts to cure the problems associated with Act 77 of 2019, the election Reform Code where incorporated into House Bill 2626 of the 2019-2020 session. The Governor threatened to veto the bill when it became apparent that the Supreme Court was going to incorporate more favorable changes to Act 77 of 2019 than House Bill 2626 authorized.

5. Permitted inconsistent drop box processes by counties with little to no controls or audits processes which essentially gave way to substantial opportunities for ballot harvesting.

6. The Secretary of State has shown bias in get-out-the-vote efforts due to the Secretary's coordination efforts for get out the vote efforts only in Democrat party-controlled counties and localities.

In addition to the concerns of the actions of the Secretary of State and the legislative overreach by the Pennsylvania Supreme Court, the inaccuracies of the actual results themselves call into question the accuracy of the SURE system, the consistency of the application of voting laws throughout the counties. Certain inconsistencies stand out to include:

At the county level the pattern of inconsistencies is easily seen.  For instance, Over-vote in Philadelphia County -- On November 4th at 11:30am, the DOS posted updated mail in vote counts for Philadelphia County.  The number of ballots reported to have been counted was an impossible 508,112 ballots despite the fact that only 432,873 ballots had been issued to voters in that county.  Later that day, the ballots counted number was reduced but this begs the question, who had the authority to add and subtract votes on the ballot counts reported to the Department of State?  Even if this was simply a data entry error, the lack of internal controls over such reporting necessitates a review of the numbers, the process and system access.

Information Sharing -- Members of the legislature or any oversight body of election inspectors, were not provided access to any data that was not available to the general public in open source records.  There are many other anomalies that one could not include in the letter because we have not been provided with the information you need to evaluate.  We have had to file right to know Right-to-Know requests to access the data.  Whenever the systems lack transparency it is IMPOSSIBLE for anyone to contend that fraud did not occur.

**Mail Date**

- Ballots Mailed on or BEFORE 9-11-2020.  That total is 27995.
- Ballots Mailed on November 1, 2 or 3.  That total is 8163.
- Ballots with NO MAILED date. That total is 9005.
- Ballots Returned on or BEFORE the Mailed Date.  That total is 58221.
- Ballots Returned one day after Mailed Date.  That total is 51200.

**Voter Date of Birth**

- Mail Votes cast by voters over the age of 100.  That total is 1532.
- In Allegheny County, there were 41 ballots mailed to people born on 01/01/1800- making them all 220 years old.
- Mail Votes by voters with NO Date of Birth.  That total is 245.

Additionally, in a data file received on November 4, 2020, the Commonwealth's PA Open Data sites reported over 3.1 million mail in ballots sent out.  The CSV file from the state on November 4 depicts 3.1 million mail in ballots sent out but on November 2, the information was provided

that only 2.7 million ballots had been sent out.  This discrepancy of approximately 400,000 ballots from November 2 to November 4 has not been explained.

This apparent discrepancy can only be evaluated by reviewing all transaction logs into the SURE system to determine the access, authority for the entry, the verification of the data entered as well as the authentication of the security certificates of the sites from which the data had been entered.

It is also important to note that the Department of State removed all election data from the PA Open Data platform in Mid-November 2020.  They provided no explanation for removing the data.  That is part of the issue—the data changed over time despite the fact that the number of ballots mailed should not have changed after November 2nd and the number of mail ballots received/cast should not have changed after November 3rd.

In light of the above, the mail-in ballot process in the Commonwealth of Pennsylvania in the 2020 General Election was so defective that it is essential to declare the selection of presidential electors for the Commonwealth to be in dispute.  The United States Congress is asked to declare the selection of presidential electors in this Commonwealth to be in dispute and to intervene in the selection of the electors for the Commonwealth of Pennsylvania for the 2020 General Election.

Respectfully Submitted,

Francis X. Ryan, Member
101st Legislative District, PA


Brad Roae, Member
6th Legislative District, PA

Daryl Metcalfe, Member
12th Legislative District, PA


Mike Puskaric, Member
39th Legislative District, PA

Valerie Gaydos, Member
44th Legislative District, PA

Eric Nelson, Member
57th Legislative District, PA

Kathy L. Rapp, Member
65th Legislative District

Stephanie Borowicz, Member
76th Legislative District, PA

David Rowe, Member
85th Legislative District, PA

Rob Kauffman, Member
89th Legislative District, PA

Mike Jones, Member
93rd Legislative District, PA

David Zimmerman, Member
99th Legislative District, PA

Jim Cox, Member
129th Legislative District, PA

Barbara Gleim, Member
199th Legislative District, PA

Russ Diamond, Member
102nd Legislative District

Cc: Members of the United States House of Representatives, Members of the United States Senate, President of the United States, Governor Tom Wolf, Secretary State of Pennsylvania, PA Senator Jake Corman, PA Senator Kim Ward, PA Speaker of the House Bryan Cutler, and PA Representative Kerry Benninghoff

PRINTER'S NO. **4634**

## THE GENERAL ASSEMBLY OF PENNSYLVANIA

# HOUSE RESOLUTION

## No. 1094 Session of 2020

INTRODUCED BY DIAMOND, NELSON, SCHEMEL, ROTHMAN, RYAN, KEEFER,
JONES, ROWE, PUSKARIC, GLEIM, COOK, DUSH, BOROWICZ,
ZIMMERMAN, METCALFE, MALONEY, MOUL, ROAE, RAPP, COX,
KAUFFMAN, DAVANZO, DOWLING, IRVIN, BERNSTINE, LEWIS, GREINER,
WARNER, OWLETT, TOBASH, MACKENZIE, METZGAR, SANKEY, KNOWLES,
WHEELAND, JOZWIAK, B. MILLER, RIGBY AND HICKERNELL,
NOVEMBER 30, 2020

REFERRED TO COMMITTEE ON STATE GOVERNMENT, NOVEMBER 30, 2020

### A RESOLUTION

1  Declaring the results of Statewide electoral contests in the
2     2020 general election to be in dispute.

3     WHEREAS, Article I, Section 4, Clause 1 of the Constitution

4  of the United States empowers state legislatures, including the

5  General Assembly of the Commonwealth of Pennsylvania, to

6  prescribe the "Times, Places, and Manner" of conducting

7  elections; and

8     WHEREAS, Article II, Section 1, Clause 2 of the Constitution

9  of the United States empowers state legislatures, including the

10 General Assembly of the Commonwealth of Pennsylvania, to direct

11 the manner of appointing electors for President and Vice

12 President of the United States; and

13    WHEREAS, The General Assembly of the Commonwealth of

14 Pennsylvania has exercised its authority to establish election

15 administration procedures for the Commonwealth under the act of

1  June 3, 1937 (P.L.1333, No.320), known as the Pennsylvania

2  Election Code; and

3      WHEREAS, The Pennsylvania Election Code requires all mail-in

4  ballots to be received by 8 p.m. on the day of the election; and

5      WHEREAS, The Pennsylvania Election Code requires election

6  officials at polling places to authenticate the signatures of

7  in-person voters; and

8      WHEREAS, The Pennsylvania Election Code requires that county

9  boards of elections shall not meet to conduct a pre-canvass of

10  all absentee and mail-in ballots until 7 a.m. on election day,

11  during which time defects on mail-in ballots would be

12  identified; and

13      WHEREAS, The Pennsylvania Election Code prohibits the

14  counting of defective absentee or mail-in ballots; and

15      WHEREAS, The Pennsylvania Election Code authorizes

16  "watchers," selected by candidates and political parties, to

17  observe the process of canvassing absentee and mail-in ballots;

18  and

19      WHEREAS, The Commonwealth conducted an election on November

20  3, 2020, for Federal offices, including selecting electors for

21  President and Vice President of the United States; and

22      WHEREAS, Officials in the Executive and Judicial Branches of

23  the Commonwealth infringed upon the General Assembly's authority

24  under the Constitution of the United States by unlawfully

25  changing the rules governing the November 3, 2020, election in

26  the Commonwealth; and

27      WHEREAS, On September 17, 2020, less than seven weeks before

28  the November 3, 2020, election, the partisan majority on the

29  Supreme Court of Pennsylvania unlawfully and unilaterally

30  extended the deadline for mail-in ballots to be received and

I APP. 668

1 mandated that ballots mailed without a postmark would be
2 presumed to be received timely and could be accepted without a
3 verified voter signature; and

4     WHEREAS, On October 23, 2020, less than two weeks before the
5 November 3, 2020, election and upon a petition from the
6 Secretary of the Commonwealth, the Supreme Court of Pennsylvania
7 ruled that county boards of election need not authenticate
8 signatures for mail-in ballots, thereby treating in-person and
9 mail-in voters dissimilarly and eliminating a critical safeguard
10 against potential election crime; and

11     WHEREAS, On November 2, 2020, the night before the November
12 3, 2020, election and prior to the prescribed time for pre-
13 canvassing mail-in ballots, the office of the Secretary of the
14 Commonwealth encouraged certain counties in this Commonwealth to
15 notify party and candidate representatives of mail-in voters
16 whose ballots contained defects; and

17     WHEREAS, Heavily Democrat counties permitted mail-in voters
18 to cure ballot defects while heavily Republican counties
19 followed the law and invalidated defective ballots; and

20     WHEREAS, In certain counties in this Commonwealth, watchers
21 were not allowed to meaningfully observe the pre-canvassing and
22 canvassing activities relating to absentee and mail-in ballots;
23 and

24     WHEREAS, In other parts of this Commonwealth, watchers
25 observed irregularities concerning the pre-canvassing and
26 canvassing of absentee and mail-in ballots; and

27     WHEREAS, Postal employees in Pennsylvania have reported
28 anomalies relating to mail-in ballots, including multiple
29 ballots delivered to a single address with unfamiliar
30 addressees, ballots mailed to vacant homes and empty lots and

20200HR1094PN4634     - 3 -

1  ballots mailed to addresses that did not exist; and

2      WHEREAS, Witnesses testifying before the Pennsylvania Senate

3  Majority Policy Committee on November 25, 2020, have provided

4  additional compelling information regarding the questionable

5  nature of the administration of the 2020 general election; and

6      WHEREAS, There remains ongoing litigation concerning the

7  administration of the November 3, 2020, election in this

8  Commonwealth; and

9      WHEREAS, In 2016, Pennsylvania's general election results

10  were certified on December 12, 2016, and on November 24, 2020,

11  the Secretary of the Commonwealth unilaterally and prematurely

12  certified results of the November 3, 2020, election regarding

13  presidential electors despite ongoing litigation; and

14      WHEREAS, The Pennsylvania House of Representatives has the

15  duty to ensure that no citizen of this Commonwealth is

16  disenfranchised, to insist that all elections are conducted

17  according to the law, and to satisfy the general public that

18  every legal vote is counted accurately; therefore be it

19      RESOLVED, That the House of Representatives:

20      (1)  Recognize allegations of substantial irregularities

21      and improprieties associated with mail-in balloting, pre-

22      canvassing and canvassing during the November 3, 2020,

23      election.

24      (2)  Disapprove of the infringement on the General

25      Assembly's authority pursuant to the Constitution of the

26      United States to regulate elections.

27      (3)  Disapprove of and disagree with the Secretary of the

28      Commonwealth's premature certification of the results of the

29      November 3, 2020, election regarding presidential electors.

30      (4)  Declare that the selection of presidential electors

20200HR1094PN4634                    - 4 -

I APP. 670

1  and other Statewide electoral contest results in this

2  Commonwealth is in dispute.

3      (5)  Urge the Secretary of the Commonwealth and the

4  Governor to withdraw or vacate the certification of

5  presidential electors and to delay certification of results

6  in other Statewide electoral contests voted on at the 2020

7  general election.

8      (6)  Urge the United States Congress to declare the

9  selection of presidential electors in this Commonwealth to be

10  in dispute.

PRINTER'S NO. **4432**

**THE GENERAL ASSEMBLY OF PENNSYLVANIA**

# HOUSE RESOLUTION

No. **1032** Session of 2020

INTRODUCED BY EVERETT, SEPTEMBER 28, 2020

REFERRED TO COMMITTEE ON STATE GOVERNMENT, SEPTEMBER 28, 2020

A RESOLUTION

1　Establishing the Select Committee on Election Integrity to
2　　investigate, review and make recommendations concerning the
3　　regulation and conduct of the 2020 general election.
4　　WHEREAS, The Elections Clause of the Constitution of the
5　United States, Article I, Section 4, Clause 1, as well as
6　provisions of the Constitution of Pennsylvania, provide that the
7　General Assembly is empowered to regulate the time, place and
8　manner of elections; and
9　　WHEREAS, This Commonwealth has traditionally only allowed
10　absentee voting by individuals with a statutorily defined excuse
11　to do so, such as a physical disability or absence from their
12　municipality on election day; and
13　　WHEREAS, Before the enactment of Act 77 of 2019, for an
14　individual to vote absentee in this Commonwealth, the individual
15　must have provided a permissible reason to do so, received an
16　absentee ballot and returned the absentee ballot no later than
17　5:00 p.m. on the Friday before election day; and
18　　WHEREAS, In addition to allocating $90 million to ensure that
19　Pennsylvanians could vote safely and securely on modern voting

1  machines, Act 77 of 2019 created a new category of mail-in

2  voting; and

3      WHEREAS, As a result of Act 77 of 2019, mail-in voters do not

4  have to provide a customary reason to vote by mail and are able

5  to return their ballots several days later than had

6  traditionally been allowed; and

7      WHEREAS, After the enactment of Act 77 of 2019, the General

8  Assembly continued to work diligently to fine-tune these

9  election reforms by enacting Act 94 of 2019, which streamlined

10  operations to ensure that ballot materials were suitable to

11  allow the ballots to be properly scanned; and

12      WHEREAS, As the COVID-19 pandemic upended seemingly every

13  facet of American life, once again, the General Assembly

14  provided additional election reforms in Act 12 of 2020,

15  including numerous accommodations, to ensure that the 2020

16  primary election could be conducted even amidst the COVID-19

17  pandemic; and

18      WHEREAS, In addition to other election reforms, Act 12 of

19  2020 moved the date of the 2020 primary election to allow more

20  time to flatten the curve and protect the health of

21  Pennsylvania's voters; and

22      WHEREAS, After the 2020 primary election, the General

23  Assembly enacted Act 35 of 2020 to require a report on the 2020

24  primary election, including information concerning the recent

25  reforms of Act 77 of 2019 and Act 12 of 2020; and

26      WHEREAS, More recently, the House of Representatives

27  developed and passed House Bill No. 2626, Printer's No. 4335,

28  which provides for another series of reforms to improve the

29  election process in this Commonwealth; and

30      WHEREAS, The publicly accessible Internet website of the

I APP. 673

1  Department of State of the Commonwealth explains that "[t]he

2  Secretary is Pennsylvania's Chief Election Official"; and

3      WHEREAS, The Department of State has provided guidance

4  documents for distribution to the county boards of elections,

5  including guidance that naked ballots, without the secrecy

6  envelope, should be counted and that absentee or mail-in ballots

7  could not be set aside based solely on signature analysis; and

8      WHEREAS, In light of longstanding Pennsylvania law and as

9  recognized in the majority and concurring opinions of the

10 Supreme Court of Pennsylvania in *Pennsylvania Democratic Party*

11 *v. Boockvar*, the guidance documents provided by the Department

12 of State include clearly erroneous information; and

13     WHEREAS, The guidance documents and other communications from

14 the Department of State have apparently resulted in confusion

15 among county officials; and

16     WHEREAS, A recent media report noted that more than a dozen

17 counties have experienced the loss of election directors or

18 deputy directors in the last year; and

19     WHEREAS, The same media report quoted a county election

20 official saying that the Department of State, "keeps changing

21 everything so we have to keep throwing stuff away"; and

22     WHEREAS, Recent actions by the Department of State call into

23 question whether the Commonwealth's administration of election

24 laws should be assigned to a different entity; and

25     WHEREAS, It is imperative that the General Assembly, on

26 behalf of the people of this Commonwealth, have access to a

27 comprehensive investigation and review of the regulation and

28 conduct of the 2020 general election, as well as events leading

29 up to the 2020 general election, in order to determine the need

30 to enact legislation before or after the 2020 general election;

I APP. 674

1  therefore be it

2     RESOLVED, That the House of Representatives establish the

3  Select Committee on Election Integrity to investigate, review

4  and make recommendations concerning the regulation and conduct

5  of the 2020 general election; and be it further

6     RESOLVED, That the select committee be authorized and

7  empowered to investigate, review and make findings and

8  recommendations regarding the regulation and conduct of the 2020

9  general election, including all of the following:

10        (1)  Actions taken, instructions provided and information

11     distributed by the Department of State and the Secretary of

12     the Commonwealth concerning the 2020 general election.

13        (2)  Actions taken, instructions provided and information

14     distributed by the county boards of elections.

15        (3)  Best practices of other states concerning the

16     regulation and conduct of the 2020 general election.

17        (4)  Legislative, regulatory or other changes to improve

18     the conduct of the 2020 general election or subsequent

19     elections;

20  and be it further

21     RESOLVED, That the select committee consist of five members

22  of the House of Representatives, including three members from

23  the majority caucus of the House of Representatives and two

24  members from the minority caucus of the House of

25  Representatives; and be it further

26     RESOLVED, That the Speaker of the House of Representatives

27  appoint the chair of the select committee from among the members

28  of the select committee; and be it further

29     RESOLVED, That the select committee hold hearings, call

30  witnesses, take testimony and make investigations at places as

I APP. 675

1  the select committee deems necessary within this Commonwealth;

2  and be it further

3  RESOLVED, That the chair of the select committee, on behalf

4  of the select committee, be authorized and empowered to do all

5  of the following:

6        (1)  Send for persons and papers and subpoena witnesses,

7     documents and other materials under the hand and seal of the

8     chair.

9        (2)  Administer oaths to witnesses.

10       (3)  Take testimony.

11       (4)  Prepare and file pleadings and other legal

12    documents.

13       (5)  Employ staff for the use of the select committee;

14  and be it further

15  RESOLVED, That the Sergeant-at-Arms or other person

16  designated by the chair of the select committee serve the

17  process of the select committee and execute the orders of the

18  chair and the select committee; and be it further

19  RESOLVED, That the select committee be authorized to sit

20  during the sessions of the House of Representatives; and be it

21  further

22  RESOLVED, That the expenses of the investigation be paid by

23  the Chief Clerk of the House of Representatives from

24  appropriation accounts under the Chief Clerk's exclusive control

25  and jurisdiction, upon a written request approved by the Speaker

26  of the House of Representatives, the Majority Leader of the

27  House of Representatives or the Minority Leader of the House of

28  Representatives; and be it further

29  RESOLVED, That the State Government Committee of the House of

30  Representatives assist the select committee to the fullest

I APP. 676

1   extent possible; and be it further

2      RESOLVED, That, upon adoption of this resolution by the House

3   of Representatives, the Chief Clerk of the House of

4   Representatives transmit a copy of this resolution to the

5   Secretary of the Commonwealth and each of the county boards of

6   elections; and be it further

7      RESOLVED, That the select committee submit interim and final

8   reports, as necessary, of its findings with its recommendations

9   for appropriate legislation or other action to the members of

10  the House of Representatives at the earliest practicable date.

I APP. 677



Committee of Sponsoring Organizations of the Treadway Commission

# Internal Control — Integrated Framework

## Executive Summary



May 2013

I APP. 678

ISBN 978-1-93735-239-4

©2013 All Rights Reserved. No part of this publication may be reproduced, redistributed, transmitted or displayed in any form or by any means without written permission. For information regarding licensing and reprint permissions please contact the American Institute of Certified Public Accountants, licensing and permissions agent for COSO copyrighted materials. Direct all inquiries to copyright@aicpa.org or to AICPA, Attn: Manager, Rights and Permissions, 220 Leigh Farm Rd., Durham, NC 27707. Telephone inquiries may be directed to 888-777-7077.



Committee of Sponsoring Organizations of the Treadway Commission

# Internal Control — Integrated Framework

## Executive Summary



**May 2013**

I APP. 680

This project was commissioned by COSO, which is dedicated to providing thought leadership through the development of comprehensive frameworks and guidance on internal control, enterprise risk management, and fraud deterrence designed to improve organizational performance and oversight and to reduce the extent of fraud in organizations. COSO is a private sector initiative, jointly sponsored and funded by:

- American Accounting Association (AAA)
- American Institute of Certified Public Accountants (AICPA)
- Financial Executives International (FEI)
- Institute of Management Accountants (IMA)
- The Institute of Internal Auditors (IIA)

# Committee of Sponsoring Organizations of the Treadway Commission

## Board Members

**David L. Landsittel**
*COSO Chair*

**Mark S. Beasley**
**Douglas F. Prawitt**
*American Accounting Association*

**Richard F. Chambers**
*The Institute of Internal Auditors*

**Charles E. Landes**
*American Institute of Certified Public Accountants*

**Marie N. Hollein**
*Financial Executives International*

**Sandra Richtermeyer**
**Jeffrey C. Thomson**
*Institute of Management Accountants*

# PwC—Author

## Principal Contributors

**Miles E.A. Everson**
*Engagement Leader*
New York, USA

**Stephen E. Soske**
*Project Lead Partner*
Boston, USA

**Frank J. Martens**
*Project Lead Director*
Vancouver, Canada

**Cara M. Beston**
*Partner*
San Jose, USA

**Charles E. Harris**
*Partner*
Florham Park, USA

**J. Aaron Garcia**
*Director*
San Diego, USA

**Catherine I. Jourdan**
*Director*
Paris, France

**Jay A. Posklensky**
*Director*
Florham Park, USA

**Sallie Jo Perraglia**
*Manager*
New York, USA

# Advisory Council

## Sponsoring Organizations Representatives

**Audrey A. Gramling**
Bellarmine University
*Fr. Raymond J. Treece*
*Endowed Chair*

**Steven E. Jameson**
Community Trust Bank
*Executive Vice President and Chief*
*Internal Audit & Risk Officer*

**J. Stephen McNally**
Campbell Soup Company
*Finance Director/Controller*

**Ray Purcell**
Pfizer
*Director of Financial Controls*

**William D. Schneider Sr.**
AT&T
*Director of Accounting*

## Members at Large

**Jennifer Burns**
Deloitte
*Partner*

**James DeLoach**
Protiviti
*Managing Director*

**Trent Gazzaway**
Grant Thornton
*Partner*

**Cees Klumper**
The Global Fund to Fight AIDS,
Tuberculosis and Malaria
*Chief Risk Officer*

**Thomas Montminy**
PwC
*Partner*

**Alan Paulus**
Ernst & Young LLP
*Partner*

**Thomas Ray**
Baruch College

**Dr. Larry E. Rittenberg**
University of Wisconsin
*Emeritus Professor of Accounting*
*Chair Emeritus COSO*

**Sharon Todd**
KPMG
*Partner*

**Kenneth L. Vander Wal**
ISACA
*International President*
*2011–2012*

## Regulatory Observers and Other Observers

**James Dalkin**
Government Accountability Office
*Director in the Financial*
*Management and*
*Assurance Team*

**Harrison E. Greene Jr.**
Federal Deposit Insurance
Corporation
*Assistant Chief Accountant*

**Christian Peo**
Securities and Exchange
Commission
*Professional Accounting Fellow*
*(Through June 2012)*

**Amy Steele**
Securities and Exchange
Commission
*Associate Chief Accountant*
*(Commencing July 2012)*

**Vincent Tophoff**
International Federation
of Accountants
*Senior Technical Manager*

**Keith Wilson**
Public Company Accounting
Oversight Board
*Deputy Chief Auditor*

# Foreword

In 1992 the Committee of Sponsoring Organizations of the Treadway Commission (COSO) released its *Internal Control—Integrated Framework* (the original framework). The original framework has gained broad acceptance and is widely used around the world. It is recognized as a leading framework for designing, implementing, and conducting internal control and assessing the effectiveness of internal control.

In the twenty years since the inception of the original framework, business and operating environments have changed dramatically, becoming increasingly complex, technologically driven, and global. At the same time, stakeholders are more engaged, seeking greater transparency and accountability for the integrity of systems of internal control that support business decisions and governance of the organization.

COSO is pleased to present the updated *Internal Control—Integrated Framework* (*Framework*). COSO believes the *Framework* will enable organizations to effectively and efficiently develop and maintain systems of internal control that can enhance the likelihood of achieving the entity's objectives and adapt to changes in the business and operating environments.

The experienced reader will find much that is familiar in the *Framework*, which builds on what has proven useful in the original version. It retains the core definition of internal control and the five components of internal control. The requirement to consider the five components to assess the effectiveness of a system of internal control remains unchanged fundamentally. Also, the *Framework* continues to emphasize the importance of management judgment in designing, implementing, and conducting internal control, and in assessing the effectiveness of a system of internal control.

At the same time, the *Framework* includes enhancements and clarifications that are intended to ease use and application. One of the more significant enhancements is the formalization of fundamental concepts that were introduced in the original framework. In the updated *Framework*, these concepts are now principles, which are associated with the five components, and which provide clarity for the user in designing and implementing systems of internal control and for understanding requirements for effective internal control.

The *Framework* has been enhanced by expanding the financial reporting category of objectives to include other important forms of reporting, such as non-financial and internal reporting. Also, the *Framework* reflects considerations of many changes in the business and operating environments over the past several decades, including:

- Expectations for governance oversight

- Globalization of markets and operations

- Changes and greater complexities of business

- Demands and complexities in laws, rules, regulations, and standards

- Expectations for competencies and accountabilities

- Use of, and reliance on, evolving technologies

- Expectations relating to preventing and detecting fraud



I APP. 684

This *Executive Summary*, provides a high-level overview intended for the board of directors, chief executive officer, and other senior management. The *Framework and Appendices* publication sets out the *Framework*, defining internal control, describing requirements for effective internal control including components and relevant principles, and providing direction for all levels of management to use in designing, implementing, and conducting internal control and in assessing its effectiveness. Appendices within the *Framework and Appendices* provide additional reference, but are not considered a part of the *Framework*. The *Illustrative Tools for Assessing Effectiveness of a System of Internal Control*, provides templates and scenarios that may be useful in applying the *Framework*.

In addition to the *Framework*, *Internal Control over External Financial Reporting: A Compendium of Approaches and Examples* has been published concurrently to provide practical approaches and examples that illustrate how the components and principles set forth in the *Framework* can be applied in preparing external financial statements.

COSO previously issued *Guidance on Monitoring Internal Control Systems* to help organizations understand and apply monitoring activities within a system of internal control. While this guidance was prepared to assist in applying the original framework, COSO believes this guidance has similar applicability to the updated *Framework*.

COSO may, in the future, issue other documents to provide assistance in applying the *Framework*. However, neither the *Internal Control over External Financial Reporting: A Compendium of Approaches and Examples, Guidance on Monitoring Internal Control Systems*, nor any other past or future guidance takes precedence over the *Framework*.

Among other publications published by COSO is the *Enterprise Risk Management—Integrated Framework* (*ERM Framework*). The *ERM Framework* and the *Framework* are intended to be complementary, and neither supersedes the other. Yet, while these frameworks are distinct and provide a different focus, they do overlap. The *ERM Framework* encompasses internal control, with several portions of the text of the original *Internal Control–Integrated Framework* reproduced. Consequently, the *ERM Framework* remains viable and suitable for designing, implementing, conducting, and assessing enterprise risk management.

Finally, COSO would like to thank PwC and the Advisory Council for their contributions in developing the *Framework* and related documents. Their full consideration of input provided by many stakeholders and their insight were instrumental in ensuring that the core strengths of the original framework have been preserved, clarified, and strengthened.

David L. Landsittel
*COSO Chair*

# Executive Summary

Internal control helps entities achieve important objectives and sustain and improve performance. COSO's *Internal Control—Integrated Framework (Framework)* enables organizations to effectively and efficiently develop systems of internal control that adapt to changing business and operating environments, mitigate risks to acceptable levels, and support sound decision making and governance of the organization.

Designing and implementing an effective system of internal control can be challenging; operating that system effectively and efficiently every day can be daunting. New and rapidly changing business models, greater use and dependence on technology, increasing regulatory requirements and scrutiny, globalization, and other challenges demand any system of internal control to be agile in adapting to changes in business, operating and regulatory environments.

An effective system of internal control demands more than rigorous adherence to policies and procedures: it requires the use of judgment. Management and boards of directors[1] use judgment to determine how much control is enough. Management and other personnel use judgment every day to select, develop, and deploy controls across the entity. Management and internal auditors, among other personnel, apply judgment as they monitor and assess the effectiveness of the system of internal control.

The *Framework* assists management, boards of directors, external stakeholders, and others interacting with the entity in their respective duties regarding internal control without being overly prescriptive. It does so by providing both understanding of what constitutes a system of internal control and insight into when internal control is being applied effectively.

For management and boards of directors, the *Framework* provides:

- A means to apply internal control to any type of entity, regardless of industry or legal structure, at the levels of entity, operating unit, or function

- A principles-based approach that provides flexibility and allows for judgment in designing, implementing, and conducting internal control—principles that can be applied at the entity, operating, and functional levels

- Requirements for an effective system of internal control by considering how components and principles are present and functioning and how components operate together

- A means to identify and analyze risks, and to develop and manage appropriate responses to risks within acceptable levels and with a greater focus on anti-fraud measures

---

1    The *Framework* uses the term "board of directors," which encompasses the governing body, including board, board of trustees, general partners, owner, or supervisory board.

I APP. 686

- An opportunity to expand the application of internal control beyond financial reporting to other forms of reporting, operations, and compliance objectives

- An opportunity to eliminate ineffective, redundant, or inefficient controls that provide minimal value in reducing risks to the achievement of the entity's objectives

For external stakeholders of an entity and others that interact with the entity, application of this *Framework* provides:

- Greater confidence in the board of directors' oversight of internal control systems

- Greater confidence regarding the achievement of entity objectives

- Greater confidence in the organization's ability to identify, analyze, and respond to risk and changes in the business and operating environments

- Greater understanding of the requirement of an effective system of internal control

- Greater understanding that through the use of judgment, management may be able to eliminate ineffective, redundant, or inefficient controls

Internal control is not a serial process but a dynamic and integrated process. The *Framework* applies to all entities: large, mid-size, small, for-profit and not-for-profit, and government bodies. However, each organization may choose to implement internal control differently. For instance, a smaller entity's system of internal control may be less formal and less structured, yet still have effective internal control.

The remainder of this Executive Summary provides an overview of internal control, including a definition, categories of objective, description of the requisite components and associated principles, and requirement of an effective system of internal control. It also includes a discussion of limitations—the reasons why no system of internal control can be perfect. Finally, it offers considerations on how various parties may use the *Framework*.

# Defining Internal Control

Internal control is defined as follows:

*Internal control is a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance.*

This definition reflects certain fundamental concepts. Internal control is:

- *Geared to the achievement of objectives* in one or more categories—operations, reporting, and compliance

- *A process* consisting of ongoing tasks and activities—a means to an end, not an end in itself

- *Effected by people*—not merely about policy and procedure manuals, systems, and forms, but about people and the actions they take at every level of an organization to affect internal control

- Able to *provide reasonable assurance*—but not absolute assurance, to an entity's senior management and board of directors

- *Adaptable to the entity structure*—flexible in application for the entire entity or for a particular subsidiary, division, operating unit, or business process

This definition is intentionally broad. It captures important concepts that are fundamental to how organizations design, implement, and conduct internal control, providing a basis for application across organizations that operate in different entity structures, industries, and geographic regions.

# Objectives

The *Framework* provides for three categories of objectives, which allow organizations to focus on differing aspects of internal control:

- *Operations Objectives*—These pertain to effectiveness and efficiency of the entity's operations, including operational and financial performance goals, and safeguarding assets against loss.

- *Reporting Objectives*—These pertain to internal and external financial and non-financial reporting and may encompass reliability, timeliness, transparency, or other terms as set forth by regulators, recognized standard setters, or the entity's policies.

- *Compliance Objectives*—These pertain to adherence to laws and regulations to which the entity is subject.

I APP. 688

# Components of Internal Control

Internal control consists of five integrated components.

## Control Environment

The control environment is the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization. The board of directors and senior management establish the tone at the top regarding the importance of internal control including expected standards of conduct. Management reinforces expectations at the various levels of the organization. The control environment comprises the integrity and ethical values of the organization; the parameters enabling the board of directors to carry out its governance oversight responsibilities; the organizational structure and assignment of authority and responsibility; the process for attracting, developing, and retaining competent individuals; and the rigor around performance measures, incentives, and rewards to drive accountability for performance. The resulting control environment has a pervasive impact on the overall system of internal control.

## Risk Assessment

Every entity faces a variety of risks from external and internal sources. Risk is defined as the possibility that an event will occur and adversely affect the achievement of objectives. Risk assessment involves a dynamic and iterative process for identifying and assessing risks to the achievement of objectives. Risks to the achievement of these objectives from across the entity are considered relative to established risk tolerances. Thus, risk assessment forms the basis for determining how risks will be managed.

A precondition to risk assessment is the establishment of objectives, linked at different levels of the entity. Management specifies objectives within categories relating to operations, reporting, and compliance with sufficient clarity to be able to identify and analyze risks to those objectives. Management also considers the suitability of the objectives for the entity. Risk assessment also requires management to consider the impact of possible changes in the external environment and within its own business model that may render internal control ineffective.

## Control Activities

Control activities are the actions established through policies and procedures that help ensure that management's directives to mitigate risks to the achievement of objectives are carried out. Control activities are performed at all levels of the entity, at various stages within business processes, and over the technology environment. They may be preventive or detective in nature and may encompass a range of manual and automated activities such as authorizations and approvals, verifications, reconciliations, and business performance reviews. Segregation of duties is typically built into the selection and development of control activities. Where segregation of duties is not practical, management selects and develops alternative control activities.

## Information and Communication

Information is necessary for the entity to carry out internal control responsibilities to support the achievement of its objectives. Management obtains or generates and uses relevant and quality information from both internal and external sources to support the functioning of other components of internal control. Communication is the continual, iterative process of providing, sharing, and obtaining necessary information. Internal communication is the means by which information is disseminated throughout the organization, flowing up, down, and across the entity. It enables personnel to receive a clear message from senior management that control responsibilities must be taken seriously. External communication is twofold: it enables inbound communication of relevant external information, and it provides information to external parties in response to requirements and expectations.

## Monitoring Activities

Ongoing evaluations, separate evaluations, or some combination of the two are used to ascertain whether each of the five components of internal control, including controls to effect the principles within each component, is present and functioning. Ongoing evaluations, built into business processes at different levels of the entity, provide timely information. Separate evaluations, conducted periodically, will vary in scope and frequency depending on assessment of risks, effectiveness of ongoing evaluations, and other management considerations. Findings are evaluated against criteria established by regulators, recognized standard-setting bodies or management and the board of directors, and deficiencies are communicated to management and the board of directors as appropriate.

I APP. 690

## Relationship of Objectives and Components

A direct relationship exists between *objectives*, which are what an entity strives to achieve, *components*, which represent what is required to achieve the objectives, and the *organizational structure* of the entity (the operating units, legal entities, and other). The relationship can be depicted in the form of a cube.



- The three categories of objectives—operations, reporting, and compliance—are represented by the columns.

- The five components are represented by the rows.

- An entity's organizational structure is represented by the third dimension.

## Components and Principles

The *Framework* sets out seventeen principles representing the fundamental concepts associated with each component. Because these principles are drawn directly from the components, an entity can achieve effective internal control by applying all principles. All principles apply to operations, reporting, and compliance objectives. The principles supporting the components of internal control are listed below.

### Control Environment

1. The organization[2] demonstrates a commitment to integrity and ethical values.

2. The board of directors demonstrates independence from management and exercises oversight of the development and performance of internal control.

3. Management establishes, with board oversight, structures, reporting lines, and appropriate authorities and responsibilities in the pursuit of objectives.

4. The organization demonstrates a commitment to attract, develop, and retain competent individuals in alignment with objectives.

5. The organization holds individuals accountable for their internal control responsibilities in the pursuit of objectives.

---

2   For purposes of the *Framework*, the term "organization" is used to collectively capture the board, management, and other personnel, as reflected in the definition of internal control.

I APP. 691

## Risk Assessment

6.  The organization specifies objectives with sufficient clarity to enable the identification and assessment of risks relating to objectives.

7.  The organization identifies risks to the achievement of its objectives across the entity and analyzes risks as a basis for determining how the risks should be managed.

8.  The organization considers the potential for fraud in assessing risks to the achievement of objectives.

9.  The organization identifies and assesses changes that could significantly impact the system of internal control.

## Control Activities

10. The organization selects and develops control activities that contribute to the mitigation of risks to the achievement of objectives to acceptable levels.

11. The organization selects and develops general control activities over technology to support the achievement of objectives.

12. The organization deploys control activities through policies that establish what is expected and procedures that put policies into action.

## Information and Communication

13. The organization obtains or generates and uses relevant, quality information to support the functioning of internal control.

14. The organization internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control.

15. The organization communicates with external parties regarding matters affecting the functioning of internal control.

## Monitoring Activities

16. The organization selects, develops, and performs ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning.

17. The organization evaluates and communicates internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate.

I APP. 692

# Effective Internal Control

The *Framework* sets forth the requirements for an effective system of internal control. An effective system provides reasonable assurance regarding achievement of an entity's objectives. An effective system of internal control reduces, to an acceptable level, the risk of not achieving an entity objective and may relate to one, two, or all three categories of objectives. It requires that:

- Each of the five components and relevant principles is present and functioning. "Present" refers to the determination that the components and relevant principles exist in the design and implementation of the system of internal control to achieve specified objectives. "Functioning" refers to the determination that the components and relevant principles continue to exist in the operations and conduct of the system of internal control to achieve specified objectives.

- The five components operate together in an integrated manner. "Operating together" refers to the determination that all five components collectively reduce, to an acceptable level, the risk of not achieving an objective. Components should not be considered discretely; instead, they operate together as an integrated system. Components are interdependent with a multitude of interrelationships and linkages among them, particularly the manner in which principles interact within and across components.

When a major deficiency exists with respect to the presence and functioning of a component or relevant principle, or with respect to the components operating together in an integrated manner, the organization cannot conclude that it has met the requirements for an effective system of internal control.

When a system of internal control is determined to be effective, senior management and the board of directors have reasonable assurance, relative to the application within the entity structure, that the organization:

- Achieves effective and efficient operations when external events are considered unlikely to have a significant impact on the achievement of objectives or where the organization can reasonably predict the nature and timing of external events and mitigate the impact to an acceptable level

- Understands the extent to which operations are managed effectively and efficiently when external events may have a significant impact on the achievement of objectives or where the organization can reasonably predict the nature and timing of external events and mitigate the impact to an acceptable level

- Prepares reports in conformity with applicable rules, regulations, and standards or with the entity's specified reporting objectives

- Complies with applicable laws, rules, regulations, and external standards

The *Framework* requires judgment in designing, implementing, and conducting internal control and assessing its effectiveness. The use of judgment, within the boundaries established by laws, rules, regulations, and standards, enhances management's ability to make better decisions about internal control, but cannot guarantee perfect outcomes.

I APP. 693

# Limitations

The *Framework* recognizes that while internal control provides reasonable assurance of achieving the entity's objectives, limitations do exist. Internal control cannot prevent bad judgment or decisions, or external events that can cause an organization to fail to achieve its operational goals. In other words, even an effective system of internal control can experience a failure. Limitations may result from the:

- Suitability of objectives established as a precondition to internal control

- Reality that human judgment in decision making can be faulty and subject to bias

- Breakdowns that can occur because of human failures such as simple errors

- Ability of management to override internal control

- Ability of management, other personnel, and/or third parties to circumvent controls through collusion

- External events beyond the organization's control

These limitations preclude the board and management from having absolute assurance of the achievement of the entity's objectives—that is, internal control provides reasonable but not absolute assurance. Notwithstanding these inherent limitations, management should be aware of them when selecting, developing, and deploying controls that minimize, to the extent practical, these limitations.

# Using the *Internal Control—Integrated Framework*

How this report can be used depends on the roles of the interested parties:

- *The Board of Directors*—The board should discuss with senior management the state of the entity's system of internal control and provide oversight as needed. Senior management is accountable for internal control and to the board of directors, and the board needs to establish its policies and expectations of how members should provide oversight of the entity's internal control. The board should be apprised of the risks to the achievement of the entity's objectives, the assessments of internal control deficiencies, the management actions deployed to mitigate such risks and deficiencies, and how management assesses the effectiveness of the entity's system of internal control. The board should challenge management and ask the tough questions, as necessary, and seek input and support from internal auditors, external auditors, and others. Sub-committees of the board often can assist the board by addressing some of these oversight activities.

- *Senior Management*—Senior management should assess the entity's system of internal control in relation to the *Framework*, focusing on how the organization applies the seventeen principles in support of the components of internal control. Where management has applied the 1992 edition of the framework, it should first review the updates made to this version (as noted in Appendix F of the *Framework*), and consider implications of those updates to the entity's

I APP. 694

system of internal control. Management may consider using the *Illustrative Tools* as part of this initial comparison and as an ongoing evaluation of the overall effectiveness of the entity's system of internal control.

- *Other Management and Personnel*—Managers and other personnel should review the changes made to this version and assess implications of those changes on the entity's system of internal control. In addition, they should consider how they are conducting their responsibilities in light of the *Framework* and discuss with more senior personnel ideas for strengthening internal control. More specifically, they should consider how existing controls affect the relevant principles within the five components of internal control.

- *Internal Auditors*—Internal auditors should review their internal audit plans and how they applied the 1992 edition of the framework. Internal auditors also should review in detail the changes made to this version and consider possible implications of those changes on audit plans, evaluations, and any reporting on the entity's system of internal control.

- *Independent Auditors*—In some jurisdictions, an independant auditor is engaged to audit or examine the effectiveness of the client's internal control over financial reporting in addition to auditing the entity's financial statements. Auditors can assess the entity's system of internal control in relation to the *Framework*, focusing on how the organization has selected, developed, and deployed controls that affect the principles within the components of internal control. Auditors, similar to management, may use the *Illustrative Tools* as part of this evaluation of the overall effectiveness of the entity's system of internal control.

- *Other Professional Organizations*—Other professional organizations providing guidance on operations, reporting, and compliance may consider their standards and guidance in comparison to the *Framework*. To the extent diversity in concepts and terminology is eliminated, all parties benefit.

- *Educators*—With the presumption that the *Framework* attains broad acceptance, its concepts and terms should find their way into university curricula.

I APP. 695



PRINTER'S NO.  **4634**

### THE GENERAL ASSEMBLY OF PENNSYLVANIA

# HOUSE RESOLUTION
No.  **1094**  Session of 2020

INTRODUCED BY DIAMOND, NELSON, SCHEMEL, ROTHMAN, RYAN, KEEFER, JONES, ROWE, PUSKARIC, GLEIM, COOK, DUSH, BOROWICZ, ZIMMERMAN, METCALFE, MALONEY, MOUL, ROAE, RAPP, COX, KAUFFMAN, DAVANZO, DOWLING, IRVIN, BERNSTINE, LEWIS, GREINER, WARNER, OWLETT, TOBASH, MACKENZIE, METZGAR, SANKEY, KNOWLES, WHEELAND, JOZWIAK, B. MILLER, RIGBY AND HICKERNELL, NOVEMBER 30, 2020

REFERRED TO COMMITTEE ON STATE GOVERNMENT, NOVEMBER 30, 2020

A RESOLUTION

1  Declaring the results of Statewide electoral contests in the
2     2020 general election to be in dispute.
3     WHEREAS, Article I, Section 4, Clause 1 of the Constitution
4  of the United States empowers state legislatures, including the
5  General Assembly of the Commonwealth of Pennsylvania, to
6  prescribe the "Times, Places, and Manner" of conducting
7  elections; and
8     WHEREAS, Article II, Section 1, Clause 2 of the Constitution
9  of the United States empowers state legislatures, including the
10 General Assembly of the Commonwealth of Pennsylvania, to direct
11 the manner of appointing electors for President and Vice
12 President of the United States; and
13    WHEREAS, The General Assembly of the Commonwealth of
14 Pennsylvania has exercised its authority to establish election
15 administration procedures for the Commonwealth under the act of

I APP. 698

1   June 3, 1937 (P.L.1333, No.320), known as the Pennsylvania

2   Election Code; and

3       WHEREAS, The Pennsylvania Election Code requires all mail-in

4   ballots to be received by 8 p.m. on the day of the election; and

5       WHEREAS, The Pennsylvania Election Code requires election

6   officials at polling places to authenticate the signatures of

7   in-person voters; and

8       WHEREAS, The Pennsylvania Election Code requires that county

9   boards of elections shall not meet to conduct a pre-canvass of

10  all absentee and mail-in ballots until 7 a.m. on election day,

11  during which time defects on mail-in ballots would be

12  identified; and

13      WHEREAS, The Pennsylvania Election Code prohibits the

14  counting of defective absentee or mail-in ballots; and

15      WHEREAS, The Pennsylvania Election Code authorizes

16  "watchers," selected by candidates and political parties, to

17  observe the process of canvassing absentee and mail-in ballots;

18  and

19      WHEREAS, The Commonwealth conducted an election on November

20  3, 2020, for Federal offices, including selecting electors for

21  President and Vice President of the United States; and

22      WHEREAS, Officials in the Executive and Judicial Branches of

23  the Commonwealth infringed upon the General Assembly's authority

24  under the Constitution of the United States by unlawfully

25  changing the rules governing the November 3, 2020, election in

26  the Commonwealth; and

27      WHEREAS, On September 17, 2020, less than seven weeks before

28  the November 3, 2020, election, the partisan majority on the

29  Supreme Court of Pennsylvania unlawfully and unilaterally

30  extended the deadline for mail-in ballots to be received and

1 mandated that ballots mailed without a postmark would be
2 presumed to be received timely and could be accepted without a
3 verified voter signature; and

4 WHEREAS, On October 23, 2020, less than two weeks before the
5 November 3, 2020, election and upon a petition from the
6 Secretary of the Commonwealth, the Supreme Court of Pennsylvania
7 ruled that county boards of election need not authenticate
8 signatures for mail-in ballots, thereby treating in-person and
9 mail-in voters dissimilarly and eliminating a critical safeguard
10 against potential election crime; and

11 WHEREAS, On November 2, 2020, the night before the November
12 3, 2020, election and prior to the prescribed time for pre-
13 canvassing mail-in ballots, the office of the Secretary of the
14 Commonwealth encouraged certain counties in this Commonwealth to
15 notify party and candidate representatives of mail-in voters
16 whose ballots contained defects; and

17 WHEREAS, Heavily Democrat counties permitted mail-in voters
18 to cure ballot defects while heavily Republican counties
19 followed the law and invalidated defective ballots; and

20 WHEREAS, In certain counties in this Commonwealth, watchers
21 were not allowed to meaningfully observe the pre-canvassing and
22 canvassing activities relating to absentee and mail-in ballots;
23 and

24 WHEREAS, In other parts of this Commonwealth, watchers
25 observed irregularities concerning the pre-canvassing and
26 canvassing of absentee and mail-in ballots; and

27 WHEREAS, Postal employees in Pennsylvania have reported
28 anomalies relating to mail-in ballots, including multiple
29 ballots delivered to a single address with unfamiliar
30 addressees, ballots mailed to vacant homes and empty lots and

I APP. 700

1 ballots mailed to addresses that did not exist; and

2     WHEREAS, Witnesses testifying before the Pennsylvania Senate

3 Majority Policy Committee on November 25, 2020, have provided

4 additional compelling information regarding the questionable

5 nature of the administration of the 2020 general election; and

6     WHEREAS, There remains ongoing litigation concerning the

7 administration of the November 3, 2020, election in this

8 Commonwealth; and

9     WHEREAS, In 2016, Pennsylvania's general election results

10 were certified on December 12, 2016, and on November 24, 2020,

11 the Secretary of the Commonwealth unilaterally and prematurely

12 certified results of the November 3, 2020, election regarding

13 presidential electors despite ongoing litigation; and

14     WHEREAS, The Pennsylvania House of Representatives has the

15 duty to ensure that no citizen of this Commonwealth is

16 disenfranchised, to insist that all elections are conducted

17 according to the law, and to satisfy the general public that

18 every legal vote is counted accurately; therefore be it

19     RESOLVED, That the House of Representatives:

20         (1)  Recognize allegations of substantial irregularities

21     and improprieties associated with mail-in balloting, pre-

22     canvassing and canvassing during the November 3, 2020,

23     election.

24         (2)  Disapprove of the infringement on the General

25     Assembly's authority pursuant to the Constitution of the

26     United States to regulate elections.

27         (3)  Disapprove of and disagree with the Secretary of the

28     Commonwealth's premature certification of the results of the

29     November 3, 2020, election regarding presidential electors.

30         (4)  Declare that the selection of presidential electors

1   and other Statewide electoral contest results in this

2   Commonwealth is in dispute.

3     (5)  Urge the Secretary of the Commonwealth and the

4   Governor to withdraw or vacate the certification of

5   presidential electors and to delay certification of results

6   in other Statewide electoral contests voted on at the 2020

7   general election.

8     (6)  Urge the United States Congress to declare the

9   selection of presidential electors in this Commonwealth to be

10   in dispute.

PRIOR PRINTER'S NOS. 3977, 4025                    PRINTER'S NO. **4335**

**THE GENERAL ASSEMBLY OF PENNSYLVANIA**

# HOUSE BILL
## No. 2626 Session of 2020

INTRODUCED BY MOUL, RYAN, JAMES, STAATS, MILLARD, PYLE, THOMAS,
MENTZER, SCHLEGEL CULVER AND GAYDOS, JUNE 23, 2020

AS AMENDED ON SECOND CONSIDERATION, HOUSE OF REPRESENTATIVES,
SEPTEMBER 1, 2020

AN ACT

1  ~~Amending the act of June 3, 1937 (P.L.1333, No.320), entitled~~  <--
2  ~~"An act concerning elections, including general, municipal,~~
3  ~~special and primary elections, the nomination of candidates,~~
4  ~~primary and election expenses and election contests; creating~~
5  ~~and defining membership of county boards of elections;~~
6  ~~imposing duties upon the Secretary of the Commonwealth,~~
7  ~~courts, county boards of elections, county commissioners;~~
8  ~~imposing penalties for violation of the act, and codifying,~~
9  ~~revising and consolidating the laws relating thereto; and~~
10 ~~repealing certain acts and parts of acts relating to~~
11 ~~elections," in the Secretary of the Commonwealth, further~~
12 ~~providing for powers and duties of the Secretary of the~~
13 ~~Commonwealth; in county boards of elections, further~~
14 ~~providing for powers and duties of county boards; in~~
15 ~~preparation for and conduct of primaries and elections,~~
16 ~~providing for deadline for change of enrollment of political~~
17 ~~party; in voting by qualified absentee electors, further~~
18 ~~providing for applications for official absentee ballots, for~~
19 ~~date of application for absentee ballot, for approval of~~
20 ~~application for absentee ballot, for official absentee voters~~
21 ~~ballots, for voting by absentee electors and for canvassing~~
22 ~~of official absentee ballots and mail in ballots; in voting~~
23 ~~by qualified mail in electors, further providing for~~
24 ~~applications for official mail in ballots, for date of~~
25 ~~application for mail in ballot, for approval of application~~
26 ~~for mail in ballot, for official mail in elector ballots and~~
27 ~~for voting by mail in electors; and making a related repeal.~~
28 AMENDING THE ACT OF JUNE 3, 1937 (P.L.1333, NO.320), ENTITLED  <--
29 "AN ACT CONCERNING ELECTIONS, INCLUDING GENERAL, MUNICIPAL,
30 SPECIAL AND PRIMARY ELECTIONS, THE NOMINATION OF CANDIDATES,
31 PRIMARY AND ELECTION EXPENSES AND ELECTION CONTESTS; CREATING
32 AND DEFINING MEMBERSHIP OF COUNTY BOARDS OF ELECTIONS;
33 IMPOSING DUTIES UPON THE SECRETARY OF THE COMMONWEALTH,

```
 1   COURTS, COUNTY BOARDS OF ELECTIONS, COUNTY COMMISSIONERS;
 2   IMPOSING PENALTIES FOR VIOLATION OF THE ACT, AND CODIFYING,
 3   REVISING AND CONSOLIDATING THE LAWS RELATING THERETO; AND
 4   REPEALING CERTAIN ACTS AND PARTS OF ACTS RELATING TO
 5   ELECTIONS," IN PRELIMINARY PROVISIONS, FURTHER PROVIDING FOR
 6   DEFINITIONS; IN SECRETARY OF THE COMMONWEALTH, PROVIDING FOR
 7   REPORTS ON IMPLEMENTATION OF ELECTIONS; IN COUNTY BOARDS OF
 8   ELECTIONS, FURTHER PROVIDING FOR POWERS AND DUTIES OF COUNTY
 9   BOARDS, FOR RECORDS AND DOCUMENTS TO BE OPEN TO PUBLIC
10   INSPECTION AND PROVISO, FOR PRESERVATION OF RECORDS AND FOR
11   WATCHERS OR ATTORNEYS AT SESSIONS OF COUNTY BOARD AND
12   CANDIDATES MAY BE PRESENT; IN DISTRICT ELECTION OFFICERS,
13   FURTHER PROVIDING FOR QUALIFICATIONS OF ELECTION OFFICERS AND
14   FOR APPOINTMENT OF WATCHERS; IN VOTING BY QUALIFIED ABSENTEE
15   ELECTORS, FURTHER PROVIDING FOR APPLICATIONS FOR OFFICIAL
16   ABSENTEE BALLOTS, FOR DATE OF APPLICATION FOR ABSENTEE
17   BALLOT, FOR OFFICIAL ABSENTEE VOTERS BALLOTS, FOR DELIVERING
18   OR MAILING BALLOTS, FOR VOTING BY ABSENTEE ELECTORS AND FOR
19   CANVASSING OF OFFICIAL ABSENTEE BALLOTS AND MAIL-IN BALLOTS;
20   IN STATEWIDE UNIFORM REGISTRY OF ELECTORS ADVISORY BOARD,
21   PROVIDING FOR SURE REQUIREMENTS; IN VOTING BY QUALIFIED MAIL-
22   IN ELECTORS, FURTHER PROVIDING FOR APPLICATIONS FOR OFFICIAL
23   MAIL-IN BALLOTS, FOR DATE OF APPLICATION FOR MAIL-IN BALLOT,
24   FOR OFFICIAL MAIL-IN ELECTOR BALLOTS, FOR DELIVERING OR
25   MAILING BALLOTS AND FOR VOTING BY MAIL-IN ELECTORS; IN
26   PENALTIES, PROVIDING FOR AN ENHANCEMENT OF PENALTIES FOR
27   CERTAIN VIOLATIONS; AND MAKING AN EDITORIAL CHANGE.

28   The General Assembly of the Commonwealth of Pennsylvania

29   hereby enacts as follows:

30   Section 1.  Section 201 of the act of June 3, 1937 (P.L.1333,   <--

31   No.320), known as the Pennsylvania Election Code, is amended by

32   adding a subsection to read:

33   Section 201.  Powers and Duties of the Secretary of the

34   Commonwealth.  The Secretary of the Commonwealth shall exercise

35   in the manner provided by this act all powers granted to him by

36   this act, and shall perform all the duties imposed upon him by

37   this act, which shall include the following:

38   * * *

39   (i)  To develop a tracking system by which each ballot,

40   absentee ballot and mail-in ballot is assigned a unique

41   scannable identification number to ensure that multiple ballots

42   are not cast by a qualified elector.

43   Section 2.  Section 302(p) of the act, amended March 27, 2020
```

I APP. 704

1  (P.L.41, No.12), is amended and the section is amended by adding

2  a subsection to read:

3     Section 302.  Powers and Duties of County Boards.  The county

4  boards of elections, within their respective counties, shall

5  exercise, in the manner provided by this act, all powers granted

6  to them by this act, and shall perform all the duties imposed

7  upon them by this act, which shall include the following:

8     * * *

9     (p)  A county board of elections shall not pay compensation

10  to a judge of elections who wilfully fails to deliver by two

11  o'clock A. M. on the day following the election envelopes;

12  supplies, including all uncast provisional ballots; and returns,

13  including all provisional ballots cast in the election district

14  and [statements signed under sections 1306 and 1302 D.]

15  completed absentee ballot and envelopes containing the

16  declaration of the elector received by the judge of elections

17  under sections 1306(b)(3) and 1306-D(b)(3).

18     (q)  To administer the ballot tracking system developed by

19  the Secretary of the Commonwealth under section 201(i) as

20  prescribed and directed by the Secretary of the Commonwealth.

21     Section 3.  The act is amended by adding a section to read:

22     Section 1231.1.  Deadline for Change of Enrollment of

23  Political Party.  Not later than thirty days prior to an

24  election, a registered elector who desires to change the

25  enrollment of political designation or who, although registered,

26  has not previously enrolled as a member of a party may appear

27  before a commissioner, registrar or clerk or may submit an

28  application by mail under 25 Pa.C.S. § 1324 (relating to

29  application by mail) and state in a signed writing the political

30  party in which the registered elector desires to be enrolled. If

1   the signature of the elector is verified by comparison with the

2   registered elector's signature as it appears on file with the

3   commission, the commissioner, registrar or clerk shall make the

4   change in its registration records. If supported by other

5   evidence of identity, a mark may be made in lieu of a signature

6   by a registered elector who is unable to write. The mark must be

7   made in the presence of a witness who must sign the registration

8   application.

9      Section 4.  Section 1302(i)(1) of the act, amended March 27,

10  2020 (P.L.41, No.12), is amended to read:

11     Section 1302.  Applications for Official Absentee Ballots.  *

12  * *

13     (i)  (1)  Application for official absentee ballots shall be

14  on physical and electronic forms prescribed by the Secretary of

15  the Commonwealth.

16     (1.1)  The application shall state that an elector who

17  applies for an absentee ballot pursuant to section 1301 shall

18  not be eligible to vote at a polling place on election day

19  [unless the elector brings the elector's absentee ballot to the

20  elector's polling place, remits the ballot and the envelope

21  containing the declaration of the elector to the judge of

22  elections to be spoiled and signs a statement subject to the

23  penalties of 18 Pa.C.S. § 4904 (relating to unsworn

24  falsification to authorities) to the same effect.] except by

25  provisional ballot. The application shall also state that an

26  elector may deliver an absentee ballot and the envelope

27  containing the declaration of the elector to the judge of

28  elections of the elector's election district at the elector's

29  polling place during the hours that the polling place is open on

30  election day.

1    (1.2)  [Such physical] Physical application forms shall be

2    made freely available to the public at county board of

3    elections, municipal buildings and at such other locations

4    designated by the secretary.

5    (1.3)  [Such electronic] Electronic application forms shall

6    be made freely available to the public through publicly

7    accessible means.

8    (1.4)  No written application or personal request shall be

9    necessary to receive or access the application forms.

10   (1.5)  Copies and records of all completed physical and

11   electronic applications for official absentee ballots shall be

12   retained by the county board of elections.

13   * * *

14   Section 5.  Section 1302.1(a) and (a.3)(1) and (2) of the

15   act, amended October 31, 2019 (P.L.552, No.77), are amended to

16   read:

17   Section 1302.1.  Date of Application for Absentee Ballot.

18   (a)  Except as provided in subsection (a.3), applications for

19   absentee ballots shall be received in the office of the county

20   board of elections not earlier than fifty (50) days before the

21   primary or election, except that if a county board of elections

22   determines that it would be appropriate to its operational

23   needs, any applications for absentee ballots received more than

24   fifty (50) days before the primary or election may be processed

25   before that time. Applications for absentee ballots shall be

26   processed if received not later than five o'clock P.M. of the

27   [first Tuesday] fifteenth day prior to the day of any primary or

28   election.

29   (a.3)  (1)  The following categories of electors may apply

30   for an absentee ballot under this subsection, if otherwise

1  qualified:

2   (i)  An elector whose physical disability or illness

3  prevented the elector from applying for an absentee ballot

4  before five o'clock P.M. on the [first Tuesday] fifteenth day

5  prior to the day of the primary or election.

6   (ii)  An elector who, because of the elector's business,

7  duties or occupation, was unable to apply for an absentee ballot

8  before five o'clock P.M. on the [first Tuesday] fifteenth day

9  prior to the day of the primary or election.

10   (iii)  An elector who becomes so physically disabled or ill

11  after five o'clock P.M. on the [first Tuesday] fifteenth day

12  prior to the day of the primary or election that the elector is

13  unable to appear at the polling place on the day of the primary

14  or election.

15   (iv)  An elector who, because of the conduct of the elector's

16  business, duties or occupation, will necessarily be absent from

17  the elector's municipality of residence on the day of the

18  primary or election, which fact was not and could not reasonably

19  be known to the elector on or before five o'clock P.M. on the

20  [first Tuesday] fifteenth day prior to the day of the primary or

21  election.

22   (2)  An elector described in paragraph (1) may submit an

23  application for an absentee ballot at any time up until the time

24  of the closing of the polls on the day of the primary or

25  election. The application shall include a declaration describing

26  the circumstances that prevented the elector from applying for

27  an absentee ballot before five o'clock P.M. on the [first

28  Tuesday] fifteenth day prior to the day of the primary or

29  election or that prevent the elector from appearing at the

30  polling place on the day of the primary or election, and the

I APP. 708

1 elector's qualifications under paragraph (1). The declaration

2 shall be made subject to the provisions of 18 Pa.C.S. § 4904

3 (relating to unsworn falsification to authorities).

4 * * *

5 Section 6. Sections 1302.2(c), 1303(e) and 1306(a)

6 introductory paragraph and (b)(3) of the act, amended March 27,

7 2020 (P.L.41, No.12), are amended to read:

8 Section 1302.2. Approval of Application for Absentee

9 Ballot.—

10 * * *

11 (c) The county board of elections, upon receipt of any

12 application of a qualified elector required to be registered

13 under the provisions of preceding section 1301, shall determine

14 the qualifications of such applicant by verifying the proof of

15 identification and comparing the information set forth on such

16 application with the information contained on the applicant's

17 permanent registration card. If the board is satisfied that the

18 applicant is qualified to receive an official absentee ballot,

19 the application shall be marked "approved." Such approval

20 decision shall be final and binding, except that challenges may

21 be made only on the ground that the applicant was not a

22 qualified elector. Such challenges must be made to the county

23 board of elections prior to five o'clock p.m. on the Friday

24 prior to the election, or during the pre-canvassing of an

25 elector's absentee ballot, whichever is earlier: Provided,

26 however, That a challenge to an application for an absentee

27 ballot shall not be permitted on the grounds that the elector

28 used an application for an absentee ballot instead of an

29 application for a mail-in ballot or on the grounds that the

30 elector used an application for a mail-in ballot instead of an

1    application for an absentee ballot.

2    * * *

3    Section 1303.  Official Absentee Voters Ballots.--* * *

4    (e)  The official absentee voter ballot shall state that an

5    elector who receives an absentee ballot pursuant to section 1301

6    and whose voted ballot is not timely received by the commission

7    or voted ballot and the envelope containing the declaration of

8    the elector is timely received by the judge of elections of the

9    elector's election district at the elector's polling place on

10   election day and who, on election day, is capable of voting at

11   the appropriate polling place may only vote on election day by

12   provisional ballot [unless the elector brings the elector's

13   absentee ballot to the elector's polling place, remits the

14   ballot and the envelope containing the declaration of the

15   elector to the judge of elections to be spoiled and signs a

16   statement subject to the penalties under 18 Pa.C.S. § 4904

17   (relating to unsworn falsification to authorities) to the same

18   effect].

19   Section 1306.  Voting by Absentee Electors.--(a)  Except as

20   provided in paragraphs (2) and (3), at any time after receiving

21   an official absentee ballot, but on or before eight o'clock P.M.

22   the day of the primary or election, the elector shall, in

23   secret, proceed to mark the ballot only in black lead pencil,

24   indelible pencil or blue, black or blue black ink, in fountain

25   pen or ball point pen, and then fold the ballot, enclose and

26   securely seal the same in the envelope on which is printed,

27   stamped or endorsed "Official Election Ballot." This envelope

28   shall then be placed in the second one, on which is printed the

29   form of declaration of the elector, and the address of the

30   elector's county board of election and the local election

I APP. 710

1  district of the elector. The elector shall then fill out, date

2  and sign the declaration printed on such envelope. Such envelope

3  shall then be securely sealed and the elector shall send same by

4  mail, postage prepaid, except where franked, or deliver it in

5  person to said county board of election or to the judge of

6  elections of the elector's election district at the elector's

7  polling place.

8  * * *

9  (b) * * *

10  (3)  Notwithstanding paragraph (2), an elector who requests

11  an absentee ballot and who is not shown on the district register

12  as having voted the ballot may [vote at the polling place if the

13  elector remits the ballot and the envelope containing the

14  declaration of the elector to the judge of elections to be

15  spoiled and the elector signs a statement subject to the

16  penalties under 18 Pa.C.S. § 4904 (relating to unsworn

17  falsification to authorities) in substantially the following

18  form:

19  I hereby declare that I am a qualified registered elector who

20  has obtained an absentee ballot or mail in ballot. I further

21  declare that I have not cast my absentee ballot or mail-in

22  ballot, and that instead I remitted my absentee ballot or

23  mail-in ballot and the envelope containing the declaration of

24  the elector to the judge of elections at my polling place to

25  be spoiled and therefore request that my absentee ballot or

26  mail-in ballot be voided.

27  (Date)

28  (Signature of Elector)................(Address of Elector)

29  (Local Judge of Elections)] deliver the completed absentee

30  ballot to the judge of elections of the elector's election

1   district at the elector's polling place.

2       * * *

3       Section 7.  Section 1308(g)(1.1) and (2) of the act, amended

4   March 27, 2020 (P.L.41, No.12), is amended, subsection (g) is

5   amended by adding a paragraph and the section is amended by

6   adding a subsection to read:

7       Section 1308.  Canvassing of Official Absentee Ballots and

8   Mail-in Ballots.  * * *

9       (a.1)  A judge of elections shall deliver all completed

10  absentee ballots, mail-in ballots and envelopes containing the

11  declaration of the elector received under sections 1306(b)(3)

12  and 1306-D(b)(3) to the county board of elections by two o'clock

13  A.M. on the day following the election.

14      * * *

15      (g)  * * *

16      (1.1)  The county board of elections shall meet [no earlier

17  than seven o'clock A.M. on election day] at leasT once before

18  election day at the county courthouse or the offices of the

19  county board of election to pre-canvass all ballots received

20  prior to the meeting.

21      (1.2)  A county board of elections that meets to pre-canvass

22  absentee ballots and mail-in ballots may complete the tasks

23  described in paragraph (4)(i), (ii) and (iii) at any point

24  during the period beginning twenty-one days prior to the

25  election and up to and including the day before the election,

26  provided that the board completes a pre-canvass of all absentee

27  ballots or mail-in ballots received prior to the Friday before

28  the election. A county board of elections shall provide at least

29  forty-eight hours' notice of a pre-canvass meeting by publicly

30  posting a notice of a pre-canvass meeting on its publicly

I APP. 712

1  accessible Internet website. [One] The authorized representative
2  of each candidate in an election, the county chairperson of each
3  political party and one representative from each political party
4  shall be permitted to remain in the room in which the absentee
5  ballots and mail in ballots are pre canvassed. The proceedings
6  of the pre canvassing shall be recorded and made available upon
7  request. No person observing, attending or participating in a
8  pre canvass meeting may disclose the results of any portion of
9  any pre canvass meeting prior to the close of the polls.
10  (2)   The county board of elections shall meet no earlier than
11  the close of polls on the day of the election at the county
12  courthouse or the offices of the county board of election and no
13  later than the third day following the election to begin
14  canvassing absentee ballots and mail in ballots not included in
15  the pre canvass meeting. The meeting under this paragraph shall
16  continue until all absentee ballots and mail in ballots received
17  prior to the close of the polls have been canvassed. The county
18  board of elections shall not record or publish any votes
19  reflected on the ballots prior to the close of the polls. The
20  canvass process shall continue through the eighth day following
21  the election for valid military overseas ballots timely received
22  under 25 Pa.C.S. § 3511 (relating to receipt of voted ballot). A
23  county board of elections shall provide at least forty eight
24  hours' notice of a canvass meeting by publicly posting a notice
25  on its publicly accessible Internet website. One authorized
26  representative of each candidate in an election, the county
27  chairperson of each political party and one representative from
28  each political party shall be permitted to remain in the room in
29  which the absentee ballots and mail in ballots are canvassed.
30  The proceedings of the canvassing shall be recorded and made

I APP. 713

1  available upon request.

2  * * *

3  Section 8. Section 1302-D(f) of the act, amended March 27,

4  2020 (P.L.41, No.12), is amended and subsection (g) is amended

5  by adding a paragraph to read:

6  Section 1302-D.  Applications for official mail-in ballots.

7  * * *

8  (f)  Form.  The following shall apply:

9  (1)  Application for an official mail-in ballot shall be

10  on physical and electronic forms prescribed by the Secretary

11  of the Commonwealth.

12  (2)  The application shall state that a voter who applies

13  for a mail-in ballot under section 1301-D shall not be

14  eligible to vote at a polling place on election day [unless

15  the elector brings the elector's mail-in ballot to the

16  elector's polling place, remits the ballot and the envelope

17  containing the declaration of the elector to the judge of

18  elections to be spoiled and signs a statement subject to the

19  penalties under 18 Pa.C.S. § 4904 (relating to unsworn

20  falsification to authorities) to the same effect.] except by

21  provisional ballot. The application shall also state that an

22  elector may deliver a mail-in ballot and the envelope

23  containing the declaration of the elector to the judge of

24  elections of the elector's election district at the elector's

25  polling place during the hours that the polling place is open

26  on election day.

27  (3)  The physical application forms shall be made freely

28  available to the public at county board of elections,

29  municipal buildings and at other locations designated by the

30  Secretary of the Commonwealth.

I APP. 714

1   (4) The electronic application forms shall be made

2 freely available to the public through publicly accessible

3 means.

4   (5) No written application or personal request shall be

5 necessary to receive or access the application forms.

6   (6) Copies and records of all completed physical and

7 electronic applications for official mail-in ballots shall be

8 retained by the county board of elections.

9 (g) Permanent mail-in voting list.—

10   * * *

11   (1.1) A county board of elections shall remove a person

12 from the permanent mail-in ballot list if the elector does

13 any of the following:

14     (i) The person loses eligibility to vote.

15     (ii) The elector votes in person at the elector's

16 polling place.

17     (iii) The elector requests removal from the

18 permanent mail-in ballot list.

19   * * *

20 Section 9. Section 1302.1-D(a) of the act, added October 31,

21 2019 (P.L.552, No.77), is amended to read:

22 Section 1302.1-D. Date of application for mail-in ballot.

23 (a) General rule.—Applications for mail-in ballots shall be

24 received in the office of the county board of elections not

25 earlier than 50 days before the primary or election, except that

26 if a county board of elections determines that it would be

27 appropriate to the county board of elections' operational needs,

28 any applications for mail-in ballots received more than 50 days

29 before the primary or election may be processed before that

30 time. Applications for mail-in ballots shall be processed if

I APP. 715

1  received not later than five o'clock P.M. of the [first Tuesday]

2  fifteenth day prior to the day of any primary or election.

3       * * *

4       Section 10.  Sections 1302.2 D(a)(3), 1303 D(e) and 1306 D(a)

5  and (b)(3) of the act, amended March 27, 2020 (P.L.41, No.12),

6  are amended to read:

7  Section 1302.2 D.  Approval of application for mail in ballot.

8       (a)  Approval process.  The county board of elections, upon

9  receipt of any application of a qualified elector under section

10  1301 D, shall determine the qualifications of the applicant by

11  verifying the proof of identification and comparing the

12  information provided on the application with the information

13  contained on the applicant's permanent registration card. The

14  following shall apply:

15       * * *

16       (3)  Challenges must be made to the county board of

17  elections prior to five o'clock p.m. on the Friday prior to

18  the election or during the precanvassing of an elector's

19  mail in ballot, whichever is earlier: Provided, however, That

20  a challenge to an application for a mail in ballot shall not

21  be permitted on the grounds that the elector used an

22  application for a mail in ballot instead of an application

23  for an absentee ballot or on the grounds that the elector

24  used an application for an absentee ballot instead of an

25  application for a mail in ballot.

26       * * *

27  Section 1303 D.  Official mail in elector ballots.

28       * * *

29       (e)  Notice.  The official mail in voter ballot shall state

30  that a voter who receives a mail in ballot under section 1301 D

I APP. 716

1   and whose voted mail-in ballot is not timely received by the
2   commission or voted ballot and the envelope containing the
3   declaration of the elector is timely received by the judge of
4   elections of the elector's election district at the elector's
5   polling place on election day may only vote on election day by
6   provisional ballot [unless the elector brings the elector's
7   mail-in ballot to the elector's polling place, remits the ballot
8   and the envelope containing the declaration of the elector to
9   the judge of elections to be spoiled and signs a statement
10  subject to the penalties of 18 Pa.C.S. § 4904 (relating to
11  unsworn falsification to authorities) to the same effect].
12  Section 1306-D.  Voting by mail-in electors.
13      (a)  General rule.--At any time after receiving an official
14  mail-in ballot, but on or before eight o'clock P.M. the day of
15  the primary or election, the mail-in elector shall, in secret,
16  proceed to mark the ballot only in black lead pencil, indelible
17  pencil or blue, black or blue-black ink, in fountain pen or ball
18  point pen, and then fold the ballot, enclose and securely seal
19  the same in the envelope on which is printed, stamped or
20  endorsed "Official Election Ballot." This envelope shall then be
21  placed in the second one, on which is printed the form of
22  declaration of the elector, and the address of the elector's
23  county board of election and the local election district of the
24  elector. The elector shall then fill out, date and sign the
25  declaration printed on such envelope. Such envelope shall then
26  be securely sealed and the elector shall send same by mail,
27  postage prepaid, except where franked, or deliver it in person
28  to said county board of election or to the judge of elections of
29  the elector's election district at the elector's polling place.
30      * * *

I APP. 717

1    (b)  Eligibility.--

2         * * *

3         (3)  Notwithstanding paragraph (2), an elector who

4    requests a mail-in ballot and who is not shown on the

5    district register as having voted the ballot may [vote at the

6    polling place if the elector remits the ballot and the

7    envelope containing the declaration of the elector to the

8    judge of elections to be spoiled and the elector signs a

9    statement subject to the penalties of 18 Pa.C.S. § 4904

10   (relating to unsworn falsification to authorities) which

11   shall be in substantially the following form:

12        I hereby declare that I am a qualified registered elector

13   who has obtained an absentee ballot or mail-in ballot. I

14   further declare that I have not cast my absentee ballot or

15   mail-in ballot, and that instead I remitted my absentee

16   ballot or mail-in ballot to the judge of elections at my

17   polling place to be spoiled and therefore request that my

18   absentee ballot or mail-in ballot be voided.

19        (Date)

20        (Signature of Elector)...........(Address of Elector)

21        (Local Judge of Elections)] deliver the completed mail-in

22   ballot and the envelope containing the declaration of the

23   elector to the judge of elections of the elector's election

24   district at the elector's polling place.

25        * * *

26   Section 11. Repeals are as follows:

27        (1)  The General Assembly declares that the repeal under

28   paragraph (2) is necessary for the addition of section

29   1231.1.

30        (2)  25 Pa.C.S § 1503 is repealed.

1    ~~Section 12.  This act shall take effect in 30 days.~~

2    SECTION 1.  SECTION 102(A.1) AND (Q.1) OF THE ACT OF JUNE 3,  **<--**

3    1937 (P.L.1333, NO.320), KNOWN AS THE PENNSYLVANIA ELECTION

4    CODE, AMENDED OR ADDED MARCH 27, 2020 (P.L.41, NO.12), ARE

5    AMENDED TO READ:

6    SECTION 102.  DEFINITIONS.--THE FOLLOWING WORDS, WHEN USED IN

7    THIS ACT, SHALL HAVE THE FOLLOWING MEANINGS, UNLESS OTHERWISE

8    CLEARLY APPARENT FROM THE CONTEXT:

9    * * *

10   (A.1)  THE WORD "CANVASS" SHALL MEAN THE [GATHERING OF

11   BALLOTS AFTER THE FINAL PRE-CANVASS MEETING AND THE COUNTING,

12   COMPUTING AND TALLYING OF THE VOTES REFLECTED ON THE BALLOTS.]

13   ACTIVITIES PERMITTED UNDER SECTION 1308(G)(3) AND (4).

14   * * *

15   (Q.1)  THE WORD "PRE-CANVASS" SHALL MEAN [THE INSPECTION AND

16   OPENING OF ALL ENVELOPES CONTAINING OFFICIAL ABSENTEE BALLOTS OR

17   MAIL-IN BALLOTS, THE REMOVAL OF SUCH BALLOTS FROM THE ENVELOPES

18   AND THE COUNTING, COMPUTING AND TALLYING OF THE VOTES REFLECTED

19   ON THE BALLOTS. THE TERM DOES NOT INCLUDE THE RECORDING OR

20   PUBLISHING OF THE VOTES REFLECTED ON THE BALLOTS.] THE

21   ACTIVITIES PERMITTED UNDER SECTION 1308(G)(3) AND (4)(I), (II)

22   AND (III).

23   * * *

24   SECTION 2.  THE ACT IS AMENDED BY ADDING A SECTION TO READ:

25   SECTION 209.  REPORTS ON IMPLEMENTATION OF ELECTIONS.--(A)

26   NO LATER THAN SIXTY DAYS AFTER AN ELECTION, THE BUREAU OF

27   COMMISSIONS, ELECTIONS AND LEGISLATION OF THE DEPARTMENT OF

28   STATE SHALL ISSUE A REPORT TO THE CHAIR AND MINORITY CHAIR OF

29   THE STATE GOVERNMENT COMMITTEE OF THE SENATE AND THE CHAIR AND

30   MINORITY CHAIR OF THE STATE GOVERNMENT COMMITTEE OF THE HOUSE OF

I APP. 719

1  REPRESENTATIVES. A COPY OF THE REPORT SHALL ALSO BE MADE

2  AVAILABLE ON THE DEPARTMENT OF STATE'S PUBLICLY ACCESSIBLE

3  INTERNET WEBSITE.

4     (B)  THE REPORT UNDER SUBSECTION (A) SHALL INCLUDE ONLY THE

5  FOLLOWING INFORMATION RELATING TO THE ADMINISTRATION OF THE

6  ELECTION BY THE DEPARTMENT OF STATE, A COUNTY BOARD OF ELECTIONS

7  OR A REGISTRATION COMMISSION ESTABLISHED UNDER 25 PA.C.S. § 1203

8  (RELATING TO COMMISSIONS):

9     (1)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

10  NUMBER OF APPLICATIONS FOR AN ABSENTEE BALLOT WHICH WERE

11  RECEIVED BY THE COUNTY BOARDS OF ELECTIONS.

12     (2)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

13  NUMBER OF APPLICATIONS FOR A MAIL-IN BALLOT WHICH WERE RECEIVED

14  BY THE COUNTY BOARDS OF ELECTIONS.

15     (3)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

16  NUMBER OF APPLICATIONS FOR AN ABSENTEE BALLOT WHICH WERE

17  APPROVED BY THE COUNTY BOARDS OF ELECTIONS.

18     (4)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

19  NUMBER OF APPLICATIONS FOR A MAIL-IN BALLOT WHICH WERE APPROVED

20  BY THE COUNTY BOARDS OF ELECTIONS.

21     (5)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

22  NUMBER OF ABSENTEE BALLOTS WHICH WERE VOTED BY QUALIFIED

23  ELECTORS.

24     (6)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

25  NUMBER OF MAIL-IN BALLOTS WHICH WERE VOTED BY QUALIFIED

26  ELECTORS.

27     (7)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

28  NUMBER OF PROVISIONAL BALLOTS CAST UNDER SECTION 1210(A.4).

29     (8)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

30  NUMBER OF QUALIFIED ELECTORS VOTING BY A PROVISIONAL BALLOT

I APP. 720

1  UNDER SECTION 1306(B)(2).

2  (9)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

3  NUMBER OF QUALIFIED ELECTORS VOTING BY PROVISIONAL BALLOT UNDER

4  SECTION 1306-D(B)(2).

5  (10)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

6  NUMBER OF PROVISIONAL BALLOTS UNDER PARAGRAPH (7) WHICH WERE

7  CANVASSED.

8  (11)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

9  NUMBER OF PROVISIONAL BALLOTS UNDER PARAGRAPH (8) WHICH WERE

10  CANVASSED.

11  (12)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

12  NUMBER OF PROVISIONAL BALLOTS UNDER PARAGRAPH (9) WHICH WERE

13  CANVASSED.

14  (13)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

15  NUMBER OF VOTER REGISTRATION APPLICATIONS UNDER SECTION 1231 AND

16  25 PA.C.S. PT. IV (RELATING TO VOTER REGISTRATION) WHICH WERE

17  RECEIVED:

18  (I)  FEWER THAN THIRTY DAYS BEFORE THE ELECTION.

19  (II)  FEWER THAN FIFTEEN DAYS BEFORE THE ELECTION.

20  (14)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

21  NUMBER OF POLLING PLACES IN SCHOOL BUILDINGS.

22  (15)  FOR EACH COUNTY, THE DATE, STARTING TIME AND ENDING

23  TIME THAT THE COUNTY BOARD OF ELECTIONS MET TO PRE-CANVASS

24  ABSENTEE BALLOTS AND MAIL-IN BALLOTS UNDER SECTION 1308(G)(1.1).

25  (16)  FOR EACH COUNTY, THE DATE, STARTING TIME AND ENDING

26  TIME THAT THE COUNTY BOARD OF ELECTIONS MET TO CANVASS ABSENTEE

27  BALLOTS AND MAIL-IN BALLOTS UNDER SECTION 1308(G)(2).

28  (17)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

29  NUMBER OF ABSENTEE BALLOTS WHICH WERE CHALLENGED UNDER SECTION

30  1302.2(C).

1    (18)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

2   NUMBER OF MAIL-IN BALLOTS WHICH WERE CHALLENGED UNDER SECTION

3   1302.2-D(A)(2).

4    (19)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

5   NUMBER OF ABSENTEE BALLOTS SUBJECT TO CHALLENGES UNDER PARAGRAPH

6   (17) WHICH WERE NOT CANVASSED.

7    (20)  FOR EACH COUNTY AND THE SUM FOR THIS COMMONWEALTH, THE

8   NUMBER OF MAIL-IN BALLOTS SUBJECT TO CHALLENGES UNDER PARAGRAPH

9   (18) WHICH WERE NOT CANVASSED.

10   (21)  THE NUMBER OF INCIDENTS KNOWN TO THE DEPARTMENT OF

11  STATE, COUNTY BOARDS OF ELECTIONS OR REGISTRATION COMMISSIONS

12  RELATING TO EACH OF THE FOLLOWING CATEGORIES:

13   (I)  AN ABSENTEE BALLOT OR MAIL-IN BALLOT WHICH WAS SENT TO

14  THE WRONG INDIVIDUAL OR WRONG ADDRESS.

15   (II)  AN ABSENTEE BALLOT OR MAIL-IN BALLOT WHICH WAS VOTED BY

16  AN INDIVIDUAL OTHER THAN THE INDIVIDUAL WHO APPLIED FOR THE

17  ABSENTEE BALLOT OR MAIL-IN BALLOT.

18   (III)  AN ABSENTEE BALLOT OR MAIL-IN BALLOT WHICH WAS

19  RETURNED TO THE COUNTY BOARDS OF ELECTIONS BY A MEANS OTHER THAN

20  PERMITTED BY LAW.

21   (22)  TO THE EXTENT CONSISTENT WITH FEDERAL AND STATE LAW, A

22  REVIEW OF ANY ACTION TAKEN BY THE DEPARTMENT OF STATE, COUNTY

23  BOARDS OF ELECTIONS OR REGISTRATION COMMISSIONS IN RESPONSE TO

24  AN INCIDENT UNDER PARAGRAPH (21), INCLUDING DETERMINATIONS MADE

25  ON THE INCIDENT, LEGAL ACTIONS FILED AND REFERRALS TO LAW

26  ENFORCEMENT.

27   (23)  A REVIEW OF ISSUES OR INCIDENTS ENCOUNTERED WITH AN

28  ELECTRONIC VOTING SYSTEM THAT RECEIVED THE APPROVAL OF THE

29  SECRETARY OF THE COMMONWEALTH UNDER SECTION 1105-A, INCLUDING

30  ANY TECHNICAL ISSUES ENCOUNTERED AT POLLING PLACES.

1     (C)   THE DEPARTMENT OF STATE SHALL DEVELOP A PROCESS TO

2   COLLECT DATA REQUIRED TO BE INCLUDED IN THE REPORT UNDER

3   SUBSECTION (B) FROM EACH COUNTY BOARD OF ELECTIONS WHICH

4   CONDUCTS AN ELECTION AND EACH REGISTRATION COMMISSION UNDER 25

5   PA.C.S. PT. IV IN A COUNTY WHICH CONDUCTS AN ELECTION, AS

6   APPLICABLE. A COUNTY BOARD OF ELECTIONS OR REGISTRATION

7   COMMISSION UNDER THIS SUBSECTION SHALL COMPLY WITH THE PROCESS

8   FOR SUBMISSION OF DATA UNDER THIS SUBSECTION NO LATER THAN

9   FORTY-FIVE DAYS AFTER AN ELECTION.

10     SECTION 3.  SECTION 302(P) OF THE ACT, AMENDED MARCH 27, 2020

11   (P.L.41, NO.12), IS AMENDED TO READ:

12     SECTION 302.  POWERS AND DUTIES OF COUNTY BOARDS.--THE COUNTY

13   BOARDS OF ELECTIONS, WITHIN THEIR RESPECTIVE COUNTIES, SHALL

14   EXERCISE, IN THE MANNER PROVIDED BY THIS ACT, ALL POWERS GRANTED

15   TO THEM BY THIS ACT, AND SHALL PERFORM ALL THE DUTIES IMPOSED

16   UPON THEM BY THIS ACT, WHICH SHALL INCLUDE THE FOLLOWING:

17     * * *

18     (P)  A COUNTY BOARD OF ELECTIONS SHALL NOT PAY COMPENSATION

19   TO A JUDGE OF ELECTIONS WHO WILFULLY FAILS TO DELIVER BY TWO

20   O'CLOCK A. M. ON THE DAY FOLLOWING THE ELECTION ENVELOPES;

21   SUPPLIES, INCLUDING ALL UNCAST PROVISIONAL BALLOTS; AND RETURNS,

22   INCLUDING ALL PROVISIONAL BALLOTS CAST IN THE ELECTION DISTRICT

23   AND [STATEMENTS SIGNED UNDER SECTIONS 1306 AND 1302-D.] ALL

24   MATERIAL DELIVERED UNDER SECTIONS 1306(B)(3)(I) AND 1306-D(B)(3)

25   (I).

26     SECTION 4.  SECTIONS 308, 309, 310(A), 402(A) AND 417(B) OF

27   THE ACT ARE AMENDED TO READ:

28     SECTION 308.  RECORDS AND DOCUMENTS TO BE OPEN TO PUBLIC

29   INSPECTION; PROVISO.--THE RECORDS OF EACH COUNTY BOARD OF

30   ELECTIONS, GENERAL AND DUPLICATE RETURNS, TALLY PAPERS,

1  AFFIDAVITS OF VOTERS AND OTHERS, NOMINATION PETITIONS,

2  RECORDINGS OF PRE-CANVASSING MEETINGS, RECORDINGS OF CANVASSING

3  MEETINGS, CERTIFICATES AND PAPERS, OTHER PETITIONS, APPEALS,

4  WITNESS LISTS, ACCOUNTS, CONTRACTS, REPORTS AND OTHER DOCUMENTS

5  AND RECORDS IN ITS CUSTODY, EXCEPT THE CONTENTS OF BALLOT BOXES

6  AND VOTING MACHINES AND RECORDS OF ASSISTED VOTERS, SHALL BE

7  OPEN TO PUBLIC INSPECTION, EXCEPT AS HEREIN PROVIDED, AND MAY BE

8  INSPECTED AND COPIED BY ANY QUALIFIED ELECTOR OF THE COUNTY

9  DURING ORDINARY BUSINESS HOURS, AT ANY TIME WHEN THEY ARE NOT

10  NECESSARILY BEING USED BY THE BOARD, OR ITS EMPLOYES HAVING

11  DUTIES TO PERFORM THERETO: PROVIDED, HOWEVER, THAT SUCH PUBLIC

12  INSPECTION THEREOF SHALL ONLY BE IN THE PRESENCE OF A MEMBER OR

13  AUTHORIZED EMPLOYE OF THE COUNTY BOARD, AND SHALL BE SUBJECT TO

14  PROPER REGULATION FOR SAFEKEEPING OF THE RECORDS AND DOCUMENTS,

15  AND SUBJECT TO THE FURTHER PROVISIONS OF THIS ACT: AND PROVIDED

16  FURTHER, THAT GENERAL AND DUPLICATE RETURNS, TALLY PAPERS,

17  AFFIDAVITS OF VOTERS AND OTHERS, AND ALL OTHER PAPERS REQUIRED

18  TO BE RETURNED BY THE ELECTION OFFICERS TO THE COUNTY BOARD

19  SEALED, SHALL BE OPEN TO PUBLIC INSPECTION ONLY AFTER THE COUNTY

20  BOARD SHALL, IN THE COURSE OF THE COMPUTATION AND CANVASSING OF

21  THE RETURNS, HAVE BROKEN SUCH SEALS AND FINISHED, FOR THE TIME,

22  THEIR USE OF SAID PAPERS IN CONNECTION WITH SUCH COMPUTATION AND

23  CANVASSING[.]: AND PROVIDED FURTHER, THAT RECORDINGS OF PRE-

24  CANVASSING MEETINGS SHALL BE OPEN TO PUBLIC INSPECTION UNDER

25  THIS SECTION ONLY AFTER THE CLOSE OF POLLS ON ELECTION DAY; AND

26  PROVIDED FURTHER, THAT RECORDINGS OF PRE-CANVASSING MEETINGS

27  SHALL ALSO BE OPEN TO PUBLIC INSPECTION UNDER THIS SECTION BY AN

28  AUTHORIZED REPRESENTATIVE UNDER SECTION 1308(G)(1.1)(VI): AND

29  PROVIDED FURTHER, THAT RECORDINGS OF CANVASSING MEETINGS SHALL

30  BE OPEN TO PUBLIC INSPECTION UNDER THIS SECTION BY AN AUTHORIZED

1   REPRESENTATIVE UNDER SECTION 1308(G)(2)(VI).

2      SECTION 309.  PRESERVATION OF RECORDS.--ALL DOCUMENTS, PAPERS

3   AND RECORDS IN THE OFFICE OF THE COUNTY BOARD OF ELECTIONS OF

4   EACH COUNTY SHALL BE PRESERVED THEREIN FOR A PERIOD OF AT LEAST

5   ELEVEN (11) MONTHS, AND ALL OFFICIAL BALLOTS [AND], THE CONTENTS

6   OF BALLOT BOXES AND RECORDINGS OF PRE-CANVASSING MEETINGS AND

7   CANVASSING MEETINGS SHALL BE PRESERVED THEREIN FOR A PERIOD OF

8   AT LEAST FOUR (4) MONTHS; IN THE EVENT THE COUNTY BOARD HAS BEEN

9   NOTIFIED IN WRITING BY THE DISTRICT ATTORNEY OF THE COUNTY, OR

10  BY A JUDGE OF A COURT OF RECORD, TO PRESERVE SAID [PAPERS OR

11  CONTENTS OF BALLOT BOXES] RECORDS FOR A LONGER PERIOD OF TIME,

12  FOR THE PURPOSES OF PENDING PROSECUTION OR LITIGATION, SAID

13  RECORDS SHALL BE PRESERVED ACCORDINGLY.

14     SECTION 310.  WATCHERS OR ATTORNEYS AT SESSIONS OF COUNTY

15  BOARD; CANDIDATES MAY BE PRESENT.--

16     (A)  ANY PARTY OR POLITICAL BODY OR BODY OF CITIZENS WHICH

17  NOW IS, OR HEREAFTER MAY BE, ENTITLED TO HAVE WATCHERS AT ANY

18  REGISTRATION, PRIMARY OR ELECTION, SHALL ALSO BE ENTITLED TO

19  APPOINT WATCHERS WHO ARE QUALIFIED ELECTORS [OF THE COUNTY], OR

20  ATTORNEYS, TO REPRESENT SUCH PARTY OR POLITICAL BODY OR BODY OF

21  CITIZENS AT ANY PUBLIC SESSION OR SESSIONS OF THE COUNTY BOARD

22  OF ELECTIONS, AND AT ANY COMPUTATION AND CANVASSING OF RETURNS

23  OF ANY PRIMARY OR ELECTION AND RECOUNT OF BALLOTS OR RECANVASS

24  OF VOTING MACHINES UNDER THE PROVISIONS OF THIS ACT. SUCH

25  WATCHERS OR ATTORNEYS MAY EXERCISE THE SAME RIGHTS AS WATCHERS

26  AT REGISTRATION AND POLLING PLACES, BUT THE NUMBER WHO MAY BE

27  PRESENT AT ANY ONE TIME MAY BE LIMITED BY THE COUNTY BOARD TO

28  NOT MORE THAN THREE FOR EACH PARTY, POLITICAL BODY OR BODY OF

29  CITIZENS.

30     * * *

20200HB2626PN4335            - 23 -

I APP. 725

1    SECTION 402.  QUALIFICATIONS OF ELECTION OFFICERS.--(A)

2    EXCEPT AS PROVIDED IN SUBSECTION (B), ELECTION OFFICERS SHALL BE

3    QUALIFIED REGISTERED ELECTORS OF THE [DISTRICT IN WHICH THEY ARE

4    ELECTED OR APPOINTED.] COUNTY IN WHICH THE POLLING PLACE IS

5    LOCATED. AN ELECTION OFFICER SHALL NOT BE REQUIRED TO BE A

6    QUALIFIED REGISTERED ELECTOR IN THE ELECTION DISTRICT IN WHICH

7    THE ELECTION OFFICER IS APPOINTED. NO PERSON SHALL BE QUALIFIED

8    TO SERVE AS AN ELECTION OFFICER WHO SHALL HOLD, OR SHALL WITHIN

9    TWO MONTHS HAVE HELD, ANY OFFICE, APPOINTMENT OR EMPLOYMENT IN

10   OR UNDER THE GOVERNMENT OF THE UNITED STATES OR OF THIS STATE OR

11   OF ANY CITY OR COUNTY OR POOR DISTRICT, OF ANY MUNICIPAL BOARD,

12   COMMISSION OR TRUST IN ANY CITY, SAVE ONLY DISTRICT JUSTICES,

13   NOTARIES PUBLIC AND PERSONS IN THE MILITIA SERVICE OF THE STATE;

14   NOR SHALL ANY ELECTION OFFICER BE ELIGIBLE TO ANY CIVIL OFFICE

15   TO BE VOTED FOR AT A PRIMARY OR ELECTION AT WHICH HE SHALL

16   SERVE, EXCEPT THAT OF AN ELECTION OFFICER.

17   * * *

18   SECTION 417.  APPOINTMENT OF WATCHERS.--

19   * * *

20   (B)  EACH WATCHER SO APPOINTED MUST BE A QUALIFIED REGISTERED

21   ELECTOR [OF THE COUNTY IN WHICH THE ELECTION DISTRICT FOR WHICH

22   THE WATCHER WAS APPOINTED IS LOCATED]. EACH WATCHER SO APPOINTED

23   SHALL BE AUTHORIZED TO SERVE IN THE ELECTION DISTRICT FOR WHICH

24   THE WATCHER WAS APPOINTED AND, WHEN THE WATCHER IS NOT SERVING

25   IN THE ELECTION DISTRICT FOR WHICH THE WATCHER WAS APPOINTED, IN

26   ANY OTHER ELECTION DISTRICT [IN THE COUNTY IN WHICH THE WATCHER

27   IS A QUALIFIED REGISTERED ELECTOR]: PROVIDED, THAT ONLY ONE

28   WATCHER FOR EACH CANDIDATE AT PRIMARIES, OR FOR EACH PARTY OR

29   POLITICAL BODY AT GENERAL, MUNICIPAL OR SPECIAL ELECTIONS, SHALL

30   BE PRESENT IN THE POLLING PLACE AT ANY ONE TIME FROM THE TIME

1   THAT THE ELECTION OFFICERS MEET PRIOR TO THE OPENING OF THE

2   POLLS UNDER SECTION 1208 UNTIL THE TIME THAT THE COUNTING OF

3   VOTES IS COMPLETE AND THE DISTRICT REGISTER AND VOTING CHECK

4   LIST IS LOCKED AND SEALED, AND ALL WATCHERS IN THE ROOM SHALL

5   REMAIN OUTSIDE THE ENCLOSED SPACE. IT SHALL NOT BE A REQUIREMENT

6   THAT A WATCHER BE A RESIDENT OF THE ELECTION DISTRICT FOR WHICH

7   THE WATCHER IS APPOINTED. AFTER THE CLOSE OF THE POLLS AND WHILE

8   THE BALLOTS ARE BEING COUNTED OR VOTING MACHINE CANVASSED, ALL

9   THE WATCHERS SHALL BE PERMITTED TO BE IN THE POLLING PLACE

10  OUTSIDE THE ENCLOSED SPACE. EACH WATCHER SHALL BE PROVIDED WITH

11  A CERTIFICATE FROM THE COUNTY BOARD OF ELECTIONS, STATING HIS

12  NAME AND THE NAME OF THE CANDIDATE, PARTY OR POLITICAL BODY HE

13  REPRESENTS. WATCHERS SHALL BE REQUIRED TO SHOW THEIR

14  CERTIFICATES WHEN REQUESTED TO DO SO. WATCHERS ALLOWED IN THE

15  POLLING PLACE UNDER THE PROVISIONS OF THIS ACT, SHALL BE

16  PERMITTED TO KEEP A LIST OF VOTERS AND SHALL BE ENTITLED TO

17  CHALLENGE ANY PERSON MAKING APPLICATION TO VOTE AND TO REQUIRE

18  PROOF OF HIS QUALIFICATIONS, AS PROVIDED BY THIS ACT. DURING

19  THOSE INTERVALS WHEN VOTERS ARE NOT PRESENT IN THE POLLING PLACE

20  EITHER VOTING OR WAITING TO VOTE, THE JUDGE OF ELECTIONS SHALL

21  PERMIT WATCHERS, UPON REQUEST, TO INSPECT THE VOTING CHECK LIST

22  AND EITHER OF THE TWO NUMBERED LISTS OF VOTERS MAINTAINED BY THE

23  COUNTY BOARD: PROVIDED, THAT THE WATCHER SHALL NOT MARK UPON OR

24  ALTER THESE OFFICIAL ELECTION RECORDS. THE JUDGE OF ELECTIONS

25  SHALL SUPERVISE OR DELEGATE THE INSPECTION OF ANY REQUESTED

26  DOCUMENTS.

27      * * *

28  SECTION 5.   SECTION 1302(I)(1) OF THE ACT, AMENDED MARCH 27,

29  2020 (P.L.41, NO.12), IS AMENDED AND THE SUBSECTION IS AMENDED

30  BY ADDING PARAGRAPHS TO READ:

1    SECTION 1302.  APPLICATIONS FOR OFFICIAL ABSENTEE BALLOTS.--*

2  * *

3    (I)  (1)  APPLICATION FOR OFFICIAL ABSENTEE BALLOTS SHALL BE

4  ON PHYSICAL AND ELECTRONIC FORMS PRESCRIBED BY THE SECRETARY OF

5  THE COMMONWEALTH.

6    (1.1)  THE APPLICATION SHALL STATE [THAT] THE FOLLOWING:

7    (I)  THAT AN ELECTOR WHO APPLIES FOR AN ABSENTEE BALLOT

8  PURSUANT TO SECTION 1301 SHALL NOT BE ELIGIBLE TO VOTE AT A

9  POLLING PLACE ON ELECTION DAY [UNLESS THE ELECTOR BRINGS THE

10 ELECTOR'S ABSENTEE BALLOT TO THE ELECTOR'S POLLING PLACE, REMITS

11 THE BALLOT AND THE ENVELOPE CONTAINING THE DECLARATION OF THE

12 ELECTOR TO THE JUDGE OF ELECTIONS TO BE SPOILED AND SIGNS A

13 STATEMENT SUBJECT TO THE PENALTIES OF 18 PA.C.S. § 4904

14 (RELATING TO UNSWORN FALSIFICATION TO AUTHORITIES) TO THE SAME

15 EFFECT. SUCH PHYSICAL] EXCEPT BY PROVISIONAL BALLOT.

16   (II)  THAT AN ELECTOR WHO DOES NOT RETURN THE ABSENTEE BALLOT

17 BY MAIL MAY PERSONALLY DELIVER THE ABSENTEE BALLOT TO ONLY THE

18 FOLLOWING:

19   (A)  A MEMBER OR EMPLOYE OF THE COUNTY BOARD OF ELECTIONS AT

20 THE PERMANENT OFFICES OF THE COUNTY BOARD OF ELECTIONS.

21   (B)  A MEMBER OR EMPLOYE OF THE COUNTY BOARD OF ELECTIONS AT

22 A LOCATION AT THE COUNTY COURTHOUSE DESIGNATED BY THE COUNTY

23 BOARD OF ELECTIONS.

24   (C)  A JUDGE OF ELECTIONS AT THE ELECTOR'S POLLING PLACE ON

25 ELECTION DAY.

26   (1.2)  PHYSICAL APPLICATION FORMS SHALL BE MADE FREELY

27 AVAILABLE TO THE PUBLIC AT COUNTY BOARD OF ELECTIONS, MUNICIPAL

28 BUILDINGS AND AT SUCH OTHER LOCATIONS DESIGNATED BY THE

29 SECRETARY. [SUCH ELECTRONIC]

30   (1.3)  ELECTRONIC APPLICATION FORMS SHALL BE MADE FREELY

I APP. 728

1  AVAILABLE TO THE PUBLIC THROUGH PUBLICLY ACCESSIBLE MEANS.

2  (1.4)  NO WRITTEN APPLICATION OR PERSONAL REQUEST SHALL BE

3  NECESSARY TO RECEIVE OR ACCESS THE APPLICATION FORMS.

4  (1.5)  COPIES AND RECORDS OF ALL COMPLETED PHYSICAL AND

5  ELECTRONIC APPLICATIONS FOR OFFICIAL ABSENTEE BALLOTS SHALL BE

6  RETAINED BY THE COUNTY BOARD OF ELECTIONS.

7  * * *

8  SECTION 6.  SECTION 1302.1(A) AND (A.3)(1) AND (2) OF THE

9  ACT, AMENDED OCTOBER 31, 2019 (P.L.552, NO.77), ARE AMENDED TO

10  READ:

11  SECTION 1302.1.  DATE OF APPLICATION FOR ABSENTEE BALLOT.--

12  (A)  EXCEPT AS PROVIDED IN SUBSECTION (A.3), APPLICATIONS FOR

13  ABSENTEE BALLOTS SHALL BE RECEIVED IN THE OFFICE OF THE COUNTY

14  BOARD OF ELECTIONS NOT EARLIER THAN FIFTY (50) DAYS BEFORE THE

15  PRIMARY OR ELECTION, EXCEPT THAT IF A COUNTY BOARD OF ELECTIONS

16  DETERMINES THAT IT WOULD BE APPROPRIATE TO ITS OPERATIONAL

17  NEEDS, ANY APPLICATIONS FOR ABSENTEE BALLOTS RECEIVED MORE THAN

18  FIFTY (50) DAYS BEFORE THE PRIMARY OR ELECTION MAY BE PROCESSED

19  BEFORE THAT TIME. APPLICATIONS FOR ABSENTEE BALLOTS SHALL BE

20  PROCESSED IF RECEIVED NOT LATER THAN FIVE O'CLOCK P.M. OF THE

21  [FIRST TUESDAY] FIFTEENTH DAY PRIOR TO THE DAY OF ANY PRIMARY OR

22  ELECTION.

23  (A.3)  (1)  THE FOLLOWING CATEGORIES OF ELECTORS MAY APPLY

24  FOR AN ABSENTEE BALLOT UNDER THIS SUBSECTION, IF OTHERWISE

25  QUALIFIED:

26  (I)  AN ELECTOR WHOSE PHYSICAL DISABILITY OR ILLNESS

27  PREVENTED THE ELECTOR FROM APPLYING FOR AN ABSENTEE BALLOT

28  BEFORE FIVE O'CLOCK P.M. ON THE [FIRST TUESDAY] FIFTEENTH DAY

29  PRIOR TO THE DAY OF THE PRIMARY OR ELECTION.

30  (II)  AN ELECTOR WHO, BECAUSE OF THE ELECTOR'S BUSINESS,

I APP. 729

1  DUTIES OR OCCUPATION, WAS UNABLE TO APPLY FOR AN ABSENTEE BALLOT

2  BEFORE FIVE O'CLOCK P.M. ON THE [FIRST TUESDAY] FIFTEENTH DAY

3  PRIOR TO THE DAY OF THE PRIMARY OR ELECTION.

4    (III)  AN ELECTOR WHO BECOMES SO PHYSICALLY DISABLED OR ILL

5  AFTER FIVE O'CLOCK P.M. ON THE [FIRST TUESDAY] FIFTEENTH DAY

6  PRIOR TO THE DAY OF THE PRIMARY OR ELECTION THAT THE ELECTOR IS

7  UNABLE TO APPEAR AT THE POLLING PLACE ON THE DAY OF THE PRIMARY

8  OR ELECTION.

9    (IV)  AN ELECTOR WHO, BECAUSE OF THE CONDUCT OF THE ELECTOR'S

10  BUSINESS, DUTIES OR OCCUPATION, WILL NECESSARILY BE ABSENT FROM

11  THE ELECTOR'S MUNICIPALITY OF RESIDENCE ON THE DAY OF THE

12  PRIMARY OR ELECTION, WHICH FACT WAS NOT AND COULD NOT REASONABLY

13  BE KNOWN TO THE ELECTOR ON OR BEFORE FIVE O'CLOCK P.M. ON THE

14  [FIRST TUESDAY] FIFTEENTH DAY PRIOR TO THE DAY OF THE PRIMARY OR

15  ELECTION.

16    (2)  AN ELECTOR DESCRIBED IN PARAGRAPH (1) MAY SUBMIT AN

17  APPLICATION FOR AN ABSENTEE BALLOT AT ANY TIME UP UNTIL THE TIME

18  OF THE CLOSING OF THE POLLS ON THE DAY OF THE PRIMARY OR

19  ELECTION. THE APPLICATION SHALL INCLUDE A DECLARATION DESCRIBING

20  THE CIRCUMSTANCES THAT PREVENTED THE ELECTOR FROM APPLYING FOR

21  AN ABSENTEE BALLOT BEFORE FIVE O'CLOCK P.M. ON THE [FIRST

22  TUESDAY] FIFTEENTH DAY PRIOR TO THE DAY OF THE PRIMARY OR

23  ELECTION OR THAT PREVENT THE ELECTOR FROM APPEARING AT THE

24  POLLING PLACE ON THE DAY OF THE PRIMARY OR ELECTION, AND THE

25  ELECTOR'S QUALIFICATIONS UNDER PARAGRAPH (1). THE DECLARATION

26  SHALL BE MADE SUBJECT TO THE PROVISIONS OF 18 PA.C.S. § 4904

27  (RELATING TO UNSWORN FALSIFICATION TO AUTHORITIES).

28    * * *

29    SECTION 7.  SECTION 1303(E) OF THE ACT, AMENDED MARCH 27,

30  2020 (P.L.41, NO.12), IS AMENDED TO READ:

1    SECTION 1303.  OFFICIAL ABSENTEE VOTERS BALLOTS.--* * *

2       (E)  <u>(1)</u>  THE OFFICIAL ABSENTEE VOTER BALLOT SHALL STATE

3    [THAT AN ELECTOR WHO RECEIVES AN ABSENTEE BALLOT PURSUANT TO

4    SECTION 1301 AND WHOSE VOTED BALLOT IS NOT TIMELY RECEIVED BY

5    THE COMMISSION AND WHO, ON ELECTION DAY, IS CAPABLE OF VOTING AT

6    THE APPROPRIATE POLLING PLACE MAY ONLY VOTE ON ELECTION DAY BY

7    PROVISIONAL BALLOT UNLESS THE ELECTOR BRINGS THE ELECTOR'S

8    ABSENTEE BALLOT TO THE ELECTOR'S POLLING PLACE, REMITS THE

9    BALLOT AND THE ENVELOPE CONTAINING THE DECLARATION OF THE

10   ELECTOR TO THE JUDGE OF ELECTIONS TO BE SPOILED AND SIGNS A

11   STATEMENT SUBJECT TO THE PENALTIES UNDER 18 PA.C.S. § 4904

12   (RELATING TO UNSWORN FALSIFICATION TO AUTHORITIES) TO THE SAME

13   EFFECT.] <u>THE FOLLOWING:</u>

14      <u>(I)  THAT AN ELECTOR WHO DOES NOT RETURN THE ABSENTEE BALLOT</u>

15   <u>BY MAIL MAY PERSONALLY DELIVER THE BALLOT, ENCLOSED WITHIN BOTH</u>

16   <u>THE ENVELOPE MARKED "OFFICIAL ELECTION BALLOT" AND THE ENVELOPE</u>

17   <u>CONTAINING THE DECLARATION OF THE ELECTOR, TO ONLY THE</u>

18   <u>FOLLOWING:</u>

19      <u>(A)  A MEMBER OR AN EMPLOYE OF THE COUNTY BOARD OF ELECTIONS,</u>

20   <u>BEFORE ELECTION DAY OR PRIOR TO EIGHT O'CLOCK P.M. OF ELECTION</u>

21   <u>DAY, AT:</u>

22      <u>(I)  THE PERMANENT OFFICES OF THE COUNTY BOARD OF ELECTIONS;</u>

23   <u>OR</u>

24      <u>(II)  A LOCATION AT THE COUNTY COURTHOUSE DESIGNATED BY THE</u>

25   <u>COUNTY BOARD OF ELECTIONS.</u>

26      <u>(B)  THE JUDGE OF ELECTIONS AT THE ELECTOR'S POLLING PLACE ON</u>

27   <u>ELECTION DAY DURING POLLING HOURS.</u>

28      <u>(II)  THAT AN ELECTOR WHO RECEIVES AN ABSENTEE BALLOT</u>

29   <u>PURSUANT TO SECTION 1301 AND WHOSE VOTED BALLOT IS NOT TIMELY</u>

30   <u>RECEIVED AS SET FORTH IN SUBPARAGRAPH (I) AND WHO, ON ELECTION</u>

1  DAY, IS CAPABLE OF VOTING AT THE APPROPRIATE POLLING PLACE MAY

2  ONLY VOTE ON ELECTION DAY BY PROVISIONAL BALLOT.

3  (III)  THAT AN ELECTOR MUST PERSONALLY RETURN OR MAIL THE

4  ELECTOR'S BALLOT.

5  (2)  THE SECRETARY OF THE COMMONWEALTH SHALL PRESCRIBE THE

6  TEXT AND THE MANNER BY WHICH THE NOTICE UNDER THIS SUBSECTION

7  SHALL BE PRINTED ON A BALLOT AND SHALL INCLUDE THE FOLLOWING

8  STATEMENT:

9  THIS BALLOT MAY BE MAILED BY THE ELECTOR TO THE COUNTY BOARD

10  OF ELECTIONS OR PERSONALLY RETURNED BY THE ELECTOR TO THE

11  JUDGE OF ELECTIONS AT THE ELECTOR'S POLLING PLACE ON ELECTION

12  DAY, OR IN PERSON ON OR BEFORE ELECTION DAY TO A MEMBER OR AN

13  EMPLOYEE OF THE COUNTY BOARD OF ELECTIONS AT A LOCATION AT

14  THE COUNTY COURTHOUSE DESIGNATED BY THE COUNTY BOARD OF

15  ELECTIONS OR IN PERSON ON OR BEFORE ELECTION DAY TO A MEMBER

16  OR AN EMPLOYEE OF THE COUNTY BOARD OF ELECTIONS AT THE

17  PERMANENT OFFICES OF THE COUNTY BOARD OF ELECTIONS AND TO NO

18  OTHER LOCATION.

19  SECTION 8.  SECTION 1305(B)(1) OF THE ACT, AMENDED OCTOBER

20  31, 2019 (P.L.552, NO.77), IS AMENDED TO READ:

21  SECTION 1305.  DELIVERING OR MAILING BALLOTS.--

22  * * *

23  (B)  (1)  THE COUNTY BOARD OF ELECTIONS UPON RECEIPT AND

24  APPROVAL OF AN APPLICATION FILED BY ANY ELECTOR QUALIFIED IN

25  ACCORDANCE WITH THE PROVISIONS OF SECTION 1301, SUBSECTIONS (I)

26  TO (L), INCLUSIVE, SHALL COMMENCE TO DELIVER OR MAIL OFFICIAL

27  ABSENTEE BALLOTS AS SOON AS A BALLOT IS CERTIFIED AND THE

28  BALLOTS ARE AVAILABLE. WHILE ANY PROCEEDING IS PENDING IN A

29  FEDERAL OR STATE COURT WHICH WOULD AFFECT THE CONTENTS OF ANY

30  BALLOT, THE COUNTY BOARD OF ELECTIONS MAY AWAIT A RESOLUTION OF

1 THAT PROCEEDING BUT IN ANY EVENT, SHALL COMMENCE TO DELIVER OR

2 MAIL OFFICIAL ABSENTEE BALLOTS NOT LATER THAN THE [SECOND]

3 FOURTH TUESDAY PRIOR TO THE PRIMARY OR ELECTION. FOR THOSE

4 APPLICANTS WHOSE PROOF OF IDENTIFICATION WAS NOT PROVIDED WITH

5 THE APPLICATION OR COULD NOT BE VERIFIED BY THE BOARD, THE BOARD

6 SHALL SEND THE NOTICE REQUIRED UNDER SECTION 1302.2(D) WITH THE

7 ABSENTEE BALLOT. AS ADDITIONAL APPLICATIONS ARE RECEIVED AND

8 APPROVED AFTER THE TIME THAT THE COUNTY BOARD OF ELECTIONS

9 BEGINS DELIVERING OR MAILING OFFICIAL ABSENTEE AND MAIL-IN

10 BALLOTS, THE BOARD SHALL DELIVER OR MAIL OFFICIAL ABSENTEE

11 BALLOTS TO SUCH ADDITIONAL ELECTORS WITHIN FORTY-EIGHT HOURS.

12    * * *

13 SECTION 9.  SECTION 1306(A) INTRODUCTORY PARAGRAPH AND (B)(3)

14 OF THE ACT, AMENDED MARCH 27, 2020 (P.L.41, NO.12), ARE AMENDED

15 AND SUBSECTION (B) IS AMENDED BY ADDING A PARAGRAPH TO READ:

16 SECTION 1306.  VOTING BY ABSENTEE ELECTORS.--(A)  EXCEPT AS

17 PROVIDED IN PARAGRAPHS (2) AND (3), AT ANY TIME AFTER RECEIVING

18 AN OFFICIAL ABSENTEE BALLOT, BUT ON OR BEFORE EIGHT O'CLOCK P.M.

19 THE DAY OF THE PRIMARY OR ELECTION, THE ELECTOR SHALL, IN

20 SECRET, PROCEED TO MARK THE BALLOT ONLY IN BLACK LEAD PENCIL,

21 INDELIBLE PENCIL OR BLUE, BLACK OR BLUE-BLACK INK, IN FOUNTAIN

22 PEN OR BALL POINT PEN, AND THEN FOLD THE BALLOT, ENCLOSE AND

23 SECURELY SEAL THE SAME IN THE ENVELOPE ON WHICH IS PRINTED,

24 STAMPED OR ENDORSED "OFFICIAL ELECTION BALLOT." THIS ENVELOPE

25 SHALL THEN BE PLACED IN THE SECOND ONE, ON WHICH IS PRINTED THE

26 FORM OF DECLARATION OF THE ELECTOR, AND THE ADDRESS OF THE

27 ELECTOR'S COUNTY BOARD OF ELECTION AND THE LOCAL ELECTION

28 DISTRICT OF THE ELECTOR. THE ELECTOR SHALL THEN FILL OUT, DATE

29 AND SIGN THE DECLARATION PRINTED ON SUCH ENVELOPE. SUCH ENVELOPE

30 SHALL THEN BE SECURELY SEALED AND THE ELECTOR SHALL SEND SAME BY

1  MAIL, POSTAGE PREPAID, EXCEPT WHERE FRANKED, OR DELIVER IT IN

2  PERSON TO SAID COUNTY BOARD OF ELECTION[.] TO A MEMBER OR AN

3  EMPLOYE OF THE COUNTY BOARD OF ELECTIONS AT THE PERMANENT

4  OFFICES OF THE COUNTY BOARD OF ELECTIONS, TO A MEMBER OR AN

5  EMPLOYE OF THE COUNTY BOARD OF ELECTIONS AT A LOCATION AT THE

6  COUNTY COURTHOUSE DESIGNATED BY THE COUNTY BOARD OF ELECTIONS OR

7  TO THE JUDGE OF ELECTIONS OF THE ELECTOR'S ELECTION DISTRICT AT

8  THE ELECTOR'S POLLING PLACE DURING POLLING HOURS AND TO NO OTHER

9  LOCATION.

10      * * *

11      (B)  * * *

12      (3)  NOTWITHSTANDING PARAGRAPH (2), AN ELECTOR WHO REQUESTS

13  AN ABSENTEE BALLOT AND WHO IS NOT SHOWN ON THE DISTRICT REGISTER

14  AS HAVING VOTED THE BALLOT MAY [VOTE AT THE POLLING PLACE IF THE

15  ELECTOR REMITS THE BALLOT AND THE ENVELOPE CONTAINING THE

16  DECLARATION OF THE ELECTOR TO THE JUDGE OF ELECTIONS TO BE

17  SPOILED AND THE ELECTOR SIGNS A STATEMENT SUBJECT TO THE

18  PENALTIES UNDER 18 PA.C.S. § 4904 (RELATING TO UNSWORN

19  FALSIFICATION TO AUTHORITIES) IN SUBSTANTIALLY THE FOLLOWING

20  FORM:

21      I HEREBY DECLARE THAT I AM A QUALIFIED REGISTERED ELECTOR WHO

22      HAS OBTAINED AN ABSENTEE BALLOT OR MAIL-IN BALLOT. I FURTHER

23      DECLARE THAT I HAVE NOT CAST MY ABSENTEE BALLOT OR MAIL-IN

24      BALLOT, AND THAT INSTEAD I REMITTED MY ABSENTEE BALLOT OR

25      MAIL-IN BALLOT AND THE ENVELOPE CONTAINING THE DECLARATION OF

26      THE ELECTOR TO THE JUDGE OF ELECTIONS AT MY POLLING PLACE TO

27      BE SPOILED AND THEREFORE REQUEST THAT MY ABSENTEE BALLOT OR

28      MAIL-IN BALLOT BE VOIDED.

29      (DATE)

30      (SIGNATURE OF ELECTOR)...............(ADDRESS OF ELECTOR)

I APP. 734

1    (LOCAL JUDGE OF ELECTIONS)] PERSONALLY DELIVER THE COMPLETED

2    ABSENTEE BALLOT, ENCLOSED WITHIN BOTH THE ENVELOPE MARKED

3    "OFFICIAL ELECTION BALLOT" AND THE ENVELOPE CONTAINING THE

4    DECLARATION OF THE ELECTOR, TO ONLY THE FOLLOWING:

5    (I)   THE JUDGE OF ELECTIONS OF THE ELECTOR'S ELECTION

6    DISTRICT AT THE ELECTOR'S POLLING PLACE DURING POLLING HOURS.

7    (II)   A MEMBER OR AN EMPLOYE OF THE COUNTY BOARD OF ELECTIONS

8    AT A LOCATION AT THE COUNTY COURTHOUSE DESIGNATED BY THE COUNTY

9    BOARD OF ELECTIONS.

10   (III)   A MEMBER OR AN EMPLOYE OF THE COUNTY BOARD OF

11   ELECTIONS AT THE PERMANENT OFFICES OF THE COUNTY BOARD OF

12   ELECTIONS.

13   (4)   A JUDGE OF ELECTIONS SHALL KEEP ALL MATERIAL DELIVERED

14   UNDER PARAGRAPH (3)(I) IN A SECURE, SAFE AND SEALED CONTAINER IN

15   THE CUSTODY OF THE JUDGE OF ELECTIONS UNTIL DELIVERY OF THE

16   MATERIAL TO THE COUNTY BOARD OF ELECTIONS UNDER SECTION

17   1308(A.1).

18   * * *

19   SECTION 10.   SECTION 1308(G)(1.1), (2) AND (3) OF THE ACT,

20   AMENDED OCTOBER 31, 2019 (P.L.552, NO.77) AND MARCH 27, 2020

21   (P.L.41, NO.12), ARE AMENDED AND THE SECTION IS AMENDED BY

22   ADDING A SUBSECTION TO READ:

23   SECTION 1308.   CANVASSING OF OFFICIAL ABSENTEE BALLOTS AND

24   MAIL-IN BALLOTS.--* * *

25   (A.1)   A JUDGE OF ELECTIONS SHALL DELIVER ALL MATERIAL

26   PERSONALLY DELIVERED UNDER SECTIONS 1306(B)(3)(I) AND 1306-D(B)

27   (3)(I) TO THE COUNTY BOARD OF ELECTIONS BY TWO O'CLOCK A.M. ON

28   THE DAY FOLLOWING THE ELECTION.

29   * * *

30   (G)   * * *

I APP. 735

1      (1.1)  THE FOLLOWING APPLY TO PRE-CANVASSING BY A COUNTY

2  BOARD OF ELECTIONS:

3      (I)  THE COUNTY BOARD OF ELECTIONS SHALL MEET [NO EARLIER

4  THAN SEVEN O'CLOCK A.M. ON ELECTION DAY] AT LEAST ONCE BEFORE

5  ELECTION DAY TO PRE-CANVASS ALL BALLOTS RECEIVED PRIOR TO THE

6  MEETING.

7      (II)  A COUNTY BOARD OF ELECTIONS MAY NOT PRE-CANVASS

8  ABSENTEE BALLOTS AND MAIL-IN BALLOTS BEFORE EIGHT O'CLOCK A.M.

9  ON THE SATURDAY BEFORE THE ELECTION.

10     (III)  A COUNTY BOARD OF ELECTIONS MAY NOT PRE-CANVASS

11  ABSENTEE BALLOTS OR MAIL-IN BALLOTS RECEIVED ON OR AFTER THE DAY

12  OF THE ELECTION.

13     (IV)  IF A COUNTY BOARD OF ELECTIONS MEETS TO PRE-CANVASS

14  ABSENTEE BALLOTS AND MAIL-IN BALLOTS AT A LOCATION OTHER THAN

15  THE OFFICES OF THE COUNTY BOARD OF ELECTIONS, THE COUNTY BOARD

16  OF ELECTIONS SHALL MAINTAIN SECURITY AND CHAIN OF CUSTODY OF ANY

17  MATERIAL TRANSPORTED TO THE LOCATION FROM THE OFFICES OF THE

18  COUNTY BOARD OF ELECTIONS.

19     (V)  A COUNTY BOARD OF ELECTIONS SHALL PROVIDE AT LEAST

20  FORTY-EIGHT HOURS' NOTICE OF A PRE-CANVASS MEETING BY PUBLICLY

21  POSTING A NOTICE OF A PRE-CANVASS MEETING ON ITS PUBLICLY

22  ACCESSIBLE INTERNET WEBSITE.

23     (VI)  ONE AUTHORIZED REPRESENTATIVE OF EACH CANDIDATE IN AN

24  ELECTION, ONE AUTHORIZED REPRESENTATIVE OF THE COUNTY

25  CHAIRPERSON OF EACH POLITICAL PARTY AND ONE AUTHORIZED

26  REPRESENTATIVE [FROM] OF EACH POLITICAL PARTY SHALL BE PERMITTED

27  TO REMAIN IN THE ROOM IN WHICH THE ABSENTEE BALLOTS AND MAIL-IN

28  BALLOTS ARE PRE-CANVASSED. AUTHORIZED REPRESENTATIVES SHALL BE

29  PERMITTED TO BE IN AN AREA WHICH IS WITHIN AUDIO RANGE AND HAS A

30  CLEAR LINE OF SIGHT OF THE PRE-CANVASSING ACTIVITIES.

I APP. 736

1    (VII)  A COUNTY BOARD OF ELECTIONS SHALL RECORD THE PRE-

2    CANVASSING ACTIVITIES WITH AUDIO AND VISUAL RECORDING. A

3    RECORDING UNDER THIS SUBPARAGRAPH SHALL BE MADE AVAILABLE ONLY

4    AFTER THE CLOSE OF THE POLLS UNDER SECTION 308.

5    (VIII)  NO PERSON OBSERVING, ATTENDING OR PARTICIPATING IN A

6    PRE-CANVASS MEETING OR WHO VIEWS OR LISTENS TO A RECORDING UNDER

7    SUBPARAGRAPH (VII) MAY DISCLOSE THE RESULTS OF ANY PORTION OF

8    ANY PRE-CANVASS MEETING PRIOR TO THE CLOSE OF THE POLLS.

9    (2)  THE FOLLOWING APPLY TO CANVASSING BY A COUNTY BOARD OF

10   ELECTIONS:

11   (I)  THE COUNTY BOARD OF ELECTIONS SHALL MEET NO EARLIER THAN

12   THE CLOSE OF POLLS ON THE DAY OF THE ELECTION AND NO LATER THAN

13   [THE THIRD] NINE O'CLOCK A.M. ON THE DAY FOLLOWING THE ELECTION

14   TO BEGIN CANVASSING ABSENTEE BALLOTS AND MAIL-IN BALLOTS [NOT

15   INCLUDED IN THE PRE-CANVASS MEETING].

16   (II)  THE MEETING UNDER THIS PARAGRAPH SHALL CONTINUE UNTIL

17   ALL ABSENTEE BALLOTS AND MAIL-IN BALLOTS RECEIVED PRIOR TO THE

18   CLOSE OF THE POLLS HAVE BEEN CANVASSED.

19   (III)  THE COUNTY BOARD OF ELECTIONS SHALL NOT RECORD OR

20   PUBLISH ANY VOTES REFLECTED ON THE BALLOTS PRIOR TO THE CLOSE OF

21   THE POLLS.

22   (IV)  THE CANVASS PROCESS SHALL CONTINUE THROUGH THE EIGHTH

23   DAY FOLLOWING THE ELECTION FOR VALID MILITARY-OVERSEAS BALLOTS

24   TIMELY RECEIVED UNDER 25 PA.C.S. § 3511 (RELATING TO RECEIPT OF

25   VOTED BALLOT).

26   (V)  A COUNTY BOARD OF ELECTIONS SHALL PROVIDE AT LEAST

27   FORTY-EIGHT HOURS' NOTICE OF A CANVASS MEETING BY PUBLICLY

28   POSTING A NOTICE ON ITS PUBLICLY ACCESSIBLE INTERNET WEBSITE.

29   (VI)  ONE AUTHORIZED REPRESENTATIVE OF EACH CANDIDATE IN AN

30   ELECTION, ONE AUTHORIZED REPRESENTATIVE OF THE COUNTY

I APP. 737

1  CHAIRPERSON OF EACH POLITICAL PARTY AND ONE AUTHORIZED
2  REPRESENTATIVE [FROM] OF EACH POLITICAL PARTY SHALL BE PERMITTED
3  TO REMAIN IN THE ROOM IN WHICH THE ABSENTEE BALLOTS AND MAIL-IN
4  BALLOTS ARE CANVASSED. AUTHORIZED REPRESENTATIVES SHALL BE
5  PERMITTED TO BE IN AN AREA WHICH IS WITHIN AUDIO RANGE AND HAS A
6  CLEAR LINE OF SIGHT OF THE CANVASSING ACTIVITIES.
7      (VII)  A COUNTY BOARD OF ELECTIONS SHALL RECORD THE
8  CANVASSING ACTIVITIES WITH AUDIO AND VISUAL RECORDING. A
9  RECORDING UNDER THIS SUBPARAGRAPH SHALL BE MADE AVAILABLE UNDER
10 SECTION 308.
11     (3)  WHEN THE COUNTY BOARD MEETS TO PRE-CANVASS OR CANVASS
12 ABSENTEE BALLOTS AND MAIL-IN BALLOTS UNDER PARAGRAPHS (1), (1.1)
13 AND (2), THE BOARD SHALL [EXAMINE] DO ALL OF THE FOLLOWING:
14     (I)  EXAMINE THE DECLARATION ON THE ENVELOPE OF EACH BALLOT
15 NOT SET ASIDE UNDER SUBSECTION (D) AND SHALL COMPARE THE
16 INFORMATION THEREON WITH THAT CONTAINED IN THE "REGISTERED
17 ABSENTEE AND MAIL-IN VOTERS FILE," THE ABSENTEE VOTERS' LIST
18 AND/OR THE "MILITARY VETERANS AND EMERGENCY CIVILIANS ABSENTEE
19 VOTERS FILE," WHICHEVER IS APPLICABLE.
20     (II)  IF THE COUNTY BOARD HAS VERIFIED THE PROOF OF
21 IDENTIFICATION AS REQUIRED UNDER THIS ACT AND IS SATISFIED THAT
22 THE DECLARATION IS SUFFICIENT AND THE INFORMATION CONTAINED IN
23 THE "REGISTERED ABSENTEE AND MAIL-IN VOTERS FILE," THE ABSENTEE
24 VOTERS' LIST AND/OR THE "MILITARY VETERANS AND EMERGENCY
25 CIVILIANS ABSENTEE VOTERS FILE" VERIFIES HIS RIGHT TO VOTE, [THE
26 COUNTY BOARD SHALL] PROVIDE A LIST OF THE NAMES OF ELECTORS
27 WHOSE ABSENTEE BALLOTS OR MAIL-IN BALLOTS ARE TO BE PRE-
28 CANVASSED OR CANVASSED.
29     (III)  FOR ABSENTEE BALLOTS OR MAIL-IN BALLOTS WHICH THE
30 COUNTY BOARD IS NOT SATISFIED THAT PROOF OF IDENTIFICATION HAS

I APP. 738

1  BEEN PROVIDED DUE TO ANY INABILITY TO MATCH THE SIGNATURE

2  PRESENT ON THE BALLOT TO THE SIGNATURE ON FILE:

3      (A)  NOTIFY THE ELECTOR BY MAIL, E-MAIL, TELEPHONE OR TEXT

4  MESSAGE THAT THE SIGNATURE ON THE ELECTOR'S BALLOT DOES NOT

5  MATCH THE ELECTOR'S SIGNATURE IN THE REGISTRATION BOOKS.

6      (B)  DIRECT THE ELECTOR TO APPEAR BEFORE, OR TO PROVIDE AN

7  ELECTRONIC, FACSIMILE OR PAPER COPY TO, THE COUNTY BOARD OF

8  ELECTIONS WITHIN SIX (6) CALENDAR DAYS OF THE NOTICE WITH:

9      (I)  PROOF OF IDENTIFICATION AND AN EXECUTED AFFIRMATION

10 ATTESTING, UNDER PENALTY OF PERJURY, THAT THE ELECTOR IS THE

11 SAME INDIVIDUAL WHO PERSONALLY REMITTED THE ABSENTEE BALLOT OR

12 MAIL-IN BALLOT; OR

13     (II)  AN EXECUTED AFFIRMATION ATTESTING, UNDER PENALTY OF

14 PERJURY, THAT THE ELECTOR IS THE SAME INDIVIDUAL WHO PERSONALLY

15 REMITTED THE ABSENTEE BALLOT OR MAIL-IN BALLOT AND THAT THE

16 ELECTOR IS INDIGENT AND UNABLE TO OBTAIN PROOF OF IDENTIFICATION

17 WITHOUT THE PAYMENT OF A FEE.

18     (C)  NOTIFY THE ELECTOR THAT THE ABSENTEE BALLOT OR MAIL-IN

19 BALLOT MAY NOT BE COUNTED IF THE ELECTOR FAILS TO COMPLY WITH

20 CLAUSE (B).

21     * * *

22     SECTION 11.  THE HEADING OF ARTICLE XIII-C OF THE ACT IS

23 AMENDED TO READ:

24                     ARTICLE XIII-C

25    STATEWIDE UNIFORM REGISTRY OF ELECTORS [ADVISORY BOARD]

26    SECTION 12.  THE ACT IS AMENDED BY ADDING A SECTION TO READ:

27 SECTION 1303-C.  SURE REQUIREMENTS.

28    IN ADDITION TO THE REQUIREMENTS UNDER 25 PA.C.S. § 1222(C)

29 (RELATING TO SURE SYSTEM), THE SURE SYSTEM SHALL DO ALL OF THE

30 FOLLOWING:

I APP. 739

1      (1)   TRACK APPLICATIONS FOR ABSENTEE BALLOTS AND MAIL-IN

2    BALLOTS; AND

3      (2)   ASSIGN A UNIQUE SCANNABLE IDENTIFICATION NUMBER TO

4    BE AFFIXED TO THE ENVELOPE CONTAINING THE DECLARATION OF THE

5    ELECTOR WHICH IS RETURNED BY THE ELECTOR WITH EACH ABSENTEE

6    BALLOT AND MAIL-IN BALLOT.

7    SECTION 13.   SECTION 1302-D(F) OF THE ACT, AMENDED MARCH 27,

8    2020 (P.L.41, NO.12), IS AMENDED TO READ:

9    SECTION 1302-D.   APPLICATIONS FOR OFFICIAL MAIL-IN BALLOTS.

10     * * *

11   (F)   FORM.--THE FOLLOWING SHALL APPLY:

12     (1)   APPLICATION FOR AN OFFICIAL MAIL-IN BALLOT SHALL BE

13   ON PHYSICAL AND ELECTRONIC FORMS PRESCRIBED BY THE SECRETARY

14   OF THE COMMONWEALTH.

15     (2)   THE APPLICATION SHALL STATE [THAT] THE FOLLOWING:

16       (I)   THAT A VOTER WHO APPLIES FOR A MAIL-IN BALLOT

17     UNDER SECTION 1301-D SHALL NOT BE ELIGIBLE TO VOTE AT A

18     POLLING PLACE ON ELECTION DAY [UNLESS THE ELECTOR BRINGS

19     THE ELECTOR'S MAIL-IN BALLOT TO THE ELECTOR'S POLLING

20     PLACE, REMITS THE BALLOT AND THE ENVELOPE CONTAINING THE

21     DECLARATION OF THE ELECTOR TO THE JUDGE OF ELECTIONS TO

22     BE SPOILED AND SIGNS A STATEMENT SUBJECT TO THE PENALTIES

23     UNDER 18 PA.C.S. § 4904 (RELATING TO UNSWORN

24     FALSIFICATION TO AUTHORITIES) TO THE SAME EFFECT.] EXCEPT

25     BY PROVISIONAL BALLOT.

26       (II)   THAT AN ELECTOR WHO DOES NOT RETURN THE MAIL-IN

27     BALLOT BY MAIL MAY PERSONALLY DELIVER THE MAIL-IN BALLOT

28     TO ONLY THE FOLLOWING:

29         (A)   A MEMBER OR EMPLOYEE OF THE COUNTY BOARD OF

30         ELECTIONS AT THE PERMANENT OFFICES OF THE COUNTY

I APP. 740

1      BOARD OF ELECTIONS.

2          (B)  A MEMBER OR EMPLOYEE OF THE COUNTY BOARD OF

3      ELECTIONS AT A LOCATION AT THE COUNTY COURTHOUSE

4      DESIGNATED BY THE COUNTY BOARD OF ELECTIONS.

5          (C)  A JUDGE OF ELECTIONS AT THE ELECTOR'S

6      POLLING PLACE ON ELECTION DAY.

7      (3)  THE PHYSICAL APPLICATION FORMS SHALL BE MADE FREELY

8   AVAILABLE TO THE PUBLIC AT COUNTY BOARD OF ELECTIONS,

9   MUNICIPAL BUILDINGS AND AT OTHER LOCATIONS DESIGNATED BY THE

10  SECRETARY OF THE COMMONWEALTH.

11     (4)  THE ELECTRONIC APPLICATION FORMS SHALL BE MADE

12  FREELY AVAILABLE TO THE PUBLIC THROUGH PUBLICLY ACCESSIBLE

13  MEANS.

14     (5)  NO WRITTEN APPLICATION OR PERSONAL REQUEST SHALL BE

15  NECESSARY TO RECEIVE OR ACCESS THE APPLICATION FORMS.

16     (6)  COPIES AND RECORDS OF ALL COMPLETED PHYSICAL AND

17  ELECTRONIC APPLICATIONS FOR OFFICIAL MAIL-IN BALLOTS SHALL BE

18  RETAINED BY THE COUNTY BOARD OF ELECTIONS.

19  * * *

20  SECTION 14.  SECTION 1302.1-D(A) OF THE ACT, ADDED OCTOBER

21  31, 2019 (P.L.552, NO.77), IS AMENDED TO READ:

22  SECTION 1302.1-D.  DATE OF APPLICATION FOR MAIL-IN BALLOT.

23  (A)  GENERAL RULE.--APPLICATIONS FOR MAIL-IN BALLOTS SHALL BE

24  RECEIVED IN THE OFFICE OF THE COUNTY BOARD OF ELECTIONS NOT

25  EARLIER THAN 50 DAYS BEFORE THE PRIMARY OR ELECTION, EXCEPT THAT

26  IF A COUNTY BOARD OF ELECTIONS DETERMINES THAT IT WOULD BE

27  APPROPRIATE TO THE COUNTY BOARD OF ELECTIONS' OPERATIONAL NEEDS,

28  ANY APPLICATIONS FOR MAIL-IN BALLOTS RECEIVED MORE THAN 50 DAYS

29  BEFORE THE PRIMARY OR ELECTION MAY BE PROCESSED BEFORE THAT

30  TIME. APPLICATIONS FOR MAIL-IN BALLOTS SHALL BE PROCESSED IF

1  RECEIVED NOT LATER THAN FIVE O'CLOCK P.M. OF THE [FIRST TUESDAY]

2  FIFTEENTH DAY PRIOR TO THE DAY OF ANY PRIMARY OR ELECTION.

3  * * *

4  SECTION 15.  SECTIONS 1303-D(E) AND 1305-D OF THE ACT,

5  AMENDED MARCH 27, 2020 (P.L.41, NO.12), ARE AMENDED TO READ:

6  SECTION 1303-D.  OFFICIAL MAIL-IN ELECTOR BALLOTS.

7  * * *

8  (E)  NOTICE.--

9  (1)  THE OFFICIAL MAIL-IN VOTER BALLOT SHALL STATE [THAT

10  A VOTER WHO RECEIVES A MAIL-IN BALLOT UNDER SECTION 1301-D

11  AND WHOSE VOTED MAIL-IN BALLOT IS NOT TIMELY RECEIVED MAY

12  ONLY VOTE ON ELECTION DAY BY PROVISIONAL BALLOT UNLESS THE

13  ELECTOR BRINGS THE ELECTOR'S MAIL-IN BALLOT TO THE ELECTOR'S

14  POLLING PLACE, REMITS THE BALLOT AND THE ENVELOPE CONTAINING

15  THE DECLARATION OF THE ELECTOR TO THE JUDGE OF ELECTIONS TO

16  BE SPOILED AND SIGNS A STATEMENT SUBJECT TO THE PENALTIES OF

17  18 PA.C.S. § 4904 (RELATING TO UNSWORN FALSIFICATION TO

18  AUTHORITIES) TO THE SAME EFFECT.] THE FOLLOWING:

19  (I)  THAT AN ELECTOR WHO DOES NOT RETURN THE MAIL-IN

20  BALLOT BY MAIL MAY PERSONALLY DELIVER THE BALLOT,

21  ENCLOSED WITHIN BOTH THE ENVELOPE MARKED "OFFICIAL

22  ELECTION BALLOT" AND THE ENVELOPE CONTAINING THE

23  DECLARATION OF THE ELECTOR, TO ONLY THE FOLLOWING:

24  (A)  A MEMBER OR AN EMPLOYEE OF THE COUNTY BOARD

25  OF ELECTIONS, BEFORE ELECTION DAY OR PRIOR TO 8 P.M.

26  OF ELECTION DAY, AT:

27  (I)  THE PERMANENT OFFICES OF THE COUNTY

28  BOARD OF ELECTIONS; OR

29  (II)  A LOCATION AT THE COUNTY COURTHOUSE

30  DESIGNATED BY THE COUNTY BOARD OF ELECTIONS.

I APP. 742

1              (B)   THE JUDGE OF ELECTIONS AT THE ELECTOR'S
2         POLLING PLACE ON ELECTION DAY DURING POLLING HOURS.
3              (II)   THAT AN ELECTOR WHO RECEIVES A MAIL-IN BALLOT
4         UNDER SECTION 1301-D AND WHOSE VOTED BALLOT IS NOT TIMELY
5         RECEIVED AS SET FORTH UNDER SUBPARAGRAPH (I) AND WHO, ON
6         ELECTION DAY, IS CAPABLE OF VOTING AT THE APPROPRIATE
7         POLLING PLACE MAY ONLY VOTE ON ELECTION DAY BY
8         PROVISIONAL BALLOT.
9              (III)   THAT AN ELECTOR MUST PERSONALLY RETURN OR MAIL
10        THE ELECTOR'S BALLOT.
11        (2)   THE SECRETARY OF THE COMMONWEALTH SHALL PRESCRIBE
12        THE TEXT AND THE MANNER BY WHICH THE NOTICE UNDER THIS
13        SUBSECTION SHALL BE PRINTED ON A BALLOT AND SHALL INCLUDE THE
14        FOLLOWING STATEMENT:
15              THIS BALLOT MAY BE MAILED BY THE ELECTOR TO THE
16              COUNTY BOARD OF ELECTIONS OR PERSONALLY RETURNED BY
17              THE ELECTOR TO THE JUDGE OF ELECTIONS AT THE
18              ELECTOR'S POLLING PLACE ON ELECTION DAY, OR IN PERSON
19              ON OR BEFORE ELECTION DAY TO A MEMBER OR AN EMPLOYEE
20              OF THE COUNTY BOARD OF ELECTIONS AT A LOCATION AT THE
21              COUNTY COURTHOUSE DESIGNATED BY THE COUNTY BOARD OF
22              ELECTIONS OR IN PERSON ON OR BEFORE ELECTION DAY TO A
23              MEMBER OR AN EMPLOYEE OF THE COUNTY BOARD OF
24              ELECTIONS AT THE PERMANENT OFFICES OF THE COUNTY
25              BOARD OF ELECTIONS AND TO NO OTHER LOCATION.
26   SECTION 1305-D.   DELIVERING OR MAILING BALLOTS.
27        THE COUNTY BOARD OF ELECTIONS, UPON RECEIPT AND APPROVAL OF
28   AN APPLICATION FILED BY A QUALIFIED ELECTOR UNDER SECTION 1301-
29   D, SHALL COMMENCE TO DELIVER OR MAIL OFFICIAL MAIL-IN BALLOTS
30   AS SOON AS A BALLOT IS CERTIFIED AND THE BALLOTS ARE AVAILABLE.

1  WHILE ANY PROCEEDING IS PENDING IN A FEDERAL OR STATE COURT

2  WHICH WOULD AFFECT THE CONTENTS OF ANY BALLOT, THE COUNTY BOARD

3  OF ELECTIONS MAY AWAIT A RESOLUTION OF THAT PROCEEDING BUT IN

4  ANY EVENT, SHALL COMMENCE TO DELIVER OR MAIL OFFICIAL MAIL-IN

5  BALLOTS NOT LATER THAN THE [SECOND] FOURTH TUESDAY PRIOR TO THE

6  PRIMARY OR ELECTION. FOR APPLICANTS WHOSE PROOF OF

7  IDENTIFICATION WAS NOT PROVIDED WITH THE APPLICATION OR COULD

8  NOT BE VERIFIED BY THE BOARD, THE BOARD SHALL SEND THE NOTICE

9  REQUIRED UNDER SECTION 1302.2-D(C) WITH THE MAIL-IN BALLOT. AS

10  ADDITIONAL APPLICATIONS ARE RECEIVED AND APPROVED, THE BOARD

11  SHALL DELIVER OR MAIL OFFICIAL MAIL-IN BALLOTS TO THE ADDITIONAL

12  ELECTORS WITHIN 48 HOURS.

13  SECTION 15.1.  SECTION 1306-D(A) AND (B)(3) OF THE ACT,

14  AMENDED MARCH 27, 2020 (P.L.41, NO.12), ARE AMENDED AND

15  SUBSECTION (B) IS AMENDED BY ADDING A PARAGRAPH TO READ:

16  SECTION 1306-D.  VOTING BY MAIL-IN ELECTORS.

17  (A)  GENERAL RULE.--AT ANY TIME AFTER RECEIVING AN OFFICIAL

18  MAIL-IN BALLOT, BUT ON OR BEFORE EIGHT O'CLOCK P.M. THE DAY OF

19  THE PRIMARY OR ELECTION, THE MAIL-IN ELECTOR SHALL, IN SECRET,

20  PROCEED TO MARK THE BALLOT ONLY IN BLACK LEAD PENCIL, INDELIBLE

21  PENCIL OR BLUE, BLACK OR BLUE-BLACK INK, IN FOUNTAIN PEN OR BALL

22  POINT PEN, AND THEN FOLD THE BALLOT, ENCLOSE AND SECURELY SEAL

23  THE SAME IN THE ENVELOPE ON WHICH IS PRINTED, STAMPED OR

24  ENDORSED "OFFICIAL ELECTION BALLOT." THIS ENVELOPE SHALL THEN BE

25  PLACED IN THE SECOND ONE, ON WHICH IS PRINTED THE FORM OF

26  DECLARATION OF THE ELECTOR, AND THE ADDRESS OF THE ELECTOR'S

27  COUNTY BOARD OF ELECTION AND THE LOCAL ELECTION DISTRICT OF THE

28  ELECTOR. THE ELECTOR SHALL THEN FILL OUT, DATE AND SIGN THE

29  DECLARATION PRINTED ON SUCH ENVELOPE. SUCH ENVELOPE SHALL THEN

30  BE SECURELY SEALED AND THE ELECTOR SHALL SEND SAME BY MAIL,

1   POSTAGE PREPAID, EXCEPT WHERE FRANKED, OR DELIVER IT IN PERSON

2   [TO SAID COUNTY BOARD OF ELECTION.] TO A MEMBER OR AN EMPLOYEE

3   OF THE COUNTY BOARD OF ELECTIONS AT THE PERMANENT OFFICES OF THE

4   COUNTY BOARD OF ELECTIONS, TO A MEMBER OR AN EMPLOYEE OF THE

5   COUNTY BOARD OF ELECTIONS AT A LOCATION AT THE COUNTY COURTHOUSE

6   DESIGNATED BY THE COUNTY BOARD OF ELECTIONS OR TO THE JUDGE OF

7   ELECTIONS OF THE ELECTOR'S ELECTION DISTRICT AT THE ELECTOR'S

8   POLLING PLACE DURING POLLING HOURS AND TO NO OTHER LOCATION.

9       * * *

10  (B)   ELIGIBILITY.--

11        * * *

12        (3)   NOTWITHSTANDING PARAGRAPH (2), AN ELECTOR WHO

13  REQUESTS A MAIL-IN BALLOT AND WHO IS NOT SHOWN ON THE

14  DISTRICT REGISTER AS HAVING VOTED THE BALLOT [MAY VOTE AT THE

15  POLLING PLACE IF THE ELECTOR REMITS THE BALLOT AND THE

16  ENVELOPE CONTAINING THE DECLARATION OF THE ELECTOR TO THE

17  JUDGE OF ELECTIONS TO BE SPOILED AND THE ELECTOR SIGNS A

18  STATEMENT SUBJECT TO THE PENALTIES OF 18 PA.C.S. § 4904

19  (RELATING TO UNSWORN FALSIFICATION TO AUTHORITIES) WHICH

20  SHALL BE IN SUBSTANTIALLY THE FOLLOWING FORM:

21        I HEREBY DECLARE THAT I AM A QUALIFIED REGISTERED ELECTOR

22  WHO HAS OBTAINED AN ABSENTEE BALLOT OR MAIL-IN BALLOT. I

23  FURTHER DECLARE THAT I HAVE NOT CAST MY ABSENTEE BALLOT OR

24  MAIL-IN BALLOT, AND THAT INSTEAD I REMITTED MY ABSENTEE

25  BALLOT OR MAIL-IN BALLOT TO THE JUDGE OF ELECTIONS AT MY

26  POLLING PLACE TO BE SPOILED AND THEREFORE REQUEST THAT MY

27  ABSENTEE BALLOT OR MAIL-IN BALLOT BE VOIDED.

28        (DATE)

29        (SIGNATURE OF ELECTOR)...........(ADDRESS OF ELECTOR)

30        (LOCAL JUDGE OF ELECTIONS)] MAY PERSONALLY DELIVER THE

I APP. 745

1    COMPLETED MAIL-IN BALLOT, ENCLOSED WITHIN BOTH THE ENVELOPE

2    MARKED "OFFICIAL ELECTION BALLOT" AND THE ENVELOPE CONTAINING

3    THE DECLARATION OF THE ELECTOR, TO ONLY THE FOLLOWING:

4         (I)  THE JUDGE OF ELECTIONS OF THE ELECTOR'S ELECTION

5         DISTRICT AT THE ELECTOR'S POLLING PLACE DURING POLLING

6         HOURS.

7         (II)  A MEMBER OR AN EMPLOYEE OF THE COUNTY BOARD OF

8         ELECTIONS AT A LOCATION AT THE COUNTY COURTHOUSE

9         DESIGNATED BY THE COUNTY BOARD OF ELECTIONS.

10        (III)  A MEMBER OR AN EMPLOYEE OF THE COUNTY BOARD OF

11        ELECTIONS AT THE PERMANENT OFFICES OF THE COUNTY BOARD OF

12        ELECTIONS.

13        (4)  A JUDGE OF ELECTIONS SHALL KEEP ALL MATERIAL

14   DELIVERED UNDER PARAGRAPH (3)(I) IN A SECURE, SAFE AND SEALED

15   CONTAINER IN THE CUSTODY OF THE JUDGE OF ELECTIONS UNTIL

16   DELIVERY OF THE MATERIAL TO THE COUNTY BOARD OF ELECTIONS

17   UNDER SECTION 1308(A.1).

18   * * *

19   SECTION 16.  SECTIONS 1801, 1802, 1802.1, 1803, 1804, 1805,

20   1806, 1807, 1808, 1809, 1810, 1811, 1812, 1813, 1814, 1815,

21   1816, 1817, 1818, 1819, 1820, 1821, 1823, 1824, 1825, 1827,

22   1828, 1829, 1830, 1831, 1832, 1833, 1834, 1835, 1836, 1837,

23   1838, 1839, 1840, 1841, 1843, 1845, 1847, 1848, 1849 AND 1850

24   OF THE ACT ARE AMENDED TO READ:

25   SECTION 1801.  DISOBEYING LAWFUL INSTRUCTIONS.--ANY PERSON

26   WHO WILFULLY DISOBEYS ANY LAWFUL INSTRUCTION OR ORDER OF ANY

27   COUNTY BOARD OF ELECTIONS, OR WHO REFUSES TO OBEY THEIR SUBPOENA

28   DULY ISSUED AND SERVED UNDER THE PROVISIONS OF THIS ACT, SHALL

29   BE GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL

30   BE SENTENCED TO PAY A FINE NOT EXCEEDING [FIVE HUNDRED ($500)]

1 ONE THOUSAND ($1,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT NOT

2 EXCEEDING [ONE (1) YEAR] TWO (2) YEARS, OR BOTH, IN THE

3 DISCRETION OF THE COURT.

4   SECTION 1802.  PERJURY.--ANY WILFUL FALSE STATEMENT MADE

5 UNDER OATH OR AFFIRMATION OR IN WRITING, STATING THAT IT IS SO

6 MADE, ALTHOUGH SUCH OATH OR AFFIRMATION MAY NOT HAVE ACTUALLY

7 BEEN MADE, BY ANY PERSON REGARDING ANY MATERIAL MATTER OR THING

8 RELATING TO ANY SUBJECT BEING INVESTIGATED, HEARD, DETERMINED OR

9 ACTED UPON BY ANY COUNTY BOARD OF ELECTIONS, OR MEMBER THEREOF,

10 OR BY ANY COURT OR JUDGE THEREOF, JUDGE OF ELECTION, INSPECTOR

11 OF ELECTION, OR OVERSEER, IN ACCORDANCE WITH THE TERMS OF THIS

12 ACT, SHALL BE PERJURY, A MISDEMEANOR OF THE FIRST DEGREE, AND

13 ANY PERSON, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A

14 FINE NOT EXCEEDING [TEN THOUSAND ($10,000)] TWENTY THOUSAND

15 ($20,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT MORE

16 THAN [FIVE (5)] TEN (10) YEARS, OR BOTH, IN THE DISCRETION OF

17 THE COURT.

18   SECTION 1802.1.  FALSE AFFIDAVITS OF CANDIDATES.--ANY

19 CANDIDATE FOR STATE, COUNTY, CITY, BOROUGH, INCORPORATED TOWN,

20 TOWNSHIP OR SCHOOL DISTRICT OFFICE OR FOR THE OFFICE OF UNITED

21 STATES SENATOR OR REPRESENTATIVE IN CONGRESS OR ANY OTHER

22 ELECTIVE PUBLIC OFFICE WHO KNOWINGLY MAKES A FALSE STATEMENT

23 REGARDING HIS ELIGIBILITY OR QUALIFICATIONS FOR SUCH OFFICE IN

24 HIS CANDIDATE'S AFFIDAVIT SHALL, IN LITIGATION WHICH RESULTS IN

25 THE REMOVAL OF THE CANDIDATE FROM THE BALLOT, BE LIABLE FOR

26 COURT COSTS, INCLUDING FILING FEES, ATTORNEY FEES, INVESTIGATION

27 FEES AND SIMILAR COSTS, IN AN AMOUNT UP TO [TEN THOUSAND

28 ($10,000)] TWENTY THOUSAND ($20,000) DOLLARS.

29   SECTION 1803.  REFUSAL TO PERMIT INSPECTION OF PAPERS;

30 DESTRUCTION OR REMOVAL; SECRETARY OF THE COMMONWEALTH.--ANY

1    SECRETARY OF THE COMMONWEALTH, DEPUTY, OR EMPLOYE OF HIS OFFICE,

2    WHO SHALL REFUSE TO PERMIT THE PUBLIC INSPECTION OR COPYING AS

3    AUTHORIZED, EXCEPT WHEN IN USE IN HIS OFFICE, BY THIS ACT, OF

4    ANY RETURN, NOMINATION PETITION, CERTIFICATE OR PAPER, OTHER

5    PETITION, ACCOUNT, CONTRACT, REPORT OR ANY OTHER DOCUMENT OR

6    RECORD IN HIS CUSTODY WHICH, UNDER THE PROVISIONS OF THIS ACT,

7    IS REQUIRED TO BE OPEN TO PUBLIC INSPECTION; OR WHO SHALL

8    DESTROY OR ALTER, OR PERMIT TO BE DESTROYED OR ALTERED, ANY SUCH

9    DOCUMENT OR RECORD DURING THE PERIOD FOR WHICH THE SAME IS

10   REQUIRED TO BE KEPT IN HIS OFFICE; OR WHO SHALL REMOVE ANY SUCH

11   DOCUMENT OR RECORD FROM HIS OFFICE DURING SAID PERIOD, OR PERMIT

12   THE SAME TO BE REMOVED, EXCEPT PURSUANT TO THE DIRECTION OF ANY

13   COMPETENT COURT OR ANY COMMITTEE REQUIRED TO DETERMINE ANY

14   CONTESTED PRIMARY OR ELECTION, SHALL BE GUILTY OF A MISDEMEANOR,

15   AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE

16   NOT EXCEEDING [ONE THOUSAND ($1,000)] TWO THOUSAND ($2,000)

17   DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT LESS THAN [ONE (1)

18   MONTH] TWO (2) MONTHS NOR MORE THAN [TWO (2)] FOUR (4) YEARS, OR

19   BOTH, IN THE DISCRETION OF THE COURT.

20       SECTION 1804.  REFUSAL TO PERMIT INSPECTION OF PAPERS;

21   DESTRUCTION OR REMOVAL; COUNTY BOARDS OF ELECTIONS.--ANY MEMBER,

22   CHIEF CLERK OR OTHER EMPLOYE OF ANY COUNTY BOARD OF ELECTIONS,

23   WHO SHALL REFUSE TO PERMIT THE PUBLIC INSPECTION OR COPYING, AS

24   AUTHORIZED BY THIS ACT, OF ANY GENERAL OR DUPLICATE RETURN

25   SHEET, TALLY PAPER, AFFIDAVIT, NOMINATION PETITION, CERTIFICATE

26   OR PAPER, OTHER PETITION, WITNESS LIST, ACCOUNT, CONTRACT,

27   REPORT OR ANY OTHER DOCUMENT OR RECORD IN THE CUSTODY OF SUCH

28   COUNTY BOARD WHICH, UNDER THE PROVISIONS OF THIS ACT, IS

29   REQUIRED TO BE OPEN TO PUBLIC INSPECTION; OR WHO SHALL DESTROY

30   OR ALTER, OR PERMIT TO BE DESTROYED OR ALTERED, ANY SUCH

I APP. 748

1  DOCUMENT OR RECORD DURING THE PERIOD FOR WHICH THE SAME IS

2  REQUIRED TO BE KEPT IN THE OFFICE OF SUCH COUNTY BOARD; OR WHO

3  SHALL REMOVE ANY SUCH DOCUMENT OR RECORD FROM THE OFFICE OF SUCH

4  COUNTY BOARD DURING SAID PERIOD, OR PERMIT THE SAME TO BE

5  REMOVED, EXCEPT PURSUANT TO THE DIRECTION OF ANY COMPETENT COURT

6  OR ANY COMMITTEE REQUIRED TO DETERMINE ANY CONTESTED PRIMARY OR

7  ELECTION, SHALL BE GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION

8  THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT EXCEEDING [ONE

9  THOUSAND ($1,000)] TWO THOUSAND ($2,000) DOLLARS, OR TO UNDERGO

10 AN IMPRISONMENT OF NOT LESS THAN [ONE (1) MONTH] TWO (2) MONTHS

11 NOR MORE THAN [TWO (2)] FOUR (4) YEARS, OR BOTH, IN THE

12 DISCRETION OF THE COURT.

13      SECTION 1805.  INSERTION AND ALTERATION OF ENTRIES IN

14 DOCUMENTS; REMOVAL; REFUSAL TO DELIVER.--ANY MEMBER, CHIEF CLERK

15 OR EMPLOYE OF ANY COUNTY BOARD OF ELECTIONS OR JUDGE, INSPECTOR

16 OR CLERK OF ELECTION, MACHINE INSPECTOR, OVERSEER, OR OTHER

17 PERSON, WHO KNOWINGLY INSERTS OR KNOWINGLY PERMITS TO BE

18 INSERTED ANY FICTITIOUS NAME, FALSE FIGURE OR OTHER FRAUDULENT

19 ENTRY ON OR IN ANY REGISTRATION CARD, DISTRICT REGISTER, VOTER'S

20 CERTIFICATE, LIST OF VOTERS, AFFIDAVIT, TALLY PAPER, GENERAL OR

21 DUPLICATE RETURN SHEET, STATEMENT, CERTIFICATE, OATH, VOUCHER,

22 ACCOUNT, BALLOT OR OTHER RECORD OR DOCUMENT AUTHORIZED OR

23 REQUIRED TO BE MADE, USED, SIGNED, RETURNED OR PRESERVED FOR ANY

24 PUBLIC PURPOSE IN CONNECTION WITH ANY PRIMARY OR ELECTION; OR

25 WHO MATERIALLY ALTERS OR INTENTIONALLY DESTROYS ANY ENTRY WHICH

26 HAS BEEN LAWFULLY MADE THEREIN, EXCEPT BY ORDER OF THE COUNTY

27 BOARD OF ELECTIONS OR COURT OF COMPETENT JURISDICTION, OR WHO

28 TAKES OR REMOVES ANY SUCH BOOK, AFFIDAVIT, RETURN, ACCOUNT,

29 BALLOT OR OTHER DOCUMENT OR RECORD FROM THE CUSTODY OF ANY

30 PERSON HAVING LAWFUL CHARGE THEREOF, IN ORDER TO PREVENT THE

1  SAME FROM BEING USED OR INSPECTED OR COPIED AS REQUIRED OR

2  PERMITTED BY THIS ACT, OR WHO NEGLECTS OR REFUSES, WITHIN THE

3  TIME AND IN THE MANNER REQUIRED BY THIS ACT, TO DELIVER THE SAME

4  INTO THE CUSTODY OF THE OFFICERS WHO ARE REQUIRED BY THIS ACT TO

5  USE OR KEEP THE SAME, SHALL BE GUILTY OF A MISDEMEANOR, AND,

6  UPON CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT

7  EXCEEDING [ONE THOUSAND ($1,000)] TWO THOUSAND ($2,000) DOLLARS,

8  OR TO UNDERGO AN IMPRISONMENT OF NOT LESS THAN [ONE (1) MONTH]

9  TWO (2) MONTHS OR MORE THAN [TWO (2)] FOUR (4) YEARS, OR BOTH,

10  IN THE DISCRETION OF THE COURT.

11     SECTION 1806.  REFUSAL TO PERMIT OVERSEERS, WATCHERS,

12  ATTORNEYS OR CANDIDATES TO ACT.--ANY MEMBER OF A COUNTY BOARD OF

13  ELECTIONS, JUDGE OF ELECTION OR INSPECTOR OF ELECTION WHO SHALL

14  REFUSE TO PERMIT ANY OVERSEER OR WATCHER, ATTORNEY OR CANDIDATE

15  TO BE PRESENT, AS AUTHORIZED BY THIS ACT, AT ANY SESSION OF A

16  COUNTY BOARD, COMPUTATION AND CANVASSING OF RETURNS OF ANY

17  PRIMARY OR ELECTION, RECOUNT OF BALLOTS OR RECANVASS OF VOTING

18  MACHINES, AS AUTHORIZED BY THIS ACT, OR AT ANY POLLING PLACE

19  DURING THE TIME THE POLLS ARE OPEN AT ANY PRIMARY OR ELECTION,

20  AND AFTER THE CLOSE OF THE POLLS DURING THE TIME THE BALLOTS ARE

21  COUNTED OR VOTING MACHINE CANVASSED AND UNTIL THE RETURNS OF

22  SUCH PRIMARY OR ELECTION HAVE BEEN MADE UP AND SIGNED, SHALL BE

23  GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE

24  SENTENCED TO PAY A FINE NOT EXCEEDING [ONE THOUSAND ($1,000)]

25  TWO THOUSAND ($2,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT NOT

26  EXCEEDING [ONE (1) YEAR] TWO (2) YEARS, OR BOTH, IN THE

27  DISCRETION OF THE COURT.

28     SECTION 1807.  DRIVING AWAY WATCHERS, ATTORNEYS, CANDIDATES

29  OR OVERSEERS.--ANY PERSON WHO BY VIOLENCE OR INTIMIDATION SHALL

30  THREATEN OR DRIVE AWAY ANY WATCHER, ATTORNEY, CANDIDATE OR

1  OVERSEER, OR REPRESENTATIVE OF THE COUNTY BOARD OF ELECTIONS, OR

2  OF THE SECRETARY OF THE COMMONWEALTH, REQUIRED OR PERMITTED TO

3  BE PRESENT AT ANY POLLING PLACE, OR WHO SHALL IN ANY MANNER

4  PREVENT ANY OVERSEER, OR REPRESENTATIVE OF THE COUNTY BOARD OF

5  ELECTIONS OR OF THE SECRETARY OF THE COMMONWEALTH FROM

6  PERFORMING HIS DUTY UNDER THIS ACT, SHALL BE GUILTY OF A

7  MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO

8  PAY A FINE NOT EXCEEDING [ONE THOUSAND ($1,000)] TWO THOUSAND

9  ($2,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT LESS THAN

10 [ONE (1) MONTH] TWO (2) MONTHS NOR MORE THAN [TWO (2)] FOUR (4)

11 YEARS, OR BOTH, IN THE DISCRETION OF THE COURT.

12    SECTION 1808.  REFUSAL TO PERMIT ELECTION OFFICERS, CLERKS

13 AND MACHINE INSPECTORS TO ACT; DRIVING AWAY SAID PERSONS.--ANY

14 PERSON, INCLUDING ANY ELECTION OFFICER, WHO SHALL REFUSE TO

15 PERMIT ANY ELECTION OFFICER, CLERK OR MACHINE INSPECTOR, DULY

16 ELECTED OR APPOINTED AND AUTHORIZED TO ACT, TO PERFORM THE

17 DUTIES IMPOSED ON HIM OR TO ACT AS PERMITTED BY THIS ACT; OR WHO

18 SHALL BY VIOLENCE OR INTIMIDATION THREATEN OR DRIVE AWAY, ANY

19 SUCH ELECTION OFFICER, CLERK OR MACHINE INSPECTOR OR WHO SHALL,

20 IN ANY MANNER, PREVENT ANY SUCH ELECTION OFFICER, CLERK OR

21 MACHINE INSPECTOR FROM PERFORMING HIS RIGHTS AND DUTIES UNDER

22 THIS ACT, SHALL BE GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION

23 THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT EXCEEDING [ONE

24 THOUSAND ($1,000)] TWO THOUSAND ($2,000) DOLLARS, OR TO UNDERGO

25 AN IMPRISONMENT OF NOT LESS THAN [ONE (1) MONTH] TWO (2) MONTHS

26 OR MORE THAN [TWO (2)] FOUR (4) YEARS, OR BOTH, IN THE

27 DISCRETION OF THE COURT.

28    SECTION 1809.  REFUSAL TO ADMINISTER OATH; ACTING WITHOUT

29 BEING SWORN.--IF ANY JUDGE OF ELECTION OR MINORITY INSPECTOR OF

30 ELECTION REFUSES OR FAILS TO ADMINISTER THE OATH TO THE OFFICERS

I APP. 751

1  OF ELECTION, IN THE MANNER REQUIRED BY THIS ACT, OR IF ANY JUDGE

2  OF ELECTION, INSPECTOR OF ELECTION, CLERK OF ELECTION, OR

3  MACHINE INSPECTOR, SHALL ACT WITHOUT BEING FIRST DULY SWORN, OR

4  IF ANY SUCH PERSON SHALL SIGN THE WRITTEN FORM OF OATH WITHOUT

5  BEING DULY SWORN, OR IF ANY JUDGE OF ELECTION OR MINORITY

6  INSPECTOR OF ELECTION OR ANY OTHER PERSON AUTHORIZED TO

7  ADMINISTER OATHS SHALL CERTIFY THAT ANY SUCH PERSON WAS SWORN

8  WHEN HE WAS NOT, HE SHALL BE GUILTY OF A MISDEMEANOR, AND, UPON

9  CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT

10  EXCEEDING [ONE HUNDRED ($100)] TWO HUNDRED ($200) DOLLARS, OR TO

11  UNDERGO AN IMPRISONMENT NOT EXCEEDING [SIX (6) MONTHS] ONE (1)

12  YEAR, OR BOTH, IN THE DISCRETION OF THE COURT.

13      SECTION 1810.  VIOLATION OF OATH OF OFFICE BY ELECTION

14  OFFICERS.--ANY JUDGE OF ELECTION, INSPECTOR OF ELECTION, CLERK

15  OF ELECTION, OR MACHINE INSPECTOR WHO SHALL WILFULLY VIOLATE ANY

16  OF THE PROVISIONS OF HIS OATH OF OFFICE, SHALL BE GUILTY OF A

17  MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO

18  PAY A FINE NOT EXCEEDING [ONE THOUSAND ($1,000)] TWO THOUSAND

19  ($2,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT NOT EXCEEDING

20  [ONE (1) YEAR] TWO (2) YEARS, OR BOTH, IN THE DISCRETION OF THE

21  COURT.

22      SECTION 1811.  PEACE OFFICERS; FAILURE TO RENDER ASSISTANCE;

23  HINDERING OR DELAYING COUNTY BOARD MEMBERS AND OTHERS.--ANY

24  SHERIFF, DEPUTY SHERIFF, CONSTABLE, DEPUTY CONSTABLE, POLICE OR

25  OTHER PEACE OFFICER, WHO SHALL FAIL UPON DEMAND OF ANY MEMBER OF

26  A COUNTY BOARD OF ELECTIONS, JUDGE OR INSPECTOR OF ELECTION, OR

27  OVERSEER TO RENDER SUCH AID AND ASSISTANCE TO HIM AS HE SHALL

28  REQUEST IN THE MAINTENANCE OF PEACE AND IN THE MAKING OF

29  ARRESTS, AS HEREIN PROVIDED, OR WHO SHALL WILFULLY HINDER OR

30  DELAY OR ATTEMPT TO HINDER OR DELAY ANY MEMBER OF A COUNTY

I APP. 752

1   BOARD, JUDGE OR INSPECTOR OF ELECTION, OR OVERSEER IN THE

2   PERFORMANCE OF ANY DUTY UNDER THIS ACT, SHALL BE GUILTY OF A

3   MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO

4   PAY A FINE NOT EXCEEDING [FIVE HUNDRED ($500)] ONE THOUSAND

5   ($1,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT LESS THAN

6   [THREE (3)] SIX (6) MONTHS NOR MORE THAN [TWO (2)] FOUR (4)

7   YEARS, OR BOTH, IN THE DISCRETION OF THE COURT.

8      SECTION 1812.  NOMINATION PETITIONS AND PAPERS; OFFENSES BY

9   SIGNERS.--IF ANY PERSON SHALL KNOWINGLY AND WILFULLY SIGN ANY

10  NOMINATION PETITION OR NOMINATION PAPER, WITHOUT HAVING THE

11  QUALIFICATIONS PRESCRIBED BY THIS ACT, OR IF ANY PERSON SHALL

12  SET OPPOSITE A SIGNATURE ON A NOMINATION PETITION OR PAPER, A

13  DATE OTHER THAN THE ACTUAL DATE SUCH SIGNATURE WAS AFFIXED

14  THERETO, OR IF ANY PERSON SHALL SET OPPOSITE THE SIGNATURE ON A

15  NOMINATION PETITION OR NOMINATION PAPER, A FALSE STATEMENT OF

16  THE SIGNER'S PLACE OF RESIDENCE OR OCCUPATION, OR IF ANY PERSON

17  SHALL SIGN MORE NOMINATION PETITIONS OR NOMINATION PAPERS THAN

18  PERMITTED BY THE PROVISIONS OF THIS ACT, HE SHALL BE GUILTY OF A

19  MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO

20  PAY A FINE NOT EXCEEDING [ONE HUNDRED ($100)] TWO HUNDRED ($200)

21  DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT LESS THAN [THREE

22  (3)] SIX (6) MONTHS NOR MORE THAN [TWO (2)] FOUR (4) YEARS, OR

23  BOTH, AT THE DISCRETION OF THE COURT.

24     SECTION 1813.  FALSE SIGNATURES AND STATEMENTS IN NOMINATION

25  PETITIONS AND PAPERS.--IF ANY PERSON SHALL KNOWINGLY MAKE A

26  FALSE STATEMENT IN ANY AFFIDAVIT REQUIRED BY THE PROVISIONS OF

27  THIS ACT, TO BE APPENDED TO OR TO ACCOMPANY A NOMINATION

28  PETITION OR A NOMINATION PAPER, OR IF ANY PERSON SHALL

29  FRAUDULENTLY SIGN ANY NAME NOT HIS OWN TO ANY NOMINATION

30  PETITION OR NOMINATION PAPER, OR IF ANY PERSON SHALL

I APP. 753

1  FRAUDULENTLY ALTER ANY NOMINATION PETITION OR NOMINATION PAPER
2  WITHOUT THE CONSENT OF THE SIGNERS, HE SHALL BE GUILTY OF A
3  MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO
4  PAY A FINE NOT EXCEEDING [FIVE HUNDRED ($500)] ONE THOUSAND
5  ($1,000) DOLLARS, OR TO UNDERGO IMPRISONMENT OF NOT MORE THAN
6  [ONE (1) YEAR] TWO (2) YEARS, OR BOTH, IN THE DISCRETION OF THE
7  COURT.
8     SECTION 1814.  NOMINATION PETITIONS; CERTIFICATES AND PAPERS;
9  DESTRUCTION; FRAUDULENT FILING; SUPPRESSION.--ANY PERSON WHO
10  SHALL FALSELY MAKE ANY NOMINATION CERTIFICATE OR WHO SHALL
11  WILFULLY DEFACE OR DESTROY ANY NOMINATION PETITION, NOMINATION
12  CERTIFICATE OR NOMINATION PAPER, OR ANY PART THEREOF, OR ANY
13  LETTER OF WITHDRAWAL, OR WHO SHALL FILE ANY NOMINATION PETITION,
14  NOMINATION CERTIFICATE OR NOMINATION PAPER OR LETTER OF
15  WITHDRAWAL KNOWING THE SAME, OR ANY PART THEREOF, TO BE FALSELY
16  MADE, OR WHO SHALL SUPPRESS ANY NOMINATION PETITION, NOMINATION
17  CERTIFICATE OR NOMINATION PAPER, OR ANY PART THEREOF, WHICH HAS
18  BEEN DULY FILED, SHALL BE GUILTY OF A MISDEMEANOR, AND, UPON
19  CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT
20  EXCEEDING [ONE THOUSAND ($1,000)] TWO THOUSAND ($2,000) DOLLARS,
21  OR TO UNDERGO AN IMPRISONMENT OF NOT MORE THAN [ONE (1) YEAR]
22  TWO (2) YEARS, OR BOTH, IN THE DISCRETION OF THE COURT.
23     SECTION 1815.  OFFENSES BY PRINTERS OF BALLOTS.--ANY PRINTER
24  EMPLOYED BY ANY COUNTY BOARD OF ELECTIONS TO PRINT ANY OFFICIAL
25  BALLOTS, OR ANY PERSON ENGAGED IN PRINTING THE SAME WHO SHALL
26  APPROPRIATE TO HIMSELF OR GIVE OR DELIVER OR KNOWINGLY PERMIT TO
27  BE TAKEN ANY OF SAID BALLOTS BY ANY OTHER PERSON THAN SUCH
28  COUNTY BOARD OF ELECTION OR THEIR DULY AUTHORIZED AGENT, OR WHO
29  SHALL WILFULLY PRINT OR CAUSE TO BE PRINTED ANY OFFICIAL BALLOT
30  IN ANY FORM OTHER THAN THAT PRESCRIBED BY SUCH COUNTY BOARD OR

I APP. 754

1   WITH ANY OTHER NAMES OR PRINTING, OR WITH THE NAMES SPELLED

2   OTHERWISE THAN AS DIRECTED BY THEM OR THE NAMES OR PRINTING

3   THEREON ARRANGED IN ANY OTHER WAY THAN THAT AUTHORIZED AND

4   DIRECTED BY THIS ACT, SHALL BE GUILTY OF A MISDEMEANOR, AND,

5   UPON CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT

6   EXCEEDING [ONE THOUSAND ($1,000)] TWO THOUSAND ($2,000) DOLLARS,

7   OR TO UNDERGO AN IMPRISONMENT OF NOT LESS THAN [SIX (6) MONTHS]

8   ONE (1) YEAR NOR MORE THAN [FIVE (5)] TEN (10) YEARS, OR BOTH,

9   IN THE DISCRETION OF THE COURT.

10      SECTION 1816.  UNLAWFUL POSSESSION OF BALLOTS; COUNTERFEITING

11  BALLOTS.--ANY PERSON OTHER THAN AN OFFICER CHARGED BY LAW WITH

12  THE CARE OF BALLOTS, OR A PERSON ENTRUSTED BY ANY SUCH OFFICER

13  WITH THE CARE OF THE SAME FOR A PURPOSE REQUIRED BY LAW, WHO

14  SHALL HAVE IN HIS POSSESSION OUTSIDE THE POLLING PLACE ANY

15  OFFICIAL BALLOT, OR ANY PERSON WHO SHALL MAKE OR HAVE IN HIS

16  POSSESSION ANY COUNTERFEIT OF AN OFFICIAL BALLOT, SHALL BE

17  GUILTY OF A MISDEMEANOR OF THE SECOND DEGREE, AND, UPON

18  CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT

19  EXCEEDING [FIVE THOUSAND ($5,000)] TEN THOUSAND ($10,000)

20  DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT MORE THAN [TWO

21  (2)] FOUR (4) YEARS, OR BOTH, IN THE DISCRETION OF THE COURT.

22      SECTION 1817.  FORGING AND DESTROYING BALLOTS.--ANY PERSON

23  WHO SHALL FORGE OR FALSELY MAKE THE OFFICIAL ENDORSEMENT ON ANY

24  BALLOT OR WILFULLY DESTROY OR DEFACE ANY BALLOT OR WILFULLY

25  DELAY THE DELIVERY OF ANY BALLOTS SHALL BE GUILTY OF A

26  MISDEMEANOR OF THE SECOND DEGREE, AND, UPON CONVICTION THEREOF,

27  SHALL BE SENTENCED TO PAY A FINE NOT EXCEEDING [FIVE THOUSAND

28  ($5,000)] TEN THOUSAND ($10,000) DOLLARS, OR TO UNDERGO AN

29  IMPRISONMENT OF NOT MORE THAN [TWO (2)] FOUR (4) YEARS, OR BOTH,

30  IN THE DISCRETION OF THE COURT.

1    SECTION 1818.   TAMPERING WITH VOTING MACHINES.--ANY ELECTION

2    OFFICER OR OTHER PERSON WHO SHALL UNLAWFULLY OPEN OR WHO SHALL

3    TAMPER WITH OR INJURE OR ATTEMPT TO INJURE ANY VOTING MACHINE TO

4    BE USED OR BEING USED AT ANY PRIMARY OR ELECTION, OR WHO SHALL

5    PREVENT OR ATTEMPT TO PREVENT THE CORRECT OPERATION OF SUCH

6    MACHINE, OR ANY UNAUTHORIZED PERSON WHO SHALL MAKE OR HAVE IN

7    HIS POSSESSION A KEY TO A VOTING MACHINE TO BE USED OR BEING

8    USED IN ANY PRIMARY OR ELECTION, SHALL BE GUILTY OF A

9    MISDEMEANOR OF THE SECOND DEGREE, AND, UPON CONVICTION THEREOF,

10   SHALL BE SENTENCED TO PAY A FINE NOT EXCEEDING [FIVE THOUSAND

11   ($5,000)] TEN THOUSAND ($10,000) DOLLARS, OR TO UNDERGO AN

12   IMPRISONMENT OF NOT MORE THAN [TWO (2)] FOUR (4) YEARS, OR BOTH,

13   IN THE DISCRETION OF THE COURT.

14   SECTION 1819.   DESTROYING, DEFACING OR REMOVING NOTICES, ET

15   CETERA.--ANY PERSON WHO SHALL, PRIOR TO ANY PRIMARY OR ELECTION,

16   WILFULLY DEFACE, REMOVE OR DESTROY ANY NOTICE OR LIST OF

17   CANDIDATES POSTED IN ACCORDANCE WITH THE PROVISIONS OF THIS ACT,

18   OR WHO, DURING ANY PRIMARY OR ELECTION, SHALL WILFULLY DEFACE,

19   TEAR DOWN, REMOVE OR DESTROY ANY CARD OF INSTRUCTIONS, NOTICE OF

20   PENALTIES, SPECIMEN BALLOT OR DIAGRAM PRINTED OR POSTED FOR THE

21   INSTRUCTION OF ELECTORS, OR WHO SHALL, DURING ANY PRIMARY OR

22   ELECTION, WILFULLY REMOVE OR DESTROY ANY OF THE SUPPLIES OR

23   CONVENIENCES FURNISHED BY THE COUNTY BOARD OF ELECTIONS TO ANY

24   POLLING PLACE IN ORDER TO ENABLE ELECTORS TO VOTE, OR THE

25   ELECTION OFFICERS TO PERFORM THEIR DUTIES, OR WHO SHALL WILFULLY

26   HINDER THE VOTING OF OTHERS, SHALL BE GUILTY OF A MISDEMEANOR,

27   AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE

28   NOT EXCEEDING [ONE HUNDRED ($100)] TWO HUNDRED ($200) DOLLARS,

29   OR TO UNDERGO AN IMPRISONMENT OF NOT MORE THAN [THREE (3)] SIX

30   (6) MONTHS, OR BOTH, IN THE DISCRETION OF THE COURT.

I APP. 756

1    SECTION 1820.  POLICE OFFICERS AT POLLING PLACES.--ANY POLICE

2    OFFICER IN COMMISSION, WHETHER IN UNIFORM OR IN CITIZEN'S

3    CLOTHES, WHO SHALL BE WITHIN ONE HUNDRED (100) FEET OF A POLLING

4    PLACE DURING THE CONDUCT OF ANY PRIMARY OR ELECTION, EXCEPT IN

5    THE EXERCISE OF HIS PRIVILEGE OF VOTING OR FOR THE PURPOSE OF

6    SERVING WARRANTS, OR IN ACCORDANCE WITH THE PROVISIONS OF THE

7    EXCEPTION SET FORTH IN SECTION 1207 OF THIS ACT WHERE THE POLICE

8    STATION OR HEADQUARTERS IS LOCATED IN THE SAME BUILDING OR ON

9    THE PREMISES WHERE THE POLLING PLACE IS LOCATED OR UNLESS CALLED

10   UPON TO PRESERVE THE PEACE, AS PROVIDED BY THIS ACT, SHALL BE

11   GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE

12   SENTENCED TO PAY A FINE NOT EXCEEDING [FIVE HUNDRED ($500)] ONE

13   THOUSAND ($1,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT

14   MORE THAN [ONE (1) YEAR] TWO (2) YEARS, OR BOTH, IN THE

15   DISCRETION OF THE COURT.

16   SECTION 1821.  PEACE OFFICER; FAILURE TO QUELL DISTURBANCES

17   AT POLLS; HINDERING OR DELAYING ELECTION OFFICERS AND OTHERS.--

18   ANY MAYOR, CHIEF BURGESS, SHERIFF, DEPUTY SHERIFF, CONSTABLE,

19   DEPUTY CONSTABLE, POLICE OFFICER OR OTHER PEACE OFFICER WHO

20   SHALL NEGLECT OR REFUSE TO CLEAR AN AVENUE TO THE DOOR OF ANY

21   POLLING PLACE WHICH IS OBSTRUCTED IN SUCH A WAY AS TO PREVENT

22   ELECTORS FROM APPROACHING, OR WHO SHALL NEGLECT OR REFUSE TO

23   MAINTAIN ORDER AND QUELL ANY DISTURBANCE IF SUCH ARISES AT ANY

24   POLLING PLACE UPON THE DAY OF ANY PRIMARY OR ELECTION, WHEN

25   CALLED UPON SO TO DO BY ANY ELECTION OFFICER OR ANY THREE

26   QUALIFIED ELECTORS OF THE ELECTION DISTRICT, OR WHO SHALL

27   WILFULLY HINDER OR DELAY, OR ATTEMPT TO HINDER OR DELAY, ANY

28   JUDGE, INSPECTOR OR CLERK OF ELECTION, MACHINE INSPECTOR OR

29   OVERSEER IN THE PERFORMANCE OF ANY DUTY UNDER THIS ACT, SHALL BE

30   GUILTY OF A MISDEMEANOR IN OFFICE, AND, UPON CONVICTION THEREOF,

1  SHALL BE SENTENCED TO PAY A FINE NOT EXCEEDING [ONE THOUSAND

2  ($1,000)] TWO THOUSAND ($2,000) DOLLARS, OR TO UNDERGO AN

3  IMPRISONMENT OF NOT MORE THAN [ONE (1) YEAR] TWO (2) YEARS, OR

4  BOTH, IN THE DISCRETION OF THE COURT.

5     SECTION 1823.  ELECTION OFFICERS PERMITTING UNREGISTERED

6  ELECTORS TO VOTE; CHALLENGES; REFUSING TO PERMIT QUALIFIED

7  ELECTORS TO VOTE.--ANY JUDGE OR INSPECTOR OF ELECTION WHO

8  PERMITS ANY PERSON TO VOTE AT ANY PRIMARY OR ELECTION WHO IS NOT

9  REGISTERED IN ACCORDANCE WITH LAW, EXCEPT A PERSON IN ACTUAL

10 MILITARY SERVICE OR A PERSON AS TO WHOM A COURT OF COMPETENT

11 JURISDICTION HAS ORDERED THAT HE SHALL BE PERMITTED TO VOTE, OR

12 WHO PERMITS ANY REGISTERED ELECTOR TO VOTE KNOWING THAT SUCH

13 REGISTERED ELECTOR IS NOT QUALIFIED TO VOTE, WHETHER OR NOT SUCH

14 PERSON HAS BEEN CHALLENGED, OR WHO PERMITS ANY PERSON WHO HAS

15 BEEN LAWFULLY CHALLENGED TO VOTE AT ANY PRIMARY OR ELECTION

16 WITHOUT REQUIRING THE PROOF OF THE RIGHT OF SUCH PERSON TO VOTE

17 WHICH IS REQUIRED BY LAW, OR WHO REFUSES TO PERMIT ANY DULY

18 REGISTERED AND QUALIFIED ELECTOR TO VOTE AT ANY PRIMARY OR

19 ELECTION, WITH THE KNOWLEDGE THAT SUCH ELECTOR IS ENTITLED TO

20 VOTE, SHALL BE GUILTY OF A FELONY OF THE THIRD DEGREE, AND, UPON

21 CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT

22 EXCEEDING [FIFTEEN THOUSAND ($15,000)] THIRTY THOUSAND ($30,000)

23 DOLLARS, AND TO UNDERGO AN IMPRISONMENT OF NOT MORE THAN [SEVEN

24 (7)] FOURTEEN (14) YEARS, OR BOTH.

25     SECTION 1824.  ELECTION OFFICERS REFUSING TO PERMIT ELECTOR

26 TO VOTE IN PROPER PARTY AT PRIMARIES.--ANY JUDGE, INSPECTOR OR

27 CLERK OF ELECTION WHO REFUSES TO PERMIT AN ELECTOR AT ANY

28 PRIMARY AT WHICH BALLOTS ARE USED TO RECEIVE THE BALLOT OF THE

29 PARTY WITH WHICH HE IS ENROLLED, OR WHO GIVES TO ANY SUCH

30 ELECTOR THE BALLOT OF ANY PARTY IN WHICH HE IS NOT ENROLLED, OR

I APP. 758

1  ANY JUDGE, OR INSPECTOR OF ELECTION, OR MACHINE INSPECTOR WHO,

2  AT ANY PRIMARY AT WHICH VOTING MACHINES ARE USED, ADJUSTS ANY

3  VOTING MACHINE ABOUT TO BE USED BY AN ELECTOR SO AS NOT TO

4  PERMIT HIM TO VOTE FOR THE CANDIDATES OF THE PARTY IN WHICH HE

5  IS ENROLLED, OR SO AS TO PERMIT HIM TO VOTE FOR THE CANDIDATES

6  OF ANY PARTY IN WHICH HE IS NOT ENROLLED, SHALL BE GUILTY OF A

7  MISDEMEANOR OF THE FIRST DEGREE, AND, UPON CONVICTION THEREOF,

8  SHALL BE SENTENCED TO PAY A FINE NOT EXCEEDING [TEN THOUSAND

9  ($10,000)] TWENTY THOUSAND ($20,000) DOLLARS, OR TO UNDERGO AN

10 IMPRISONMENT OF NOT MORE THAN [FIVE (5)] TEN (10) YEARS, OR

11 BOTH, IN THE DISCRETION OF THE COURT.

12     SECTION 1825.  FRAUDS BY ELECTION OFFICERS.--ANY JUDGE,

13 INSPECTOR OR CLERK OF ELECTION OR MACHINE INSPECTOR WHO SHALL BE

14 GUILTY OF ANY WILFUL FRAUD IN THE CONDUCT OF HIS DUTIES AT A

15 PRIMARY OR ELECTION, AND ANY PERSON WHO SHALL MAKE A FALSE

16 RETURN OF THE VOTES CAST AT ANY PRIMARY OR ELECTION, OR WHO

17 SHALL DEPOSIT FRAUDULENT BALLOTS IN THE BALLOT BOX OR CERTIFY AS

18 CORRECT A RETURN OF BALLOTS IN THE BALLOT BOX WHICH HE KNOWS TO

19 BE FRAUDULENT, OR WHO SHALL REGISTER FRAUDULENT VOTES UPON ANY

20 VOTING MACHINE OR CERTIFY AS CORRECT A RETURN OF VOTES CAST UPON

21 ANY VOTING MACHINE WHICH HE KNOWS TO BE FRAUDULENTLY REGISTERED

22 THEREON, OR WHO SHALL MAKE ANY FALSE ENTRIES IN THE DISTRICT

23 REGISTER, OR WHO SHALL FAIL TO INSERT IN THE VOTING CHECK LIST

24 THE VOTER'S CERTIFICATE OF ANY ELECTOR ACTUALLY VOTING AT ANY

25 PRIMARY OR ELECTION, OR WHO SHALL FAIL TO RECORD VOTING

26 INFORMATION AS REQUIRED HEREIN, OR WHO SHALL FAIL TO INSERT IN

27 THE NUMBERED LISTS OF VOTERS THE NAME OF ANY PERSON ACTUALLY

28 VOTING, OR WHO SHALL WILFULLY DESTROY OR ALTER ANY BALLOT,

29 VOTER'S CERTIFICATE, OR REGISTRATION CARD CONTAINED IN ANY

30 DISTRICT REGISTER, OR WHO SHALL WILFULLY TAMPER WITH ANY VOTING

1  MACHINE, OR WHO SHALL PREPARE OR INSERT IN THE VOTING CHECK LIST
2  ANY FALSE VOTER'S CERTIFICATES NOT PREPARED BY OR FOR AN ELECTOR
3  ACTUALLY VOTING AT SUCH PRIMARY OR ELECTION, FOR THE PURPOSE OF
4  CONCEALING THE DESTRUCTION OR REMOVAL OF ANY VOTER'S
5  CERTIFICATE, OR FOR THE PURPOSE OF CONCEALING THE DEPOSIT OF
6  FRAUDULENT BALLOTS IN THE BALLOT BOX, OR THE REGISTERING OF
7  FRAUDULENT VOTES UPON ANY VOTING MACHINE OR OF AIDING IN THE
8  PERPETRATION OF ANY SUCH FRAUD, OR WHO SHALL FAIL TO RETURN TO
9  THE COUNTY BOARD OF ELECTION FOLLOWING ANY PRIMARY OR ELECTION
10 ANY KEYS OF A VOTING MACHINE, BALLOT BOX, GENERAL OR DUPLICATE
11 RETURN SHEET, TALLY PAPER, OATHS OF ELECTION OFFICERS,
12 AFFIDAVITS OF ELECTORS AND OTHERS, RECORD OF ASSISTED VOTERS,
13 NUMBERED LIST OF VOTERS, DISTRICT REGISTER, VOTING CHECK LIST,
14 UNUSED, SPOILED AND CANCELLED BALLOTS, BALLOTS DEPOSITED,
15 WRITTEN OR AFFIXED IN OR UPON A VOTING MACHINE, OR ANY
16 CERTIFICATE, OR ANY OTHER PAPER OR RECORD REQUIRED TO BE
17 RETURNED UNDER THE PROVISIONS OF THIS ACT; OR WHO SHALL CONSPIRE
18 WITH OTHERS TO COMMIT ANY OF THE OFFENSES HEREIN MENTIONED, OR
19 IN ANY MANNER TO PREVENT A FREE AND FAIR PRIMARY OR ELECTION,
20 SHALL BE GUILTY OF A FELONY OF THE THIRD DEGREE, AND, UPON
21 CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT
22 EXCEEDING [FIFTEEN THOUSAND ($15,000)] THIRTY THOUSAND ($30,000)
23 DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT MORE THAN [SEVEN
24 (7)] FOURTEEN (14) YEARS, OR BOTH, IN THE DISCRETION OF THE
25 COURT.
26     SECTION 1827.  INTERFERENCE WITH PRIMARIES AND ELECTIONS;
27 FRAUDS; CONSPIRACY.--IF ANY PERSON SHALL PREVENT OR ATTEMPT TO
28 PREVENT ANY ELECTION OFFICERS FROM HOLDING ANY PRIMARY OR
29 ELECTION, UNDER THE PROVISIONS OF THIS ACT, OR SHALL USE OR
30 THREATEN ANY VIOLENCE TO ANY SUCH OFFICER; OR SHALL INTERRUPT OR

I APP. 760

1   IMPROPERLY INTERFERE WITH HIM IN THE EXECUTION OF HIS DUTY; OR

2   SHALL BLOCK UP OR ATTEMPT TO BLOCK UP THE AVENUE TO THE DOOR OF

3   ANY POLLING PLACE; OR SHALL USE OR PRACTICE ANY INTIMIDATION,

4   THREATS, FORCE OR VIOLENCE WITH DESIGN TO INFLUENCE UNDULY OR

5   OVERAWE ANY ELECTOR, OR TO PREVENT HIM FROM VOTING OR RESTRAIN

6   HIS FREEDOM OF CHOICE; OR SHALL PREPARE OR PRESENT TO ANY

7   ELECTION OFFICER A FRAUDULENT VOTER'S CERTIFICATE NOT SIGNED IN

8   THE POLLING PLACE BY THE ELECTOR WHOSE CERTIFICATE IT PURPORTS

9   TO BE; OR SHALL DEPOSIT FRAUDULENT BALLOTS IN THE BALLOT BOX; OR

10  SHALL REGISTER FRAUDULENT VOTES UPON ANY VOTING MACHINE; OR

11  SHALL TAMPER WITH ANY DISTRICT REGISTER, VOTING CHECK LIST,

12  NUMBERED LISTS OF VOTERS, BALLOT BOX OR VOTING MACHINE; OR SHALL

13  CONSPIRE WITH OTHERS TO COMMIT ANY OF THE OFFENSES HEREIN

14  MENTIONED, OR IN ANY MANNER TO PREVENT A FREE AND FAIR PRIMARY

15  OR ELECTION, HE SHALL BE GUILTY OF A FELONY OF THE THIRD DEGREE,

16  AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE

17  NOT EXCEEDING [FIFTEEN THOUSAND ($15,000)] TWENTY THOUSAND

18  ($20,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT MORE

19  THAN [SEVEN (7)] FOURTEEN (14) YEARS, OR BOTH, IN THE DISCRETION

20  OF THE COURT.

21      SECTION 1828.  PERSONS INTERFERING IN OTHER DISTRICTS.--ANY

22  PERSON WHO SHALL ON THE DAY OF ANY PRIMARY OR ELECTION VISIT ANY

23  POLLING PLACE AT WHICH HE IS NOT ENTITLED TO VOTE AND AT WHICH

24  HE IS NOT ENTITLED TO BE PRESENT UNDER ANY PROVISION OF THIS

25  ACT, AND SHALL USE ANY INTIMIDATION OR VIOLENCE FOR THE PURPOSE

26  OF PREVENTING ANY ELECTION OFFICER FROM PERFORMING THE DUTIES

27  REQUIRED OF HIM BY THIS ACT, OR FOR THE PURPOSE OF PREVENTING

28  ANY QUALIFIED ELECTOR FROM EXERCISING HIS RIGHT TO VOTE OR FROM

29  EXERCISING HIS RIGHT TO CHALLENGE ANY PERSON OFFERING TO VOTE,

30  OR FOR THE PURPOSE OF INFLUENCING THE VOTE OF ANY ELECTOR, HE

1  SHALL BE GUILTY OF A FELONY OF THE THIRD DEGREE, AND, UPON

2  CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT

3  EXCEEDING [FIFTEEN THOUSAND ($15,000)] THIRTY THOUSAND ($30,000)

4  DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT MORE THAN [SEVEN

5  (7)] FOURTEEN (14) YEARS, OR BOTH, IN THE DISCRETION OF THE

6  COURT.

7      SECTION 1829.  ASSAULT AND BATTERY AT POLLS.--ANY PERSON WHO

8  SHALL UNLAWFULLY STRIKE, WOUND OR COMMIT AN ASSAULT AND BATTERY

9  UPON THE PERSON OF ANY ELECTOR AT OR NEAR THE POLLING PLACE

10  DURING THE TIME OF ANY PRIMARY OR ELECTION SHALL BE GUILTY OF A

11  MISDEMEANOR OF THE FIRST DEGREE, AND, UPON CONVICTION THEREOF,

12  SHALL BE SENTENCED TO PAY A FINE NOT EXCEEDING [TEN THOUSAND

13  ($10,000)] TWENTY THOUSAND ($20,000) DOLLARS, OR TO UNDERGO AN

14  IMPRISONMENT OF NOT MORE THAN [FIVE (5)] TEN (10) YEARS, OR

15  BOTH, IN THE DISCRETION OF THE COURT.

16      SECTION 1830.  UNLAWFUL ASSISTANCE IN VOTING.--ANY ELECTOR AT

17  ANY PRIMARY OR ELECTION WHO SHALL ALLOW HIS BALLOT OR THE FACE

18  OF THE VOTING MACHINE VOTED BY HIM TO BE SEEN BY ANY PERSON WITH

19  THE APPARENT INTENTION OF LETTING IT BE KNOWN HOW HE IS ABOUT TO

20  VOTE; OR IN DISTRICTS IN WHICH BALLOTS ARE USED, SHALL CAST OR

21  ATTEMPT TO CAST ANY OTHER THAN THE OFFICIAL BALLOT WHICH HAS

22  BEEN GIVEN TO HIM BY THE PROPER ELECTION OFFICER; OR WHO,

23  WITHOUT HAVING MADE THE DECLARATION UNDER OATH OR AFFIRMATION

24  REQUIRED BY SECTION 1218 OF THIS ACT, OR WHEN THE DISABILITY

25  WHICH HE DECLARED BEFORE ANY REGISTRATION COMMISSION NO LONGER

26  EXISTS, SHALL PERMIT ANOTHER TO ACCOMPANY HIM INTO THE VOTING

27  COMPARTMENT OR VOTING MACHINE BOOTH, OR TO MARK HIS BALLOT OR

28  PREPARE THE VOTING MACHINE FOR VOTING BY HIM; OR WHO SHALL MARK

29  HIS BALLOT OR PREPARE THE VOTING MACHINE FOR VOTING WHILE

30  ANOTHER IS UNLAWFULLY PRESENT IN THE VOTING MACHINE COMPARTMENT

I APP. 762

1   OR VOTING MACHINE BOOTH WITH HIM; OR WHO SHALL STATE FALSELY TO

2   ANY ELECTION OFFICER THAT BECAUSE OF ILLITERACY HE IS UNABLE TO

3   READ THE NAMES ON THE BALLOT OR BALLOT LABELS OR THAT BY REASON

4   OF PHYSICAL DISABILITY HE CANNOT SEE OR MARK THE BALLOT OR ENTER

5   THE VOTING COMPARTMENT WITHOUT ASSISTANCE OR THAT HE CANNOT SEE

6   OR OPERATE THE VOTING MACHINE OR ENTER THE VOTING MACHINE BOOTH

7   WITHOUT ASSISTANCE; OR WHO SHALL STATE, AS HIS REASON FOR

8   REQUIRING ASSISTANCE, A DISABILITY FROM WHICH HE DOES NOT

9   SUFFER; OR ANY PERSON WHO SHALL GO INTO THE VOTING COMPARTMENT

10  OR VOTING MACHINE BOOTH WITH ANOTHER WHILE VOTING OR BE PRESENT

11  THEREIN WHILE ANOTHER IS VOTING, OR MARK THE BALLOT OF ANOTHER

12  OR PREPARE THE VOTING MACHINE FOR VOTING WITH ANOTHER, EXCEPT IN

13  STRICT ACCORDANCE WITH THE PROVISIONS OF THIS ACT; OR ANY PERSON

14  WHO SHALL INTERFERE WITH ANY ELECTOR WHEN INSIDE THE ENCLOSED

15  SPACE OR WHEN MARKING HIS BALLOT, OR PREPARING THE VOTING

16  MACHINE FOR VOTING, OR WHO SHALL ENDEAVOR TO INDUCE ANY ELECTOR

17  BEFORE DEPOSITING HIS BALLOT TO SHOW HOW HE MARKS OR HAS MARKED

18  HIS BALLOT; OR ANY PERSON GIVING ASSISTANCE WHO SHALL ATTEMPT TO

19  INFLUENCE THE VOTE OF THE ELECTOR WHOM HE IS ASSISTING OR WHO

20  SHALL MARK A BALLOT OR PREPARE A VOTING MACHINE FOR VOTING IN

21  ANY OTHER WAY THAN THAT REQUESTED BY THE VOTER WHOM HE IS

22  ASSISTING, OR WHO SHALL DISCLOSE TO ANYONE THE CONTENTS OF ANY

23  BALLOT WHICH HAS BEEN MARKED OR ANY VOTING MACHINE WHICH HAS

24  BEEN PREPARED FOR VOTING WITH HIS ASSISTANCE, EXCEPT WHEN

25  REQUIRED TO DO SO IN ANY LEGAL PROCEEDING, SHALL BE GUILTY OF A

26  MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO

27  PAY A FINE NOT EXCEEDING [ONE THOUSAND ($1,000)] TWO THOUSAND

28  ($2,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT MORE THAN

29  [ONE (1) YEAR] TWO (2) YEARS, OR BOTH, IN THE DISCRETION OF THE

30  COURT.

1    SECTION 1831.  ELECTION OFFICERS PERMITTING UNLAWFUL

2  ASSISTANCE.--ANY ELECTION OFFICER WHO SHALL PERMIT A VOTER TO BE

3  ACCOMPANIED BY ANOTHER INTO THE VOTING COMPARTMENT OR VOTING

4  MACHINE BOOTH WHEN THE REGISTRATION CARD OF SUCH PERSON CONTAINS

5  NO DECLARATION THAT SUCH PERSON REQUIRES ASSISTANCE, OR WHEN

6  SUCH PERSON HAS NOT MADE, UNDER OATH OR AFFIRMATION, THE

7  STATEMENT REQUIRED BY SECTION 1218 OF THIS ACT, OR WHEN SUCH

8  ELECTION OFFICER KNOWS THAT THE DISABILITY WHICH THE ELECTOR

9  DECLARED BEFORE ANY REGISTRATION COMMISSION NO LONGER EXISTS, OR

10  WHO SHALL PERMIT ANY PERSON TO ACCOMPANY AN ELECTOR INTO THE

11  VOTING COMPARTMENT OR VOTING MACHINE BOOTH, EXCEPT AS PROVIDED

12  BY THIS ACT, SHALL BE GUILTY OF A MISDEMEANOR, AND, UPON

13  CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT

14  EXCEEDING [ONE THOUSAND ($1,000)] TWO THOUSAND ($2,000) DOLLARS,

15  OR TO UNDERGO AN IMPRISONMENT OF NOT MORE THAN [ONE (1) YEAR]

16  TWO (2) YEARS, OR BOTH, IN THE DISCRETION OF THE COURT.

17    SECTION 1832.  FAILURE TO KEEP AND RETURN RECORD OF ASSISTED

18  VOTERS.--ANY JUDGE OF ELECTION WHO SHALL FAIL TO RECORD, AS

19  REQUIRED BY SECTION 1218 (C) OF THIS ACT, THE NAME OF EACH

20  ELECTOR WHO RECEIVED ASSISTANCE OR WHO IS ACCOMPANIED BY ANOTHER

21  INTO THE VOTING COMPARTMENT OR VOTING MACHINE BOOTH; OR WHO

22  SHALL INSERT IN THE RECORD OF ASSISTED VOTERS THE NAME OF ANY

23  ELECTOR WHO DOES NOT RECEIVE ASSISTANCE OR IS NOT ACCOMPANIED BY

24  ANOTHER INTO THE VOTING COMPARTMENT OR VOTING MACHINE BOOTH; OR

25  WHO SHALL FAIL TO RECORD THE EXACT DISABILITY OF ANY ASSISTED

26  ELECTOR WHICH MAKES THE ASSISTANCE NECESSARY, OR SHALL RECORD IN

27  RESPECT OF ANY ASSISTED ELECTOR A DISABILITY, OTHER THAN THAT

28  STATED BY THE ELECTOR; OR WHO SHALL FAIL TO RECORD THE NAME OF

29  EACH PERSON RENDERING ASSISTANCE TO AN ELECTOR AS PRESCRIBED BY

30  THIS ACT; OR WHO SHALL KNOWINGLY RECORD AS THE NAME OF SUCH

I APP. 764

1   PERSON GIVING ASSISTANCE A NAME WHICH IS NOT THE NAME OF SUCH

2   PERSON; OR WHO SHALL FAIL OR NEGLECT TO RETURN THE RECORD OF

3   ASSISTED VOTERS TO THE COUNTY BOARD OF ELECTIONS AS REQUIRED BY

4   THIS ACT, SHALL BE GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION

5   THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT EXCEEDING [ONE

6   THOUSAND ($1,000)] TWO THOUSAND ($2,000) DOLLARS, OR TO UNDERGO

7   AN IMPRISONMENT OF NOT LESS THAN [TWO (2)] FOUR (4) MONTHS NOR

8   MORE THAN [TWO (2)] FOUR (4) YEARS, OR BOTH, IN THE DISCRETION

9   OF THE COURT.

10      SECTION 1833.  UNLAWFUL VOTING.--ANY PERSON WHO VOTES OR

11  ATTEMPTS TO VOTE AT ANY PRIMARY OR ELECTION, KNOWING THAT HE

12  DOES NOT POSSESS ALL THE QUALIFICATIONS OF AN ELECTOR AT SUCH

13  PRIMARY OR ELECTION, AS SET FORTH IN THIS ACT, SHALL BE GUILTY

14  OF A MISDEMEANOR OF THE FIRST DEGREE, AND, UPON CONVICTION

15  THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT EXCEEDING [TEN

16  THOUSAND ($10,000)] TWENTY THOUSAND ($20,000) DOLLARS, OR TO

17  UNDERGO AN IMPRISONMENT OF NOT MORE THAN [FIVE (5)] TEN (10)

18  YEARS, OR BOTH, IN THE DISCRETION OF THE COURT.

19      SECTION 1834.  ELECTOR VOTING BALLOT OF WRONG PARTY AT

20  PRIMARY.--ANY ELECTOR WHO SHALL WILFULLY VOTE AT ANY PRIMARY THE

21  BALLOT OF A PARTY IN WHICH HE IS NOT ENROLLED, IN VIOLATION OF

22  THE PROVISIONS OF THIS ACT, SHALL BE GUILTY OF A MISDEMEANOR OF

23  THE SECOND DEGREE, AND, UPON CONVICTION THEREOF, SHALL BE

24  SENTENCED TO PAY A FINE NOT EXCEEDING [FIVE THOUSAND ($5,000)]

25  TEN THOUSAND ($10,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF

26  NOT MORE THAN [TWO (2)] FOUR (4) YEARS, OR BOTH, IN THE

27  DISCRETION OF THE COURT.

28      SECTION 1835.  REPEAT VOTING AT ELECTIONS.--IF ANY PERSON

29  SHALL VOTE IN MORE THAN ONE ELECTION DISTRICT, OR OTHERWISE

30  FRAUDULENTLY VOTE MORE THAN ONCE AT THE SAME PRIMARY OR

I APP. 765

1  ELECTION, OR SHALL VOTE A BALLOT OTHER THAN THE BALLOT ISSUED TO

2  HIM BY THE ELECTION OFFICERS, OR SHALL ADVISE OR PROCURE ANOTHER

3  SO TO DO, HE SHALL BE GUILTY OF A FELONY OF THE THIRD DEGREE,

4  AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE

5  NOT EXCEEDING [FIFTEEN THOUSAND ($15,000)] THIRTY THOUSAND

6  ($30,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT MORE

7  THAN [SEVEN (7)] FOURTEEN (14) YEARS, OR BOTH, IN THE DISCRETION

8  OF THE COURT.

9      SECTION 1836.  REMOVING BALLOTS.--ANY PERSON REMOVING ANY

10  BALLOT FROM ANY BOOK OF OFFICIAL BALLOTS, EXCEPT IN THE MANNER

11  PROVIDED BY THIS ACT, SHALL BE GUILTY OF A MISDEMEANOR OF THE

12  SECOND DEGREE, AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED

13  TO PAY A FINE NOT EXCEEDING [FIVE THOUSAND ($5,000)] TEN

14  THOUSAND ($10,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT

15  MORE THAN [TWO (2)] FOUR (4) YEARS, OR BOTH, IN THE DISCRETION

16  OF THE COURT.

17      SECTION 1837.  COMMISSIONERS TO TAKE SOLDIERS' VOTES.--ANY

18  COMMISSIONER APPOINTED BY OR UNDER THE PROVISIONS OF ARTICLE

19  XIII OF THIS ACT WHO SHALL KNOWINGLY VIOLATE HIS DUTY OR

20  KNOWINGLY OMIT OR FAIL TO DO HIS DUTY THEREUNDER OR VIOLATE ANY

21  PART OF HIS OATH, SHALL BE GUILTY OF PERJURY, AND, UPON

22  CONVICTION THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT

23  EXCEEDING [ONE THOUSAND ($1,000)] TWO THOUSAND ($2,000) DOLLARS,

24  OR TO UNDERGO AN IMPRISONMENT OF NOT MORE THAN [ONE (1) YEAR]

25  TWO (2) YEARS, OR BOTH, IN THE DISCRETION OF THE COURT.

26      SECTION 1838.  FRAUDULENT VOTING BY SOLDIERS.--ANY PERSON WHO

27  SHALL VOTE OR ATTEMPT TO VOTE AT ANY ELECTION BY ELECTORS IN

28  MILITARY SERVICE UNDER THE PROVISIONS OF ARTICLE XIII OF THIS

29  ACT, NOT BEING QUALIFIED TO VOTE AT SUCH ELECTION, SHALL BE

30  GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE

I APP. 766

1   SENTENCED TO PAY A FINE NOT EXCEEDING [ONE THOUSAND ($1,000)]

2   TWO THOUSAND ($2,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF

3   NOT MORE THAN [ONE (1) YEAR] TWO (2) YEARS, OR BOTH, IN THE

4   DISCRETION OF THE COURT.

5       SECTION 1839.  BRIBERY AT ELECTIONS.--ANY PERSON WHO SHALL,

6   DIRECTLY OR INDIRECTLY, GIVE OR PROMISE OR OFFER TO GIVE ANY

7   GIFT OR REWARD IN MONEY, GOODS OR OTHER VALUABLE THING TO ANY

8   PERSON, WITH INTENT TO INDUCE HIM TO VOTE OR REFRAIN FROM VOTING

9   FOR ANY PARTICULAR CANDIDATE OR CANDIDATES OR FOR OR AGAINST ANY

10  CONSTITUTIONAL AMENDMENT OR OTHER QUESTION AT ANY PRIMARY OR

11  ELECTION; OR WHO SHALL, DIRECTLY OR INDIRECTLY, PROCURE FOR OR

12  OFFER OR PROMISE TO PROCURE FOR SUCH PERSON ANY SUCH GIFT OR

13  REWARD WITH THE INTENT AFORESAID; OR, WHO WITH THE INTENT TO

14  INFLUENCE OR INTIMIDATE SUCH PERSON TO GIVE HIS VOTE OR TO

15  REFRAIN FROM GIVING HIS VOTE FOR ANY PARTICULAR CANDIDATE OR

16  CANDIDATES OR FOR OR AGAINST ANY CONSTITUTIONAL AMENDMENT OR

17  OTHER QUESTION AT ANY PRIMARY OR ELECTION, SHALL GIVE TO OR

18  OBTAIN FOR OR ASSIST IN OBTAINING FOR OR OFFER OR PROMISE TO

19  GIVE TO OR OBTAIN FOR OR ASSIST IN OBTAINING FOR SUCH PERSON ANY

20  OFFICE, PLACE, APPOINTMENT OR EMPLOYMENT, PUBLIC OR PRIVATE, OR

21  THREATEN SUCH PERSON WITH DISMISSAL OR DISCHARGE FROM ANY

22  OFFICE, PLACE, APPOINTMENT OR EMPLOYMENT, PUBLIC OR PRIVATE,

23  THEN HELD BY HIM, SHALL BE GUILTY OF A FELONY OF THE THIRD

24  DEGREE, AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED TO PAY

25  A FINE NOT EXCEEDING [FIFTEEN THOUSAND ($15,000)] THIRTY

26  THOUSAND ($30,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT

27  MORE THAN [SEVEN (7)] FOURTEEN (14) YEARS, OR BOTH, IN THE

28  DISCRETION OF THE COURT.

29      SECTION 1840.  RECEIPTS AND DISBURSEMENTS OF PRIMARY AND

30  ELECTION EXPENSES BY PERSONS OTHER THAN CANDIDATES AND

I APP. 767

1  TREASURERS.--ANY MEMBER OF A POLITICAL COMMITTEE WHO SHALL

2  RECEIVE OR DISBURSE ANY MONEY OR INCUR ANY LIABILITY FOR PRIMARY

3  OR ELECTION EXPENSES, EXCEPT THROUGH THE TREASURER OF SUCH

4  POLITICAL COMMITTEE, AND ANY PERSON NOT A CANDIDATE OR MEMBER OF

5  A POLITICAL COMMITTEE WHO SHALL RECEIVE OR DISBURSE ANY MONEY OR

6  INCUR ANY LIABILITY FOR PRIMARY OR ELECTION EXPENSES, SHALL BE

7  GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE

8  SENTENCED TO PAY A FINE NOT EXCEEDING [ONE THOUSAND ($1,000)]

9  TWO THOUSAND ($2,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF

10  NOT LESS THAN [ONE (1) MONTH] TWO (2) MONTHS NOR MORE THAN [TWO

11  (2)] FOUR (4) YEARS, OR BOTH, IN THE DISCRETION OF THE COURT.

12     SECTION 1841.  RECEIPTS OF PRIMARY AND ELECTION EXPENSES BY

13  UNAUTHORIZED PERSONS.--ANY PERSON OR ANY POLITICAL COMMITTEE WHO

14  RECEIVES MONEY ON BEHALF OF ANY CANDIDATE WITHOUT BEING

15  AUTHORIZED TO DO SO UNDER THE PROVISIONS OF SECTION 1623, SHALL

16  BE GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL

17  BE SENTENCED TO PAY A FINE NOT EXCEEDING [FIVE THOUSAND DOLLARS

18  ($5,000)] TEN THOUSAND DOLLARS ($10,000), OR TO UNDERGO AN

19  IMPRISONMENT OF NOT LESS THAN [ONE (1) MONTH] TWO (2) MONTHS NOR

20  MORE THAN [TWO (2)] FOUR (4) YEARS, OR BOTH, IN THE DISCRETION

21  OF THE COURT.

22     SECTION 1843.  CONTRIBUTIONS BY CORPORATIONS OR

23  UNINCORPORATED ASSOCIATIONS.--ANY CORPORATION OR UNINCORPORATED

24  ASSOCIATION, WHICH SHALL PAY, GIVE OR LEND OR AGREE TO PAY, GIVE

25  OR LEND ANY MONEY BELONGING TO SUCH CORPORATION OR

26  UNINCORPORATED ASSOCIATION OR IN ITS CUSTODY OR CONTROL, IN

27  VIOLATION OF THE PROVISIONS OF SECTION 1633, SHALL BE GUILTY OF

28  A MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED

29  TO PAY A FINE OF NOT LESS THAN [ONE THOUSAND DOLLARS ($1,000)]

30  TWO THOUSAND DOLLARS ($2,000) NOR MORE THAN [TEN THOUSAND

1  DOLLARS ($10,000)] TWENTY THOUSAND DOLLARS ($20,000). ANY

2  DIRECTOR, OFFICER, AGENT OR EMPLOYE OF ANY CORPORATION OR

3  UNINCORPORATED ASSOCIATION WHO SHALL ON BEHALF OF SUCH

4  CORPORATION OR UNINCORPORATED ASSOCIATION PAY, GIVE OR LEND OR

5  AUTHORIZE TO BE PAID, GIVEN OR LENT ANY MONEY BELONGING TO SUCH

6  CORPORATION OR UNINCORPORATED ASSOCIATION OR IN ITS CUSTODY OR

7  CONTROL IN VIOLATION OF THE PROVISIONS OF SECTION 1633, SHALL BE

8  GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE

9  SENTENCED TO PAY A FINE NOT EXCEEDING [TEN THOUSAND DOLLARS

10 ($10,000)] TWENTY THOUSAND DOLLARS ($20,000), OR TO UNDERGO AN

11 IMPRISONMENT OF NOT LESS THAN [ONE (1) MONTH] TWO (2) MONTHS NOR

12 MORE THAN [TWO (2)] FOUR (4) YEARS, OR BOTH, IN THE DISCRETION

13 OF THE COURT.

14    SECTION 1845.  FAILURE TO FILE EXPENSE ACCOUNT.--ANY

15 CANDIDATE OR TREASURER OF A POLITICAL COMMITTEE OR PERSON ACTING

16 AS SUCH TREASURER WHO SHALL FAIL TO FILE AN ACCOUNT OF PRIMARY

17 OR ELECTION EXPENSES, AS REQUIRED BY THIS ACT, SHALL BE GUILTY

18 OF A MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE

19 SENTENCED TO PAY A FINE NOT EXCEEDING [FIVE THOUSAND DOLLARS

20 ($5,000)] TEN THOUSAND DOLLARS ($10,000), OR TO UNDERGO AN

21 IMPRISONMENT OF NOT LESS THAN [ONE (1) MONTH] TWO (2) MONTHS NOR

22 MORE THAN [TWO (2)] FOUR (4) YEARS, OR BOTH, IN THE DISCRETION

23 OF THE COURT.

24    SECTION 1847.  PROHIBITING DURESS AND INTIMIDATION OF VOTERS

25 AND INTERFERENCE WITH THE FREE EXERCISE OF THE ELECTIVE

26 FRANCHISE.--ANY PERSON OR CORPORATION WHO, DIRECTLY OR

27 INDIRECTLY--(A) USES OR THREATENS TO USE ANY FORCE, VIOLENCE OR

28 RESTRAINT, OR INFLICTS OR THREATENS TO INFLICT ANY INJURY,

29 DAMAGE, HARM OR LOSS, OR IN ANY OTHER MANNER PRACTICES

30 INTIMIDATION OR COERCION UPON OR AGAINST ANY PERSON, IN ORDER TO

1  INDUCE OR COMPEL SUCH PERSON TO VOTE OR REFRAIN FROM VOTING AT
2  ANY ELECTION, OR TO VOTE OR REFRAIN FROM VOTING FOR OR AGAINST
3  ANY PARTICULAR PERSON, OR FOR OR AGAINST ANY QUESTION SUBMITTED
4  TO VOTERS AT SUCH ELECTION, OR TO PLACE OR CAUSE TO BE PLACED OR
5  REFRAIN FROM PLACING OR CAUSING TO BE PLACED HIS NAME UPON A
6  REGISTER OF VOTERS, OR ON ACCOUNT OF SUCH PERSON HAVING VOTED OR
7  REFRAINED FROM VOTING AT SUCH ELECTION, OR HAVING VOTED OR
8  REFRAINED FROM VOTING FOR OR AGAINST ANY PARTICULAR PERSON OR
9  PERSONS OR FOR OR AGAINST ANY QUESTION SUBMITTED TO VOTERS AT
10 SUCH ELECTION, OR HAVING REGISTERED OR REFRAINED FROM
11 REGISTERING AS A VOTER; OR (B) BY ABDUCTION, DURESS OR COERCION,
12 OR ANY FORCIBLE OR FRAUDULENT DEVICE OR CONTRIVANCE, WHATEVER,
13 IMPEDES, PREVENTS, OR OTHERWISE INTERFERES WITH THE FREE
14 EXERCISE OF THE ELECTIVE FRANCHISE BY ANY VOTER, OR COMPELS,
15 INDUCES, OR PREVAILS UPON ANY VOTER TO GIVE OR REFRAIN FROM
16 GIVING HIS VOTE FOR OR AGAINST ANY PARTICULAR PERSON AT ANY
17 ELECTION; OR (C) BEING AN EMPLOYER, PAYS HIS EMPLOYES THE SALARY
18 OR WAGES DUE IN "PAY ENVELOPES" UPON WHICH OR IN WHICH THERE IS
19 WRITTEN OR PRINTED ANY POLITICAL MOTTO, DEVICE, STATEMENT OR
20 ARGUMENT CONTAINING THREATS, EXPRESS OR IMPLIED, INTENDED OR
21 CALCULATED TO INFLUENCE THE POLITICAL OPINIONS OR ACTIONS OF
22 SUCH EMPLOYES, OR WITHIN NINETY DAYS OF ANY ELECTION OR PRIMARY
23 PUTS OR OTHERWISE EXHIBITS IN THE ESTABLISHMENT OR PLACE WHERE
24 HIS EMPLOYES ARE ENGAGED IN LABOR, ANY HANDBILL OR PLACARD
25 CONTAINING ANY THREAT, NOTICE, OR INFORMATION THAT IF ANY
26 PARTICULAR TICKET OR CANDIDATE IS ELECTED OR DEFEATED WORK IN
27 HIS PLACE OR ESTABLISHMENT WILL CEASE, IN WHOLE OR IN PART, HIS
28 ESTABLISHMENT BE CLOSED UP, OR THE WAGES OF HIS EMPLOYES
29 REDUCED, OR OTHER THREATS, EXPRESS OR IMPLIED, INTENDED OR
30 CALCULATED TO INFLUENCE THE POLITICAL OPINIONS OR ACTIONS OF HIS

I APP. 770

1 EMPLOYES, SHALL BE GUILTY OF A MISDEMEANOR OF THE SECOND DEGREE.

2 ANY PERSON OR CORPORATION, CONVICTED OF A VIOLATION OF ANY OF

3 THE PROVISIONS OF THIS SECTION, SHALL BE SENTENCED TO PAY A FINE

4 NOT EXCEEDING [FIVE THOUSAND ($5,000)] TEN THOUSAND ($10,000)

5 DOLLARS, OR SUCH PERSON OR THE OFFICERS, DIRECTORS OR AGENTS OF

6 SUCH CORPORATION RESPONSIBLE FOR THE VIOLATION OF THIS SECTION,

7 SHALL BE SENTENCED TO UNDERGO AN IMPRISONMENT OF NOT MORE THAN

8 [TWO (2)] FOUR (4) YEARS, OR BOTH, IN THE DISCRETION OF THE

9 COURT.

10     SECTION 1848.  FAILURE TO PERFORM DUTY.--ANY SECRETARY OF THE

11 COMMONWEALTH, MEMBER OF A COUNTY BOARD OF ELECTIONS, CHIEF

12 CLERK, EMPLOYE, OVERSEER, JUDGE OF ELECTION, INSPECTOR OF

13 ELECTION, CLERK OF ELECTION, MACHINE INSPECTOR OR CUSTODIAN OR

14 DEPUTY CUSTODIAN OF VOTING MACHINES ON WHOM A DUTY IS LAID BY

15 THIS ACT WHO SHALL WILFULLY NEGLECT OR REFUSE TO PERFORM HIS

16 DUTY, SHALL BE GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION

17 THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT EXCEEDING [ONE

18 THOUSAND ($1,000)] TWO THOUSAND ($2,000) DOLLARS, OR TO UNDERGO

19 AN IMPRISONMENT OF NOT MORE THAN [TWO (2)] FOUR (4) YEARS, OR

20 BOTH, IN THE DISCRETION OF THE COURT.

21     SECTION 1849.  HINDERING OR DELAYING PERFORMANCE OF DUTY.--

22 ANY PERSON WHO INTENTIONALLY INTERFERES WITH, HINDERS OR DELAYS

23 OR ATTEMPTS TO INTERFERE WITH, HINDER OR DELAY ANY OTHER PERSON

24 IN THE PERFORMANCE OF ANY ACT OR DUTY AUTHORIZED OR IMPOSED BY

25 THIS ACT, SHALL BE GUILTY OF A MISDEMEANOR, AND, UPON CONVICTION

26 THEREOF, SHALL BE SENTENCED TO PAY A FINE NOT EXCEEDING [FIVE

27 HUNDRED ($500)] ONE THOUSAND ($1,000) DOLLARS, OR TO UNDERGO AN

28 IMPRISONMENT OF NOT MORE THAN [ONE (1) YEAR] TWO (2) YEARS, OR

29 BOTH, IN THE DISCRETION OF THE COURT.

30     SECTION 1850.  VIOLATION OF ANY PROVISION OF ACT.--ANY PERSON

I APP. 771

1  WHO SHALL VIOLATE ANY OF THE PROVISIONS OF THIS ACT, FOR WHICH A

2  PENALTY IS NOT HEREIN SPECIFICALLY PROVIDED, SHALL BE GUILTY OF

3  A MISDEMEANOR, AND, UPON CONVICTION THEREOF, SHALL BE SENTENCED

4  TO PAY A FINE NOT EXCEEDING [ONE THOUSAND ($1,000)] TWO THOUSAND

5  ($2,000) DOLLARS, OR TO UNDERGO AN IMPRISONMENT OF NOT MORE THAN

6  [ONE (1) YEAR] TWO (2) YEARS, OR BOTH, IN THE DISCRETION OF THE

7  COURT.

8      SECTION 17.  SECTION 1853 OF THE ACT, AMENDED MARCH 27, 2020

9  (P.L.41, NO.12), IS AMENDED TO READ:

10     SECTION 1853.  VIOLATIONS OF PROVISIONS RELATING TO ABSENTEE

11 AND MAIL-IN BALLOTS.--IF ANY PERSON SHALL SIGN AN APPLICATION

12 FOR ABSENTEE BALLOT, MAIL-IN BALLOT OR DECLARATION OF ELECTOR ON

13 THE FORMS PRESCRIBED KNOWING ANY MATTER DECLARED THEREIN TO BE

14 FALSE, OR SHALL VOTE ANY BALLOT OTHER THAN ONE PROPERLY ISSUED

15 TO THE PERSON, OR VOTE OR ATTEMPT TO VOTE MORE THAN ONCE IN ANY

16 ELECTION FOR WHICH AN ABSENTEE BALLOT OR MAIL-IN BALLOT SHALL

17 HAVE BEEN ISSUED TO THE PERSON, OR SHALL DISCLOSE RESULTS OF A

18 PRE-CANVASSING MEETING UNDER SECTION 1308(G)(1.1), OR SHALL

19 VIOLATE ANY OTHER PROVISIONS OF ARTICLE XIII OR ARTICLE XIII-D

20 OF THIS ACT, THE PERSON SHALL BE GUILTY OF A MISDEMEANOR OF THE

21 THIRD DEGREE, AND, UPON CONVICTION, SHALL BE SENTENCED TO PAY A

22 FINE NOT EXCEEDING [TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500)]

23 FIVE THOUSAND DOLLARS ($5,000), OR BE IMPRISONED FOR A TERM NOT

24 EXCEEDING [TWO (2)] FOUR (4) YEARS, OR BOTH, AT THE DISCRETION

25 OF THE COURT.

26     IF ANY CHIEF CLERK OR MEMBER OF A BOARD OF ELECTIONS, MEMBER

27 OF A RETURN BOARD OR MEMBER OF A BOARD OF REGISTRATION

28 COMMISSIONERS, SHALL NEGLECT OR REFUSE TO PERFORM ANY OF THE

29 DUTIES PRESCRIBED BY ARTICLE XIII OR ARTICLE XIII-D OF THIS ACT,

30 OR SHALL REVEAL OR DIVULGE ANY OF THE DETAILS OF ANY BALLOT CAST

1  IN ACCORDANCE WITH THE PROVISIONS OF ARTICLE XIII OR ARTICLE

2  XIII-D OF THIS ACT, <u>OR SHALL DISCLOSE RESULTS OF A PRE-</u>

3  <u>CANVASSING MEETING UNDER SECTION 1308(G)(1.1),</u> OR SHALL COUNT AN

4  ABSENTEE BALLOT OR MAIL-IN BALLOT KNOWING THE SAME TO BE

5  CONTRARY TO ARTICLE XIII OR ARTICLE XIII-D, OR SHALL REJECT AN

6  ABSENTEE BALLOT OR MAIL-IN BALLOT WITHOUT REASON TO BELIEVE THAT

7  THE SAME IS CONTRARY TO ARTICLE XIII OR ARTICLE XIII-D, OR SHALL

8  PERMIT AN ELECTOR TO CAST THE ELECTOR'S BALLOT <u>OTHER THAN A</u>

9  <u>PROVISIONAL BALLOT</u> AT A POLLING PLACE KNOWING THAT THERE HAS

10 BEEN ISSUED TO THE ELECTOR AN ABSENTEE BALLOT <u>OR MAIL-IN BALLOT</u>,

11 THE [ELECTOR] <u>INDIVIDUAL</u> SHALL BE GUILTY OF A FELONY OF THE

12 THIRD DEGREE, AND, UPON CONVICTION, SHALL BE PUNISHED BY A FINE

13 NOT EXCEEDING [FIFTEEN THOUSAND DOLLARS ($15,000)] <u>THIRTY</u>

14 <u>THOUSAND DOLLARS ($30,000),</u> OR BE IMPRISONED FOR A TERM NOT

15 EXCEEDING [SEVEN (7)] <u>FOURTEEN (14)</u> YEARS, OR BOTH, AT THE

16 DISCRETION OF THE COURT.

17     SECTION 18.  THIS ACT SHALL TAKE EFFECT IMMEDIATELY.



BLACKSTRATUS SOLUTIONS BRIEF

# SOX RELOADED:

Essential Practices for Successful Compliance



I APP. 774

## WHAT SOX IS

The Sarbanes-Oxley Act of 2002 (more commonly known as SOX) is legislation passed by the US Congress to protect shareholders and the American public from fraudulent accounting practices as well as simple errors in the enterprise. As part of its mandate, it was also expected to ensure the accuracy of corporate disclosures. In June of 2003, the Securities and Exchange Commission (SEC) implemented Section 404 of the Sarbanes-Oxley Act of 2002 (SOX) that required corporations not only include assessments of the controls they used to manage their financial reporting, but to also provide an auditor's report on that assessment. Both of which were required as mandatory inclusions to their annual reports.

SOX was intended to improve corporate governance and accountability. It allowed oversight of not only a corporation's financial controls and reporting, but also how it managed its information systems and electronic records. The controls were put in place to help rebuild investor confidence in corporate reporting standards that had been tainted by several accounting scandals in the early 2000s. So while many agreed that the increased oversight was needed, no one was prepared for the costs.

## SOX COMPLIANCE  IS EXPENSIVE

Based on a survey conducted by Protiviti in 2015, 58% of large corporations spent more on SOX audit fees than in previous year. The research also showed that more than half of large corporations surveyed spent more than $1 million on audit fees associated with SOX compliance, with 25% spending more than $2M. This is an average of $1M spent on SOX for every $1B in revenues. Most of this spending is for increased manpower – internal auditors and accountants – to document, test, and certify internal controls.

## REGULATORY  RELIEF?

The U.S. SEC and the Public Company Accounting Oversight Board (PCAOB) encourage auditors to consider a risk-based approach in evaluating the internal controls over financial reporting of public companies. They want auditors to focus on matters most important to internal controls that pose higher risk of fraud or material error. Similarly, auditors are being encouraged to consider and use the work of other auditors. As more auditors adopt this risk-based approach and consider the work of others, audits will be more scalable for the smaller and less complex companies. If properly put into practice, this new focus of auditing for SOX compliance is expected to make SOX more manageable, reduce the associated cost, and enhance its effectiveness in ensuring adequacy of controls and integrity of financial reporting.

I APP. 775

## PROACTIVE SECURITY IS THE LYNCH PIN

A proactive approach to security is the lynch pin to ensuring SOX compliance. Monitoring access to sensitive corporate and customer data is an essential element of an effective SOX compliance and risk management strategy. Companies need to ensure that threats to critical data do not go undetected and when incidents do occur, that they are quickly remediated and documented for internal and external audits.

## WE OFFER A BETTER ALTERNATIVE

This paper explores how security information management (SIM) solutions offer a cost effective alternative for proactive risk management across your network, applications, databases, and user activities, while enabling SOX compliance as a result of these actions. Properly implemented, a best-practices SIM solution provides organizations reliable, end-to-end security monitoring and incident management processes surrounding financial applications and data, and the IT systems that support them. SIM can enable companies to meet Section 404 objectives through incident resolution management, data collection and retention, accountability, and reporting. By deploying an effective SIM solution, companies are equipped with a full range of tools that support SOX compliance objectives.

## THE SOX CHALLENGE CONTINUES: MAINTAINING ACCUATE AND RELIABLE FINANCIAL REPORTING

SOX mandates all public companies to document, evaluate, monitor, and report on internal controls for financial reporting. It also requires disclosure of controls and procedures that include IT controls. Where SOX or the implementation of PCAOB standards do not define or are not clear on specific issues, auditors will rely on industry accepted best practices that are defined by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission. The SEC makes specific reference to the COSO Internal Control Framework. PCAOB has also indicated a preference to COSO as a suitable framework. The objectives of the COSO framework include:

- Preventing fraud.
- Improving efficiency and profitability.
- Developing accurate financial reporting.
- Complying with applicable laws and rules.

COSO has identified the essential components of effective internal controls to include risk assessment, control environment and activities, information and communication, and monitoring. COSO clearly summarized the post-SOX environment when it stated, "The increasing power and sophistication of computers and computer-based information systems may contribute even more to the changing nature of fraudulent financial reporting. The last decade has seen the decentralization and the proliferation of computers and information systems into almost every part of the company. This development has enabled management to make decisions more quickly and on the basis of more timely and accurate information. Yet by doing what they do best –

I APP. 776

placing vast quantities of data within easy reach, computers multiply the potential for misusing or manipulating information, increasing the risk of fraudulent financial reporting. Using computer technology effectively to prevent, detect, and deter fraudulent financial reporting is a challenge that requires foresight, judgment, and cooperation among computer specialists, management, and internal auditors.

## SECURITY INFORMATION MANAGEMENT: ENABLES IT CONTROL OBJECTIVE FOR SOX

For a public company to maintain the accuracy and reliability of financial reporting required by SOX, its IT teams must have:

- Clear visibility into the network.
- Complete oversight and control of logical access to the network, applications, databases, and sensitive data.

- An effective incident resolution management protocol that allows it to respond rapidly to material events within 24 to 48 hours.

- Access to historical data for audit and forensic activities.

A comprehensive and specific approach to managing the IT controls associated with Section 404 of SOX can begin by leveraging a SIM solution – one that enables real-time monitoring and on-demand trend reporting. But technology alone is not the answer. Tools supplement a comprehensive security program that integrates existing assets – people, processes, and policies – that function within the operating environment. By implementing effective, comprehensive SIM policies and procedures for establishing accountability and consistent data collection, retention, and reporting practices,

organizations can successfully demonstrate that IT controls support a sound internal control framework that meet Section 404 requirements. A high-performing organization that executes a proactive SIM strategy will establish six key practices from the top-down and bottom-up to:

**1.** Clearly define the control environment – Identify the systems, services, devices, data, and personnel associated with financial data and reporting. When selecting controls for the organization, it will help to ensure that such controls support business processes.

**2.** Strictly control access – Not only protect the data, but the systems, services, and devices within the organization. The organization must be able to demonstrate that it knows which employees, contractors, and partners have physical and logical access to the network, devices, applications, and data for specific and authorized business purposes, and that unauthorized access attempts – both physical and logical – can be identified and mitigated.

**3.** Validate security controls – Regularly monitor the environment for performance and effectiveness of the controls in place. Establish baseline activity, study trend line analysis, and ensure that unusual activity can be quickly identified and corrected as necessary.

**4.** Document all corrective action – Demonstrate that the proper steps were taken to correct systems and adjust policy if a noncompliant situation is identified.

**5.** Study the results of testing and reporting – Continuously manage and oversee the environment through reporting and testing, while providing documented evidence of due diligence to auditors.

**6.** Retain data according to local jurisdictional requirements – Preserve near-term and long-term data in its purest form for audit, forensics, and evidentiary presentation.

## DATA COLLECTION  AND RETENTION  IS PARAMOUNT

The success of each organization's SIM solution is dependent upon its ability to collect sufficient data from across the network and applications. Each organization should take reasonable steps to ensure that sufficient data is collected to identify and respond to security incidents and to monitor and enforce policies and service level agreements. Appropriate data collection controls enable network and security personnel to review and analyze early warnings of potential system failures, unauthorized access attempts and security violations, provide support for personnel actions, and aid in reconstructing compromised systems. Automated data collection and retention allows many indicators of security and performance across the network and critical applications to be tracked on a continuous basis – as opposed to a periodic review – helping to create a proactive risk management process for:

• Identifying:
   o Policy violations
   o Anomalous behavior
   o Unauthorized configuration and other conditions that increase the risk of intrusion or other security events
• Real-time collection and historical data retention to quickly and accurately identify, classify, escalate, report, and guide responses to security events or weaknesses
• Incident remediation
• Audit trails
• Forensics support

## THE ROLE OF SECURITY INFORMATION  MANAGEMENT

### The  BlackStratus  Solution:  A  Holistic Approach  to SOX Compliance

BlackStratus security and compliance platform enables an efficient, comprehensive strategy for examining the adequacy and effectiveness of information security policies, procedures, and practices. BlackStratus delivers a robust security information management system with a variety of tools to help organizations:

• Collect and retain security event data from across the network.

• Identify, track, analyze, and remediate incidents.

• Implement an integrated incident resolution management work flow with embedded knowledge to resolve security incidents.

## BLACKSTRATUS  SOLUTIONS

BlackStratus security and compliance platform automates the collection and correlation of the immense volumes of data created through customer-defined policies and procedures. This high-performance SIM platform also provides periodic assessments of the risk and degree of harm that could result from unauthorized access, modifications, or destruction to data and information systems that support operations and organizational assets, a fundamental principle behind Section 404. More specifically, the BlackStratus platform provides organizations a core-to-perimeter set of tools and technologies that support Section 404 requirements, including:

• **Device, database and application monitoring –** Centralized application and device monitoring enables the collection, correlation, analysis, reporting, and retention of audit events from disparate security and network technologies. The BlackStratus platform monitors web and database applications, security and network devices, servers, and desktops to identify threats at the network perimeter, as well as malicious and erroneous inside activity. By monitoring and consolidating security activity on all systems, databases, and devices, and by leveraging a highly intuitive security and compliance reporting system, organizations can protect the integrity of enterprise data – especially from the increasing prevalence of insider threats.

• **Incident resolution management –** By integrating incidence response processes with existing enterprise workflow systems, the BlackStratus platform enables an accelerated incidence response through a best practice, collaborative approach. Companies need to continuously reduce risk exposure through timely and effective incident response, even when faced with vast amounts of security data including countless false positives. Using a clearly defined, repeatable, documented security information workflow, organizations can ensure quick and accurate handling of security incidents and prove diligence in SOX audits.

• **Compliance dashboards –** BlackStratus' customizable dashboards provide real-time monitoring and a holistic view of the company's security posture at a given point in time, and allows security staff to quickly measure threat levels against high value assets – including those most critical to achieving regulatory compliance.

• **Embedded knowledge base –** The BlackStratus knowledge base delivers guidance in analyzing, documenting, and reporting on security issues, including newly discovered vulnerabilities, malware, and vendor-specific vulnerability data. Security operators and analysts can obtain a continual flow of relevant and actionable information to pinpoint attacks and provide containment and remediation steps to network and configuration managers. Security teams can get highly specific response guidance in the event of a reoccurrence because the knowledge base can be updated with organization-specific data, such as information about a previous incident.

• **Security operations performance measurement –** SOX compliance is driving the need for metrics-based security management. BlackStratus gives organizations the tools to measure the performance of security operations, to better understand risk, and to quantify the success of SOX compliance initiatives. BlackStratus automates key compliance metrics – from vulnerability metrics to high-level risk metrics by providing reports that focus on vulnerability, threat, and incident response for all SOX related assets.

• **Risk assessment –** BlackStratus delivers a continuous, comprehensive picture of risk through a suite of risk assessment tools, techniques, and reports that capture real-time and historical risk information – pinpointing threats and vulnerabilities at the network and user activity level. An array of risk assessment reports provide the necessary details behind each SOX related asset and its associated risk, enabling security teams to pinpoint and prioritize threats. Real-time insight into the risk baseline is delivered through a suite of operational and management reports that are available from a customizable dashboard.

• **Strong correlation of system-wide security events –** BlackStratus' correlation technologies go beyond simply logging security information, and instead speed threat identification and provide an accurate picture of risk. These technologies are architected to handle the massive volume of security information from network-related sources as well as server logs, applications, and databases and identify attacks from the inside and beyond based on a thorough understanding of network and user activity. The correlation technologies process large volumes of data from the perimeter down to the core to identify real-time threats and historical patterns. Organizations can leverage their broad security knowledge base and correlate the information to uncover threats that would otherwise go undetected, facilitating proactive security management.

• **Incident detection through visualization and reporting –** With the BlackStratus solution, organizations can visualize threats as well as the security information underlying the threats. Security teams can assimilate information faster and then focus on the real security threats, mitigating vulnerabilities before threats proliferate. Through in-depth reporting, key stakeholders and auditors have ready access to actionable information on all security related issues such as viruses, worms, and other malicious code; all system status and configuration changes; and privilege and authorization changes.

• **A highly scalable and redundant security architecture –** The extensive scalability of BlackStratus architecture cost effectively supports growth and ensures that as your organization grows and changes, your SIM solution can grow and evolve with it. These robust SIM architectures incorporate high volumes of data from across the organization, regardless of the number of devices, applications and databases. BlackStratus offers the only multitier SIM architecture with full failover to ensure SOX compliance.

## SECURITY AND COMPLIANCE MANAGEMENT SOLUTIONS

With BlackStratus Security information and Log Management platform capabilities, BlackStratus delivers the most well-engineered security compliance management solutions available today: powerful, scalable and flexible. From real-time threat identification and mitigation to log management and audit readiness, BlackStratus is renowned for providing solutions that help organizations take control of security, operations and compliance. Our patented, award-winning technologies tie together silos of data to obtain a complete, understandable picture of network security and compliance posture. By centralizing huge volumes of data - from the perimeter to the core of the network - and delivering the right security information into the right hands at the right time, BlackStratus solution dramatically improve your organization's ability to identify and rapidly respond to threats. Companies can finally gain an effective, proactive approach to protecting critical data and ensuring compliance with regulatory mandates and corporate policies. The BlackStratus platform delivers a whole new breadth and depth of security intelligence, regardless of organizational

I APP. 780

size, type, or budget. Unlike other SIM or Log Management vendors, BlackStratus will not force an overly expensive SIM with more horsepower than you need, or try to ineffectively scale a basic log management solution to fit the needs of a complex, distributed environment. We are the only SIM vendor that has a complete line of solutions to effectively address your specific needs, from both a performance and cost perspective. We believe that no matter how large or small your network, you should not have to make a choice between being secure and being compliant.

## BlackStratus – Enterprise-class Security and Compliance Platform

The BlackStratus security and compliance platform, the industry's most robust Security Information Management software solution, transforms huge volumes of disparate, security-related data into understandable, actionable intelligence. Built on a highly-scalable n-tier architecture, it enables large organizations with complex networks to centrally gather, analyze, and accurately report on security events and risk posture. By identifying and enabling a rapid response to threats and providing an auditable compliance framework, it helps protect valuable data and address a myriad of regulatory challenges.

BlackStratus offers an all-in-one or combined SIM and Log Management appliances that are fast, effective and exceptionally affordable. Easy to deploy and use, BlackStratus features advanced correlation technologies and real-time monitoring for rapidly identifying and prioritizing threats. Add to that comprehensive log collection, documentation and storage - and organizations can now cost-effectively meet compliance demands while enhancing their overall security posture. BlackStratus offers flexible deployment options to accommodate any size networking environment.

# CONCLUSIONS

With concerns regarding ongoing costs associated with addressing a SOX audit, many affected organizations lose sight of the positive effect on corporate governance gained by improving the accuracy and reliability of financial data. SOX compliance can assist organizations in improving operational efficiencies, and provide assurance of good business practice to consumers and investors. Section 404 mandates that management take an active role in operational oversight. Additionally, many organizations have a new appreciation for the role of IT in the internal control structure and a renewed appreciation for effective information security controls. Management needs to work closely with IT organizations on risk assessment and the implementation of security policies and operations. Overall, a security program that integrates people, policies, process, and technology is the best approach to managing Section 404 compliance. Fully implemented, holistic SIM solutions like BlackStratus, along with alignment of human, process, and information controls, enables organizations to meet SOX objectives. By leveraging existing technology and tools, organizations can identify, assess, and report on the status and security of financial-related processes and information, and can provide tangible evidence of their information security initiatives.

## ADDITIONAL RESOURCES

Further information about Sarbanes-Oxley is available at the following websites:

- **The Securities and Exchange Commission:** www.sec.gov – the official source of government information on regulation, documentation, interpretation, and updates

- **The Public Company Accounting Oversight Board:** www.pcaob.org – the official source of Sarbanes-Oxley for auditors

- **The IT Governance Institute:** www.itgi.org – an industry consortia that has produced interpretation documentation and guidance for filers and implementers

- **SOX Financial Frameworks:** http://www.soxonline. com/coso_cobit_coso_framework.html – information on Sarbanes-Oxley and supporting working documents, with daily news updates

- **Sarbanes-Oxley.com:** www.sarbanes-oxley.com – a private information website, portions of which are available only to subscribers

## ABOUT BLACKSTRATUS

BlackStratus is a pioneer of security and compliance solutions deployed and operated on premise, in the cloud or "as a Service" by providers of all sizes, government agencies and individual enterprises. Through our patented multitenant security information and event management (SIEM) technology, BlackStratus delivers unparalleled security visibility, prevents costly downtime, and achieves and maintains compliant operations at a lower cost to operate.



BlackStratus and the BlackStratus logo are trademarks of BlackStratus, Inc. Other third-party trademarks are the property of their respective owners. © 2016 BlackStratus, Inc. All Rights Reserved.

BlackStratus,  Inc.  |  1551 South Washington Avenue  Suite 401  |  Piscataway, NJ 08854  |  T. 732.393.6000  |  F. 732.393.6090  |  www.blackstratus.com

## AU Section 314

# *Understanding the Entity and Its Environment and Assessing the Risks of Material Misstatement*

(Supersedes SAS No. 55.)

Source: SAS No. 109.

Effective for audits of financial statements for periods beginning on or after December 15, 2006. Earlier application is permitted.

## Introduction

**.01** This section establishes standards and provides guidance about implementing the second standard of field work, as follows:

> The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.

The importance of the auditor's risk assessment as a basis for further audit procedures is discussed in the explanation of audit risk in section 312, *Audit Risk and Materiality in Conducting an Audit*. See section 326, *Audit Evidence*, for guidance on how the auditor uses relevant assertions [1] in sufficient detail to form a basis for the assessment of risks of material misstatement and to design and perform further audit procedures. The auditor should make risk assessments at the financial statement and relevant assertion levels based on an appropriate understanding of the entity and its environment, including its internal control. Section 318, *Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained*, discusses the auditor's responsibility to determine overall responses and to design and perform further audit procedures whose nature, timing, and extent are responsive to the risk assessments. This section should be applied in conjunction with the standards and guidance provided in other sections. In particular, the auditor's responsibility to consider fraud in an audit of financial statements is discussed in section 316, *Consideration of Fraud in a Financial Statement Audit*.

**.02** The following is an overview of this standard:

- *Risk assessment procedures and sources of information about the entity and its environment, including its internal control.* This section explains the audit procedures that the auditor should perform to obtain the understanding of the entity and its environment, including its internal control (risk assessment procedures). The audit team should discuss the susceptibility of the entity's financial statements to material misstatement.

---

[1] *Relevant assertions* are assertions that have a meaningful bearing on whether the account is fairly stated. For example, valuation may not be relevant to the cash account unless currency translation is involved; however, existence and completeness are always relevant. Similarly, valuation may not be relevant to the gross amount of the accounts receivable balance, but is relevant to the related allowance accounts. Additionally, the auditor might, in some circumstances, focus on the presentation and disclosure assertions separately in connection with the period-end financial reporting process.

**AU §314.02**

I APP. 783

**1668**      **The Standards of Field Work**

- *Understanding the entity and its environment, including its internal control.* This section provides guidance to the auditor in understanding specified aspects of the entity and its environment, and components of its internal control, in order to identify and assess risks of material misstatement, and in designing and performing further audit procedures.

- *Assessing the risks of material misstatement.* This section provides guidance to the auditor in assessing the risks of material misstatement at the financial statement and relevant assertion levels. The auditor should:
    — Identify risks by considering the entity and its environment, including relevant controls, and by considering the classes of transactions, account balances, and disclosures in the financial statements.
    — Relate the identified risks to what could go wrong at the relevant assertion level.
    — Consider the significance and the likelihood of material misstatement for each identified risk.

    This section also provides guidance to the auditor in determining whether any of the assessed risks are significant risks that require special audit consideration or risks for which substantive procedures alone do not provide sufficient appropriate audit evidence. The auditor should evaluate the design of the entity's controls, including relevant control activities, over such risks and determine whether they are adequate and have been implemented.

- *Documentation.* This section provides related documentation guidance.

**.03** Obtaining an understanding of the entity and its environment is an essential aspect of performing an audit in accordance with generally accepted auditing standards. In particular, that understanding establishes a frame of reference within which the auditor plans the audit and exercises professional judgment about assessing risks of material misstatement of the financial statements and responding to those risks throughout the audit, for example when:

- Establishing materiality for planning purposes and evaluating whether that judgment remains appropriate as the audit progresses.

- Considering the appropriateness of the selection and application of accounting policies and the adequacy of financial statement disclosures.

- Identifying areas where special audit consideration may be necessary, for example, related-party transactions, the appropriateness of management's use of the going-concern assumption, complex or unusual transactions, or considering the business purpose of transactions.

- Developing expectations for use when performing analytical procedures.

- Designing and performing further audit procedures to reduce audit risk to an appropriately low level.

- Evaluating the sufficiency and appropriateness of audit evidence obtained, such as evidence related to the reasonableness of management's assumptions and of management's oral and written representations.

**.04** The auditor should use professional judgment to determine the extent of the understanding required of the entity and its environment, including its

**AU §314.03**

I APP. 784

internal control. The auditor's primary consideration is whether the understanding that has been obtained is sufficient to assess risks of material misstatement of the financial statements and to design and perform further audit procedures. The depth of the overall understanding that the auditor obtains in performing the audit is less than that possessed by management in managing the entity.

# Risk Assessment Procedures and Sources of Information About the Entity and Its Environment, Including Its Internal Control

**.05**   Obtaining an understanding of the entity and its environment, including its internal control, is a continuous, dynamic process of gathering, updating, and analyzing information throughout the audit. Throughout this process, the auditor should also follow the guidance in section 316. As described in section 326, audit procedures to obtain the understanding are referred to as *risk assessment procedures* because some of the information obtained by performing such procedures may be used by the auditor as audit evidence to support assessments of the risks of material misstatement. In addition, in performing risk assessment procedures, the auditor may obtain audit evidence about the relevant assertions related to classes of transactions, account balances, or disclosures and about the operating effectiveness of controls, even though such audit procedures were not specifically planned as substantive procedures or as tests of controls. The auditor also may choose to perform substantive procedures or tests of controls concurrently with risk assessment procedures because it is efficient to do so.

## Risk Assessment Procedures

**.06**   The auditor should perform the following risk assessment procedures to obtain an understanding of the entity and its environment, including its internal control:

*a.*   Inquiries of management and others within the entity

*b.*   Analytical procedures

*c.*   Observation and inspection

The auditor is not required to perform all the risk assessment procedures described above for each aspect of the understanding described in paragraph .21. However, all the risk assessment procedures should be performed by the auditor in the course of obtaining the required understanding.

**.07**   In addition, the auditor might perform other procedures where the information obtained may be helpful in identifying risks of material misstatement. For example, in cooperation with the entity, the auditor may consider making inquiries of others outside the entity such as the entity's external legal counsel or of valuation experts that the entity has used. Reviewing information obtained from external sources such as reports by analysts, banks, or rating agencies; trade and economic journals; or regulatory or financial publications may also be useful in obtaining information about the entity.

**.08**   Although much of the information the auditor obtains by inquiries can be obtained from management and those responsible for financial reporting, inquiries of others within the entity, such as production and internal audit personnel, and other employees with different levels of authority, may be useful in

**1670**                    **The Standards of Field Work**

providing the auditor with a different perspective in identifying risks of material misstatement. In determining others within the entity to whom inquiries may be directed, or the extent of those inquiries, the auditor should consider what information may be obtained that might help the auditor in identifying risks of material misstatement. For example:

- Inquiries directed toward those charged with governance[2] may help the auditor understand the environment in which the financial statements are prepared.

- Inquiries directed toward internal audit personnel may relate to their activities concerning the design and effectiveness of the entity's internal control and whether management has satisfactorily responded to any findings from these activities.

- Inquiries of employees involved in initiating, authorizing, processing, or recording complex or unusual transactions may help the auditor in evaluating the appropriateness of the selection and application of certain accounting policies.

- Inquiries directed toward in-house legal counsel may relate to such matters as litigation, compliance with laws and regulations, knowledge of fraud or suspected fraud affecting the entity, warranties, post-sales obligations, arrangements (such as joint ventures) with business partners, and the meaning of contract terms.

- Inquiries directed toward marketing, sales, or production personnel may relate to changes in the entity's marketing strategies, sales trends, production strategies, or contractual arrangements with its customers.

**.09** Paragraphs .04 and .06 of section 329, *Analytical Procedures*, specify that the auditor should apply analytical procedures in planning the audit to assist in understanding the entity and its environment and to identify areas that may represent specific risks relevant to the audit. For example, analytical procedures may be helpful in identifying the existence of unusual transactions or events, and amounts, ratios, and trends that might indicate matters that have financial statement and audit implications. In performing analytical procedures as risk assessment procedures, the auditor should develop expectations about plausible relationships that are reasonably expected to exist. When comparison of those expectations with recorded amounts or ratios developed from recorded amounts yields unusual or unexpected relationships, the auditor should consider those results in identifying risks of material misstatement. However, when such analytical procedures use data aggregated at a high level (which is often the situation), the results of those analytical procedures provide only a broad initial indication about whether a material misstatement may exist. Accordingly, the auditor should consider the results of such analytical procedures along with other information gathered in identifying the risks of material misstatement.

**.10** Observation and inspection may support inquiries of management and others, and also provide information about the entity and its environment. Such audit procedures ordinarily include:

- Observation of entity activities and operations

- Inspection of documents (such as business plans and strategies), records, and internal control manuals

- Reading reports prepared by management (such as quarterly management reports and interim financial statements), those charged with

---

[2] See footnote 4 of section 311, *Planning and Supervision*, for the definition of and discussion about those charged with governance.

**AU §314.09**

## Understanding the Entity and Its Environment        **1671**

governance (such as minutes of board of directors' meetings), and internal audit

- Visits to the entity's premises and plant facilities
- Tracing transactions through the information system relevant to financial reporting, which may be performed as part of a walk-through

**.11** When the auditor intends to use information about the entity and its environment obtained in prior periods, the auditor should determine whether changes have occurred that may affect the relevance of such information in the current audit. For continuing engagements, the auditor's previous experience with the entity contributes to the understanding of the entity. For example, audit procedures performed in previous audits ordinarily provide audit evidence about the entity's organizational structure, business, and controls, as well as information about past misstatements and whether or not they were corrected on a timely basis, which assists the auditor in assessing risks of material misstatement in the current audit. However, such information may have been rendered irrelevant by changes in the entity or its environment. The auditor should make inquiries and perform other appropriate audit procedures, such as walk-throughs of systems, to determine whether changes have occurred that may affect the relevance of such information.

**.12** Section 316 specifies that the auditor should specifically assess the risk of material misstatement[3] of the financial statements due to fraud and states that the auditor should consider that assessment in designing audit procedures to be performed. In making this assessment, the auditor should also consider fraud risk factors that relate to either material misstatements arising from fraudulent financial reporting or misstatements arising from misappropriation of assets. Fraud risk factors that relate to fraudulent financial reporting are (*a*) management's characteristics and influence over the control environment, (*b*) industry conditions, and (*c*) operating characteristics and financial stability. Fraud risk factors that relate to misappropriation of assets are (*a*) susceptibility of assets to misappropriations and (*b*) absence of controls. The auditor's response to the assessment of the risk of material misstatement due to fraud is influenced by the nature and significance of the risk factors identified as being present. In some circumstances, the auditor may conclude that the conditions indicate a need to modify audit procedures. In these circumstances, the auditor should consider whether the assessment of the risk of material misstatement due to fraud calls for an overall response, one that is specific to a particular account balance, class of transactions, or disclosures at the relevant assertion level, or both. However, since such risk factors do not necessarily indicate the existence of fraud, the results of the assessment of the risk of material misstatement due to fraud provide only a broad initial indication about whether a material misstatement due to fraud may exist. Accordingly, the auditor should consider the results of the assessment of the risk of material misstatement due to fraud performed during planning along with other information gathered in identifying the risks of material misstatements.

**.13** When relevant to the audit, the auditor also should consider other information such as that obtained from the auditor's client acceptance or continuance process or, where practicable, experience gained on other engagements performed for the entity, for example, engagements to review interim financial information.

---

[3] Risk of material misstatement is described as the auditor's combined assessment of inherent risk and control risk. See paragraph .22 of section 312, *Audit Risk and Materiality in Conducting an Audit*, for the definition of and further discussion about risk of material misstatement.

**AU §314.13**
I APP. 787

**1672**                    **The Standards of Field Work**

## Discussion Among the Audit Team

**.14** The members of the audit team, including the auditor with final responsibility for the audit, should discuss the susceptibility of the entity's financial statements to material misstatements. This discussion could be held concurrently with the discussion among the audit team that is specified by section 316 to discuss the susceptibility of the entity's financial statements to fraud. When the entire engagement is performed by a single auditor, the auditor should consider and document the susceptibility of the entity's financial statements to material misstatements. In these circumstances, the auditor should consider other factors that may be necessary in the engagement, such as personnel possessing specialized skills.

**.15** Professional judgment should be used to determine which members of the audit team should be included in the discussion, how and when it should occur, and the extent of the discussion. Key members of the audit team, including the auditor with final responsibility, should be involved in the discussion; however, it is not necessary for all team members to have a comprehensive knowledge of all aspects of the audit. The extent of the discussion is influenced by the roles, experience, and information needs of the audit team members. An additional consideration is whether to include specialists assigned to the audit team. For example, the auditor may determine that a professional possessing information technology (IT)[4] or other specialized skills is needed on the audit team and therefore include that individual in the discussion.

**.16** The auditor with final responsibility should consider which matters are to be communicated to members of the engagement not involved in the discussion. In a multilocation audit, for example, there may be multiple discussions that involve the key members of the audit team in each significant location.

**.17** The objective of this discussion[5] is for members of the audit team to gain a better understanding of the potential for material misstatements of the financial statements resulting from fraud or error in the specific areas assigned to them, and to understand how the results of the audit procedures that they perform may affect other aspects of the audit, including the decisions about the nature, timing, and extent of further audit procedures.

**.18** The discussion provides an opportunity for more experienced team members, including the auditor with final responsibility for the audit, to share their insights based on their knowledge of the entity and for the team members to exchange information about the business risks[6] to which the entity is subject and about how and where the financial statements might be susceptible to material misstatement. As specified in section 316, particular emphasis should be given to the susceptibility of the entity's financial statements to material misstatement due to fraud. In addition, the audit team should discuss critical issues, such as areas of significant audit risk; areas susceptible to management override of controls; unusual accounting procedures used by the client; important control systems; materiality at the financial statement level and at the account level; and how materiality will be used to determine the extent of testing. The discussion should also address application of generally accepted

---

[4] Information technology (IT) encompasses automated means of originating, processing, storing, and communicating information, and includes recording devices, communication systems, computer systems (including hardware and software components and data), and other electronic devices. An entity's use of IT may be extensive; however, the auditor is primarily interested in the entity's use of IT to initiate, authorize, record, process, and report transactions or other financial data.

[5] There may be one or more discussions, depending on the circumstances of the engagement.

[6] See paragraphs .29 through .33.

**AU §314.14**

## Understanding the Entity and Its Environment        **1673**

accounting principles to the entity's facts and circumstances and in light of the entity's accounting policies.

**.19** The auditor should plan and perform the audit with an attitude of professional skepticism. The discussion among the audit team members should emphasize the need to exercise professional skepticism throughout the engagement, to be alert for information or other conditions that indicate that a material misstatement due to fraud or error may have occurred, and to be rigorous in following up on such indications.

**.20** Depending on the circumstances of the audit, there may be multiple discussions in order to facilitate the ongoing exchange of information between audit team members regarding the susceptibility of the entity's financial statements to material misstatements. The purpose is for audit team members to communicate and share information obtained throughout the audit that may affect the assessment of the risks of material misstatement due to fraud or error or the audit procedures performed to address the risks.

# Understanding the Entity and Its Environment, Including Its Internal Control

**.21** The auditor's understanding of the entity and its environment consists of an understanding of the following aspects:

*a.* Industry, regulatory, and other external factors

*b.* Nature of the entity

*c.* Objectives and strategies and the related business risks that may result in a material misstatement of the financial statements

*d.* Measurement and review of the entity's financial performance

*e.* Internal control, which includes the selection and application of accounting policies

**.22** Appendix A [paragraph .125] contains examples of matters that the auditor may consider in obtaining an understanding of the entity and its environment relating to categories (*a*) through (*d*) above. Appendix B [paragraph .126] contains a detailed explanation of the internal control components.

**.23** The nature, timing, and extent of the risk assessment procedures performed depend on the circumstances of the engagement, such as the size and complexity of the entity and the auditor's experience with it. In addition, identifying significant changes in any of the above aspects of the entity from prior periods is particularly important in gaining a sufficient understanding of the entity to identify and assess risks of material misstatement.

## Industry, Regulatory, and Other External Factors

**.24** The auditor should obtain an understanding of relevant industry, regulatory, and other external factors. These factors include industry conditions, such as the competitive environment, supplier and customer relationships, and technological developments; the regulatory environment encompassing, among other matters, relevant accounting pronouncements, the legal and political environment, and environmental requirements affecting the industry and the entity; and other external factors, such as general economic conditions.[7]

**.25** The industry in which the entity operates may be subject to specific risks of material misstatement arising from the nature of the business, the

---

[7] See section 317, *Illegal Acts by Clients*, for additional requirements related to the legal and regulatory framework applicable to the entity and the industry.

**1674**          **The Standards of Field Work**

degree of regulation, or other external forces (such as political, economic, so-
cial, technical, and competitive). For example, long-term contracts may involve
significant estimates of revenues and costs that give rise to risks of material
misstatement of the financial statements. Similarly, regulations may specify
certain financial reporting requirements for the industry in which the entity
operates. In such cases, the auditor should consider whether the audit team
includes members with sufficient relevant knowledge and experience. If man-
agement fails to comply with such regulations, its financial statements may be
materially misstated.

## Nature of the Entity

**.26** The auditor should obtain an understanding of the nature of the entity.
The nature of an entity refers to the entity's operations, its ownership, gover-
nance, the types of investments that it is making and plans to make, the way
that the entity is structured, and how it is financed. An understanding of the na-
ture of an entity enables the auditor to understand the classes of transactions,
account balances, and disclosures to be expected in the financial statements.

**.27** The entity may have a complex structure with subsidiaries or other
components in multiple locations. In addition to the difficulties of consolida-
tion in such cases, other issues with complex structures that may give rise to
risks of material misstatement include the allocation of goodwill to subsidiaries,
and its impairment; whether investments are joint ventures, subsidiaries, or in-
vestments accounted for using the equity method; and whether special-purpose
entities are accounted for appropriately.

**.28** An understanding of the ownership, management, and other key per-
sonnel and their relations between owners and other people or entities is also
important in determining whether related-party transactions have been iden-
tified and accounted for appropriately. Section 334, *Related Parties*, provides
additional guidance on the auditor's considerations relevant to related parties.

## Objectives and Strategies and Related Business Risks

**.29** The auditor should obtain an understanding of the entity's objectives
and strategies, and the related business risks that may result in material mis-
statement of the financial statements. The entity conducts its business in the
context of industry, regulatory, and other internal and external factors. To re-
spond to these factors, the entity's management or those charged with gover-
nance define objectives, which are the overall plans for the entity. Strategies are
the operational approaches by which management intends to achieve its objec-
tives. Business risks result from significant conditions, events, circumstances,
actions, or inactions that could adversely affect the entity's ability to achieve
its objectives and execute its strategies, or through the setting of inappropri-
ate objectives and strategies. Just as the external environment changes, the
conduct of the entity's business is also dynamic and the entity's strategies and
objectives change over time.

**.30** Business risk is broader than the risk of material misstatement of the
financial statements, although it includes the latter. For example, a new entrant
to the marketplace with the competitive advantage of brand recognition and
economies of scale may represent a business risk to a manufacturer's ability to
garner as much shelf space at retailers and compete on price. The potential risk
of material misstatement of the financial statements related to such business
risk might be obsolescence or overproduction of inventory that could only be
sold at discounted amounts. Business risk particularly may arise from change
or complexity, although a failure to recognize the need for change may also give

**AU §314.26**

rise to risk. Change may arise, for example, from the development of new products that may fail; from an inadequate market, even if successfully developed; or from flaws that may result in liabilities and reputation risk. As an example of complexity, the conduct and management of long-term engineering projects (such as ship construction or the building of a suspension bridge) give rise to risks in the areas of percentage of completion, pricing, costing, design, and performance control. An understanding of business risks increases the likelihood of identifying risks of material misstatement. However, the auditor does not have a responsibility to identify or assess all business risks.

**.31** Most business risks will eventually have financial consequences and, therefore, an effect on the financial statements. However, not all business risks give rise to risks of material misstatement. A business risk may have an immediate consequence for the risk of misstatement for classes of transactions, account balances, or disclosures at the relevant assertion level or for the financial statements taken as a whole. For example, the business risk arising from a contracting customer base due to industry consolidation may increase the risk of misstatement associated with the valuation of accounts receivable. Similarly, a business risk may have an immediate consequence for the risk of misstatement of the financial statements taken as a whole. For example, the business risk of significant transactions with related parties may increase the risk of misstatement of a range of significant account balances and relevant assertions. Furthermore, a business objective and related risks may also have a longer-term consequence that the auditor may need to consider when assessing the appropriateness of the going concern assumption. For example, the business risk of a decline in the industry in which the entity operates may affect the entity's ability to continue as a going concern. The auditor's consideration of whether a business risk may result in material misstatement is, therefore, made in light of the entity's circumstances. Examples of conditions and events that may indicate risks of material misstatement are given in Appendix C [paragraph .127].

**.32** Usually management identifies business risks and develops approaches to address them. Such a risk assessment process is part of internal control and is discussed in paragraphs .76 to .80.

**.33** Smaller entities often do not set their objectives and strategies, or manage the related business risks, through formal plans or processes. In many cases there may be no documentation of such matters. In such entities, the auditor's understanding may be obtained through inquiries of management and observation of how the entity responds to such matters.

## Measurement and Review of the Entity's Financial Performance

**.34** The auditor should obtain an understanding of the measurement and review of the entity's financial performance. Performance measures and their review indicate to the auditor aspects of the entity's performance that management and others consider to be important. Performance measures, whether external or internal, create pressures on the entity that, in turn, may motivate management to take action to improve the business performance or to misstate the financial statements. Obtaining an understanding of the entity's performance measures assists the auditor in considering whether such pressures result in management actions that may have increased the risks of material misstatement.

**.35** Management's measurement and review of the entity's financial performance is to be distinguished from the monitoring of controls (discussed as a component of internal control in paragraphs .97 through .101), although their purposes may overlap. Monitoring of controls, however, is specifically concerned with the effective operation of internal control through consideration of

**1676**        **The Standards of Field Work**

information about the controls. The measurement and review of performance is directed at whether business performance is meeting the objectives set by management (or third parties), but it may be that performance indicators also provide information that enables management to identify deficiencies in internal control.

**.36** Internally generated information used by management for this purpose may include key performance indicators (financial and nonfinancial); budgets; variance analysis; subsidiary information and divisional, departmental, or other level performance reports; and comparisons of an entity's performance with that of competitors. External parties may also measure and review the entity's financial performance. For example, external information, such as analysts' reports and credit rating agency reports, may provide information useful to the auditor's understanding of the entity and its environment. Such reports may be obtained from the entity being audited or from websites.

**.37** Internal measures may highlight unexpected results or trends requiring management's inquiry of others in order to determine their cause and take corrective action (including, in some cases, the detection and correction of misstatements on a timely basis). Performance measures may also indicate to the auditor a risk of misstatement of related financial statement information. For example, performance measures may indicate that the entity has unusually rapid growth or profitability when compared to that of other entities in the same industry. Such information, particularly if combined with other factors such as performance-based bonus or incentive remuneration, may indicate the potential risk of management bias in the preparation of the financial statements.

**.38** Much of the information used in performance measurement may be produced by the entity's information system. If management assumes that data used for reviewing the entity's performance is accurate without having a basis for that assumption, errors may exist in the information, potentially leading management to incorrect conclusions about performance. When the auditor intends to make use of the performance measures for the purpose of the audit (for example, for analytical procedures), the auditor should consider whether the information related to management's review of the entity's performance provides a reliable basis and is sufficiently precise for such a purpose. If making use of performance measures, the auditor should consider whether they are precise enough to detect material misstatements.

**.39** Smaller entities ordinarily do not have formal processes to measure and review the entity's financial performance. Management nevertheless often relies on certain key indicators that knowledge and experience of the business suggest are reliable bases for evaluating financial performance and taking appropriate action.

## Internal Control[8]

**.40** The auditor should obtain an understanding of the five components of internal control sufficient to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures. The auditor should obtain a sufficient understanding by performing risk assessment procedures to evaluate the design of controls relevant to an audit of financial statements and to determine whether they have been implemented. The auditor should use such knowledge to:

---

[8] This section recognizes the definition and description of internal control contained in *Internal Control—Integrated Framework*, published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO Report).

**AU §314.36**

## Understanding the Entity and Its Environment     **1677**

- Identify types of potential misstatements.
- Consider factors that affect the risks of material misstatement.
- Design tests of controls, when applicable, and substantive procedures.

**.41** Internal control[9] is a process—effected by those charged with governance, management, and other personnel—designed to provide reasonable assurance about the achievement of the entity's objectives with regard to reliability of financial reporting, effectiveness and efficiency of operations, and compliance with applicable laws and regulations.[10] Internal control over safeguarding of assets against unauthorized acquisition, use, or disposition may include controls relating to financial reporting and operations objectives. Internal control consists of five interrelated components:

- a.  *Control environment* sets the tone of an organization, influencing the control consciousness of its people. It is the foundation for all other components of internal control, providing discipline and structure.
- b.  Entity's *risk assessment* is the entity's identification and analysis of relevant risks to achievement of its objectives, forming a basis for determining how the risks should be managed.
- c.  *Information and communication systems* support the identification, capture, and exchange of information in a form and time frame that enable people to carry out their responsibilities.
- d.  *Control activities* are the policies and procedures that help ensure that management directives are carried out.
- e.  *Monitoring* is a process that assesses the quality of internal control performance over time.

Appendix B [paragraph .126] contains a detailed discussion of the internal control components.

**.42** The division of internal control into the five components provides a useful framework for auditors to consider how different aspects of an entity's internal control may affect the audit. The division does not necessarily reflect how an entity considers and implements internal control. Also, the auditor's primary consideration is whether, and how, a specific control prevents, or detects and corrects, material misstatements in relevant assertions related to classes of transactions, account balances, or disclosures, rather than its classification into any particular component. Accordingly, auditors may use different terminology or frameworks to describe the various aspects of internal control, and their effect on the audit, than those used in this section, provided all the components described in this section are addressed.

**.43** The way in which internal control is designed and implemented varies with an entity's size and complexity. Specifically, smaller entities may use less formal means and simpler processes and procedures to achieve their objectives. For example, smaller entities with active management involvement in the financial reporting process may not have extensive descriptions of accounting procedures or detailed written policies. For some entities, in particular very small entities, the owner-manager[11] may perform functions that in a larger entity would be regarded as belonging to several of the components of internal control. Therefore, the components of internal control may not be clearly distinguished within smaller entities, but their underlying purposes are equally valid.

---

[9]  Internal control also may be referred to as internal control structure.

[10]  It follows that internal control is designed and effected to address business risks that threaten the achievement of any of these objectives.

[11]  This section uses the term *owner-manager* to indicate proprietors of entities who are involved in the running of the entity on a day-to-day basis.

I APP. 793

**1678**      **The Standards of Field Work**

**.44** The auditor should obtain an understanding of the entity's selection and application of accounting policies and should consider whether they are appropriate for its business and consistent with generally accepted accounting principles and accounting policies used in the relevant industry,[12] or with a comprehensive basis of accounting other than generally accepted accounting principles.[13] The understanding encompasses the methods the entity uses to account for significant and unusual transactions; the effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus; and changes in the entity's accounting policies. The auditor should also identify financial reporting standards and regulations that are new to the entity and consider when and how the entity will adopt such requirements. Where the entity has changed its selection of or method of applying a significant accounting policy, the auditor should consider the reasons for the change and whether it is appropriate and consistent with generally accepted accounting principles.

**.45** The presentation of financial statements in conformity with generally accepted accounting principles should include adequate disclosure of material matters. These matters relate to the form, arrangement, and content of the financial statements and their appended notes, including, for example, the terminology used, the amount of detail given, the classification of items in the statements, and the bases of amounts set forth. The auditor should consider whether the entity has disclosed a particular matter appropriately in light of the circumstances and facts of which the auditor is aware at the time.

**.46** For the purposes of this section, the term *internal control* encompasses all five components of internal control stated above. In addition, the term *controls* refers to one or more of the components, or any aspect thereof.

### *Controls Relevant to Reliable Financial Reporting and to the Audit*

**.47** There is a direct relationship between an entity's objectives and the internal control components it implements to provide reasonable assurance about their achievement. In addition, internal control is relevant to the entire entity, or to any of its operating units or business functions. This relationship is depicted as follows:



---

[12] [Footnote deleted, October 2009, to reflect conforming changes necessary due to the withdrawal of SAS No. 69.]

[13] The term *comprehensive basis of accounting other than generally accepted accounting principles* is defined in section 623, *Special Reports*. Hereafter, reference to generally accepted accounting principles in this section includes, where applicable, an other comprehensive basis of accounting.

**AU §314.44**

### Understanding the Entity and Its Environment     **1679**

Although the entity's objectives, and therefore controls, relate to financial reporting, operations, and compliance, as referred to in paragraph .41, not all of these objectives and controls are relevant to the audit. Further, although internal control applies to the entire entity, or to any of its operating units or business functions, an understanding of internal control relating to each of the entity's operating units and business functions may not be necessary to the performance of the audit.

**.48**  Ordinarily, controls that are relevant to an audit pertain to the entity's objective of preparing financial statements that are fairly presented in conformity with generally accepted accounting principles, including the management of risk that may give rise to a risk of material misstatement in those financial statements. However, it is not necessary to assess all controls in connection with assessing the risks of material misstatement and designing and performing further audit procedures in response to assessed risks. It is a matter of the auditor's professional judgment, as to the controls or combination of controls that should be assessed. However, as stated in paragraph .115, for significant risks, to the extent the auditor has not already done so, the auditor should evaluate the design of the entity's related controls, including relevant control activities, and determine whether they have been implemented. In exercising that judgment, the auditor should consider the circumstances, the applicable component, and factors such as the following:

- Materiality.
- The size of the entity.
- The nature of the entity's business, including its organization and ownership characteristics.
- The diversity and complexity of the entity's operations.
- Applicable legal and regulatory requirements.
- The nature and complexity of the systems that are part of the entity's internal control, including the use of service organizations.

**.49**  Controls over the completeness and accuracy of information produced by the entity may also be relevant to the audit if the auditor intends to make use of the information in designing and performing further audit procedures. The auditor's previous experience with the entity and information obtained in understanding the entity and its environment and throughout the audit assist the auditor in identifying controls relevant to the audit.

**.50**  Controls relating to operations and compliance [14] objectives may, however, be relevant to an audit if they pertain to information or data the auditor may evaluate or use in applying audit procedures. For example, controls pertaining to nonfinancial data that the auditor may use in analytical procedures, such as production statistics, or controls pertaining to detecting noncompliance with laws and regulations that may have a direct and material effect on the financial statements, such as controls over compliance with income tax laws and regulations used to determine the income tax provision, may be relevant to an audit.

**.51**  An entity generally has controls relating to objectives that are not relevant to an audit and therefore need not be considered. For example, an entity may rely on a sophisticated system of automated controls to provide efficient and effective operations (such as a manufacturing plant's computerized

---

[14]  An auditor may need to consider controls relevant to compliance objectives when performing an audit in accordance with section 801, *Compliance Audits*. [Footnote revised, December 2010, to reflect conforming changes necessary due to the issuance of SAS No. 117.]

**AU §314.51**

I APP. 795

**1680**         **The Standards of Field Work**

production scheduling system), but these controls ordinarily would not be relevant to the audit.

**.52**   Internal control over safeguarding of assets against unauthorized acquisition, use, or disposition may include controls relating to financial reporting and operations objectives. In obtaining an understanding of each of the components of internal control, the auditor's consideration of safeguarding controls is generally limited to those relevant to the reliability of financial reporting. For example, use of access controls, such as passwords, that limit access to the data and programs that process cash disbursements may be relevant to a financial statement audit. Conversely, safeguarding controls relating to operations objectives, such as controls to prevent the excessive use of materials in production, generally are not relevant to a financial statement audit.

**.53**   Controls relevant to the audit may exist in any of the components of internal control and a further discussion of controls relevant to the audit is included under the heading of each internal control component below (see paragraphs .67 through .101). In addition, paragraphs .115 and .117 discuss certain risks for which the auditor should evaluate the design of the entity's controls over such risks and determine whether they have been implemented.

### *Depth of Understanding of Internal Control*

**.54**   Obtaining an understanding of internal control involves evaluating the design of a control and determining whether it has been implemented. Evaluating the design of a control involves considering whether the control, individually or in combination with other controls, is capable of effectively preventing or detecting and correcting material misstatements. Further explanation is contained in the discussion of each internal control component below (see paragraphs .67 through .101). Implementation of a control means that the control exists and that the entity is using it. The auditor should consider the design of a control in determining whether to consider its implementation. An improperly designed control may represent a material weakness[15] in the entity's internal control and the auditor should consider whether to communicate this to those charged with governance and management.

**.55**   As stated in paragraph .06, the auditor should perform risk assessment procedures to obtain an understanding of internal control. Procedures to obtain audit evidence about the design and implementation of relevant controls may include inquiring of entity personnel, observing the application of specific controls, inspecting documents and reports, and tracing transactions through the information system relevant to financial reporting. Inquiry alone is not sufficient to evaluate the design of a control relevant to an audit and to determine whether it has been implemented.

**.56**   Obtaining an understanding of an entity's controls is not sufficient to serve as testing the operating effectiveness of controls, unless there is some automation[16] that provides for the consistent application of the operation of the control (manual and automated elements of internal control relevant to the audit are further described below). For example, obtaining audit evidence about the implementation of a manually operated control at a point in time does not provide audit evidence about the operating effectiveness of the control at other times during the period under audit. However, IT enables an entity to process large volumes of data consistently and enhances the entity's ability to monitor the performance of control activities and to achieve effective segregation of

---

[15] A *material weakness* is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

[16] This is assuming effective IT general controls.

**AU §314.52**

duties by implementing security controls in applications, databases, and operating systems. Therefore, because generally, IT processing is inherently consistent, performing audit procedures to determine whether an automated control has been implemented may serve as a test of that control's operating effectiveness, depending on the auditor's assessment and testing of IT general controls, including computer security and program change control. Tests of the operating effectiveness of controls are further described in section 318.

### *Characteristics of Manual and Automated Elements of Internal Control Relevant to the Auditor's Risk Assessment*

**.57** *Effect of information technology on internal control.* An entity's use of IT may affect any of the five components of internal control relevant to the achievement of the entity's financial reporting, operations, or compliance objectives, and its operating units or business functions. For example, an entity may use IT as part of discrete systems that support only particular business units, functions, or activities, such as a unique accounts receivable system for a particular business unit or a system that controls the operation of factory equipment. Alternatively, an entity may have complex, highly integrated systems that share data and that are used to support all aspects of the entity's financial reporting, operations, and compliance objectives.

**.58** The use of IT also affects the fundamental manner in which transactions are initiated, authorized, recorded, processed, and reported.[17] In a manual system, an entity uses manual procedures and records in paper format (for example, individuals may manually record sales orders on paper forms or journals, authorize credit, prepare shipping reports and invoices, and maintain accounts receivable records). Controls in such a system also are manual and may include such procedures as approvals and reviews of activities, and reconciliations and follow-up of reconciling items. Alternatively, an entity may have information systems that use automated procedures to initiate, authorize, record, process, and report transactions, in which case records in electronic format replace such paper documents as purchase orders, invoices, shipping documents, and related accounting records. Controls in systems that use IT consist of a combination of automated controls (for example, controls embedded in computer programs) and manual controls. Further, manual controls may be independent of IT, may use information produced by IT, or may be limited to monitoring the effective functioning of IT and of automated controls, and to handling exceptions. When IT is used to initiate, authorize, record, process, or report transactions, or other financial data for inclusion in financial statements, the systems and programs may include controls related to the corresponding assertions for material accounts or may be critical to the effective functioning of manual controls that depend on IT. An entity's mix of manual and automated controls varies with the nature and complexity of the entity's use of IT.

**.59** Generally, IT provides potential benefits of effectiveness and efficiency for an entity's internal control because it enables an entity to:

- Consistently apply predefined business rules and perform complex calculations in processing large volumes of transactions or data.
- Enhance the timeliness, availability, and accuracy of information.
- Facilitate the additional analysis of information.
- Enhance the ability to monitor the performance of the entity's activities and its policies and procedures.
- Reduce the risk that controls will be circumvented.

---

[17] Paragraph B9 of Appendix B [paragraph .126] defines *initiation*, *authorizing*, *recording*, *processing*, and *reporting* as used throughout this section.

**1682**            **The Standards of Field Work**

- Enhance the ability to achieve effective segregation of duties by implementing security controls in applications, databases, and operating systems.

**.60**  IT also poses specific risks to an entity's internal control, including:

- Reliance on systems or programs that are processing data inaccurately, processing inaccurate data, or both.
- Unauthorized access to data that may result in destruction of data or improper changes to data, including the recording of unauthorized or nonexistent transactions or inaccurate recording of transactions.
- Unauthorized changes to data in master files.
- Unauthorized changes to systems or programs.
- Failure to make necessary changes to systems or programs.
- Inappropriate manual intervention.
- Potential loss of data or inability to access data as required.

**.61**  The extent and nature of these risks to internal control vary depending on the nature and characteristics of the entity's information system. For example, multiple users, either external or internal, may access a common database of information that affects financial reporting. In such circumstances, a lack of control at a single user entry point might compromise the security of the entire database, potentially resulting in improper changes to or destruction of data. When IT personnel or users are given, or can gain, access privileges beyond those necessary to perform their assigned duties, a breakdown in segregation of duties can occur. This could result in unauthorized transactions or changes to programs or data that affect the financial statements. Therefore, the nature and characteristics of an entity's use of IT in its information system affect the entity's internal control.

**.62**  Manual controls of systems may be more suitable where judgment and discretion are required, such as for the following circumstances:

- Large, unusual, or nonrecurring transactions.
- Circumstances where misstatements are difficult to define, anticipate, or predict.
- In changing circumstances that require a control response outside the scope of an existing automated control.
- In monitoring the effectiveness of automated controls.

**.63**  Manual controls are performed by people, and therefore pose specific risks to the entity's internal control. Manual controls may be less reliable than automated controls because they can be more easily bypassed, ignored, or overridden and they are also more prone to errors and mistakes. Consistency of application of a manual control element cannot therefore be assumed. Manual systems may be less suitable for the following:

- High volume or recurring transactions, or in situations where errors that can be anticipated or predicted can be prevented or detected by control parameters that are automated.
- Control activities where the specific ways to perform the control can be adequately designed and automated.

### Limitations of Internal Control

**.64**  Internal control, no matter how well designed and operated, can provide an entity with reasonable, but not absolute, assurance about achieving an

**AU §314.60**

entity's objectives. The likelihood of achievement is affected by limitations inherent to internal control. These include the realities that human judgment in decision making can be faulty and that breakdowns in internal control can occur because of human failures such as simple errors or mistakes. For example, if an entity's information system personnel do not sufficiently understand how an order entry system processes sales transactions, they may design changes to the system that will erroneously process sales for a new line of products. On the other hand, such changes may be correctly designed but misunderstood by individuals who translate the design into program code. Errors also may occur in the use of information produced by IT. For example, automated controls may be designed to report transactions over a specified amount for management review, but individuals responsible for conducting the review may not understand the purpose of such reports and, accordingly, may fail to review them or investigate unusual items.

**.65**   Additionally, controls, whether manual or automated, can be circumvented by the collusion of two or more people or inappropriate management override of internal control. For example, management may enter into undisclosed agreements with customers that alter the terms and conditions of the entity's standard sales contracts, which may result in improper revenue recognition. Also, edit checks in a software program that are designed to identify and report transactions that exceed specified credit limits may be overridden or disabled.

**.66**   Smaller entities often have fewer employees, which may limit the extent to which segregation of duties is practicable. However, for key areas, even in a very small entity, it can be practicable to implement some degree of segregation of duties or other form of unsophisticated but effective controls. The potential for override of controls by the owner-manager depends to a great extent on the control environment and, in particular, the owner-manager's attitudes about the importance of internal control.

### *Internal Control Components*

**.67**   *Control environment.* The control environment sets the tone of an organization, influencing the control consciousness of its people. It is the foundation for all other components of internal control, providing discipline and structure.

**.68**   The primary responsibility for the prevention and detection of fraud and error rests with those charged with governance and the management of the entity. In obtaining an understanding of the control environment, the auditor should consider the design and implementation of entity programs and controls to address the risk of fraud as discussed in section 316. The absence or inadequacy of such programs and controls may constitute a significant deficiency or a material weakness. An example of such programs is a "hotline process" for employees to report on a confidential basis any known or suspected fraudulent activity.

**.69**   In evaluating the design of the entity's control environment, the auditor should consider the following elements and how they have been incorporated into the entity's processes:

a. *Communication and enforcement of integrity and ethical values.* Essential elements that influence the effectiveness of the design, administration, and monitoring of controls.

b. *Commitment to competence.* Management's consideration of the competence levels for particular jobs and how those levels translate into requisite skills and knowledge.

**1684**            **The Standards of Field Work**

    *c.*  *Participation of those charged with governance.* Independence from management, the experience and stature of its members, the extent of its involvement and scrutiny of activities, the information it receives, the degree to which difficult questions are raised and pursued with management, and its interaction with internal and external auditors.

    *d.*  *Management's philosophy and operating style.* Management's approach to taking and managing business risks, and management's attitudes and actions toward financial reporting, information processing and accounting functions, and personnel.

    *e.*  *Organizational structure.* The framework within which an entity's activities for achieving its objectives are planned, executed, controlled, and reviewed.

    *f.*  *Assignment of authority and responsibility.* How authority and responsibility for operating activities are assigned and how reporting relationships and authorization hierarchies are established.

    *g.*  *Human resource policies and practices.* Recruitment, orientation, training, evaluating, counseling, promoting, compensating, and remedial actions.

For example, management's response to internal control deficiencies communicated in prior periods may relate to one or more of the aforementioned elements, such as commitment to competence or management's philosophy and operating style.

    **.70**  The auditor should obtain sufficient knowledge of the control environment to understand the attitudes, awareness, and actions of those charged with governance concerning the entity's internal control and its importance in achieving reliable financial reporting. In understanding the control environment, the auditor should concentrate on the implementation of controls because controls may be established but not acted upon.

    **.71**  The responsibilities of those charged with governance are of considerable importance. This is recognized in codes of practice and other regulations or guidance produced for the benefit of those charged with governance. The basis for management remuneration, especially executive performance-related compensation, places stress on management arising from the conflicting demands of fair reporting and the perceived benefits to shareholders of improved results. It is one, but not the only, role of those charged with governance to counterbalance such pressures. In understanding the control environment, the auditor should consider such matters as the independence of the directors and their ability to evaluate the actions of management. The auditor also should consider whether there is a group of those charged with governance that understands the entity's business transactions and evaluates whether the financial statements are presented fairly in conformity with generally accepted accounting principles.

    **.72**  In understanding the control environment elements, the auditor should consider whether they have been implemented. The auditor should obtain sufficient appropriate audit evidence through a combination of inquiries and other risk assessment procedures, for example, corroborating inquiries through observation or inspection of documents. For example, through inquiries of management and employees, the auditor may obtain an understanding of how management communicates to employees its views on business practices and ethical behavior. The auditor should determine whether controls have been implemented by considering, for example, whether management has established a formal code of conduct and whether it acts in a manner that supports or condones violations of or authorizes exceptions to the code.

**AU §314.70**

I APP. 800

## Understanding the Entity and Its Environment      **1685**

**.73** Audit evidence for elements of the control environment may not be available in documentary form, in particular for smaller entities where communication between management and other personnel may be informal, yet effective. For example, management's commitment to ethical values and competence are often implemented through the behavior and attitude they demonstrate in managing the entity's business instead of in a written code of conduct. Consequently, management's attitudes, awareness, and actions are of particular importance in the design of a smaller entity's control environment. In addition, the role of those charged with governance is often undertaken by the owner-manager where there are no other owners.

**.74** When obtaining an understanding of the control environment, the auditor also should consider the collective effect on the control environment of strengths and weaknesses in various control environment elements. Management's strengths and weaknesses may have a pervasive effect on internal control. For example, owner-manager controls may mitigate a lack of segregation of duties in a small business, or an active and independent board of directors may influence the philosophy and operating style of senior management in larger entities. Alternatively, management's failure to commit sufficient resources to address security risks presented by IT may adversely affect internal control by allowing improper changes to be made to computer programs or to data, or by allowing unauthorized transactions to be processed. Similarly, human resource policies and practices directed toward hiring competent financial, accounting, and IT personnel may not mitigate a strong bias by top management to overstate earnings.

**.75** The existence of a satisfactory control environment is a positive factor when the auditor assesses the risks of material misstatement of the financial statements. Although an effective control environment is not an absolute deterrent to fraud because of the limitations of internal control, it may help reduce the risks of fraud. Because of the pervasive effect of the control environment on assessing the risks of material misstatement, the auditor's preliminary judgment about its effectiveness often influences the nature, timing, and extent of the further audit procedures to be performed. For example, weaknesses in the control environment may lead the auditor to perform more substantive procedures as of the date of the balance sheet rather than at an interim date, modify the nature of the tests of controls or substantive procedures to obtain more persuasive evidence, or increase the number of locations to be included in the scope of the audit. Conversely, an effective control environment may allow the auditor to have some degree of increased confidence in internal control and the reliability of evidence generated internally within the entity and thus, for example, allow the auditor to perform tests of controls and substantive procedures at an interim date rather than at the balance sheet date. However, the control environment ordinarily is not specific enough to prevent or detect material misstatements in account balances, classes of transactions, or disclosures and related assertions. The auditor, therefore, should consider the effect of other components of internal control in conjunction with the control environment when assessing the risks of material misstatement, for example, the monitoring of controls and the operation of specific control activities.

**.76** *The entity's risk assessment process.* An entity's risk assessment process for financial reporting purposes is its identification, analysis, and management of risks relevant to the preparation of financial statements that are presented fairly in conformity with generally accepted accounting principles. For example, risk assessment may address how the entity considers the possibility of unrecorded transactions or identifies and analyzes significant estimates

**1686**                        **The Standards of Field Work**

recorded in the financial statements. Risks relevant to reliable financial reporting also relate to specific events or transactions.

**.77**   Risks relevant to financial reporting include external and internal events and circumstances that may occur and adversely affect an entity's ability to initiate, authorize, record, process, and report financial data consistent with the assertions of management in the financial statements.[18] Risks can arise or change due to circumstances such as the following:

- Changes in operating environment
- New personnel
- New or revamped information systems
- Rapid growth
- New technology
- New business models, products, or activities
- Corporate restructurings
- Expanded foreign operations
- New accounting pronouncements

**.78**   The auditor should obtain sufficient knowledge of the entity's risk assessment process to understand how management considers risks relevant to financial reporting objectives and decides about actions to address those risks. In evaluating the design and implementation of the entity's risk assessment process, the auditor should consider how management identifies business risks relevant to financial reporting, estimates the significance of the risks, assesses the likelihood of their occurrence, and decides upon actions to manage them. An entity's risk assessment process for financial reporting that encompasses the elements of internal control herein might be part of an entity's risk management framework. As such, auditors should focus on aspects of the framework that affect risks of material misstatements in financial reporting. If the entity's risk assessment process is appropriate to the circumstances, it assists the auditor in identifying risks of material misstatement.

**.79**   The auditor should inquire about business risks that management has identified and should consider whether they may result in material misstatement of the financial statements. An entity's risk assessment process differs from the auditor's consideration of audit risk in a financial statement audit. The purpose of an entity's risk assessment process is to identify, analyze, and manage risks that affect the entity's objectives. In a financial statement audit, the auditor assesses risks to evaluate the likelihood that material misstatements could occur in the financial statements. Not all of the entity's risks are necessarily audit risks. However, the entity's risk assessment process may affect the auditor's consideration of audit risk. During the audit, the auditor may identify business risks or risks of material misstatement in the financial statements that management failed to identify. In such cases, the auditor should consider why the entity's risk assessment process failed to identify those risks and whether the process is appropriate to its circumstances.

**.80**   In a smaller entity, management may not have a formal risk assessment process as described in paragraph .76. For such entities, the auditor should discuss with management how risks to the business are identified by management and how they are addressed.

---

[18]   These assertions are discussed in section 326, *Audit Evidence*.

**AU §314.77**

**.81** *Information system, including the related business processes relevant to financial reporting, and communication.* The information system relevant to financial reporting objectives, which includes the accounting system, consists of the procedures, whether automated or manual, and records established to initiate, authorize, record, process, and report entity transactions (as well as events and conditions) and to maintain accountability for the related assets, liabilities, and equity. The quality of system-generated information affects management's ability to make appropriate decisions in controlling the entity's activities and to prepare reliable financial reports.

**.82** Communication involves providing an understanding of individual roles and responsibilities pertaining to internal control over financial reporting.

**.83** The auditor should obtain sufficient knowledge of the information system, including the related business processes relevant to financial reporting, to understand:

- The classes of transactions in the entity's operations that are significant to the financial statements.

- The procedures, within both automated and manual systems, by which those transactions are initiated, authorized, recorded, processed, and reported in the financial statements.

- The related accounting records, whether electronic or manual, supporting information, and specific accounts in the financial statements involved in initiating, authorizing, recording, processing, and reporting transactions.

- How the information system captures events and conditions, other than classes of transactions, that are significant to the financial statements.

- The financial reporting process used to prepare the entity's financial statements, including significant accounting estimates and disclosures.

**.84** When IT is used to initiate, authorize, record, process, or report transactions or other financial data for inclusion in financial statements, the systems and programs may include controls related to the corresponding assertions for significant accounts or may be critical to the effective functioning of manual controls that depend on IT.

**.85** The auditor also should obtain an understanding of how the incorrect processing of transactions is resolved. For example, such understanding might include whether there is an automated suspense file, how it is used by the entity to ensure that suspense items are cleared out on a timely basis, and how system overrides or bypasses to controls are processed and accounted for.

**.86** In obtaining an understanding of the financial reporting process (including the closing process), the auditor should obtain an understanding of the automated and manual procedures an entity uses to prepare financial statements and related disclosures, and how misstatements may occur. Such procedures include those used to:

- *Enter transaction totals into the general ledger (or equivalent record).* In some information systems, IT may be used to transfer such information automatically from transaction processing systems to general ledger or financial reporting systems. The automated processes and controls in such systems may reduce the risk of inadvertent error but do not overcome the risk that individuals may inappropriately override such automated processes, for example, by changing the amounts

**AU §314.86**

I APP. 803

**1688**        **The Standards of Field Work**

being automatically passed to the general ledger or financial report-
ing system. Furthermore, in planning the audit, the auditor should
be aware that when IT is used to transfer information automatically
there may be little or no visible evidence of such intervention in the
information systems.

- *Initiate, authorize, record, and process journal entries in the general
  ledger.* An entity's financial reporting process used to prepare the fi-
  nancial statements typically includes the use of standard journal en-
  tries that are required on a recurring basis to record transactions such
  as sales, purchases, and cash disbursements, or to record accounting
  estimates that are periodically made by management such as changes
  in the estimate of uncollectible accounts receivable. An entity's finan-
  cial reporting process also includes the use of nonstandard journal en-
  tries to record nonrecurring or unusual transactions or adjustments
  such as a business combination or disposal, or a nonrecurring estimate
  such as an asset impairment. In manual, paper-based general ledger
  systems, such journal entries may be identified through inspection of
  ledgers, journals, and supporting documentation. However, when IT is
  used to maintain the general ledger and prepare financial statements,
  such entries may exist only in electronic form and may be more easily
  identified through the use of computer-assisted audit techniques.

- *Initiate and record recurring and nonrecurring adjustments to the fi-
  nancial statements.* These are procedures relating to adjustments and
  reclassifications that are not reflected in formal journal entries.

- *Combine and consolidate general ledger data.* This includes procedures
  to combine detailed general ledger accounts, prepare the trial balance,
  and prepare consolidated financial data (for example, transferring gen-
  eral ledger data and adjusting journals into a consolidation system or
  spreadsheet; performing consolidation routines; and reconciling and
  reviewing consolidated financial data, including footnote data).

- *Prepare financial statements and disclosures.* These are procedures
  designed to ensure that information required to be presented and dis-
  closed is accumulated, recorded, processed, summarized, and appro-
  priately reported in the financial statements.

**.87**   The auditor should obtain an understanding of the entity's informa-
tion system relevant to financial reporting in a manner that is appropriate to
the entity's circumstances. This includes obtaining an understanding of how
transactions originate within the entity's business processes. An entity's busi-
ness processes are the activities designed to develop, purchase, produce, sell,
and distribute an entity's products and services; ensure compliance with laws
and regulations; and record information, including accounting and financial
reporting information.

**.88**   The auditor should obtain sufficient knowledge of the communica-
tion component to understand how the entity communicates financial reporting
roles and responsibilities and significant matters relating to financial reporting.
Communication involves providing an understanding of individual roles and re-
sponsibilities pertaining to internal control over financial reporting and may
take such forms as policy manuals and financial reporting manuals. It includes
the extent to which personnel understand how their activities in the finan-
cial reporting information system relate to the work of others and the means
of reporting exceptions to an appropriate higher level within the entity. Open
communication channels help ensure that exceptions are reported and acted on.
The auditor's understanding of communication pertaining to financial reporting

**AU §314.87**

## Understanding the Entity and Its Environment **1689**

matters also includes communications between management and those charged with governance, particularly the audit committee, as well as external communications, such as those with regulatory authorities.

**.89** ***Control activities.*** The auditor should obtain an understanding of those control activities relevant to the audit. Control activities are the policies and procedures that help ensure that management directives are carried out; for example, that necessary actions are taken to address risks that threaten the achievement of the entity's objectives. Control activities, whether automated or manual, have various objectives and are applied at various organizational and functional levels. Examples of specific control activities include the following:

- *Authorization.* Control activities related to the initiation of derivatives and other off-balance sheet transactions may be relevant to the auditor's design of audit procedures related to the completeness assertion.

- *Segregation of duties.* Whether the personnel responsible for recording estimates for uncollectible accounts receivables are independent of personnel authorizing sales transactions may be relevant to the auditor's design of audit procedures related to the valuation assertion.

- *Safeguarding.* Control activities related to whether inventory is securely stored and the movement and access to inventory is limited to authorized individuals may be relevant to the auditor's design of audit procedures related to the existence assertion, in particular, the auditor's consideration as to the number of locations to visit.

- *Asset accountability.* Control activities related to reconciliations of the detailed records to the general ledger are ordinarily necessary to design and perform audit procedures for material classes of transactions and account balances.

**.90** The auditor should consider the knowledge about the presence or absence of control activities obtained from the understanding of the other components of internal control in determining whether it is necessary to devote additional attention to obtaining an understanding of control activities. An audit does not require an understanding of all the control activities related to each class of transactions, account balance, and disclosure in the financial statements or to every relevant assertion. Ordinarily, control activities that may be relevant to an audit include those relating to authorization, segregation of duties, safeguarding of assets, and asset accountability, including, for example, reconciliations of the general ledger to the detailed records. The auditor should obtain an understanding of the process of reconciling detail to the general ledger for significant accounts. Also, control activities are relevant to the audit if the auditor is required to evaluate them as discussed in paragraphs .115 through .117.

**.91** In obtaining an understanding of control activities, the auditor's primary consideration is whether, and how, a specific control activity, individually or in combination with others, prevents, or detects and corrects, material misstatements in classes of transactions, account balances, or disclosures. Control activities relevant to the audit are those for which the auditor considers it necessary to obtain an understanding in order to assess risks of material misstatement at the assertion level and to design and perform further audit procedures responsive to the assessed risks. The auditor's emphasis is on identifying and obtaining an understanding of control activities that address the areas where the auditor considers that material misstatements are more likely to occur. When multiple control activities achieve the same objective, it is unnecessary to obtain an understanding of each of the control activities related to such objective.

I APP. 805

**1690**    **The Standards of Field Work**

**.92**    The auditor should obtain an understanding of how IT affects control activities that are relevant to planning the audit. Some entities and auditors may view the IT control activities in terms of application controls and general controls. Application controls apply to the processing of individual applications. Accordingly, application controls relate to the use of IT to initiate, authorize, record, process, and report transactions or other financial data. These controls help ensure that transactions occurred, are authorized, and are completely and accurately recorded and processed. Examples include edit checks of input data, numerical sequence checks, and manual follow-up of exception reports.

**.93**    Application controls may be performed by IT (for example, automated reconciliation of subsystems) or by individuals. When application controls are performed by people interacting with IT, they may be referred to as user controls. The effectiveness of user controls, such as reviews of computer-produced exception reports or other information produced by IT, may depend on the accuracy of the information produced. For example, a user may review an exception report to identify credit sales over a customer's authorized credit limit without performing procedures to verify its accuracy. In such cases, the effectiveness of the user control (that is, the review of the exception report) depends on both the effectiveness of the user review and the accuracy of the information in the report produced by IT.

**.94**    General controls are policies and procedures that relate to many applications and support the effective functioning of application controls by helping to ensure the continued proper operation of information systems. General controls commonly include controls over data center and network operations; system software acquisition, change, and maintenance; access security; and application system acquisition, development, and maintenance. While ineffective general controls do not, by themselves, cause misstatements, they may permit application controls to operate improperly and allow misstatements to occur and not be detected. For example, if there are weaknesses in the general controls over access security, and applications are relying on these general controls to prevent unauthorized transactions from being processed, such a general control weakness may have a more severe effect on the effective design and operation of the application control. General controls should be assessed in relation to their effect on applications and data that become part of the financial statements. For example, if no new systems are implemented during the period of the financial statements, weaknesses in the general controls over "systems development" may not be relevant to the financial statements being audited.

**.95**    The use of IT affects the way that control activities are implemented. For example, when IT is used in an information system, segregation of duties often is achieved by implementing security controls.

**.96**    The auditor should consider whether the entity has responded adequately to the risks arising from IT by establishing effective controls, including effective general controls upon which application controls depend. From the auditor's perspective, controls over IT systems are effective when they maintain the integrity of information and the security of the data such systems process.

**.97**    ***Monitoring of controls.*** The auditor should obtain an understanding of the major types of activities that the entity uses to monitor internal control over financial reporting, including the sources of the information related to those activities, and how those activities are used to initiate corrective actions to its controls.

**.98**    An important management responsibility is to establish and maintain internal control on an ongoing basis. Management's monitoring of controls includes whether they are operating as intended and that they are modified as

**AU §314.92**

appropriate for changes in conditions. Monitoring of controls may include activities such as management's review of whether bank reconciliations are being prepared on a timely basis, internal auditors' evaluation of sales personnel's compliance with the entity's policies on terms of sales contracts, and legal department's oversight of compliance with the entity's ethical or business practice policies.

**.99** Monitoring of controls is a process to assess the quality of internal control performance over time. It involves assessing the design and operation of controls on a timely basis and taking necessary corrective actions. Monitoring is done to ensure that controls continue to operate effectively. For example, if the timeliness and accuracy of bank reconciliations are not monitored, personnel are likely to stop preparing them. Management accomplishes monitoring of controls through ongoing activities, separate evaluations, or a combination of the two. In many entities, internal auditors or personnel performing similar functions contribute to the monitoring of an entity's activities. When obtaining an understanding of the internal audit function, the auditor should follow the guidance in paragraphs .04 through .08 of section 322, *The Auditor's Consideration of the Internal Audit Function in an Audit of Financial Statements*. Management's monitoring activities may include using information from communications from external parties such as customer complaints and regulator comments that may indicate problems or highlight areas in need of improvement.

**.100** In many entities, much of the information used in monitoring may be produced by the entity's information system. If management assumes that data used for monitoring is accurate without having a basis for that assumption, errors may exist in the information, potentially leading management to incorrect conclusions from its monitoring activities. The auditor should obtain an understanding of the sources of the information related to the entity's monitoring activities, and the basis upon which management considers the information to be sufficiently reliable for the purpose.

**.101** The auditor's understanding of management's monitoring of controls may assist the auditor in identifying the existence of more detailed controls or other activities that the auditor may consider in making risk assessments.

## Assessing the Risks of Material Misstatement

**.102** The auditor should identify and assess the risks of material misstatement at the financial statement level and at the relevant assertion level related to classes of transactions, account balances, and disclosures. For this purpose, the auditor should:

- Identify risks throughout the process of obtaining an understanding of the entity and its environment, including relevant controls that relate to the risks, and considering the classes of transactions, account balances, and disclosures in the financial statements.

- Relate the identified risks to what can go wrong at the relevant assertion level.

- Consider whether the risks are of a magnitude that could result in a material misstatement of the financial statements.

- Consider the likelihood that the risks could result in a material misstatement of the financial statements.

**.103** The auditor should use information gathered by performing risk assessment procedures, including the audit evidence obtained in evaluating the

**1692**     **The Standards of Field Work**

design of controls and determining whether they have been implemented, as audit evidence to support the risk assessment. The auditor should use the risk assessment to determine the nature, timing, and extent of further audit procedures to be performed. When the risk assessment is based on an expectation that controls are operating effectively to prevent or detect material misstatement, individually or when aggregated, at the relevant assertion level, the auditor should perform tests of the controls that the auditor has determined to be suitably designed to prevent or detect a material misstatement in the relevant assertion to obtain audit evidence that the controls are operating effectively, as described in section 318.

**.104** The auditor should determine whether the identified risks of material misstatement relate to specific relevant assertions related to classes of transactions, account balances, and disclosures, or whether they relate more pervasively to the financial statements taken as a whole and potentially affect many relevant assertions. The latter risks (risks at the financial statement level) may derive in particular from a weak control environment.

**.105** The nature of the risks arising from a weak control environment is such that they are not likely to be confined to specific individual risks of material misstatement in particular classes of transactions, account balances, and disclosures. Rather, weaknesses such as management's lack of competence may have a more pervasive effect on the financial statements and may require an overall response by the auditor.

**.106** In making risk assessments, the auditor should identify the controls that are likely to prevent or detect and correct material misstatements in specific relevant assertions. Generally, the auditor gains an understanding of controls and relates them to relevant assertions in the context of processes and systems in which they exist. Doing so is useful because individual control activities often do not in themselves address a risk. Often only multiple control activities, together with other elements of internal control, will be sufficient to address a risk.

**.107** Conversely, some control activities may have a specific effect on an individual relevant assertion embodied in a particular class of transaction or account balance. For example, the control activities that an entity established to ensure that its personnel are properly counting and recording the annual physical inventory relate directly to the existence and completeness assertions for the inventory account balance.

**.108** Controls can be either directly or indirectly related to an assertion. The more indirect the relationship, the less effective that control may be in preventing or detecting and correcting misstatements in that assertion. For example, a sales manager's review of a summary of sales activity for specific stores by region ordinarily is only indirectly related to the completeness assertion for sales revenue. Accordingly, it may be less effective in reducing risk for that assertion than controls more directly related to that assertion, such as matching shipping documents with billing documents.

**.109** In assessing risks, deficiencies in an entity's internal control may come to the auditor's attention that are significant enough that they are, in the auditor's judgment, significant deficiencies that should be communicated to those charged with governance as required by section 325, *Communication of Internal Control Related Matters Noted in an Audit*. Furthermore, the auditor's understanding of internal control may raise doubts about the auditability of an entity's financial statements. Concerns about the integrity of the entity's management may be so serious as to cause the auditor to conclude that the risk of management misrepresentation in the financial statements is such that an

**AU §314.104**

audit cannot be conducted. Also, concerns about the condition and reliability of an entity's records may cause the auditor to conclude that it is unlikely that sufficient appropriate audit evidence will be available to support an unqualified opinion on the financial statements. In such circumstances, the auditor should consider a qualification or disclaimer of opinion, but in some cases the auditor's only recourse may be to withdraw from the engagement.

## Significant Risks That Require Special Audit Consideration

**.110**  As part of the risk assessment described in paragraph .102, the auditor should determine which of the risks identified are, in the auditor's judgment, risks that require special audit consideration (such risks are defined as "significant risks"). Paragraphs .45 and .53 of section 318 describe the consequences for further audit procedures of identifying a risk as significant.

**.111**  The determination of significant risks, which arise on most audits, is a matter for the auditor's professional judgment. In exercising this judgment, the auditor should consider inherent risk[19] to determine whether the nature of the risk, the likely magnitude of the potential misstatement including the possibility that the risk may give rise to multiple misstatements, and the likelihood of the risk occurring are such that they require special audit consideration. Routine, noncomplex transactions that are subject to systematic processing are less likely to give rise to significant risks because they have lower inherent risks. On the other hand, significant risks are often derived from business risks that may result in a material misstatement. In considering the nature of the risks, the auditor should consider a number of matters, including the following:

- Whether the risk is a risk of fraud

- Whether the risk is related to recent significant economic, accounting, or other developments and, therefore, requires specific attention

- The complexity of transactions

- Whether the risk involves significant transactions with related parties

- The degree of subjectivity in the measurement of financial information related to the risks, especially those involving a wide range of measurement uncertainty

- Whether the risk involves significant nonroutine transactions that are outside the normal course of business for the entity, or that otherwise appear to be unusual

**.112**  Significant risks often relate to significant nonroutine transactions and judgmental matters. Nonroutine transactions are transactions that are unusual, either due to size or nature, and that therefore occur infrequently. Judgmental matters may include the development of accounting estimates for which there is significant measurement uncertainty.

**.113**  Risks of material misstatement may be greater for risks relating to significant nonroutine transactions arising from matters such as the following:

- Greater management intervention to specify the accounting treatment

- Greater manual intervention for data collection and processing

- Complex calculations or accounting principles

---

[19]  The auditor does this before considering the effect of identified controls related to the risk.

**1694**          **The Standards of Field Work**

- The nature of nonroutine transactions, which may make it difficult for the entity to implement effective controls over the risks
- Significant related-party transactions

**.114** Risks of material misstatement may be greater for risks relating to significant judgmental matters that require the development of accounting estimates arising from matters such as the following:

- Accounting principles for accounting estimates or revenue recognition may be subject to differing interpretation.
- Required judgment may be subjective or complex, or may require assumptions about the effects of future events, for example, judgment about fair value.

**.115** For significant risks, to the extent the auditor has not already done so, the auditor should evaluate the design of the entity's related controls, including relevant control activities, and determine whether they have been implemented. An understanding of the entity's controls related to significant risks should provide the auditor with adequate information to develop an effective audit approach. Management ought to be aware of significant risks; however, risks relating to significant nonroutine or judgmental matters are often less likely to be subject to routine controls. Therefore, the auditor's understanding of whether the entity has designed and implemented controls for such significant risks includes whether and how management responds to the risks and whether control activities such as a review of assumptions by senior management or experts, formal processes for estimations, or approval by those charged with governance have been implemented to address the risks. For example, where there are nonrecurring events such as the receipt of notice of a significant lawsuit, consideration of the entity's response will include such matters as whether it has been referred to appropriate experts (such as internal or external legal counsel), whether an assessment has been made of the potential effect, and how it is proposed that the circumstances are to be disclosed in the financial statements.

**.116** If management has not appropriately responded by implementing controls over significant risks and if, as a result, the auditor judges that there is a significant deficiency or material weakness in the entity's internal control over financial reporting, the auditor should communicate this matter to those charged with governance. In these circumstances, the auditor also should consider the implications for the auditor's risk assessment.

## Risks for Which Substantive Procedures Alone Do Not Provide Sufficient Appropriate Audit Evidence

**.117** As part of the risk assessment described in paragraph .102, the auditor should evaluate the design and determine the implementation of the entity's controls, including relevant control activities, over those risks for which, in the auditor's judgment, it is not possible or practicable to reduce detection risk at the relevant assertion level to an acceptably low level with audit evidence obtained only from substantive procedures. The consequences for further audit procedures of identifying such risks are described in paragraph .24 of section 318.

**.118** The understanding of the entity's information system relevant to financial reporting enables the auditor to identify risks of material misstatement that relate directly to the recording of routine classes of transactions or account balances and the preparation of reliable financial statements; these include risks of inaccurate or incomplete processing. Ordinarily, such risks relate

**AU §314.114**

**Understanding the Entity and Its Environment**      **1695**

to significant classes of transactions, such as an entity's revenue, purchases, and cash receipts or cash payments.

**.119** The characteristics of routine day-to-day business transactions often permit highly automated processing with little or no manual intervention. In such circumstances, it may not be possible to perform only substantive procedures in relation to the risk. For example, in circumstances where a significant amount of an entity's information is initiated, authorized, recorded, processed, or reported electronically, such as in an integrated system, the auditor may determine that it is not possible to design effective substantive procedures that by themselves would provide sufficient appropriate audit evidence that relevant classes of transactions or account balances are not materially misstated. In such cases, audit evidence may be available only in electronic form, and its appropriateness and sufficiency usually depend on the effectiveness of controls over its accuracy and completeness. Furthermore, the potential for improper initiation or alteration of information to occur and not be detected may be greater if information is initiated, authorized, recorded, processed, or reported only in electronic form and appropriate controls are not operating effectively.

**.120** Examples of situations in which the auditor may find it impossible to design effective substantive procedures that by themselves provide sufficient appropriate audit evidence that certain relevant assertions are not materially misstated include the following:

- An entity that conducts its business using IT to initiate orders for the purchase and delivery of goods based on predetermined rules of what to order and in what quantities and to pay the related accounts payable based on system-generated decisions initiated upon the confirmed receipt of goods and terms of payment. No other documentation of orders placed or goods received is produced or maintained, other than through the IT system.

- An entity that provides services to customers via electronic media (for example, an Internet service provider or a telecommunications company) and uses IT to create a log of the services provided to its customers, to initiate and process its billings for the services, and to automatically record such amounts in electronic accounting records that are part of the system used to produce the entity's financial statements.

## Revision of Risk Assessment

**.121** The auditor's assessment of the risks of material misstatement at the relevant assertion level is based on available audit evidence and may change during the course of the audit as additional audit evidence is obtained. In particular, the risk assessment may be based on an expectation that controls are operating effectively to prevent or detect and correct a material misstatement at the relevant assertion level. In performing tests of controls to obtain audit evidence about their operating effectiveness, the auditor may obtain audit evidence that controls are not operating effectively at relevant times during the audit. Similarly, in performing substantive procedures, the auditor may detect misstatements in amounts or frequency that is greater than is consistent with the auditor's risk assessment. When the auditor obtains audit evidence from performing further audit procedures that tends to contradict the audit evidence on which the auditor originally based the assessment, the auditor should revise the assessment and should further modify planned audit procedures accordingly. See paragraphs .70 and .74 of section 318 for further guidance.

I APP. 811

**1696**     The Standards of Field Work

## Documentation

**.122** The auditor should document:

a. The discussion among the audit team regarding the susceptibility of the entity's financial statements to material misstatement due to error or fraud, including how and when the discussion occurred, the subject matter discussed, the audit team members who participated, and significant decisions reached concerning planned responses at the financial statement and relevant assertion levels.

b. Key elements of the understanding obtained regarding each of the aspects of the entity and its environment identified in paragraph .21, including each of the components of internal control identified in paragraph .41, to assess the risks of material misstatement of the financial statements; the sources of information from which the understanding was obtained; and the risk assessment procedures.

c. The assessment of the risks of material misstatement both at the financial statement level and at the relevant assertion level as required by paragraph .102 and the basis for the assessment.

d. The risks identified and related controls evaluated as a result of the requirements in paragraphs .110 and .117.

**.123** The manner in which these matters are documented is for the auditor to determine using professional judgment. Section 339, *Audit Documentation*, provides general guidance regarding the purpose, content, and ownership and confidentiality of audit documentation. Examples of common techniques used alone or in combination include narrative descriptions, questionnaires, checklists, and flowcharts. Such techniques may also be useful in documenting the auditor's assessment of the risks of material misstatement at the overall financial statement and relevant assertions level. The form and extent of this documentation are influenced by the nature, size, and complexity of the entity and its environment, including its internal control, and the availability of information from the entity and the specific audit methodology and technology used in the course of the audit. For example, documentation of the understanding of a complex information system in which a large volume of transactions are electronically initiated, authorized, recorded, processed, or reported may include flowcharts, questionnaires, or decision tables. For an information system making limited or no use of IT or for which few transactions are processed (for example, long-term debt), documentation in the form of a memorandum may be sufficient. Generally, the more complex the entity and its environment, including its internal control, and the more extensive the audit procedures performed by the auditor, the more extensively the auditor should document his or her work. The specific audit methodology and technology used in the course of the audit will also affect the form and extent of documentation.

## Effective Date

**.124** This section is effective for audits of financial statements for periods beginning on or after December 15, 2006. Earlier application is permitted.

**AU §314.122**

I APP. 812

.125

# Appendix A

## Understanding the Entity and Its Environment

**A1.** This Appendix provides additional guidance on matters the auditor may consider when obtaining an understanding of the industry, regulatory, and other external factors that affect the entity; the nature of the entity; objectives and strategies and related business risks; and measurement and review of the entity's financial performance. The examples provided cover a broad range of matters applicable to many engagements; however, not all matters are relevant to every engagement and the list of examples is not necessarily complete. Additional guidance on internal control is contained in Appendix B [paragraph .126].

### Industry, Regulatory, and Other External Factors

**A2.** Examples of matters an auditor may consider include the following:

- Industry conditions
  - The market and competition, including demand, capacity, and price competition
  - Cyclical or seasonal activity
  - Product technology relating to the entity's products
  - Supply availability and cost
- Regulatory environment
  - Accounting principles and industry-specific practices
  - Regulatory framework for a regulated industry
  - Legislation and regulation that significantly affect the entity's operations
    - Regulatory requirements
    - Direct supervisory activities
  - Taxation (corporate and other)
  - Government policies currently affecting the conduct of the entity's business
    - Monetary, including foreign exchange controls
    - Fiscal
    - Financial incentives (for example, government aid programs)
    - Tariffs and trade restrictions
  - Environmental requirements affecting the industry and the entity's business
- Other external factors currently affecting the entity's business
  - General level of economic activity (for example, recession, growth)
  - Interest rates and availability of financing
  - Inflation and currency revaluation

**1698**          **The Standards of Field Work**

## Nature of the Entity

**A3.** Examples of matters an auditor may consider include the following:

- Business operations
  - Nature of revenue sources (for example, manufacturer; wholesaler; banking, insurance, or other financial services; import-export trading, utility, transportation, and technology products and services)
  - Products or services and markets (for example, major customers and contracts, terms of payment, profit margins, market share, competitors, exports, pricing policies, reputation of products, warranties, backlog, trends, marketing strategy and objectives, and manufacturing processes)
  - Conduct of operations (for example, stages and methods of production, subsidiaries or divisions, delivery of products and services, and details of declining or expanding operations)
  - Alliances, joint ventures, and outsourcing activities
  - Involvement in e-commerce, including Internet sales and marketing activities
  - Geographic dispersion and industry segmentation
  - Location of production facilities, warehouses, and offices
  - Key customers
  - Important suppliers of goods and services (for example, long-term contracts, stability of supply, terms of payment, imports, and methods of delivery, such as "just-in-time")
  - Employment (for example, by location, supply, wage levels, union contracts, pension and other postemployment benefits, stock option or incentive bonus arrangements, and government regulation related to employment matters)
  - Research and development activities and expenditures
  - Transactions with related parties
- Investments
  - Acquisitions, mergers, or disposals of business activities (planned or recently executed)
  - Investments and dispositions of securities and loans
  - Capital investment activities, including investments in plant and equipment and technology, and any recent or planned changes
  - Investments in nonconsolidated entities, including partnerships, joint ventures, and special-purpose entities
  - Life cycle stage of enterprise (start-up, growing, mature, declining)
- Financing
  - Group structure—major subsidiaries and associated entities, including consolidated and nonconsolidated structures
  - Debt structure, including covenants, restrictions, guarantees, and off-balance-sheet financing arrangements
  - Leasing of property, plant, or equipment for use in the business
  - Beneficial owners (local and foreign business reputation and experience)
  - Related parties

**AU §314.125**

I APP. 814

- — Use of derivative financial instruments
- • Financial reporting
  - — Accounting principles and industry-specific practices
  - — Revenue recognition practices
  - — Accounting for fair values
  - — Inventories (for example, locations and quantities)
  - — Foreign currency assets, liabilities, and transactions
  - — Industry-specific significant categories (for example, loans and investments for banks, accounts receivable and inventory for manufacturers, research and development for pharmaceuticals)
  - — Accounting for unusual or complex transactions including those in controversial or emerging areas (for example, accounting for stock-based compensation)
  - — Financial statement presentation and disclosure

## Objectives and Strategies and Related Business Risks

**A4.** Examples of matters an auditor may consider include the following:

- • Existence of objectives (that is, how the entity addresses industry, regulatory, and other external factors) relating to, for example, the following:
  - — Industry developments (a potential related business risk might be, for example, that the entity does not have the personnel or expertise to deal with the changes in the industry)
  - — New products and services (a potential related business risk might be, for example, that there is increased product liability)
  - — Expansion of the business (a potential related business risk might be, for example, that the demand has not been accurately estimated)
  - — New accounting requirements (a potential related business risk might be, for example, incomplete or improper implementation, or increased costs)
  - — Regulatory requirements (a potential related business risk might be, for example, that there is increased legal exposure)
  - — Current and prospective financing requirements (a potential related business risk might be, for example, the loss of financing due to the entity's inability to meet requirements)
  - — Use of information technology (IT) (a potential related business risk might be, for example, that systems and processes are not compatible)
  - — Risk appetite of managers and stakeholders
- • Effects of implementing a strategy, particularly any effects that will lead to new accounting requirements (a potential related business risk might be, for example, incomplete or improper implementation)

## Measurement and Review of the Entity's Financial Performance

**A5.** Examples of matters an auditor may consider include:

- • Key ratios and operating statistics
- • Key performance indicators

**1700**            **The Standards of Field Work**

- Employee performance measures and incentive compensation policies
- Trends
- Use of forecasts, budgets, and variance analysis
- Analyst reports and credit rating reports
- Competitor analysis
- Period-on-period financial performance (revenue growth, profitability, and leverage)

.126

# Appendix B

## Internal Control Components

**B1.**  As set forth in paragraph .41 and described in .67 through .101, internal control consists of the following components:

- *a.*  Control environment
- *b.*  Risk assessment
- *c.*  Information and communication systems
- *d.*  Control activities
- *e.*  Monitoring

This Appendix further explains these components as they relate to the financial statement audit.

### Control Environment

**B2.**  The control environment sets the tone of an organization, influencing the control consciousness of its people. It is the foundation for effective internal control, providing discipline and structure.

**B3.**  The control environment encompasses the following elements:

- *a.*  *Communication and enforcement of integrity and ethical values.* The effectiveness of controls cannot rise above the integrity and ethical values of the people who create, administer, and monitor them. Integrity and ethical values are essential elements of the control environment that influence the effectiveness of the design, administration, and monitoring of other components of internal control. Integrity and ethical behavior are the product of the entity's ethical and behavioral standards, how they are communicated, and how they are reinforced in practice. They include management's actions to remove or reduce incentives and temptations that might prompt personnel to engage in dishonest, illegal, or unethical acts. They also include the communication of entity values and behavioral standards to personnel through policy statements and codes of conduct and by example.

- *b.*  *Commitment to competence.* Competence is the knowledge and skills necessary to accomplish tasks that define the individual's job. Commitment to competence includes management's consideration of the competence levels for particular jobs and how those levels translate into requisite skills and knowledge.

- *c.*  *Participation of those charged with governance.* An entity's control consciousness is significantly influenced by those charged with governance. Attributes include those charged with governance's independence from management, the experience and stature of its members, the extent of its involvement and scrutiny of activities, the appropriateness of its actions, the information it receives, the degree to which difficult questions are raised and pursued with management, and its interaction with internal and external auditors. The importance of responsibilities of those charged with governance is recognized in codes

I APP. 817

**1702**     **The Standards of Field Work**

of practice and other regulations or guidance produced for the benefit of those charged with governance. Other responsibilities of those charged with governance include oversight of the design and effective operation of whistle-blower procedures and of the process for reviewing the effectiveness of the entity's internal control.

d.   *Management's philosophy and operating style.* Management's philosophy and operating style encompass a broad range of characteristics. Such characteristics may include the following: management's approach to taking and monitoring business risks; management's attitudes and actions toward financial reporting (conservative or aggressive selection from available alternative accounting principles, and conscientiousness and conservatism with which accounting estimates are developed); and management's attitudes toward information processing and accounting functions and personnel.

e.   *Organizational structure.* An entity's organizational structure provides the framework within which its activities for achieving entity-wide objectives are planned, executed, controlled, and reviewed. Establishing a relevant organizational structure includes considering key areas of authority and responsibility and appropriate lines of reporting. An entity develops an organizational structure suited to its needs. The appropriateness of an entity's organizational structure depends in part on its size and the nature of its activities.

f.   *Assignment of authority and responsibility.* This factor includes how authority and responsibility for operating activities are assigned and how reporting relationships and authorization hierarchies are established. It also includes policies relating to appropriate business practices, knowledge and experience of key personnel, and resources provided for carrying out duties. In addition, it includes policies and communications directed at ensuring that all personnel understand the entity's objectives, know how their individual actions interrelate and contribute to those objectives, and recognize how and for what they will be held accountable.

g.   *Human resource policies and practices.* Human resource policies and practices relate to recruitment, orientation, training, evaluating, counseling, promoting, compensating, and remedial actions. For example, standards for recruiting the most qualified individuals—with emphasis on educational background, prior work experience, past accomplishments, and evidence of integrity and ethical behavior—demonstrate an entity's commitment to competent and trustworthy people. Training policies that communicate prospective roles and responsibilities and include practices such as training schools and seminars illustrate expected levels of performance and behavior. Promotions driven by periodic performance appraisals demonstrate the entity's commitment to the advancement of qualified personnel to higher levels of responsibility.

### Application to Small and Midsized Entities

**B4.** Small and midsized entities may implement the control environment elements differently than larger entities. For example, smaller entities might not have a written code of conduct but, instead, develop a culture that emphasizes the importance of integrity and ethical behavior through oral communication and by management example. Similarly, those charged with governance in smaller entities may not include independent or outside members.

**AU §314.126**

## Entity's Risk Assessment Process

**B5.** An entity's risk assessment process is its process for identifying and responding to business risks and the results thereof. For financial reporting purposes, the entity's risk assessment process includes how management identifies risks relevant to the preparation of financial statements that are presented fairly in conformity with generally accepted accounting principles, estimates their significance, assesses the likelihood of their occurrence, and decides upon actions to manage them. For example, the entity's risk assessment process may address how the entity considers the possibility of unrecorded transactions or identifies and analyzes significant estimates recorded in the financial statements. Risks relevant to reliable financial reporting also relate to specific events or transactions.

**B6.** Risks relevant to financial reporting include external and internal events and circumstances that may occur and adversely affect an entity's ability to initiate, authorize, record, process, and report financial data consistent with the assertions of management in the financial statements. Once risks are identified, management considers their significance, the likelihood of their occurrence, and how they should be managed. Management may initiate plans, programs, or actions to address specific risks, or it may decide to accept a risk because of cost or other considerations. Risks can arise or change due to such circumstances as the following:

- *Changes in operating environment.* Changes in the regulatory or operating environment can result in changes in competitive pressures and significantly different risks.

- *New personnel.* New personnel may have a different focus on or understanding of internal control.

- *New or revamped information systems.* Significant and rapid changes in information systems can change the risk relating to internal control.

- *Rapid growth.* Significant and rapid expansion of operations can strain controls and increase the risk of a breakdown in controls.

- *New technology.* Incorporating new technologies into production processes or information systems may change the risk associated with internal control.

- *New business models, products, or activities.* Entering into business areas or transactions with which an entity has little experience may introduce new risks associated with internal control.

- *Corporate restructurings.* Restructurings may be accompanied by staff reductions and changes in supervision and segregation of duties that may change the risk associated with internal control.

- *Expanded foreign operations.* The expansion or acquisition of foreign operations carries new and often unique risks that may affect internal control, for example, additional or changed risks from foreign currency transactions.

- *New accounting pronouncements.* Adoption of new accounting principles or changing accounting principles may affect risks in preparing financial statements.

### *Application to Small and Midsized Entities*

**B7.** The basic concepts of the entity's risk assessment process are relevant to every entity, regardless of size, but the risk assessment process is likely to be less formal and less structured in small and midsized entities than in larger ones. All

**1704**  **The Standards of Field Work**

entities should have established financial reporting objectives, but they may be recognized implicitly rather than explicitly in smaller entities. Management may be able to learn about risks related to these objectives through direct personal involvement with employees and outside parties.

## Information System, Including the Related Business Processes Relevant to Financial Reporting, and Communication

**B8.** An information system consists of infrastructure (physical and hardware components), software, people, procedures (manual and information technology [IT]), and data. Infrastructure and software will be absent, or have less significance, in systems that are exclusively or primarily manual. Many information systems rely extensively on IT.

**B9.** The information system relevant to financial reporting objectives, which includes the accounting system, consists of the procedures, whether IT or manual, and records established to initiate, authorize, record, process, and report entity transactions (as well as events and conditions) and to maintain accountability for the related assets, liabilities, and equity. Transactions may be initiated manually or automatically by programmed procedures. Authorization includes the process of approving transactions by the appropriate level of management. Recording includes identifying and capturing the relevant information for transactions or events. Processing includes functions such as edit and validation, calculation, measurement, valuation, summarization, and reconciliation, whether performed by IT or manual procedures. Reporting relates to the preparation of financial reports as well as other information, in electronic or printed format, that the entity uses in measuring and reviewing the entity's financial performance and in other functions. The quality of system-generated information affects management's ability to make appropriate decisions in managing and controlling the entity's activities and to prepare reliable financial reports.

**B10.** Accordingly, an information system encompasses methods and records that:

- Identify and record all valid transactions.
- Describe on a timely basis the transactions in sufficient detail to permit proper classification of transactions for financial reporting.
- Measure the value of transactions in a manner that permits recording their proper monetary value in the financial statements.
- Determine the time period in which transactions occurred to permit recording of transactions in the proper accounting period.
- Present properly the transactions and related disclosures in the financial statements.

**B11.** Communication involves providing an understanding of individual roles and responsibilities pertaining to internal control over financial reporting. It includes the extent to which personnel understand how their activities in the financial reporting information system relate to the work of others and the means of reporting exceptions to an appropriate higher level within the entity. Open communication channels help ensure that exceptions are reported and acted on.

**B12.** Communication takes such forms as policy manuals, accounting and financial reporting manuals, and memoranda. Communication also can be made electronically, orally, and through the actions of management.

**AU §314.126**

### *Application to Small and Midsized Entities*

**B13.** Information systems and related business processes relevant to financial reporting in small or midsized organizations are likely to be less formal than in larger organizations, but their role is just as significant. Smaller entities with active management involvement may not need extensive descriptions of accounting procedures, sophisticated accounting records, or written policies. Communication may be less formal and easier to achieve in a small or midsized company than in a larger enterprise due to the smaller organization's size and fewer levels as well as management's greater visibility and availability.

## Control Activities

**B14.** Control activities are the policies and procedures that help ensure that management directives are carried out, for example, that necessary actions are taken to address risks that threaten the achievement of the entity's objectives. Control activities, whether automated or manual, have various objectives and are applied at various organizational and functional levels.

**B15.** Generally, control activities that may be relevant to an audit may be categorized as policies and procedures that pertain to the following:

- *Performance reviews.* These control activities include reviewing and analyzing actual performance versus budgets, forecasts, and prior-period performance; relating different sets of data—operating or financial—to one another, together with analyses of the relationships and investigative and corrective actions; comparing internal data with external sources of information, and reviewing functional or activity performance, such as a bank's consumer loan manager's review of reports by branch, region, and loan type for loan approvals and collections.

- *Information processing.* A variety of controls are performed to check accuracy, completeness, and authorization of transactions. The two broad groupings of information systems control activities are application controls and general controls. Application controls apply to the processing of individual applications. These controls help ensure that transactions occurred, are authorized, and are completely and accurately recorded and processed. Examples of application controls include checking the arithmetical accuracy of records, maintaining and reviewing accounts and trial balances, automated controls such as edit checks of input data and numerical sequence checks, and manual follow-up of exception reports. General controls are policies and procedures that relate to many applications and support the effective functioning of application controls by helping to ensure the continued proper operation of information systems. General controls commonly include controls over data center and network operations; system software acquisition, change, and maintenance; access security; and application system acquisition, development, and maintenance. These controls apply to mainframe, miniframe, and end-user environments. Examples of such general controls are program change controls, controls that restrict access to programs or data, controls over the implementation of new releases of packaged software applications, and controls over system software that restrict access to or monitor the use of system utilities that could change financial data or records without leaving an audit trail.

- *Physical controls.* These activities encompass the physical security of assets, including adequate safeguards such as secured facilities to

**AU §314.126**

**1706**  **The Standards of Field Work**

limit access to assets and records; authorization for access to computer programs and data files; and periodic counting and comparison with amounts shown on control records (for example, comparing the results of cash, security, and inventory counts with accounting records). The extent to which physical controls intended to prevent theft of assets are relevant to the reliability of financial statement preparation, and therefore the audit, depends on circumstances such as when assets are highly susceptible to misappropriation. For example, these controls would ordinarily not be relevant when any inventory losses would be detected pursuant to periodic physical inspection and recorded in the financial statements. However, if for financial reporting purposes management relies solely on perpetual inventory records, the physical security controls would be relevant to the audit.

- *Segregation of duties.* Assigning different people the responsibilities of authorizing transactions, recording transactions, and maintaining custody of assets is intended to reduce the opportunities to allow any person to be in a position to both perpetrate and conceal errors or fraud in the normal course of his or her duties. Examples of segregation of duties include reporting, reviewing and approving reconciliations, and approval and control of documents.

**B16.** Certain control activities may depend on the existence of appropriate higher-level policies established by management or those charged with governance. For example, authorization controls may be delegated under established guidelines, such as investment criteria set by those charged with governance; alternatively, nonroutine transactions such as major acquisitions or divestments may require specific high-level approval, including in some cases that of shareholders.

### *Application to Small and Midsized Entities*

**B17.** The concepts underlying control activities in small or midsized organizations are likely to be similar to those in larger entities, but the formality with which they operate varies. Further, smaller entities may find that certain types of control activities are not relevant because of controls applied by management. For example, management's retention of authority for approving credit sales, significant purchases, and draw-downs on lines of credit can provide strong control over those activities, lessening or removing the need for more detailed control activities. An appropriate segregation of duties often appears to present difficulties in smaller organizations. Even companies that have only a few employees, however, may be able to assign responsibilities to achieve appropriate segregation or, if that is not possible, to use management oversight of the incompatible activities to achieve control objectives.

## Monitoring of Controls

**B18.** An important management responsibility is to establish and maintain internal control on an ongoing basis. Management's monitoring of controls includes considering whether they are operating as intended and that they are modified as appropriate for changes in conditions. Monitoring of controls may include activities such as management's review of whether bank reconciliations are being prepared on a timely basis, internal auditors' evaluation of sales personnel's compliance with the entity's policies on terms of sales contracts, and a legal department's oversight of compliance with the entity's ethical or business practice policies.

**AU §314.126**

I APP. 822

**B19.** Monitoring of controls is a process to assess the quality of internal control performance over time. It involves assessing the design and operation of controls on a timely basis and taking necessary corrective actions. Monitoring is done to ensure that controls continue to operate effectively. For example, if the timeliness and accuracy of bank reconciliations are not monitored, personnel are likely to stop preparing them. Monitoring of controls is accomplished through ongoing monitoring activities, separate evaluations, or a combination of the two.

**B20.** Ongoing monitoring activities are built into the normal recurring activities of an entity and include regular management and supervisory activities. Managers of sales, purchasing, and production at divisional and corporate levels are in touch with operations and may question reports that differ significantly from their knowledge of operations.

**B21.** In many entities, internal auditors or personnel performing similar functions contribute to the monitoring of an entity's controls through separate evaluations. They regularly provide information about the functioning of internal control, focusing considerable attention on evaluating the design and operation of internal control. They communicate information about strengths and weaknesses and recommendations for improving internal control.

**B22.** Monitoring activities may include using information from communications from external parties that may indicate problems or highlight areas in need of improvement. Customers implicitly corroborate billing data by paying their invoices or complaining about their charges. In addition, regulators may communicate with the entity concerning matters that affect the functioning of internal control, for example, communications concerning examinations by bank regulatory agencies. Also, management may consider communications relating to internal control from external auditors in performing monitoring activities.

### *Application to Small and Midsized Entities*

**B23.** Ongoing monitoring activities of small and midsized entities are more likely to be informal and are typically performed as a part of the overall management of the entity's operations. Management's close involvement in operations often will identify significant variances from expectations and inaccuracies in financial data.

.127

## Appendix C

## Conditions and Events That May Indicate Risks of Material Misstatement

**C1.** The following are examples of conditions and events that may indicate the existence of risks of material misstatement. The examples provided cover a broad range of conditions and events; however, not all conditions and events are relevant to every audit engagement and the list of examples is not necessarily complete.

- Operations in regions that are economically unstable, for example, countries with significant currency devaluation or highly inflationary economies.

- Operations exposed to volatile markets, for example, futures trading.

- High degree of complex regulation.

- Going concern and liquidity issues, including loss of significant customers.

- Marginally achieving explicitly stated strategic objectives.

- Constraints on the availability of capital and credit.

- Changes in the industry in which the entity operates.

- Changes in the supply chain.

- Developing or offering new products or services, or moving into new lines of business.

- Expanding into new locations.

- Changes in the entity, such as large acquisitions, reorganizations, or other unusual events.

- Entities or divisions likely to be sold.

- Complex alliances and joint ventures.

- Use of off-balance-sheet finance, special-purpose entities, and other complex financing arrangements.

- Significant transactions with related parties.

- Lack of personnel with appropriate accounting and financial reporting skills.

- Changes in key personnel, including departure of key executives.

- Weaknesses in internal control, especially those not addressed by management.

- Inconsistencies between the entity's information technology (IT) strategy and its business strategies.

- Changes in the IT environment.

- Installation of significant new IT systems related to financial reporting.

**AU §314.127**

**Understanding the Entity and Its Environment**          **1709**

- Inquiries into the entity's operations or financial results by regulatory or government bodies.

- Past misstatements, history of errors, or a significant amount of adjustments at period end.

- Significant amount of nonroutine or nonsystematic transactions, including intercompany transactions and large revenue transactions at period end.

- Transactions that are recorded based on management's intent, for example, debt refinancing, assets to be sold, and classification of marketable securities.

- Application of new accounting pronouncements.

- Complex processes related to accounting measurements.

- Events or transactions that result in significant measurement uncertainty, including accounting estimates.

- Pending litigation and contingent liabilities, for example, sales warranties, financial guarantees, and environmental remediation.

_____

PRIOR PRINTER'S NO. 1216                PRINTER'S NO. **1453**

## THE GENERAL ASSEMBLY OF PENNSYLVANIA

# HOUSE BILL

No.   **1053**  Session of 2019

INTRODUCED BY RYAN, BERNSTINE, COX, DUSH, GABLER, GILLEN,
    GREINER, GROVE, HERSHEY, IRVIN, KAUFFMAN, KEEFER, B. MILLER,
    OWLETT, RAPP, ROTHMAN, STAATS, STRUZZI AND ZIMMERMAN,
    APRIL 5, 2019

AS REPORTED FROM COMMITTEE ON STATE GOVERNMENT, HOUSE OF
    REPRESENTATIVES, AS AMENDED, APRIL 16, 2019

AN ACT

1  Providing for duties of the Department of the Auditor General,
2      for initial performance audit of major State agencies, for
3      continuing performance audits of major State agencies, for
4      duties of major State agencies and for progress report by
5      major State agencies.

6      The General Assembly of the Commonwealth of Pennsylvania

7  hereby enacts as follows:

8  Section 1.  Short title.

9      This act shall be known and may be cited as the Lean State

10 Government Act.

11 Section 2.  Findings and declarations.

12     The General Assembly finds and declares as follows:

13         (1)  The purpose of this act is to require a major State

14     agency to implement a lean process improvement system to

15     analyze and improve the major State agency's operations.

16         (2)  A lean process improvement system has been

17     successfully used by private and public entities around the

18     world to create efficient and goal-oriented operations.

1     (3)  A major State agency benefits by examining the major

2     State agency's operations and determining which activities

3     accomplish the major State agency's mission, vision and

4     strategic objectives.

5     (4)  A major State agency should focus the major State

6     agency's operations around value-adding activities and

7     eliminating wasteful operations which do not add value.

8     (5)  A critical step in a lean process improvement system

9     is the use of a performance audit to determine the

10     effectiveness of programs and operations by evaluating

11     specific performance measures and to determine whether the

12     money spent on these performance measures has resulted in

13     better major State agency performance.

14     (6)  Implementing a lean process improvement system will

15     assist a major State agency to reduce costs and improve

16     operations and delivery of services.

17 Section 3.  Definitions.

18 The following words and phrases when used in this act shall

19 have the meanings given to them in this section unless the

20 context clearly indicates otherwise:

21 "Certified fraud examiner."  An individual who has satisfied

22 the requirements of the Association of Certified Fraud Examiners

23 to become a certified fraud examiner.

24 "Certified internal auditor."  An individual who has

25 satisfied the requirements of The Institute of Internal Auditors

26 to become a certified internal auditor.

27 "Certified public accountant."  As defined in the act of May

28 26, 1947 (P.L.318, No.140), known as the CPA Law.

29 ~~"Chartered Global Management Accountant."  An individual who~~ <--

30 ~~meets the requirements specified by the Association of Certified~~

1  ~~Fraud Examiners or the Chartered Institute of Management~~

2  ~~Accountants as a Chartered Global Management Accountant.~~

3      "Cost-drivers."  Anything that causes cost in providing a

4  service or producing a good. When aggregated, the marginal cost

5  of producing a good or service.

6      "Department."  The Department of the Auditor General of the

7  Commonwealth.

8      "Lean process improvement system."  A management methodology

9  system for a major State agency that improves process speed and

10  quality, reduces waste and lowers cost through the use of data-

11  driven project or service analysis. The term includes any of the

12  following practices:

13      (1)  Developing a process map that describes a widely

14      accepted business process improvement system by which the

15      major State agency engages in specific activities that

16      increase efficiency and reduce waste at the major State

17      agency.

18      (2)  Engaging in specific activities to rapidly improve

19      the major State agency's processes that will increase value

20      or decrease staff time, inventory, defects, overproduction,

21      complexity, delays or excessive movement.

22      (3)  Utilizing the major State agency's employees to map

23      the major State agency's processes and recommend improvements

24      to the processes with an emphasis on involving the major

25      State agency's employees who directly provide a product or

26      service to an end user.

27      (4)  Providing the means to measure, through a limited

28      number of performance metrics based on how resources are

29      allocated and delivered to residents of this Commonwealth,

30      the major State agency's processes in order to demonstrate

I APP. 828

1    the effectiveness of the processes.

2        (5)  Training the major State agency employees to mentor

3    and train other major State agency employees in business

4    improvement process systems.

5        (6)  Providing for public comment regarding performance

6    audits and reports conducted under this act.

7    "Major State agency."  Any office, department, authority,

8    board or commission of the executive branch with a budget

9    exceeding $100,000,000 in a fiscal year.

10    "Management letter."  A written communication that states or

11    implies all of the following:

12        (1)  Assurance as to the reliability of attested

13    information, compiled financial statements or assessments of

14    the status or performance of a major State agency.

15        (2)  The issuer of the written communication has special

16    knowledge or competence in accounting or auditing arising

17    from any of the following:

18            (i)  The issuer of the communication has a name or

19        title indicating that the issuer or any individual

20        employed by or affiliated with the issuer is an

21        accountant or auditor.

22            (ii)  The language of the written communication.

23    "Performance audit."  A comprehensive evaluation of a major

24    State agency's performance, including all of the following:

25        (1)  The effectiveness, efficiency and economy with which

26    resources are managed and consumed.

27        (2)  Findings and recommendations based on the

28    comprehensive evaluation which are submitted to a major State

29    agency in a management letter.

30    "Qualified performance auditor."  A certified internal

1   auditor, certified fraud examiner, OR certified public        <--

2   accountant or Chartered Global Management Accountant who       <--

3   possesses a minimum of five years of experience conducting

4   performance or operational audits of private or public entities.

5   Section 4.  Duties of department.

6       (a)  General rule.--The department shall have the following

7   duties:

8           (1)  Entering into contracts with a qualified performance

9       auditor to conduct performance audits of major State agencies

10      if necessary to administer this act.

11          (2)  Choosing a schedule of performance audits of major

12      State agencies so that each major State agency will be the

13      subject of a performance audit at least once during an

14      initial three-year period after the effective date of this

15      act.

16          (3)  Choosing a schedule of continuing performance audits

17      for selected major State agencies.

18          (4)  Recommending a set of performance measures prior to

19      the commencement of a performance audit.

20          (5)  Upon receipt of a performance audit of a major State

21      agency under this act, posting the performance audit on the

22      department's publicly accessible Internet website and

23      providing a copy of the performance audit to all of the

24      following, or their authorized designee:

25              (i)  The Governor.

26              (ii)  The chairperson and minority chairperson of the

27          appropriate oversight committee of the Senate, if

28          applicable.

29              (iii)  The chairperson and minority chairperson of

30          the appropriate oversight committee of the House of

1        Representatives, if applicable.

2            (iv)  The major State agency subject to the

3        performance audit.

4        (6)  Developing a lean process improvement system

5        training program for major State agencies.

6        (7)  Recommending a lean process improvement system

7        training schedule for major State agencies that shall recur

8        no less than once every three years for each major State

9        agency.

10       (b)  Training.--A major State agency shall provide lean

11   process improvement system training for all management employees

12   of the major State agency prior to the implementation of the

13   lean process improvement system and a training program that

14   recurs no less than once every three years thereafter.

15   Section 5.  Initial performance audit of major State agencies.

16       (a)  Schedule.--All major State agencies shall be subject to

17   a performance audit during an initial three-year period after

18   the effective date of this act. The schedule of performance

19   audits for the initial three-year period shall be determined by

20   the department.

21       (b)  Audit.--All major State agencies shall be subject to

22   performance audits by a qualified performance auditor. The

23   performance audits shall be completed no later than three years

24   after the effective date of this act unless a request for an

25   extension has been approved by the General Assembly. A

26   performance audit shall contain findings and recommendations

27   regarding the operations of the major State agency being audited

28   and the qualified performance auditor shall submit the findings

29   and recommendations to the department upon completion of the

30   performance audit.

1  (c)  Submission.--Upon receipt of a performance audit under
2  subsection (b), the department shall provide a copy of each
3  performance audit to all of the following:

4      (1)  The Governor.

5      (2)  The General Assembly.

6      (3)  The chairperson and minority chairperson of the
7  appropriate oversight committee of the Senate, if applicable.

8      (4)  The chairperson and minority chairperson of the
9  appropriate oversight committee of the House of
10  Representatives, if applicable.

11     (5)  The major State agencies subject to the performance
12  audits.

13  Section 6.  Continuing performance audits of major State
14             agencies.

15  (a)  Schedule.--A major State agency may be subject to a
16  performance audit every three years after the lapse of the
17  initial three-year period under section 5. The schedule of
18  continuing performance audits shall be determined by the
19  department, and may be revised as the department deems
20  necessary. The department may consider a major State agency's
21  size and financial status and may choose not to schedule smaller
22  and financially stable major State agencies for continuing
23  audits.

24  (b)  Audit.--Major State agencies specified in the schedule
25  shall be subject to a continuing performance audit every three
26  years by a qualified performance auditor. Performance audits
27  shall contain findings and recommendations regarding the
28  operations of the major State agency and the qualified
29  performance auditor shall submit the findings and
30  recommendations to the department upon completion of the

1  performance audit.

2     (c)  Submission.--The department shall provide a copy of each

3  performance audit to all of the following:

4        (1)  The Governor.

5        (2)  The General Assembly.

6        (3)  The major State agencies subject to the performance

7     audits.

8  Section 7.  Duties of major State agencies.

9     (a)  Records.--Except as prohibited by the laws of this

10 Commonwealth, a major State agency shall provide the department

11 all the records that the department determines to be necessary

12 to allow the qualified performance auditor to conduct the

13 performance audit as required under this act.

14    (b)  System.--Based on the findings and recommendations of a

15 performance audit conducted under this act, a major State agency

16 shall utilize a lean process improvement system as follows:

17       (1)  Identifying and documenting all of the following:

18            (i)  The mission and purpose of the major State

19       agency.

20            (ii)  The services to be accomplished by the major

21       State agency.

22            (iii)  Cost-drivers at the major State agency.

23            (iv)  Critical success factors at the major State

24       agency.

25            (v)  Measures of effectiveness at the major State

26       agency.

27            (vi)  Processes utilized by the major State agency.

28       (2)  Taking corrective steps to eliminate inefficiencies

29    in the major State agency's processes.

30    (c)  Recovered money.--

I APP. 833

1    (1)  A major State agency shall provide notice of any

2    money saved as a result of the implementation of a lean

3    process improvement system to the Office of the Budget and

4    the General Assembly.

5    (2)  Any money saved by a major State agency as a result

6    of the implementation of a lean process improvement system

7    shall be deposited into the Budget Stabilization Reserve Fund

8    established in section 1701-A of the act of April 9, 1929

9    (P.L.343, No.176), known as The Fiscal Code.

10  Section 8.  Progress report by major State agencies.

11  (a)  Submission.--A major State agency shall submit a report,

12  which shall be a public record, one year after the major State

13  agency receives a performance audit under this act. If the

14  performance audit contains recommendations for corrective

15  action, a major State agency shall submit a report, which shall

16  be a public record, each of the next two years after submitting

17  the initial report. Reports required under this section shall be

18  submitted to all of the following:

19    (1)  The Governor.

20    (2)  The General Assembly.

21    (3)  The department.

22  (b)  Contents.--Reports required under this section shall

23  contain the following information:

24    (1)  The major State agency's progress in remedying

25    concerns and implementing suggestions detailed in the

26    performance audit.

27    (2)  The major State agency's implementation of a lean

28    process improvement system as specified under section 7(b).

29  Section 9.  Effective date.

30  This act shall take effect in 60 days.