# Petitioners' Appendix

1. Zachary C. Larsen
2. Jessy Jacobs
3. Ruth Johnson
4. William C. Hartmann
5. Monica Palmer
6. Angelic Johnson
7. Cynthia Cassell
8. Rhonda Weber
9. Christine Muise
10. G. Kline Preston IV
11. Andrew Sitto
12. Kristina Karamo
13. Articia Bomer
14. Dr. Phillip O'Halloran
15. Cynthia O'Halloran
16. Janice Hermann
17. Jason Humes
18. Patricia Blackmer
19. Bob Cushman
20. Jennifer Seidl
21. Cassandra Brown
22. Danny Gustafson
23. Eugene Dixon
24. Anna England
25. Adam di Angeli
26. John McGrath

27. William Carzon
28. Kayla Toma
29. Lynn Mills
30. Matthew Mikolajczak
31. Mellissa Carone
32. Braden Giacobazzi
33. Rena M. Lindevaldesen
34. Kristy Klamer
35. Laurie Ann Knott
36. Lucille Ann Huizinga
37. Marilyn Jean Nowak
38. Marlene Kay Hager
39. Sandra Sue Workman
40. Ian A. Northon—Letter to Board of Canvassers
41. Doug A. Ringler, CPA, CIA—Michigan Auditor General's Performance Audit Report to State Bureau of Elections
42. Expert James R. Carlson—Stillwater Solutions
43. Expert Matthew Braynard
44. Expert Qianying "Jennie" Zhang
45. Expert John McLaughlin Jonathan
46. Brater—Head of Elections (adverse)
47. State's Data Sharing Agreement with Rock the Vote

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and EDWARD P.
McCALL, JR.,

                    **Plaintiff,**

-vs-

CITY OF DETROIT; DETROIT ELECTION
COMMISSION; JANICE M. WINFREY, in
her official capacity as the CLERK OF THE
CITY OF DETROIT and the Chairperson of
the DETROIT ELECTION COMMISSION;
CATHY M. GARRETT, in her official
capacity as the CLERK OF WAYNE
COUNTY; and the WAYNE COUNTY
BOARD OF CANVASSERS,

                    **Defendants.**

_____/

**AFFIDAVIT OF ZACHARY LARSEN**

**FILE NO: 20-_____-AW**

**JUDGE**

David A. Kallman       (P34200)
Erin E. Mersino        (P70886)
Jack C. Jordan         (P46551)
Stephen P. Kallman   (P75622)
GREAT LAKES JUSTICE CENTER
Attorneys for Plaintiff
5600 W. Mount Hope Hwy.
Lansing, MI 48917
(517) 322-3207/Fax: (517) 322-3208

## AFFIDAVIT

The Affiant, Zachary Larsen, being first duly sworn, hereby deposes and states as follows:

1.     My name is Zachary Larsen, I am over the age of eighteen, have personal

knowledge of the facts stated in this Affidavit and, if sworn as a witness, I am competent to testify

to these facts.

2. I am an attorney in private practice and licensed in the State of Michigan. Prior to my entry into private practice, I served as an Assistant Attorney General for eight years from January 2012 through January 2020, where I was recognized with an award for the quality of my work and served the state on several high-priority litigation matters.

3. In September 2020, I volunteered to serve as a poll challenger for the Michigan Republic Party's election day operations to ensure the integrity of the vote and conformity of the election process to the election laws of Michigan.

4. In preparation for my service, I attended an elections training, reviewed materials relating to the conduct of elections, and read pertinent sections of Michigan's election law.

5. On Election Day, Tuesday, November 3, 2020, I served as a roving attorney and credentialed poll challenger with a group of attorneys and visited approximately 20-30 voting precincts in Lansing, East Lansing, and Williamston, Michigan to confirm that the election was conducted in accordance with law, and on a few occasions, to address complaints raised by specific voters.

6. During my visits to precincts on Election Day, I was allowed to visually inspect the poll book without touching it at every precinct where we asked to review it. In each instance, I was allowed to stand a respectful distance behind the election officials while remaining close enough to read relevant names and numbers.

7. The following day, on Wednesday, November 4, 2020, I arrived at the former Cobo Center, now known as the TCF Center, in Detroit, Michigan to serve as a poll challenger for the absent voter count occurring in Detroit and arrived between 9:30 and 9:45 a.m.

GREAT LAKES JUSTICE CENTER

8. Prior to my admission to the floor where the absent voter count was occurring, I received credentials from the Michigan Republican Party and further instruction regarding the process for handling ballots at absent voter counting boards ("AVCBs").

9. Thereafter, I received a temperature scan from election officials that confirmed I did not have an elevated temperature. I arrived inside, and I was "checked in" by an election official who reviewed my driver's license and confirmed my credentials and eligibility to serve as a challenger. I was admitted at approximately 10:30 a.m.

10. When I arrived at a counting table and began to observe the process, I noticed immediately that part of the process that was being implemented did not conform to what I had been told in my training and the materials that I had received.

11. Specifically, the information I had received described the process that was supposed to be occurring at the tables as follows.

12. A first election official would scan a ballot. If the scan did not confirm a voter in the poll book, that official would then check the voter against a paper copy "supplemental poll book."

13. The official would then read the ballot number to a second election official and hand the ballot to that official, who would remove the ballot (while still in the secrecy sleeve) and confirm the ballot number. That second official would then hand the ballot (in the secrecy sleeve) to a third official who would tear the stub off of the ballot, and place the stub in a ballot stub envelope, then pass the remaining ballot to a fourth official.

14. The fourth official would then remove the ballot from the secrecy sleeve, flatten the ballot to ensure it was capable of processing, and visually inspect for rips, tears, or stains before placing the ballot in the "ballots to be tabulated box." However, if that fourth official identified a

3

concern, she would place the ballot back in its envelope and into a "problem ballots" box that required additional attention to determine whether they would be processed and counted. A copy of a diagram that I had received on this process is attached as Exhibit A to this affidavit.

15.     What I observed immediately was that the secrecy of the ballot was not being respected.

16.     Instead, the second official at the table where I was observing was repeatedly placing her fingers into the secrecy sleeve to separate the envelope and visually peek into the envelopes in a way that would allow her to visually observe the ballot and identify some of the votes cast by the voter.

17.     Sometimes, the third official whose job was merely to remove the stub from the ballot would likewise remove the ballot from the secrecy sleeve or otherwise peek to observe the ballot. Sometimes a ballot would be removed completely from the secrecy sleeve and then placed back inside and passed along this process.

18.     I conferred regarding this issue with another challenger at a nearby table, and he indicated he had observed similar irregularities regarding the use of the secrecy sleeves.

19.     When that challenger raised the issue with a supervisor, and he was immediately asked "why does it matter?" and "what difference does it make?"

20.     Beyond the legal requirements for maintaining ballot secrecy, both of us were concerned that the violations of the secrecy of the ballot that we witnessed could be or were being used to manipulate which ballots were placed in the "problem ballots" box.

21.     Later that morning, at another table, a challenger identified concerns that ballots were being placed into "problem ballots" boxes purportedly based on the reason that the voter had failed to place the ballot in the secrecy sleeve, while other ballots at the same table were being

4

passed along and placed into the "ballots to be tabulated" box that also did not have secrecy sleeves.

22.     I personally observed that several ballots were placed into the "problem ballots" boxed and marked with a sticky note indicating that they were "problem ballots" merely because of the lack of a secrecy sleeve.

23.     When I spoke with a supervisor regarding this issue, he explained that these ballots were being placed in the "problem ballots" box for efficiency.

24.     From my experience at the first table I had visited (addressed in Paragraphs 15 through 17 above), I had also witnessed ballots that were placed into the "ballots to be tabulated" box that had arrived without a secrecy sleeve. So the differentiation among these ballots despite both ballots arriving in secrecy sleeves was perplexing and again raised concerns that some ballots were being marked as "problem ballots" based on who the person had voted for rather than on any legitimate concern about the ability to count and process the ballot appropriately.

25.     Just before noon, I arrived at another table (which I later contemporaneously noted as AVCB # 23), and I conferred with the Republican challenger who had been observing the process from a viewing screen and watching the response of the computer system as ballots were scanned by the first official.

26.     I asked the challenger if she had observed anything of concern, and she immediately noted that she had seen many ballots scanned that did not register in the poll book but that were nonetheless processed. Because she needed to leave for lunch, I agreed to watch her table.

27.     As I watched the process, I was sensitive to her concern that ballots were being processed without confirmation that the voter was an eligible voter in the poll book, so I stood at the monitor and watched.

5

GREAT LAKES JUSTICE CENTER

28.     The first ballot scanned came in as a match to an eligible voter. But the next several ballots that were scanned did not match any eligible voter in the poll book.

29.     When the scan came up empty, the first official would type in the name "Pope" that brought up a voter by that last name.

30.     I reviewed the running list of scanned in ballots in the computer system, and it appeared that the voter had already been counted as having voted. Then the first official appeared to assign a number to a different voter as I observed a completely different name that was added to the list of voters at the bottom of a running tab of processed ballots on the right side of the screen.

31.     That same official would then make a handwritten notation on her "supplemental poll book," which was a hard copy list that she had in front of her at the table.

32.     The supplemental poll book appeared to be a relatively small list.

33.     I was concerned that this practice of assigning names and numbers indicated that a ballot was being counted for a non-eligible voter who was not in either the poll book or the supplemental poll book. From my observation of the computer screen, the voters were certainly not in the official poll book. Moreover, this appeared to be the case for the majority of the voters whose ballots I had personally observed being scanned.

34.     Because of this concern, I stepped behind the table and walked over to a spot behind where the first official was conducting her work.

35.     Understanding health concerns due to COVID-19, I attempted to stand as far away from this official as I reasonably could while also being able to visually observe the names on the supplemental poll book and on the envelopes.

6

GREAT LAKES JUSTICE CENTER

36.     Partly inhibiting my ability to keep a distance, the tables were situated so that two counting tables were likely a maximum of eight feet apart. In other words, you could not stand more than four feet behind one without being less than four feet from another.

37.     As soon as I moved to a location where I could observe the process by which the first official at this table was confirming the eligibility of the voters to vote, the first official immediately stopped working and glared at me. I stood still until she began to loudly and aggressively tell me that I could not stand where I was standing. She indicated that I needed to remain in front of the computer screen.

38.     I responded, "Ma'am, I am allowed by statute to observe the process." As I did, a Democratic challenger ran towards me and approached within two feet of me, saying "You cannot speak to her! You are not allowed to talk to her." I responded, "Sir, she spoke to me. I was just answering her."

39.     The first official again told me that the only place I was allowed to observe from was at the computer screen. A second official at the table reiterated this. I said that was not true.

40.     Both officials then began to tell me that because of COVID, I needed to be six feet away from the table. I responded that I could not see and read the supplemental poll book from six feet away, but I was attempting to keep my distance to the extent possible.

41.     Just minutes before at another table, a supervisor had explained that the rules allowed me to visually observe what I needed to see and then step back away. Likewise, on Election Day, I had been allowed to stand at equivalent distance from poll books in Lansing and East Lansing precincts without any problem. With this understanding, I remained in a position where I would be able to observe the supplemental poll book until I could do so for the voter whose ballots had just been scanned and did not register in the poll book.

GREAT LAKES JUSTICE CENTER

42.     Both officials indicated that I could not remain in a position that would allow me to observe their activities and they were going to get their supervisor.

43.     This seemed particularly concerning because the Democratic challenger who raised concerns over my verbal response to the official had been positioned behind the second official (the one who confirms ballots as described in Paragraph 13) no further away than I was from the first official at that time and had not been stationed at the computer screen as the officials repeatedly told me was the only place that I could stay.

44.     When the supervisor arrived, she reiterated that I was not allowed to stand behind the official with the supplemental poll book, and I needed to stand in front of the computer screen. I told her that was not true, and that I was statutorily allowed to observe the process, including the poll book.

45.     The supervisor then pivoted to arguing that I was not six feet away from the first official. I told her I was attempting to remain as far away as I could while still being able to read the names on the poll book.

46.     In an attempt to address her concerns, I took a further step away from the table and indicated I would try to keep my distance, and that I thought I was about six feet away from the first official. The supervisor then stood next to the chair immediately to the left of the first official and indicated that I was "not six feet away from" the supervisor and that she intended to sit in the chair next to the official with the poll book, so I would need to leave.

47.     This supervisor had not been at the table at any time during the process, and she had responsibility for numerous ACVBs. Further, the supervisor's choice of chairs was approximately three feet to the left of the first official and therefore in violation of the six-foot distance rule.

8

48. Accordingly, I understood that this was a ruse to keep me away from a place where I could observe the confirmation of names in the supplemental poll book. The supervisor began to repeatedly tell me that I "needed to leave" so I responded that I would go speak with someone else or fill out a challenge form.

49. I went to find another attorney serving as a challenger and returned to discuss the matter further with the supervisor. When I returned, she reiterated her assertions and insisted that there was nowhere where I could stand in conformity with the six-foot rule that would allow me to observe the supplemental poll book. Ultimately, to avoid further conflict with the supervisor, I agreed that I would leave that counting table and move to another table.

50. Between 1:30 p.m. and 2 p.m., my colleague and I decided to return to the suite that housed the Republican challengers to get lunch. We left the counting floor and went up to the Republicans second-floor suite.

51. About 30 to 45 minutes later, an announcement was made that challengers needed to return to the floor. As we attempted to return, we were made aware that the officials admitting people had limited the number of election challengers to another 52 people who would be allowed inside. I displayed my credentials and walked up to near the door where a small crowd was gathering to be let in.

52. Shortly thereafter, a man came out to announce that no one would be let in (despite the prior announcement) because the room had reached the maximum number of challengers. As he was asked why we would not be let in, he explained that the maximum number of challengers were determined from the number of names on the sign-in sheet, regardless of how many people had left the room.

9

GREAT LAKES JUSTICE CENTER

53.    Many Republican challengers had left the room for lunch without signing out, including myself and my colleague. Accordingly, we were being arbitrarily "counted" towards this capacity limitation without actually being allowed into the room to observe.

54.    When challengers raised this issue with the man at the door, he refused to discuss any solutions such as confirming the identify of challengers who had been previously admitted.

55.    To the best of my recollection, I was never informed that if I left the room and failed to sign out that I would be refused admission or that there would be no means of confirming that I had been previously admitted.

56.    The above information is true to the best of my information, knowledge, and belief.

57.    Further affiant says not.

_____
Zachary Larsen

On this 8th day of November, 2020, before me personally appeared Zachary Larsen, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by his subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

_____
Stephen P. Kallman
Notary Public, Eaton County, Michigan
My Commission Expires: 11/26/2025

10

GREAT LAKES JUSTICE CENTER

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and EDWARD P. McCALL, JR.,

                              Plaintiff,

-vs-

CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,

                              Defendants.

                                                            /

AFFIDAVIT OF JESSY JACOB

FILE NO: 20-_____-AW

JUDGE

David A. Kallman          (P34200)
Erin E. Mersino          (P70886)
Jack C. Jordan           (P46551)
Stephen P. Kallman        (P75622)
GREAT LAKES JUSTICE CENTER
Attorneys for Plaintiff
5600 W. Mount Hope Hwy.
Lansing, MI 48917
(517) 322-3207/Fax: (517) 322-3208

**AFFIDAVIT**

The Affiant, Jessy Jacob, being first duly sworn, hereby deposes and states as follows:

1. My name is Jessy Jacob. I am an adult citizen and resident of the State of Michigan.

2. I have been an employee for the City of Detroit for decades.

3. I was assigned to work in the Elections Department for the 2020 election.

4. I received training from the City of Detroit and the State of Michigan regarding the election process.

1

GREAT LAKES JUSTICE CENTER

5. I worked at the election headquarters for most of September and I started working at a satellite location for most of October, 2020.

6. I processed absentee ballot packages to be sent to voters while I worked at the election headquarters in September 2020 along with 70-80 other poll workers. I was instructed by my supervisor to adjust the mailing date of these absentee ballot packages to be dated earlier than they were actually sent. The supervisor was making announcements for all workers to engage in this practice.

7. At the satellite location, I processed voter registrations and issued absentee ballots for people to vote in person at the location.

8. I directly observed, on a daily basis, City of Detroit election workers and employees coaching and trying to coach voters to vote for Joe Biden and the Democrat party. I witnessed these workers and employees encouraging voters to do a straight Democrat ballot. I witnessed these election workers and employees going over to the voting booths with voters in order to watch them vote and coach them for whom to vote.

9. During the last two weeks while working at this satellite location, I was specifically instructed by my supervisor not to ask for a driver's license or any photo I.D. when a person was trying to vote.

10. I observed a large number of people who came to the satellite location to vote in-person, but they had already applied for an absentee ballot. These people were allowed to vote in-person and were not required to return the mailed absentee ballot or sign an affidavit that the voter lost the mailed absentee ballot.

11. Whenever I processed an absentee voter application or in-person registration, I was instructed to input the person's name, address, and date of birth into the Qualified Voter File (QVF) system.

12. The QVF system can be accessed and edited by any election processor with proper credentials in the State of Michigan at any time and from any location with internet access.

13. I worked at the satellite location until the polls closed on November 3, 2020 at 8:00 p.m. and properly completed the entry of all absentee ballots into the QVF by 8:30 p.m.

2

14. I then reported to work at the TCF Center on November 4, 2020, at 8:30 a.m. to process ballots. I was instructed not to validate any ballots and not to look for any deficiencies in the ballots.

15. Absentee ballots that were received in the mail would have the voter's signature on the envelope. While I was at the TCF Center, I was instructed not to look at any of the signatures on the absentee ballots, and I was instructed not to compare the signature on the absentee ballot with the signature on file.

16. All absentee ballots that existed were required to be inputted into the QVF system by 9:00 p.m. on November 3, 2020. This was required to be done in order to have a final list of absentee voters who returned their ballots prior to 8:00 p.m. on November 3, 2020. In order to have enough time to process the absentee ballots, all satellites were instructed to collect the absentee ballots from the drop-box once every hour on November 3, 2020.

17. On November 4, 2020, I was instructed to improperly pre-date the absentee ballots receive date that were not in the QVF as if they had been received on or before November 3, 2020. I was told to alter the information in the QVF to falsely show that the absentee ballots had been received in time to be valid. I estimate that this was done to thousands of ballots.

18. The above information is true to the best of my information, knowledge, and belief.

19. Further affiant says not.

_____
Jessy Jacob

On this 7th day of November, 2020, before me personally appeared Jessy Jacob, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that she has read the foregoing affidavit by her subscribed and knows the contents thereof, and that the same is true of her own knowledge and belief, except as to those matters she states to be on information and belief, and as to those matters she believes them to be true.

_____
Stephen P. Kallman
Notary Public, Eaton County, Michigan
My Commission Expires: 11/26/2025

3

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and EDWARD P. McCALL, JR.,

               **Plaintiffs,**

-vs-

CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,

               **Defendants.**

                             /

**AFFIDAVIT OF SENATOR RUTH JOHNSON**

**FILE NO: 20-014780-AW**

**HON. TIMOTHY M. KENNY**

David A. Kallman        **(P34200)**
Erin E. Mersino        **(P70886)**
Jack C. Jordan         **(P46551)**
Stephen P. Kallman    **(P75622)**
**GREAT LAKES JUSTICE CENTER**
**Attorneys for Plaintiff**
**5600 W. Mount Hope Hwy.**
**Lansing, MI 48917**
**(517) 322-3207/Fax: (517) 322-3208**

## AFFIDAVIT

The Affiant, Ruth Johnson, being first duly sworn, hereby deposes and states as follows:

1. My name is Ruth Johnson. I am an adult citizen and resident of the State of Michigan.

2. I am currently a Michigan State Senator for the 14th District.

3. I served as Michigan's Secretary of State from January 1, 2011 to January 1, 2019. As a prior Secretary of State, I am familiar with Michigan's elections laws, process, and execution.

4. I have reviewed Plaintiffs' Complaint and all attached affidavits (including the supplemental affidavit by Mellissa Carone) and I have reviewed the affidavit of Christopher Thomas.

5. The allegations and issues raised by Plaintiffs are very concerning to me and, in my opinion, require court intervention. In particular, I am concerned about the illegal activity alleged by Plaintiffs regarding voter coaching at polling places, election staff being instructed not to request photo identification or an affidavit from persons coming to vote, and Mr. Larsen's allegation that ballots were being assigned to random persons on the voter list.

6. Based upon my review of these documents, I believe that it would be proper for an independent audit to be conducted as soon as possible to ensure the accuracy and integrity of this election.

7. The above information is true to the best of my information, knowledge, and belief.

8. Further affiant says not.

_Ruth Johnson_
Ruth Johnson

On this 11th day of November, 2020, before me personally appeared Ruth Johnson, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

_Jenni Moiles_
Notary Public, Ingham County,

Michigan

My Commission Expires: September 15, 2025

JENNIFER MOILES
NOTARY PUBLIC, STATE OF MI
COUNTY OF INGHAM
MY COMMISSION EXPIRES Sep 15, 2025
ACTING IN COUNTY OF Ingham

2

## **AFFIDAVIT**

The Affiant, William C. Hartmann, being first duly sworn, hereby deposes and states as follows:

1. My name is William C. Hartmann. I am an adult citizen, voter, and resident of the State of Michigan.

2. I am a member of the Board of Canvassers of Wayne County, Michigan.

3. I personally observed the Absent Voter Counting Boards in Detroit at TCF Center.

4. Since the election on November 3rd, I have attended the Wayne County Canvass on an almost daily basis.

5. On November 17, 2020, at 3:00 p.m. there was a meeting of the Board of Canvassers to determine whether to certify the results of Wayne County. The meeting did not start until 5:00 p.m. We were told it was delayed so that representatives of the Democrat Board members could obtain additional affidavits.

6. At 5:00 p.m. an open meeting and discussion began to discuss the issue of whether to certify the vote. In my review of the results, I determined that approximately 71% of Detroit's 134 Absent Voter Counting Boards (AVCB) were left unbalanced and many *unexplained*. I informed the Board members of the discrepancies, but soon thereafter, a motion to certify was

made by Vice-Chairman Jonathan Kinloch. After further discussion, I renewed my concerns that the reason that the numbers did not balance for the majority of AVCB's in Detroit, and importantly, could not be explained. If the vote totals did not match, there should have been a documented reason explaining why.

7. The Board considered the ultimate question of whether to certify the vote, and the motion to certify the Wayne County elections failed 2-2.

8. This vote was followed by public derision from our two democrat colleagues. I, and Monica Palmer, who also voted against certification, were berated and ridiculed by members of the public and other Board members. This conduct included specious claims that I was racially motivated in my decision. This public ostracism continued for hours during which time we were not provided an opportunity to break for dinner and were not advised that we could depart and resume the hearing on another date.

9. I discussed a potential resolution with Vice-Chair Kinloch in confidence. Ms. Anderson-Davis told us that we must vote to certify on that night. We were told that we could not consider matters such as the unexplained reasons that most of Detroit's AVCB's did not balance and no one knew why. We

were informed that this consideration was outside of the scope of the Board's authority.

10. During the evening, Wayne County counsel, Ms. Janet Anderson-Davis, and my colleagues on the Board, continued to discuss irregularities in the AVCB's. Ms. Anderson-Davis advised the Board that the discrepancies were not a reason to reject the certification, and based on her explicit legal guidance, I was under the belief that I could not exercise my independent judgment in opposition to the certification. Therefore, I voted to certify the results.

11. Late in the evening, I was enticed to agree to certify based on the promise that a full and independent audit would take place. I would not have agreed to the certification but for the promise of an audit.

12. Vice-Chairman Jonathan Kinloch then assured us that if we voted to certify the election, a full, independent, and complete audit of Detroit's election, would be undertaken. We relied on this assurance in coming to an agreement. Without this assurance, I would not have agreed to certify Wayne County on November 17th.

13. After the meeting, I was made aware that Michigan Secretary of State, Jocelyn Benson made a public claim that the representations made by Mr. Kinlock, on which we had relied, would not be followed.

14. I thus rescind my prior vote to certify Wayne County.

15. I remain of the firm belief that the Wayne County vote should not be certified. These are more than clerical errors.

16. The Wayne County election was conducted in a manner which calls into serious question whether the voice of Wayne County residents is reflected in the result. During the election process I repeatedly asked for information and data that would help verify the process was accurate and fair. Despite my requests I have not received a written Executive Summary of the election results that could be read. This Executive Summary will tell you which AVCBs are over/under as well as which AVCBs were balanced.

17. Moreover, there are other questions which need to be answered and can only be answered if Wayne County's Canvass is transparent and provides information within its control. This information includes:

    a. The logs indicating when dropbox ballots were collected and delivered, the log of persons who made these deliveries and who had access to dropbox keys and when that access was obtained.

    b. Similar concerns exist regarding the delivery of ballots to the TCF Center during the night of November 3 and the morning hours of November 4.

c. I am also concerned about the use of private monies directing local officials regarding the management of the elections, how those funds were used and whether such funds were used to pay election workers. I have not received answers to these questions, and I believe the people of Michigan deserve these answers. Can we release the logs to the tabulators demonstrating what happened in Detroit?

d. Why do the pollbooks, Qualified Voter Files, and final tallies not match or balance?

e. 71% of Detroit AVCB's did not balance, why not?

f. Did the chairperson of each of Detroit's 134 AVCB's keep logs of shift changes?

g. Why were republicans *not* used in signing seals certified at the end of the night on Monday, and Wednesday evening before ballot boxes were documented, closed, and locked?

h. How many challenged ballots were counted?

i. Was any information placed directly into the Qualified Voter Files in the AVCB's?

j. How many voter birthdates were altered in the pollbooks?

k. Were ballots counted in TCF that were not reflected in the electronic pollbook or paper supplemental list?

l. Based upon information and belief, there were over 18,000 same-day registrations in Detroit on November 3. Were these new applicants verified as proper voters prior to the tabulation of their ballots?

18. I voted not to certify, and I still believe this vote should *not* be certified.

19. Until these questions are addressed, I remain opposed to certification of the Wayne County results.

19. The above information is true to the best of my information, knowledge, and belief.

I certify under penalty of perjury, that my statement and the evidence submitted with it, are all true and correct.

Printed Name: _WILLIAM C. HARTMANN_

Signed Name: _Will. C. H._

Date:

Sworn to before me this _18th_ day of November, 2020 at _6:29pm_

_Melissa Wojnar-Raycraft_
_Notary Public  Melissa Wojnar-Raycraft_

My Commission expires on: _Feb. 9, 2023_



Melissa Wojnar-Raycraft
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
MY COMMISSION EXPIRES FEBRUARY 9, 2023
ACTING IN THE COUNTY OF _Wayne_

## AFFIDAVIT

I, Monica Palmer, being first duly sworn, and under oath, state:

1. I am the Chairperson of the Wayne County Board of Canvassers.

2. The Board is a four-member board, required to have two Republican and two Democrat members, and I serve as one of the Republican members.

3. On August 4, 2020, the Michigan primary election was held.

4. On August 18, 2020, the Board held a public meeting at the Board's office in Detroit. I attended the meeting with the other three members of the Board.

5. The Board reviewed the Wayne County election results and considered whether to certify the August 4, 2020 primary election.

6. As reflected in the meeting minutes, Wayne County Election Director Gregory Mahar gave the Board a report at the meeting that included the following findings:

   - Staff encountered difficulties while trying to canvass the City of Detroit absentee precincts. "He indicated that aside from receiving the poll books on the first Friday and Sunday after the canvass began, the list of voters received made it difficult to determine how many voters actually returned their ballot. He reported that the City of Detroit used the QVF printed list of voters but there was also a handwritten list of voters, which is common to use both, but the two lists combined put the precincts severely out of balance."

   - "Director Mahar also reported on the difficulties staff encountered with trying to retabulate any absentee precincts that were out of balance. He stated that according to the Election Management system, he could see the City of Detroit did not scan a single precinct within a batch. When multiple precincts are scanned within a batch, it makes it nearly impossible to retabulate a precinct without potentially disrupting a perfectly balanced precinct."

   - "Deputy Director Jennifer Redmond reported on the irregularities she encountered while trying to retabulate out of balance precincts. She indicated that in some cases staff could not retabulate because the number of physical ballots counted in the container did not match the number of voters according to the poll book. Staff also requested the applications to vote for Detroit precinct 444 and precinct 262. Both containers ha[d] fewer ballots in the container than the number of voters according to the poll book, but what was strange was there appeared to be some missing applications." 1

7. It was reported that in the August 2020 primary that 72% of Detroit's absentee voting precincts were out of balance.

8. After discussion among the Board members, I voted along with all the other canvassers in a unanimous vote in favor of certifying the August 4, 2020 Primary Election.

9. Although certifying the primary election results, all Board members expressed serious concerns about the irregularities and inaccuracies. The Board unanimously approved a proposed joint resolution titled "Requesting a State Election Monitor and Investigation" that stated "Now Therefore Be it Resolved That, The Board of Canvassers for the County of Wayne, Michigan, request for the Secretary of State as Michigan's Chief Election Officer, to appoint a monitor to supervise the training and administration of the City of Detroit, Absentee Voter Counting Boards in the 2020 November General Election. Be it Finally Resolved, That, the Board of Canvassers for the County of Wayne, Michigan, request an investigation be conducted by the State Department of Elections into the training and processes used by the City of Detroit in the 2020 August Primary Election."

10. On November 3, 2020, the general election was held. I went to observe the election process at the TCF Center on November 3, 2020 and November 4, 2020.

11. Since November 5, I went to the Wayne County Canvas almost every day and helped the Wayne County staff.

12. On November 17, 2020, there was a board of Canvassers meeting scheduled to start at 3:00pm to determine whether or not to certify the November election. The meeting did not begin until 4:46pm.

13. Minutes before the meeting began at 4:46pm, I was given a report on the final canvas. We were not given an executive summary which was customary at most other certification meetings.

14. During this meeting, I determined that more than 70% of Detroit's 134 Absent Voter Counting Boards (AVCB) did not balance and many had no explanation to why they did not balance.

15. Vice-Chair Kinloch made a motion to certify the vote. I noted our prior reservations about unbalanced precincts in August 2020 and determined the record had discrepancies and irregularities and was incomplete.

16. A motion was made to certify the vote, and I voted not to certify. The vote to certify the Wayne County elections failed 2-2.

17. After the vote, my Democrat colleagues chided me and Mr. Hartmann for voting to not certify.

18. After the vote, public comment period began and dozens of people made personal remarks against me and Mr. Hartmann. The comments made accusations of racism and threatened me and members of my family. The public comment continued for over two hours and I felt pressured to continue the meeting without break.

19. After several hours of harsh comments, Vice-Chair Kinloch suggested a potential resolution. Wayne County Corporate Counsel Janet Anderson-Davis told me that I had to certify the vote that night. She told the members their role was ministerial and they could not use their discretion on matters like the record being incomplete. We were told that discretion was outside the board's authority.

20. After being told by Ms. Anderson-Davis that I could not use my discretion regarding the anomalies, I believed I had no choice but to certify the results despite my desire to oppose certification based on the incomplete record.

21. Additionally, we were presented with a resolution that promised a full, independent audit that would present answers to the incomplete record. I voted to agree to certify based on the promise of a full, independent audit. I would not have agreed to vote to certify but for that promise of a full, independent audit.

22. Vice-Chairman Jonathan Kinloch gave me assurances that voting for the certification of the November election would result in a full, independent audit of Detroit's unbalanced precincts. I relied on that assurance and voted to certify the election based on that assurance. Without that assurance I would not have voted to certify the Wayne County November election.

23. Later that evening, I was sent statements that Secretary Jocelyn Benson made saying that she did not view our audit resolution to be binding. Her comments disputed the representations made by Vice-Chair Kinloch on which I relied.

24. As a result of these facts, I rescind my prior vote to certify Wayne County elections.

25. I fully believe the Wayne County vote should not be certified.

26. The Wayne County election had serious process flaws which deserve investigation. I continue to ask for information to assure Wayne County voters that these elections were conducted fairly and accurately. Despite repeated requests, I have not received the requisite information and believe an additional 10 days of canvas by the State Board of Canvassers will help provide the information necessary.

27. I initially voted not to certify the election, and I still believe this vote should *not* be certified and the State Board of Canvassers should canvass for an additional period.

28. Until these questions are addressed, I remain opposed to certification of the Wayne County results.

The above information is true to the best of my information, knowledge, and belief.

I certify under penalty of perjury, that my statement and the evidence submitted with it, are all true and correct.

Printed Name: *Monica J Palmer*

Signed Name: *Monica J Palmer*

Date:

Sworn to before me this *18* day of November 2020 at *9:33 pm*

My Commission expires on: *08/3/2022*

JANICE L. DANIELS
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF OAKLAND
My Commission Expires August 3, 2022
Acting in the County of *WAYNE*

# AFFIDAVIT OF ANGELIC JOHNSON

The Affiant, Angelic Johnson, being first duly sworn, hereby deposes and states as follows:

1. My name is Angelic Johnson. I am an adult citizen and resident of the State of Michigan.

2. I served and was trained to be a credentialed poll challenger for the November 3, 2020 general election.

3. I am a member of Black Voices for Trump, an organization of black Americans who advocate for economic opportunity, safer communities, and better healthcare policies, and who support the policies of President Donald J. Trump. One of our advisors is Dr. Alveda King, the niece of Dr. Martin Luther King Jr.

4. On November 4, 2020, I was asked to come to the TCF Center because there were very few poll challengers from the Republican Party.

5. I arrived to TCF Center around 9am. I checked in, received training and credentials, signed in at a table, and then started observing on the counting floor.

6. In the morning, I could see that there were over 100 tables at the TCF Center, but perhaps only about 50 total republicans in the building.

7. At one point, I noticed a female election worker having trouble because the ballot would not process. She alerted her supervisor that the ballot would not go through because it was a spoiled ballot. Her supervisor instructed her to "just send it through." I was going to challenge the ballot, but because the supervisor was so adamant about sending the ballot through, the ballot was tabulated.

8. I alerted an attorney with the Republican party who said it was too late to challenge the ballot because the supervisor had sent it through the tabulator.

9. Later in the day, I noticed a table with six people, including election workers and challengers, but not one republican at the table.

10. I saw an attorney from the republican party kicked out of the counting room. I thought this was odd because I did not notice any disturbance prior to him getting kicked out. However, as he was being escorted out, I saw and heard election workers cheering to that he was being kicked out. I took video because it seemed like quite unprofessional behavior.

11. During the cheering, I heard a male election worker say "all y'all get out!!!!"

12. Then, I saw the doors of the counting room locked. A large number of republican poll challengers were locked out of the counting room, and then we were even more short-staffed than we had been previously.

13. I left the TCF Center around 6pm.

Julie Bolke
Notary Public State of Michigan
County of Macomb
My Commission Expires May 17, 2023
Acting in the County of Macomb

_____
Angelic Johnson

On this 21 day of November, 2020, before me personally appeared Angelic Johnson, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that she has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters she believes them to be true.



Julie Bolke
Notary Public State of Michigan
County of Macomb
My Commission Expires May 17, 2023
Acting in the County of _Macomb_

Michigan

Notary Public, _Macomb_ County,

My Commission Expires: _May 17, 2023_

**AFFIDAVIT OF CYNTHIA CASSELL**

The Affiant, Cynthia Cassell, being first duly sworn, hereby deposes and states as follows:

1. My name is Cynthia Cassell. I am an adult citizen and resident of the State of Michigan.

2. On November 3, 2020 from around 9am-1pm, I helped surveil the exterior of the Department of Elections in the City of Detroit located on West Grand Blvd.

3. I observed organizations, including a group called "Election Defenders" handing out free food and t-shirts from large "Dominion Voting" boxes. The boxes of freebies were taken out of a Ford Focus and placed around two male employees from the Department of Elections.

4. These two men from the Department of Elections held USPS white open trays. People driving in the street and walking on the sidewalk would drop absentee ballots off in the tray.

5. Election Defenders stationed themselves very close to the employees from the Department of Elections where people dropped off ballots.

6. Campaign workers holding signs and actively campaigning, also stationed themselves close to the Department of Elections workers, certainly within 100 feet.

7. People walked or drove up and would get handed a free t-shirt that said the word "Vote" on it upon dropping off absentee ballots.

8. The two men from the Department of Elections with the open trays would go up to cars, lean into open windows in the cars to take the ballots, or people would use the trays as a drop box.

9. The trays were open; nothing seemed secure about this procedure.

10. I saw numerous people drop off absentee ballots and then be handed meals and t-shirts.

11. My account of being denied to work for the City of Detroit as an election worker, my report from my surveillance on November 3, 2020, and my experience at TCF Center on November 4, 2020 is attached to this affidavit.

_____
Cynthia Cassell

On this _____th day of November, 2020, before me personally appeared Cynthia Cassell, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that she has read the foregoing affidavit by her subscribed and knows the contents thereof, and that the same is true of her own knowledge and belief, except as to those matters she states to be on information and belief, and as to those matters she believes them to be true.

_____
Name of Notary Public

_____ County, Michigan

My Commission Expires: 04/25/2024

Brittani Wright
Notary Public of Michigan
Wayne County
Expires 04/25/2024
Acting in the County of _____

11/3/2020

Cynthia Cassell Surveillance of Detroit Board of Elections, 2978 W. Grand Blvd, Detroit, 48202

I arrived at 9:00 am and witnessed two black males, 20's, wearing a Detroit Election Apron collecting ballots on West Grand Blvd from cars. They were using open USPS boxes without a top. Sometimes the drivers would drop the ballot in the box, at other times the work would lean into the car and take the ballot from the occupants. Around 10:00am an SUV with World Central Kitchen workers pulled up in front of the Board of Elections entrance. The workers were giving free take-away meals to people who had dropped off their ballots. In front of the SUV was a hatchback belonging to Election Defenders, who was also giving away free T-shirts and snacks such as chips and cookies to voters.

Within 20 feet of the Election Workers collecting ballots were campaigners for **Sherry Gay-Dagnogo**. They were campaigning with signs.

10:30 an election worker bought out Dominion Voting boxes. In those boxes were T-shirts with the word VOTE in large letters, and something written in red in smaller letters. I was unable to read the red writing. The men with the boxes collecting ballots were giving away the t-shirts to the voters in the cars. People were also coming out of the Board of Elections and collecting T-shirts for themselves. Everyone during this time were also going to the World Central Kitchen vehicle and collecting a free meal and bottle of water.

12:30 A large commercial vehicle was circling the block giving away pizza to voters. I was on the phone with the Trump Election Attorneys giving my report so I do not have the exact wording but I believe it was Pizza To the Polls.

1:00 pm I went to TCF Center to be a poll challenger. Attached is my incident report with a democrat supervisor taking me into the Men's Room with a blank ballot.

While in the counting room I was told that I was not allowed to stand near other GOP Poll Challengers and was kept about 20' away from the counting tables. I did not notice any republican vote counters at the table. It was a very hostile environment. I was taken to the blank ballot and military vote table. I witnessed a poll worker taking a stack of military ballots and placing it under the table. The poll worker was challenged and put the ballots back.

2:30 pm I went to lunch with other GOP Poll workers. When we returned to the counting room we were locked out by the police who claimed that the room was over

capacity. I was able to use my Press Pass to re-enter the room but was not allowed outside the press area.

I received a call to return to my surveillance at the Board of Elections. I did not witness anything of significance, and I left around 5:30 with the 3 other GOP members who were also watching the rear of the building for ballot transfers.

# INCIDENT REPORT

| TIME: | | Type of ballot: ☐ Absentee ☐ Early Voting ☐ Election Day ☐ Provisional |
|---|---|---|
| NAME | | CYNTHIA GAIL CASSELL |
| FULL ADDRESS | | ▮▮▮▮▮ <br> DETROIT, MI 48224 |
| PHONE | | ▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮ |

## LOCATION

| STATE | MICHIGAN | COUNTY | WAYNE |
|---|---|---|---|
| MUNICIPALITY | DETROIT | POLLING LOCATION | TCF Center |

**DESCRIPTION OF INCIDENT (Use back to continue if necessary)**

1:00 pm Nov 4, 2020

An election worker picked up a blank ballot from the ballot table. My assignment was to follow the ballot to the counting table. The man asked why I was following him. I explained that I have to follow the ballot to the table. He tried to be funny and took me through the entire hall into the men's room. He was going in I told him that a blank ballot

**WHAT REMEDY OR RESPONSE, IF ANY, WAS TAKEN WITH RESPECT TO THE INCIDENT?**

may not go into the men's room. He finally relented when he saw that I was serious and took the ballots to table #67. It was trying to intimidate me and sexually harass me.

I was asked by party workers to fill out an incident report.

**Category of Incident (check all that apply)**

☐ Illegal Voting ☐ Intimidation ☐ Electioneering ☐ Ballots ☐ Machines ☐ Election Workers
☐ Provisional Ballots ☐ Poll Opening ☐ Poll Closing ☐ Violence ☐ Challenge ☐ Other

| Is the Issue Resolved? ☐ YES ☐ NO | Call taken by: |
|---|---|

Paid For by Donald J. Trump for President, Inc.

I, Cynthia Cassell, was hired as a Poll Worker for Absentee Ballots in Detroit as a Republican. It was very difficult to get assigned to any training class. I made several calls and finally got to the very last class at Wayne County Community College North West Campus on Saturday, October 24. I started the class and an hour through I realized they had placed me in the incorrect class. I was taken out of the class and sent to a supervisor. I was then told that they hired too many people and I can't be placed anywhere in Detroit. I did have several heated emails with the Clerk's Office, but since they were sent through their internal system, I do not have copies. For months I filled out their forms waiting for training. I was never placed in a Poll Working paid position, yet when I was in Cobo Hall as a Poll Challenger, I only saw tables of Democrats, many of them wearing political t-shirts and masks.

To follow are some of the emails confirming that I was hired.

.

# Poll Worker Training Resources
Inbox

**Democracy MVP <DemocracyMVP@govsubscriptions.michigan.gov>** Mon, Nov 26,
1:12 PM

to litlsecr

Hi Cynthia

Thank you again for signing up to serve as an election worker in the upcoming election. By stepping up to serve your state and community, you are making a significant difference and helping our elections run safely and smoothly.

**If you have been hired and placed by a local clerk to work on Election Day, congratulations and thank you!**

RECEIVED by MSC 11/26/2020 2:44:13 AM

If you have not been hired and placed by a clerk to work on Election Day, please check-in with us and let us know where you're at in the process by filling out our **check-in form**: **https://www.surveymonkey.com/r/67Q78FR**

In addition to mandatory training provided by clerk staff, please take a moment to review the training resources below so you are ready to serve on Election Day.

There are 8 short videos – and you can watch them all on our Youtube playlist.

You can also find supplemental poll worker training resources by visiting Michigan.gov/DemocracyMVP and visiting our Election Worker Resources section. There, you will find informational one-pagers in addition to the videos in the playlist above.

Training videos and materials cover many key subjects, including:

- What to Expect on Election Day
- Opening the Polls
- Processing Voters
- Closing the Polls
- Absentee Counting Boards
- Challengers
- COVID-19 Safety
- Five Facts About Voting

These resources don't replace training provided by clerks. But they can help you prepare.

Thank you for being part of the team preserving and protecting democracy this fall.

All the best,
The DemocracyMVP Team

## Re: Poll Worker - #DI00271586
Inbox

**DemocracyMVP Inbox via mdossupport.happyfox.com**    Mon, Oct 12, 7:01 PM

to me

Dear Cynthia Cassell,

Thanks for letting us know and for your patience here - there is definitely still a need in the area we suggested you apply. We are aware that their clerk's office is still currently assessing needs, sorting through election worker applications and actively reaching out to applicants. We appreciate your patience as they continue contacting applicants to set up training - I'd advise sitting tight and waiting to hear from them for at least another week or so.

You can also proactively reach out to their elections department to check on the status of your application - although there may be a wait to speak with someone.

Hope this helps and please let me know if you have further questions.

Sincerely,

**Sarah Reinhardt**
*Department of State Information Center*
Michigan Department of State
Secretary of State Jocelyn Benson
Michigan.gov/SOS
-

**Email ID:** #DI00271586
**Subject:** Poll Worker

**Message:** Last Contact Reply
From: Cynthia Cassell
Date: Mon, Oct 12, 2020 at 02:47 PM
I have been contacted by phone once regarding training to be a poll worker. Since I work 8-6 I was going to be contacted about a weekend training class. I haven't been contacted and would like to work at Cobo Hall with the absentee ballots.

Please contact me so that I may finish this process.

Cynthia Cassell
Extraordinary Person
248-672-4431 | cynthiacassell@gmail.com

**detroitpollworkers@pollchief.com**                    Mon, Oct 5,
                                                         5:08 PM

to CYNTHIACASSELL

Hello CYNTHIA CASSELL

Welcome to your elections officer portal. This portal will enable you to indicate that you're interested in working in an upcoming election, to switch yourself from one

scheduled class into a different class, to review your payroll history, to review previous messages, and to see your work assignment.

To log in, click on this link https://www.vote4detroit.net/Pollaccess, enter your user name 824412 and password 110807 in the appropriate boxes, then click on the **Login** button.

This will open your home page:

We recommend that once you've logged in, you click on the "**Change my username**" and "**Change my password**" and change them to something more easily memorable for you.

Then you may want to click **Update/change my personnel information** to add or to change the details we have listed for you.

Since we may be planning more than one election simultaneously, please check the dropdown menu to be sure you are working on the correct election when you click to view your work assignments or your training classes.

To access your portal, please click on the link below. You may wish to save this link to your Favorites bar in your online browser for easy access in the future. Then enter the pre-assigned user name and password.

Link to access the portal: https://www.vote4detroit.net/Pollaccess
Pre-assigned user name: 824412 (Don't forget to change it to a user name you can remember).
Pre-assigned password: 110807 (Don't forget to change it to a password you can remember).

Enjoy exploring your poll worker portal.

Sincerely

Detroit Election Administrator

# Poll Worker Check-In - Response Requested
Inbox

**MDOS-DemocracyMVP <DemocracyMVP@michigan.gov>**    Sun, Sep 27, 11:18 AM

to litlsecr@umich.edu

Hi Cynthia – Hope all is well with you! This is Sally with Democracy MVP. I wanted to check in with you on your status as a Michigan poll worker and to see how the process is going for you! Thanks again for signing up to serve in Michigan and for helping to protect our elections - could you take a look at the below questions and send me a reply as soon as you can?

**Please review this email carefully and provide the requested response.**

**Please respond to this email and let us know:**
1. **Have you submitted your application to a clerk office?**
2. **Which clerk's office did you submit your application to?**
3. **Have you heard back from the clerk on next steps (hiring, training, placement etc)?**

As a reminder, serving as a poll worker in Michigan is a paid position, *not a volunteer position.* To serve as a poll worker, you must be formally hired and trained by a clerk's office.

If you have submitted your application at least one week ago but have not yet heard from the clerk's office on next steps, we want to know so we can be sure you are connected with an office that needs your help! For more details on how Democracy MVP works to connect you with a clerk's office in need, please read **"How does this process work?"** below the line.

If you still need to submit your application, a reminder of your next steps are also listed below the line. **Please submit your application to the clerk's office** *as soon as possible.* Most clerk's offices in Michigan conduct training in late September or October, so don't miss your window to apply!

We invite you to keep us updated on your election worker journey and also help us recruit more election workers by following and sharing Democracy MVP content on Twitter, Instagram, and Facebook at @DemocracyMVP.

Sincerely,

**Sally Marsh**
*Director of Special Projects*
Michigan Department of State
Secretary of State Jocelyn Benson

---------------------------------------------------------------------------------

If you have not yet submitted your application to your clerk's office, your next steps are listed below...

*... but first, I want to explain a bit how this process works.*

## How does this process work?

Democracy MVP helps to match prospective election workers, also known as election inspectors or poll workers, with a clerk's office in Michigan who may hire them to help with elections.

We have listed instructions on how to apply below, but first, there are a few important things to note in order to participate in this process.

**1. Democracy MVP does not hire poll workers.** Our office serves as a "matchmaker" for prospective election workers looking for a clerk's office in Michigan to work for in November. We provide you with a suggested clerk's office to apply at, and all hiring decisions are made at individual clerks' offices.

**2. Each clerk's office operates independently from Democracy MVP.** Each clerk's office is also run independently of one another. This means that each clerk handles hiring, training and payment of poll workers differently. Clerks also do not typically share poll worker applications with other clerks, meaning that when you apply with a clerk, you are only applying to serve as a poll worker with that specific location.
Once you've submitted your application to a clerk's office, all questions regarding your application status, scheduling, training, polling location placement, and pay rate should be directed to the clerk's office where you applied.

**3. Our suggested assignments are just that – suggestions!** As a registered voter in Michigan, you are welcome to apply to serve as a poll worker at any clerk's office in Michigan. If you do not wish to work at the location we suggested, you can apply elsewhere.

You can find any clerk's contact details by visiting Michigan.gov/Vote

**4. Michigan's poll workers are paid employees, not volunteers.** To serve as a poll worker, you must be hired by a clerk's office and trained. Please do not show up to serve as a poll worker on election day without having first been formally hired and trained by a Michigan Clerk.

If you have general questions or comments about the role of a poll worker, about the process, or if you are having difficulty applying with or contacting your suggested clerk's office, feel free to email us at DemocracyMVP@Michigan.gov

## How do I become an election worker?
**Your next step for becoming an election worker is to complete the official State of Michigan State of Michigan Election Inspector Application and submit the full application to your assigned clerk's office for review.**

As a reminder, to become an election worker (also known as an election inspector or poll worker) in Michigan, **you must be a registered voter in Michigan** – or if you are between the ages of 16 – 17, you must be a Michigan resident.

**We have listed a suggested clerk's office for you to submit your application, as well as their contact information, in a previous email.** Please note that suggested clerk's office assignments have been made based on areas with the highest need for election workers and proximity, and that our suggested clerk may not be your personal clerk's office.

If you have a strong preference to submit an application to your local clerk over your suggested location, you can find your local clerk's information and office hours at Michigan.gov/Vote. Just input your name, birth year, and zip code, and, on the next page, select "Local Clerk."

## Initial Training Video

Before you attend the local clerk's training and work the polls on Election Day, please view this introductory election inspector training video from the Michigan Bureau of Elections (it's only about 10 minutes long). It will give you an overview of your role and an introduction to key items to know on Election Day.

You can view the training video here: https://www.youtube.com/watch?v=u1cavVSNoeY&feature=youtu.be

## Can I sign up with a friend?

Absolutely! While we cannot guarantee you will be selected to work together on election day, we encourage you to ask your friends, family and neighbors to sign up to serve together. If you are hoping to work at the same location, have your friend fill out our online sign-up form at Michigan.gov/DemocracyMVP, and then you can both submit your full and complete State of Michigan Election Inspector Application (link above) to the same clerk's office.

## What happens after I submit my application?

Upon submission of your application, all future correspondence regarding your election worker application status, training and next steps will come from the clerk's office. Each clerk's office handles election worker hiring and assignments independently, so our office will be unable to provide status updates on your application once submitted.

**If you have submitted your application at least one week ago, but have not heard back from the clerk's office, please let us know** so we can make sure you are placed in a jurisdiction that needs your help on Election Day.

For questions, concerns or updates on election worker recruitment, feel free to reach out to us at DemocracyMVP@Michigan.gov our check out our FAQ available at Michigan.gov/DemocracyMVP. You can also help us recruit more election workers by following and sharing our Democracy MVP on Twitter, Instagram, and Facebook at @DemocracyMVP.

Thanks again for joining the team that is protecting and strengthening our democracy. We are fortunate to have your help in this important endeavor for our state.

Attachments area
Preview YouTube video Democracy MVP Training Video



# November Election Worker Next Steps
Inbox

**MDOS-DemocracyMVP <DemocracyMVP@michigan.gov>**          Sat, Sep 5, 1:05 PM

to litlsecr@umich.edu

Dear Cynthia,

Thank you signing up to serve as an election worker in Michigan! You are part of an impressive team of thousands from across the state who have stepped up to serve.

**Please find your next steps for becoming an election worker listed below, as well as answers to frequently asked questions.**

Michigan's elections need help in November. You're doing your part - now help us recruit more! After you follow the below steps to become a poll worker, follow this link to share on Twitter and encourage others to join our team! You can also follow us at Democracy MVP on Instagram, and Facebook.

## Your suggested clerk's office assignment and next steps:

**Wayne County – Detroit City**
**Clerk Janice Winfrey**
2978 W. GRAND BOULVARD
DETROIT MI 48204
313-224 3260

Your next step is to visit the Detroit Poll Worker Portal (link below) and select "Click Here to Apply Online" to submit your information directly to the Detroit City Clerk's Office.

**Detroit Poll Worker Portal: Vote4Detroit.net/PollAccess**

You should hear from the Detroit City Clerk's office within a few days of completing the portal about signing up for a training session.

## What if I want to work a specific assignment or polling location?
If you have a request to work a specific assignment, job, or polling location, please communicate this with the clerk's office where you apply. If the clerk's office where you apply is not able to accommodate your request, feel free to notify us and we are happy to refer you to a different clerk's office in need.

All suggested clerk assignments have been made based on highest need areas and proximity, and that the suggested clerk may not be your personal clerk's office. **You may apply in any jurisdiction in Michigan.**

If you have a strong preference to submit an application to a different clerk, you can find your local clerk's information and office hours at Michigan.gov/Vote. Just input your name, birth year, and zip code, and, on the next page, select "Local Clerk."

## Initial Training Video
Before you attend the local clerk's training and work the polls on Election Day, please view this introductory election inspector training video from the Michigan Bureau of Elections (it's

only about 10 minutes long). It will give you an overview of your role and an introduction to key items to know on Election Day.

You can expect to hear from our office with further additional training resources as we approach November.

You can view the training video here: https://www.youtube.com/watch?v=u1cavVSNoeY&feature=youtu.be

## Can I sign up with a friend?

Absolutely! While we cannot guarantee you will be selected to work together on election day, we encourage you to ask your friends, family, and neighbors to sign up to serve together. If you are hoping to work at the same location, have your friend fill out our online sign-up form at Michigan.gov/DemocracyMVP, and you can both submit your full and complete State of Michigan Election Inspector Application (link above) to the same clerk's office.

---------------------------------------------------------------------------------------------------

For questions, concerns or updates on election worker recruitment, contact us at DemocracyMVP@Michigan.gov our check out our FAQ available at Michigan.gov/DemocracyMVP.

Thank you again for joining the team that is protecting and strengthening our democracy. We are fortunate to have your help this fall.

Sincerely,

**Sally Marsh**
Director of Special Projects
Michigan Department of State
Secretary of State Jocelyn Benson

_____     11-10-2020
Cynthia Gail Cassell                                             Date

_____     11/10/2020
Notary                                                                   Date

Brittani Wright
Notary Public of Michigan
Wayne County
Expires 04/28/2024
Acting in the County of Wayne

# AFFIDAVIT OF RHONDA WEBER

The Affiant, Rhonda Weber, being first duly sworn, hereby deposes and states as follows:

1.      My name is Rhonda Weber. I am an adult citizen and resident of the State of Michigan.

2.      I was asked to help provide surveillance of the Department of Elections in the City of Detroit for the November 2020 elections as suspicious activity had been reported there.

3.      On election day, November 3, 2020 around 4:43pm on West Grand Blvd., I noticed that a man working for the Department of Elections was on the street and sidewalk collecting absentee ballots in a USPS mail tray. The tray was not secure; it had no lid. It was open and the man would walk around with this open tray on the sidewalk and go into the street with the ballots just loose in the tray.

4.      Cars would driveway, roll down their windows, and drop ballots off into the tray.

5.      I noticed multiple ballots being dropped off by one person.

6.      The man from the Department of Elections simply accepted the ballots in the tray.

7.      I saw a black SUV park off West Grand Blvd on the street. A woman with blonde hair had a Tupperware filled with absentee ballots. She had to make three separate trips to dump ballots in the man's USPS tray using her large open Tupperware container. The woman was not wearing anything official and it seems very odd that she would be dropping off this large number of ballots on the street on election day.

8.      People who dropped off absentee ballots on the sidewalk or from the street could get free food, drinks, and t-shirts. Groups were stationed before the man with the USPS tray and

RECEIVED by MSC 11/26/2020 2:44:13 AM

after him on the street. Photographs are attached to this affidavit. These photographs are true and accurate depictions of what I saw on West Grand Blvd on November 3, 2020.

9.      On November 4, 2020, I was again conducting surveillance on the Department of Elections.

10.      Around noon an off-duty police officer notified me that he observed a man taking absentee ballots from the Department of Elections and putting them in his car.

11.      I then saw the man who had put ballots the backseat of his car.

12.      I followed the man as he drove to the post office. True and accurate photographs of the man at the post office are attached to this affidavit. The man wore bright red pants and was driving a black Ford Crown Victoria with municipal plates.

13.      The man went inside the post office and white trays were delivered to him that I believe were filled with additional absentee ballots.

14.      At that time, the man noticed my surveillance. He aggressively backed his car up and boxed me into where I was parked. Then suddenly, the man accelerated extremely quickly and took off. While I could not catch up to him, I saw that he turned in the direction of the TCF Center.

15.      Around 2pm, I was notified by the off-duty police officer that he saw the man in the red pants return to the Department of Elections without any of the absentee ballots or USPS trays.

*Rhonda Weber*
Rhonda Weber

RECEIVED by MSC 11/26/2020 2:44:13 AM

On this *21st* th day of November, 2020, before me personally appeared Rhonda Weber, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that she has read the foregoing affidavit by her subscribed and knows the contents thereof, and that the same is true of her own knowledge and belief, except as to those matters she states to be on information and belief, and as to those matters she believes them to be true.

_____

Name of Notary Public:

_____ County, Michigan

My Commission Expires: _____

LINI ALUCHI
Notary Public - Michigan
Wayne County
My Commission Expires Apr 7, 2021
Acting in the County of Wayne

RECEIVED by MSC 11/26/2020 2:4:13 AM

## AFFIDAVIT OF CHRISTINE L. MUISE

I, Christine L. Muise, being first duly sworn, and under oath, state the following:

1.  I am an adult citizen of the United States and a resident of Michigan.

2.  Prior to the 2020 general election held on November 3, 2020, I received from the Michigan Secretary of State, Jocelyn Benson, an unsolicited absent voter ballot application, which was mailed to my home address. A true and correct copy of Secretary Benson's mailing is attached to this affidavit as Exhibit A.

3.  I was alarmed by this mailing because I did not request an absent voter ballot application.

4.  I legally voted in-person during the 2020 general election because, upon information and belief, voting fraud is a serious problem, and it is facilitated by absentee voting.

### VERIFICATION

I swear that the foregoing is true and correct.

*Christine L. Muise*

Christine L. Muise

Sworn to before me and subscribed in my presence this 20th day of November 2020.

*Lucie A. Ramsdell*

Notary Public

Washtenaw County, MI

My commission expires: 1-14-21

LUCIE A. RAMSDELL
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WASHTENAW
My Commission Expires Jan. 14, 2021
Acting in the County of Washtenaw



# EXHIBIT A



STATE OF MICHIGAN
JOCELYN BENSON, SECRETARY OF STATE
**DEPARTMENT OF STATE**
LANSING

Dear Registered Voter,

You have the right to vote by mail in every election. Voting by mail is easy, convenient, and secure. During the outbreak of COVID-19, it also enables you to stay home and stay safe while still making your voice heard in our elections.

There are two upcoming elections in Michigan this year: a statewide election in August and a national election in November. If you would like to vote by mail in these elections, you can request that your clerk mail your ballot directly to you by completing the enclosed form. After you have signed the form, you can submit it in any one of the following ways:

- **Option 1** – Scan or take a photo of the form that clearly shows your signature, and <u>email it to your clerk</u> at the email address included on the bottom of your AV application.

    OR

- **Option 2** – <u>Mail or drop-off the form to your local clerk</u> at the address included on the bottom of your AV application.

Go to www.Michigan.gov/Vote for more information about how to return your absent voter ballot application electronically.

Democracy is essential to the success of our nation, and your vote is the foundation of our democracy. Thank you for doing your part by being a registered voter, and making your voice heard.

Sincerely,

Jocelyn Benson

Jocelyn Benson
Michigan Secretary of State

0192119117721

## Michigan Absent Voter Ballot Application        Approved by: _____

### Check election(s) which you are requesting ballot(s).

| ☐ BOTH 2020 ELECTIONS | ☐ ELECTION: 8/4/2020 | ☐ ELECTION: 11/3/2020 |
|---|---|---|

CHRISTINE LUCILLE MUISE

See other side for additional instructions

☐ I want to vote absentee in all future elections. Automatically send me an application for every election

**1 Sign** I certify that I am a United States citizen and a qualified and registered elector of the Michigan city or township listed above, and I apply for an official ballot, to be voted by me in the election(s) checked above, and the statements in this application are true.

X _____          /    /

**Voter's Signature (Voter must sign - power of attorney is not acceptable)        Date**

**2 Other**

| Aug 4 Primary Date leaving for this address: | Street Address | Nov 3 General Date leaving for this address: | Street Address |
|---|---|---|---|
| Date of return: / / | City     State     Zip | Date of return: / / | City     State     Zip |

**3 Optional**    Email Address                          Phone #  (      )

Your email address and phone number help your clerk contact you if there is a problem with your application or ballot.

| Clerk's Use Only | Primary | Ballot No: | General | Ballot No: |
|---|---|---|---|---|
| Filed:  /  / | Mailed:   /  / | Returned:   /  / | Mailed:   /  / | Returned:   /  / |
| Wd/Pct: 00005 | Clerk: | | Clerk: | |

00005    8/4/2020    1030

8/4/2020

11/3/2020    Ballot No: _____
Voter No: _____
Inspector Initials: _____

Complete and return to:

CHRISTINE LUCILLE MUISE



## ABSENT VOTER BALLOT APPLICATION INSTRUCTIONS

**STEP 1.**   Fill out the application completely. You must sign the form to get a ballot.

**STEP 2.**   Deliver the application by one of the following methods:

**1. Mail it.** Make sure the envelope has proper postage and is addressed to your local clerk.

**2. E-mail it.** Take a picture of the form (or scan it) and e-mail it to your clerk. Make sure your signature is visible.

**3. Deliver it** in person to the clerk, the clerk's office, or the clerk's authorized assistant. Someone in your immediate family or living in your household can help you deliver this application. If that's not possible, you can ask any Michigan registered voter to deliver it for you. The person helping you must sign the "Certificate of Authorized Registered Elector Assisting in Returning Application".

## CERTIFICATE OF AUTHORIZED REGISTERED ELECTOR ASSISTING IN RETURNING APPLICATION

I certify that my name is_____ , my address is
_____ , date of birth is_____ / ____ / ____ ;
that I am delivering the absent voter ballot application of_____
at his or her request; I did not solicit or request to return the application or make any markings on or alter it; I did not influence the applicant; I understand that a false statement in this certificate is a violation of Michigan election law.

_____          _____
Date                                                        Signature

---

### _WARNING_

You must be a United States citizen to vote. If you are not a United States citizen, you will not be issued an absent voter ballot. A person making a false statement in this absent voter ballot application is guilty of a misdemeanor. It is a violation of Michigan election law for a person other than those listed in the above instructions to return, offer to return, agree to return, or solicit to return your absent voter ballot application to the clerk. An assistant authorized by the clerk who receives absent voter ballot applications at a location other than the clerk's office must have credentials signed by the clerk. Ask to see his or her credentials before entrusting your application with a person claiming to have the clerk's authorization to return your application.

---

**Moving between August and November?** You might want to apply for August only and apply for November after you move. How to decide:

(1) If you're moving within the same city or township and apply for both August and November, then as long as you update your registration address before your clerk mails your ballot (usually around September 21), your clerk will send you a ballot to the new address in November. You can still update your address after your November ballot is mailed but you will need to fill out additional paperwork before you get your ballot.

(2) If you're moving to a different city or township, when you update your registration address* your old clerk will cancel your absent voter ballot application for November and you'll have to reapply with the new clerk in your new city or township.

*You must update your voter registration address when you move (it isn't updated automatically unless you update your Michigan driver license/ID card). Find out how to update your registration address at Michigan.gov/Vote.

**Already applied for a November ballot?**
If you voted by absent voter ballot in March, you might have already applied for November. You'll get that ballot no matter how you fill out this form. If you want to cancel your November request or have questions, contact your clerk.



Secretary of State
**Jocelyn Benson**
www.Michigan.gov/sos

P.O. Box 30330
Lansing, MI 48909-1570

CTE-SP1 48198

*OFFICIAL
ELECTION MAIL*
Authorized by the U.S. Postal Service
®

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
**PAID**
LANSING, MI
PERMIT NO. 1200

## IN RE: PRESIDENTIAL ELECTION
## NOVEMBER 3-4, 2020
## DETROIT, MICHIGAN

**I hereby depose and testify under penalty of perjury as follows:**

1. That I was an attorney for the GOP in Michigan on November 3-4, 2020.

2. That I am competent to testify based on my personal knowledge, experience and observations.

3. That my testimony is true.

4. That I am an attorney and I am licensed in the State of Tennessee and I have been continuously licensed in Tennessee since 1995. That I am also licensed in the United States Supreme Court, Sixth Circuit of Appeals, United States District Courts for the Northern and Southern Districts of Illinois, United States District Court for the Eastern District of Michigan, United States District Court for the Northern District of Indiana, United States District Court for the Southern District of Ohio, United States District Court for the Eastern District of Wisconsin, United States District Courts for the Middle and Western Districts of Tennessee, United States District Court for Nevada, United States District Court for Arizona, United States District Court for Nebraska, United States District Court for the Western District of Kentucky, and by the Association of Russian Jurists.

5. That my legal experience includes having written fourteen (14) books on various subjects of the law including the following: *In Re: The December 4, 2011 Parliamentary Elections Of The Russian Federation, The Law on*

*Copyright of the Russian Federation, The Copyright Legislation of the Russian Federation (2011), Reporter of All Russian Appellate Copyright Cases, Volumes I-IV, The Civil Code of the Russian Federation, Volumes I-IV, The Art of Gittin' Paid, and The Law on Advertising of the Russian Federation.*

6. That I was present on November 4, 2020 at TCF Center in Detroit, Michigan as an attorney for the GOP and observed processing of ballots at the Detroit Department of Elections Central Counting Boards for the majority of the day and into the evening.

7. That I worked with Jason R. Humes who was the leader of the MI-GOP floor team that day.

8. That at approximately 7:00 p.m. on November 4, 2020, it was brought to my attention by various poll challengers who personally observed that there were problem ballots that were not in the poll books that were being moved between the elevated restricted area to the center table which was not accessible to any poll challengers. The elevated restricted area contained approximately twenty (20) computers and twenty (20) Detroit Department of Elections employees who had no oversight by poll challengers. They were located on an elevated stage and their computers were well above eyesight.

9. That Jason R. Humes effectively challenged all of these problem ballots and requested that they be sequestered in order to preserve and record his timely, well-stated challenge to these ballots. He made this request to

2

Messrs. Daniel Baxter and Chris Thomas, Mr. Humes explained the challenge in detail as set forth in his sworn statement dated November 10, 2020.

10. That Mr. Humes challenged the problem ballots on the following bases:

    1. After the problem ballots were removed from each AB on Tuesday and Wednesday, we were denied all access to observe the ballots including how they resolved each ballot issue;

    2. Ballots were not in the electronic poll book or supplemental printed poll book before the ballots were opened;

    3. The ballots were all open and removed to an area with no access to observe;

    4. Signature verification could not be assured given access to the absentee voter application was not available at TCF.

11. That the entire set-up of the administration and calculation of ballots on November 4, 2020 at the Detroit Department of Elections in the TCF Center was improper because a central part of their procedure was hidden and obscured in plain sight by the raised stage on which unknown functions were performed involving ballots which were not subject to observation, review, scrutiny or challenge.

3

_____      _____
G. Kline Preston, IV, Esq.     11/10/20
                                              Date

Respectfully submitted,

**KLINE PRESTON LAW GROUP**

G. Kline Preston, IV, Esq (#017141)
Belle Meade Office Park
4515 Harding Pike, Suite 107
Nashville, TN 37205
Tel: 615-279-1619
Fax: 866-610-9565
kpreston@klineprestonlaw.com

4

RECEIVED by MSC 11/26/2020 2:44:13 AM

### AFFIDAVIT OF ANDREW SITTO

I, Andrew Sitto, make this declaration under 28 U.S.C. § 1746 and based on my personal knowledge and upon information and belief where noted.

1. I am an adult citizen of the United States and a resident of Michigan.

2. On November 3, 2020, I served as a credentialed poll challenger for the November 2020 election.

3. I arrived at the TCF Center at 9:30 p.m. on November 3, 2020.

4. I reported to the counting room, which is a large room on the main floor of the TCF Center. The room is about 100 yards long and about 50 yards wide with windows.

5. The poll challengers watch the counters who sat at tables comparing paper ballots to Michigan electronic poll book or registered voter list (sometimes called the QVF) on computer screens. Each counter compares the ballot to an electronic database on his/her computer to determine if the ballot correlates to a person who is registered to vote.

6. I was standing in the center of the room where there were replacement or duplicate ballots for damaged ballots. I remained in this location from about 10:00 p.m. until about 4:30 a.m. If a counter needed a duplicate ballot, they would come to this central location to take a duplicate ballot.

7. I noticed a few times where workers would take duplicate ballots without any formal check out process and hand them to other workers or take the ballots without the need to make a duplication.

8. I observed ballots being duplicated where the original appeared to possess no issues.

- 1 -

9. I was not allowed to get close enough to the duplication to see if the ballot was being accurately duplicated.

10. However, I did see a large number of duplications where workers completed the duplicated ballot as a straight ticker democrat ballot, and I am not confident that the original ballot reflected the same.

11. I also noticed that Republican challengers would tell an election supervisor of a challenge, but the supervisor would not process or document the challenge. This happened repeatedly throughout the night.

12. At approximately 4:30 a.m., I thought everyone was going to go home as our shift had ended.

13. There were two men in charge of the counting, one in his 30s and one in his 50s.

14. At approximately 4:30 a.m., on November 4, 2020, the man in his 50s got on the microphone and stated that another shipment of absentee ballots would be arriving and would have to be counted.

15. I heard other challengers say that several vehicles with out-of-state license plates pulled up to the TCF Center a little before 4:30 a.m. and unloaded boxes of ballots.

16. At approximately 4:30 a.m., tens of thousands of ballots were brought in and placed on eight long tables. Unlike the other ballots, these boxes were brought in from the rear of the room.

17. The same procedure was performed on the ballots that arrived at approximately 4:30 a.m., but I specifically noticed that every ballot I observed was cast for Joe Biden.

- 2 -

18.     While counting these new ballots, I heard counters say at least five or six times that all five or six ballots were for Joe Biden. All ballots sampled that I heard and observed were for Joe Biden.

19.     There was a shift change at 5:00 a.m. for the poll challengers. Many challengers decided to leave at the 5:00 a.m. shift change. I decided not to leave and continued to monitor the ballot counting.

20.     Upon information and belief, the TCF Center was the only place where absentee ballots were being counted.

21.     I filled out about six or seven incident reports about what occurred at the TCF Center.

22.     At approximately 2:00 p.m. on November 4, 2020, election officials covered windows to the counting room with cardboard to block the view.

23.     A little after 2:00 p.m., I exited the glass enclosed room to take a break in the lobby area of the TCF Center. When I tried to go back into the counting room, security guards refused to allow me back in to monitor the counting

24.     Previously, people could come and go freely into the counting room.

25.     Election officials refused to let me into the room to observe the counting of the military ballots, although I was a certified challenger on the attendance list.

26.     The above information is true to the best of my information, knowledge, and belief.

27.     Further affiant says not.

Andrew Sitto

- 3 -

On this 20th day of November, 2020, before me personally appeared Andrew Sitto, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

Notary Public, Oakland County, Michigan
My Commission Expires: 7/12/2025

MICHAEL BADALAMENT
Notary Public, State of Michigan
County of Oakland
My Commission Expires 07-12-2025
Acting in the County of Oakland

- 4 -

# INCIDENT REPORT

| TIME: | Type of ballot: ☒ Absentee ☐ Early Voting ☐ Election Day ☐ Provisional |
|---|---|

| NAME | Kristina Karamo |
|---|---|
| FULL ADDRESS | 18430 Rosemary Blvd. Oak Park, MI 48237 |
| PHONE | 248-798-9443 | E-MAIL | Kristina.Karamo@gmail.com |

## LOCATION

| STATE | Michigan | COUNTY | Wayne |
|---|---|---|---|
| MUNICIPALITY | Detroit | POLLING LOCATION | TCF Center Absentee Counting |

## DESCRIPTION OF INCIDENT (Use back to continue if necessary)

① On 11/3/2020 I asked for the tabulation numbers for each counting machine between 7pm-8pm. I wanted ensure that when the new shift started, they were starting at the right point so we would know that the count is balanced. I was given the run around requesting who I should talk to. Only to be denied the information entirely.

② Very early on 11/4/20 to 1 was standing at the adjudication table. A ballot came on the screen, the voter voted straight party Republican and straight party Democrat. One of the women at the table who it is to input the ballot, decided to give it to the Democrats. The voter made no other votes on the ballot. Only two filled in circles for straight party for each the Republican + Democratic party. [Continue on Back]

## WHAT REMEDY OR RESPONSE, IF ANY, WAS TAKEN WITH RESPECT TO THE INCIDENT?

For incident number #2, I reported what happened to attorney onsite for the GOP named Brian. He also wrote on the report which was turned in to the G.O.P staff that was there about 7am on 11/04/2020. [more on back]

## Category of Incident (check all that apply)

☒ Illegal Voting ☐ Intimidation ☐ Electioneering ☐ Ballots ☐ Machines ☒ Election Workers
☐ Provisional Ballots ☐ Poll Opening ☐ Poll Closing ☐ Violence ☒ Challenge ☐ Other

| Is the Issue Resolved? ☐ YES ☐ NO | Call taken by: |
|---|---|

Paid For by Donald J. Trump for President, Inc.

1 of 5

Continued......
Per election law, the ballot should have been tossed
out. However, the worker insisted because the circle
for Democrats, they should get the vote. That is
illegal because each mark was a filled in circle,
which is an intentional mark. So I went to get
her supervisor, who then asked the worker what
they thought. The law is clear on what they
are to do. So I got the supervisor's supervisor and
he did the same thing. This supervisor was overseeing
the entire 10pm-5am shift. He asked the worker
what she thought. So I asked the worker
why not give it to the Republicans. He then
began to scream at me, telling me not to talk
with her. Then he instructed her to "push it
through," when the ballot legally should
have been rejected. I said I'm challenging
the ballot. He continued to yell at me that
I could do what I want to do. But he
continued to tell the worker to push it
through. I insisted that they wait for me
to challenge it, and to get the GOP attorney,
the head supervisor refused and told the
worker to count the ballot.

(3). I also witnessed ballots being delivered between
3:00am-3:30am 11/4/2020

(4). I witnessed workers using their body to shield challengers
from seeing the duplication process

(5). conservatives were severely outnumbered, so more
people should up to help us the weren't allowed in and
the doors were chained shut which is a safety hazard
in case of fire or other emergency.

(6). I witnessed addresses and name being keyed in that
were not in the pollbook, which were given the
birthday 01/01/1900, which is false. Also this
voter is still on the voter rolls

2 of 3

_Kristina E. Karamo_

signature

_11/10/2020_

Date

Marian E Sheridan
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF OAKLAND
December 12, 2022
Acting in the County of _Oakland_

_Marian Sheridan_

3 of 3

# AFFIDAVIT OF ARTICIA BOMER

The Affiant, Articia Bomer, being first duly sworn, hereby deposes and states as follows:

1.     My name is Articia Bomer. I am an adult citizen residing in the State of Michigan.

2.     I was trained and credentialed to be a poll challenger for the November 2020 general election.

3.     I witnessed many election irregularities and violations of Michigan Election law, and I hope you take my statement seriously. I am sharing this information under the penalty of perjury and would testify to the same.

4.     On November 3, 2020 between 9:30-10pm, I reported to TCF Center. I was assigned to two separate tables, Absentee Voting Counting Board (AVCB) 123 and 120. I immediately noticed that things were not normal.

5.     Election workers were allowed to wear Biden t-shirts or blue face masks. I recognized one of the masks as being worn by Governor Whitmer. I also saw poll workers wearing "BLM" face masks in support of Black Lives Matters. I am not passing judgment on this; I am a proud black woman. I note this because I had been strictly told not to wear anything partisan or related to any candidates for office. So, election supervisors seem to be implementing a double standard.

6.     Election workers had jackets, backpacks, purses, etc. on the tables and on the ground. There was no system to check your personal effects. Some people even had coolers for food with them.

7.     I observed an election worker pull a ballot from an envelope where the circle was completed next to the name Donald J. Trump. I could see this because the marking was at the very top left corner of the ballot. Instead of processing the ballot, I saw the election worker push the ballot back into the envelop and place put it with the empty envelopes.

8.     I saw election workers but ballots on the ground instead of in any sorting pile or secure container. This concerned me because it was right next to open backpacks and purses. At one point, I thought I

may have seen an election worker stuff a ballot into her bag under the table, but I do not have 100% certainty because I was not close enough to verify with certainty.

9. At points, election workers would put ballots into USPS trays on the floor instead of processing them in the normal fashion. I saw that votes cast for Donald J. Trump were put into these USPS bins.

10. I observed election workers run ballots through the tabulator multiple times without first properly clearing the tabulation machine.

11. I observed that there were no specific barcodes on any of the ballots, so I believe that the same ballots were tabulated multiple times. Additionally, the tabulator seemed to simply record the additional ballots and no one working at the election did anything to void the additional votes.

12. It seemed to me that once the tab with the ballot number was ripped from the ballot, there was no way to know who cast the ballot or any sort of distinguishing features to the ballot.

13. I saw one election worker run a stack of ballots through the tabulator four separate times.

14. I saw an election worker peel white correction tape from the ballot. A few times, I observed white correction tape on a ballot jam the tabulator. The election worker would then remove the correction tape and run the ballot as usual. The ballot was then counted as any other ballot.

15. I saw on the computer monitor that a ballot that had been cast for straight ticket republican was overridden and not properly tabulated.

16. It seemed that the atmosphere in the counting room grew more hostile throughout the evening as the news announced that Donald J. Trump led in Michigan.

17. I witnessed a male table leader say "No. This is OUR house tonight." It seems he was referring to the counting room being the democrats' house. This table lead then said, "they will do what we say from here on out," seemingly referring to republican poll challengers and poll watchers.

18. Around or a little after 4am on November 4, 2020, I saw around 50 new boxes/trays, full of ballots, brought into the counting room.

19. What struck me was that election workers were cheering instead of complaining about having to process the new ballots. I found this odd.

20. Around 5:30am election supervisors announced that all the ballots that just came in had been counted and that everyone could start cleaning off their tables. It would have been impossible to count that many ballots in approximately 1 hour.

21. As a poll challenger, I was frequently intimidated and told to stand back, more than six feet.

_Bomer_
Articia Bomer

On this 21st th day of November, 2020, before me personally appeared Articia Bomer, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that she has read the foregoing affidavit by her subscribed and knows the contents thereof, and that the same is true of her own knowledge and belief, except as to those matters she states to be on information and belief, and as to those matters she believes them to be true.

_Katanna A Nix_
Name of Notary Public:

_Wayne_ County, Michigan

My Commission Expires: 8/2/2026

RECEIVED by MSC 11/26/2020 2:44:13 AM

LATASHIA A. NIX
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Aug 2, 2026
ACTING IN COUNTY OF _wayne_

RECEIVED by MSC 11/26/2020 2:44:13 AM

## Village Health

**Urgent and Family Care**
12150 30 Mile Rd. Washington, MI 48065        PH: (586) 752-7256    FAX: (586) 331-2323

### FACSIMLE TRANSMITTAL SHEET

DATE: _11 - 20 - 2020_

ATTN: _ERIN_

FAX NUMBER: _248 - 429 - 1465_

RE: _AFFIDAVITS - PHILIP + CYNTHIA O'HALLORAN_

NUMBER OF PAGES, INCLUDING COVER: _15 INCLUDING COVER SHEET._

COMMENTS:

FROM: PHIL O'HALLORAN  248.760.0522

(1) AFFIDAVIT - PHILIP M. O'HALLORAN - 3 pgs.
(2) STATEMENT - PHILIP M. O'HALLORAN - 2 pgs.
(3) DECLARATION PHILIP M. O'HALLORAN - 5 pgs.
(4) OAKLAND COUNTY OBSERVATION - CYNTHIA O'HALLORAN - 2 pgs.
(5) STATEMENT - SATELLITE CYNTHIA O'HALLORAN - 2 pgs.

THANK YOU!

**Confidentiality statement:**
The attached information is CONFIDENTIAL and is protected under the Privacy Act of 1974. It is intended for the use of the addressee(s) identified above. This faxed material must be destroyed appropriately when its use is no longer required. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the attached information to the intended recipients(s), please note that any dissemination distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication on error should notify Village Health immediately and return the original message to the address as the top of the cover sheet via U.S. mail.

Nov. 20. 2020  5:45PM   Village Health                    No. 1957  P. 2

## Affidavit of Philip M. O'Halloran

Philip M. O'Halloran, being sworn, declares under penalty of perjury:

I Philip M. O'Halloran, a register voter in and citizen of the State of Michigan make the following statement of record.

Re: Movements of white Penske moving truck on November 4th.

At 3:15 pm on November 4th, I spoke with Andre Gilbert on the floor of the TCF Center. He is an official working for the Department of Elections, who assured me that there would be no further ballots brought over from the Department of Elections or anywhere else. I asked if all the drop boxes had been emptied and ballots had been brought to the TCF Center. He answered that they had. I asked if the drop boxes were still capable of having ballots placed inside, and he said that they had been locked and that they were scheduled to be pulled off the streets in a few days. I asked if any ballot was found at the postal service and delivered late, would it be counted and he said "absolutely not".

At approximately 5:30pm on Wednesday, November 4th, 2020, I drove to the alley off 3rd Avenue due south of West Grand Blvd and due west of the Detroit Department of Elections (DOE). I was with three other people who were Republican election observers watching the election-related activities outside the Department of Elections.

We observed the comings and goings in the alley for several minutes when I remarked to the others that there was a white Penske Truck parked on 3rd Avenue and pointing in the direction of West Grand Blvd., that was similar, if not identical, to the one that we'd seen transporting pallets of completed 2020 General Election ballots from DOE to the TCF AV Counting Board.

Several minutes later I noticed that there was a heavy duty white pickup truck behind the white Penske truck and inside there were two heavy set black males in their twenties who appeared to be watching the Penske truck. They were just sitting idle, not doing anything but looking straight ahead at the truck.

Our group decided to depart the area, but before I left, I walked south along 3rd Ave. to the light/stop sign? and crossed over to the side of the street where the Penske (lic plate 2352303) and pickup (City of Detroit #186227) were parked.

I then photographed the truck and the passenger side of the pickup, which had both its passenger side wheels on the sidewalk, the same as did the Penske truck and another, white pickup further down the street toward West Grand Blvd. (see photo).

RECEIVED by MSC 11/26/2020 2:44:13 AM

I walked around the front of the pickup and politely addressed the two occupants "excuse me, I'm doing some election observing. Could you tell me what's in the truck right there? Are there any ballots in there?". The driver responded "No, it's empty". I left the area shortly afterward.

Later in the evening, I returned with my wife, Cindy at approximately 9:30 pm, at which time we noted that both the Penske truck and the pickup truck were still in the same location and, notably, the two occupants were also still seated in the pickup. We suspected that they had been there for the past four hours or more and wondered why they were essentially guarding an empty delivery truck into the night hours.

My wife and I left the area and proceeded to TCF Center, where we attempted to enter to perform challenger duties for the GOP, but were denied entry to the building by security. We left soon after this and decided to drive back to the DOE. As we approached, we witnessed the white Penske truck driving West on first W. Milwaukee Avenue and then West Grand Blvd. We surmised that it had turned into the alley behind the DOE, possibly picked up a load at the building's rear loading area and then turned right onto 2nd Avenue, and right onto W. Milwaukee. The white pickup was no longer present. We followed the Penske truck from a distance down the Lodge Freeway and onto Steve Yzerman Drive and watched it slowly back into one of the service entrances behind the TCF Center and, after several minutes, it disappeared inside the TCF Center (see photos and video).

At this time, we proceeded to the front of TCF and managed to enter the building. We went down the stairs to the entrance to the AV Counting Board where we were denied entry by members of a 6-8-person Special Operations team of tactical Detroit Police officers led by a Sgt. Barrick. After what was, at times, a heated discussion between the election authorities who barred our entry and a GOP official named Brian Szmytke and an ensuing more civil discussion with the police and later Sgt. Barrick, I informed the Sergeant of my concerns that the white Penske truck MAY be delivering ballots to the TCF Center, which we had observed it doing on at least one occasion prior to Election Day. I explained that the truck would enter through the garage door (sally port) at the rear of the TCF Counting Board room. I added that, if there are ballots in the truck, and if they arrived *after* the close of the polls at 8 pm on November 3rd, that such delivery and subsequent counting of these late ballots would be a crime (see video).

The sergeant agreed to look into it but admitted that he would not be searching the truck himself, but rather would refer it to Detroit police investigators. I asked how soon that could take place. He didn't answer definitively. At this point, Mr. Szmytke, asked the sergeant if he could check to see if the truck was inside the building as I had claimed. Sgt. Barrick agreed to do this. I then proceeded to my car and drove again to the rear of the TCF Center on Steve Yzerman Drive to confirm that the truck was not leaving. I watched if for perhaps half an hour and then left the area. I was unable to learn what the sergeant found, if anything, regarding the white Penske truck.

Signature page attached

RECEIVED by MSC 11/26/2020 2:44:13 AM

Nov. 20. 2020  5:46PM    Village Health                              No. 1957   P. 4

## Affidavit of Philip M. O'Halloran

Signature page

Dated _November 20h_ ,2020          _Philip O'Halloran_

Philip M. O'Halloran

Subscribed and sworn to before me on  _November 20th 2020_

_Catherine Swetich_

Notary Public  State of Michigan, County of _Oakland_          .

My Commission Expires:  _12-30-2024_

CATHERINE SWETICH
Notary Public, State of Michigan
County of Oakland
My Commission Expires Dec. 30, 2024
Acting in the County of _Oakland_

RECEIVED by MSC 11/26/2020 2:44:13 AM

Statement of Philip M. O'Halloran regarding observations on October 8th, 2020

I, Philip M. O'Halloran, a Republican was performing volunteer election observations with my wife, Cynthia O'Halloran, outside the Adams Butzell Detroit Absent Voter Satellite Center at 10500 Lyndon St. on the above date.
We entered the facility and spoke for a while with two election workers there. This went smoothly and we returned to our car. While I was observing the surveillance camera system outside, my wife and I noted a young lady, who looked to be between the ages of 18 and 23, walk from her car in front of us toward the facility's entrance. She was openly carrying 3 ballots as if she was dropping them off inside. Several moments later she came out of the building (without the ballots) and returned to her car. My wife noted several dreadlocks throughout her hair and she had khaki pants and a light pastel button down blouse. She appeared to have a Mullato complexion and a bigger-boned body appearance.

Less than an hour later, after we had left the above facility and gone to Northwest Activity Center Absent Voter Satellite Center, 18100 Meyers Rd., we were talking with a supervisor, a Ms. Outlaw, who was explaining the system and answering our questions.

While we were conversing with Ms. Outlaw inside the center, someone walked in the door approximately 15 feet to our right and began walking in the direction of Ms. Outlaw. My wife noted that it was the same girl with braids that we had seen at the Adams Butzell Center. At the same time, I also turned to look at her and noted that she was carrying what I estimated to be at least 5-6 ballots openly in one hand. This struck me as suspect since Michigan law requires only immediate family members or people living together to handle ballots, other than their own, with a few other exceptions that didn't seem to apply here.

When I glanced back at Ms. Outlaw she appeared to be concerned that we were viewing the young lady with the ballots and moved quickly to *physically interpose herself* between us and the woman so that we could no longer see the ballots. She appeared to be holding her hands up, palms facing the young woman in a signal to move back toward the door she came in through. At the same time, the young woman glanced quickly at my wife and I with a look of concern. She stepped back toward the door and, at the non-verbal direction of Ms. Outlaw, placed the ballots into a small box that was just inside the door.

At this point, Ms. Outlaw returned to us and resumed the conversation before we left the room. While walking out I looked down into the small box to view clearly the stack of half a dozen or so ballots that the young lady had brought in and confirmed that they appeared to be completed ballots with a signature on the outside. She soon led us upstairs, where I asked to view the surveillance equipment that was monitoring the outside drop boxes.

There, I asked her where ballots were stored after collection and she stated that they were stored in a locked room, to which only she has the key. I then asked about a hypothetical situation, in which a person was seen by staff to be inserting, say, one hundred ballots into the

RECEIVED by MSC 11/26/2020 2:44:13 AM

drop box or submitting them to the center's staff. I asked what her staff's response would be and she said that this would definitely raise concerns, since it would not be viewed as legal.

I said that was reassuring but then raised the issue of the young woman carrying six ballots into the center that we had witnessed downstairs. She paused before responding "she...works for me". I asked her why she was bringing them inside the center instead of upstairs to the locked room. She paused again and stated "she got them from the locked room". I stated, "but, wait, I thought only you have the key, right?" At this point she said something to the effect of "where are we going with this?", after which I said I was just trying to understand why she would be bringing ballots into the AV Center from the locked room upstairs. She did not have an answer and with the conversation apparently at an impasse, my wife and I thanked her for her time and left the facility not long afterward.

I declare under penalty of perjury, that the foregoing statements are true and correct.

DATED this ___ day of November 2020.

Philip O'Halloran

On this 20th day of November, 2020, before me personally appeared Philip O'Halloran, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

Notary Public, ___Oakland___ County, Michigan
My Commission Expires: ___12-30-2024___

CATHERINE SWETICH
Notary Public, State of Michigan
County of Oakland
My Commission Expires Dec. 30, 2024
Acting in the County of ___Oakland___

RECEIVED by MSC 11/26/2020 2:44:13 AM

## DECLARATION OF PHILIP O'HALLORAN

I, Philip O'Halloran, under penalty of perjury, declare as follows:

1. I am at least 18 years of age, and I have personal knowledge of the facts as stated in this Declaration.

2. I am registered to vote in the state of Michigan.

3. On or around October 8th my wife Cynthia O'Halloran and I went to the Detroit Department of Elections on West Grand Blvd. in Detroit. I wanted to participate in the political process and exercise my rights as poll challenger during the signature verification and ballot handling process, which was being done differently than in prior elections in which I had volunteered. I was also concerned about the possible use of the Relia-vote ballot processing system. My wife signed up as a poll worker and shared my concerns. We also wanted to learn about other opportunities, namely when and where we could observe the processing of absentee ballots and learn about the entire procedure, including the camera monitoring of the thirty or so drop boxes located throughout the city. We met Mr. Caven West, Deputy Director to the Detroit City Clerk. Mr. West was either unable or unwilling to provide us access to observe the signature verification process and procedure regarding ballot security. Mr. West was either unwilling or unable to answer many of our questions related to other opportunities to participate in the process. Mr. West gave me his email address and offered to track down the information we were seeking if I sent him a follow up email detailing our requests. He refused to provide us with his phone number.

4. On October 12, 2020 I sent an email to Mr. West. The email (a copy of which is attached hereto) outlined our request to observe the processing of absentee ballots and view the ballot storage procedure. Mr. West still has not responded to that email.

5. On October 22, 2020 my wife, Steve Potter, Georgia Dixon and myself again went to the Detroit Department of Elections for answers. We were told Mr. West was out sick. We met with Mr. George Azzouz and Mr. Daniel Baxter. Here again, they were either unable or unwilling to provide us with many answers or meaningful access. Again, we were told to memorialize our requests via email and they assured us they would respond.

RECEIVED by MSC 11/26/2020 2:44:13 AM

Specifically, they stated they would provide the detailed written procedure, followed by the DOE in the processing of absent voter ballots.

6.  On October 26, 2020 I forwarded the email I had sent Mr. West to Mr. Azzouz and Mr. Baxter and again, emphasized our concerns and requests for access (also attached).

7.  On October 27, 2020 I received a less than fulsome response from Mr. Azzouz. It was still unclear how the signatures were being verified and we were still not able to ascertain when and where we could observe the signature verification process and ballot security and storage.

8.  My wife and I were repeatedly denied access to observe the signature verification process and to observe the storage and security procedure for absentee ballots.

9.  On November 1st Steve Potter and I again visited the DOE and met with a supervisor, who, after we showed our challenger credentials, did permit us to view a single signature verification. When Mr. Azzouz and Mr. Baxter saw this, they were unhappy with the supervisor and Mr. Azzouz let her know this. Upon further questioning, Mr. Azzouz did inform us, finally, that all ballots were stored in a locked room and that it was under 24/7 camera surveillance.

10. On November 3, 2020 at approximately 2:30 p.m. I was present at the TCF Center located at 1 Washington Blvd., Detroit, Michigan 48226.

11. TCF Center was used as the Detroit Department of Elections Central Counting Board, where absentee ballots are processed and counted.

12. I was duly authorized and eligible to serve as a poll challenger at the TCF Center.

13. I'm not sure when this occurred but I was given several blank incident reports and told to fill them out should I witness anything irregular.

14. I was told during my training by the Republican party not to aggressively engage anyone verbally and to avoid speaking directly to poll workers but to direct questions and concerns to their supervisors.

15. On November 3rd, at 2:45 p.m., a man knocked on the outside door next to the garage at the back of the TCF AV Counting Board. Several moments later, Daniel Baxter arrived and opened the door for him and two people entered with a Dodge Caravan (IL plates 118078). They brought in ten USPS trays of ballots. There were no signatures or hand-off paperwork at the ballot receiving table.

RECEIVED by MSC 11/26/2020 2:44:13 AM

16. At 3:25 p.m., four men walked in carrying two USPS trays from a Department of Elections van, plates 090490. They would not answer questions about where the ballots were from.

17. At 5:10 p.m., five USPs trays arrived at the back entrance, side door, DOE van plate 118078.

18. On either November 3rd or 4th (I can't recall for certain which day), I asked a supervisor a mundane procedural question, but our conversation was almost immediately interrupted by at least two loud and intrusive Democrats (lawyers or challengers – I did not see visible credentials) who stated that I could not ask her this question. I found such antagonistic behavior to be a frequent occurrence. Poll workers were told by Democrat operatives, some of whom refused to provide credentials on request, that their six-foot separation privileges or other rules were being violated (they were not). The poll worker would then protest loudly against the false injustice and I, or a GOP colleague, would soon look for a counting board with more cooperative workers.

19. On a later occasion, I was performing my duties as a challenger watching a poll worker compare the numbers on the ballot envelope and identification tab. I would lean in for about 1-2 seconds to match the numbers and then would swiftly step back to a six-foot separation. I did this with extreme deference to the poll worker, probably at the cost of accuracy in my observations. At one point, a heavy-set black male came walking very fast toward me and yelled "get back SIX FEET!" I told him I already was approximately six feet back but he loudly insisted I had to get back further and used his own height as a visual guide. I took a step back and was about to resume my duties when the poll worker – a large man in his thirties – whose work I had been observing, turned to the first man and said "THANK you. I was about to ELBOW him!" and he made a motion to me with his elbow. He then turned to me and said angrily: "you 'bout to get an elbow!" I left that counting board not long afterward.

20. At the October 29th challenger conference on the floor of the counting board at TCF hosted by the chief election contractor for the City of Detroit, Chris Thomas; I had asked him if we would be permitted to challenge from the raised platform in the center of the counting board known as "the stage". He had responded that he would "take that under advisement". He never got back to me. On either November 3rd or 4th I asked fellow GOP

RECEIVED by MSC 11/26/2020 2:44:13 AM

challenger, Bob Cushman to join me in going up onto the stage. On it were maybe a dozen computers, apparently used to monitor the vote counts coming in from dozens of tabulators below. We asked a few of the half a dozen or so staff on the stage to explain the process to us but they declined. I then approached Mr. Thomas, seated at the back corner of the stage. He looked up and before I could complete a sentence angrily yelled "you get the hell down offa here!" I protested briefly that we should have a right as challengers to view this aspect of the vote count but then complied with his instructions.

21. On November 4th in the afternoon I was monitoring the transfer of the military ballots when we noted that a poll worker approached the tables adjacent to the ballot receiving tables, where a large (estimate 3,000) blank ballots were laying in several open postal trays. The worker picked up at about 3 blank ballots, without signing them out to anyone or logging them anywhere and walked back to her counting board. I followed her and then spoke with her supervisor despite loud objections from Democrats (whether challengers, lawyers or uncredentialled operatives, I don't know). I showed the supervisor that this worker had simply laid the ballots on the table in a haphazard, insecure fashion and I asked if there were several duplications that she was about to perform. She stated that there were not and that she was merely saving steps by pre-positioning the blank ballots in the event she needed them for a duplication. I alerted a GOP lawyer who took over the situation.

22. At around the same time frame I was told by a challenger that a fellow GOP challenger was being blocked from viewing duplications being performed by two Democrats. Those blocking her were two very large male Democrats who stood shoulder to shoulder. I was told that when the female GOP challenger asked to be permitted to see the process, they refused to comply and even blocked her by placing a large bin that blocked her access from the side. I came upon the situation as the challenger was walking away from the table appearing very distraught and I was able to confirm the shoulder to shoulder positioning of the two Democrats standing behind the duplicators.

23. On November 4th, several GOP challengers chanted "Stop the count" to alert the DOE management to our exasperation at being unable to perform our duties, even despite our lawyers pleadings. The chanting ended in less than two minutes. I then heard multiple loud hostile comments from poll workers and Dem operatives such as "throw 'em all

RECEIVED by MSC 11/26/2020 2:44:13 AM

out!" and "call the police!" About 20 police officers subsequently arrived. There were no scuffles that I could see.

24. My firm impression, based on multiple interactions involving both myself and my observations of other GOP challengers, between poll workers -- including several wearing "BLM" masks and/or tee shirts -- Democrat operatives, including lawyers and many uncredentialled persons acting in a thuggish manner, is that there was coordination of their actions and that the tactic of working together to make and support specious accusations against GOP challengers was deliberate and designed to intimidate, with the threat of police action against us, which was successful in several instances. I believe that the ultimate goal of the organizers of this reprehensible, flagrantly undemocratic behavior was to prevent we Republican challengers from adequately performing our duties. It was quite a successful ploy.

25. I also affirm that in many previous elections, in which I served as a challenger for the GOP, dating back to the mid 1990's and in jurisdictions as diverse as Southfield, Rochester and Detroit, I have NEVER seen hostile, orchestrated obstruction of my ability to perform my lawful duties as a Republican challenger. In fact, as recently as August 4th of this year at the primary on the same TCF floor in Detroit, I was always treated with respect and was never hampered in any way in doing my job. Until November 3rd my interactions with poll workers, supervisors and election officials have always been cordial and professional. Therefore, I conclude that the well of good will and professionalism was poisoned deliberately by those with an agenda other than ensuring fair and honest AV Counting Board proceedings.

26. I declare under penalty of perjury, that the foregoing statements are true and correct.

DATED this 20th day of November 2020.                 _____
                                                      Philip O'Halloran

On this __20__ day of November, 2020, before me personally appeared Philip O'Halloran, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

CATHERINE SWETICH
Notary Public, State of Michigan
County of Oakland
My Commission Expires Dec. 30, 2024
Acting in the County of Oakland

_____

RECEIVED by MSC 11/26/2020 2:44:13 AM

OAKLAND COUNTY ELECTION
OBSERVATION REGARDING CELL PHONE
USE IN POD 2

I, Cynthia A. O'Halloran, under penalty of perjury, declare as follows:

I worked at Oakland County Elections on Tuesday, Nov. 3, 2020 as a duplicator for Military Absentee Voter ballots.  The location was 2111 Pontiac Lake Rd, Waterford, MI, and I worked in Pod 2.

I observed a man walk into Pod 2 in the late afternoon/early evening and hold out a cell phone with his arms fully extended in front of him at eye level. He was about 10-15 feet to my right front. He held it out for approximately 1 minute.  He was not texting.  I thought it was unusual that he had his arms extended in that position for that long.
Note: a tabulator machine was located approximately 30 feet in front of him at 12'oclock at the opposite end of Pod 2.

Description of the man:  Caucasian, mid to late 30's in age, 5'8 or 5'9 height, medium build (carried a few extra pounds).  Dark hair, blue or green eyes.

I alerted people nearby "Hey, that man has a cell phone in here!"  "We aren't allowed to have phones!" I'm sure he heard me. Then someone behind me said, "Oh, yeah that is the IT guy," so I assumed I should not worry or question his use of a cell phone further.

I did recognize that it was indeed the IT guy, who my supervisor Heather referred to at the beginning of the election process.  The same man came back at the end of the night to sit at or near what I believe was the adjudication area.   I, along with a supposed female Republican poll watcher, waited for the tally numbers to come out.

I left the Oakland County Election site approximately 11p.m or 11:15pm. I proceeded to walk to the lit parking area to where my vehicle was located.  In the dark (what I would call the median), center of the horseshoe driveway, was an individual pacing with a lit cigarette.  There was only one other vehicle at the time who was fortunately leaving when I was walking to my car.  The median area was extremely dark, however, the person with the lit cigarette was moving quickly in my direction.

I suddenly felt very scared and walked even quicker to my vehicle.  He was about 20-30 feet away and I started saying prayers.  Fortunately, my car was parked where the other car was backing out and leaving.  I made it to my vehicle safely and noticed that the individual who was carrying the lit cigarette was the same IT guy who has holding up his cell phone in Pod 2. He proceeded in the direction of some other vehicles.

Respectfully submitted,

*Cynthia A. O'Halloran*

_Cynthia A. O'Halloran_

Date: _11-20-2020_

On this ___ day of November, 2020, before me personally appeared Philip O'Halloran, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

Notary Public, _Oakland_ County, Michigan
My Commission Expires: _12-30-2024_

CATHERINE SWETICH
Notary Public, State of Michigan
County of Oakland
My Commission Expires Dec. 30, 2024
Acting in the County of _Oakland_

RECEIVED by MSC 11/26/2020 2:44:13 AM

RECEIVED by MSC 11/26/2020 2:44:13 AM

### STATEMENT OF CYNTHIA A. O'HALLORAN
### OBSERVATION – SATELLITE VOTING CENTERS
#### October 8, 2020

I, Cynthia A. O'Halloran, under penalty of perjury, declare as follows:

I am a Republican and resident in the State of Michigan, and I was performing volunteer election observations with my husband, Philip M. O'Halloran, outside the Adams Butzell Detroit Absent Voter Satellite Center on 10500 Lyndon Street, Detroit, MI on October 8, 2020.

Observations upon entering the building: we spoke with (2) individuals: 1 caucasian poll worker (employee) – short hair, overweight (late 50's). In discussions, she shared that she was laid off from her government position but was called back to work the polls. The other poll worker was a petite, black woman who sat behind a table (also late 50's) The two individuals were stationed almost immediately as you enter the building (off to the left side) upon entering the building. We asked several questions about how and when the ballots are picked up from their site, etc.

After speaking, primarily to the Caucasian poll worker, we left the building and sat in our car for several minutes. I witnessed a young lady walking on the sidewalk, possibly late teens, with a larger bonded build, carried a few extra pounds, but not obsese, wearing a pink or pink striped button-down dress shirt, khaki/tan colored pants, around 5'8 or so. Hair: dreadlocks, skin: milato (light-skin African American). She was walking on the sidewalk towards the entry of the Adams Butzell satellite center carrying ballots – 4-5 or so in hand. We waited in our car in the parking lot for the same young lady to come out empty handed. We then left the location.

Our next location was the Northwest Activity Center Satellite – 18100 Meyers Rd, Detroit, MI  - we walked in and headed down the stairs where we were introduced to a woman named Outlaw. Note: She had (what I believe to be a blue cottony top) with an oval embroidered patch displayed on her right side of the top stating Outlaw. Medium skinned African American woman – around 5'7 or 5'8 – carried extra pounds, mid or late 40's. 2 braids – one braid hung over each side of head. I confirmed that the patch on her top was indeed her name "Outlaw" to which she confirmed – "yes".

My husband, Philip M. O'Halloran, and I each asked a series of questions ranging from the topic of the drop box and security measures taken for Absentee Ballots.

I then noticed the same (khaki/tan pant wearing) young lady coming into the room while we were talking to Outlaw. She was heading towards Outlaw. I gave my husband a wide-eyed look and slightly touched (brushed) his arm as if to alert him to what I was seeing. Outlaw immediately in mid-discussion hurried over to where the (khaki/tan pant wearing) young lady who was carrying a large handful of ballots – approximately 6-8 ballots. There was a long table located to the right as soon as you enter the room with baskets sitting on top. There were at least 2 other individuals sitting behind the table area. Outlaw held her hands up in a quietly-motioned "STOP" position in front of the young lady who was holding the ballots mid-level at her chest. (Outlaw's hands touched the young lady's hands – who was holding on to the ballots). Outlaw's hand motioned toward the basket to the young lady and she stated a few words. The young lady gave a slight nod and then placed the ballots into the basket upon the direction of Outlaw.

RECEIVED by MSC 11/26/2020 2:44:13 AM

### STATEMENT OF CYNTHIA A. O'HALLORAN
### OBSERVATIONS – SATELLITE VOTING CENTERS
### OCTOBER 8, 2020 – PAGE 2

My husband asked further questions about ballot storage and she mentioned a locked area, to which only Outlaw had the key and that no one would be entering the room. Philip asked Outlaw about the (khaki pant wearing) young lady who was carrying several ballots into the center, "who was she?" Outlaw's response was "she works for me!" He also questioned why the (khaki/tan pant wearing) young lady was bringing them (downstairs) inside the voting center from the locked room (upstairs)? Outlaw then said "she got them from the locked room." Outlaw moments ago stated that she was the only one who had a key to the locked room. At this point, I could feel tensions from Outlaw, who then stated, "where are we going with all of this?" I stated that "we are just trying to get a better understanding of the process."

We then met with another associate (secretary) located on the main floor. Since it was during the lunch hour and we walked towards the doors to where we saw the drop box and asked several questions pertaining to the camera/security.

Respectfully submitted,

Cynthia A. O'Halloran

_Cynthia A. O'Halloran_          Date: 11-20-2020
Cynthia A. O'Halloran

On this 20 day of November, 2020, before me personally appeared Philip O'Halloran, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

Notary Public, Oakland County, Michigan
My Commission Expires: 12-30-2024

CATHERINE SWETICH
Notary Public, State of Michigan
County of Oakland
My Commission Expires Dec. 30, 2024
Acting in the County of Oakland

**AFFIDAVIT OF JANICE HERMANN**

The Affiant, Janice Hermann, being first duly sworn, hereby deposes and states as follows:

1.  My name is Janice Hermann.  I am an adult citizen and resident of the State of Michigan.

2.  I served and was trained to be a Republican challenger for the November 2020 election in Detroit, Michigan at TCF Hall.

3.  On November 4, 2020 upon arriving at TCF Hall, I noticed that the hall was very large with hundreds of tables, but there were only a small number of Republicans challenger assigned to tables.

4.  Specifically, Republicans were not assigned to tables where election workers were duplicating ballots.  This process entails taking the original ballot and copying the votes by hand on a new ballot so the ballot can be run through the tabulator.

5.  The election supervisors and workers would not let Republican Challengers watch this process or get close enough to see the process.

6.  This was highly disturbing because the vote can simply be changed by hand and then run through the tabulator.  My understanding is that state law requires members of both parties to witness the duplication process to ensure its integrity.

7.  This did not occur.

8. I tried to observe the duplication process. My polite efforts were often met with hostility. The workers would present their backs between me and the process going on, creating a "wall."

9. I saw a ballot removed from the spoiled ballot box. As the election worker was duplicating the ballot, I asked to see it to make sure it was being duplicated properly. I was shown the ballot from a far distance away, too far for me to read it. Then, the ballot was quickly disposed of. As a challenger, it was literally my job that day to watch election processes such as this, but I was repeatedly disallowed from doing so and saw alarming acts of intimidation.

10. At one point, I saw a woman wield a letter opener as a weapon to make sure the observer was not close enough to see what she was doing as she duplicated ballots. This was also witnessed by my friend who was accompanying me, along with other observers.

11. At no time did I ever see an election worker or supervisor authenticate signatures to process any ballots.

12. I saw election workers attributing names and birthdates to ballots that did not appear in the computer system.

13. I saw the election workers repeatedly set aside ballots that did not appear on the voter list, and I was given no indication of where they were taken and why.

14. I also saw election workers attribute ballots to very early birth years. Once I caught on that this was occurring habitually, I noted one voter who was supposed to have been born on May 29, 1921, began voting on January 31, 1900, and registered to vote in Michigan in 2010.

15. I also noticed a very large number of voter registrations had taken place in September and October, 2020.

16. When the election workers processed all of the military ballots, I tried to observe the duplication process of these ballots as there were no Republican challengers allowed to observe the process up close. Again, I was denied the ability to witness any duplications of military ballots.

17. I was locked out and denied access to TCF Hall without warning.

18. Further affiant says not.

Janice Hermann

On this _12_th day of November, 2020, before me personally appeared Janice Hermann, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that she has read the foregoing affidavit by her subscribed and knows the contents thereof, and that the same is true of her own knowledge and belief, except as to those matters she states to be on information and belief, and as to those matters she believes them to be true.

Name of Notary Public:

_OAkland_ County, Michigan

My Commission Expires: _7/31/2026_

Thad Sylvester
NOTARY PUBLIC, OAKLAND COUNTY, MI
My Commission Expires 07/31/2026
Acting in the County of _OAKlud_

**AFFIDAVIT**

I, Jason R Humes (Affiant), personally appear before the undersigned notary public, and under oath or affirmation make the following statements:

My name is Jason R Humes. I am an adult citizen and resident of the State of Michigan. I volunteered to be a MI-GOP poll challenger and was trained for the November 3, 2020 election. The multiple trainings included specific training for the Detroit Absentee Ballot Counting Boards taking place at TCF Center. During my observations on November 3, 2020, which started at 7 am and ended at 8 pm, I was assigned to lead the MI-GOP team at the absentee ballot adjudication review screens (approximately 12 screens / stations in total) located in the middle of the room alongside the raised platform.

I personally observed 1-2 screens from approximately 8:30 am to 7:30 pm, except for a break when the election workers took a break. Each adjudication screen had two election works who reviewed the computer-generated overlay which included a green highlight with a large check mark if readable and a yellow highlight with no check mark if unreadable. Election works and challengers were unable to see original voter marking of ballot unless the election workers removed the overlay. The majority of the time election workers quickly decisioned each ballot and did not remove the overlay to review all the markings on the ballot to see the entire intent of the voter. Each election worker adjudication team was asked by MI-GOP Poll Challengers if the team was balanced, with one declared republican and one declared democrat. Out of the approximate 12 election worker teams, only 2-3 were balanced during the day. At approximately 10 am one of the adjudication screens I was observing had an error message pop up on the screen. Within a few minutes, upon my observation, all the screens had error messages and the terminals at the raised platform were also impacted. The election IT employees were scrambling for at least 30 minutes to restore the computer system. No explanation was provided on what caused the computer issue.

_Jason R Humes_ Date 11/10/2020

Signature of Affiant

State of Michigan

County of Oakland

Signed and sworn to (or affirmed) before me on 11/10/2020

Date

by Jason R Humes ,

Printed name(s) of individual(s) making statement

who proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

✓ Personally Known

or

_____ Produced Identification

Type of ID _____

_Karel J Van Ak_

Signature of notary public

_____
(Name of notary, typed, stamped or printed)
Notary Public State of Michigan                    Stamp/Seal

My commission expires: _____

Karel J Van Akin
Notary Public of Michigan
Oakland County
Expires 11/13/2020
Acting in the County of Oakland

**AFFIDAVIT**

I, Jason R Humes (Affiant), personally appear before the undersigned notary public, and under oath or affirmation make the following statements:

My name is Jason R Humes. I am an adult citizen and resident of the State of Michigan. I volunteered to be a MI-GOP poll challenger and was trained for the November 3, 2020 election. The multiple trainings included specific training for the Detroit Absentee Ballot Counting Boards taking place at TCF Center. During my observations on November 4, 2020, which started at 9 am and ended at 8:30 pm, I observed AV counting board 1, 2 and 6 and was assigned to lead the MI-GOP floor team which involved coordinating MI-GOP volunteers and attorneys.

At approximately 9:15 AM, I observed AV counting board 1. Upon arrival at the table, I noticed the problem ballot bin was completely full (approximately 200-300 ballots) so I requested to speak with the supervisor or team lead. Jason Mcgowan was the team lead and he provided the following explanation. The counting team had scanned each ballot in the electronic poll book, and the ballots did not come up. The counting team also checked the supplemental printed poll book and they were not found on the list. Given the ballots did not show up in either poll book (electronic or printed), I challenged all the ballots in the problem bin. Chris Thomas became involved and he explained it was likely due to election employee error caused by them likely not clicking save and close when issuing the ballots. This was troubling to me because the absentee ballots envelopes upon receipt by the clerk were to be verified against the voter record confirming the ballot number, name and signature. The problem ballots were removed from AV counting board 1 and taken to the raised platform with my continuous observation. Upon arrival, Daniel Baxter reviewed a few ballots in detail and determined the ballots were in the wrong AB. The supplemental list was obtained for the AVCB 2 and the ballots were returned to AVCB 2. I observed approximately 15 ballots being reviewed against the electronic poll book and printed supplemental list and one ballot, #2497 was still not in the poll book. I challenged the ballot; it was placed back into the problem ballot bin and then I informed our lead attorney. I also challenged ballots 7044 and 3251 at AVCB 6 for the same reason. All of these problem ballots were removed from the AVCB's and taken to the raised platform at the center of the room. We requested on numerous occasions access to this raised platform area which contained 15-20 computer workstations and election employees along with numerous ballots and problem ballot bins, but we were denied.

At approximately 7 pm, after the military ballots had been completed, it was brought to my attention the problem ballots that were not in the poll books were moved from the restricted area to the center table where each AVCB comes to receive ballots for their respective table. I estimate the number of ballots to be 5,000 to 7,000. I was asked to get a full explanation from the lead election officials with an attorney present. Attorney Kline Preston joined me in an

Page 1 of 3

extensive, approximately 30 minute discussion regarding the ballots with Daniel Baxter and Chris Thomas. They explanation the ballots were not showing up in the electronic poll books and supplemental printed poll books due to election employee error. They explained when the ballots were returned to the clerk's office the election workers did not complete the check in process by not clicking save and close on the last screen. They explained this is why they were not showing up on any list because there was no record of them being received. We asked to be shown the process for one of the ballots. They walked over to a terminal at the raised platform area and showed us the state of Michigan voter record system. They went into a few screens and showed us the final screen were the election worker needed to click save and close. I then asked to show us how this example ballot signature was verified. They explained if the voter had an ID or driver's license the signature would be contained in a box they showed us in the State of Michigan Voter record system. In this case, the voter did not have a signature in the box so I asked how this signature was verified. They explained they would go to the absentee ballot application and verify the signatures match. I asked them to show us the absentee ballot application in this example and they explained they did not have access to those records at TCF. We then asked how we could be assured these problem ballots were properly verified and the answer was trust us. We then asked what the process after these problem ballots were returned to each AVCB. They explained each ballot was going to be checked against a 3rd version of the printed supplemental poll book and if the ballots were still not on the list that each ballot was to be manually entered the electronic poll book.

After a quick discussion with our attorneys, Kline Preston and I quickly returned to Mr. Baxter and Mr. Thomas. I challenged all the problem ballots on the following basis.

1. After the problem ballots were removed from each AB on Tuesday and Wednesday, we were denied all access to observe the ballots including how they resolved each ballot issue
2. Ballots were not in the electronic poll book or supplemental printed poll book before the ballots were opened
3. The ballots were all open and removed to an area with no access to observe
4. Signature verification could not be assured given access to the absentee voter application was not available at TCF

We demanded, per the challenge process, that each ballot be marked challenged, entered into the poll as challenged and allow us to write down each ballot number. Mr. Baxter and Mr. Thomas repeatedly denied the challenge on the grounds it was not a valid challenge.

_Jason R Humes_ Date. 11/10/2020
Signature of Affiant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

State of Michigan

County of Oakland

Signed and sworn to (or affirmed) before me on 11/10/2020
Date

by _Jason R Humes_
Printed name(s) of individual(s) making statement

who proved to me on the basis of satisfactory evidence to be the person(s)
who appeared before me.

_✓_ Personally Known
or
____ Produced Identification

Type of ID _____

_Karel J. Van Akin_
Signature of notary public

_____
(Name of notary, typed, stamped or printed)
Notary Public State of Michigan                    Stamp/Seal

My commission expires: _____

Karel J Van Akin
Notary Public of Michigan
Oakland County
Expires 11/13/2026
Acting in the County of Oakland

Page 3 of 3

# AFFIDAVIT OF PATRICIA BLACKMER

I, Patricia Blackmer, do depose and state the following under penalty of perjury:

1. I served as an inspector at the TCF Center AV Counting Board in Detroit.

2. I have personal knowledge of the facts stated herein.

3. I am competent and able to testify if called to do so.

4. I make this affidavit of my own free will.

5. I have been registered to vote in the state of Michigan for 42 years.

6. I can be contacted at ███████████████████████████████;
   ██████████████████████████████████████████.

7. On Monday, November 2, my husband, Ron, and I were working at counting board #19 at the TCF Center AV Counting Board in Detroit. Our three sons and two other friends, all Republicans, were each working at different counting boards. At the end of the night, after our counting boards had completed the end-of-shift procedures, we exited the room to go home. My son Brendan was the last one left. When he didn't come out, I went in to see what was taking so long.

8. Brendan was with a small group of people including two Republican challengers, an attorney, the AV director, and others. He had been asked to sign as the Republican on the check-out sheet in the black Poll Book for

1

several counting boards because the sheets were missing Republican signatures. I was uncomfortable with his signing for counting boards he had not worked and, therefore, could not affirm numbers of ballots inside the ballot boxes.

9.  I looked at a handful of the green Transfer Case Seal Certificate cards (in the plastic sleeves secured to the outside of the boxes with a seal) and noticed that most were not complete.  I was going to point this out to the attorney, but when he found out I was a Republican and that there were five other Republicans waiting outside the room, he immediately asked me to have all of them come in so we could expedite closing down the rest of the incomplete counting boards' check-out sheets.

10. After some discussion with the attorney and others, it was agreed that we would sign as the Republican but include the words "seal numbers only" beside our signatures since that was the only information we could verify. Three of us began signing in this manner, two simply signed their names having missed this last instruction, and two did not sign at all.  The five of us signed as the Republican for likely more than three quarters of the 134 total counting boards.

11. On many of the sheets, the words "if possible" were written in parentheses by hand on the line for the Republican signature.  Some sheets only had the

2

signature for the Democrat, while others had no signatures at all. Some check-out sheets were completely blank.

12. I myself and one Democrat worker proceeded to fill in or correct the seal number for several rows of counting boards. Then a second Democrat worker replaced the first one because the first one had to leave.

13. In one case, there were three seals on one bag. One was white plastic, another was metal, and a third was another metal seal looped onto the first metal one. We called the director over to figure out what to do. He proceeded to cut all three seals off, put them inside the bag, and secured a new metal seal on the zipper.

14. At one point during the night, I noticed a pile of 7 or 8 metal seals lying beside a small plastic bag they had apparently been in left unattended on a table.

15. We finished around 10:00 PM--two hours past the 8:00 PM time our shift was scheduled to end.

16. It is worth noting that back in October, training classes were being cancelled, as was ours. On October 8, I found out that a friend and some others had shown up for training that morning only to be sent home, as the class was being limited to the first 100 people in line.

3

17. I immediately called the Detroit Elections Office and got through to Monique Stevens. It was 4:50 PM. I told her about the people who had been sent home that morning. She said she knew about it and that it was because too many people had signed up. I asked how it was possible for too many people to have signed up. She said another group in the building was taking applications. I asked what group it was. She said she didn't know.

18. I asked how Detroit could be sure to have equal amounts of people from each party if they just took the first 100 people in line. She said, "They'll figure that out on the day." I asked how they could be sure to have equal amounts from each party if there were two groups taking applications. She said again, "They'll figure that out on the day."

19. I asked when the next class was. She said tomorrow morning, October 9. I asked how many people were signed up. She said there were 89 so far, but that she didn't know how many the other group might have scheduled. She advised we arrive early and bring our patience and a coffee to drink. I immediately signed all seven of us up, hoping everyone could get off work. They did. We arrived 45 minutes early for class and received our training.

20. It is also worth noting that the procedures we were taught in class were different from what we were told to do when we arrived for work.

4

FURTHER AFFIANT SAYETH NOT

I declare under penalty of perjury that the foregoing is true and correct. (28

US Code § 1746.)

Dated this 21st day of November 2020.

*Patricia Blackmer*
(Signature of Affiant)

Patricia Blackmer
(Printed name of Affiant)

Debra Haas
Notary Public of Michigan
Oakland County
Expires 02/14/2024
Acting in the County of *Oakland*

Sworn to me on November 22, 2020,
*Debra Haas*

5

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and EDWARD P.
McCALL, JR.,

        **Plaintiff,**

-vs-

CITY OF DETROIT; DETROIT ELECTION
COMMISSION; JANICE M. WINFREY, in
her official capacity as the CLERK OF THE
CITY OF DETROIT and the Chairperson of
the DETROIT ELECTION COMMISSION;
CATHY M. GARRETT, in her official
capacity as the CLERK OF WAYNE
COUNTY; and the WAYNE COUNTY
BOARD OF CANVASSERS,

        **Defendants.**

_____/

**AFFIDAVIT OF ROBERT
CUSHMAN**

FILE NO: 20-_____-AW

JUDGE

David A. Kallman      (P34200)
Erin E. Mersino      (P70886)
Jack C. Jordan      (P46551)
Stephen P. Kallman    (P75622)
**GREAT LAKES JUSTICE CENTER**
**Attorneys for Plaintiff**
5600 W. Mount Hope Hwy.
Lansing, MI 48917
(517) 322-3207/Fax: (517) 322-3208

_____

## AFFIDAVIT

The Affiant, Robert Cushman, being first duly sworn, hereby deposes and states as follows:

    1.    My name is Robert Cushman. I am an adult citizen and resident of the State of Michigan.

    2.    I served and was trained to be a poll challenger for the November 2020 election in Detroit, Michigan.

1

GREAT LAKES JUSTICE CENTER

3.      During my observations of the normal processing of ballots on November 4th between about 7:45 a.m. and 8:30 a.m. I was substantially obstructed from performing my challenger duties of observing and making notes at Board Number 31. The persons involved either directly or indirectly involved: 1. A worker named Joe, 2. A supervisor named Miss Browner, 3. an unknown person with no credentials, 4. a Democratic Challenger with credentials and one of the AVCB leaders named David Nathan.

4.      On Wednesday, November 4, 2020, Detroit election officials told us that they were going to process military ballots last. I did my best to try to observe the processing/duplication of the military ballots.

5.      On November 4, 2020, I was surprised to see numerous new boxes of ballots arrive at the TCF Center in the evening. I first noticed these boxes in the distribution area after many of the military ballots had been distributed and processed. I estimate these boxes contained several thousand new ballots when they appeared.

6.      The main list of persons who had registered to vote on or before November 1, 2020, was listed on an electronic poll book, often referred to as the QVF. As I understand it, the Supplemental Sheets were the lists of persons who had registered to vote on November 2, 2020 or November 3, 2020.

7.      I observed that none of the names on these new ballots were on the QVF or the Supplemental Sheets.

8.      I saw the computer operators at several counting boards manually adding the names and addresses of these thousands of ballots to the QVF system.

9.      When I asked what the possible justification was to counting ballots from unknown, unverified "persons," I was told by election supervisors that the Wayne County Clerk's Office had "checked them out."

10.      I challenged not one ballot, but the entire process as the names were not in the QVF or Supplemental Sheets and because the DOB's were all wrong, all being marked as 01-01-1900.

11.      An Election Supervisor near board number #86 advised me to go to the podium of election officials and ask one of them to help me. I did, and I enlisted the help of one of the leaders, a young man named Anthony Miller.

12. Mr. Miller walked me back to board number #86 and asked what I wanted the challenge to say. I said that I did not want to challenge just one ballot, but the entire process, as I was witnessing several thousand ballots inputted illegally.

13. Mr. Miller advised the computer operator what to type in as a challenge so that it was part of the Official Record in the Poll Book for Board Number #86.

14. I challenged the authority and the authenticity of all of these ballots that were being processed late with absolutely no accompanying documentation, no corresponding name in the QVF, and no corresponding name in the Supplemental List.

15. Every ballot was being fraudulently and manually entered into the Electronic Poll Book (QVF), as having been born on January 1, 1900. This "last" batch of ballots was processed in the 8:00 p.m. to 10:00 p.m. time frame.

16. When I asked about this impossibility of each ballot having the same birthday occurring in 1900, I was told that was the instruction that came down from the Wayne County Clerk's office.

17. Mr. Miller was very clear about these late ballots and that the instructions were coming from the Wayne County Clerk's office.

18. I was surprised and disappointed at the preponderance of dishonesty, irregularities, and fraudulent tactics at the November 3, 2020 election at the TCF Center.

19. The above information is true to the best of my information, knowledge, and belief.

20. Further affiant says not.

*Robert F. Cushman*

Robert Cushman

On this 7th day of November, 2020, before me personally appeared Robert Cushman, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

*Stephen P. Kallman*

Stephen P. Kallman
Notary Public, Eaton County, Michigan
My Commission Expires: 11/26/2025

3

## AFFIDAVIT OF JENNIFER SEIDL

The Affiant, Jennifer Seidl, being first duly sworn, hereby deposes and states as follows:

1.  I am an adult citizen of the United States and a resident of Michigan.

2.  I served and was trained to be a certified challenger for the November 2020 election in Detroit, Michigan at TCF Center.

3.  On November 3, 2020, I arrived at TCF Center about 6:45am. I checked in with my credentials shortly after 7:00am. The hall was very large with around 134 counting board tables on both sides of the room with a rows of scanners, tabulators, long tables and a large raised platform from where the adjudicators and election officials worked. There were at least 10 stations with computers set up on this platform.

4.  Election officials wore either white or black long shirts with an election insignia on the left chest. I did not see any identification tags on the poll workers. Poll workers wore a white tops and black pants or skirts.

5.  Challengers for the democrat party wore credit card sized pins as well as a small, round lime-green sticker. These stickers were usually stuck to their upper arm or upper back. The organizers gave non-partisan or independent observers/challengers different types and colors of identification.

6.  I first observed counting board numbers 2, 3, and 14, but because of being understaffed, I also tried to monitor several others as well. Consistently, poll workers told me to stand six feet away from the tables, regardless of proximity of poll workers. On occasion election workers allowed me to take one step towards the table for around fifteen seconds, but I was still too far away to see any details of the ballots or computer screens.

- 1 -

7.     Monitors were set up at every counting board table, and I noticed in the lower right hand corner a red message that said "Backup Overdue." I asked an election official what it meant, and he said he did not know. I noticed this message on every monitor I saw throughout both November 3rd and 4th, 2020.

8.     Sometimes viewing the monitor was insufficient because the information would flash on the screen too quickly.

9.     Within the first two hours of observing, the amount of ballot duplications that each table was performing grew exponentially. The duplication efforts were taking place without oversight or signatures from both political parties.

10.     Looking across the room, I could tell when election workers duplicated ballots because election officials in white shirts stood behind the poll workers at their counting board tables. Unfortunately, this positioning blocked certified challengers from overseeing the process.

11.     I tried to stand on the other side of the table to observe the duplications from the front, but election officials reprimanded me and disallowed me from doing so.

12.     I estimate that I was blocked from observing about hundred ballot duplications.

13.     From the duplications I did see, election workers provided reasons for the duplication, including: voter did not return the correct ballot, voter used two different colored ink pens, ballot could not be scanned properly, and most perplexing was "bad" ballot.

14.     I witnessed two opaque USPS bins full of "bad" ballots sitting on the floor by a counting board table. I asked an election official to explain the "bad" ballot and to see an example of one compared to a "good" ballot to which he obliged. He said the paper had an issue or perhaps there could be ink in the lower left-hand corner of the ballot. I could not discernibly see any

- 2 -

difference or markings on these ballots, and he could not provide me any further information. When I probed further, he said he would be back. I never saw him again.

15. At one table, I saw a single ballot duplicated four times. I was told by the table lead that the first duplicate was because of the wrong precinct. The second was user error. The third was the wrong precinct again. I managed to see that notes in the QVF and that the incorrect ballots were listed. The duplicate ballots were in numerical order.

16. I estimate I saw 3,000 to 4,000 duplications during the time I was in the TCF Center.

17. An election official told me that one precinct mailed the wrong absentee ballots to about five thousand voters that all 5,000 had to be duplicated by hand.

18. TCF Center was extremely chaotic. Ballots were stacked in piles everywhere and most of the counting occurred with no semblance of checks or balances. I observed election workers of all levels of carrying around ballots without privacy sleeves the entire time I was there.

19. I returned to the TCF Center on November 4, 2020 at about 11:45am.

20. I folded my credentials into a clear plastic case on a thick lanyard, so they would not get damaged. New challengers had their credentials printed on a letter size sheet of paper folded lengthwise and pinned to their shirt.

21. Before entering the room, I noticed there was a gathering of around 60 Democrats being briefed outside the entry doors. The Democrat challengers again had a small round green or yellow sticker on their upper arms or chest, but no other form of credentials or identification was visible.

22. The tone of the room on November 4, 2020 was much different from election day.

23. The Democrat poll workers were overtly hostile towards the Republican challengers, causing some volunteers to walk out of the hall.

- 3 -

24.　That afternoon, election officials locked the doors claiming that the TCF was at full capacity. But new groups of observers entered the hall from the NAACP, the ACLU, Election Defenders, and the UAW.

25.　The Democrat representatives from the Election Defenders were easy to see because they wore bright orange hooded sweatshirts and the others had different identification tags or credentials from the independent and republican challengers.

26.　A poll worker falsely accused me of taking videos or pictures of ballots, which I did not do.

27.　I politely asked the poll worker if he was talking to me because I was confused and was unclear about what he was accusing me. The poll worker yelled at me, "You people ain't allowed to talk to us! Shut your motherfucking mouth, racist!" Another poll worker from that table called me a "motherfucking cocksucker" and a "racist." I am neither.

28.　This yelling incident was around the same time I saw that poll workers were duplicating a large number of ballots like the day before.

29.　Again, the election officials were standing around the poll workers as they worked, and Democrat challengers and representatives from other groups stood around the tables blocking the duplications.

30.　A group of police officers wearing SWAT gear entered the hall and followed election officials to a table across the room from me. Some of the poll workers and election officials started yelling and screaming, some stomped their feet or clapped their hands. I noticed Democrat challengers laughing and taking pictures.

- 4 -

31.     I then saw police officers take an attorney with the Republican party. I heard shouts of, "Get the fuck out!", "That's what you get, racist!", and "Take them all out!" I was surprised because I had not seen this attorney act in an untoward manner.

32.     Right after, I heard pounding on the glass doors and noticed that the windows were covered up with paper. The tension in the room spiked and within the next ten minutes, poll workers and police removed three more people.

33.     I stood by the military ballots at the center tables and over the next hour, I saw at least 25 more Republican challengers and attorneys escorted out of the hall.

34.     Just after, the tables were busy again, but I decided I would stand nearby the military ballots to observe how they were processed. We saw the military ballots being counted last, and I had been trying to keep an eye on these ballots. The military sacrifice so much for our country, I wanted to try to persevere the accuracy of their votes.

35.     Police Officers and election officials told me that only 2 Republican challengers could stand by the military ballots at a time even though they allowed many more Democrats.

36.     There were also challengers from the Democrats and special interest groups such as the NAACP and ACLU. The Democrats far outnumbered the Republican challengers who insulted and tried to intimidate me.

37.     I witnessed Republican challengers removed from the room for challenging a ballot or even asking a question. Election officials told me that if I wanted to continue monitoring the military ballots, I had to "keep my people in line" and "keep my mouth shut."

38.     Election officials told me to stand six feet away from the military ballots. This, however, did not apply to a representative from the NAACP and another person without credentials who were looking in the bins of separated ballots for several minutes.

- 5 -

39.     A group of eight to ten Republican challengers left to take a quick break and never allowed back in the hall.

40.     As election workers prepared the military ballots to go out to the challenge board tables, I could only see 7 Republican challengers.

41.     I asked an election official why they were not allowing more Republican representatives in, and he claimed MIOSHA guidelines and COVID-19 limited the number of people allowed in the hall. Yet I saw several groups of people enter the door, just none with Republican credentials.

42.     The military ballots were not in envelopes and were divided up by precinct and distributed to those specific counting board tables throughout the hall. Representatives from Election Defenders walked with the person holding the ballots back to the table and stood around the table to block observation.

43.     Based on the format of the military ballot, each requires duplication.

44.     I tried to ensure that a Republican challenger followed the ballots to every table but they were being passed out to groups of ten tables at a time, and there were not enough Republican challengers in the room to cover every table.

45.     As the military ballots were being distributed, I noticed that another long table was set up and bins were being stuffed with absentee ballots. Stack after stack of envelopes were being sorted and put into bins. I estimate around 40 bins were filled with ballot envelopes and more were being sorted.

46.     The ballots were not in any sealed container, but in open bins or hand carried to the bins from either the adjudicating area or the back of the room.

47.     All of these ballots were inside mailing envelopes.

- 6 -

48. I asked two election supervisors what these ballots were, and they answered, "I don't know" and "I'm just doing what I was told to do."

49. I heard an election official order, "Enter them! Make everything match, and get it done as soon as possible!"

50. When these envelopes were scanned, the result shown on the monitors said, "0 matching voters."

51. The right-hand side of the screen was blank, which made it easier to observe from six feet away.

52. On the left-hand side of the screen, there was a manual entry with a name and a birthdate of 1/1/1900.

53. Ballot after ballot was scanned with the same result, "0 matching voters" with just a name and birthdate of 1/1/1900.

54. I could see and hear the frustration and confusion of the poll workers.

55. Election officials required the day shift to work overtime and process all these additional ballots with no matching voters, just a name and bad birthdate.

56. I believe these workers were still processing these ballots at 9:45pm when I left the hall.

57. I passed by the hall again when I was leaving the building at 11:45pm and saw the Republican challengers were still trying to get in the hall and could not.

58. I could see that the tables in the room still had poll workers processing ballots.

59. I never saw election officials use a paper voter roll during my volunteering at TCF Center.

60. I never saw anyone authenticate signatures from the absentee ballot envelopes.

- 7 -



Jennifer Seidl

On this 20 th day of November, 2020, before me personally appeared Jennifer Seidl, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that she has read the foregoing affidavit by her subscribed and knows the contents thereof, and that the same is true of her own knowledge and belief, except as to those matters she states to be on information and belief, and as to those matters she believes them to be true.

Hilda Cyars / _____

Name of Notary Public:

Oakland _____ County, Michigan

My Commission Expires: 12/06/2023

HILDA CYARS
Notary Public – State of Michigan
County of Wayne
My Commission Expires Dec 6, 2022
Acting in the County of Oakland

- 8 -

RECEIVED by MSC 11/26/2020 2:44:13 AM

## AFFIDAVIT OF CASANDRA BROWN

The Affiant, Cassandra Brown, being first duly sworn, hereby deposes and states as follows:

1.    My name is Cassandra Brown.  I am an adult citizen and resident of the State of Michigan in the County of Lenawee for the last twenty-three years.

2.    I am a Republican delegate for Ogden Township.

3.    My children and I signed up to work the November 2020 elections in Ann Arbor, Michigan.

4.    On October 2, 2020, I spoke with Ann Arbor election officials about the need for Republicans to be present at the polls in Ann Arbor to work the elections. The officials were concerned that there were not enough Republicans signed up, and in order to preserve election integrity, members of both parties must be involved in the counting and duplication of votes.

5.    After discussing with my children where they would like to work within the elections process, we decided to volunteer to help count absentee ballots.

6.    After signing up, we were contacted to attend training. Ann Arbor election officials stated during our training that they needed more hands for preprocessing on November 2, 2020.  I signed up to work.  There was a very limited number of Republicans working.

7.    On November 2, 2020 at 10am, I reported to Huron High School in Ann Arbor, Michigan to help with the preprocessing of absentee ballots.

8.    I was assigned to Absentee Voting Count Board (AVCB) 7 ward 3, 5-7 precincts with Susan and Phil LNUs.  Election officials told us to count ballots, check the ballot log for the total, and to verify the count.

9.    Election officials also told us to put that day's received ballots in numerical order.

10. Once count was made, election officials told us to pull all challenge or moved ballots and put them aside, as they could not be opened until election day.

11. Election officials instructed us to take ballots to the taper, then letter opener. After that we were to check the ballot numbers on the ballots and match the ballot numbers to the number on the envelope. Then we were to make sure the ballots were facing the proper direction.

12. Around 2pm on November 2, 2020, my group began ward 3 precinct 7.

13. I had ballots numbered approximately 700 to 1400.

14. I was adding in Monday's received ballots to the piles when I noticed a large gap in the number sequence. First, I assumed one of my teammates had the ballots, but none did.

15. I then thought that maybe we were missing a box of ballots, but that was not the case either because we had both of the boxes of absentee ballots.

16. I then went the ballot log. In the ballot log there was a jump from around ballot 937 to 1362. This meant that approximately 400 ballots were missing.

17. I showed both Susan and Phil with whom I was working that I was missing approximately 400 ballots. Not one in the entire sequence of approximately 400 was turned in. We discussed how strange and weird it was. Every group of 100 ballots had at least some returned.

18. I asked an official at the polling site, who told me that the ballots were pulled for use for duplications on Election Day. But then said, I should confirm that with an election supervisor. There were three election supervisors.

19. One supervisor said the ballots were sent out to remote early voting locations like the University of Michigan and Yuma, and that I should not worry about it. I returned to my counting table concerned, but continued working.

20. Around 7:30pm, my shift ended, and I was released for the night since all counting and preprocessing had to be done by 8pm. All doors were closed and locked.

21. On my way home, one thing hit me hard. When I agreed to work the polls, I had to vote absentee or do in person early voting. When I inquired about in person early voting, I was informed by my county clerk, as well as my Township clerk, that in person was the same as absentee. The only difference was an absentee ballot is mailed to the voter, but for early voting and the person picked up the ballot and could fill the ballot out and hand right in, but both are sealed in the envelope and cannot be counted until election day.

22. So, the election supervisor's information could not have been true because an absentee ballot would have been sent via the mail and would not have been the same as the in person early voting ballots. Also, the early voting ballots should have been turned in by then.

23. If those ballots were used for early voting, the ballots would have been there at the AVCB.

24. The next day, November 3, 2020, my children and I arrived at Huron High School at 6:30am.

25. We walked in as the doors open around 6:50am. My children are ages sixteen and seventeen and were assigned to duplicate ballots.

26. Ann Arbor election official made sure that there was at least one republican present at each board to conduct duplications. This is required under state law. The location we worked at was short-handed on Republicans, so most republicans were assigned to that duty.

27. Duplications involve duplicating the original votes from the original ballot onto a new ballot exactly as the voter originally marked. There are void reasons for duplications that

prevent a ballot from just being run through the tabulator, such as the ballot was ripped or the voter spilled coffee on the ballot. In Ann Arbor, both a Republican and a Democrat at each board checked each duplication to make sure it was identical to the original. If a ballot had not been identical, the ballot the duplication would have been voided. Both parties worked together to ensure that the voter's original selections were absolutely preserved at the duplicator tables.

28.      In Ann Arbor, we were never to guess at what a voter's intent might be. If a ballot had two circles completely filled in for one category, such as straight ticket voting, president, etc., we would not be allowed to change what the voter marked. We would have to duplicate the ballot completing exactly as the voter had marked and run those selections through the tabulator. The tabulator would have rejected the ballot as an overvote and the ballot would have been set aside into the bin of unrecordable ballots. No one would be allowed to select one candidate over the other when the voter had not done so him/herself.

29.      There were 15 AV boards to 5 wards 38 precinct. I believe. When my table duplicator 6 received our ballots, the first thing I noticed were the ballot numbers 4201.

30.      I volunteered to hand out the tally sheets to the duplications table for two reasons: one, we had been at the site for over an hour and half and no ballot tabulation was being done. Everyone was waiting for supplies. And two, I could check the other ballot numbers. At the end of the day, there were still no ballots in the 950-1350 area. This meant the ballots could not have been used for the duplications. So, I received misinformation from the other election supervisor as well.

31.      I left around 8:15pm when I finished my shift. I tried to inform the Republican party.

32.     I was asked to go to the TCF Center, in Detroit, Michigan on November 4, 2020 to be a Republican poll challenger for a third day. To look for these type of discrepancy and others. Being a AVCB worker who had the first hand knowledge on how absentee ballots and duplication are supposed to be processed.

33.     However, when I arrived, I was refused entry and told that I may no longer observe the ongoing counting.

34.     The process from November 2-4, 2020 concerned me because it was ridden with irregularities that would significantly affect the vote count. I witnessed missing ballots, experienced election supervisors providing me with incorrect information, there were unassigned ballots, and the logs at AVCB in Ann Arbor would not reflect what was sent. Election workers were only looking for the number of ballots received by clerks to balance what was in the box. In Ann Arbor, if every site followed the same process, this would result in 6,000 unaccounted for ballots. State-wide, this would create a 50,000-150,000 vote discrepancy. Unless I was seasoned in counting ballots and working at the polls, a person would not know how the process normally works or that proper protocol was not followed.

35.     However, the duplication process itself was done with integrity and transparency at the precinct I worked at in Ann Arbor. Election officials made sure the both republicans and democrats signed off on the duplications and that duplicators preserved the original voting decisions of the voter.

_Casandra Brown_
Casandra Brown

RECEIVED by MSC 11/26/2020 2:44:13 AM

On this 21st th day of November, 2020, before me personally appeared Cassandra Brown, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that she has read the foregoing affidavit by her subscribed and knows the contents thereof, and that the same is true of her own knowledge and belief, except as to those matters she states to be on information and belief, and as to those matters she believes them to be true.

Name of Notary Public: _____

_____ County, Michigan

My Commission Expires: _____

MARGARITA SEAGRAVES
Notary Public, State of Michigan
County of Lenawee
My Commission Expires Dec. 12, 2022
Acting in the County of _____

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and EDWARD P. McCALL, JR.,

          **Plaintiff,**

-vs-

CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,

          **Defendants.**

_____/

**AFFIDAVIT OF DANIEL GUSTAFSON**

FILE NO: 20-_____-AW

JUDGE

David A. Kallman     (P34200)
Erin E. Mersino     (P70886)
Jack C. Jordan     (P46551)
Stephen P. Kallman     (P75622)
GREAT LAKES JUSTICE CENTER
Attorneys for Plaintiff
5600 W. Mount Hope Hwy.
Lansing, MI 48917
(517) 322-3207/Fax: (517) 322-3208

## AFFIDAVIT

The Affiant, Daniel Gustafson, being first duly sworn, hereby deposes and states as follows:

1. My name is Daniel Gustafson. I am an adult citizen and resident of the State of Michigan.

2. I served and was trained to be a poll challenger for the November 3, 2020 election.

1

GREAT LAKES JUSTICE CENTER

4.  Large quantities of ballots were delivered to the TCF Center in what appeared to be mail bins with open tops.

5.  These ballot bins and containers did not have lids, were not sealed, and did not have the capability of having a metal seal.

6.  The ballot bins were not marked or identified in any way to indicate their source of origin.

7.  The above information is true to the best of my information, knowledge, and belief.

8.  Further affiant says not.

Daniel Gustafson

On this 8th day of November, 2020, before me personally appeared Daniel Gustafson, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

Stephen P. Kallman
Notary Public, Eaton County, Michigan
My Commission Expires: 11/26/2025

2

## AFFIDAVIT OF EUGENE G. DIXON

The Affiant, Eugene G. Dixon, being first duly sworn, hereby deposes and states as follows:

1. My name is Eugene G. Dixon. I am an adult citizen and resident of the State of Michigan.
2. I was trained and served to be an election challenger for the November 3, 2020 General Election and was credentialed by two organizations.
3. On Monday, November 2, 2020 I reported to TCF Center-Detroit to observe the preparation of mail-in and absentee ballots for tabulation. During this day the ballots were removed from their outer envelopes and voter names were marked in the electronic poll book. I asked why voter signatures on the envelopes were not verified at the tables. I was told that signature verifications were done earlier by the Detroit Department of Elections. Near the end of the day, ballots in their privacy sleeves, were placed in metal boxes, the boxes sealed, and stored at TCF Center over night to be guarded by Detroit Police officers.
4. On Tuesday, November 3, I again reported to TCF Center in the morning. I worked from 9 AM to 4 PM. During that time I observed that the procedure for tabulating ballots included carrying stacks of 200 ballots to the tabulator area, to be fed 50 at a time. Counted ballots would then go into metal bins near the tabulators. At one point I noticed an election worker carry the metal bin, containing tabulated ballots, back to where the ballots were being picked up at the table. This would have easily allowed removing tabulated ballots from the container, adding them to the pile of yet to be tabulated ballots. When I complained to a supervisor - this practice stopped.
5. The Detroit Department of Elections did not make sure that a republican was included in the five-member teams at the absent voter counting boards.
6. The Detroit Department of Elections did not make sure that a republican was present when duplicate ballots were made, to replace damaged ballots.
7. Approximately 11 PM, I returned to TCF Center and noticed there was a driveway with an open garage door in the basement tabulation area. I thought it was odd that several cars would drive in to the area, park there for a few minutes and then leave without anyone getting out of the car, as I observed.

8. At approximately 1:30 to 2:00 AM, November 4, 2020, I observed a group of approximately 100 young people, most carrying backpacks and cell phones, enter through the front doors of the TCF Center and come directly in to the area where votes were tabulated and processed. Some members from the "group" were wearing yellow, "protect the vote" sweatshirts and others were wearing all black. During this time there was no security, and no check-in for credentialing for anyone. On November 2nd and 3rd, only election workers and credentialed election challengers could enter the counting area.

9. This large group of young people were a distraction and disruptive to me and some in the group seemed to harass and intimidate election challengers. I wondered why these young people were there. They were not election workers, and they did not appear to be nor act as credentialed challengers. What was their intent ? - I do not know.

10. At approximately 3:00 AM, November 4, 2020, a Detroit Department of Elections van arrived at the basement doorway adjacent to the counting area. They delivered 39 boxes of ballots, which were placed on tables in the middle of the counting room. There were already approximately 20 boxes of ballots on those tables waiting for processing and tabulation. When the 39 boxes arrived, election officials, standing in a raised area in the middle of the room, advised and announced that these 39 boxes were the last remaining mail-in/ absentee ballots for processing and tabulation. At that time it appeared to me that approximately 75 percent of the tables were idle having no ballots to process or tabulate. It appeared that once the total approximate 59 boxes were tabulated, all mail-in/absentee ballots would then be processed/tabulated and the work at TCF concluded.

11. I left the TCF Center at approximately 4:00 AM, November 4, 2020.

_Eugene S. Dixon_ 11/22/2020 **EUGENE G. DIXON**

On this 22nd day of November, 2020, before me appeared Eugene G. Dixon, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him and knows the contents thereof, and the the same ins true of his own knowledge and belief except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

_Thru E. Dyler_ Notary Public, _Oakland_ County, Michigan. My Commission Expires: _August 16, 2023_

State of Michigan )
County of Wayne ) Sworn Statement:

1. My name is Anna England. I am a resident of Lincoln Park, Michigan. I was a ballot challenger on Wednesday, November 4th, 2020 at the TCF ("Cobo") Center in downtown Detroit.

2. On Nov 4, 2020 I received a post by Karen Girgenti Budzinski that the TCF Center needed additional challengers. I quickly took my day off and went to help. I noticed that downtown Detroit was extremely quiet. Upon arriving around 11am on Nov. 4, I got my credentials, and was made a poll challenger.

3. I entered the counting room at noon. We had to sign in with our name and the time we got there. As a Republican challenger, I carried a 8.5x11 sheet with our name/GOP. Democrats were wearing small green stickers somewhere on their person.

4. I observed several precincts as they were counting ballots. Around 2pm I felt lightheaded as I hadn't eaten much and had brought no water, so I tried to leave the counting room. As I was about to leave, I asked someone who worked near the door if I could get back in if I left. He told me maybe not, so I should stay if I wanted to stay, which I did. A small buildup of volunteers was forming at the entrance door to the counting room at that time.

5. The officials then started bringing in more police that I hadn't seen all day and barring the door in the front of the counting room, which was mostly Republicans trying to make their way back inside as challengers. I heard from people inside the room that officials were claiming that Covid restrictions limited the number of challengers that they could let in. Officials were not letting us switch out (one person leaves, one goes in.) A friend who was outside of the counting room told me that they were letting in a few Democrats, but no Republicans.

6. When I was in the counting room walking around, a few of us Republicans mentioned that there were far more Democratic than Republican challengers in the counting room.

7. The officials then started blocking the front windows to the counting room with cardboard to block the people outside seeing what was going on in the counting room. This caused people to become heated and the situation in the counting room also became tense. I was sitting next to a Democratic challenger who turned to me and said "that looks very unconstitutional;" she said that she would also be upset if her party was on the other side of the glass.

8. I also was told by a Republican that there needed to be a Democrat and a Republican at each precinct table and that we should be asking officials if that were the case. I went over to a supervisor over a couple precinct tables and asked it that were true. She replied that no, it doesn't matter and she's not asking the volunteer their political party. She said, "it doesn't matter at all;" "that's not true."

9. Later, I phoned a friend who leans Democratic and has worked the polls in Southfield, MI for a long time. She told me specifically that the requirement that a Democrat and a Republican be at each precinct table was indeed true, and that the supervisor was wrong.

10. I left the Convention Center at around 5:15pm. There were demonstrators outside the Convention Center.

11. I posted a video of the demonstration to Instagram and it quickly circulated. Facebook started blocking it from being shared.

Anna England

Notary Public __Macomb__ County, Michigan
Acting in __Oakland__ County, Michigan
My Commission Expires: __7/1/27__

Sworn to before me this

day of November 2020



## AFFIDAVIT OF ADAM de ANGELI

The Affiant, Adam de Angeli, being first duly sworn, hereby deposes and states as follows:

1.    I am an adult citizen of the United States and a resident of Michigan.

2.    I declare under penalty of perjury that the foregoing is true and correct.

3.    I served as a poll worker in the City of Detroit on November 3, 2020.

4.    I have been a Republican Party precinct delegate since 2008. Since getting involved in politics, I have worked on numerous campaigns, serving at various times in every role from volunteer to senior consultant.

5.    I have been a campaign manager, treasurer, press secretary, information technology director, and state campaign manager for a presidential campaign.

6.    I have been a poll challenger and an election day operations coordinator. I was also a challenger in a recount.

7.    I worked in the U.S. House of Representatives as a legislative assistant for more than a year, and in the Michigan House of Representatives as a senior legislative assistant for more than three years. In these capacities, I became very familiar with Michigan elections.

8.    I registered to become a poll worker for the City of Detroit on September 1, 2020 using the City of Detroit website: https://detroitmi.gov/departments/elections/become-election-day-pollworker._Neither the web page nor the application contained an email address or even mailing address where the application was to be submitted, so I called the Department of Elections and asked if there was a way to submit my application electronically. I was told I could apply online at "vote4detroit.net".

1

9. I advised the elections official that there was no application at the website; nothing but a login screen. He responded: "That's strange. The website was supposed to be open today. Maybe they're still working on it. You can try again tomorrow." The web page appears to remain unchanged as of November 8, 2020 and the page is archived at https://web.archive.org/web/20181127073658/https://www.vote4detroit.net/.

10. I ended up driving to the Department of Elections at 2978 W. Grand Blvd in Detroit and delivered my application in person. At the Department of Elections there was a man behind a counter and two women speaking with him. The man asked if I was there to apply to be a poll worker; I said yes and presented my application. He took it from me and thanked me. However, I later received no response from the Department of Elections, not even an acknowledgment of receipt.

11. After hearing no response in weeks, I eventually applied to be a poll worker in Oakland County. The County Clerk Department of Elections' website featured a link to the poll worker application. The form included an email address to submit applications. I received prompt acknowledgement of receipt and received a phone call to schedule training within 48 hours of applying.

12. Three weeks from the date I first applied to be a Detroit poll worker, on September 22, I received an email from a friend indicating that an online registration form was discovered at this address: https://www.vote4detroit.net/Pollaccess/PollWorkerReg.aspx. I applied the following day and immediately received an automated email attached, including a login link, username, and password.

13. I opened the link and logged in successfully. The home page displayed top-level tabs: "Home", "Training", "Work Assignment", "Messages", and "Questions/Comments". The

2

"Home" page contained links for "Edit My Personal Information", "View Work History", "Update Username/Password", and "Review Training Materials." The "Review Training Materials" link took me to a page with no training materials. The "View Work History" page was blank. The "Training" and "Work Assignment" pages were blank. The "Messages" tab contained only one message, identical to the automated email I had received, and the "Questions/ Comments" tab led to a web form for submitting questions and comments. Essentially, there was no information on the web page.

14. On October 13, 2020 at 11:38am, a man, who introduced himself as from the Department of Elections, called from the phone number 313-876-0261, identified on my phone's caller ID as "Skalski Anntt".

15. The individual from the Department of Elections asked if I have taken my poll worker training. I replied that I had not heard from anyone with the City of Detroit since signing up three weeks ago and was not aware of any training.

16. The individual from the Department of Elections said trainings were available the next day at 10am, 1pm, 5pm.

### TRAININGS OCTOBER 14th and 15th, 2020

17. I arrived for training the next day, October 14, 2020, at Wayne County Community College at 8200 Outer Drive West in Detroit at 1:00pm. I was asked what I was there for, and I responded I was there for poll worker training. The training took place on the third floor; the room number was an even number approximately 324. No one asked for ID or credentials.

3

18.     Training began at 1:42pm.     I recorded the training for the main purpose of listening to it again before Election Day to remind myself of any important information.  I was acting in an official capacity as a poll worker and the training appeared to be a public meeting.

19.     The trainer noted that we were to request six feet of space from any poll challengers.  The trainer recognized this distance would make it impossible for poll challengers to perform their duties and could create a confrontational environment conducive to a law enforcement intervention.

20.     When I arrived home, I logged into the poll worker website. I noticed I had a new message, dated October 13, 2020 01:13pm (95 minutes after the call I had taken the prior morning).   The message was sent from Yvonne Brookins with the subject line "STRIKE TEAM."  The message contained credentials authorizing me to work as a "SUBSTITUE POLLWORKER."   Under the "Work Assignment" tab, it now stated that my assigned job title was "-EPI". (Electronic Pollbook Inspector).

21.     This meant I had been sent to the wrong training: I had attended the standard poll worker training for ballot inspector and ballot box inspector. The Electronic Pollbook Inspector was a different role: The EPI uses the laptop pollbook to process ballot applications and record the issuing of ballots.

22.     At approximately 5:00pm, I used the "Questions/Comments" tab to indicate that I had taken the wrong training and asked about receiving the correct training.   Shortly after sending the message, it occurred to me that I might not receive a timely reply. I checked the "Training" tab for a list of upcoming trainings. It displayed approximately ten events coming up in the week ahead, but all of them were listed as "precinct chairperson training."  There were no upcoming EPI trainings listed.  I remembered from the initial phone call with the individual from

4

the Department of Elections that trainings were going to be offered at the same times the following day.

23.     Therefore, on October 15, 2020 at 1:00pm, I returned to the same location to take EPI training. The check-in attendant asked if she had seen me the day before. I told her I had taken the wrong training and needed to take EPI training. For the same reasons as before, and because I was taken aback by the comments the prior day, I recorded this training.

24.     On October 15, 2020, the two trainers identified themselves as "Andrea and Miss Tyra." Andrea was wearing a City of Detroit employee uniform shirt with an embroidered nametag identifying her as "A. Johnson."

25.     The training began with a lecture regarding from Andrea. Miss Tyra took over and lectured for the remainder of the training and discussed the use of the electronic pollbook computers.

26.     Most of the training consisted of basic instructions for performing the jobs we were assigned. There were, however, moments I found remarkable.

27.     I was instructed to tell poll challengers to stay away from me. An hour and thirty-six minutes into the training, I heard the following exchange:

> Miss Tyra: They have to wear a mask and they have to stay six feet. That's important because they can come behind your table, but if you don't have six feet, they can't come back there. [...] Any questions?
>
> Trainee: So, if they're six feet back, they can't actually see.
>
> Miss Tyra: Exactly! Unless they got reeeally good vision or they brought their binoculars
>
> [Laughter]

5

Miss Tyra: Six feet. That's the rule, right? And you are entitled to your six feet!

28.     Miss Tyra then encouraged poll workers to "call 9-1-1", "call the police on 'em," and "have 'em thrown up out of there."

29.     In both trainings, poll challengers were trained that poll workers could strictly enforce social distancing rules that would prevent challengers from coming within six feet of them,

30.     On the October 15, 2020 EPI training, Miss Tyra indicated that she was happily aware this would impede poll challengers' ability to perform their duties.

31.     Based on my observations with just signing up and being trained, I believe that there was no way for a member of the general public to be reasonably expected to figure out how to even *apply* to become a poll worker in the City of Detroit.

32.     A Department of Elections official was unable to direct me to the online application. After providing me a faulty web address, I was either incorrectly or falsely advised that I could simply wait until the address would work.

33.     I was *only* able to successfully apply to become a poll worker because I had been given the link to the online application—an unlisted page on an unlisted website—by someone "in the know."

34.     I still do not know why I received an email with the subject line "STRIKE TEAM."

35.     As noted above, I attend two distinct training sessions: first for poll inspector; then for electronic pollbook inspector (EPI). I audio-recorded the trainings of the October 14th and October 15th, 2020; a true and correct copy of the recordings are attached.

6

36.     We were furnished printed packets of training materials. The October 14 training packet is attached.

37.     I am familiar that on October 16, 2020, the Secretary of State issued an updated guidance document that stated:

> "Challengers / Poll Watchers: While challengers' [sic] and poll watchers' [sic] have their rights and responsibilities established under law, election workers can strictly enforce requirements that they observe proper social distancing." ("Polling Place Safety and Accessibility", Michigan Department of State, Bureau of Elections, updated 10/16/2020) I do not know whether this guidance appeared in earlier versions of the document.

38.     In both trainings, it was emphasized that, unlike prior elections, the City of Detroit overstaffed and received more applications than needed. However, it was emphasized that "many" of the Electronic Pollbook Inspectors were minors that would be unable to discharge their duties to accompany the precinct chairperson to the Receiving Board.

39.     In the October 14 training, this was noted in discussion of pay. Trainees were informed that they could make an extra $50 if they joined the precinct chairperson in delivering the critical election materials—including the poll book, the laptop, the results tapes, tabulator SD cards, and of course, the transfer case containing the ballots-- "but I stress," the trainer said, "you can only do this if your EPI is a teenager. Many of our EPIs will be teenagers, who can't work until 2, 3 o'clock in the morning." She then emphasized, however, that it was a lot of work for little pay: the benefit of being a lowly ballot inspector is that you could go home as soon as the polling place was closed. Those going to the Receiving Board could expect to be there "all night": 2:00am, 3:00am, or later.

7

40.    In the October 15 training, this was noted to inform the teenaged boys constituting the majority of trainees that they needed to notify their precinct chairperson early in the day if they were unable to deliver the materials to the Receiving Board ("because it's late, right?" not said: due to work restrictions on minors). They could be there as late as 1:00am, she warned them.

41.    It seemed notable to me that, while on one hand it was so difficult to impossible for members of the public to even find out how to apply, a large number of teenagers were recruited to work the polls and assigned with particularity to be electronic pollbook inspectors.

42.    On the applications to work for the City of Detroit, applicants were required to list party affiliation. "Independent" or "non-partisan" was not an option. Upon knowledge and belief, clerks are required by law to hire an equal number of Democrat and Republican poll workers. However, Michigan does not have partisan voter registration, so this process is subject only to the affirmation of applicants, and minor employees being ineligible to vote would have no record to check against anyhow.

43.    In the October 14 training, it was emphasized that, although there would be phone numbers to call for troubleshooting on Election Day, we would be unlikely to get through to anyone. "Honestly speaking," the trainer said, "it's going to be hard to get ahold of someone, because there's going to be 10 people calling us at the same time."

44.    In the October 15 training, we were trained to deceive voters that were listed in the poll book as having already voted absentee but who insisted they had not. We were advised to issue them a provisional ballot "to quiet them down" that would not be tabulated but would instead by destroyed by the Department of Elections.

45.    The trainer said the following:

8

Miss Tyra:     There's no reason for him to vote again. At all. Ever-- that day. He's done. But what if he gets what? Loud! Rude!  (impersonating voter) "That's not me! I didn't vote! I want to vote!"  And just acts the purest, right? What can you do, besides call your chairperson?  That's what you should do. Call your chairperson. Your chairperson can issue him what type of ballot?

Trainees:     "Provisional!"

Miss Tyra:     A provisional envelope! Why?

Trainees:     "Because he wants to vote."

Miss Tyra:     But why a provisional envelope? Where's it going? Not in the tabulator! It's going in that envelope, right?  We have how many days? Six! So, what is the Department of Elections going to do with it?

Trainees:     Throw it out.

Miss Tyra:     Destroy it!  He's already voted.  The people are going to try to test the system.  And some of them are going to act the . . . and 9-1-1 is always an option, right?  It's always your first option.  But if they just insist, "that's not me, I didn't do that, I don't know who did that, that's not me" that is an option.  The last resort is to call your chairperson, and have them do the envelope, vote it because that quiets him down, that gets him out, and it doesn't what? It doesn't count. He doesn't know that, does he? Does he?

Trainees:     No.

Miss Tyra:     No. He doesn't know that.

46.     This training struck me because I was not apparent to what the "six" days referred.  This was a clear and specific directive to mislead a voter in the event that the voter was

9

listed as having already voted absentee. While a voter that already voted absentee certainly should not be allowed to vote a second time, it struck me that there was a distinct possibility that an absentee ballot could be have stolen or the system was otherwise incorrect, and the proper procedure would be for all provisional ballots to be carefully reviewed, not simply destroyed. I would think all ballots, including rejected ballots, should not be destroyed in any event.

47.     In the October 15 training, we were advised of the process for issuing ballots to voters that were not listed in the poll book because they had only registered to vote in the past three days pursuant to the new policy that eligible people could register to vote up to and on Election Day. According to the training, the voter would "hopefully" have a receipt from the clerk's office indicating that he or she was a newly registered voter. As shown in the training manual on Page 17, the receipt would either direct the poll workers to issue a regular ballot, or a challenged ballot. No explanation was given as to why a voter would be given one or the other. The sample receipts shown in the manual did not appear to include security devices of any kind.

48.     It struck me that anybody could submit a forged document and be issued a regular ballot, which once inside the tabulator would be anonymous and irrevocably counted. After the training I asked other election officials if this was their policy as well. A township clerk, of Oakland Township, told me that her staff were directed to call the clerk to verify these receipts. The York Township clerk said she was embossing receipts with the township seal.

49.     The Detroit officials gave no indication that any such safeguards would be in place, and indeed, as noted above, we were actually advised that it would be difficult if not impossible to get ahold of a higher-level election official for any reason.

10

50. Also, in the City of Detroit trainings, the description of the ballot challenge process was bizarre both for what was said and what was unsaid. We were told that challenged ballots were not to be separated into a challenged ballots envelope.

51. Instead, we were to write the ballot number on the stub onto the ballot itself, cover up the ballot number with white Post-It tape, and feed the ballot into the tabulator. Upon knowledge and belief, this was a statewide policy. Knowing that tabulated ballots are kept in a locked transfer case that is only ever opened in the event of a recount, I concluded that all challenged ballots are presumptively counted and could only be un-counted later in the event of a recount.

52. What was *unsaid* in either training was when this should be done, other than in the event described above where a voter presents a late registration directing us to process it as a challenged ballot. In fact, we were advised in both trainings that poll challengers can challenge a process or challenge a voter's eligibility; however, it was indicated that unless we discovered an error on our part, we were to disregard to the challenge and process the voter as normal.

53. I posted the complete audio recordings of both trainings and the training material packets on the Web at: http://theadamd.com/affidavit/

54. The statements made at the training events compelled me to share this information with others. I provided the recording to individuals who became plaintiffs in a lawsuit against the Secretary of State and Director of Elections over the poll challenger social distancing requirement. The case was 20-000211-MZ in the Court of Claims, filed on October 23.

55. An emergency motion for temporary restraining order was heard on Wednesday, October 28. The hearing was published on the Court of Claims' YouTube channel, on the web at https://www.youtube.com/watch?v=wrosDhuGpYE. In the hearing, the parties announced that

11

they had reached a settlement to change the policy to allow for poll challengers to come within six feet of poll workers as needed to perform their duties. The settlement further stipulated that the State would "provide this amended directive to local election officials in a manner most likely to ensure timely receipt". The proposed final order is attached.

56.     I never told or trained that poll challengers could come within six feet to complete their work.

57.     On November 2, 2020, the day before the election, I logged into the poll worker website to find that I was now assigned to be a ballot box inspector at Precinct 366 located at Henderson Upper School at 16101 Chicago Street in Detroit. I wrote down the location but neglected to record the precinct number, erroneously thinking the street address was sufficient.

## ELECTION DAY NOVEMBER 3, 2020

58.     When I arrived at the school at 5:45am, I discovered there were polling stations set up for 5 precincts in the room. I located the polling site assessor, Caroline, who was in charge of the entire location. She was too busy to speak to me. There was no sign-in sheet, no list of who was assigned where, and nobody checked my credentials. After standing around uselessly for about 5 minutes, I saw a sign for precinct 374, which sounded right to me, and offered to help them set up. This precinct had two individuals, Eric and Keith, both serving as precinct chairperson for the day. I was the only one in the group assigned to be ballot box inspector, so I performed the job at that location for the entire day. At any rate, no other precinct appeared to be short-staffed.

We were given nametag stickers to wear throughout the day. Some were blue and some were red. While these were possibly intended to distinguish between Democrat and Republican poll

12

workers here were no instructions to use them as such, nobody appeared to be aware of the rule and it appeared that coworkers chose them randomly. The password for the tabulator was the date: "11032020." The passwords we used in our trainings had been the dates of prior elections, e.g. "08042020." I noted that the usage of the most obvious possible password, which was printed on the laminated instruction sheet attached to the tabulator anyway, essentially rendered this security device meaningless.

59.     As we began processing voters, it became immediately obvious that there no concern for voters' privacy, neither from the staff nor the voters themselves. The secrecy sleeves for the ballots were several inches too short for the paper, so I invariably saw the top few lines of every ballot as I tore off the stubs. About halfway through the day, we discussed this, and Eric or Keith decided we should re-fold the sleeve to make it cover the front side at the expense of coverage of the back, but ballots were often presented to me upside-down, backwards, or outside the sleeve altogether.

60.     On at least three instances, voters would enter another's voting booth to "help" the voter. In two cases it was a wife helping a husband; in another it was a mother helping her daughter.

61.     In the second instance, the husband's ballot was rejected by the tabulator, which refused to accept any ballots with stray marks or incomplete ovals, resulting in the need to spoil the ballot and issue a new one. After having spoiled the ballot, the wife, who had just completed her own ballot, took the husband's new ballot and simply completed the entire ballot for him.

62.     I asked our precinct chairpersons if it was proper for voters to be in others' voting booths and, in that case, voting for him. I was advised that family members are

13

permitted to help them vote. "Isn't that a problem for voter privacy?" I asked. "What if someone is being pressured by a family member to vote a certain way? Isn't the whole point of the privacy of a voting booth that a voter cannot feel pressured to vote a certain way?" They acknowledged I had a point but were pretty sure about the policy and continued to allow family members to "help" voters at their voting booths.

63.     Almost every voter entering the polling site carried and displayed leaflets, some for individual candidates and others that were "cheat sheet" instructions. We soon discovered they were very frequently left inside the voting booths for the next voter to find and began checking after each voter to retrieve and throw out the campaign materials.

64.     Upon taking my first break, I discovered that there were piles of campaign literature at the windowsill in the hallway, in the bathroom, and on the table next to the sanitation station. Outside the entrance, campaign workers were distributing the literature to voters as they entered.

65.     Unlike other locations I've worked in prior elections, there was no "100 foot" marking cone to indicate the limit from the entrance where electioneering was allowed. Furthermore, Michigan's election law requires campaign workers to be 100 feet from *all* building entrances, not just the main entrance, and the campaigners were less than 20 feet from another building entrance and 10 feet directly in front of an exit.

66.     I asked my precinct chairpersons about the voters displaying literature. "Isn't that inappropriate?" I asked. "Isn't that no different from a voter displaying a candidate's name and logo on his shirt?" I was advised that it was not inappropriate.

67.     Poll challengers arrived at our precinct at approximately 9:00am. We had received no revised guidance with respect to the 6-foot rule having been amended by the

14

Secretary of State, and nobody seemed aware of it. The poll challengers themselves spent most of the day at the far end of the check-in table, which was less than 6 feet from the wall.

68.     At approximately 3:00pm, our polling site was visited by Marian Sheridan of the Michigan Republican Party who saw the campaign literature in the polling area and stated, "They are not allowed to do that," she said. Marian requested that the precinct chairperson note in the poll book that most voters were displaying campaign materials inside the polling site, which I believe he did.

69.     We had at least one instance where I noticed a voter was issued a ballot who was not listed in the poll book. When I heard about this, I asked the Electronic Pollbook Inspector what had happened. She indicated that she was able to verify the voter's eligibility by visiting the Secretary of State website (mi.gov/vote) on her phone and entered the voter's information. She represented that the voter was listed on the website as being registered in the precinct. She said he was added to the poll book as a registered voter not in poll book and was given a regular ballot.

70.     After the polls closed at 8:00pm, we began shutting down the precinct and began the process to close the ballot box. This involved connecting a modem to the machine to transmit the results to the city and the county. The machine appeared to connect and transit the results successfully to the Wayne County clerk's office; however, it repeatedly failed to transmit the results to the City of Detroit. We eventually gave up, reasoning that the tabulator tapes would be delivered to the Receiving Board anyway.

71.     Because I was working at the ballot box, I could not see how many voters throughout the day had been listed as having already been issued absentee ballots. As we closed the poll, I saw what appeared to be about 12 orange slips of paper that were affidavits that the

15

voters did not have absentee ballots to surrender to the polling place. 199 people voted, and at least 5% of those people had also received an absentee ballot. However, we received zero returned absentee ballots.

72. Having worked in several elections in many counties in Michigan, it is my opinion that certified fraud examiners are needed to audit this election, including but not limited to the following anomalies:

 a. Poll workers were trained to strictly enforce social distancing rules upon challengers, contrary to a legal settlement, knowing challengers will not be able to view the processing and duplication of ballots.

 b. Poll workers were advised to deceive voters who may have been subject to errors or stolen ballots by issuing fake ballots that would be destroyed by the Department of Elections.

 c. The poll worker hiring process made it extremely difficult for the general public to apply, and the high propensity of teenagers employed as electronic pollbook inspectors and only electronic pollbook inspectors strongly suggests that poll workers were recruited in an unknown but clearly specific and possibly targeted manner.

 d. Ballot privacy was completely disregarded throughout the precinct on Election Day.

 e. Prohibitions on electioneering within 100 feet of and inside polling places were completely ignored.

 f. Absentee ballots previously issued were not reclaimed.

16

g. Workers were trained to add voters to the rolls and issue regular ballots to those that present an unverifiable paper receipt with no security devices.

h. Workers were trained to resist the challenging of ballots and even challenged ballots were to be tabulated at the polls, and therefore could not be removed from the total except in the event of a recount.

_A de Angeli_ (signature)

Adam de Angeli

On this ___ day of November, 2020, before me personally appeared Adam de Angeli, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

Name of Notary Public: Shane Trejo

_____ County, Michigan

My Commission Expires: _____

SHANE TREJO
Notary Public, State of Michigan
County Of Oakland
My Commission Expires 11-20-2022
Acting in the County of OAKLAND

17

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

ANGELIC JOHNSON and SARAH STODDARD,

Plaintiffs,

v.

JOCELYN BENSON, in her official capacity as Michigan Secretary of State; and JEANNETTE BRADSHAW, in her official capacity as Chair of the Board of State Canvassers for Michigan,

Defendants.

No. 1:20-cv-1098

Hon. Janet T. Neff

## DECLARATION OF JOHN McGRATH

I, John McGrath, make this declaration under 28 U.S.C. § 1746 and based on my personal knowledge and upon information and belief where noted.

1.    I am an adult citizen of the United States and a resident of Michigan.

2.    I volunteered to be an election challenger for a non-partisan group for the November 2020 election.

3.    On Wednesday, November 4, 2020, I worked at the TCF Center in Detroit.

4.    At around 3:00am, tens of thousands of absentee ballots arrived from Wayne County. Upon information and belief, these ballots were received after the election deadline of 8pm on November 3, 2020.

5.    During the counting of these ballots, and the ballots I observed being counted on November 4, 2020 until the time I left at 9:30pm, I saw numerous ballots assigned to "Unlisted Voters."

- 1 -

6.     Unlisted Voters are ballots with names of people not registered on any absentee voter list and yet these ballots were all being counted the same as those voters who were registered.

7.     The Unlisted Voters had no dates of birth in the system in contrast to the registered voters who already had Dates of Birth either the electronic poll book or on the paper supplemental sheets.

8.     Workers continually entered the default Date of Birth, January 1, 1900, into the computer system in order to process these votes.

9.     There were an inordinate number of Unlisted Voter ballots.

10.     I witnessed election supervisors lock volunteers and republican challengers out of the counting room at TCF Center.

11.     I was able to enter the counting room at around 6:30 pm.

12.     I saw ballots being processed for Absent Voter Counting Board (AVCB) #73 without any election challengers present. AVCB #73 had nearly completed their work when I reached their table.

13.     I challenged three of the last few ballots that were being processed.

14.     The Election Supervisor of AVCB #73 asked me why I was challenging the initial ballot. I informed her that it is an "Unlisted Voter" who is not registered on either the electronic nor paper list/roll of registered voters. She said, "Ok" and instructed the poll worker at the laptop computer to make note of the challenge for that ballot. I also wrote down the names on the ballots and the ballot numbers I challenged on my report.

15.     Since there were no more ballots at County Board #73 at that time, I looked around for another table working on ballots. I eventually noticed another AVCB where

- 2 -

election workers were again processing ballots with no election challengers present. This table was AVCB #56.

16.    I went over to the monitor to see what AVCB #56 was working on and saw they were processing the ballot for yet another "Unlisted Voter." I immediately informed the Supervisor that I was challenging this ballot. She asked why, and I told her.

17.    While I talked with the Supervisor, the poll worker started working on the next ballot which was another "Unlisted Voter." I informed the Supervisor that I was challenging this ballot too for the same reason. Then the next ballot was also "Unlisted Voter," and I informed the Supervisor again that I was challenging this ballot.

18.    The Supervisor then told me that I don't have to keep telling her I am challenging each ballot and that she would note that I am challenging these and all subsequent "Unlisted Voter" ballots. I affirmed to her my challenge of all "Unlisted Voter" ballots for this AVCB. She said she would have this noted.

19.    Although the Supervisor agreed to do this, I continued to write down the names and numbers of "Unlisted Voter" ballots that kept appearing. While doing so, I was approached by a woman who asked why I was challenging these ballots. I asked who she was, and she identified herself as a Democrat election challenger. I told her the reason why I was challenging all the "Unlisted Voter" ballots for AVCB #56. She started telling me why she thought the ballots should be processed but while I listened to her, I missed the ballot number of the next "Unlisted Voter." I asked the Supervisor for this number since the last two digits of the ballot numbers were hidden on the computer monitor. The Supervisor refused to tell me the ballot number that I had missed.

20.    "Unlisted Voter" ballots kept appearing, one after the other.

- 3 -

21.     I tried to notate the ballots, but I was again approached by a man in a business suit who introduced himself as a lawyer with the Democrat party. The man asked how I was credentialed. I explained that I was with a non-partisan group. He then told me that the challenges I was making will not amount to anything. These two individuals tried to engage me in conversation in an effort to distract me from notating the "Unlisted Voter" ballots that poll workers were processing very quickly.

22.     At this point, I had noted approximately two dozen "Unlisted Voter" ballots that were processed at AVCB #56. I was again approached by a challenger with the Democrat party. She asked me who I was with. I explained that I was with a non-partisan group. She then accused me of being a Republican. It was another attempt to engage me in conversation and distract me from documenting challenges.

23.     A large number of ballots were being processed very quickly, so it was impossible for me to catch all "Unlisted Voter" ballots.

24.     I do recall clearly that one of the "Unlisted Voter" ballots at this AVCB came from Saginaw, Michigan which is not even in Wayne County.

25.     When AVCB #56 got to the end of processing these ballots, I noted that the total number of ballots processed was 1,454.

26.     Due to COVID-19 regulations, I stood far away from the table with the election workers and the table supervisor would not let me use the corner of the table nearest me to write on. However, I frequently saw the Supervisor standing closer to the poll workers than I would have been had she let me use the corner of the table nearest me to write on.

27.     In hindsight, I question whether my challenges of "Unlisted Voters" for AVCB #56 were notated as the Supervisor indicated they would be.

- 4 -

28. If they were not notated as the Supervisor indicated they would be, it means my challenges were not handled in good faith.

29. The above information is true to the best of my information, knowledge, and belief.

30. Further affiant says not.

_____
John McGrath

On this 20th day of November, 2020, before me personally appeared John McGrath, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

CONSUELA MAYS
NOTARY PUBLIC - MICHIGAN
WAYNE COUNTY
MY COMMISSION EXPIRES APRIL 01, 2025
ACTING IN WAYNE COUNTY

_____
Notary Public, Oakland County, Michigan
My Commission Expires: April 1, 2025

_____
John McGrath

- 5 -

RECEIVED by MSC 11/26/2020 2:44:13 AM

## AFFIDAVIT OF WILLIAM CARZON

*William Carzon, being first duly sworn, hereby declares under penalty of perjury:*

1.  I am personally familiar with the facts stated in this Affidavit and, if sworn as a witness, am competent to testify to them as well.

2.  I am an adult citizen, resident of Plymouth Township, *and a registered voter of* the State of Michigan.

3.  I voted in the November 2020 Presidential Election.

4.  I volunteered and was certified to be a Republican poll challenger during the absentee ballot counting on election night November 3, 2020 at the TCF center in Detroit, Michigan. I volunteered to participate as a poll challenger from November 3, 2020 starting at 10 pm through November 4, 2020, until 5:00 am.

5.  On November 3, I arrived at the TCF center at around 9:30 pm and proceeded to room number 260 where I was given further instructions on the layout for each of the absentee ballot counting board groups, each consisting of 5 inspectors (if fully staffed). At approximately 10 pm I proceeded the floor of the TCF center where the counting would take place. I presented my credentials in the counting board room and spent a significant part of my time at table 18.

6.  Counting began shortly after that time and I watched the process at table 18, first paying attention to the label scanning, name and ballot number announcement (operator 1) and verification of the name/number (operator 2) on the ballot. In general, table 18 followed this communication process but it was

1

RECEIVED by MSC 11/26/2020 2:44:13 AM

not always easy to hear the confirmation. I also took the opportunity to walk to other counting stations throughout the night and I did not see that this discipline of announcing the name and number between operator 1 and 2 always being consistently followed.

7. During the night, on two occasions (at the start of the 10 pm shift and again later in the night), the counting board supervisors working at the TCF center were called over the TCF announcement system to meet near the front of the hall.

8. On two occasions during the night, I followed operator 5 at another counting board group as he took the ballots to a tabulator station in the center of the hall to be counted. I saw the ballots fed through the tabulator machine on at least two occasions multiple times. It is not clear if there was a count mismatch requiring the ballots to be re-run through the tabulator, and I could not clearly see that if there was a count mismatch, that the tabulator was zeroed out before re-running them.

9. On one occasion at a tabulator station, after the person operating the tabulator had run the ballots through the tabulator provided to her by operator number 5, she handed back one ballot to operator number 5 who originally brought the ballots from his counting board station to be counted. He took the ballot and then proceeded to walk back to his counting board table. I am not certain why a ballot would be handed back, and understood that after the ballots were run through the tabulator and the count matched, the ballots that were run through the

2

tabulator were all to be stored in the security boxes directly behind the tabulator stations for the given precinct.

RECEIVED by MSC 11/26/2020 2:44:13 AM

10. Between approximately 1am to 4am, the counting taking place at the TCF center was at a standstill at many tables. I observed some counting board tables where some operators had their heads resting on their tables during this slow time without ballots to process. I also observed some operators at the tabulators similarly with their heads resting on their tables. I also witnessed one tabulator operator towards the back of the floor playing some sort of card game on his computer/tabulator screen. This was also witnessed by my son and another acquaintance that we both know.

11. At around 4 am, a truck arrived at the back entrance of the TCF center hall. I walked to the back of the hall to the large door opening and witnessed a white truck which had an emblem with a flag and the words *Vote Mobile* written on it. My son, who was also a poll challenger at TCF during this time, also witnessed this as we were standing together for a short time watching the truck being unloaded. White postal boxes were being taken off the truck. The white postal boxes were similar to those holding ballots that were also at the various counting board tables throughout the hall. The boxes that were unloaded from the truck had a cardboard wrap sleeve around them. I saw boxes being unloaded from the truck and placed on a dolly and rolled over to the center of the TCF hall where they were placed on tables next to the main stage area. The tables in this area

3

did not have similar boxes on them when these new boxes arrived. I was able to roughly count the boxes from the truck which were placed on the tables and estimate that approximately 60 boxes were unloaded from the truck from that 4 am delivery. When the cardboard sleeve was removed from the postal boxes, the individual manila envelopes used to hold absentee ballots could be clearly seen. Shortly afterwards, over the TCF speaker/announcement system, specific counting board tables were called up and representatives then came up to get their "additional work" as it was announced over the speaker/ announcement system. I witnessed a person who distributed the ballots, handing them out to some of the respective counting board representatives who were coming up to pick them up.

12.    The above information is true to the best of my knowledge, information and belief.

13.    Further affiant says not.

Dated: _November 21, 2020_          _William Carzon_

William Carzon

Subscribed and sworn before me on:
_November 21_____, 2020

(s) _____
Notary Public, State of Michigan, County of _WAYNE_
My Commission Expires: _06/20/2025_
Acting in the County _WAYNE_

GAIL M BERRY
Notary Public - State of Michigan
County of Wayne
My Commission Expires Jun 20, 2025
Acting in the County of WAYNE

4

State of Michigan )

County of Oakland ) Sworn Statement

1. My name is Kayla Toma, I am a law school graduate, a US citizen, an Oakland County resident, and registered voter who resides in Novi, MI.

2. On Election Day, November 3, 2020, I was a volunteer for the Michigan Republican Party and Trump Campaign in Lansing at the Radisson hotel. I signed up for the 12 to 3 PM shift, but ended up working until 12 AM.

3. At the headquarters, I filled out incident reports. I would get calls and emails relating to poll challengers, poll watchers, or concerned voters that called the EDO hotline to report an incident or something that they saw as suspicious.

4. I made notes about incidents as quickly as possible. I was able to receive and note scores of unlawful incidents and report them to the on-site attorneys.

5. If there was a clear violation of election law, I would walk over to the two supervisors, give them a quick description of the incident, and they reported it to the lawyers.

6. Our written reports contained blanks for description of the incident, name, phone, township or city, county, polling location, category of incident (illegal voting, intimidation, electioneering, ballots, machines, election workers, etc.), as well as what was the remedy/response (if any).

7. While making these reports, I began seeing a pattern and frequently encountering illegal situations, and other strange situations, that were very concerning and stuck with me.

8. The following is not an exhaustive list of the reports that were made to me as an EDO Hotline operator, but these stuck out as highly questionable or concerning:

9. During a challenger's shift at the polling location, the election worker preemptively shut down the machine, prior to any malfunction or jam. The election worker, after being approached by the challenger, told the challenger that they could just tell when a machine is about to jam so they were allowed to do this.

10. There were several reports of polling places with their malfunctioning machines

11. While the machines were down in various areas in the morning, afternoon and evening, concerned voters began calling to verify if it was OK that they are being told by election workers to place their ballots in the back of the machine even though the ballots were within reach and could be easily pulled out after they left.

12. Other callers, at separate polling locations, had similar concerns. Instead of putting their ballots in the back of the machine, they were required to place their ballots in a blue square clear bag located just behind the machine.

13. In Detroit, after attempting to enforce the rules re. a provisional ballot, a challenger was met with a hostility by election workers—the challenger pointed out the hostility and they then refused to allow the challenger to see the poll book.

14. Similarly, several challengers were not allowed to stand behind the election workers and were blocked from seeing poll books.

15. In one situation, a challenger was extremely upset that she was told she had to be 10-15 feet away and could not see the poll book. She requested a lawyer to come out right away. Poll workers then became aggressive and bullied her by saying that she was blind for not being able to see a poll book 10-15 feet away from a diagonal angle, and even threatened to have her arrested.

16. In different polling locations, there were several calls made about clear violations of the 100-foot rule. There were posters, pamphlets, and banners, explicitly advocating for Democratic candidates within 100 feet of the front door. The challengers/voters that I spoke with took photographs and videos of these violations, including incidents of literature distributed at the door, pamphlets of lists of Democrats that the voter should vote for within 50 feet of the door, and large Democratic boards and banners within 100 feet of the door.

17. Poll challengers or Republican voters reported a water pipe broken in a precinct. (I heard that in other states water pipes were breaking in Republican districts.)

18. There were several calls from challengers and voters claiming that voters were required to use permanent markers on the ballot; one voter observed that the marker bled through to the back of his ballot, allowing duplication of on the ground that this was a "mistake" by the voter.

19. One caller reported containers/coolers in the polling location which could have contained ballots.

20. One voter reported that Googling "Republican Party near me" and "Republican Party number near me," showed only Democratic hotlines. It wasn't until she searched MI GOP on Facebook that she got the number.

Kayla Toma

Sworn to before me this 13 NOV, 2020

day of November 2020

INDERPREET NANCY
Notary Public, State of Michigan
County of Wayne
My Commission Expires 01-
Acting in the County of

State of Michigan )

County of Oakland ) Sworn Statement

1. My name is Kayla Toma, I am a law school graduate, a US citizen, an Oakland County resident, and registered voter who resides in Novi, MI.

2. On Wednesday, November 4, 2020, I received an email from Nicholas Schneider, Michigan Republican Deputy Coalitions Director in Michigan to volunteer.

3. I signed up to be a canvasser in Oakland County, Michigan.

4. On Nov. 4 at about 12:00 I arrived at the 1200 Building in Pontiac, Michigan. At 12:05, I found the Oakland County Elections Office. I told the front desk person that I that I was a canvasser.

5. Inside the office, I noticed a long line and stock pile of boxes, and bins that were stacked on top of one another. The bins were overfilled with folders.

6. The front desk lady showed me two sign-in sheets that were side-by-side. The left side, I was told, was for the general public, whereas the right was for the employees who would be reviewing and deciding on the reports. I signed in at 12:09, but I never signed the time that I left. (I have evidence of the sign-in sheet).

7. The canvassing room was huge, at least 100 feet long. There were five people having lunch close to one another.

8. There were two African females; one younger Caucasian female with dark hair; one older Caucasian female, with a blue shirt, red vest, and light-colored hair that was short; and one husky Caucasian older male.

9. Initially, (I have a video) the rooms were divided by sections of rows; at the end of the room and along the back walls, there were 5 office desks.

10. By the time I left, the room changed drastically. There were no more sections or tables--only chairs pushed to the walls and employees working at their desks at least 100ft away. One desk was 50ft away, so far that I could not observe anything or hear what was said or whispered.

11. The following is the layout (I have photos and videos of the layout) of how the room looked initially:

12. There was at least one chair for every table. There was plexiglass that divided each table. There was at least six tables for each row (3, side-by-side).

13. Each row was long, and there were seven rows. Two rows were laid out on the right side of the room, directly when you walk into the room. Two rows were going vertically: one of those rows were where the employees were eating their lunch.

14. One row was in the near middle to the left side of the room; and two rows were on the left side of the room.

15. Five out of the seven rows had election materials on them, either they were folders, papers, and pencils and highlighters, and they also had very large bins stuffed to the top with large folders right next to the table or on top.

16. When I sat down, I pulled out my phone to take a picture. The older Caucasian female in the vest struck up a conversation with me. She told me everyone was at lunch and that they will not begin working for another 40 minutes. She suggested that I should to leave and return later. She told me it was going to be boring to observe. I said no thanks, I'd wait. She then asked me who am I here with, I told her that I am here as a volunteer to observer as a member of the public. She then asked again, who am I here with, and I replied that I was a Republican volunteer to observe as a canvasser. I could tell that the answer did not sit well with her because she began to get defensive and her mood switched. She then repeated that they were not going to start for another 40 minutes. And I said I'll wait, that I did not mind.

17. Shortly after the exchange, two other Caucasian females, middle-aged, came into the room. I noticed that the person in the red vest, looked at me and then went to those two females who then began whispering and huddling in a pack. One of the females had a manila envelope in her hand. I thought they were acting suspicious; their body language told me that they didn't like me there. So, I took pictures of them. One other woman said that she took a picture of us.

18. As they formed their group, I noticed another group come in. This time it was a group of men. The vested woman ordered him to break down the tables and put it on the outside of the side of the room. She told him to take away the plexiglass.

19. I asked one of the guys what they were doing, and then asked him how was I supposed to observe? He didn't like what was happening. (I have a video) he then walked over to the husky man. The husky man then walked over to me.

20. The husky man (recording number 348,1:35) told me that I needed to contact Rocky (Rajkowski), whom I knew to be a member of the Oakland County GOP.

21. The husky man stated that since we didn't get tables, we had to sit in the chairs, and then I asked how was I supposed to review (observe) the documents and then he said "you don't get to! This isn't what this about. Rocky has been here this morning, to straighten that out. He left with a clear understanding of the process." He told me that I needed to check in with Rocky. I told him that I do not have his contact information, and if he's willing to give it to me, and he said no.

22. I explained that I was unfamiliar with the process and that I did not have Rocky's number, and asked if there were a particular rule that I should be aware of.

23. The husky man then told me that "the people who sent me should have prepared me." I said that I understood, and asked for a particular rule, and he told me MCL 160

24. After looking this rule up on my phone, I realized that the husky man was intentionally trying to undermine my right to observe since there is no election law under MCL160. I turned on my camera and began recording them breaking down the tables and stacking up the chairs instead.

25. I made sure my chair was not going to be touched, by sitting in it, while it was already dragged off to the side and against the wall.

26. I contacted Mayra Rodriguez, who was involved with the 14th Congressional District. I told her at 12:44 that they were taking tables away, while everyone was out to lunch. She told me that she would let others know. I text her at 12:52 when I spoke with the supervisor, Ellie (or a name that is similar to it), who claimed that the tables were rentals, but they were never taken from the office. They were still on the side of the room off to the side, even at the time I left at 2pm. The tables were there for 2 hours, so they did not appear to rentals.

27. Before they began but after they broke down the tables, an older lady in navy-colored outfit, also a public observer, came back from her lunch break and sat near me. She told me that she was with the League of Women Voters of Michigan. (I have a recording of this conversation, recording number 349, 5:06). She said that the tables were a waste of space and it was good to have it removed because of Covid.

28. She attempted to say that they removed the tables because of social distancing. I said that social distancing meant 6 feet, not 20 feet, apart. I said that plexiglass dividers protected people. Observers were simply unable to observe.

29. Before lunch, the tables were set up, and used by everyone, but when I came at noon, after stating my political affiliation, the guys were called to break down the tables, and cleared out the room. I was fed up. I went out of the room and into the office area.

30. I recorded a conversation with the receptionist, Andie (or Angie or Addie) (I have this recording, recording number 350, at 1:20) Andie was at the front desk.

31. I approached Andie to ask if they are having the chairs placed on top of each other, or against the wall, where the observers were supposed to review the reports, as the distance they wanted was at least 100 feet between my seat and where the workers and reports were. I asked how I was supposed to observe from 100 feet away.

32. Andie stated that "you can't be on top of them." I told her that it is not my intention to be "on top of them" because I have a very low immune system, and even showed her medical proof

33. Andie became sympathetic. I explained that I understand there's high stress levels, hostility, in the workers who may resent that I was judging or checking their jobs, but that was not my intention. My intent was to volunteer to make sure that there was a lawful election.

34. I explained that this was the law. I also apologized to her in advance for asking more questions.

35. She then explained the process: at the end of the night, there was paperwork that each polling location required, including canvass reports. Everything had to be complete, signed properly, and votes balanced—all this was to be recorded.

36. I told her that they wanted me against the wall, with no tables in their room, with workers at their desk at the very end of the far side of the room. I couldn't see what is going on.

37. I said that they wanted me 100 feet away, so I could not observe, just try to listen.

38. Andie then introduced me to Ellie, who was "the second in command to the director". Ellie was a supervisor of the whole office.

39. I asked Ellie what happened if I could not observe or even hear discussions? The workers were whispering and barely talking.

40. Ellie told me that workers do not have to discuss the reports; they could unilaterally decide discrepancies, and correct them on the report that is within the report, without discussing it amongst their peers. I asked if they were going to at least call out the information on the reports and she told me that I wouldn't get to know the numbers, and they didn't have to tell me or discuss anything.

41. I asked why I should be there, i.e. what was the point of having a law for observers to observe if they could not hear or see anything. She couldn't answer this question. I realized that they were all following a pattern. Indeed, she went right back to talking about Covid. In addition, I thought that it was odd that the courthouse could not afford tables and had to rent them. It didn't make sense. Nevertheless, I went back into the room.

42. I heard the lady in the red vest tell the African-American female worker to add two points.

43. Immediately, I walked outside to find Ellie to ask her one last question. Andie told me Ellie is not in her office. Andie told me to tell her my question so she can rely it to Ellie since she is going to go look for her now. I stated to Andie, my question is whether I could ask questions to a person reviewing the reports, i.e. elaborate, after they made a remark? (Recording 352).

44. Ellie answered the question, according to Andie, who then relied that answer. Andie told me that I was not allowed to talk to them. I was not allowed to ask any questions nor obtain any information.

45. At this time, I was so fed up that I texted Mayra and a family friend, saying that I needed a lawyer because I knew these were blatant violations

46. I also then called Rocky and told him what the workers were claiming. I told him I was leaving because they would not let me hear or know or see anything. I walked out of the room. I told Rocky how they told me that I was unable to view any reports, they didn't need to talk to each other and could unilaterally decide and correct incorrect canvassing reports on their own.

47. I left the room about four times. Whenever I walked out of the room, the older lady in the red vest always followed me. I was being watched. She was listening to my conversations and watching what I was doing

48. Before going on one restroom break, I placed my purse on the chair and left the room and the office. When I came back into the office, the doors were locked. I looked and pointed at the door after seeing Andie, who opened the door. The lady in the red vest was nearby. She seemed annoyed, and I noticed that two blue coolers that once were placed on top of each other were moved side by side.

49. By the coolers there was a black box that look like a drive or a modem. When the coolers were set side by side, the black box was in front.

50. I believe it was odd that coolers were used because everyone brought their own lunch, and in their own lunch bags. (please see videos of break-down of tables). They never went to the coolers while I was present. I believe that other items, not the regular drinks or food, were kept in the coolers

Kayla Toma

Sworn to before this   13 NOV. 2020

day of November 2020

INDERPREET NANCY
Notary Public, State of Michigan
County of Wayne
My Commission Expires 01-06-2027
Acting In the County of _____

Affidavit of Witness - Michigan

I, ___Lynn Mills___, a resident of the ___Livonia___ (city/town) of Michigan, make oath and hereby affirm that:

1) I am a resident and voter of the state of Michigan, and reside at, ___3 8415 Plymouth Rd___.

2) On [date] I applied through [online?] to be a paid poll inspector with Wayne County and specifically in the city of Detroit in at TCF Center;

3) I noted that I was a republican;

4) I had email correspondence with ___unknown___;

5) I never received a call-back or offer to serve as a poll challenger.

I certify under penalty of perjury, that my statement and the evidence submitted with it, are all true and correct.

Printed Name: ___Lynn Mills___

Signed Name: ___Lynn Mills___

Date: ___11-3-2020___

Matthew Mikolajczak

PH#: 734-513-9780

Email: MattM-ERI@att.net

Zip Code: 48375

State: Michigan

County of Incident: Wayne

Name of polling place: TCF

November 3rd – 7:00 am to 10PM shift

Incident #1

Opening announcement - "how many republican poll workers are here?   From where I was standing - Board #41  - I could not see even one raised hand.   There was not a republican worker to be found at the board tables near or around me.   My wife and I had volunteered to be republican poll workers and were told poll workers were no longer needed. As there were 134 boards at TCF – there should have been at least 134 republicans assigned as poll workers with one seated at each of those boards.

The 25 tabulator machines required two poll workers as well – so an additional 50 poll workers – 25 which should have been republicans.   The tabulator actually counts the ballots – and there was no equal representation at these sites.

With this obvious unfair worker representation – how was counting even allowed to take place?

The Michigan SOS claims there was equal representation – where is the proof or list of republican poll workers?  As I understand it now - the assistant of the ex- mayor of Detroit filled these poll worker positions.  My wife and I ended up working at TCF as poll challengers.

*Matthew Mikolajczak*

*Daniela Verber*

DANIELA VEBER
NOTARY PUBLIC, WAYNE COUNTY, MI
My Commission Expires 06/15/2025
Acting in the County of _OAKLAND_

Matthew Mikolajczak

PH#: 734-513-9780

Email: MattM-ERI@att.net

Zip Code: 48375

State: Michigan

County of Incident: Wayne

Name of polling place: TCF

November 3rd — 7:00 am to 10PM shift

Incident #2

11/3/20 at 8:07 AM

Board #41 board monitor was flashing "Backup Overdue!" in RED LETTERS right hand lower corner of monitor. This message was not occurring on surrounding board monitors - just this one. I told board supervisor - Tonya Anderson - she said she would inquire with IT. I never got a response as to why this was happening. Later in the day I noticed multiple monitors flashing same message on other nearby board monitors.

11/4/2020 11:38am - flashing message "Backup Overflow" on most board monitors.

*Matthew Mikolajczak*

*Daniela Veber*
**DANIELA VEBER**
NOTARY PUBLIC, WAYNE COUNTY, MI
My Commission Expires 06/15/2025
Acting in the County of _OAKLAND_

Matthew Mikolajczak

PH#: 734-513-9780

Email: MattM-ERI@att.net

Zip Code: 48375

State: Michigan

County of incident: Wayne

Name of polling place: TCF

Incident #3

11/3/20 at 10:26 am

Board #41 monitor pop up – Microsoft has prevented a hack attempt. I went to area supervisor – Tonya Anderson and showed her (she witnessed) and she proceeded to get IT worker to view. By the time IT arrived pop up was gone. Darrell Finken was the area poll challenger and was made aware of the Microsoft message (message gone by time he arrived), Raphael Washington was the team leader of the board.

Jean Kordenbrock – Trump lawyer - was made aware of incident and was present at board #41 ( message had vanished before she arrived). I was asked if I would sign affidavit and I said I would. I gave my contact info to Trump legal team. The supervisor – Tonya Washington verified she had seen the message. Tonya said it was just the firewall protecting the system and she sees this all the time with her home computer. Tonya mentioned the message said prevented – so nothing to worry about. She has Norton on her computer at home and it works just fine. Issue is why were these board computers on a non local, secure intranet system? I asked IT tech and he said he only worked on tabulator network and had nothing to do with board network.

*Matthew Mikolajczak*

*[signature]*
DANIELA VEBER
NOTARY PUBLIC, WAYNE COUNTY, MI
My Commission Expires 06/15/2025
Acting in the County of _OAKLAND_

Matthew Mikolajczak

PH#: 734-513-9780

Email: MattM-ERI@att.net

Zip Code: 48375

State: Michigan

County of Incident: Wayne

Name of polling place: TCF

Incident #4

11/3/20 Tabulator ICC10 , AVCB # 46 , 3:50PM

Multiple batch runs of what appeared to be same ballots 2/3 times.  I couldn't see software being zeroed between runs and the operator - refused to let me see count – intrusion of her space.

4:08PM   Operator was pulling ballots from jam midstream – not zeroing and just continuing runs.  Multiple batch jams – ballot reshuffles with pulling and placing of ballots into stack and midstream restarts.   Over counts and under counts – from what I could occasionally see from six feet away.

*Matthew Mikolajczak*

*Daniela Veber*

DANIELA VEBER
NOTARY PUBLIC, WAYNE COUNTY, MI
My Commission Expires 06/15/2025
Acting in the County of ___OAKLAND___

Matthew Mikolajczak

PH#: 734-513-9780

Email: MattM-ERI@att.net

Zip Code: 48375

State: Michigan

County of Incident: Wayne

Name of polling place: TCF

Incident #5

Nov 3rd, 2020

At around 4:30PM the TCF poll lead came over the loudspeakers and asked for our attention. He congratulated us on having processed 60,000 ballots from the opening (which didn't start until around 10am). Shortly thereafter ~5:00PM - about 40% of the counting floor workers headed for the upstairs break area for lunch/dinner and refreshments.

At around 7:00 PM I heard that the count was now at 128,000 ballots processed. How could 68,000 additional ballots get processed in 2.5 hours - with a reduced work crew? It took 6.5 hours to process 60,000 earlier?

The floor was starting to shut down at 7:15pm for supposed cleaning and many poll workers were actually putting coats on leaving - not through the front doors but via the upstairs refreshment room escalator - well before their 8:00PM scheduled work end time. After around 10/15 minutes of this mass exodus, the TCF lead came over the loudspeaker system and had to warn them to stay at their boards or they wouldn't get paid. Some workers came back down to their respective boards via the escalator from the upstairs break area. On Wednesday –when I exited from those upstairs doors because of the crowds, chanting and window covering going on at the front entrance - I realized that the upstairs area had public access doors people could exit from - or potentially bring stuff in with them - under coats or in lunch coolers. I don't know if anyone was watching those upstairs doors – be it TCF security, poll watchers, poll challengers or police. Definitely a potential breach of sequester policy and an open opportunity for ballot fraud.

*Matthew Mikolajczak*

DANIELA VEBER
NOTARY PUBLIC, WAYNE COUNTY, MI
My Commission Expires 06/15/2025
Acting in the County of OAKLAND

Matthew Mikolajczak

PH#: 734-513-9780

Email: MattM-EIII@att.net

Zip Code: 48375

State: Michigan

County of Incident: Wayne

Name of polling place: TCF

Incident #6

11/4/20  from 11:30AM to 4:30PM

Observed new, hostile attitude by most poll workers – even negative verbal comments.   Lots of workers demanding to stay six feet away – telling me I had to stay six feet away.   I used the paper saying we were allowed to get closer to review the counts – but workers seemed to block screens and impede monitoring at every opportunity.   Tabulator supervisors were NOT helpful and claimed the same six foot distancing demand.   After I stood my ground, showed them paper explaining our rights - they left.   I believe these people were trying to intimidate new people that were not aware of their rights to get closer than six feet.   Democrat lawyers, there everywhere on Wednesday, were also interjecting (harassing) me for trying to read the tabulator counts.   They called security and the tabulator operator – much to my surprise – told security I was only doing my job and he left.   Then supposed poll watchers ( they had no credentials I could see) – basically young women agitators began harassing me and another tabulator watcher saying we were spreading covid  (verbal harassment and intimidation)– I showed them my paper stating our rights and told them to stand away from me.   After the agitators left my wife and I were watched by two democrat lawyers for over an hour standing directly behind us while we were trying to monitor the tabulators.

In general, they were removing jammed ballots and just continuing on with the runs.   We were told they were supposed to remove the jam, reset the tabulator and run the entire stack.   That was not the procedure that was being followed at TCF – either day I worked there or at any tabulator site I watched.

I also noticed – way to frequently, the jams occurred at ballot 27 in the count (on different tabulator machines, different operators).   The operator would remove the jam – usually a dog eared corner on the document or left over piece of removed top ballot – and then just proceed with the count.   I could not get close enough to see what the vote on the dog eared ballot was (Trump or Biden) – but this scenario sure occurred way too frequently.   I wondered if the board people were purposely dog earring the ballot to create the jam and get the Trump vote removed.   A fellow poll challenger said he observed there were typically about 1 or 2 Trump votes per batch he could he discern while watching the boards.   Were these the ballots purposely used to jam the tabulators?   I don't know and I was not allowed – stopped by supervisors - to talk to the operators or ask questions of them.   I did notice the one performance indicator was at 46/47 – meaning – I think - the average run was 46 or 47 ballots.   The batches were supposed to be 50 ballots – so, if this was the case, these machine count averages weren't very good.   Or were the Trump ballots not being counted ……   I don't know.   Would have helped to have the tabulator user manuals available at poll challenger training sessions so we understood what we were watching and what tampering could have been going on.

JANIELLA VEBER

NOTARY PUBLIC, WAYNE COUNTY, MI

My Commission Expires 06/15/2025

Acting in the County of _OAKLAND_

Matthew Mikolajczak

PH#: 734-513-9780

Email: MattM-ERI@att.net

Zip Code: 48375

State: Michigan

County of Incident: Wayne

Name of polling place: TCF

Suggestions:

NO BLACK pens or markers should have been allowed on the counting floor – just like phones/cameras or any communicating electronics. Red pens should have been used for any administrative purposes stopping board workers from filling in Biden on republican straight ticket ballots and allowing challengers and watchers to be sure no candidate selection tampering was occurring.

Tabulator screen counts, control buttons, should have been done in much larger, bold fonts allowing for observation from 10 feet minimum. Control buttons presses/selections should have been shown in writing on screen for at least 5 seconds (again bold and very large font). Tabulator screen wasn't even 20% utilized – making any monitoring impossible from more than a foot away. Ridiculous.

Need a mandate that every tabulator be manned with one republican and one democrat.

Tabulator user manuals should have been available at training sessions. When the workers are not allowed to answer questions and poll watchers/challengers not allowed to talk to workers – very difficult to credibly watch what is happening and why.

*Matthew Mikolajczak*

*Daniela Veber*

DANIELA VEBER
NOTARY PUBLIC, WAYNE COUNTY, MI
My Commission Expires 06/15/2025
Acting in the County of _OAKLAND_

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

MELLISSA A. CARONE,

                Plaintiff,

-vs-

CITY OF DETROIT: DETROIT ELECTION

COMMISSION; JANICE M. WINFREY, in

her official capacity as the CLERK OF THE

CITY OF DETROIT and the Chairperson of

The DETROIT ELECTION COMMISSION;

CATHY M. GARRETT, in her official

Capacity as the CLERK OF WAYNE COUNTY

BOARD OF CANVASSERS,

                Defendants,

_____/

**AFFIDAVIT OF MELLISSA A.**

**CARONE**


FILE NO:_____-AW


JUDGE

BOBBY TENORIO
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WASHTENAW
My Commission Expires February 19, 2021
Acting in the County of Wayne

David A. Kallman     (P43200)

Erin E. Mersino     (P70886)

Jack C. Jordan     (P46551)

Stephan P. Kallman     (P75622)

**GREAT LAKES JUSTICE CENTER**

**Attorneys for Plantiff**

**5600 W. Mount Hope Hwy.**

**Lansing, MI 48917**

**(517) 322-3207/ Fax: (517) 322-3208**

## AFFIDAVIT

The Affiant, Mellissa A. Carone, being the first duly sworn, hereby deposes and states as follows:

1. My name is Mellissa A. Carone, I was contracted by Dominion Voting Services to do IT work at the TCF Center for the November 3, 2020 election, and I am a resident of Wayne County.

2. I arrived at the TCF Center at approximately 6:15 AM November 3, 2020 and worked until 4:00 AM November 4, 2020. I went home to get some sleep, then arrived back at the TCF Center at 10:00 AM in which I stayed until 1:45 PM. During this time I witnessed nothing but fraudulent actions take place.

3. The counters (which were trained very little or not at all), were handed a "batch" (stack of 50) of mail-in ballots in which they would run through the tabulator. The tabulators would get jammed 4-5 times an hour, when they jammed the computer would put out an error that tells the worker the ballot number that was jammed and gives an option to either discard the batch or continue scanning at which the counter should discard the batch, put the issue ballot on top of the batch and rescan the entire batch. I witnessed countless workers rescanning the batches without discarding them first which resulted in ballots being counted 4-5 times.

4. At approximately midnight I was called over to assist one of the counters with a paper jam and noticed his PC had a number of over 400 ballots scanned- which means one batch was counted over 8 times. This happened countless times while I was at the TCF Center. I confronted my manager, Nick Ikonomakis saying how big of a problem this was, Nick told me he didn't want to hear that we have a big problem. He told me we are here to do assist with IT work, not to run their election.

5. The adjudication process, from my understanding there's supposed to be a republican and a democrat judging these ballots. I overheard numerous workers talking during shift change in which over 20 machines had two democrats judging the ballots-resulting in an unfair process.

6. Next, I want to describe what went on during shift change, it was a chaotic disaster. It took over two hours for workers to arrive at their "assigned areas", over 30 workers were taken upstairs and told they didn't have a job for them to do. These people were chosen to be counters, in which 6 workers admitted to me that they received absolutely no training at all.

7. The night shift workers were free to come and go as they pleased, they could go out and smoke from the counting room. This is illegal, as there were boxes and stacks of ballots everywhere, anyone could have taken some out or brought some in, and No one was watching them.

8. There was two vans that pulled into the garage of the counting room, one on day shift and one on night shift. These vans were apparently bringing food into the building because they only had enough food for not even 1/3 of the workers. I never saw any food coming out of these vans, coincidently it was announced on the news that Michigan had discovered over 100,000 more ballots- not even two hours after the last van left.

9. When a worker had a ballot that they either could not read, or it had something spilled on it, they would go to a table that had blank ballots on it and fill it out. They were supposed to be filling them out exactly like the one they had received but this was not the case at all. The workers would also sign the name of the person that the ballot belonged to-which is clearly illegal.

10. Samuel Challandes and one more young man in his mid-20 were responsible for submitting the numbers into the main computer. They had absolutely no overhead, my manager Nick would assist them with any questions but Nick was on the floor assisting with IT most of the time.

BOBBY TENORIO
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WASHTENAW
My Commission Expires February 19, 2021
Acting in the County of _Washtenaw_

11. There was a time I overheard Samuel talking to Nick about losing tons of data, they all got on their phones and stepped to the side of the stage. I asked Nick what was going one and he told me it was all taken care of and not to worry about it. I fully believe that this was something very crucial that they just covered up.

12. I was the only republican working for Dominion Voting, and on the stage there was many terrible comments being made by the city workers and Dominion workers about republicans. I did not give out any indication that I was a republican, I have a family at home and knew I was going to have to walk to my car at the end of my shift. If anyone had an American flag on their shirt or mask, they were automatically deemed to be Trump supporters.

13. I called the FBI and made a report with them, I was told that I will be getting a call back.

14. I am doing my best to make sure something is done about this, I was there and I seen all of this take place.

On this 8th day of November, 2020, before me personally appeared Mellissa A. Carone, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and behalf, and as to those matters he believes them to be true.

Mellissa A. Carone _(signature)_ 11/05/20

Notary Public, Washtenaw County, Michigan

My Commission Expires: 02 19 2021
Feb 19, 2021

_(signature)_ 11/8/2020

BOBBY TENORIO
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WASHTENAW
My Commission Expires February 19, 2021
Acting in the County of Wayne

RECEIVED by MSC 11/26/2020 2:44:13 AM

## AFFIDAVIT OF BRADEN GAICOBAZZI

Braden Gaicobazzi being sworn, declares under penalty of perjury:

I am personally familiar with the facts stated in this Affidavit and, if sworn as a witness, am competent to testify to them as well.

1. I am a registered voter in the State of Michigan.

2. I had the following experiences at TCF (COBO) Hall on 11/4/2020

3. I experienced: Intimidation countless times, persistent lies from some table supervisors and managers regarding rules that prohibited me from doing my job, and threats of assault. I was escorted from the room by police after about 9 or 10 hours of peacefully doing my job for simply standing my ground at a table with people who were denying me access to see ballots and threatening me. I did not resist police in any way and left peacefully.

4. I saw an online note from someone within my GOP network of friends that 35,000 ballots had been received in the middle of the night and that they needed poll watchers on November 4th. I arrived in the late morning to be trained.

5. The first thing I noticed was that at least one person outside the ballot room entrance had a BLM mask on. She appeared to be doing temperature checks. Once inside, it was apparent that many and probably most tables in the room were hostile towards people with GOP lanyards.

6. I initially worked with an honest table, but after a few hours, I moved to another table because we were low on GOP Challengers. This is because they kept kicking out GOP challengers, using the police in the room to physically remove them. In fact, early in the afternoon or later morning, someone came into the room, made an announcement, and several people appeared to be

removed from the room as the doors were locked and the windows were boarded up with cardboard. I was informed that no GOP people were allowed in and that, if we left, we could not get back in. I asked several of the 'independent' lawyers and law students who were acting as challengers and none of them seemed to believe this to be an issue.

7.I talked with several of these 'independent' lawyers/law students at length in casual, friendly conversation and, based upon their answers to basic questions about the news, it was evident that EVERY single one of the lawyers/law students that I talked to was ideologically far-left, supporting things like CHAZ/CHOP in Seattle and condoning the crime skyrocketing around the country or wanting to work in Brooklyn because they support 'progressive' changes to law to 'not prosecute rioters,' etc. Yet, they all claimed to be independent. Anyway, every time a GOP staffer was removed from the room, most of the entire room would erupt in cheers and laughter and oftentimes derogatory insults as GOP Challengers were walked out by police.

8.Throughout the day, I was on numerous occasions told that I was not allowed within 6 feet of the tables. I told them I had to step in for a moment for each ballot to ensure that numbers or names matched and assured them that it would be brief and that the lawyers said this was by lawful, but table supervisors and their broader supervisors would often step in the way and prevent me from seeing ballots while claiming I was trying to kill or endanger their ballot counters with Covid. This was obviously incorrect and even when lawyers would tell the whole table this, they would often argue with the lawyer. After the lawyer would leave, sometimes the behavior would continue.

9.For much of the day I was with one good table. However, as the night drew long I was bouncing between several tables, mostly near the back of the room, because there were not enough GOP challengers remaining in the room and many tables had no challengers watching them at all. At around 8pm at one of the tables in the second-to-last row near the right corner, a specifically egregious moment occurred.

10.The table was counting a stack of about 35 ballots that all appeared to have pink challenge stickers on them. None of these ballots appeared to be in the digital database of voters, so the people at the table were simply entering names and addresses into the computer with birthdates of 1/1/1900. I personally was able to observe the 1/1/1900 birthdates on the computer. There were also addresses and names which I could not verify because I wasn't allowed close enough to the table for long enough to compare anything. I told the table I was challenging every one of these ballots. They laughed and said I can't just do that. I then noticed that at least one of the ballots and envelopes was mismatched based on the numbers. I waited to see if the table checker (at I believe station 2) would catch this and he did not, so I spoke up requested that the ballot be reviewed/challenged. I could not see any political affiliation information on the ballot, including voting; just the numbers on the envelope and ballot.

11.At some point, another GOP volunteer went to grab a lawyer for me because a debate ensued over this. There weren't nearly enough lawyers in the room to act on our behalf. When I would try to verify the names on the envelope or check the ballot number against the envelope number to ensure everything was okay, I was given the Covid runaround and separated from the table. (I cannot tell you by whom because, throughout the day, I recall very few people at these tables were ever willing to give me their name and party affiliation or even their job title. Everyone else stonewalled and said I wasn't allowed to talk with anyone at the table and that no one at those tables was required to tell me anything, often including the table supervisors and their managers.

12.The table supervisor came over and began giving me the same speech and, while I was politely telling him I was just doing my job, another GOP staffer went to find a lawyer for me. In this time, the table swarmed with, I assume, Democrat operatives getting very close to me and then yelling at me to back off 6 feet from him for Covid and complaining about the way I was wearing my mask moving because I was being forced to talk to him so much. The

supervisors and table had no problem with these people being close to the table and seemed to be familiar with one another, as though they were all on the same team. The antagonistic staffers invented any kind of reason to prevent me from doing my job and get me agitated. Finally, a lawyer showed up who told them I was allowed to do my job; like other tables, they simply argued with him as well. Having missed several ballots due to the arguing, I stepped in for a moment to verify the next ballot number matched its envelope.

13. The table supervisor, his supervisor and several other operatives (none of them would give their names or credentials) swarmed in and began intimidating me. I was separated from the table at one point by the table supervisor's supervisor and told to stand back. He stepped closer and closer to me as I backed further away to the other side of the table. I asked him what his name and job title was and he, along with the rest of the intimidators, refused to give me any information. He made some kind of innuendo about 'playing with' him that made me uncomfortable and he then told me something to the effect that he would either 'kick my ass or kick me out'.

14. In disbelief, I asked him if he was truly threatening me because I was just doing my job. He repeated his mantras multiple times and called the cops over and had me forcibly removed. The police questioned nothing and I didn't fight them at all and left peacefully. However, I had to grab my coat and gave my unfinished notes to another GOP volunteer, Andrew, so I do not have them as I write this affidavit and don't recall if I was able to write down the table number of this final event of my evening. Once escorted out of the building, I held the door for a brief moment to ask the police how to get to my car because I had no idea where I was in relationship to the parking deck, and they said they had no idea.

15. As a final note, I did find it odd that, throughout the day/night, I saw a few dozen military ballots be counted. Although I cannot provide specific numbers or names, I can estimate that at least 80% of the military ballots I saw were straight ticket democrat or simply had Joe Biden's name filled in on them. I had always been told that military personnel tended to be more conservative, so this stuck out to me as the day went on.

Dated: November 8, 2020

Braden Gaicobazzi

Subscribed and sworn to before me on:

/s/ 08 November, 2020

Notary public, State of Michigan, County of: Wayne

My commission expires: 06-14-2022

Florence Dortenzio Giummo

Braden Giacobazzi
231-420-3569

ECEIVED by MSC 11/26/2020 2:44:13 AM

RECEIVED by MSC 11/26/2020 2:44:13 AM

4.      The illegal voter registration uses the address where I grew up – my parents' home in Chesaning, Michigan. However, I never in my life registered to vote at that location. I left Chesaning, Michigan when I was seventeen years old in 1987 to move to North Carolina. I voted in the 1988 presidential election in North Carolina. Shortly thereafter, I moved to East Lansing, Michigan to finish out my college education at Michigan State University. I voted in the 1990 midterm election in East Lansing. I was also on the local ballot there as I was running for a position as a Democratic state convention delegate. I am not exactly sure of the precise name of the position I ran for, but I do recall that it was for a delegate position of some sorts. In March of 1992, I moved to New York City to attend law school. I remained in New York, as a registered Republican voter, until I moved out of the state in January of 2003. At that time, I became a registered Republican voter in the State of Florida. Finally, when I moved to Virginia (where I currently reside) in March of 2005, I became a registered Republican voter in Virginia. I remain a registered Republican voter in Virginia.

5.      As the prior paragraph demonstrates, at no time did I, personally, ever register to vote in Chesaning, Michigan. The Michigan Voter Information Center reflects that I was registered for the November 3, 2020 general election with Chesaning, Michigan as my designated polling place. However, I actually remained a registered voter in Appomattox, Virginia for the November 3, 2020 election and did in fact vote in person in Virginia on November 3, 2020. Thus, whoever illegally registered me did it in a location I do not live (and have not lived since 1987) and under a name that legally ceased to exist in 1995.

6.      Related to the illegal voter registration, I began receiving text messages from different get out the Democratic vote organizations in Michigan. The messages were informing me about absentee ballot voting and the vote early options. I believe I began receiving them one or two

2

months in advance of the election. The only one I saved was sent to me on October 23, 2020 and states, "Hi Anne, this is Ashley with the MI AFL-CIO. I'm texting fellow union members. Can I count on you to vote 4 Joe Biden & pro-worker candidates? Reply 'stop' to unsubscribe." I texted "stop" and received no further text messages from the MI AFL-CIO. *See* attached copy of the text.

7.      What is concerning to me about this text message, and the others I received, is that (a) I am not and never was a member of the AFL-CIO (or any union for that matter) and (b) the organization somehow had my current cell phone number (which I have only had since living in Virginia) connected to the name Anne Bila. The entire time I have lived in Virginia I have used the legal name of Rena Marie-Anne Lindevaldsen. My cell phone was never registered under the name Anne Bila (or Rena Bila).

8.      In addition to the text messages, my parents began to receive get out the vote mailings addressed to Anne Bila. As best as I can recall, in the past thirty-three years since I last lived in Chesaning, Michigan, this was the first election where mail was sent to Anne Bila related to the election.

9.      At this time, I do not know whether someone actually voted as me in the election. The Voter Information Center does not reflect an absentee ballot for me, but I do not know how current the site is for those who may have voted in person. Thus, I am certain someone illegally

3

RECEIVED by MSC 11/26/2020 2:44:13 AM

registered me to vote, but do not know whether someone actually cast a vote on behalf of Anne

Bila in the November 3, 2020 general election.

.

*Rena M. Lindevaldsen*
Rena M. Lindevaldsen

Signed and sworn to before me in the City of Lynchburg, Virginia on the _11_ day of November, 2020.

*Davinda Lee Yates*
Notary Signature

Notary Stamp:
DAVINDA LEE YATES
NOTARY PUBLIC
REGISTRATION # 7815302
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
JUNE 30, 2023

RECEIVED by MSC 11/26/2020 2:44:13 AM

**Text Message**
Fri, Oct 23, 7:43 PM

Hi Anne, this is Ashley with the MI AFL-CIO. I'm texting fellow union members. Can I count on you to vote 4 Joe Biden & pro-worker candidates? Reply 'stop' to unsubscribe

Stop

# AFFIDAVIT OF KRISTY KLAMER

Kristy Klamer, being sworn, declares under penalty of perjury:

1.    I am personally familiar with the facts stated in this Affidavit and, if sworn as a witness, am competent to testify to them as well.

2.    I am a registered voter in the State of Michigan.

3.    I was at the TCF Center in Detroit Michigan from 7:00am to 10:00pm on Tuesday, November 3, 2020 and from 8:30am on Wednesday November 4, 2020 to 4:30am Thursday on November 5, 2020.

4.    I along with many others were intimidated, harassed, verbally attacked, or met with resistance consistently on November 4, 2020 from Democrat challengers, independents, a lawyer, team leaders, and supervisors. I experienced a lawyer, 2 team leaders, and 3 others come as a group to come intimidate me after challenging a ballot in which I was met with much resistance. It never got put in the computer. I was told by a Democrat lawyer that I couldn't keep challenging the ballots and was told I might get escorted out. I was told by the same Democrat lawyer that I could not challenge every ballot. I asked the lawyer nicely, as she began aggressively accusing me & trying to bait me, if she was trying to intimidate me. She said "don't put words in my mouth. You're a liar." I walked away. I witnessed two other people experiencing a similar situation both times I stepped in to try to deescalate the situation. I was repeatedly lied to by different people and told things like I shouldn't be watching the ballots being duplicated and should "just let them do their job."

5.    The events described above impaired my ability to properly observe and challenge.

Scanned with CamScanner

RECEIVED by MSC 11/26/2020 2:44:13 AM

6. At one point I had about 8-10 Democrat challengers all near me. I had two big guys come stand close to me and say "I think we're going to stand right here." My friend was silently raising her hand to challenge a ballot and no one was coming. A crowd drew and a man started attacking her verbally. I began to see a pattern of intimidation against Republican challengers. I also noticed a tactic of fake befriending & trying to ask lots of questions to Republican challengers to either gather info or distract you while trying to observe.

7. I walked around the whole room many times. At one point I walked around the whole room and saw about 3 confrontations.

8. Around early afternoon tensions began to rise there seemed to be a literal shift in the room. I noticed the team leaders, after one of their many meetings (I couldn't figure out why they met so often & it was frustrating because they were unavailable to us for a while during that time), began to become more aggressive. There seemed to be a distinct difference. There was a specific team leader that was helping to eject Republican challengers and really enjoyed making it a big scene as the police would escort out. He would walk with them and one time said "you wanted to go outside is that what you want." He was trying to get everyone riled up and he seemed to love the applause that would break out every time one of our attorneys or other Republicans were escorted out. I never saw a Democrat escorted out.

9. I witnessed an Asian Republican man being teamed up against (4-5 people). This man was being told he wasn't allowed to watch a ballot being duplicated.

Scanned with CamScanner

10. I had a democrat challenger ask me where I lived. After sharing with her she said "Why did you come here?" I told her that they needed more Republicans here. She said "I'm sure there is fraud everywhere I think I'll go to your town next time."

11. I stayed along with 10-12 other people until 4:30am on Thursday 11/5 morning to make sure all the ballots were properly secured. They let the election workers go around 11:30. There was a big line of election workers that formed to sign something. Two women heard them offer $300 for the election workers to stay. The election workers then had some meetings with the supervisors & team leaders meanwhile the tables were left with the ballots not being secured in anyway. We did our best to be at as many tables as we could for the securing process.

12. After checking all of the tables we found about 8 or so that were "locked," but they were not latched so you could just open them. They were not secure. I wrote down the numbers and as a team we made sure they were properly latched/locked. There were multiple tables where the ballots seemed to not add up. So much so that election workers at one table took everything out and were recounting it.

13. I observed 46 ballots processed that were not in the computer system. For these ballots election workers manually entered information including birthdates of "1/1/1900." These ballots were the following:

**Precinct# 57** Theresa Mccants #3647, Danielle Murphy #3224, Latoya Flowers #3641, Lawanda Williams #6051, Antoine Stubbs #4207, Dujuan Sample #2278, Sabrina Nellems #3162, Leroy Simmons #3165, Shanese Scott #0721, Clanecia Sailor #4327, Yevette Polk #5318, Brian Reed #4326, Deborah Witcher #2280, Lakirra Thompson #4323, Dundre Thomas Jr. #1122, Kathleen Smiley #0757,

- 3 -

Scanned with CamScanner

Anthony Norris #4324, Paulette Pace #3591, Tranel Patterson #1368, Crystal Martin- Patterson #1237, Rasheed Jabbaar #3163, Nushamm Jabrell #4328, Antoine Garrison #3167, Jerisha Frazier #1302, Robert Loury #4206, Jarmane Keys Jr #4325, Matthew Jordeen #4276, Christopher Kent #1383, Condrea Mashatt #5322, Michael Moore Jr. #2300, Traci Armond #2096, Ariana Driscoll #1366, Gerald Bryant #0958, Diana Morrison #1121, Angel-Renee Taylor #1358, Derrick Mason #1176, Katia Butler #3161,

**Precinct #74** Eric Gaskin #2689, Lavonia Perryman #1488, Francisco Williams #1489, Hector Collazo #2183, Andrew Radke #1822, Brennan Jessie #2182, Hannah Gates #0260.

**Precinct #68** Mary Perkins-Randle #4251

**Precinct #66** Jasmine Anderson #5452

Dated: ~~November 9,~~ November 23, 2020

_Kristy Ann Klamer_

[Print name] *Kristy Ann Klamer*

Subscribed and sworn to before me on:
/s/ November 23, 2020
Notary public, State of Michigan, County of: Wayne
My commission expires: 6/28/2023

KATHI YOKOM
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Jun 28, 2023
ACTING IN COUNTY OF Oakland

- 4 -

RECEIVED by MSC 11/26/2020 2:44:13 AM

RECEIVED by MSC 11/26/2020 2:44:13 AM

## AFFIDAVIT OF LAURIE ANN KNOTT

I, Laurie Ann Knott, do depose and state the following under penalty of perjury:

1. I am retired.

2. I have worked as an election worker in Grand Rapids for more than 10 years, for state, local and national election cycles.

3. I have personal knowledge of the facts stated herein.

4. I am competent and able to testify if called to do so.

5. I make this affidavit of my own free will.

6. I have been registered to vote in the state of Michigan for more than 40 years.

7. I am a registered Republican.

8. I can be contacted at 1121 Sweet NE, Grand Rapids, MI 49505, my phone number is 616-490-8435.

9. I arrived at the DeVos Convention Center on November 2, 2020, at 10:00 a.m. and was scheduled to work to 8:00 p.m. and was given the responsibility, along with others, to open envelopes of mailed-in-ballots.

10. There were approximately 40 election teams working on processing absentee and mail-in ballots. Each team consisted of 2 or 3 people and was required to have at least one Democrat and one Republican as a member of the team.

11. On November 2, 2020, once the envelopes were to be opened by a letter-opening machine, but the machines (2 of them) did not arrive until 2:00 p.m.,

1

RECEIVED by MSC 11/26/2020 2:44:13 AM

so we had to open the envelopes with whatever we had handy, i.e. a pen, pencil, etc. Our responsibility was to assure that the number on the ballot matched the number on the outside of the envelope. This was the extent of our work on November 2, 2020.

12. We were to compare the ballot number on the outside to the inside by taking the ballot and the ballot sleeve envelope out of the outer envelope and stack them in piles with the ballot and the sleeve envelope in one pile and the outer mail envelope in another pile.

13. These ballots were then returned to a table to be handled by others to secure them. However, based on information, because the City of Grand Rapids did not have enough cases to secure the ballots we were told that we had to stop for the night at 7:00 p.m.

14. I arrived at the DeVos Convention Center on November 3, 2020, election day, at 7:00 a.m. along with others to begin work.

15. Upon arrival on the morning of November 3, 2020, we were sworn in to uphold the Michigan Constitution and the U.S. Constitution.

16. The responsibility on November 3, 2020 was initially the same as the work we had performed on November 2, 2020--to take a precinct of the ballots and again make certain that the number on the ballot matched the number on the outside of the envelope.

2

RECEIVED by MSC 11/26/2020 2:44:13 AM

17. We received the ballots to process by going to a table and we would be handed a plastic tote with a precinct of ballots.

18. The ballots were processed by precinct and were kept in groups so we could keep track of a total number of ballots that should be in that precinct to assure the number matched the number of voters for that precinct identified on the sheet we were to follow for the counting.

19. Some workers were responsible for this task.

20. I worked with a team that was responsible for taking the ballot out of the ballot sleeve envelope and rip off the stub with the ballot number, then flatten the ballot so it could be run through the tabulation machine.

21. Throughout the day the tabulation machines kept breaking down and so tabulating of the ballots was slow.

22. There was much fraud, miscalculations of ballots, recounting and recounting.

23. There should have been more tabulators to use with the huge number of ballots.

24. At noon, approximately, we had a short lunch break before returning to work for the afternoon.

25. However, we ran out of ballots to process about 2:20 p.m. and sat doing nothing until 4:45 p.m. when we had a dinner break, which ended at 5:30 p.m.

3

26. There were no ballots brought from City Hall from that dinner break until approximately 700 ballots arrived at 7:30 pm., which some workers processed but my team had nothing until approximately 10:30 p.m.

27. This was very unusual! Past elections about every 90 minutes to every 2 hours we would always be brought more ballots to process; we always had a full day and full night of work handling absentee ballots.  This was just one of the differences from other elections.

28. During past elections the election supervisor, Daniel Kvamme, usually kept us very informed as to what we would expect; this time he told us nothing; many commented how off his behavior was as compared to past elections. He was definitely not acting as he had in the past. Daniel also seemed very confused both in his behavior and in some of the comments he made; as though he didn't know what to do.

29. We were also informed that there were thousands of more ballots yet to be processed at City Hall but none were brought throughout the rest of the evening.  No additional information was given to us at that point but we had no ballots to process.

30. Strangely we would get patches of ballots for Biden in unusually numbers as compared to Trump despite that historically Kent County has been heavily Republican.  While counting ballots there was an average of only 10% for

4

RECEIVED by MSC 11/26/2020 2:44:13 AM

RECEIVED by MSC 11/26/2020 2:44:13 AM

Trump and 90% for Biden, of these mail-in ballots.  This was not the normal for other elections with absentee and mail-in ballots!

31. We could not leave but we were not given any information throughout the evening.

32. The City Clerk finally came to dismiss us about 1:00 a.m., which was when we were finally told we could leave.

33. We were finally told we could leave between 12:30 a.m. and 1:00 a.m. on the morning of November 4, 2020.

34. The thousands of ballots we were told we would be getting to process never materialized.

35. It was later reported on the news that 30,000 ballots from Grand Rapids had been shipped to Detroit for processing, despite workers being available and able to have processed those in Grand Rapids.

FURTHER AFFIANT SAYETH NOT

I declare under penalty of perjury that the foregoing is true and correct. (28 US Code § 1746.)

Dated this 23rd day of November 20 20 .

Laurie Ann Knott

STATE OF MICHIGAN )
                   ) ss.

5

COUNTY OF KENT        )

     Subscribed and sworn to before me, a Notary Public, on *November 23* 2020, by Laurie Ann Knott, known to me or properly identified, who affirms she has signed this of her own free will and deed and with full knowledge of the content and the purpose of this Affidavit.

*Heather J VandenBos*
Heather J VandenBos, Notary Public
County of Kent, State of Michigan
My Commission: *10-12-2021*
*Newaygo, MI  acting in kent*

Prepared by:
LaRae G. Munk.  (P41154)
Law Office of LaRae G. Munk, P.C.
517-410-6957
attorney@wwdb.org

HEATHER J VANDENBOS
Notary Public, Newaygo Co.,MI
My Comm. Expires 10/12/2021

6

RECEIVED by MSC 11/26/2020 2:44:13 AM

# AFFIDAVIT OF LUCILLE ANN HUIZINGA

I, Lucille Ann Huizinga, do depose and state the following under penalty of perjury:

1. I am retired.

2. I have worked as an election worker in Grand Rapids for more than 10 years, for state, local and national election cycles.

3. I have personal knowledge of the facts stated herein.

4. I am competent and able to testify if called to do so.

5. I make this affidavit of my own free will.

6. I have been registered to vote in the state of Michigan for 50 years.

7. I am a registered Republican.

8. I can be contacted at 3425 Eagle Circle Court, Grand Rapids, MI 49525, my phone number is 616-581-2429.

9. I arrived at the DeVos Convention Center on November 2, 2020, at 10:00 a.m. and was scheduled to work to 8:00 p.m. and was given the responsibility, along with others, to open envelopes of mailed-in-ballots.

10. There were approximately 40 election teams working on processing absentee and mail-in ballots. Each team consisted of 2 or 3 people and was required to have at least one Democrat and one Republican as a member of the team.

1

11. On November 2, 2020, once the envelopes were opened by a letter-opening machine, our responsibility was to assure that the number on the ballot matched the number on the outside of the envelope. This was the extent of our work on November 2, 2020.

12. We were to compare the ballot number on the outside to the inside by taking the ballot and the ballot sleeve envelope out of the outer envelope and stack them in piles with the ballot and the sleeve envelope in one pile and the outer mail envelope in another pile.

13. These ballots were then returned to a table to be handled by others to secure them. However, based on information, because the City of Grand Rapids did not have enough cases to secure the ballots we were told that we had to stop for the night at 7:00 p.m.

14. I arrived at the DeVos Convention Center on November 3, 2020, election day, at 7:00 a.m. along with others to begin work.

15. Upon arrival on the morning of November 3, 2020, we were sworn in to uphold the Michigan Constitution and the U.S. Constitution.

16. The responsibility on November 3, 2020 was initially the same as the work we had performed on November 2, 2020--to take a precinct of the ballots and again make certain that the number on the ballot matched the number on the outside of the envelope.

2

17. We received the ballots to process by going to a table and we would be handed a plastic tote with a precinct of ballots.

18. The ballots were processed by precinct and were kept in groups so we could keep track of a total number of ballots that should be in that precinct to assure the number matched the number of voters for that precinct identified on the sheet we were to follow for the counting.

19. Some workers were responsible for this task.

20. I worked with a team that was responsible for taking the ballot out of the ballot sleeve envelope and rip off the stub with the ballot number, then flatten the ballot so it could be run through the tabulation machine.

21. At noon, approximately, we had a short lunch break before returning to work for the afternoon.

22. However, we ran out of ballots to process about 2:20 p.m. and sat doing nothing until 4:45 p.m. when we had a dinner break, which ended at 5:30 p.m.

23. There were no ballots brought from City Hall from that dinner break until approximately 700 ballots arrived at 7:30 pm., which some workers processed but my team had nothing until approximately 10:30 p.m.

24. This was very unusually! Past elections about every 90 minutes to every 2 hours we would always be brought more ballots to process; we always had a

3

full day and full night of work handling absentee ballots. This was just one of the differences from other elections.

25. During past elections the election supervisor, Daniel Kvamme, usually kept us very informed as to what we would expect; this time he told us nothing; many commented how off his behavior was as compared to past elections.

26. We were also informed that there were thousands of more ballots yet to be processed at City Hall but none were brought throughout the rest of the evening. No additional information was given to us at that point but we had no ballots to process.

27. Strangely we would get patches of ballots for Biden in unusually numbers as compared to Trump despite that historically Kent County has been heavily Republican.

28. We could not leave but we were not given any information throughout the evening.

29. The City Clerk finally came to dismiss us about 1:00 a.m., which was when we were finally told we could leave.

30. We were finally told we could leave between 12:30 a.m. and 1:00 a.m. on the morning of November 4, 2020.

31. The thousands of ballots we were told we would be getting to process never materialized.

4

RECEIVED by MSC 11/26/2020 2:44:13 AM

FURTHER AFFIANT SAYETH NOT

    I declare under penalty of perjury that the foregoing is true and correct. (28 US Code § 1746.)

Dated this 23rd day of November, 20 20.

*Lucille Ann Huizinga*
Lucille Ann Huizinga

STATE OF MICHIGAN )
                ) ss.
COUNTY OF KENT )

    Subscribed and sworn to before me, a Notary Public, on November 23, 2020, by Lucille Ann Huizinga, known to me or properly identified, who affirms she has signed this of her own free will and deed and with full knowledge of the content and the purpose of this Affidavit.

*Heather J Vanden Bos*
Heather J Vandenbos Notary Public
County of Kent, State of Michigan
My Commission: 10-12-2021
Newaygo county acting in Kent

Prepared by:
LaRae G. Munk. (P41154)
Law Office of LaRae G. Munk, P.C.
517-410-6957
attorney@wwdb.org

HEATHER J VANDENBOS
Notary Public, Newaygo Co., MI
My Comm. Expires 10/12/2021

5

# AFFIDAVIT OF MARILYN JEAN NOWAK

I, Marilyn Jean Nowak, do depose and state the following under penalty of perjury:

1. I am a retired insurance receptionist and I worked as an election worker for the City of Grand Rapids for the 2020 presidential election. I have previously worked as an election worker for the 2016 presidential election, as well other state and local elections.

2. I have personal knowledge of the facts stated herein.

3. I am competent and able to testify if called to do so.

4. I make this affidavit of my own free will.

5. I have been registered to vote in the state of Michigan for 68 years.

6. I can be contacted at 1283 Suncrest Dr., NE, Grand Rapids, MI 49525, 616-243-9908.

7. I arrived at the DeVos Convention Center on November 2, 2020, at 10:00 a.m. to 5:00 p.m and was given the responsibility, along with others, to open envelopes of mailed-in-ballots.

8. Once the envelopes were opened by a machine, our responsibility was to assure that the number on the ballot matched the number on the outside of the envelope. This was the extent of our work on November2, 2020.

1

9. I arrived at the DeVos Convention Center on November 3, 2020, election day, at 7:00 a.m. along with others to begin work.

10. The responsibility was to take a precinct of the ballots and again make certain that the number on the ballot matched the number on the outside of the envelope; this was our primary responsibility.

11. We received the ballots to process by going to a table and we would be handed a plastic tote with a precinct of ballots.

12. The ballots were processed by precinct and were kept in groups of 25 so we could keep track of a total number of ballots that should be in that precinct to assure the number matched the number of voters for that precinct identified on the sheet we were to follow for the counting.

13. At noon, approximately, we had a short lunch break before returning to work for the afternoon.

14. The dinner break was, based on my memory, between 4:30 pm to 5:00 pm but we didn't leave the area and went back to eat at the same table where we were counting the ballots.

15. We didn't take the break for dinner until we had finished a precinct.

16. After dinner when we returned to get additional precinct totes of ballots to count we were told that there was nothing to count. No additional information was given to us at that point but we had no precincts to process.

2

17. It was nearly 5 hours later, sometime between 9:00 pm and 10:00 pm we were informed that all the ballots had been sent to Detroit to be processed.

FURTHER AFFIANT SAYETH NOT

I declare under penalty of perjury that the foregoing is true and correct. (28 US Code § 1746.)

Dated this _____ day of _____ 20 ___.

_____
Marilyn Jean Nowak

STATE OF MICHIGAN )
                   ) ss.
COUNTY OF KENT )

Subscribed and sworn to before me, a Notary Public, on November 28, 2020, by Marilyn Jean Nowak, known to me or properly identified, who affirms she has signed this of her own free will and deed and with full knowledge of the content and the purpose of this Affidavit.

_____
Heather J VandenBos Notary Public
County of Kent, State of Michigan
My Commission: 10-12-2021
Newaygo, MI acting in Kent

Prepared by:
LaRae G. Munk. (P41154)
Law Office of LaRae G. Munk, P.C.
517-410-6957
attorney@wwdb.org

HEATHER J VANDENBOS
Notary Public, Newaygo Co., MI
My Comm. Expires 10/12/2021

3

## **AFFIDAVIT OF MARLENE KAY HAGER**

I, Marlene Kay Hager, do depose and state the following under penalty of perjury:

1. I am a retiree and I worked as an election worker for the City of Grand Rapids for the 2020 presidential election. I have previously worked as an election worker for the 2016 presidential election, as well other state and local elections.

2. I have personal knowledge of the facts stated herein.

3. I am competent and able to testify if called to do so.

4. I make this affidavit of my own free will.

5. I have been registered to vote in the state of Michigan for 60 years.

6. I can be contacted at 6775 Noffke Dr., Caledonia, MI 49316, my phone number is 616-891-1926.

7. I arrived at the DeVos Convention Center on November 2, 2020, at 8:00 a.m. to 5:00 p.m and was given the responsibility, along with others, to open envelopes of mailed-in-ballots.

8. Once the envelopes were opened by a machine, our responsibility was to assure that the number on the ballot matched the number on the outside of the envelope. This was the extent of our work on November 2, 2020.

9. I arrived at the DeVos Convention Center on November 3, 2020, election day, at 7:00 a.m. along with others to begin work.

1

10. The responsibility was to take a precinct of the ballots and again make certain that the number on the ballot matched the number on the outside of the envelope; this was our primary responsibility.

11. We worked in teams and there were more teams this year because of the anticipated high turnout.

12. We received the ballots to process by going to a table and we would be handed a plastic tote with a precinct of ballots.

13. The ballots would be brought approximately every few hours from City Hall to the Convention Center.

14. The ballots were processed by precinct and were kept in groups of 25 so we could keep track of a total number of ballots that should be in that precinct to assure the number matched the number of voters for that precinct identified on the sheet we were to follow for the counting.

15. At noon, approximately, we had a short lunch break before returning to work for the afternoon.

16. The dinner break was, based on my memory, between 4:30 pm to 5:00 pm but we didn't leave the area and went back to eat at the same table where we were counting the ballots.

17. We didn't take the break for dinner until we had finished a precinct.

18. After dinner when we returned to get additional precinct totes of ballots to count we were told that there was nothing to count. No additional information was given to us at that point but we had no precincts to process.

19. We were not told there were no more ballots coming over from City Hall.

20. Only a few hundred ballots were all that came over during the evening and those were processed.

21. In the past the election supervisor would tell us what was going on, what the delay in getting more ballots, or what to expect.

22. This time there was no information and we remained in our place until between midnight and 12:30 a.m. when we were dismissed to leave.

23. I was never told why there were no ballots to process, but this was very unusual as compared to previous elections.

FURTHER AFFIANT SAYETH NOT

I declare under penalty of perjury that the foregoing is true and correct. (28 US Code § 1746.)

Dated this 23rd day of November 20 20.

*Marlene Kay Hager*
Marlene Kay Hager

STATE OF MICHIGAN )
 ) ss.

3

COUNTY OF KENT    )

     Subscribed and sworn to before me, a Notary Public, on November 23rd, 2020, by Marlene Kay Hager, known to me or properly identified, who affirms she has signed this of her own free will and deed and with full knowledge of the content and the purpose of this Affidavit.

> CHERYL ANN RUSH
> Notary Public, State of Michigan
> County of Barry
> My Commission Expires Jun 10, 2024
> Acting in the County of Kent

Cheryl Ann Rush, Notary Public
County of Kent, State of Michigan
My Commission: June 10, 2024

Prepared by:
LaRae G. Munk.  (P41154)
Law Office of LaRae G. Munk, P.C.
517-410-6957

4

## AFFIDAVIT OF SANDRA SUE WORKMAN

I, Sandra Sue Workman, do depose and state the following under penalty of perjury:

1. I am a retired Customer Service Representative for the City of Grand Rapids in the Water Department. I previously worked in the City of Grand Rapids Clerk's office during the 2000 (Bush/Gore) presidential election. All total I worked for the City of Grand Rapids for 12 years.

2. I previously worked as a poll worker for elections, but after I retired I have worked as an election worker for the City of Grand Rapids for the 2020 presidential election. I have previously worked as an election worker for the 2016 presidential election, as well other state and local elections.

3. I have personal knowledge of the facts stated herein.

4. I am competent and able to testify if called to do so.

5. I make this affidavit of my own free will.

6. I have been registered to vote in the state of Michigan for 50 years.

7. I am a registered Democrat.

8. I can be contacted at 2873 Porter St., SW, Grandville, MI 49418, and I can be reached at 616-257-4405.

1

RECEIVED by MSC 11/26/2020 2:44:13 AM

9. I arrived at the DeVos Convention Center on November 2, 2020, at 10:00 a.m. and was scheduled to work to 8:00 p.m and was given the responsibility, along with others, to open envelopes of mailed-in-ballots.

10. There were approximately 40 election teams working on processing absentee and mail-in ballots. Each team consisted of 2 or 3 people and was required to have at least one Democrat and one Republican as a member of the team.

11. Upon information and belief, not all teams had a member of each party.

12. On November 2, 2020, once the envelopes were opened by a letter-opening machine, our responsibility was to assure that the number on the ballot matched the number on the outside of the envelope. This was the extent of our work on November 2, 2020.

13. We were to compare the ballot number on the outside to the inside by taking the ballot and the secrecy envelope out of the outer envelope and stack them in piles of 25 with the ballot and the secrecy envelop in one pile and the outer mail envelop in another pile.

14. Those ballots would then be locked in a case with a serial number for security. However, because the City of Grand Rapids did not have enough cases to secure the ballots we were told that we had to stop for the night at 7:00 p.m.

15. I arrived at the DeVos Convention Center on November 3, 2020, election day, at 7:00 a.m. along with others to begin work.

2

16. The responsibility was initially a repeat of the tasks for November 2, 2020--to take a precinct of the ballots and again make certain that the number on the ballot matched the number on the outside of the envelope.

17. We received the ballots to process by going to a table and we would be handed a plastic tote with a precinct of ballots.

18. The ballots were processed by precinct and were kept in groups of 25 so we could keep track of a total number of ballots that should be in that precinct to assure the number matched the number of voters for that precinct identified on the sheet we were to follow for the counting.

19. Some workers were responsible for this task, while other workers would take the ballot out of the secrecy envelope and rip off the stub with the ballot number, then flatten the ballot so it could be run through the tabulation machine.

20. All workers moved to the responsibility of taking the ballot out of the secrecy envelop and removing the stub ballot number and flattening the ballot once they had completed opening the ballots as had been done on November 2, 2020.

21. At noon, approximately, we had a short lunch break before returning to work for the afternoon.

22. The dinner break was, based on my memory, between 4:30 pm to 5:00 pm.

3

23. We didn't take the break for dinner until we had finished a precinct.

24. There were no ballots brought from City Hall from that dinner break until approximately 700 ballots arrived at 7:30 pm.

25. We were told that these were collected from Drop-boxes from Monday's mail.

26. We were also informed that there were thousands of more ballots yet to be processed at City Hall but none were brought throughout the rest of the evening. No additional information was given to us at that point but we had no precincts to process.

27. I personally obtained an absentee ballot from the City of Grandville.

28. Based on personal knowledge I know that my brother, his wife, and my niece did not request an absentee ballot and yet received ballots by mail.

29. Upon information and belief, I know others who have informed me of similar discrepancies—that they never requested an absentee ballot, but received one or more at their address.

30. Upon information and belief, I was also informed by friends that at least one couple received ballots for parents long deceased and they submitted; some ballots received for individuals deceased more than 20 years.

31. We could not leave but we were not given any information throughout the evening.

4

32. We were finally told we could leave between 12:30 a.m. and 1:00 a.m. on the
morning of November 4, 2020.

33. The thousands of ballots we were told we would be getting to process never
materialized.

FURTHER AFFIANT SAYETH NOT

I declare under penalty of perjury that the foregoing is true and correct. (28
US Code § 1746.)

Dated this __23rd__ day of __November__ 20 __20__.

_Sandra Sue Workman_
Sandra Sue Workman

STATE OF MICHIGAN )
               ) ss.
COUNTY OF KENT   )

Subscribed and sworn to before me, a Notary Public, on __November 23__,
2020, by Sandra Sue Workman, known to me or properly identified, who affirms
she has signed this of her own free will and deed and with full knowledge of the
content and the purpose of this Affidavit.

_Heather J VandenBos_
Heather J VandenBos Notary Public
County of Kent, State of Michigan
My Commission: __10-12-2021__
_Newaygo County acting in kent_

Prepared by:
LaRae G. Munk. (P41154)
Law Office of LaRae G. Munk, P.C.
517-410-6957
attorney@wwdp.org

HEATHER J VANDENBOS
Notary Public, Newaygo Co., MI
My Comm. Expires 10/12/2021

5

## AFFIDAVIT OF IAN NORTHON

I, Ian A. Northon, being first duly sworn, and under oath, state the following:

1.    I am an adult citizen of the United States and a resident of Michigan.

2.    I am an attorney licensed to practice law in Michigan.

3.    On November 22, 2020, I sent the letter attached to this affidavit as Exhibit A to the Board of State Canvassers for Michigan in anticipation of the Board's meeting on November 23, 2020—a meeting convened to begin the process of certifying the Michigan election results for the 2020 general election.  Exhibit A includes the letter and the index of the sworn affidavits that were attached to the letter.  Exhibit A does not include the voluminous affidavits as they have been submitted separately to this Court as part of the appendix.

4.    I submitted the letter attached as Exhibit A and all of the supporting materials by electronic mail to the addresses provided by the Board for submitting matters for the Board's consideration.  I also sent the letter and materials to the Board via FedEx for overnight delivery,

## VERIFICATION

I swear that the foregoing is true and correct.

_____
Ian A. Northon

Sworn to before me and subscribed in my presence this 25th day of November 2020.

Notary Public  Jalaine M. Minore

_____Kent_____ County, MI

My commission expires: 01|06|21



Ian Northon | Attorney
office: 616.235.3500
direct: 616.233.5125
fax: 616.233.5269
email: inorthon@rhoadesmckee.com

55 Campau Avenue NW
Suite 300
Grand Rapids, MI 49503

RECEIVED by MSC 11/26/2020 2:44:13 AM

November 22, 2020

**Mr. Northon is licensed in Florida,
Pennsylvania, and Michigan.**

By Electronic Mail and Federal Express
STATE OF MICHIGAN BOARD OF CANVASSERS
c/o    Jonathan Brater; Its Secretary
Elections@Michigan.gov; MDOS-Canvassers@Michigan.gov;

Chair: Jeannette Bradshaw - Democrat
Vice-Chair: Aaron Van Langevelde - Republican
Norman D. Shinkle - Republican
Julie Matuzak – Democrat

Re:    Request to Stop Certification Process until Investigation, Audit and Accurate
Determination is Completed and Demand to Preserve all Evidence

Dear Madame Chairwoman Bradshaw:

We are counsel for the non-profit Election Integrity Fund, and individual voters from across the State, including Angelic Johnson and Dr. Linda Traver, some of whom filed pre-election challenges to ensure the accuracy and integrity of the General Election. Regrettably, the serious issues we raised before Election Day came home to roost, and the 2020 General Election is mired in controversy despite the hard work of many men and women of goodwill on either end of the politic spectrum and all points in between.

And while political differences are in the spotlight, one thing everyone should agree on is that we want the citizens of the great state of Michigan to be confident in election marked with "accuracy and integrity". As a result of the passage of Proposal 3, the Michigan Constitution now provides in relevant part:

(1) Every citizen of the United States who is an elector qualified to vote in Michigan ***shall*** have the following rights:

(a) The right, once registered, to vote a secret ballot in all elections.

* * *

(h) ***The right to have the results of statewide elections audited, in such manner as prescribed by law, to <u>ensure the accuracy and integrity</u> of elections***.

All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes.

* * *

RECEIVED by MSC 11/26/2020 2:44:13 AM

(2) Except as otherwise provided in this constitution or in the constitution or laws of the United States the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, **to preserve the purity of elections**, to preserve the secrecy of the ballot, **to guard against abuses of the elective franchise**, and to provide for a system of voter registration and absentee voting. . . .

Const 1963, art 2, § 4 (emphasis added).

With this goal in mind, patience and thoroughness need to rule the day. We ask that you and the bipartisan Board wait to certify the November 3, 2020 election results until the lawful inquiries made into numerous election integrity questions can be resolved.

In fact, you have a duty in your role of canvassers to hold off on certification until the concerns brought to light by Michigan voters are addressed fairly and openly. The Supreme Court of the United States in *Bush v. Gore*, 531 U.S. 98 (2000) wrote, "The press of time does not diminish the constitutional concern. A desire for speed is not a general excuse for ignoring equal protection guarantees." Unfortunately, we and others raise many equal protection questions that must be resolved before the Board certifies this election.

Specific questions remain over the integrity of the election that cut at the root of Michigan's electoral process.

Serious inquires remain Statewide as to:

- Why was *Rock the Vote* given access to Michiganders' private information, including their social security numbers, birthdays, drivers licenses numbers, address, and eye color?
- Why was *Rock the Vote* given this information in "real-time" through data feeds, internet hookups, and API access?
- Whether citizens voted early and then moved out of the state.
- Whether ballots were cast with the names of citizens who did not do the voting.
- Whether ballots were cast on behalf of deceased persons.
- Whether citizens voted in more than one state.
- Whether citizens voted in a county where they no longer live.
- Whether felons or the criminally insane were allowed to vote.
- Whether there was harassment and intimidation at the AVCBs.
- Whether election officials ignored or refused to record valid challenges.
- Whether absentee ballots were backdated.
- Whether multiple ballots were sent to a single voter/address.
- Whether credentialed challengers were locked out of the vote counting rooms.
- Whether duplication of ballots was conducted in a manner in violation of statute.
- Whether election workers encouraged voters to vote in a certain manner.
- Whether some Michigan counties had more registered voters than citizens of proper voting age.
- Whether voter secrecy was honored, or privacy sleeves disregarded.
- Whether Veterans ballots were treated differently.

RECEIVED by MSC 11/26/2020 2:44:13 AM

We also list some of those questions raised in Wayne County alone below:

- Were ballots received after the statutory deadline?
- Were people added to the voters rolls (QVF) after the statutory deadline?
- Were tabulator computers connected to the internet? How?
- Were adjudicator computers connected to the internet? How?
- Were counting board computers hosting the electronic poll books connected to the internet? How?
- Were "stage" computers used by Detroit Election Officials connected to the internet? How?
- If the City of Detroit used Wi-Fi networks, what were the name of the networks?
- Were the computers used to tabulate votes hacked?
- How were tabulator vote tallies reported to the counties? To media?
- Did you observe evidence of "hacking" or outside access to the AVCB network?
- Which/how many ballots/AVCB's were processed through paper pollbooks, electronic pollbooks? Which/how many were processed through QVF?
- Where/when were ballots processed through the QVF checked? Who took these actions? Were poll challengers able to observe?
- If pollbooks were overwhelmed, why wasn't the vast amount of poll inspector downtime used to process these ballots?
- Three AVCB's final tallies were zero...yet ballots with the corresponding lock boxes had several ballots inside, how did this happen? AVCB #33 had #22 rejected ballots on the pollbook, how did this occur?
- Why did poll workers sign a page that says zero votes?
- Why was a Republican not used to sign off on all 134 seals on Monday night at the end of processing at the TCF Center?
- Why was a Republican not used to sign off on all 134 seals at the end of counting on Wednesday evening/Thursday processing at the TCF Center?
- Where are the chain of custody logs for each of the 134 lock boxes?
- How was chain of custody kept for ballots between worker shift changes, as hundreds of workers came and left? Did table chairpersons keep logs of these shift changes?
- Which boxes were locked between shift changes?
- Were any boxes left open during shift changes?
- What is the process when the ballot's number didn't match the pollbook? Were ballot stub numbers manually altered in the electronic pollbooks to match the ballot number on the paper ballot received? If so, what would happen if the original ballot was later received?
- Is there a record of how many ballot stub numbers were manually changed in pollbooks?
- Under what circumstances would it be appropriate to alter voter birthdates? How many birthdates were altered? How many voter QVF's showed voters who were born in the year 1900 or earlier?
- Almost 19,000 City of Detroit residents registered for same-day registration, how were these 19,000 ballots processed and verified against a pollbook?

RECEIVED by MSC 11/26/2020 2:44:13 AM

- What is the "unrestricted list"? How was it used? We would like a copy.
- What happened to absentee ballots requested but never turned in?
- What happened to unsolicited absentee ballots that were sent but never returned?
- Was private funding and "walking around" money misused at the TCF Center?

As you can see, there are too many outstanding, substantial questions that need to be answered before any legitimate certification can take place. We are attaching an appendix of thirty (30) notarized statements and affidavits signed under the penalty of perjury that reveal not just irregularities, but allegations of manifest fraud and clear statutory violations, calling into question the integrity of this election and its outcome.

Please consider this letter not only an invitation to fulfil your statutory duty to protect the constitutional rights of Michigan voters, but a demand to stop certification until these serious disputes are resolved. While it is generally true that the Board has 40 days from Election Day to make its determination (*see* MCL § 168.842; Deadline: December 13), **time is of the essence** here because disputes over Michigan's Electors for U.S. President must be resolved by the Safe Harbor Deadline of December 8 to be properly seated.

As you know, if disputes remain, then the popularly elected Michigan Legislature takes over the process under MCL § 168.846. We respectfully demand, therefore, that you either:

1.) immediately refuse to certify until a <u>full</u>, impartial, and independent audit and investigation of the General Election is conducted to ensure Michigan voters that the election was fair and honest. This includes, at a minimum, a full investigation into the allegations of voter fraud and irregularities outlined in this letter and identified by the affiants in their sworn affidavits; or

2.) make a determination that such an audit and investigation is not necessary, thereby refusing our demand.

Because time is of the essence, we request that you make your determination regarding our request within 2 business days (Deadline by close of business November 24) and to immediately notify us of this determination via email to me at ian@rhoadesmckee.com.

If you fail to respond within the deadline set forth above, it will be considered a determination by you to reject our request. Thank you for your prompt attention and consideration.

Very truly yours,

Ian A. Northon

cc: Erin Mersino, Esq.
Robert J. Muise, Esq.

# INDEX OF SWORN AFFIDAVITS
## SUBMITTED TO STATE CANVASSING BOARD 11/22/2020

1. Zachary C. Larsen
2. Jessy Jacobs
3. Ruth Johnson
4. William C Hartmann
5. Monica Palmer
6. Angelic Johnson, attachments: video, photos
7. Cynthia Cassel
8. Rhonda Weber, attachments: Photographs
9. Christine Muise
10. G Kline Preston IV
11. Andrew Sitto
12. Kristina Karamo
13. Articia Bomer
14. Dr. Phillip O'Halloran
15. Cynthia O'Halloran
16. Janice Hermann
17. Jason Humes (2)
18. Patricia Blackmer
19. Bob Cushman
20. Jennifer Seidl
21. Cassandra Brown
22. Danny Gustafson
23. Gene Dixon
24. Anna England
25. Adam di Angeli,
26. John McGrath
27. William Carzon
28. Kayla Toma
29. Lynn Mills
30. Matthew Mikolajczak (7)

RECEIVED by MSC 11/26/2020 2:44:13 AM

# Office of the Auditor General
Performance Audit Report

---

## **Bureau of Elections**
Department of State

December 2019

---

State of Michigan Auditor General
Doug A. Ringler, CPA, CIA

Appendix--00205

I APP. 1039

The auditor general shall conduct post audits of financial transactions and accounts of the state and of all branches, departments, offices, boards, commissions, agencies, authorities and institutions of the state established by this constitution or by law, and performance post audits thereof.

The auditor general may make investigations pertinent to the conduct of audits.

*Article IV, Section 53 of the Michigan Constitution*



**OAG** — Office of the Auditor General

# Report Summary

## _Performance Audit_

## _Bureau of Elections (BOE)_

## _Department of State_

**Report Number:**
231-0235-19

**Released:**
December 2019

BOE was established to assist with the administration of the Secretary of State's election-related duties and responsibilities. BOE maintains the State's Qualified Voter File (QVF), which is the complete list of 7.5 million registered electors in Michigan. BOE offers guidance and develops and provides training to the 1,608 county, city, and township clerks and 1,979 other local election officials who independently administer elections under their jurisdiction. BOE also administers the State's campaign finance, lobbyist, and casino disclosure laws, which help to ensure the transparency of the State's election process. As of the end of fiscal year 2018, BOE expended $24.6 million and had 35 employees.

| Audit Objective | Conclusion |
|---|---|
| Objective #1: To assess the sufficiency of BOE's efforts to maintain the integrity of QVF. | Sufficient |

| Findings Related to This Audit Objective | Material Condition | Reportable Condition | Agency Preliminary Response |
|---|---|---|---|
| Improved control procedures will help decrease the risk of ineligible electors voting in Michigan (Finding #1). | | X | Agrees |

| Audit Objective | Conclusion |
|---|---|
| Objective #2: To assess the effectiveness of selected application access controls over the QVF Refresh System (QVF Refresh). | Moderately effective |

| Findings Related to This Audit Objective | Material Condition | Reportable Condition | Agency Preliminary Response |
|---|---|---|---|
| BOE's lack of adherence to established policies enabled an unauthorized user to access QVF Refresh (Finding #2). | X | | Agrees |

| Audit Objective | Conclusion |
|---|---|
| Objective #3:  To assess the sufficiency of BOE's efforts to establish and provide training to county, city, and township officials who are responsible for conducting elections. | Sufficient |

| Findings Related to This Audit Objective | Material Condition | Reportable Condition | Agency Preliminary Response |
|---|---|---|---|
| Election officials had not completed the required training to obtain or retain accreditation in 14% of counties, 14% of cities, and 23% of townships (Finding #3). | | X | Agrees |

| Supplemental Information Related to This Audit Objective |
|---|
| Counties, Cities, and Townships in Michigan Without a Fully Accredited Election Official |

| Audit Objective | Conclusion |
|---|---|
| Objective #4:  To assess the sufficiency of BOE's efforts to comply with the requirements of the Campaign Finance Act (CFA); the Lobbyists, Lobbying Agents, and Lobbying Activities Act (LLALAA); and the Casino Interest Registration Act (CIRA). | Sufficient, with exceptions |

| Findings Related to This Audit Objective | Material Condition | Reportable Condition | Agency Preliminary Response |
|---|---|---|---|
| BOE's review was not timely for 79%, 42%, and 67% of the campaign statements, lobby reports, and campaign finance complaints, respectively, that we selected for audit (Finding #4). | | X | Agrees |

**Obtain Audit Reports**

Online: audgen.michigan.gov

Phone: (517) 334-8050

Office of the Auditor General
201 N. Washington Square, Sixth Floor
Lansing, Michigan  48913

**Doug A. Ringler, CPA, CIA**
Auditor General

**Laura J. Hirst, CPA**
Deputy Auditor General



**Doug A. Ringler, CPA, CIA**
Auditor General

201 N. Washington Square, Sixth Floor • Lansing, Michigan 48913 • Phone: (517) 334-8050 • audgen.michigan.gov

December 27, 2019

The Honorable Jocelyn Benson
Secretary of State
Richard H. Austin Building
Lansing, Michigan

Dear Secretary Benson:

This is our performance audit report on the Bureau of Elections, Department of State.

We organize our findings and observations by audit objective. Your agency provided preliminary responses to the recommendations at the end of our fieldwork. The *Michigan Compiled Laws* and administrative procedures require an audited agency to develop a plan to comply with the recommendations and to submit it to the State Budget Office upon completion of an audit. Within 30 days of receipt, the Office of Internal Audit Services, State Budget Office, is required to review the plan and either accept the plan as final or contact the agency to take additional steps to finalize the plan.

We appreciate the courtesy and cooperation extended to us during this audit.

Sincerely,

Doug Ringler

Doug Ringler
Auditor General

Appendix--00209

I APP. 1043

**TABLE OF CONTENTS**

BUREAU OF ELECTIONS

| | Page |
|---|---|
| Report Summary | 1 |
| Report Letter | 3 |
| | |
| Audit Objectives, Conclusions, Findings, and Observations | |
| QVF Integrity | 8 |
| Findings: | |
| 1. Control procedures needed over QVF. | 10 |
| QVF Refresh Application Access Controls | 12 |
| Findings: | |
| 2. Improvement of access controls over QVF Refresh needed. | 13 |
| Local Election Official Training | 18 |
| Findings: | |
| 3. Improvements needed to training notification process. | 19 |
| CFA, LLALAA, and CIRA Requirements | 21 |
| Findings: | |
| 4. Statement, report, and complaint review needs improvement. | 22 |
| | |
| Supplemental Information | |
| Counties, Cities, and Townships in Michigan Without a Fully Accredited Election Official | 24 |
| Agency Description | 25 |
| Audit Scope, Methodology, and Other Information | 26 |
| Glossary of Abbreviations and Terms | 32 |

Appendix--00211

I APP. 1045

# AUDIT OBJECTIVES, CONCLUSIONS, FINDINGS, AND OBSERVATIONS

RECEIVED by MSC 11/26/2020 2:44:13 AM

| | |
|---|---|
| **BACKGROUND** | The Michigan Election Law* (Section 168.509o of the *Michigan Compiled Laws*) states that the Secretary of State (SOS) shall direct and supervise the establishment of a Statewide Qualified Voter File (QVF).  The purpose of this file is to serve as the official record that identifies all registered electors* for the conduct of all elections held in this State and accurately identify the precinct of each elector. |

Elector records are updated through various parties, including local election officials, SOS branch offices, and SOS online voter registration applications.  According to the Michigan Election Law, local clerks are responsible for verifying the accuracy of the names and addresses of registered electors in QVF and the SOS is responsible for maintaining the systems necessary for the operation of QVF.

In 2016, the Bureau of Elections (BOE) identified the QVF system as QVF Legacy* because BOE had used the system since 1998 and it needed to be upgraded.  In 2017, BOE began implementation of its new system, QVF Refresh*.  This new system replaced QVF Legacy on August 15, 2019 in preparation for the 2020 elections.

As of April 26, 2019, QVF contained 7.5 million registered electors and these electors cast 13.0 million votes throughout 7 elections:

| Election Date | Number of Election Votes |
|---|---|
| November 8, 2016 | 4,899,745 |
| May 2, 2017 | 336,081 |
| August 8, 2017 | 248,043 |
| November 7, 2017 | 773,331 |
| May 8, 2018 | 235,663 |
| August 7, 2018 | 2,206,961 |
| November 6, 2018 | 4,326,530 |
| Total election votes | 13,026,354 |

| | |
|---|---|
| **AUDIT OBJECTIVE** | To assess the sufficiency of BOE's efforts to maintain the integrity* of QVF. |
| **CONCLUSION** | Sufficient. |

*See glossary at end of report for definition.*

Appendix--00214

I APP. 1048

**FACTORS
IMPACTING
CONCLUSION**

- 98.9% of registered electors' information in QVF accurately reflected data contained in the SOS driver's license file* (DLF). We sampled 34 records from the 1.1% that did not match DLF and determined that acceptable reasons existed for the differing information.

- 100% of the electors who voted during our audit period were within acceptable age parameters.

- 99.9% of votes cast during our audit period were not identified as a duplicate vote. We sampled 24 electors from the 2,212 potentially duplicated votes and determined that none resulted in a duplicated vote. In each case, the potentially duplicated vote was caused by either a system processing error or a clerical error that resulted in electors being marked as having voted twice in an election.

- Reportable condition* related to improving control procedures over QVF (Finding #1).

---

*See glossary at end of report for definition.*

**FINDING #1**

**Control procedures needed over QVF.**

BOE should improve control procedures over QVF to help decrease the risk of ineligible electors voting in Michigan.

Section 168.492 of the *Michigan Compiled Laws* requires that the elector, in order to register to vote, must be:

- A citizen of the United States.

- At least 17.5 years of age.

- A resident of the State.

- A resident of the township or city.

The State of Michigan voter registration application requires individuals to certify that they are United States citizens and are, or will be, at least 18 years of age by election day and provide residential address documentation.

Sections 168.509o and 257.315 of the *Michigan Compiled Laws* prohibit an individual from having different residential addresses in the Department of State's QVF and DLF.

Our review of QVF disclosed:

a. BOE should improve its process for reconciling data between QVF and DLF. BOE completes a periodic reconciliation when a change in name or address is made to DLF which initiates an update to QVF; however, BOE does not have a procedure to complete a full reconciliation between files.

   We judgmentally and randomly sampled 34 records in which names and/or addresses did not match between QVF and DLF. We noted that 26 records had valid reasons, such as a street name missing the directional description. For the remaining 8 records, BOE indicated that additional analysis was needed, but it was possible that some of these errors may have occurred when records were carried forward from the legacy version of QVF. Therefore, they were not subject to the edit checks that were in place during the audit period.

b. BOE did not have control procedures to detect, follow up, and correct certain integrity discrepancies for 2,472 records. For example, 2,212 electors were recorded as having voted more than once in an election. We provided BOE with 24 electors and BOE explained that QVF contained records of multiple votes for the electors because of system processing or clerical errors, but that did not mean an individual had actually voted twice. In addition, we identified 230 registered electors who had an age that was greater than 122 years, the oldest officially documented person to ever live. BOE does perform an exact match to ensure that all electors who are certified as

being dead are removed from QVF. However, if it is not an exact match, further follow-up is needed to confirm mismatched information.

We noted a similar condition in our prior audit related to the strengthening of control procedures to prevent, detect, and correct instances in which ineligible electors are recorded as having voted. The Department agreed in part with the recommendation and indicated that it would work with local election officials to more strongly reinforce established procedures to ensure, to the extent possible, that they do not make clerical errors while recording elector history.

**RECOMMENDATION**

We recommend that BOE improve control procedures over QVF to help decrease the risk of ineligible electors voting in Michigan.

**AGENCY PRELIMINARY RESPONSE**

The Department of State provided us with the following response:

*BOE agrees to explore additional controls to decrease the risk that ineligible voters are recorded as having voted in the QVF. BOE notes, however, that of the examples provided, there was not a single verified case that an ineligible person voted.*

*BOE agrees to develop a formalized procedure to document the full reconciliation between DLF and QVF.*

*BOE also agrees to continue to reinforce existing procedures to reduce the likelihood that local election officials mistakenly record an individual as having voted twice when the individual actually voted only once. BOE will work with local election officials to ensure to the extent possible that local officials do not make clerical errors while recording voter history, as this is legally a local—not state—responsibility. BOE also notes that since 2016, BOE now completes a post-election review which initiates a detailed verification process of any voter record that has a voter recorded as having voted both in person and absentee. In the very rare instances that a clerical error did not occur, individuals who truly voted multiple times are referred for criminal prosecution.*

*With regard to individuals recorded in QVF with an age greater than 122 years, BOE notes that in most of these cases, further follow-up is needed with the voter to confirm his/her actual date of birth; and thus these individuals do not actually have "an age greater than 122 years." It is impossible to have a "blank" in the QVF date of birth field. Individuals with no recorded date of birth have been deliberately coded with an implausible birth date (such as 5/5/1850) to more clearly indicate records needing further follow-up. BOE agrees to pursue additional methods for contacting and validating birth date data for these voters, as permissible by law.*

# QVF REFRESH APPLICATION ACCESS CONTROLS

**BACKGROUND**

Access controls* limit or detect inappropriate access to computer resources, thereby protecting the resources from unauthorized modification, loss, and disclosure. For access controls to be effective, they should be properly designed, implemented, and maintained.

Access controls over QVF Refresh are the responsibility of BOE. These responsibilities include approving, removing, and monitoring user activity for State employees, contractors, and local election officials.

As of April 29, 2019, there were 3,219 active users in QVF Refresh. The table below summarizes the users by type of access:

| Type of Users | Users With Administrator Access | Users With Nonadministrator Access |
|---|---|---|
| State users | 28 | 38 |
| Local election officials | 0 | 3,153 |
| Total | 28 | 3,191 |

**AUDIT OBJECTIVE**

To assess the effectiveness* of selected application access controls over the QVF Refresh System (QVF Refresh).

**CONCLUSION**

Moderately effective.

**FACTORS IMPACTING CONCLUSION**

- BOE had designed procedures related to user account management.

- BOE provided training prior to granting user access to QVF Refresh.

- BOE ensured that users who obtained access had a signed user agreement.

- Material condition* related to improving access controls over QVF Refresh (Finding #2).

---

*\* See glossary at end of report for definition.*

## FINDING #2

**Improvement of access controls over QVF Refresh needed.**

BOE needs to improve its access controls over QVF Refresh to help prevent and detect inappropriate access and protect elector information from unauthorized use, disclosure, modification, or destruction.

State of Michigan Technical Standard 1340.00.020.01 requires agencies to implement processes to grant access rights based on the principle of least privilege*, review the appropriateness of user accounts annually or semiannually for privileged accounts, disable user accounts after 60 days of inactivity, and immediately remove access when it is determined to be no longer required. Further, BOE's QVF Security Manual requires local users to receive training and State of Michigan employees and contractors to obtain approval before system access is granted.

BOE did not:

a. Periodically review the appropriateness of active user accounts to determine if users with modification privileges were removed when access was no longer required. We noted:

(1) 972 (30%) of the 3,219 active QVF Refresh user accounts had not accessed the application in over 60 days as of April 29, 2019. As summarized in the following table:

| Days Since Last Log In | Number of Users |
|---|---|
| 60 - 180 | 502 |
| 180 - 360 | 230 |
| Greater than 360 | 69 |
| Never | 171 |
| Total | 972 |

(2) 2 (7%) of the 28 State of Michigan employees and contractors with administrator privileges did not have their access removed after departing State employment. Subsequent to our review, these users' rights were removed.

One administrator attempted logging in 5 times after the departure date and was successful in accessing QVF Refresh on 3 of the attempts. The user's activity recorded on the audit log disclosed that the user completed elector searches but did not add, delete, or edit any elector data, although the user's access privileges would have allowed the user to do so.

Because BOE did not appropriately remove access privileges, one individual with administrator privileges was successful in accessing QVF Refresh 3 times after leaving State employment.

(3) 4 (12%) of 33 randomly sampled users with nonadministrative privileges did not have their access

* See glossary at end of report for definition.

removed when access was no longer required to perform their job duties. Subsequent to our review, these users' rights were removed.

Removing access on a timely basis would help ensure that inappropriate modifications are not input into QVF Refresh.

b. Grant access based on the principle of least privilege. We noted:

(1) 7 (25%) of the 28 system administrators were granted more privileges than what was required to complete their job responsibilities.

(2) 8 (24%) of 33 randomly sampled users with nonadministrative privileges were granted more privileges than they requested.

c. Follow established procedures when granting access. We noted:

(1) 16 (57%) of 28 system administrators did not obtain proper approvals prior to being granted access to QVF Refresh.

(2) 154 (5%) of the active 3,219 QVF Refresh users as of May 3, 2019 did not have an active account in BOE's eLearning Center*, which provides online courses, materials, and procedures for day-to-day operations in QVF Refresh.

In relation to parts b. and c., granting employees privileges beyond what is required to perform their job functions or beyond their level of training increases the risk of inappropriate data modification, disclosure, or destruction.

d. Ensure that QVF Refresh security configurations were appropriate. Because of the confidentiality of these configurations, we summarized our testing results for presentation in this portion of the finding and provided the underlying details to the SOS.

BOE informed us that because of the transition from QVF Legacy to QVF Refresh, the procedures over access to QVF Refresh were evolving and this resulted in inconsistencies in implementation.

We consider this finding to be a material condition in relation to the audit objective because the combination of deficiencies identified in this finding could result in inappropriate access to

_* See glossary at end of report for definition._

QVF Refresh that would not be prevented, detected, and/or corrected on a timely basis. This could, in turn, result in additions, deletions, or modifications to elector registration data and ultimately could raise questions regarding the integrity of QVF.

**RECOMMENDATION**

We recommend that BOE improve its access controls over QVF Refresh to help prevent and detect inappropriate access and protect elector information from unauthorized use, disclosure, modification, or destruction.

**AGENCY PRELIMINARY RESPONSE**

The Department of State provided us with the following response:

a. *Periodic Review of Active QVF Accounts: BOE agrees and has improved its access controls over QVF Refresh through the following:*

(1) *BOE inactivated all users who have not accessed the application in over 60 days. BOE submitted a software request to DTMB to enhance QVF Refresh to automatically inactivate user accounts who have not accessed the application in over 60 days. BOE notes that in times of key election periods, this process may need to be flexible to ensure all needed functionality is available to all users.*

(2) *BOE developed a process to require a DTMB Manager confirm a list of DTMB employees and contractors who need access to the QVF Refresh system on a monthly basis and to report immediately when an employee no longer works on the QVF system.*

(3) *BOE submitted a software request to DTMB to enhance QVF Refresh to automatically require a local clerk to confirm a list of county/city/township employees and contractors who need access to the QVF Refresh system every 60 days.*

b. *Access Based on the Principle of "Least Privilege": BOE agrees and will comply.*

(1) *BOE agrees and has submitted a software request to DTMB to enhance QVF Refresh by adding one additional user role to separate the BOE Program Development staff (who provide technical support) and the Election Liaison staff (who provide policy/procedural assistance to clerks and voters statewide). Until the software changes are implemented, QVF Access for Election Liaison staff was reduced to read-only (which also removes their ability to fully assist local election officials on issues related to individual voters in the QVF).*

(2) BOE acknowledges that the eight randomly selected non-administrative users cited were granted a level of privilege that did not correspond to a box on the form referring to that privilege level, but notes that these users completed the level of training necessary to obtain that access. BOE gave them the access they needed to perform their job responsibilities (and to which they were entitled based on their training), even though they did not check a box specifically requesting that level of access. BOE has updated the access form to clarify the levels of access available and alleviate this confusion. Six of the users have completed a new form. BOE is following up on the two remaining forms.

c. *Follow Established Procedures when Granting Access:*

(1) BOE agrees to correct the clerical errors that occurred during system development and implementation by having the 16 internal users complete updated security forms with the proper sequence of obtaining signatures and dates.

(2) BOE agrees that not all active QVF users have an ongoing eLearning account. BOE notes that ongoing access to the eLearning system is not necessary or required for all QVF users. BOE grants ongoing access to eLearning only to those who need access to eLearning for purposes other than signing up for QVF classes. Necessary QVF reference material is available to all users within the QVF system itself. As part of the review agreed to in 2a, BOE will verify that all QVF users who lack an eLearning account are authorized QVF users per the local, city, or township clerk.

d. *Ensure QVF Refresh security configurations:* BOE agrees and has corrected the security configurations.

*"Material Condition":* BOE agrees with the auditor's emphasis on security and the importance of preventing unauthorized disclosure, modification, or destruction of QVF information. BOE has taken steps to resolve all identified issues with corrective action plans to address all issues identified in this report.

BOE recognizes that it is up to the auditor's discretion to determine whether a condition qualifies as a material finding. The findings cited here show that during the statewide rollout of the QVF Refresh system in 2018, the format of the user agreement was not optimal and some users made mistakes in filling out these forms. Additionally, a small number of users did not have their access immediately revoked once they no longer needed access to the QVF system.

*It is critical to note that there has been no documented instance of unauthorized modification or destruction of the individual records within the QVF file. As noted above, BOE has taken steps to prevent the issues identified by the auditors from resulting in unauthorized access to the QVF system. BOE development of the QVF system will regularly emphasize security and monitoring access at all levels.*

# LOCAL ELECTION OFFICIAL TRAINING

**BACKGROUND**

The Michigan Election Law requires all individuals responsible for conducting elections to be adequately trained. This serves to regulate elections, guard against abuse, and provide for the purity of elections.

BOE established the eLearning Center to facilitate the distribution of training and made it available to 1,608 local clerks and 1,979 other local election officials. Users who have access to the eLearning Center have the ability to sign up for in-person classes and/or take any of the established online learning classes in order to expand their knowledge about the Michigan election process.

BOE uses the eLearning Center to assign training required by law and as it deems appropriate. For example, with the implementation of Proposal 3 of 2018*, BOE established a training course and assigned this course to users who had access to the eLearning Center.

**AUDIT OBJECTIVE**

To assess the sufficiency of BOE's efforts to establish and provide training to county, city, and township officials who are responsible for conducting elections.

**CONCLUSION**

Sufficient.

**FACTORS IMPACTING CONCLUSION**

- BOE established training material covering a wide range of election-related topics.

- BOE established training material on a timely basis as changes to the law were implemented and affected the election process.

- BOE provided training materials, online classes, and in-person classes via the eLearning Center. BOE also made its training materials readily available via the SOS Internet site.

- Reportable condition related to promoting accreditation* (Finding #3).

*See glossary at end of report for definition.*

## FINDING #3

**Improvements needed to training notification process.**

BOE should improve its process to promote accreditation to help ensure that local election officials are fully trained and updated on Michigan's election process.

Section 31 of the Michigan Election Law (Section 168.31 of the *Michigan Compiled Laws*) requires the SOS to establish comprehensive training and an accreditation program for all county, city, and township officials who are responsible for conducting elections. This accreditation program includes both an initial comprehensive training course, as well as continuing education training for all clerks. The Michigan Election Law requires local clerks to participate in accreditation courses and complete continuing education at least once every two years to maintain accreditation.

We obtained a list of all election officials from the eLearning Center as of May 3, 2019 to determine if the election officials obtained and maintained accreditation. We noted 32 counties, 83 cities, and 426 townships where the clerk had not completed initial accreditation training or, if already accredited, all continuing education training as required by law. We also reviewed other local election officials to determine if any election officials in those areas were fully accredited. We identified 12 counties, 38 cities, and 290 townships where the clerk had not completed the initial accreditation or continuing education training requirements and no other local election official had achieved <u>full accreditation</u>* (see supplemental information):

**In 12 counties, 38 cities, and 290 townships, no local election official had achieved full accreditation.**

| | Without a Fully Accredited Clerk | Without a Fully Accredited Election Official | Jurisdictions That Require a Clerk | Percent Without a Fully Accredited Election Official |
|---|---|---|---|---|
| Counties | 32 | 12 | 83 | 14% |
| Cities | 83 | 38 | 280 | 14% |
| Townships | 426 | 290 | 1,240 | 23% |
| Total | 541 | 340 | 1,603 | 21% |

BOE made training available to users with access to the eLearning Center, notified clerks of their required training via weekly newsletters, and used the functionality in the eLearning Center to directly assign some of the training and continuing education assignments. Although the Michigan Election Law requires that BOE provide initial accreditation training and continuing education training, it does not grant BOE the authority to enforce participation. Therefore, assigning all required trainings and sending additional notifications to the clerks of their statutory training requirements could help improve the participation rate and help accreditation across the State.

*See glossary at end of report for definition.*

We noted a similar condition in our prior audit related to BOE's ability to enhance controls to further promote compliance with the Michigan Election Law regarding training of election officials. The Department agreed in part with the recommendation and indicated that it would work to further promote and communicate with election officials of the need to comply with mandated training requirements.

**RECOMMENDATION**

We recommend that BOE improve its process to promote accreditation to help ensure that local election officials are fully trained and updated on Michigan's election process.

**AGENCY PRELIMINARY RESPONSE**

The Department of State provided us with the following response:

*BOE agrees to further increase its communications with local election officials statewide to ensure, to the extent possible, that all understand and comply with mandated training requirements. Further, BOE agrees to increase targeted communications (and the frequency of targeted communications) to those local election officials who have not completed all training requirements timely; and to implement changes within the eLearning system to clearly show each user their own individual accreditation status on an ongoing basis.*

*BOE notes that the primary issue involves completion of ongoing training assignments (continuing education). Participation in the initial clerk accreditation program, the most comprehensive of BOE's training programs designed for new election officials, is extremely high.*

# CFA, LLALAA, AND CIRA REQUIREMENTS

**BACKGROUND**

Michigan's Campaign Finance Act (CFA) requires candidate committees and various other committees to periodically file campaign statements (e.g., statements of contributions and expenditures) with BOE. CFA requires that each committee keep detailed records and receipts to substantiate the information contained in the statements filed; however, CFA does not give BOE the express authority to obtain the detailed records to verify the accuracy of the information contained in the statements.

The Lobbyists, Lobbying Agents, and Lobbying Activities Act (LLALAA) was enacted to provide public disclosure of the activities of persons who attempt to influence the legislative or administrative actions of State-level lobbyable public officials. The LLALAA requires persons to register as lobbyists or lobbying agents when incurring expenses and receiving reimbursement or compensation for lobbying activities in excess of certain thresholds.

The Casino Interest Registration Act (CIRA) requires persons with casino interests to file a registration with the SOS. BOE prepares a summary of the registrations for public dissemination.

**AUDIT OBJECTIVE**

To assess the sufficiency of BOE's efforts to comply with the requirements of CFA, LLALAA, and CIRA.

**CONCLUSION**

Sufficient, with exceptions.

**FACTORS IMPACTING CONCLUSION**

- BOE appropriately reviewed statements, reports, registrations, and campaign finance complaints that were submitted in accordance with CFA, LLALAA, and CIRA.

- BOE appropriately made available, via its SOS Internet site, applicable information within financial reports, registrations, and complaints that were submitted in accordance with CFA, LLALAA, and CIRA.

- Reportable condition related to the timeliness of review (Finding #4).

Appendix--00227

I APP. 1061

## FINDING #4

**Statement, report, and complaint review needs improvement.**

BOE did not ensure compliance with the timeliness requirements of CFA and LLALAA in its review of campaign statements, lobby reports, and campaign finance complaints. Without timely identification and correction of errors, omissions, and violations, the public may not have access to relevant and accurate information related to campaign finance and lobbying activities.

Sections 169.216 and 4.423 of the *Michigan Compiled Laws* require BOE to notify a filer of an error or an omission in a campaign statement within 4 business days and a lobby report within 10 calendar days, respectively. In addition, Section 169.215 of the *Michigan Compiled Laws* requires BOE to notify the person against whom a campaign finance complaint is filed within 5 business days and to make a final determination regarding the complaint within 135 business days.

We reviewed 33 campaign statements, 33 lobby reports, and 12 campaign finance complaints. Our review disclosed:

a. 26 (79%) statements were not reviewed within 4 business days. BOE reviewed these statements within 6 to 98 business days, averaging 33 business days.

b. 14 (42%) reports were not reviewed within 10 calendar days. BOE reviewed these reports within 13 to 40 calendar days, averaging 18 calendar days.

c. 8 (67%) complaints were not reviewed within 5 business days. Furthermore, BOE was unable to make the final determination and resolution for 3 of these complaints within the required 135 business days.

BOE informed us that the number of job duties has increased, yet staffing has remained unchanged. For example, the overall workload has grown in part because of the rise of social media campaign donations and increased campaign costs. In addition, campaign statements and winter lobby reports share a due date of January 31 annually.

We noted a similar condition in our prior audit related to the timeliness requirement for review of campaign statements and reports. The Department agreed that it could not realistically meet the mandated 4 business day review requirement established by the *Michigan Compiled Laws* and would work to potentially improve its process through automation or seek legislative change.

**RECOMMENDATION**

We recommend that BOE improve its efforts to ensure compliance with the timeliness requirements of CFA and LLALAA.

**AGENCY PRELIMINARY RESPONSE**

The Department of State provided us with the following response:

*BOE agrees and has already instituted additional steps and controls to more closely track compliance for the complaints process to ensure a more timely rate of review in the future, and will do the same with the 10-day review requirement for lobby reports.*

*BOE continues to agree that it cannot realistically meet the mandated four business day review requirement established by the Michigan Campaign Finance Act. BOE indicated that it will work to seek staffing increases that would allow for full review within the timeframes required, as well as a possible legislative change to lengthen the four-day review requirement.*

UNAUDITED

<u>BUREAU OF ELECTIONS</u>
Department of State

Counties, Cities, and Townships in Michigan Without a Fully Accredited Election Official
<u>As of May 3, 2019</u>



To view the interactive map, use this link:  https://audgen.michigan.gov/231-0235-19-map/

Source:  The OAG created this map using unaudited data from BOE's eLearning Center as of
May 3, 2019.

Appendix--00230

I APP. 1064

## AGENCY DESCRIPTION

BOE was established under legislation enacted in 1951 to assist with the administration of the SOS's election-related duties and responsibilities. BOE maintains the State's QVF, which is the complete list of 7.5 million registered electors in Michigan. BOE offers guidance and develops and provides training to 1,608 local clerks and 1,979 other local election officials who independently administer elections under their jurisdiction. BOE also administers the State's campaign finance, lobbyist, and casino disclosure laws, which help to ensure the transparency of the State's election process. As of the end of fiscal year 2018, BOE expended $24.6 million and had 35 employees.

# AUDIT SCOPE, METHODOLOGY, AND OTHER INFORMATION

**AUDIT SCOPE**

To examine the processes and records related to BOE. We conducted this performance audit* in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

We did not review:

- Whether elections were conducted or counted in accordance with the Michigan Election Law.

- The implementation of Proposal 2 of 2018*.

- The implementation of Proposal 3 of 2018.

- IT controls over the database, operating system, or network that support QVF.

- The purchasing of voter equipment by local election officials.

All of the above items except the implementation of Proposal 3 of 2018 are not within the scope of the audit or were subject to review in other audits. Proposal 3 of 2018 was not implemented until the May 2019 election, and because of the lack of the number of individuals who participated in this election, we do not believe that there would be sufficient, appropriate evidence to provide a reasonable basis for a conclusion. Accordingly, we do not express conclusions on the above subjects.

**PERIOD**

Our audit procedures, which included a preliminary survey, audit fieldwork, report preparation, analysis of agency responses, and quality assurance, generally covered October 1, 2016 through April 30, 2019.

**METHODOLOGY**

We conducted a preliminary survey to gain an understanding of BOE's operations to formulate a basis for establishing our audit objectives, scope, and methodology. During our preliminary review, we:

- Interviewed BOE management and staff regarding their functions and responsibilities.

*See glossary at end of report for definition.*

Appendix--00232

I APP. 1066

- Reviewed applicable BOE operating procedures, sections of the *Michigan Compiled Laws*, prior audit reports, and Michigan election information available to the public.

- Analyzed QVF Legacy and QVF Refresh data and BOE expenditures.

- Analyzed eLearning Center data.

- Performed walkthroughs of BOE's review and publication of CFA, LLALAA, and CIRA submitted statements, reports, registrations, and complaints.

**OBJECTIVE #1**

To assess the sufficiency of BOE's efforts to maintain the integrity of QVF.

To accomplish this objective, we:

- Judgmentally sampled 34 of 84,628 discrepancies in names, dates of birth, and addresses between QVF Refresh and DLF as of May 8, 2019. Because we used a judgmental sample, we could not project our results to the entire population.

- Reviewed QVF Refresh for underage electors or electors with extraordinary ages.

- Reviewed QVF Refresh for registered electors with an address in a state other than Michigan.

- Reviewed QVF Refresh for registered electors with blank fields (name, date of birth, address, city, state, and zip code).

- Reviewed the QVF Legacy voting history for underage electors.

- Reviewed the QVF Legacy voting history for electors who voted more than once per election.

- Completed an independent verification to determine if deceased individuals were recorded as having voted in the 2018 primary election in QVF Legacy.

- Reviewed the QVF Legacy voting history for electors who voted while incarcerated.

- Reviewed the QVF Refresh system edit to ensure that noncitizens were not automatically added to QVF when updates occurred in DLF.

**OBJECTIVE #2**  To assess the effectiveness of selected application access controls over the QVF Refresh System.

To accomplish this objective, we:

- Reviewed the appropriateness of access rights for all 28 active QVF Refresh users with administrative access as of April 29, 2019.

- Reviewed the appropriateness of access rights for 33 of 3,191 active QVF Refresh users with nonadministrative access as of April 29, 2019. We randomly selected our sample to eliminate any bias and to enable us to project the results to the entire population.

- Reviewed the date of last log-in to QVF Refresh for 3,219 active users as of April 29, 2019 to identify users who had not accessed the system for a significant time period or who had never accessed the system.

- Reviewed BOE's process for granting, monitoring, and removing user access.

- Evaluated BOE's controls over access requirements.

**OBJECTIVE #3**  To assess the sufficiency of BOE's efforts to establish and provide training to county, city, and township officials who are responsible for conducting elections.

To accomplish this objective, we:

- Reviewed the Michigan Election Law to determine BOE's responsibilities related to the training of election officials.

- Reviewed training courses in the eLearning Center to determine whether BOE:

  o Established election training in the eLearning Center.

  o Provided training to local election officials.

  o Provided guidance distinguishing local-level and State-level responsibilities.

  o Included information that would allow election officials to be knowledgeable on the Michigan Election Law and trending election topics.

- Reviewed BOE's training records for 1,608 local clerks and 1,979 other local election officials to determine whether:

  o Clerks and other local election officials completed accreditation requirements.

  o Clerks completed continuing election education at least once every two years.

- Evaluated BOE's process to identify clerks and other election officials who completed the accreditation requirements.

- Evaluated BOE's processes to remove the accreditation of clerks who had not completed continuing education.

- Evaluated BOE's process of assigning training courses to local election officials.

**OBJECTIVE #4**     To assess the sufficiency of BOE's efforts to comply with the requirements of CFA, LLALAA, and CIRA.

To accomplish this objective, we:

- Randomly sampled 33 of 12,102 campaign statements filed from October 1, 2016 through April 30, 2019 to determine whether BOE:

  o Publicly provided statement information.

  o Reviewed the reports in a timely manner.

  o Assessed late filing fees.

  o Notified committees of errors and omissions.

- Randomly sampled 12 of 111 campaign finance complaints filed from October 1, 2016 through November 21, 2018 to determine whether BOE:

  o Notified the person against whom the complaint was filed in a timely manner.

  o Endeavored to correct or prevent further violations by using informal methods, such as a conciliation agreement in a timely manner.

- Randomly sampled 33 of 998 registration forms of lobbyists or lobbing agents whose active dates were from October 1, 2016 through April 30, 2019 to determine whether BOE:

  o Assessed late filing fees.

- o Publicly provided registration information consistent with filed data.

- Randomly sampled 33 of 5,373 lobby reports for financial reporting years 2017, 2018, and 2019 through June 10, 2019 to determine whether BOE:

  - o Reviewed the reports in a timely manner.

  - o Assessed late filing fees.

  - o Notified the filer of errors and omissions in a timely manner.

  - o Identified expenditures as being for a public official when applicable.

- Randomly sampled 8 of 72 casino interest registration forms filed from October 1, 2016 through April 30, 2019 to determine whether BOE:

  - o Publicly provided casino interest registration information consistent with filed data.

  - o Assessed late filing fees for all 72 forms.

We randomly selected our samples to eliminate bias and to enable us to project the results to the respective populations.

**CONCLUSIONS**

We base our conclusions on our audit efforts and any resulting material conditions or reportable conditions.

When selecting activities or programs for audit, we direct our efforts based on risk and opportunities to improve State government operations. Consequently, we prepare our performance audit reports on an exception basis.

**CONFIDENTIAL AND SENSITIVE INFORMATION**

Because of the confidentiality of security configurations, we summarized our testing results in Finding #2, part d., and provided the underlying details to the SOS.

**AGENCY RESPONSES**

Our audit report contains 4 findings and 4 corresponding recommendations. The Department of State's preliminary response indicates that BOE agrees with all of the recommendations.

The agency preliminary response that follows each recommendation in our report was taken from the agency's written comments and oral discussion at the end of our fieldwork. Section 18.1462 of the *Michigan Compiled Laws* and the State of Michigan Financial Management Guide (Part VII, Chapter 4, Section 100) require an audited agency to develop a

plan to comply with the recommendations and to submit it to the State Budget Office upon completion of an audit.  Within 30 days of receipt, the Office of Internal Audit Services, State Budget Office, is required to review the plan and either accept the plan as final or contact the agency to take additional steps to finalize the plan.

**PRIOR AUDIT FOLLOW-UP**

Following is the status of the reported findings from our May 2012 performance audit of the Bureau of Elections, Department of State (231-0235-11):

| Prior Audit Finding Number | Topic Area | Current Status | Current Finding Number |
|---|---|---|---|
| 1 | QVF Voter History File | Rewritten* | 1 |
| 2 | Defining QVF Responsibilities | Complied | Not applicable |
| 3 | Guidance on QVF Access Controls | Complied | Not applicable |
| 4 | Promotion of Election Law Compliance Training | Rewritten | 3 |
| 5 | Expanding Availability of Accreditation Programs | Complied | Not applicable |
| 6 | Timeliness of CFA Statement and Report Review | Rewritten | 4 |
| 7 | Revision of Michigan Gaming Control Board Memorandum of Understanding | Complied | Not applicable |
| 8 | CIRA Reporting and Notification | Complied | Not applicable |

**SUPPLEMENTAL INFORMATION**

Our audit report includes a map of the counties, cities, and townships in Michigan without a fully accredited election official. Our audit was not directed toward expressing a conclusion on this information.

*\* See glossary at end of report for definition.*

# GLOSSARY OF ABBREVIATIONS AND TERMS

**access controls**        Controls that protect data from unauthorized modification, loss, or disclosure by restricting access and detecting inappropriate access attempts.

**accreditation**        BOE's process of validation in which local election officials are evaluated to determine their level of knowledge of Michigan's election process.

**BOE**        Bureau of Elections.

**CFA**        Campaign Finance Act.

**CIRA**        Casino Interest Registration Act.

**driver's license file (DLF)**        The SOS data file that contains all driver's licenses and includes all personal identification numbers.

**DTMB**        Department of Technology, Management, and Budget.

**effectiveness**        Success in achieving mission and goals.

**eLearning Center**        The Web-based application used by BOE to facilitate the distribution of training to local election officials.

**elector**        A person who has the right to vote in an election.

**full accreditation**        Documented completion of an initial training course and all continuing education assignments and subsequent training courses.

**integrity**        Accuracy, completeness, and timeliness of data in an information system.

**LLALAA**        Lobbyists, Lobbying Agents, and Lobbying Activities Act.

**material condition**        A matter that, in the auditor's judgment, is more severe than a reportable condition and could impair the ability of management to operate a program in an effective and efficient manner and/or could adversely affect the judgment of an interested person concerning the effectiveness and efficiency of the program.  Our

assessment of materiality is in relation to the respective audit objective.

**Michigan Election Law**     Sections 168.1 - 168.992 of the *Michigan Compiled Laws*.

**OAG**     Office of the Auditor General.

**performance audit**     An audit that provides findings or conclusions based on an evaluation of sufficient, appropriate evidence against criteria. Performance audits provide objective analysis to assist management and those charged with governance and oversight in using the information to improve program performance and operations, reduce costs, facilitate decision-making by parties with responsibility to oversee or initiate corrective action, and contribute to public accountability.

**principle of least privilege**     The practice of limiting access to the minimal level that will allow normal functioning. Applied to employees, the principle of least privilege translates to giving people the lowest level of user access rights that they can have and still do their jobs. The principle is also applied to things other than people, including programs and processes.

**Proposal 2 of 2018**     A proposed constitutional amendment to create a commission of citizens for redistricting purposes and authorize the commission to adopt reapportionment plans for Congressional, State Senate, and State House of Representatives districts.

**Proposal 3 of 2018**     A proposed constitutional amendment to regulate and authorize no-reason absentee voting, require a straight-party voting option on general election ballots, provide for automatic and Election Day voter registration, require post-election audits, and make other voting changes.

**QVF**     Qualified Voter File.

**QVF Legacy**     The original system used as the official file for the conduct of all elections held in the State. It was developed in the 1990s and has been rewritten to be more a modern, secure, and real-time Web-based system.

**QVF Refresh**     This system is the official file for the conduct of all elections held in the State and replaced QVF Legacy on August 15, 2019 in preparation for the 2020 election.

| | |
|---|---|
| reportable condition | A matter that, in the auditor's judgment, is less severe than a material condition and falls within any of the following categories: an opportunity for improvement within the context of the audit objectives; a deficiency in internal control that is significant within the context of the audit objectives; all instances of fraud; illegal acts unless they are inconsequential within the context of the audit objectives; significant violations of provisions of contracts or grant agreements; and significant abuse that has occurred or is likely to have occurred. |
| rewritten | The recurrence of similar conditions reported in a prior audit in combination with current conditions that warrant the prior audit recommendation to be revised for the circumstances. |
| SOS | Secretary of State. |

RECEIVED by MSC 11/26/2020 2:44:13 AM



**Report Fraud/Waste/Abuse**

Online: audgen.michigan.gov/report-fraud

Hotline: (517) 334-8060, Ext. 1650

# *Stillwater Technical Solutions*
### *"Complex Problems Solved Well"*

October 9, 2020

Mr. Phill Kline                                    Mr. Erick Kaardal
Thomas More Society                   Mohrman, Kaardal and Erickson PA
309 West Washington Street, Suite 1250    150 South Fifth Street, Suite 3100
Chicago, IL 60606                         Minneapolis, MN 55402

Re: The Legitimacy and Effect of Private Funding in State and Federal Electoral Processes

Dear Mr. Kline:

*Introduction -*

Thank you for retaining Stillwater Technical Solutions (STS) to survey the impact of public/private partnership funding on state certified Help America Vote Act (HAVA) implementation plans, and state electoral administrative processes. STS is a non-partisan, for-profit research and public-policy advisory firm specializing in federal and local government administrative procedures, land and natural resource policymaking, local governmental relations, and program management.

Thomas Moore Society (TMS) has retained STS to analyze whether grants from private, non-profit organizations that are independent of state certified HAVA implementation plans and legislative appropriations processes may legitimately be integrated with public funding by local governments for electoral administration. Our brief response, expanded throughout this briefing paper, is that there is no statutory or administrative basis or history for local jurisdictions to solicit or receive private funding outside of state plans or legislative and congressional appropriation processes.

STS was specifically requested to brief TMS on the following questions:

1) Whether state certified HAVA implementation plans or state legislative prerogatives are compromised through the injection of private grants from the Center for Technology and Civic Life (CTCL) into local elections offices;

2) If existing appropriations from federal, state or local sources are sufficient to execute the 2020 elections, making funding from public/private partnerships unnecessary;

3) How the reporting and claw back provisions in CTCL agreements with local governments represent an ongoing liability for local governments, skews state legislative budgeting, and result in inaccurate federal and state audits required for HAVA programs;[1]

4) How injection of CTCL funds in discreet jurisdictions distorts legislative appropriation formulas, resulting in an inequitable distribution of funding throughout the state, contrary to HAVA and state implementation plans.

---

[1] 41 CFR Part 105-71. *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments.*

RECEIVED by MSC 11/26/2020 2:44:13 AM

*Approach -*

For this survey, STS analyzed the requirements from the U.S. Elections Assistance Commission (EAC) and provisions in CTCL agreements in the context of the state certified HAVA implementation plans for the states of Wisconsin,[2] Minnesota[3,4] Michigan,[5] and Pennsylvania.[6] These four states were selected because of an early emphasis and focused collaboration between CTCL and large municipalities, as well as the timing of CTCL grants, beginning in late spring 2020. A chronology of the CTCL and local governmental transactions, previously reported by STS, was also integrated in this analysis.[7]

Through assessment of the administrative responsibilities of state electoral commissions, as codified in state HAVA implementation plans, and documentation of vast unaccessed federal appropriations through HAVA and the Coronavirus Aid Relief and Economic Security (CARES) Act,[8] STS was able to demonstrate that there is no deficit of governmental funding available to the states or local jurisdictions for administration of the 2020 elections.

One question that emerges is the history, influence, and impact that private funding could have on the long-term *culture* of state and federal elections. Because large amounts of onshore and offshore funding into non-profit foundations has been documented to influence federal agencies and U.S. policymaking,[9] the potential negative effect of funding on state HAVA implementation programs and local elections is of national import, and beyond the scope of this briefing letter.

*Background; Situation Appraisal -*

The responsibility to administer state and federal elections is the sole prerogative of the Wisconsin, Minnesota, Michigan, Pennsylvania and remaining state legislatures.[10] Those legislatures maintain responsibility for appropriations and delegation of authority to state electoral commissions, who in turn administrate elections on a statewide basis. The state elections commissions enact administrative policies, support county and municipal officials in their individual precincts, and are responsible to administer and report HAVA expenditures in accordance with certified implementation plans approved by the state legislatures and the EAC.

---

[2] Certified Wisconsin HAVA State Plan of 2002. WI Elections Board. FR Vol. 69 No. 57 March 24 2004.

[3] Certified Minnesota HAVA State Plan of 2002. Mary Kiffmeyer Secretary. FR Vol. 69 No. 57 March 24 2004.

[4] Publication of States Plan Pursuant to the Help America Vote Act. Federal Register Vol. 74, No 237 Friday December 11, 2009.

[5] Certified Michigan HAVA State Plan of 2002. Terri Lynn Land Secretary. FR Vol. 69 No. 57 March 24 2004.

[6] Certified Pennsylvania HAVA State Plan of 2002. Edward Rendell Governor, P.A. Cortes Secretary FR Vol. 69 No. 57 March 24 2004.

[7] *CTCL Grant Awards History, Chronology, and Issues.* Stillwater Technical Solutions. October 2020.

[8] Federal Election Assistance Commission. *Post Primary CARES Act Expenditure Report. September 22, 2020.*

[9] *The Chain of Command. How Billionaires and Foundations Control Environmental Movement.* US Senate Report July 30 2014.

[10] U.S. Const. Art. I, § 4.

RECEIVED by MSC 11/26/2020 2:44:13 AM

With promulgation of HAVA on October 29, 2002 and assistance from the EAC, individual state legislatures are provided a conduit for federal funding and assistance for reform and administration of electoral programs. At the federal level, auditing is the responsibility of the Office of the Inspector General and any necessary prosecutorial actions are undertaken by the U.S. Attorney General.

Access to federal HAVA funding requires participating state legislatures to prepare and certify detailed state implementation plans that ensure election integrity, provide for security, assure privacy, improve voter access, and provide for reporting and auditing. The state HAVA implementation plans provide measures to upgrade voter systems, standards for database integrity, methods of voter communication, requirements for recruitment and training of poll workers, and many other policies to be implemented by electoral officials at the local level.

Preparation and revision of HAVA implementation plans are governed by the administrative procedure statutes of the individual states. State administrative procedures and other executive branch policies typically impose public notification, opportunity for public comment, and other protective, procedural constraints on executive commissions and agencies before HAVA implementation plans may legitimately be modified.

The ongoing availability of HAVA appropriations to state legislatures is dependent upon compliance with state implementation plans and annual reporting to the EAC. All state certified HAVA elections plans must meet the federal audit standards under the *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments* at 41 CFR Part 105-71.

The CARES Act, signed into law on March 27, 2020, provides an additional $400 million to the EAC, the states, the District of Columbia, and U.S. Territories *"to prevent, prepare for, and respond to coronavirus, domestically or internationally, for the 2020 Federal election cycle."* The CARES Act requires state agencies to coordinate with the Pandemic Response Accountability Committee, and dissemination of CARES Act funding takes place through the existing HAVA state implementation planning process.

It is important to note that large amounts of the CARES Act relief funding appropriated by the EAC to Wisconsin, Minnesota, Michigan, Pennsylvania and the other states for electoral administration is unspent and remains available to municipalities and counties.[11] Because large amounts of federal funding continue to be available, the need for augmentation from the private sector is both unjustified and unwarranted.

In Wisconsin, as of July 10, 2020, the EAC reported that only 60% of the $7,362,345 CARES funding has been spent.[12,13] This makes solicitation of CTCL funding by Racine Mayor Mason for redistribution to the cities of Madison, Milwaukee, Green Bay, and Kenosha unnecessary and outside of the protocols of the Wisconsin HAVA implementation plan for electoral administration.[14]

---

[11] Federal Election Assistance Commission. Post Primary CARES Act Expenditure Report. September 22, 2020.

[12] Elections Assistance Commission. CARES Act Quarterly Report to the Pandemic Response Committee. July 10, 2020.

[13] Federal Election Assistance Commission. Post Primary CARES Act Expenditure Report. September 22, 2020.

[14] Ibid. Stillwater Technical Solutions Chronology Matrix. October 2020.

RECEIVED by MSC 11/26/2020 2:44:13 AM

Public funding for administration of local elections has also been made available at the individual state level. In Wisconsin, the state legislature sponsored and funded an aid program called *Wisconsin Routes to Recovery*.[15] The *Routes to Recovery* program reimburses local governments for unbudgeted expenditures necessary to respond to the COVID-19 public health emergency.

The CTCL grant program has the appearance of being initiated after the EAC and Congress appropriated HAVA and CARES Act funding, with the range of funded programs being similar to those already provided for in HAVA state implementation plans.[16] Remarkably, the CTCL grant program is being administered at the local level *independent* of the EAC, delegated state commissions, or state HAVA implementation plans. This approach distorts local and state budgeting processes, circumvents mandated funding formulas that provide for uniform and equitable distribution of funding, and bypasses public notification, public comment, and other administrative processes that ensure the public can hold government accountable.

---

[15] Guidance. Wisconsin Routes to Recovery Reimbursement Program. September 25 2020.

[16] Elections Assistance Commission. Plans for Use of CARES Act Funds. Report to Pandemic Response Committee.

RECEIVED by MSC 11/26/2020 2:44:13 AM

*Conflict Summary -*

## I. Injection of private funding into county and municipal elections circumvents State and Federal appropriations processes, violates protocols in HAVA state implementation plans, and results in inaccurate reporting under HAVA 254(a)(5):

a. The Help America Vote Act (HAVA) prescribes an intergovernmental administrative process that includes the U.S. Election Assistance Commission (EAC), state legislatures, and delegated state commissions.

b. The mechanism and authority for administration of HAVA mandates for both HAVA and CARES Act appropriation funding is prescribed in Wisconsin, Minnesota, Michigan, and Pennsylvania[17] state certified HAVA plans.

c. The individual state HAVA implementation plans incorporate detailed planning requirements for 13 HAVA categories, including election security protocols; standards for voter systems; equipment procurement requirements; voter and electoral official training procedures; provisional voting and balloting processes; provisions to improve voting access; mail-in voter registration requirements; voter complaint resolution protocols; and appropriations monitoring, auditing and reporting protocols.

d. The claw back and reporting provisions in CTCL contracts with local counties and municipalities, if exercised, will result in skewed recordkeeping and state reporting under HAVA 254(a)(5) and the Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Governments at 41 CFR Part 105-71.

e. The claw back language in the CTCL agreements represents a contingent, ongoing, and long-term liability for local counties and municipalities who access the CTCL grants. The public record already records instances of local governments voting to incorporate CTCL funds in their general budget.

f. Scaled up across the 15 states of known CTCL activity, inaccuracies in state/federal HAVA Title II reporting and auditing resulting from unreported funding and claw back provisions is substantial.

g. The appropriate mechanism for charitable donations to electoral processes is through donations earmarked into the general fund of the individual state legislatures. There is no state or federal statutory authority or mechanism for counties, municipalities, or other local electoral jurisdictions to solicit, receive, or appropriate private funding for administration of public elections beyond the authority of state HAVA implementation plans.

---

[17] Notice, *Publication of State Plans Pursuant to the Help America Vote Act*, Federal Register Volume 69, No. 57, Wednesday, March 24, 2004.

RECEIVED by MSC 11/26/2020 2:44:13 AM

II. **HAVA, CARES, and state appropriations for local elections in Michigan, Wisconsin, Pennsylvania, and Minnesota remain sufficient for the 2020 election cycle, rendering CTCL funding unnecessary:**

a. Public appropriations for federal elections through the U.S. Election Assistance Commission (EAC), state matching funds, and other public moneys are the appropriate funding sources for administration of U.S. elections. State-level funding formulas provide for proportional and equitable distribution of funds, ensuring resources are evenly allocated to serve the voting public. State and federal mandates require funding recipients to report how election funding was spent within their jurisdictions.

b. For the 2020 election cycle, federal and state appropriations for administration of local elections have been substantially augmented to address the COVID-19 pandemic by additional funding through the CARES Act and other legislation.

c. Additional COVID-19 pandemic response funding for election administration has been made available through state appropriations and other allocations of public funds. As example, the State of Wisconsin used CARES Act funding and state matches for its *Routes to Recovery Program*.

d. The combination of the HAVA election security and CARES Act funding, along with any state matches, remains adequate to facilitate election operations, upgrade of election-specific hardware and software, cybersecurity, training for voter and elections officials, and COVID-19 specific needs. Publicly sourced funding remains sufficient without any private contributions.

e. Local electoral officials in Michigan who performed due diligence on CTCL grants have observed the sufficiency of CARES Act funding and remarked as to the non-necessity of CTCL grants. Michigan's Oakland County Clerk Lisa Brown decided not to seek CTCL funding because "*We already had an opportunity through the CARES Act to get extra equipment and things we would need at the county level. It seemed to me that they were offering up the same sort of thing.*" [18]

f. The 2019 HAVA Title II 251 Report to the EAC from Michigan Secretary Jocelyn Benson documents an unexpended HAVA surplus for administration of statewide elections of $1,285,975.[19] The public record indicates that Secretary Benson was aware of the availability of adequate public funding for dissemination to Ann Arbor, Flint, Lansing, East Lansing, Muskegon, Pontiac, Romulus, Kalamazoo, and Saginaw – jurisdictions currently seeking CTCL funds. This contrasts with Secretary Bensons public promotion of CTCL funding for administration of elections in Michigan.

g. Concerns with CTCL funding include lack of public accountability, no state legislative or EAC oversight, and agreements that require reporting of electoral information from government back to a non-governmental organization.

---

[18] *Benson accused of letting 'partisan operatives' influence election.* Detroit News. October 6, 2020.
[19] Michigan HAVA 251 Funds Report. December 2019.

RECEIVED by MSC 11/26/2020 2:44:13 AM

| Table 1 - HAVA and CARES Funding Plus State Matching Funds for 2020 Elections[20] | | | | | |
|---|---|---|---|---|---|
| | **2019 HAVA Carryover** | **Election Security** | **Match** | **CARES** | **Match** | **Total** |
| **MI** | $6,635,744 | $12,053,705 | $2,410,741 | $11,299,561 | $2,259,912 | $34,689,663 |
| **MN** | $6,548,440 | $7,418,672 | $1,483,734 | $6,958,233 | $1,391,647 | $23,800,726 |
| **PA** | $3,531,998 | $15,175,567 | $3,035,113 | $14,233,603 | $2,844,721 | $38,821,002 |
| **WI** | $4,316,403 | $7,850,124 | $1,570,025 | $7,362,345 | $1,472,469 | $22,531,366 |

| Table 2 - Estimated CARES Act Expenditures 20 Days Post Primary Election[21] | | | | | |
|---|---|---|---|---|---|
| | **Amount Appropriated** | **State Match** | **Initial Total Available** | **Estimated Expenditure** | **Available Funds** |
| **MI** | $11,299,561 | $2,249,551 | $13,549,112 | $6,821,392 | $6,727,720 49% |
| **MN** | $6,958,233 | $1,386,122 | $8,344,355 | $363,867 | $7,980,488 92% |
| **PA** | $14,233,603 | $2,831,101 | $17,064,704 | $3,511,525 | $13,553,179 79% |
| **WI** | $7,362,345 | $1,472,469 | $8,834,814 | $3,228,484 | $5,303,330 60% |

| Table 3 – Government Funding and CTCL Grant Funding | |
|---|---|
| **2020 HAVA + CARES Funding[22]** | **2020 CTCL Grants[23, 24]** |
| **MI** | $28,023,919 | $6,369,753  (22.7%) |
| **MN** | $17,252,286 | $2,297,342  (13.3%) |
| **PA** | $35,289,004 | $15,824,895  (44.8%) |
| **WI** | $18,254,963 | $6,946,767  (38.1%) |

h.  Because of the COVID-19 pandemic, Congress provided additional elections funding through the CARES Act that nearly doubled the funding levels already provided in the annual HAVA funding. Much of the remaining CARES funding has not yet been expended. The CTCL grant funding is predicated on assisting local election offices in meeting unexpected election expenses resulting from the effects of the COVID-19 pandemic. Because adequate provision for meeting those expenses has already been provided though public sources, the CTCL grants are excess to needs.

---

[20] *Election Assistance Commission—Election Security Grant Funding Chart July 16, 2020* and *Election Assistance Commission—CARES Grant Funding Chart July 22, 2020*
[21] *ESTIMATED CARES Act Expenditures As Reported in 20 Day Post Primary Reports (September 22, 2020 Update)*
[22] Includes federal funding + state matching funds; does not include 2019 carryover.
[23] CTCL grant dollar amount accompanied with size as a percentage of total government funding for the state.
[24] CTCL grant values must be viewed as approximate because the numbers reported by news sources and local governments vary, and grant awards continue.

### III. When evaluated in context of the 2016 presidential election, CTCL grant funding patterns demonstrate partisanship in grant funding awards:

a. A review of data for 2020 CTCL grant-making in Michigan, Minnesota, Pennsylvania, and Wisconsin, and incorporation of 2016 presidential election voting records for jurisdictions receiving CTCL grants, reveals a pattern of greater funding being awarded to jurisdictions where candidate Hillary Clinton won versus grant-receiving jurisdictions where candidate Donald Trump won. While CTCL maintains that it is a non-partisan organization and its grants are available to all local jurisdictions, the grant pattern can be understood to have a clear color of partisanship. Attachment A contains charts, graphs and a table supporting this conclusion.

b. **Michigan** - At the time of this survey, CTCL had awarded eleven grants in Michigan. Recipient cities were Detroit ($3,512,000), Lansing ($443,742), East Lansing ($43,850), Flint ($475,625), Ann Arbor ($417,000), Muskegon ($433,580), Pontiac ($405,564), Romulus ($16,645), Kalamazoo ($218,869), and Saginaw ($402,878). In the 2016 election, only Saginaw was won by candidate Donald Trump; the remainder were won by candidate Hillary Clinton. In total, $9,451,235 (95.7%) was awarded to the ten jurisdictions where candidate Clinton won and only $402,878 (4.3%) where candidate Trump won.

c. **Minnesota** - At the time of this survey, the only Minnesota jurisdiction that had been awarded a CTCL grant was Minneapolis, in the amount of $2,297,342. Candidate Hillary Clinton won the 2016 presidential vote in the jurisdiction.

d. **Pennsylvania** - At the time of this survey, CTCL had awarded seven grants in Pennsylvania. Three of these grants were awarded to the cities of Philadelphia ($10,016,074), Erie ($148,729), and Lancaster ($474,202). Five were awarded to counties: Wayne County ($25,000), Northumberland County ($44,811), Center County ($863,828), Delaware County ($2,200,000), and Allegheny County ($2,052,251). A total of $13,063,828 (94.7%) went to jurisdictions where candidate Hillary Clinton won in the 2016 presidential election; only $692,742 (5.3%) went to jurisdictions where candidate Donald Trump won.

e. **Wisconsin** - At the time of this survey, CTCL had awarded multiple grants to five Wisconsin cities: Milwaukee - two for a total of $2,164,500; Madison - two for a total of $1,281,788; Green Bay - two for a total of $1,625,600; Racine - two for a total of $1,002,100; and, Kenosha - two for a total of $872,779. The $60,000 grant to Racine is what remained of a $100,000 CTCL grant to that municipality that included a stipulation that Racine would distribute a $10,000 sub-grant to each of the other four cities. This appears to place Racine in the position of being an agent acting on behalf of CTCL for the purpose of distributing grant moneys along with CTCL instruction. Candidate Hillary Clinton won handily in all five jurisdictions. [25]

---

[25] Wisconsin Safe Voting Plan. June 15, 2020.

*Concluding Remarks and Opinions -*

Despite wars, depressions, onshore attacks, and other national traumas, the United States, throughout its 224-year history, has been able to successfully navigate electoral processes with reasonable normalcy. The current pandemic, though real, is neither exceptional nor reason to alter longstanding processes or timing of electoral administration.

The national and state governments provide public funding to carry out elections because funding from private sources could subject electoral officials to coercion, manipulation, and corruption. Private funding into local elections, over time and if allowed, will change the culture of how county clerks and municipalities view and access public funding.

With respect to the CTCL grant program itself, injection of funding into local jurisdictions circumvents longstanding administrative processes that protect voters from disenfranchisement, fraud, or an inequitable statewide distribution of funding across the electoral precincts. This condition could foreseeably and negatively affect rural voters or in-person voters.

Based upon the information in this Briefing Paper, STS offers the following actions or activities for consideration by TMS:

1. Administrative, judicial or informational actions aimed at local governments or municipalities receiving CTCL grants;

2. Provision of information to State Attorneys General who are responsible for oversight of nonprofit organizations within their respective states;

3. Provide support and information to local citizenry of CTCL grant receiving counties and municipalities such that they may inform, disagree with, or even formally challenge grant decisions by local commissions.

Please feel free to contact me as you have questions or comments on the enclosed.

Regards,

J.R. Carlson
Managing Partner
Stillwater Technical Solutions

## Attachment A
### Charts, Graphs and Tables

**Note:** Variations in grant amounts were reported by editors, the press and in meeting minutes from local governments. These variations might result in perceived inaccuracies in the dollar amounts of some CTCL grants. Because CTCL continues to make grants, source information in these calculations will outdate. The data presented is sufficient and reliable to conclude clear political trends in CTCL grant awarding patterns.

Except where noted, individual grant amounts are linked to source information.

**CTCL Michigan Grants[1]**



- CTCL Grants with More Clinton Votes
- CTCL Grants with More Trump Votes

Chart note[1] The chart above contains the sum of CTCL grants to the 10 Michigan Cities listed in Table 1 below.

Table 2

| CTCL Grants with More Clinton Votes | CTCL Grants with More Trump Votes |
|---|---|
| $5,966,875[1] | $402,878[1] |

Table 2 note[1]. $5,966,875 and $0 are sums of CTCL's grants to the 10 Michigan cities listed in Table 1 below.

Table 1

| City | CTCL Grant with More Clinton Votes | CTCL Grant with More Trump Votes |
|---|---|---|
| Detroit | $3,512,000 | $0 |
| Lansing | $443,742 | $0 |
| East Lansing | $43,850 | $0 |
| Flint | $475,625 | $0 |
| Ann Arbor | $417,000 | $0 |
| Muskegon | $433,580 | $0 |
| Pontiac | $405,564 | $0 |
| Romulus | $16,645 | $0 |
| Kalamazoo | $218,869 | $0 |
| Saginaw | $0 | $402,878 |
| Total CTCL MI Grant | $5,996,875 | $402,878 |

Appendix--00255

**Clinton Michigan Votes v. Trump Michigan Votes[1]**



Chart Note[1]. Only the 10 Michigan cities in the above graph received 2020 CTCL funding.

Table 1

| City or County | 2016 Clinton Votes | 2016 Trump Votes |
|---|---|---|
| Detroit | 234,871 | 7,682 |
| Lansing | 65,272 | 22,390 |
| East Lansing | 26,146 | 8,294 |
| Flint | 16,163 | 4,677 |
| Ann Arbor | 128,025 | 50,335 |
| Muskegon | 8,933 | 3,372 |
| Saginaw | 10,263 | 11,077 |
| Pontiac | 14,351 | 2,735 |
| Romulus | 7,573 | 3,078 |
| Kalamazoo | 18,644 | 5,456 |

## CTCL Minnesota Grant with More Clinton Votes



- CTCL Grant with More Clinton Votes
- CTCL Grant with More Trump Votes

100%

Table 1

| City | CTCL Grant with More Clinton Votes | CTCL Grant with More Trump Votes |
|---|---|---|
| Minneapolis | $2,297,342 | $0 |

**Clinton and Trump Minnesota Votes that Received CTCL Grant in 2020**



Table 1

| City | Clinton Votes in City that Received CTCL Grant | Trump Votes in City that Received CTCL Grant |
|---|---|---|
| Minneapolis | 174,585 | 25,693 |

### CTCL Pennsylvania Grants[1]



- CTCL Grants with More Clinton Votes
- CTCL Grants with More Trump Votes

4%

96%

Chart note[1] The chart above contains the sum of CTCL's
Pennsylvania grant money listed in Table 2 below

### Table 1

| | |
|---|---|
| **CTCL Grants with More Clinton Votes** | $15,132,153[1] |
| **CTCL Grants with More Trump Votes** | $692,742[1] |

Table 1 note[1]. $15,132,153 and $692,742 are sums of the CTCL Pennsylvania
grants listed in Table 2 below

### Table 2

| City or County | CTCL Grant With More Clinton Votes | CTCL Grants with More Trump Votes |
|---|---|---|
| Delaware County | $2,200,000 | |
| Philadelphia | $10,016,074 | |
| Centre County | $863,828 | |
| Allegheny County | $2,052,251 | |
| Wayne County | | $25,000 |
| Erie | | $148,729 |
| Lancaster | | $474,202 |
| Northumberland | | $44,811 |
| Total CTCL Grants | $15,132,153 | $692,742 |

Appendix--00259

I APP. 1093

**Pennsylvania Clinton Votes v. Trump Votes[1]**



Chart note[1] Only the City of Philadelphia and the seven (7) counties in the above chart received CTCL Pennsylvania grants.

Table 1

| | Clinton Votes | Trump Votes |
|---|---|---|
| Delaware County | 177,402 | 110,667 |
| City of Philadelphia | 584,025 | 108,748 |
| Centre County | 37,088 | 35,274 |
| Wayne County | 7,008 | 16,244 |
| Erie County | 58,112 | 60,069 |
| Lancaster County | 91,093 | 137,914 |
| Northumberland County | 9,788 | 25,427 |
| Allegheny County | 366,934 | 259,125 |



- ● CTCL Grants with More 2016 Clinton Votes
- ○ CTCL Grants with More 2016 Trump Votes

100%

Chart note[1]. The chart above contains the sum of CTCL's 11 grants to five Wisconsin cities listed in Table 1 below.

Table 2

| CTCL Grants with More 2016 Clinton Votes | CTCL Grants with More 2016 Trump Votes |
|---|---|
| $6,946,767[1] | $0[1] |

Table 2 note[1]. $6,946,767 and $0 are the sums of CTCL's 11 grants to the five Wisconsin cities in Table 1 below.

Table 1

| City | CTCL Grants with More Clinton 2016 Votes | CTCL Grants with 2016 More Trump Votes |
|---|---|---|
| Green Bay | $1,093,400 | $0 |
| Green Bay | $10,000[1] | $0 |
| Green Bay | $522,200 | $0 |
| Kenosha | $862,779 | $0 |
| Kenosha | $10,000[1] | $0 |
| Madison | $1,271,788 | $0 |
| Madison | $10,000[1] | $0 |
| Milwaukee | $2,154,500 | $0 |
| Milwaukee | $10,000[1] | $0 |
| Racine | $942,100 | $0 |
| Racine | $60,000[1] | $0 |
| Total CTCL WI Grant | $6,946,767 | $0 |

Table 1 note[1]. CTCL Executive Director Tiana Epps-Johnson wrote Racine Mayor Mason on May 28, 2020. Epps-Johnson letter stated that Racine will receive a $100,000 CTCL grant. As part of CTCL and the City of Racine's agreement, Racine was obligated to redistribute $10,000 to the cities of Green Bay, Kenosha, Madison and Milwaukee and keep the remaining $60,000. There is no hyperlink for these grants.

RECEIVED by MSC 11/26/2020 2:44:13 AM

**Clinton Wisconsin Votes v. Trump Wisconsin Votes**[1]



Note[1] Only the five Wisconsin cities in the above graph received 2020 CTCL funding

Table 1

| CTCL Grant Recipients | 2016 Clinton Votes | 2016 Trump Votes |
|---|---|---|
| Milwaukee | 188,653 | 45,167 |
| Madison | 120,078 | 23,053 |
| Racine | 19,029 | 8,934 |
| Green Bay | 21,291 | 19,821 |
| Kenosha | 22,848 | 15,829 |
| Total WI Votes | 371,899 | 112,804 |

Clinton won all five Wisconsin cities that received CTCL grants by a margin of 259,096 votes. Trump won Wisconsin by 22,748 votes. CTCL's Wisconsin grant of $6.32 million reached more than three times more Clinton voters (blue in graph) than Trump voters (green in graph). 371,900 Clinton voters / 112,804 Trump voters = 3.30 more Clinton voters

**CTCL Grants to MN, WI, MI, and PA**



Table 1

| State | CTCL Grants to Jurisdictions Clinton Won | CTCL Grants to Jurisdictions Trump Won |
|---|---|---|
| Minnesota | $2,297,342 | $0 |
| Wisconsin | $6,946,767 | $0 |
| Michigan | $5,996,875 | $402,878 |
| Pennsylvania | $15,132,153 | $692,742 |

RECEIVED by MSC 11/26/2020 2:44:13 AM

**Clinton Votes v. Trump Votes in MN, WI, MI, and PA**





Table 1-1

| State | Clinton State Vote | Trump State Vote |
|---|---|---|
| Minnesota | 174,585 | 25,693 |
| Wisconsin | 371,899 | 112,804 |
| Michigan | 530,241 | 119,086 |
| Pennsylvania | 1,331,450 | 753,468 |

# The Center for Technology and Civic Life
## Public/Private Partnership Grant Awards
### Administrative History, Chronology, and Issues
#### Revision 1

*"Complex Problems Solved Well"*

| Date | Summary & Location | Description | Comments | References |
|---|---|---|---|---|
| October 31, 2019 | **Legislation –** Pennsylvania - Act 77 2019 | Pennsylvania Act 77 is a collection of omnibus amendments to the act of June 3, 1937 (P.L. 1333, No. 320, Pennsylvania Election Code).  Act 77 requires that if the Commonwealth wishes to decertify voting apparatuses in 50% or more counties, the Department of State must submit a written plan to the General Assembly at least 180 days prior to the effective date of replacement.  Act 77 also provides a **$90 million bond and cost share to counties for upgrading voting apparatuses to ensure a verifiable paper trail**, and a **fixed compensation range between $75 and $200 for District Election Officers.** | The **verifiable paper trail and fixed compensation provisions** in 2019 Act 77 may be compromised by the disparate and indiscriminate injection of private funding into Pennsylvania counties and local precincts. | *Pennsylvania Election Reform Act 77.  ACLU Summary*<br>*Pennsylvania Election Reform Act of October 31, 2019, P.L. 552, No. 77*<br>*Pennsylvania Consolidated Statutes Title 25 Elections (2020 Edition)* |
| November 27, 2019 | **Legislation –** Pennsylvania - Act 94 2019 | Pennsylvania Act 94 is a collection of omnibus amendments to the Act of June 3, 1937 (P.L. 1333, No. 320, Pennsylvania Election Code) in addition to those found in Act 77.  Two articles in Act 94 are amendments to Act 77. | Amendments in Act 94 are codified in Title 25 of the Pennsylvania Elections Consolidated Statutes (2020 Edition). | *Pennsylvania Election Code – Omnibus Amendments, Act of Nov. 27, 2019, P.L. 673, No. 94 Cl. 25*<br>*Pennsylvania Consolidated Statutes Title 25 Elections (2020 Edition)* |
| March 16, 2020 | **Common Council Action - Granting Authority to Relocate Polling Places -** Wisconsin - Kenosha | Resolution 48-20, introduced by Mayor Antaramian of Kenosha, grants authority to Kenosha City Clerk to relocate polling places due to COVID-19. | | *City of Kenosha Resolution 48-20*<br>*Kenosha Resolutions 48-20 0316/20* |
| March 27, 2020 | **Legislation -** Pennsylvania – 2020 Act 12 | Pennsylvania Act 12 is a collection of omnibus amendments to the act of June 3, 1937 (P.L. 1333, No. 320, Pennsylvania Election Code).  Many of the amendment provisions are found in Pennsylvania Act 77 2019. | | *Pennsylvania Election Code - Omnibus Amendments, Act of Mar. 27, 2020, P.L. 41, No. 12 Cl. 25*<br>*Pennsylvania Consolidated Statutes Title 25 Elections (2020 Edition)* |
| March 27, 2020 | **Litigation -** Wisconsin - Green Bay | Using COVID-19 as justification, Green Bay County Clerk Teske files a lawsuit against the Wisconsin Election Commission, the Wisconsin Governor, and Wisconsin Health Department requesting cancellation of April 7 election, procedural modifications, and **transition to mail in balloting**. Lawsuit dismissed by Federal District Judge William Greisbach for lack of federal Jurisdiction. | Judge Greisach noted: *"the City and its mayor are not the proper parties to bring such a claim in federal court."* | *City of Green Bay, Kris Teske and Eric Genrich v. Marge Bostelmann, et al, Case No. 20-C-479* |

| Date | Summary & Location | Description | Comments | References |
|------|-------------------|-------------|----------|-----------|
| April 2020 | **Executive Order 74 Postponing of Elections -** Wisconsin - State | Using COVID 19 as justification, Wisconsin Governor Evers issues EO 74 suspending in person voting | Citing health statistics, a court order delaying absentee ballots, and the spread of COVID from voting, Governor Evers suspends in person voting until June 9 | *Wisconsin Executive Order 74 Relating to suspending in-person voting on April 7, 2020 due to the COVID-19 Pandemic* |
| April 7, 2020 | **Polling Place Closures -** Wisconsin - Green Bay | Using a reduction of poll workers and COVID 19 as justification, Mayor Erin Genrich **declines assistance from Wisconsin National Guard,** and **closes 29 of the 31 primary electoral polling stations in Green Bay.** | Four-hour lines were recorded at the two open polling stations located at Green Bay East and Green Bay West High Schools. Questions about the scope of Mayor Genrich's Executive authority to close polls exist. | https://fox11online.com/news/election/gree n-bay-among-areas-declining-national-guard-help-despite-poll-worker-shortage |
| April 16, 2020 | **Voter Disenfranchisement from Executive Actions -** Wisconsin -- Madison | Resolution 60266 and the public record demonstrate **hundreds of instances of voters having difficulty with online voting systems,** problems with uploading of voter identification, and systemic absentee ballot problems.  4,828 individuals used curbside and in-office early in-person absentee voting. Of the **87,890 absentee ballots issued by the Madison clerk's office, 69,437 were returned.** | **Madison Voters were affected by State and local Executive actions** brought about by closure of 26 polling stations. | *Madison City Council Resolution 60266* https://madison.legistar.com/LegislationDet ail.aspx?ID=4422477&GUID=29F59925-6B36-465E-A643-4690167F4C39 |
| May 28, 2020 | **CTCL Grant Transmittal Letter to Mayor Mason -** Wisconsin -- Racine | Transmittal of a $100,000 grant to Racine for "*election planning and administration,*" and **redistribution** of $10,000 each to the cities of Green Bay, Kenosha, Madison, and Milwaukee.  **Grant was conditioned** upon development of June 15, 2020 Wisconsin Safe Voting Plan which occurred two weeks later. | Grant was issued to Racine Mayor **prior** to CTCL receiving an application or the CTCL stipulated plan.  Transmittal letter **explicitly conditions** [*Shall*] the transfer $10,000 from Racine to four other Wisconsin municipalities for election administration. | *CTCL Grant Transmittal to Racine Mayor 052820* |
| May 5, 2020 | **Common Council Action Approving Mailing of Absentee Ballots to All Registered Racine voters** Wisconsin - Racine | Consent agenda communication by Mayor Mason to the Racine Common Council requesting the council to direct the Clerk to mail absentee ballot applications with postage-paid envelopes to **all registered Racine voters in time for the August 11, 2020 election.** | Postage paid return envelopes were mailed to *all* registered voters with an absentee ballot. | *Racine CTCL Grant Acceptance and Ballot Actions File 0242-20* |
| May 21, 2020 | **Common Council Action - Changing Polling Places for August and November Elections** Wisconsin - Kenosha | Using COVID-19 and Governors' Executive Order 74 as justification, Resolution 82-20 makes polling place changes to 54 wards throughout Kenosha for the August 11 primary and November 3 general elections. | Resolution 82-20 was introduced and signed by Kenosha Mayor John Antaramian. | *City of Kenosha Resolution 82-20 to Relocate Polling Places* |

CTCL GRANTS TO PUBLIC ELECTORAL PROCESSES - ADMINISTRATIVE HISTORY, CHRONOLOGY, AND ISSUES REV. 1            THOMAS MORE SOCIETY - AMISTAD PROJECT

2/8

Appendix--00266
I APP. 1100

| Date | Summary & Location | Description | Comments | References |
|------|-------------------|-------------|----------|-----------|
| June 02, 2020 | **Common Council Action - Approving Application for CTLC Grant and Redistribution to other Cities**<br><br>Wisconsin - Racine | Racine Common Council action applying for and accepting a $100,000 CTLC grant. Fiscal note explicitly notes redistribution to Green Bay, Kenosha, Madison, and Milwaukee for *"coordinated election planning."* | *Fiscal Note:* $60,000.00 of these grant funds will be retained by the City of Racine and $10,000.00 will be distributed to each of the cities of Green Bay, Kenosha, Madison, and Milwaukee for this coordinated planning." | *Racine City Council Resolution 0318-20* |
| June 15, 2020 | **Wisconsin Safe Voting Plan; Appointment of "Voter Navigators"-**<br><br>Wisconsin – Racine, Madison, Milwaukee, Kenosha, Green Bay | The Wisconsin Safe Voting Plan 2020 (WSVP) was submitted to CTLC by five Wisconsin cities as part of the private grant-funding process. The public record indicates that in some cases the WSVP was submitted to CTLC **after the grants were made.**<br><br>WSVP presents a detailed, specific election funding plan on per-city basis, and adds positions that conflict and confuse the duties of elected officials already responsible to oversee and certify electoral processes. | The WSVP details collaboration by public officials to solicit private funding for public electoral processes. The public record points to the grants and WSVP process.<br><br>Page 9 of the WSVP documents an extralegal appointment of bilingual **"Voter Navigators" to assist as "election inspectors," for completion of ballots, and in witnessing of voter signature process.** | *Wisconsin Safe Voting Plan* |
| July 14, 2020 | **Common Council Action - Authorizing Acceptance of CTLC Funding from Racine, and Delegating Authority to Accept Private Funding for Electoral Administration**<br><br>Wisconsin - Madison | Madison Common Council Action authorizing the Clerk to accept a $10,000 CTLC grant from Racine for election administration and granting broad authority to Mayor Conway to execute future CTLC grant agreements absent council oversight.<br><br>Resolution 61255 authorizes the Madison City Clerk to apply for and accept a private $1,271,788 CTLC grant, and amends the Clerk's 2020 budget by $1,271,788 to reflect a salary increase of $683,788. | Resolution 61255 explicitly **coalesces private and public funding in the City Clerks 2020 budget** for election administration, including salaries.<br><br>Resolution 60266 (04/16/2020) accepting the $10,000 CTLC grant **predates** the June 15, 2020 **Wisconsin Safe Voting Plan.** | *City of Madison Meeting Minutes for July 14, 2020 (Legislative File 61124, Page 7)* |
| July 21, 2020 | **Common Council Action Approving Acceptance of CTLC Funding**<br><br>Wisconsin – Milwaukee | Common Council action approving recommendations by the City Finance and Personnel Committee to place a **redistricting referendum procedure request** on November 3, 2020 ballot. | | *Racine City Council Resolution 0453-20 Redistricting Ballot Initiative* |
| July 21, 2020 | **Common Council Action - Approving acceptance of $1,093,400 CTLC grant**<br><br>Wisconsin - Green Bay | Green Bay Elections Committee Funding **Transcript**, and Election Tracking Forms documenting intent to use CTLC funds for the following purposes:<br>• Elections outreach and education;<br>• Poll worker database & scheduling equipment **from US Digital Response;** | The Voter Navigator duties are vague and appear not sanctioned by the WEC or state elections law.<br>The Voter Navigator Position and CTLC funding was questioned by others in the meeting. | *Green Bay Common Council Agenda Packet Item for CTLC Grant* |

CTCL GRANTS TO PUBLIC ELECTORAL PROCESSES - ADMINISTRATIVE HISTORY, CHRONOLOGY, AND ISSUES REV 1          THOMAS MORE SOCIETY - AMISTAD PROJECT

3/8

Appendix--00267
I APP. 1101

| Date | Summary & Location | Description | Comments | References |
|------|-------------------|-------------|----------|-----------|
| July 21, 2020 | **Common Council Action** -Approving acceptance of $1,093,400 CTCL grant<br><br>Wisconsin - Green Bay | • Dropbox "team" with undisclosed dropbox locations;<br>• $50,000 for cameras, boxes, and installations;<br>• $150,000 RFP for **outside services** to focus on **unregistered voter contact.**<br>• Poll worker funding increases that **raise the state appropriations amount from $140 to $350 per worker**<br>• $45,000 for the addition of **"Voter Navigators"** with no position description or outline. | Following an email directive from the WEC citing 1 dropbox per 15,000 to 20,000 population, the 15 dropbox proposal appears to have been reduced to only 5 to 6, based upon their population.  The dropbox correction by WEC appears to demonstrate how the Wisconsin Safe Voting Plan has neglected WEC standards and protocol. | *Green Bay Common Council Minutes Approving CTLC Grant (Item R, Page 12 and Pages 148-152)*<br><br>*Green Bay Elections Committee Cares Act Funds 072120* |
| July 24, 2020 | **Common Council Action - Approving $942,100 in CTCL grants and Authorizing Mayor Mason to Receive Funding**<br><br>Wisconsin – Racine | Racine Common Council action authorizing Mayor Mason and City **Clerk** to accept **$942,100 CTCL grant** for administration of Wisconsin Safe Voting Plan. | Common Council action was sponsored by Mayor Mason who appears to be the central coordinator of CTCL grants, authorship of the Wisconsin Safe Voting Plan, and funding dissemination to other Wisconsin cities.<br><br>Council action *precedes* release of the Wisconsin Safe Voting Plan. | *Racine Consent Agenda File Number 491-20* |
| July 28, 2020 | **Common Council Action - Accepting a CTCL grant of a $2,154,500 for Election Administration**<br><br>Wisconsin - Milwaukee | Milwaukee Common Council Resolution 200448 accepting a private, $2,154,500 CTCL grant under the city's Special Revenue Fund.  CTCL grant is to be administered consistent with the Wisconsin Safe Voting Plan 2020 and Milwaukee Code of Ordinances Section 304-81. | Resolution 200448 recognizes the CTLC grant as revenue to be administered for electoral purposes, raising material questions of how private funding, when coalesced with state appropriations, may affect electoral processes. | *Milwaukee City Council Acceptance of CTLC Grant* |
| August 19, 2020 | **Delaware County Council Action - Acceptance of a $2,172,858 CTCL grant for Election Administration**<br><br>Pennsylvania - Delaware County | A CTLC grant of $2,172,858.00, ratified by Delaware County Council on August 19, must still be approved by the Pennsylvania Board of Elections and Solicitor.<br>Private CTLC funds if approved, will be used to:<br>• Install walk-in satellite voting centers with mobile "pop up" voting centers<br>• Provide poll worker hazard pay<br>• Place and monitor 50 drop boxes for vote-by-mail ballots<br>• Purchase equipment<br>• Hire staff to process mail in ballot applications and ballots | | https://delcopa.gov/publicrelations/releases/2020/safeelectionsgrant.html<br><br>*Delaware City Council Minutes CTLC Grant Approval (Minutes page 2)* |

CTCL GRANTS TO PUBLIC ELECTORIAL PROCESSES - ADMINISTRATIVE HISTORY, CHRONOLOGY, AND ISSUES REV. 1          THOMAS MORE SOCIETY - AMISTAD PROJECT

4/8

| Date | Summary & Location | Description | Comments | References |
|---|---|---|---|---|
| August 21, 2020 | **CTLC Grant Agreement Transmittal to Philadelphia Grants Officer Del Blanco – $10,016,074**<br>Pennsylvania – Philadelphia | The CTLC agreement and implementing city plan contain **specific stipulations holding the Philadelphia to its plan.** The City plan includes drop boxes, poll operating hours, the addition of 800 polling places, and many other specific requirements.<br>Grant allocations are to be used for:<br>• Mail-in and Absentee and Processing Equipment: **$5,500,554;**<br>• Satellite Election Offices for in-person and mail-in voting: **$2,272,220;**<br>• In-person Voting at Polling Places on Election Day: **$1,321,300;**<br>• Secure Drop boxes and related needs: **$552,000;**<br>• Printing and Postage: **$370,000.** | The CTLC and city plan is a significant example of how elite private funding sources may impose non-statutory requirements upon public officials.<br>Neither the CTLC Agreement or city plan discuss approvals from the Pennsylvania Board of Elections office or solicitor that may be required under 2019 Pennsylvania Act 77. | *Philadelphia Grant Agreement CTLC Signed August 21, 2020* |
| August 30, 2020 | **Jay Stone FEC Complaint**<br>Wisconsin - Pleasant Prairie | Pleasant Prairie, Wisconsin voter Jay Stone files a 39 page, 247 exhibit sworn complaint against CTLC with the Federal Elections Commission. Complaint alleges Executive Director Tiana Epps-Johnson, CTCL Government Services Director Whitney May, Center for Election Innovation and Research Executive Director David Becker, Mark Zuckerberg, and Priscilla Chan have no medical authority or legal right to participate in elections or electoral process. | | *Jay Stone FEC Complaint 083020* |
| September 1, 2020 | **Common Council Action - Authorizing Mayor to Accept $657,000 for Ballot Collection and Coordination**<br>Wisconsin - Racine | Racine Common Council action authorizing Mayor Mason and City Clerk to accept $657,000 in private CTCL funding for *"absentee ballot coordination, collection and processing associated with the November 3 Presidential Election."* | Council action sponsored by Racine Mayor Mason. | *Racine City Council Actions File No. 0571-20 000120* |
| September 2, 2020 | **Detroit City Council Action - CTLC Grant Approval and Collaboration of State Secretary in Elections** | The CTLC grant and associated Detroit City Safe Voting Plan were approved during a recess session of the Formal City of Detroit Agenda. According to Detroit personnel, the grant was approved during recess, no notes were taken and the CRLC grant and Plan have been filed.<br>**Detroit City Clerk Janice Winfrey and Michigan Secretary of State Jocelyn Benson announce a collaboration to:** | As of December Secretary Benson was aware of surplus CARES act funding | *Email Correspondence Detroit City Louise Jones to Belinda Groner 092820* |

CTCL GRANTS TO PUBLIC ELECTORAL PROCESSES - ADMINISTRATIVE HISTORY, CHRONOLOGY, AND ISSUES REV. 1     THOMAS MORE SOCIETY - AMISTAD PROJECT

5/8

Appendix–00269
I APP. 1103

| Date | Summary & Location | Description | Comments | References |
|---|---|---|---|---|
| September 2, 2020 | Michigan $3,512,000 | • To recruit and train additional staff and election workers<br>• Open 14 new satellite clerk offices, for a total of 21 where voters can register and return absentee ballots;<br>• Provide additional "support" for absentee ballot tabulation;<br>• Install 30 drop boxes;<br>• Recruit and train 6,000 election workers for 182 polling locations and 134 absentee counting boards;<br>• Hire additional staff to support the City clerk's office;<br>• Revise ballot counting and sorting protocols to **make more effective use of high-speed scanners.** | | https://www.michigan.gov/som/0,4669,7-192-47796-538528--,00.html<br><br>*Press Release Detroit Clerk Winfrey and Secretary Benson Elections Collaboration 090220.pdf*<br><br>Michigan Secretary Benson HAVA 251 Funds Report, December 2019.pdf |
| September 4, 2020 | **Press Release - City Clerk CTLC Award**<br><br>Michigan - Lansing $443,742 | Press release from Lansing City Clerk Chris Swope announcing award of a $443,742 CTLC grant for administration during the November 3rd Election.<br>The private CTLC funding will specifically be used for:<br>• Mailing of absentee ballot applications to every remaining Lansing City voter (over 60,000) who have not requested a ballot;<br>• Purchase and installation of 12 drop-boxes at six fire stations, four community centers, a CATA CTC station, and the Lansing City Cemetery;<br>• Hazard bonus pay of $100 for 500 election, precinct and absentee ballot counters and $50 for shorter shifts.<br>• Expanded in-person early voting opportunities.<br>• Additional staff and extended poll hours at the South Washington Election Unit at 2500 S. Washington Ave beginning in October<br>• A third satellite location at the Alfreda Schmidt Southside Community Center from October 19 – October 30. | The Press Release was removed from the Lansing Website on September 25, 2020. | *City of Lansing Press Release CTLC Grant Announcement 090420* |

CTCL GRANTS TO PUBLIC ELECTORIAL PROCESSES - ADMINISTRATIVE HISTORY, CHRONOLOGY, AND ISSUES REV. 1          THOMAS MORE SOCIETY · AMISTAD PROJECT

6/8

Appendix--00270
I APP. 1104

| Date | Summary & Location | Description | Comments | References |
|------|-------------------|-------------|----------|-----------|
| | | • Expanding voter education and outreach efforts | | |
| September 8, 2020 | **Council Action –Scanning System Equipment -** Michigan - East Lansing | Council Action (Item 3.13) approving an Agenda Item Report to use $35,350 in CTCL funding for the purchase of an Image Cast high-speed scanning system from Dominion Voting for counting of absentee ballots and authorizing the City Manager to sign for future CTCL grant funding. | | *East Lansing MI Council Minutes Scanner Purchase 090820.pdfCity of East Lansing Minutes* |
| September 10, 2020 | **Council Action and Approval - CTLC Grant Transmittal Letter to Inez Brown** $475,625 Michigan-Flint | Flint Resolution 200391 accepting a private, $475,625 CTCL grant and initiating a revenue and expense account under the city's' 296 fund.  CTCL grant is to be administered consistent with the Flint Safe Voting Plan 2020 and authorizing the *"appropriate City Officials to do all things necessary to accept the Center for Tech and Civic Life grant award for the City of Flint Safe Voting Plan 2020."* | CTLC grant letter contains language that the city shall not reduce the budget of the City Clerk or fail to appropriate or provide previously budgeted funds to the clerk for the term of this grant. | *CTLc Grant Transmittal to City Clerk 091020*  *City of Flint MI Resolution 200391 Accept CTLC Funding 091420.pdf* |
| September 14, 2020 | **CTLC Supplementary Grant Transmittal Letter; Draft CTLC Approval Letter - $522,200** Wisconsin — Green Bay | Personal email correspondence from CTCL Executive Director Tiana Epps-Johnson to Kris Teske, City of Green Bay Clerk, approving a $522,200 private funding package for COVID 19 related expenditures, cleaning and to hire election personnel.  Draft CTLC approval letter with budget breakdown. | Grant approval precedes receipt of agreement. CTLC breakout budget includes carts, lift trucks, computers, ballot processing equipment, and a labor budget, potentially conflicting with State purchasing and appropriations policies for election related capital equipment. | *CTCL Grant Approval Epps-Johnson Email With Green Bay Clerk Teske 091420*  *Green Bay CTLC Application Supplement 091420* |
| September 16, 2020 | **CTLC Grant Agreement Transmittal -** Michigan - Muskegon $433,580 | The executed CTLC agreement with Muskegon contains **specific stipulations** that hold the City to its plan, including drive through voting, election department real estate costs, satellite election department costs, overtime and hazard pay, and other costs. | Stipulations accompanying private funds into public elections set up policy conflicts, create a dangerous precedent for future, and disenfranchise local populations who themselves may be unable to contribute goods or funds to electoral processes. | *CTLC Grant Transmittal to Muskegon Clerk Meisch Signed 091620.pdf* |

CTCL GRANTS TO PUBLIC ELECTORIAL PROCESSES - ADMINISTRATIVE HISTORY, CHRONOLOGY, AND ISSUES REV. 1          THOMAS MORE SOCIETY - AMISTAD PROJECT

7/8

Appendix–00271
I APP. 1105

| Date | Summary & Location | Description | Comments | References |
|---|---|---|---|---|
| September 21, 2020 | **City Council Action - Approving Expansion of Voter Registration Plan Using CTLC Grant $56,626** Michigan-Kalamazoo | Kalamazoo Resolution H.3. approves a $56,626 CTLC grant to implement a 2019 plan backgrounded by the advocacy groups **Voters Not Politicians, Kalamazoo NAACP, and the League of Women Voters**. Funding will cover the costs of additional office hours, the branch office location at WMU, and the ballot drop boxes. | Kalamazoo Resolution H.3 ties a 2019 plan from advocacy groups to expand voter registration on a college campus with CTLC funding. | *Kalamazoo MI Commission Resolution CTLC Grant Approval 092120.pdf* |
| September 22, 2020 | **City Council Action - Authorizing Approval of CTLC Funding for Electoral Administration $405,564** Michigan-Pontiac | City Council Resolution 20-428 to approve a $405,564.00 grant agreement between the City and CTCL. | | *City of Pontiac MI Resolution 20428 Accept CTLC Funding 092220.pdf* |
| September 22, 2020 | **County Elections Council Action -** Pennsylvania - Centre County | The Centre County Elections Board voted unanimously to approve a CTLC application for COVID 19 response grant funding. Grant is proposed to be used to fund Election Systems equipment software.   Formal approval from commissioners in October. | Commissioner Dershem requested Solicitor Betsy Dupuis to review the CTLC grant application and agreement. Procedurally, it appears that the funding has not been formally requested and that Solicitor Dupuis could determine additional approvals are required from Pennsylvania election officials. | *Centre County PA Board of Elections Minutes CTLC Grant Approval 090820.pdf* |
| September 24, 2020 | **City Council Action - Authorizing Approval of CTLC Funding for Electoral Administration $405,564** Michigan-Saginaw | The Saginaw City Council Resolution, as recommended by City Manager Timothy Morales in Council Communication CC-28, accepts $405,564 in CTCL grant funding and **incorporates an offset amount of $402,878.00 into the City General Revenue and Expense Account No. 101-0000-674.000.** CTCL grant is to be administered consistent with the Saginaw Safe Voting Plan 2020 | Through its official action, the Saginaw City Council has **coalesced private CTLC funding into a public, general revenue-and-expense account to be used for elections purposes.** The public record is **silent as to whether a consistency assessment with Michigan elections law or state appropriations policy was performed** by the Saginaw City Council | *Saginaw MI Council Resolution CC-28 CTLC Grant Approval 091420.pdf* |

CTCL GRANTS TO PUBLIC ELECTORIAL PROCESSES - ADMINISTRATIVE HISTORY, CHRONOLOGY, AND ISSUES REV. 1          THOMAS MORE SOCIETY - AMISTAD PROJECT

8/8

Appendix--00272
I APP. 1106

| Date | Summary & Location | Description | Comments | References |
|------|-------------------|-------------|----------|-----------|
| | | | Prior to incorporation of private funding into public revenue accounts. | |
| September 26, 2020 | **Minneapolis Policy Action Committee – Action Authorizing $2,297,342 for Ballot Collection and Coordination** Minnesota-Minneapolis | Unanimous action by Minneapolis Policy and Government Oversight Committee on item 2020A-0703 accepting $2,297,342 to implement the Safe Voting Plan during the 2020 presidential election. | Presented on September 15, 2020; approved on September 26, 2020 | *Minneapolis Common Council Approval of Private CTCL Grant Funding Application for 2020 Presidential Elections 092620* |
| September 22, 2020 | **CARES Act Financial Reports from EAC** | The 20 day, post primary CARES Act expenditure report by the Federal EAC indicates as of September 22, 2020 **only 34% of the total funds appropriated under CARES for COVID elections purposes have been used.**   All CARES funding has to be used by December 31, 2020, | Private, CTLC funding for COVID response and related elections equipment continues to not be necessary, as federal appropriations for elections remains unspent. | EAC Cares Act Expenditure Report September 22 2020. |

CTCL GRANTS TO PUBLIC ELECTORIAL PROCESSES - ADMINISTRATIVE HISTORY, CHRONOLOGY, AND ISSUES REV. 1                    THOMAS MORE SOCIETY - AMISTAD PROJECT

9/8

Appendix–00273
I APP. 1107



STATE OF MICHIGAN
JOCELYN BENSON, SECRETARY OF STATE
DEPARTMENT OF STATE
LANSING

# MICHIGAN PLAN AND NARRATIVE: 2018 HAVA ELECTION SECURITY GRANT

## Introduction / General Summary

The State of Michigan was awarded a total of $10,706,992 in recently-released Federal Help America Vote Act (HAVA) election security grant funds. The required 5% match ($535,350) has been appropriated into the Department of State's budget by the Michigan legislature, for a total of **$11,242,342** available for use to implement improvements to further enhance Michigan's election security. Michigan takes pride in the robust security processes which are built into its elections administration. Michigan has checks and balances throughout the election lifecycle and continues to build strong partnerships with law enforcement and security agencies, while working closely with state and federal partners to continue to build and enhance our reputation for secure voting. Michigan is pleased to receive additional funding to further enhance our election system's security end to end.

In 2017, Michigan began the process of replacing its aging paper-based optical scan voting systems with upgraded digital optical scan systems; in doing so, the continued use of a paper ballot statewide was a major priority. Gradual rollout of the new systems began in August of 2017, and all jurisdictions statewide will use the new systems in Michigan's upcoming August 7, 2018 primary. Michigan was able to fund the purchase of this new generation of more secure voting systems by utilizing remaining funding from the original HAVA grant ($30 million), along with an additional $10 million appropriated by the Michigan legislature. Therefore, the recently-released additional HAVA funding will not be used to replace voting systems, but instead will be focused on assessing and enhancing election security at all levels (state, county, local); as well as continued enhancements to a major upgrade already underway for the statewide Qualified Voter File (QVF), with an overall emphasis on security. Additionally, Michigan will pursue several targeted efforts that involve data validation and integrity projects, as well as comprehensive training, auditing and communication efforts specifically focused on election security at all levels.

## State-Level Security Assessments

Michigan's 2018 HAVA grant spend plan focuses on cyber, information and physical security; specifically, our largest area of emphasis will involve providing funding and resources statewide to allow for the completion of detailed election system security assessments at the state, county and local (city-township) level. With Michigan being one of only eight states in the nation to administer elections at the local level (with over 1,600 different county, city and township officials each independently administering elections locally), a substantial portion of the security grant will be used to assist counties, cities and townships with assessing their end-to-end election systems,

identifying possible issues and making the necessary changes and improvements to ensure the highest possible level of security is present in all major systems involved in administering elections.

At the state level, the QVF is already secured and protected by Michigan's Department of Technology, Management and Budget (DTMB), via a robust network and multiple layers of monitoring, including intrusion detection systems. All of these systems and tools are housed in the state's centralized Data Center, managed by DTMB. All counties, cities and townships access the QVF through this network. Advanced security testing has already been completed on the statewide QVF and is also occurring on the statewide Election Night Reporting (ENR) system. A portion of the funding will be used to ensure regular testing of this type continues to occur with key election system components at the state level.

In addition to major election IT-related systems, Michigan's statewide assessment of end-to-end election systems and processes will include a review of state-local procedures, responsibilities and communications. Currently in the Request for Proposal (RFP) stage, the state plans to award a contract to a qualified consultant group with specialized, multi-faceted expertise in election administration; cyber, information and physical security; and communications. The results of this assessment will also help to set further detailed plans into motion for continued use of the grant funds to assist county and local election officials with similar detailed assessments and completion of necessary improvements at the county and local level.

**County-Local Security Assessments**
Michigan expects to follow a model similar to the statewide election assessment currently underway to work with counties and local jurisdictions to conduct similar evaluations and implement improvements throughout their individual system configurations. Michigan plans to evaluate and qualify multiple service providers who may assist counties, cities and townships with local assessments; as well as provide multiple security-related product options (such as sensors, software, and intrusion detection systems) which may be purchased with HAVA security grant funds as needs are identified. Multiple qualified service providers will be available statewide to provide individualized assessments for county and local election officials to thoroughly review and evaluate election systems and develop plans for necessary changes to improve and enhance security. These assessments are expected to include a review of connectivity to the state QVF; voting system election management system software configurations and networks; county and local election night reporting systems; and other key election-related systems, configurations and procedures in place at the county and local level. Grant funding may also be allocated to implement needed and approved changes at the county and local level.

**State Qualified Voter File – Continued Advancement and Focus on Security**
A major upgrade to Michigan's QVF system is underway. Michigan's statewide QVF system has been an internally-developed product (and a national leader) since its inception in the mid-1990s. The upgrade continues with an internally-developed system and involves a migration to a secure, modern platform and programming language, along with numerous system enhancements to increase security and provide added features that have been requested by users at the county and local level. HAVA security grant funding will be utilized to ensure a dedicated focus on security and an overall structure to provide ongoing assistance and response to the needs of our over 3,000 users. Additionally, further security enhancements will be added to fully implement a security protocol that includes multi-factor authentication.

### Other Data and Security-Related Projects

Additional projects are planned that will involve a varied and wide-ranging approach to measuring and enhancing election-related data, including election audits; data validation and integrity projects; a statewide infrastructure change to a proven, cutting edge geo-spatial addressing system in the QVF; and an upgraded, improved, interactive and secure statewide Election Night Reporting system.

### Plan Implementation: Dedicated Election Security-Related Resources

To ensure a full focus on election security and to assist with the timely completion of all planned activities related to the HAVA election security grant, Michigan plans to employ dedicated resources who are focused on election security. These resources will include at least two limited term (5-year) employees; one working directly in Michigan's Bureau of Elections (Election Security Specialist), and a 2nd under the direction of the State's DTMB (Cyber Election Security Specialist). These resources will work closely together and with the Bureau of Elections and State DTMB to ensure completion of all facets of our HAVA security grant plan, and will be heavily involved in the various efforts and projects mentioned here. Additionally, the Election Security Specialist will also work with other Bureau of Elections staff to fully develop and implement a comprehensive training plan with a specific focus on security – cyber security as it relates to elections, as well as physical and information security; and additional thorough training on other key county and local procedural requirements that affect the overall security of the elections process.

### HAVA Election Security Grant Spend Plan - Summary by Category

Michigan's HAVA Security Grant Budget Detail is attached. A summary of the total estimated costs by major program category, including specific components under each, are listed below:

| Program Category | Total Estimated Spend Plan | Major Plan Components |
|---|---|---|
| Cyber Security | $5.5 million | • Statewide election security assessment<br>• State, county and local security assessments and improvements<br>• Dedicated resources |
| Voter Registration System | $3.1 million | • State, county and local security assessments and improvements<br>• Dedicated resources<br>• Multi-factor authentication<br>• Geo-Spatial addressing structure<br>• Data validation and integrity initiatives |
| Communications / Training / Auditing | $1.6 million | • Dedicated resources<br>• Comprehensive election security training<br>• Election security procedural reviews<br>• Enhanced/expanded post-election audits<br>• Enhanced/expanded state-local election security, disaster recovery and overall communication plans |
| Election Night Reporting (ENR) | $1 million | • State, county and local security assessments and improvements<br>• Enhanced, interactive and secure statewide ENR |

Expert Opinions Continued

RECEIVED by MSC 11/26/2020 2:44:13 AM

STATE OF MICHIGAN

IN THE SUPREME COURT

_____

ANGELIC JOHNSON, et al.
    Petitioners,

Supreme Court Case No. _____

v

JOCELYN BENSON, et al.,
    Respondents.

SPECIAL COUNSEL FOR THOMAS MORE SOCIETY—
AMISTAD PROJECT

Ian A. Northon, Esq. (P65082)
Gregory G. Timmer (P39396)
RHOADES MCKEE, PC*
55 Campau Avenue
Suite 300
Grand Rapids, MI 49503
Tel.: (616) 233-5125
Fax: (616) 233-5269
ian@rhoadesmckee.com
ggtimmer@rhoadesmckee.com

Robert J. Muise, Esq. (P62849)
AMERICAN FREEDOM LAW CENTER*
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org

Erin Elizabeth Mersino, Esq. (P70886)
GREAT LAKES JUSTICE CENTER*
5600 W. Mt. Hope Highway
Lansing, Michigan 48917
(517) 322-3207
erin@greatlakesjc.org

*for identification purposes only
COUNSEL FOR PETITIONERS

# EXPERT REPORT OF MATTHEW BRAYNARD

## I.  INTRODUCTION

I have been retained as an expert witness on behalf of Petitioners in the above captioned proceeding.  I expect to testify on the following subject matters:  (i) analysis of the database for the November 3, 2020 election for the selection of Presidential Electors in the State of Wisconsin ("State"); (ii) render opinions regarding whether individuals identified in the State's voter database actually voted; and (iii) render opinions regarding whether individuals identified in the State's voter database were actually qualified to vote on election day.

This is a statement of my relevant opinions and an outline of the factual basis for these opinions.  The opinions and facts contained herein are based on the information made available to me in this case prior to preparation of this report, as well as my professional experience as an election data analyst.

I reserve the right to supplement or amend this statement on the basis of further information obtained prior to the time of trial or in order to clarify or correct the information contained herein.

## II.  DOCUMENTS REVIEWED

I reviewed the following documents in arriving at my opinions.

1.   The voter records and election returns as maintained on the State's election database;

2.     Records maintained by the National Change of Address Source which is maintained by the United States Postal Service and which is available for licensed users on the internet. I am a licensed member.

3.     Records developed by the staff of my call centers and social media researchers; and

4.     A national voter database maintained by L2 Political;

In addition, I discussed the facts of this matter with Petitioner's attorney Ian Northon and members of his legal team.

## III.   PROFESSIONAL QUALIFICATIONS

I have attached hereto as Exhibit 1 a true and correct copy of my resume. As detailed in the resume, I graduated from George Washington University in 2000 with a degree in business administration with a concentration in finance and management information systems. I have been working in the voter data and election administration field since 1996. I have worked building and deploying voter databases for the Republican National Committee, five Presidential campaigns, and no less than one-hundred different campaigns and election-related organizations in all fifty states and the U.S. Virgin Islands. I worked for eight years as a senior analyst at the nation's premier redistricting and election administration firm, Election Data Services, where I worked with states and municipalities on voter databases, delineation, and litigation support related to these matters. Also, while at Election Data Services, I worked under our contract with the US Census Bureau analyzing voting age population. Since 2004, I have worked for my own business, now known as External Affairs, Inc., providing

statistical and data analysis for local, state, and federal candidates and policy organizations in the areas of voter targeting, polling/research, fundraising, branding, and online development and strategy. My firm has worked for over two-hundred candidates from president to town council and over a dozen DC-based policy/advocacy organizations.

With respect to publications I have authored in the last 10 years, I have not authored any publications in the last ten years.

## IV. COMPENSATION

I have been retained as an expert witness for Petitioners. I am being compensated for a flat fee of $40,000.

## V. PRIOR TESTIMONY

I have not provided testimony as an expert either at trial or in deposition in the last four years.

## VI. STATEMENT OF OPINIONS

As set forth above, I have been engaged to provide expert opinions regarding analysis in the November 3, 2020 election of Presidential electors. Based on my review of the documents set forth above, my discussions with statisticians and analysts working with me and at my direction, my discussions with the attorneys representing the Petitioners, I have the following opinions:

1. From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 3,507,410 individuals who the State's database identifies as applying for and the

State sending an absentee ballot, that in my sample of this universe, 12.23% of those absentee voters did not request an absentee ballot to the clerk's office.

2. From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 139,190 individuals who the State's database identifies as having not returned an absentee ballot, that in my sample of this universe, 24.14% of these absentee voters in the State did not request an absentee ballot.

3. From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 139,190 individuals who the State's database identifies as having not returned an absentee ballot, that in my sample of this universe, 22.95% of those absentee voters did in fact mail back an absentee ballot to the clerk's office.

4. From the State's database for the November 3, 2020 election, the NCOA database, and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 51,302 individuals had changed their address before the election, that in my sample of this universe, 1.38% of those individuals denied casting a ballot.

5. From the State's database for the November 3, 2020 election and the NCOA database and other state's voter databases, it is my opinion to a reasonable degree of scientific certainty, that at least 13,248 absentee or early voters were not residents of the State when they voted.

6. From the State's database for the November 3, 2020 election and comparing that data to other states voting data and identifying individuals who cast early/absentee ballots in multiple states, it is my opinion to a reasonable degree of scientific certainty, that at least 317 individuals in the State voted in multiple states.

## VII.   BASIS AND REASONS SUPPORTING OPINIONS.

It is my opinion that due to the lax controls on absentee voting in the November 3, 2020 election that the current unofficial results of that election include tens of thousands of individuals who were not eligible to vote or failed to record ballots from individuals that were.

First, State maintains a database for the November 3, 2020 election which I obtained from L2 Political and which L2 Political obtained from the State's records on, among other things, voters who applied for an absentee or early voter status. I received this database from L2 Political in a table format with columns and rows which can be searched, sorted and filtered. Each row sets forth data on an individual voter. Each column contained information such as the name of the voter, the voter's address, whether the voter applied for an absentee ballot, whether the voter voted and whether the voter voted indefinitely confined status.

Second, we are able to obtain other data from other sources such as the National Change of Address Database maintained by the United States Postal Service and licensed by L2 Political. This database also in table format shows the name of an individual, the individual's new address, the individual's old address and the date that the change of address became effective.

Third, I conducted randomized surveys of data obtained from the State's database by having my staff or the call center's staff make phone calls to and ask questions of individuals identified on the State's database by certain categories such as absentee voters who did not return a ballot. Our staff, if they talked to any of these individuals, would then ask a series of questions beginning with a confirmation of the individual's name to ensure it matched the name of the voter identified in the State's database. The staff would then ask additional questions of the individuals and record the answers.

Fifth, attached as Exhibits 2 is my written analysis of the data obtained.

Below are the opinions I rendered and the basis of the reasons for those opinions.

1. From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 3,507,410 individuals who the State's database identifies as applying for and the State sending an absentee ballot, that in my sample of this universe, 12.23% of those absentee voters did not request an absentee ballot to the clerk's office.

I obtained this data from the State via L2 Political after the November 3, 2020, Election Day. This data identified 3,507,410 individuals as having applied for an absentee ballot and the State sending an absentee ballot to these individuals.

I then had my staff make phone calls to a sample of this universe. When contacted, I had my staff confirm the individual's identity by name. Once the name was confirmed, I then had staff ask if the person requested an absentee ballot or not for the November General Election. Staff then recorded the number of persons who answered yes. Of the 834 persons who agreed to answer the question of whether the person requested an absentee ballot for the November general election, 732 individuals answered yes to the question whether they requested an absentee ballot and 102 individuals answered no to the question. Attached as Exhibit 2 is my written analysis containing information from the data above on absentee voters. Paragraph 2 of Exhibit 2 presents this information. Based on these results, 12.23% of our sample of these absentee voters in the State did not request an absentee ballot.

2. From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 139,190 individuals who the State's database identifies as having not returned an absentee ballot, that in my sample of this universe, 24.19% of these absentee voters in the State did not request an absentee ballot.

I obtained this data from the State via L2 Political after the November 3, 2020, Election Day. This data identified 139,129 absentee voters who were sent a ballot but who failed to return the absentee ballot.

I then had my staff make phone calls to a sample of this universe. When contacted, I had my staff confirm the individual's identity by name. Once the name was confirmed, I then had staff ask if the person requested an absentee ballot or not. Staff then recorded the number of persons who answered yes. My staff then recorded that of the 1,050 individuals who answered the question, 796 individuals answered yes to the question whether they requested an absentee ballot. My staff recorded that 254 individuals answered no to the question whether they requested an absentee ballot. Attached as Exhibit 2 is my written analysis containing information from the data above on absentee voters. Paragraph 2 of Exhibit 2 presents this information.

Based on these results, 24.19% of our sample of these absentee voters in the State did not request an absentee ballot.

3. From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 96,771 individuals who the State's database identifies as having not returned an absentee ballot, that in my sample of this universe, 15.37% of those absentee voters did in fact mail back an absentee ballot to the clerk's office.

Next, I then had staff ask the individuals who answered yes, they requested an absentee ballot, whether the individual mailed back the absentee ballot or did not mail back the absentee ballot. Staff then recorded that of the 740 individuals who answered the question, 241 individuals answered yes, they mailed back the absentee ballot. Staff

recorded 499 individuals answered no, they did not mail back the absentee ballot. Paragraph 2 of Exhibit 2 presents this information.

Based on these results, 47.52% of our sample of these absentee voters in the State did not request an absentee ballot.

4. From the State's database for the November 3, 2020 election, the NCOA database, and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 26,673 individuals had changed their address before the election, that in my sample of this universe, 1.11% of those individuals denied casting a ballot.

On Exhibit 2, in paragraph 4, I took the State's database of all absentee or early voters and matched those voters to the NCOA database for the day after election day. This data identified 51,302 individuals whose address on the State's database did not match the address on the NCOA database on election day. Next, I had my staff call the persons identified and ask these individuals whether they had voted. My call center staff identified 501 individuals who confirmed that they had casted a ballot. My call center staff identified 7 individuals who denied casting a ballot. Our analysis shows that 1.38% of our sample of these individuals who changed address did not vote despite the State's data recorded that the individuals did vote.

5. From the State's database for the November 3, 2020 election and the NCOA data and other state's voter data, it is my opinion to a reasonable degree of scientific certainty, that at least 6,924 absentee or early voters were not residents of the State when they voted.

On Exhibit 2, in paragraph 1, I took the State's database of all absentee or early voters and matched those voters to the NCOA database for the day after Election Day. This data identified 12,120 individuals who had moved of the State prior to Election Day.

Further, by comparing the other 49 states voter databases to the State's database, I identified 1,170 who registered to vote in a state other than the State subsequent to the date they registered to vote in the State. When merging these two lists and removing the duplicates, and accounting for moves that would not cause an individual to lose their residency and eligibility to vote under State law, these voters total 13,248.

6. From the State's database for the November 3, 2020 election and comparing that data to other states voting data and identifying individuals who cast early/absentee ballots in multiple states, it is my opinion to a reasonable degree of scientific certainty, that at least 234 individuals in the State voted in multiple states.

On Exhibit 2, in paragraph 2, I had my staff compare the State's early and absentee voters to other states voting data and identified individuals who cast early/absentee ballots in multiple states. My staff located 317 individuals who voted in the State and in other states for the November 3, 2020 general election.

## VIII. EXHIBITS TO BE USED AT TRIAL TO SUMMARIZE OR EXPLAIN OPINIONS

At the present time, I intend to rely on the documents produced set forth above as possible exhibits.

**REMAINDER OF PAGE LEFT INTENTIONALLY BLANK**

**SIGNATURE PAGE TO FOLLOW**

Dated: 11/20/2020

Matthew Braynard

11

STATE OF MICHIGAN

IN THE SUPREME COURT

ANGELIC JOHNSON, et al.
    Petitioners,

Supreme Court Case No. _____

v

JOCELYN BENSON, et al.,
    Respondents.

SPECIAL COUNSEL FOR THOMAS MORE SOCIETY—
AMISTAD PROJECT

Ian A. Northon, Esq. (P65082)
Gregory G. Timmer (P39396)
RHOADES MCKEE, PC*
55 Campau Avenue
Suite 300
Grand Rapids, MI 49503
Tel.: (616) 233-5125
Fax: (616) 233-5269
ian@rhoadesmckee.com
ggtimmer@rhoadesmckee.com

Robert J. Muise, Esq. (P62849)
AMERICAN FREEDOM LAW CENTER*
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org

Erin Elizabeth Mersino, Esq. (P70886)
GREAT LAKES JUSTICE CENTER*
5600 W. Mt. Hope Highway
Lansing, Michigan 48917
(517) 322-3207
erin@greatlakesjc.org

*for identification purposes only
COUNSEL FOR PETITIONERS

# EXPERT REPORT OF DR. QIANYING "JENNIE" ZHANG

## I.   INTRODUCTION

I have been retained as an expert witness on behalf of Petitioners in the above captioned proceeding.  I expect to testify on the following subject matters: a statistical analysis report on the database analysis conducted by Matthew Braynard for the State of Michigan ("State").

This is a statement of my relevant opinions and an outline of the factual basis for these opinions.  The opinions and facts contained herein are based on the information made available to me in this case, prior to preparation of this report, as well as my professional experience as an assistant professor of Finance at Hillsdale College in the Department of Economics and Business Administration teaching, among other courses, college level statistics.

I reserve the right to supplement or amend this statement on the basis of further information and deposition testimony obtained prior to the time of trial, or in order to clarify or correct the information contained herein.

## II.   DOCUMENTS REVIEWED

I reviewed the following documents in arriving at my opinions.

1.     The expert report of Matthew Braynard;

2.     The data documents Matthew Braynard relied on in preparing his expert opinion.

In addition, I discussed the facts of this matter with attorney Ian Northon and members of his legal team.

2

## III.  PROFESSIONAL QUALIFICATIONS

I am an assistant professor of finance and economics at Hillsdale College.  I obtained a B.S. degree in economics and mathematics from East China Normal University in 2009, a M.S. degree in economics from the University of Illinois, Urbana-Champaign in 2010, and a Ph.D. in economics from Florida International University in 2016.  As an assistant professor of Finance at Hillsdale College in the Department of Economics and Business Administration, my research areas are in empirical asset pricing and applied time-series econometrics.  I teach college level courses in statistics. I am currently teaching Econometrics, Quantitative Analysis and Business, and Economic Statistics at Hillsdale College.  I am also a member of Mensa and a CFA Level II candidate.

With the amount of work in which I am engaged and have been for the last several years, I have not authored any publications within the last decade.

## IV.  COMPENSATION

I have been retained as an expert witness for Petitioners.  I am being compensated at a flat fee of $5,000.

## V.  PRIOR TESTIMONY

I have not provided testimony as an expert either at trial or in a deposition in the last four years.

## VI.  STATEMENT OF OPINIONS

As set forth above, I have been engaged to provide an expert opinion regarding a statistical analysis of the November 3, 2020 election of Presidential electors.  I have

3

RECEIVED by MSC 11/26/2020 2:44:13 AM

reviewed the data analysis performed by Matthew Braynard and his call center staff who contacted absentee voters in the State. My opinions are predicated on the assumption that the responders to these calls are a representative sample of the population of registered voters in the State who requested an absentee ballot and responded accurately to the questions during the phone calls. As of November 23, 2020, there were 3,507,410 persons who requested absentee ballots in the State. In addition, of the 3,507,410 persons who requested an absentee ballot in the State, the State's database showed that the absentee ballot was not returned by 139,190 persons. Matthew Braynard's call center staff conducted a random phone survey from a sample of both the 3,507,410 persons who applied for an absentee ballot and the 139,190 individuals the State's database showed that the absentee ballot was not returned. With respect to the random survey of the 3,507,410 persons who requested absentee ballots in the State, Matthew Braynard's call center staff contacted 834 individuals who answered the question of whether those individuals requested an absentee ballot. Those responses were used to estimate how many of these 3,507,410 absentee ballots that the State sent out were actually requested by a voter. In addition, with respect to the random survey of the 139,190 individuals that the State's database showed as not returning an absentee ballot, Matthew Braynard's call center staff contacted 1,050 individuals who answered the question of whether those individuals requested an absentee ballot and, of the 740 answered yes, whether they had returned the absentee ballot. These responses are used to estimate how many of these 139,190 absentee ballots were requested by someone other than the named person, and to estimate how many of these absentee ballots were mailed back but not received.

Based on my review of the documents set forth above, my discussions with

4

statisticians and analysts working with me and at my direction, and my discussions with

the attorneys representing the Petitioners, I have the following opinions:

1. <u>Absentee Ballots Not Requested</u>. From the State's database identifying 3,507,410 individuals as requesting absentee ballots, Braynard's call center staff contacted and spoke with a random sample of 834 of these individuals. In response to Braynard's staff's question whether those 834 absentee voters contacted actually requested an absentee ballot from the State, 102 said they did not request an absentee ballot. This is a ratio of 12.23% of the 834 absentee voters contacted. Based on my statistical analysis of these numbers, it is my expert opinion to a reasonable degree of scientific certainty that there is a 95% confidence interval for the probability of the percentage of absentee voters who did not request an absentee ballot in the State of between 10.01% and 14.45%. Based on my statistical analysis of these numbers, it is my further expert opinion to a reasonable degree of scientific certainty that there is a 99% confidence interval for the probability of the percentage of absentee voters who did not request an absentee ballot of between 9.31% and 15.15%. Using these percentages and applying them to the number of absentee ballots identified above of 3,507,410, based on my statistical analysis, there is a 95% confidence interval that between 350,972 and 506,956 of such absentee ballots were not requested by an eligible State voter, and there is a 99% confidence interval that between 326,460 and 531,467 of the absentee ballots the State issued were not requested by an eligible State voter.

2. <u>Absentee Ballots Not Requested from Unreturned Sample</u>. From the State's database identifying 139,190 individuals the State identifies (i) as having requested an absentee ballot, (ii) the State mailed an absentee ballot to the individual and (iii) for whom the State's database identifies not having returned the absentee ballot to the State, Braynard's call center staff contacted and spoke with a random sample of 1,050 of these individuals. In response to Braynard's staff's question whether those 1,050 absentee voters contacted actually requested an absentee ballot from the State, 254 said they did not request an absentee ballot. This is a ratio of 24.19% of the 1,050 absentee voters contacted. Based on my statistical analysis of these numbers, it is my expert opinion to a reasonable degree of scientific certainty that there is a 95% confidence interval for the probability of the percentage of absentee voters who did not request an absentee ballot from the list of absentee ballot voters who did not return an absentee ballot in the State of between 21.60 % and 26.78 %. Based on my statistical analysis of these numbers, it is my further expert opinion to a reasonable degree of scientific certainty that there is a 99%

5

confidence interval for the probability of the percentage of absentee voters who did not request an absentee ballot from the list of absentee ballot voters who did not return an absentee ballot in the State of between 20.79 % and 27.59 %. Using these percentages and applying them to the number of absentee ballots identified above of 139,190, based on my statistical analysis, there is a 95% confidence interval that between 30,065 and 37,276 of such absentee ballots were not requested by an eligible State voter and there is a 99% confidence interval that between 28,932 and 38,409 of the absentee ballots the State issued were not requested by an eligible State voter.

3. <u>Absentee Ballots Returned But Not Counted</u>. From the State's database identifying 139,190 individuals who the State further identifies (i) as having requested an absentee ballot, (ii) the State mailed an absentee ballot to the individual and (iii) for whom the State's database identifies not having returned the absentee ballot to the State but who answered yes that they requested an absentee ballot, Braynard's call center staff contacted and spoke with a random sample of 740 of these individuals. In response to Braynard's staff's question whether those 740 absentee voters actually mailed back an absentee ballot from the State, 241 of these absentee voters said they did mail back an absentee ballot to the State. This is a ratio of 32.57% of the 740 absentee voters contacted. Based on my statistical analysis of these numbers, it is my expert opinion to a reasonable degree of scientific certainty that there is a 95% confidence interval for the probability of the percentage of these absentee voters who did mail back an absentee ballot in the State of between 29.19 % and 35.94%. Based on my statistical analysis of these numbers, it is my further expert opinion to a reasonable degree of scientific certainty that there is a 99% confidence interval for the probability of the percentage of these absentee voters who did return an absentee ballot of between 28.13% and 37.01%. Using these percentages and applying them to the estimated number of requested absentee ballots of 105,519 based on my statistical analysis, there is a 95% confidence interval that between 30,802 and 37,928 of the absentee ballots the State issued and did not count were returned to the State by an eligible State voter, and there is a 99% confidence interval that between 29,682 and 39,048 of the absentee ballots the State issued and did not count were returned to the State by an eligible State voter.

## VII.  BASIS AND REASONS SUPPORTING OPINIONS.

The basis and reasons supporting my opinions are set forth below. First, I

received a data set of responses to a phone survey given to absentee voters in the State.

Out of 3,507,410 individuals identified as having applied for an absentee ballot and the State sending an absentee ballot to these individuals, I received a data set of responses to a phone survey given to absentee voters in the State who the State identified as having requested an absentee ballot but who said they did not request an absentee ballot. Matthew Braynard's staff contacted 834 of these individuals in a random phone survey. For purposes of this report, I assume that the 834 individuals who responded to Mr. Braynard's staff are a representative sample of this population, and responded accurately to the questions posed to them. These respondents were asked whether they requested an absentee ballot. Of the 834 respondents, 102 (12.23%) said they did not request an absentee ballot.

Under our assumptions, I can use these survey results regarding the individuals who responded stating that they did not request an absentee ballot to extrapolate to the larger population of interest. Applying a standard statistical formula,[1] I can say with certainty that there is a 95% confidence interval for the probability of the percentage of absentee voters who the State identifies as having requested an absentee ballot that the percentage of such absentee voters who actually did not request an absentee ballot in the State is between 10.01% and 14.45%.

---

[1] If each person from the population of size $N$ is independently chosen to be in the sample of size $n$, and each person has the same probability $p$ of having the desired property, then the number of people in the sample with the property can be approximated by a normal distribution. We have 95% within 1.96 standard deviations and 99% is within 2.576 standard deviations. This leads to the following confidence intervals, where below $p$ is the observed sample proportion having the property ($p = x/n$):

$$CI(95\%) = p \pm 1.96\sqrt{\frac{p(1-p)}{n}}; \quad CI(99\%) = p \pm 2.576\sqrt{\frac{p(1-p)}{n}}.$$

To extrapolate to the entire population of interest, we multiple the above equations by $N$.

Appendix --000295
I APP. 1129

Based on my statistical analysis of these numbers, it is my further expert opinion to a reasonable degree of scientific certainty that there is a 99% confidence interval for the percentage of these same absentee voters of between 9.31% and 15.15%. Using these percentages and applying them to the number of absentee ballots the State identified as being requested of 3,507,410, based on my statistical analysis, there is a 95% confidence interval that between 350,972 and 506,956 of such absentee ballots were not requested by an eligible State voter and there is a 99% confidence interval that between 326,460 and 531,467 of the absentee ballots the State issued were not requested by an eligible State voter.

Second, I received a data set of responses to a phone survey given to absentee voters in the State who were sent an absentee ballot but who failed to return the absentee ballot. Out of 3,507,410 individuals identified as having applied for an absentee ballot and the State sending an absentee ballot to these individuals, there were 139,190 (3.97%) such voters. Matthew Braynard's staff contacted a random sample of 1,050 from the 139,190 absentee voters identified on the State's database. For purposes of this report, I assume that the 1,050 individuals who responded to Mr. Braynard's staff are a representative sample of this population and responded accurately to the questions posed to them. These respondents were asked whether they had requested an absentee ballot. Of the 1,050 respondents, 254 (24.19%) denied having requested an absentee ballot.

Under our assumptions, I can use these survey results regarding the individuals who responded to the question of whether they requested an absentee ballot to the larger population of interest. Applying the same standard statistical formula set forth in footnote 1, I can say with certainty that there is a 95% confidence interval for the probability of

8

the percentage of absentee voters who individuals the State identifies (i) as having requested an absentee ballot, (ii) the State mailed an absentee ballot to the individual and (iii) for whom the State's database identifies not having returned the absentee ballot to the State, the percentage of such absentee voters who did not request an absentee ballot in the State is between 21.60% and 26.78%. Based on my statistical analysis of these numbers, it is my further expert opinion to a reasonable degree of scientific certainty that there is a 99% confidence interval for the percentage of these same absentee voters of between 20.79% and 27.59%. Using these percentages and applying them to the number of absentee ballots identified above of 139,190, based on my statistical analysis, there is a 95% confidence interval that between 30,065 and 37,276 of such absentee ballots were not requested by an eligible State voter, and there is a 99% confidence interval that between 28,932 and 38,409 of the absentee ballots the State issued were not requested by an eligible State voter.

Third, I received a data set of responses to a phone survey given to absentee voters the State's database shows did not return an absentee ballot but who said they did return an absentee ballot. Out of 3,507,410 individuals identified as having applied for an absentee ballot and the State sending an absentee ballot to these individuals, there were 139,190 (3.97%) voters who failed to return the absentee ballot. Matthew Braynard's staff contacted 1,050 of these 139,190 absentee voters identified on the State's database. For purposes of this report, I assume that the 740 individuals who responded to Mr. Braynard's staff are a representative sample of this population and responded accurately to the questions posed to them. These respondents were asked whether they had returned

an absentee ballot to the State. Of the 740 respondents, 241 (32.57%) said they returned the ballot to the State and the State did not count the ballot.

Under our assumptions, I can use these survey results regarding the individuals who responded to the question of whether they requested an absentee ballot to the larger population of interest. Applying the same standard statistical formula set forth in footnote 1, I can say with certainty that there is a 95% confidence interval for the probability of the percentage of absentee voters who individuals the State identifies (i) as having requested an absentee ballot, (ii) the State mailed an absentee ballot to the individual and (iii) for whom the State's database identifies not having returned the absentee ballot to the State but who said they did return the absentee ballot, the percentage of such absentee voters who did return an absentee ballot in the State is between 29.19% and 35.94%. Based on my statistical analysis of these numbers, it is my further expert opinion to a reasonable degree of scientific certainty that there is a 99% confidence interval for the percentage of these same absentee voters of between 28.13% and 37.01%. Using these percentages and applying them to the number of absentee ballots identified above of 139,190, based on my statistical analysis, there is a 95% confidence interval that between 30,802 and 37,928 of such absentee ballots were not requested by an eligible State voter, and there is a 99% confidence interval that between 29,682 and 39,048 of the absentee ballots the State issued were not requested by an eligible State voter.

## VIII. EXHIBITS TO BE USED AT TRIAL TO SUMMARIZE OR EXPLAIN OPINIONS

At the present time, I intend to rely on the documents produced set forth above as possible exhibits.

**REMAINDER OF PAGE LEFT INTENTIONALLY BLANK**
**SIGNATURE PAGE TO FOLLOW**

RECEIVED by MSC 11/26/2020 2:44:13 AM

Appendix --000299
I APP. 1133

Dated: November 25, 2020

_Qianying Zhang_
Qianying Jennie Zhang

RECEIVED by MSC 11/26/2020 2:44:13 AM

### Declaration of John McLaughlin

I, John McLaughlin, declare that the following statements are true to the best of my knowledge and recollection:

1.     I am the Chief Executive Officer and Partner of McLaughlin & Associates, a polling and strategic consulting firm.

2.     I have worked professionally as a strategic consultant and pollster for over 35 years.

3.     During this time, I have earned a reputation for helping some of America's most successful corporation and winning some of the toughest elections in the nation.

4.     In 2016, I worked as an advisor and pollster for Donald Trump from the primaries through election day.

5.     My political clients have included former Presidential candidates Steve Forbes, Fred Thompson, former California Governor Arnold Schwarzenegger, former Florida Governor Jeb Bush, former Georgia Governor Nathan Deal and 22 current and former U.S. Senators and 16 current Republican members of Congress.

6.     Internationally, I have done work in Israel for Prime Minister Benjamin Natanyahu, for the Conservative Party in the United Kingdom, for former Conservative Prime Minister Stephen Harper of Canada and for Hungarian Prime Minister Viktor Orban in his 2018 landslide reelection.

7.     I am founding partner of Opinoines Latinas, a public opinion research company dedicated to researching opinions of Latinos nationwide.

8. I have appeared on every major broadcast and cable channel, as well as prominent radio talk shows across America.

9. My articles have been published in a wide range of publications including National Review, Middle East Quarterly, Campaigns and Elections and The Polling Report.

10. My work has been recognized by winning Telly and PR Week Campaign Awards.

11. I am a graduate of Fordham College (B.A.) and hold an M.B.A. from Fordham University with concentrations in Finance and Quantitative Methods. I am a member of MENSA.

12. I have attached two of my documents to this declaration.

13. The first document, a true and correct copy which is attached as Exhibit A, is my November 11, 2020 report titled "Major Divergence Between In-Person Election-Day Votes and Early Mail Voters" based on my polling and analysis. I incorporate the contents of the attached report as if it were fully re-stated herein.

14. The second document, a true and correct copy which is attached as Exhibit B, is my August 2020 report titled "BATTLEGROUND STATES GENERAL ELECTION VOTERS" based on my polling and analysis. I incorporate the contents of the attached report as if it were fully re-stated herein.

I declare under penalty of perjury under the laws of Virginia that the forgoing is true and correct.

Dated: November 17, 2020

/s/electronically signed by John McLaughlin
_____
John McLaughlin

# ◤ McLaughlin & Associates

**From:** John McLaughlin
**Re:** Major Divergence Between In-Person Election-Day Votes and Early Mail Voters
**Date:** November 11, 2020

Our national post-election survey conducted on November 2nd and 3rd clearly shows President Trump winning by 26-points (62% to 36%) among adults who voted in-person on election-day. Among adults who voted early in-person at a designated polling location, Joe Biden edged President Trump by 2-points (51% to 49%). However, among adults who voted early by mail, Joe Biden won by 28-points (63% to 35%). Our August and October surveys conducted in the battleground states told the same story of President Trump leading big among in-person, election-day voters while Joe Biden led by wide margins with early by mail voters.

### National Post-Election Online Survey (n1000): November 2-3, 2020

| | Total | Voted Election Day | Voted Early | In-Person Early | Mail Early |
|---|---|---|---|---|---|
| Vote Trump | 48% | 62% | 40% | 49% | 35% |
| Vote Biden | 50% | 36% | 58% | 51% | 63% |
| **NET** | **-2** | **+26** | **-18** | **-2** | **-28** |

| | Total | Vote Election Day | Vote Early | In-Person Early | Mail Early |
|---|---|---|---|---|---|
| Republican | 35% | 45% | 29% | 37% | 25% |
| Democrat | 37% | 26% | 44% | 39% | 46% |
| Independent | 28% | 30% | 27% | 24% | 29% |
| **NET** | **-2** | **+19** | **-15** | **-2** | **-21** |

### Battleground Online Survey (n1200): October 14-16, 2020

| | Total | Vote Election Day | Vote Early | In-Person Early | Mail Early |
|---|---|---|---|---|---|
| Vote Trump | 43% | 57% | 37% | 46% | 31% |
| Vote Biden | 49% | 33% | 55% | 47% | 61% |
| **NET** | **-6** | **+24** | **-18** | **-1** | **-30** |

| | Total | Vote Election Day | Vote Early | In-Person Early | Mail Early |
|---|---|---|---|---|---|
| Republican | 35% | 43% | 31% | 39% | 27% |
| Democrat | 36% | 31% | 38% | 29% | 43% |
| Independent | 29% | 26% | 31% | 32% | 30% |
| **NET** | **-1** | **+12** | **-7** | **+10** | **-16** |

# ◤ McLaughlin & Associates

**Battleground Online Survey (n800): August 18-19, 2020**

|  | Total | Vote Election Day | Vote Early | In-Person Early | Mail Early |
|---|---|---|---|---|---|
| Vote Trump | 44% | 62% | 34% | 46% | 30% |
| Vote Biden | 49% | 31% | 59% | 47% | 65% |
| **NET** | **-5** | **+31** | **-25** | **-1** | **-35** |

|  | Total | Vote Election Day | Vote Early | In-Person Early | Mail Early |
|---|---|---|---|---|---|
| Republican | 36% | 47% | 29% | 34% | 27% |
| Democrat | 35% | 25% | 40% | 36% | 42% |
| Independent | 30% | 28% | 31% | 29% | 32% |
| **NET** | **+1** | **+22** | **-11** | **-2** | **-15** |

In the August battleground survey, virtually 9 in 10 voters agreed that it was important for their state and local government to provide in-person voting for the election. Two-thirds (65%) said it was "very" important. There was strong census across party lines.

*"HOW IMPORTANT DO YOU THINK IT IS FOR YOUR STATE AND LOCAL GOVERNMENT TO CONTINUE TO PROVIDE IN-PERSON VOTING FOR THE 2020 ELECTION?"*

|  | Total | Republican | Democrat | Independent |
|---|---|---|---|---|
| **Important** | **88%** | **94%** | **86%** | **85%** |
| Very | 65% | 78% | 59% | 55% |
| Somewhat | 24% | 17% | 27% | 29% |
| **Not Important** | **12%** | **6%** | **14%** | **16%** |



# McLaughlin & Associates

**BATTLEGROUND STATES**
**GENERAL ELECTION VOTERS**
**N=800 LIKELY VOTERS (+/- 3.4% MoE)**
**FIELD DATES: AUGUST 18-19, 2020**

**42. HOW WILL YOU BE VOTING IN THIS ELECTION?**

| | |
|---|---|
| **Total Answering** | **800** |
| **VOTE EARLY** | **64.3** |
| **VOTE BY MAIL** | **42.9** |
| Mailing it back | 24.4 |
| Dropping it off | 18.5 |
| In Person | 21.4 |
| **VOTE ON ELECTION DAY** | **35.7** |
| **DON'T KNOW** | **0.0** |

**46. HOW IMPORTANT DO YOU THINK IT IS FOR YOUR STATE AND LOCAL GOVERNMENT TO CONTINUE TO PROVIDE IN-PERSON VOTING FOR THE 2020 ELECTION?**

| | |
|---|---|
| **Total Answering** | **800** |
| **IMPORTANT** | **88.4** |
| Very | 64.6 |
| Somewhat | 23.9 |
| **NOT IMPORTANT** | **11.5** |
| Not That | 6.6 |
| At All | 4.9 |
| **DK/REFUSED** | **0.1** |
| **Net Diff.** | **77.0** |
| Mean | 3.48 |

**47. DO YOU APPROVE OR DISAPPROVE OF VOTER IDENTIFICATION LAWS TO MAKE SURE THAT EVERY VOTE THAT IS CAST IN THE ELECTION FOR PRESIDENT AND CONGRESS IS CAST BY A LEGAL CITIZEN WHO IS ELIGIBLE TO VOTE?**

| | |
|---|---|
| **Total Answering** | **800** |
| **APPROVE** | **85.9** |
| Strongly | 64.1 |
| Somewhat | 21.8 |
| **DISAPPROVE** | **13.9** |
| Somewhat | 8.1 |
| Strongly | 5.8 |
| **DON'T KNOW** | **0.2** |
| **Net Diff.** | **72.0** |
| Mean | 3.45 |

**48. DO YOU APPROVE OR DISAPPROVE OF REQUIRING ALL 50 STATES TO PROVIDE UNIVERSAL MAIL-IN VOTING FOR THE NOVEMBER ELECTION, IN WHICH ALL REGISTERED VOTERS ARE AUTOMATICALLY MAILED A LIVE BALLOT?**

| Total Answering | 800 |
|---|---|
| **APPROVE** | **60.6** |
| Strongly | 34.2 |
| Somewhat | 26.4 |
| **DISAPPROVE** | **39.3** |
| Somewhat | 14.1 |
| Strongly | 25.2 |
| **DON'T KNOW** | **0.2** |
| **Net Diff.** | **21.3** |
| Mean | 2.70 |

**49. WHICH OF THE FOLLOWING COMES CLOSEST TO YOUR OPINION REGARDING VOTING BY MAIL?**

**1. WE SHOULD AUTOMATICALLY MAIL A LIVE BALLOT TO EVERY REGISTERED VOTER WHETHER THEY REQUEST ONE OR NOT.**
**2. WE SHOULD ONLY MAIL A BALLOT TO VOTERS WHO HAVE REQUESTED VOTING BY ABSENTEE BALLOT.**
**3. THERE SHOULD BE NO VOTING BY MAIL, PEOPLE SHOULD ONLY VOTE IN-PERSON.**

| Total Answering | 800 |
|---|---|
| AUTOMATICALLY MAIL | 33.1 |
| ONLY REQUESTED | 53.0 |
| NO VOTE BY MAIL | 13.8 |
| **DON'T KNOW** | **0.0** |

**50. DO YOU APPROVE OR DISAPPROVE OF THE JOB THE U.S. POSTAL SERVICE IS DOING?**

| Total Answering | 800 |
|---|---|
| **APPROVE** | **76.9** |
| Strongly | 35.4 |
| Somewhat | 41.5 |
| **DISAPPROVE** | **22.4** |
| Somewhat | 16.8 |
| Strongly | 5.7 |
| **DON'T KNOW** | **0.7** |
| **Net Diff.** | **54.4** |
| Mean | 3.07 |

**51. DO YOU AGREE OR DISAGREE WITH THE FOLLOWING STATEMENT? "WE HAVE COME TO RELY ON OUR POST OFFICE AND THEY HAVE DONE A GOOD JOB OVER THE YEARS. DELAYS IN MAIL DELIVERY IS A NEW PHENOMENON DUE TO A LACK OF PROPER FUNDING."**

| Total Answering | 800 |
|---|---|
| **AGREE** | **69.8** |
| Strongly | 36.0 |
| Somewhat | 33.8 |
| **DISAGREE** | **29.7** |
| Somewhat | 19.6 |
| Strongly | 10.0 |
| **DK/REFUSED** | **0.6** |
| **Net Diff.** | **40.1** |
| Mean | 2.96 |

**52. DO YOU TRUST OR DISTRUST THE U.S. POSTAL SERVICE TO DELIVER ALL COMPLETED MAILED IN-BALLOTS TO THE ELECTION BOARDS ON TIME AND WITHOUT SIGNIFICANT ERRORS?**

| Total Answering | 800 |
|---|---|
| **TRUST** | **66.2** |
| Strongly | 32.1 |
| Somewhat | 34.1 |
| **DISTRUST** | **33.3** |
| Somewhat | 21.5 |
| Strongly | 11.7 |
| **DK/REFUSED** | **0.5** |
| **Net Diff.** | **32.9** |
| **Mean** | 2.87 |

**53. HOW CONCERNED ARE YOU ABOUT POSSIBLE PROBLEMS WITH THE DELIVERY OF MAIL-IN BALLOTS THAT MANY ELECTIONS THROUGHOUT THE UNITED STATES MAY NOT BE DECIDED FOR WEEKS OR MONTHS AFTER MANY LEGAL CHALLENGES?**

| Total Answering | 800 |
|---|---|
| **CONCERNED** | **72.9** |
| Very | 36.0 |
| Somewhat | 37.0 |
| **NOT CONCERNED** | **26.8** |
| Not That | 18.7 |
| At All | 8.1 |
| **DK/REFUSED** | **0.2** |
| **Net Diff.** | **46.1** |
| **Mean** | 3.01 |

**54. MANY VOTERS ARE CONCERNED THAT THE U.S. POSTAL SERVICE MAY OR MAY NOT BE ABLE TO DELIVER A MAIL-IN BALLOT IN TIME FOR THE NOVEMBER ELECTIONS. ARE YOU WILLING TO RISK MAILING IN YOUR BALLOT FOR PRESIDENT AND CONGRESS EVEN THOUGH THE POST OFFICE COULD LOSE YOUR BALLOT OR IT MAY NOT BE RECEIVED IN TIME AND IT WOULD NEVER BE RECEIVED AT ALL?**

| Total Answering | 800 |
|---|---|
| YES, WILLING TO RISK IT | 47.0 |
| NO, NOT WILLING/RISK IT | 52.8 |
| **DON'T KNOW** | **0.2** |
| **Net Diff.** | **-5.8** |

**55. WOULD YOU APPROVE OR DISAPPROVE OF ACCEPTING AND COUNTING MAIL-IN BALLOTS THAT ARE RECEIVED AFTER ELECTION DAY BUT ARE POSTMARKED WITH A DATE SHOWING IT WAS SENT BEFORE ELECTION DAY?**

| Total Answering | 800 |
|---|---|
| **APPROVE** | **74.9** |
| Strongly | 46.3 |
| Somewhat | 28.6 |
| **DISAPPROVE** | **24.8** |
| Somewhat | 11.6 |
| Strongly | 13.2 |
| **DON'T KNOW** | **0.3** |
| **Net Diff.** | **50.1** |
| **Mean** | 3.08 |

**56. WOULD YOU APPROVE OR DISAPPROVE OF ACCEPTING AND COUNTING MAIL-IN BALLOTS THAT ARE RECEIVED AFTER ELECTION DAY WITHOUT ANY POSTMARK DATE?**

| Total Answering | 800 |
|---|---|
| **APPROVE** | **28.5** |
| Strongly | 12.7 |
| Somewhat | 15.8 |
| **DISAPPROVE** | **71.2** |
| Somewhat | 27.1 |
| Strongly | 44.1 |
| **DON'T KNOW** | **0.3** |
| **Net Diff.** | **-42.7** |
| **Mean** | 1.97 |

**57. NANCY PELOSI AND THE DEMOCRATS ARE PROPOSING THAT THE U.S. POSTAL SERVICE GET $25 BILLION DOLLARS TO COVER THEIR BUDGET SHORTFALL AND DEFICIT AND THAT STATES GET $3.5 BILLION DOLLARS TO HELP THEM SEND OUT MAIL-IN BALLOTS TO ALL REGISTERED VOTERS. DO YOU APPROVE OR DISAPPROVE OF THIS PROPOSAL?**

| Total Answering | 800 |
|---|---|
| **APPROVE** | **57.3** |
| Strongly | 32.9 |
| Somewhat | 24.3 |
| **DISAPPROVE** | **42.4** |
| Somewhat | 16.0 |
| Strongly | 26.4 |
| **DON'T KNOW** | **0.3** |
| **Net Diff.** | **14.8** |
| **Mean** | 2.64 |

**58. THE U.S. POSTAL SERVICE IS AN INDEPENDENT AGENCY THAT IS SUPPOSED TO PAY FOR ITSELF, BUT LAST YEAR RAN AN $8.8 BILLION DOLLAR DEFICIT THAT IS GROWING TODAY. THE DEMOCRATS IN CONGRESS SUPPORT A $25 BILLION DOLLAR BAILOUT FOR THE U.S. POSTAL SERVICE. PRESIDENT TRUMP'S ADMINISTRATION HAS BEEN MAKING POSTAL REFORMS TO ADDRESS THE BUDGET PROBLEMS. WHICH OF THE FOLLOWING COMES CLOSER TO YOUR OPINION?**

**1. PRESIDENT TRUMP'S ADMINISTRATION HAS BEEN MAKING POSTAL REFORMS TO HELP STOP THE U.S. POSTAL SERVICE FROM LOSING MONEY.OR,**
**2. PRESIDENT TRUMP'S ADMINISTRATION IS JUST TRYING TO STOP THE U.S. POSTAL SERVICE FROM DELIVERING MAIL-IN BALLOTS.**

| Total Answering | 800 |
|---|---|
| REFORM USPS | 46.7 |
| STOP USPS/DLIVRNG BLLTS | 53.1 |
| **DON'T KNOW** | **0.2** |
| **Net Diff.** | **-6.4** |

**59. RECENTLY PRESIDENT TRUMP SIGNED EXECUTIVE ORDERS TO EXTEND UNEMPLOYMENT INSURANCE, DEFER STUDENT LOAN INTEREST PAYMENTS, PREVENT EVICTIONS AND SAVE AND CREATE JOBS BY SUSPENDING THE PAYROLL TAX UNTIL THE END OF THE YEAR. NANCY PELOSI HAS REFUSED TO AGREE TO THESE MEASURES TO PROVIDE RELIEF TO PEOPLE, BUT IS BRINGING CONGRESS BACK THIS SATURDAY TO VOTE TO PROVIDE BILLIONS OF DOLLARS FOR UNIVERSAL MAIL-IN BALLOTS. WHILE CONGRESS IS THERE DO YOU THINK NANCY PELOSI SHOULD HAVE CONGRESS VOTE TO MAKE PRESIDENT TRUMP'S EXECUTIVE ORDERS THE LAW?**

| Total Answering | 800 |
|---|---|
| YES | 64.3 |
| NO | 34.9 |
| **DON'T KNOW** | **0.8** |
| **Net Diff.** | **29.4** |

**60. PRESIDENT TRUMP SAYS THAT HE WON'T APPROVE EXTRA FUNDING TO HELP THE U.S. POSTAL SERVICE HANDLE UNIVERSAL MAIL-IN BALLOTS UNTIL CONGRESS ACTS TO HELP SMALL BUSINESSES AND EXTEND UNEMPLOYMENT BENEFITS. DO YOU APPROVE OR DISAPPROVE OF PRESIDENT TRUMP'S STANCE?**

| Total Answering | 800 |
|---|---|
| APPROVE | 55.4 |
| Strongly | 32.5 |
| Somewhat | 22.9 |
| DISAPPROVE | 44.0 |
| Somewhat | 17.2 |
| Strongly | 26.8 |
| DON'T KNOW | 0.6 |
| Net Diff. | 11.4 |
| Mean | 2.61 |

**61. WHO DO AGREE WITH MORE ON UNIVERSAL MAIL-IN BALLOTS FOR THE NOVEMBER ELECTIONS, IN WHICH ALL REGISTERED VOTERS ARE AUTOMATICALLY MAILED A LIVE BALLOT?**

**1. PRESIDENT TRUMP WHO SAYS THAT UNIVERSAL MAIL-IN BALLOTS ARE SUBJECT TO ALL KINDS OF FRAUD. OR, 2. JOE BIDEN AND NANCY PELOSI WHO SAY UNIVERSAL MAIL-IN BALLOTS ARE NEEDED DURING THE CORONAVIRUS PANDEMIC TO GIVE VOTERS AN ALTERNATIVE TO IN-PERSON VOTING.**

| Total Answering | 800 |
|---|---|
| TRUMP/FRAUD | 46.0 |
| BIDEN/UNIVERSAL VOTING | 53.8 |
| DON'T KNOW | 0.2 |
| Net Diff. | -7.8 |

**62. WOULD YOU APPROVE OR DISAPPROVE OF USING UNIVERSAL MAIL-IN BALLOTS FOR THE NOVEMBER ELECTIONS WITHOUT ANY VOTER IDENTIFICATION OR SIGNATURE VERIFICATION RULES?**

| Total Answering | 800 |
|---|---|
| APPROVE | 29.3 |
| Strongly | 12.6 |
| Somewhat | 16.6 |
| DISAPPROVE | 70.6 |
| Somewhat | 20.8 |
| Strongly | 49.8 |
| DON'T KNOW | 0.1 |
| Net Diff. | -41.3 |
| Mean | 1.92 |

**63. MOST STATES REQUIRE PHOTO IDENTIFICATION IN ORDER TO VOTE. JOE BIDEN AND NANCY PELOSI PROPOSE PROHIBITING STATES FROM REQUIRING SIGNATURE VERIFICATION AND VOTER IDENTIFICATION WITH UNIVERSAL MAIL-IN BALLOTS. THEY PROPOSE THAT PEOPLE BE ALLOWED TO VOTE BY UNIVERSAL MAIL-IN BALLOTS AS LONG AS THEY SWEAR ON AN AFFIDAVIT SAYING THEY ARE THE VOTER IN QUESTION EVEN WITHOUT PROVIDING IDENTIFICATION. DO YOU APPROVE OR DISAPPROVE OF THE PROPOSAL?**

| Total Answering | 800 |
|---|---|
| APPROVE | 39.6 |
| Strongly | 16.5 |
| Somewhat | 23.1 |
| DISAPPROVE | 60.2 |
| Somewhat | 19.2 |
| Strongly | 41.0 |
| DON'T KNOW | 0.2 |
| Net Diff. | -20.6 |
| Mean | 2.15 |

**64. JOE BIDEN AND NANCY PELOSI PROPOSE ALLOWING POLITICAL PARTY WORKERS TO COLLECT SIGNED BALLOTS AND TURN THEM IN TO BE COUNTED AS VOTES. THEY SAY THAT WITH THE CORONAVIRUS, THE RISKS OF IN-PERSON VOTING MIGHT DISCOURAGE PEOPLE FROM VOTING. PRESIDENT TRUMP SAYS THAT ALLOWING CAMPAIGN WORKERS TO COLLECT BALLOTS WOULD INVITE AND ENABLE FRAUD SINCE THERE WOULD BE NO WAY OF KNOWING IF THE BALLOTS WERE LEGITIMATE OR NOT. DO YOU APPROVE OR DISAPPROVE OF THE PROPOSAL?**

| Total Answering | 800 |
|---|---|
| APPROVE | 41.2 |
| Strongly | 17.0 |
| Somewhat | 24.1 |
| DISAPPROVE | 58.5 |
| Somewhat | 18.7 |
| Strongly | 39.7 |
| DON'T KNOW | 0.4 |
| Net Diff. | -17.3 |
| Mean | 2.19 |

**65. JOE BIDEN AND NANCY PELOSI WANT TO REQUIRE SAME-DAY VOTER REGISTRATION WHERE NEW VOTERS COULD REGISTER ON THE DAY THEY GO TO VOTE WITHOUT REQUIRING IDENTIFICATION. PRESIDENT TRUMP SAYS THIS PROPOSAL INVITES VOTER FRAUD. DO YOU APPROVE OR DISAPPROVE OF THE PROPOSAL?**

| Total Answering | 800 |
|---|---|
| APPROVE | 38.2 |
| Strongly | 18.3 |
| Somewhat | 19.9 |
| DISAPPROVE | 61.5 |
| Somewhat | 20.4 |
| Strongly | 41.1 |
| DON'T KNOW | 0.3 |
| Net Diff. | -23.3 |
| Mean | 2.15 |

**66. WHICH POINT OF VIEW COMES CLOSEST TO YOUR OWN?**

**1. PRESIDENT TRUMP WHO SAYS JOE BIDEN AND NANCY PELOSI ARE TRYING TO CHANGE ELECTION RULES SO THEY CAN STEAL THE ELECTION. OR,**
**2. JOE BIDEN AND NANCY PELOSI WHO SAY THEY ARE JUST TRYING TO PROTECT VOTING AMID THE CORONAVIRUS.**

| Total Answering | 800 |
|---|---|
| TRUMP/BIDEN CHANGE ELEC. | 49.4 |
| BIDEN/PROTECT VOTING | 50.6 |
| DON'T KNOW | 0.0 |
| Net Diff. | -1.1 |

**67. WHICH OF THE FOLLOWING DO YOU THINK BEST DESCRIBES PRESIDENT TRUMP'S REASON FOR OPPOSING UNIVERSAL MAIL-IN BALLOTS?**

**1. THE RISK OF VOTER FRAUD. OR,**
**2. HE JUST WANTS TO HOLD DOWN THE TURNOUT TO DISCOURAGE LOW-INCOME PEOPLE FROM VOTING.**

| Total Answering | 800 |
|---|---|
| RISK OF VOTER FRAUD | 50.7 |
| HOLD DOWN THE TURNOUT | 49.3 |
| DON'T KNOW | 0.1 |
| Net Diff. | 1.4 |

**68. IF STATES WERE REQUIRED TO ACCEPT UNIVERSAL MAIL-IN BALLOTS BUT ONLY IF A COPY OF A DRIVER'S LICENSE OR OTHER PROOF OF IDENTITY WAS ENCLOSED WITH THE BALLOT AND THE STATE ALSO HAD TO VERIFY THE REGISTRATION, AND SIGNATURES OF THOSE VOTING TO PREVENT FRAUD, WOULD YOU SUPPORT OR OPPOSE THE PROPOSAL?**

| Total Answering | 800 |
|---|---|
| SUPPORT | 68.6 |
| Strongly | 29.0 |
| Somewhat | 39.6 |
| OPPOSE | 31.0 |
| Somewhat | 15.9 |
| Strongly | 15.2 |
| DK/REFUSED | 0.4 |
| Net Diff. | 37.6 |
| Mean | 2.83 |

**69. IN ORDER TO PREVENT VOTER FRAUD, WOULD YOU SUPPORT OR OPPOSE LINKING VOTER RECORDS TO SOCIAL SECURITY RECORDS SO THAT EVERY PERSON WHO VOTES WHETHER BY MAIL OR IN-PERSON IS PROVEN TO BE A VALID AMERICAN CITIZEN?**

| Total Answering | 800 |
|---|---|
| SUPPORT | 73.7 |
| Strongly | 37.3 |
| Somewhat | 36.5 |
| OPPOSE | 25.6 |
| Somewhat | 14.8 |
| Strongly | 10.8 |
| DK/REFUSED | 0.7 |
| Net Diff. | 48.2 |
| Mean | 3.01 |

**70. IF STATES WERE REQUIRED TO ACCEPT UNIVERSAL MAIL-IN BALLOTS BUT ONLY IF THE LAST FOUR DIGITS OF THE VOTER'S SOCIAL SECURITY NUMBER WAS INCLUDED WITH THE BALLOT AND THE STATE ALSO HAD TO VERIFY THE REGISTRATION, AND SIGNATURE ON THE BALLOT TO PREVENT FRAUD, WOULD YOU SUPPORT OR OPPOSE THE PROPOSAL?**

| Total Answering | 800 |
|---|---|
| SUPPORT | 71.0 |
| Strongly | 30.1 |
| Somewhat | 40.9 |
| OPPOSE | 28.7 |
| Somewhat | 17.1 |
| Strongly | 11.6 |
| DK/REFUSED | 0.2 |
| Net Diff. | 42.3 |
| Mean | 2.90 |

**71. IF THE PRESIDENTIAL RACE IS CLOSE AGAIN AND THERE ARE MILLIONS OF MAIL-IN BALLOT THAT NEED TO BE CERTIFIED AS VALID OR INVALID, THE PROCESS WOULD FALL INTO THE HANDS OF LAWYERS, STATE JUDGES AND POSSIBLY THE SUPREME COURT TO DECIDE THE ELECTION. KNOWING THIS, WOULD YOU APPROVE OR DISAPPROVE OF JOE BIDEN AND NANCY PELOSI'S PROPOSAL TO PROVIDE UNIVERSAL MAIL-IN VOTING FOR THE NOVEMBER ELECTION?**

| Total Answering | 800 |
|---|---|
| APPROVE | 51.7 |
| Strongly | 24.8 |
| Somewhat | 26.9 |
| DISAPPROVE | 48.0 |
| Somewhat | 15.7 |
| Strongly | 32.3 |
| DON'T KNOW | 0.3 |
| Net Diff. | 3.7 |
| Mean | 2.44 |

**72. AFTER EVERYTHING YOU HAVE READ, DO YOU APPROVE OR DISAPPROVE OF REQUIRING ALL 50 STATES TO PROVIDE UNIVERSAL MAIL-IN VOTING FOR THE NOVEMBER ELECTION, IN WHICH ALL REGISTERED VOTERS ARE AUTOMATICALLY MAILED A LIVE BALLOT?**

| Total Answering | 800 |
|---|---|
| **APPROVE** | **51.4** |
| Strongly | 26.0 |
| Somewhat | 25.4 |
| **DISAPPROVE** | **48.5** |
| Somewhat | 17.6 |
| Strongly | 30.8 |
| **DON'T KNOW** | **0.1** |
| **Net Diff.** | **3.0** |
| **Mean** | **2.47** |

**73. HAVE YOU EVER VOTED BY MAIL-IN BALLOT OR ABSENTEE BALLOT BEFORE?**

| Total Answering | 800 |
|---|---|
| YES | 46.5 |
| NO | 53.5 |
| **DON'T KNOW** | **0.0** |
| **Net Diff.** | **-7.0** |

**74. DO YOU KNOW IF YOUR BALLOT WAS ACTUALLY RECEIVED AND COUNTED?**

| Total Answering | 372 |
|---|---|
| YES | 51.9 |
| NO | 47.1 |
| **DON'T KNOW** | **0.9** |
| **Net Diff.** | **4.8** |

STATE OF MICHIGAN
COURT OF CLAIMS

ELECTION INTEGRITY FUND and GLEN
SITEK,

      Plaintiffs,

v

JOCELYN BENSON, in her official capacity as
Secretary of State,

      Defendant.

No. 20-000169-MM

HON. CYNTHIA STEPHENS

Ian Northon (P65082)
Attorney for Plaintiffs
55 Campau Ave, NW, #300
Grand Rapids, Michigan 49503
616.233.5125
inorthon@rhoadesmckee.com

Edward D. Greim
Attorney for Plaintiffs
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
816.236.3181
edgreim@gravesgarrett.com

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

                                         /

## DECLARATION AND VERIFICATION OF JONATHAN BRATER

    I, Jonathan Brater, declare that I have firsthand knowledge of the matters

stated herein and, if called upon to testify to them, I would do so truthfully and

competently. Under MCR 2.109(D)(3)(b), I declare and affirm the following:

1.     I have been employed by the Secretary of State as Director of Elections since January 2, 2020 and in such capacity serve as Director of the Bureau of Elections (Bureau). *See* MCL 168.32.

2.     I bring this declaration in support of Defendant Secretary of State Jocelyn Benson's 10/9/20 Motion for Summary Disposition and Response in Opposition to Plaintiffs' 9/25/20 Motion for a Preliminary Injunction in the above-cited case.

3.     If called as a witness, I could testify truthfully and accurately as to the information contained within this declaration.

4.     The Michigan Election Law requires that requests for an absent voter ballot application be signed. MCL 168.759. On June 12, 2020, the Michigan Department of State (Department) launched an online tool that voters can use to submit absent voter ballot applications.

5.     Prior to the development of the online tool, voters could submit a signed request for an absent voter ballot either on paper or electronically. For years, local clerks have been instructed to accept applications for AV ballots by facsimile or by email.[1] However, in order to do this electronically voters needed to print the application and sign it before submitting it electronically. For example, a

---

[1] See Chapter 6, Michigan's Absentee Voting Process, October 6, 2020, p 2, available at https://www.michigan.gov/documents/sos/VI_Michigans_Absentee_ Voting_Process_265992_7.pdf.

voter could print out an absent voter ballot application, fill it out and sign it, and then scan or photograph the signed application and email it to the clerk.

6.    The online tool available on the Michigan Department of State's Bureau of Elections website was developed so that a voter could submit a signed absent voter ballot request without having to print out the application. Using the online tool, a voter with a Michigan Driver's License or State ID card can log in using the driver's license or ID card number and apply for an AV ballot by authorizing the use of a stored, digital image of the voter's handwritten signature provided to the Michigan Department of State (MDOS) when the voter obtained his/her driver's license or state identification. If an applicant does not have a signature on file, or is not a registered voter, the applicant cannot avail him/herself of this online tool.

7.    The online AV ballot application requires the voter to provide the date of the election or elections for which the voter is requesting a ballot; the voter's name; the statements that the voter is a U.S. citizen and a qualified and registered elector in the jurisdiction; a statement that the voter requests to apply for an official ballot; a section for the voter to specify if the voter wants a ballot mailed to an alternate address; a statement for the voter to certify that the statements in the application are true; and a warning about requirements to vote and false statements for voting. The voter signs the application by authorizing submission of his/her handwritten signature stored on file with the Michigan Department of State (MDOS). This signature must be compared with the applicant's digitized signature

3

in the qualified voter file (QVF) or registration card. Only if the signatures agree may a local clerk mail the actual AV ballot to the applicant.

8.      The online AV ballot application incorporates safeguards against voter fraud in the application process. For example, a person who makes a false statement on an AV ballot application is guilty of a misdemeanor, and a person who forges a signature on an AV ballot application is guilty of a felony – under Michigan law. *See* MCL 168.759(8). This is true regardless of whether the AV ballot application is submitted through the online tool, or by paper or electronic means. In addition, in order to access the online tool, an applicant must provide unique identifying information – including a driver's license or state identification number and the last four digits of the individual's social security number – which are not required on an AV ballot application signed without use of the online tool.[2]

9.      Moreover, the online AV application tool only authorizes the use of the signature on file for the application for the AV ballot – it does not affect the AV ballot itself. Upon receipt of the application for an AV ballot and after comparing the signatures on the application to the qualified voter file, local clerks remain obligated under Michigan law to mail the AV ballot to the voter, who must then complete the ballot, handwrite his/her signature on the envelope provided for return, and return it to their local clerk. *See* MCL 168.761. The handwritten signature on the AV ballot envelope is then compared to the signature on the

---

[2] *See* https://www.michigan.gov/documents/sos/AVApp_535884_7.pdf

Appendix 000316
I APP. 1150

application, regardless of how the application was submitted. AV ballots must be delivered through one of the methods specified under Michigan law, *see* MCL 168.764a & MCL 168.764b(1), and an individual who knowingly makes a false statement on the return envelope is subject to criminal penalties. MCL 168.761(5).

10. The Department released and publicized the release of the online AV application tool in June 2020 – months before the August primary election. Thousands of voters have already used the tool to request AV ballots for the August election and already cast ballots that were counted in that election. Thousands more have already applied for AV ballots for the November 3, 2020 general election using the tool. Specifically, at least 74,000 online absent voter ballot applications have been received for the November election, and at least 7,000 individuals who applied for an absent voter ballot online have already received and returned their ballots.

11. I declare under the penalty of perjury that this Declaration and Verification have been examined by me, that its contents are true to the best of my knowledge, information and belief.

_____

Jonathan Brater

Date: October 9, 2020

5

SOM DSA #: _____

Disclosing Agency id #: _____

Partner Agency id #: _____

Review cycle: _____

1st review date: _____

2nd review date: _____

DATA SHARING AGREEMENT

BETWEEN

MICHIGAN DEPARTMENT OF STATE

AND

ROCKTHEVOTE

FOR

AN APPLICATION PROCESSING INTERFACE (API) CONNECTION TO ONLINE VOTER REGISTRATION

## 1. Introduction

This Data Sharing Agreement (DSA) is between the Michigan Department of State (MDOS) and RockTheVote (Partner Agency). MDOS and Partner Agency are collectively referred to as the parties.

The Partner Agency is the party that is collecting and sharing data with MDOS under this DSA. MDOS will be receiving and validating the data submitted by RockTheVote. The data will be received by the Online Voter Registration (OVR) system and validated against the Mainframe. Each eligible voter registration will be processed and recorded by the Michigan Department of State.

This DSA establishes the conditions under which MDOS agrees to receive privileged data from the Partner Agency (the data) and it provides for the protection of that data. It also identifies the responsibilities of each party and establishes terms governing the use, disclosure, and disposition of the data.

## 2. Purpose

The data will be used by the Partner Agency only as is expressly agreed upon by the parties under this DSA. Access to the data by any party or for any purpose not identified in this DSA is strictly forbidden. Data provided by MDOS remains the property of MDOS.

Partner Agency will send data collected from prospective voters on their website, via the Application Processing Interface (API), to the Michigan Online Voter Registration. The API will transmit all required information necessary to complete a voter registration transaction via the Online Voter Registration.

### 3.   Data To Be Shared

Partner Agency will provide MDOS with the data required to complete an online voter registration. Partner Agency will provide full name, Michigan Driver License/Personal Identification number, birthdate, eye color, and last four digits of the social security number. MDOS will provide the Partner Agency with basic (approval or rejection notification) information related to the status of each submitted voter registration.  The Data provided by MDOS remains the sole and exclusive property of the MDOS.

### 4.   Method of Transfer

The data will be shared by the following means:

☐ File drop
☐ Secure file transfer
☐ Encrypted email attachment
☐ Encrypted file on a removable storage device
☐ File Transfer Service
☐ Data warehouse
☐ Paper (hard copy)
☐ Fax
☐ Online access
☒ Other: (describe) RockTheVote will establish an Application Programming Interface (API) with the State of Michigan's Online Voter Registration (OVR)

MDOS requires that all data should be encrypted at rest and in transit in compliance with DTMB standards.

### 5.   Frequency of Transfer

The data to be shared under this DSA will be transferred only at a frequency and for a period of time as is necessary to meet the purpose stated in §2 above.  The frequency is expected to be on-going and the duration will be until one party agrees to discontinue transfers.

### 6.   Availability of Data

MDOS reserves the right to schedule the time and duration of the availability of electronic access to the Online Voter Registration.  MDOS does not guarantee continuous availability during scheduled times, but will use reasonable efforts to make the Online Voter Registration available as agreed under this DSA.

### 7.    Legal Authority

**MDOS**.  MDOS shall adhere to all federal and state laws and regulations pertaining to sharing the requested data, including but not limited to: the Identity Theft Protection Act, MCL § 445.61 *et. seq.*, the Social Security Number Privacy Act, MCL § 445.81 *et. seq.*, and Fair Credit Reporting Act, 15 U.S. Code § 1681 *et seq.*

**Partner Agency**.  The Partner Agency acts under an established authority to collect the data.  The Partner Agency collects data from Michigan residents and provides the information through the API.  This API is established only to assist Michigan citizens with registering to vote. The Partner Agency shall adhere to the DPPA, Identity Theft Protection Act, Fair Credit Reporting Act, and the Social Security Number Privacy Act, as applicable.

### 8.    Notices and Consents

To the extent required by law, regulations, or rules, MDOS and the partner agency covenant that appropriate notices, consents, and authorizations have been and will continue to be obtained from the individuals and entities the data concerns. Notices will include how data obtained from the individuals and entities the data concerns will be used and stored.

### 9.    Data Classification

The MDOS has classified the data using DTMB Technical Standard No. 1340.00.14, *Information Technology Information Security*.

The data classification level for the data shared under this DSA is confidential.

The security categorization is moderate.

The minimum security controls and control enhancements derive from the National Institute of Standards and Technology (NIST) SP 800-53, *Recommended Security Controls for Federal Information Systems*.  The minimum baseline security controls are the starting point for the security control selection process, and are the basis from which controls and control enhancements may be removed, added or customized to achieve the level of security protection required for the data or information system.

Additional security controls that are not addressed in the NIST SP 800-53 Security Controls may be required based on regulatory compliance or by contractual obligation.  The MDOS considers all non-publicly available data to be considered a minimal classification of confidential with a potential moderate data impact level. The additional security controls associated with the data include: The API is built using a NIST approved process.

*Draft*

3

10. **MDOS' Responsibilities**

MDOS must:

a. Provide Partner Agency with access to the data consistent with law, regulations, rules, and contractual obligations, and the terms and conditions of this DSA.

b. If necessary, work with Partner Agency and the Department of Technology, Management, and Budget (DTMB) to facilitate the sharing of data under this DSA.

c. Perform access reviews to ensure that Partner Agency has established and uses adequate administrative, technical, and physical safeguards to protect data from unauthorized disclosure.

d. Perform annual reviews to ensure each person with access to MDOS' data: (1) needs and uses the data in connection with their State work duties and (2) understands their responsibility in protecting the data. MDOS may perform onsite inspections of Partner Agency's premises to ensure compliance with this DSA.

11. **Partner Agency's Responsibilities**

Partner Agency must:

a. **Protect the data.** Partner Agency must establish and use appropriate administrative, technical, and physical safeguards to protect the data from being accessed, used, disclosed, or stored in a manner other than as provided in this DSA. Protocols must be in writing and provided to the MDOS upon request.

    i. **Administrative safeguards** include policies, procedures, training, and other measures designed to carry out security requirements. For example, appointing a security officer or implementing an incident response plan.

    ii. **Physical safeguards** include limitation of access to physical areas of information systems. For example, implementing a clean-desk policy, requiring locked file cabinets, or use of identification cards to access certain areas.

    iii. **Technical safeguards** include automated processes used to protect and control access to data on information systems. Examples include encryption, use of passwords, and data loss prevention tools.

b. **Create a security policy pertaining to the data**. A security policy is a written document describing the system in terms of categories of data processed, users allowed access,

*Draft*

174 and access rules between the users and the data. It describes procedures to prevent
175 unauthorized access by clearing all protected data on storage objects before they are
176 allocated or reallocated out of or into each system. Further security protocols using
177 password protection and authentication must be provided where the computer system
178 contains information for more than one program, project, office, or agency so that
179 personnel do not have unauthorized or unlimited access. Partner Agency must provide
180 MDOS with a copy of the security policy upon request.

181

182 c. **Maintain a log of the data received from MDOS**. The log must contain the data
183 requested; purpose of request; date data received; name of
184 agency/division/unit/employee making the request; name of other employees who may
185 have access; date destroyed; and method of destruction. MDOS may require Partner
186 Agency to include categories of information in addition to those listed in this subsection.
187 The log must be retained by the Partner Agency for either term of agreement plus five
188 years, or according to agency retention schedule, whichever is longer. Partner Agency
189 must provide MDOS with a copy of the log upon request.

190

191 d. **Use the data only for the stated purpose**. Partner Agency will use the data provided
192 under this DSA solely for the purpose identified in §2 above.

193

194 e. **Limit access** to the data provided under this DSA to those specifically listed in **Schedule**
195 **B**.

196

197 f. **Limit access** to the data provided under this DSA to the agents, contractors, and
198 subcontractors who require access to the data to perform the intended activities on
199 behalf of Partner Agency, upon review and written permission by MDOS. Agents,
200 contractors, and subcontractors must agree in writing to the same or more stringent
201 terms and conditions of this DSA The Partner Agency must provide a copy of the written
202 agreements referenced here upon the request of MDOS.

203

204 g. **Minimize data requests, usage, and disclosures**. Partner Agency will request, use, and
205 disclose only the minimum amount of data necessary to fulfill the purposes of this DSA.

206

207 h. **Not disclose the data except as expressly permitted in this DSA or as required by law**.
208 Except as otherwise provided in this DSA, Partner Agency will not disclose the data to
209 others.

210

211 i. **Exempt data from disclosure under FOIA when permitted**. Partner Agency will not
212 disclose the data in response to a request under the Freedom of Information Act (FOIA),
213 MCL 15.231, *et seq.* unless the law requires (and not merely permits) disclosure.
214 Partner Party must exempt the data from disclosure under FOIA when permitted by law.
215 If Partner Agency determines the law requires disclosure of the data under FOIA,
216 Partner Agency will notify MDOS prior to making any disclosures of data not intended
217 under this DSA. Exceptions to this subsection include:

5

    i.  data that was already in Partner Agency's possession without an obligation of confidentiality;

    ii.  data that was developed independently by the Partner Agency;

    iii.  data that was obtained from a source other than MDOS without an obligation of confidentiality; or

    iv.  data that was or is publicly available when received, or thereafter became publicly available (other than through any unauthorized disclosure by the Partner Agency).

j.  **Comply with retention and disposal schedules.** Partner Agency's must destroy the data, including copies of the data, upon completion of the purpose stated in §2, consistent with applicable law and State record retention and disposal schedules. Partner Agency must provide written certification of data destruction if requested by MDOS.

### 12.    Training

By executing this DSA, Partner Agency certifies that the driver, and vehicle, and related records obtained by Partner Agency will be used in compliance with the federal DPPA and related Michigan driver privacy legislation. Partner Agency understands that the willful, unauthorized use or improper re-disclosure of personal information or highly restricted personal information obtained under this DSA could subject an individual to criminal penalties imposed by law. DOS will provide, and Partner Agency will mandate, DPPA training to all persons that will access DOS data. Failure to comply with this section is a material breach and grounds for termination of this DSA.

### 13.    Costs and Damages

Partner Agency agrees to reimburse MDOS for all documented costs incurred to implement this DSA, including but not limited to, hardware, storage, and communication charges, as well as DTMB staff costs. Partner Agency will be charged for necessary programming changes at the applicable DTMB rates.

Partner Agency further agrees that they shall be responsible for all database administration functions, including database backup, and that they shall pay all costs related to operating and maintaining the data supplied by MDOS. Partner Agency further agrees that they will not impose, or seek to impose, any audit requirement or audit cost upon MDOS as a result of this DSA.

*Draft*

Each party will be responsible for its own costs, losses, and damages related to the sharing of data under this DSA except as otherwise provided in §14 below. Neither party will be liable to the other for any claim related to or arising under this DSA for consequential, incidental, indirect, or special damages.

### 14. Security Breach Notification

Partner Agency must adhere to DTMB Technical Procedure No. 1340.00.01.02, *How to Handle a Breach of Personal Identifiable/Sensitive Information Incidents*. Partner Agency must implement internal policies and procedures for reporting data security incidents and provide MDOS a copy upon request. Partner Agency's internal policies and procedures for data security incidents must be as stringent as or more stringent than MDOS's.

Notwithstanding any internal policy to the contrary, if Partner Agency discovers any "suspected or actual" use or disclosure of MDOS's data not provided for under this DSA, the Partner Agency must report it to MDOS within one business day of the breach or suspected breach being identified. The parties will cooperate with one another to investigate, mitigate, and remedy unauthorized access, use, or disclosure of the data.

Partner Agency must identify through audits or other available means entities or persons who improperly access, use, or disclose the data.

If any act, error, omission, negligence, misconduct, and/ or breach by Partner Agency or its contractor compromises the security, confidentiality, or integrity of the data, Partner Agency will take all reasonable actions required to comply with applicable law as a result of such security incident and assumes full responsibility for any associated costs and duties, including but not limited to notification of affected individuals and entities, and if requested by MDOS, will provide credit and identity monitoring services for 24 months to affected individuals.

### 15. Accuracy

MDOS will use reasonable efforts to ensure the completeness, accuracy, and timeliness of the data provided under this DSA. However, MDOS cannot guarantee data accuracy and will therefore not be held responsible for any damage to Partner Agency resulting from the disclosure or use of data that is inaccurate, incomplete, or outdated.

### 16. Cooperation; Execution of Additional Agreements

The parties will execute such documents as may be necessary to realize the intentions of this DSA or comply with law. The parties will also require third parties to execute such documents as may be necessary to realize the intentions of this DSA or comply with law, prior to granting the third-party access to the data. Examples include business associate and non-disclosure agreements.

305
306 **17.** **Issue Resolution**
307

308 The parties will work collectively to resolve system issues relative to Partner Agency's
309 access to the data. Additionally, upon the request of either party, the parties will convene as
310 reasonably necessary for the purpose of resolving problems that may arise in the
311 administration or enforcement of this DSA. The parties will exchange documentation as
312 reasonably necessary to identify and explain issues and positions. Any portion of this DSA that
313 may be subject to interpretation will be addressed at these meetings.
314

315 **18.** **Notices**
316

317 Notices and other written communications must be addressed to the individuals below
318 or their successors. Parties may amend contact information by providing written notice of the
319 change to the other party. Notices or other written communications required or related to this
320 DSA must be in writing and delivered in person or by email.
321

| For MDOS: | For Partner Agency: |
|---|---|
| Melissa Smiley, Chief of Staff<br>430 W. Allegan<br>Lansing, MI 48933<br>(517) 335-2436<br>SmileyM1@michigan.gov | Carolyn DeWitt, Executive Director<br>RockTheVote<br>1440 G Street NW<br>Washington, DC 20005<br>202-719-9910 |
| With copy to:<br>Michael J. Brady, Chief Legal Director<br>430 W. Allegan<br>Lansing, MI 48933<br>517-599-7343<br>bradym@michigan.gov | |

322
323 **19.** **Compliance Monitoring**
324

325 On at least an annual basis, the parties will review the practices and procedures outlined
326 in this DSA to ensure compliance with the terms of the DSA and the law. The parties will
327 provide the results of such reviews to the other party upon written request. The parties will
328 also ensure that they take appropriate measures to ensure that information about the DSA is
329 kept up-to-date. The parties have designated the individuals listed below as responsible for this
330 section.
331 Main Point of Contact for **MDOS: Jonathan Brater, Bureau of Elections Director**

8

*Draft*

Main Point of Contact for RockTheVote: Carolyn DeWitt, Executive Director

The parties also recognize that this DSA is subject to compliance audits, investigations, and reviews as provided by law.

**20.    Amendments**

This DSA may be amended by written agreement of the parties.  If amendment to this DSA is required to comply with federal or State laws, rules, or regulations, the parties will promptly enter into negotiations to meet those legal requirements.

**21.    Effective Date and Term**

This DSA is effective as of April 25, 2020 and will expire on April 1st, 2025, unless terminated under §22.  The DSA may be renewed by amending the DSA. Parties will meet no less than 30 days prior to the end of this term to begin renewal process.

**22.    Termination**

This DSA may be terminated for any reason by either party upon 30 days' prior written notice to the other party.

**23.    Survival**

The rights, obligations, and conditions set forth in §10, MDOS's Responsibilities; §11, Partner Agency's Responsibilities; and any right, obligation, or condition that, by its express terms or nature and context is intended to survive the termination or expiration of this DSA, survives any such termination or expiration.

**24.    Entire Agreement**

This DSA replaces and supersedes all prior agreements between the parties relating to the subject matter of this DSA.

**25.    Execution**

This DSA may be executed in counterparts, each of which is deemed to be an original, and all of which taken together constitutes one and the same instrument.  The signature of any party transmitted by email is binding.

**26.    Successors; Assignment**

*Draft*

375     This DSA insures to the benefit of and is binding upon the parties, their respective
376 successors-in-interest by way of reorganization, operation of law, or otherwise, and their
377 permitted assigns.  Neither party may assign this DSA to any other party without the prior
378 approval of the other party.
379
380     **27.**     **No Third-Party Beneficiaries**

381     This DSA does not confer any rights or remedies upon any person or entity other than
382 the parties and their respective successors-in-interest by way of reorganization, operation of
383 law, or otherwise, and their permitted assigns.
384
385
386
387     **28.**     **Authority to Bind**
388
389     Each person signing this DSA represents that he or she is duly authorized to execute this
390 DSA on behalf of the responsible agency.
391

**For MDOS:**

_____      _____
Jonathan Brater                          Date
Director, Bureau of Elections

**For Partner Agency:**

_____      _____
Carolyn DeWitt                           Date
Executive Director, RockTheVote

392
393

394
395

**Schedule A**
**Data To Be Shared and File Formats of the Data**

| Data to Be Shared | File Format |
|---|---|
| Full name (Middle Name, if applicable), Michigan Driver License/Personal Identification number, birthdate, eye color, and last four digits of the social security number. | This data will be transmitted from RockTheVote to the State of Michigan via a Application Processing Interface (API). The file format will be a JSON string. |

396
397

*Draft*

398   Data Elements

399
400   **Schedule B**
401   **State Employees with Data Access Privileges**
402   This access is the same as the general public. The general public does not authenticate to the
403   OVR application. However, during completion of the application the OVR application sends
404   information submitted in the application to the Driver License (DL) Mainframe to validate if the
405   person completing the application has a valid driver's license or Personal Identification Card
406   (PID). The data elements used to validate if the person is a registered voter on the mainframe
407   include the following: full name, driver's license or state id number, birthdate, eye color, and
408   SSN4 (specified in MCL 168.509ii). This information will be used to notify the general public
409   whether or not they have a valid driver's license or state id and if they are allowed to register to
410   vote.

411   If a SOM Employee needs to view the data submitted by the general public, they would use
412   their standard QVF user ID and password to access the information.

413   *1 (One) - State Administrative Manager*

414   *7 (Seven) – Departmental Analysts*

415   *2 (Two) – Departmental Technicians*

416
417
418
419
420
421
422
423
424
425
426
427
428
429
430
431
432
433
434

*Draft*

435
436
437
438
439
440
441
442
443
444
445
446
447
448
449
450
451
452
453
454
455
456
457
458
459
460
461
462
463
464
465
466
467
468
469
470
471
472
473
474
475
476
477
478

**Schedule C**
**Security Procedures for Partner Agency**

Rock the Vote is compliant with the NIST 800-53 and Virginia SEC 525 security standards, and the organization underwent an external audit from ImpactMakers in 2018 to certify compliance with both standards.

Rock the Vote maintains several NIST-based internal security policies and processes, including but not limited to:
-    Software development lifecycle;
-    Hosting contingency plan;
-    Hosting quarterly review process;
-    Disaster recovery plan (DRP) and business continuity plan (BCP);
-    Info system security plan (SSP);
-    Configuration management plan (CMP);
-    Incident response plan (IRP);
-    Business impact analysis (BIA).

Rock the Vote runs quarterly vulnerability scans using a third-party software (Qualys), runs monthly log file audits, receives and follows recommended GitHub security alerts for vulnerable dependencies, forces quarterly password resets for all system, and has automated password resets for inactive accounts, etc.

Rock the Vote's Online Voter Registration Platform is a cloud-deployed Ruby application on an AWS environment, with infrastructure built using a certified AWS architect. Rock the Vote uses an external firewall service (Sucuri), DDoS mitigation and prevention, and IP-based restrictions to continually monitor, log, and deflect any attempts to penetrate the system.

*Draft*

13

**Schedule D**
**Third-Party with Data Access Privileges**

Rock the Vote volunteers never have access to or can see the State of Michigan's API. Only Rock the Vote's Data Privacy Officer (David Pruter) and other Rock the Vote employees, as designated solely on an as-needed basis by the Data Privacy Officer, will have access to API keys/tokens.

Only certain Rock the Vote employees with white-listed IPs can access non-sensitive user data from the Online Voter Registration Platform. No Rock the Vote employees, volunteers, or affiliates ever have access to PII such as SSNs or driver's license/ID numbers.

480
481
482
483
484
485
486
487
488
489
490
491

*Draft*