Clerk of the Superior Court
*** Electronically Filed ***
T. Hays, Deputy
12/4/2020 6:31:14 PM
Filing ID 12293613

**Corrected**
By Clerk of the Court

SPILSBURY LAW, PLLC
*s/David W. Spilsbury*
David W. Spilsbury, 031145
18 East University Dr., Suite 208
Mesa, AZ. 85201
(602) 388-8893
dave@spilsburylaw.com

ATTORNEYS FOR PLAINTIFFS

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| **JAMES STEVENSON, BARON BENHAM, LYNIE STONE, JESSICA CHAMBERS, AS AGGRIEVED ELECTORS,**<br><br>        **Plaintiffs,**<br><br>**vs.**<br><br>**GOVERNOR DOUG DUCEY AND SECRETARY OF STATE KATIE HOBBS,**<br><br>        **Defendants.** | **Case No.** CV2020-096490<br><br><br>**EXPERT REPORT OF QIANYING JENNIE ZHANG** |

-1-

## I.      INTRODUCTION

I have been retained as an expert witness on behalf of Proposed Intervenor-Plaintiffs James Stevenson, Baron Benham, Lynie Stone, and Jessica Chambers in the above captioned proceeding.  I expect to testify on the following subject matters:  (i) a statistical analysis report on the database analysis conducted by Matthew Braynard conducted for the State of Arizona ("State").

This is a statement of my relevant opinions and an outline of the factual basis for these opinions.  The opinions and facts contained herein are based on the information made available to me in this case, prior to preparation of this report, as well as my professional experience as an assistant professor of Finance at Hillsdale College in the Department of Economics and Business Administration teaching, among other courses, college level statistics.

I reserve the right to supplement or amend this statement on the basis of further information and deposition testimony obtained prior to the time of trial, or in order to clarify or correct the information contained herein.

## II.     DOCUMENTS REVIEWED

I reviewed the following documents in arriving at my opinions.

1.      The expert report of Matthew Braynard;

2.      The data documents Matthew Braynard relied on in preparing his expert opinion.

I APP. 1397

In addition, I discussed the facts of this matter with attorney William Mohrman and members of his legal team.

## III.    PROFESSIONAL QUALIFICATIONS

I am an assistant professor of finance and economics at Hillsdale College.  I obtained a B.S. degree in economics and mathematics from East China Normal University in 2009, a M.S. degree in economics from the University of Illinois, Urbana-Champaign in 2010, and a Ph.D. in economics from Florida International University in 2016.  As an assistant professor of Finance at Hillsdale College in the Department of Economics and Business Administration.  My research areas are in empirical asset pricing and applied time-series econometrics.  I teach college level courses in statistics. I am currently teaching Econometrics, Quantitative Analysis and Business and Economic Statistics at Hillsdale College.  I am also a member of Mensa and a CFA Level II candidate.

With respect to publications I have authored in the last 10 years, I have not authored any publications in the last ten years.

## IV.    COMPENSATION

I have been retained as an expert witness for Petitioners.  I am being compensated at a flat fee of $5,000.

## V.    PRIOR TESTIMONY

I have not provided testimony as an expert either at trial or in deposition in the last four years.

## VI.   STATEMENT OF OPINIONS

As set forth above, I have been engaged to provide expert opinions regarding a statistical analysis of the November 3, 2020 election of Presidential electors.  I have reviewed the data analysis performed by Matthew Braynard and his call center staff who contacted absentee voters in the State.  My opinions are predicated on the assumption that the responders to these calls are a representative sample of the population of registered voters in the State who requested an absentee ballot and responded accurately to the questions during the phone calls. As of November 23, 2020, there were 2,181,959 individuals voted early or applied for and the State sent an absentee or mail-in ballot.  In addition, the State's database also shows 518,560 voters whom the State marks as having requested and been sent an absentee ballot but who did not return it.

Matthew Braynard's call center staff conducted a random phone survey from a sample this universe.  When contacted, Matt Braynard's staff confirmed the individual's identity by name.  Once the name was confirmed, Matt Braynard's staff asked if the person requested an absentee ballot or not.  The staff then recorded the number of persons who answered yes.  Of the 2,050 individuals who answered the question, 1,144 individuals answered yes to the question whether they requested an absentee ballot. Matt Braynard's staff recorded that 906 individuals answered no to the question whether they requested an absentee ballot.

Next, Matt Braynard's staff asked the individuals who answered yes, they requested an absentee ballot, whether the individual mailed back the absentee ballot or did not mail back the absentee ballot.  Staff then recorded that of the 708 individuals who

4

answered the question, 355 individuals answered yes, they mailed back the absentee

ballot.  Staff recorded 353 individuals answered no, they did not mail back the absentee

ballot.  Paragraph 2 of Exhibit 2 presents this information.

1. <u>Absentee Ballots Not Requested</u>.  From the State's database identifying 518,560 individuals the State identifies (i) as having requested an absentee ballot, (ii) the State mailed an absentee ballot to the individual and (iii) for whom the State's database identifies not having returned the absentee ballot to the State, Braynard's call center staff contacted and spoke with a random sample of 2,050 of these individuals. In response to Braynard's staff's question whether those 2,050 absentee voters contacted actually requested an absentee ballot from the State, 906 said they did not request an absentee ballot.  This is a ratio of 44.20% of the 2,050 absentee voters contacted.  Based on my statistical analysis of these numbers, it is my expert opinion to a reasonable degree of scientific certainty that there is a 95% confidence interval for the probability of the percentage of absentee voters who did not request an absentee ballot from the list of absentee ballot voters who did not return an absentee ballot in the State of between 42.05% and 46.34%.  Based on my statistical analysis of these numbers, it is my further expert opinion to a reasonable degree of scientific certainty that there is a 99% confidence interval for the probability of the percentage of absentee voters who did not request an absentee ballot from the list of absentee ballot voters who did not return an absentee ballot in the State of between 41.37% and 47.02%.  Using these percentages and applying them to the number of absentee ballots identified above of 518,560, based on my statistical analysis, there is a 95% confidence interval that between 218,030 and 240,326 of such absentee ballots were not requested by an eligible State voter and there is a 99% confidence interval that between 214,526 and 243,830 of the absentee ballots the State issued were not requested by an eligible State voter.

2. <u>Absentee Ballots Returned But Not Counted</u>.  From the State's database identifying 518,560 individuals who the State further identifies (i) as having requested an absentee ballot, (ii) the State mailed an absentee ballot to the individual and (iii) for whom the State's database identifies not having returned the absentee ballot to the State but who answered yes that they requested an absentee ballot, Braynard's call center staff contacted and spoke with a random sample of 708 of these individuals.  In response to Braynard's staff's question whether those 708 absentee voters actually mailed back an absentee ballot from the State, 355 of these absentee voters said they did mail back an absentee ballot to the State.  This is a ratio of 50.14% of the 708 absentee voters contacted.  Based on my statistical analysis of these numbers, it

I APP. 1400

is my expert opinion to a reasonable degree of scientific certainty that there is a 95% confidence interval for the probability of the percentage of these absentee voters who did mail back an absentee ballot in the State of between 46.46% and 53.82%.  Based on my statistical analysis of these numbers, it is my further expert opinion to a reasonable degree of scientific certainty that there is a 99% confidence interval for the probability of the percentage of these absentee voters who did return an absentee ballot of between 45.30% and 54.98%.  Using these percentages and applying them to the estimated number of requested absentee ballots of 289,382 based on my statistical analysis, there is a 95% confidence interval that between 134,442 and 155,758 of the absentee ballots the State issued and did not count were returned to the State by an eligible State voter and there is a 99% confidence interval that between 131,092 and 159,107 of the absentee ballots the State issued and did not count were returned to the State by an eligible State voter.

## VII.  BASIS AND REASONS SUPPORTING OPINIONS.

The basis and reasons supporting my opinions are set forth below.  First, I received a data set of responses to a phone survey given to absentee voters in the State who were sent an absentee ballot but whom failed to return the absentee ballot. Out of 2,181,959 individuals identified as having applied for an absentee ballot and the State sending an absentee ballot to these individuals, there were 518,560 (23.77%) such voters. Matthew Braynard's staff contacted 2,050 of the 518,560 absentee voters identified on the State's database.  For purposes of this report, I assume that the 2,050 individuals who responded to Mr. Braynard's staff are a representative sample of this population and responded accurately to the questions posed to them.  These respondents were asked whether they had requested an absentee ballot.  Of the 2,050 respondents, 906 (44.20%) denied having requested an absentee ballot.

Under our assumptions, I can use these survey results regarding the individuals who responded to the question of whether they requested an absentee ballot to the larger

6

population of interest. Applying a standard statistical formula,[1] I can say with certainty that there is a 95% confidence interval for the probability of the percentage of absentee voters who individuals the State identifies (i) as having requested an absentee ballot, (ii) the State mailed an absentee ballot to the individual and (iii) for whom the State's database identifies not having returned the absentee ballot to the State, the percentage of such absentee voters who did not request an absentee ballot in the State is between 42.05% and 46.34%.  Based on my statistical analysis of these numbers, it is my further expert opinion to a reasonable degree of scientific certainty that there is a 99% confidence interval for the percentage of these same absentee voters of between 41.37% and 47.02%.  Using these percentages and applying them to the number of absentee ballots identified above of 518,560, based on my statistical analysis, there is a 95% confidence interval that between 218,030 and 240,326 of such absentee ballots were not requested by an eligible State voter and there is a 99% confidence interval that between 214,526 and 243,830 of the absentee ballots the State issued were not requested by an eligible State voter.

Second, I received a data set of responses to a phone survey given to absentee voters the State's database shows did not return an absentee ballot but who said they did

---

[1] If each person from the population of size *N* is independently chosen to be in the sample of size *n*, and each person has the same probability *p* of having the desired property, then the number of people in the sample with the property can be approximated by a normal distribution. We have 95% within 1.96 standard deviations and 99% is within 2.576 standard deviations. This leads to the following confidence intervals, where below *p* is the observed sample proportion having the property (*p* = *x*/*n*) :

$$CI(95\%) = p \pm 1.96 \sqrt{\frac{p(1-p)}{n}}; \ CI(99\%) = p \pm 2.576 \sqrt{\frac{p(1-p)}{n}}.$$

To extrapolate to the entire population of interest, we multiple the above equations by *N*.

return an absentee ballot.  Out of 2,181,959 individuals identified as having applied for an absentee ballot and the State sending an absentee ballot to these individuals, there were 518,560 (23.77%) voters who failed to return the absentee ballot. Matthew Braynard's staff contacted 2,050 of these 518,560 absentee voters identified on the State's database.  For purposes of this report, I assume that the 708 individuals who responded to Mr. Braynard's staff are a representative sample of this population, and responded accurately to the questions posed to them.  These respondents were asked whether they had returned an absentee ballot to the State.  Of the 708 respondents, 355 (50.14%) said they returned the ballot to the State and the State did not count the ballot.

Under our assumptions, I can use these survey results regarding the individuals who responded to the question of whether they requested an absentee ballot to the larger population of interest. Applying the same standard statistical formula set forth in footnote 1, I can say with certainty that there is a 95% confidence interval for the probability of the percentage of absentee voters who individuals the State identifies (i) as having requested an absentee ballot, (ii) the State mailed an absentee ballot to the individual and (iii) for whom the State's database identifies not having returned the absentee ballot to the State but who said they did return the absentee ballot, the percentage of such absentee voters who did return an absentee ballot in the State is between 46.46% and 53.82%. Based on my statistical analysis of these numbers, it is my further expert opinion to a reasonable degree of scientific certainty that there is a 99% confidence interval for the percentage of these same absentee voters of between 45.30% and 54.98%.  I estimate that there are 289,382 voters who solicited ballots using the product of the number of people

8

that were sent a ballot but whom failed to return the absentee ballot and the proportion of respondents in Braynard's analysis who confirmed soliciting a ballot (518,560 times 55.80%). Using the percentages and applying them to the number of absentee ballots identified above of 289,382, based on my statistical analysis, there is a 95% confidence interval that between 134,442 and 155,758 of such absentee ballots were not requested by an eligible State voter and there is a 99% confidence interval that between 131,092 and 159,107 of the absentee ballots the State issued were not requested by an eligible State voter.

## VIII.  EXHIBITS TO BE USED AT TRIAL TO SUMMARIZE OR EXPLAIN OPINIONS

At the present time, I intend to rely on the documents produced set forth above as possible exhibits.

### REMAINDER OF PAGE LEFT INTENTIONALLY BLANK
### SIGNATURE PAGE TO FOLLOW

I APP. 1404

Dated: <u>December 2, 2020</u>

Qianying Jennie Zhang

I APP. 1405

Corrected
By Clerk of the Court

1  SPILSBURY LAW, PLLC
   *s/David W. Spilsbury*
2  David W. Spilsbury, 031145
   18 East University Dr., Suite 208
3  Mesa, AZ. 85201
   (602) 388-8893
4  dave@spilsburylaw.com

5  ATTORNEYS FOR PLAINTIFFS

6

7

8          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
9             **IN AND FOR THE COUNTY OF MARICOPA**

10 | **JAMES STEVENSON, BARON** | |
   | **BENHAM, LYNIE STONE, JESSICA** | |
11 | **CHAMBERS, AS AGGRIEVED** | |
   | **ELECTORS,** | Case No.  CV2020-0964 |
12 | | 90 |
   | **Plaintiffs,** | |
13 | | |
   | **vs.** | |
14 | | |
   | **GOVERNOR DOUG DUCEY AND** | |
15 | **SECRETARY OF STATE KATIE** | **DECLARATION OF** |
   | **HOBBS,** | **DAVID W. SPILSBURY** |
16 | | |
   | **Defendants.** | |
17

18

19

20

21

22      I, David W. Spilsbury, hereby declare as follows under penalty of perjury:

23      1.      The following statements are based on my personal knowledge, and if called

24 to testify I could swear competently thereto.

25      2.      Attached as Exhibit A is a copy of CTCL Grant Award, dated October 13,

26 2020.

27

28

1    I declare under penalty of perjury under the laws of the United States of America

2    that the forgoing is true and correct.

3

4

5    Dated: December 4, 2020                    SPILSBURY LAW, PLLC
                                                 s/ David W. Spilsbury
6                                                David W. Spilsbury, 031145
                                                 18 East University Dr., Suite 208
7                                                Mesa, AZ. 85201

8                                                (602) 388-8893

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

I APP. 1407



October 13, 2020

Maricopa County, Arizona

Maricopa County Recorder

111 S. Third Ave.

Phoenix, AZ 85003

Dear Adrian Fontes,

I am pleased to inform you that based on and in reliance upon the information and materials provided by Maricopa County, the Center for Tech and Civic Life ("CTCL"), a nonprofit organization tax-exempt under Internal Revenue Code ("IRC") section 501(c)(3), has decided to award a grant to support the work of Maricopa County ("Grantee").

The following is a description of the grant:

**AMOUNT OF GRANT:** $2,995,921.50 USD

**PURPOSE:** The grant funds must be used exclusively for the public purpose of planning and operationalizing safe and secure election administration in Maricopa County in 2020 ("Purpose").

Before CTCL transmits these funds to Grantee, CTCL requires that Grantee review and sign this agreement ("Grant Agreement") and agree to use the grant funds in compliance with the Grant Agreement and with United States tax laws and the laws and regulations of your state and jurisdiction ("Applicable Laws"). Specifically, by signing this letter Grantee certifies and agrees to the following:

1. Grantee is a local government unit or political subdivision within the meaning of IRC section 170(c)(1).
2. This grant shall be used only for the Purpose described above, and for no other purposes.

EXHIBIT A

3. Grantee has indicated that the amount of the grant shall be expended on the following specific election administration needs: Drive-through voting, Election department real estate costs, or costs associated with satellite election department offices, Non-partisan voter education, Personal protective equipment (PPE) for staff, poll workers, or voters, Poll worker recruitment funds, hazard pay, and/or training expenses, Polling place rental and cleaning expenses for early voting or Election Day, Temporary staffing, and Vote-by-mail/Absentee voting equipment or supplies. Grantee may allocate grant funds among those needs, or to other public purposes listed in the grant application, without further notice to or permission of CTCL.

4. Grantee shall not use any part of this grant to make a grant to another organization, except in the case where the organization is a local government unit or political subdivision within the meaning of IRC section 170(c)(1) or a nonprofit organization tax-exempt under IRC section 501(c)(3), and the subgrant is intended to accomplish the Purpose of this grant. Grantee shall take reasonable steps to ensure that any such subgrant is used in a manner consistent with the terms and conditions of this Grant Agreement, including requiring that subgrantee agrees in writing to comply with the terms and conditions of this Grant Agreement.

5. The grant project period of June 15, 2020 through December 31, 2020 represents the dates between which covered costs may be applied to the grant. The Grantee shall expend the amount of this grant for the Purpose by December 31, 2020.

6. Grantee is authorized to receive this grant from CTCL and certifies that (a) the receipt of these grant funds does not violate any Applicable Laws, and (b) Grantee has taken all required, reasonable and necessary steps to receive, accept and expend the grant in accordance with the Purpose and Applicable Law.

7. The Grantee shall produce a brief report explaining and documenting how grant funds have been expended in support of the activities described in paragraph 3. This report shall be sent to CTCL no later than January 31, 2021 in a format approved by CTCL and shall include with the report a signed certification by Grantee that it has complied with all terms and conditions of this Grant Agreement.

8. This grant may not supplant previously appropriated funds. The Grantee shall not reduce the budget of the County Recorder ("the Election Department") or fail to appropriate or provide previously budgeted funds to the Election Department for the term of this grant. Any amount supplanted, reduced or not provided in contravention of this paragraph shall be repaid to CTCL up to the total amount of this grant.

9. CTCL may discontinue, modify, withhold part of, or ask for the return all or part of the grant funds if it determines, in its sole judgment, that (a) any of the above terms and conditions of this grant have not been met, or (b) CTCL is required to do so to comply with applicable laws or regulations.

10. The grant project period of June 15, 2020 through December 31, 2020 represents the dates between which covered costs for the Purpose may be applied to the grant.

EXHIBIT A

I APP. 1409

Your acceptance of and agreement to these terms and conditions and this Grant Agreement is indicated by your signature below on behalf of Grantee. Please have an authorized representative of Grantee sign below, and return a scanned copy of this letter to us by email at grants@techandciviclife.org.

On behalf of CTCL, I extend my best wishes in your work.

Sincerely,

Tiana M. Johnson

Tiana Epps Johnson

Executive Director

Center for Tech and Civic Life

GRANTEE

By: _____

Title: Maricopa County Recorder

Date: 10/15/2020

CENTER FOR TECH & CIVIC LIFE
233 N. MICHIGAN AVE., SUITE 1800
CHICAGO, IL 60601
HELLO@TECHANDCIVICLIFE.ORG
PAGE 3

# EXHIBIT A

Corrected
by CCEC per Court Order

Clerk of the Superior Court
*** Electronically Filed ***
T. Hays, Deputy
12/4/2020 6:20:04 PM
Filing ID 12293597

1   SPILSBURY LAW, PLLC
    *s/David W. Spilsbury*
2   David W. Spilsbury, 031145
    18 East University Dr., Suite 208
3   Mesa, AZ. 85201
    (602) 388-8893
4   dave@spilsburylaw.com

5   ATTORNEYS FOR PLAINTIFFS

6

7

8            **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
             **IN AND FOR THE COUNTY OF MARICOPA**
9

10  **JAMES STEVENSON, BARON**
    **BENHAM, LYNIE STONE, JESSICA**
11  **CHAMBERS, AS AGGRIEVED**
    **ELECTORS,**                          **Case No.** CV2020-0964
12                                          90
            **Plaintiffs,**
13
    **vs.**
14
    **GOVERNOR DOUG DUCEY AND**            **EXPERT REPORT OF**
15  **SECRETARY OF STATE KATIE**           **DENNIS NATHAN CAIN**
    **HOBBS,**
16
17          **Defendants.**

18

19

20

21

22

23

24

25

26

27

28

                                -1-

I APP. 1411

## I.       INTRODUCTION

I have been retained as an expert witness on behalf of Petitioners  in the above

captioned proceeding.  I expect to testify on the following subject matters:  (i)  application of

the federal law's maximum-acceptable error rate of one in 500,000 ballot positions, or,

alternatively, one in 125,000 ballots to the November 3, 2020 election for the selection of

Presidential Electors in the State of Arizona ("State"); (ii) render opinions regarding whether

the maximum-acceptable error rate was exceeded based on government data and Braynard's

and Zhang's analysis relating to the November 3, 2020 election for the selection of

Presidential Electors in the State; and (iii) render opinions regarding whether the error rate

of the November 3, 2020 election for the selection of Presidential Electors in the State so

exceeded the federal law's maximum-acceptable error rate that State certification is legally

unauthorized.

This is a statement of my relevant opinions and an outline of the factual basis for

these opinions.  The opinions and facts contained herein are based on the information made

available to me in this case prior to preparation of this report, as well as my professional

experience as an election data analyst.

I reserve the right to supplement or amend this statement on the basis of further

information obtained prior to the time of trial or in order to clarify or correct the

information contained herein.

## II.      DOCUMENTS REVIEWED

I reviewed the following documents in arriving at my opinions.

1.       Matt Braynard's declaration (attached as Exhibit 1)

2.      Qianying (Jennie) Zhang's declaration (attached as Exhibit 2)

In addition, I discussed the facts of this matter with Petitioner's attorney Erick G. Kaardal and members of his legal team.

## III.    PROFESSIONAL QUALIFICATIONS

My name is Dennis Nathan Cain. I am a resident of Berkley County, West Virginia. I am a Cybersecurity Subject Matter Expert with a combined 23 years experience in information assurance, risk management, vulnerability assessment, systems engineering, and systems certification assessment and authorization.

I currently maintain and have held a TOP SECRET clearance with a Single Scope Background Investigation (SSBI) for 22 years.

I hold credentials as a Certified Information Systems Security Professional (CISSP) #420251 since April 30, 2012 and as Navy Qualified Validator (NQV) and have worked for Army, Navy, Marine Corps, DISA, FBI, and others.

I was trained in NSA's CYBERCORE program at PHNX II and was a member of the MARFORCYBER Cyber Protection Team (CPT) National Mission, whose core responsibility was protecting national critical infrastructure against cyber-attack by domestic and foreign adversaries. I currently am employed with cleared defense contractor Assett, Inc

as a Senior Cybersecurity Engineer and provide systems cybersecurity assessment as a NQV

for US NAVY, NAVSEA, TSUBCYBER for their Submarine program.

My work consists of consulting as a Subject Matter Expert trusted agent, validating

Navy information and weapon systems for compliance with NIST Special Publication 800

series, specifically the NIST SP 800-53rev4 Security Controls and various ISO standards.

These same standards are cited as requirements for certification of all electronic

voting systems under both Help America Vote Act (HAVA) under the Federal Election

Commission (FEC) Voting Systems Standards (VSS), Volume I and the Federal Information

Security Modernization Act (FISMA).

I was brought together with a team of experts in various fields related to election

operations, process, and cybersecurity, due to my expertise and knowledge of government

IT systems cybersecurity certification requirements. During my examination of HAVA, the

FEC VSS, FISMA, NIST SP 800-53rev4 Security Controls, I discovered several

inconsistencies with stated maximum error requirements in these federal laws and standards.

## IV.   COMPENSATION

I have been retained as an expert witness for Petitioners.  I am not being

compensated.

## V.   PRIOR TESTIMONY

I have not provided testimony as an expert either at trial or in deposition in the last

four years.

I APP. 1414

## VI.   STATEMENT OF OPINIONS

As set forth above, I have been engaged to provide expert opinions regarding analysis in the November 3, 2020 election of Presidential electors in the State.  Based on my review of the documents set forth above, my discussions with statisticians and analysts working with me and at my direction, my discussions with the attorneys representing the Petitioners, I have the following opinions:

1. It is my opinion, to a reasonable degree of scientific certainty, that the State's data and Braynard's and Zhang's analysis show that the November 3, 2020 election error rate exceeded the federal law's maximum-acceptable error rate of one in 500,000 ballot positions, or, alternatively, one in 125,000 ballots to the November 3, 2020 election.

2. It is my opinion, to a reasonable degree of scientific certainty, that in the State, the November 3, 2020 election error rate exceeded the federal law's maximum-acceptable error rate of one in 500,000 ballot positions, or, alternatively, one in 125,000 ballots to the November 3, 2020 election.

3. It is my opinion, to a reasonable degree of scientific certainty, that the State's certification of the November 3, 2020 election for the selection of Presidential Electors in the State is legally unauthorized because the error rate of the election exceeded the federal law's maximum-acceptable error rate.

## VII.   BASIS AND REASONS SUPPORTING OPINIONS.

It is my opinion that based on government data and the analysis of Braynard and Zhang, and due to the lax controls on absentee voting in the November 3, 2020 election in the State, that the State's election error rate for the November 3, 2020 election exceeds the federal law's maximum-acceptable error rate.  As a result, it is my opinion that the State's election results should not be certified.

First, the error rate of the State's election far exceeds the federal law's maximum-acceptable error rates. The maximum-acceptable error rate under federal law is one in 500,000 ballot positions, or, alternatively one in 125,000 ballots.

Section 3.2.1 of the voting systems standards issued by the FEC which were in effect on the date of the enactment of HAVA provides that the voting system shall achieve a maximum acceptable error rate in the test process of one in 500,000 ballot positions. A ballot position is every possible selection on the ballot, to include empty spaces. As stated in the voting systems standards, "[t]his rate is set at a sufficiently stringent level such that the likelihood of voting system errors affecting the outcome of an election is exceptionally remote even in the closest of elections."  An update to the FEC VSS was made by the Election Assistance Commission (EAC) in the Voluntary Voting Systems Standards to enhance the FEC VSS standard, which the State has adopted by law.  The FEC VSS standard provides for an error rate of one in 125,000 ballots as an alternative to the one and 500,000 ballot positions to make it easier to calculate said error rate. The FEC standards, which are incorporated into HAVA § 301(a)(5), require that all systems be tested in order to certify that they meet the maximum error rate set by federal law.

When the federal law's maximum-acceptable error rates are applied to the State's absentee ballot error rates, the State's presidential Elector results are uncertifiable.  Applying the federal law's maximum-acceptable error rate to the State's total vote of about 3,300,000 comes to about 27 votes.  So, under federal law, the maximum-acceptable error rate would be violated if the combination of illegal votes counted and illegal votes not counted exceeded 27 votes.

6

The following chart, based on government data and Braynard's and Zhang's analysis, shows estimate of illegal votes counted and legal votes not counted to exceed 150,000 ballots.

**Arizona Presidential Election Contest**
**Margin +10,457**

| Type | Description | Margin |
|---|---|---|
| 1) Illegal Votes Counted | Estimate of ballots requested in the name of someone other than that person | 214,526 |
| 2) Legal Votes Not Counted | Estimate of ballots that the requester returned but were not counted | 131,092 |
| 3) Illegal Votes Counted* | Electors voted where they did not reside. | 19,997 |
| 4) Illegal Votes Counted* | Out of State Residents Voting in State | 5,726 |
| 5) Illegal Votes Counted* | Double Votes | 157 |
| **TOTAL 1 & 2** | | 345,618 |
| **TOTAL** | | 371,498 |

*May overlap

Any certification of the State's November 3 election results is not legally authorized because of the State's violation of the federal law's maximum-acceptable error rate.

## VIII.  EXHIBITS TO BE USED AT TRIAL TO SUMMARIZE OR EXPLAIN OPINIONS

At the present time, I intend to rely on the documents produced set forth above as possible exhibits.

REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

SIGNATURE PAGE TO FOLLOW

Electronically signed by /s/ Dennis
Nathan Cain

Dated: December 3, 2020

_____

Dennis Nathan Cain

I APP. 1418

Clerk of the Superior Court
*** Electronically Filed ***
T. Hays, Deputy
12/4/2020 6:11:48 PM
Filing ID 12293586

**Corrected**
By Clerk of the Court

SPILSBURY LAW, PLLC
*s/David W. Spilsbury*
David W. Spilsbury, 031145
18 East University Dr., Suite 208
Mesa, AZ. 85201
(602) 388-8893
dave@spilsburylaw.com

ATTORNEYS FOR PLAINTIFFS

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| **JAMES STEVENSON, BARON BENHAM, LYNIE STONE, JESSICA CHAMBERS, AS AGGRIEVED ELECTORS,**<br><br>   **Plaintiffs,**<br><br>**vs.**<br><br>**GOVERNOR DOUG DUCEY AND SECRETARY OF STATE KATIE HOBBS,**<br><br>   **Defendants.** | **Case No.** CV2020-0964 90<br><br><br>**EXPERT REPORT OF MATTHEW BRAYNARD** |

-1-

## I.    INTRODUCTION

I have been retained as an expert witness on behalf of Proposed Intervenor-Plaintiffs James Stevenson, Baron Benham, Lynie Stone, and Jessica Chambers in the above captioned proceeding.  I expect to testify on the following subject matters:  (i) analysis of the database for the November 3, 2020 election for the selection of Presidential Electors in the State of Arizona ("State"); (ii) render opinions regarding whether individuals identified in the State's voter database actually voted; and (iii) render opinions regarding whether individuals identified in the State's voter database were actually qualified to vote on election day.

This is a statement of my relevant opinions and an outline of the factual basis for these opinions.  The opinions and facts contained herein are based on the information made available to me in this case prior to preparation of this report, as well as my professional experience as an election data analyst.

I reserve the right to supplement or amend this statement on the basis of further information obtained prior to the time of trial or in order to clarify or correct the information contained herein.

## II.    DOCUMENTS REVIEWED

I reviewed the following documents in arriving at my opinions.

1.    The voter records and election returns as maintained on the State's election database;

I APP. 1420

2.      Records maintained by the National Change of Address Source which is maintained by the United States Postal Service and which is available for licensed users on the internet.  I am a licensed member.

3.      Records developed by the staff of my call centers and social media researchers; and

4.      A national voter database maintained by L2 Political;

In addition, I discussed the facts of this matter with Petitioner's attorney Erick G. Kaardal and members of his legal team.

## III.    PROFESSIONAL QUALIFICATIONS

I have attached hereto as Exhibit 1 a true and correct copy of my resume.  As detailed in the resume, I graduated from George Washington University in 2000 with a degree in business administration with a concentration in finance and management information systems.  I have been working in the voter data and election administration field since 1996.  I have worked building and deploying voter databases for the Republican National Committee, five Presidential campaigns, and no less than one-hundred different campaigns and election-related organizations in all fifty states and the U.S. Virgin Islands. I worked for eight years as a senior analyst at the nation's premier redistricting and election administration firm, Election Data Services, where I worked with states and municipalities on voter databases, delineation, and litigation support related to these matters. Also, while at Election Data Services, I worked under our contract with the US Census Bureau analyzing voting age population. Since 2004, I have worked for my own business, now known as External Affairs, Inc., providing

3

statistical and data analysis for local, state, and federal candidates and policy

organizations in the areas of voter targeting, polling/research, fundraising, branding, and

online development and strategy. My firm has worked for over two-hundred candidates

from president to town council and over a dozen DC-based policy/advocacy

organizations.

With respect to publications I have authored in the last 10 years, I have not

authored any publications in the last ten years.

## IV.   COMPENSATION

I have been retained as an expert witness for Petitioners.  I am being compensated

for a flat fee of $40,000.

## V.   PRIOR TESTIMONY

I have not provided testimony as an expert either at trial or in deposition in the last

four years.

## VI.   STATEMENT OF OPINIONS

As set forth above, I have been engaged to provide expert opinions regarding

analysis in the November 3, 2020 election of Presidential electors.  Based on my review

of the documents set forth above, my discussions with statisticians and analysts working

with me and at my direction, my discussions with the attorneys representing the

Petitioners, I have the following opinions:

1. It is my opinion, to a reasonable degree of scientific certainty, that in the State, the
   State's database for the November 3, 2020 election show 2,181,959 individuals
   voted early or applied for and the State sent an absentee or mail-in ballot, and
   518,560 voters whom the state marks as having requested and been sent an

absentee ballot did not return it.  It is my opinion, to a reasonable degree of scientific certainty, that in my sample of this universe, 44.20% of these absentee voters in the State did not request an absentee ballot.

2.  From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that 481,022 individuals whom the State's database identifies as having not returned an absentee ballot, that in my sample of this universe, 17.32% of those absentee voters did in fact mail back an absentee ballot to the clerk's office.

3.  From the State's database for the November 3, 2020 election, the NCOA database, and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 19,997 individuals had changed their address before the election, that in my sample of this universe, 0.41% of those individuals denied casting a ballot.

4.  From the State's database for the November 3, 2020 election and the NCOA database and other state's voter databases, it is my opinion to a reasonable degree of scientific certainty, that at least 5,726 absentee or early voters were not residents of the State when they voted.

5.  From the State's database for the November 3, 2020 election and comparing that data to other states voting data and identifying individuals who cast early/absentee ballots in multiple states, it is my opinion to a reasonable degree of scientific certainty, that at least 157 individuals in the State voted in multiple states.

## VII.  BASIS AND REASONS SUPPORTING OPINIONS.

It is my opinion that due to the lax controls on absentee voting in the November 3, 2020 election that the current unofficial results of that election include thousands of individuals who were not eligible to vote or failed to record ballots from individuals that were.

First, State maintains a database for the November 3, 2020 election which I obtained from L2 Political and which L2 Political obtained from the State's records on, among other things, voters who applied for an absentee or early voter status.  I received this database from L2 Political in a table format with columns and rows which can be

searched, sorted and filtered.  Each row sets forth data on an individual voter.  Each column contained information such as the name of the voter, the voter's address, whether the voter applied for an absentee ballot, whether the voter voted and whether the voter voted indefinitely confined status.

Second, we are able to obtain other data from other sources such as the National Change of Address Database maintained by the United States Postal Service and licensed by L2 Political.  This database also in table format shows the name of an individual, the individual's new address, the individual's old address and the date that the change of address became effective.

Third, I conducted randomized surveys of data obtained from the State's database by having my staff or the call center's staff make phone calls to and ask questions of individuals identified on the State's database by certain categories such as absentee voters who did not return a ballot.  Our staff, if they talked to any of these individuals, would then ask a series of questions beginning with a confirmation of the individual's name to ensure it matched the name of the voter identified in the State's database.  The staff would then ask additional questions of the individuals and record the answers.

Fifth, attached as Exhibits 2 is my written analysis of the data obtained.

Below are the opinions I rendered and the basis of the reasons for those opinions.

1. It is my opinion, to a reasonable degree of scientific certainty, that in the State, the State's database for the November 3, 2020 election show 2,181,959 individuals voted early or applied for and the State sent an absentee or mail-in ballot, and 518,560 voters whom the state marks as having requested and been sent such a ballot did not return it.  It is my opinion, to a reasonable degree of scientific certainty, that in my sample of

this universe, 44.20% of these voters in the State did not request such a ballot.

I obtained this data from the State via L2 Political after the November 3, 2020, Election Day.  This data identified 2,181,959 individuals as having voted early or applied for an absentee and the State sending an absentee/mail-in ballot to these individuals who requested it.  This data also identified 518,560 absentee voters who were sent a ballot but who failed to return the ballot.

I then had my staff make phone calls to a sample of this universe.  When contacted, I had my staff confirm the individual's identity by name.  Once the name was confirmed, I then had staff ask if the person requested an absentee ballot or not.  Staff then recorded the number of persons who answered yes.  My staff then recorded that of the 2,050 individuals who answered the question, 1,144 individuals answered yes to the question whether they requested an absentee ballot. My staff recorded that 906 individuals answered no to the question whether they requested an absentee ballot. Attached as Exhibit 2 is my written analysis containing information from the data above on absentee voters.  Paragraph 2 of Exhibit 2 presents this information.

Next, I then had staff ask the individuals who answered yes, they requested an absentee ballot, whether the individual mailed back the absentee ballot or did not mail back the absentee ballot.  Staff then recorded that of the 708 individuals who answered the question, 355 individuals answered yes, they mailed back the absentee ballot.  Staff recorded 353 individuals answered no, they did not mail back the absentee ballot. Paragraph 2 of Exhibit 2 presents this information.

Based on these results, 17.32% of our sample of these voters in the State did not request an absentee ballot.

2. From the State's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that 518,560 individuals whom the State's database identifies as having not returned an absentee ballot, that in my sample of this universe, 17.32% of those absentee voters did in fact mail back an absentee ballot to the clerk's office.

This opinion includes the analysis set forth above. Among the 708 who told our call center that they did request an absentee ballot and answered the second question, 355 told our staff that they mailed the absentee ballot back, which is 17.32% of the total sample of 2,050 whom the State identified as having not returned the absentee ballot the State sent them. Paragraph 2 of Exhibit 2 presents this information.

3. From the State's database for the November 3, 2020 election, the NCOA database, and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 19,997 individuals had changed their address before the election, that in my sample of this universe, 0.41% of those individuals denied casting a ballot.

On Exhibit 2, in paragraph 4, I took the State's database of all absentee or early voters and matched those voters to the NCOA database for the day after election day. This data identified 19,997 individuals whose address on the State's database did not match the address on the NCOA database on election day. Next, I had my staff call the persons identified and ask these individuals whether they had voted. My call center staff identified 1,219 individuals who confirmed that they had casted a ballot. My call center staff identified 5 individuals who denied casting a ballot. Our analysis shows that 0.41%

I APP. 1426

of our sample of these individuals who changed address did not vote despite the State's

data recorded that the individuals did vote.

> 4. From the State's database for the November 3, 2020 election and the
>    NCOA database and other state's voter databases, it is my opinion to a
>    reasonable degree of scientific certainty, that at least 5,726 absentee or
>    early voters were not residents of the State when they voted.

On Exhibit 2, in paragraph 1, I took the State's database of all absentee or early

voters and matched those voters to the NCOA database for the day after Election Day.

This data identified 5,084 individuals who had moved of the State prior to Election Day.

Further, by comparing the other 49 states voter databases to the State's database, I

identified 744 who registered to vote in a state other than the State subsequent to the date

they registered to vote in the State.  When merging these two lists and removing the

duplicates, and accounting for moves that would not cause an individual to lose their

residency and eligibility to vote under State law, these voters total 5,726.

> 5. From the State's database for the November 3, 2020 election and
>    comparing that data to other states voting data and identifying individuals
>    who cast early/absentee ballots in multiple states, it is my opinion to a
>    reasonable degree of scientific certainty, that at least 157 individuals in the
>    State voted in multiple states.

On Exhibit 2, in paragraph 2, I had my staff compare the State's early and

absentee voters to other states voting data and identified individuals who cast

early/absentee ballots in multiple states. My staff located 157 individuals who voted in

the State and in other states for the November 3, 2020 general election.

## VIII.   EXHIBITS TO BE USED AT TRIAL TO SUMMARIZE OR EXPLAIN OPINIONS

At the present time, I intend to rely on the documents produced set forth above as

possible exhibits.

**REMAINDER OF PAGE LEFT INTENTIONALLY BLANK**

**SIGNATURE PAGE TO FOLLOW**

I APP. 1428

Dated: 11/20/2020

Matthew Braynard

I APP. 1429

# MATT BRAYNARD

1521 Boyd Pointe Way #3001, Vienna VA 22182 | 202.423.5333 (c) | matt@braynard.com

Matt Braynard is the president of both political consulting firm External Affairs, Inc., and a voter-registration non-profit, Look Ahead America.

CURRENT EMPLOYMENT

External Affairs, Inc.
**Principal**                                                      **2004 – Present**
External Affairs, Inc. works for local, state, and federal candidates and policy organizations in the areas of voter targeting, polling/research, fundraising, branding, and online development and strategy. The firm has worked for over two-hundred candidates from president to town council and over a dozen DC-based policy/advocacy organizations.

Look Ahead America, Inc.
**President**                                                      **March 2017 – Present**
Matt founded LAA, a 501(c)(3), along with over thirty other former Trump campaign staffers with the goal of registering and turning out disaffected, patriotic voters.

PREVIOUS EMPLOYMENT

Donald J. Trump for President, Inc.
**Director, Data Division**                                        **October 2015 – March**
**2016**
Matt was responsible for developing the voter contact strategy, building technology infrastructure, managing vendor relationships, recruiting the data division staff, and supporting and auditing state efforts on door-to-door, phone, mail, and email operations.

Election Data Services, Inc.
**Senior Analyst**                                                 **2001-2005**
Matt Braynard was responsible for analyzing and redistricting states and municipal political boundaries, as well as analyzing election result administration data.

Republican National Committee
**Political Analyst**                                              **1996, 1998-2001**
Matt Braynard worked in the political analysis department developing and deploying voter targeting databases, and directed the precinct election result research project.

Luntz Research Companies
**Research Consultant**                                            **1997-2001**
Matt Braynard analyzed survey toplines and cross tabulations to create executive presentation materials.

EDUCATION

Columbia University                                                **2018**
**Master of Fine Arts**
Writing Program

The George Washington University
**Bachelors of Business Administration**                           **2000**
Concentrations in Finance and Management Information Systems

Exhibit 1

I APP. 1430

Date:     November 19, 2020

From:     Matt Braynard
          External Affairs, Inc.
          matt@braynard.com
          202.423.5333
          November 19, 2020

Re:       Arizona Voter Integrity Project: Illegal Ballots Preliminary Results

---

This is an outline of the six analysis methods we have applied to the State of Arizona ("State") and the results we have obtained as of the date set forth above.

### 1.   Residency Violations

We have evaluated early and absentee voters who were matched to the national change of address database (NCOA) or are found to have registered to vote in other states subsequent to their registration in target states (OOSSR), strongly indicating a violation of residency requirements.

|     | NCOA  | OOSSR |  | Merged |
|-----|-------|-------|--|--------|
| AZ  | 5,084 | 744   |  | 5,790  |

The OOSSR would be much higher, but we limited due to the lack of full dates of birth available to us from many states' voter databases. A full, complete birthdate is necessary for our match process.

### 2.   Double Voting (Early/Absentee ONLY)

We compared the target state early and absentee voters to other states voting data and identified individuals who cast early/absentee ballots in multiple states.

AZ: 157

### 3.   Confirmation of "Unreturned" Absentee Ballots

I obtained data from the State via L2 Political after the November 3, 2020, Election Day.  This data identified 518,560 voters who were sent an absentee ballot but who failed to return the absentee ballot.

We then called a sample of these voters totaling 2,050 individuals to ask if they requested the absentee ballot. Of the 2,050 individuals our call center contacted and spoke with whom the State data identified as having requested an absentee ballot but the data identified as having not returned the ballot, our call center identified 906 individuals who did not request an

Exhibit 2

I APP. 1431

absentee ballot. Among those who said they had requested an absentee ballot and answered whether they had mailed the ballot back, 355 individuals told our call center that they returned a ballot

| State | Did Not Request | Percentage of 2,114 Sample |
|---|---|---|
| Arizona | 1144 | 44.20% |

| State | Returned | Percentage of 2,114 Sample |
|---|---|---|
| Arizona | 355 | 17.32% |

**4.   Confirmation of National Change of Address Voters**

We contacted individuals who have been recorded having voted but filed a national change of address to confirm that they did indeed cast a ballot. Once again, our call center staff contacted a random sample of 1,224 individuals from the State data.  From these calls, our staff identified 1,219 individuals who told our call center staff they did cast a ballot and 5 individuals who told our call center staff they did cast a ballot.  The following counts and percent of people we reached by phone told us they did NOT cast an early or absentee ballot despite the state recording such a ballot.

| State | Total | Percentage of Sample |
|---|---|---|
| Arizona | 5 | 0.41% |

**5.   Confirmation of Low Propensity in Heavy Turnout Precincts**

We reached out to Individuals who were marked as having voted despite never voting, not voting in many years, or just recently registered. We concentrated this in precincts with unusually high turnout.

| State | Total | Percentage of Sample |
|---|---|---|
| Arizona | 21 | 0.94% |

2

Exhibit 2

I APP. 1432