

# WISCONSIN LEGISLATURE

P.O. Box 7882 • Madison, WI 53707-7882

December 14, 2020

Governor Tony Evers
P.O. Box 7863
Madison WI 53707
DELIVERED ELECTRONICALLY

Dear Governor Evers:

The American people must possess both faith and confidence that elections conducted in our country are fair, free, open and credible. Anything less than full confidence undermines the very foundation of our republic.

The Wisconsin Assembly Committee on Campaigns and Elections and the Senate Committee on Elections, Ethics and Rural Issues conducted an extensive hearing on December 11, 2020. The committees heard from expert witnesses and demonstrated the existence of real, substantial misconduct and illegalities in the November 3rd election.

Unfortunately, after hearing evidence presented during Friday's committee hearing, there is clear, irrefutable evidence that there were irregularities in the administration of Wisconsin's presidential election.

Based upon the testimony heard, we contest the decision to have electors from Wisconsin participate in the national Electoral College until all legal actions and matters outlined below have been resolved.

As a result of the hearing, three things are clear:

1) The chair of the Wisconsin Elections Commission (WEC) violated state law by unilaterally certifying the presidential results, which the governor then improperly forwarded to the United States government[1];

2) The illegal certification by the chair of the WEC occurred two full weeks before certification is required by law[2], before a statutorily required audit of voting machines was conducted, and before lawfully brought legal challenges to alleged elections violations were concluded;

3) Because of this pre-mature certification, serious questions about the validity of administration and the results of the 2020 election have yet to be answered.

The Wisconsin Legislature has exercised its authority[3] to establish election administration procedures. State agencies and individual officials may not ignore or unilaterally alter these procedures.

At the public hearing or in statements provided to the committee, evidence was brought forward that demonstrated numerous instances of disregard of the law. Some examples include:

- Contrary to state law, absentee ballots were counted that did not contain the mandatory clerk initials;

- Contrary to state law, absentee ballots were counted in cases when the clerk was required but did not verify photo ID;
- The county clerks in Wisconsin's two largest counties encouraged (and eventually had to rescind) voters to violate state law and improperly assert they were indefinitely confined;
- Instances of illegal ballot harvesting conducted by the city of Madison;
- Absentee ballots that were missing the required witness address were counted;
- The mayor of Green Bay illegally altered the central count voting site without authorization from elections officials;
- Elections observers in Milwaukee County were not permitted to have the legally required access to view the recount and handling of ballots and envelopes;

In closing, due to the credible and irrefutable evidence brought to the committee, we believe there are problems within our election system that need to be addressed in order to restore voter confidence.

Sincerely,

Rep. Ron Tusler
Elections Committee Chair
3rd Assembly District

Rep. Joe Sanfelippo
Elections Committee Vice Chair
15th Assembly District

Rep. Shae Sortwell
Elections Committee Member
2nd Assembly District

Rep. Janel Brandtjen
Elections Committee Member
22nd Assembly District

Rep. Dave Murphy
Elections Committee Member
56th Assembly District

---

[1] 770 (5) (b) For presidential electors, the commission shall prepare a certificate showing the determination of the results of the canvass and the names of the persons elected, and the governor shall sign, affix the great seal of the state, and transmit the certificate by registered mail to the U.S. administrator of general services. The governor shall also prepare 6 duplicate originals of such certificate and deliver them to one of the presidential electors on or before the first Monday after the 2nd Wednesday in December.

[2] In 2020, the "first Monday after the 2nd Wednesday in December" would be Monday, December 14th. The Chair of the Elections Commission certified the results and the Governor submitted them on Monday, November 30th.

[3] Article 1, Section 4 of the Wisconsin Constitution.

# CERTIFICATE OF THE VOTES OF THE
# 2020 ELECTORS FROM MICHIGAN

## **********

WE, THE UNDERSIGNED, being the duly elected and qualified Electors for President and Vice President of the United States of America from the State of Michigan, do hereby certify the following:

(A) That we convened and organized in the State Capitol, in the City of Lansing, Michigan, and at 2:00 p.m. Eastern Standard Time on the 14th day of December, 2020, performed the duties enjoined upon us;

(B) That being so assembled and duly organized, we proceeded to vote by ballot, and balloted first for President and then for Vice President, by distinct ballots; and

(C) That the following are two distinct lists, one, of all the votes for President; and the other, of all the votes for Vice President, so cast as aforesaid:

### FOR PRESIDENT

| Names of the Persons Voted For | Number of Votes |
|---|---|
| DONALD J. TRUMP of the State of Florida | 16 |

### FOR VICE PRESIDENT

| Names of the Persons Voted For | Number of Votes |
|---|---|
| MICHAEL R. PENCE of the State of Indiana | 16 |

IN WITNESS WHEREOF, we, the undersigned, have hereunto, in the City of Lansing, in the State of Michigan, on this 14th day of December, 2020, subscribed our respective names.

Kathy Berden, Chairperson

Mayra Rodriguez, Secretary

Meshawn Maddock

John Haggard

Kent Vanderwood

Marian Sheridan

James Renner

Amy Facchinello

Rose Rook

Hank Choate

Mari-Ann Henry

Clifford Frost

Stanley Grot

Timothy King

Michele Lundgren

Ken Thompson

**From:** Jack Prodigy <jlat89@prodigy.net>
**Sent:** Thursday, December 17, 2020 9:54 AM
**To:** Rep.Loudenbeck <Rep.Loudenbeck@legis.wisconsin.gov>
**Subject:** FW: Money given to certain Wisconsin cities only

1

Good morning,

Rep Loudenbeck,

Would you please answer these questions and requests.

I am somewhat confused.  In this lawsuit filed  *The Thomas More Society's Amistad Project filing*
https://beta.documentcloud.org/documents/20416559-trump-v-wec-petition-1  Paragraph 51 -54 addresses the States responsibility regarding gifts to cities.  Now as the suit points out
the gift can be given **provided the State Legislature Joint Committee on Finance approves**.  See paragraphs mentioned above. **Are you not the vice chair of that committee?  Did the Joint Committee approve such funds?  And if the committee did so please send me the documents showing approval**

Cheers,

John Latimer
Walworth WI

**From:** Rep.Loudenbeck [mailto:Rep.Loudenbeck@legis.wisconsin.gov]
**Sent:** Thursday, December 17, 2020 11:18 AM
**To:** Jack Prodigy; Rep.Loudenbeck
**Subject:** RE: Money given to certain Wisconsin cities only

The Joint Finance Committee was not asked to approve any such funds

 Virus-free. www.avast.com

I APP. 1474

# CERTIFICATE OF THE VOTES OF THE
# 2020 ELECTORS FROM WISCONSIN

**\*\*\*\*\*\*\*\*\***

WE, THE UNDERSIGNED, being the duly elected and qualified Electors for President and Vice President of the United States of America from the State of Wisconsin, do hereby certify the following:

(A) That we convened and organized at the State Capitol, in the City of Madison, Wisconsin, at 12:00 noon on the 14th day of December, 2020, to perform the duties enjoined upon us;

(B) That being so assembled and duly organized, we proceeded to vote by ballot, and balloted first for President and then for Vice President, by distinct ballots; and

(C) That the following are two distinct lists, one, of all the votes for President; and the other, of all the votes for Vice President, so cast as aforesaid:

**FOR PRESIDENT**

| Names of the Persons Voted For | Number of Votes |
|---|---|
| DONALD J. TRUMP of the State of Florida | 10 |

**FOR VICE PRESIDENT**

| Names of the Persons Voted For | Number of Votes |
|---|---|
| MICHAEL R. PENCE of the State of Indiana | 10 |

IN WITNESS WHEREOF, we, the undersigned, have hereunto, at the Capitol, in the City of Madison, in the State of Wisconsin, on this 14th day of December, 2020, subscribed our respective names.

Andrew Hitt, Chairperson

Kelly Ruh, Secretary

Carol Brunner

Edward Scott Grabins

Bill Feehan

Robert F. Spindell, Jr.

Kathy Kiernen

Darryl Carlson

Pam Travis

Mary Buestrin

# THE CHAIRMAN'S REPORT OF THE ELECTION LAW STUDY SUBCOMMITTEE OF THE STANDING SENATE JUDICIARY COMMITTEE

### SUMMARY OF TESTIMONY FROM DECEMBER 3, 2020 HEARING

Honorable William T. Ligon, Chairman
Senator, District 3

Honorable John Kennedy
Senator, District 18

Honorable Bill Heath
Senator, District 31

Honorable Blake Tillery
Senator, District 19

Honorable Michael Rhett
Senator, District 33

Honorable Elena Parent
Senator, District 42


I.   INTRODUCTION

II.  EXECUTIVE SUMMARY

III. ORAL TESTIMONY

IV.  FINDINGS

V.   RECOMMENDATIONS

I APP. 1477

## I.    INTRODUCTION

The charge assigned to the Election Law Study Subcommittee of the Standing Senate Judiciary Committee was to examine the recent election cycle, the recount process, the audit process, the current investigations taking place, the litigation that is moving forward, as well as address issues relating to the upcoming runoffs. In the matter of the law itself, we were to also consider Georgia's election laws as they have impacted and are impacting the current election cycle. This Report may be further amended prior to the 2021 Georgia Legislative Session.

This Subcommittee met once at the Georgia State Capitol on Thursday, December 3, 2020. The hearing was open to the public, and there was an open invitation for citizens to speak before the committee. Subcommittee members also expressed stories they had heard from their constituents. Other committee meetings have also been hearing testimony which should be considered to present an even broader understanding. At this time, the additional committees which have met and received testimony are the Senate Governmental Affairs Committee and the House Governmental Oversight Committee. Many who could not testify due to lack of time have recorded their own testimonies online and shared their written speeches with this committee; the Subcommittee received many affidavits under oath.

This Report by the Subcommittee Chair has not been formally approved by the Subcommittee or the standing Judiciary Committee.  It is submitted for informational purposes to be a part of the record at the request of the Judiciary Chair.  It is a summary of testimony given in person and by affidavit.  For more information, please refer to the video record of the hearing and the affidavits submitted.

## II.    EXECUTIVE SUMMARY

The November 3, 2020 General Election (the "Election") was chaotic and any reported results must be viewed as untrustworthy.  The Subcommittee took evidence from witnesses and received affidavits sworn under oath.  The Subcommittee heard evidence that proper protocols were not used to ensure chain of custody of the ballots throughout the Election, after the opening of ballots prior to the Election, and during the recounts. The Subcommittee heard testimony that it was possible or even likely that large numbers of fraudulent ballots were introduced into the pool of ballots that were counted as voted; there is no way of tracing the ballots after they have been separated from the point of origin. The Subcommittee heard testimony of pristine ballots whose origin looked suspicious or which could not be verified and the inability of poll workers to distinguish between test ballots and absentee ballots. Signatures were not consistently verified according to law in the absentee balloting process.

Poll watchers on Election Night testified that they had noted that ballots were not secured, that seals and security tags were not used, and the chain of custody was often lax or non-existent. During the recount process, the monitors observed similar patterns of unsecured ballots that had broken seals and open cases of ballots laying around for hours or overnight in unsecured

2

locations. There was a lack of enforcement of the law, sloppy handling of the ballots by those counting, deliberate covering-up of voting numbers by workers, lack of following the process during the recount, unsafe handling of military ballots, and insecure data such as on laptops and flash drives. According to submitted testimony, there were also many equipment failures when ballots would not go through the machines and other times when ballots were counted more than once.

A great deal of testimony supported evidence of a coordinated effort to prevent a transparent process of observing the counting of ballots during the absentee ballot opening period and on Election Night. Witnesses testified to hostility to Republican poll workers during the recount – directional signage was unavailable, doors were locked, and Republican poll watchers were sent home early or given menial assignments.

Monitors throughout the state were often kept at an unreasonably long distance – some social distancing was understandable, but monitors were blocked from having the visual ability to see what was written on the ballots or to have any meaningful way to check the counting or to double-check that what was counted was actually assigned to the right candidate. They also could not observe what was entered into the ARLO system, nor could they be told the count that was being entered into ARLO. Instead, they were told that those numbers would be totaled and come back from the Secretary of State's Office. They were also told not to take pictures, film, or have other means of acquiring proof of the process that they were experiencing based on a rule from the State Elections Board.  That rule contravenes the spirit and purpose of the election law.

The Secretary of State's Office was unresponsive to its hotline. It has been unresponsive to many who wonder if their vote ever really counted. The office has turned a blind eye to fraud to the point that it ought to be considered gross negligence.

The Subcommittee did not have time to investigate the numerous publicly reported issues with the Dominion voting machines. The Subcommittee takes notice of the various publicly reported functions of the machines and heard evidence that the machines can duplicate fraudulent ballots to the point that not even trained personnel can tell the difference between a test ballot and a real ballot. Testimony also suggested that the system responds wirelessly to being reset from an unknown location as happened with the poll books. The Subcommittee also heard that Dominion machines can be programmed with algorithms that reallocate votes between candidates. In addition, the Dominion machines are programmed to count votes using percentages of whole numbers rather than actual votes, which is a feature incompatible with the actual voting process.  The Subcommittee learned that the history and control of the company that owns the Dominion voting system is unclear and provides serious implications of foreign interference in the U.S. election.

I APP. 1479

## III.    ORAL TESTIMONY

**Violation of Ballot/Computer Security Procedures During Early Voting and on Election Day**

■ Bridget Thorne, who has nine years' experience as a poll worker/precinct manager in Fulton County, worked for five and a half days during early voting as a technician in the temporary warehouse in the Georgia World Congress Center. Because of positive COVID tests among Fulton County elections employees, Dominion Software was selected to run the warehouse. Thorne was disturbed at the lack of ballot security. Test ballots were printed on the same type of paper (official Rolland Voting paper) as real ballots, but test ballots were not routinely marked as such or destroyed. Thorne testified she saw a stack of these ballots almost eight inches tall.

On October 30, when early voting finished at State Farm Arena in Fulton County (the "State Farm Arena"), Thorne observed 40-50 scanners being brought into the arena and tens of thousands of ballots being scanned in by random people pulling ballots from random places – no formal procedure, no oaths, no chain of custody. When Thorne objected to this haphazard process, a Dominion employee replied, "It's fine, we have been doing this all week." When Thorne left that night, she observed unsecured suitcases of ballots next to the scanners.

Upon arriving at the State Farm Arena the following morning, Thorne saw that suitcases of ballots had been piled in a corner and sealed. But there was no restricted access, so anyone could have removed one or more suitcases. In addition, anyone could have opened them and resealed them" because "seals were easily accessible." During the day, employees brought Thorne other ballots that were found in the warehouse, asking if they were real or test. She had no way of knowing.

The following night, when Thorne was again working at the warehouse, she observed a Dominion employee and an Election Group Consultant printing "test ballots" but doing so incorrectly. She realized then that "<u>anyone </u>in the warehouse had access to printing real ballots."

Before Election Day, Thorne attempted to report her concerns about these insecure ballot operations to the Secretary of State (SOS) office and to the State Board of Elections; she received no response.

Since giving her testimony to the Senate Subcommittee, Bridget Thorne has been fired by a consultant working for Fulton County.

**Recount: Counting Votes Without Monitoring, or Without Meaningful Monitoring**

- Election Day – Video from State Farm Arena in Fulton County showed a Fulton County Election worker approaching the media and poll monitors. After a brief exchange, the media and monitors packed up and left. This coincided with media reports that everyone was told to leave State Farm Arena around 10 p.m. on Election Night; workers testified they were told that tabulation was stopping for the night and would resume the next morning. Instead, video from State Farm Arena revealed that about six workers stayed behind. What happened next revealed a coordinated effort by election workers to deliberately conceal their continued counting of ballots out of public view, in direct violation of the law. This incident was premeditated. Those workers pulled out four concealed cases of ballots from under a table and continued counting for another two hours. During those two hours there were multiple machines running, each of which could process up to 3000 ballots per hour.  A "representative" of The Secretary of State's office claimed that it had a representative present during that period, and the media reported that statement widely; it was not true.  The representative admitted he was not present during that time period and is not evident on the video.

- David Cross, though unable to speak at the hearing due to time constraints, submitted written testimony with graphs, one of which appears to enhance the significance of what took place with the change in vote totals just after the late-night activities took place at State Farm Arena. Due to its significance to the State Farm Arena video seen by the committee, his graph is included with this Report. It shows that 136,155 votes suddenly appeared in Biden's vote column at 1:59 a.m., November 4, 2020.

- Scott Hall of Fulton County is an experienced poll watcher who testified that there was a secured "lunch area" but when he bought lunch for workers, they were not permitted to use that area.  There were no cameras in that area, yet tables were set up for counting, and poll watchers were excluded.  He has photographs of the area.  He also testified that there were stacks and stacks of unsecured blank ballots ("checks," as he called them) that were in the open.

- Mr. Hall noted a limitation of one monitor per 10 recounting tables as being an inadequate ratio to be truly effective.  He was constantly engaged in the recount, even being called to go to the World Congress Center at ridiculous hours, such as 10 p.m., for more counting.  He was adamant that something was seriously wrong with how Fulton County was handling the ballots.

- Mark Amick reported that in DeKalb County, only one monitor was allowed per 10 tables of 16 recounters.  He testified that monitors were kept six feet away and could not see the totals entered on the computer screens.

- At State Farm Arena at the end of the recount day on November 14, Susan Voyles of Sandy Springs observed pallets of ballots remaining to be counted beginning the following day. When she arrived the next morning, November 15, those pallets were gone.

- On November 15, Voyles and her partner with whom she had traveled to State Farm Arena (also identified as a Republican), were given only 60 ballots to review, even though other tables had thousands. Voyles and her partner, as well as other Republican monitors, were told at 10 a.m. there was nothing else for them to do, so they should leave. Since giving her testimony to the Senate Subcommittee, Susan Voyles has been fired by a consultant working for Fulton County.

- Tony Burrison of Savannah and a military veteran served as one of very few recount observers during the recount in Chatham County. He described the process as "disgusting" – stacks of ballots were being counted with no oversight or accountability. Based on what he observed, he believed there is a major problem with voting integrity due to tampering with the vote.

- Nancy Kain of DeKalb reported that she was kept too far from the counting to verify any votes.

- Hal Soucie of Smyrna, a poll watcher at State Farm Arena, testified that he was told that he was not supposed to be close enough to see batch numbers.

**No Chain of Custody**

- Annette Davis Jackson, a Gwinnett monitor, saw broken locks on the bins containing paper backup ballots.

- Scott Hall of Fulton County was told to leave the World Congress Center after he tried to document and photograph nine unsecured bags of ballots.  He testified he "cried" over the incidents he saw.

- Dana Smith, a Republican poll watcher in Hart County, testified that she observed the paper backup ballots being placed in unlocked canvas bags for transport to the county office of the Elections Supervisor. The precinct manager finally (at Smith's insistence) obtained locks before transporting the bags in her car, but she refused to complete chain-of-custody forms.  Smith also testified that there was open access to the special paper used to print the paper backup ballots.

I APP. 1482

■ Hal Soucie observed the recount process in two counties, Cobb and Fulton. At State Farm Arena in Fulton County, he reported "suitcases" full of ballots "all over the place," with no chain-of-custody procedures, no time and no date information. He observed people taking ballots out of the cases, counting, and putting them right back into the cases. No one checked him in as a credentialed observer, and one man handed him a stack of ballots without knowing who he was or where the ballots came from.

**Suspicious "Pristine" Absentee Ballots**

■ At the State Farm Arena recount on November 14, Susan Voyles – who has 20 years' experience managing election precincts in Fulton County – reviewed a stack of 110 absentee ballots [ballots are normally placed in stacks of 100] and noticed they were "pristine." They had not been folded, and they did not appear worn as though voters and election workers had handled them. Each ballot was "bubbled in" with exactly the same marking, which showed a small crescent of white in the bubble. It appeared as though one ballot had been marked and then reproduced over 100 times. In addition, one of these ballots bore the distinctive ink markings of having been pulled from a printer too soon. Almost all of these ballots were votes for Vice President Biden; only two were for President Trump. In her 20 years of election experience, Voyles had never seen any ballots like these. As noted above, Ms. Voyles has been fired from her position as a poll manager with Fulton County, presumably for her honest testimony.

■ Hal Soucie, who was also at the State Farm Arena, verified that he saw the pristine ballots mentioned by Ms. Voyles.

■ During the recount, Scott Hall of Fulton County saw large quantities of ballots at the World Congress Center that appeared to have been machine-produced. He stated that he saw this "over and over."  The Subcommittee received evidence that other poll workers throughout the State reported similar instances of "pristine" ballots with no explicable origin.

**Duplication of Ballots Without Oversight**

■ Nancy Kain, a naturalized citizen in DeKalb County, volunteered as a poll watcher for Advance Voting at lower Roswell Road, served as a poll monitor during processing of absentee ballots and as a poll watcher on Election Day. At 10 a.m. on November 5, at the State Farm Arena, she was not asked for credentials and noticed that many people did not even have credentials. She observed a young man with paper ballots putting in selections on a ballot on a voting machine and wondered why it was not going through the scanner. The supervisor explained that the military ballots are transcribed in proper format and ballots come in that they were trying to salvage because of damage, thus they were just transferring them to a new ballot, and that was the process. Yet, no one was there to verify what the young man was doing. He was the brother of the

I APP. 1483

supervisor. Technically, he was voting for someone else on a voting machine. She took video and photographs and recorded her conversation with the supervisor.

■ Mark Amick observed the processing of Provisional, Military and UOCAVA ballots in Fulton County on November 6 from early morning until 10:15 p.m. The only "oversight" provided was from a Secretary of State (SOS) employee who was not seen in the area before mid-morning, and who spent much of day not observing the duplication and tabulation process but rather sitting in the back of the room and leaving the room while on his phone. The first time Amick saw the SOS employee on the counting/sorting floor was 5:53 p.m. By 6:02 p.m. he had returned to his chair at the back of the room, and he did not go back onto the counting/sorting floor by the time Amick left at 10:15 p.m.

**Denial of Entry to Election Day Poll Watchers and During Recount**

■ Mark Amick, a credentialed Statewide Poll Watcher in Milton (Fulton County), was denied entry into the Birmingham Falls Elementary School precinct despite his statewide credentials. The Subcommittee has also received evidence from monitors that some of them were denied entrance during the recount.

**Hostility**

■ Hale Soucie of Symrna testified that Cobb County was using an electronic counting machine on the first day to count ballots, which was not the approved way to do the recount. The next day, it was the hand count process. He stated that on his second day he immediately observed that the first auditor made three mistakes in two minutes calling three ballots marked for Trump as Biden votes, but the second auditor caught those mistakes. He noticed another table that was not even doing a double-check at all. When he sought to observe, he was met with great hostility and vulgar name calling directed at him. The Subcommittee received other evidence of hostility against the monitors.

**Wildly Disparate Vote Totals from the Recount**

■ While observing the recount at the DeKalb County Board of Elections on November 15, Mark Amick saw that a box of ballots was recorded as 10,707 votes for Biden and 13 votes for President Trump. He flagged this obvious disparity to the election workers, who discussed among themselves how it came to be. Two election officials with whom he engaged about this issue became agitated with Amick for his continued monitoring of the situation. They finally agreed to recount the box, resulting in a revised total of 1,081 votes for Vice President Biden and 13 for President Trump – still statistically disparate, but 9,626 votes less so.  Amick was not certain if the corrected count was actually entered into the final recount totals.

8

- At State Farm Arena during the recount, Susan Voyles also noted a stack of absentee ballots with only two votes for President Trump.

- Hal Soucie of Smyrna, while monitoring in State Farm Arena, noticed stacks of ballots quite high, such as eight inches high for Biden, yet not a single Trump vote. He stated that he works with data and marketing, and anytime figures start reaching the 90th percentile, that type of consumer data is suspect, and when it gets to 100 percent that is passing the level of improbable to impossible.

**Ballots Counted from Ineligible Voters**

- Mark Davis analyzed data from U.S. Postal Service change-of-address (COA) forms and compared it to voters who voted in their former precincts. For example, he discovered that 14,980 out-of-state movers still voted in the Georgia General Election. Another 40,279 moved across county lines more than 30 days prior to the election, yet still voted in their former county precincts, a violation of Georgia law. He also noted that about 1,000 voters had voted twice in the Primary, inferring that the same pattern could have existed in the General Election.

**Constitutional Violations of Duly Passed Law**

- Dr. John C. Eastman, former Professor of Law and former Dean of the Chapman University Fowler School of Law and current Fellow at the Claremont Institute, testified regarding the plenary authority of the legislative body of the States to set the "Times, Places and Manner" of elections involving Federal officials, including with respect to the selection of Electors for the Electoral College in the presidential election, citing Article I, Section 4 and Article II, Section 1 of the U.S. Constitution. He noted that when States have vested that authority in the people of their States that they are bound to follow the people's choice in a free and fair election, but where fraud and failure to follow the law as passed by the legislative body is evident, that authority can be withdrawn. The legislature then can exercise its plenary authority to choose the electors in a presidential contest. He referenced both *Bush v. Gore* and *McPherson v. Blacker* as authoritative.

  Professor Eastman further explained that the failure of State election officials to follow the manner of conducting the election according to the statutes duly passed by the legislative body can annul an election. The U.S. Constitution clearly gives State legislatures under Article I, Section 4 the duty to determine the "manner" of federal elections, and that power rests solely with the State legislatures unless Congress passes its own laws that preempt State election laws. There is no provision which allows any Executive branch member to modify, set aside, enhance, or otherwise create policies or procedures which undermine or contravene those laws.

He noted various ways State election officials had failed to follow the statutes in conducting the election. He reiterated failures such as counting the votes of approximately 66,000 underage individuals, the 2,500 felons whose votes were unlawfully counted, the votes of those who had no verifiable residences within the State, and the "biggest" of all he believed was the March 2020 settlement agreement that was entered into with Georgia's Secretary of State and "certain democrat committee challengers that effectively altered the signature verification process" with regard to Absentee Ballots, an agreement that was contrary to State law.  He further noted that the "intermingling of legal and illegal ballots" also meant that the election cannot legally be certified. "The State has failed to make a choice on Election Day in accordance with the manner" the legislature prescribed. In light of the failures, the fraud, and the unconstitutional agreement, Dr. Eastman opined that it was the duty of the legislative body to choose the State's Electors for the presidential election.

**Data Analysis in General and Dominion Issues**

- Russell J. Ramsland, Jr., a cybersecurity expert from Texas, testified that his team had compared data from Dominion voting machines in those places where they were used around the nation. They discovered that with Dominion machines, Vice President Biden outperformed what he was statistically expected to receive by an "amazing" 5%. He also outperformed statistical expectations when the analysis was run by county, with Vice President Biden picking up 78% of Dominion counties but only 46% of counties using machines from other manufacturers. Depending on the type of analysis performed, Ramsland estimated that these anomalies translated to between 123,000 and 136,000 extra votes for Vice President Biden in Georgia.

  Ramsland also found that the rejection rate for absentee ballots in Georgia was much lower in 2020 (0.2%) than in 2016 (6.4%). He also identified over 96,000 phantom votes, meaning that they had been counted, but there was no record of the counties recording those ballots as "received."

- Phil Waldron, a former U.S. Army information officer with expertise in electronic warfare, identified a "pretty significant information warfare campaign" conducted across the country during the Election. He described the history of the Dominion and other voting machines, with the operating software sharing the same "DNA" going back to Smartmatic, which was created to help steal elections in Venezuela.

  Waldron analyzed these machines in Michigan and found them extremely insecure. He said a good hacker could get into them within two minutes, while an elementary-school student could probably do it in twelve. There are 12 avenues of attack. Dominion also sends voter data outside the United States.

10

I APP. 1486

Waldron discussed fractional voting. Waldron testified that the Dominion software used in the Georgia machines assigns a fractional value to each vote; there is no legitimate purpose in assigning an elector's vote as a fractional vote.  That feature can allow the manipulation of election results.

Waldron said federal law (USC Title 46) requires that the ballot images within the machine are required to be preserved for 22 months, but only a forensic analysis would show if this was done. Each machine can record 2,000-3,000 ballots per hour.  His Michigan analysis showed "huge breaches in chain of custody" with respect to the machines and to absentee ballots. In Georgia, there was an unexplained upload of ballots at 3:36 a.m. on November 4.

Waldron urged a full forensic audit of the machines and of absentee ballots (for example, ink analysis would show if ballots were mass-produced).

- Scott Hall of Fulton County stated that when he worked at the English Street facility that he had concerns about the contractors hired there. He noted that every vote in Fulton County ends up on thumb drives that eventually find their way to the English Street location. He said, "I have photographs of pallet loads of basically signed checks." "So you've got every single vote, you've got currency, and now you just need someone to do it." He said he hired one of his own guys to determine if a fraudulent vote could be recorded on the Dominion machines at that point in the process.  "Now, I've got all these votes that have not been uploaded anywhere. And he actually wrote me a paper, and he said that it was the 'stupidest, simplest thing I've ever seen.' He said, 'Dominion's own documentation shows how you take an entire batch, swipe it off, and then swipe on a new batch, before you put it into the real-time reader that uploads." He summed up the voter fraud by using the analogy that the referee got paid off to call the game and something is very wrong.

**Outside Influence Over Governmental Election Functions**

- Scott Walter from the Capitol Research Group testified about Mark Zuckerberg's Center for Technology and Civic Life (CTCL), a progressive advocacy group that seeks to influence elections via voter "education" and get-out-the-vote efforts. In the 2020 election, CTCL made grants to individual counties, in Georgia and elsewhere, ostensibly to help run safe elections during COVID. But county boards could use the money for whatever they wanted, and the bulk of the grants (95% of total funding) went to counties that voted for Clinton in 2016 and for Biden in 2020. In fact, nine of the 10 Georgia counties that experienced the largest shifts toward Democrats in 2020 received CTCL grants -- $4.38-$10.47 spent per each man, woman, and child in those counties. Georgia should not allow "privatized" elections via the organization that the Washington Post has called the "Democratic Party's Hogwarts for digital wizardry."

11

**Voters Unable to Verify Votes Counted**

- Grace Lennon, a student at Georgia Tech, hoped to early vote on October 23. When she arrived, she was told that she had been sent an absentee ballot.  She never received an absentee ballot. She had to sign an affidavit saying that she had not requested nor had she received an absentee ballot. She was then given a voter card to vote on the machine. However, the next day, she learned that someone had voted absentee in her name on October 7th.  She was not able to verify that her vote actually counted for the one she chose to select in the election or whether the absentee ballot counted instead. Senator Greg Dolezal confirmed that most all the Senators had heard many similar stories.

## V.    FINDINGS

1- The November 3, 2020 election was chaotic and the results cannot be trusted.
2- The Secretary of State and the State Elections Board failed to enforce the law as written in the Georgia Code, and furthermore, created policies that contravened State law. As Senator Matt Brass concluded at the December 3 hearing, "We have heard evidence that State law was not followed, time after time after time."
3- The Secretary of State failed to have a transparent process for the verification of signatures for absentee ballots, for the counting of votes during the subsequent recount and audit, and for providing the type of guidance and enforcement necessary to ensure that monitors and other observers had meaningful access to the process.
4- The Secretary of State instituted an unconstitutional gag order so that monitors were told not to use photography or video recording devices during the recount.
5- Election officials at all levels failed to secure test ballots and actual ballots. Many reports indicate that proper procedures were not followed, and there was systematic failure to maintain appropriate records of the chain of custody for these ballots, both prior to and after voting and throughout the recount.
6- The Secretary of State and Election Supervisors failed to stop hostile behavior of workers toward citizen volunteer monitors during the recount process.
7- The events at the State Farm Arena are particularly disturbing because they demonstrated intent on the part of election workers to exclude the public from viewing the counting of ballots, an intentional disregard for the law. The number of votes that could have been counted in that length of time was sufficient to change the results of the presidential election and the senatorial contests. Furthermore, there appears to be coordinated illegal activities by election workers themselves who purposely placed fraudulent ballots into the final election totals.
8- Grants from private sources provided financial incentives to county officials and exerted influence over the election process.
9- The oral testimonies of witnesses on December 3, 2020, and subsequently, the written testimonies submitted by many others, provide ample evidence that the 2020 Georgia General Election was so compromised by systemic irregularities and voter fraud that it should not be certified.

I APP. 1488

## VI.    RECOMMENDATIONS

### A.   Absentee Ballots

In addition to following the law as already written by the legislature, such as not opening absentee ballots until Election Day, additional steps should be taken to ensure that only legal absentee votes are counted.

At a minimum, these recommendations include requiring photo identification, following signature match procedures faithfully, allowing absentee ballots to be used only upon demonstration of need, mailing absentee ballots out only upon the request of the registered voter, and although already illegal, expressly prohibiting drop boxes.

### B.   Secure Chain of Custody and Additional Security Measures

Procedures should be established to ensure proper chain of custody for all ballots, whether they are test ballots, new unused ballots, spoiled ballots, cast BMD-generated ballots, absentee ballots, and even the specialty paper that is used to print the ballots.

Penalties should be clearly known and enforced for any violations.

There should be complete security when workers go on the job, with sign-in of their names and a time stamp, when they go in and when they go out.

Cameras should also be on-site to monitor the process at all times, as well as all the entrances to the buildings where ballots and the ballot paper are stored.

### C.   Meaningful Access for Poll Watchers and Monitors

Citizens who are seeking to ensure the integrity of the vote need to be able to truly see the process. They should be able to ensure that people are reading their ballots before they are cast. They should be able to inspect the signature match process when ballots are opened. They should be able to write down seal information so they can ensure proper custody is in place. They should be close enough to see the names on the ballots during any recounts, the counts written on recount report sheets, the counts going into the ARLO system, the counts written on ballot containers, the process of the seals being broken as the ballots are entering the process, and so forth.

I APP. 1489

More poll watchers and monitors should be allowed to participate since the ratio needs to be improved. Objections by monitors should be addressed immediately on-site to ensure access and transparency.

Hostile actions by election workers toward volunteers should be immediately addressed and should be cause for dismissal.

**D.   No Unconstitutional Gag Orders**

There is no reason to ban cameras when tabulation is taking place or when recounts and audits are taking place.

Furthermore, there is no reason to ban cameras at the polling booth as long as voters have privacy while voting.

The State Board of Elections should not ban cameras and recording equipment. They must fulfill their duty to ensure a transparent election process. Furthermore, citizens have a right to share those photos, recordings, and thoughts about what they observe.

**E.   Unqualified Voters Should Be Purged from the System**

No underage voters should be in the system to allow their votes. No felons should be in the system to allow their votes.

Other categories of voters, such as the deceased and those who have moved out of state, should also be examined as to their continued presence on the voter rolls.

**F.   Violations of State Election Laws Must Be Prosecuted**

The Georgia Bureau of Investigation ("GBI") and the Attorney General should aggressively investigate and prosecute those who violate election laws, including those conspiring to place fraudulent ballots into the system and the 1,000 persons identified by the Secretary of State who voted twice in the 2020 primaries. If prosecutions do not happen, violations will recur.

The GBI should establish an independent office for the investigation of all claims of voter fraud. That office should report regularly to the Judiciary Committee and, except in the case of investigations involving the Secretary of State or its personnel, the office of the Secretary of State.

The GBI should investigate the cases where many affidavits already exist regarding election fraud in the 2020 General Election.

I APP. 1490

### G. Forensic Audits of Ballots and Machines

The Legislature must determine if ballot marking devices (BMDs) have been manipulated to provide a fraudulent result and without regard to whether the forensic audits can actually identify the manipulation of votes and the authenticity of the ballots that are in the ballot boxes, either generated by the BMDs or those that are absentee ballots.

Independent third-party auditors should review the fiducials on all ballots types (absentee, military, machine generated), audit the absentee ballot results from the last election, confirm the number of external envelopes in each county, and the number of ballots for each county.

Such audits should help ensure that phantom ballots and other fraudulent ballots are not counted in election results, and that legal votes are the only votes counted.

### H. For Rectifying the 2020 General Election Results

The Legislature should carefully consider its obligations under the U.S. Constitution.  If a majority of the General Assembly concurs with the findings of this report, the certification of the Election should be rescinded and the General Assembly should act to determine the proper Electors to be certified to the Electoral College in the 2020 presidential race.  Since time is of the essence, the Chairman and Senators who concur with this report recommend that the leadership of the General Assembly and the Governor immediately convene to allow further consideration by the entire General Assembly.

Respectfully submitted this the <u>17th</u> day of December 2020.

_William T. Ligon, Jr._

Honorable William T. Ligon, Chairman
Senator, District 3

15

I APP. 1491

**File Number: Res. 0492-20**

**Agenda Date: 08/05/2020**                                      **File Type:** Resolution

Mobile Voting Precinct

Resolved, that formal bidding, sole source, may be waived and the Mayor and City Clerk are
authorized and directed to enter into an agreement with Burlington RV to purchase a mobile
voting precinct.

Fiscal Note: Funds available from the Center for Tech and Civic Life Safe Elections Grant not to
exceed $250,000.00.



August 21, 2020


City of Philadelphia
Office of the Director of Finance
1401 John F. Kennedy Blvd. Ste 1330
Philadelphia, Pennsylvania 19102


To whom it may concern:

I am pleased to inform you that the Center for Tech and Civic Life ("CTCL") has awarded the City of Philadelphia ("City") a grant to support its work in connection with the safe administration of elections in 2020 (the "Grant").

The following is a description of the Grant:

**AMOUNT OF GRANT:** Ten million, sixteen thousand and seventy-four US dollars (USD $10,016,074).

**PURPOSE:** The Grant funds must be used exclusively for the public purpose of planning and operationalizing safe and secure election administration in the City of Philadelphia in accordance with the attached Philadelphia Safe Voting Plan 2020.

Before we transmit these funds, we ask that you sign this agreement promising to use the Grant funds in compliance with United States tax laws.  Specifically, by signing this letter on behalf of the City you confirm and agree to the following:

I APP. 1493

1.   The City is a local government unit or political subdivision in the meaning of 26 USC 170(c)(1).

2.   This Grant shall be used *only* for the public purpose described above, and for no other purposes.

3.   The City shall not use any part of this grant to give a grant to another organization unless CTCL agrees to the specific sub-grant in writing.

4.   The City has produced a plan for safe and secure election administration in 2020, including an assessment of election administration needs, budget estimates for such assessment, and an assessment of the impact of the plan on voters ("the Plan"). The Plan is attached to this agreement. The City shall use the Grant Funds only for purposes contained in The Plan.

5.   The City will endeavor to expend Grant funds pursuant to the section of the Plan entitled "Mail in and absentee equipment" on the items listed in that section of the Plan and shall repay any portion of the Grant funds designated for any item not purchased by November 15, 2020, absent an agreed-upon substitution or expenditure or extension of time by grantor.

6.   The City shall expend Grant funds as follows:

   i.   The City and the City Commissioners ("the Commissioners") have submitted to CTCL a plan which includes a section entitled "Satellite Election Offices and Ballot Drop-off Options. The City shall communicate any changes from this section of the plan including any reduction in planned number, operating hours, or operating dates of satellite election centers to grantor and shall communicate the reasons for any such reduction. Nothing in this section shall be construed to require action inconsistent with state or federal law or regulation nor shall anything in this section be construed to limit in any way the independent decision-making rights, abilities, and obligations of the Philadelphia County Board of Elections.

   ii.   The City and the Commissioners have submitted to CTCL a plan which includes a section entitled "Secure Dropboxes." The City shall communicate any changes from this section of the plan including any reduction in the planned number, operating hours, or operating dates


I APP. 1494

of satellite election centers and shall communicate the reasons for any such reduction. Nothing in this section shall be construed to require action inconsistent with state or federal law or regulation nor shall anything in this section be construed to limit in any way the independent decision-making rights, abilities, and obligations of the Philadelphia County Board of Elections.

iii.   The City and the Commissioners have submitted to CTCL a plan which includes a section entitled "In-person Voting at Polling Places on Election Day."  The City and the Commissioners shall work to secure 800 or more in-person polling places on Election Day, pursuant to this Section.  To extent the goals of that section of the Plan are not met, the City shall communicate to grantor the number of polling places, rationale for opening fewer than 800 polling places, the approximate average and maximum distance between a registered voter's residence and their assigned polling place, a description of all courses of action or plans undertaken to open 800 or more polling places, and why each such course of action or plan was not successful. Nothing in this section shall be construed to require action inconsistent with state or federal law or regulation nor shall anything in this section be construed to limit in any way the independent decision-making rights, abilities, and obligations of the Philadelphia County Board of Elections.

iv.   Grantor shall not unreasonably withhold agreement to modify any requirement under this paragraph for good cause.

7.   The City shall produce a report documenting how the Grant funds have been expended in support of the activities described in paragraphs 4-6. This report shall be written and sent to CTCL by January 31, 2021 or in any other format approved by CTCL.

8.   Subject to the City's Code and Charter, the City shall use funds granted pursuant to this agreement only to supplement its election administration as detailed in this agreement. The City shall not supplant state or local funds that have been previously allocated.



I APP. 1495

9.     CTCL may discontinue, withhold part of, or request the return of all or part of any unspent Grant funds if it determines, that any of the above conditions have not been met.

10.    The Grant funds shall be used during the project period of June 15, 2020 through December 31, 2020 or as otherwise agreed upon.

Your acceptance of these agreements should be indicated below. Please have an authorized representative of The City of Philadelphia sign below, and return a scanned copy of this letter to us by email at grants@techandciviclife.org.

On behalf of CTCL, I extend my best wishes in your work.

Sincerely,

*Tiana M. Johnson*

Tiana Epps Johnson
Executive Director
Center for Tech and Civic Life

**CITY OF PHILADELPHIA**

By: _Ashley Del Bianco_____

Title: Ashley Del Bianco, Chief Grants Officer
       _____

Date: 8/21/20_____



**To: Center for Technology and Civic Life**
**From: Nick Custodio, Deputy Commissioner**
**Date: August 7, 2020**
**Re: Funding Request for Election Systems for November General Election**

## Overview

The City of Philadelphia faces significant challenges in executing the November 3, 2020 general election. As the June 2 primary revealed, in November the city will essentially have to run two elections, at the same time, on an unprecedented scale: one via absentee and mail-in ballots; and a second at in-person polling places. The number of **total ballots cast is expected to be between 730,000 and 800,000**, potentially split between the two modes of voting, which will each entail special challenges.

This document offers an assessment of resources needed for Philadelphia to safely and thoroughly prepare for the general election. In addition to projecting needs based on the unique June 2 primary, turnout from past presidential elections, and the continued risks of COVID-19, this plan capitalizes on new voting procedures authorized by Act 77 of 2019[1] that should help ensure the election is safe, secure and accessible for every eligible Philadelphia voter.

In these extraordinary circumstances, to deliver a smooth voting process and a satisfactory voting experience for Philadelphia's 1.1 million voters will require a concerted and collaborative effort. Accordingly, we have convened a working group consisting of my office, the Mayor's Office, the Governor's Office, other relevant public entities, and advocacy groups to work through challenges regarding implementation. Meeting this challenge will also require additional resources to the City of Philadelphia for election implementation.

A preliminary budget overview estimate on top of what is already available to the City is as follows:

| | |
|---|---|
| Mail-in and Absentee and Processing Equipment | $5,500,554 |
| Satellite Election Offices for in-person mail-in voting | $2,272,220 |
| In-person Voting at Polling Places on Election Day | $1,321,300 |
| Secure Dropboxes and related needs | $552,000 |
| Printing and Postage and related needs | $370,000 |
| **Total** | **$10,016,074** |

---

[1] Act of Oct. 31, 2019, P.L. 552, No. 77.

## Needs Assessment & Costs

The following sections outline initial details of the mailhouse-type processing operation, installation of drop boxes, additional satellite election offices for early voting, personnel needs, and the costs associated with each:

## Mail-in and Absentee Equipment

Automation will be critical to efficiently and accurately manage hundreds of thousands of ballot envelopes and ballots in the 2-4 weeks leading up to Election Day and in the canvassing process afterwards and help report results faster. The following equipment is needed to relieve the 50+ staffers and extensive overtime that was utilized in the primary:

- **High-speed industrial Printer:** Printer will be used to print mail-in and absentee ballots. Currently, the City Commissioners' six (6) networked printers can produce about 15,000 ballots a day, if running optimally. A high-speed industrial printer capable of 15,000 per hour would greatly reduce the time between application approval and a voter's ballot entering the mail stream. This is particularly important around the application deadline on the Tuesday before the election. **Cost: $987,980**

- **Specialized VBM Inserter:** An inserter combines the contents of the ballot packet and the prints addresses on the outgoing and return envelope. Ballot packs include multiple items: the ballot, instructions, return declaration envelope with the voter's information printed on it, secrecy envelope, and plain English statements of the ballot questions. An inserter rapidly folds the ballots and constructs the packets, guaranteeing the appropriate ballot is inserted for a specific voter. The inserter also prints the voter's address on the outgoing envelope and the voter's information on the return declaration envelope, information which must include the voter's name, address, ward-division, and a barcode with the same information so that the automation of the sorting equipment can read information. The inserter being requested is able to print on both sides of the envelope and include an intelligent mail barcode (IMB). The double-sided printing and applying the IBM all at once is important to increase accuracy, ensure the voter receives the correct ballot packet and improves efficiency. **Cost:$798,895; or for two: $1,597,790, plus $69,500 for 2 high-speed folder.**

- **Sorters** automate the sorting of both outbound ballot packs for cheaper US Postal Service rates and inbound ballot envelopes, decreasing mailing inefficiencies and delays in opening and scanning returned ballots. The sorter also will do the voter history update scan, which is a time-consuming process currently that takes dozens of Commissioners' staffers at least a week to complete. The scan would also allow for the adjudication of declaration envelopes to be done electronically, which is significantly faster than the current hand method. Lastly, it will sort the ballots into ward and division order, a process that took 40 people several days to complete during the 2020 Primary. **Cost:$488,592, or for two: $977,184**

2

- **Extractors:** Though the Commissioners had automatic letter openers in the primary, they were not enough. The process of physically removing ballots from the envelopes took too long and took staff away from other activities and created a backlog so that the Commissioners' were unable to keep their scanners constantly going. The extractors not only cut open the ballot return and secrecy envelopes, but they also present the contents for staff to remove and immediately replace with a fresh envelope. Discarded envelopes are checked automatically to ensure their contents were removed. Twenty-two extractors, eleven for working on each envelope, will eliminate the need for any envelope opening by hand and open all anticipated ballots in three working days. **Estimated cost: ~$660,000**

- **Ballot scanners:** Philadelphia used four Election Systems and Software (ES&S) DS450 scanners in the primary election, each of which can scan up to 72 ballots per minute. ES&S manufacturers another scanner (DS850) which can scan up to 300 ballots per minute. With the additional equipment speeding up the ballot opening process, additional scanners are needed to prevent a backlog. Philadelphia will seek to purchase 4 additional DS450s and 4 DS850s. **Cost: $611,300.**

|  | Total cost | Units | Unit costs |
|---|---|---|---|
| **Printer** | $987,980 | 1 | $987,980 |
| **Inserter** | $1,597,790 | 2 | $798,895 |
| **Sorter** | $977,187 | 2 | $488,592 |
| **Extractors** | $660,000 | 22 | $30,000 |
| **Ballot Scanners – DS850** | $411,500 | 4 | $102,875 |
| **Ballot Scanners – DS450** | $199,800 | 4 | $49,950 |
| **Highspeed Folder** | $69,500 | 2 | $34,750 |
| **Space for equipment** | $200,000 | | $2000,000 |
| **1 year Additional Maintenance** | $334,137 | 1 | $334,137 |
| **Ink** | $14,060 | 1 | $14,060 |

3

| | | | |
|---|---|---|---|
| **Ballot Prep Software** | $48,600 | 1 | $48,600 |
| **TOTAL** | **$5,500,554** | | |

## Satellite Election Offices and Ballot Drop-off Options

Act 77 of 2019 allows counties to set up multiple election offices where a voter can request an absentee or mail-in ballot, then complete and return it in the same visit.[2] A voter can go to any satellite office and register to vote, if needed, request a mail-in ballot in-person, receive it, vote, and return it all at the same location. In addition, voters could bring already voted ballots making the satellite offices additional drop-off locations. Early voting satellite offices will be open and fully staffed until the deadline to apply for a mail-in ballot, thereafter through Election Day they will remain open as ballot drop-off locations. They must also be sufficiently staffed with permanent staff with hazard pay to limit worker turnover, handle a surge in voters before polls open, and manage sites in a pandemic environment.

**The City Commissioners already have two in-person mail-in voting locations set up at their existing offices at City Hall and 520 N. Columbus Blvd, that are fully equipped to offer these services. These two offices are both in the Center City Region. The City Commissioners would like to open up 15 additional regional offices throughout the city.** However, it will require a notable investment in equipment, staff, real estate, and close collaboration with other city departments. Satellite election offices must meet the following conditions according to PA Department of State guidance:

- Staffed by trained elections staff and in a municipal or county-owned or leased property
- Connected to the Statewide Uniform Registry of Electors (SURE) system for staff to confirm voters' registration record (via local county network or a VPN connection)
- Ability to provide any ballot style used in the election (Philadelphia has nearly 60 in the November 2020 general election)
- Secure storage for completed ballots

Cost per additional satellite location is as follows:

| | Item | Quantity | Base | | Total | |
|---|---|---|---|---|---|---|
| Onetime | Voting Booths | 4 | $ | 165 | $ | 660 |
| Onetime | Accessibility Voting Booths | 1 | $ | 190 | $ | 190 |
| Onetime | Ballotar laptop and Oakie Printers | 2 | $ | 10,810 | $ | 21,620 |
| Recurring | ES&S Ballotar Annual Software Fee | 2 | $ | 880 | $ | 1,760 |

---

[2] Pennsylvania Applications and Balloting Guidance: Mail-in and Absentee Ballots and Voter Registration Changes. PA Department of State. January 10, 2020.

4

| | | | | | | |
|---|---|---|---|---|---|---|
| Recurring | Clerk 1 | 2 | $ | 33,476 | $ | 66,952 |
| Recurring | Additional Regular OT | 2 | $ | 12,400 | $ | 24,800 |
| Recurring | Additional Holiday OT | 2 | $ | 438 | $ | 875.00 |
| Onetime | Temporary Employee | 1 | $ | 6,000 | $ | 6,000 |
| Onetime | Temporary Employee - OT | 1 | $ | 1,391 | $ | 1,391 |
| Onetime | Office Equipment - Folding Machine | 1 | $ | 7,800 | $ | 7,800 |
| Onetime | Computer Equipment | 2 | $ | 750 | $ | 1,500 |
| Onetime | Furniture & Furnishings | 2 | $ | 500 | $ | 1,000 |
| Onetime | Secure Ballot Box | 1 | $ | 1,500 | $ | 1,500 |
| Onetime | Signage | 1 | $ | 500 | $ | 500 |
| **Total** | | | | | **$** | **136,548** |

Team Leader (4) @ $56,000 each= $224,000

**Estimated cost to open 15 additional satellite locations - $2,272,220**

## Secure Dropboxes

Installing at least **15 secure, 24-hour drop boxes** at each early vote location will help ensure that voters have some opportunity to return their ballots if it may be too late to send via USPS. (Current law does not honor postmarks.) These would be in addition to 24-hour drop boxes located at City Hall and the Voter Registration Office at Delaware and Spring Garden. **Purpose-built ballot drop boxes cost approximately $10,000 each**, including installation, and can be more easily secured on election night to prevent ballots from being deposited after 8pm. Each box needs 24-hour video surveillance. In addition to equipment costs, courier/pick-up teams will be needed to pick up deposited ballots from 24-hour drop boxes and to monitor drop-off boxes within public facilities. Chain of custody protocols and sufficient staffing to manage higher volume prior to Election Day will be critical.

| | Total cost | Units | Unit costs |
|---|---|---|---|
| **Secure Dropbox** | $150,000 | 15 | $10,000 |
| **Temporary Ballot Collection Staff** | $40,000 | 5 | $8,000 |
| **Ballot Collection Team Leader** | $112,000 | 2 | $56,000 |
| **Security needs** | $250,000 | | |

5

I APP. 1501

| | |
|---|---|
| **TOTAL** | **$552,000** |

---

**In-person Voting at Polling Places on Election Day**

**The Office of the City Commissioners is committed to working to secure more than 800 fully-staffed polling places on election day.** The Commissioners will make the final decisions based on ADA standards, relative distance to the division, accessibility, and voter convenience.

For each division to have a full, 5-member Election Board (Judge of Elections, two Inspectors of Election, one Clerk, and one Machine Inspector) will require recruiting, training, and assigning up to 8,515 poll workers (1,703 divisions x 5 Election Board members). Philadelphia's Election Board unit is reaching out and confirming Election Board workers currently, earlier than usual. Currently the Election Board unit has confirmed 1,898 Election Board Workers.

The City Commissioners and elections staff are working to update training materials (currently a 52-page guide and 40-slide presentation). Additional changes may be necessary based on further changes to the Election Code made by the General Assembly, the outcome of active litigation, and new COVID guidance. Training resources will ideally include:

- Updated Election Board Guide and seminar presentation
- Online training with audio and visual components (e.g., videos, self-assessment)
- In-person training sessions with up to 20 attendees, depending on space and health risks
- Additional space for poll workers to access computers and Internet for online training (e.g., school computer labs)

| | **Total cost** | **Units** | **Unit costs** |
|---|---|---|---|
| **Online training platform** | $19,500 | 15 | $1300 per user/per year |
| **Training Manual** | $10,500 | | |
| **Poll Worker Hazard Pay** | $851,500 | 8,515 | $100 per poll worker |
| **Poll Worker PPE** | $250,000 | | |
| **Poll Place Cleaning Bonus** | $94,800 | 474 | $200 per private location |
| **OT Costs to Open Schools** | $60,000 | | |
| **Student Poll Worker Campaign Costs** | $10,000 | | |

6

I APP. 1502

| | |
|---|---|
| **Advertising for Poll Worker Recruitment** | $25,000 |
| **TOTAL** | **$1,321,300** |

## <u>Conclusion</u>

The investments outlined above will allow the City of Philadelphia to reduce the risk of exposure to coronavirus for Philadelphia voters, election staff and poll workers; identify best practices; innovate to efficiently and effectively educate our residents about how to exercise their right to vote; be intentional and strategic in reaching our historically disenfranchised residents and communities; and, above all, ensure the right to vote in a diversity of communities throughout the City of Philadelphia. Thank you for the opportunity to submit this request.

7

I APP. 1503

SIXTEENTH JUDICIAL DISTRICT COURT

PARISH OF ST. MARTIN, STATE OF LOUISIANA

NUMBER: 89811                                                    DIVISION:

STATE OF LOUISIANA, THROUGH
JEFF LANDRY, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF THE STATE

VERSUS

CENTER FOR TECH AND CIVIC LIFE, NEW VENTURE FUND,
D/B/A CENTER FOR SECURE AND MODERN ELECTIONS,
DAWN MAISAL COLE AND FULL CIRCLE STRATEGIES, LLC

*********************************************************************************

<u>PETITION FOR PERMANENT INJUNCTION AND DECLARATORY JUDGMENT
ON BEHALF OF THE STATE OF LOUISIANA</u>

The Petition of the STATE OF LOUISIANA, appearing through JEFF LANDRY, in his official capacity as Attorney General and chief legal officer of the State of Louisiana, domiciled in East Baton Rouge Parish, Louisiana, respectfully represents:

1.

The Attorney General brings this suit on behalf of the State of Louisiana pursuant to La. Const. Art. IV, § 8 to prevent the injection of unregulated private money into the Louisiana election system and to protect the integrity of elections in the State by ensuring against the corrosive influence of outside money on Louisiana election officials.

2.

Made defendants are:

A. CENTER FOR TECHNOLOGY AND CIVIC LIFE, (CTCL) upon information and belief a non-profit corporation domiciled and with its principal place of business in the State of Illinois that has not appointed an agent for service of process in Louisiana but has engaged in business in the State in connection with elections scheduled for November 3, 2020;

B. NEW VENTURE FUND, a non-profit corporation domiciled and with its principal place of business in Washington, DC, operating under the trade name Center for Secure and Modern Elections (CSME) in the State of Louisiana that has not appointed an agency for service of process in the state but has engaged in business in the State in connection with elections scheduled for November 3, 2020;

C. DAWN MAISEL COLE, a person of the age of majority domiciled in St. Martin Parish, Louisiana who at all times pertinent hereto acted as *de facto* agent for CTCL and New Venture Fund.

I APP. 1504

D.  FULL CIRCLE STRATEGIES, LLC, a domestic limited liability company domiciled and with

its registered office in St. Martin Parish, Louisiana who at all times pertinent hereto acted as *de*

*facto* agent for CTCL and New Venture Fund.

3.

CTCL is a non-profit corporation based in Chicago, Illinois that accepts contributions and

distributes monies to election officials and jurisdictions.

4.

Its website touts a recent $250 million contribution that it intends to distribute by way of

"grants" to election officials and jurisdictions in connection with the upcoming presidential

election.

> The Center for Tech and Civic Life (CTCL) is excited to expand our COVID-19 Response
> Grant program to all U.S. local election jurisdictions. Backed by a <u>generous $250M</u>
> <u>contribution</u>, CTCL will provide grants to local election jurisdictions across the country to
> help ensure you have the staffing, training, and equipment necessary so this November
> every eligible voter can participate in a safe and timely way and have their vote counted.

5.

The New Venture Fund, operating in Louisiana under the trade name Center for Secure and

Modern Elections (CSME), partnered with CTCL to solicit applications and information from Louisiana

officials in connection with the proposed grants.

6.

CTCL and CSME worked their grant scheme in the State of Louisiana through a lobbyist

by the name of Dawn Maisel Cole, owner and operation of Full Circle Strategies, LLC, as their

Louisiana representative and agent to target registrars of voters, clerks of court and local election

officials.

7.

The scheme targeted 13 parishes, some to receive contributions of *more than $500,000*,

accompanied by a request for detailed information about the operations, conduct and expenses of

the registrar's/clerk's offices.  See, Exhibit A, solicitation from Dawn Cole, attached.

8.

The application for the subject grants captures information from each official applying for

a grant including:

> You will need to provide the following information in your grant application:
>
> - Number of active registered voters in the election office jurisdiction as of September 1, 2020
> - Number of full-time staff (or equivalent) on the election team as of September 1, 2020
> - Election office 2020 budget as of September 1, 2020

- Election office W-9
- Local government body who needs to approve the grant funding (if any)
- What government official or government agency the grant agreement should be addressed to.

9.

The "grant" also requires the applicant to execute an agreement dictating terms, conditions, limitations and reimbursement requirements in connection with the expenditure of funds that are the subject of the grant.

10.

The grant further requires that the recipient provide a written report detailing the election official's expenditures in connection with the grant amounting to an "information grab" about the operations and expenses of the recipient's office.

11.

Ms. Cole directly solicited registrars and clerks of court to accept contributions from CTCL and New Venture for the operation of their respective offices in the manner reflected in Exhibit A.

12.

Private contributions to local election officials are unlawful and contrary to the methods for election funding established by law in the State of Louisiana, and such contributions by these defendants should be declared illegal and permanently enjoined.

13.

The time, place and manner of holding elections in Louisiana is established by the State subject to regulations set by Congress in accordance with Article I, Section 4, Clause 1 of the U.S. Constitution and La. Const. arts. I, § 26, and XI, § 1 thus making the administration of elections the exclusive province of state and federal governments.

14.

Federal and state laws provide comprehensively and exclusively for the funding of elections and election costs in La. R.S. 18:1400.1 - 1400.8, 1400.21; 29 USC 20901, *et seq.* (HAVA); 15 USC 9041, *et. seq.* (CARES ACT) and related statutes which preempt and preclude the use of private money to fund elections in the State of Louisiana.

15.

Louisiana has seen fit to fund and pay expenses incurred by local election officials, particularly registrars of voters and clerks of court, through the Secretary of State, parishes, municipalities or other local entities that call an election as required by La. R.S. 1400.1 – 1400.8.

16.

Federal funds that arrive through HAVA are deposited in a special account in the Treasurer's office, referred to as the Help Louisiana Vote Fund, to be allocated and administered by the Secretary of State and the Treasurer as required by La. R.S. 1400.21.

17.

The statutes nowhere provide for the receipt or expenditure of private funds by registrars or clerks of court except as administered and paid by the Secretary of State and parish, municipal or other local governing authority in connection with elections.

18.

The reasons that the Louisiana Legislature and U.S. Congress exclude private funding sources for local elections are obvious enough:

a.   The influence that would inevitably accompany private financial contributions to local election officials;

b.   Outside donations to local election officials sow distrust in the administration of the election system;

c.   Private contributions would inevitably spawn competition for party and corporate control over local election funding and would lead to bidding for election favor by party and private interests;

d.   Private contributors are likely to be political parties or large corporations that have partisan and/or economic objectives to foster with their contributions to election officials;

e.   Private interests, as in this instance, fund particular parishes and particular aspects of the election that they believe advance their election goals and objectives;

f.   Should registrars and clerks become reliant upon private funding of their governmental activities, they may well be compelled to respond to the objectives of those providing the funding in order to ensure that the funding continues;

I APP. 1507

g.      Such private funding, washed through non-profit organizations, invites the potential for contributions from foreign governments to the Louisiana system and its election officials;

h.      Private contributions open the door to election suits and contests based upon perceived or actual influence on the part of local election officials in the conduct of an election.

19.

It has been the longstanding policy of the State of Louisiana to prevent, in the interest of free and fair elections, the introduction of unregulated and unlimited money in the context of candidate contributions that may create the appearance if not the actuality of corruption.

> L. (1) The legislature recognizes that it is essential to the operation of effective democratic government in this state that citizens have confidence in the electoral process and that elections be conducted so as to prevent influence and the appearance of influence of candidates for public office and of the election process by special interests, particularly by persons substantially interested in the gaming industry in this state.

> La. R.S. 18:1505.2.

20.

Louisiana courts have similarly recognized the State's interest in preventing the insidious and corrupting effect of money on the political system in the context of candidate fundraising.

> The primary interest served by the limitations contained in the CFDA, and indeed, by the CFDA as a whole, is the prevention of actual or perceived corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their subsequent actions if elected to office.

> *State Through Bd. of Ethics for Elected Officials as Supervisory Comm. on Campaign Fin. Disclosure v. Duke*, 94-0398 (La. App. 1 Cir. 4/7/95), 658 So. 2d 1276, 1290, as amended on reh'g (Aug. 4, 1995).

21.

Funding elections through even-handed government administrators acting in the interest of all voters is an imperative of free and fair elections, and elections must remain untainted by money from private sources with private economic or political interests.

22.

Contributions to select officials and jurisdictions skews election funding and favors some local jurisdictions over others resulting in the unequal and inequitable treatment of voters.

23.

Louisiana has a compelling interest in maintaining a free and fair election system untainted by party and corporate money.

24.

Whether the defendants here may be well-intentioned, private money in any amount, but particularly the amount of money offered by the defendants to select clerks and/or registrars, has an inherently insidious and corrupting effect.

25.

At a minimum the appearance of influence buying is inescapable and would undermine the integrity and public trust in elections and in all respects runs counter to the U.S. and Louisiana Constitutions as well as state and federal statutes providing for the funding of Louisiana elections.

26.

The financial contribution scheme advanced by these defendants is contrary to law and would result in irreparable harm to the State of Louisiana, its election officials and voters, and the contributions should be enjoined.

27.

Moreover, the State is entitled to a declaration by the courts that private contributions to local election officials and the election system in general are unlawful and contrary to Louisiana law.

WHEREFORE, the State of Louisiana, through the Attorney General prays that after due proceedings had, there be judgment in their favor and against the defendants, Center for Tech and Civil Life (CTCL), New Venture Fund d/b/a Center for Secure and Modern Elections, Dawn Maisel Cole, and Full Circle Strategies, LLC, as follows:

1. That a declaratory judgment issue declaring that funding contributions from the defendants as private sources of election funding is contrary to law and is impermissible under the Louisiana election funding laws; and

2. That a permanent injunction issue prohibiting the defendants from making, offering, advertising, proposing or in any other manner seeking to introduce or issue grants, contributions, donations or other funds into the Louisiana election system.

JEFF LANDRY
ATTORNEY GENERAL

BY:

Carey T. Jones (LSBA #07474)
David Jeddie Smith (LSBA #27089)
Ryan Montegut (LSBA #30363)
Jeffrey M. Wale (LSBA #36070)
Assistant Attorneys General
Louisiana Department of Justice, Civil Division
P.O. Box 94005
Baton Rouge, LA 70804
Telephone: (225) 326-6000
Facsimile: (225) 326-6098
Email: jonescar@ag.louisiana.gov
           smithda@ag.louisiana.gov
           montegutr@ag.louisiana.gov
           walej@ag.louisiana.gov

Please Serve:

CENTER FOR TECH AND CIVIC LIFE
Through its de facto agent in the State,
Dawn Maisel Cole
1044 Angelwood Drive
Breaux Bridge, Louisiana 70517

        -and-

Through the Louisiana Secretary of State
8585 Archives Avenue
Baton Rouge, Louisiana  70809

NEW VENTURE FUND, D/B/A CENTER FOR SECURE AND MODERN ELECTIONS
Through its de facto agent in the State,
Dawn Maisel Cole
1044 Angelwood Drive
Breaux Bridge, Louisiana 70517

        -and-

Through the Louisiana Secretary of State
8585 Archives Avenue
Baton Rouge, Louisiana  70809

DAWN MAISEL COLE
Dawn Maisel Cole
1044 Angelwood Drive
Breaux Bridge, Louisiana 70517

FULL CIRCLE STRATEGIES, LLC
Through its agent for service of process
Dawn Maisel Cole
1044 Angelwood Drive
Breaux Bridge, Louisiana 70517

RECEIVED AND FILED

2020 OCT -2  PM 2: 51


DEPUTY CLERK
ST. MARTIN PARISH

I APP. 1510

SIXTEENTH JUDICIAL DISTRICT COURT

PARISH OF ST. MARTIN, STATE OF LOUISIANA

NUMBER:                                                                    DIVISION:

STATE OF LOUISIANA, THROUGH
JEFF LANDRY, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF THE STATE

**From:** Dawn Cole <dawn@fullcirclelouisiana.com>
**Sent:** Monday, September 21, 2020 3:57 PM
**To:** Mike Spence <Mike.Spence@caddoclerk.com>
**Subject:** Fwd: Important CTCL Grant Opportunity

CAUTION: This email originated from outside of the **Caddo Parish Clerk of Court's Office**. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Mr. Spence,

Thank you for taking my call this afternoon.  As we discussed, 13 of Louisiana's 64 parishes were prioritized to receive over $500,000 per parish through the CTCL grant.  Caddo Parish is on the Priority List and is eligible for more than the basic amount based on population and election needs!

In addition to completing the online application (https://www.techandciviclife.org/our-work/election-officials/grants/), your office is asked to complete the attached 3-page Safe Voting questionnaire and return to me via email once completed.  The Center will consider the information provided when evaluating and granting funds.

I am here to assist so please don't hesitate in contacting me if you have any questions.  I am excited about this wonderful opportunity!

Dawn Maisel Cole

Full Circle Strategies, LLC

337.288.5007 | dawn@fullcirclelouisiana.com

www.fullcirclelouisiana.com



EXHIBIT

A

I APP. 1511

REQUEST FOR ADMISSION NO. 2:

    Please admit that you authored Exhibit A.

REQUEST FOR ADMISSION NO. 3:

    Please admit that you directed Exhibit A to the Caddo Parish Clerk of Court.

REQUEST FOR ADMISSION NO. 4:

    Please admit that you were acting on behalf of the Center for Tech and Civic Life, LLC (CTCL) in composing and sending Exhibit A to the Caddo Parish Clerk of Court.

REQUEST FOR ADMISSION NO. 5:

    Please admit that you entered into a contract with CTCL to aid in distributing grants to Louisiana certain election officials.

REQUEST FOR ADMISSION NO. 6:

    Please admit that the grants to certain Louisiana election officials referenced in the immediately preceding Request for Admission were to be distributed in the time period August to December, 2020.

REQUEST FOR ADMISSION NO. 7:

    Please admit that 13 parishes were selected to receive offers of grant funds from CTCL in excess of $5,000 each.

REQUEST FOR ADMISSION NO. 8:

    Please admit that you are domiciled in St. Martin Parish, Louisiana.


## INTERROGATORIES

    The Responding Party must answer, separately and fully in writing under oath, the following interrogatories. If any interrogatory is objected to, the Responding Party shall state the reason(s) for objecting. The person answering the interrogatories must sign them and shall verify that he or she has read and confirmed the answers and objections. The answers, and objections if any, to the interrogatories must be served on Plaintiff's counsel within 30 days after the service of these interrogatories.

INTERROGATORY NO. 1:

    Please state your full name and residence address.

INTERROGATORY NO. 2:

    Please describe your relationship with Full Circle Strategies, LLC.

2

I APP. 1512

INTERROGATORY NO. 3:

Please describe your relationship with the Center for Tech and Civic Life (CTCL), with New Venture Fund and/or with Center for Secure and Modern Elections, and provide the following information with respect to each entity:

    a) The date of your first contact with any and all of the three entities;

    b) The names and addresses of any and all representatives of each entity with whom you had contact or communications in 2020.

    c) The date(s) of each and every contact or communication between you and each of the three entities.

INTERROGATORY NO. 4:

Please describe any and all work you have performed on behalf of CTCL, on behalf of New Venture Fund and/or on behalf of Center for Secure and Modern Elections, and provide the following information with respect to each entity:

    a) The date any and all such work was performed;

    b) The nature of the work performed;

    c) The purpose or objective of the work;

    d) How much money you have been paid or expect to be paid in connection with such work;

    e) How the amount of money you have been paid or expect to be paid was calculated.

INTERROGATORY NO. 5:

With respect to the 13 parishes referenced in Exhibit A, please identify each and every parish and the basis upon which each and every such parish was selected.

INTERROGATORY NO. 6:

Please describe the criteria used to determine the amount of the grant(s) to be awarded to the 13 parishes referenced in Exhibit A.

INTERROGATORY NO. 7:

Please give the total number of grant applications received from applicants in the State of Louisiana in connection with the aforementioned CTCL grants.

INTERROGATORY NO. 8:

Please identify each and every such grant applicant from whom an application was received.

I APP. 1513

## REQUESTS FOR PRODUCTION OF DOCUMENTS

The Responding Party must produce, by serving on Plaintiff's counsel the documents and things, whether paper, electronic or other, requested below.  The documents and things requested are to be served within 30 days of the service of these requests for production.  In lieu of providing the documents and things, the Responding Party may elect to make available for inspection and copying such documents as are responsive to the requests within 30 days of service at a place within the jurisdiction of the court and on a date and time to be agreed upon by the parties.

REQUEST FOR PRODUCTION NO. 1:

Produce a copy of any and all documents of any kind or nature that in any way relate to the transaction(s), occurrence(s), and event(s) that form the subject matter of this suit.

REQUEST FOR PRODUCTION NO. 2:

Please provide a copy of any and all contracts that you and/or Full Circle Strategies, LLC have entered into with CTCL, New Venture Fund and/or Center for Secure and Modern Elections.

REQUEST FOR PRODUCTION NO. 3:

Please provide a copy of any and all documents reflecting compensation, salary, or other benefit that you have received or expect to receive from CTCL, New Venture Fund and/or Center for Secure and Modern Elections.

REQUEST FOR PRODUCTION NO. 4:

Please provide a copy of any and all emails, correspondence, letters, texts and/or written communications of any kind or nature between you and any state or local official or office, agency head, clerk of court, parish government, municipal government, registrar of voters and/or local governing authority in any way relating to grants or funding issued or to be issued by CTCL, New Venture Fund and/or Center for Secure and Modern Elections.

REQUEST FOR PRODUCTION NO. 5:

Please provide a copy of any notes, log book entries, memoranda or recording of any kind or nature reflecting contacts, communications and/or conversations that you had with CTCL, New Venture Fund, Center for Secure and Modern Elections and/or any representative or

4

I APP. 1514

employee thereof concerning election related grants or donations to Louisiana clerks of court, registrars of voters or any other entity in any way involved in the Louisiana election process between the January 1, 2020 to the present.

REQUEST FOR PRODUCTION NO. 6:

Please provide a copy of any notes, log book entries, memoranda or recording of any kind or nature reflecting contacts, communications and/or conversations that you had with any and all Louisiana clerks of court, registrars of voters, public entity, public official and/or any representative or employee thereof concerning election related grants or donations to Louisiana entities in any way involved in the Louisiana election process between the January 1, 2020 to the present.

REQUEST FOR PRODUCTION NO. 7:

Please provide a copy of any and all emails, letters, texts or written communications of any kind or nature between you and any clerk of court, registrar of voters and/or parish and state official and/or any representative or employee thereof in any way related to the subject matter of this suit.

REQUEST FOR PRODUCTION NO. 8:

Please provide a copy of any document or communication related to the marketing, targeting, focusing, prioritizing or strategy for the placement of grants or donations with any Louisiana clerk of court, registrar of voters or public official.

REQUEST FOR PRODUCTION NO. 9:

Please provide a copy of any document or communication reflecting or relating to the source(s) of the grants, donations or funds offered or advertised to any Louisiana clerk of court, registrar of voters or public official.

REQUEST FOR PRODUCTION NO. 10:

Please provide a copy of any document or communication related to grants, donations or funds offered, advertised or distributed to public entities or officials in states other than Louisiana.

These discovery requests are continuing and must be supplemented as additional information and documents that are responsive to the discovery requests are identified or discovered.

5

JEFF LANDRY
ATTORNEY GENERAL


BY:   
Carey T. Jones (LSBA #07474)
David Jeddie Smith (LSBA #27089)
Ryan Montegut (LSBA #30363)
Jeffrey M. Wale (LSBA #36070)
Assistant Attorneys General
Louisiana Department of Justice, Civil Division
P.O. Box 94005
Baton Rouge, LA 70804
Telephone: (225) 326-6000
Facsimile: (225) 326-6098
Email: jonescar@ag.louisiana.gov
         smithda@ag.louisiana.gov
         montegutr@ag.louisiana.gov
         walej@ag.louisiana.gov

RECEIVED AND FILED
2020 OCT -2  PM 2: 51

DEPUTY CLERK
ST MARTIN PA
6

SIXTEENTH JUDICIAL DISTRICT COURT

PARISH OF ST. MARTIN, STATE OF LOUISIANA

NUMBER:                                                                                    DIVISION:

STATE OF LOUISIANA, THROUGH
JEFF LANDRY, IN HIS OFFICIAL CAPACITY
~~AS ATTORNEY GENERAL OF THE STATE~~

**From:** Dawn Cole <dawn@fullcirclelouisiana.com>
**Sent:** Monday, September 21, 2020 3:57 PM
**To:** Mike Spence <Mike.Spence@caddoclerk.com>
**Subject:** Fwd: Important CTCL Grant Opportunity

CAUTION: This email originated from outside of the **Caddo Parish Clerk of Court's Office**. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Mr. Spence,

Thank you for taking my call this afternoon.  As we discussed, 13 of Louisiana's 64 parishes were prioritized to receive over $500,000 per parish through the CTCL grant.  Caddo Parish is on the Priority List and is eligible for more than the basic amount based on population and election needs!

In addition to completing the online application (https://www.techandcivicjife.org/our-work/election-officials/grants), your office is asked to complete the attached 3-page Safe Voting questionnaire and return to me via email once completed.  The Center will consider the information provided when evaluating and granting funds.

I am here to assist so please don't hesitate in contacting me if you have any questions.  I am excited about this wonderful opportunity!

Dawn Maisel Cole

Full Circle Strategies, LLC

337.288.5007 | dawn@fullcirclelouisiana.com

www.fullcirclelouisiana.com



EXHIBIT

A

I APP. 1517

REQUEST FOR ADMISSION NO. 1:

Please admit the authenticity of Exhibit A hereto.

REQUEST FOR ADMISSION NO. 2:

Please admit that Dawn Cole authored Exhibit A.

REQUEST FOR ADMISSION NO. 3:

Please admit that Dawn Cole directed Exhibit A to the Caddo Parish Clerk of Court.

REQUEST FOR ADMISSION NO. 4:

Please admit that you entered into a contract with CTCL to aid in distributing grants to Louisiana certain election officials.

REQUEST FOR ADMISSION NO. 6:

Please admit that the grants to certain Louisiana election officials referenced in the immediately preceding Request for Admission were to be distributed in the time period August to December, 2020.

REQUEST FOR ADMISSION NO. 7:

Please admit that 13 parishes were selected to receive offers of grant funds from CTCL in excess of $5,000 each.

REQUEST FOR ADMISSION NO. 8:

Please admit that you are a domestic limited liability company domiciled in St. Martin Parish, Louisiana.


INTERROGATORIES

The Responding Party must answer, separately and fully in writing under oath, the following interrogatories. If any interrogatory is objected to, the Responding Party shall state the reason(s) for objecting. The person answering the interrogatories must sign them and shall verify that he or she has read and confirmed the answers and objections. The answers, and objections if any, to the interrogatories must be served on Plaintiff's counsel within 30 days after the service of these interrogatories.

INTERROGATORY NO. 1:

Please give your full name and business address.

INTERROGATORY NO. 2:

Please describe your relationship with Dawn Maisel Cole.

2

I APP. 1518

INTERROGATORY NO. 3:

Please describe your relationship with the Center for Tech and Civic Life (CTCL), with New Venture Fund and/or with Center for Secure and Modern Elections, and provide the following information with respect to each entity:

a) The date of your first contact with any and all of the three entities;

b) The names and addresses of any and all representatives or employees of each entity with whom you had contact or communications in 2020.

c) The date(s) of each and every contact or communication between you and each of the three entities.

INTERROGATORY NO. 4:

Please describe any and all work you have performed on behalf of CTCL, on behalf of New Venture Fund and/or on behalf of Center for Secure and Modern Elections, and provide the following information with respect to each entity:

a) The date any and all such work was performed;

b) The nature of the work performed;

c) The purpose or objective of the work;

d) How much money you have been paid or expect to be paid in connection with such work;

e) How the amount of money you have been paid or expect to be paid was calculated.

INTERROGATORY NO. 5:

With respect to the 13 parishes referenced in Exhibit A, please identify each and every parish and the basis upon which each and every such parish was selected.

INTERROGATORY NO. 6:

Please describe the criteria used to determine the amount of the grant(s) to be awarded to the 13 parishes referenced in Exhibit A.

INTERROGATORY NO. 7:

Please describe any and all communications you have had with and Louisiana public official or office, including but not limited to the Secretary of State, clerks of court, registrars of voters, local governing authorities and/or any representative or employee thereof in any way relating to grants for Louisiana elections, and provide the following information with respect

I APP. 1519

thereto:

    a)  The date of the communication;

    b)  The name and address of the person with whom you communicated;

    c)  The subject and nature of the communication.

INTERROGATORY NO. 8:

      Please identify any and all persons with whom you worked, collaborated, coordinated with, communicated with and/or contracted with in connection with grants or donations proposed, offered or advertised to Louisiana state and local election officials or offices by CTCL, New Venture Fund and/or Center for Secure and Modern Elections from January 1, 2020 to the present.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

      The Responding Party must produce, by serving on Plaintiff's counsel the documents and things, whether paper, electronic or other, requested below.  The documents and things requested are to be served within 30 days of the service of these requests for production.  In lieu of providing the documents and things, the Responding Party may elect to make available for inspection and copying such documents as are responsive to the requests within 30 days of service at a place within the jurisdiction of the court and on a date and time to be agreed upon by the parties.

REQUEST FOR PRODUCTION NO. 1:

      Produce a copy of any and all documents of any kind or nature that in any way relate to the transaction(s), occurrence(s), and event(s) that form the subject matter of this suit.

REQUEST FOR PRODUCTION NO. 2:

      Please provide a copy of any and all contracts that you and/or Dawn Maisel Cole have entered into with CTCL, New Venture Fund and/or Center for Secure and Modern Elections.

REQUEST FOR PRODUCTION NO. 3:

      Please provide a copy of any and all documents reflecting compensation, salary, payment or other benefit that you have received or expect to receive from CTCL, New Venture Fund and/or Center for Secure and Modern Elections.

REQUEST FOR PRODUCTION NO. 4:

      Please provide a copy of any and all emails, correspondence, letters, texts and/or written communications of any kind or nature between you and any state or local official or office, agency

4

head, clerk of court, parish government, municipal government, registrar of voters and/or local governing authority in any way relating to grants or funding issued or to be issued by CTCL, New Venture Fund and/or Center for Secure and Modern Elections.

REQUEST FOR PRODUCTION NO. 5:

Please provide a copy of any notes, log book entries, memoranda or recording of any kind or nature reflecting contacts, communications and/or conversations that you had with CTCL, New Venture Fund, Center for Secure and Modern Elections and/or any representative or employee thereof concerning election related grants or donations to Louisiana clerks of court, registrars of voters or any other entity in any way involved in the Louisiana election process between the January 1, 2020 to the present.

REQUEST FOR PRODUCTION NO. 6:

Please provide a copy of any notes, log book entries, memoranda or recording of any kind or nature reflecting contacts, communications and/or conversations that you had with any and all Louisiana clerks of court, registrars of voters, public entity, public official and/or any representative or employee thereof concerning election related grants or donations to Louisiana entities in any way involved in the Louisiana election process between the January 1, 2020 to the present.

REQUEST FOR PRODUCTION NO. 7:

Please provide a copy of any and all emails, letters, texts or written communications of any kind or nature between you and any clerk of court, registrar of voters and/or parish and state official and/or any representative or employee thereof in any way related to the subject matter of this suit.

REQUEST FOR PRODUCTION NO. 8:

Please provide a copy of any document or communication related to the marketing, targeting, focusing, prioritizing or strategy for the placement of grants or donations with any Louisiana clerk of court, registrar of voters or public official.

REQUEST FOR PRODUCTION NO. 9:

Please provide a copy of any document or communication reflecting or relating to the source(s) of the grants, donations or funds offered or advertised to any Louisiana clerk of court, registrar of voters or public official.

REQUEST FOR PRODUCTION NO. 10:

Please provide a copy of any document or communication related to grants, donations or

5

I APP. 1521

funds offered, advertised or distributed to public entities or officials in states other than Louisiana.

REQUEST FOR PRODUCTION NO. 11:

Please provide a copy of any and all documents and communications in any form received from CTCL, New Venture Fund, Center for Secure and Modern Elections and/or any representative or employee thereof concerning election related grants or donations to Louisiana clerks of court, registrars of voters or any other entity in any way involved in the Louisiana election process between the January 1, 2020 to the present.


These discovery requests are continuing and must be supplemented as additional information and documents that are responsive to the discovery requests are identified or discovered.




                                    JEFF LANDRY
                                    ATTORNEY GENERAL


                         BY:    _____
                                    Carey T. Jones (LSBA #07474)
                                    David Jeddie Smith (LSBA #27089)
                                    Ryan Montegut (LSBA #30363)
                                    Jeffrey M. Wale (LSBA #36070)
                                    Assistant Attorneys General
                                    Louisiana Department of Justice, Civil Division
                                    P.O. Box 94005
                                    Baton Rouge, LA 70804
                                    Telephone: (225) 326-6000
                                    Facsimile: (225) 326-6098
                                    Email: jonescar@ag.louisiana.gov
                                           smithda@ag.louisiana.gov
                                           montegutr@ag.louisiana.gov
                                           walej@ag.louisiana.gov




RECEIVED AND FILED

2020 OCT -2  PM 2: 51


DEPUTY CLERK OF
ST MARTIN

                                    6

I APP. 1522

SIXTEENTH JUDICIAL DISTRICT COURT

PARISH OF ST. MARTIN, STATE OF LOUISIANA

NUMBER:                                                                      DIVISION:

STATE OF LOUISIANA, THROUGH
JEFF LANDRY, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF THE STATE

**From:** Dawn Cole <dawn@fullcirclelouisiana.com>
**Sent:** Monday, September 21, 2020 3:57 PM
**To:** Mike Spence <Mike.Spence@caddoclerk.com>
**Subject:** Fwd: Important CTCL Grant Opportunity

CAUTION: This email originated from outside of the **Caddo Parish Clerk of Court's Office.** Do not click links or open attachments unless you recognize the sender and know the content is safe.

Mr. Spence,

Thank you for taking my call this afternoon.  As we discussed, 13 of Louisiana's 64 parishes were prioritized to receive over $500,000 per parish through the CTCL grant.  Caddo Parish is on the Priority List and is eligible for more than the basic amount based on population and election needs!

In addition to completing the online application (https://www.techandciviclife.org/our-work/election-officials/grants/), your office is asked to complete the attached 3-page Safe Voting questionnaire and return to me via email once completed.  The Center will consider the information provided when evaluating and granting funds.

I am here to assist so please don't hesitate in contacting me if you have any questions.  I am excited about this wonderful opportunity!

Dawn Maisel Cole

Full Circle Strategies, LLC

337.288.5007 | dawn@fullcirclelouisiana.com

www.fullcirclelouisiana.com



I APP. 1523

REQUEST FOR ADMISSION NO. 1:

Please admit that your business domicile is Chicago, Illinois.

REQUEST FOR ADMISSION NO.2:

Please admit that you do not have a certificate of authority to transact business in the State of Louisiana.

REQUEST FOR ADMISSION NO. 3:

Please admit that between August 1, 2020 and the present you transacted business in the State of Louisiana.

REQUEST FOR ADMISSION NO. 4:

Please admit that you are not authorized to do business in the State of Louisiana.

REQUEST FOR ADMISSION NO. 5:

Please admit that you are not registered with the Secretary of State as a corporation in the State of Louisiana.

REQUEST FOR ADMISSION NO. 6:

Please admit that you have not designated an agent for service of process in the State of Louisiana.

REQUEST FOR ADMISSION NO. 7:

Please admit that you do not have any employee or officer in the State of Louisiana.

REQUEST FOR ADMISSION NO. 8:

Please admit that you proposed to distribute grant funds to local election officials in the State of Louisiana in connection with the November 3, 2020 presidential election.

REQUEST FOR ADMISSION NO. 9:

Please admit that you contracted with Dawn Maisel Cole to promote, solicit, offer and distribute grants for acceptance by Louisiana election officials, including registrars of voters and clerks of court.

REQUEST FOR ADMISSION NO. 10:

Please admit that Dawn Maisel Cole acted as your representative in Louisiana in connection with the promotion, solicitation and offers of grants to Louisiana election officials, including registrars of voters and clerks of court.

REQUEST FOR ADMISSION NO. 11:

Please admit that you entered into a contract with Full Circle Strategies, LLC to aid in

2

I APP. 1524

offering and distributing grants to Louisiana certain election officials.

REQUEST FOR ADMISSION NO. 12:

Please admit that grants to Louisiana election officials referenced in the foregoing Requests for Admission were to be distributed during the time period August to December, 2020.

REQUEST FOR ADMISSION NO. 13:

Please admit that you selected 13 parishes to receive offers of grant funds in excess of $5,000 each in connection with the November 3, 2020 presidential election.


INTERROGATORIES

The Responding Party must answer, separately and fully in writing under oath, the following interrogatories. If any interrogatory is objected to, the Responding Party shall state the reason(s) for objecting. The person answering the interrogatories must sign them and shall verify that he or she has read and confirmed the answers and objections. The answers, and objections if any, to the interrogatories must be served on Plaintiff's counsel within 30 days after the service of these interrogatories.

INTERROGATORY NO. 1:

Please describe your relationship with Dawn Maisel Cole and Full Circle Strategies, LLC. and provide the following information with respect thereto:

    a)  How, by whom and when was contact initiated between you and Dawn Maisel Cole and/or Full Circle Strategies;

    b)  What was your reason for choosing Dawn Maisel Cole and/or Full Circle Strategies to pursue and facilitate grant transactions with Louisiana election officials;

    c)  Provide the name and address of the person or persons who selected Dawn Maisel Cole and/or Full Circle Strategies in connection with the grant proposals and solicitations with Louisiana election officials.

INTERROGATORY NO. 2:

Please describe your legal and/or business relationship with New Venture Fund and/or with Center for Secure and Modern Elections.

INTERROGATORY NO. 3:

With respect to any and all grant funds proposed for distribution to Louisiana election officials, please provide the following information:

3

I APP. 1525

a) the principal source of the funds for the proposed grants;

b) the role and/or contribution that Facebook and/or Mark Zuckerburg played in the grant funding;

c) how much money was proposed for distribution in Louisiana;

d) which persons or entities were selected for the receipt of grants in Louisiana;

e) which persons or entities were selected for the receipt of grants in excess of $5,000 in the State of Louisiana;

f) on what basis were each of the entities proposed to receive grants in Louisiana chosen?

g) identify by name and address any and all persons who participated or advised you in the selection of grant recipients;

h) give the reason that some recipients were to receive more grant money than others.

INTERROGATORY NO. 4:

With respect to the 13 parishes referenced in the immediately preceding interrogatory, please identify each and every parish and the basis upon which each and every such parish was selected.

INTERROGATORY NO. 5:

Please describe the criteria used to determine the amount of the grant(s) to be awarded to the 13 parishes selected to receive grants in excess of $5,000.

INTERROGATORY NO. 6:

Please describe any and all communications you have had with any Louisiana public official or office, including but not limited to the Secretary of State, clerks of court, registrars of voters, local governing authorities and/or any representative or employee thereof in any way relating to grants for Louisiana elections, and provide the following information with respect thereto:

a) The date of the communication;

b) The name and address of the person with whom you communicated;

c) The subject and nature of the communication.

INTERROGATORY NO. 7:

Please identify any and all persons with whom you worked, collaborated, coordinated with, communicated with and/or contracted with in connection with grants or donations proposed, offered or advertised to Louisiana state and local election officials or offices by CTCL, New

4

I APP. 1526

Venture Fund and/or Center for Secure and Modern Elections from January 1, 2020 to the present.

INTERROGATORY NO. 8:

Please identify any and all donors to CTCL who made donations from January 1, 2020 to the present, and provide the following information with respect thereto:

a) the date of any and all communications between you and the donors;

b) the name and address of any and all persons employed by or acting on behalf of CTCL who communicated with the donors;

c) whether emails, correspondence, texts or written communications of any kind or nature were sent by you to the donors.


REQUESTS FOR PRODUCTION OF DOCUMENTS

The Responding Party must produce, by serving on Plaintiff's counsel the documents and things, whether paper, electronic or other, requested below.  The documents and things requested are to be served within 30 days of the service of these requests for production.  In lieu of providing the documents and things, the Responding Party may elect to make available for inspection and copying such documents as are responsive to the requests within 30 days of service at a place within the jurisdiction of the court and on a date and time to be agreed upon by the parties.

REQUEST FOR PRODUCTION NO. 1:

Produce a copy of any and all documents of any kind or nature that in any way relate to the transaction(s), occurrence(s), and event(s) that form the subject matter of this suit.

REQUEST FOR PRODUCTION NO. 2:

Please provide a copy of any and all contracts that you and Dawn Maisel Cole and/or Full Circle Strategies, LLC have entered into in connection with the grant funding referenced herein.

REQUEST FOR PRODUCTION NO. 3:

Please provide a copy of any and all documents reflecting compensation, salary, payment or other benefit to Dawn Maisel Cole and/or Full Circle Strategies.

REQUEST FOR PRODUCTION NO. 4:

Please provide a copy of any and all emails, correspondence, letters, texts and/or written communications of any kind or nature between you and any state or local official or office, agency head, clerk of court, parish government, municipal government, registrar of voters and/or local governing authority in any way relating to grants or funding issued or to be issued by CTCL, New

5

I APP. 1527

Venture Fund and/or Center for Secure and Modern Elections.

REQUEST FOR PRODUCTION NO. 5:

Please provide a copy of any notes, log book entries, memoranda or recording of any kind or nature reflecting contacts, communications and/or conversations that you had with New Venture Fund, Center for Secure and Modern Elections, Dawn Maisel Cole, Full Circle Strategies and/or any representative or employee thereof concerning election related grants or donations to Louisiana clerks of court, registrars of voters or any other entity in any way involved in the Louisiana election process between the January 1, 2020 to the present.

REQUEST FOR PRODUCTION NO. 6:

Please provide a copy of any notes, log book entries, memoranda or recording of any kind or nature reflecting contacts, communications and/or conversations that you had with any and all Louisiana clerks of court, registrars of voters, public entity, public official and/or any representative or employee thereof concerning election related grants or donations to Louisiana entities in any way involved in the Louisiana election process between the January 1, 2020 to the present.

REQUEST FOR PRODUCTION NO. 7:

Please provide a copy of any and all emails, letters, texts or written communications of any kind or nature between you and any Louisiana election official, clerk of court, registrar of voters and/or parish and state official and/or any representative or employee thereof in any way related to the subject matter of this suit.

REQUEST FOR PRODUCTION NO. 8:

Please provide a copy of any and all documents or communications related to the marketing, targeting, focusing, prioritizing or strategy for the placement of grants or donations with any Louisiana clerk of court, registrar of voters or public official.

REQUEST FOR PRODUCTION NO. 9:

Please provide a copy of any document or communication reflecting or relating to the source(s) of the grants, donations or funds offered or advertised to any Louisiana clerk of court, registrar of voters, local governing authority or public official.

REQUEST FOR PRODUCTION NO. 10:

Please provide a copy of any document or communication related to grants, donations or funds offered, advertised or distributed to public entities or officials in states other than Louisiana

I APP. 1528

in connection with the presidential election of November 3, 2020.

REQUEST FOR PRODUCTION NO. 11:

Please provide a copy of any and all documents and communications in any form that you received from New Venture Fund, Center for Secure and Modern Elections, Dawn Maisel Cole and/or any representative or employee thereof concerning election related grants or donations to Louisiana clerks of court, registrars of voters or any other entity in any way involved in the Louisiana election process between the January 1, 2020 to the present.

REQUEST FOR PRODUCTION NO. 12:

Please produce any and all documents of any kind or nature that you prepared, that was prepared by others and/or that you received in connection with or in any way related to the grant funding referenced in these requests and the petition filed herein.

These discovery requests are continuing and must be supplemented as additional information and documents that are responsive to the discovery requests are identified or discovered.

JEFF LANDRY
ATTORNEY GENERAL

BY: _____
Carey T. Jones (LSBA #07474)
David Jeddie Smith (LSBA #27089)
Ryan Montegut (LSBA #30363)
Jeffrey M. Wale (LSBA #36070)
Assistant Attorneys General
Louisiana Department of Justice, Civil Division
P.O. Box 94005
Baton Rouge, LA 70804
Telephone: (225) 326-6000
Facsimile: (225) 326-6098
Email: jonescar@ag.louisiana.gov
      smithda@ag.louisiana.gov
      montegutr@ag.louisiana.gov
      walej@ag.louisiana.gov

RECEIVED AND FILED

2020 OCT -2 PM 2: 51


DEPUTY CLERK OF
ST MARTIN PARISH

7

I APP. 1529

SIXTEENTH JUDICIAL DISTRICT COURT

PARISH OF ST. MARTIN, STATE OF LOUISIANA

NUMBER:                                                          DIVISION:

STATE OF LOUISIANA, THROUGH
JEFF LANDRY, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF THE STATE

VERSUS

CENTER FOR TECH AND CIVIC LIFE NEW VENTURE FUND,
D/B/A CENTER FOR SECURE AND MODERN ELECTIONS,
DAWN MAISAL COLE AND FULL CIRCLE STRATEGIES, LLC

---

FIRST REQUEST FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR
PRODUCTION OF DOCUMENTS BY THE ATTORNEY GENERAL TO THE CENTER
FOR NEW VENTURE FUND D/B/A CENTER FOR SECURE AND
MODERN ELECTIONS (CSME)

---

PROPOUNDING PARTY:   Plaintiff, Jeff Landry, Louisiana Attorney General

RESPONDING PARTY:    Defendant, New Venture Fund d/b/a CSME

SERVICE:                    Please serve with the Petition

        Pursuant to Rules 1467-1468, 1457-1458, and 1461-1463 of the Louisiana Code of Civil

Procedure, Plaintiff, Jeff Landry, hereby requests that Defendant, New Venture Fund, respond to

the Request for Admissions, Interrogatories, and Requests for Production of Documents

propounded below as they relate to the transaction, occurrences, and events sued upon herein.


                                     REQUEST FOR ADMISSIONS

        Within 30 days after service of this request, the New Venture Fund, as the Responding

Party must serve on Plaintiff's counsel a written answer or objection to each and every request for

admission.  The admissions must be signed by the Responding Party or its attorney.  For each

request for admission, the Responding Party shall admit or deny the statement or explain in detail

why it cannot truthfully be admitted or denied.  A denial must fairly meet the substance of the

requested admission, and when good faith requires that the Responding Party qualify her answer

or deny only a part of the matter, she shall specify so much of the request for admission as is true

and qualify or deny the remainder.  If objection is made to any request for admission, the reason

for the objection shall be stated.

1

I APP. 1530

REQUEST FOR ADMISSION NO. 1:

Please admit that your business domicile is Washington, D.C.  (If not, please provide your business domicile).

REQUEST FOR ADMISSION NO.2:

Please admit that you do not have a certificate of authority to transact business in the State of Louisiana.

REQUEST FOR ADMISSION NO. 3:

Please admit that between August 1, 2020 and the present you transacted business in the State of Louisiana under the name of the Center for Secure and Modern Elections.

REQUEST FOR ADMISSION NO. 4:

Please admit that you are not authorized to do business in the State of Louisiana.

REQUEST FOR ADMISSION NO. 5:

Please admit that you are not registered with the Secretary of State as a corporation in the State of Louisiana.

REQUEST FOR ADMISSION NO. 6:

Please admit that you have not designated an agent for service of process in the State of Louisiana.

REQUEST FOR ADMISSION NO. 7:

Please admit that you do not have any employee or officer in the State of Louisiana.

REQUEST FOR ADMISSION NO. 8:

Please admit that you proposed to distribute grant funds to local election officials in the State of Louisiana in connection with the November 3, 2020 presidential election.

REQUEST FOR ADMISSION NO. 9:

Please admit that you contracted with Dawn Maisel Cole to promote, solicit, offer and distribute grants for acceptance by Louisiana election officials, including registrars of voters and clerks of court.

REQUEST FOR ADMISSION NO. 10:

Please admit that Dawn Maisel Cole acted as your representative in Louisiana in connection with the promotion, solicitation and offers of grants to Louisiana election officials, including registrars of voters and clerks of court.

2

I APP. 1531

REQUEST FOR ADMISSION NO. 11:

Please admit that you entered into a contract with Full Circle Strategies, LLC to aid in offering and distributing grants to Louisiana certain election officials.

REQUEST FOR ADMISSION NO. 12:

Please admit that grants to Louisiana election officials referenced in the foregoing Requests for Admission were to be distributed during the time period August to December, 2020.

REQUEST FOR ADMISSION NO. 13:

Please admit that you selected 13 parishes to receive offers of grant funds in excess of $5,000 each in connection with the November 3, 2020 presidential election.


## INTERROGATORIES

The Responding Party must answer, separately and fully in writing under oath, the following interrogatories. If any interrogatory is objected to, the Responding Party shall state the reason(s) for objecting. The person answering the interrogatories must sign them and shall verify that he or she has read and confirmed the answers and objections. The answers, and objections if any, to the interrogatories must be served on Plaintiff's counsel within 30 days after the service of these interrogatories.

INTERROGATORY NO. 1:

Please describe your business and legal relationship with Dawn Maisel Cole and Full Circle Strategies, LLC., with the Center of Tech and Civic Life, with the Center for Secure and Modern Elections.

INTERROGATORY NO. 2:

With respect to any and all grant funds proposed for distribution to Louisiana election officials, please provide the following information:

    a) your role in the proposed distribution of any and all such grants;

    b) the principal source of the funds for the proposed grants;

    c) the role and/or contribution that Facebook and/or Mark Zuckerburg played in the grant funding;

    d) how much money was proposed for distribution in Louisiana;

    e) which persons or entities were selected for the receipt of grants in Louisiana;

    f) which persons or entities were selected for the receipt of grants in excess of $5,000 in

3

I APP. 1532

the State of Louisiana;

g) on what basis were each of the entities proposed to receive grants in Louisiana chosen?

h) identify by name and address any and all persons who participated or advised you in the selection of grant recipients;

i) give the reason that some recipients were to receive more grant money than others.

INTERROGATORY NO. 3:

Please describe any and all communications you have had with and Louisiana public official or office, including but not limited to the Secretary of State, clerks of court, registrars of voters, local governing authorities and/or any representative or employee thereof in any way relating to grants for Louisiana elections, and provide the following information with respect thereto:

a) The date of the communication;

b) The name and address of the person with whom you communicated;

c) The subject matter and nature of the communication.

INTERROGATORY NO. 4:

Please identify any and all persons with whom you worked, collaborated, coordinated with, communicated with and/or contracted with in connection with grants or donations proposed, offered or advertised to Louisiana state and local election officials or offices by CTCL, New Venture Fund and/or Center for Secure and Modern Elections from January 1, 2020 to the present.

INTERROGATORY NO. 5:

Please identify any and all donors who made donations in excess of $500,000 to you from January 1, 2020 to the present, and provide the following information with respect thereto:

a) the date of any and all communications between you and the donors;

b) the name and address of any and all persons employed by or acting on behalf of CTCL who communicated with the donors;

c) whether emails, correspondence, texts or written communications of any kind or nature were sent by you to the donors.

REQUESTS FOR PRODUCTION OF DOCUMENTS

The Responding Party must produce, by serving on Plaintiff's counsel the documents and things, whether paper, electronic or other, requested below.  The documents and things requested

4

I APP. 1533

are to be served within 30 days of the service of these requests for production.  In lieu of providing the documents and things, the Responding Party may elect to make available for inspection and copying such documents as are responsive to the requests within 30 days of service at a place within the jurisdiction of the court and on a date and time to be agreed upon by the parties.

REQUEST FOR PRODUCTION NO. 1:

Produce a copy of any and all documents of any kind or nature that in any way relate to the transaction(s), occurrence(s), and event(s) that form the subject matter of this suit.

REQUEST FOR PRODUCTION NO. 2:

Please provide a copy of any and all contracts that you and/or Center for Tech and Civic Life, Center for Secure and Modern Elections, Dawn Maisel Cole and/or Full Circle Strategies, LLC have entered into in connection with the grant funding referenced herein.

REQUEST FOR PRODUCTION NO. 3:

Please provide a copy of any and all emails, correspondence, letters, texts and/or written communications of any kind or nature between you and any state or local official or office, agency head, clerk of court, parish government, municipal government, registrar of voters and/or local governing authority in any way relating to grants or funding issued or to be issued by CTCL, New Venture Fund and/or Center for Secure and Modern Elections.

REQUEST FOR PRODUCTION NO. 4:

Please provide a copy of any notes, log book entries, memoranda or recording of any kind or nature reflecting contacts, communications and/or conversations that you had with CTCL, Dawn Maisel Cole, Full Circle Strategies, LLC and/or any representative or employee thereof concerning election related grants or donations to Louisiana clerks of court, registrars of voters or any other entity in any way involved in the Louisiana election process between the January 1, 2020 to the present.

REQUEST FOR PRODUCTION NO. 5:

Please provide a copy of any notes, log book entries, memoranda or recording of any kind or nature reflecting contacts, communications and/or conversations that you had with any and all Louisiana clerks of court, registrars of voters, public entity, public official and/or any representative or employee thereof concerning election related grants or donations to Louisiana entities in any way involved in the Louisiana election process between the January 1, 2020 to the present.

5

I APP. 1534

REQUEST FOR PRODUCTION NO. 6:

      Please provide a copy of any and all emails, letters, texts or written communications of any kind or nature between you and any Louisiana election official, clerk of court, registrar of voters and/or parish and state official and/or any representative or employee thereof in any way related to the subject matter of this suit.

REQUEST FOR PRODUCTION NO. 7:

      Please provide a copy of any and all documents or communications related to the marketing, targeting, focusing, prioritizing or strategy for the placement of grants or donations with any Louisiana clerk of court, registrar of voters or public official.

REQUEST FOR PRODUCTION NO. 8:

      Please provide a copy of any document or communication reflecting or relating to the source(s) of the grants, donations or funds offered or advertised to any Louisiana clerk of court, registrar of voters, local governing authority or public official.

REQUEST FOR PRODUCTION NO. 9:

      Please provide a copy of any document or communication related to grants, donations or funds offered, advertised or distributed to public entities or officials in states other than Louisiana in connection with the presidential election of November 3, 2020.

REQUEST FOR PRODUCTION NO. 10:

      Please provide a copy of any and all documents and communications in any form that you received from CTCL, Dawn Maisel Cole, Full Circle Strategies, LLC and/or any representative or employee thereof concerning election related grants or donations to Louisiana clerks of court, registrars of voters or any other entity in any way involved in the Louisiana election process between the January 1, 2020 to the present.

REQUEST FOR PRODUCTION NO. 11:

      Please produce any and all documents of any kind or nature that you prepared, that was prepared by others and/or that you received in connection with or in any way related to the grant funding referenced in these requests and the petition filed herein.

      These discovery requests are continuing and must be supplemented as additional information and documents that are responsive to the discovery requests are identified or discovered.

6

I APP. 1535

JEFF LANDRY
ATTORNEY GENERAL

BY: _____
Carey T. Jones (LSBA #07474)
David Jeddie Smith (LSBA #27089)
Ryan Montegut (LSBA #30363)
Jeffrey M. Wale (LSBA #36070)
Assistant Attorneys General
Louisiana Department of Justice, Civil Division
P.O. Box 94005
Baton Rouge, LA 70804
Telephone: (225) 326-6000
Facsimile: (225) 326-6098
Email: jonescar@ag.louisiana.gov
       smithda@ag.louisiana.gov
       montegutr@ag.louisiana.gov
       walej@ag.louisiana.gov



RECEIVED AND FILED
2020 OCT -2  PM 2: 51

DEPUTY CLERK OF COURT
ST. MARTIN PARISH

7

I APP. 1536

DECLARATION

I, Lynn C Kozlowski Stone, being duly sworn, declares as follows:

1.      I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College. I am a voter in Arizona. I voted in the November 3, 2020 election for President and Vice President.

2.      I have personal knowledge of the following.

3.      I demanded through the Arizona Election Integrity Forum that the state legislature meet to vote for post-election certification of the Presidential Electors. If the state legislature does not do so, the Presidential electors cannot be counted. The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

4.      I am seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

5.      Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15. There are textual and structural arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and state legislature should interpret  3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

6.     Analogously, under the Electors Clause, the state legislatures lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done in A.R.S. § 16-212 (B) delegating certification powers to the Arizona Secretary of State.  The Electors Clause, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential elector, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state executive branch officials.  If the Electors Clause wanted "delegation," the Electors Clause would have the word "delegate," not the word "direct," in it.  Therefore, the Governor and state legislature should interpret A.R.S. § 16-212 (B) as unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

7.     If the state legislature does vote affirmatively for post-election certification of the Presidential electors, the Presidential electors cannot be counted.

8.     I will, therefore, be injured as a voter because my vote and others' votes are not being counted and certified by the state legislature as required by the Constitution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 13, 2020

*Lynn C Kozlowski Stone*

Lynn C. Kozlowski Stone
10410 E Prince Rd.
Tucson, AZ 85749

DECLARATION

I, Baron Benham, being duly sworn, declares as follows:

1.      I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College.  I am a voter in Arizona.  I voted in the November 3, 2020 election for President and Vice President.

2.      I have personal knowledge of the following.

3.      I demanded through the Arizona Election Integrity Alliance that the state legislature meet to vote for post-election certification of the Presidential Electors.  If the state legislature does not do so, the Presidential electors cannot be counted.  The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

4.      I am seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

5.      Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15.   There are textual and structural arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and state legislature should interpret  3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

Governor Doug Ducey

Speaker Russell Bowers
Arizona House of Representatives

Senate Majority Leader Karen Fann
Arizona Senate

Dear Governor and state legislative leaders:

I am a Member of the Arizona Election Integrity Alliance.   I am writing to you on behalf of our members who voted in the November 3, 2020 Presidential election.  We demand that the state legislature meet to vote for post-election certification of the Presidential Electors.  If the state legislature does not do so, the Presidential electors cannot be counted.  The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

We are seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15.   There are textual and structural arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and state legislature should interpret  3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

Analogously, under the Electors Clause, the state legislatures lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done in A.R.S. § 16-212 (B)  delegating certification powers to the Arizona Secretary of State.  The Electors Clause, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential elector, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state executive branch officials.  If the Electors Clause wanted "delegation," the Electors Clause would have the word "delegate, not the word "direct," in

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

it.  Therefore, the Governor and state legislature should interpret A.R.S. § 16-212 (B) as unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

If you do not respond to this letter by December 14, 2020, we intend to proceed with a lawsuit to delineate these constitutional duties and responsibilities for the November 3, 2020, and future elections.

Sincerely,

Baron Benham
Member
Arizona Election Integrity Alliance

DECLARATION

I, <u>warren petersen</u>, being duly sworn, declares as follows:

1.      I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College.  I am a voter in Arizona.  I voted in the November 3, 2020 election for President and Vice President.  [If applicable: I am also a state legislator in the Arizona <u>House</u>.]

2.      I have personal knowledge of the following.

3.      I demanded through the Arizona Election Integrity Forum that the state legislature meet to vote for post-election certification of the Presidential Electors.  If the state legislature does not do so, the Presidential electors cannot be counted.  The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

4.      I am seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

5.      Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15.   There are textual and structural arguments for these federal statutes being unconstitutional.[1]  Therefore, the Governor and

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

state legislature should interpret 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

6.      Analogously, under the Electors Clause, the state legislatures lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done in A.R.S. § 16-212 (B) delegating certification powers to the Arizona Secretary of State. The Electors Clause, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential elector, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state executive branch officials.  If the Electors Clause wanted "delegation," the Electors Clause would have the word "delegate, not the word "direct," in it.  Therefore, the Governor and state legislature should interpret A.R.S. § 16-212 (B) as unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

7.      If the state legislature does vote affirmatively for post-election certification of the Presidential electors, the Presidential electors cannot be counted.

8.      I will, therefore, be injured as a voter because my vote and others' votes are not being counted and certified by the state legislature as required by the Constitution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December ___, 2020                    *Warren Petersen*

DECLARATION

I, John Wood, being duly sworn, declares as follows:

1.      I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College.  I am a voter in Georgia.  I voted in the November 3, 2020 election for President and Vice President.

2.      I have personal knowledge of the following.

3.      I am President of the Georgia Voters Alliance. We believe that the state legislature is required to meet to vote for post-election certification of the Presidential votes and of the Presidential Electors.  If the state legislature does not do so, the Presidential electors cannot be counted.  Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

4.      I am seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

5.      Under Article II of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15.   There are textual and structural arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and state legislature should interpret  3

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

6.      Analogously, under the Electors Clause, the state legislatures lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done in Ga. Code § 21-2-499 (B) delegating certification to the Georgia Secretary of State and Governor.  Article II, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential elector, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state executive branch officials.  If Article II wanted "delegation," the Electors Clause would have the word "delegate, not the word "direct," in it.  Therefore, the Governor and state legislature should interpret Ga. Code § 21-2-499 (B) as an unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

7.      Under these laws, even if the state legislature did vote affirmatively for post-election certification of the Presidential electors, the Presidential electors will not be counted based on that certification if it differs from the Governor's certification.

8.      I am, therefore, injured as a voter because my vote and others' votes are not being counted and certified by the state legislature as required by to the Constitution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 22, 2020

/s/ John Wood

_____

DECLARATION

I, Debi Haas, being duly sworn, declare as follows:

1.       I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College. I am a voter in Michigan. I voted in the November 3, 2020 election for President and Vice President.

2.       I have personal knowledge of the following:

3.       I demanded through the Election Integrity Fund that the Michigan state legislature meet to vote for post-election certification of the Presidential Electors. If the state legislature does not do so, the Presidential electors cannot be counted. The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

4.       I am seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

5.       Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15. There are textual and structural arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and state legislature should interpret 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as

---

[1]

     ☐ Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

6.       Analogously, under the Electors Clause, the state legislatures lack legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done with delegating under M.C.L.A. § 168.46 certification power to the Michigan State Board of Canvassers and Governor. The Electors Clause, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential electors, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state executive branch officials.  If the Electors Clause wanted "delegation," the Electors Clause would have the word "delegate, not the word "direct," in it.  Therefore, the Governor and state legislature should interpret M.C.L.A. § 168.46 as unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

7.       If the state legislature does vote affirmatively for post-election certification of the Presidential electors, the Presidential electors cannot be counted.

8.       I will, therefore, be injured as a voter because my vote and others' votes are not being counted and certified by the state legislature as required by the Constitution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 13, 2020                    Debi Haas
                                            President of Election Integrity Fund
                                            5530 Rivers Edge Drive
                                            Commerce, MI  48382

Governor Gretchen Whitmer

Speaker Lee Chatfield
Michigan House of Representatives

Senate Majority Leader Mike Shirkey
Michigan Senate

Dear Governor and state legislative leaders:

     I, Debi Haas, am the President of Election Integrity Fund.  I am writing to you on behalf of our Michigan members who voted in the November 3, 2020 Presidential election. We demand that the state legislature meet to vote for post-election certification of the Presidential Electors.  If the state legislature does not do so, the Presidential electors cannot be counted.  The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

     We are seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

     Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15.   There are textual and structural arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and state legislature should interpret  3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

     Analogously, under the Electors Clause, the state legislatures lack legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done with delegating under M.C.L.A. § 168.46 certification power to the Michigan State Board of Canvassers and Governor. The Electors Clause, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential electors, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state executive branch officials.  If the Electors Clause wanted "delegation," the Electors Clause would have the word "delegate, not the word "direct," in it.  Therefore, the

---

1

☐ Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

Governor and state legislature should interpret M.C.L.A.  § 168.46 as unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

If you do not respond to this letter by December 14, 2020, we intend to proceed with a lawsuit to delineate these constitutional duties and responsibilities for the November 3, 2020, and future elections.

Sincerely,

Debi Haas
President of Election Integrity Fund
810-499-9895
Debihaas56@gmail.com

I APP. 1549

Governor Gretchen Whitmer

Speaker Lee Chatfield
Michigan House of Representatives

Senate Majority Leader Mike Shirkey
Michigan Senate

Dear Governor and state legislative leaders:

     I, Brenda Savage, am the Vice President of Communication of Election Integrity Fund.  I am writing to you on behalf of our Michigan members who voted in the November 3, 2020 Presidential election.  We demand that the state legislature meet to vote for post-election certification of the Presidential Electors.  If the state legislature does not do so, the Presidential electors cannot be counted.  The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

     We are seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

     Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15.   There are textual and structural arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and state legislature should interpret  3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

     Analogously, under the Electors Clause, the state legislatures lack legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done with delegating under M.C.L.A.  § 168.46 certification power to the Michigan State Board of Canvassers and Governor. The Electors Clause, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential electors, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state

---

[1]

     Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

executive branch officials.  If the Electors Clause wanted "delegation," the Electors Clause would have the word "delegate, not the word "direct," in it.  Therefore, the

Governor and state legislature should interpret M.C.L.A.  § 168.46 as unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

If you do not respond to this letter by December 14, 2020, we intend to proceed with a lawsuit to delineate these constitutional duties and responsibilities for the November 3, 2020, and future elections.

Sincerely,

Brenda Savage

Brenda Savage
V.P. Communication
Election Integrity Fund
248-410-7386
electionintegrityfund.org

I APP. 1551

DECLARATION

I, Daire Rendon, being duly sworn, declares as follows:

1.      I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College.  I am a voter in Michigan.  I voted in the November 3, 2020 election for President and Vice President.

2.      I am also a state legislator in the Michigan 103rd District.

3.      I have personal knowledge of the following.

4.      I demanded through the Election Integrity Fund that the Michigan state legislature meet to vote for post-election certification of the Presidential Electors.  If the state legislature does not do so, the Presidential electors cannot be counted.  The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

5.      I am seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

6.      Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15.   There are textual and structural arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

state legislature should interpret  3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

7.     Analogously, under the Electors Clause, the state legislatures lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done with delegating under M.C.L.A.  § 168.46 certification power to the Michigan State Board of Canvassers and Governor. The Electors Clause, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential elector, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state executive branch officials.  If the Electors Clause wanted "delegation," the Electors Clause would have the word "delegate, not the word "direct," in it.  Therefore, the Governor and state legislature should interpret M.C.L.A.  § 168.46 as unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

8.     If the state legislature does vote affirmatively for post-election certification of the Presidential electors, the Presidential electors cannot be counted.

9.     I will, therefore, be injured as a voter because my vote and others' votes are not being counted and certified by the state legislature as required by the Constitution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 15, 2020                        _____

I APP. 1553

DECLARATION

I, Matt Maddock, being duly sworn, declares as follows:

1.      I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College. I am a voter in Michigan. I voted in the November 3, 2020 election for President and Vice President.

2.      I am also a state legislator in the Michigan 44th District.

3.      I have personal knowledge of the following.

4.      I demanded through the Election Integrity Fund that the Michigan state legislature meet to vote for post-election certification of the Presidential Electors. If the state legislature does not do so, the Presidential electors cannot be counted. The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

5.      I am seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

6.      Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15. There are textual and structural arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

state legislature should interpret  3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as

unconstitutional interference with the state legislative prerogatives guaranteed by the

Constitution.

       7.     Analogously, under the Electors Clause, the state legislatures lacks legal

authority to enact state laws which are a perpetual and wholesale delegation of post-election

certification to state executive branch officials—as it has done with delegating under

M.C.L.A.  § 168.46 certification power to the Michigan State Board of Canvassers and

Governor. The Electors Clause, and its non-delegation doctrine, left it to the state

legislatures to "direct" post-election certification of Presidential elector, not to "delegate"

post-election certification, perpetually and in a wholesale fashion, to state executive branch

officials.  If the Electors Clause wanted "delegation," the Electors Clause would have the

word "delegate, not the word "direct," in it.  Therefore, the Governor and state legislature

should interpret M.C.L.A.  § 168.46 as unconstitutional delegation of the state legislative

prerogative of post-election certification of Presidential voters.

       8.     If the state legislature does vote affirmatively for post-election certification of

the Presidential electors, the Presidential electors cannot be counted.

       9.     I will, therefore, be injured as a voter because my vote and others' votes are

not being counted and certified by the state legislature as required by the Constitution.

       I declare under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

Dated: December 15, 2020              _____

DECLARATION

I, Matthew Dodich, being duly sworn, declares as follows:

1.     I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College. I am a voter in Pennsylvania. I voted in the November 3, 2020 election for President and Vice President.

2.     I have personal knowledge of the following.

3.     I have demanded through the Pennsylvania Voters Alliance that the state legislature meet to vote for post-election certification of the Presidential Electors. If the state legislature does not do so, the Presidential electors cannot be counted. The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

4.     I am seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

5.     Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15. There are textual and structural arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and state legislature should interpret 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

6.      Analogously, under the Electors Clause, the state legislatures lacks legal
authority to enact state laws which are a perpetual and wholesale delegation of post-
election certification to state executive branch officials—as it has done with 25 P.S. §
3166 delegating certification to the Secretary of Commonwealth and Governor.  The
Electors Clause, and its non-delegation doctrine, left it to the state legislatures to
"direct" post-election certification of Presidential elector, not to "delegate" post-
election certification, perpetually and in a wholesale fashion, to state executive branch
officials.  If the Electors Clause wanted "delegation," the Electors Clause would have
the word "delegate, not the word "direct," in it.  Therefore, the Governor and state
legislature should interpret 25 P.S. § 3166 as an unconstitutional delegation of the
state legislative prerogative of post-election certification of Presidential voters.

7.      If the state legislature does vote affirmatively for post-election certification of
the Presidential electors, the Presidential electors cannot be counted.

8.      I will, therefore, be injured as a voter because my vote and others' votes are
not being counted and certified by the state legislature as required by the
Constitution.

I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

Dated: December 13, 2020

DECLARATION

I, Leah Hoopes, being duly sworn, declares as follows:

1.     I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College.  I am a voter in Pennsylvania.  I voted in the November 3, 2020 election for President and Vice President.  applicable:

-

2.     I have personal knowledge of the following.

3.     I have demanded through the Pennsylvania Voters Alliance that the state legislature meet to vote for post-election certification of the Presidential Electors.  If the state legislature does not do so, the Presidential electors cannot be counted.  The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

4.     I am seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

5.     Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15.   There are textual and structural arguments for these federal statutes being unconstitutional.[1]  Therefore, the Governor and

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

state legislature should interpret 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

6.      Analogously, under the Electors Clause, the state legislatures lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done with 25 P.S. § 3166 delegating certification to the Secretary of Commonwealth and Governor.  The Electors Clause, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential elector, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state executive branch officials.  If the Electors Clause wanted "delegation," the Electors Clause would have the word "delegate, not the word "direct," in it.  Therefore, the Governor and state legislature should interpret 25 P.S. § 3166 as an unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

7.      If the state legislature does vote affirmatively for post-election certification of the Presidential electors, the Presidential electors cannot be counted.

8.      I will, therefore, be injured as a voter because my vote and others' votes are not being counted and certified by the state legislature as required by the Constitution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 13th,2020 2020

*Leah Hoopes*

Verified by PDFfiller
12/13/2020

## DECLARATION

I, Ronald H. Heuer, residing at E3530 Townline Road, Kewaunee, WI 54216, being

duly sworn, declares as follows:

1.      I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit

regarding the Electoral College.  I am a voter in Wisconsin.  I voted in the November 3,

2020 election for Vice President.

2.      I have personal knowledge of the following.

3.      I have demanded through the Wisconsin Voters Alliance that the state

legislature meet to vote for post-election certification of the Presidential Electors.  If the

state legislature does not do so, the Presidential electors cannot be counted.  The Electors

Clause of Article II of the Constitution requires state legislative post-election certification of

the Presidential electors for their vote to count.

4.      I am seeking a constitutionally-compliant process for post-election

certification of Presidential electors and counting of their votes for the November 3, 2020

Presidential election and future elections.

5.      Under the Electors Clause of Article II and the Twelfth Amendment of the

United States Constitution, Congress lacks legal authority to enact laws interfering with the

state-by-state state legislative post-election certification of Presidential electors as it has done

with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15.  There are textual and structural

arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

state legislature should interpret 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

6.    Analogously, under the Electors Clause, the state legislatures lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done in Wis. Stat. § 7.70 (5) (b) by delegating certification to the Wisconsin Elections Commission. The Electors Clause, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential elector, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state executive branch officials.  If the Electors Clause wanted "delegation," the Electors Clause would have the word "delegate, not the word "direct," in it.  Therefore, the Governor and state legislature should interpret Wis. Stat. § 7.70 (5) (b)  as an unconsitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

7.    If the state legislature does vote affirmatively for post-election certification of the Presidential electors, the Presidential electors cannot be counted.

8.    I will, therefore, be injured as a voter because my vote and others' votes are not being counted and certified by the state legislature as required by the Constitution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 13, 2020

Ronald H. Heuer

I, Debbie Jacques, residing at 1839 S Oneida Street, Green Bay, WI 54304, being duly sworn, declares as follows:

1.      I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College.  I am a voter in Wisconsin.  I voted in the November 3, 2020 election for Vice President.  I am a concerned citizen.

2.      I have personal knowledge of the following.

3.      I have demanded through the Wisconsin Voters Alliance that the state legislature meet to vote for post-election certification of the Presidential Electors.  If the state legislature does not do so, the Presidential electors cannot be counted.  The Electors Clause of Article II of the Constitution requires state legislative post-election certification of the Presidential electors for their vote to count.

4.      I am seeking a constitutionally-compliant process for post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

5.      Under the Electors Clause of Article II and the Twelfth Amendment of the United States Constitution, Congress lacks legal authority to enact laws interfering with the state by state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15. There are textual and structural arguments for these federal statutes being unconstitutional.[1]  Therefore, the Governor and state legislature should interpret  3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793 (2002).

6.      Analogously, under the Electors Clause, the state legislatures lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done in Wis. Stat. § 7.70 (5) (b) by delegating certification to the Wisconsin Elections Commission. The Electors Clause, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential elector, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state executive branch officials. If the Electors Clause wanted "delegation," the Electors Clause would have the word "delegate, not the word "direct," in it. Therefore, the Governor and state legislature should interpret Wis. Stat. § 7.70 (5) (b) as an unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

7.      If the state legislature does vote affirmatively for post-election certification of the Presidential electors, the Presidential electors cannot be counted.

8.      I will, therefore, be injured as a voter because my vote and others' votes are not being counted and certified by the state legislature as required by the Constitution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 13, 2020

Debbie Jacques

DECLARATION

I, Richard W. Kucksdorf, residing at W2289 Church Drive, Bonduel, WI 54107,

being duly sworn, declares as follows:

1.      I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit

regarding the Electoral College.  I am a voter in Wisconsin.  I voted in the November 3,

2020 election for Vice President.

2.      I have personal knowledge of the following.

3.      I have demanded through the Wisconsin Voters Alliance that the state

legislature meet to vote for post-election certification of the Presidential Electors.  If the

state legislature does not do so, the Presidential electors cannot be counted.  The Electors

Clause of Article II of the Constitution requires state legislative post-election certification of

the Presidential electors for their vote to count.

4.      I am seeking a constitutionally-compliant process for post-election

certification of Presidential electors and counting of their votes for the November 3, 2020

Presidential election and future elections.

5.      Under the Electors Clause of Article II and the Twelfth Amendment of the

United States Constitution, Congress lacks legal authority to enact laws interfering with the

state-by-state state legislative post-election certification of Presidential electors as it has done

with 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14 and 15.  There are textual and structural

arguments for these federal statutes being unconstitutional.[1] Therefore, the Governor and

---

[1] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1793
(2002).

state legislature should interpret 3 U.S.C. §§ 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 as unconstitutional interference with the state legislative prerogatives guaranteed by the Constitution.

6.    Analogously, under the Electors Clause, the state legislatures lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done in Wis. Stat. § 7.70 (5) (b) by delegating certification to the Wisconsin Elections Commission. The Electors Clause, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential elector, not to "delegate" post-election certification, perpetually and in a wholesale fashion, to state executive branch officials. If the Electors Clause wanted "delegation," the Electors Clause would have the word "delegate, not the word "direct," in it. Therefore, the Governor and state legislature should interpret Wis. Stat. § 7.70 (5) (b) as an unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

7.    If the state legislature does vote affirmatively for post-election certification of the Presidential electors, the Presidential electors cannot be counted.

8.    I will, therefore, be injured as a voter because my vote and others' votes are not being counted and certified by the state legislature as required by the Constitution!

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 13, 2020

Richard W. Kucksdorf

DECLARATION

I, Debbie Jacques, residing at 1839 Soul Oneida Street, Green Bay, WI being duly sworn, declares as follows:

I am a plaintiff in the US District Court for the district of Columbia lawsuit regarding the Electoral College.

I am a voter in Wisconsin. I voted in the November 3rd general election, and the Presidential electors should not be counted. I will be injured as a voter because my vote and others' votes relating to the November 3rd 2020 presidential election were not properly, legally and/equally obtained, counted and/ or certified.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 14, 2020

Debbie Jacques
Concerned Wisconsin Citizen

## DECLARATION

I, David Steffen, residing at 715 Olive Tree Court, Green Bay, WI 54313, being duly sworn, declares as follows:

I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College.

I am a voter in Wisconsin.  I voted in the November 3 presidential general election, and the Presidential electors should not be counted.  I will be injured as a voter because my vote and others' votes relating to the November 3, 2020 presidential election were not properly, legally and/or equally obtained, counted and/or certified.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 14, 2020

_____
David Steffen
State Representative, 4th Assembly District

DECLARATION

I, Jeff L. Mursau, residing at 4 Oak Street, Crivitz, WI 54114, being duly sworn, declares as follows:

I am a plaintiff in the U.S. District Court for the District of Columbia lawsuit regarding the Electoral College.

I am a voter in Wisconsin. I voted in the November 3, 2020 election for Vice President. I am also a state legislator in the Wisconsin. I will, therefore, be injured as a voter because my vote and others' votes are not being counted and certified by the state legislature as required by the Constitution. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 13, 2020



Jeff L. Mursau
State Representative, 36th Assembly District

I APP. 1568