# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **WISCONSIN VOTERS ALLIANCE**, *et al.*,<br><br>    **Plaintiffs,**<br><br>v.<br><br>**VICE PRESIDENT MICHAEL R. PENCE,** *et al.*,<br><br>    **Defendants.** | **Case No. 20-cv-3791 (JEB)** |

## DECLARATION OF RICHARD W. DRISCOLL, ESQUIRE

I, Richard W. Driscoll, pursuant to LCvR 11.2, hereby declare under penalty of perjury as follows:

1.    I am an attorney admitted to practice in the District of Columbia, Maryland, and Virginia. I have been an attorney for 30 years and a member of this Court for over 20 years. I am also a member of the U.S. Courts of Appeals for the District of Columbia and the Fourth Circuit, U.S. District Courts for the District of Maryland, Eastern District of Virginia and Western District of Virginia, and the U.S. Bankruptcy Court for Eastern District of Virginia.

2.    Since at least 1995, a focus of my practice is advising and representing individual attorneys and law firms regarding their professional obligations and liability. I am a member of the Association of Professional Responsibility Lawyers and the American Bar Association Center for Professional Responsibility. I received a B.A. degree from the University of Utah in 1986 and a J.D. degree from The American University, Washington College of Law in 1990. I am currently a principal in the Alexandria, Virginia law firm of Driscoll & Seltzer, PLLC. My hourly rate is $625.00 per hour.

3.      Based on my knowledge, skill, experience, training, education and review of relevant pleadings from this litigation as well as independent research, I am providing the following opinions and conclusions to a reasonable degree of legal certainty.

4.      Erick G. Kaardal is admitted to practice before the U.S. District Court for the District of Columbia ("District Court"). Mr. Kaardal is the Plaintiffs' counsel in an action styled as *Wisconsin Voters Alliance, et al. v. Pence, et al.*, Case No. 20-cv-3791-JEB (the "Voters Alliance Action"). Attorneys representing Mr. Kaardal requested I review the Complaint and other related pleadings to determine whether the claims alleged therein constitute a clear and convincing violation of Rule 3.1 of the Rules of Professional Conduct.

5.      Attorneys who are admitted to practice before the District Court are subject to the District of Columbia Rules of Professional Conduct ("Rules"). A violation of the Rules is grounds for discipline by the Committee on Grievances ("Committee"). LCvR 83.15(a). When deemed necessary or appropriate, a Court may refer a Complaint to the Committee regarding any attorney who engaged in conduct which, if substantiated, would warrant the imposition of discipline. LCvR 83.16(d)(2). If the alleged misconduct identified in a complaint to the Committee is sustained by clear and convincing evidence, the Committee "may reprimand, censure, suspend, disbar or otherwise discipline" the attorney. LCvR 83.16(d)(8).

6.      On January 4, 2021, the District Court issued a Memorandum Opinion denying a Motion for Preliminary Injunction in the Voters Alliance Action. Following voluntary dismissal of the Complaint on January 7, 2021, the District Court issued a Minute Order requiring that "Plaintiffs' counsel shall show cause why the Court should not refer him to the Committee on Grievances for all of the reasons discussed in its recent [10] Memorandum Opinion."

7.     A lawyer's professional responsibility for advancing meritorious claims and contentions is governed by Rule 3.1 of the Rules of Professional Conduct, which reads, in relevant part:

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good-faith argument for an extension, modification, or reversal of existing law.

8.     Attorney conduct is governed by the words of each Rule of Professional Conduct. However, general guidance from the introductory Scope of the Rules applies to Mr. Kaardal's circumstances.  The District of Columbia, and other jurisdictions, view the Rules as "rules of reason" that "should be interpreted with reference to the purposes of legal representation and of the law itself." Scope, Comment [1].  "The Rules simply provide a framework for the ethical practice of law." *Id.* at Comment [2].

9.     Mr. Kaardal's compliance with Rule 3.1 is evaluated by the facts and circumstances known on December 22, 2020, the filing date for the Complaint and related Motion for Preliminary Injunction:

> Failure to comply with an obligation or prohibition imposed by a rule is a basis for invoking the disciplinary process. ***The Rules presuppose that disciplinary assessment of a lawyer's conduct will be made on the basis of the facts and circumstances as they existed at the time of the conduct in question and in recognition of the fact that a lawyer often has to act upon uncertain or incomplete evidence of the situation***. Moreover, the Rules presuppose that whether or not discipline should be imposed for a violation, and the severity of a sanction, depend on all the circumstances, such as the willfulness and seriousness of the violation, extenuating factors, and whether there have been previous violations.

Scope, Comment [3] (emphasis added).

10.     When applying Rule 3.1 in the District of Columbia, the Committee is instructed that the law is not static and determining a meritorious claim from an ethical perspective must

3

account for the "law's ambiguities and potential for change." Comment [1] to D.C. Rule 3.1 reads, in part:

> The law, both procedural and substantive, establishes the limits within which an advocate may proceed. ***However, the law is not always clear and never is static***. Accordingly, in determining the proper scope of advocacy, ***account must be taken of the law's ambiguities and potential for change***.

(Emphasis added.)

11.     Claims for relief have merit even when the attorney advancing a claim does not believe it will succeed provided there is a basis in law and fact that is not frivolous. The guidance from Comment [2] applies with full force to this case:

> Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail. The action is frivolous if the lawyer is ***unable either to make a good-faith argument on the merits of the action taken or to support the action taken by a good-faith argument for an extension, modification, or reversal of existing law***.

Rule 3.1, Comment [2] (emphasis added). Comment [2] clarifies that likelihood of success on the merits is not the touchstone for determining a meritorious claim. Indeed, every unsuccessful litigant advanced at least one claim that was not likely to succeed.

12.     The language of, and Comments for, Rule 3.1 clearly demonstrate that determining whether a claim is meritorious is not concerned with the likability of the plaintiff(s), their political viewpoints, the equity of their position, the equity of the relief sought, whether one would advise their own client to file such a claim, or any similar considerations. ***It matters only whether there is an objective basis in law and fact for the claim that is not frivolous***.

13.     Regarding Rule 3.1, the District of Columbia Court of Appeals cautions: "Attorneys in the District of Columbia should not fear discipline for making aggressive and creative arguments." *In re Pearson*, 228 A.3d 417, 424 (D.C. 2020) (citations omitted). Thus, a

4

frivolous complaint "is more than ultimately meritless, and the good faith exception to a Rule 3.1 violation allows a wide range of creative and aggressive challenges to existing law." *Id.* The Rules of Professional Conduct, and in particular Rule 3.1, are not meant to have a chilling effect on meritorious but unpopular claims.

14.     The Complaint filed by Mr. Kaardal for the Plaintiffs contains three claims seeking declaratory and injunctive relief. Count 1 alleges that under Article II of the U.S. Constitution and the non-delegation doctrine:

- Plaintiffs have a voting right to state legislative post-election certification of their Presidential votes and Presidential electors;

- State legislative bodies may not delegate the post-election certification responsibilities to state executive branch officials or the federal government;

- Congress lacks legal authority to interfere in the legislative post-election certification;

- 3 U.S.C. §§ 5, 6 and 15, and any state laws enacted based on these statutes, are an unconstitutional interference of the non-delegable right to post-election Presidential elector certification; and

- Any count of Presidential electors who did not receive state legislative post-election certification is invalid.

Count 2 (Equal Protection) and Count 3 (Due Process) are derivative of Count 1. The foregoing summary is abbreviated and simple as the legal basis for this claim is alleged in Paragraphs 31 through 96 of the Complaint and includes 31 statutory and case law citations. The remaining 73 pages of allegations contain examples of tumult, disorder, and lawlessness that the Plaintiffs seek to correct. *See* Complaint [Docket No. 1] at p. 14 and ¶¶ 97-431.

15.     The District Court's Memorandum Opinion identifies several deficiencies relating to the alleged claims, including that the central premise of the Complaint is "flat-out wrong" based on the plain language of Article II. Employing a mode of interpretation known as textualism, the

District Court concludes that the phrase "as the Legislature thereof may direct" means that the state legislature may employ any process it approves. Memorandum Opinion at p. 5 ("So if the legislature directs that the Governor, Secretary of State, or other executive-branch entity shall make the certification, that is entirely constitutional."). The District Court also challenged the good faith of Plaintiffs (and their counsel) because they waited seven weeks after the election to challenge state and federal statutes that existed in some instances for decades.

16.     Based on my review of the Complaint, Motion for Preliminary Injunction, authorities cited therein, Declaration of Erick G. Kaardal and independent research, it is my opinion that the claims alleged in the Complaint filed by Mr. Kaardal on December 22, 2020 do not violate Rule 3.1 of the D.C. Rules of Professional Conduct. At a minimum, Mr. Kaardal possessed a legal basis consisting of a good-faith argument for an extension, modification, or reversal of existing law and a factual basis consisting of five state legislative schemes consistent with his legal theory.

17.     Relying on intertextual and structural modes of constitutional interpretation, Plaintiffs allege that the term "direct" as used in Article II, Section 1, requires the state legislature to be directly engaged in, and may not delegate, the post-election certification of Presidential votes and Presidential electors. Recently, the U.S. Court of Appeals for the Seventh Circuit acknowledged that the "Electors Clause" is susceptible to "at least" two differing interpretations, and possible more:

> *Defining the precise contours of the Electors Clause is a difficult endeavor. The text seems to point to at least two constructions, and the case law interpreting or applying the Clause is sparse.* This case does not require us to answer the question, as the Commission's guidance did not amount to a violation under the two most likely interpretations.

6

*Trump v. Wisconsin Elections Comm'n*, 983 F.3d 919, 926 (7th Cir. 2020) (emphasis added). The Seventh Circuit's statements recognize the ambiguity in the Electors Clause, which places the alleged claims of the Complaint within the area where "consideration should be given to the clarity or ambiguity of the law." *In re Spikes*, 881 A.2d 1118, 1125 (D.C. 2005). Mr. Kaardal was engaged in a "difficult endeavor." Because "the law is not always clear and never is static, . . . lawyers must be able to press for change and reform in the law." *Id.*

18.     It is not uncommon for differing modes of constitutional interpretation to result in entirely different readings of the Constitution, many of which establish rights that do not appear in the express language of the document.  For example, in *Griswold v. Connecticut*, 381 U.S. 479 (1965), the majority concluded that the Due Process Clause of the Fourteenth Amendment includes a general right to privacy and declared a Connecticut law unconstitutional for criminalizing the provision of birth control to married couples. In the dissent, Justice Black critiqued the majority for diverging from the pure text of the Constitution and relying too much on natural law to establish the right to privacy. *Id.* at 507 – 27.

19.     The District Court's Memorandum Opinion challenges Mr. Kaardal's good faith based on the Complaint's timing. For purposes of Rule 3.1, timing is relevant only to the evaluate the legal and factual merit of the alleged claims. Based on Mr. Kaardal's Declaration, timing was calculated to ensure that the claims were ripe considering 3 U.S.C. § 7, which provides that electors will "meet and give their votes on the first Monday after the second Wednesday in December." The decision was made based on substantial research and analysis. Once the process concluded on December 14, 2020, the Complaint was filed only eight days later. It is my opinion that Mr. Kaardal's conclusion based on research, analysis and statutory interpretation regarding timing

satisfies the necessary good faith for filing these creative and aggressive claims and does not demonstrate a violation of Rule 3.1 by clear and convincing evidence.

20.     Some attorneys may not agree with the claims asserted by Mr. Kaardal (myself included) and would not advise their clients to file the Complaint. However, evaluating the merits of the Complaint must be done solely from the context of whether there was a basis in law and fact on December 22, 2020. Professional regulation of the legal profession cannot be based on disagreement with political views or requested relief. The same standard for discipline applies to all attorneys, even those who make "aggressive and creative arguments." *Pearson*, 228 A.3d at 424. Here, Mr. Kaardal acted in compliance with Rule 3.1.

21.     I certify that this report is a complete and accurate statement of all of my opinions, and the basis and reasons for them, to which I will testify under oath.

I HEREBY DECLARE under penalty of perjury that the forgoing is true and correct.

Dated: February 4, 2021

Richard W. Driscoll, Esquire (436471)
Driscoll & Seltzer, PLLC
2000 Duke Street, Suite 300
Alexandria, VA 22314
703.822.5001 Telephone
703.997.4892 Facsimile
Email: rdriscoll@driscollseltzer.com

# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**WISCONSIN VOTERS ALLIANCE,** *et al.*,

PLAINTIFFS,

V.

**VICE PRESIDENT MICHAEL R. PENCE,**
*et al.,*

DEFENDANTS.

**CASE NO.: 1:20-CV-03791-JEB**

<u>**Declaration of Erick G. Kaardal, Esquire**</u>

I, ERICK G. KAARDAL, ESQUIRE, pursuant to Rule 11.2 of the Local Rules, declare under penalty of perjury that:

<u>**Introduction**</u>

1.      By way of background, I am 55 years old and the father of eight children.  My oldest child works on Capitol Hill as a U.S. House of Representatives Legislative Correspondent.

2.      I graduated from Harvard University in 1988. After graduating from Harvard University, I enrolled at the University of Chicago School of Law.  I graduated from the University of Chicago School of Law in 1991 with a juris doctor degree.

3.      After graduating from the University of Chicago School of Law, I applied for admission to Bar of the Minnesota Supreme Court. In October, 1992, after passing the bar examination, I was admitted to practice before the Minnesota Supreme Court.  I started working as an associate attorney with Faegre & Benson (n/k/a Faegre, Drinker, Biddle & Reath, LLP) in Minneapolis, Minnesota in October, 1992. After working at Faegre, I joined the law firm of Trimble & Associates in Anoka, Minnesota. Finally, in 2000, I joined my current law partner, William F. Mohrman, at his law firm in Minneapolis. Upon my hiring, the firm's name was

changed to Mohrman & Kaardal, P.A.  I have worked at Mohrman & Kaardal continuously since 2000.  The firm is now known as Mohrman, Kaardal & Erickson, P.A.

4.      During my practice, I have handled numerous business and public policy cases. Attached as Exhibit T is a copy of a list of cases I have handled through the appellate level.

5.      I am admitted to practice law in several jurisdictions and courts. I am admitted in state court in Minnesota and Wisconsin. My admission in state court in Illinois is pending. I am admitted in the U.S. Supreme Court.  I am admitted in the following circuits of the U.S. Court of Appeals:  D.C. Circuit, Federal Circuit, 3rd Circuit, 6th Circuit, 7th Circuit and 8th Circuit.  I am admitted in the U.S. Court of Federal Claims and in the U.S. Tax Court. I am admitted to the following U.S. District Courts: District of Columbia, Minnesota and Western District of Wisconsin.

6.      I have been practicing law for over twenty-nine (29) years and I have not been disciplined by any attorney regulatory authority.

7.      I submit this declaration to explain my position and catalog my extensive efforts and research regarding the four areas of concern this Court addressed in its January 4, 2021, Order: Plaintiffs' standing, personal jurisdiction, service of the Complaint on the named Defendants, and further explanation for the support underlying the Complaint and Motion for Preliminary Injunction.

### **Plaintiffs' Standing**

8.      In the Memorandum supporting the Motion for Preliminary Injunction I set forth the basis for Plaintiffs' standing in this case. Ex. H, Memorandum at 36-42. In short, Plaintiffs have standing as voters because Defendants violated Plaintiffs' voting rights to have the respective state legislatures provide for post-election certifications of their votes and of Presidential Electors

and to count only the votes of Presidential Electors so certified being counted toward the election of President and Vice President.

9.      As voters, the Plaintiffs had legal standing to bring these constitutional claims to ensure that Presidential elections are constitutionally conducted by Defendants. Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., Art. III, § 2.

10.     The U.S. Court of Appeals for the Fourth Circuit found plaintiffs had Article III standing in *Baten v. McMaster*, 967 F.3d 345, 352–53 (4th Cir. 2020). Plaintiffs alleged their votes for Democratic presidential candidates were, in effect, discarded under South Carolina's winner-take-all process. The Fourth Circuit held this type of disenfranchisement "is the type of concrete, particularized injury that Article III contemplates." *Baten*, 967 F.3d at 353.

11.     Similarly, here, the Plaintiffs claimed they had been disenfranchised. The Plaintiffs alleged that Article II of the U.S. Constitution provides a voter a constitutional right to the voter's Presidential vote being certified as part of the state legislature's post-election certification of Presidential Electors. Absent such certification, the Presidential Electors' votes from that state cannot be counted by the Federal Defendants toward the election of President and Vice President under Article II of the U.S. Constitution. Because the Plaintiffs' votes are not counted as part of the constitutionally-required state legislative post-election certification of Presidential Electors, the Plaintiffs are disenfranchised.

12.     The Defendants' disenfranchisement of the Plaintiffs' voting rights is that the Plaintiffs' votes were never properly certified by the state legislature which, based on that certification, certifies the Presidential Electors whose votes are counted by the Federal Defendants to elect the President and Vice President. The Defendants' disenfranchisement of the Plaintiffs'

voting rights is caused by 3 U.S.C. §§ 5, 6, 15, and the Defendants' state constitutions and state laws including Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat. § 3166.

13.     When Defendants violate the U.S. Constitution as it relates to Presidential elections in the Defendant States, all voters in Presidential elections suffer an injury-in-fact caused by the Defendants. Voters in a Presidential election, in this instance, have an injury-in-fact different than the public because they voted and they thus had an interest that the election in which they voted is conducted consistent with the U.S. Constitution. The same is true of future Presidential elections. Finally, the Court can redress the Plaintiffs' injuries by issuing a declaratory judgment and accompanying injunction to ensure Defendants have the respective state legislatures certify their respective slate of Presidential Electors after the November general election.

14.     Furthermore, as voters, each Plaintiff has a fundamental right to vote. *Reynolds v. Sims*, 377 U.S. 533, 554–55, 562 (1964). Thus, each Plaintiff has a recognized protectable interest in voting. As the U.S. Supreme Court has long recognized, a person's right to vote is "individual and personal in nature." *Id*. 377 U.S. at 561. Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). "Safeguarding the integrity of the electoral process is a fundamental task of the Constitution, and [the courts] must be keenly sensitive to signs that its validity may be impaired." *Johnson v. FCC*, 829 F.2d 157, 163 (D.C. Cir. 1987). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

15.     For Presidential elections, the Defendant States under Article II have no legal authority to prevent state legislatures from post-election certifications of Presidential votes and of

Presidential Electors. That is the harm Plaintiffs suffered. Article II's imperative sentence regarding Presidential elections gives voters the right to have their respective state legislatures engage in post-election certifications of Presidential votes and of Presidential Electors —not Governors nor state or local election officials.

16.     The harm from the federal law—3 U.S.C. §§ 5, 6, 15—and the state laws— including Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat. § 3166—is the loss of a voter remedy of state legislative post-election certifications required as a core governmental function under Article II. In turn, the Federal Defendants' acceptance of the Presidential Electors' votes without state legislative post-election certification of Presidential Electors is a further violation of Article II causing more injury to the Plaintiffs.

17.     Additionally, in this Court's January 4, 2021 Memorandum Order, this Court questioned "[n]or do they ever mention why they have waited until seven weeks after the election to bring this action and seek a preliminary injunction based on purportedly unconstitutional statutes that have existed for decades - since 1948 in the case of the federal ones." *See* ECF No. 10 at 6.

18.     The timing of the filing of this lawsuit was in accordance with 3 U.S. Code § 7. The electoral votes were cast in the respective states on December 14, 2020, pursuant to 3 U.S. Code § 7 which states:

> The electors of President and Vice President of each State shall meet and give their votes on the first Monday after the second Wednesday in December next following their appointment at such place in each State as the legislature of such State shall direct.

19.     If at any time prior to December 14, 2020, the respective state legislatures had conducted a post-election certification of the Presidential Electors, Plaintiffs' claims here would have been moot.  Moreover, the claims in this case were probably not ripe before December 14,

2020.  Plaintiffs filed this lawsuit on December 22, 2020 – just eight (8) days later.

**Personal Jurisdiction**

20.     This Court does not cite any legal authority in its January 4, 2021 Memorandum

Opinion supporting its conclusion that it did not have personal jurisdiction over the Defendants in

this case. Personal jurisdiction under the District of Columbia's long-arm statute, D.C. Code § 13-

423, existed over the state official Defendants—and there are two "open questions" left for the

D.C. Circuit to decide which are directly on point for this issue.

21.     First, in this Court there is an "open question" on whether personal jurisdiction over

state officers sued in their official capacity for *Ex parte Young* prospective relief (as had happened

in this case) should be analyzed as a suit against the state officer, individually, or against the state

itself. Specifically, as this Court noted in 2019:

> It is an open question in this Circuit whether, for jurisdictional
> purposes, a suit like this one against state officers sued in their
> official capacities for prospective relief, see *Ex parte Young*, 209
> U.S. 123, 155-56, 28 S. Ct. 441, 52 L. Ed. 714 (1908), should be
> considered a suit against state officers in their individual capacities
> or instead as a suit against the state itself. *See West*, 60 F. Supp. 3d
> at 196 (noting the open question).

*Trump v. Comm. on Ways & Means*, 415 F.Supp.3d 98, 106 (D.D.C. 2019).

22.     Second, the United States Court of Appeals for the District of Columbia Circuit in

*West v. Lynch*, 427 U.S. App. D.C. 260 (2017), left open a different question of whether state

officials fall under the District of Columbia's long-arm statute, D.C. Code § 13-423(a)(1), because

of "transacting any business in the District of Columbia."  The lower court, in addition to finding

a lack of Article III standing, found a lack of personal jurisdiction over the state officials

interpreting "business" on D.C.'s long-arm statute as not including political business. On appeal,

the Circuit Court was troubled enough by the lower court's narrow interpretation of "business" in

D.C. Code § 13-423(a)(1), that the Circuit Court appointed amicus curiae counsel to argue appellant's position.

23.     In *West*, the D.C. Circuit-appointed amicus curiae counsel argued on plaintiffs' behalf that the Court had personal jurisdiction over state officials under D.C. Code § 13-423(a)(1) because they did "business" in the District of Columbia:

> The district court erred in construing the D.C. long-arm statute. Under D.C. law, personal jurisdiction is available based on "transacting any business" in the District. Although this Court and the D.C. Court of Appeals interpret that provision broadly, the district court narrowed it to reach only "commercial" business. A decision of this Court strongly suggests that "transacting any business" is not so limited, and other courts have squarely held that it is not. As a matter of ordinary usage and an accepted definition in Black's Law Dictionary, it is common to refer to noncommercial affairs as "business." Because Plaintiff has alleged that Governor Inslee engaged in extensive contacts with the District on state business relevant to his claims, the long-arm statute is satisfied.

Ex. I, Brief for Court-Appointed Amicus Curiae Supporting Reversal in *West v. Lynch*, 2016 WL 4942829 (D.C. Cir. 2016) at 9-10. The D.C. Circuit Court did not address personal jurisdiction in its final decision because the Circuit Court affirmed dismissal based on a lack of Article III standing.  *West*, 845 F.3d at 1231, n. 2.  Upon information and belief, to date, the D.C. Circuit has not addressed the Court-appointed amicus curiae arguments in *West* that D.C. Code § 13-423(a)(1) covers state officials acting in their official capacity for purposes of personal jurisdiction.

24.     The Complaint and Memorandum in Support of the Motion for Preliminary Injunction have many allegations and facts supporting that D.C. Code § 13-423 was satisfied. Particularly, subsections (a)(1), (a)(3), (a)(4) and (b) were satisfied.

25.     For example, the Memorandum in Support of the Motion for Preliminary Injunction includes discussion of how the State Defendants' certification, or lack of certification, affects the Congressional count of the states' Presidential Electors, which occurs in the Hall of the House of

Representatives, located in the District of Columbia:

> Under 3 U.S.C. §§ 5, 6 and 15, each of the Defendants, except the
> state legislative leaders and their state legislatures, have a role to
> play in state post-election certification of Presidential votes, state
> post-election certification of a State's Presidential Electors or
> counting of the Presidential Electors' votes. Under 3 U.S.C. § 15,
> "Congress shall be in session on the sixth day of January succeeding
> every meeting of electors. The Senate and House of Representatives
> shall meet in the <u>Hall of the House of Representatives</u> at the hour of
> 1 o'clock in the afternoon on that day." Under 3 U.S.C. § 15, Vice
> President Michael Richard Pence is the presiding officer on January
> 6, 2021: "and the President of the Senate shall be their presiding
> officer." Vice President Pence, the U.S. Senate and the U.S. House
> of Representatives are Defendants who presume under 3 U.S.C. §§
> 5 and 6, that each State's Presidential Elector votes can be counted
> because they are designated by the Governor of each Defendant
> State —even without state legislative post-election certification.

Ex. H at 3 (emphasis added).

26.     Accordingly, the Plaintiffs' Memorandum in Support of the Motion for Preliminary

Injunction claims that injury occurred to them in the District of Columbia when the Federal

Defendants unconstitutionally counted ballots of Presidential Electors designated by the

Governors, not the state legislatures, under 3 U.S.C. §§ 5, 6, 15:

> The federal and state laws violate voters' rights by preempting state
> legislative post-election certification of their Presidential votes and
> post-election certification of the Presidential Electors. 3 U.S.C. §§
> 5, 6, 15 also unconstitutionally allow [Congressionally] counting of
> votes of Presidential Electors who [were identified by the Governors
> but] have not received the constitutionally-required state legislative
> postelection certification.

*Id*. at 14.

**I.     D.C. Code § 13-423(a)(1) was satisfied.**

27.     Due to the D.C. Circuit in *West* not resolving the differing interpretations of

subsection (a)(1), there is still an "open question" as of December 22, 2020 whether "business" in

subsection (a)(1) includes political business. The D.C. Circuit-appointed amicus curiae counsel

argued it did. Ex. I, 2016 WL 4942829 at 9-10. The D.C. Circuit neither accepted nor rejected the argument instead affirming dismissal based on a lack of Article III standing. *West*, 845 F.3d at 1231, n. 2. On the other hand, the Court in *Trump* interpreted "business" narrowly to preclude political business. *Trump*, 415 F.Supp.3d at 106-107.

28.     Under the circumstances, the amicus curiae counsel in *West* has the better argument under subsection (a)(1): political business is covered by "business." The amicus curiae counsel argued that "business" in subsection (a)(1) covered "political business" and that Governor Inslee engaged in political business in the District of Columbia. Ex. I at 10-11.

29.     Similar to the amicus curiae brief in *West*, Plaintiffs in this case argue that the State Defendants are involved in political business in the District of Columbia. As a result, subsection (a)(1) was satisfied. Specifically, Article II and 3 U.S.C. §§ 5, 6 and 15 involve the State Defendants in the Congressional electoral counting process on January 6, every four years after a Presidential election. The states appoint the Presidential Electors according to the state legislature's method and the Governors, under federal law, identify the Presidential Electors for Congress. All these state official activities precede the Congressional counting in the District of Columbia on January 6.

30.     Notably, there is nothing in the D.C. Circuit opinion in *West*, nor the Court's decision in *Trump*, that the arguments about subsection (a)(1) applying to "political business" were frivolous or bad faith. In fact, given this Court's statement in *Trump* that the issue of personal jurisdiction in the District of Columbia over state officials acting in their official capacity is an "open question" in the D.C. Circuit, I believe an argument asserting such personal jurisdiction can be made in good faith.

II.     **D.C. Code § 13-423(a)(3) was satisfied.**

31.     Under D.C. Code § 13-423(a)(3), the claim must arise from "tortious injury in the District of Columbia by an act or omission in the District of Columbia."  The Court in *Trump* analyzed subsection (a)(3) and found it not satisfied.  *Trump*, 415 F.Supp.3d at 108-109.  But, the facts in this case were distinguishable from *Trump* because Article II and 3 U.S.C. §§ 5, 6 and 15 involve the State Defendants in the Congressional electoral counting process in the District of Columbia on January 6, every four years after a Presidential election. Congress, under 3 U.S.C. § 15 in the District of Columbia, counts the Presidential Elector votes it chooses to count under a process involving objection and rejection by the two houses.

32.     Part of that process is that the Governor's act in the District of Columbia by delivering through their agents the votes of the identified Presidential Electors.  Part of that process is that the state legislatures in the District of Columbia are unconstitutionally omitting delivering their certified list of Presidential Electors and votes.

33.     The collective acts of Congress, the Governors and state legislatures in the District of Columbia under 3 U.S.C. §§ 5, 6 and 15 violate Article II because the state legislatures are not involved in the certification of Presidential Electors—but Congress and the Governors are.

34.     These acts in the District of Columbia cause injury in the District of Columbia to the Plaintiffs.

III.    **D.C. Code § 13-423(a)(4) was satisfied.**

35.     Under D.C. Code § 13-423(a)(4), the claim must arise from "causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia...."  The

Court in *Trump* analyzed subsection (a)(4) and found it not satisfied because there was no "plus factor present" including the most lenient "no persistent course of conduct" in the District of Columbia. *Trump*, 415 F.Supp.3d at 109-110.

36.     The facts in this case are distinguishable from *Trump* because Article II and 3 U.S.C. §§ 5, 6 and 15 involve the State Defendants in the Congressional electoral counting process in the District of Columbia on January 6, every four years after a Presidential election. The Federal and State Defendants engage in a persistent course of conduct regarding Article II and Congress under 3 U.S.C. § 15 in the District of Columbia.

37.     Congress counts the Presidential Elector votes it chooses to count under a process involving objection and rejection by the two houses of Congress. Part of that process is that the Governor's act by delivering through their agents the votes of the identified Presidential Electors. Part of that process is that the state legislatures are unconstitutionally omitting delivering their certified list of Presidential Electors and votes.

38.     The collective acts of Congress, the Governors and state legislatures in the District of Columbia under 3 U.S.C. §§ 5, 6 and 15 violate Article II because the state legislatures are not involved in the certification of Presidential Electors—but Congress and the Governors are. These acts in the District of Columbia cause injury in the District of Columbia to the Plaintiffs. These acts are a persistent course of conduct in the District of Columbia. In 2024 and future elections, everyone's votes are similarly threatened by the Federal and State Defendants' unconstitutional process in the District of Columbia.

## IV.    D.C. Code § 13-423(b) was satisfied.

39.     Finally, D.C. Code § 13-423(b) limits the claims to the acts specified in subsection (a): "When jurisdiction over a person is based solely upon this section, only a claim for relief

arising from acts enumerated in this section may be asserted against him." In this case, the Plaintiffs' claims were limited to acts specified in subsection (a).  As detailed above, the Plaintiffs asserted personal jurisdiction based on their claims arising out of the Presidential Electoral processes created by 3 U.S.C. §§ 5, 6 and 15 which violates Article II. The same acts and omissions supporting personal jurisdiction support the constitutional claims. Therefore, D.C. Code § 13-423(b) was also satisfied.

40.     Accordingly, this Court had personal jurisdiction over the Defendants in this case.

**Service on Defendants**

41.     On December 22, 2020, this Court issued the Summons for this case. Ex. F at ECF No. 7. Immediately following receipt of the Summons for the various Defendants I began my efforts to effectuate service on each of the named Defendants. First, on December 22, 2020, I directed my staff to deliver the Summons and Complaint to each of the Defendants by Priority Mail under Rule 4.  Attached as Exhibit K are the receipts from the United States Postal Service of the mailings which includes the date of the mailing and addressee. Attached as Exhibit L are the four Waivers of the Service of Summons I obtained.

42.     Second, I hired process servers to serve the Summons and Complaints.  Attached as Exhibit K are copies of Affidavits of Service the process servers signed serving the Summons and Complaints. Attached as Exhibit M are the invoices issued by the process servers I hired to serve the Summons and Complaints.

43.     On December 23, 2020, this Court issued a Minute Order which stated in full "MINUTE ORDER: The Court ORDERS that, as soon as Plaintiffs file proofs of service on all Defendants, a briefing schedule and hearing shall be set. SO ORDERED by Judge James E. Boasberg on 12/23/2020." Ex. F at 7.

44.     I understood this Order to mean that filing proof of service on "all" defendants was required before a briefing schedule and hearing date would be set. Accordingly, in good faith, I interpreted this Court's Order as requiring the proofs of service be filed after "all" the Defendants were served. I interpreted the order in this manner because I assumed that the Court could not set a briefing schedule and hearing date until after all defendants had been served.  I also did not want to place the burden on the Court of determining when all of the defendants had been served. Rather, I believed that what the Court wanted me to do was to file the proofs of service after all of the defendants had been served. As such, I continued my efforts to serve all named Defendants so I could file the proofs of service for all Defendants at the same time.

45.     Twelve (12) days after the filing of this Court's Minute Order on December 23, 2020, which included two weekends, Christmas Day and New Year's Day, this Court issued its Memorandum Opinion on January 4, 2021, which states in relevant part that there was a "failure to make any effort to serve or formally notify any Defendant – even after reminder by the Court in its Minute Order – renders it difficult to believe that the suit is meant seriously." ECF No. 10 at 6. However, as set forth above, I interpreted this Court's December 23, 2020, Minute Order as requiring the proofs of service be filed after all the Defendants were served. In fact, I had been working diligently to serve all the Defendants and obtain proofs of service for all Defendants beginning this work prior to the Court's filing of its Minute Order on December 23, 2020.

46.     As of January 4, 2021, all Defendants, except one individual in Arizona and one individual in Wisconsin, were served. With respect to those individuals, multiple attempts were made prior to January 4, 2021. Attached as Exhibit U are two Affidavits of Due Diligence covering the last two Defendants who were not personally served. The Affidavits reflect the attempts made prior to January 7, 2021. Ex. U, Affidavits of Due Diligence. Due to COVID-19 protocols, closed

13

government office buildings and difficulties reaching people over the holiday season, some governmental Defendants were more difficult to complete service on than others. Also, some governmental Defendants, but not all, were willing to waive service.

47.     I memorialized my efforts regarding service in a letter to this Court which was electronically filed at ECF Number 11 on January 5, 2021. Ex. C. Also on January 5, 2021, I filed multiple Return of Service Affidavits and Waiver of Service Forms at ECF Numbers 12-14. Ex. E, ECF Nos. 12-14. The court clerk advised me on January 6, 2021, that my letter to this Court at ECF Number 11 was rejected because it did not have a case caption so I refiled the Notice of Filing of Proofs of Service on January 6, 2021. Ex. D, ECF No. 15.

48.     Therefore, I did attempt to serve all Defendants with the Summons and Complaint starting on December 22, 2020. In fact, I succeeded in serving all except two Defendants. I discontinued efforts to serve the remaining two Defendants when I filed the Notice of Voluntary Dismissal on January 7, 2021.

49.     Upon reflection, based on (i) the quick moving nature of this case, (ii) the Motion for Preliminary Injunction that was pending, and (iii) this Court's December 23, 2020, Minute Order, I now understand it would have been optimal in this case to file the proofs of service on the various Defendants as they were received/confirmed on a rolling basis so this Court could be kept apprised on my efforts to effectuate service.

50.     After the denial of the Motion for Preliminary Injunction, the Plaintiffs voluntarily dismissed their Complaint without prejudice on January 7, 2021. No Defendant made an appearance in the case. The State Defendants were immediately served with the Notice of Voluntary Dismissal pleading prior to any notice of appearance being filed.

### The Complaint and Motion for Preliminary Injunction Were Legally Supported

51.     Prior to filing the Complaint in this case, I performed a significant amount of legal research. My legal research determined that there is a strong legal argument that after each Presidential elections every four years each state legislature must meet and vote to determine the state's Presidential electors.  The underlying legal basis of this argument rests on the "independent state legislature doctrine," a legal doctrine essentially stating that when the U.S. Constitution calls for the state legislatures to perform an act, each state legislature, is the only body authorized to perform the act without interference from any other body or law.

52.     After the disputed 1876 election, which was disputed in large part because several states sent different "slates" of presidential electors to the President of the U.S. Senate, Congress passed the Federal Electoral Counting Act. 3 U.S.C. §1, *et seq.*  Most importantly for the above captioned action, the Federal Electoral Counting Act provided that Congress would undertake an independent role determining which Presidential electors would be counted for each state. 3 U.S.C. §3. In addition, the Federal Electoral Counting Act provided for any individual congressperson to object to any state's slate of electors.

53.     In the Complaint filed in the above captioned action, the Plaintiffs asserted that the Federal Electoral Counting Act was unconstitutional under Article II, Section 1 of the U.S. Constitution.  Plaintiffs claimed only the state legislature could certify the Presidential Electors after the election under Article II and send that certification to Congress to be counted by the President of the U.S. Senate. Thus, under Plaintiffs' theory, Congress would have no role in determining slates of the electors or objecting to any particular slate of electors.

54.     If the Plaintiffs prevailed, since the state legislature has plenary authority, and a corresponding constitutional duty, and the state legislature is not subject to any court injunction,

the Plaintiffs proposed an appropriate declaratory judgment and related injunction under Rule 65 of the Rules of Civil Procedure – i.e., that is Congress not counting the votes of Presidential electors who do not have state legislative certification.

55.     As set forth in detail below, the Complaint and Motion for Preliminary Injunction had legal basis to support the legal theories Plaintiffs advanced. This lawsuit was not filed in bad faith or as a symbolic political gesture. At the time this case was filed, Plaintiffs intended to litigate this case.

56.     Plaintiffs claimed in the Complaint that under the intertextual constitutional arguments sometimes called the "independent state legislature doctrine," Article II grants each state legislature with the sole plenary authority to determine the Presidential Electors which federal law, except for a constitutional amendment, and state law cannot abridge. *See Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76 (2000); *McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Carson v. Simon*, 978 F.3d 1051, 1059–60 (8th Cir. 2020). Second, 3 USC § 15, the Federal Electoral Counting Act, is unconstitutional because it interferes with the state legislature's plenary authority under Article II.  Third, if the Plaintiffs prevailed, since the state legislature has plenary authority, and a corresponding constitutional duty, and the state legislature is not subject to any court injunction, the Plaintiffs proposed an appropriate declaratory judgment and related injunction under Rule 65 of the Rules of Civil Procedure – i.e., that is Congress not counting the votes of Presidential Electors who did not obtain post-election certification from the respective state legislatures.  Fourth, the text and structure of the Constitution support Plaintiffs' constitutional claims.

I.      Under the "independent state legislature doctrine," Article II grants each respective state legislature with sole and plenary authority to determine the Presidential Electors which federal and state law cannot abridge.

57.      Under the constitutional arguments called the "independent state legislature doctrine," Article II grants each respective state legislature with sole plenary authority to determine the appointment of Presidential Electors which federal and state law cannot abridge. The independent state legislature doctrine basically provides that when the U.S. Constitution grants authority to "state legislatures," no other body or law can interfere with the state legislature's authority. Neither the state's own constitution, the state's courts, nor the state's governor can interfere with state legislature's authority under Article II. The U.S. Supreme Court cases cited for the independent state legislature doctrine to apply to Article II include *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("The constitution .... leaves it to the legislature exclusively[.]") and *Bush v. Palm Beach Cnty. Canvassing Bd*., 531 U.S. 70, 76 (2000) in the concurring opinion.

58.      Most recently, the Supreme Court in dissent relied on the independent state legislature doctrine in *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 824–25 (2015).  In *Arizona State Legislature*, the U.S. Constitution requires the "state legislature" to draw up new congressional districts in each state every ten years after the completion of the census. The State of Arizona by popular referendum created an independent commission to draw up new congressional districts every year rather than the state legislature.  The Arizona State Legislature sued claiming the independent state legislature doctrine prohibited the new independent commission from drawing these new districts as opposed to the Arizona State Legislature.  The Arizona State Legislature lost 5-4 at the Supreme Court.

59.      However, the dissent was very clear about the application of the independent state legislature doctrine:

Just over a century ago, Arizona became the second State in the Union to ratify the Seventeenth Amendment. That Amendment transferred power to choose United States Senators from "the Legislature" of each State, Art. I, § 3 "the people thereof." The Amendment resulted from an arduous, decades-long campaign in which reformers across the country worked hard to garner approval from Congress and three-quarters of the States.

What chumps! Didn't they realize that all they had to do was interpret the constitutional term "the Legislature" to mean "the people"? The Court today performs just such a magic trick with the Elections Clause. Art. I, § 4. That Clause vests congressional redistricting authority in "the Legislature" of each State. An Arizona ballot initiative transferred that authority from "the Legislature" to an "Independent Redistricting Commission." The majority approves this deliberate constitutional evasion by doing what the proponents of the Seventeenth Amendment dared not: revising "the Legislature" to mean "the people."

*Arizona State Legislature*, 576 U.S. at 824–25.

60.     Chief Justice Roberts continued in his dissent in *Arizona State Legislature*:

The next relevant precedent is this Court's decision in *McPherson v. Blacker,* 146 U.S. 1, 13 S.Ct. 3, 36 L.Ed. 869 (1892). That case involved a constitutional provision with considerable similarity to the Elections Clause, the Presidential Electors Clause of Article II: "Each State shall appoint, in such Manner *as the Legislature thereof* may direct, a Number of Electors...." § 1, cl. 2 (emphasis added). The question was whether the state legislature, as a body of representatives, could divide authority to appoint electors across each of the State's congressional districts. The Court upheld the law and emphasized that the plain text of the Presidential Electors Clause vests the power to determine the manner of appointment in "the Legislature" of the State. That power, the Court explained, "*can neither be taken away nor abdicated.*" 146 U.S., at 35, 13 S.Ct. 3 (emphasis added; internal quotation marks omitted).

*Id.* at 839–40 (emphasis in original).

61.     Further, the U.S. Court of Appeals for the Eighth Circuit, three months ago, relying on *McPherson* and *Bush*, applied the independent state legislature doctrine to Article II in requiring an injunction to issue against the Minnesota Secretary of State enjoining the Secretary of State

from changing election mail-in ballot deadlines due to the COVID pandemic:

> We conclude the Electors are likely to succeed on the merits. This follows from our determination that the Secretary's actions in altering the deadline for mail-in ballots likely violates the Electors Clause of Article II, Section 1 of the United States Constitution. The analysis is relatively straightforward. By its plain terms, the Electors Clause vests the power to determine the manner of selecting electors exclusively in the "Legislature" of each state. U.S. Const. art. II, § 1, cl. 2; *McPherson v. Blacker*, 146 U.S. 1, 27, 13 S.Ct. 3, 36 L.Ed. 869 (1892) ("The constitution .... leaves it to the legislature exclusively[.]"). And this vested authority is not just the typical legislative power exercised pursuant to a state constitution. Rather, when a state legislature enacts statutes governing presidential elections, it operates "by virtue of a direct grant of authority" under the United States Constitution. *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000). Consequently, only the Minnesota Legislature, and not the Secretary, has plenary authority to establish the manner of conducting the presidential election in Minnesota.
>
> Simply put, the Secretary has no power to override the Minnesota Legislature. In fact, a legislature's power in this area is such that it "cannot be taken from them or modified" even through "their state constitutions." *McPherson*, 146 U.S. at 35, 13 S.Ct. 3; *see also Palm Beach*, 531 U.S. at 76–77, 121 S.Ct. 471. Thus, the Secretary's attempt to re-write the laws governing the deadlines for mail-in ballots in the 2020 Minnesota presidential election is invalid. However well-intentioned and appropriate from a policy perspective in the context of a pandemic during a presidential election, it is not the province of a state executive official to re-write the state's election code, at least as it pertains to selection of [P]residential [E]lectors.

*Carson*, 978 F.3d at 1059–60.

62.     Likewise, the U.S. Supreme Court in *Coleman v. Miller*, 59 S.Ct. 972, 979 (1939) addressed, in part, addressed whether the Kansas Lieutenant Governor could participate in state legislative ratification of federal constitutional amendments under Article V because a state executive officer was not a member of the "state legislature" under Article V.  The U.S. Supreme Court was equally divided on the legal issue:

19

> Second.—The participation of the Lieutenant Governor.—
> Petitioners contend at, in the light of the powers and duties of the
> Lieutenant Governor and his relation to the Senate under the state
> constitution, as construed by the supreme court of the state, the
> Lieutenant Governor was not a part of the 'legislature' so that under
> Article V of the Federal Constitution, he could be permitted to have
> a deciding vote on the ratification of the proposed amendment, when
> the senate was equally divided.
>
> Whether this contention presents a justiciable controversy, or a
> question which is political in its nature and hence not justiciable, is
> a question upon which the Court is equally divided and therefore the
> Court expresses no opinion upon that point.

*Coleman*, 59 S.Ct. at 979.

63.     Legal scholars also support the independent state legislature doctrine.  Professor
Michael T. Morley wrote "The Intratextual Independent 'Legislature' and the Elections Clause"
for Northwestern University Law Review. Ex. N, Michael Morley, *The Intratextual Independent
"Legislature" and the Elections Clause*, 109 Nw. U. L. Rev. 847 (2015). Among other things,
Professor Morley wrote:

> Many states have delegated substantial authority to regulate federal
> elections to entities other than their institutional legislatures, such as
> independent redistricting commissions empowered to determine the
> boundaries of congressional districts. Article I's Elections Clause
> and Article II's Presidential Electors Clause, however, confer
> authority to regulate federal elections specifically upon State
> "legislatures," rather than granting it to States as a whole. An
> intratextual analysis of the Constitution reveals that the term
> "legislature" is best understood as referring solely to the entity
> within each state comprised of representatives that has the general
> authority to pass laws. Thus, state constitutional provisions or laws
> creating independent redistricting commissions that purport to limit
> a state legislature's power to draw congressional districts or
> otherwise regulate federal elections violate the Elections Clause.

Ex. N at 847.

64.     In his article, Morley cited in two footnotes law review articles in support of the doctrine and law review articles opposed to the doctrine.  The cited law review articles supporting the independent state legislature doctrine were:

> Walter Clark, *The Electoral College and Presidential Suffrage,* 65 U. PA. L. REV. 737, 741 (1917) ("[T]he exercise of such power [to regulate presidential elections] is given to the state legislature subject to no restriction from the state Constitution."); Richard D. Friedman, *Trying to Make Peace with* Bush v. Gore, 29 FLA. ST. U. L. REV. 811, 835 (2001) ("Suppose, then, that the state Constitution forbade felons to vote. If the legislature, operating under the authority granted it by Article II rather than by the state Constitution, decided that this limitation should not apply in voting for [P]residential [E]lectors, the legislative choice should prevail."); James C. Kirby, Jr., *limitations on the Power of State Legislatures over Presidential Elections,* 27 LAW & CONTEMP. PRO. 495, 504 (1962) ("[S]tate legislatures are limited by constitutional provisions for veto, referendum, and initiative in prescribing the manner of choosing [P]residential [E]lectors, but... state constitutional provisions concerning suffrage qualifications and the manner of choosing electors do not limit the substantive terms of legislation.")

*Id.* at 869, n. 122.

65.     The cited law review articles opposed to the independent state legislature doctrine were:

> *See, e.g.,* Hayward H. Smith, *History of the Article II Independent State Legislature Doctrine,* 29 FLA. ST. U. L. REV. 731, 783-84 (2001) (arguing that the Founders did not construe the Presidential Electors Clause as authorizing state legislatures to act independently of state constitutions); *see also* Richard H. Pildes, *Judging "New Law" in Election Disputes,* 29 FLA. ST. U. L. REV. 691, 727-28 (2001) (accepting Smith's conclusion that, "as a matter of historical practice, state legislatures were not understood at the time to be more 'independent' by virtue of Article II of the constraints and conditions on their power than they were when acting pursuant to any other source of authority"); David A. Strauss, Bush v. Gore*: What Were They Thinking?,* 68 U. CHI. L. REV. 737, 748 (2001) ("It is far from clear what the relationship is between a state's Constitution and the power that a state 'legislature' may exercise

under Article II, Section 1 to 'direct' the 'manner' in which electors
are appointed.")

*Id.* at 869, n. 123.

66.     Professor Morley, in his Law Review Article, did not state that the independent
state legislature doctrine was a frivolous argument.  In fact, he appeared to support it.

**II.       3 USC § 15, the Federal Electoral Counting Act, is unconstitutional.**

67.      The Complaint's principal claim is that 3 USC § 15, the Federal Electoral Counting
Act, is unconstitutional.  The Federal Electoral Counting Act authorizes Congress to do more than
count the electoral votes as Article II requires. Rather, the Federal Electoral Counting Act
authorizes Congress to object, debate and reject votes of a State's Presidential Electors.  There has
been no court decision upholding the constitutionality of 3 USC § 15.

68.     Textualist and structural arguments support that 3 USC § 15 is unconstitutional.
Consistently, the U.S. Supreme Court cases of *McPherson* ("The constitution .... leaves it to the
legislature exclusively[.]") and *Bush*, and the Eighth Circuit decision in *Carson* support that 3 USC
§ 15 is unconstitutional as violating the state legislatures' Article II prerogatives over Presidential
Electors. Vasan Kesavan, in his law review article "Is the Electoral Count Act Unconstitutional?"
argues that 3 USC § 15 is unconstitutional. Ex. G, Vasen Kesavan, *Is the Electoral Count Act
Unconstitutional*, 80 N.C. L. Rev. 1653 (2002).

69.     In his North Carolina law review article, Kesavan relies on the history of the
electoral college and legal authorities, particularly Article II of the U.S. Constitution, to argue that
3 USC § 15, specifically, is unconstitutional.  *See generally* Ex. G. The Complaint and Motion for
Preliminary Injunction's legal theories are consistent with and rely upon the law review article's
historical analysis and textualist and structuralist arguments that 3 USC § 15 is unconstitutional.

70.     Kesavan's law review article, attached as Exhibit G, at pages 1663 through 1678

covers the history of Article II and the Electoral Count as follows:

| I. The History of the Electoral Count | 1663 |
| --- | --- |
| A. Congressional Efforts to Regulate Presidential Election and the Electoral Count | 1664 |
| 1. Act of March 1, 1792 | 1664 |
| 2. The Grand Committee Bill of 1800 | 1669 |
| 3. The Twenty-second Joint Rule of 1865 | 1675 |
| 4. The Electoral Count Act of 1887 | 1677 |

71.     Kesavan's law review article at pages 1679 through 1693 covers the problems with

the Electoral Count as follows:

| B. The Problems of the Electoral Count | |
| --- | --- |
| 1. The Massachusetts Incident of 1809 | 1679 |
| 2. The Indiana Incident of 1817 | 1680 |
| 3. The Missouri Incident of 1821 | 1681 |
| 4. The Postmaster and Michigan Incidents of 1837 | 1683 |
| 5. The Wisconsin Incident of 1857 | 1685 |
| 6. The Greeley Incident and the Other Incidents of 1873 | 1687 |
| 7. The Hayes-Tilden Incident of 1877 | 1688 |
| 8. The Hawaii Incident of 1961 | 1691 |
| 9. The Bailey Incident of 1969 | 1692 |

72.     Kesavan's law review article at pages 1694 through 1758 present the texualist

argument why the Electoral Count Act, 3 U.S.C. § 15, is unconstitutional as follows:

| | |
|---|---|
| II. The Argument Against the Constitutionality of the Electoral Count Act | 1694 |
| A. The Textual Argument | 1696 |
| 1. Some Basics: Who, What, When, and Where? | 1696 |
| a. Who Is the Presiding Officer of the Electoral Count? | 1696 |
| b. Who Opens the Electoral Certificates and Counts the Electoral Votes? | 1701 |
| c. What Is Counting and What Is To Be Counted? | 1711 |
| d. When Is the Counting Done? | 1717 |
| e. Where Is the Counting Done? | 1720 |
| 2. Where Is the Font of Power? | 1729 |
| a. The Necessary and Proper Clause | 1731 |
| b. The Electoral College Clauses | 1743 |
| c. Textual Arguments from Negative Implication | 1747 |
| 3. The Intratextual Argument | 1748 |
| a. The Times, Places, and Manner Clause | 1749 |
| b. The House Judging Clause | 1752 |
| 4. Conclusions | 1758 |

73.    Kesavan's law review article at pages 1759 through 1793 present the structuralist argument why the Electoral Count Act, 3 U.S.C. § 15, is unconstitutional as follows:

| | |
|---|---|
| B. The Structural Argument | |
| 1. Five Principles of Presidential Election | 1759 |
| a. The Anti-Senate Principle | 1759 |
| b. The Anti-Congress Principle | 1764 |

| | |
|---|---|
| c. The Anti-President Principle | 1767 |
| d. The Pro-States and Pro-State Legislatures Principle | 1769 |
| e. The Pro-Electors Principle | 1774 |
| 2. Principles of Rule-Making and Law-Making | 1779 |
| a. The Anti-Binding Principle of Rule-Making | 1779 |
| b. The Chadha Principle of Law-Making | 1787 |
| 3. Conclusions | 1793 |

74.     Much of the legal analysis in the Complaint and Motion for the Preliminary Injunction for this case followed the Kesavan's arguments in his law review article.

**III.      Under Rule 65, the Plaintiffs proposed an appropriate declaratory judgment and related injunction that Congress not count the votes of Presidential Electors who did not have state legislative approval—which is less judicially intrusive than other remedies the Court might choose.**

75.     The Complaint and Motion for Preliminary Injunction proposed a prospective equitable remedy of Congress of not counting the votes of Presidential Electors who did not have state legislative post-election certification.  Rule 65(d) of the Rules of Civil Procedure requires that the scope of an injunction be carefully drafted by the Court—not by the parties:

> (1) Contents.  Every order granting an injunction…must:
>     (A) state the reasons why it issued;
>     (B) state its terms specifically; and
>     (C) describe in reasonable detail—and not by referring to the complaint or other document—the acts restrained or required.

USCS Fed Rules Civ. Proc. R. 65 (2021).

76.     The Complaint and Motion for Preliminary Injunction proposed a narrowly tailored remedy acknowledging two facts: (1) A state legislature, having sole plenary authority under

Article II regarding Presidential Electors, is not subject to a court's injunction; and (2) A state legislature, having plenary authority under Article II regarding Presidential Electors, may choose not to certify Presidential Electors even though it has an Article II constitutional duty to do so.

77.     Based on these acknowledgements, the Complaint and Motion for Preliminary Injunction tailored the requested relief toward satisfaction of Rule 65(d).  The rationale was that Congress not counting the votes of non-legislatively certified Presidential Electors is a lot less judicially intrusive than a declaratory judgment or injunction against a state legislature to hold an approval vote on Presidential Electors.  But, of course, at all times, the Court was free under Rule 65(d) to tailor its own remedy in the case of the Plaintiffs prevailing.

**IV.     The Plaintiffs' constitutional arguments were supported by the text and structure of the Constitution.**

78.     The Plaintiffs' constitutional arguments in the Complaint and Motion for Preliminary Injunction were supported by the text and structure of the Constitution.  As mentioned above, the following cases support Plaintiffs' textual and structural arguments that the state legislatures have plenary authority regarding Presidential Electors:  *McPherson*, 146 U.S. at 27 ("The constitution .... leaves it to the legislature exclusively[.]"); *Bush*, 531 U.S. at 76; and *Carson*. Additionally, the dissenting opinion in *Arizona State Legislature*, 135 S.Ct. at 2686 supports the independent state legislature doctrine applying in an Article II context for the reasons provided above.

**A.     Legal standards for challenging Congress' constitutional authority.**

79.     Two legal standards cover cases challenging Congress' constitutional authority to enact statutes. The first legal standard is that Congress can only enact laws which are constitutionally authorized. This legal standard applies when the party claims an Act of Congress is not constitutionally authorized by one of the powers delegated to Congress in Article I of the

Constitution. *See*, *e.g., Perez v. United States,* 402 U.S. 146 (1971); *McCulloch v. Maryland,* 17 U.S. 316 (1819).

80.     The second legal standard is that Congress cannot enact laws which violate state sovereignty preserved in the Constitution. This legal standard applies when the party claims an Act of Congress invades the province of state sovereignty granted by an express constitutional provision or reserved by the Tenth Amendment. "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. U.S.,* 505 U.S. 144, 156 (1992) (citations omitted). It is in this sense that the Tenth Amendment "states but a truism that all is retained which has not been surrendered." *United States v. Darby,* 312 U.S. 100, 124 (1941).

81.     Plaintiffs asserted that the 3 U.S.C. § 15 is both constitutionally unauthorized and invades each respective state legislature's power to certify Presidential votes and Presidential Electors granted by Article II and reserved by the Tenth Amendment:

> …the two Houses [of Congress] concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified…

3 U.S.C. § 15.

82.     Because Article II grants the state legislature the sole and plenary power to direct the appointment of Presidential Electors, Congress has no constitutional authority to enact 3 U.S.C. § 15 depriving the state legislature of the constitutionally-granted authority to approve the Presidential Electors. Second, 3 U.S.C. § 15 authorizes the "two Houses" to invade the state legislatures' sole power to appoint Presidential Electors by allowing individual congresspersons

to object to a State's Presidential Electors and allowing Congress to actually reject a State's Presidential Electors.

**B.      The textualist argument supports that the state legislatures, not Congress, nor state executive branch officials, must approve Presidential Electors.**

83.      The textualist argument in support of the state legislature's plenary authority over approval of Presidential Electors is based on the following one sentence in Article II of the U.S. Constitution:

> He shall hold his office during the term of four years, and, together with the Vice President, chosen for the same term, be elected, as follows:  Each state shall appoint, in such manner as the Legislature thereof may direct, a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or person holding an office of trust or profit under the United States, shall be appointed an elector.

84.      The key clause empowering state legislatures to "appoint" Presidential Electors is "in such manner as the Legislature thereof may direct."  The Plaintiffs claimed, based on this clause, that approval of Presidential votes and approval of Presidential Electors are exclusively state legislative decisions.  In turn, the Plaintiffs claimed that 3 U.S.C. § 15 and related laws encroaching, every four years, these state legislative prerogatives are unconstitutional.

85.      The plain meaning of the text is consistent with Plaintiffs' arguments. The constitutional phrase is an imperative: the state legislatures has the power to direct the appointment of Presidential Electors. The "state" appoints the Presidential Electors and "the legislature may "direct" the "manner" of the appointment.

86.      The sentence phrase "as follows" provides specific directions on how the President is elected.  This imperative sentence is an instruction to all governmental actors identified to be empowered in certain, specific ways—Vice President, U.S Congress, Presidential Electors, states

and state legislatures—and to those not identified and not empowered—Governors, other state executive officials, federal judiciary and state judiciaries. Consistently, the constitutional text requires that, every four years, "the legislature" may "direct" the "manner" of appointing of the Presidential Electors.  Plaintiffs claim that it is this aspect of the constitutional text that is violated when the challenged federal and state laws legally preclude state legislative approval of Presidential votes and of Presidential Electors. Plaintiffs claim that, every four years, "the legislature must be involved in such approvals so that it may "direct" the "manner" of "appoint[ing]" of the Presidential Electors—as the constitutional imperative sentence requires."

87.    The challenged laws requiring Congressional and state executive approval of Presidential Electors, currently considered as having full legal force and effect, have the legal consequence that the state legislatures, every four years, "may" NOT "direct" the "manner" of "appointing" the Presidential Electors.  Again, the state legislatures, not Congress nor the state executive branch officials, have the constitutional prerogative to approve Presidential Electors.

**C.     The textual argument supports that 3 U.S.C. § 15 is unconstitutional.**

88.    Under textualism, the Constitution's text supports the unconstitutionality of 3 U.S.C. § 15 because it fails to guarantee voter's rights to their respective states' approvals of Presidential votes and of Presidential Electors to vote for President and Vice President.  Congress neither has express constitutional authority nor implied constitutional authority to enact 3 U.S.C. § 15.

89.    Congress has no express constitutional authority to enact 3 U.S.C. § 15 which regulates state appointment of Presidential Electors and counting Presidential Elector votes to elect a President and Vice President. Article II puts state appointment of Presidential Electors in the exclusive hands of the state legislatures every four years, "[e]ach state shall appoint, in such

manner as the Legislature thereof may direct." By contrast, Article II lacks the express grant of authority to Congress found in Article I's Elections Clause for Congressional elections:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

90.     Article I thus grants great power to Congress with respect to the elections of congressional representatives and senators – i.e., the Constitution provides a power to Congress "to make or alter such [state] Regulations." However, this Constitutionally-conferred power to Congress is absent in Article II.

91.     Similarly, Article I, section 5 also establishes that Congress shall be the judge of the elections of its own members: "Each House shall be the judge of the elections, returns and qualifications of its own members…" Article II lacks a similar clause empowering Congress to be the "judge" of state appointment of Presidential Electors.

92.     Further, Article II excludes the Senate from any role in the Presidential election process. Article II does not authorize Congress to include the Senate in the Presidential election process under 3 U.S.C. § 15.  Apparently, the House included the Senate in 3 U.S.C. § 15, contrary to Article II, in order to convince the Senate to pass the bill into law.

93.     Lacking express constitutional authority in Article II's imperative sentence regarding Presidential elections, the only alternative for Congressional authority is an implied constitutional authority.  However, such implied authority is also lacking.  The only candidates for the government's implied constitutional authority would be Article I's Necessary and Proper Clause and Article II itself.

94.     As to the Necessary and Proper Clause, "Congress possesses only limited powers; the States and the people retain the remainder. The States have broad authority to enact legislation

for the public good—what we have often called a 'police power.'" *Bond v. U.S.,* 134 S.Ct. 2077, 2086 (2014). Congress, by contrast, has no such general authority and "can exercise only the powers granted to it," *McCulloch*, 17 U.S. at 405, including the power to make "all Laws which shall be necessary and proper for carrying into Execution" the enumerated powers, U.S. Const., Art. I, § 8, cl. 18. "Of course, as Chief Justice Marshall stated, a federal statute, in addition to being authorized by Art. I, § 8, must also "not [be] prohibited" by the Constitution." *U.S. v. Comstock*, 130 S.Ct. 1949, 1957 (2010), *quoting McCulloch, supra,* at 421.

95.     Any implied Congressional authority under the Necessary and Proper Clause does not apply to Article II and Presidential elections. The Necessary and Proper Clause provides that Congress shall have power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." However, the Necessary and Proper Clause reveals that there are three prongs of power. Under the Clause, Congress has power for carrying into execution (1) "the foregoing Powers," (2) "all other Powers vested by this Constitution in the Government of the United States," and (3) "all other Powers vested by this Constitution... in any Department or Officer thereof." None of these prongs support the constitutionality of 3 U.S.C. § 15.

96.     First, the phrase "foregoing Powers" refers to the enumerated powers of Article I. None of the enumerated Congressional powers in Article I cover the appointment of and voting by Presidential Electors - which is covered by Article II. The "foregoing powers" requirement is not satisfied.

97.     Second, the phrase "all other Powers vested by this Constitution in the Government of the United States" does not apply. The text of Article II's imperative sentence regarding

Presidential elections does not employ the word "power" over the appointment of Presidential Electors and give it to Congress. Article II gives that power to the state legislatures instead.  In other words, Article II's imperative sentence regarding Presidential elections does not vest an implied "power" in Congress over state legislatures' express power to determine the manner of appointment of Presidential Electors every four years, including the approval of Presidential Electors. Therefore, the phrase "all other Powers vested by this Constitution in the Government of the United States" is not satisfied.

98.     Third, the phrase "all other Powers vested by this Constitution ... in any Department or Officer thereof" does not include Congress or Congressional members. For the purposes of this phrase, Congress is not a Department of the United States or officer of the United States. Similarly, members of Congress are not Departments of the United States or officers of the United States. In fact, Congressional members are not subject to impeachment by the House of Representatives and conviction by the Senate because they are not "civil Officers of the United States." *See* U.S. Const., art. II, § 4 ("The President, Vice President, and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."). Furthermore, the Ineligibility Clause of Article I, Section 6 provides that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." So, the phrase "all other Powers vested by this Constitution... in any Department or Officer thereof" is not satisfied.

99.     Article II itself also fails to support a constitutional authority for Congress to enact 3 U.S.C. § 15. Article II states that it is the state legislatures' exclusive constitutional prerogative to determine the state's appointment of Presidential Electors, including approval of the Presidential Electors to vote for President and Vice President. Article II's imperative sentence regarding

Presidential elections and the Twelfth Amendment do not grant Congress any "power" over the state legislatures' constitutional prerogatives over Presidential Electors. Instead, these constitutional texts define a very limited and specific role for the Vice President, U.S. Senate and U.S. House of Representatives.

100.    For example, Congress' enactment of 3 U.S.C. § 15, creating a process for Congressional objections to reject a State's Presidential Elector votes, goes far beyond the constitutionally-prescribed roles for Vice President, U.S. Senate and the U.S. House of Representatives in Article II and the Twelfth Amendment. In violation of Article II, 3 U.S.C. § 15 sets up a process for Congress to object and reject Presidential Elector votes—which is more than just counting the legislatively-approved Presidential Electors:

> Upon such reading of any such certificate or paper, the President of the Senate shall call for objections, if any. Every objection shall be made in writing, and shall clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives before the same shall be received. When all objections so made to any vote or paper from shall have been received and read, the Senate shall thereupon withdraw, and such objections shall be submitted to the Senate for its decision; and the Speaker of the House of Representatives shall, in like manner, submit such objections to the House of Representatives for its decision; and no electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to according to section 6 of this title from which but one return has been received shall be rejected, <u>but the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified.</u>

3 U.S.C. § 15 (emphasis added).

101.    Congress' statutory enactment of this process for objecting-and-rejecting a State's Presidential Electors is inconsistent with Article II and any implied constitutional authority thereunder.

33

102.     Additionally, there is a textualist argument based on the negative implication. When the Constitution provides Congressional power regarding the Presidency, it says so—twice.  First, Article II, Section 1, Clause 4 which provides that "[t]he Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." Second, the Presidential Succession Clause of Article II provides that:

> In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.

103.     In both of these instances, the Constitution provides Congress with express authority over a limited, narrowly-prescribed aspect of the Presidency. By negative implication, Article II's imperative sentence regarding Presidential elections and selection of Presidential Electors every four years does not provide implied constitutional authority for Congress to object-and-reject the state legislatures' approvals of Presidential votes and of Presidential Electors.

104.     Finally, the text of the Constitution also provides an intertextual argument. When the Constitution provides a Congressional role in election, the Constitution says so. First, Article I's Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Second, The House Judging Clause provides that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members." In both instances, the Constitution provides Congress with express constitutional authority regarding elections involving

Congress. However, regarding Presidential Electors, there is constitutional silence—no express power is granted to Congress—because Article II empowers the state legislatures, exclusively, to govern the states' appointments of Presidential Electors.

### D. Structuralist arguments also support that 3 U.S.C. § 15 is unconstitutional.

105. The interpretivist's structuralist arguments also support the unconstitutionality of 3 U.S.C. § 15. *See, generally,* Ex. G at 1759-1793. Under this approach, interpretation requires drawing inferences from the design and structure of the Constitution:

> Another mode of constitutional interpretation draws inferences from the design of the Constitution: the relationships among the three branches of the federal government (commonly called separation of powers); the relationship between the federal and state governments (known as federalism); and the relationship between the government and the people.

Ex. O, Brandon J. Murrill, *Modes of Constitutional Interpretation*, Congressional Research Service (Mar. 15, 2018) at 2.

106. The structure of Article II is to empower the state legislatures, not Congress or the state's Governors, to appoint the Presidential Electors. 3 U.S.C. § 15 violates Article II's structure because 3 U.S.C. § 15 empowers Congress and the state's Governors in the Presidential Elector process—excluding the state legislatures from the Presidential Elector approval process.

107. The structure of the Article II for Presidential elections solely empowers state legislatures and not Congress, its members nor state Governors. Article II's imperative sentence regarding Presidential elections puts the state legislatures in exclusive control of a state's appointment of Presidential Electors. The state legislatures, who enact the state elections law applicable to federal elections, are identified to choose the manner of appointment of the Presidential Electors.

108.    Under Article II, Congress and the Governors are to have no substantive role in the procedures of approving Presidential Electors to vote for President and Vice President. Under Article II, the Federal Defendants are just there to count the Presidential Electors' votes of the Presidential Electors who have received state legislative certification; 3 U.S.C. § 15 and related federal law authorizing Congress to object and reject a State's Presidential Elector votes violate Article II.

**1)      The rejection of a role for Congress under Article II.**

109.    The Constitution mistrusts Congress in Presidential elections. This is the anti-Congress/anti-Senate principles of Article II. Congress is to have a limited, narrowly-prescribed role in Presidential elections. Congress is not to interfere with the state legislature directing the appointment of Presidential Electors. Congress is not trusted in Article II.

110.    First, Article II's electoral college method of selecting a President and Vice President is a rejection of Congressional decision-making. The Constitution replaced the Articles of Confederation which authorized Congress to elect a President of the United States in Congress Assembled—parliamentary style. Under the Articles of Confederation, John Hanson was the first President of the United States in Congress Assembled and served from November 5, 1781 to November 4, 1782. The Constitution replaced that parliamentary system with the Electoral College in Article II which gives Congress no role in selecting the President.

111.    Alexander Hamilton in Federalist Papers, No. 68, on "The Mode of Electing the President" (1788) was concerned about Congress' "sinister bias":

> No senator, representative, or other person holding a place of trust or profit under the United States, can be of the numbers of the electors. Thus without corrupting the body of the people, the immediate agents in the election will at least enter upon the task free from any sinister bias."

Ex. P, The Mode of Electing the President.

112.    Similarly, Joseph Story in his Commentaries on the Constitution (1833) stated that

Article II was to protect against Congressional dangers of cabal, intrigue and corruption and

against pre-existing bodies being tampered with beforehand to prostitute their vote:

> Assuming that the choice ought not to be confined to the national legislature, there remained various other modes, by which it might be effected; by the people directly; by the state legislatures, or by electors, chosen by the one, or the other.  The latter mode was deemed most advisable; and the reasoning by which it was supported, was to the following effect: …The same circumstances would naturally lessen the dangers of cabal, intrigue and corruption, especially if congress, should, as they undoubtedly would, prescribe the same day for the choice of electors, and for giving their votes throughout the United States. The scheme, indeed, presents every reasonable guard against these fatal evils to republican governments.  The appointment of the president is not to depend upon any pre-existing body of Men, who might be tampered with beforehand to prostitute their votes, but is delegated to persons chosen by the immediate act of the people, for that sole and temporary purpose.

Ex. Q, Commentaries on the Constitution at Sec. 1451.

113.    Second, the Senate was to have no role in the selection of the President whatsoever.

In Federalist No. 66, Alexander Hamilton explained that the House received powers related to

Presidential elections in the event of a candidate does not receive a majority of the votes of the

Presidential electors because the Senate received other powers:

> [T]o secure the equilibrium of the national House of Representatives, the plan of the convention has provided in its favor several important counterpoises to the additional authorities to be conferred upon the Senate. The exclusive privilege of originating money bills will belong to the House of Representatives. The same house will possess the sole right of instituting impeachments; is not this a complete counterbalance to that of determining them? The same house will be the umpire in all elections of the President which do not unite the suffrages of a majority of the whole number of electors; a case which it cannot be doubted will sometimes, if not

> frequently, happen. The constant possibility of the thing must be a
> fruitful source of influence to that body.

Ex. R, Federalist No. 66.

114.    St. George Tucker, in his "American Blackstone," explained the rationale for

excluding the Senate from the Presidential election process:

> [The Senate's] exclusion from any participation in the election of a
> president, is certainly founded upon the wisest policy: being
> associated with him in the exercise of his most important powers,
> and being chosen for a much longer period than the representatives,
> the presumption of undue influence, where the contest might be
> between a president in office, and any other person, would be
> altogether unavoidable.

*See* St. George Tucker, Blackstone's Commentaries with notes of reference to the Constitution and

Laws of the Federal Government of the United States and of the Commonwealth of Virginia at

328 (1803).

115.    Notably, one of the reasons the House passed 3 U.S.C. § 15 to incorporate the

Senate into Presidential elections, contrary to Article II, was to get 3 U.S.C. § 15 enacted – i.e.,

the Senate would not adopt 3 U.S.C. §15 unless the Senate received some power under the Act.

116.    Third, Article II's Elector Incompatibility Clause, stating that "no Senator or

Representative, or Person holding an Office or Trust of Profit under the United States, shall be

appointed as an Elector," is a rejection of Congressional decision-making. The relevant purpose

of the Elector Incompatibility Clause is to absolutely separate the Presidential Electors from

Congress. The Presidential Electors are to be independent from Congress. Joseph Story stated that

this Elector Incompatibility Clause was intended to preclude Congressional members from

exerting official influence on the electoral college and to avoid any Congressional bias or

impartiality on the electoral college:

> In respect to persons holding office, it is reasonable to suppose, that their partialities would all be in favour of the reelection of the actual incumbent, and they might have strong inducements to exert their official influence in the electoral college. In respect to senators and representatives, there is this additional reason for excluding them, that they would be already committed by their vote in the electoral college; and, thus, if there should be no election by the people, they could not bring to the final vote either the impartiality, or the independence, which the theory of the Constitution requires.

Ex. Q Sec. 1467.

117.    One cannot imagine any greater influence than the power to reject electors.

**2)      The rejection of a role for State Governors under Article II.**

118.    The Constitution mistrusts Governors and state executive branch officials in Presidential elections. The state's executive branch officials are to have no role in Presidential selection. Article II's electoral college method of selecting a President and Vice President empowers the state legislatures, not the state's executive branch officials.

119.    First, the Eighth Circuit recently held under Article II that a state executive branch official cannot take away a state legislature's power over Presidential elections:

> Simply put, the Secretary has no power to override the Minnesota Legislature. In fact, a legislature's power in this area is such that it "cannot be taken from them or modified" even through "their state constitutions." *McPherson*, 146 U.S. at 35, 13 S.Ct. 3; *see also Palm Beach*, 531 U.S. at 76–77, 121 S.Ct. 471. Thus, the Secretary's attempt to re-write the laws governing the deadlines for mail-in ballots in the 2020 Minnesota presidential election is invalid. However well-intentioned and appropriate from a policy perspective in the context of a pandemic during a presidential election, it is not the province of a state executive official to re-write the state's election code, at least as it pertains to selection of [P]residential [E]lectors.

*Carson,* 978 F.3d at1059–60.

120.    Second, Article II's imperative sentence regarding Presidential elections specifies "state legislatures"—not Governors nor "state executives"—to have the power over the

appointment of Electors: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress .…"

121.    Thus, one of the purposes of Article II's imperative sentence regarding Presidential elections was to exclude the states' Governors from having a role in Presidential elections—including approving the Presidential Electors.

122.    Third, the Electors Clause specifies that the Presidential Electors are to vote in their states and the Vice President and Congress, not the State's Governors, would open and count the Presidential Electors' ballots for President and Vice President:

> The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted.

123.    One of the purposes of the Electors Clause was also to exclude the states' Governors from having a role in approving, opening and counting the Presidential Electors' ballots.

**3)    Article II grants sole power to state legislatures in selecting Presidential Electors.**

124.    The Constitution trusts state legislatures in Presidential elections. The state legislatures, not Congress nor the states' Governors, are to direct the selection of Presidential Electors. Article II trusts state legislatures to choose Presidential Electors—even trusting them to directly elect them as was done by some state in the 1800's. *See, e.g.,* Ex. S, Georgia Constitution of 1798, Art. IV, § 2 at 12.

125.    First, Article II's imperative sentence regarding Presidential elections empowers "state legislatures"—not Congress, nor the States' executives—to have the power over the appointment of Presidential Electors:

> He shall hold his office during the term of four years, and, together with the Vice President, chosen for the same term, be elected, as follows:  Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress…

Thus, one of the other purposes of Article II's imperative sentence regarding Presidential elections was to empower state legislatures to appoint the Presidential Electors.

126.    Second, the Electors Clause specifies that the Presidential Electors are to vote in their states and specifies the Vice President and Congress will have limited, defined roles of opening and counting the Presidential Electors' ballots for the election of President and Vice President:

> The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted.

127.    One of the purposes of the Electors Clause was to limit and define the Vice President's and Congress' role in the Electoral College process to ensure that the state legislature, not Congress, would have the exclusive power to appoint the Presidential Electors.

**4)    Conclusion.**

128.    Structuralist arguments based on Article II support the unconstitutionality of 3 U.S.C. § 15. Article II contains an anti-Congress/anti-Senate principle, an anti-Governors principle

and a pro-state legislature principle. The structure of Article II is to empower the state legislatures, not Congress nor the Governors (or state executive branch officials), to appoint or approve the Presidential Electors. 3 U.S.C. § 15 violate Article II's structure because it empowers Congress, unconstitutionally including the Senate, and the state's executives in the Presidential Elector approval and counting process—every four years, cancelling the state legislatures out of the Presidential Elector approval process and the subsequent counting process.

129.    As set forth above, Plaintiffs' legal arguments which I developed were based in fact and law to challenge the Federal Electoral Counting Act, 3 USC § 15 as unconstitutional as well as state statutes Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann. § 21-2-499 (B), Mich. Comp. Laws. § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat. § 3166 which impermissibly delegate post-election certification, perpetually and in a wholesale fashion, to state executive branch officials.

130.    To encapsulate the foregoing declaration, I filed the Complaint and Motion for Preliminary Injunction for this case in good faith based on my research that there was a meritorious claim supported by well-developed legal theories. In addition, Plaintiffs had standing to file this lawsuit also based on well-developed legal theories. Moreover, this Court had personal jurisdiction over the Defendants under well-developed legal theories which are still an "open question" in the D.C. Circuit as this Court recognized only 14 months ago.  Finally, all but two Defendants were served with the Complaint prior to the Court's issuance of its January 4, 2021 Order. I conducted extensive research into the legal theories advanced before the Complaint was filed to ensure I could stand by the arguments that were made. I take my role as an office of this Court seriously.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___February 5, 2021___ .

_____

Erick G. Kaardal, Esquire