# Exhibit G



NORTH CAROLINA LAW REVIEW

Volume 80 | Number 5                                                    Article 4

6-1-2002

# Is the Electoral Count Act Unconstitutional

Vasan Kesavan

Follow this and additional works at: http://scholarship.law.unc.edu/nclr

 Part of the Law Commons

Recommended Citation

Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653 (2002).
Available at: http://scholarship.law.unc.edu/nclr/vol80/iss5/4

This Article is brought to you for free and open access by Carolina Law Scholarship Repository. It has been accepted for inclusion in North Carolina Law Review by an authorized administrator of Carolina Law Scholarship Repository. For more information, please contact law_repository@unc.edu.

# IS THE ELECTORAL COUNT ACT UNCONSTITUTIONAL?

### VASAN KESAVAN[*]

*This Article takes on one of the most unasked questions of* Bush v. Gore—*whether the Electoral Count Act, the federal statutory scheme at issue in that case, is constitutional. Enacted in 1887 and hardly discussed for the past 114 years, the Electoral Count Act sets forth complicated regulations for counting (and not counting) electoral votes. This Article argues that Section 15 of Title 3 of the United States Code, the heart of the Electoral Count Act, is unconstitutional.*

*Since 1800, Congress has attempted to enact legislation regulating the electoral count, finally succeeding in 1887. This Article traces these principal congressional efforts to regulate the electoral count and the surrounding constitutional text and structure to show why the Electoral Count Act is unconstitutional. The Electoral Count Act may seem like a good statutory scheme to deal with the problems of the electoral count, but not every good statutory scheme is a constitutional one. Some problems may only be remedied by constitutional amendment, not by statute. Anyone who wishes to argue that the Electoral Count Act is constitutional bears a very high burden of proof.*

INTRODUCTION ........................................................................... 1655
I.     THE HISTORY OF THE ELECTORAL COUNT ........................... 1663
       A.   *Congressional Efforts to Regulate Presidential Election*
            *and the Electoral Count* ...................................................... 1664
            1.  Act of March 1, 1792 .................................................. 1664

* Vice President, Francisco Partners. J.D., Yale Law School, 2001; B.A.S., B.S., B.A., University of Pennsylvania, 1995. For their helpful comments and suggestions, thanks to Bruce Ackerman, Akhil Amar, Robert Bennett, Steven Calabresi, Joel Goldstein, Neal Katyal, Kumar Kesavan, Jennifer Koester, Michael Paulsen, Nick Rosenkranz, Stephen Siegel, Laurence Tribe, and John Yoo. I also wish to thank Professor Ellen Peters for supervising the initial drafting of this Article in her federalism seminar at Yale Law School in the fall of 1999, a year before *Bush v. Gore*, and the editors of the *North Carolina Law Review* for their excellent editing. The author disclaims any prescience in writing about the Electoral Count Act.

2. The Grand Committee Bill of 1800................................1669
3. The Twenty-second Joint Rule of 1865 ......................1675
4. The Electoral Count Act of 1887 ................................1677
B. *The Problems of the Electoral Count*................................1678
1. The Massachusetts Incident of 1809 ...........................1679
2. The Indiana Incident of 1817....................................1680
3. The Missouri Incident of 1821 ...................................1681
4. The Postmaster and Michigan Incidents of 1837.......1683
5. The Wisconsin Incident of 1857 ................................1685
6. The Greeley Incident and the Other Incidents of
1873................................................................................1687
7. The Hayes-Tilden Incident of 1877.............................1688
8. The Hawaii Incident of 1961......................................1691
9. The Bailey Incident of 1969 .......................................1692
II. The Argument Against the Constitutionality of
the Electoral Count Act ................................................1694
A. *The Textual Argument*.......................................................1696
1. Some Basics:  Who, What, When, and Where?.........1696
a. Who Is the Presiding Officer of the Electoral
Count? ........................................................................1696
b. Who Opens the Electoral Certificates and
Counts the Electoral Votes? ....................................1701
c. What Is Counting and What Is To Be Counted?.1711
d. When Is the Counting Done? .................................1717
e. Where Is the Counting Done? ................................1720
2. Where Is the Font of Power?......................................1729
a. The Necessary and Proper Clause..........................1731
b. The Electoral College Clauses................................1743
c. Textual Arguments from Negative Implication...1747
3. The Intratextual Argument.........................................1748
a. The Times, Places, and Manner Clause ................1749
b. The House Judging Clause......................................1752
4. Conclusions..................................................................1758
B. *The Structural Argument*..................................................1759
1. Five Principles of Presidential Election......................1759
a. The Anti-Senate Principle.......................................1759
b. The Anti-Congress Principle ..................................1764
c. The Anti-President Principle ..................................1767
d. The Pro-States and Pro-State Legislatures
Principle......................................................................1769
e. The Pro-Electors Principle......................................1774
2. Principles of Rule-Making and Law-Making.............1779

The first three of these questions might seem downright outlandish, and prior to the presidential election of 2000, the fourth was too. Now is a good time to remember that these four questions were not at all outlandish in the spring of 1800 when America faced her first electoral crisis of *"Jefferson v. Adams."*[3]    These four

---

3. The presidential election of 1800 and the electoral count of 1801 were truly a constitutional crisis of the first magnitude, leading to the adoption of the Twelfth Amendment in 1804. The electoral count on February 11, 1801 was inconclusive because there were two persons who had the requisite majority of the whole number of electors appointed. (The original Constitution did not require or even permit electors to cast separate votes for President and Vice President). Democrat-Republican and then-Vice President Thomas Jefferson and Democrat-Republican Aaron Burr each received seventy-three votes; Federalist and then-President John Adams and Federalist Charles C. Pinckney received sixty-five and sixty-four votes, respectively; Federalist John Jay received one vote.

The choice of President thus devolved on the House of Representatives. U.S. CONST. art. II, § 1, cl. 3 provides:

> The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed; and if there be more than one who have such Majority, and have an equal Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President . . . . But in chusing the President, the Votes shall be taken by States, the Representation from each State having one Vote . . . .

The House, controlled by Federalists, was forced to choose between Democrat-Republicans Jefferson and Burr. On February 11, the House balloted nineteen times with no success: each time eight states voted for Jefferson, six for Burr, and two were divided. On February 12, the House balloted nine times with no success; on February 13, once; February 14, four times; and February 16, once. On February 17, after another such round, the House chose a President-elect on the thirty-sixth round of balloting: ten states voted for Jefferson, four for Burr and two did not vote. For the basic facts of the election of 1800 and the electoral count of 1801, see BERNARD A. WEISBERGER, AMERICA AFIRE: JEFFERSON, ADAMS, AND THE REVOLUTIONARY ELECTION OF 1800, at 227–77 (2000).

To complicate this saga further, Democrat-Republicans Jefferson and Burr only had a majority of the whole number of electors appointed because Vice President Jefferson, presiding over the electoral count, decided to count four "improper" votes from the State of Georgia in favor of Jefferson-Burr. *See infra* note 230 and accompanying text. Without these votes, Jefferson and Burr would have had sixty-nine votes each, exactly one half and not a majority of the whole number of electors appointed, and the choice of President would have devolved on the House of Representatives. But importantly, the original Constitution provided that "if no Person have a Majority, then from the *five* highest on the List the said House in like Manner chuse the President." U.S. CONST. art. II, § 1, cl. 3 (emphasis added). There is little doubt that the Federalist-controlled House would have elected Federalists John Adams and Charles C. Pinckney as President and Vice President, respectively.

Perhaps most intriguingly, the Federalist-controlled Legislature of Maryland, aware of the popular support for Democrat-Republicans Jefferson-Burr,

> seriously contemplated that the legislature should repeal the law under which the electors were chosen by the people, and should choose them by the legislature; and this on the avowed ground that it was necessary to defeat the candidate whom it was supposed that the majority of the people preferred.

HOUSE SPECIAL COMMITTEE, COUNTING ELECTORAL VOTES, H.R. MISC. DOC. NO. 44-

      a.  The Anti-Binding Principle of Rule-Making ....... 1779
      b.  The *Chadha* Principle of Law-Making ................. 1787
    3.  Conclusions ................................................................. 1793
III.  WHAT SHOULD WE DO IF ELECTORS GO BANANAS? ........ 1793
   A.  *Answers to the Paradigm Problems of the Electoral*
     *Count* ............................................................................ 1795
    1.  The Problems of the Electoral Certificate ................. 1795
      a.  The Unsigned, Uncertified, or Unsealed
        Electoral Certificate Problem ............................... 1795
      b.  The Puerto Rico, or Unrepublican State,
        Electoral Certificate Problem ............................... 1796
      c.  The Number of Electoral Votes Problem ............ 1797
      d.  The Multiple Electoral Certificates Problem ....... 1799
      e.  The Misdated Electoral Certificate Problem ....... 1799
      f.  The Elector Ineligibility Problem .......................... 1802
    2.  The Problems of the Electoral Vote .......................... 1804
      a.  The Faithless Elector Problem .............................. 1804
      b.  The Presidential or Vice Presidential
        Ineligibility Problem .............................................. 1805
      c.  The Inhabitants of the Same State Problem ........ 1805
    3.  Conclusions ................................................................. 1808
   B.  *The Twentieth Amendment* ................................................ 1808
   C.  *Revising the Electoral Count Act* ........................................ 1811
CONCLUSION ............................................................................... 1812

## INTRODUCTION

*Bush v. Gore*[1] is history.  We all have plenty to think about.  So here are four questions that are well worth considering before Election Day 2004, or at least January 6, 2005, the date specified by federal law for counting electoral votes.[2]  What if an elector votes for a presidential or vice presidential candidate who is not a natural born citizen, at least thirty-five years of age, and who has not been a resident of the United States long enough?  What if an elector who is constitutionally ineligible to be an elector votes?  What if an elector votes for inhabitants of her state for both President and Vice President?  What if two sets of electors from the same state both claim that they are the lawfully appointed electors of the state?

---

1.  531 U.S. 98 (2000) (per curiam).
2.  *See* 3 U.S.C. § 15 (2000) ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors.").

questions were the paradigm problems of the electoral count debated in the Sixth Congress.[4]  Federalist Senator Ross of Pennsylvania firmly stated that "such cases might happen and were very likely to happen."[5]  Democrat-Republican Senator Pinckney of South Carolina, more sanguine, stated that these cases "may not happen once in a century."[6]  In addition to these four problems of the electoral count, a fifth problem has proved much more likely throughout history:  What if an elector is "faithless" and votes for a President or Vice President in contravention of the popular vote?[7]

---

13, at 443 (1877) [hereinafter COUNTING ELECTORAL VOTES] (remarks of Sen. Anthony).  This should sound familiar.  This action was not carried out, but had it been, Maryland's ten electoral votes would have been given solely to Federalists Adams and Pinckney, instead of having been given equally to Jefferson and Adams.  Adams would have received 70 votes; Pinckney 69 votes; Jefferson 68 votes; Burr 68 votes; and Jay 1 vote.  Adams and Pinckney would have become President and Vice President respectively.  According to Senator Anthony, "[T]he election would have been strictly and unquestionably legal and constitutional." *Id.* This point is subject to serious debate today.  There may be a constitutional right to vote for presidential and vice presidential electors, at least in some cases.  *See* U.S. CONST. amend. XIV, § 2; U.S. CONST. amend. XXIV; Michael C. Dorf, We Need A Constitutional Right To Vote in Presidential Elections (Dec. 13, 2000), *at* http://writ.findlaw.com/dorf/20001213.html (on file with the North Carolina Law Review).  *But see Bush,* 531 U.S. at 104 ("The State, of course, after granting the franchise in the special context of Article II, can take back the power to appoint electors.") (citation omitted).

The presidential election of 1800 and the electoral count of 1801 is currently the subject of a fascinating, timely, and forthcoming book by Professor Bruce Ackerman.  BRUCE ACKERMAN, AMERICA ON THE BRINK:  THE CONSTITUTIONAL CRISIS OF THE EARLY REPUBLIC (forthcoming 2002) (on file with the North Carolina Law Review).  For two rich discussions of the election of 1800, see generally Joanne B. Freeman, *The Election of 1800: A Study in the Logic of Political Change,* 108 YALE L.J. 1959 (1999); John J. Janssen, *Dualist Constitutional Theory and the Republican Revolution of 1800,* 12 CONST. COMMENT. 381 (1995).  For a recent book-length treatment, see WEISBERGER, *supra.*

4.  For specific reference to these four questions, see, for example, 10 ANNALS OF CONG. 29 (1800) (remarks of Sen. Ross); *id.* at 131 (remarks of Sen. Pinckney); *id.* at 133 (remarks of Sen. Pinckney).

5.  *Id.* at 29.

6.  *Id.* at 132.

7.  Thankfully, the problem has been a very small one, with approximately a dozen electors of over 25,000 casting votes in opposition to the wishes of the voters in the course of 213 years.  *See* Beverly J. Ross & William Josephson, *The Electoral College and the Popular Vote,* 12 J.L. & POL. 665, 667 (1996).  There is no consensus on the exact number of faithless electors since the Founding.  The paradigm case is that of Samuel Miles, a Federalist elector from Pennsylvania, who in 1796, just eight years after the adoption of the Constitution and in the third presidential election, voted for Democrat-Republican Jefferson instead of Federalist Adams.  This action prompted a Federalist voter to exclaim:  "Do I chuse Samuel Miles to determine for me whether John Adams or Thomas Jefferson shall be President?  No!  I chuse him to act, not to think."  E. STANWOOD, A HISTORY OF THE PRESIDENCY 51 (August M. Kelley Publishers 1975) (1928).

The faithless elector problem was of particular concern in the presidential election of 2000:  Any two faithless votes by Bush electors would have thrown the election into the House of Representatives, and any three faithless votes would have thrown the election to

*NORTH CAROLINA LAW REVIEW*    [Vol. 80

What does the Constitution say about these potential problems? The relevant text of the Constitution simply provides that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."[8] It ought to be obvious that the Constitution does not provide any answers to these tricky problems of the electoral count.[9] The Framers and Ratifiers simply did not contemplate the possibilities of unconstitutional or faithless electoral votes.

The critical question is whether we can fix the *casus omissus* of the Constitution short of constitutional amendment. The counting of the electoral votes is no trivial matter. It is the critical step in the election of the President and Vice President. As one leading scholar has stated, it seems to be "the magic, formal moment of vesting in which the winning candidate is elected as 'President.' "[10] Some might quibble with this formalist point, but at the founding, when there were no telegraphs, telephones, or television, and when electoral

---

former Vice President Gore. Going into December 18, 2000 (the date specified by federal law for the giving of electoral votes by the electors), the expected electoral count was 271 votes for Bush and 267 votes for Gore. The final electoral count for President was 271 votes for Bush and 266 votes for Gore. *See* 147 CONG. REC. H44 (2001). One Gore-Lieberman elector from the District of Columbia, protesting the District's lack of statehood, refused to cast her votes for President and Vice President. *See* Charles Babington, *Electors Reassert Their Role; Bush Wins Vote; Protest Costs Gore*, WASH. POST., Dec. 19, 2000, at A1. For additional discussion of the faithless elector problem, see *infra* notes 176–191, 590–592 and accompanying text.

8. U.S. CONST. amend. XII. The only differences between this text of the Twelfth Amendment and the text of the original Constitution are in punctuation and capitalization. *See* U.S. CONST. art. II, § 1, cl. 3 ("The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted."). The Twelfth Amendment overwrote U.S. CONST. art. II, § 1, cl. 3, but not two other clauses that relate to the Electoral College mode of presidential election, U.S. CONST. art. II, § 1, cls. 2, 4. For ease of exposition, I will variously refer to these clauses as the "Electoral College Clauses."

9. As Justice Joseph Story described:

In the original plan, as well as in the amendment, no provision is made for the discussion or decision of any questions, which may arise, as to the regularity and authenticity of the returns of the electoral votes, or the right of the persons, who gave the votes, or the manner, or circumstances, in which they ought to be counted. It seems to have been taken for granted, that no question could ever arise on the subject; and that nothing more was necessary, than to open the certificates, which were produced, in the presence of both houses, and to count the names and numbers, as returned.

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1464, at 327 (1833) [hereinafter STORY'S COMMENTARIES]; *see also* 17 CONG. REC. 815 (1886) (remarks of Sen. Sherman) (discussing specific problems of the electoral count); 18 CONG. REC. 50–51 (1886) (remarks of Rep. Adams) (same).

10. Akhil Reed Amar, *Presidents, Vice Presidents, and Death: Closing the Constitution's Succession Gap*, 48 ARK. L. REV. 215, 217 (1995).

votes were more secret, there was no way of knowing the identity of the winning candidates until the electoral votes were formally counted.   Recent history should be a powerful reminder of the significance of the electoral count.  One key lesson of the presidential election of 2000 is that the President-elect is not elected by "We the People" on election day, or even by the electors on the day they cast their votes, but by the joint convention of the Senate and House of Representatives on the day the electoral votes are formally counted.

The counting function appears to be a ministerial duty of tabulation imposed by the Constitution because each of the electoral colleges meet in their respective states instead of at some central location.  Conventional wisdom holds that the joint convention of the Senate and House of Representatives does the counting, and not the President of the Senate, but this is not at all clear from the text of the Electoral College Clauses.  But does the counting function subsume the power not to count?  What about unconstitutional votes?  What about faithless votes?

As is now somewhat well known, Congress has answered the question whether the counting function subsumes the power not to count affirmatively.  The relevant statute is the Electoral Count Act of 1887,[11] presently codified at 3 U.S.C. §§ 5–6, 15–18.  The heart of the Electoral Count Act is undisputedly 3 U.S.C. § 15, a complicated provision that sets forth rules for counting (and not counting) electoral votes.  In a nutshell, this section provides that in a case of single returns, the joint convention may only reject electoral votes that are not "regularly given" if both Houses of Congress concur.[12]  In a case of multiple returns from the same state, this section provides that the joint convention may only accept electoral votes as "regularly given" if both Houses of Congress concur (with a few important wrinkles to be discussed later).[13]   The meaning of the phrase "regularly given"[14] in § 15 is far from clear.  The precedents of the electoral count, however, strongly suggest that the joint convention will not count unconstitutional votes, and possibly not faithless votes either.

While 3 U.S.C. § 15 sets forth the rules for counting (and not counting) electoral votes, 3 U.S.C. § 5, the specific federal statutory provision at issue in *Bush v. Gore*, sets forth the so-called "safe

---

11.  Act of Feb. 3, 1887, ch. 90, 24 Stat. 373 (codified as amended at 3 U.S.C. §§ 5–6, 15–18 (2000)).

12.  *See* 3 U.S.C. § 15 (2000).

13.  *See id.*

14.  *Id.*

harbor" provision for counting electoral votes with respect to a state's determination of any controversy or contest concerning the appointment of its electors.[15] *Bush v. Gore* indicates that there must be nine votes on the Supreme Court for the proposition that 3 U.S.C. § 5 is constitutional. Although neither party briefed or argued the constitutionality of this provision of the Electoral Count Act, each of the Justices must have reached an independent, antecedent determination that 3 U.S.C. § 5 passes constitutional muster.[16] Curiously, *Bush v. Gore*, for all that it did address regarding presidential election, did not address the heart of the Electoral Count Act—3 U.S.C. § 15. Only Justice Breyer, with Justices Stevens and Ginsburg concurring, even mentioned this key section, and he did so approvingly.[17] The prevailing wisdom, in the Supreme Court and elsewhere, is that the Electoral Count Act is constitutional.[18]

---

15. *Id.* § 5.

16. Needless to say, this assumes that each of the Justices was doing his or her job, and not violating his or her oath to support the Constitution, *see* U.S. CONST. art. VI, cl. 3, which is an assumption that may beget controversy, depending on one's jurisprudential (political?) preferences.

17. *See* 531 U.S. 98, 153–54 (2000) (Breyer, J., dissenting) ("[T]he Twelfth Amendment commits to Congress the authority and responsibility to count electoral votes. A federal statute, the Electoral Count Act, enacted after the close 1876 Hayes-Tilden presidential election, specifies that, after States have tried to resolve disputes (through 'judicial' or other means), Congress is the body primarily authorized to resolve remaining disputes."); *id.* at 155 (Breyer, J., dissenting) ("Given this detailed, comprehensive scheme for counting electoral votes [3 U.S.C. § 15], there is no reason to believe that federal law either foresees or requires resolution of such a political issue by this Court."). Others have similarly argued that the "political question doctrine," *see, e.g.,* Baker v. Carr, 369 U.S. 186, 217 (1962), counsels (if not requires) that the Supreme Court should not have entered the fray in the presidential election of 2000. *See, e.g.,* Laurence H. Tribe, Erog v. Hsub *and Its Disguises: Freeing* Bush v. Gore *from Its Hall of Mirrors*, 115 HARV. L. REV. 170, 276–87 (2001); *id.* at 277 n.433 (citing argument made by Professors Charles Fried and Einer Elhauge in Brief of the Florida Senate and House of Representatives as Amici Curiae in Support of Neither Party at 7, Bush v. Palm Beach County Canvassing Bd., 531 U.S. 70 (2000) (No. 00-836)); Rachel E. Barkow, *More Supreme than Court? The Fall of the Political Question Doctrine and the Rise of Judicial Supremacy*, 102 COLUM. L. REV. 237, 273–300 (2002). Whether *Bush v. Gore* presented a non-justiciable political question is beyond the scope of this Article.

18. Only a handful of scholars have addressed the constitutionality of the Electoral Count Act since its initial adoption more than one hundred and twenty years ago. Professor Spear, writing in 1877, concluded that the Electoral Count Act of 1877 was unconstitutional. *See* Samuel T. Spear, D.D., *Counting the Electoral Votes*, 15 ALB. L.J. 156, 156–61 (1877). Professor Burgess, writing in 1888, concluded that the Electoral Count Act of 1887 was constitutional. *See* John W. Burgess, *The Law of the Electoral Count*, 3 POL. SCI. Q. 633, 653 (1888). More recently, Professor Ross and Mr. Josephson have apparently concluded that the Electoral Count Act is constitutional. *See* Ross & Josephson, *supra* note 7, at 704–40.

　　Two other scholars have obliquely addressed the constitutionality of the Electoral Count Act in recent years. Professor Glennon, in his primer on the Electoral College,

Yet there has been virtually no scrutiny of this conventional wisdom in the wake of *Bush v. Gore*. One of the most unasked questions regarding the presidential election of 2000 is whether the federal statutory scheme at issue in that case is constitutional.

This Article argues that the Electoral Count Act, specifically 3 U.S.C. § 15, is unconstitutional. The Electoral Count Act violates the text and structure of the Constitution in multiple ways. For example, where is the font of express or implied power to pass the Electoral Count Act? Where does Congress have the power to regulate the manner of presidential election? Where do the Electoral College Clauses provide for bicameralism in counting electoral votes? What gives the 49th Congress the authority to bind future Congresses and joint conventions in counting electoral votes?

More generally: What gives the joint convention the power to *judge* the validity of electoral votes? The counting function seems to be arithmetic and ministerial. If the joint convention could judge electoral votes, it could reject enough votes to thwart the electors' will or trigger a contingency election for President in the House of Representatives and for Vice President in the Senate, thereby arrogating to the two Houses of Congress the power to appoint the Nation's two highest executive officers.[19] The tight margin of the

somewhat casually concludes that the Electoral Count Act is constitutional. *See* MICHAEL J. GLENNON, WHEN NO MAJORITY RULES: THE ELECTORAL COLLEGE AND PRESIDENTIAL SUCCESSION 35–43 (1992). Professor Amar, in an article on presidential succession, assumes that the Electoral Count Act is constitutional in the course of proposing an improvement to the process of presidential election. He suggests that "Congress should provide by statute that an electoral vote for any person who is dead at the time of the congressional counting is a valid vote, and will be counted, so long as the death occurred on or after Election Day." Amar, *supra* note 10, at 222.

Most recently, after *Bush v. Gore*, several commentators have assessed the constitutionality of the Electoral Count Act, but only in passing. *See, e.g.*, SAMUEL ISSACHAROFF ET AL., WHEN ELECTIONS GO BAD: THE LAW OF DEMOCRACY AND THE PRESIDENTIAL ELECTION OF 2000, at 98 (2001) ("Questions about the constitutionality of the Electoral Count Act have been raised but never fully addressed."); Dan T. Coenen & Edward J. Larson, *Congressional Power Over Presidential Elections: Lessons from the Past and Reforms for the Future*, 43 WM. & MARY L. REV. 851, 860–71, 909–16 (2002) (concluding that the Electoral Count Act is constitutional and that congressional power to enact such legislation should support national-ballot and voting equipment legislation); Jesse H. Choper, Why the Supreme Court Should Not Have Decided the Presidential Election of 2000, at 15 (stating that "the Electoral Count Act is not free of certain ambiguities and possible constitutional problems") (unpublished manuscript, on file with the North Carolina Law Review), *available at* http://papers.ssrn.com/abstract=281869.

19. For an excellent articulation of this point, see 17 CONG. REC. 1059 (1886) where Sen. Wilson stated:

Can we conclude that the [F]ramers of our Constitution, when they conferred on the respective Houses of Congress these extraordinary powers, intended to invest them with the still more extraordinary power of rejecting the votes of

*NORTH CAROLINA LAW REVIEW*

presidential election of 2000—in both the popular vote and electoral vote—demonstrates that these possibilities are not necessarily remote. In a close presidential election, every electoral vote counts. As Chancellor Kent put the point in his treatise on the Constitution first published over 175 years ago, "In the case of questionable votes, and a closely contested election, this [counting] power may be all-important."[20] As bizarre as it may seem, the joint convention must count the electoral votes—including unconstitutional or faithless votes. As unfortunate as it may be, a solution to the problem of unconstitutional or faithless electoral votes requires constitutional amendment. The constitutional infirmities of the electoral count are yet additional reasons to scrap the Electoral College mode of presidential election altogether.

This Article proceeds in three parts. Part I presents the history of the electoral count, addressing the principal congressional efforts to regulate presidential election and the electoral count, and the actual problems of the electoral counts from the Founding to today. Part II contains the constitutional argument against the constitutionality of Electoral Count Act and sets forth "interpretivist" arguments from constitutional text and structure.[21] Part III considers

---

electors appointed by the several States, and thereby creating by themselves and for themselves the contingency which alone gives them the right and power to elect a President and Vice-President?

*See also* 18 CONG. REC. 74 (1886) (remarks of Rep. Baker) (similar).

Early commentators on the Constitution, writing in the wake of the electoral crisis of 1800–01, were quick to point out the evils of presidential election by the House of Representatives. *See, e.g.*, 1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES WITH NOTES OF REFERENCE TO THE CONSTITUTION AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND OF THE COMMONWEALTH OF VIRGINIA, app. at 327 (1803) [hereinafter TUCKER'S COMMENTARIES]. St. George Tucker stated:

Then, indeed, intrigue and cabal may have their full scope: then, may the existence of the union be put in extreme hazard: then might a bold and desperate party, having the command of an armed force, and of all the resources of government, attempt to establish themselves permanently in power, without the future aid of forms, or the control of elections.

*Id.*; *see* WILLIAM ALEXANDER DUER, COURSE OF LECTURES ON THE CONSTITUTIONAL JURISPRUDENCE OF THE UNITED STATES 82 (Lenox Hill Pub. & Dist. Co. 1971) (1843) [hereinafter DUER'S COMMENTARIES] (noting that "on one memorable occasion... much riotous and violent conduct was exhibited in the House of Representatives, when, upon an equality of electoral votes between two of the persons voted for, the choice devolved upon that body"); 1 JAMES KENT, COMMENTARIES ON AMERICAN LAW *279 [hereinafter KENT'S COMMENTARIES] ("All elections by the representative body are peculiarly liable to produce combinations for sinister purposes.").

20. KENT'S COMMENTARIES, *supra* note 19, at *276.

21. The methodological approach taken in this Article—one that places almost exclusive reliance on constitutional text and structure and one that may be described as "interpretivist" or "originalist"—may be criticized by some as out of touch with the

what should happen if the Electoral Count Act is unconstitutional, and electors go bananas and cast unconstitutional or faithless votes. This Part suggests answers to the paradigm problems of the electoral count and considers where we should go from here.

## I. The History of the Electoral Count

The history of the electoral count is woefully understudied.[22] This is especially problematic because "[d]isputes concerning presidential electors and their votes are more common than one may think."[23] Although the electoral count's history does not directly (or necessarily) bear on the constitutionality of the Electoral Count Act, it is worth studying for at least a few reasons. First, there is much we can learn about our electoral past. Given the risk that history might repeat itself, the history of the electoral count furnishes important precedent for future electoral disputes, in much the same way as cases furnish precedent for future cases.[24] Second, participants in the Electoral Count Act debates referred to the history of the electoral

---

subject matter. The arguments run as follows: the electoral college mode of presidential election has worked in ways never contemplated by the Framers and Ratifiers—with the advent of political parties, not to mention the perfunctory role of electors themselves in presidential election. Indeed, one might say that the electoral college mode of presidential election has (ironically or not) worked in a way positively antithetical to the original expectations of the Framers and Ratifiers. Moreover, as we shall see, the constitutional lacunae seem to be especially large when it comes to the thorny issues of the electoral count—these issues were under-specified from the start. And so the argument concludes that constitutional meaning should be determined by subsequent practice—what works, or has been accepted as if valid—more than by constitutional text and structure. Nevertheless, this Article's methodological approach does yield (I submit) a definitive result as to the constitutionality of the Electoral Count Act. It is rather difficult to see why non-constitutional developments in electoral politics relating to presidential election—however stark when compared to the Founding—create congressional power to regulate the electoral count when none existed. In any case, this Article's methodological approach is far from useless even for those who choose to ignore its results. *See* Akhil Reed Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U. L. REV. 205, 207–08 n.7 (1985) (discussing the value of "interpretivist" methodology whether or not one subscribes to its results).

22. The *vade mecum* in the study of the history of the electoral count is a House Special Committee report issued after the Hayes-Tilden presidential election of 1872. *See* COUNTING ELECTORAL VOTES, *supra* note 3; *see also* 3 HIND'S PRECEDENTS OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES 209–67 (Alfred C. Hinds ed., 1907) (discussing the electoral counts of 1789 to 1905). Two scholars have also nicely summarized the relevant history. *See generally* C.C. Tansill, *Congressional Control of the Electoral System*, 34 YALE L.J. 511 (1924–25); L. Kinvin Wroth, *Election Contests and the Electoral Vote*, 65 DICK. L. REV. 321 (1961).

23. John Harrison, *Nobody for President*, 16 J.L. & POL. 699, 699 (2000).

24. Indeed, *Bush v. Gore* provides two excellent examples. For references to the Hayes-Tilden Incident of 1877, see *infra* notes 157–64 and accompanying text. For references to the Hawaii Incident of 1961, see *infra* notes 165–75 and accompanying text.

count in debating the constitutionality of the Electoral Count Act. A familiarity with the history of the electoral count better informs these legislative debates. Third, participants in the Electoral Count Act debates referred to the history of the electoral count—and specifically the actual problems of the electoral count—in debating the necessity and expediency of the Electoral Count Act. A critical examination of this history better affords a basis to assess whether the Electoral Count Act is necessary and expedient to address these historical problems and whether there may be other non-statutory solutions.

This Part seeks to fill this void in scholarship and proceeds in two sections. The first section summarizes four principal congressional efforts—three successful, one not—to regulate presidential election and the electoral count, including the Act of 1792, the Grand Committee Bill, the Twenty-second Joint Rule, and finally the Electoral Count Act. The second section summarizes the actual problems of the electoral count. In the course of fifty-four electoral counts in the history of the Republic, there have been only a dozen or so problems of the electoral count, most of which occurred in the nineteenth-century.[25]

A.  *Congressional Efforts to Regulate Presidential Election and the Electoral Count*

### 1. Act of March 1, 1792

On March 1, 1792, the Second Congress passed "An Act relative to the election of a President and Vice-President of the United States and declaring the officer who shall act as President in case of vacancies in the offices both of President and Vice-President."[26] The Act thus regulated presidential election and presidential succession, the latter pursuant to Article II, Section 1, Clause 6.[27]

---

25. As of 1886, Senator Sherman observed that "[s]ince [the Founding] there have been eleven cases of disputes as to electoral votes, and twenty-one objections have been made to the electoral votes of different States, presenting a great variety of questions," though he did not elaborate. 17 CONG. REC. 815 (1886).

26. Act of Mar. 1, 1792, ch. 8, 1 Stat. 239. For the relevant part of the act relating to presidential election, see COUNTING ELECTORAL VOTES, *supra* note 3, at 9.

27. U.S. CONST. art. II, § 1, cl. 6 provides:

In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.

2002]                *ELECTORAL COUNT ACT*                1665

The Act did a number of things with respect to presidential election. Sections 1 and 2 of the Act, pursuant to Article II, Section 1, Clause 4,[28] established the time of choosing the electors by the States as thirty-four days before their meeting, and the day on which the electors were to give their votes as the first Wednesday in December of each presidential election year.[29]   Section 1 also clarified Article II, Section 1, Clause 2[30] by providing that each state shall appoint a number of electors equal to the number of Senators and Representatives to which the state is entitled at the time when the President and Vice President to be chosen would come into office.[31]

Section 2 also clarified Article II, Section 2, Clause 3[32] by specifying the manner of certifying and transmitting the electoral certificates to the President of the Senate.   It provided that the electors in each state shall make and sign three electoral certificates—one to be sent by messenger appointed by a majority of the electors, a second by post to the President of the Senate, and the third to be delivered to the judge of the district in which the electors in each state

---

With respect to presidential succession, the Act provided that, after the Vice President, the President *pro tempore* and the Speaker of the House of Representatives would next be in line to act as President.  For a strong and persuasive claim that this mode of presidential succession is unconstitutional because Members of Congress are not "Officer[s]" within the meaning of the Presidential Succession Clause, see Akhil Reed Amar & Vikram David Amar, *Is the Presidential Succession Law Constitutional?*, 48 STAN. L. REV. 113 (1995).

28.  *See* U.S. CONST. art. II, § 1, cl. 4 ("The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.").

29.  For the modern codification, see 3 U.S.C. § 1 (2000) ("The electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President."); *id.* § 7 ("The electors of President and Vice President of each State shall meet and give their votes on the first Monday after the second Wednesday in December next following their appointment at such place in each State as the legislature of such State shall direct.").

30.  U.S. CONST. art. II, § 1, cl. 2 provides:
   Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress:  but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

31.  A proviso to section 1 provided:  "That where no apportionment of Representatives shall have been made after any enumeration, at the time of choosing electors, then the number of electors shall be according to the existing apportionment of Senators and Representatives."  For the modern codification, see 3 U.S.C. § 3.

32.  *See* U.S. CONST. art. II, § 2, cl. 3 ("And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate.").

shall assemble.[33]  Section 3 further specified the manner of certifying and transmitting the electoral certificates, but well beyond the text of Article II, Section 2, Clause 3.  It provided that

> the executive authority of each State shall cause three lists of the names of the electors of such State to be made and certified and to be delivered to the electors on or before the said first Wednesday in December; and the said electors shall annex one of the said lists to each of the lists of their votes.[34]

These provisions of sections 2 and 3 are noteworthy because the Electoral College Clauses do not expressly grant Congress the power to specify the manner of certifying or transmitting the electoral certificates.  Interestingly, a draft of Article II, Section 1, Clause 4 at the Philadelphia Convention of 1787 provided that "[t]he Legislature may determine the time of choosing the Electors, and of their giving their votes; *and the manner of certifying and transmitting their votes*— But the election shall be on the same day throughout the U—States."[35]  The italicized language was inexplicably dropped by the time the Framers referred the draft Constitution to the Committee of Style and Arrangement.[36]  It is a slippery exercise to infer the meaning of this clause from language rejected in predecessor drafts.  Perhaps the Framers intended to deny Congress the power to legislate on the manner of certification and transmission of electoral votes.  Or perhaps the Framers intended that Congress could enact

---

33.  For the modern codification, see 3 U.S.C. § 11 and 3 U.S.C. § 9, which provides: The electors shall make and sign six certificates of all the votes given by them, each of which certificates shall contain two distinct lists, one of the votes for President and the other of the votes for Vice President, and shall annex to each of the certificates one of the lists of the electors which shall have been furnished to them by direction of the executive of the State.

34.  For the modern codification, see 3 U.S.C. § 6.

35.  *See* 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 529 (Max Farrand ed., 1911) [hereinafter FARRAND] (emphasis added); *see also* David P. Currie, *The Constitution in Congress: The Second Congress, 1791–1793*, 90 NW. U. L. REV. 606, 617–18 (1996) (noting this point).  Alexander Hamilton's draft of the Constitution contained a broader grant of law-making power.  *See* 3 FARRAND, *supra*, at 624 ("The Legislature shall by permanent laws provide such further regulations as may be necessary for the more orderly election of the President, not contravening the provisions herein contained.").

36.  Contrary to Professor Currie's view, *see* Currie, *supra* note 35, at 617–18, this language was not dropped by the Committee of Style, but was dropped by the Framers themselves.  *See* 2 FARRAND, *supra* note 35, at 573 (draft Constitution referred to Committee of Style and Arrangement) ("The Legislature may determine the time of chusing the Electors and of their giving their votes—But the election shall be on the same day throughout the United States.").

these sections either pursuant to Article II, Section 1, Clause 4 itself or pursuant to the Necessary and Proper Clause.[37]

In any case, it is difficult to see how section 3 and its modern codification at 3 U.S.C. § 6 are constitutional, strictly speaking. When section 3 of the Act of 1792 was read in the House of Representatives, Representative Niles, joined by Representative Hillhouse, objected to it on constitutional grounds, questioning Congress's ability to impose duties on the executive authority of each state and calling the section "degrading to the Executives of the several States."[38]   Speaker Sedgwick responded that "if Congress were not authorized to call on the Executives of the several States, he could not conceive what description of persons they were empowered to call upon,"[39] and Representative Niles's motion to strike the clause was negatived.

Democrat-Republican Senator Charles Pinckney, a Framer and leading delegate to the South Carolina ratifying convention, probably would have agreed with Representative Niles's constitutional objection. In a speech before the Senate in March of 1800, Senator Pinckney observed that the Act of 1792 may "in one or two particulars of no importance" go "farther than the Constitution warrants," though he did not identify any particular sections.[40]   In modern constitutional parlance, the duties imposed on State Executives by section 3 of the Act of 1792 and 3 U.S.C. § 6, do not seem quite like "purely ministerial reporting requirements,"[41] but those who have a broader view of "executive commandeering" are unlikely to question seriously the constitutionality of section 3 of the Act of 1792 and 3 U.S.C. § 6.[42]

Other provisions of the Act of 1792 are much less questionable. Section 4 provided that if the electoral certificate of a state shall not have been received at the Seat of Government by the first Wednesday in January, then the Secretary of State shall send a special messenger to the district judge of the State who held one of the three electoral

---

37. These two possible fonts of power for the Electoral Count Act are discussed in Part II.A.2 *infra*.

38. 3 ANNALS OF CONG. 279 (1791).

39. *Id.* at 279.

40. 10 ANNALS OF CONG. 134 (1800).

41. *See Printz v. United States*, 521 U.S. 898, 936 (1997) (O'Connor, J., concurring) (suggesting that "purely ministerial reporting requirements imposed by Congress on state and local authorities" may be constitutionally valid).

42. *See, e.g., id.* at 939 (Stevens, J., dissenting); *id.* at 970–71 (Souter, J., dissenting); *id.* at 976–77 (Breyer, J., dissenting); Saikrishna Bangalore Prakash, *Field Office Federalism*, 79 VA. L. REV. 1957, 1990–2007 (1993) (presenting extensive early historical evidence of "executive commandeering").

*NORTH CAROLINA LAW REVIEW* [Vol. 80

certificates.[43] Section 5 provided that Congress shall be in session on the second Wednesday in February for the purpose of opening the electoral certificates and counting the electoral votes.[44] Section 6 provided that if the President of the Senate were absent when the electoral certificates arrived, they would be given to the Secretary of State for safekeeping, to be delivered as soon as practicable to the President of the Senate. Section 7 provided for the compensation of messengers who would carry one of the three electoral certificates from each of the states to the Seat of Government at the rate of twenty-five cents a mile. Section 8 prescribed a $1,000 penalty (no small sum in those days) for messengers who failed to perform the service.[45]

Whatever we think about the constitutionality of section 3 of the Act of 1792, the Act did not in any way assert any congressional control over the electoral count itself. As one early scholar of the Electoral Count Act noted, "There is no attempt here, legislatively, to interpret the Constitution, or devise any counting machinery other than that which appears on its face, or establish any rule for its action.

---

43. The modern codification provides:

When no certificate of vote and list mentioned in sections 9 and 11 of this title from any State shall have been received by the President of the Senate or by the Archivist of the United States by the fourth Wednesday in December, after the meeting of the electors shall have been held, the President of the Senate or, if he be absent from the seat of government, the Archivist of the United States shall request, by the most expeditious method available, the secretary of state of the State to send up the certificate and list lodged with him by the electors of such State; and it shall be his duty upon receipt of such request immediately to transmit same by registered mail to the President of the Senate at the seat of government.

3 U.S.C. § 12 (2000). Additionally:

When no certificates of votes from any State shall have been received at the seat of government on the fourth Wednesday in December, after the meeting of the electors shall have been held, the President of the Senate or, if he be absent from the seat of government, the Archivist of the United States shall send a special messenger to the district judge in whose custody one certificate of votes from that State has been lodged, and such judge shall forthwith transmit that list by the hand of such messenger to the seat of government.

*Id.* § 13.

44. For the modern codification, see 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors.").

45. For the modern codification (with the same $1,000 penalty), see 3 U.S.C. § 14 ("Every person who, having been appointed, pursuant to section 13 of this title, to deliver the certificates of the votes of the electors to the President of the Senate, and having accepted such appointment, shall neglect to perform the services required from him, shall forfeit the sum of $1,000.").

It was assumed that the Constitution interprets itself, and executes itself by its own provisions."[46]

### 2. The Grand Committee Bill of 1800

In early 1800, the Federalist-controlled Sixth Congress attempted to regulate the electoral count.[47] The impetus for the regulation was plainly corrupt: The upcoming presidential election between President and Federalist John Adams and Vice President and Democrat-Republican Thomas Jefferson commanded the nation's attention, and the Federalist-controlled Congress desired to deal Vice President Jefferson's electoral chances a "crippling blow."[48] Historian John Bach McMaster explained that

> [t]he leaders of the [Federalist] party were determined that, if the presidential election could not be carried by fair means, it should by foul. Adams's electors might be defeated in the Legislatures and at the poles [sic], but the votes of the Jefferson electors should, if possible, be thrown out by Congress. With this for its purpose, an electoral-count bill appeared in the Senate.[49]

On January 23, 1800, Federalist Senator James Ross moved "[t]hat a committee be appointed to consider whether any, and what, provisions ought to be made by law for deciding disputed elections of President and Vice President of the United States, and for determining the legality or illegality of the votes given for those officers in the different States" and that the committee be authorized to report a bill.[50] This motion was the subject of significant debate, much of which we shall uncover in Part II. On February 14, 1800, Senator Ross reported "A bill prescribing the mode of deciding disputed elections of President and Vice-President of the United

---

46. Spear, *supra* note 18, at 158.
47. For an easily accessible account of this history, see DAVID P. CURRIE, THE CONSTITUTION IN CONGRESS: THE FEDERALIST PERIOD, 1789–1801, at 288–291 (1997).
48. JEAN EDWARD SMITH, JOHN MARSHALL: DEFINER OF A NATION 263 (1996).
49. 2 JOHN BACH MCMASTER, A HISTORY OF THE PEOPLE OF THE UNITED STATES: FROM THE REVOLUTION TO THE CIVIL WAR 462 (1928); *see id.* at 463 ("The purpose of this shameful bill was plain to all."); *see also* 2 ALBERT J. BEVERIDGE, THE LIFE OF JOHN MARSHALL 452–53 (1916) (describing Federalist effort to regulate electoral count as "in reality a high-handed attempt to control the [coming] presidential election, regardless of the votes of the people"); Wroth, *supra* note 22, at 326 & n.24 (describing Federalist effort to regulate electoral count as "a last ditch effort to stem the tide of Jeffersonian Republicanism").
50. 6 ANNALS OF CONG. 29 (1800).

States."[51]  This bill is commonly known as the "Grand Committee" Bill.[52]

As its shorthand name suggests, this bill featured the appointment of a "Grand Committee" on the day before the second Wednesday in February.  This Committee would have thirteen members:  six Representatives chosen by ballot in the House, six Senators chosen by ballot in the Senate, and the Chief Justice of the United States who was to act as chairman (if the Chief Justice were absent then the next most senior Justice would attend).[53]  This committee was to have power to examine, and finally to decide, all disputes relating to the election of President and Vice President including the:

> power to inquire, examine, decide, and report upon the constitutional qualifications of the persons voted for as President and Vice-President of the United States; upon the constitutional qualifications of the electors appointed by the different States, and whether their appointment was authorized by the State Legislature or not; upon all petitions and exceptions against corrupt, illegal conduct of the electors, or force, menaces, or improper means used to influence their votes; or against the truth of their returns, or the time, place or manner of giving their votes.[54]

---

51. COUNTING ELECTORAL VOTES, *supra* note 3, at 16.

52. Historian Albert Beveridge writes that the bill was "aimed particularly at the anticipated Republican presidential majority in Pennsylvania which had just elected a Republican Governor over the Federalist candidate." 2 BEVERIDGE, *supra* note 49, at 463. It should come as no surprise that the losing Federalist candidate was Senator Ross of Pennsylvania, the principal proponent of the Grand Committee Bill.

53. The idea for a committee of thirteen may have its roots in a proposal by Elbridge Gerry at the Philadelphia Convention of 1787 who proposed that, in case of electoral deadlock, "the eventual election should be made by six Senators and seven Representatives chosen by joint ballot of both Houses." 2 FARRAND, *supra* note 35, at 514. This proposal failed by a vote of two to eight. *Id.*  Note that Gerry's proposal decidedly favors the House of Representatives—the People's branch of the national legislature—both in committee representation and committee election given the joint ballot procedure. Under a joint ballot, the Members of the House of Representatives, at the founding, would be entitled to sixty-five of ninety-one votes. For a mathematical depiction of Gerry's thinking, see *id.* at 99 (proposing the selection of President by a randomly chosen subset of members of Congress taken together).

54. COUNTING ELECTORAL VOTES, *supra* note 3, at 18.  The one exception to this grant of power was that

> no petition, or exception, shall be granted, allowed, or considered by the sitting grand committee which has for its object to dispute, draw into question the number of votes given for an elector in any of the States, or the fact whether an elector was chosen by a majority of votes in his State or district."

*Id.* In other words, the Grand Committee was not to *judge* the elections or returns of the electors.

The committee was "to sit with closed doors." It was to have the "power to send for persons, papers, and records to compel the attendance of witnesses,"[55] and its report was to be made "on the first day of March next after their appointment." This report was to be "a final and conclusive determination of the admissibility or inadmissibility of the votes given by the electors for President and Vice-President of the United States."[56]

Republican Senator Charles Pinckney delivered a "closely reasoned attack"[57] on the Grand Committee Bill, which occupies some twenty-one pages in the *Annals of Congress*.[58] It is not surprising that Senator Pinckney led the effort in the Senate against the Grand Committee Bill. Some historians place him as the campaign manager in South Carolina for Democrat-Republican and Vice President Thomas Jefferson, who had everything to lose with the passage of the Grand Committee Bill.

In his introductory remarks, Senator Pinckney described the Grand Committee Bill as more dangerous than the Alien and Sedition Acts of 1798 because, unlike the latter, the former was perpetual.[59] Relying on his experience as a Framer and a leading delegate at the South Carolina ratifying convention, Senator Pinckney forcefully articulated his principal objection to the bill:

> Knowing that it was the intention of the Constitution to
> make the President completely independent of the Federal

---

55. *Id.* at 17.

56. *Id.* at 18.

57. Tansill, *supra* note 22, at 517.

58. *See* 10 ANNALS OF CONG. 126–46 (1800). In his remarks opposing the Grand Committee Bill, Senator Pinckney described it thus:

> [W]hat is the mode [of electing President] proposed by this bill? That the Senate and House of Representatives of the United States shall each of them elect six members, who with a chairman, to be appointed by the latter from a nomination of the former, would form a *grand committee* who should, sitting with *closed doors*, have a right to examine all the votes given by the Electors in the several States for President and Vice President, and all the memorials and petitions respecting them; and have power finally to decide respecting them, and to declare what votes of different States shall be rejected, and what admitted; and, in short, that this committee, thus chosen, and sitting with closed doors, shall possess complete, uncontrollable, and irrevocable power to decree, without appeal from their decision, who has been returned, and who shall be proclaimed President of the United States.

*Id.* at 129. Professor Ross and Mr. Josephson suggest that, given the length of Senator Pinckney's speech, it was not extemporaneous. *See* Ross & Josephson, *supra* note 7, at 711 n.252.

59. 10 ANNALS OF CONG. 126. Recall that the Alien and Sedition Acts were set to expire on June 25, 1800 and March 3, 1801 respectively. *See* Alien Act of June 25, 1798 § 6, 1 Stat. 570, 572; Sedition Act of July 14, 1798 § 4, 1 Stat. 596, 597.

Legislatures, I well remember it was the object, as it is at present not only the spirit but the letter of that instrument, to give to Congress no interference in, or control over the election of a President. It is made their duty to count over the votes in a convention of both Houses, and for the President of the Senate to declare who has the majority of the votes of the Electors so transmitted. It never was intended, nor could it have been safe, in the Constitution, to have given to Congress thus assembled in convention, the right to object to any vote, or even to question whether they were constitutionally or properly given. . . . To give to Congress, even when assembled in convention, a right to reject or admit the votes of States, would have been so gross and dangerous an absurdity, as the [F]ramers of the Constitution never could have been guilty of. How could they expect, that in deciding on the election of a President, particularly where such election was strongly contested, that party spirit would not prevail, and govern every decision?[60]

According to Senator Pinckney, the animating principle of the Electoral College Clauses was to remove Congress from the business of electing the President as much as possible. Despite Senator Pinckney's strong and well reasoned objections, many of which we shall uncover in Part II, in the course of the argument against the constitutionality of the Electoral Count Act, the Senate passed the Grand Committee Bill by a "strict party vote"[61] of sixteen to twelve on March 28, 1800.[62]

Three days later the bill reached the House. In the House, Federalist Representative John Marshall—soon to be Chief Justice Marshall—broke with his party, and much to the Federalists' dismay, lobbied very hard against the Grand Committee Bill.[63] He was

---

60. 10 ANNALS OF CONG. 130. Senator Pinckney also observed that the Framers "well knew, that to give to the members of Congress a right to give votes in this election, or to decide upon them when given, was to destroy the independence of the Executive and make him the creature of the Legislature." *Id.* at 131. The potential for party spirit in Congress to dominate the choice of President was well recognized. In the Second Congress, Speaker of the House Sedgwick "descanted on the pernicious consequences which might result from the collision of parties, and the working of passions in the breasts of men whose ardor would probably be excited to the greatest degree" if the House of Representatives were to choose the President. 3 ANNALS OF CONG. 278 (1791). During the Wisconsin Incident of 1857, Senator Collamer made similar remarks. *See* COUNTING ELECTORAL VOTES, *supra* note 3, at 132–33 (remarks of Sen. Collamer).

61. 2 BEVERIDGE, *supra* note 49, at 454.

62. 10 ANNALS OF CONG. 146.

63. *See* 2 BEVERIDGE, *supra* note 49, at 455. ("In these cloak-room talks, Marshall, to the intense disgust and anger of the Federalist leaders, was outspoken against this attempt to seize the Presidency under the forms of a National law."); SMITH, *supra* note 48, at 264

*ELECTORAL COUNT ACT*

appointed chairman of a select committee to redraft the bill. Marshall reported the Senate bill in the House of Representatives on April 25, 1800 with significant amendments.[64]  Under the amended bill, the committee's report was not to be the final and conclusive determination on the electoral votes.  Instead, this determination would devolve upon the two Houses after receiving the committee's report. The House bill provided that, upon objection to any elector's vote in a joint meeting of the two Houses, the vote was to be counted unless the two Houses, meeting separately, *concurred* in rejecting it. Indeed, as we shall see, the Electoral Count Act bears significant resemblance to this amended bill.[65]

These amendments "gutted" the Grand Committee Bill.[66]  The Senate considered this amended bill on May 8, 1800, and rejected the House amendments by a "strict party vote."[67]  The Senate then passed an amendment striking out the word "rejecting" and inserting the word "admitting."  The effect of this change was to create a "one-House veto" over electoral votes.  When the two Houses could not agree on the amended bills, the bill died.[68]  According to John Marshall scholar Albert J. Beveridge, if Marshall had not waged his campaign against the Grand Committee Bill, the election of Thomas Jefferson would have been impossible.[69]

It is extremely difficult to see how the original Grand Committee Bill was constitutional.[70]  In addition to the constitutional argument that will be explored in detail in Part II, there are at least four additional attacks on this bill.  First, what gives Congress the

---

("Marshall worked the cloakrooms and corridors assiduously, voicing his objections and lining up the opposition vote.").

64.  *See* COUNTING ELECTORAL VOTES, *supra* note 3, at 23–26.

65.  *See* Part I.A.4 *infra*.

66.  SMITH, *supra* note 48, at 264.

67.  2 BEVERIDGE, *supra* note 49, at 456.

68.  *See* Wroth, *supra* note 22, at 327 ("The House, less aggressively partisan than the Senate, refused to accept a measure which would permit rejection by vote of the Senate alone.").

69.  2 BEVERIDGE, *supra* note 49, at 456. Thomas Jefferson, for his part, was less than fully appreciative of John Marshall's efforts, suggesting that the Marshall amendments did not make the Grand Committee Bill constitutional. In a private letter, he wrote:

Marshall made a dexterous manoeuver; he declares against the constitutionality of the Senate's bill, and proposes that the right of decision of their grand committee should be controllable by the *concurrent* vote of the two [H]ouses of [C]ongress; but to stand good if not rejected by a concurrent vote.  You will readily estimate the amount of this sort of controul.

*Id.* (quoting Letter from Thomas Jefferson, to Robert Livingston (Apr. 30, 1800)).

70.  The amended Grand Committee Bill largely parallels the Electoral Count Act. *See* Part I.A.4 *infra*.

authority to delegate the counting function to a committee, if Congress has counting authority at all?[71]  Second, what gives Congress the authority to take the Chief Justice (or other Justices) away from her judicial duties?[72]  Third, what gives Congress the authority to delay the counting of the electoral votes in violation of the immediacy principle of the Electoral College Clauses?[73]  Fourth, what gives Congress the authority to secretly count electoral votes in violation of the publicity principle of the Electoral College Clauses?[74]

In sum, one should seriously doubt the constitutionality of the Grand Committee Bill.  It is far from clear that Representative John Marshall's amendments removed the multiple constitutional infirmities.  Arguably, the failure of the Second Congress to address congressional regulation of the electoral count after significant constitutional debate suggests the unconstitutionality of the Grand Committee Bill; Senator Pinckney certainly thought so.[75]

---

71.  Apparently, John Marshall also questioned Congress's ability to delegate authority to the Grand Committee.  2 BEVERIDGE, *supra* note 49, at 457 (citing Letter from Speaker Sedgwick, to Sen. Rufus King (May 11, 1800)).

72.  The Constitution carefully circumscribes the Chief Justice's judicial duties under Article III, with one exception.  *See* U.S. CONST. art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments.  When sitting for that Purpose, they shall be on Oath or Affirmation.  When the President of the United States is tried, the Chief Justice shall preside . . . .").

It might be argued that the Chief Justice's role in the Grand Committee is quasi-judicial and that the foregoing clause invites the Chief Justice to play a special role with respect to the Presidency.  For an expression of this claim, see Amar, *supra* note 10, at 223 n.16.  Notably, however, the Framers rejected other non-judicial roles for the Chief Justice and other Justices of the Supreme Court.  *See, e.g.*, 2 FARRAND, *supra* note 35, at 75, 298 (rejecting participation in "[r]evisionary power" or veto power); *id.* at 342 (rejecting participation in "Council of State" or Privy Council).

73.  *See* text accompanying *infra* notes 267–74.

74.  *See* text accompanying *infra* notes 276–86.

75.  Senator Pinckney remarked:

Were not the then Executive, and a number of the members of both Houses, members of the Convention which framed the Constitution; and if it intended to give to Congress, or to authorize them to delegate to a committee of their body, powers contemplated by this bill, could the Congress or the President of 1792, have been so extremely uninformed, and indeed ignorant of its meaning and of their duty, as not to have known it?

10 ANNALS OF CONG. 136 (1800).  However, it must be noted that, during the debate over the Act of 1792, Speaker of the House Sedgwick did mention the possibility of a "contested election" and "left it to the consideration of the Committee" to address the solution.  *See* 3 ANNALS OF CONG. 279 (1791).

### 3. The Twenty-second Joint Rule of 1865

The third principal congressional effort to regulate the electoral count came sixty-five years later in 1865.[76]  On January 30, 1865, the House of Representatives passed a resolution now commonly referred to as the "Twenty-second Joint Rule." A few days later, on February 6, 1865, after minor amendment, the Senate passed the House resolution. Sparsely attended Houses of Congress passed the Twenty-Second Joint Rule with no debate.[77]  As Dean Wroth has observed, it was "a political measure, passed and used by Republican majorities of both Houses to assure control over the votes of the recently rebellious southern states."[78]  The purpose of the Twenty-Second Joint Rule was thus to exclude the electoral votes of putative states as needed, not to exclude the electoral votes of electors. It provided in relevant part:

> If, upon the reading of any such certificate by the tellers, any question shall arise in regard to counting the votes therein certified, the same, having been stated by the Presiding Officer, shall be submitted, first by the President of the Senate to that body, and then by the Speaker to the House of Representatives, and no question shall be decided affirmatively, and no vote objected to shall be counted, except by the concurrent votes of the two houses, said votes of the two houses to be reported to and declared by the Presiding Officer, and upon any such question there shall be no debate; and any other question pertinent to the object for which the two houses are assembled may be submitted and determined in like manner.[79]

---

76. Three other interim and unsuccessful congressional efforts to regulate the electoral count deserve brief mention.  First, on December 12, 1820, Senator Wilson submitted a resolution entitled *Attempt to Remedy the Uncertainty as to Counting the Electoral Vote by Legislation.  See* COUNTING ELECTORAL VOTES, *supra* note 3, at 48. Second, on March 4, 1824, Senator Van Buren—soon to be President Van Buren in 1837—reported a bill similar to Representative John Marshall's Grand Committee Bill. This bill passed the Senate on April 19, 1824, but died without having been considered by the House of Representatives.  *See id.* at 57–60; *see also* Spear, *supra* note 18, at 158 (describing the historical background); Wroth, *supra* note 22, at 327 (same).  Third, on May 10, 1828, Representative Wilde moved a resolution entitled *"A Proposition to Inquire into the Legality of the Certificates of the Votes of the Previous Presidential Election."* COUNTING ELECTORAL VOTES, *supra* note 3, at 63–65.

77. *See* Spear, *supra* note 18, at 158; Wroth, *supra* note 22, at 328 n.33.

78. Wroth, *supra* note 22, at 328; *see also* Tansill, *supra* note 22, at 522 ("[T]he occasion for this assertion of jurisdiction was the breach between the Executive and Congress relative to the reconstruction of the southern states.").

79. COUNTING ELECTORAL VOTES, *supra* note 3, at 148 (House version); *see also* Tansill, *supra* note 22, at 523 (describing the surrounding history); Wroth, *supra* note 22, at 328 (citing same passage).

As the text of the Joint Rule indicates, "no vote objected to shall be counted, except by the concurrent votes of the two houses." Any Member of Congress could object to an electoral vote for any reason, and each House was to have a "one-House veto" as to which votes were to be counted.[80] Thus, each House could, by rejecting enough votes, trigger a contingency election in the House of Representatives for the President and in the Senate for the Vice-President.[81] As we shall see shortly, even the Electoral Count Act does not go this far.

A report by the House Committee on Privileges and Elections in 1874 called the Twenty-Second Joint Rule "the most dangerous contrivance to the peace of the nation that has ever been invented by Congress."[82] Indeed, the consensus view during the Electoral Count Act debates was that the Twenty-Second Joint Rule was unconstitutional.[83] Unsurprisingly, scholars who have studied the

---

80. Sen. Morton offered an analysis:

> Under the rule as it now exists, when the votes for President and Vice-President are counted, any formal objection, no matter how trifling or insufficient or even contemptible in its character, has the effect to separate the two houses, and they are to vote upon this objection, and unless both houses concur in voting it down the electoral vote of that State is lost. In that way, by the dissent of either house, any State may be disfranchised; the vote of the State of New York or of Indiana may be rejected by the most foolish and trivial objection unless both houses shall concur in voting down that objection. The vote of every State may be rejected in this way.

COUNTING ELECTORAL VOTES, *supra* note 3, at 444.

81. A report by the Committee on Privileges and Elections in 1874 stated: "Here is a powerful temptation to the House of Representatives by non-concurrence to throw the election into its own body, and thus, perhaps, secure the election of a candidate who may have been overwhelmingly beaten at the polls." COUNTING ELECTORAL VOTES, *supra* note 3, at 417.

82. *Id.*

83. *See, e.g., id.* at 444 (remarks of Sen. Morton) ("[T]he existence of this rule imperils the peace of the nation and subjects the Government to great danger. . . . It requires no argument, therefore, to prove the absurdity, the unconstitutionality, and the danger of this rule."); *id.* (remarks of Sen. Bayard) ("I have for a long time been of opinion that the constitutionality of this rule altogether may well be doubted."); *id.* at 472 (remarks of Sen. Bayard) ("That such a rule was without constitutional warrant, I cannot doubt; and I do not think I am going too far when I say that the unconstitutionality of that rule is generally admitted."); *id.* at 526 (remarks of Sen. Morton) ("It was absurd, wickedly and dangerously unconstitutional."); *id.* at 540 (remarks of Sen. Maxey) ("It is a blot upon the mode and manner of counting the votes of the electoral college. It gives to either [H]ouse of Congress the right to stab to the death a sovereign State of this Union."). Sen. Bayard remarked:

> Then, under the maleficent working of a rule adopted without regard to the Constitution, under the assumption of powers utterly unwarranted by the two [H]ouses of Congress, there came the assumption of a veto power by either branch of Congress, in silence, without debate, without reason, to throw out the electoral vote and disfranchise one or more communities at will.

*Id.* at 665.

Rule have identified it as the apex of congressional control over the electoral count.[84]   Simply put, the Twenty-second Joint Rule was unconstitutional.[85]

### 4. The Electoral Count Act of 1887

The legislative history of the Electoral Count Act of 1887 is complex, and much of this history has been well catalogued elsewhere.[86]   The heart of the Electoral Count Act is currently codified at 3 U.S.C. § 15, titled "Counting electoral votes in Congress."[87]   This section sets forth a complicated set of provisions for counting electoral votes.

Two noticeable differences exist between the Electoral Count Act and the Twenty-second Joint Rule.  First, the Electoral Count Act is a *law* and not a *joint rule*.  Second, the Electoral Count Act does not have the "one-House veto" provision of the Twenty-second Joint Rule.  It is not clear that these two significant changes cure the constitutional infirmities of the Twenty-second Joint Rule.

Charting the basic workings of the Electoral Count Act is a good place to begin.  The Act provides for the reading of the electoral votes by state and the objection to an electoral vote.  Unlike its predecessors, the Electoral Count Act requires an objection to an electoral vote to have the signature of at least one Senator *and* at least one Representative.[88]   After all the objections to the electoral votes from a state have been received and read, the Senate and the House of Representatives withdraw for separate deliberations.

---

84. *See* Tansill, *supra* note 22, at 522 ("In 1865, the climax of congressional control [over the electoral vote] was reached, . . . ."); Wroth, *supra* note 22, at 328 ("Congress asserted total power over the electoral vote with the adoption of the Twenty-second Joint Rule in 1865.").

85. The "one-House veto" of the Twenty-second Joint Rule bears a remarkable resemblance to the scheme held unconstitutional in *INS v. Chadha*, 462 U.S. 919, 959 (1983) (holding a "one-House veto" provision unconstitutional).

86. In a nutshell, the precursor bill to the Electoral Count Act was introduced in the Republican Senate in May 1878.  "Spurred by two close presidential elections, the Senate repassed the bill three times in the next decade, but each time could not win the agreement of the House." Wroth, *supra* note 22, at 334 (footnotes omitted).  The two Houses of Congress finally agreed in 1887, after "the passions of Reconstruction had cooled." *Id.*  For a comprehensive summary of the legislative history of the Electoral Count Act, see Ross & Josephson, *supra* note 7, at 722–30, and Wroth, *supra* note 22, at 334–35.

87. 3 U.S.C § 15 (2000).

88. *Id.* ("Every objection shall be made in writing, and shall state clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives before the same shall be received.").

Unless there is a case of "double returns," the applicable provision is as follows:

> [N]o electoral vote or votes from any State which shall have been *regularly given* by electors whose appointment has been lawfully certified to according to section 6 of this title from which but one return has been received shall be rejected, but the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so *regularly given* by electors whose appointment has been so certified.[89]

In the case of "double returns" with "more than one return or paper purporting to be a return from a State,"[90] the applicable statutory provision is considerably more complex.    The joint convention first looks to see if the state has determined the controversy, and if it has, that determination is binding.[91]  If, however, there should be multiple state authorities which claim to have decided the controversy, then the two Houses of Congress, acting separately, must decide concurrently which set to count.  If the two Houses disagree, then the Electoral Count Act provides that "the votes of the electors whose appointment shall have been certified by the executive of the state, under the seal thereof, shall be counted."[92]  The Electoral Count Act does not address what happens if the same executive authority certifies different electors or if multiple executive authorities certify different electors.

## B.    *The Problems of the Electoral Count*

Fortunately, Senator Ross's doomsday prediction in the Sixth Congress that the thorny problems of the electoral count "might happen, and were very likely to happen"[93] has not been borne out in

---

89. *Id.* (emphasis added).  Note that the referred to section 6, 3 U.S.C. § 6 (2000), is the modern codification of section 3 of the Act of 1792.

90. 3 U.S.C. § 15.

91. *Id.* § 5 ("Determination of controversy as to appointment of electors") provides:
If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.

92. *Id.* § 15.

93. 6 ANNALS OF CONG. 29 (1800); COUNTING ELECTORAL VOTES, *supra* note 3, at

the course of two hundred and thirteen years of the Republic. There have been a dozen or so problems of the electoral count and consequent challenges to electoral votes, almost all of which occurred in the nineteenth-century. This section summarizes the historical problems of the electoral count.

### 1. The Massachusetts Incident of 1809

The first congressional objection to the votes of electors occurred in the electoral count of 1809.[94] On December 26, 1808, Representative Barker introduced a memorial from some disgruntled inhabitants of Hanover, Massachusetts that the appointment of Massachusetts electors was "irregular and unconstitutional"[95] relative to the Massachusetts Constitution, and praying that Congress look into the matter during the electoral count. When a resolution was called to appoint a committee of the House to investigate, Representative Randolph spoke in very strong terms against it:

> He said it appeared to him that, under color of redress of grievances, the resolution might go in a very alarming and dangerous manner to enlarge the sphere of action of the General Government at the expense of the dearest rights of the States. In what manner, asked he, is the General Government constituted? We, as one of the branches of the Legislature, are unquestionably the judges of our own qualifications and returns. The Senate, the other branch of the Legislature, is in like manner the judge without appeal of the qualifications of its own members. But with respect to the appointment of President on whom is that authority devolved in the first instance? On the electors, who are to all intents and purposes, according to my apprehension, as much the judges of their own qualifications as we are of ours . . . .[96]

Representative Rowan also spoke strongly against the resolution. He thought that "Congress did not possess a superintending power over the acts of the States in general cases" and doubted that Congress had any power in this case; he recommended that the petitions of the Massachusetts citizens not be placed on the files of the House "because they related to a subject on which the House had no power to legislate."[97] The resolution passed nevertheless, but

---

16.

94. COUNTING ELECTORAL VOTES, *supra* note 3, at 37–42.
95. *Id.* at 37–38.
96. *Id.* at 38.
97. *Id.* at 39.

there is no record that anything further was done. No one objected during the electoral count, and all Massachusetts electoral votes were counted.

### 2. The Indiana Incident of 1817

The second congressional objection to the votes of electors occurred in the electoral count of 1817.[98] On February 11, 1817, the two Houses gathered in the House of Representatives. During the electoral count, Representative Taylor, "compelled" to speak "by his sense of duty,"[99] objected to the counting of the electoral votes from Indiana because the Indiana electors were elected before Indiana joined the Union. The Speaker of the House interrupted him and stated that, when assembled in joint convention, the two Houses "could consider no proposition, nor perform any business not prescribed by the Constitution."[100] Accordingly, the Senate withdrew to its chamber by their unanimous consent. Representative Taylor then repeated his argument that, because the Indiana electors were chosen before Indiana was admitted into the Union, "the votes of that State were no more entitled to be counted than if they had been received from Missouri or any other Territory of the United States."[101] In his view, the votes of the Indiana electors were "illegal."[102]

Although Representative Taylor did not refer to it, the improper appointment of the Indiana electors was in violation of section 1 of the Act of 1792. However, the votes of Indiana's electors were cast after Indiana was admitted into the Union. Indiana was admitted into the Union as the nineteenth State effective December 11, 1816. This date was after the date set by Congress for the meeting of the electoral colleges but before the date set by Congress for the electoral count.

Representative Cady countered. He thought that the matter had been settled by the admission of Senators and Representatives from Indiana to their seats, and that it was too late on that account to question her right to participate in the election of President; and that from the moment the constitution of the State was assented to, she

---

98. *See id.* at 44–47.
99. *Id.* at 46.
100. *Id.*
101. *Id.* at 47.
102. *Id.*

was entitled to all the privileges of an independent member of the Union.[103]

A joint resolution to settle the question was indefinitely postponed by the House of Representatives.[104] The Senate re-entered the House Chamber and the electoral count resumed. According to the record of congressional debate, "[n]o one appeared to question the power of Congress to reject the vote of Indiana if that State was not a State in the Union at the time the electoral votes were cast."[105] In the end, the votes of Indiana's three electors were counted.

### 3. The Missouri Incident of 1821

The third congressional objection to the votes of electors occurred in the electoral count of 1821.[106] In early February of 1821, Congress passed a resolution appointing a joint committee "to ascertain and report a mode of examining the votes for President and Vice-President of the United States, and of notifying the persons elected of their election."[107] On February 13, 1821, the Senate resolved that if any objection was made to the electoral votes of Missouri *and* if the result of the electoral count did not turn on counting or omitting the Missouri votes, then the President of the Senate would announce the winners of the presidential and vice presidential electoral vote, plus a conditional tally—that is to say, if Missouri's votes were counted, the tally would be $x$; if Missouri's votes were not counted, the tally would be $y$. In the Senate, a "long debate" took place on this resolution and four Senators strongly opposed it "principally for the reason that it was not competent in the Senate to decide such a question in anticipation."[108]

When the resolution was read in the House of Representatives, Representative Randolph stated he would rather have seen no votes counted at all than a "special verdict" announced:

---

103. *Id.*
104. *Id.* When Representative Sharp offered the joint resolution, Representative Bassett objected, stating that the resolution should not be joint because a joint resolution might establish a precedent which would "deprive [the] House of one of its powers, by permitting the Senate to participate in this question." *Id.* at 47. There is no record of any Representative supporting this erroneous view. There is no textual reason to conclude that the House has judicial power during the electoral count but that the Senate does not, or vice versa.
105. *Id.*
106. *See id.* at 48–56.
107. *Id.* at 48 (Senate Resolution); *id.* at 51 (House Resolution).
108. *Id.* at 49.

*NORTH CAROLINA LAW REVIEW*     [Vol. 80

> He could not recognize in this house or the other house, singly or conjointly, the power to decide on the votes of any State. . . .  He maintained that the electoral college was as independent of Congress as Congress of them; and we have no right, said he, to judge of their proceedings. . . .  Suppose a case, in which some gentlemen of one house or the other should choose to turn up his nose at the vote of some State, and say that if it be so and so, such a person is elected; and if so and so, what-you-call-'im is elected—did not everybody see the absurdity of such a proposition?[109]

Representative Floyd also objected to the special verdict. He stated,

> If they had any power over the votes of Missouri at all, it was when her votes were first received; but no such power existed.  He protested against this assumption of authority on the part of Congress, and wished to show his disapprobation of the resolution in the strongest manner.[110]

Representative Rhea agreed, finding that the Constitution was not designed to be expedient and that "it was not in the power of this House, or of both Houses, by resolution, to remedy a defect in the Constitution."[111]

Soon afterwards, during the electoral count, Senator Livermore objected to the electoral votes from Missouri because Missouri was not a State of the Union. He was right. Missouri was admitted into the Union as the twenty-fourth State effective August 10, 1821. In the House, Representative Floyd submitted a resolution "[t]hat Missouri is one of the States of this Union, and her votes for President and Vice-President of the United States ought to be received and counted."[112]

After extended comments by Representatives Randolph and Archer against the resolution on the ground that it was not within the power of the House, a motion to table the resolution passed, and the Senate reassembled in the House Chamber for the electoral count.[113] The President of the Senate proceeded to announce the result of the vote conditionally, as provided in the Senate resolution:

> The whole number of electors appointed by the several States was 235.  One elector in each of the States of Pennsylvania, Tennessee, and Mississippi having died before the meeting of the electoral college of which he was a

---

109.  *Id.* at 51.
110.  *Id.* at 52.
111.  *Id.*
112.  *Id.* at 53.
113.  *Id.* at 50–53.

member, made the whole number of votes actually cast 232, including the vote of Missouri, of which 117 make a majority; or, excluding the vote of Missouri, 229, of which 115 make a majority; but in either event James Monroe is elected President, and Daniel D. Tompkins, Vice-President.[114]

When Representative Floyd asked the President of the Senate if Missouri's votes were in fact counted, the joint convention broke into disorder.   Representative Randolph tried to speak but was pronounced out of order by the Speaker of the House.  The President of the Senate concluded and the Senate withdrew to its Chamber.[115]

Thereafter, Representative Randolph introduced two resolutions in the House declaring that the electoral count was illegal.  The first resolution provided that the electoral votes of Missouri were counted. The second resolution provided

> [t]hat the whole number of electors appointed, and of votes given for President and Vice-President, has not been agreeably announced by the presiding officer of the Senate and House of Representatives, agreeably to the provision of the Constitution of the United States, and that therefore the proceeding has been *irregular* and *illegal*.[116]

As he was putting his resolutions into writing, the House voted to adjourn and did not act upon either resolution.[117]

### 4. The Postmaster and Michigan Incidents of 1837

The fourth congressional objection to the votes of electors occurred during the electoral count of 1837.[118]  The electoral count of 1837 actually involved two separate incidents:   the Postmaster Incident and the Michigan Incident.  In late January of 1837, the Senate and the House of Representatives resolved to appoint a joint committee "to ascertain and report a mode of examining the votes of President and Vice President of the United States, and of notifying

---

114. *Id.* at 50.  As this pronouncement makes clear, the electoral count of 1821 is unique for another reason:  this was the first (and only) time when electors who were appointed died before the meeting of the electoral colleges.  It appears that the President of the Senate miscalculated the number necessary for a majority of the votes.  The Electoral College Clauses provide that the needed majority be "a majority of the whole number of Electors *appointed.*" U.S. CONST. amend. XII (emphasis added); *see* U.S. CONST. art. II, § 1, cl. 3.  Thus, the correct majority was either 116 or 118 votes, depending on the exclusion or inclusion of Missouri.

115. COUNTING ELECTORAL VOTES, *supra* note 3, at 56.

116. *Id.* (emphasis added).

117. *Id.* at 56.

118. *See id.* at 70–76.

the persons of their election."[119]   Senator Grundy, who was one of three Senators on the joint committee, reported to the Senate on February 4, 1837 that some electors may have been constitutionally ineligible to be electors because "no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an elector."[120]   He reported that Isaac Waldron, an elector from New Hampshire, was the "president of a deposit-bank at Portsmouth, and was appointed and acting as pension-agent, without compensation, under the authority of the United States" and the two North Carolina electors held the "offices of deputy postmasters under the General Government."[121]   In addition, the appointment of three other electors (from New Hampshire, Connecticut, and North Carolina, respectively) was in question.[122]   The Committee concluded that the Electoral Incompatibility Clause "excludes and disqualifies deputy postmasters from the appointment of electors; and the disqualification relates to the time of the appointments, and that a resignation of the office of deputy postmaster after his appointment as elector would not entitle him to vote as elector under the Constitution."[123]

The Senate took no further action on the issue.  Debate in the House of Representatives was minimal.  One Representative pointed out that all of these electors probably resigned from their offices before the day on which they cast their votes,[124] but was quickly corrected by another who noted that the ineligibility under the Electoral Incompatibility Clause extended to the time of the appointment.[125]   These issues were not raised during the electoral count, and all of these electoral votes were counted.

The Michigan Incident was similar to the Indiana and Missouri Incidents.  Michigan was admitted into the Union as the twenty-sixth State effective January 26, 1837.   This date was *after* the date Congress set for the meeting of the Electoral Colleges, but *before* the date Congress set for the counting of electoral votes.  On February 4, 1837, the Senate proposed a resolution to count Michigan's electoral votes in the same manner as Missouri's.  Senator Norvell objected to

---

119. *Id.* at 70 (Senate Resolution).
120. U.S. CONST. art. II, § 1, cl. 2.
121. COUNTING ELECTORAL VOTES, *supra* note 3, at 71 (remarks of Sen. Grundy).
122. *See id.* (noting that "five or six votes only would in any event be abstracted from the whole number").
123. *Id.*
124. *Id.* at 73 (remarks of Rep. Cambreling).
125. *Id.* (remarks of Rep. Thomas).

this resolution, arguing that the Michigan question was exactly the same as that of the Indiana Incident.[126]

Senator Calhoun also opposed the resolution, stating that "Michigan was a State *de facto* at the time she formed her constitution; and if her electors were not legally appointed, *neither were her Senators, who were admitted upon this floor.*"[127] The Senate adopted this resolution by a vote of thirty-four to nine.[128] The House adopted the same resolution on February 6, 1837, although Representative Crary of Michigan also "thought the position of his State was analogous to that of Indiana, and that her vote should be received and counted."[129]

On February 8, 1837, the President of the Senate announced the result of the electoral count in the same way as in the Missouri Incident. Martin Van Buren of New York was declared the President-elect.[130] If Michigan's votes were counted, he had 170; if not, he had 167 votes. In either event, Martin Van Buren had a majority of the whole number of electors appointed. However, a different situation presented itself in the case of the Vice President-elect. Richard M. Johnson of Kentucky had the most electoral votes. If Michigan's votes were counted, he had 147 votes; if not, he had 144 votes. In either event, he did not have the requisite majority to be the Vice President-elect, and thus, the choice devolved upon the Senate.[131] The Senate elected Johnson as Vice President.

### 5. The Wisconsin Incident of 1857

The fifth congressional objection to the votes of electors occurred during the electoral count of 1857.[132] In the election of 1856, the five electors of the State of Wisconsin did not cast their votes on the day prescribed by federal law because of a snowstorm.[133] The President of the Senate counted Wisconsin's electoral votes over the objections of both Representatives and Senators assembled in

---

126. *Id.* at 72 (remarks of Sen. Norvell). Senator Lyon agreed and "contended that Michigan was as much entitled to count her vote as was the State of Indiana." *Id.* Senator Clay disagreed. *Id.*
127. *Id.* (second emphasis added).
128. *Id.*
129. *Id.* at 73.
130. *Id.* at 75.
131. *Id.* at 75–76.
132. *See id.* at 86–144.
133. *See, e.g., id.* at 117 (remarks of Sen. Seward) (referring to "accidental delay produced by the interposition of Providence preventing the vote being cast at the prescribed time").

*NORTH CAROLINA LAW REVIEW*     [Vol. 80

convention.[134]  When Representative Lechter objected to Wisconsin's electoral votes and moved to exclude them, the presiding officer (the President of the Senate) simply stated that no debate was in order when the votes were being read by the tellers or even after they were finished.[135]   When Senator Crittenden then asked the presiding officer, "Do I understand the Chair to decide that Congress, in no form, has power to decide upon the validity or invalidity of a vote?,"[136] the presiding officer replied that it was his constitutional duty to announce the result of the electoral count and that "[w]hat further action may be taken, if any further action should be taken, will devolve upon the properly-constituted authorities of the country–the Senate or House of Representatives, as the case may be."[137]

While the final result did not turn on the decision to count Wisconsin's electoral votes, several Members of Congress were concerned that the decision to count Wisconsin's electoral votes would set a dangerous precedent.[138]   According to Senator Pugh, unlike the Missouri Incident which was "never likely to happen again," the Wisconsin Incident "may occur one hundred times again, if the Government should stand that many years."[139]   Senator Crittenden made the point that the electoral votes of Wisconsin were not really "votes" at all, by stating:  "Here is a vote tendered us from a State given on another day.  We call it a vote in common parlance; but in the constitutional sense is it a vote at all?  Is it not merely null? Unquestionably, it seems to me, it is null and void."[140]  This statement attracted considerable support.  Almost every Member of Congress who spoke on the subject agreed that the votes of Wisconsin should not have been counted.[141]

---

134.  *Id.* at 87–89.
135.  *Id.* at 89.
136.  *Id.*
137.  *Id.*; *see also id.* ("The Presiding Officer would state that, the votes having been counted and announced, the functions of the two houses, assembled for the purpose of counting the votes, are discharged.").
138.  *See, e.g., id.* (remarks of Rep. Marshall); *id.* (remarks of Sen. Toombs); *id.* at 90 (remarks of Sen. Butler); *id.* at 110 (remarks of Sen. Nourse).
139.  *Id.* at 137 (remarks of Sen. Pugh).
140.  *Id.* at 131.
141.  Senators Hale and Houston were the sole exceptions in the Senate.  Senator Hale urged that Wisconsin's votes should be counted because the people of Wisconsin ought not to be disenfranchised because of an "accident" of their agents.  His cry was very much one of substance over form.  *See id.* at 119.  Senator Houston argued that any resolution that Wisconsin's votes should not have been counted was unconstitutional.  In his view, the electoral count of 1857 was "good, constitutional, and lawful."  *Id.* at 122–23.

*ELECTORAL COUNT ACT*

Ultimately, resolutions were introduced in each House of Congress that Wisconsin's electoral votes were null and void and ought not to have been included in the electoral count, but these resolutions failed.[142]

### 6. The Greeley Incident and the Other Incidents of 1873

The sixth congressional objection to the votes of electors occurred during the electoral count of 1873.[143] In the election of 1872, three Georgia electors cast votes for Horace Greeley of New York. Greeley had died after the November popular election but before the electors met in the electoral colleges. These three electors voted for Greeley anyway, feeling bound by the wishes of their constituents. Senator Hoar objected to these three votes and stated that they could not be counted because Greeley was not a "person" within the meaning of the Constitution when the electors voted.[144] Representative Banks objected on the basis that "we have no power to decide on the eligibility of any man voted for for President."[145] The question of whether to count these votes was a very close one. The House voted 101 to 99 (with forty not voting) *not* to count the Greeley votes.[146] The Senate voted forty-four to nineteen to count them.[147] Because the two Houses did not concur, the Greeley votes were not counted pursuant to the Twenty-second Joint Rule.[148]

The electoral count of 1873 presented at least three other important challenges to electoral votes. First, two objections were made to Mississippi's electoral votes. The Mississippi electors did not certify that they voted by ballot.[149] One of the electors from that state, A.T. Morgan, was absent and the electors appointed an alternate, J.J. Spellman. Spellman's appointment was not signed by the Governor of Mississippi as required by the laws of that state.[150] The House and the Senate voted to count all Mississippi electoral votes, including Spellman's.[151]

---

142. *See id.* at 132 (proposed joint House and Senate resolution); *id.* at 144 (House).
143. *See id.* at 357–408.
144. *Id.* at 366.
145. *Id.* at 368.
146. *Id.*
147. *Id.* at 377.
148. *Id.* at 380. The Greeley precedent almost certainly affected the electoral vote of 1912. In that year, the defeated Republican candidate for Vice President died *before* the meeting of the electoral colleges, and the pledged electors voted for someone else. *See* 115 CONG. REC. 148 (1969) (remarks of Rep. McCulloch).
149. *See* COUNTING ELECTORAL VOTES, *supra* note 3, at 380.
150. *See id.*
151. *Id.*

*NORTH CAROLINA LAW REVIEW*    [Vol. 80

Second, Senator Morton objected to Georgia's votes for a different reason. Apparently two votes were cast for Charles J. Jenkins of Georgia for President, and five votes for Alfred H. Colquitt of Georgia for Vice President.[152] This vote distribution revealed a mathematical certainty: at least one of the electors from that State had violated the constitutional requirement that he vote for at least one person who is not an inhabitant of his State.[153] Because the objection was made after the electoral votes from Georgia were read, the Chair decided that it came too late and no decision was made on this objection.[154]

Third, two objections were made to Texas's electoral votes. The executive authority of Texas had failed to certify that its electors were properly appointed. Moreover, four of the electors (less than a majority of those elected) themselves appointed four persons to take the place of four elected, but absent, electors.[155] Nonetheless, both the House and the Senate voted to count all of Texas's electoral votes.[156]

### 7. The Hayes-Tilden Incident of 1877

The seventh and most important objection to the votes of electors occurred during the electoral count of 1877—the "never again" incident that directly led to the passage of the Electoral Count Act roughly a decade later. Undoubtedly, the electoral count of 1877 is the most objectionable electoral count in history, having been described by one of our leading scholars as "the most violent, fraudridden, and tumultuous in history."[157]

In 1876, Democrat Samuel J. Tilden squeaked out a majority of the total number of popular votes for President, defeating Republican Rutherford B. Hayes by just 250,000 votes.[158] Hayes, however,

---

152. *Id.*
153. *Id.*
154. *Id.* at 380–81.
155. *Id.* at 382–83.
156. *Id.* at 389.
157. Michael W. McConnell, *The Forgotten Constitutional Moment*, 11 CONST. COMMENT. 115, 127 (1994).
158. For an excellent summary of the incident, see McConnell, *supra* note 157, at 127–33. For the principal historical scholarship on this incident, see CHARLES FAIRMAN, FIVE JUSTICES AND THE ELECTORAL COMMISSION OF 1877 (Paul A. Freund & Stanley N. Katz eds., 1988); ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION 1863–1877, at 575–87 (1988); PAUL LELAND HAWORTH, THE HAYES-TILDEN DISPUTED PRESIDENTIAL ELECTION (1906); KEITH POLAKOFF, THE POLITICS OF INERTIA: THE ELECTION OF 1876 AND THE END OF RECONSTRUCTION (1973). For a discussion of this incident by those who have written on the Electoral Count Act, see, for

claimed a one-vote majority of the electoral votes with 185 votes to Tilden's 184. The problem was that rival Republican and Democratic state governments in three states—Florida, Louisiana, and South Carolina—each had sent rival electoral certificates to Congress, presenting the standard case of "double returns" from these states.[159]

After mediation failed, Congress created an "Electoral Commission" to resolve the disputed double returns from these states.[160] This Commission was to consist of fifteen persons: five Senators, five Representatives, and five Justices of the Supreme Court. As ought to be apparent, the Commission has some very eerie similarities to the Grand Committee of 1800. The plan was to appoint seven Republicans and seven Democrats; the fifteenth person would be a Justice of the Supreme Court picked by the other four "partisan" Justices. Justice David Davis, an Independent, initially received the nod to be this fifteenth person, but he declined the offer after the Illinois Legislature appointed him to fill a vacancy in the Senate. Justice Joseph P. Bradley, a Republican, then received the thankless job.

---

example, GLENNON, *supra* note 18, at 16–17, and Wroth, *supra* note 22, at 331–34 & 331 n.46 (collecting other sources).

159. There was a problem with one electoral vote from Oregon as well: one of the Oregon electors for Hayes was a postmaster, and was therefore ineligible to the office of elector, *see* U.S. CONST. art. II, § 1, cl. 2. Oregon's Democratic Governor, refusing to certify the electoral certificate, struck the name of the postmaster-elector for Hayes and substituted that of an elector for Tilden, who received the next most votes. This account is briefly recollected in Harrison, *supra* note 23, at 700 n.2 (citing ARI HOOGENBOOM, THE PRESIDENCY OF RUTHERFORD B. HAYES 30–31 (1988)).

160. During the Electoral Count Act debates, at least one Senator noted that the Electoral Commission of 1877 was constitutionally suspect, though he noted that it was "a wise solution to a great difficulty." *See* 17 CONG. REC. 817 (1886) (remarks of Sen. Sherman). In his book on Reconstruction, Professor Bruce Ackerman calls this Electoral Commission "extraconstitutional." 2 BRUCE ACKERMAN, WE THE PEOPLE: TRANSFORMATIONS 247 (1998). Perhaps this is a clever attempt to avoid calling it "unconstitutional." Other scholars have firmly taken the position that the Electoral Commission was unconstitutional. I agree. *See, e.g.*, Harrison, *supra* note 23, at 700 n.3 ("Under now-current separation of powers doctrine the commission was almost certainly unconstitutional. Its members exercised significant government power but were not appointed consistently with the Appointments Clause, as *Buckley v. Valeo* says they should have been.") (citation omitted); Tribe, *supra* note 17, at 278 & n.438. Professor Tribe states:

> Today, of course, the service on such a body by members of Congress would be understood to violate the separation of powers as construed by *Buckley v. Valeo*, and the reservation of a veto power in Congress acting by anything less than full legislation presented to the President for signature or veto would be understood to violate the nonparliamentary structure of our government.

(citation omitted) (citing INS v. Chadha, 462 U.S. 919, 959 (1983)).

Interestingly, the Commission was to have "the same powers, if any, now possessed . . . by the two Houses."[161]  The Commission was only to have jurisdiction over the cases of double returns; objections to electoral votes in cases of single returns would be handled as later provided by the Electoral Count Act (the two Houses, meeting separately, would need to concur to reject a vote).  The decisions of the Commission, like that of the Grand Committee, were to be final, but with one exception:  the two Houses could overturn the decision of the Commission if they so concurred.[162]

Given the political composition of the Commission, it is not surprising that the Commission secured a victory for Hayes.  In each case of double returns, the Commission voted eight to seven to count the votes of the Republican electors by a strict party vote, with Justice Bradley casting the decisive vote in each case.  This perceived partisanship had huge political costs.  The Democrats controlled the House of Representatives and threatened a filibuster to delay the counting of electoral votes.  A constitutional crisis loomed:  if no President was elected by March 4, 1877, then the Presidential Succession Clause might kick in.[163]

The famous "Compromise of 1877," announced on March 1, 1877, served to avert this crisis.  Southern Democrats would proceed with the formal counting of the electoral votes, allowing Republican Hayes to be elected President, but would extract several substantial concessions from him.  Among other things, congressional Republicans, speaking for Hayes, agreed to cease federal military support for the Reconstruction governments of the South, sealing the end of Reconstruction.  The upshot of the Hayes-Tilden Incident is that Hayes became President although he was the clear loser in the popular vote and the likely loser of the electoral vote.[164]

---

161.  Act of Jan. 29, 1877, ch. 37, § 2, 19 Stat. 227, 229; *see* Wroth, *supra* note 22, at 331.

162.  This "two-House veto" provision is constitutionally problematic.  *See* INS v. Chadha, 462 U.S. 919, 944–51 (1983); Tribe, *supra* note 17, at 278 (noting same point).

163.  *See* text accompanying *infra* note 476.

164.  The modern view is that Samuel Tilden should have garnered the electoral votes of Florida, thus giving him a several vote majority of the electoral votes.  *See, e.g.,* C. VANN WOODWARD, REUNION AND REACTION:  THE COMPROMISE OF 1877 AND THE END OF RECONSTRUCTION 19 (2d. ed. 1966); Jerrell H. Schofner, *Florida Courts and the Disputed Election of 1876*, 48 FLA. HIST. Q. 26, 46 (1969); Jerrell H. Schofner, *Florida in the Balance: The Electoral Count of 1876*, 47 FLA. HIST. Q. 122, 148–50 (1968).

### 8. The Hawaii Incident of 1961

The eighth congressional objection to the votes of electors occurred during the electoral count of 1961.[165]  This incident, involving the validity of the electoral certificate(s) of Hawaii, was the most significant problem of the electoral count of the twentieth century, and the one most relevant given recent history.

The initial election results in Hawaii showed Republicans Richard M. Nixon and Henry Cabot Lodge as the winners of the popular vote for President and Vice President.  A slate of Nixon-Lodge electors was appointed on November 16, 1960, certified by the acting Governor of Hawaii on November 28, 1960.  A recount was ordered to begin on December 13, 1960.  On December 19, 1960, a slate of Nixon-Lodge electors cast their votes for President and Vice President.[166]  This electoral certificate was previously certified by the Acting Governor of Hawaii.[167]  However, on December 19, 1960, a slate of Kennedy-Johnson electors also cast their votes for President and Vice President, *without* any previous certification from the executive authority of Hawaii.[168]  On December 30, 1960, the Circuit Court of the First Judicial Circuit of the State of Hawaii determined that the Kennedy-Johnson electors won the popular vote in Hawaii.[169]  A few days later, on January 4, 1961, the newly-elected Governor of Hawaii certified the electoral certificate of the Kennedy-Johnson electors.[170]  The Administrator of General Services received this certification on January 6, 1961—the day of the electoral count.

During the electoral count, President of the Senate Richard Nixon stated that "[t]he Chair has received three certificates from persons claiming to be the duly appointed electors from the State of Hawaii."[171]  These three certificates were (1) the Nixon-Lodge electoral certificate of December 19, 1960, certified by the executive authority of Hawaii as of November 28, 1960; (2) the Kennedy-Johnson electoral certificate of December 19, 1960; and (3) the Kennedy-Johnson electoral certificate of December 19, 1960, certified by the newly-elected executive authority of Hawaii as of January 4, 1961.[172]  After these three electoral certificates were opened and read,

---

165.  *See* 107 CONG. REC. 288–91 (1961).
166.  *See id.* at 289.
167.  *See id.*
168.  *See id.*
169.  *See id.* at 290.
170.  *See id.* at 289–90.
171.  *Id.* at 289.
172.  *Id.* at 289–90.

Nixon stated that "[t]he Chair has knowledge, and is convinced that he is supported by the facts" that the third electoral certificate "properly and legally portrays the facts" with respect to the popular election in Hawaii.[173] Accordingly, he stated that

> [i]n order not to delay the further count of the electoral vote here, the Chair, *without the intent of establishing a precedent*, suggests that the electors named in the certificate of the Governor of Hawaii dated January 4, 1961, be considered as the lawful electors from the State of Hawaii.[174]

No one objected and all three of Hawaii's electoral votes were counted.[175]

### 9. The Bailey Incident of 1969

The ninth and most recent congressional objection to the votes of electors occurred during the electoral count of 1969.[176] It was well known before the joint convention convened for the purposes of the electoral count that Dr. Lloyd W. Bailey, a Republican elector from North Carolina, had been "faithless" in giving his two electoral votes—instead of following the popular vote for Richard M. Nixon for President and Spiro Agnew as Vice President, Dr. Bailey voted for George C. Wallace for President and Curtis Lemay as Vice President. The Governor of North Carolina certified the state's electoral certificate with knowledge of Dr. Bailey's faithlessness.

A few days before the electoral count, some Senators, led by Senator Muskie (who was then running for Vice President), introduced a memorandum in the Senate recommending that Dr. Bailey's vote be rejected, and that it be recast in accordance with the popular vote in North Carolina.[177] This memorandum announced the authors' intention to object to the vote of North Carolina on January 6, 1969.[178] During the electoral count on January 6, 1969, Representative O'Hara objected to the electoral votes of North

---

173. *Id.* at 290.

174. *Id.* (emphasis added).

175. The result of the electoral count did not even come close to turning on the legal status of Hawaii's three electoral votes. Democrats Kennedy and Johnson prevailed in the electoral count by a margin of eighty-four votes. *See id.* at 291.

176. *See* 115 CONG. REC. 9–11 (1969); *id.* at 146–72 (House debate); *id.* at 209–46 (Senate debate); *see also* GLENNON, *supra* note 18, at 37–40 (discussing history); Ross & Josephson, *supra* note 7, at 731–37 (same).

177. *See* 115 CONG. REC. 11.

178. Interestingly, the memorandum cited the Necessary and Proper Clause, U.S. CONST. art. I, § 8, cl. 18, as the font of power to pass the Electoral Count Act. *See* 115 CONG. REC. 11.

Carolina and presented a written objection signed by him and Senator Muskie in which thirty-seven Representatives and six Senators joined.[179] The objection proposed simply that Dr. Bailey's vote be rejected (and not recast in accordance with the popular vote in North Carolina).[180]

The debate in each House of Congress was extensive, with over forty Representatives and over twenty-five Senators speaking on the objection. The House of Representatives debated the objection for a full two hours—the maximum time allowed by the Electoral Count Act. The rationale in the House for sustaining the objection and rejecting Dr. Bailey's vote was mixed. Some Representatives argued that only Congress could check faithless electors.[181] Representative Edmondson stated that the "power of Congress to count the electoral vote" is "the only constitutional power specifically granted to anybody [sic] or agent to protect the electoral system against arbitrary or unlawful action to thwart the popular will of the people of the States in electing the President of the United States."[182] Other Representatives argued that Dr. Bailey's faithless vote was not "regularly given" within the meaning of the Electoral Count Act.[183] Yet others rested their justification to sustain the objection on more lofty constitutional arguments of "one man, one vote"[184] and "justice."[185]

The Representatives who spoke against the objection were more unified. They argued that Congress had no power not to count Dr. Bailey's faithless vote because that power was not within the meaning of the Electoral Count Act,[186] or because Congress had no such power under the Constitution.[187] Representative Rarick put the latter point best:

---

179. *See id.* at 146.

180. *See id.*

181. *See, e.g., id.* at 147 (remarks of Rep. Wright) (stating that Congress has "the legal and constitutional power, and indeed the duty, to prevent faithless electors from corrupting the election of a President"); *id.* at 158 (remarks of Rep. Corman) (stating that "Congress sits as a court of last resort"); *id.* at 170 (remarks of Rep. O'Hara) ("Only the Congress can see to it that the elector respects his obligations . . . .").

182. *Id.* at 148.

183. *See, e.g., id.* at 169 (remarks of Rep. Schwengel).

184. *See, e.g., id.* at 146–47 (remarks of Rep. Wright); *id.* at 158 (remarks of Rep. Rodino).

185. *See id.* at 165 (remarks of Rep. Hosmer).

186. *See, e.g., id.* at 151 (remarks of Rep. Anderson) (arguing that Electoral Count Act was "intended to circumscribe to the very narrowest limits the power of the Congress to do anything other than to certify the results in the States"); *id.* at 168 (remarks of Rep. Fish).

187. *See, e.g., id.* at 148–49 (remarks of Rep. McCulloch) (arguing that electors are

Under the Constitution and our oath of office we, as Congressmen, are not election supervisors nor given discretion to recompute the vote received from a sovereign state. The Constitution clearly proscribes our duty as "to count the electoral votes," the ministerial function of a central collecting agency and a tabulating point.[188]

Ultimately, the House of Representatives voted to reject the objection, but not by an overwhelming margin. The vote was 170 to 228, with thirty-two not voting and four not yet sworn.[189] Among the Representatives voting for the objection were future Presidents George H.W. Bush and Gerald R. Ford.[190] The Senate debate was similar but briefer. Ultimately, the Senate also voted to reject the objection not by an overwhelming margin. The vote was thirty-three to fifty-eight, with seven not voting and two live pair.[191] Because both Houses of Congress did not vote to sustain the objection and reject Dr. Bailey's vote, the vote was counted.

## II. The Argument Against the Constitutionality of the Electoral Count Act

In Part I, we examined the principal congressional efforts to regulate the electoral count. The fact that Congress did not pass the Electoral Count Act until 1887, and only after several failed attempts to enact legislation regulating the counting of electoral votes is (perhaps surprisingly) of minimal consequence in assessing the constitutionality of the Electoral Count Act.[192] The better clue relates

---

independent under the Electoral College Clauses and concluding that Congress could not "tamper" with Dr. Bailey's vote). Representative Poff argued that

[i]f the Congress can look behind the solemn certificate of the Chief Executive of a State, reject that certificate and by a simple majority vote decide what electoral votes were "regularly given" and which were given irregularly, then the Congress can expropriate from the people their power to elect their President.

*Id.* at 157; *see also id.* at 162 (remarks of Rep. Henderson) (arguing that Congress's role is like a local board of elections whose "function is solely to receive the votes, count them, and certify the result . . . not to determine whether votes were properly cast"); *id.* at 164 (remarks of Rep. Eckhardt) (stating that it was "beyond question in the Constitution . . . that the joint session of the House and the Senate has no power whatsoever other than to hear the returns of the electors read"); *id.* at 166–67 (remarks of Rep. Fountain) (calling Congress "powerless").

188. *Id.* at 168.

189. *Id.* at 170.

190. For Representative Gerald Ford's statement in support of the objection, see *id.* at 163–64.

191. *Id.* at 246.

192. The converse is not true. *See, e.g.,* Harmelin v. Michigan, 501 U.S. 957, 980 (1991) (opinion of Scalia, J.) (stating that "[t]he actions of the First Congress . . . are of course persuasive evidence of what the Constitution means") (citations omitted); Powell v.

not to timing, but to tone. As we saw somewhat in Part I and as we shall see in more detail in this Part, the constitutionality of legislation regulating the counting of electoral votes was controversial from the start. In particular, the constitutionality of the Electoral Count Act was considered and debated by several Congresses that considered such legislation in the Reconstruction Era. This level of extended debate should raise a red flag as to the possible unconstitutionality of the Electoral Count Act.

An "interpretivist" resolution of the constitutionality of the Electoral Count Act must, however, be based on arguments from constitutional text and structure. This Part sets forth these two arguments. The textual argument carefully parses the words of the Electoral College Clauses, and shows how the Electoral Count Act clashes with the Constitution. In addition, the textual argument, unlike conventional "clause-bound" textual arguments, examines the text of the Constitution as a coherent whole, invoking a host of other clauses, in order to squeeze yet additional meaning from the Electoral College Clauses, and shed additional light on the unconstitutionality of the Electoral Count Act. The structural argument identifies a number of structural principles of the Constitution that relate to presidential election and to legislation, and shows how the Electoral Count Act violates these principles.

Anyone who wishes to argue that the Electoral Count Act is constitutional bears a high burden of proof, in light of the arguments presented, and in light of the asymmetry of constitutional proofs. In order to prove that a statute is unconstitutional, one need only find *one* reason why a statute is unconstitutional, whereas in order to prove that a statute is constitutional, one must defend a statute against all possible constitutional attacks and find that there is *no possible reason* why a statute is unconstitutional.[193] There is more than one reason why the Electoral Count Act is unconstitutional.

---

McCormack, 395 U.S. 486, 547 (1969) ("[T]he precedential value of these cases tends to increase in proportion to their proximity to the Convention in 1787."); Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 297 (1888) (stating that an act "passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning"). Even then, however, a statute is only *presumed* to be constitutional.

193. This part presents, in my view, many if not most of the arguments against the constitutionality of the Electoral Count Act. There may be others.

A.   *The Textual Argument*

### 1. Some Basics: Who, What, When, and Where?

The relevant clause of the Twelfth Amendment provides that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."[194]   Careful parsing of these twenty-seven words yields surprisingly rich clues into the mode and manner of the electoral count.  These words and the rest of the Twelfth Amendment (and their counterparts in the original Constitution) are, not surprisingly, woefully understudied.[195]   As Professors Levinson and Young recently put it, "[t]he Twelfth Amendment is a Rodney Dangerfield of the Constitution: it gets no respect."[196]   At the same time, these words of the Twelfth Amendment are incredibly important in assessing the constitutionality of the Electoral Count Act:  the Constitution is supreme to conflicting federal statutory law.[197]   In order to determine whether the Electoral Count Act is constitutionally permissible, we must examine the Constitution itself.

This sub-section addresses the following five basic questions relating to counting electoral votes:  (1) Who is the presiding officer of the electoral count?  (2) Who opens the electoral certificates and counts the electoral votes?  (3) What is counting and what is to be counted?  (4) When is the counting done?  (5) Where is the counting done?

### a.   Who Is the Presiding Officer of the Electoral Count?

The relevant clause of the Twelfth Amendment provides that "[t]he President of the Senate shall, in the presence of the Senate and

---

194. U.S. CONST. amend. XII.  The only differences between the text of the Twelfth Amendment and the text of the original Constitution are in punctuation and capitalization.  *See* U.S. CONST. art. II, § 1, cl. 3.

195. No full-scale law review article dissects the text of the Twelfth Amendment.  Two recent articles explore the so-called "Habitation Clause" of the Twelfth Amendment which provides that Electors must not vote for a President and Vice President of the same state as themselves.  U.S. CONST. amend. XII ("The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; . . . ."); *see* James C. Ho, *Much Ado About Nothing: Dick Cheney and the Twelfth Amendment*, 5 TEX. REV. L. & POL. 227 *passim* (2000); Sanford Levinson & Ernest A. Young, *Who's Afraid of the Twelfth Amendment?*, 29 FLA. ST. U. L. REV. 925, 932–54 (2001).

196. Levinson & Young, *supra* note 195, at 925.

197. *See* U.S. CONST. art. VI, cl. 2 ("This Constitution, and the Laws of the United States *which shall be made in Pursuance thereof* . . . shall be the supreme Law of the Land . . . .") (emphasis added); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 180 (1803).

House of Representatives, open all the certificates and the votes shall then be counted."[198]   This clause does not explicitly answer the question of who is the presiding officer during the electoral count.[199] Because the President of the Senate is the only named individual in the clause, it may be tempting to conclude that the President of the Senate is the presiding officer of the electoral count, but this is far from clear.  There are three possibilities with respect to the President of the Senate:  (1) the President of the Senate *shall be* the presiding officer of the electoral count; (2) the President of the Senate *may be* the presiding officer of the electoral count; and (3) the President of the Senate *shall not be* the presiding officer of the electoral count.

As a textual matter, nothing in the clause suggests that the President of the Senate shall be the presiding officer of the electoral count.[200]   As a structural matter, the President of the Senate is the presiding officer of the Senate, not the presiding officer of the joint convention of Senators and Representatives (or the joint assemblage of the Senate and House of Representatives), which needless to say is not the Senate.  It seems only logical that there must be a presiding officer of the electoral count.  Every parliamentary body needs a presiding officer in order to function smoothly.[201]   What then is the answer to the constitutional question?

If historical practice is any guide, the President of the Senate or the President pro tempore shall be (or at least may be) the presiding officer of the electoral count.  One of these two officers has been the presiding officer of every electoral count since the beginning of the Republic—before and after the adoption of the Electoral Count Act. Not surprisingly, 3 U.S.C. § 15 provides that

> Congress shall be in session on the sixth day of January succeeding every meeting of the electors.  The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the

---

198.  U.S. CONST. amend. XII.

199.  This simple point was not lost during the Electoral Count Act debates.  *See, e.g.,* 17 CONG. REC. 865 (1886) (remarks of Sen. Morgan) ("We frequently hear it stated that the President of the Senate is the president of the joint meeting.  If he is, it is only by reason of some rule or agreement between the two Houses.  The Constitution is silent upon that point.  The Constitution speaks of no officer who is to preside over the joint meeting.").

200.  *But see* COUNTING ELECTORAL VOTES, *supra* note 3, at 541 (remarks of Sen. Maxey) ("By the Constitution [the President of the Senate] is the presiding officer over the joint assemblage of the Senate and the House.").

201.  *Cf.* 17 CONG. REC. 865 (remarks of Sen. Morgan) (discussing presiding officer of the electoral count) ("To be a house in parliamentary law and in constitutional law it must be organized under the presidency of its rightful officer.").

*NORTH CAROLINA LAW REVIEW* [Vol. 80

afternoon on that day, *and the President of the Senate shall be their presiding officer.*[202]

This unbroken historical practice is entitled to great weight in constitutional interpretation.[203]

This is not to say, however, that historical practice necessarily settles the meaning of the Electoral College Clauses. The text of the Constitution is the first-best and hence authoritative source of constitutional meaning, not extra-textual sources of constitutional meaning. To the extent that the text of the Constitution is clear, it may not be trumped by extra-textual history. The Electoral College Clauses are not quite as ambiguous as they may appear when we read the Constitution as a coherent whole. Although it may seem bizarre, it may be downright unconstitutional for the President of the Senate to be the presiding officer of the electoral count upon a closer reading of the text of the Constitution.[204]

No less than the Office of President of the United States is at stake during the electoral count. Likewise, no less than the Office of President of the United States is at stake during presidential impeachment. Yet, with respect to the latter, the Senate Impeachment Clause carefully provides that "[w]hen the President of the United States is tried, the Chief Justice shall preside," not the President of the Senate.[205] Should the electoral count be any different when no less may be at stake?

The Senate Impeachment Clause demonstrates that the Framers were quite sensitive to the obvious conflict of interest problem when they focused on it.[206] To be sure, the Framers did not focus on the

---

202. 3 U.S.C. § 15 (2000) (emphasis added).

203. *See, e.g.*, Walz v. Tax Comm'n, 397 U.S. 664, 678 (1970) (stating that "an unbroken practice . . . is not something to be lightly cast aside" in constitutional interpretation); The Pocket Veto Case, 279 U.S. 655, 689 (1929) (stating that a "[l]ong-settled and established practice is a consideration of great weight in a proper interpretation" of the Constitution); *cf.* Marsh v. Chambers, 463 U.S. 783 (1983) (holding that legislative prayer, which began in the First Congress, is constitutional).

204. This statement may be surprising, but I ask the reader to suspend his or her skepticism.

205. U.S. CONST. art. I, § 3, cl. 6. But this clause is not nearly as careful as it should be—the Framers forgot to specify that the Vice President cannot preside at her own impeachment trial, leaving the matter to necessary implication. For thoughtful commentaries, see Joel K. Goldstein, *Can the Vice President Preside at His Own Impeachment Trial?: A Critique of Bare Textualism*, 44 ST. LOUIS U. L.J. 849 (2000); Michael Stokes Paulsen, *Someone Should Have Told Spiro Agnew*, 14 CONST. COMMENT. 245 (1997).

206. *See* THE FEDERALIST NO. 10, at 47 (James Madison) (Clinton Rossiter ed., Mentor 1999) (1961) ("No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment and, not improbably, corrupt his integrity.");

similar but less obvious conflict of interest problem when drafting the Electoral College Clauses. But the Framers did seem to understand and appreciate the general conflict-of-interest problem. When the Framers discussed direct presidential election by Congress, they considered and agreed to a joint ballot procedure that would require a majority of Senators and Representatives who are present considered together, in lieu of one that would require the concurrence of the two Houses of Congress voting separately.[207] James Wilson, supporting the joint ballot procedure, suggested that the Senate might have a conflict of interest problem, remarking that "as the President of the Senate was to be the President of the U—S. that Body in cases of vacancy might have an interest in throwing dilatory obstacles in the way, if its separate concurrence should be required."[208] If this interest were true of the Senate, it would be particularly true of the Vice President.

More generally, the founders likely understood that the Vice President would oftentimes be a candidate for President or Vice President in the next election. During the Electoral Count Act debates, Senator Hoar, discussing the mood at the founding, stated:

> The President of the Senate would almost always be and would be expected to be one of the chief candidates for the presidential office. He would have been one of the two principal candidates four years before, and it was the fashion of those days very much more than of these to continue the same person in public trusts and in political candidacy, and several times in our history the Vice-President of the United States has succeeded to the Presidency, Adams to Washington, Jefferson to Adams, Van Buren to Jackson.[209]

Even if the Framers and Ratifiers of the original Constitution did not understand that the Vice President would be a candidate for President or Vice President in the next election, the Framers and Ratifiers of the Twelfth Amendment—which overwrote the relevant

---

WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 206 (1825) ("As the vice president succeeds to the functions and emoluments of the president of the United States whenever a vacancy happens in the latter office, it would be inconsistent with the implied purity of a judge that a person under a probable bias of such a nature, should participate in the trial, and it would follow that he should—wholly to retire from the court."); 2 FARRAND, *supra* note 35, at 493.

207.  *See* 2 FARRAND, *supra* note 35, at 401–03.

208.  *Id.* at 402–03; *see also id.* at 403 (remarks of James Madison) (supporting the joint ballot procedure and observing in passing that "[t]he President of the *Senate* also is to be occasionally President of the U.S.").

209.  17 CONG. REC. 1019 (1886).

*NORTH CAROLINA LAW REVIEW* [Vol. 80

provision of the original Constitution—understood the conflict-of-interest problem well, especially given the imbroglio of the electoral count of 1801 where Vice President and presidential candidate Thomas Jefferson not only presided over the electoral count but also assumed the counting function.[210] It is thus possible to say that the conflict-of-interest principle applies to the Twelfth Amendment if not to the original Constitution.

There is no evidence from the Electoral College Clauses that the President of the Senate shall be the presiding officer of the electoral count. In the absence of such evidence, the Senate Impeachment Clause supplies a strong argument that the President of the Senate shall not be the presiding officer of the electoral count. The difference—and perhaps the constitutionally significant difference—between presidential impeachment and counting electoral votes may be that the Vice President *necessarily* has a conflict of interest in the former because the Vice President is to act as President,[211] whereas the Vice President does not *necessarily* have a conflict of interest in the latter because the Vice President may or may not be a candidate in the next presidential or vice presidential election. Nevertheless, the better reading of the Electoral College Clauses, when read in light of the Senate Impeachment Clause and of conflict-of-interest principles generally, is that the Vice President, the President of the Senate, shall not be the presiding officer of the electoral count.[212] The Electoral Count Act may be unconstitutional for this reason alone.[213]

---

210. *See supra* note 3 and text accompanying *infra* note 230.

211. *See* U.S. CONST. art. II, § 1, cl. 6; U.S. CONST. amend. XXV, § 1.

212. An interesting question arises whether a Senator or Representative—who may also be a presidential or vice presidential candidate—may be the presiding officer of the electoral count, even though the Vice President shall not be. The better answer is "Yes." Before opening the electoral certificates and inspecting the electoral votes, the identities of the presidential or vice presidential candidates are (at least theoretically) unknown, and hence it would be impossible to know which Senators or Representatives to exclude from the presiding officer's chair. The argument is that the Constitution implicitly assumes that the Vice President—more than any other person present at the electoral count—would be a presidential or vice presidential candidate, and hence makes the Vice President uniquely ineligible to be the presiding officer. As a prudential matter, of course, the presiding officer should be someone who is not known to be a presidential or vice presidential candidate.

213. There is one more reason why the "Presiding Officer Clause" of 3 U.S.C. § 15 may be unconstitutional. That clause provides that "the President of the Senate *shall* be their presiding officer." 3 U.S.C. § 15 (2000) (emphasis added). What gives Congress the authority to *super-add* to the Vice President's duties specified by the Constitution? *See, e.g.,* U.S. CONST. art. I, § 3, cl. 4 ("The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided."); U.S. CONST. art. II, § 1, cl. 6 ("In Case of the Removal of the President from Office, or of his Death, Resignation or Inability to discharge the Powers and Duties of the said Office, the

If the President of the Senate shall not be the presiding officer of the electoral count, who then is the presiding officer? The answer to this question is simpler than it appears: One of the Senators and Representatives then and there present at the electoral count. Each parliamentary body has, almost by definition, the right to choose its presiding officer and other officers from one of its own, at least in the absence of any explicit declaration to the contrary.[214] Whether Congress may exercise this choice on behalf of the joint convention of Senators and Representatives is an entirely different question, and one to be discussed later.[215]

### b.   Who Opens the Electoral Certificates and Counts the Electoral Votes?

With respect to who does the opening of electoral certificates and the counting of electoral votes, the relevant clause of the Twelfth Amendment provides that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."[216] The critical question to ask is whether the counting function belongs to the President of the Senate or to the Senate and House of Representatives. The interpretive stakes are high: If the counting function belongs to the President of the Senate, the Electoral Count Act is unconstitutional because it vests the counting function in the two Houses of Congress, and under the Constitution, Congress may not strip the President of the Senate of her constitutional duty.[217]

---

Same shall devolve on the Vice President . . . ."); U.S. CONST. amend. XXV, § 1 (similar); U.S. CONST. amend. XII ("The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."). If Congress may add to the Vice President's duties, why not the President's duties or the Chief Justice's duties? If "shall" means "must," the Presiding Officer Clause of the Electoral Count Act would seem to be, strictly speaking, unconstitutional.

214.  *Compare* U.S. CONST. art. I, § 2, cl. 5 ("The House of Representatives shall chuse their Speaker and other Officers."), *and* U.S. CONST. art. I, § 3, cl. 5 ("The Senate shall chuse their other Officers, and also a President pro tempore, in the Absence of the Vice President, or when he shall exercise the Office of President of the United States."), *with* U.S. CONST. art. I, § 3, cl. 4 ("The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided.").

215.  *See infra* notes 498–525 and accompanying text.

216.  U.S. CONST. amend. XII.

217.  Others have made this obvious point. *See, e.g.,* 17 CONG. REC. 1059 (1886) (remarks of Sen. Wilson) (arguing that the counting function is vested in the President of the Senate and that the Necessary and Proper Clause "does not confer on Congress the power to assume unto itself the duty which the Constitution imposes on that officer"); 18 CONG. REC. 74 (remarks of Rep. Baker) ("If the Constitution . . . does . . . by fair implication, vest in the President of the Senate the power and duty not only to open, but also to count, the votes, then Congress can not, by this or any other legislation, take away

We begin with the first part of the clause: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates."[218]   It is clear that the opening of the certificates function belongs to the Vice President, who is the President of the Senate.[219]   The Constitution provides no wiggle room:   the President of the Senate shall open *all* the certificates, not some.[220]

---

or transfer to any other person or officer that power and duty."); Paulsen, *supra* note 205, at 245 (noting that each House of Congress may not use the Rules of Proceedings Clause to strip the Vice President of constitutional duties); Spear, *supra* note 18, at 156 ("The Constitution says that 'the votes shall then be counted,' and if this mandate is addressed to the President of the Senate, that ends the question so far as the counting is concerned. The Constitution has then trusted him with the whole power, and any legislation to direct him, would be an impertinent intrusion upon his prerogative."); *cf.* Harrison, *supra* note 23, at 703 ("Neither House nor Senate is given any authority over the President of the Senate when it comes to opening the certificates, and Congress by statute may no more control the exercise of this constitutionally granted authority than it may tell the President whom to pardon.").

218.  U.S. CONST. amend. XII.

219.  *See* U.S. CONST. art. I, § 3, cl. 4 ("The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided.").   It does appear that the President *pro tempore* acted in place of the Vice President in at least the electoral counts of 1809, 1825, 1857, 1877, and most recently 1969 when Vice President Hubert H. Humphrey "recused" himself from the electoral count.

220.  There is the rather tricky question whether the President of the Senate must open all certificates in a case of multiple returns from the same state, as in the Hayes-Tilden incident of 1887, or in a case of a return from a putative state (say for example, a certificate from Puerto Rico).   The best answer is that the opening-of-the-certificates function contains no power of discretion because any discretion in the opening of certificates would interfere with the counting-of-electoral-votes function.   Translated into the recent past:  if two certificates had come from Florida during the electoral count of 2001, the Vice President could not, constitutionally speaking, have refused to open both of them.

          In a recent essay, Professor Harrison takes a contrary view on the specific question of multiple (putative) electoral certificates.   In his view, "[t]he certificates that the President of the Senate is to open, however, are those of the electors, not those of non-electors.   Hence in order to know which certificates to open, the President of the Senate must know which of competing slates of electors were validly appointed."   Harrison, *supra* note 23, at 702–03.   This is a clever (and obvious) textual argument.   He continues: "If the Twelfth Amendment is assumed to be a dispute resolution mechanism, a natural reading of it thus indicates that in one especially important context the dispute is to be resolved by a single individual."   *Id.* at 703.   The vice of this reading, as Professor Harrison acknowledges, is that one person has the power to resolve at least one kind of dispute in presidential election, a conclusion that is generally to be avoided.   Indeed, he acknowledges in his very next paragraph that "[i]t would be much easier to believe that this important decision was vested in a collective body, were there not serious problems with the operation of the collective body, the joint session of Congress (if it is to be called that)."   *Id.*   Notwithstanding the latter "problems" (which are overstated in my view), Professor Harrison ignores the point that in the case of multiple putative electoral certificates, the opening of the certificates function interferes with the counting-of-electoral-votes function.   The former enables the latter; the former is more of an

The counting function is, however, noticeably ambiguous: "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates *and the votes shall then be counted.*" There are two plausible readings of this oddly phrased text employing the passive voice.[221] The counting function may be read as one vested in the President of the Senate, or jointly in the Senate and House of Representatives.[222] If the President of the Senate is to count the votes, the clause easily could have been written to provide that "[t]he President of the Senate shall . . . open all the certificates and

---

"exercise" whereas the latter is more of a "function." Moreover, the former is simply less important than the latter—a President and Vice President elect are determined after the electoral votes are actually counted, not when the electoral certificates are opened. The better answer, I submit, is that the President of the Senate has discretion in the opening-of-electoral-certificates function only if she also has the counting-of-electoral-votes function, and even then, that discretion would follow as a matter of the latter function, not the former.

   This scenario of multiple putative electoral certificates was the subject of discussion during the Electoral Count Act debates, given the cases of double returns in the electoral counts of 1873 and 1877. For statements that the President of the Senate has no discretion in opening the certificates in the case of multiple returns, see, for example, COUNTING ELECTORAL VOTES, *supra* note 3, at 446–47 (remarks of Sen. Bayard); *id.* at 449–50 (remarks of Sen. Thurman). *But see id.* at 454 (remarks of Sen. Morton) (arguing that President of the Senate's discretion in opening certificates "shows the necessity for an amendment of the Constitution").

221. "The famous phrase of the Constitution 'the votes shall then be counted' has been like an apple of discord almost since the beginning of Government." J. HAMPDEN DOUGHERTY, THE ELECTORAL SYSTEM OF THE UNITED STATES 254 (1906); *see also* Albert J. Rosenthal, *The Constitution, Congress, and Presidential Elections*, 67 MICH. L. REV. 1, 27 (1968) (noting that the passive voice of this phrase breaks one of the "cardinal rules of draftsmanship"); Tribe, *supra* note 17, at 279 ("The Framers should have listened to the time-honored injunction to avoid the passive voice. 'Shall be counted'—by whom?").

   During the Electoral Count Act debates, Representative Herbert carefully examined the grammar of this patch of constitutional text:
   Here is a duty imposed upon the President of the Senate. He shall, in the presence of the Senate and House of Representatives, open the certificates. Then the first person is dropped and the third person is taken up; there the sentence changes its construction; there the duty imposed upon the President of the Senate ceases, and afterwards a new part of speech is used—the third person is adopted, and a verb relating to a noun in the third person, "the votes," employed, and a new duty imposed by the words, "and the votes shall then be counted."
18 CONG. REC. 75 (1886).
222. The ambiguity is well-evidenced in the congressional debate over the electoral count. *See, e.g.,* COUNTING ELECTORAL VOTES, *supra* note 3, at 48 (remarks of Sen. Wilson) ("It is not said who shall count the votes, nor who shall decide what votes shall be counted."); *id.* at 451 (remarks of Sen. Frelinghuysen) ("So when the Constitution says the vote shall be counted, it says that a decision shall be made by some one, and it must be made either by the presiding officer of the Senate or by the Senate and House, who are required to be present."); *see also* Spear, *supra* note 18, at 156 (noting a similar point).

shall then count the votes."[223]   If the Senate and House of Representatives are to count the votes, the clause easily could have been written to provide that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted by the Senate and House of Representatives."[224]

The text does not equally support these two plausible readings once we escape a narrow "clause-bound" interpretivism.  When read in light of the conflict-of-interest principle of the Senate Impeachment Clause, the better answer (again, but by no means an unassailable one) is that the counting function of the Electoral College Clauses is vested in the Senate and House of Representatives, not the President of the Senate.  To be sure, the Constitution does not explicitly address *how* the Senate and House of Representatives is to exercise the counting function—by the two Houses acting separately

---

223. This obvious point was made during the Electoral Count Act debates. *See, e.g.*, 18 CONG. REC. 46 (remarks of Rep. Dibble).

224. These are the two most obvious readings, but there are at least four other readings.  A third reading is that the Clause is simply silent as to who shall count the votes and that Congress may specify the counting agent.

A fourth reading, suggested by Representative Dibble during the Electoral Count Act debates, is that the counting function is split between the House of Representatives and the Senate:  the House is to count the presidential votes and the Senate the vice presidential votes, because, in case of deadlock, the House chooses the President and the Senate the Vice President. *See* 18 CONG. REC. 46.  There is no textual or historical support whatsoever for this reading.  Moreover, this reading would have been impossible before the adoption of the Twelfth Amendment which required Electors to cast separately marked votes for President and Vice President, and it is unlikely that the Twelfth Amendment added to the evident textual ambiguity.

A fifth reading, suggested by Senator Thompson during the electoral count of 1857, makes even less sense.  He suggested that the counting function is vested solely in the Senate, with the House only present as witnesses. *See, e.g.*, COUNTING ELECTORAL VOTES, *supra* note 3, at 126 ("The Constitution, in my judgment, is that these votes are to be returned to us and counted by us, and the House of Representatives are admitted to be present at the count to prevent a combination, a clandestine operation, a secret session, a *coup d'etat.*"); *id.* at 130 ("When we are counting the votes, (for the President of the Senate only counts them in his official capacity, and in the session of the Senate, because he cannot count them as a private individual,) it is improper for the House members to be anything but listeners."); *id.* at 136 ("The members of that House of Representatives are to sit by, and whether we put them in the gallery, or the reporters' desks, or in niches—wherever they are placed they are to look on.").

Finally, a sixth reading, suggested by Senator Call in 1876, is equally nonsensical.  He suggested that the counting function is vested solely in the House of Representatives, because the Constitution vests in that body the duty to choose the President in case there is no winner in the Electoral College mode of presidential election, *see* U.S. CONST. amend. XII, and only that body may determine whether there is such a winner. *See* 17 CONG. REC. 1061 (1886); *see also id.* at 1019 (remarks of Sen. Hoar) (acknowledging and dismissing as incorrect this view of the counting function).

*ELECTORAL COUNT ACT*

in their corporate capacities, or by the two Houses acting conjointly as one "House" of Senators and Representatives.[225]   In addition, when we consider early state constitutions,[226] we see that early state constitutions did not vest the counting of electoral votes in any one person.[227]

---

225. The Constitution only requires that the Senate and House of Representatives, as separately organized bodies, be present as witnesses for the opening of electoral certificates and (probably) the counting of electoral votes (to the extent that the "in presence of the Senate and House of Representatives" phrase modifies the counting phrase, "the votes shall then be counted," *see infra* notes 278–86 and accompanying text), but does not address whether the counting of electoral votes is to be done by the Senate and House of Representatives as such or by Senators and Representatives on a per capita vote basis (equivalent to the Senate and House of Representatives voting by joint ballot). Other scholars have noted similar points. *See, e.g.,* Tribe, *supra* note 17, at 279 ("Is any such [counting] authority reposed instead in one or another House, or in the two Houses acting concurrently, or in the two Houses acting as a single organ even though not precisely as the Congress of the United States?"); and Harrison, *supra* note 23, at 703. Professor Harrison states:

> How is the joint session [of the Senate and House of Representatives] to make decisions?  The Constitution provides no explicit rule, and certainly does not indicate that the House and Senate are to be put together into one body that will act by majority vote.  Rather, the two chambers appear to retain their separate identities:  the certificates are to be opened in the presence, not of the Senators and Representatives, but of the Senate and the House.

*Id.* For various textual and largely structural reasons, I conclude that the counting of electoral votes is to be done by joint ballot of Senators and Representatives. *See infra* notes 291–313 and accompanying text (discussing unicameralism principle); *infra* notes 429–45 and accompanying text (discussing anti-Senate principle of presidential election); *infra* notes 526–53 and accompanying text (discussing *Chadha* principle of law-making).

226. For a classic use of early state constitutions to inform the meaning of provisions in the Constitution, see THE FEDERALIST NO. 47, at 271–76 (James Madison) (Clinton Rossiter ed., Mentor 1999) (1961) (surveying the early state constitutions in discussing the separation of powers).

227. During the Electoral Count Act debates, Senator Hoar made this point, though he did not cite specific provisions from early state constitutions. *See* 17 CONG. REC. 1019. For specific provisions, see, for example, the constitutions of the following states:

> Delaware: "A president or chief magistrate shall be chosen by joint ballot of both houses, to be taken in the house of assembly, and the box examined by the *speakers of each house* in the presence of the other members . . . ." DEL. CONST. OF 1776, art. 7 (emphasis added). Maryland:

> That a person of wisdom, experience, and virtue, shall be chosen Governor, . . . by the joint ballot of both Houses (to be taken in each House respectively) deposited in a conference room; the boxes to be examined by a *joint committee of both Houses*, and the numbers severally reported, that the appointment may be entered . . . .

MD. CONST. OF 1776, art. XXV (emphasis added). Massachusetts:

> The *selectmen* of the several towns shall preside at such meetings impartially, and shall receive the votes of all the inhabitants of such towns, present and qualified to vote for senators, and shall sort and count them in open town meeting, and in presence of the town clerk, who shall make a fair record, in presence of the selectmen, and in open town meeting, of the name of every person voted for, and of the number of votes against his name . . . .

The history, however, undercuts these fundamental textual and structural considerations. The Framers clearly thought that the counting function was vested in the President of the Senate alone. In a unanimous resolution attached to the final Constitution, the Framers described the procedures for electing the first Chief Executive, recommending in relevant part "that the Senators should appoint a President of the Senate, for the sole Purpose of receiving, opening and counting the Votes for President."[228] The records of the First Congress confirm this construction. On April 6, 1789, Senator John Langdon was elected as President of the Senate "for the sole purpose of opening and counting the votes for President of the United States."[229] This early practice should be of limited precedential value, however, because they relate to the creation of the Government of the United States before a President and Vice President were ever elected.

The dangers of this initial construction soon appeared when Presidents of the Senate were also candidates for President or Vice President. In the electoral count of 1797, President of the Senate John Adams purportedly counted "improper votes" from Vermont,

---

MASS. CONST. OF 1780, pt. 2, ch. 1, § II, art. II. Also Massachusetts:

> Those persons who shall be qualified to vote for Senators and Representatives . . . shall . . . give in their votes for a Governor to the Selectmen, who shall preside at such meetings; and *the Town Clerk, in the presence and with the assistance of the Selectmen*, shall, in open town meeting, sort and count the votes, and form a list of the persons voted for, with the number of votes for each person against his name; . . . .

MASS. CONST. OF 1780, pt. 2, ch. 2, § I, art. III (emphasis added). Vermont:

> [A]t the opening of the General Assembly, *there shall be a committee* appointed out of the Council and Assembly, who, after being duly sworn to the faithful discharge of their trust, shall proceed to receive, sort, and count, the votes for the Governor, and declare the person who has the major part of the votes, to be Governor, for the year ensuing.

VT. CONST. OF 1777, ch. 2 § XVII (emphasis added). Virginia:

> A Governor, or chief magistrate, shall be chosen annually by joint ballot of both Houses (to be taken in each House respectively) deposited in the conference room; the boxes examined jointly by a *committee of each House*, and the numbers severally reported to them, that the appointments may be entered . . . .

VA. CONST. OF 1776, cl. 29 (emphasis added). Other early state constitutions providing for the election of the executive authority by the legislature (for example, Georgia, North Carolina, New Jersey, Pennsylvania, and South Carolina) or by direct popular election (for example, New York) did not address the counting of such votes. *See, e.g.*, GA. CONST. OF 1777, art. XXIII; N.C. CONST. OF 1776, art. XV; N.J. CONST. OF 1776, art. VII; PA. CONST. OF 1776, § 19; S.C. CONST. OF 1776, art. III.

228. 2 FARRAND, *supra* note 35, at 666; *see also* Burgess, *supra* note 18, at 647 ("The [F]ramers of the constitution undoubtedly meant that the president of the Senate should count the electoral votes . . . .").

229. 1 ANNALS OF CONG. 16–17 (Joseph Gales ed., 1789).

*ELECTORAL COUNT ACT*

and in the electoral count of 1801, President of the Senate Thomas Jefferson purportedly counted dubious electoral votes from Georgia.[230]   By 1800, some members of the Senate of the Sixth Congress interpreted the counting language as vesting the counting function in the "members composing" the Senate and the House of Representatives,[231] and to the extent there is any difference, Senator Pinckney interpreted the counting language as vesting the counting function in "Congress."[232]

The Twelfth Amendment, adopted in 1804, did not resolve the textual ambiguity between the first two readings of the counting function.   In fact, it contains language identical to that found in Article II, Section 1, Clause 3.   However, as Dean Wroth has suggested, it is arguable that, with the later precedents, the Twelfth Amendment changed the original understanding of the counting function, shifting this function from the President of the Senate to the Senate and House of Representatives.[233]   But early commentators on

---

230. *See* Tansill, *supra* note 22, at 516; Wroth, *supra* note 22, at 326 n.23; *see also* COUNTING ELECTORAL VOTES, *supra* note 3, at 116 (remarks of Sen. Reid) ("It has often happened that the Vice-President is a candidate for re-election; and we can scarcely suppose that the Constitution intended to confer on him the power of declaring himself elected by the votes he may count, without an appeal from his decision."). For more on the history of self-counting, see COUNTING ELECTORAL VOTES, *supra* note 3, at 533 (remarks of Sen. Morton) (presenting history of self-counting in 1797, 1801, 1821, 1837, 1841, and 1861); Harrison, *supra* note 23, at 703 n.12 (providing more examples).

231. *See* 10 ANNALS OF CONG. 120 (1800). The bill stated:

And the constitution of the United States having directed that "the President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates, and that the votes shall then be counted," *from which the reasonable inference and practice has been, that they are to be counted by the members composing the said Houses,* and brought there for that office, no other being assigned them; and inferred the more reasonably, as thereby the Constitutional weight of each State in the election of those high officers is exactly preserved in the *tribunal* which is to judge of its validity: the number of Senators and Representatives from each State, composing the said tribunal, being exactly that of the Electors of the same State . . . .

*Id.* (emphasis added).

232. 3 FARRAND, *supra* note 35, at 386 (remarks of Sen. Pinckney, Mar. 28, 1800) ("It is made *their* [Congress's] duty to count over the votes in a convention of both Houses, and for the President of the Senate to declare who has the majority of the votes of the Electors so transmitted.") (emphasis added).   Indeed, there is an important difference between the "Congress" and the "Senate and the House of Representatives."   The word "Congress" necessarily implies the two Houses of Congress acting independently in their corporate capacities, whereas the text of the Constitution is more ambivalent—allowing for the two Houses of Congress acting independently in their corporate capacities or for the two Houses of Congress acting conjointly in one corporate capacity.

233. *See* Wroth, *supra* note 22, at 327 & n.28 (examining language of implementing Act of Twelfth Amendment, Act of March 26, 1804, ch. 50, 2 Stat. 295, and language used in the electoral count of February 13, 1805).

the Constitution, such as Chancellor James Kent and Professor William Duer, writing in the wake of the Twelfth Amendment, thought that the counting function still belonged to the President of the Senate.[234]

The Wisconsin Incident of 1857[235] probably stands as a paradigm case in support of the proposition that the counting function belongs to the Senate and House of Representatives and not to the President of the Senate. During the Wisconsin Incident, Senator Pugh noted the obvious conflict-of-interest problem if the President of the Senate had sole responsibility for counting, calling it a "power higher than the veto."[236] During the Electoral Count Act debates, Senator Bayard keenly observed that the President of the Senate "cannot even count" the electoral votes; that "[h]e cannot even inspect them, except in the incidental and casual manner that is implied by the fact that his hand shall open the sealed envelope which contains the list of the electoral vote."[237] Representative Caldwell recalled the President of the Senate's unsuccessful attempts to assume the counting function in the Wisconsin Incident of 1857 and the Hayes-Tilden Incident of 1877,[238] and described the primary purpose of the Electoral Count Act as "decid[ing], first, that the power to count the vote is not in the President of the Senate."[239]

---

234. Chancellor Kent stated:
> I presume, in the absence of all legislative provision on the subject, that the President of the Senate counts the votes, and determines the result, and that the two houses are present only as spectators, to witness the fairness and accuracy of the transaction, and to act only if no choice be made by the electors.

2 KENT'S COMMENTARIES, supra note 19, at *276–77; *see* DUER'S COMMENTARIES, *supra* note 19, at 88–89 (similar). Note that Chancellor Kent seems to believe that Congress may by *law* take the counting function away from the President of the Senate; the source of Congress's power to do so is unclear. The question of Congress's source of power to enact legislation regulating the counting function is discussed in Part II.A.2 *infra*.

235. *See supra* notes 132–42 and accompanying text.

236. COUNTING ELECTORAL VOTES, *supra* note 3, at 135. Representative Humphrey Marshall stated his belief that "I am sure that the duty of determining whether a vote shall be counted belongs to the Senate and House, and not to the President of the Senate." *Id.* at 96; *see also id.* at 113 (remarks of Sen. Butler) (noting obvious conflicts of interest problem). However, as late as the Wisconsin Incident of 1857, some Members of Congress believed that the President of the Senate had the sole power to decide what to count and what not to count. *See, e.g., id.* at 134 (remarks of Sen. Stuart).

237. *Id.* at 445 (remarks of Sen. Bayard).

238. *See* 18 CONG. REC. 30 (1886) (remarks of Rep. Caldwell); *see also* 17 CONG. REC. 815 (1886) (remarks of Sen. Sherman) (noting the President of the Senate's attempt to assume the counting function in the electoral count of 1857); 18 CONG. REC. 75 (remarks of Rep. Herbert) (noting the President of the Senate's attempt to assume the counting function in the electoral count of 1877).

239. 18 CONG. REC. 30.

The best interpretation as a matter of text and the better interpretation as a matter of history is that the counting function is vested in the Senate and House of Representatives.  This does not answer, however, whether the counting function is delegable.  The relevant text of the Constitution is best read to exclude counting by unnamed agents, notwithstanding general constitutional limits to the delegation of powers.  The consensus view of the Members of Congress during the Electoral Count Act debates was that the counting function is not delegable.[240]  Moreover, the related textual considerations of the "when" and "where" of counting electoral votes strongly militate against the delegation of the counting function to unnamed agents—including coordinate branches of government such as the federal judiciary.[241]

A final consideration is whether the President of the Senate has a vote in the counting function when questions arise.  Although the counting of electoral votes takes place in the presence of the President of the Senate, the President of the Senate participates no more in the counting function than she participates in trial of impeachment—in neither case does the Vice President have a vote.[242]  The Constitution carefully circumscribes the participation of the Vice President in the business of the Senate:  "The Vice President of the United States shall be President of the Senate, but shall have no Vote,

---

240.  For the historical view, see, for example, COUNTING ELECTORAL VOTES, *supra* note 3, at 445 (remarks of Sen. Bayard) ("That you could not delegate that power to another body I cannot doubt."); *id.* at 531 (remarks of Sen. Boutwell) ("Congress must exercise the power and perform the duty, and it is not possible under the Constitution to transfer it to anybody else."); 18 CONG. REC. 51 (remarks of Rep. Adams) ("I can not conceive that any statute can take away from either of these two legislative bodies the power to come to a yes or no on any question relating to the business they then have in hand under the provisions of the Constitution.").

The scholarly view also supports the non-delegation of the counting function. *See, e.g.,* Ross & Josephson, *supra* note 7, at 715 ("We agree with Pinckney that the Grand Committee procedure proposed in 1800 was unconstitutional because we do not believe Congress could delegate its joint power to count to a committee of selected members."); Spear, *supra* note 18, at 157 (observing that if the counting power is lodged in the two Houses of Congress, Congress cannot delegate the counting power to a committee "any more than it can establish a commission to levy taxes, or declare war").

241.  *See* text accompanying *infra* notes 267–313.

242.  *But cf.* RAWLE, *supra* note 206, at 206. Rawle argued that:
  It is not stated in the Constitution whether the president of the senate is on the trial of an impeachment restricted, as in legislative cases, to the casting vote. As he is constituted one of the judges by being appointed to preside without any restriction, the fair inference would be, that he is entitled to vote like the other judges, but on the trial last mentioned of a judge of the Supreme Court, the vote of the vice president does not appear in the printed journal.
*Id.*

unless they be equally divided."[243]  The joint convention of the Senate and House of Representatives—assembled for the purpose of the electoral count—is most decidedly not the Senate.  To be sure, the Electoral Count Act provides that, upon any objection to an electoral vote, the Senate shall separately withdraw to consider the objection.[244] Notwithstanding constitutional objections to this bicameralism,[245] neither textual nor structural reasons suggest that the President of the Senate's tie-breaking vote in the Article I business of the Senate applies to any Article II business of the Senate in counting electoral votes.[246]

---

243.  U.S. CONST. art. I, § 3, cl. 4.

244.  *See* 3 U.S.C. § 15 (2000).

245.  *See infra* notes 287–313, 526–53 and accompanying text.

246.  As a related matter, it is not at all clear that the Vice President may cast a tie-breaking vote in a contingency election for Vice President in the Senate should there be no winner under the electoral college mode of vice presidential election.  U.S. CONST. amend. XII provides:

> The person having the greatest number of votes as Vice-President, shall be the Vice-President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice.

Some scholars have suggested that the Vice President could cast such a tie-breaking vote.  *See, e.g.,* Ho, *supra* note 195, at 239 n.47; Levinson & Young, *supra* note 195, at 934 n.37.  At least one scholar has raised the possibility that the Vice President could not cast such a tie-breaking vote.  *See* Akhil Reed Amar, *President Thurmond?* (Nov. 2, 2000), *at* http://slate.msn.com/?id=1006401 (on file with the North Carolina Law Review).

There are some very good reasons to seriously doubt that the Vice President could cast such a tie-breaking vote.  As a textual matter, the Vice President is not a "Senator" and the Twelfth Amendment ostensibly requires a majority of the whole number of *Senators*—today, fifty-one Senators.  If there is no majority of *Senators* in a contingency election for Vice President in the Senate, the Senate would have to choose again.  Note that the same is true in the House of Representatives where there is no arbiter to cast a tie-breaking vote.  If there is no majority of *states* in a contingency election for President in the House of Representatives, the House would have to choose again.  We have seen this done before:  In the contingency election for President in 1801, the House of Representatives completed *thirty-five* rounds of balloting before choosing a President, *see supra* note 3.

More generally:  The Framers generally understood and appreciated the conflict of interest problems of the Vice Presidency, *see supra* notes 204–13 and accompanying text.  It is worth hesitating before concluding that *one person* has the power to determine an election, particularly (but not only) when that one person would be likely to benefit from the decision.  While it is true that other Senators may have conflict of interest problems because they too could be candidates for Vice President, it is one thing to say that a Senator may vote for himself or herself along with other Senators, and quite another to give the decisive vote to one man or woman.  The Vice President's tie-breaking vote is decisive in a way that the votes of Senators are not.  Interestingly, when the Framers contemplated direct presidential election by Congress, they rejected without discussion

###### c.   What Is Counting and What Is To Be Counted?

Two significant and interrelated questions remain. First, what is counting?   Second, what is to be counted?   Again, the relevant constitutional text provides that "[t]he President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, *and the Votes shall then be counted.*"[247]  As has been documented extensively, the word "shall" is a word of obligation.[248]

---

giving the Vice President a tie-breaking vote. *See* 2 FARRAND, *supra* note 35, at 403 ("[Mr[.] Read moved 'that in case the numbers for the two highest in votes should be equal, then the President of the Senate shall have an additional casting vote,' which was disagreed to by a general negative.").

Finally, if the theory is that the Vice President's power to cast tie-breaking votes only applies to Article I business (legislation and the internal matters of the Senate, including the election of Senate officers and the appointment of Senate committees) and not to Article II or Twelfth Amendment business, then it would also follow that the Vice President would not have a tie-breaking vote under the Treaty Clause or the Appointments Clause, which both appear in Article II. *See* U.S. CONST. art. II, § 2, cl. 2. This appears to be the case, reinforcing the arguments above.   It is not possible for the Vice President to cast a tie-breaking vote with respect to treaties which require a two-thirds majority of Senators, *see id.*, but it is possible for the Vice President to do so with respect to presidential nominations under the Appointments Clause, which only require a majority of Senators. Notwithstanding, Alexander Hamilton intimated early on that the Vice President could not cast a tie-breaking vote on presidential nominations under the Appointments Clause. *See* THE FEDERALIST NO. 69, at 389 (Alexander Hamilton) (Clinton Rossiter ed., Mentor 1999) (1961) ("In the national government, if the Senate should be divided, no appointment could be made; in the government of New York, if the council should be divided, the governor can turn the scale and confirm his own nomination."). The lack of mention of the Vice President is surprising given that he discussed the Vice President (and her tie-breaking vote) in the immediately preceding essay, *see* THE FEDERALIST NO. 68, at 47 (Alexander Hamilton) (Clinton Rossiter ed., Mentor 1999) (1961), but perhaps he thought that the Vice President would not necessarily act in accordance with the President's interests (recall that prior to the development of the party system, the Vice President was merely the runner-up in the presidential election and oftentimes the chief opponent of the President). Only once in our nation's history, to my knowledge, has a Vice President cast a tie-breaking vote on a presidential appointment. In 1832, President Andrew Jackson nominated Senator Martin Van Buren as ambassador to Great Britain. The Senate split evenly, and Vice President Calhoun broke the tie by voting *against* President Jackson's nomination. *See* Vice Presidents of the United States, Martin Van Buren (1833–1837), *at* http://www.senate.gov/learning/stat_vp8.html (last visited Apr. 17, 2002) (on file with the North Carolina Law Review). Vice President Calhoun's negative vote was unnecessary of course, as a tie vote is widely considered to be defeated, though some accounts treat his vote as the "deciding vote." *See, e.g., id.*

247. U.S. CONST. amend. XII (emphasis added).

248. *See* Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: Guided Quest for the Original Understanding of Article III*, 132 U. PA. L. REV. 741, 782 & n.147 (1984) (stating that the Framers used "shall" as a word of obligation and "may" as a word of discretion and providing numerous examples in the Constitution); *see also* 2 FARRAND, *supra* note 35, at 485–86 (stating that the Framers carefully distinguished between the words "ought," "shall," and "may" in the drafting of the Full Faith and Credit Clause, U.S. CONST. art. IV, § 1). Indeed, the Electoral College Clauses make the point amply: the

*NORTH CAROLINA LAW REVIEW*     [Vol. 80

The Electoral College Clauses do not say "and the Votes *may* then be counted."

Ardent textualists will readily notice two points. First, what is the significance of the difference between "Certificates" and "Votes"? The Constitution says that only the "Votes" are to be counted. Second, what is the significance of the word "all" and its selective use and seeming disuse? The Constitution says that "all" of the certificates are to be opened but does not say that "all" of the votes shall then be counted. Are these subtle textual distinctions a grant of power to the counting agent not to count all votes?

The ultimate question is whether counting is, on balance, a ministerial or judicial act. If counting is a ministerial act, it is one of ascertainment and aggregation—Congress is simply a "central collecting agency" and a "tabulating point."[249] This view has some support in the purpose of the Electoral College Clauses. There would be no need for Congress to aggregate electoral votes if the electors met at some central location, but it was precisely to avoid the potential for cabal and corruption that the Electoral Colleges Clauses provide that the electors should meet in their respective states.[250] We shall call this the "thin" conception of the counting function.[251]

---

word "shall" is used some eighteen times and the word "may" is used once. *See* U.S. CONST. art. II, § 1, cl. 4 ("The Congress *may* determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.") (emphasis added).

249. 115 CONG. REC. 168–69 (1969) (remarks of Rep. Rarick during the Bailey Incident of 1969).

250. *See, e.g.,* THE FEDERALIST NO. 68, *supra* note 246, at 380 ("Nothing was more to be desired [in the use of the Electoral College mode of presidential election] than that every practicable obstacle should be opposed to cabal, intrigue, and corruption."); 4 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 122 (Jonathan Elliot ed., 2d ed. 1836) [hereinafter ELLIOT'S DEBATES] (remarks of William Davie at North Carolina ratifying convention) ("He is elected on the same day in every state, so that there can be no possible combination between the electors."). At the North Carolina ratifying convention, James Iredell remarked:

> Had the time of election been different in different states, the electors chosen in one state might have gone from state to state, and conferred with the other electors, and the election might have been thus carried on under undue influence. But by this provision, the electors must meet in the different states on the same day, and cannot confer together. They may not even know who are the electors in the other states. There can be, therefore, no kind of combination. It is probable that the man who is the object of choice of thirteen different states, the electors in each voting unconnectedly with the rest, must be a person who possesses, in high degree, the confidence and respect of his country.

4 *id.* at 105. Sen. Rufus King later remarked:

> [M]embers of the General Convention . . . did indulge the hope, by apportioning, limiting, and confining the Electors within their respective States, and by the guarded manner of giving and transmitting the ballots of the Electors to the Seat

If counting is a judicial act, then Congress sits as a court of sorts—a "court of last resort"[252]—checking the actions of electors in the electoral colleges. We shall call this the "thick" conception of the counting function. As Professor Spear nicely summarized, counting, "in so far as it is a mere enumeration and aggregation of units, is a purely *ministerial* act; but, in so far as it involves any judgment as to *what* votes shall be counted, it is a *judicial*, or, at least, *quasi judicial* act."[253]   Clearly, there is no clean break between the "thin" and "thick" conceptions of the counting function. Even the "thin" conception requires some ascertainment of *what* is to be counted.[254]

The debates over the drafting of the Electoral College Clauses at the Philadelphia Convention of 1787 suggest that the Framers had the ascertainment issue in mind. The Framers rejected a proposal by James Madison and Hugh Williamson to insert the phrase "who shall have balloted" after the word "Electors." The purpose of this proposal was "so that the non voting electors not being counted might not increase the number necessary as a majority of the whole—to decide the choice without the agency of the Senate."[255]   John Dickinson successfully moved to insert after "Electors" the word "appointed." Thus, under the Electoral College Clauses, the requisite number of electoral votes needed for victory is "a Majority of the whole Number of Electors appointed."[256]   This drafting history suggests that the Framers considered the possibility that there might not be a "vote"—but only if an elector shall not have balloted. They did not consider the possibility that an electoral vote might be unconstitutional. While silence is difficult to interpret, the Framers'

---

of Government, that intrigue, combination, and corruption, would be effectually shut out, and a free and pure election of the President of the United States made perpetual.

3 FARRAND, *supra* note 35, at 461 (Mar. 18, 1824); *see also* 1 KENT'S COMMENTARIES, *supra* note 19, at *280 ("These electors assemble in separate and distantly detached bodies, and they are constituted in a manner best calculated to preserve them free from all inducements to disorder, bias, or corruption.").

251. Professor Amar has suggested, albeit in passing, that the counting function is ministerial. *See* Amar, *supra* note 10, at 229 ("In counting votes, Congress performs in effect a ministerial function, registering the will of the voters in the electoral college.").

252. 115 CONG. REC. 158 (remarks of Rep. Corman during the Bailey Incident of 1969).

253. Spear, *supra* note 18, at 156.

254. *See id.* (noting that the counting function "must, to some extent, be judicial, in order that it may be ministerial and declarative. It is not possible to count, . . . without deciding what shall be counted").

255. 2 FARRAND, *supra* note 35, at 515.

256. U.S. CONST. art. II, § 1, cl. 3; U.S. CONST. amend. XII.