probable conception of the counting function was more "thin" than "thick."

Members of Congress have debated the nature of the counting function intensely over the past 210 years. The issue was first debated during the Missouri Incident. Representative Clay stated his belief that counting necessarily involved judging:

> In a case of votes coming forward which could not be counted, the Constitution was silent; but, fortunately, the end in that case carried with it the means. The two Houses were called on to enumerate the votes for President and Vice-President; of course they were called on to decide what are votes.[257]

This was a fairly "thick" conception of the counting function. Representative Randolph disagreed. " 'Your office,' said he, 'in regard to the electoral vote is merely ministerial. It is to count the votes, and you undertake to reject votes.' "[258] Representative Archer, responding to Representative Randolph's argument, thought that counting could not exist without judging:

> He was a little surprised . . . that the House had no power to pass any judgment on any return. He always thought that, wherever was lodged the power to receive a return, there was also a power to pass judgment on the validity of that return. Suppose any Territory not within the limits of the United States at the time, Florida, for example, to send votes here for electors; was there no authority by which these votes could be rejected? Suppose a State entitled to twenty-seven votes should send thirty-seven votes, would any gentlemen contend that there was no power in this House to judge of the proper number?[259]

This is not necessarily a "thick" conception of counting at all; as we shall see, many of Representative Archer's concerns come before Congress meets for the purpose of the electoral count. For instance,

---

257. COUNTING ELECTORAL VOTES, *supra* note 3, at 52 (1821). Just two years later, Senator Benton observed:

> Two questions of great delicacy now present themselves:
>
> 1. If electors are not appointed according to the Constitution, can their votes be counted?
>
> 2. If objected to, who shall judge them?
>
> It is the duty of the two houses of Congress to count the votes. Can they count unconstitutional votes? If they cannot, shall they not judge every vote before it is counted?

*Id.* at 57 (1823).

258. *Id.* at 54.

259. *Id.*

prior to the electoral count, each House of Congress would have resolved whether or not to recognize Florida as a member of the Union in considering whether to seat any of Florida's Senators or Representatives.

During the Wisconsin Incident, Representative Marshall also advocated a "thick" conception of the counting function. He bluntly asked, "What is to count? What faculty does it involve? I say not only the faculty of enumerating, but the faculty of judging whether it is a vote or not."[260] In a speech directed to the President of the Senate during the electoral count, Representative Marshall sought to justify his conception of the counting function upon the textual distinction between the word "Certificates" and the word "Votes":

> Whether that is a vote or not must depend upon the determination of this convention, and if you will regard the verbiage of the Constitution, you will find that your function goes no further than to open the certificates. The language of the Constitution is that "the President of the Senate, in the presence of the House of Representatives, shall open all the certificates," and then the phraseology changes, and proceeds, "and the votes shall be counted," not by you, but by us; and whenever a vote is challenged, this is the time, and this the only place, where a determination can be formed whether it is a vote.[261]

This argument does not withstand a close examination of the Electoral College Clauses. The Constitution employs the word "Certificates" instead of "Votes" for a simple reason. Each of the Electoral Colleges sends a "List" (now two lists with the adoption of the Twelfth Amendment)—which contains the "Votes" of the electors—to the President of the Senate. The Constitution requires that each "List" be signed and certified by the electors in each State; when the "List" is so signed and certified, it becomes a "Certificate." Thus, the contradistinction between "Certificates" and "Votes" is of little interpretive value.

Other Members of Congress agreed with Representative Marshall. For example, Representative Orr asked, "Does not the requisition to be present at the counting necessarily carry the right to

260. *Id.* at 142.

261. *Id.* at 89. Representative Marshall misquoted the constitutional text. He also did not notice the textual significance in the use and seeming disuse of the word "all." In a later remark, he came close: "The President of the Senate has to open *all* the certificates, and then *his* function is performed; and after *all* the certificates have been opened, the counting of the votes is *then to commence and be concluded.*" *Id.* at 95 (emphasis in original).

determine what votes offered are legal, and what votes may be void, as an inseparable incident to the power of counting?"[262] He concluded that the "Constitution makes us the managers or canvassers to count the electoral votes, and in doing so gives us the power to say whether a vote presented is or is not legal."[263] Those who advocated a "thin" conception of the counting function were in the minority. Senator Toucey put the point best in his statement that "[t]he whole proceeding of counting is based on the idea merely of disclosing to the public in a safe, authentic way, the actual state of the vote; and when that is ascertained truly, the President who is chosen by that vote is President, let Congress do what it may."[264]

Finally, the nature of the counting function occupied a prominent position in the debates over the Electoral Count Act. The positions taken are well summarized by the statements of Senator Edmunds, who supported the Electoral Count Act, and Senator Bayard, who opposed it. Senator Edmunds was of the view that a vote

> must mean a legal vote, a vote which is in accordance with the provisions of the Constitution of the United States and in accordance with the laws which have existed for so many years respecting the method by which and the time within which the vote of each State is to be expressed and returned.[265]

Senator Bayard pointed out the implications of Senator Edmunds's view. He asked:

> Were the two houses of Congress ever intended to become the judges of the electoral vote of the people of this country? Apparently by the Constitution their duties would seem to be of a ministerial character only. They were to stand by and witness the counting, and their presence in that way as witnesses was supposed to be a security. Now you change this from a merely ministerial power into a judicial power of the very gravest and most important character. Is there a warrant for that in the Constitution of the United States?[266]

262. *Id.* at 140; *see also id.* at 112 (remarks of Sen. Toombs) ("When we are called upon to see these votes counted, it becomes our first duty to know what are the votes to be counted.").

263. *Id.* at 140.

264. *Id.* at 134.

265. *Id.* at 456; *see also id.* at 531 (remarks of Sen. Boutwell) (stating his belief that "the counting of the votes, in the language of the Constitution, means something more than a mere examination of the certificates returned from the electors of the respective States").

266. *Id.* at 523 (remarks of Sen. Bayard).

In sum, there is considerable historical support for both the "thin" and "thick" conceptions of the counting function. An answer to the scope of Congress's counting power is informed by the "when" and "where" of counting, issues which we shall take up next.

d. When Is the Counting Done?

The Electoral College Clauses contain an immediacy principle and for good reason. The relevant text of the Constitution provides that once the President of the Senate has opened all of the Certificates, "the votes shall *then* be counted."[267] This is the immediacy principle of the Electoral College Clauses. Another part of this clause reinforces this immediacy principle. In case of electoral deadlock, the House of Representatives is to "immediately" choose the next President from those on the list.[268]

The word "immediately" has special significance in the Electoral College Clauses.[269] According to Senator Pinckney, the word "immediately" in this Clause means "instantly, and on the spot, without leaving the House in which they are then assembled, and without adjournment."[270] He explained that the word was inserted to guard against the possibility of domestic intrigue and foreign influence at the Seat of Government of the United States:

> [T]he election by the House of Representatives taking place *immediately* after the votes have been opened and counted, that body would go to the election free and uninfluenced [by leaders of domestic intrigue and foreign emissaries], as they ought. And is not this, sir, safer; is it not better than that the smallest delay should take place in determining it? . . . [I]t will be less dangerous to the public interest, that even one who may not be the most qualified of the five, should be elected, than that Congress should adjourn to deliberate on it, and thus expose themselves, and the best interests of their constituents, to the secret and artful attacks that will be made on their integrity.[271]

---

267. U.S. CONST. amend. XII (emphasis added).

268. *Id.*

269. The word "immediately" is rare in the original Constitution, and is used in only one other clause of the original Constitution. *See* U.S. CONST. art. I, § 3, cl. 2 ("Immediately after they shall be assembled in Consequence of the first Election, they shall be divided as equally as may be into three Classes.").

270. *See* 10 ANNALS OF CONG. 137 (1800).

271. *See id.* at 138 (emphasis added). The Twelfth Amendment, adopted in 1804, also contains a requirement that the House of Representatives shall "immediately" choose a President. However, the Twelfth Amendment seems to significantly soften—and perhaps quash—Senator Pinckney's immediacy principle. The Twelfth Amendment, unlike the

At the Philadelphia Convention of 1787, James Wilson echoed Senator Pinckney's observation and his underlying rationale. He noted that "if the election be made as it ought as soon as the votes of the electors are opened & it is known that no one has a majority of the whole, there can be little danger of corruption."[272] In a letter to the Washington Federalist, "Horatius" advised that

> [t]he choice is required to be *immediately made*, in order that the result may be declared in the presence of the Senate, and to prevent the possibility of intrigue and corruption. The choice must be therefore made before the house adjourns or disperses, and after the convention of the Senate and House of Representatives terminates, the house cannot at a future day act upon this subject.[273]

---

original Electoral College Clauses, provides that "if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice-President shall act as President, as in the case of the death or other constitutional disability of the President." U.S. CONST. amend. XII, *amended by* U.S. CONST. amend. XX, § 3. Federal law, at the time of the adoption of the Twelfth Amendment, specified that the counting of electoral votes would take place on the second Wednesday in February. Thus, the Twelfth Amendment seems to countenance up to two weeks of deliberation by the House of Representatives. William Alexander Duer made the point that

> [a]lthough the Constitution directs that when no person is found to have a majority of the Electoral votes, the choice shall be *immediately* made by the House of Representatives, yet it is not held obligatory upon that House to proceed to the election directly upon the separation of the two Houses; but that it may proceed either at that time and place, or omit it until afterwards. This construction was adopted before the [Twelfth Amendment], and there can now be no doubt of its correctness, as the amendment expressly declares the choice of the House to be valid, if made before the fourth of March following the day on which the Electoral votes are counted.

DUER'S COMMENTARIES, *supra* note 19, at 89–90.

If we read the immediacy principle as loosely as Professor Duer suggests, the current Constitution seems to countenance exactly seventeen days of deliberation by the House of Representatives. *See* U.S. CONST. amend. XX, § 1 ("The terms of the President and Vice President shall end at noon on the 20th day of January, and the terms of Senators and Representatives at noon on the 3d day of January, . . . and the terms of their successors shall then begin.").

It should be noted that the Twelfth Amendment does not specify when the Senate shall choose the Vice President should the choice devolve upon it. Could it be that the framers of the Twelfth Amendment simply forgot to add comparable language for the Senate? *See also* 1 KENT'S COMMENTARIES, *supra* note 19, at *278 ("The [C]onstitution does not specifically prescribe when or where the [S]enate is to choose [V]ice-[P]resident, if no choice be made by the electors; and, I presume, the [S]enate may elect by themselves, at any time before the fourth day of March following."). It goes without saying that the current Constitution seems to countenance exactly seventeen days of deliberation by the Senate. *See* U.S. CONST. amend. XX, § 1.

272. 2 FARRAND, *supra* note 35, at 502.

273. Horatius, *The Presidential Knot*, WASH. FEDERALIST, Jan. 6, 1801 [hereinafter Horatius Letter]. I am grateful to Professor Ackerman for providing me with a copy of

The immediacy principle implies that the counting agent may not delay in counting the electoral votes. The "then" requirement militates against the deliberative aspects of counting and the judging of the electoral votes. After all, judicial determinations take time.

The Electoral Count Act does not violate the immediacy principle. 3 U.S.C. § 17 puts strict time limits on the electoral count: when the two Houses separate to debate an objection to an electoral vote, each Member of each House may only speak once on the objection for a maximum of five minutes, and total debate in each House is limited to two hours.[274] Although this provision does not violate the immediacy principle, it is *patently* unconstitutional—Congress may not bind by statute either House in the rules of its proceedings.[275] As we shall see next, the "then" requirement also has

---

Horatius's letter. Professor Ackerman believes that "Horatius" is John Marshall, a conclusion which he (tentatively) reaches based on a computer analysis of Marshall's writings (performed with his linguist friend, Roger Shuy), and based on other "old-fashioned circumstantial evidence," including a snippet from Marshall historian Albert J. Beveridge. *See* Email from Bruce Ackerman to Vasan Kesavan (Apr. 17, 2002) (on file with author).

274. 3 U.S.C. § 17 (2000) provides that

> When the two Houses separate to decide upon an objection that may have been made to the counting of any electoral vote or votes from any State, or other question arising in the matter, each Senator and Representative may speak to such objection or question five minutes, and not more than once; but after such debate shall have lasted two hours it shall be the duty of the presiding officer of each House to put the main question without further debate.

275. *See* U.S. CONST. art. I, § 5, cl. 2 (Rules of Proceedings Clause) ("Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two[-]thirds, expel a Member."). Anyone who wishes to argue that the Electoral Count Act is constitutional faces the most difficult task in justifying the constitutionality of 3 U.S.C. § 17.

During the Electoral Count Act debates, Senator Christiancy noted the constitutional problem. "I notice," said Christiancy,

> that this bill, which it is proposed to make an act of Congress, provides for the length of the time that any Senator or Representative may speak when the Senate is acting separately and the House is acting separately. I wish to know if that is not trenching upon the constitutional power of each house to make its own rules to regulate its own proceedings.

COUNTING ELECTORAL VOTES, *supra* note 3, at 688 (1876). Senator Thurman responded to the point with an entirely unconvincing answer:

> The joint rule heretofore adopted prohibited all debate, and it seems to have been held good. No question was ever made in respect of that rule. If we have the right to legislate upon this subject, as I think we have—and this whole bill goes upon that foundation—then I think we have a right to regulate the mode of procedure so that it shall not be defeated, as it otherwise might be, by the consumption of time in speaking."

*Id.* Senator Edmunds, for his part, rightly noted that "[t]hen you might pass a law as to all bills." *Id.*

an implication for *where* the counting (and any potential judging) of electoral votes takes place.

e. Where Is the Counting Done?

The Electoral College Clauses provide that the lists of electoral votes from the several states are to be "directed to the President of the Senate"[276] and that "[t]he President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted."[277] These clauses are the font of two mutually reinforcing "where" principles: the publicity principle and the unicameralism principle.

The publicity principle is easy to identify. The President of the Senate is not supposed to open all of the certificates behind closed doors, but is only to do so "in the *presence* of the Senate and House of Representatives."[278] Although this phrase does not necessarily modify the subsequent vote counting phrase as a grammatical matter, the Constitution almost certainly requires that the counting of the votes take place in an equally public manner.[279] Moreover, there is an

---

276. U.S. CONST. art. II, § 1, cl. 3. This language is likely a vestige of early drafts of the Electoral College Clauses which vested the choice of a President and Vice President in case of electoral deadlock in the Senate. *See, e.g.*, 2 FARRAND, *supra* note 35, at 497–98. There is a reasonable functional explanation as to why the Framers kept this requirement. The Framers believed that the Senate would be in *almost* constant session anyway, unlike the House of Representatives. *See, e.g.*, *id.* at 274 (remarks of George Mason) (observing that Senators "will probably settle themselves at the seat of Govt." unlike Representatives "chosen frequently and obliged to return frequently among the people"); *id.* at 523 (remarks of James Wilson) ("The Senate, will moreover in all probability be in constant Session."); *id.* at 537 (remarks of George Mason) (supporting privy council of six members to the President on basis that it would "prevent the constant sitting of the Senate which he thought dangerous"); *id.* at 639 (remarks of George Mason) (referring to "long continued sessions of the Senate"); GEORGE MASON, OBJECTIONS TO THE CONSTITUTION OF GOVERNMENT FORMED BY THE CONVENTION (1787), *reprinted in* 2 THE COMPLETE ANTI-FEDERALIST 11 (Herbert J. Storing ed., 1981) (referring to Senate as "a constant existing Body almost continually sitting"); Essay XVI of Brutus (Apr. 10, 1788), *reprinted in id.* at 444 (stating that Senators "will for the most part of the time be absent from the state they represent" and that Senators will be inhabitants of the "federal city").

277. U.S. CONST. art. II, § 1, cl. 3.

278. U.S. CONST. amend. XII (emphasis added). Interestingly, an early draft of the Electoral College Clauses at the Philadelphia Convention provided that "[t]he President of the Senate shall *in that House* open all the certificates; and the votes shall be then & there counted." 2 FARRAND, *supra* note 35, at 497–98 (emphasis added).

279. Indeed, the secret drafting history of the Constitution shows that when the "in presence" phrase was agreed to, it was inserted *after* the word "counted" in the draft of the Electoral College Clauses, thus modifying both the opening of certificates and the counting of votes. *See* 2 FARRAND, *supra* note 35, at 518, 526. When the report was produced, however, the text was re-ordered and read: "The President of the Senate shall in the presence of the Senate and House of Representatives open all the certificates & the votes shall then be counted." *Id.* at 528; *see also* COUNTING ELECTORAL VOTES, *supra*

excellent functional reason why the Senate and the House of Representatives are required to be present for the electoral count: if there should be no winner under the electoral college mode of presidential and vice presidential election, the duty of choosing the President devolves upon the House of Representatives, and the duty of choosing the Vice President devolves upon the Senate.[280]

Under the publicity principle, the secret proceeding contemplated by the Grand Committee Bill would have been grossly unconstitutional.[281] During the Wisconsin Incident of 1857, Senator Thompson thought the idea of the publicity principle "was that we were not to go into executive session, nor, by some secret cabal or clandestine arrangement, get together here and have a *coup d'etat*, and make a President."[282] Thus, the elections of 1801 and 1825, in which the House of Representatives chose the President in closed-door proceedings, were also grossly unconstitutional.[283]

---

note 3, at 451 (1875) (remarks of Sen. Frelinghuysen) ("The Constitution says that the votes shall then in the presence of the Senate and House of Representatives be counted."); 1 TUCKER'S COMMENTARIES, *supra* note 19, app. at 327 ("The certificates . . . are to be publicly opened, and counted in the presence of the whole national legislature: . . . ."); Horatius Letter, *supra* note 273 ("The constitution has enjoined that the certificates of the electors shall be opened, and their votes counted *in the presence of the Senate, and House of Representatives.*") (emphasis in original); 18 CONG. REC. 45 (1886) (remarks of Rep. Dibble) (noting that the counting of electoral votes takes place in the presence of the Senate and House of Representatives).

280. *See* U.S. CONST. amend. XII. For an eloquent expression of this point, see 18 CONG. REC. 30 (remarks of Rep. Caldwell).

281. For an eloquent expression of the publicity principle, see 10 ANNALS OF CONG. 145 (1800) where Senator Pinckney remarked:

> Give, however, the power of deciding on their votes, and of rejecting or receiving them, as they please, to thirteen men, all of the same political description, all wishing the same men, sitting with closed doors, and whose deliberations are removed from the public eye, and you will find it difficult to avoid just suspicion; your jealous citizens will remember that secrecy always accompanies corruption, and that even if this committee were to act in the most honorable manner, yet still that the friends of the candidate whose votes have been refused, if such refusal cost him his election, will never cease to suspect that all has not been fair, and that some improper reason had influenced the decision.

282. COUNTING ELECTORAL VOTES, *supra* note 3, at 126 (1857); *see also id.* at 452 (remarks of Sen. Frelinghuysen) ("Why, sir, are the House and the Senate present? It is because they represent the sovereignty of the Government at that most critical moment when the executive power is to be transmitted, and they are there that the transmission may be under their watchful guardianship.").

283. Professor Glennon seems to think that closed proceedings are constitutionally permissible, but not constitutionally desirable. *See* GLENNON, *supra* note 18, at 48 (discussing question of "Open or Closed Proceedings?"). This is a seriously flawed reading of the Electoral College Clauses, which emphasize publicity, and of the original Constitution in its entirety, which emphasizes the same. *See, e.g.*, U.S. CONST. art. I, § 5, cl. 3 (Journal of Proceedings Clause); U.S. CONST. art. I, § 7, cl. 2 (Veto Clause); U.S. CONST. art. I, § 9, cl. 7 (Receipts and Expenditures Clause); U.S. CONST. art. II, § 2, cl. 1

The publicity principle probably extends to the choosing of a President and a Vice President in case of electoral deadlock as well. Although the Constitution does not explicitly specify, it probably requires that the House of Representatives "immediately" choose the President in the presence of the Senate,[284] and that the Senate "immediately" choose the Vice President in the presence of the House.[285] This mode of presidential and vice presidential selection maximizes legitimacy.

The question is what the publicity principle implies for the *judging* of electoral votes. A narrow view of the publicity principle is that the Members of Congress come together to ensure the proper aggregation of the electoral votes. During the Wisconsin Incident of 1857, Representative Orr urged a broader view, arguing that the publicity principle is the font of congressional power to reject "illegal" electoral votes:

> Suppose the result of the election would depend on the vote of [Wisconsin]: how would it be possible to declare who was elected until it had been decided whether or not that vote was to be received? Who is to decide that? The Constitution and the laws require that the two houses shall

(Opinion Clause); U.S. CONST. art. II, § 2, cl. 3 (Commissions Clause); U.S. CONST. art. III, § 3, cl. 1 (Treason Clause); *see also* Harrison, *supra* note 23, at 705 (noting that "a public occasion for the [electoral] count will inspire public confidence in the probity of the process"); *cf.* PA. CONST. OF 1776, § 13 ("The doors of the house in which the representatives of the freemen of this state shall sit in the general assembly, shall be and remain open for the admission of all persons who behave decently, except only when the welfare of this state may require the doors to be shut.").

284. *See, e.g.*, 10 ANNALS OF CONG. 137 (remarks of Sen. Pinckney) (describing immediacy principle as "instantly, and on the spot, *without leaving the House in which they are then assembled*, and without adjournment") (emphasis added); 2 FARRAND, *supra* note 35, at 518–19 (describing motion of James Madison that, in case of electoral deadlock, two-thirds of Senators be present *in presence of the Senate and the House of Representatives* to choose the President; motion passed by a vote of six to four and was subsequently rendered moot by motion to vest choice of President in case of electoral deadlock in House of Representatives); Horatius Letter, *supra* note 273 ("The choice is required to be immediately made, *in order that the result may be declared in the presence of the Senate*, and to prevent the possibility of intrigue and corruption.").

Although the Twelfth Amendment relaxed the immediacy principle (giving the House of Representatives additional time to choose a President in case of electoral deadlock, *see supra* note 271), it is much less clear that it also relaxed the publicity principle. It appears that the House of Representatives chose the President in the presence of the Senate in 1801 and 1825. *See* 1 KENT'S COMMENTARIES, *supra* note 19, at *277 (noting that the Senate was "admitted to be present as spectators"); DUER'S COMMENTARIES, *supra* note 19, at 90 (similar).

285. This principle was violated in the electoral count of 1837. The Senate chose the Vice President because of electoral deadlock but did so in the Senate Chamber and not in the presence of the House of Representatives in joint convention.

> meet in joint convention, and that the votes of the electors of the several States shall be opened and counted before them.
>
> This, in my judgment, confers upon them the *power* to determine whether a vote be valid or invalid. Otherwise it is a mere farce if they are called on only to witness the counting. The counting might just as well be done by the Vice-President or the President of the Senate, without the presence of the two houses. But it is to guard against an illegal vote being counted that the two houses are required to be assembled together.[286]

This brings us to the second "where" principle: unicameralism. The Constitution requires that the two Houses of Congress come together for the purpose of opening all the electoral certificates and counting the electoral votes. This practice has been followed for all of our electoral count history. In the first and second presidential elections, the Senate and the House of Representatives assembled in the Senate Chamber for the opening and counting of the electoral votes, and in all subsequent elections, the Senate and the House have assembled in the House Chamber.[287]

The unicameralism principle suggests that any power to judge electoral votes is vested in the one body which is present when the electoral certificates are opened and when the electoral votes are counted[288] and is to be resolved on a per capita vote basis.[289] The

286. COUNTING ELECTORAL VOTES, *supra* note 3, at 90 (emphasis added); *see also id.* at 114 (remarks of Sen. Butler) ("The Senate of the United States is called into the other house as a corporate body, an imposing corporate body, to be a witness to the election of the Chief Magistrate of this country, and to see that the votes are counted fairly."); *id.* at 452 (remarks of Sen. Frelinghuysen) (supporting amendment to Twenty-second Joint Rule) ("Why, sir, are the House and the Senate present? It is because they represent the sovereignty of the Government at that most critical moment when the executive power is to be transmitted, and they are there that the transmission may be under their watchful guardianship.").

287. Under the current Electoral Count Act, the President of the Senate and Members of Congress are to meet in the Hall of the House of Representatives. *See* 3 U.S.C. § 15 (2000). During the Wisconsin Incident of 1857, Senator Thompson declared his belief that the intent of the Framers was to make the House of Representatives present as witnesses in the Senate Chamber. *See* COUNTING ELECTORAL VOTES, *supra* note 3, at 126.

288. In congressional debate, this one body has been repeatedly referred to as a "convention" or a "joint convention" of the two Houses, although the Constitution does not employ this word. There were, of course, those who disagreed with this term. *See, e.g.*, COUNTING ELECTORAL VOTES, *supra* note 3, at 111 (remarks of Sen. Stuart).

289. The unicameralism principle, without more, does not require that the counting function be exercised by the Senators and Representatives in the unicameral body on a per capita vote basis. The Senate and House of Representatives could, presumably without undue trouble, organize themselves and vote as separate bodies while convened

Electoral Count Act violates the unicameralism principle because it provides that, upon objection to an electoral vote in the joint assembly, the two Houses of Congress shall separate and independently decide on the legality of that electoral vote,[290] thereby giving *equal* weight to the decision of the Senate and House of Representatives. One implication of the unicameralism ("where") principle and the immediacy ("when") principle is that the resolution of any electoral count questions cannot be vested in any judicial tribunal. Senator Morton put this point nicely in debates over the Electoral Count Act:

> Then and there. You cannot refer to any other tribunal; you cannot get the case before the Supreme Court of the United States or before any special court to be created for that purpose. These votes are then to be opened, and then and there they are to be counted.[291]

The secret drafting history of the Constitution suggests the unicameralism principle. When the Committee of Eleven proposed the electoral college mode of presidential election, the draft provided that, "The President of the Senate shall in that House open all the certificates; and the votes shall be *then & there* counted" by the Senate.[292] This clause was later amended to include the phrase "in the presence of the Senate and House of Representatives" and the "& there" language was dropped.[293] However, there is very little reason to suppose that the counting was not to occur in that single body of Senators and Representatives.[294]

---

together in one room. For present purposes, I define the unicameralism principle as counting electoral votes on a per capita vote basis (equivalent to the Senate and House of Representatives voting by joint ballot), thereby giving Representatives a decisive advantage over Senators in resolving disputes in the counting of electoral votes. As we shall see presently, this conception of the counting function makes better sense of constitutional structure.

290. 3 U.S.C. § 15.

291. COUNTING ELECTORAL VOTES, *supra* note 3, at 529. Also, Senator Boutwell remarked that:

> There can be, under the Constitution, no tribunal to decide that or any other question arising in the course of counting the votes, because it is a duty imposed upon the two [H]ouses of Congress. They alone can perform it, and they have not the power to transfer its performance to anybody else.

*Id.* at 531.

292. 2 FARRAND, *supra* note 35, at 497–98 (emphasis added).

293. *See id.* at 528.

294. As a background principle, it might be said that the Framers shied away from separate action by the two Houses in electing the President when both Houses were involved. Before the Framers agreed to the electoral college mode of election, the President was to be elected by the Legislature—not the two Houses of Congress acting separately—but by *joint ballot.* 2 FARRAND, *supra* note 35, at 401–03. The rationale was

There is ample historical support for the unicameralism principle. In the Sixth Congress, Representative and Framer Albert Gallatin moved to amend the Grand Committee Bill to provide that any decision on the legality of an electoral vote would be made by a majority of the Members of Congress *then* present at the electoral count.[295] After a long debate, this motion fell just two votes shy of passing.[296] Senator Baldwin, in his remarks on January 23, 1800, recognized that the Senators and Representatives would "me[e]t together in one room" to receive the electoral votes and "to judge only of its authentication."[297] Senator Pinckney, in his remarks on March 28, 1800, also recognized the unicameralism principle, but nevertheless argued that Congress had no power to reject electoral votes.[298] Other senators also supported the unicameralism principle. The preamble of their proposed alternative to the Grand Committee Bill provided that the Senators and Representatives assembled for the purpose of the electoral count form a single tribunal, with the number of Senators and Representatives from each state equal to the number of electors from each state.[299]

---

to avoid the "[g]reat delay and confusion [which] would ensue if the two Houses shd [sic] vote separately, each having a negative on the choice of the other." *Id.* at 402 (remarks of Nathaniel Gorham).

The Framers thought that a joint ballot was particularly important in one other area. Both the draft of the Constitution referred to the Committee of Style and its report provided for the appointment of the Treasurer of the United States by joint ballot of the Congress. *See id.* at 570 (draft referred to Committee of Style) (stating that Congress shall have power "[t]o appoint a Treasurer by joint ballot"); *id.* at 594 (report of Committee of Style) (first provision of precursor to U.S. CONST. art. I, § 8) ("The Congress may by joint ballot appoint a treasurer."). This provision was subsequently deleted on September 14, 1787, just three days before the Philadelphia Convention of 1787 completed its business. *See id.* at 614.

295. Specifically,

> A motion of Mr. Gallatin was under consideration to insert, instead of the principle that in cases of doubt the Houses should divide to their respective Chambers to consider the qualification or disqualification of a vote or votes, from their joint meeting, if such question should arise at counting the votes, the following words: "And the question of the exception shall *immediately*, and without debate, be taken by yeas and nays, and decided by a majority of the members of both Houses then present."

COUNTING ELECTORAL VOTES, *supra* note 3, at 26 (emphasis added).

296. *Id.* During the Electoral Count Act debates, Representative Adams made note of Representative Gallatin's motion in 1800 in support of his argument for unicameral action. *See* 17 CONG. REC. 51 (1886) (remarks of Rep. Adams).

297. COUNTING ELECTORAL VOTES, *supra* note 3, at 16.

298. *See* 10 ANNALS OF CONG. 139 (1800) ("Congress shall not themselves, even in joint convention, have the smallest power to decide on a single vote."); *id.* ("[H]ow utterly unconstitutional it would be for Congress, either acting in their separate chambers or in convention, to attempt to assume to themselves the power to reject a single vote.").

299. *See* 10 ANNALS OF CONG. 120.

In later years, those who have supported congressional control over electoral votes have voiced the unicameralism objection to the Electoral Count Act. For example, during the Missouri Incident, Representative Archer, emphasizing the "then" immediacy requirement of the electoral count, stated:

> He was opposed to this House undertaking to proceed in any manner as to the legality of the electoral votes. He could recognize no power in the House of Representatives on this subject separate from the Senate.... Does it not follow that the votes must be counted in the presence of the two Houses? For what purposes do they assemble together unless it be to determine on the *legality* of the votes. If not for this purpose, the joint meeting is for form and show and nothing else. We must, in my apprehension, determine the question in joint meeting, and in no other way.[300]

However, Senator Rufus King disagreed, stating that he was "opposed to the settlement of any litigated question in joint meeting, where the Senate, as a body, would be lost; and argued that whenever any such should arise, it would be always proper that the two Houses should separate."[301]

During the Wisconsin Incident, Senator Pugh made a strong argument in favor of the unicameralism principle. He believed that the joint convention was the proper forum to settle the Wisconsin problem because:

> The whole number of Senators and Representatives taken together is equal to the whole number of electors in all the colleges. It is exactly the same body of men in number, equal to all of them. All the States, if they had voted there yesterday through their Senators and Representatives, would have exercised the precise power which they exercised in the election of President.[302]

---

300. COUNTING ELECTORAL VOTES, *supra* note 3, at 54; *see also id.* at 52 (remarks of Rep. Henry Clay) (implying joint action by the two Houses because the two Houses might disagree if they met separately and "then the votes would be lost altogether").

301. *Id.* at 49.

302. *Id.* at 137. Senator Cass presented the argument against the unicameralism principle:

> I wish to submit a single remark to the President and to the Senate, for I do not consider that this convention can be addressed. We can take no vote. How are we to vote? *Per capita* or by States? Are we to vote as representatives of the people or representatives of States? If we cannot vote here, we cannot discuss. The only thing which remains for us to do, if there are insuperable difficulties in the way, is to adjourn immediately to our respective halls. Then let the Senate or the House of Representatives bring up the matter for action. By the present proceeding we are overturning the Government—we are making this a national

Even if the joint convention was a single tribunal—a court of last resort, according to Senator Pugh—the question remained as to how the voting should take place within the joint convention. Senator Pugh stated his belief that the voting should be *per capita*.[303] Representative Orr, speaking before the House of Representatives, concurred: "Who was to decide on the validity of the challenged vote? The two [H]ouses in joint convention by a *per capita* vote."[304] However, the textual argument against this position is that the Electoral College Clauses provide that the counting take place "in the Presence of the Senate and House of Representatives"—not "in the Presence of Senators and Representatives," suggesting that the counting function is to be exercised by the Senate and the House of Representatives acting separately in their corporate capacities, not by Senators and Representatives acting together in a single corporate capacity.

Representative Orr, however, offered one additional structural argument in support of the per capita vote in the joint convention, an argument that answers Senator King's objection during the Missouri Incident that the power of the Senate would be "lost" in the joint convention. He pointed out that the "[s]enatorial electors" in the electoral colleges "possess[ed] no power or dignity superior to those representing the congressional districts."[305] Given this observation, the per capita vote made perfect sense: the Senate would have the same power in the joint convention that the senatorial electors had in the electoral colleges.

During the Electoral Count Act debates, Senator Thurman succinctly expressed the unicameralism principle: "The Constitution is 'and the votes shall then be counted;' that is, shall be counted right there, in the presence of the two [H]ouses. That is what the Constitution requires .... They are not to be counted elsewhere.

---

convention.

*Id.* at 91. Senator Toucey remarked that "[i]f there is to be any action, or deliberation with a view to action, the two houses must separate, deliberate, and act separately." *Id.* at 121.

303. *Id.* at 137.

304. *Id.* at 140. Representative Humphrey Marshall—Justice John Marshall's cousin—agreed:

> We have a constitutional duty to see that the count is properly made, and a separate resolution passing from this House to the Senate, and from the Senate back to this House, does not, according to my view, meet the requirements of the Constitution. The examination must be made, and the proclamation must be made, in the presence of the two houses.

*Id.* at 141.

305. *Id.* at 140.

They are to be counted then and there."[306] Several years later, Senator George made a particularly compelling structural argument for unicameral action in judging electoral votes. His argument was that the counting function "is not a legislative function which ought to be considered separately by the two Houses, but it is rather in the nature of a judicial function,"[307] and therefore the two Houses of Congress "should adopt that form in the performance of that [judicial] duty which would enable us to discharge it."[308] Invoking the image of a court, he stated:

> Why, certainly, sir, it would be an anomaly in jurisprudence, it would be an anomaly surely in Anglo-Saxon jurisprudence, that for the ascertainment of a single fact, the rendering of an operative judgment upon the ascertainment of a fact should be committed to two separate tribunals, each acting independently of the other, and each having a veto upon the other. By that sort of tribunal no judicial function has ever been performed. We require unanimity in juries, that twelve men shall agree to a verdict, but they are one body; they consult and confer with each other, and they arrive at a conclusion as the result of that conference; but nobody ever proposed to have two juries to try a case. We have a court sometimes composed of an even number of judges, and the result may be a division between the judges, and there may be a provision or there may be none, for one or the other to rule the case; but it has never been that two courts having equal power can be charged with the determination of the same case.[309]

Under Senator George's structural analogy, the number of jurors in the single body is precisely equal to the number of electors. This argument has some intuitive appeal. Indeed, the Democratic House of Representatives in 1884 passed a substitute version of the Electoral Count Act bill, which provided for the unicameral resolution of issues during the electoral count on a per capita vote basis, but the Democratic Senate did not agree.[310] This is not to say that the unicameralism principle was uncontroversial. During the Electoral Count Act debates, there were Members of Congress who strongly objected to the unicameralism principle,[311] and who believed that the

306. *Id.* at 465.

307. 17 CONG. REC. 2429 (1886) (remarks of Sen. George).

308. *Id.*

309. *Id.*

310. *See* 15 CONG. REC. 5460–68, 5547–51 (1884); 16 CONG. REC. 1618 (1885).

311. *See, e.g.*, 17 CONG. REC. 1058 (remarks of Sen. Evarts) (stating that the joint

counting function should be exercised by the two Houses acting separately in their corporate capacities.[312]

In sum, the unicameralism principle makes better sense, especially as a matter of immediacy, publicity, and jury-like structure. As we shall soon see, the unicameralism principle also avoids the presentment problem of the Electoral Count Act.[313]

2. Where Is the Font of Power?

As we have seen, the Electoral College Clauses are best interpreted as vesting the counting function in the joint convention and not the President of the Senate. Let us assume for present purposes that Congress may by law bind the joint convention in counting electoral votes—this assumption, as we shall see, is no small assumption.[314] Where is the font of power to pass the Electoral Count Act? In a Constitution of enumerated and hence limited powers,[315]

---

convention would be "wholly an unconstitutional assemblage" and that "I can find no ground to support this extra assemblage of the two Houses voting per capita"); Representative Caldwell remarked:

> It will be perceived that this bill is not predicated upon the idea of throwing the two Houses into convention and merging the smaller body, the Senate, into the larger body, the House of Representatives, and voting *per capita*. It is submitted that no constitutional warrant can be found for such an idea.

18 CONG. REC. 31 (1886). Representative Herbert remarked:

> The words are not in the presence of the members of the Senate, or in the presence of the members of the House of Representatives, but in the presence of the Senate, which can only mean the organized Senate, and the House of Representatives, which can only mean the organized House of Representatives.

*Id.* at 75.

312. For example, Representative Caldwell stated that

> the action of the two Houses shall be separate and concurrent upon all questions of contest arising under the count, but joint as to results, thus preserving the dignity and rights of the two bodies by conceding to each equal and concurrent powers in counting and judging of the validity of electoral votes without merger of the lesser body into the numerically greater.

18 CONG. REC. 31. Addtionally,

> [t]he separate concurrent action of both Houses provided for in the bill preserves the constitutional identity, rights, and dignity of each. This concession of each House to the other of equal and concurrent power to decide on informalities and illegalities appearing on the face of returns, upon objection of a Senator or Representative, is necessary to the determination of results.

*Id.*; *see also id.* at 50 (remarks of Rep. Adams) ("[M]y theory is that the two Houses of Congress, acting each in its own individual capacity, each voting by itself, have absolute control of the entire subject.").

313. *See infra* notes 526–53 and accompanying text.

314. For the structural argument that Congress may not bind the joint convention in counting electoral votes, much less future joint conventions, see *infra* notes 498–525 and accompanying text.

315. *See, e.g.*, McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 405 (1819) ("This

we must ask ourselves under what clause or clauses Congress has the express or implied power to pass the Electoral Count Act. A dedicated constitutionalist cannot escape from asking this most basic question of the Electoral Count Act.

There is, of course, no express power enabling Congress to pass the Electoral Count Act.[316] There must therefore be some implied power enabling Congress to pass the Electoral Count Act; otherwise, it must be unconstitutional. There are only two options: the Necessary and Proper Clause[317] and the Electoral College Clauses themselves.[318] Will either of these clauses bear the constitutional load?

---

government is acknowledged by all to be one of enumerated powers."); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176 (1803) ("[T]hat those limits may not be mistaken, or forgotten, the constitution is written.").

316. This easy textual point was, of course, made during the Electoral Count Act debates. For example, Senator Jones remarked that

> [t]he authority proposed to be given to the Senate and House of Representatives by this bill cannot surely be derived from any of the express powers of the Constitution. There is not a word said in the article which contains the delegated powers on this subject of counting the electoral votes. All that the Constitution says in regard to the electoral vote is to be found embodied in the second article.

COUNTING ELECTORAL VOTES, *supra* note 3, at 596.

317. U.S. CONST. art. I, § 8, cl. 18.

318. The most recent scholars to address the Electoral Count Act state that "Congress probably has the power, when explicit constitutional requirements are violated, not to count elector votes" because Members of Congress take an oath or affirmation to support the Constitution. Ross & Josephson, *supra* note 7, at 713. This argument does not support the constitutionality of the Electoral Count Act unless the Oath or Affirmation Clause is the font of power for the Electoral Count Act—an interpretation that is devoid of any textual, historical, or structural support.

It is also not at all clear whether Ross and Josephson believe that the Oath or Affirmation Clause is the font of congressional *power* or congressional *duty* to reject unconstitutional electoral votes. Their foregoing statement suggests the former, but two other statements suggest the latter. *See id.* ("Depending on the type of constitutional requirement and whether rejection of the vote would change the result of the election, Congress might have a duty, under the oath of office to which its members swear, to reject an elector vote that does not conform to the Constitution."); *id.* at 739 ("Under the oath each member takes, Congress *must* uphold constitutional requirements for presidential elections, particularly those that lie at the heart of the constitutionality of the process.") (emphasis added). If the Oath or Affirmation Clause is the font of congressional duty to reject unconstitutional electoral votes, they cannot be correct that that duty possibly turns "on the type of constitutional requirement and whether the rejection of the vote would change the result of the election." The duty to support the Constitution is absolute, not conditional.

Moreover, the argument from the Oath or Affirmation Clause has almost no historical support: only one Member of Congress, to my knowledge, pointed to the Oath or Affirmation Clause as a font of congressional power over the electoral count. *See* COUNTING ELECTORAL VOTES, *supra* note 3, at 142 (remarks of Rep. Marshall) ("You are under oath to support the Constitution, and you cannot count a vote which violates that instrument, and is a breach of the privileges of the electoral colleges."). The

a. The Necessary and Proper Clause

The first possible font of congressional power to pass the Electoral Count Act is the Necessary and Proper Clause. The Necessary and Proper Clause provides that Congress shall have power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."[319] Scholars are split as to whether the Necessary and Proper Clause is a font of power for the Electoral Count Act.[320]

A careful parsing of the Necessary and Proper Clause reveals that there are three prongs of power. Under the Clause, Congress has power for carrying into execution (1) "the foregoing Powers," (2) "all other Powers vested by this Constitution in the Government of the United States," and (3) "all other Powers vested by this Constitution . . . in any Department or Officer thereof."[321] Which of these three prongs of the Necessary and Proper Clause will support Congress's power to enact the Electoral Count Act?

We begin with the first prong. The phrase "foregoing Powers" obviously refers to the seventeen enumerated powers of Article I,

---

argument has even less textual support: when we consult the text of the Oath or Affirmation Clause, we see that Members of Congress take an oath or affirmation to support the Constitution, but so do members of the state legislatures and executive and judicial Officers of the United States and of the several states. U.S. CONST. art. VI, cl. 3. Indeed, Senator Pinckney pointed to the oaths or affirmations taken by members of the state legislatures and state executives to argue against any congressional power to judge electoral votes. *See, e.g.*, 10 ANNALS OF CONG. 131 (1800) ("Is not the Constitution the supreme law of the land, and must not the State Legislatures conform their directions in the appointment of Electors to the directions of the Constitution?"). Senator Pinckney also remarked:

> Another serious objection to this bill, or to the exercise of this power, either by Congress or committee, is, that the Executives of the States and the State Legislatures are equally bound with Congress, by oath, "to support the Constitution;" it is an oath they all take at the commencement of each new Legislature.

*Id.* at 144–45. The important point is that there is no textual justification for supposing that the Oath or Affirmation Clause gives Congress any special constitutional duty in the counting of the electoral vote. *Cf.* U.S. CONST. art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation.").

319. U.S. CONST. art. I, § 8, cl. 18.

320. *Compare* Burgess, *supra* note 18, at 646 (concluding that the Necessary and Proper Clause is the font of power for the Electoral Count Act), *with* Ross & Josephson, *supra* note 7, at 714–15 (reaching opposite conclusion).

321. As a matter of grammar and punctuation, it is arguable that there is no standalone second prong of the Necessary and Proper Clause, and that the second prong and third prong together constitute one prong.

section 8,[322] and the Electoral College Clauses of the original Constitution are not "foregoing Powers" in any way given their placement in Article II. The first prong of the Necessary and Proper Clause will not suffice as a font of power for the Electoral Count Act.

Let us, for the moment, skip over the second prong and consider the third prong. The question is whether Congress (more precisely, the assemblage of the Senate and House of Representatives for the purposes of the electoral count) is a "Department [of the United States]" whose members are "Officer[s] [of the United States]."[323] The answer to this question is "No." Congress is not a "Department" and the Members of Congress are not "Officer[s]" within the meaning of the Necessary and Proper Clause.

It is well settled that the Members of Congress are not "Officers of the United States."[324] The best textual argument for this proposition is that Members of Congress are not subject to impeachment by the House of Representatives and conviction by the Senate because they are not "civil Officers of the United States."[325] Furthermore, the Ineligibility Clause of Article I, Section 6 provides that "no Person holding any *Office under the United States*, shall be a *Member* of either House during his Continuance in Office."[326] Thus,

322. U.S. CONST. art. I, § 8, cls. 1–17; *see also* INS v. Chadha, 462 U.S. 919, 983–84 (1983) (White, J., dissenting) (stating that "the Necessary and Proper Clause vests Congress with the power 'to make all laws which shall be necessary and proper for carrying into Execution the foregoing powers [the enumerated powers of § 8]' ") (alteration in original).

323. Technically, the third prong of the Necessary and Proper Clause refers to "Department" or "Officer" and not to "Department of the United States" or "Officer of the United States." The phrase "of the United States" is fairly and necessarily attributed to both given the last word in the clause "thereof." *See* U.S. CONST. art. I, § 8, cl. 18 (stating that Congress shall have power "[t]o make all Laws which shall be necessary and proper for carrying into Execution . . . all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof"). At least one scholar agrees that the word "Officer" in the Necessary and Proper Clause is "a synonym for the term of art 'Officer of the United States.' " Steven G. Calabresi, *The Political Question of Presidential Succession*, 48 STAN. L. REV. 155, 161 (1995).

324. *See, e.g.*, LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 4-17, at 290 (2d ed. 1988); Amar & Amar, *supra* note 27, at 114–17 (presenting textual proof); Calabresi, *supra* note 323, at 158–63 (same); Vasan Kesavan, *The Very Faithless Elector?*, 104 W. VA. L. REV. 123, 133 n.46 (2001) (same).

325. *See* U.S. CONST. art. II, § 4 ("The President, Vice President, and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."). For early statements supporting this point, see, for example, 4 ELLIOT'S DEBATES, *supra* note 250, at 33 (remarks of Gov. Samuel Johnston at North Carolina ratifying convention); *id.* at 34 (remarks of Archibald Maclaine at North Carolina ratifying convention); *id.* at 127 (remarks of James Iredell at North Carolina ratifying convention).

326. U.S. CONST. art. I, § 6, cl. 2 (emphasis added); *see also* 2 FARRAND, *supra* note 35,

the Members of Congress are not "Officer[s]" within the meaning of the Necessary and Proper Clause.

The question remains whether Congress is a "Department [of the United States]" within the meaning of the Necessary and Proper Clause, even if Members of Congress are not "Officer[s] [of the United States]" within the meaning of the same. This is a trickier question, but not one without an answer. The word "Department" in the Necessary and Proper Clause has a technical, term of art meaning. It does not refer to the generic legislative, executive, and judicial departments of the United States—as used in *The Federalist*[327] or in the early United States Reports[328]—but only refers to the specific executive and judicial departments of the United States. The Constitution itself suggests as much. The word "Department" does not appear elsewhere in Article I (which appertains to the legislative department in the colloquial sense) but in the Necessary and Proper Clause; the word does appear in two other clauses—the Opinion Clause[329] and the second part of the Appointments Clause[330]—which refer to "executive Departments" and "Heads of Departments" respectively. Nowhere is the word "Department" used in the Constitution to refer to the legislative, executive, or judicial department in the colloquial sense.

There are at least a few other considerations which militate against finding that Congress is a "Department" within the meaning of the Necessary and Proper Clause. First, it would be very strange

---

at 492 ("The last clause rendering a *Seat* in the Legislature & an *office* incompatible was agreed to nem: con:.") (emphasis added).

327. *See, e.g.*, THE FEDERALIST NO. 49 (James Madison) (entitled "Method of Guarding Against the Encroachments of Any One Department of Government by Appealing to the People Through a Convention"); THE FEDERALIST NO. 49, at 282 (James Madison) (Clinton Rossiter ed., Mentor 1999) (1961) (describing "perfectly co-ordinate" legislative, executive, and judicial departments); *see also* Steven G. Calabresi & Kevin H. Rhodes, *The Structural Constitution: Unitary Executive, Plural Judiciary*, 105 HARV. L. REV. 1153, 1156 n.6 (1992) (noting similar point).

328. *See, e.g.*, Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 329 (1816) (Story, J.) ("The object of the constitution was to establish three great departments of government; the legislative, the executive, and the judicial departments."); Ware v. Hylton, 3 U.S. (3 Dall.) 199, 272–73 (1796) (Iredell, J.) (referring to the "Legislative, Executive, and Judicial Departments" and the "Legislative department"); Calder v. Bull, 3 U.S. (3 Dall.) 386, 398 (1789) (Iredell, J.) (referring to "a government, composed of Legislative, Executive and Judicial departments").

329. U.S. CONST. art. II, § 2, cl. 1 ("[The President] may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices . . . .").

330. U.S. CONST. art. II, § 2, cl. 2 ("[B]ut the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.").

(but perhaps not unthinkable) for Members of Congress not to be "Officer[s]," but for Congress to be a "Department" within the meaning of the Necessary and Proper Clause. The logical argument is that "If Department, then Officer" is true, then "If not-Officer, then not-Department" is also true. The Necessary and Proper Clause ostensibly relates to "Officers" who are "Officers of Departments" who are, in turn, "Officers of Departments of the United States," or simply "Officers . . . of the United States." Second, if Congress is a "Department" within the meaning of the Necessary and Proper Clause, then Congress would be able to legislate with respect to itself on matters concerning its own powers.[331] Such legislation flies in the face of constitutional text. The Rules of Proceedings Clause makes explicit that "[e]ach House may determine the Rules of its Proceedings."[332] Congress may not therefore enact rules of proceedings for Congress or each House thereof by statute.[333] Such legislation also violates constitutional structure. The separation of the two Houses of Congress in the exercise of its powers—in a word, bicameralism—is a critical structural feature of Article I designed to check legislative tyranny.[334] Moreover, constitutional structure suggests that Congress may not bind itself or future Congresses in the exercise of its own powers.[335] Third, the prevailing interpretation of the third prong of the Necessary and Proper Clause appears to be that it only refers to the executive and judicial departments of the United States.[336] Thus, Congress (more precisely, the assemblage of the

---

331. Such legislation is to be sharply distinguished from legislation enacted pursuant to Congress's enumerated powers operating on, for example, the federal government (including Congress) as well as the governments of the several States as well as the people (citizens and aliens) of the United States.

332. U.S. CONST. art. I, § 5, cl. 2.

333. For a contrary view taken in passing, see Calabresi, *supra* note 323, at 160 n.31 (noting that the "Necessary and Proper Clause empowers Congress to carry into execution its own powers, including the rule-making powers of both Houses").

334. *See, e.g.*, THE FEDERALIST NO. 51, at 290 (James Madison) (Clinton Rossiter ed., Mentor 1999) (1961) ("In republican government, the legislative authority necessarily predominates. The remedy for this inconveniency is to divide the legislature into different branches; and to render them, by different modes of election and different principles of action, as little connected with each other as the nature of their common functions and their common dependence on society will admit."); 1 FARRAND, *supra* note 35, at 254 (similar); 2 STORY'S COMMENTARIES, *supra* note 9, §§ 547–557, at 27–36 (discussing importance of bicameralism in constitutional structure); *see also* INS v. Chadha, 462 U.S. 919, 947–51 (1983) (same).

335. *See infra* notes 498–525 and accompanying text.

336. *See, e.g.*, Gary Lawson & Patricia B. Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*, 43 DUKE L.J. 267, 274 n.23 (1993) (reading third prong of the Necessary and Proper Clause as giving Congress power to pass laws " 'horizontally' to implement the constitutionally vested powers of federal

Senate and House of Representatives for the purposes of the electoral count)[337] is not a "Department" whose members are "Officers" within the meaning of the Necessary and Proper Clause. The third prong of the Necessary and Proper Clause also will not suffice as a font of power for the Electoral Count Act.[338]

Only the second prong of the Necessary and Proper Clause remains: Congress shall have power "[t]o make all Laws which shall be necessary and proper for carrying into Execution . . . all other Powers vested by this Constitution in the Government of the United States."[339] The question is thus whether the counting function is one

---

executive and judicial officers"); William Van Alstyne, *The Role of Congress in Determining Incidental Powers of the President and of the Federal Courts: A Comment on the Horizontal Effect of the Sweeping Clause*, 40 LAW & CONTEMP. PROBS., 102, 107–120 (1976).

337. Although this body is technically not "Congress," the argument that this body is not a "Department" whose members are "Officer[s]" within the meaning of the Necessary and Proper Clause is largely analogous to the argument set forth above concerning Congress. The members of this body are the Members of Congress, and this body is not an executive or judicial department of the United States whose officers (with the exception of the President and Vice President) are appointed pursuant to the Appointments Clause, U.S. CONST. art. II, § 2, cl. 2.

338. Professor Rosenthal believes the Necessary and Proper Clause is the font of congressional power not to count the electoral votes of faithless electors. *See* Rosenthal, *supra* note 221, at 32. His fatal mistake is that he believes that Members of Congress are "Officers of the United States." *See id.* ("The power to count electoral votes is a power vested in the President of the Senate and the members of both [H]ouses of Congress, all of whom are officers of the United States.").

Similarly, during the Electoral Count Act debates, Senator Edmunds believed that Congress was a "Department" within the meaning of the Necessary and Proper Clause. His words leave no doubt on this construction:

> The Constitution of the United States vests powers and duties in all the three great departments of the Government. It then provides that Congress shall have the power to pass all laws necessary to carry into effect the provisions of the Constitution and the powers invested in any of its several departments.
>
> . . . [I]f under your general power of regulation which the Constitution gives you of carrying into effect its powers you may provide how the Supreme Court shall exercise its functions, how the Executive shall exercise his functions carrying out the duties that the Constitution has imposed upon him, may you not also do the same thing when, assuming that to be the true construction of the Constitution, the two houses are to meet and witness the counting of these votes and to decide upon them? It seems to me that no man can considerately answer that question in the negative.

COUNTING ELECTORAL VOTES, *supra* note 3, at 455.

339. Again, this begs the question whether there is a standalone second prong of the Necessary and Proper Clause. *See supra* note 321. The only power vested by the Constitution in the "Government of the United States" as an undifferentiated whole (in contrast to powers vested in specific parts thereof) is that (arguably) under the Guarantee Clause. *See* U.S. CONST. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature

of the "Powers vested by this Constitution in the Government of the United States."

The textual evidence strongly militates against such a finding. Consider again the text of the Electoral College Clauses: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates *and the votes shall then be counted.*"[340] Obviously, the Electoral College Clauses do not employ the word "Power," unlike two other clauses outside of Article I, section 8 which do employ the word "Power" with respect to Congress—the Treason Clause and Territories Clause.[341] Moreover, the text and tenor of the Electoral College Clauses suggest duty and not discretion implied by the word "Power"—hence the use of the word "shall," and more interestingly, the use of passive voice.

There are, however, several clauses outside of Article I, section 8 where Congress has "Power" in the Article I, section 8 sense of the word, but which do not employ the word "Power." But these clauses make clear that Congress has legislative power by employing the phrase "may by law" or the phrase "shall by law" or their close variants. In the original Constitution, we need only to look to the Times, Places, and Manner Clause,[342] Presidential Succession Clause,[343] the second part of the Appointments Clause,[344] the Jury

---

cannot be convened) against domestic Violence."). Nonetheless, for present purposes, I assume that there are other "Powers vested by this Constitution in the Government of the United States" that are not "Powers vested by this Constitution . . . in any Department or Officer [of the Government of the United States]." U.S. CONST. art. I, § 8, cl. 18.

340. U.S. CONST. amend. XII (emphasis added).

341. *See* U.S. CONST. art. III, § 3, cl. 2 (Treason Clause) ("The Congress shall have *Power* to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.") (emphasis added); U.S. CONST. art. IV, § 3, cl. 2 (Territories Clause) ("The Congress shall have *Power* to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . .") (emphasis added).

342. *See* U.S. CONST. art. I, § 4, cl. 1 (Times, Places, and Manner Clause) ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress *may at any time by Law* make or alter such Regulations, except as to the Places of chusing Senators.") (emphasis added).

343. *See* U.S. CONST. art. II, § 1, cl. 6 (Presidential Succession Clause) ("Congress *may by Law* provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President . . . .") (emphasis added).

344. *See* U.S. CONST. art. II, § 2, cl. 2 (Appointments Clause) ("[B]ut the Congress *may by Law* vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.") (emphasis added).

Trial Clause,[345] and the Full Faith and Credit Clause[346] as examples of the former; and to the Census Clause,[347] the Congress Meeting Clause,[348] and the first part of the Appointments Clause[349] as examples of the latter. But, unlike these several clauses, there is no "may by law" or "shall by law" provision modifying the counting function.[350]

When the Constitution commits "Power" to Congress outside of Article I, Section 8, it says so. It is more than doubtful that the seven word phrase "and the votes shall then be counted" is one of the "Powers vested by this Constitution in the Government of the United States" within the meaning of the Necessary and Proper Clause.[351] As

---

345. *See* U.S. CONST. art. III, § 2, cl. 3 (Jury Trial Clause) ("[B]ut when not committed within any State, the Trial shall be at such Place or Places as the Congress *may by Law* have directed.") (emphasis added).

346. *See* U.S. CONST. art. IV, § 1 (Full Faith and Credit Clause) ("And the Congress *may by general Laws* prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.") (emphasis added).

347. *See* U.S. CONST. art. I, § 2, cl. 3 (Census Clause) ("The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they *shall by Law* direct.") (emphasis added).

348. *See* U.S. CONST. art. I, § 4, cl. 2 (Congress Meeting Clause) ("The Congress shall assemble at least once in every Year, and such Meeting shall be on the first Monday in December, unless they *shall by Law* appoint a different Day.") (emphasis added).

349. *See* U.S. CONST. art. II, § 2, cl. 2 (Appointments Clause) ("[The President] by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which *shall be established by Law* . . . .") (emphasis added).

350. Another example that does not neatly fit into the "may by law" or "shall by law" categories is the Congress Compensation Clause. U.S. CONST. art. I, § 6, cl. 1 ("The Senators and Representatives shall receive a Compensation for their Services, to be ascertained *by Law*, and paid out of the Treasury of the United States.") (emphasis added).

351. Nevertheless, a few scholars recently describe the counting phrase of the Electoral College Clauses as the "congressional counting power," *see* Coenen & Larson, *supra* note 18, at 909–16, or the "counting power," *see* Barkow, *supra* note 17, at 278–79, 284, 286, 288 (2002). This phraseology is wrong, at least insofar as the word "Power" is used in the Constitution. The word "power" implies discretion to do or not do something. The Electoral College Clauses are devoid of "power"; they direct the counting agent to count what-are-the-electoral-votes *and* not to count what-are-not-the-electoral-votes—nothing less and nothing more. (The scope of what-are-the-electoral-votes is discussed in Part III *infra*.) The phraseology is also odd considering that Professors Coenen and Larson acknowledge that "[t]here is not . . . a congressional *power* to count votes; there is a congressional *duty*," Coenen & Larson, *supra* note 18, at 910, emphasizing the word "shall" and the passive voice of the phrase "be counted" in the text of the counting phrase, *see id.* at n.298. Notably, Professors Coenen and Larson reject the argument that the counting phrase of the Electoral College Clauses is one of the "Powers vested by this Constitution in the Government of the United States," U.S. CONST. art. I, § 8, cl. 18, and hence not within the meaning of the Necessary and Proper Clause:

Case 1:20-cv-03791-JEB Document 22-6 Filed 02/05/21 Page 25 of 62



a matter of principled textual interpretation, the second prong of the Necessary and Proper Clause also will not suffice as a font of power to enact the Electoral Count Act.

* * *

What about the historical interpretation of the Necessary and Proper Clause? To be sure, the questions of whether the counting function is one of the "Powers vested by this Constitution in the Government of the United States" within the meaning of the Necessary and Proper Clause and whether the Necessary and Proper Clause is the font of power for congressional regulation of the electoral count has been the subject of significant debate by Members of Congress. These questions were controversial from the first.

The Senate of the Sixth Congress first debated these questions in considering the Grand Committee Bill.[352] After Federalist Senator Ross moved to appoint a committee authorized to report a bill, Senator Brown disagreed. He "was of opinion that this was a subject on which Congress had no right to legislate. When the Constitution undertook to make provisions on a subject, if they were found incomplete, or defective, they must be remedied by recommending an amendment to the Constitution."[353] Federalist Senator Dexter expressed no doubt that the Necessary and Proper Clause authorized legislation on the subject. "The law now proposed," said Dexter,

---

> We would reject this first argument on the theory that the vesting of a duty, particularly one as important as determining the identity of our President, inescapably carries with it the grant of a "power" in the sense that the word is used in the Necessary and Proper Clause. Indeed, we think that there is a strong *a fortiori* argument to be made here. If Congress can do anything appropriate to carry into effect powers it may (but need not) exercise, does it not logically follow that it can do anything appropriate to carry out those powers it has no choice but to wield? The recognition of the existence of less urgently needed powers logically dictates the recognition of more urgently needed powers as well.

Coenen & Larson, *supra* note 18, at 910 (footnotes omitted). This argument fails to persuade for at least a few reasons. First, this argument overlooks the linguistic meaning of the word "Power" as employed in the Necessary and Proper Clause and the rest of the original Constitution. Second, this argument does not grapple with the argument that Congress may not legislate with respect to itself under the Necessary and Proper Clause, *see* text accompanying *supra* notes 331–38. Third, this argument mischaracterizes the Necessary and Proper Clause as a broad-based grant of power to carry into effect all duties imposed on Congress, or for that matter, on the executive and judicial departments of the federal government. If Congress "can do anything appropriate to carry into effect powers *it* may (but need not) exercise," Coenen and Larson, *supra* note 18, at 910 (emphasis added), what about Congress doing anything appropriate to carry into effect those "powers" (read duties) that the executive and judicial departments possess but have no choice but to wield?

352. *See* 10 ANNALS OF CONG. 29–32 (1800).

353. *Id.* at 29.

"appears to be necessary to carry into effect the power of appointing the President; it is therefore clearly Constitutional."[354] His argument may be that just as certain powers may give rise to implied powers, certain duties may give rise to implied powers reasonably necessary to give effect to those duties.

Was Senator Dexter correct? Is there a "power of appointing the President" in the Electoral College Clauses? So too Federalist Senator Livermore "never felt less doubt on any subject that the one now under consideration: the Constitution has given many directions to the appointment of the President, some of which he read."[355] Unfortunately, the recorded debate does not indicate what provisions Senator Livermore read—perhaps for good reason. There is nothing in the Electoral College Clauses that suggests that Congress has any power to regulate the electoral count. Senator Baldwin, who was a Framer at the Philadelphia Convention, disagreed with the Federalists on virtually every point. In a detailed speech, much of which we shall uncover in the course of the structural argument, Senator Baldwin stated that the Federalists' efforts to regulate the electoral count "must be made by proposing an amendment to the Constitution to that effect; and that they could not be made by law, without violating the Constitution."[356] In other words, there was no express or implied power in the Constitution to regulate the electoral count by law. Senator Baldwin took particular issue with Senator Dexter's conception of the Necessary and Proper Clause. Senator Baldwin explained that the Necessary and Proper Clause

> speaks of the use of the powers *vested* by the Constitution—this resolution relates to the formation of a competent and essential part of the Government itself: that speaks of the movements of the Government after it is organized; this relates to the organization of the Executive branch, and is therefore clearly a Constitutional work, and to be done, if at all, in the manner pointed out by the Constitution, by proposing an article of amendment to the Constitution on that subject.[357]

Senator Baldwin's statement is a particularly fine textual meditation based on the word "vested" in the Necessary and Proper Clause. If we look intratextually, we see that the word "vested" appears alongside the word "Power" in each of the Vesting Clauses of

---

354. *Id.* at 30.
355. *Id.*
356. *Id.* at 32.
357. *Id.* (emphasis added).

Articles I, II, and III.[358] If the second prong of the Necessary and Proper Clause is a placeholder of sorts for the legislative, executive, and judicial powers of the United States read as a whole, then the second prong cannot support the Electoral Count Act. The Electoral College Clauses are not a part of the legislative power or the judicial power, and as Senator Baldwin keenly observed, they are not a part of (and are antecedent to) the executive power.

The Necessary and Proper Clause resurfaced some twenty years later in the regulation of the electoral count. In December of 1820, approximately two months before the electoral count of 1821, Senator Wilson introduced a resolution entitled, "*Attempt to Remedy the Uncertainty as to Counting the Electoral Vote by Legislation*."[359] He discussed the Necessary and Proper Clause as the font of congressional power to regulate the electoral count and stated that

> Congress has unquestionably the power, under the last clause of the eighth section of the first article of the Constitution, and he thought they ought to exercise it by vesting the authority to decide upon doubtful, disputed, or unlawful votes, either in the President of the Senate, the Senate itself, the House of Representatives, or the two houses conjointly or separately.[360]

This statement reflects some serious problems with the scope of congressional power to regulate the electoral count under the Necessary and Proper Clause. Even if Congress may enact counting legislation under the Necessary and Proper Clause vesting the "counting power" in both Houses of Congress (conjointly or separately), how may Congress vest such power in either House alone? And how may Congress vest such power in the President of the Senate, possibly expanding the constitutional duties of the Vice President? The Committee of the Judiciary, which considered Senator Wilson's resolution, seemed to think that counting legislation was constitutional but merely inexpedient, and hence Senator Wilson's resolution was not acted upon.[361]

---

358. *See* U.S. CONST. art. I, § 1 ("All legislative *Powers* herein granted shall be *vested* in a Congress of the United States, which shall consist of a Senate and House of Representatives.") (emphasis added); U.S. CONST. art. II, § 1, cl. 1 ("The executive *Power* shall be *vested* in a President of the United States of America.") (emphasis added); U.S. CONST. art. III, § 1 ("The judicial *Power* of the United States, shall be *vested* in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.") (emphasis added).

359. COUNTING ELECTORAL VOTES, *supra* note 3, at 48.

360. *Id.*

361. *Id.* (remarks of Sen. Smith, member of Committee of the Judiciary) (reporting

Little was said about the application of the Necessary and Proper Clause to counting electoral votes in the years immediately following 1820. Senator Van Buren introduced a bill in the Senate in 1824 that was very similar to the Electoral Count Act.[362] Senator Macon did not think that this bill was necessary or constitutional and argued that "Congress had no power to legislate upon the subject" of Senator Van Buren's bill.[363] This bill passed the Senate but the House never considered it.

During the Wisconsin Incident of 1857, Senator Hunter invoked the Necessary and Proper Clause as the font of power "to regulate by law the details of the mode in which the votes are to be counted."[364] But Senator Collamer expressed his serious doubts that Congress could legislate on the Wisconsin problem: "I very much doubt whether the [F]ramers of the Constitution ever intended to leave the subject of the presidential election to the House of Representatives, or the Senate, or either, or both of them."[365] This statement echoes Senator Wilson's observations on the scope of congressional power to regulate the electoral count under the Necessary and Proper Clause.

During the Electoral Count Act debates, the Members of Congress repeatedly pointed to the Necessary and Proper Clause as the font of power to pass the Electoral Count Act. It does appear that these Members of Congress relied on this clause as the font of power to pass the Electoral Count Act.[366] As Professors Issacharoff,

---

"[t]hat the committee have had the resolution under their consideration, and are of opinion that it is inexpedient at this time to legislate on this subject").

362. *Id.* at 57–58.

363. *Id.* at 58.

364. *Id.* at 129.

365. *Id.* at 132.

366. *See, e.g.*, 15 CONG. REC. 5461 (1884) (remarks of Rep. Springer) ("If Congress may make all laws which are necessary to carry into effect the powers granted by the Constitution, it may make such laws as it may deem necessary to carry out that express provision of the Constitution, to count the votes for President and Vice-President."). Senator Sherman argued:

> Congress has undoubted power under the residuary clause in the Constitution giving powers to Congress to pass all laws suitable and necessary to carry into execution the express grants of power. Here is a provision in the Constitution for the election of electors, and therefore the mode and manner by which the votes of electors may be counted may be pointed out, but Congress shall not provide that the votes shall *not* be counted, because the Constitution says that the votes shall be counted then and there.

17 CONG. REC. 817 (1886); *see* 18 CONG. REC. 30 (1886) (remarks of Rep. Caldwell) ("This bill is to prescribe the mode in which this count shall be made, and supply the omission that exists[,] under the first article of the Constitution, which gives Congress all power to make all laws necessary to carry out these provisions."); *id.* at 74 (remarks of Rep. Baker) ("It is conceded that [the Necessary and Proper Clause] is a delegation to

Karlan, and Pildes conclude, "A majority of Congress was persuaded by the argument that the Act was permitted under the Necessary and Proper Clause to give substance to the provisions of the Twelfth Amendment."[367]

There were, of course, those who disagreed with this interpretation of the Necessary and Proper Clause. For example, Representative Browne explicitly denied that the counting function was a "power" in the Article I, Section 8 sense of the word—a point that would implicitly apply to the word "power" in the Necessary and Proper Clause as well:

> The [F]ramers of the Constitution withheld from Congress the power to interfere with this count; they withheld it by not committing the power to do it. When the Constitution confers a power it does so in express words, as Congress shall have power to borrow money, collect taxes, regulate commerce, coin money, and the like. By no words, by no implication, has the power been given Congress to settle questions concerning the electoral count.[368]

---

Congress of power to provide for carrying into effect the power to open and count the votes of the electors lodged in the President of the Senate."). Representative Eden remarked:

> In providing by law a method to insure a fair count of the electoral vote we need exercise no doubtful powers. The Constitution requires the vote to be counted. I assume that Congress has the authority under the Constitution to pass all laws necessary to carry into effect that mandate of the Constitution.

*Id.* at 50. Representative Herbert made the point that

> [T]he Constitution vests in the Federal Government the power to count the votes; and the exercise of that power is a Federal function, to be controlled by the Federal Government.... A power has been given, and it is perfectly plain that the Constitution vests in Congress the power to enact what legislation is necessary and proper to carry out the purposes of the provision granting the power.

*Id.* at 75.

367. ISSACHAROFF ET AL., *supra* note 16, at 98.

368. 15 CONG. REC. 5465; *see also* 18 CONG. REC. 45 (remarks of Rep. Dibble). Representative Dibble, carefully parsing the Necessary and Proper Clause, stated:

> It is true there is a clause which says that Congress has the right to pass all laws necessary to carry out certain powers; but those powers are defined. It has the power to carry out its own express grants of power. It has the right to pass laws concerning any act of the Federal Government; but the election of a President is not an act of the Federal Government, but is the action of the State Government. It has the right to pass laws concerning what any Federal officer shall do or what any Federal department shall do; but there its power is exhausted. So that Congress has no power in relation to the electoral vote except to count, in the sense of enumeration.

*Id.*

And Senator Wilson made known his belief that "defects in the Constitution of the United States can not be remedied by acts of Congress."[369] At a minimum, several Members of Congress, including those who voted for the Electoral Count Act, had significant doubts with respect to its constitutionality.

The Necessary and Proper Clause is not a font of power for the Electoral Count Act. The counting function is neither one of the "foregoing Powers," nor "Powers vested by this Constitution in the Government of the United States," nor "Powers vested by this Constitution . . . in any Department or Officer [of the United States]" within the meaning of the Necessary and Proper Clause. Put differently, congressional regulation of the electoral count, however "necessary," is not "proper"—and hence not within Congress's domain or jurisdiction—within the meaning of the Necessary and Proper Clause.[370] In case there should be any doubt on this point, the structural argument makes clear that doubt should be resolved against Congress in the specific context of presidential election.[371] The Electoral Count Act treads on terribly thin textual ground vis-à-vis the Necessary and Proper Clause, and to the only remaining possible font of implied power, we now turn.

b. The Electoral College Clauses

The second possible font of congressional power to enact the Electoral Count Act is the Electoral College Clauses themselves. There are at least two historical precedents for this supposition. First, the First Congress encountered the very tricky problem of specifying the oath or affirmation for state legislators and officers under the

369. 17 CONG. REC. 1058; *see also id.* at 1059 (arguing that "a power vested by the Constitution [cannot] be divested by legislative action"). Senator Ingalls fervently stated in words that ring true today:

> Careful consideration of this subject will convince any thoughtful student of the Constitution that the scheme which has been devised and which now remains in our organic law is fatally defective, and that nothing can be done by way of legislation to cure the inevitable evils by which it is surrounded, and the more we proceed by legislation to patch, to bridge over apparent difficulties, to abbreviate the number of perils which surround it, by so much we retard and delay the exercise of the power which the people must ultimately be called upon to perform in adopting some system that shall remove the perils in which it is now environed.

*Id.* at 1026.

370. For an illuminating discussion of the "jurisdictional meaning" of the word "proper" in the Necessary and Proper Clause, see Lawson & Granger, *supra* note 336, at 297–326.

371. *See infra* notes 428–554 and accompanying text.

Oath or Affirmation Clause.[372] None of the three prongs of the Necessary and Proper Clause was thought to apply. The Oath or Affirmation Clause is not a foregoing power or one of the powers vested by the Constitution in the government of the United States, and state legislators and officers are by definition not officers of the United States. The First Congress simply concluded that the Oath or Affirmation Clause was "self-executing," and prescribed an oath or affirmation for these persons anyway.[373] Second, much later, the Supreme Court affirmed Congress's ability to enact legislation under the Fugitive Slave Clause which appears to be self-executing.[374] The rationale for this decision was that the Fugitive Slave Act is a "direct implementation" of the Fugitive Slave Clause and therefore does not go beyond the provisions of the clause.[375]

What does this mean for the Electoral Count Act? Two questions arise: whether some congressional regulation of the electoral count may be sustained under the Electoral College Clauses and whether the Electoral Count Act may be sustained under the Electoral College Clauses.[376]

---

372. *See* U.S. CONST. art. VI, cl. 3 ("The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution . . . .").

373. *See* David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. CHI. L. SCH. ROUNDTABLE 161, 169–71 (1995); *see also* Kent Greenfield, *Original Penumbras: Constitutional Interpretation in the First Year of Congress*, 26 CONN. L. REV. 79, 111–15 (1993) (building on Professor Currie's then-unpublished manuscript).

374. U.S. CONST. art. IV, § 2, cl. 3 provides:

> No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered upon Claim of the Party to whom such Service or Labour may be due.

*Id.*; *see* Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539, 596–97 (1842) (holding that the Fugitive Slave Act of 1793 was constitutional).

375. *See* Printz v. United States, 521 U.S. 898, 909 (1997). But oddly, and in what is a most tortured interpretation of the Constitution, the Supreme Court has held that legislation which is not a "direct implementation" of the Fugitive Slave Clause—that is, legislation that goes beyond the substance and procedure of the clause—is a constitutional exercise of congressional power under the Full Faith and Credit Clause which provides that "Congress may by general Laws prescribe the Manner in which such Acts, Records, and Proceedings shall be proved, and the Effect thereof." U.S. CONST. art. IV, § 1; *see* Printz, 521 U.S. at 909 n.3 (1997) (citing California v. Superior Court of Cal., San Bernardino Cty., 482 U.S. 400, 407 (1987)).

376. Indeed, Professor Currie has suggested that some congressional regulation of the electoral count may be supported on this "implicit" view of the Electoral College Clause. *See* Currie, *supra* note 35, at 620 n.73.

Article II, Section 1, Clause 3 and the Twelfth Amendment seem to be at least as self-executing as the Oath or Affirmation Clause or the Fugitive Slave Clause. Indeed, Article II, Section 1, Clause 3 is by far the longest "clause" in the original Constitution, containing approximately 290 words, compared to the next longest clause with approximately 165.[377] These two clauses look more like technical rules than the open-textured provisions such as the Privileges and Immunities Clause, Due Process Clause, and Equal Protection Clause of the Fourteenth Amendment.[378] These two clauses could hardly be more prolix for constitutional provisions. Professor Gardner offers the following account:

> Presumably, these detailed instructions reflect society's determination that the use of the particular process set forth will assure a result sufficiently accurate to justify society's consent to the winner.... This provision of the Constitution is unusual: it is rare for the people to dictate in such detail the manner in which they would like things done. More typical is article I, section 4, governing congressional elections....[379]

In addition to this point of prolixity, consider also that the Electoral College Clauses, and especially the Twelfth Amendment, contain no special provision empowering Congress to enforce it by appropriate legislation, in contrast to a host of other (and admittedly later) amendments to the Constitution.[380]

Apparently, the Second Congress did not think that Article II, Section 1, Clause 3 was fully self-executing given the regulations on the manner of certifying and transmitting electoral votes.[381] However, it is unclear whether the Second Congress based these regulations on the implied power of Article II, Section 1, Clause 4 and or of Article II, Section 1, Clause 3. Recall that the draft of Article II, Section 1, Clause 4 at the Philadelphia Convention provided that "[t]he Legislature may determine the time of choosing the electors, and of their giving their votes; *and the manner of certifying and transmitting their votes*—But the election shall be on the same day throughout the

---

377. *See* U.S. CONST. art. I, § 2, cl. 3.

378. *See* U.S. CONST. amend. XIV, § 1.

379. James A. Gardner, *Consent, Legitimacy and Elections: Implementing Popular Sovereignty Under the Lockean Constitution*, 52 U. PITT. L. REV. 189, 229 (1990).

380. *See* U.S. CONST. amend. XIII, § 2; U.S. CONST. amend. XIV, § 5; U.S. CONST. amend. XV, § 2; U.S. CONST. amend. XVIII; § 2; U.S. CONST. amend. XIX, § 2; U.S. CONST. amend. XXIV, § 2; U.S. CONST. amend. XXVI, § 2.

381. *See supra* notes 32–34 and accompanying text.

U—States"[382] and that the italicized language was inexplicably dropped.[383] To be sure, regulations on the manner of certifying and transmitting their votes do not support regulations on the electoral count.

The problem of binding future joint conventions aside,[384] some congressional regulation of the electoral count may easily be supported under the Electoral College Clauses. For example, a regulation providing that the joint convention count electoral votes in the alphabetical order of States in the Union probably would be constitutionally acceptable. The real issue is whether Congress had the legislative authority to pass the Electoral Count Act in the first place.

The Electoral Count Act goes well beyond the text of the Electoral College Clauses. The Electoral Count Act is by no means a "direct implementation" of the Electoral College Clauses. During the Electoral Count Act debates, Senator Jones made the argument from prolixity that Congress did not have the power to legislate:

> That [second] article provides the mode and manner of returning and counting that vote. If it was intended that Congress should exercise authority over this subject by general legislation, why is it that the Constitution, instead of giving as in other cases a general power to Congress, has anticipated such legislation by a lengthy provision specifying particularly the manner in which the voice of the electors shall be ascertained? It was not the intention of the Constitution to leave to Congress the power to determine how the President and Vice-President should be elected. This is clearly indicated by the express words of the first section of the second article.[385]

It is more than doubtful that the Electoral Count Act could be sustained as a direct implementation of the Electoral College Clauses. If the Electoral Count Act passes constitutional muster as a direct implementation of the Electoral College Clauses, it is most difficult to see what would constitute an indirect—and constitutionally-impermissible—implementation of those clauses.

---

382. 2 FARRAND, *supra* note 35, at 529 (emphasis added).
383. *See supra* note 36 and accompanying text.
384. *See infra* notes 498–525 and accompanying text.
385. COUNTING ELECTORAL VOTES, *supra* note 3, at 596–97.

c. Textual Arguments from Negative Implication

Two textual arguments from negative implication cast additional doubt upon any font of congressional power for the Electoral Count Act, and particularly the implied font of congressional power of the Electoral College Clauses itself. When the Constitution contemplates a legislative role for Congress with respect to the Presidency, it says so—twice.

First, consider Article II, Section 1, Clause 4 which provides that "[t]he Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States."[386] This clause contains the sole grant of power to Congress in the Electoral College Clauses. The argument from negative implication gains momentum when we remember that the Electoral College Clauses were drafted as a whole. Indeed, the original draft of Article II, Section 1, Clause 4 was a part of Article II, Section 1, Clause 3 which contains the counting function.[387] There is little reason to believe that the omission of any express legislative power in Article II, Section 1, Clause 3 was accidental.

Senator Eaton made much of the negative implication during the Electoral Count Act debates:

> Turn over to paragraph 3 of the same section and what do you find there? The only *power* that Congress has is here: "The Congress"—may do what? After the state has done its duty, "The Congress may determine"—what? "The time of choosing the electors and the day on which they shall give their votes; which day shall be the same throughout the United States." That is all the *power*. The very keeping of that *power* excludes every other idea of *power*. Every other idea of *power* belongs to the states, is in the states.[388]

---

386. U.S. CONST. art. II, § 1, cl. 4.

387. *See* 2 FARRAND, *supra* note 35, at 497–98.

388. Burgess, *supra* note 18, at 636 (emphasis added). Senator Jones made a similar point:

> This clause shows that they weighed this subject with great care, and that they thought it necessary not to leave to Congress any implied power over the election of President.
>
> Now, sir, the power to decide whether the votes of two or ten States shall or shall not be counted is a far more important and delicate power than that given to Congress in express terms to fix the time of choosing the electors. And am I not warranted in saying that, if the Constitution intended that Congress should have any more extended power than is conferred by this clause, it would have said so in plain language?

COUNTING ELECTORAL VOTES, *supra* note 3, at 597.

Second, consider the Presidential Succession Clause of Article II which provides that

> [i]n Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.[389]

This clause too was placed alongside the Electoral College Clauses in the Framers' draft Constitution and was later rearranged by the Committee of Style.[390] There is little reason to believe that the omission of any express legislative power in Article II, Section 1, Clause 3 was accidental.

The prolix Electoral College Clauses provide that "the Votes shall then be counted"—not, "the Votes shall then be counted as Congress may by Law have directed." The Framers could have so provided but they did not.

### 3. The Intratextual Argument

There is more to the textual argument against the Electoral Count Act than the sparse words of the Electoral College Clauses—much more. An Article II-centric focus on presidential election is too narrow. We can squeeze yet more meaning from the Electoral College Clauses and Congress's role in presidential election when we consider the text of the Constitution as a coherent whole. When we do so, we see that Congress has a role in presidential election, but Congress has a role in congressional elections as well. We may obtain important clues about Congress's role in presidential election by comparing and contrasting it with Congress's role in congressional elections. This intratextual analysis reveals two arguments that strongly militate against the constitutionality of the Electoral Count Act. These two arguments relate to two clauses in Article I: the Times, Places, and Manner Clause and the House Judging Clause.

---

389. U.S. CONST. art. II, § 1, cl. 6.

390. *See* 2 FARRAND, *supra* note 35, at 573 (draft referred to the Committee of Style); 2 *id.* at 598–99 (report of the Committee of Style).

a. The Times, Places, and Manner Clause

When the Constitution contemplates a "regulating" role for Congress in elections, it says so. The Times, Places, and Manner Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."[391]

The Times, Places, and Manner Clause is the font of significant congressional power over congressional elections—so significant that Alexander Hamilton devoted three essays of *The Federalist* to the clause in order to defend it from criticism from Anti-Federalists and Federalists alike.[392] Indeed, several State ratifying conventions proposed amendments to the Constitution to amend the Times, Places, and Manner Clause so as to eliminate the proviso empowering Congress to regulate congressional elections.[393]

Importantly, no such clause empowering Congress to regulate presidential election appears in Article II. A careful reading of the Electoral College Clauses reveals an important point. As we have seen, Article II, section 1, clause 4 provides that "[t]he Congress may determine the *Time* of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States."[394] This clause supplies the only grant of power to

---

391. U.S. CONST. art. I, § 4, cl. 1 (emphasis added).

392. For example, Alexander Hamilton wrote:

> This provision has not only been declaimed against by those who condemn the Constitution in the gross; but it has been censured by those who have objected with less latitude and greater moderation; and, in one instance, it has been thought exceptionable by a gentleman who had declared himself the advocate of every other part of the system.

THE FEDERALIST NO. 59, at 330 (Alexander Hamilton) (Clinton Rossiter ed., Mentor 1999) (1961). *See generally* THE FEDERALIST NOS. 59–61 (Alexander Hamilton) (discussing the regulation of congressional elections).

393. *E.g.*, 3 ELLIOT'S DEBATES, *supra* note 250, at 661 (Virginia ratifying convention) ("Congress shall not alter, modify, or interfere in the times, places, or manner of holding elections for senators and representatives or either of them, except when the legislature of any state shall neglect, refuse, or be disabled, by invasion or rebellion, to prescribe the same."); *see* 2 *id.* at 552 (Maryland ratifying convention) (similar); 2 *id.* at 545 (Pennsylvania ratifying convention) (similar); 3 *id.* at 246 (North Carolina ratifying convention) (similar).

394. U.S. CONST. art. III, § 1, cl. 4 (emphasis added). This clause may be the font of congressional power to regulate the manner of presidential election. For example, Professor Amar has suggested that, pursuant to this clause and general "electioneering" rules, "Congress could prohibit—either directly, or through conditional funding rules for any party that seeks federal election funds—any direct effort to lobby electors between Election Day and Electoral College Meeting Day by anyone other than the candidates

Congress in presidential election and the clause empowers Congress only with respect to "Time." The Constitution itself fixes the "Places" with the electors "meet[ing] in their respective States."[395] What about "Manner"? In stark contrast to congressional election, Congress has no power with respect to the "Manner" of presidential election. Article II, section 1, clause 2 provides that "[e]ach State shall appoint, in such *Manner* as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." Interestingly, Alexander Hamilton's private, unadopted draft of the Constitution provided that "[t]he Legislature shall by permanent *laws* provide such further *regulations* as may be necessary for the more orderly election of the President, not contravening the provisions herein contained,"[396] but no such provision was the subject of recorded debate at the Philadelphia Convention of 1787.

What does the Times, Places, and Manner Clause mean for the Electoral Count Act? The implications of the intratextual argument are incredibly straightforward. There is little reason to suppose that the word "Manner" in the Times, Places, and Manner Clause has a substantially different meaning from the word "Manner" in Article II, Section 1, Clause 2.[397] Whatever the scope of Congress's power to prescribe the manner of congressional elections, Congress has no such power in presidential election.

The marked silence of the founding generation on the issue of presidential election in contrast to congressional election strongly suggests that they understood presidential election to be free from congressional regulation. Unsurprisingly, the intratextual argument featured prominently in the constitutional debate over the Grand Committee Bill. In March of 1800, Senator Pinckney seized the intratextual argument from the Times, Places, and Manner Clause in his lengthy speech against the Grand Committee Bill. Read carefully his intratextual argument:

> Let us for a moment compare [the Times, Places, and Manner Clause] with the directions of the Constitution

themselves, or their direct agents." Amar, *supra* note 10, at 231 n.22. Such laws further the independence of electors and moreover do not operate on electors directly. But the existence of a constitutional power in one direction does not imply the existence of a power in the equal-and-opposite direction.

395. U.S. CONST. amend. XII; U.S. CONST. art. II, § 1, cl. 3.

396. 3 FARRAND, *supra* note 35, at 624 (emphasis added).

397. *Cf.* U.S. Term Limits v. Thornton, 514 U.S. 779, 827 (1995) (holding that neither Congress nor the States may alter the constitutional qualifications for congressional office).

> respecting the Electors of a President, and then permit me to call your attention to the remarkable difference there is between them, and the reasons for this difference.
>
> By the Constitution, Electors of a President are to be chosen in the manner directed by the State Legislatures—that is all that is said. In case the State Legislatures refuse to make these directions there is no power to compel them; there is not a single word in the Constitution which can, by the most tortured construction, be extended to give Congress, or any branch or part of our Federal Government, a right to make or alter the State Legislatures' directions on this subject. The right to make these directions is complete and conclusive, subject to no control or revision, and placed entirely with them, for the best and most unanswerable reasons.[398]

Senator Pinckney argued that the Grand Committee Bill was unconstitutional because it was an impermissible congressional regulation of the manner of presidential election. If Senator Pinckney is correct, it follows that the Electoral Count Act is also unconstitutional. Senator Pinckney is correct. Congressional regulation of the electoral count is a regulation on the manner of presidential election. The two key sections of the Electoral Count Act—3 U.S.C. § 5 and 3 U.S.C. § 15—regulate the manner in which the acts of the electors will be given effect.

The intratextual argument also has powerful implications for the question of whether there is a font of power for Congress to enact the Electoral Count Act. Imagine for a moment that the amendments proposed by several state ratifying conventions eliminating the proviso of the Times, Places, and Manner Clause empowering Congress to regulate congressional elections[399] had been adopted. There would be no question that Congress would then have zero power over the manner of congressional election. The power to implement this amended Times, Places, and Manner Clause is not a "Power vested in this Constitution in the Government of the United States" under the Necessary and Proper Clause. In other words, Congress derives its sole power to regulate congressional elections from the proviso of the Times, Places, and Manner Clause. Congress

---

398. 10 ANNALS OF CONG. 128–29 (1800).

399. *See, e.g.*, 2 ELLIOT'S DEBATES, *supra* note 250, at 552 (Maryland ratifying convention); 2 *id.* at 545 (Pennsylvania ratifying convention); 3 *id.* at 246 (North Carolina ratifying convention); 3 *id.* at 661 (Virginia ratifying convention).

may not claim that the Necessary and Proper Clause is the font of power for regulating the manner of presidential election.

In sum, the intratextual argument from the Times, Places, and Manner Clause makes clear that Congress has near zero power over the manner of presidential election and raises serious doubts as to Congress's font of power to enact the Electoral Count Act.

b. The House Judging Clause

When the Constitution contemplates a judging role for each House of Congress in elections, it says so. The House Judging Clause provides that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members."[400] The House Judging Clause is the font of awesome powers and duties. Under this clause, each House is a judicial tribunal with the judicial power to investigate the elections of its Members,[401] and has the duty to refuse to seat members who are constitutionally ineligible to the office of Representative or Senator.[402]

Importantly, no such clause appears in Article II concerning presidential election.[403] The negative implication is made more stark by the fact that the House Judging Clause was considered immediately after the drafting of the Electoral College Clauses at the Philadelphia Convention of 1787, but no Framer thought to extend the principle of the House Judging Clause to presidential election.[404]

What does the House Judging Clause mean for the Electoral Count Act? The negative implication of the House Judging Clause is that the joint convention does not have the authority to judge the elections, returns, and qualifications of electors. The joint convention is not a judicial tribunal with the power to investigate the manner of appointment and qualifications of electors, and may not refuse to count electoral votes contained in authentic electoral certificates for

400. U.S. CONST. art. I, § 5, cl. 1.

401. *See, e.g.*, Barry v. United States *ex rel.* Cunningham, 279 U.S. 597, 613 (1928) (holding that the Constitution confers upon Congress certain powers that are "judicial in character," including the "power to judge of the elections, returns and qualifications of its own members," and "[i]n exercising this power, the Senate may, of course, devolve upon a committee of its members the authority to investigate and report; and this is the general, if not the uniform, practice").

402. *See* U.S. CONST. art. I, § 2, cl. 2 (House Qualifications Clause); U.S. CONST. art. I, § 3, cl. 3 (Senate Qualifications Clause); U.S. CONST. art. VI, cl. 3 (Oath or Affirmation Clause).

403. At least one other scholar has noted this obvious point. *See* Harrison, *supra* note 23, at 702.

404. *See* 2 FARRAND, *supra* note 35, at 502–03.

reasons relating to the manner of appointment or qualifications of electors.[405]

These conclusions find support in the purpose of the House Judging Clause. Justice Story, in his *Commentaries on the Constitution of the United States*, explained that the power to judge the elections, returns, and qualifications of the members of each House must be lodged somewhere in order to safeguard the liberties of the people.[406] The only question was where to place such a power. Justice Story concluded that the power is best lodged in the body whose elections, returns and qualifications are to be judged and not in some other body. "If lodged in any other, than the legislative body itself," wrote Justice Story,

> its independence, its purity, and even its existence and action may be destroyed, or put into imminent danger. No other body, but itself, can have the same motives to preserve and perpetuate these attributes; no other body can be so perpetually watchful to guard its own rights and privileges from infringement, to purify and vindicate its own character, and to preserve the rights, and sustain the free choice of its constituents.[407]

The House Judging Clause strongly suggests that the power to judge the elections, returns, and qualifications of electors is committed to the individual electoral colleges who compose their own "Houses," but we need not decide this in order to conclude that the power most emphatically does not belong to Congress.[408] On Justice

---

405. For additional discussion, see *infra* notes 582–89 and accompanying text.

406. *See* 2 STORY'S COMMENTARIES, *supra* note 9, § 831, at 294–95.

407. 2 *id.* § 831, at 295.

408. Representative Randolph clearly made the point that each of the Electoral Colleges retained the power to judge the qualifications of electors in the Massachusetts Incident of 1809. *See* text accompanying *supra* note 96. The point was also suggested during the Postmaster Incident of 1837, which squarely presented the elector ineligibility problem of the electoral count. *See supra* notes 118–25 and accompanying text. Senator Grundy raised the issue thus:

> Should a case occur in which it became necessary to ascertain and determine upon the qualifications of electors of President and Vice-President of the United States, the important question would be presented, what tribunal would, under the Constitution, be competent to decide? Whether the respective colleges of electors in the different States should decide upon the qualifications of their own members, or Congress should exercise the power, is a question which the committee are of opinion ought to be settled by a permanent provision upon the subject.

COUNTING ELECTORAL VOTES, *supra* note 3, at 71; *see also id.* at 73 (remarks of Rep. Thomas) (reporting to the House of Representatives that the joint committee "had proposed a remedy, by either giving the power to reject to the college or to Congress, as might be deemed most expedient"). For the structural argument supporting the power of

Story's logic, the power, if vested in Congress, would risk the "independence" and "purity" of the electoral colleges, and "put [them] into imminent danger." Note too how the House Judging Clause eschews bicameralism, with each House of Congress acting independently of the other, only with respect to its own Members.

The intratextual argument from the House Judging Clause enjoys a rich pedigree in the constitutional debates over Congress's ability to regulate the electoral count. As early as 1800, Senator Baldwin, a Framer at the Philadelphia Convention of 1787, made precisely this intratextual argument in his speech against the Grand Committee Bill. "[W]hat are the questions which can arise on the subject intrusted to [electors], to which they are incompetent, or to which Congress is so much more competent?," he asked.[409] One set of questions were "[t]hose which relate to the elections, returns, and qualifications of their own members," and on this issue he concluded, "[S]hall these be taken away from that body [of electors], and submitted to the superior decision and control of Congress, without a particle of authority for it from the Constitution?"[410] Senator Baldwin clearly invoked the language of the House Judging Clause to make the intratextual argument, for the phrase "elections, returns and qualifications" appears but once in the Constitution.

During the electoral count of 1857, Senator Collamer expressed very serious constitutional doubts about whether the two Houses of Congress could by joint resolution express any opinion that the electoral votes of the State of Wisconsin were null and void because these votes had been given on a day different from that prescribed by law.[411] He "very much doubt[ed] whether the [F]ramers of the Constitution ever intended to leave the subject of presidential election to the House of Representatives, or the Senate, or either, or both of them."[412] Evidently pointing to the House Judging Clause, he stated, "The Constitution vested in each house the power to decide upon the election of its members; it provided *carefully* that it would not trust to the two houses to elect a President."[413]

In May of 1874, the House Committee on Privileges and Elections employed the intratextual argument in a lengthy report

---

each Electoral College "House" to judge the qualifications of Electors, see *infra* notes 479–97 and accompanying text.

409. 10 ANNALS OF CONG. 31 (1800).

410. *Id.*

411. COUNTING ELECTORAL VOTES, *supra* note 3, at 132.

412. *Id.*

413. *Id.* (emphasis added).

supporting a proposed amendment to the Constitution. The proposed amendment provided for the abolition of the Electoral College mode of presidential election in favor of direct, popular election and empowered Congress "to provide for holding and conducting elections of President and Vice-President, and to establish tribunals for the decision of such elections as may be contested."[414] In a section of the report captioned "Congress is not a Canvassing Board," the report provided in relevant part:

> The proposition that Congress has power to sit as a canvassing board upon the electoral votes of the States, admitting or rejecting them for reasons of its own, subverts the whole theory by which their appointment was conferred upon the States; *makes Congress the judge of the election and qualifications of President and Vice-President*, and, by the operation of the twenty-second joint rule, gives that power to each house separately, as in case of its own members. There is no such express power given to Congress in the Constitution, nor is it necessary to carry out any express power therein given, and its exercise would be in direct conflict with the known purpose of the [F]ramers to make the executive and legislative departments as nearly independent of each other as possible.[415]

The intratextual argument from the House Judging Clause did not lose any vigor in the Electoral Count Act debates. Senator Burnside put the intratextual point bluntly, stating that

> it was never the intention of the [F]ramers of the Constitution to make Congress the judge of the qualifications of the electors. If it had been so, the Constitution would have distinctly stated it. It makes each house the judge of the qualifications of its own members in express terms, but it does not imply even that Congress has any right to judge of the qualifications of the electors.[416]

So too Senator Edmunds made the intratextual argument, but a considerably more complex one. He pointed to the Vesting Clause of Article III[417] and three clauses of Article I—the House Judging Clause, the House Expulsion Clause,[418] and the Senate Impeachment

414. *Id.* at 409.

415. *Id.* at 418 (emphasis added).

416. *Id.* at 658.

417. U.S. CONST. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.").

418. U.S. CONST. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings, Punish its Members for disorderly Behavior, and, with the Concurrence of

Clause[419]—as the sole grants of "judicial power" to individual Houses of Congress, and concluded that "no judicial power is invested in either or both Houses of Congress that is not especially named and imputed to them as such and in such terms."[420]

Importantly, as the foregoing statements suggest, the intratextual argument is not just a narrow textual point from negative implication. The intratextual argument gains its strength from the context of its application. The House Judging Clause merely makes explicit an implicit idea that a body has judicial power over the privileges of its own members.[421] The important question for present purposes is whether Congress has judicial power over the privileges of non-member electors, especially in light of the "known purpose of the [F]ramers to make the executive and legislative departments as nearly independent of each other as possible."[422]

In sum, the intratextual argument from the House Judging Clause strongly suggests that Congress has no judicial power over the elections, returns, and qualifications of electors.

* * *

The intratextual arguments from both the Times, Places, and Manner Clause and the House Judging Clause are textual arguments from negative implication. These two clauses carefully empower Congress and each House of Congress, respectively, in congressional elections, and the Electoral College Clauses contain no analogues concerning presidential election. As a brute textual matter, the intratextual argument raises doubt as to Congress's ability to regulate the manner of presidential election and to judge the elections, returns, and qualifications of electors.

---

two[-]thirds, expel a Member.").

419. U.S. CONST. art. I, § 3, cl. 5 ("The Senate shall have the sole power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried the Chief Justice shall preside . . . .").

420. 17 CONG. REC. 1063–64 (1886) (remarks of Sen. Edmunds); *see also* 18 CONG. REC. 45 (1886) (remarks of Rep. Dibble) ("There [referring to House Judging Clause] you find judicial power of a certain kind expressly granted to the two Houses of Congress, making an exception to the general provision which confines judicial power to the Supreme Court and the subordinated Federal courts."); *id.* at 46 (remarks of Rep. Dribble) (noting the absence of language analogous to the House Judging Clause in the Electoral College Clauses).

421. *See* 2 FARRAND, *supra* note 35, at 503 (remarks of James Wilson) ("[He] thought the power involved, and the express insertion of it needless. It might beget doubts as to the power of other public bodies, as Courts &c. Every Court is the judge of its own privileges.").

422. COUNTING ELECTORAL VOTES, *supra* note 3, at 418.

Of course, textual arguments from negative implication need to be applied sensitively and contextually in order to avoid wooden readings of the Constitution.[423] A sensitive and contextual interpretation of the intratextual argument reveals a strong case against Congress's ability to regulate the manner of presidential election and to judge the elections, returns, and qualifications of electors. As a matter of sensitive interpretation, the intratextual arguments from negative implication deserve special weight given the prolixity of the Electoral College Clauses, relative to other clauses of Article II which mark the grand contours of executive power, and more importantly, relative to the clauses of Article I which empower Congress in congressional elections. It hardly seems that the Framers simply forgot to draft clauses in Article II analogous to the Times, Places, and Manner Clause or the House Judging Clause, or understood Article II impliedly to contain such congressional power over presidential election.

As a matter of contextual interpretation, we should be especially chary of Congress's role in presidential election. The intratextual argument deserves special weight in light of the structural features of presidential election, namely the repudiation of Congress in the process of presidential election.[424] As we shall see, the Framers instituted an electoral college mode of presidential election as a replacement for the election of the President by the Congress. The Elector Incompatibility Clause also expresses the anti-Congress principle in presidential election by prohibiting Members of Congress from even serving as electors.[425] As Senator Wilson put the point, "When the [F]ramers of the Constitution expressly prohibited Senators and Representatives from appointment as electors, they clearly indicated their purpose to exclude them from all power in or over the matter of the election of a President by the electors appointed by the States."[426]

---

423. *See* Akhil Reed Amar, *Some Opinions on the Opinion Clause*, 82 VA. L. REV. 647, 653 n.30 (1996); Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The* Nixon *and* Clinton *Cases*, 108 HARV. L. REV. 701, 702–08 & n.6 (1995). For a classic exposition of the *expressio unius* principle of textual interpretation, see THE FEDERALIST NOS. 32, 83 (Alexander Hamilton).

424. *See supra* note 60 and accompanying text; *infra* note 447 and accompanying text.

425. *See* U.S. CONST. art. II, § 1, cl. 2 ("[B]ut no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.").

426. 17 CONG. REC. 1059 (1886) (remarks of Sen. Wilson).

In sum, the intratextual argument, when interpreted sensitively and contextually, strongly militates against the constitutionality of the Electoral Count Act.

4. Conclusions

Taken together, the textual arguments—traditional and intratextual—expose the unconstitutionality of the Electoral Count Act. What may seem to be expedient is not necessarily what is constitutional. First and foremost, the textual argument makes clear that there is no source of power, express or implied, for Congress to pass the Electoral Count Act. A careful analysis of the Necessary and Proper Clause and the Electoral College Clauses reveals that neither clause supports Congress's power to enact the Electoral Count Act. In the absence of an implied grant of power to Congress to enact such a statute, the Electoral Count Act is unconstitutional. Anyone who wishes to argue that the Electoral Count Act is constitutional must grapple with the threshold question of whether and where Congress has the power under the Constitution to enact such a statute. Other textual arguments relate to specific provisions of the Electoral Count Act. The constitutionality of the "Presiding Officer Clause" of 3 U.S.C. § 15 is in serious doubt given conflict-of-interest principles relating to the vice presidency. The constitutionality of 3 U.S.C. § 17 is beyond all serious doubt. This provision, which limits (or purports to limit) the proceedings in each House of Congress in debating objections to electoral votes, is patently unconstitutional. Other textual arguments are holistic, even quasi-structural. The nature of the counting function by the counting agent is more "thin" than "thick," relating more to the ascertainment and aggregation of electoral votes, than to the judging of electoral votes. The bicameral counting procedure of 3 U.S.C. §15 violates the unicameralism principle of the Electoral College Clauses. And the intratextual argument from the Times, Places, and Manner Clause and the House Judging Clause strongly militates against the constitutionality of the Electoral Count Act, at least to the extent that the counting agent is to judge electoral votes contained in authentic electoral certificates.

These textual arguments must also be considered in light of great care that the Framers took to remove Congress as much as possible from the business of electing the President. The fact that Congress has thrice failed to pass constitutional amendments giving Congress "power to provide for holding and conducting the elections of President and Vice President and to establish tribunals for the

decision of such elections as may be contested"[427] is another clue that militates against the constitutionality of the Electoral Count Act. Moreover, these three attempts at constitutional amendment occurred in the 1880s, just a few years before Congress passed—with no enabling constitutional amendment—the Electoral Count Act in 1887.

### *B. The Structural Argument*

In addition to textual argument, the interpretivist resolution of the Electoral Count Act is based on a structural argument. The structural argument illuminates a number of important themes that emerge from the Constitution as a whole.[428] In the present context, the structural argument provides some of the most satisfying arguments that the Electoral Count Act is unconstitutional. This section proceeds in three sub-sections. The first sub-section presents five principles of presidential election. The second sub-section presents two principles of rule-making and law-making. The final sub-section assesses the conclusions of the structural argument.

#### 1. Five Principles of Presidential Election

##### a. The Anti-Senate Principle

First and foremost, the Constitution mistrusts the Senate in the process of presidential election. This is the anti-Senate principle of presidential election. The Electoral Count Act is unconstitutional because the Senate has equal agency with the House of Representatives in counting electoral votes. As we have seen, in a single return case, the joint convention may not reject electoral votes without the concurrence of the Senate, and in a multiple return case, the joint convention may not accept electoral votes without the concurrence of the Senate.[429] And as Representative Caldwell explained during the Electoral Count Act debates:

> The separate concurrent action of both Houses provided for in the bill preserves the constitutional identity, rights, and dignity of each. This concession of each House to the other of *equal and concurrent power* to decide on informalities and

427. COUNTING ELECTORAL VOTES, *supra* note 3, at 345–57 (Senate); *id.* at 408–44.

428. For an extensive classic discussion of this species of constitutional argument, see generally CHARLES L. BLACK, JR., STRUCTURE AND RELATIONSHIP IN CONSTITUTIONAL LAW (1969). For a pithy modern discussion, see PHILIP BOBBITT, CONSTITUTIONAL FATE: THEORY OF THE CONSTITUTION 74–92 (1982).

429. *See* Part I.A.4 *supra.*

> illegalities appearing on the face of returns, upon objection of a Senator or Representative, is necessary to the determination of results.[430]

Whatever may be said about the involvement of both Houses of Congress in the process of counting electoral votes, it is clear that the Senate as a separate and distinct body is to have no agency in electing the President. The Electoral College Clauses make clear that the Senate and the House of Representatives are not created equally in the process of presidential election. Under the original Constitution and the Twelfth Amendment, if the electors shall have failed to make a choice, the House of Representatives chooses the President, not the Senate. Under the Twelfth Amendment, if the electors shall have failed to make a choice, the Senate only chooses the Vice President.[431]

The logic behind the anti-Senate principle of presidential election is incredibly clear once we consult the entire text of the Constitution and its legislative history. Under the Constitution, the Senate assumes, in addition to its equal share of the Article I legislative power, three distinct powers. First, the Senate has judicial power as a court of impeachment for the President, Vice President, and all civil Officers of the United States.[432] Second, the Senate shares executive-legislative power with the President in the business of treaty-making.[433] Third, the Senate shares executive power with the President in the business of appointing Officers of the United

---

430. 18 CONG. REC. 31 (1886) (emphasis added).

431. The Senate has exercised this function only once in our history. In the electoral count of 1837, the Senate elected Richard M. Johnson as Vice President. *See supra* note 127 and accompanying text. Note that the Senate's role in choosing the Vice President was even more circumscribed under the original Constitution, further removing the Senate from the business of electing the nation's two top executive officers. Article II, Section 1, Clause 3 provided that

> [i]n every Case, after the Choice of the President [by the House of Representatives], the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President.

U.S. CONST. art. II, § 1, cl. 3.

432. *See* U.S. CONST. art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments."); *see also* THE FEDERALIST NO. 66, at 370 (Alexander Hamilton) (Clinton Rossiter ed., Mentor 1999) (1961) (referring to the Senate as a "court of impeachments").

433. *See* U.S. CONST. art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two[-]thirds of the Senators present concur."). To be sure, the founding generation seriously debated whether the treaty-making power was executive, legislative, or neither. For one view, see THE FEDERALIST NO. 75, at 419 (Alexander Hamilton) (Clinton Rossiter ed., Mentor 1999) (1961) ("The power in question seems therefore to form a distinct department, and to belong, properly, neither to the legislative nor to the executive.").

States.[434] It is important to remember that the Committee of Eleven's Report of the Electoral College Clauses at the Philadelphia Convention provided that, if the electors failed to make a choice, the Senate would elect the President and the Vice President. The House of Representatives was to have no role whatsoever. The Report provided in relevant part:

> [A]nd they shall make a list of all the persons voted for, and of the number of votes for each, which list they shall sign and certify and transmit sealed to the Seat of the[] Genl. Government, directed to the President of the Senate—The President of the Senate shall in that House open all the certificates; and the votes shall be then & there counted. The Person having the greatest number of votes shall be the President, if such number be a majority of that of the electors; and if there be more than one who have such a majority, and have an equal number of votes, then the *Senate* shall immediately choose by ballot one of them for President: but if no person have a majority[,] then from the five highest on the list, the *Senate* shall choose by ballot the President. And in every case after the choice of the President, the person having the greatest number of votes shall be vice-president: but if there should remain two or more who have equal votes, the *Senate* shall choose from them the vice-president.[435]

The Framers feared that the totality of these powers was simply too much. They feared that the Senate, already powerful, would become a dangerous aristocracy, and that the President, already dependent on the Senate in treaty-making and appointments, would be a mere creature of that body.[436] Consequently, on September 6,

---

434. U.S. CONST. art. II, § 2, cl. 2.

435. 2 FARRAND, *supra* note 35, at 497–98 (emphasis added).

436. For a classic statement to this effect, see *id.* at 522 where James Wilson remarked:

> They will have in fact, the appointment of the President, and through his dependence on them, the virtual appointment to offices; among others the offices of the Judiciary Department. They are to make Treaties; and they are to try all impeachments. In allowing them thus to make the Executive & Judiciary appointments, to be the Court of impeachments, and to make Treaties which are to be laws of the land, the Legislative, Executive & Judiciary powers are all blended in one branch of the Government.... [T]he President will not be the man of the people as he ought to be, but the Minion of the Senate. He cannot even appoint a tide-waiter without the Senate.

*See also, e.g.*, *id.* at 501 (remarks of Charles Pinckney) (objecting to the Report because "it threw the whole appointment in fact into the hands of the Senate" and "makes the same body of men which will in fact elect the President his Judges in case of an impeachment"); *id.* (remarks of Hugh Williamson) (noting "objection to such a dependence of the President on the Senate for his reappointment"); *id.* at 502 (remarks of James Wilson)

1787, on a motion by Roger Sherman, the Framers rejected the contingent election of the President and Vice President by the Senate, providing instead for the choice by the House of Representatives.[437] This change passed by a vote of ten to one.[438]

In *The Federalist No. 66*, Alexander Hamilton explained the logic for this change in the context of the balance of powers between the House of Representatives and the Senate, carefully struck by the Constitution:

> [T]o secure the equilibrium of the national House of Representatives, the plan of the convention has provided in its favor several important counterpoises to the additional authorities to be conferred upon the Senate. The exclusive privilege of originating money bills will belong to the House of Representatives. The same house will possess the sole right of instituting impeachments; is not this a complete counterbalance to that of determining them? The same house will be the umpire in all elections of the President

(suggesting that the contingent election should be made by Congress and not the Senate because "the House of Reps. will so often be changed as to be free from the influence & faction to which the permanence of the Senate may subject that branch"); *id.* at 511 (remarks of Charles Pinckney) (objecting to Report because "the dispersion of the votes would leave the appointment with the Senate, and as the President's reappointment will thus depend on the Senate he will be the mere creature of that body"); *id.* (remarks of John Rutlidge) (objecting to Report because "[i]t would throw the whole power [of presidential election] into the Senate"); *id.* at 512 (remarks of George Mason) (objecting to Report because "[i]t puts the appointment in fact into the hands of the Senate" and that "[t]he great objection with him would be removed by depriving the Senate of the eventual election"); *id.* at 512 (remarks of Hugh Williamson) ("Referring the appointment to the Senate lays a certain foundation for corruption & aristocracy."); *id.* at 513 (remarks of Governor Randolph) ("He dwelt on the tendency of such an influence of the Senate over the election of the President in addition to its other powers, to convert that body into a real & dangerous Aristocracy"); *id.* (remarks of John Dickinson) ("[He] was in favor of giving the eventual election to the Legislature, instead of the Senate—It was too much influence to be superadded to that body "); *id.* at 515 (remarks of George Mason) ("As the mode of appointment is now regulated, he could not forebear expressing his opinion that it is utterly inadmissible. He would prefer the Government of Prussia to one which will put all power into the hands of seven or eight men, and fix an Aristocracy worse than absolute monarchy."); *id.* at 522 (remarks of Elbridge Gerry) (proposing eventual election of President to be made by Congress and not Senate so as to "relieve the President from his particular dependence on the Senate for his continuance in office"); *id.* at 522 (remarks of Gouverneur Morris) (supporting Gerry's proposal because "[i]t would free the President from being tempted in naming to Offices to Conform to the will of the Senate, & thereby virtually give the appointments to office, to the Senate"); *id.* at 524 (remarks of Hugh Williamson) ("The aristocratic complexion [of the Senate] proceeds from . . . the mode of appointing the President which makes him dependent on the Senate.").

437. *See id.* at 527 ("To strike out the words 'The Senate shall immediately choose &c.' and insert 'The House of Representatives shall immediately choose by ballot one of them for President, the members of each State having one vote.' ").

438. *Id.*

> which do not unite the suffrages of a majority of the whole number of electors; a case which it cannot be doubted will sometimes, if not frequently, happen. The constant possibility of the thing must be a fruitful source of influence to that body.[439]

As this passage demonstrates, it was simply beyond question at the founding that the Senate as a separate and distinct body would have any agency in the process of presidential election.[440] St. George Tucker, in his canonical "American Blackstone," first published in the wake of the constitutional crisis of the presidential election of 1800, summarized the anti-Senate principle of presidential election thus:

> [The Senate's] exclusion from any participation in the election of a president, is certainly founded upon the wisest policy: being associated with him in the exercise of his most important powers, and being chosen for a much longer period than the representatives, the presumption of undue influence, where the contest might be between a president in office, and any other person, would be altogether unavoidable.[441]

The anti-Senate principle of presidential election was not lost in the Electoral Count Act debates. Senator Bayard thought it dispositive in urging the repeal of the Twenty-second Joint Rule.[442] "I do not think," said Bayard, "that anywhere in the Constitution can be found language in any degree constituting the Senate of the United States a factor or an actor in the election of the President of the United States."[443] He asked, "But will any Senator show me any clause of the Constitution, any implication which can be argued from any clause of the Constitution, which gives the Senate one particle of lawful power in controlling the choice of a President or a Vice-President of the United States?"[444] Senator Whyte thought the anti-Senate principle so strong an objection to the Electoral Count Act that he stated, "I would rather vote for a bill leaving it to the House of Representatives to interfere than a bill which provided that the

---

439. THE FEDERALIST NO. 66, *supra* note 432, at 371–72 (Alexander Hamilton).

440. *See also* 4 ELLIOT'S DEBATES, *supra* note 250, at 122 (remarks of William Davie at North Carolina ratifying convention) ("[The President] is perfectly independent of [the Senate] in his election."); Letter from James Madison to George Hay (Aug. 23, 1823), *reprinted in* 3 FARRAND, *supra* note 35, at 458 ("The Agency of the H. of Reps. was thought safer also than that of the Senate, on account of the greater number of its members.").

441. 1 TUCKER'S COMMENTARIES, *supra* note 19, app. at 328.

442. COUNTING ELECTORAL VOTES, *supra* note 3, at 444.

443. *Id.*

444. *Id.* at 445.

Senate should have anything to do with the election of President of the United States."[445]

The Electoral Count Act, like the Twenty-second Joint Rule, violates the anti-Senate principle of presidential election. The involvement of the Senate as a separate and distinct body in the process of counting electoral votes runs seriously afoul of constitutional structure. The equal agency of the Senate with the House of Representatives in the Electoral Count Act impermissibly infringes upon the constitutional prerogatives of the House of Representatives in "umpir[ing]" presidential election, and consequently, unduly strengthens the powers of the Senate in presidential election. Moreover, the equal agency of the Senate violates the Framers' deliberate choice to exclude the Senate altogether from the process of presidential election.

This is not to say that the anti-Senate principle of presidential election requires that Senators must not participate in counting electoral votes. There is a constitutionally significant difference between the Senate as a separate and distinct body, and Senators as members of a joint convention of Senators and Representatives, where Representatives greatly outnumber Senators. The counting function is committed to the joint convention and all questions of the electoral count must be resolved by it on a per capita basis, not by two separate and distinct legislative bodies.

b. The Anti-Congress Principle

Second, the Constitution mistrusts Congress in the process of presidential election. This is the anti-Congress principle of presidential election. The joint convention violates the anti-Congress principle to the extent that it rejects electoral votes contained in authentic electoral certificates as not "regularly given."[446] Two parts of the Electoral College Clauses carefully reflect the anti-Congress principle of presidential election.

First, the electoral college mode of presidential election itself is an instantiation of the anti-Congress principle. We should remember that of all the methods to elect the President considered by the Framers the one most emphatically rejected was election of the President by the legislature.[447] The Framers rejected the

---

445. *Id.* at 538.

446. 3 U.S.C. § 15 (2000).

447. *See* 2 FARRAND, *supra* note 35, at 497–502. A few years later, Senator Pinckney remarked:

He remembered very well that in the Federal Convention great care was used to

parliamentary system for good reason: to create an independent and firm Executive.[448]

The Electoral College Clauses further reflect the rejection of the parliamentary system. In the event the electors fail to make a choice, *Congress* does nothing in choosing the President or Vice President. In such a case, the House of Representatives chooses the President and the Senate chooses the Vice President.[449] There is no possible instance in which the two Houses of Congress act concurrently in choosing the President or Vice President.[450] Representative Randolph seized upon this point during the Missouri Incident:

> What was the theory of this Constitution? It is that this House, except upon a certain contingency, has nothing at all to do with the appointment of President and Vice-President of the United States. What was to be the practice of the Constitution, as now proposed? That an informal meeting of this and the other house is to usurp the initiative, the nominative power, with regard to the two first officers of the Government, in despite and contempt of their decision. Is there to be no limit to the power of Congress? no mound or barrier to stay their usurpation? Why were the electoral bodies established?[451]

---

> provide for the election of the President of the United States, independently of Congress; to take the business as far as possible out of their hands. . . . Nothing was more clear to him than that Congress had no right to meddle with it at all; as the whole was entrusted to the State Legislatures, they must make provision for all questions arising on the occasion.").

10 ANNALS OF CONG. 29 (1800).

448. *See, e.g.*, 2 FARRAND, *supra* note 35, at 103 (remarks of Gouverneur Morris) ("Of all possible modes of [presidential] appointment that by the Legislature is the worst. If the Legislature is to appoint, and to impeach or to influence the impeachment, the Executive will be the mere creature of it."); 10 ANNALS OF CONG. 131 (remarks of Sen. Pinckney) (stating that Framers "well knew, that to give to the members of Congress a right to give votes in this election, or to decide upon them when given, was to destroy the independence of the Executive, and make him the creature of the Legislature"); KENT'S COMMENTARIES, *supra* note 19, at *279 (noting that legislative selection of the President "would have rendered him too dependent upon the immediate authors of his elevation to comport with the requisite energy of his own department; and it would have laid him under temptation to indulge in improper intrigue, or to form a dangerous coalition with the legislative body . . . ."); 3 STORY'S COMMENTARIES, *supra* note 9, § 1450, at 313–14.

449. *See* U.S. CONST. amend XII. For an eloquent expression of this point, see 18 CONG. REC. 46 (1886) (remarks of Rep. Dibble).

450. *See also* Letter from James Madison to Henry Lee (Jan. 14, 1825), *reprinted in* 3 FARRAND, *supra* note 35, at 464 ("If, in the eventual choice of a President, the same proportional rule had been preferred [as in the Electoral Colleges], a joint ballot by the two [H]ouses of Congress would have been substituted for the mode which gives an equal vote to every State, however unequal in size.").

451. COUNTING ELECTORAL VOTES, *supra* note 3, at 54.

Indeed, if we look at the Constitution as a whole, we see that it is a clause-by-clause rejection of the parliamentary system.[452] The clear constitutional baseline is that congressional election of the President is prohibited. The concurrence of the House of Representatives and the Senate required by the Electoral Count Act runs afoul of constitutional structure.[453] The fact that Congress does not elect the President or Vice President, however, does not necessarily mean that Congress shall have no role in judging electoral votes.

Second, the Elector Incompatibility Clause provides that "no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."[454] The Elector Incompatibility Clause is a substantial structural guarantee of independence from Members of Congress. The clause "is a provision which goes . . . to show how extremely guarded the Constitution is in preventing the members of Congress from having any agency in the election, except merely in counting the votes."[455] When Members of Congress are prohibited from even giving electoral votes, what gives them the constitutional authority to judge electoral votes? But again, the fact that Members of Congress are prohibited from even giving electoral votes does not necessarily mean that Members of Congress shall have no role in judging electoral votes.

---

452. The single clause which best expresses this separation-of-powers vision is U.S. CONST. art. I, § 6, cl. 2 ("[N]o Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."). For a rich discussion of this clause's significance as a repudiation of the parliamentary system, see generally Steven G. Calabresi & Joan L. Larsen, *One Person, One Office: Separation of Powers or Separation of Personnel?*, 79 CORNELL L. REV. 1045 (1994). *See also* Amar & Amar, *supra* note 27, at 118–25 (providing additional discussion of separation-of-powers structure of Constitution).

453. One corollary of this argument is that if there is no power for concurrent action then it follows *a fortiori* that there is no power for either House of Congress alone. For example, Senator Wilson remarked:

> [I]f no such power rests with the two Houses for concurrent action, how much more preposterous does it seem to be to claim that it rests with either House alone, and especially with the House of Representatives, with which body to elect a President abides in the event of a failure of the electors to elect?

17 CONG. REC. 1059 (1886).

454. U.S. CONST. art. II, § 1, cl. 2.

455. 10 ANNALS OF CONG. 131 (1800); *see also* 17 CONG. REC. 1059 (1886) (remarks of Sen. Wilson) ("When the [F]ramers of the Constitution expressly prohibited Senators and Representatives from appointment as electors, they clearly indicated their purpose to exclude them from all power in or over the matter of the election of a President by the electors appointed by the States."); 18 CONG. REC. 46 (remarks of Rep. Dibble) ("The idea was that the President must go into office without being under any obligation of any sort to the National Legislature, and the [F]ramers of the Constitution went so far as to provide even that a member of Congress should not be an elector—that to be a member of either House of Congress should be a disqualification.").

The anti-Congress principle should bear on the overall interpretation of the Electoral Count Act. The anti-Congress principle stands for the thinnest conception of congressional regulation in counting electoral votes. As Senator Pinckney explained:

> How could [the Framers] expect, that in deciding on the election of a President, particularly where such election was strongly contested, that party spirit would not prevail, and govern every decision? Did they not know how easy it was to raise objections against the votes of particular elections, and that in determining upon these, it was more than probable, the members would recollect their *sides*, their favorite candidate, and sometimes their own interests? Or must they not have supposed, that, in putting the ultimate and final decision of the Electors in Congress, who were to decide irrevocably and without appeal, they would render the President their creature, and prevent his assuming and exercising that independence in the performance of his duties upon which the safety and honor of the Government must forever rest?[456]

Simply put, the joint convention may not judge the acts of electors—that is, their electoral votes.

c. The Anti-President Principle

Third, the Constitution does not provide any role for the President in the process of presidential election. The Electoral Count Act, however, did involve the President. The Electoral Count Act is a law, not a rule of proceeding like the Twenty-second Joint Rule. Laws require bicameralism and presentment to the President, whereas rules (including joint rules) do not.[457] The Electoral Count

---

456. 10 ANNALS OF CONG. 130–31. Professor Harrison recently put the point in the context of old and recent history:

> As the experiences of 1876–1877 and 2000 indicate, giving Congress power to resolve an electoral dispute is very close to giving it power to choose the President; indeed, electoral disputes could be trumped up for that very purpose. It is unlikely that the Constitution allows through the back door what it bars the front door against.

Harrison, *supra* note 23, at 705.

457. U.S. CONST. art. I, § 7, cl. 2 provides that:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two[-]thirds of that House shall agree to pass the Bill, it shall be

Act was presented to and approved by President Cleveland. Is it not absurd to give the President an agency in counting the electoral votes of her successors? During the Wisconsin Incident of 1857, Senator Pugh objected to a mere joint resolution stating that Wisconsin's electoral votes should not have been counted because it would require presentment to the President. "Now, confessedly," said Pugh, "the President has nothing to do with counting the votes for his successor."[458] Whether President Cleveland's approval of the Electoral Count Act presents an incurable constitutional problem of the past for the Electoral Count Act is beyond the scope of the present analysis.

What is important for present purposes, however, is that a law cannot be repealed without presentment to and approval by the President, or by a two-thirds super-majority of both Houses of Congress. This is a constitutional problem for the Electoral Count Act because the President has a significant agency in the law of the status quo. During the Electoral Count Act debates, Senator Hager put this point best:

> But, as I said suppose this bill becomes a law signed by the President, how are you to get rid of it in the future? If it is binding upon the Senate and House that meet next it requires, in order to repeal it, not only the vote of the Senate and the House, but the approval of the President. Thus the President enters into the consideration, when the Constitution never contemplated any such thing. It is a duty imposed entirely upon the Senate and House of Representatives; and if you pass this bill in order that it may be a law it requires the approval of the President, and hereafter to repeal it and get rid of it also requires the approval of the President, so that a future Senate and a future House of Representatives may be entirely under the control of the President of the United States.... Did the [F]ramers of the Constitution contemplate any such state of things as that when the twelfth article of amendment was adopted? It was the intent that the people should control the election of the President, and not the President of the United States.... The President has nothing to do with it.[459]

---

> sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two[-]thirds of that House, it shall become a Law.

*See also* U.S. CONST. art. I, § 7, cl. 3 (similar).

458. COUNTING ELECTORAL VOTES, *supra* note 3, at 135.

459. *Id.*; *see also id.* at 523 (remarks of Sen. Bayard) ("[F]or this is not a law for to-day only; it is to become a settled law, a fixed rule, requiring for its repeal the assent of a

To be sure, the President has an agency in presidential succession under the Presidential Succession Clause,[460] but the President is behind a veil of ignorance when it comes to presidential succession—unlike presidential election.

d. The Pro-States and Pro-State Legislatures Principle

Fourth, the Constitution trusts the states and state legislatures in the process of presidential election. This is the pro-states and pro-state legislatures principle of presidential election. This principle makes clear that Congress has no role over some of the problems of the electoral count.

Let us once again turn to Senator Pinckney's famous speech against the Grand Committee Bill. Invoking the Tenth Amendment, Senator Pinckney argued that the Grand Committee Bill trampled on the rights of the states: he considered the right of the states to be free from congressional interference in the election of the President as sacred as the right of the states to be free from congressional interference in matters of religion and the press.[461] Senator Pinckney then observed:

> This right of determining on the *manner* in which the Electors shall vote; the inquiry into the qualifications, and the guards necessary to prevent disqualified or improper men voting, and to insure the votes being legally given, rests and is exclusively vested in the State Legislatures. If it is necessary to have guards against improper elections of Electors, and to institute tribunals to inquire into their qualifications, with the State Legislatures, and with them alone, rests the power to institute them, and they must exercise it.[462]

Nearly three-quarters of a century later, the House Committee on Privileges and Elections in 1874 similarly reported:

---

majority of each house and the President of the United States.").

460. U.S. CONST. art. II, § 1, cl. 6.

461. 10 ANNALS OF CONG. 127 ("[The States] supposed they had placed the hand of their own authority on the rights of religion and the press, and the as sacred right of the States in the election of the President.").

462. *Id.* at 130 (emphasis added). Senator Pinckney largely dismissed problems with respect to the validity of an Elector's appointment. In answering an objection that Electors might be appointed in violation of the Elector Incompatibility Clause, he stated, "[W]here is the necessity of this bill? Is not the Constitution the supreme law of the land, and must not the State Legislatures conform their directions in the appointment of Electors to the directions of the Constitution?" *Id.* at 131; *see also id.* at 132 ("Why this anxiety, why these unnecessary efforts to take from the State Legislatures their exclusive and most valuable right?").

> It will thus be seen that the *mode* of choosing the electors is placed entirely beyond the power and jurisdiction of the National Government; and whatever disorders, irregularities, or failures in the appointment of electors may occur in any of the States, they are entirely without remedy or redress upon the part of the Government of the United States.[463]

How did Senator Pinckney and the House Committee on Privileges and Elections reach this conclusion? The italicized words ought to provide a strong clue. Senator Pinckney expressly invoked the Times, Places, and Manner Clause in his argument against the Grand Committee Bill,[464] and the use of the word "mode" by the House Committee on Privileges and Elections is merely a synonym for the word "Manner" in the Times, Places, and Manner Clause.

As we saw earlier, the intratextual implications of the Times, Places, and Manner Clause are potentially powerful. In sum, with respect to presidential election, the Constitution fixes the "Place" (with the electors meeting in their respective states), empowers Congress to fix the "Time," and empowers the state legislatures to determine the "Manner." Unlike Article I, the state legislatures have the final word on that important subject; Congress has no power to determine on the "Manner" of presidential election.

But what is the breadth of power textually committed to state legislatures in presidential election? Does the word "Manner" in the Times, Places, and Manner Clause include the power to investigate the qualifications of electors? To determine an answer to this question, let us begin by looking to *The Federalist No. 59* in which Alexander Hamilton brilliantly defends the Times, Places, and Manner Clause, which was the subject of much criticism by both Federalists and Anti-Federalists alike. Hamilton correctly notes "that there were only three ways in which this power could have been reasonably modified and disposed: that it must either have been lodged wholly in the national legislature, or wholly in the State legislatures, or primarily in the latter and ultimately in the former."[465] Consider Alexander Hamilton's justifications for reposing *ultimate* power over congressional elections in Congress:

> If the State legislatures were to be invested with an exclusive power of *regulating* these [House of Representatives] elections, every period of making them would be a delicate

463. COUNTING ELECTORAL VOTES, *supra* note 3, at 414 (emphasis added).
464. 10 ANNALS OF CONG. 128.
465. THE FEDERALIST NO. 59, *supra* note 392, at 330 (Alexander Hamilton).

> crisis in the national situation, which might issue in a dissolution of the Union, if the leaders of a few of the most important States should have entered into a previous conspiracy to prevent an election.[466]

Two points should become immediately apparent. First, as the italicized word indicates, Alexander Hamilton read the "Manner" in the Times, Places, and Manner Clause as a type of regulation by the state legislatures. This ought to come as no surprise given the text of that clause which provides that "Congress may at any time by Law make or alter such *Regulations*, except as to the Places of chusing Senators."[467]

Second, what is sauce for the goose is sauce for the gander. Hamilton's defense of the Times, Places, and Manner Clause is no less applicable to presidential election. When we consult the Electoral College Clauses, we see textually that the "Manner" of appointing electors is vested *wholly* in the state legislatures; it is not vested *primarily* in the state legislatures and *ultimately* in the Congress. If Congress had a role in regulating presidential election, Hamilton likely would have said so in *The Federalist No. 68*.

What does all of this mean for questions of the electoral count? As Senator Pinckney and the House Committee on Privileges and Elections in 1874 noted, state legislatures might have jurisdiction (perhaps exclusive jurisdiction) to decide on questions with respect to the validity of an elector's appointment.[468] Dean Wroth adopts this view. He has written that "[t]he plain implication of the original scheme is that the states in their control of the manner of appointment were to provide for the settlement of whatever controversies might arise.... Local authorities would naturally resolve any contest."[469]

The problem with this view is that it reads into the Times, Places, and Manner Clause some judicial power to look into the qualifications of an office holder. This would analogously imply that Congress has the judicial power to look into qualifications of

---

466. *Id.* at 365 (emphasis added).

467. U.S. CONST. art. I, § 4, cl. 1 (emphasis added).

468. Senator Pinckney had a much broader conception of the judicial power of State Legislatures, including the power "to insure the votes being legally given." *See* text accompanying *supra* note 462. However, it is especially hard to see how state legislatures have any jurisdiction over questions with respect to an elector's *vote* (whether, for example, that vote is constitutional or not). The "Manner" power of state legislatures is textually limited to the *appointment* of electors. Moreover, electors, once selected, are arguably independent of state legislatures.

469. Wroth, *supra* note 22, at 324.

Members of Congress because Congress has the ultimate control over the "Manner" of congressional election. The problem with this view is that such a power of Congress stands in seemingly direct violation of the power vested in each House of Congress to judge the qualifications of its members under the House Judging Clause.[470]

It is also difficult to see how state legislatures (and their tribunals) would have *exclusive* jurisdiction to settle whatever controversies might arise in the appointment of electors; the proper appointment of electors is very clearly a federal question which may be adjudicated by federal courts.

The most important problem, however, is a temporal one. Given the immediacy principle of the Electoral College Clauses,[471] there is simply no time to investigate—by the state legislatures and their tribunals or by federal courts—the validity of an elector's appointment once the electoral votes are being counted. Indeed, the better reading of the Electoral College Clauses may be that federal courts are vested with the judicial power to inquire into the proper appointment of electors between the "time of chusing the Electors" and "the Day on which they shall give their Votes." The problem here is that Members of Congress are not supposed to know who the electors in each state are in advance of the meeting of the electoral colleges, so that the electors may be as free and detached as possible. Moreover, Congress could easily make the time of choosing the electors the same day on which the electors shall give their votes,[472] leaving no time for the judicial investigation of electors' appointments.

Finally, in addition to the argument made by Senator Pinckney and the House Committee on Privileges and Elections in 1874, there is a broader argument that Congress should have no role in regulating presidential election. In reviewing Hamilton's justification for the Times, Places, and Manner Clause, we see that there could be no analogous "delicate crisis in the national situation"[473] if the state legislatures had the last word on determining "Manner." This is because our Constitution ensures that we will never be without a President.

One view is that the Electoral College Clauses were carefully crafted to provide for the election of a President should the states fail

470. U.S. CONST. art. I, § 5, cl. 1.

471. *See supra* notes 269–74 and accompanying text.

472. During the debate on the Act of 1792, Representative White expressed his wish that this be done "[i]f it had been possible." 3 ANNALS OF CONG. 278 (1791).

473. THE FEDERALIST NO. 59, *supra* note 392, at 333 (Alexander Hamilton).

in performing their constitutional duties. For example, Dean Wroth has written:

> The method for electing a President may be contrasted with the provisions for congressional elections. In the latter instance, as Hamilton pointed out in the *Federalist*, Congress must have ultimate control over the manner of election of its own members, lest the states, by refusing to elect Congressmen, cause the whole structure to fall. In the case of the presidency, since the House was ready to carry out the election if the states failed, congressional control was not only undesirable but unnecessary.[474]

Dean Wroth is clearly alluding to the provision of the Electoral College Clauses which empowers the House of Representatives to choose the President in case of electoral deadlock. While Dean Wroth is correct in his intuition that we will not be without a President, he is incorrect as a matter of text. The choice of President by the House of Representatives is not unconstrained, but is limited—to five persons by the original Constitution and now three persons by the Twelfth Amendment. If no states appoint electors and hence no electors vote, the House of Representatives could not elect a President (nor the Senate a Vice President).

In the case posited by Dean Wroth, however, it may be that under the original Constitution, the Presidential Succession Clause of Article II would kick in to ensure that we are not without a President.[475] This was the view of "Horatius" in a letter to the *Washington Federalist* on January 6, 1801—just five weeks before the troublesome election of then Vice-President Thomas Jefferson by the House of Representatives. In Horatius's view, the case of no election of President and Vice President by the electors fit squarely within the "removal" provision of the Presidential Succession Clause:

> The words used here [in the Presidential Succession Clause] are comprehensive enough to embrace every vacancy, and if they are construed not to embrace the case of removal by virtue of the constitutional terms of the offices of President and Vice-President, they will not embrace the vacancy most probable to happen, while they are admitted to embrace vacancies that are very improbable.[476]

---

474. Wroth, *supra* note 22, at 325.

475. U.S. CONST. art. II, § 1, cl. 6.

476. Horatius Letter, *supra* note 273; *see also id.* (observing that the word "removal" "comprehends the case where neither the electors nor the [H]ouse of [R]epresentatives shall elect a successor to the President whose time expires by virtue of the constitutional limitation").

We need not overly concern ourselves with the scope of "removal" in the Presidential Succession Clause because the Twentieth Amendment removes any ambiguity.[477] A critic would argue that this reading of the Presidential Succession Clause does not remove Congress from the business of electing the President when the states fail to fulfill their constitutional duties. Indeed, the Presidential Succession Clause explicitly invites *Congress* to legislate on the subject of presidential succession. However, under that clause, Congress specifies who shall *act as President* until a special, intervening presidential election, and not *who is President* as under the Electoral College Clauses. Moreover, prospective legislation under the Presidential Succession Clause—enacted behind a veil of ignorance well before any constitutional crisis—provides a much more legitimate solution than allowing the House of Representatives to choose the President based on the circumstances at hand, when party spirit is likely to govern the choice.

e. The Pro-Electors Principle

Fifth, the Constitution trusts electors in the process of presidential election. More precisely, the Constitution trusts electors with the last word on the persons receiving votes—period. This is the pro-electors principle of presidential election. The Electoral Count Act is unconstitutional to the extent that the joint convention may reject electoral votes in authentic electoral certificates as not "regularly given."[478] In other words, the joint convention may not examine the contents of electoral certificates and reject electoral votes because of the persons receiving votes.

As a structural matter, the electoral colleges constitute a separate and coordinate branch of the Government of the United States[479] (although as an "architextural" matter,[480] the electoral colleges occupy textual space in Article II along with the executive branch of the Government of the United States). What gives Congress or the joint convention the authority to judge electoral votes?

---

477. For the relevant text of the Twentieth Amendment, see text accompanying *infra* note 605.

478. 3 U.S.C. § 15 (2000).

479. Elsewhere, I have set forth a proof for the proposition that Electors occupy a "public Trust under the United States" because they are not Members of Congress, Members of the several State Legislatures, Officers of the United States, or Officers of the several States. *See* Kesavan, *supra* note 324, at 128–35; *cf.* 18 CONG. REC. 30 (1886) (remarks of Rep. Caldwell) (stating that "the elector is a Federal functionary, as much so as a Senator or Representative").

480. *See generally* Akhil Reed Amar, *Architexture*, 77 IND. L.J. (forthcoming 2002).

The electoral colleges are *inferior* neither to Congress nor to the joint convention. The numbers suggest as much: the number of electors is equal to the number of Senators and Representatives.[481] As a separate and coordinate branch of government, the electors should have interpretive authority of the Constitution with respect to the powers committed to them.[482] The founding generation understood that electors would be among the most virtuous citizens of the Republic.[483] The electors in the electoral college "houses" do "meet" and deliberate like Members of Congress.[484] They probably

481. *See* U.S. CONST. art. II, § 1, cl. 2.

482. For similar statements with respect to constitutional interpretation by the President, see Michael Stokes Paulsen, *The* Merryman *Power and the Dilemma of Autonomous Executive Branch Interpretation*, 15 CARDOZO L. REV. 81 *passim* (1993); Michael Stokes Paulsen, *The Most Dangerous Branch: Executive Power to Say What the Law Is*, 83 GEO. L.J. 217 *passim* (1994). For a similar statement with respect to constitutional interpretation by Congress, see Neal Kumar Katyal, *Legislative Constitutional Interpretation*, 50 DUKE L.J. 1335 *passim* (2001).

483. For example, John Jay argued:

> As the select assemblies for choosing the President, as well as the State legislatures who appoint the senators, will in general be composed of the most enlightened and respectable citizens, there is reason to presume that their attention and their votes will be directed to those men only who have become the most distinguished by their abilities and virtue, and in whom the people perceive just grounds for confidence.... If the observation be well founded that wise kings will always be served by able ministers it is fair to argue that as an assembly of select electors possess, in a greater degree than kings, the means of extensive and accurate information relative to men and characters, so will their appointments bear at least equal marks of discretion and discernment.

THE FEDERALIST NO. 64, at 359 (John Jay) (Clinton Rossiter ed., Mentor 1999) (1961); *see* 10 ANNALS OF CONG. 30–31 (1800) (remarks of Sen. Baldwin) ("Experience had proved that a more venerable selection of characters could not be made in this country than usually composed that electoral body."). To be sure, this understanding began to change in the first decade after the founding. *See, e.g.*, STANWOOD, *supra* note 7, at 51.

484. *See, e.g.*, U.S. CONST. amend. XII ("The Electors shall *meet* in their respective states, and vote by ballot for President and Vice-President....") (emphasis added); THE FEDERALIST NO. 68, *supra* note 246, at 380 (Alexander Hamilton) ("It was equally desirable that the immediate election should be made by men most capable of analyzing the qualities adapted to the station and acting under circumstances favorable to *deliberation*, and to a judicious combination of all the reasons and inducements which were proper to govern their choice.") (emphasis added). Hamilton further argued:

> [A]s the electors, chosen in each State, are to *assemble* and vote in the State in which they are chosen, this detached and divided situation will expose them much less to heats and ferments, which might be communicated from them to the people, than if they were all to be convened at one time, in one place.

*Id.* (emphasis added); *cf.* Vikram David Amar, *The People Made Me Do It: Can the People of the States Instruct and Coerce Their State Legislatures in the Article V Constitutional Amendment Process?*, 41 WM. & MARY L. REV. 1037, 1089 n.233 (2000) ("[T]he electoral college, like Congress and an Article V proposing convention, is truly a national group whose existence owes entirely to the Constitution. On the other hand, the electoral college does not 'meet' and deliberate like Congress or an Article V proposing