enjoy the same privileges and immunities as Members of Congress, including immunity from arrest and freedom of speech and debate.[485]

Importantly, the electors also enjoy considerable structural independence from Congress. Electors receive no compensation from Congress for their federal service, nor has any Congress, to my knowledge, ever compensated electors for such service.[486] Electors are also not subject to impeachment by the House of Representative or conviction by the Senate because they are not "civil Officers of the United States."[487]

The structural coordinacy of electors and their structural independence is destroyed if Members of Congress may second-guess the electors' judgments. Unlike inferior courts whose decisions may be judged by the Supreme Court,[488] the electors are not inferior to the joint convention of Senators and Representatives and may not be judged by them. As Representative Randolph put the point in 1821, "[T]he electoral college was as *independent* of Congress as Congress of them; and we have no right, said he, to *judge* of their proceedings."[489]

A simple counterfactual underscores the structural principles of coordinacy and independence. Imagine that the Framers gave Members of Congress, instead of electors, the choice of electing the President and Vice President. Would there be any question that Members of Congress would have the last word on the persons voted for in the presidential and vice presidential election? Would the Chief Justice of the United States refuse to administer the presidential oath or affirmation if the Members of Congress acted unconstitutionally? Would that matter?

---

convention.").

485. *See* U.S. CONST. art. I, § 6, cl. 1 ("They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech of Debate in either House, they shall not be questioned in any other Place."). For a claim that the President enjoys similar privileges although the Constitution does not so textually specify, see Amar & Katyal, *supra* note 423, at 702–08.

486. The Framers briefly considered the compensation of electors. *See* 2 FARRAND, *supra* note 35, at 73 ("Mr. Williamson moved that the Electors of the Executive should be paid out of the National Treasury for the Service to be performed by them. Justice required this: as it was a national service they were to render. The motion was agreed to nem.–con."). The provision was inexplicably dropped on subsequent debate.

487. *See* Kesavan, *supra* note 324, at 133 & n.46.

488. *See* U.S. CONST. art. III, § 2, cl. 2 ("In all other cases before mentioned, the supreme Court shall have appellate jurisdiction, both as to law and fact . . . .").

489. COUNTING ELECTORAL VOTES, *supra* note 3, at 51 (emphasis added).

*ELECTORAL COUNT ACT*

There is considerable historical support for the pro-electors principle of presidential election. Senator Baldwin, in his remarks against the Grand Committee Bill in January of 1800, succinctly observed

> that the Constitution in directing *Electors* to be appointed throughout the United States equal to the whole number of the Senators and Representatives in Congress, for the express purpose of entrusting this Constitutional branch of power to them, had provided for the existence of as respectable a body as Congress, and in whom the Constitution on this business has more confidence than in Congress.[490]

Senator Baldwin's statement highlights two important points: in absolute terms, the Constitution trusts electors, and in relative terms, the Constitution trusts electors *more* than Members of Congress.

Senator Baldwin then posed a powerful counterfactual: What if the Constitution had provided that the electors meet at some central location instead of meeting in their respective states?[491] The answer was obvious—the electors, not some other body, would resolve the problems of the electoral count.[492] It therefore followed, according to Senator Baldwin, that the joint convention of Senators and Representatives had no additional power to judge electoral votes just because the electors meet in their respective states and not at some central location. He stated, "It having been deemed more safe by the Constitution to form them into different Electoral colleges, to be assembled in the several States, does not at all alter the nature or distinctness of their powers, or subject them any more to the control of the other departments of the Government."[493] In his closing remarks, he observed that:

---

490. 10 ANNALS OF CONG. 30 (1800).

491. The Framers considered and rejected this idea. *See* 2 FARRAND, *supra* note 35, at 525; *id.* at 526 ("Mr. Spaight said if the election by Electors is to be crammed down, he would prefer their meeting altogether and deciding finally without any reference to the Senate and moved 'That the Electors meet at the seat of the General Government.' "). This motion failed with all States in the negative except North Carolina. *Id.* Senator Baldwin, a Framer, no doubt remembered this history.

492. Senator Baldwin argued:
> If this body of the Electors of all the States had been directed by the Constitution to assemble in one place, instead of being formed into different Electoral colleges, he took it for granted none of the questions on which this [Senator Ross's] resolution has been brought forward, would have occurred; every one would have acknowledged that they were to be settled in that assembly.
10 ANNALS OF CONG. 31.

493. *Id.* at 31–32.

> [A]ll the questions which had been suggested were as safely left to the decision of the assemblies of Electors as of any body of men that could be devised; and that the members of the Senate and House of Representatives, when met together in one room, should receive the act of the Electors as they would the act of any other Constitutional branch of the Government, to judge only of its authentication, and then to proceed to count the votes, as directed in the second article of the Constitution.[494]

This statement underscores the critical distinction in the problems of the electoral count. The joint convention of Senators and Representatives should "judge only of [the] authentication" of the acts of electors (that is, their electoral certificates), but not judge the acts of electors (that is, their electoral votes).[495]

Senator Pinckney, in his lengthy speech against the Grand Committee Bill in March of 1800, elaborated on the pro-electors principle of presidential election in the specific context of the presidential ineligibility problem of the electoral count—that is, the elector who votes for a President who is not constitutionally qualified. He believed that virtuous electors simply would not vote for a President of doubtful constitutional qualifications given the "immense power" of the President.[496] If they did, however, he had a forcible answer:

> It is true they, as well as any other Constitutional branch of this Government acting under that instrument, may be guilty of taking unconstitutional or corrupt steps, but they do it at their peril. Suppose either of the other branches of the Government, the Executive, or the Judiciary, or even Congress, should be guilty of taking steps which are unconstitutional, to whom is it submitted, or who has control over it, except by impeachment? *The Constitution seems to have equal confidence in all the branches on their own proper ground, and for either to arrogate superiority, or a claim to greater confidence, shows them in*

---

494. *Id.* at 32.
495. This critical distinction in the problems of the electoral count is explained in Part III.A *infra*.
496. Senator Pinckney argued:
     Who, when he reflects on the immense power the President possesses, can suppose that any man, honorably selected by his fellow-citizens as an Elector, could for a moment be so lost to a sense of his own and his country's welfare, as to vote for a man as the Supreme Executive, whose citizenship or residence were doubtful, and who were not of sufficient age?
10 ANNALS OF CONG. 132.

*particular to be unworthy of it, as it is in itself directly unconstitutional.*[497]

In sum, in the process of presidential election, the Constitution trusts electors with the last word on the persons receiving votes. The joint convention does not sit in judgment of the acts of electors—that is, their electoral votes. At a minimum, the point is a relative one: the Constitution trusts electors more than Members of Congress. It is thus unconstitutional for the joint convention to reject electoral votes contained in authentic electoral certificates—even when those electoral votes are unconstitutional.

### 2. Principles of Rule-Making and Law-Making

The Electoral Count Act violates two critical structural principles of our Constitution: the anti-binding principle of rule-making and the *Chadha* principle of law-making. These structural arguments create a rather compelling case that the Electoral Count Act is unconstitutional.

#### a. The Anti-Binding Principle of Rule-Making

The anti-binding principle of rule-making prevents one Congress from binding another with respect to the rules of proceedings.[498] Moreover, one Congress cannot bind each House of Congress in a current Congress (let alone that of future Congresses) with respect to the rules of proceedings. Article I, Section 5, Clause 2 expressly reflects this principle by providing that "[e]ach House may determine

---

497. *Id.* at 31 (emphasis added).

498. For a brilliant article on this general (and generally neglected) subject, see Paul W. Kahn, *Gramm-Rudman and the Capacity of Congress to Control the Future*, 13 HASTINGS CONST. L.Q. 185 (1986). A starting point is Blackstone's maxim: "Acts of Parliament derogatory from the power of subsequent Parliaments bind not." 1 WILLIAM BLACKSTONE, COMMENTARIES *90. For an extensive collection of British sources on this point, see Brett W. King, *Deconstructing Gordon and Contingent Legislative Authority: The Constitutionality of Supermajority Rules*, 6 U. CHI. L. SCH. ROUNDTABLE 133, 188 n.248 (1999).

Professor Kahn's argument is that there are two types of statutes: "first-order rules" and "second-order rules." The former type addresses behavior directly, and includes most laws; the latter type addresses other rules, imposing burdens on constitutionally assigned functions (for example, legislation), and necessarily raises questions as to what Congress may accomplish by statute versus by constitutional amendment. According to Kahn, the Balanced Budget and Emergency Deficit Control Act of 1985, popularly known as Gramm-Rudman, is a second-order rule, and therefore raises interesting and significant constitutional problems. He further argues that a future Congress's freedom to repeal a second-order rule does not cure the constitutional infirmities of such legislation. *See* Kahn, *supra*, at 190–204.

the Rules of its Proceedings."[499]  Indeed, as a formal matter, the rules of proceedings in the House of Representatives expire at the end of the term of each House and are re-enacted by the next House.[500]  (In contrast, the rules of proceedings in the Senate do not expire because the Senate is a continuing body.[501])

The Electoral Count Act clearly violates the anti-binding principle of rule-making.  The Electoral Count Act is a law of proceeding for the electoral count, not a rule of proceeding like the Twenty-second Joint Rule.[502]  As such, the Electoral Count Act

---

499. U.S. CONST. art. I, § 5, cl. 2. Professor Kahn usefully relates that "the House [of Representatives] has taken the position that it is free to abandon statutory provisions that purport to regulate internal House procedures." Kahn, *supra* note 498, at 226. He discusses an early precedent within the first decade after the founding concerning a subject relevant to the one at hand:  determining the outcome of disputed *congressional* elections. He observes:

> When Congress passed in 1797 a statute designed to regulate disputed elections, members in the House objected to the statute as an infringement on each house's rules powers. The statute was defended as legitimate because it did not prescribe rules for the House but rather procedures binding on the general public, outside of Congress.  The House later adopted the position that no power constitutionally committed to one House by the Constitution could be abridged by an earlier statute.

*Id.* at 226 n.149 (citing 7 ANNALS OF CONG. 683–84 (1797) (statement of Rep. Sitgreaves); 1 AMERICAN STATE PAPERS CLASS 10, No. 99, 5th Cong., 2d Sess. 159–60 (1797); 36 CONG. REC. 231–35 (1902) (contested election statute); CONG. GLOBE, 35th Cong., 1st Sess. 725–34 (1858) (same)).

500. *See* Catherine Fisk & Erwin Chemerinsky, *The Filibuster*, 49 STAN. L. REV. 181, 245 n.373 (1997) (citing RULES OF THE HOUSE OF REPRESENTATIVES, H.R. DOC. NO. 103-342, at 768 (1995)); *see also* Gojack v. United States, 384 U.S. 702, 706 n.4 (1966) ("Neither the House of Representatives nor its committees are continuing bodies.").

501. *See* Julian Eule, *Temporal Limits on the Legislative Mandate:  Entrenchment and Retroactivity*, 1987 AM. B. FOUND. RES. J. 379, 408; Fisk & Chemerinsky, *supra* note 500, at 245 n.375 (citing SENATE COMM. ON RULES & ADMIN., STANDING RULES OF THE SENATE, S. DOC. NO. 102-25, at 4 (1992)).

502. There should be no question that the Electoral Count Act is a law that regulates a particular proceeding. To be sure, Members of Congress identified it as a "permanent rule" or "fixed rule" during the Electoral Count Act debates.  *See, e.g.,* COUNTING ELECTORAL VOTES, *supra* note 3, at 520 (1876) (remarks of Sen. Bayard) (referring to "framing of such a permanent rule in the shape of law upon this subject as would be satisfactory to the American people"); *id.* at 523 (remarks of Sen. Bayard) ("[F]or this is not a law for to-day only; it is to become a settled law, a fixed rule, requiring for its repeal the assent of a majority of each house and the President of the United States."); 18 CONG. REC. 30 (1886) (remarks of Rep. Caldwell) ("This bill is to prescribe the mode in which this count shall be made . . . ."); *id.* at 49 (1886) (remarks of Rep. Eden) ("The object of the bill of the Senate is to fix certain rules by which the two Houses shall be governed in counting the electoral vote."); *id.* at 50 (similar).  Not surprisingly, some Members of Congress put the terms "law" or "joint rule" on the same constitutional plane in discussing the counting of electoral votes.  *See, e.g.,* 17 CONG. REC. 815 (1886) (remarks of Sen. Sherman) (noting that "this most important duty of counting the electoral vote . . . is now without law or rule to govern the mode and manner of its procedure"); 18 CONG. REC. 30

impermissibly binds the actions of future joint conventions. During the Electoral Count Act debates, Members of Congress naturally recognized that the Electoral Count Act would be used to bind the actions of future joint conventions by settling questions of counting electoral votes in advance.[503]   Indeed, in describing Congress's motivation in passing the Electoral Count Act, Professors Issacharoff, Karlan, and Pildes state that "Congress needed a *binding rule*, because the previous approach of counting electoral votes under a joint procedural rule that could be revoked by either house had led to the rule being revoked whenever one house disapproved of the results it would produce."[504]

Two sections of the Electoral Count Act—3 U.S.C. §§ 5 and 15—impermissibly bind (or purport to bind) the joint convention in counting electoral votes. The former section, the one at issue in *Bush v. Gore*, provides:

> If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, *shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution*, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.[505]

The latter section, as we have seen, binds the joint conventions with an intricate set of rules for counting electoral votes.[506]   This

---

(1886) (remarks of Rep. Caldwell) ("Congress may provide by law or joint rule the manner of counting the [electoral] vote."); *id.* at 46 (1886) (remarks of Rep. Dibble) ("[I]t is competent for Congress, by statute or by joint agreement, joint resolution, or joint rule, to name individuals to exercise the duty of making the [electoral] count.").

503. *See, e.g.*, 18 CONG. REC. 30 (remarks of Rep. Caldwell) ("[T]his bill if passed will be an authoritative expression of the Constitution erected into law in advance of any complication which may again arise, as it has in the past, as to the counting the electoral votes of the States and the declaration of the result."); *id.* ("The passage of this bill will settle all the questions which have arisen from time to time as to the electoral count.").

504. ISSACHAROFF ET AL., *supra* note 18, at 97 (emphasis added). For expressions of this concern during the Electoral Count Act debates, see 17 CONG. REC. 815 (remarks of Sen. Sherman), *id.* at 2427 (remarks of Sen. Hoar), and 18 CONG. REC. 50 (remarks of Rep. Eden).

505. 3 U.S.C. § 5 (2000) (emphasis added).

506. *See* Part I.A.4 *supra*.

section binds the joint conventions with even the most minor of rules, including a rule that "certificates and papers shall be opened, presented, and acted upon in the alphabetical order of the States, beginning with the letter A."[507] Thus, unless the Electoral Count Act is repealed or amended, future joint conventions could not proceed with counting electoral votes in reverse alphabetical order of states in the Union without acting *illegally*.

Two constitutional problems should be apparent. First, Congress might not have the authority to determine the rules of proceedings for *its* joint convention. The joint convention is decidedly not Congress, but a distinct parliamentary body with constitutionally-assigned functions.[508] Indeed, under our Constitution, Congress may not even determine the rules of proceedings of the House of Representatives or the Senate.[509] It would seem to follow that the joint convention has the constitutional prerogative to determine the rules of its proceedings when it meets once every four years. Second, even if Congress may bind its joint convention, Congress may not bind the joint convention *of future Congresses* in the exercise of constitutionally-assigned functions.

The anti-binding principle of rule-making should be a conclusive structural argument that the Electoral Count Act is unconstitutional. It is a formalist argument, however, and undoubtedly will be criticized as such.

Consider the writings of one of our leading constitutional scholars on the very question of the anti-binding principle, and in the very context of counting electoral votes. Professor Amar, in an essay on presidential succession originally prepared and submitted as testimony before the Senate Judiciary Subcommittee on the Constitution on February 2, 1994, recommended that "Congress should provide by statute that an electoral vote for any person who is dead at the time of the congressional counting *is a valid vote, and will be counted*, so long as the death occurred on or after Election Day."[510] Recall the Greeley incident of 1872[511]—the specific case that

---

507. 3 U.S.C. § 15.

508. Even if one believes that the counting function is committed to Congress and not to the joint convention, it is not at all clear that one Congress may bind itself in advance with respect to rules of proceedings of the electoral count. For a thoughtful discussion of one Congress binding itself with respect to rules of proceedings of legislation, see John O. McGinnis & Michael B. Rappaport, *The Constitutionality of Legislative Supermajority Requirements: A Defense*, 105 YALE L.J. 483, 506 n.109 (1995).

509. *See supra* notes 498–501 and accompanying text.

510. Amar, *supra* note 10, at 222.

511. *See supra* notes 143–48 and accompanying text.

Professor Amar sought to remedy by statute.[512]  To be sure, Professor Amar defended his proposal against the formalist argument of the anti-binding principle of rule-making:

> Spoilsports might argue that, strictly speaking, any legislation passed today could not conclusively bind a future result-oriented Congress, which would be free to replace the earlier law after [President-elect] Smith's death but before the official vote counting in Congress. (One Congress cannot generally bind a successor Congress.) *And worrywarts might fret over whether our proposed legislation should be enacted as a law rather than a joint or concurrent resolution, since it seeks to regulate how votes will be counted in Congress itself.* (Sections 15 through 18 of Title 3, however, do provide a clear precedent for regulating congressional vote-counting by law.)
>
> The spoilsports and worrywarts largely miss the point. *The key function of our proposed legislation is to serve as a precommitment and focal point.* With our proposed legislation on the books, it will be much more difficult, politically, for a future result-oriented Congress to change the rules and discount the votes for Smith. The principled precedent will be our legislation, not the Greeley affair. Citizens, pundits, reporters, and politicians will be able to point to the plain language, in black and white, in the United States Code, answering the question of the hour. Any deviation from this clear focal point will obviously smack of changing the rules in the middle of the game—indeed, after the game has ended.[513]

Call me a worrywart, but not a spoilsport. Indeed, if we are to "take text and structure seriously" and not follow "free-form" methods of constitutional interpretation,[514] call me a worrywart again. Professor Amar's statement leaves little doubt that the Electoral Count Act is *formally* unconstitutional. But does worrywart formalism make the Electoral Count Act any less unconstitutional?

---

512.  *See, e.g.*, Amar, *supra* note 10, at 218–19, 226–27, 228–29.

513.  *Id.* at 227 (emphasis added); *cf.* Harrison, *supra* note 23, at 714 (discussing ad hoc solutions to problems of the electoral count and describing the strength of having a rule, even if not the right one, as "enabl[ing] the country to avoid total political gridlock or even violence").

514.  *See generally* Laurence H. Tribe, *Taking Text and Structure Seriously: Reflections on Free-Form Method in Constitutional Interpretation*, 108 HARV. L. REV. 1221 (1995) (criticizing the "free-form" method of constitutional interpretation as an assault on the coherent and constrained character of the legal enterprise and calling for a method that is attentive to the "stubborn truths" of text, history, and structure).

Is the Electoral Count Act a "law" that only has political but not legal force?

More recently, the anti-binding problem of rule-making is coming to the fore in the burgeoning literature on *Bush v. Gore*. Scholars from both sides of the political aisle have taken notice of the point (at least in passing) in their discussions of 3 U.S.C. § 5, the so-called "safe harbor" provision. In an article published after the case, Professor Tribe, a member of Vice President Gore's legal team, states, "There is no constitutionally prescribed method by which one Congress may require a future Congress to interpret or discharge a constitutional responsibility in any particular way."[515] And in a very brief discussion of 3 U.S.C. § 15, he states, "It is true that even that procedure, untested in the 114 years during which it has been in place, was shadowed by constitutional doubt over the power of one Congress to bind its successors in such matters."[516]

Likewise, in a forthcoming article, Professor Lund, a defender of *Bush v. Gore* and a proponent of Bush-*pere* states:

> This statute, 3 U.S.C. § 5, purports to bind Congress in exercising its constitutional duty to count electoral votes. I doubt that this can constitutionally be accomplished by a statute. Each house of Congress has the authority to determine its own rules of proceeding, and it is far from clear that a statute can override that authority. But even if 3 U.S.C. § 5 is unconstitutional in this sense, that has no bearing on the legal issues that arose in *Bush v. Gore*.[517]

Not surprisingly, the anti-binding principle of rule-making featured prominently in the Electoral Count Act debates. Several Senators made the point that Congress cannot bind the joint convention,[518] and that even if Congress could bind its joint

---

515. Tribe, *supra* note 17, at 267 n.388 (citing 1 LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 2-3, at 125–26 n.1 (3d ed. 2000)). The Gore legal team did not make this argument in any of the briefs filed in *Bush v. Gore*.

516. *Id.* at 277.

517. Nelson Lund, *The Unbearable Rightness of* Bush v. Gore, 23 CARDOZO L. REV. (forthcoming 2002) (manuscript at 61 n.140, on file with the North Carolina Law Review) (citation omitted). For an extended discussion of the point with respect to 3 U.S.C. § 5, see Michael J. Glennon, *Nine Ways to Avoid a Train Wreck: How Title 3 Should Be Changed*, 23 CARDOZO L. REV. (forthcoming 2002) (manuscript at 9–15, on file with the North Carolina Law Review).

518. On the former point that Congress cannot bind the joint convention by law or joint rule, Senator Stockton remarked:

> If a constitutional amendment is not necessary, then those two bodies there assembled have the power to regulate the way they shall count the vote, and if they have not the power it certainly does not exist in these two bodies sitting before the Congress meets, before the body to whom the Constitution of the

*ELECTORAL COUNT ACT*

convention, Congress cannot bind future joint conventions. Senator Hager put the latter point best. The counting of electoral votes was a self-executing constitutional duty, and according to Senator Hager, "[W]e cannot here establish a rule by which we dictate to another Congress how they shall perform a constitutional duty."[519]  He believed that neither the Twenty-second Joint Rule nor the Electoral Count Act would have "any binding force upon the Congress that must act in this matter under the Constitution."[520]  He colorfully continued:

> Can you say, sir, that you may limit your powers or add to them by any legislation here?  Can you bind your successors in any matter of constitutional legislation?  Turn to the powers that Congress has.  Congress may "lay and collect taxes, duties, imposts, and excises."  You might just as well undertake to pass a law here pointing out how Congress shall levy taxes and imposts, as to undertake to regulate them in the performance of a constitutional duty in regard to this matter.  As well might one supreme court undertake to bind their successors as for one Congress to undertake to bind their successors.  It cannot be done either by legislation or by any rule that you may see fit to adopt.
>
> I admit that there is an imperfection in this part of the Constitution as to how the joint body when assembled together shall proceed to act and determine the result of the election.  *But as the duty is imposed upon the Senate and the House of Representatives it is for them and each body that is called upon to act in that capacity to regulate rules for themselves.*[521]

Thus, the joint convention was to determine the rules of its own proceedings.  But Senator Hager advanced a fallback position.  He reluctantly admitted that Congress could regulate the proceedings of its own joint convention by law, but strenuously maintained that Congress could not regulate the proceedings of future joint conventions.  He stated:

---

United States has committed the power to count the next vote of presidential electors has convened.  At a session before they are elected, you are here making laws to prevent them from doing that which was committed to them alone, and not to you, by the Constitution of the United States.

COUNTING ELECTORAL VOTES, *supra* note 3, at 500; *see also id.* at 515 (remarks of Sen. Stockton) ("The truth is and the honest truth is that the twenty-second joint rule ought never to have been passed.  The whole power rested in the joint assembly when it met.").

519. *Id.* at 510 (remarks of Sen. Hager).

520. *Id.*

521. *Id.* (emphasis added).

*NORTH CAROLINA LAW REVIEW* [Vol. 80

I admit we could pass a law here to regulate the election if we were to act in the matter. If we were to meet next week to count the electoral vote we could by the concurrence of both houses pass a law to regulate our action in the matter; *but we cannot, I say, pass a law to regulate the action of a future House or future Senate when they meet to perform a constitutional duty.*[522]

Senator Hager thus concluded that the Electoral Count Act bill "will be clearly unconstitutional."[523]   Other Members of Congress made similar statements.[524]

---

522. *Id.* (emphasis added). Senator Hager also remarked:

> I am satisfied that we cannot bind our successors by any legislation in regard to a constitutional duty that they have to perform. They themselves must judge how they shall perform it; and you might as well undertake to dictate that they should do it in a particular way to accomplish a particular result as to undertake to say that they shall do it according to the provisions of this bill.

*Id.*

523. *Id.* at 511.

524. Senator Sherman argued:

> Sir, if we put our joint rule, the whole of it, in the form of law, the Constitution gives to each house the power to make rules for its own government and the power to make joint rules for the government of the two houses.  That is a constitutional power, and this Forty-third Congress cannot deprive the next Congress of the power of making rules for the government of the two houses or for the government of either house. There the constitutional privilege overrides all your laws.

*Id.* at 516 (remarks of Sen. Sherman). Senator Boutwell stated:

> Here is a duty imposed upon Congress by the Constitution; it is a duty to be exercised at stated periods.  The provision of the Constitution does not operate upon every Congress, but it operates upon particular Congresses.  Now, can a Congress to which or upon which the provision of the Constitution does not attach at all legislate and bind the conscience and the judgment of a Congress that is to perform a duty imposed by the Constitution especially upon itself?  I have great doubt upon that point, whether, if the exigency should arise when it would be thought desirable, so desirable as to be expedient, for one branch or the other of Congress to disregard the law, (and that would be just the exigency when probably the law should be observed,) we should not find one body or the other willing to take the responsibility and, upon the argument that could be presented, to go to the country for justification.

*Id.* at 531. Senator Ingalls remarked:

> I shall be instructed far beyond my expectations if some great constitutional lawyer . . . can assure me how any legislative enactment that we may adopt now or at any time can in any manner whatever bind that great political tribunal which is to meet to declare the result of the presidential election in 1888 . . . . [W]hether the President of the Senate is to count the vote, whether the vote is to be counted by the Senate and House of Representatives separately or jointly, whether it is to be counted by the tribunal proposed by the Senator from Ohio, the fact still remains that the vote is to be counted, and that no act can be passed by any antecedent Congress that can deprive either of the persons or any of those great constituent bodies of the powers that they possess and which they are directed to exercise under and by virtue of the twelfth article of the amendments

In sum, the Electoral Count Act violates the anti-binding rule of rule-making because it is a law and not a rule. Ironically, the Electoral Count Act would be closer to constitutionality if it were a rule like the Twenty-second Joint Rule. If, however, the Electoral Count Act were repealed and readopted as a joint rule, the constitutional problem would remain whether Congress may bind the joint convention. Constitutional structure strongly suggests that the joint convention has the constitutional prerogative of determining the rules of its own proceedings.[525]

### b.   The *Chadha* Principle of Law-Making

The Electoral Count Act's requirement that the two Houses of Congress concur in rejecting electoral votes in the single return case and to accept electoral votes in the multiple returns case is strange and complicated.[526] This requirement is by design—recall that one purpose of the Electoral Count Act was to eliminate the "one House veto" of the Twenty-Second Joint Rule. Senator Morton, the original sponsor of what was to become the Electoral Count Act, stated,

> If we are to have a rule at all, if Congress is to interfere, let it be upon the ground on which a law is passed or a resolution is passed. It requires the vote of the two houses to pass a law, no matter how small or unimportant that law may be.[527]

---

to the Constitution.

17 CONG. REC. 1025 (1886). Representative Adams remarked:

> [T]he real question will arise when the two Houses meet here to pass upon the electoral votes in the next Presidential election; and those Houses, in my judgment, when they meet here to discharge a duty which is expressly imposed upon them by the Constitution, will not be bound by the action of the Senate and House of the Forty-ninth Congress and the President, when he signs this bill, if it shall pass. It is their duty, conferred on them by the Constitution, to count the votes. If for any reason whatever a single return shall appear to both Houses of Congress to be an invalid return they have the right so to determine; and if they do so determine, that vote will not be counted, however many statutes we may pass like this.

18 CONG. REC. 51 (1886); *see also id.* at 51–52 (remarks of Rep. Adams) (similar).

525. The critic would argue (persuasively) that the joint convention should not waste time determining the "shape of the table" on the important day of the electoral count. The two Houses of Congress are free to create a joint rule purporting to bind the joint convention. But the requirement of formalism remains. As the first matter of business, the joint convention should (and will in all likelihood) formally adopt the joint rule as *its* rule of proceeding.

526. *See* 3 U.S.C. § 15 (2000).

527. COUNTING ELECTORAL VOTES, *supra* note 3, at 453.

Ironically, the concurrence of the two Houses raises significant constitutional problems.   Consider one of the most important structural features of Article I:

> Every  Order,  Resolution,  or  Vote,  to  Which  the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two[-]thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.[528]

When  the  two  Houses  of  Congress  concur  in  rejecting  or accepting electoral votes, the vote is not presented to the President—and, as we have seen, for good reason.[529]  The question is whether this lack of presentment is constitutional.

Scholars  who  have  addressed  this  presentment  problem  in  the wake of *INS v. Chadha*[530]  have  doubted  the  existence  of  a presentment  problem  in  the  Electoral  Count  Act  because  the concurrent action of the two Houses in counting electoral votes is not legislative in nature.[531]  Clearly, the counting of the electoral votes is not legislative in nature.[532]  However, this conclusion does not dispose

---

528. U.S. CONST. art. I, § 7, cl. 3.

529. *See supra* notes 457–60 and accompanying text (presenting structural argument for anti-President principle in presidential election).

530. 462 U.S. 919, 958 (1983) (holding that section of Immigration and Nationality Act authorizing one House of Congress, by resolution, to invalidate decision of Executive Branch  to  allow  a  particular  deportable  alien  to  remain  in  the  United  States  is unconstitutional,  because  such  action  is  legislative  and  is  therefore  subject  to  the bicameralism and presentment requirements of Article I of the Constitution).

531. *See, e.g.*, GLENNON, *supra* note 18, at 43 ("While such an action is technically within the scope of the *Chadha* test, it is doubtful that the Constitution requires that a congressional objection be presented to the president" because the counting of electoral votes  is  not  a  "lawmaking  function."); Ross & Josephson, *supra* note 7, at 727 n.317 ("The suggestion  that  Congress  cannot  exercise  its  counting  function  bicamerally  without presidential  action  is  probably  not  well  taken.   The  [Presentment  Clause]  has  been interpreted to refer only to legislative action.  Whatever the houses are doing when they are counting electors' votes, they are not enacting laws.") (citations omitted).

532. During the Electoral Count Act debates, some Members of Congress made this point.  Senator George made this point with ample frequency. *See, e.g.*, 17 CONG. REC. 1063 (1886) (stating that "whoever does determine what votes shall be counted performs a judicial act"); *id.* at 2429 (1886) ("What kind of business is [counting electoral votes]? It certainly  is  not  legislative  business.   It  is  the  ascertainment  of  a  fact  and  a  very  important fact to this country."); *id.* (stating that counting electoral votes "is not a legislative function which ought to be considered separately by the two Houses, but it is rather in the nature of a judicial function").  Senator Hoar also made the point that counting electoral votes was not a legislative act. *See, e.g., id.* at 1020 (remarks of Sen. Hoar) (judicial act).  Senator

of the *Chadha* problem.  Contrary to what Professor Ross and Mr. Josephson have suggested, the Presentment Clause is not solely about legislative action.[533]

The text of the Presentment Clause itself suggests as much.  The single exception identified in the clause—"except on a question of Adjournment"[534]—is not legislative but procedural in nature.  If the Presentment Clause is only about legislative action, why does the clause specify this non-legislative exception?[535]  There are at least two other exceptions to presentment in the non-legislative context, each with a strong justification.   Presentment is not required when Congress proposes amendments to the Constitution under Article V,[536] or when Congress removes an office-holding disability under Section 3 of the Fourteenth Amendment because, in each case, the two-thirds vote requirement is precisely that needed to override a

---

Edmunds stated that "this act of receiving and counting these votes is not a legislative act, and I say with equal emphasis that, in my opinion, it is not a judicial act, because the Constitution of the United States has not imputed any such judicial power to either or both of the Houses." *Id.* at 1064.  In his view, the counting of electoral votes "is an administrative act, the same sort of administrative act that every State which existed at the time of the formation of the Constitution imputed to its executive and election officers in the canvassing and return of votes and in the final ascertainment of them by some body, for the institution of every officer of a State from a justice of the peace or an overseer of the poor up at least to its governor." *Id.*

533.  *See* Ross & Josephson, *supra* note 7, at 727 n.317 ("The [Presentment] Clause has been interpreted to refer only to legislative action.").

534.  U.S. CONST. art. I, § 7, cl. 3.

535.  It is arguable that the exception was inserted to simply clarify the meaning of the clause or out of an abundance of caution.  *See generally* Akhil Reed Amar, *Constitutional Redundancies and Clarifying Clauses*, 33 VAL. U. L. REV. 1 (1998) (asserting that "[a] considerable number of constitutional clauses are redundant in a certain sense; they illuminate and clarify what was otherwise merely implicit").  The secret drafting history of the Presentment Clause suggests otherwise.  For example, the Committee of Style inexplicably dropped the italicized language in the proposed clause:

> Every order, resolution or vote, to which the concurrence of the Senate and House of Representatives may be necessary (*except on a question of adjournment and in the cases hereinafter mentioned*) shall be presented to the President for his revision; and before the same shall have force, shall be approved by him, or, being disapproved by him, shall be repassed by the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill.

2 FARRAND, *supra* note 35, at 569 (emphasis added); *see* 2 *id.* at 594.  During the Electoral Count Act debates, Senator Hoar asserted that "[t]here are all through the Constitution, among the powers of these two Houses, powers which require the concurrence of the two Houses for their exercise, but which, not relating to legislation, are never held to require the assent of the President or to be presented to the President," but failed to present any examples other than Article V.  17 CONG. REC. 2429.

536.  *See* INS v. Chadha, 462 U.S. 919, 955 n.20 (1983); Hollingsworth v. Virginia, 3 U.S. (3 Dall.) 378, 381 (1798).

presidential veto under the second part of the Presentment Clause.[537] Clearly, the Electoral Count Act lacks this justification: a simple majority vote of each House is sufficient to reject an electoral vote. Moreover, the Impeachment Clauses furnish an important background lesson. Impeachment is a paradigmatic non-legislative activity and presentment in case of impeachment would be silly—much like the case of counting electoral votes. The impeachment powers are finely wrought and intended to avoid concurrent action of the two Houses: only the House may institute an impeachment;[538] only the Senate may try one;[539] and a two-thirds super-majority of Senators is required for a conviction of impeachment.[540]

This presentment problem was raised at least once during the Electoral Count Act debates as an argument against its constitutionality. Senator George called the presentment problem a "conclusive objection" to separate action of the two Houses.[541] "[I]t is impossible," said Senator George, "to escape from the express language of the Constitution that 'every order,' not every bill, not every act, not every statute, but every 'order,' every 'resolution,' every 'vote,' in the language of the Constitution, to which the concurrence of the two Houses is necessary, shall be presented to the President for his signature."[542] Senator Hoar responded that the Presentment Clause only related to legislative matters.[543]

---

537. Senator George made precisely this response to Senator Hoar during the Electoral Count Act debates with respect to the Article V presentment question. *See* 17 CONG. REC. 2429. Senator Hoar then asked if "the joint rules of the two Houses must be presented to the President because to their validity they require the concurrence of the two Houses?" *Id.* Senator George, relying upon the Rules of Proceedings Clause, responded that each House, in addition to making its own rules, "may also make rules besides its own separate rules for its joint action with the House, and in the same way the House may perform that function, and in that way reach joint rules." *Id.*

538. *See* U.S. CONST. art. I, § 2, cl. 5 ("The House of Representatives shall chuse their Speaker and other Officers; and shall have the sole Power of Impeachment.").

539. *See* U.S. CONST. art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments.").

540. *See id.* ("And no Person shall be convicted without the Concurrence of two[-]thirds of the Members present.").

541. *See* 17 CONG. REC. 2428–29. Professor Ross and Mr. Josephson note that Representative Adams also addressed the presentment problem in Electoral Count Act debate in the House of Representatives in late 1886, but I fail to find any such evidence. *See* Ross & Josephson, *supra* note 7, at 727 n.317 (citing 18 CONG. REC. 51–52 (1886) (remarks of Rep. Adams)).

542. 17 CONG. REC. 2428–29.

543. *See id.* at 2429 ("[The Presentment Clause] never has been held anywhere, so far as I know, to apply to anything but legislative matters which are to take effect upon the people by the authority of the Congress. There are all through the Constitution, among

A close reading of *Chadha*, unavailable of course to the participants in the Electoral Count Act debates, fortifies the basic argument made by Senator George and casts further doubt upon the constitutionality of the Electoral Count Act. The *Chadha* Court carefully explained why the "one-House veto" provision of the Immigration and Nationality Act was subject to the requirements of bicameralism and presentment in Article I.[544] The Court began by noting that "[w]hether actions taken by either House are, in law and fact, an exercise of legislative power depends not on their form but upon 'whether they contain matter which is properly to be regarded as legislative *in its character and effect*.'"[545] The Court then described the one-House veto provision in that case as one that "had the purpose and effect of altering the legal rights, duties and relations of persons, including the Attorney General, Executive Branch officials and Chadha, all outside the legislative branch,"[546] which was the first of a series of four arguments in the Court's conclusion that the provision was subject to the bicameralism and presentment requirements of Article I.[547]

The counting (and not counting) of electoral votes by a simple majority of the two Houses of Congress, acting separately and concurrently, sounds like an action that has "the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch,"[548] if there ever was one. This bicameral procedure in counting electoral votes would therefore require presentment. Even if the counting of electoral votes is more properly described in the first instance as a "judicial act," this conclusion would not be changed under the *Chadha* Court's conception of legislative power.[549] If the Electoral Colleges Clauses require (or permit) bicameralism but not presentment in counting electoral votes, the Court simply did not mention it.[550]

---

the powers of these two Houses for their exercise, but which, not relating to legislation, are never held to require the assent of the President or to be presented to the President.").

544. *See* 462 U.S. at 952–58.

545. *Id.* at 952 (emphasis added) (citation omitted).

546. *Id.*

547. *See id.* at 956–57.

548. *Id.* at 952.

549. *See id.* at 957 n.21 (discussing Justice Powell's position that the one-House veto provision is a "judicial act" and concluding that "[w]e are satisfied that the one-House veto is legislative in purpose and effect and subject to the procedures set out in Art. I").

550. In a footnote, the Court identified one exception to the Presentment Clause, and suggested another. *See id.* at 955 n.20. The exception was for the proposal of constitutional amendments by two-thirds of both Houses of Congress under Article V. *Id.* (citing Hollingsworth v. Virginia, 3 U.S. (3 Dall.) 378 (1798)). The Court then suggested

Furthermore, if the two-House veto provision of the Electoral Commission of the Hayes-Tilden Incident of 1877—which enabled the two Houses of Congress to overturn the findings of that commission without presentment—is constitutionally problematic under *Chadha*[551] as Professor Tribe has recently suggested,[552] it would surely seem to follow that the two-House veto provision of the Electoral Count Act—which enables the two Houses of Congress to overturn the "findings" of electors without presentment—is equally if not more constitutionally problematic under *Chadha*.[553]

We must interpret exceptions to the Presentment Clause faithfully. The word "every" in the Presentment Clause means every and not some. Under our Constitution, there is no other instance where a simple majority of both Houses of Congress may affect the legal rights, duties, and relations of persons outside of the legislative branch without presentment to the President. There is no textual or structural reason why the counting function of the Electoral College Clauses should constitute an exception to this important constitutional rule, especially when the stakes are an *entire branch* of government. The bicameral procedure for counting electoral votes in the Electoral Count Act is unconstitutional under the *Chadha* principle of law-making.

There is, however, a solution to the presentment problem in counting electoral votes: the unicameralism principle avoids the

---

that "[o]ne might also include another 'exception' to the rule that Congressional action having the force of law be subject to the bicameral requirement and the Presentment Clauses" by pointing to the Rules of Proceedings Clause, U.S. CONST. art. I, § 5, cl. 2, as giving to each House "the power to act alone in determining specified internal matters." *Chadha*, 462 U.S. at 955 n.2. The Court was careful to note that "this 'exception' only empowers Congress to *bind itself* and is noteworthy only insofar as it further indicates the Framers' intent that Congress not act in any legally binding manner outside a close circumscribed legislative arena, except in specific and enumerated instances." *Id.* (emphasis added). Actually, the Court incorrectly framed the point: the Rules of Proceedings Clause does not apply to "Congress" but each House of Congress. The important point is that the Court nowhere suggested that any rule-making authority *of Congress* could be used to affect the legal rights, duties, and relations of non-Members of Congress without presentment to the President. *See also* McGinnis & Rappaport, *supra* note 508, at 495 n.60 (stating that "when the [*Chadha*] Court stated that the Rules of Proceedings Clause gave Congress the power to 'bind itself,' it meant simply that the rules were binding on members of Congress as opposed to individuals or institutions outside Congress").

551. *See supra* note 162 and accompanying text.

552. *See* Tribe, *supra* note 27, at 278 & n.438.

553. Indeed, the argument is an even stronger one to the extent that electors in the electoral colleges constitute a separate and co-ordinate branch of the federal government, *see* Kesavan, *supra* note 324, at 131–35, unlike the Electoral Commission of 1877 which was a quasi-legislative body largely drawn from Members of Congress.

presentment problem entirely. The Presentment Clause cannot be said to apply to the joint convention of Senators and Representatives assembled for the purpose of the electoral count, where neither the Senate nor the House of Representatives acts in their corporate capacity.

### 3. Conclusions

The structural argument reveals that the Electoral Count Act is unconstitutional, at least it if it is anything more than merely precatory. As a prima facie matter, the Electoral Count Act, to the extent that it is a law that has legal force, clearly violates the anti-binding principle of rule-making. This is perhaps the strongest structural argument against the constitutionality of the Electoral Count Act. In addition, the Electoral Count Act is also unconstitutional in its potential operation in counting electoral votes. The bicameral procedure of 3 U.S.C. § 15 violates the anti-Senate principle of presidential election, the *Chadha* principle of law-making, and the anti-President principle of presidential election. Finally, to the extent that the joint convention rejects electoral votes contained in authentic electoral certificates as not "regularly given,"[554] the Electoral Count Act violates the anti-Congress principle of presidential election, the pro-states and pro-state legislatures principle of presidential election, and the pro-electors principle of presidential election.

### III. WHAT SHOULD WE DO IF ELECTORS GO BANANAS?

Assume that the Electoral Count Act is unconstitutional as argued in Part II. What happens if electors go bananas and vote for Professor Paulsen's dog, Gus, as President?[555] What happens if electors go bananas and also vote for Dean Ely's dog, Portland, as Vice President?[556] To make things even worse, suppose there is a case of double (or more) such returns from the same state?

---

554. 3 U.S.C. § 15 (2000).

555. *See* Michael Stokes Paulsen, *Is Bill Clinton Unconstitutional? The Case for President Strom Thurmond*, 13 CONST. COMMENT. 217, 222 (1996).

556. For Portland's claim to fame in the legal academy, see, for example, JOHN HART ELY, ON CONSTITUTIONAL GROUND 399 n.251 (1996); John Hart Ely, *Standing to Challenge Pro-Minority Gerrymanders*, 111 HARV. L. REV. 576, 581–84 (1997); John Hart Ely, *Another Spin on* Allegheny Pittsburgh, 38 UCLA L. REV. 107, 108 n.6 (1990). Dean Ely's other dog, Buffo, featured prominently in some of his earlier work, *see, e.g.*, JOHN HART ELY, DEMOCRACY AND DISTRUST 182 (1980), where she almost became Secretary of Agriculture, but Dean Ely informs me that Buffo has since "passed on to the other side." *See* Email from Dean John Hart Ely, to Vasan Kesavan (Mar. 2, 2001) (on file with

The Electoral Count Act sounds like a good statutory scheme to deal with these and less preposterous problems, but needless to say, not every good statutory scheme is a constitutional one.[557]   An argument that the Electoral Count Act is unconstitutional may (sadly) not be enough.  The critic would argue that we deserve to know what should happen when inauthentic electoral certificates are transmitted to the seat of government, or when authentic electoral certificates containing unconstitutional or faithless electoral votes are transmitted to the same.  Of course, with or without the Electoral Count Act, the potential problems of the electoral count remain.

This Part seeks to placate the critic and provide answers to these questions.  This Part proceeds in three sections.  The first section addresses the paradigm problems of the electoral count and provides (or at least suggests) answers in the absence of the Electoral Count Act.  As we shall see, the Electoral Count Act is not necessary to address any of the potential problems of the electoral count that may arise because the Constitution itself (implicitly) provides answers (however undesirable they may be).  The second section argues that the Twentieth Amendment, adopted in 1933, provides a constitutional solution to the thorniest problem of the electoral count—the problem of presidential or vice presidential ineligibility.  Given the Twentieth Amendment, the Electoral Count Act is not needed to address this potential problem of the electoral count.  Finally, the third section considers where we should go from here in revising the current statutory scheme, assuming that some statutory scheme relating to counting electoral votes would be constitutional.

---

author).

557. *See, e.g.*, Clinton v. City of New York, 524 U.S. 417, 421 (1998) (holding cancellation procedures in the Line Item Veto Act unconstitutional under the Presentment Clause); Printz v. United States, 521 U.S. 898, 935 (1997) (holding interim provisions of the Brady Handgun Violence Prevention Act unconstitutional as violating the "constitutional system of dual sovereignty"); New York v. United States, 505 U.S. 144, 149 (1992) (holding the "take title" provision of the Low-Level Radioactive Waste Policy Amendments Act unconstitutional under the Tenth Amendment); INS v. Chadha, 462 U.S. 919, 957–58 (1983) (holding a "one-House veto" provision of the Immigration and Nationality Act unconstitutional under the Presentment and Bicameralism Clauses).  By citing these cases, I do not mean to signify my agreement or disagreement with their holdings.  *Cf. Chadha*, 462 U.S. at 944 ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.  Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government . . . .").

A.  *Answers to the Paradigm Problems of the Electoral Count*

In Part I, we examined the paradigm problems of the electoral count as experienced in the electoral counts in the history of our Republic.  It is now time to provide (or at least suggest) some answers.  The paradigm problems fall easily into two categories: (1) problems relating to the electoral certificate, and (2) problems relating to the electoral vote.  The paradigm problems within each category are not of equal difficulty.  Let us consider the paradigm problems in some rough order of increasing difficulty within each category.

### 1. The Problems of the Electoral Certificate

The problems of the electoral certificate share two distinguishing characteristics.  First, they are antecedent to the problems of the electoral vote.  Second, they, as a prima facie matter, do not require any knowledge of the persons receiving votes, and may therefore be resolved without ever looking at the names of the persons receiving votes.  In sum, the problems of the electoral certificate relate to judging the authenticity or validity of the acts of electors, whereas the problems of the electoral vote relate to judging the acts of electors— that is, their electoral votes.

a.  The Unsigned, Uncertified, or Unsealed Electoral
Certificate Problem

A first problem of the electoral certificate relates to the three simple elements of the electoral certificate that attest to its authenticity.  Suppose a state should transmit an electoral certificate to the seat of government that is not (i) signed, (ii) certified, and (iii) sealed.  The result would be that the joint convention must not count the electoral votes in this electoral certificate.

The relevant clause of the Twelfth Amendment provides that "[the Electors] shall sign and certify, and transmit sealed to the seat of government of the United States, directed to the President of the Senate"[558] the electoral certificate.  Under even the "thinnest" conception of the counting function, the joint convention must judge the authenticity of the electoral certificate, distinguishing between what is merely the legal equivalent of a Publishers Clearinghouse sweepstakes entry and what is a bona fide electoral certificate.  Indeed, the word "certify" in the Twelfth Amendment is a signal of

---

558.  U.S. CONST. amend. XII.

*NORTH CAROLINA LAW REVIEW* [Vol. 80

legal significance.[559] The rejection of inauthentic electoral certificates preserves authenticity in the process of presidential election. The Electoral College Clauses contain an authenticity principle for good reason: authenticity is the principal safeguard to the risk of cabal and corruption in the election of the President.[560]

b.  The Puerto Rico, or Unrepublican State, Electoral Certificate Problem

A second problem of the electoral certificate relates to the authenticity of its sender. Suppose Puerto Rico should transmit an electoral certificate to the seat of government. Or suppose that an unrepublican State should transmit an electoral certificate to the seat of government.[561] Obviously, the result would be that the joint convention must not count the electoral votes contained in this electoral certificate.

The Constitution makes clear that only states and the District of Columbia are entitled to appoint electors,[562] and are thereby entitled to transmit electoral certificates. The political branches of the federal government have the right to recognize states in the Union.[563]

---

559. *See, e.g.*, 2 OXFORD ENGLISH DICTIONARY 1054 (2d. ed. 1989) (defining "certify" as "[t]o declare or attest by a formal or legal certificate").

560. *See, e.g.*, THE FEDERALIST NO. 68, *supra* note 246, at 380 (Alexander Hamilton) ("Nothing was more to be desired [in Electoral College mode of presidential election] than that every practicable obstacle should be opposed to cabal, intrigue, and corruption."). Senator King remarked:

> [M]embers of the General Convention . . . did indulge the hope, by apportioning, limiting, and confining the Electors within their respective States, and by the guarded manner of giving and transmitting the ballots of the Electors to the Seat of Government, that intrigue, combination, and corruption, would be effectually shut out, and a free and pure election of the President of the United States made perpetual.

3 FARRAND, *supra* note 35, at 461 (remarks of Sen. Rufus King).

561. *See, e.g.*, 18 CONG. REC. 31 (1886) (remarks of Rep. Caldwell) ("Suppose some State should enthrone a king, constitute a house of lords, and they should appoint electors, and send up but one return properly certified and finally determined as required under the second section of the bill proposed by the minority. Shall an American Congress count such a vote?").

562. *See* U.S. CONST. art. II, § 1, cl. 2 (States); U.S. CONST. amend. XXIII, § 1 (District of Columbia).

563. *See generally* Luther v. Borden, 48 U.S. (7 How.) 1 (1849) (holding that the recognition of a state government lies with Congress, not the courts); *see also* U.S. CONST. art. IV, § 3 ("New States may be admitted by the Congress into this Union . . . ."); U.S. CONST. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.").

We have seen this problem before as well as its resolution. The Thirty-eighth Congress resolved not to count the electoral votes from eleven Southern States.[564]   When Congress sent the resolution to President Lincoln for his signature, he replied in the third person:

> The joint resolution entitled "Joint resolution declaring certain States not entitled to representation in the electoral college" has been signed by the Executive in deference to the view of Congress implied in its passage and presentation to him.   In his own view, however, the two Houses of Congress, convened under the twelfth article of the Constitution, have complete power to exclude from counting all electoral votes deemed by them to be illegal; and it is not competent for the Executive to defeat or obstruct that power by a veto, as would be the case if his action were at all essential in the matter.   He disclaims all right of the Executive to interfere in any way in the matter of canvassing or counting electoral votes, and he also disclaims that, by signing said resolution, he has expressed any opinion on the recitals of the preamble or any judgment of his own upon the subject of the resolution.[565]

President Lincoln's reply suggests that Congress's power not to count electoral votes is quite broad, but we should be careful not to take it out of context of the Northerners' (Republicans') exclusion of Southern senators, representatives, and electors pursuant to the Guarantee Clause of Article IV, Section 4.

c.   The Number of Electoral Votes Problem

A third problem of the electoral certificate relates to the aggregate number of electoral votes in the electoral certificate. Suppose a state should transmit an electoral certificate to the seat of government that contains more electoral votes than the number of electors to which that state is then entitled.[566]   During the Electoral Count Act debates, Senator Frelinghuysen distinctly noted this possibility that "[a] State may claim a larger representation than has been assigned her and may appoint more electors than she is entitled

---

564.   *See* COUNTING ELECTORAL VOTES, *supra* note 3, at 147–49 (House); *id.* at 149–223 (Senate and House); *see also* Wroth, *supra* note 22, at 328–29 n.34.

565.   COUNTING ELECTORAL VOTES, *supra* note 3, at 229–30; *see also* Wroth, *supra* note 22, at 328–29 n.34.

566.   *See* U.S. CONST. art. II, § 1, cl. 2; 3 U.S.C. § 3 (2000).   For ease of exposition, I will simply refer to electoral votes instead of two distinct lists of electoral votes for President and Vice President, respectively.

*NORTH CAROLINA LAW REVIEW* [Vol. 80

to, and all their votes may be returned."[567]  His answer was clear: "[I]f a State should send as votes a larger number than it was entitled to . . . it would be a direct violation of the Constitution and an act of revolution for any one to count them."[568]  The result would be that the joint convention must not count the electoral votes in this electoral certificate.[569]

Translated into a counterfactual:  Suppose Florida's electoral certificate on January 6, 2001 contained twenty-six votes instead of the twenty-five votes to which Florida was then entitled.  The State of Florida would be disenfranchised in the presidential election.

It may be tempting to conclude that the joint convention must exclude one of the twenty-six votes, but which one?  Must they exclude a randomly selected vote?  It hardly seems more constitutional to exclude a randomly selected vote than to exclude all votes.  What about a particular vote?  In order to exclude a particular vote, the resolution of this problem would require knowledge of the persons voted for, thereby transforming a problem of the electoral certificate (a problem of judging the authenticity of the acts of electors) into a problem of the electoral vote (a problem of judging the acts of electors).  And which vote would be excluded?  There is no constitutional requirement that all electoral votes in an electoral certificate must be given for the same person.[570]  The joint convention may not exclude a particular electoral vote without affirmatively voting against a person voted for—an action that goes well beyond judging the authenticity of the acts of electors.

---

567. COUNTING ELECTORAL VOTES, *supra* note 3, at 451.

568. *Id.*

569. This counting principle does not hold in the equal-and-opposite direction: a state may transmit an electoral certificate containing less electoral votes than the number of electors to which that state is then entitled, and these votes must be counted by the joint convention.  Indeed, the Framers contemplated that electors would be appointed but would not give votes.  *See* 2 FARRAND, *supra* note 35, at 515 (rejecting the motion of James Madison and Hugh Williamson "to insert after 'Electors' the words 'who shall have balloted' so that the non voting electors not being counted might not increase the number necessary as a majority of the whole.").

570. The choice is reserved to the states.  For example, only Maine and Nebraska have proportional voting instead of "winner-take-all" voting in their electoral colleges. *See* ME. REV. STAT. ANN. tit. 21-A, § 805.2 (West 1993); NEB. REV. STAT. § 32-714 (1998).  But even in "winner-take-all" states, the possibility looms that faithless electors will give votes in contravention of the popular vote. *See supra* notes 7, 176–91 and accompanying text; *infra* notes 590–92 and accompanying text.

*ELECTORAL COUNT ACT*

### d. The Multiple Electoral Certificates Problem

A fourth problem of the electoral certificate relates to the aggregate number of electoral certificates (returns) from a putative state. Suppose two or more sets of electors from the same state should transmit an electoral certificate to the seat of government. Recall the Hayes-Tilden Incident of 1877.[571] One and only one of the following two propositions must be true as a matter of logic: (1) one of the electoral certificates is authentic and all others are not; or (2) none of the electoral certificates are authentic. Needless to say, the result would be that all of the electoral votes contained in the authentic electoral certificate must be counted and all of the electoral votes contained in the inauthentic electoral certificates must not be counted.

The multiple returns problem may seem complicated, but it is not analytically different from the Puerto Rico problem of the electoral certificate. The authentic electoral certificate (if any) is one from the state; the others, insofar as the Constitution is concerned, are merely legally equivalent to Publishers Clearinghouse sweepstakes entries transmitted to the seat of government by non-states. If multiple state authorities should claim to be the lawful authority of a state, the joint convention must choose which state government is the lawful one, but, importantly, this choice is no more difficult than the choice (previously) made by each House in deciding to seat Members of Congress from a putative state, or the choice made by the President when she sends in the troops under the Guarantee Clause to protect one of multiple authorities that request the interposition of military force.[572] Most importantly, the multiple returns problem is one of the electoral certificate and not of the electoral vote and should be treated as such. The joint convention should be able to determine which electoral certificate contains the legitimate set of electors without examining the names of the persons receiving votes.

### e. The Misdated Electoral Certificate Problem

A fifth problem of the electoral certificate relates to its date. Suppose a state should transmit an electoral certificate to the seat of government that contains electoral votes given on a day different

---

571. *See supra* notes 157–64 and accompanying text.

572. *See* U.S. CONST. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; *and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.*") (emphasis added).

*NORTH CAROLINA LAW REVIEW*          [Vol. 80

from that specified by federal law for the giving of electoral votes.[573]
Recall the Wisconsin Incident of 1857[574] and the Hawaii Incident of
1961.[575]   The result would be that the votes contained in this
certificate must not be counted by the joint convention, except
perhaps in one narrow circumstance to be discussed shortly.

Article II, Section 1, Clause 4 provides that "[t]he Congress may
determine the Time of chusing the electors, and the Day on which
they shall give their Votes; *which Day shall be the same throughout
the United States.*"[576]  This is a rule, inasmuch as the Constitution's
requirement that the President be thirty-five years of age upon
entering office is a rule;[577] this is not a standard.  It may be tempting
to conclude that the joint convention could exercise discretion as to
whether to count electoral votes given on a day different from that
specified by federal law, especially in cases of force majeure such as
the Wisconsin Incident of 1857.  Indeed, the Constitution, to the
extent that it is to be interpreted against the background of the
common law, might recognize an exception for force majeure.[578]  This
one narrow circumstance aside, however, the language of the
Constitution is unmistakably clear—adherence to the date chosen is
mandatory.  More importantly, the requirement that electoral votes
be given on the same day throughout the Union is a particularly
important part of the authenticity principle of the Electoral College
Clauses.[579]   The joint convention has the duty to support the

---

573. *See* 3 U.S.C. § 7 (2000) ("The electors of President and Vice President of each
State shall meet and give their votes on the first Monday after the second Wednesday in
December next following their appointment at such place in each State as the legislature
of such State shall direct.").

574. *See supra* notes 132–42 and accompanying text.

575. *See supra* notes 165–75 and accompanying text.

576. U.S. CONST. art. II, § 1, cl. 4 (emphasis added).  Admittedly, there is nothing in
the Electoral College Clauses that expressly provides that the electors shall date the
electoral certificate, but the requirement is fairly subsumed by that of certification.  *See*
U.S. CONST. amend. XII ("[The Electors] shall sign, and *certify*, and transmit sealed to the
seat of the government of the United States, directed to the President of the Senate.")
(emphasis added).  Who ever heard of a legal certificate without a date?

577. *See* U.S. CONST. art. II, § 1, cl. 5.

578. During the Electoral Count Act debates, Representative Dibble thought
otherwise:

> [A]s in the election of any of us, if a man who is a voter does not go to the polls
> on election day and within the hours fixed by law and cast his vote, the vote is
> lost, and it makes no difference whether he was sick, or whether he was
> prevented from casting his vote by some necessity, or mischance, or design, or
> whether his vote might have changed the complexion of the election; his vote is
> lost if his right to vote is not exercised on the day designated.

18 CONG. REC. 46 (1886) (remarks of Rep. Dibble).

579. *See, e.g.,* 2 FARRAND, *supra* note 35, at 500 (remarks of Governor Morris) ("As

authenticity principle of the Electoral College Clauses, not the power to exercise its discretion in the matter.

Translated into the past:  Wisconsin's electoral votes in 1857 (perhaps) should not have been counted and Hawaii's electoral votes in 1961 should not have been counted.  Translated into a counterfactual:  Florida's electoral votes in 2001—if given on a day other than December 18, 2000—should not have been counted,[580] though Justice Ginsburg in *Bush v. Gore* implied otherwise.[581]

---

the Electors would vote at the same time throughout the U.S. and at so great a distance from each other, the great evil of cabal was avoided.  It would be impossible to corrupt them."); 4 ELLIOT'S DEBATES, *supra* note 250, at 122 (remarks of William Davie at North Carolina ratifying convention) ("He is elected on the same day in every state, so that there can be no possible combination between the electors.").  At the North Carolina ratifying convention James Iredell remarked:

> Had the time of election been different in different states, the electors chosen in one state might have gone from state to state, and conferred with the other electors, and the election might have been thus carried on under undue influence.  But by this provision, the electors must meet in the different states on the same day, and cannot confer together.  They may not even know who are the electors in the other states.  There can be, therefore, no kind of combination.  It is probable that the man who is the object of choice of thirteen different states, the electors in each voting unconnectedly with the rest, must be a person who possesses, in high degree, the confidence and respect of his country.

*Id.* at 105.

580.  One leading scholar agrees.  *See* Michael W. McConnell, *Two-and-a-Half Cheers for* Bush v. Gore, 68 U. CHI. L. REV. 657, 676 n.93 (2001).  After quoting the Constitution's provision that the "Day [for giving electoral votes] shall be the same throughout the United States," *see* U.S. CONST. art. II, § 1, cl. 4., Professor McConnell concludes, "December 18 was so designated by statute.  It would be *unconstitutional* for Congress to allow the electors from a single state to give their votes on a later date." *Id.* (emphasis added).  He then discusses the Hawaii Incident of 1961, *see supra* notes 165–75 and accompanying text, and concludes, "That should not be treated as a precedent.  In that election, the votes of Hawaii were not necessary to the result, and on the suggestion of the losing candidate, Vice President Richard Nixon, in his capacity as President of the Senate, were recognized as a courtesy." McConnell, *supra*, at 676 n.93.

This is not to say that December 18, 2000 was a magic point in time for the electoral count of January 6, 2001.  Political difficulties aside, there is no reason why Congress could not have amended 3 U.S.C. § 7 to provide that electors shall give their votes on a date later than December 18, 2000 and, if needed, amended 3 U.S.C. § 15 to provide that the joint convention shall count their votes on a date later than January 6, 2001.  Both dates, of course, could be no later than January 20, 2001 at the time of noon, when the terms of the President and Vice-President expired.  *See* U.S. CONST. amend. XX, § 1.  The important point is that the Constitution demands that electoral votes be given on the same day throughout the Union—not forty-nine states on December 18, 2000 and one state on some other date.  When Congress could have amended 3 U.S.C. § 7 is a more difficult question.  The spirit of the Constitution suggests that, in order to minimize undue congressional interference and manipulation in presidential election, Congress could not amend 3 U.S.C. § 7 after the electors shall have given their votes on December 18, 2001 pursuant to then-existing federal law.

581.  *See* Bush v. Gore, 531 U.S. 98, 144 (Ginsburg, J., dissenting) ("But none of these dates [including December 18, 2000, the date set by 3 U.S.C. § 7 (2000)] has ultimate

*NORTH CAROLINA LAW REVIEW* [Vol. 80

f.   The Elector Ineligibility Problem

A sixth problem of the electoral certificate relates to the qualifications of the electors.  Suppose that an electoral vote is given by an elector who is constitutionally ineligible to the office of elector.[582]  Recall the Postmaster Incident of 1837.[583]  The result would be that the votes of an elector who is constitutionally ineligible to hold the office of elector must be counted.

The joint convention may not judge the manner of appointment or qualifications of electors.[584]  Once the vote of a constitutionally ineligible elector is transmitted in the electoral certificate, that vote is final and must be counted.  A congressional analogy is illuminating. Imagine that a Representative-elect does not meet the constitutional qualifications prescribed by the House Qualifications Clause.[585]  The Representative is seated, performs legislative business, and is only subsequently expelled from the House.  Are the votes of this Representative any less valid?[586]

Most importantly, the elector ineligibility problem is impossible to resolve without knowing the persons voted for and the joint convention may not judge the acts of electors.  In particular, the votes of a constitutionally-ineligible elector must be counted because of the anonymity principle of the Electoral College Clauses.

The Electoral College Clauses protect the anonymity of electors in two important ways:  (i) voting in the Electoral Colleges shall be by ballot, and (ii) the electoral certificate shall contain lists of the

---

significance in light of Congress' detailed provisions for determining, on 'the sixth day of January,' the validity of electoral votes.").

582.  There are only two clauses that specify the qualifications of electors.  *See* U.S. CONST. art. II, § 1, cl. 2 ("[B]ut no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.").  U.S. CONST. amend. XIV, § 3 provides:

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof.  But Congress may by a vote of two-thirds of each House, remove such disability.

583.  *See supra* notes 118–25 and accompanying text.

584.  *See supra* notes 400–22 and accompanying text (presenting intratextual argument from House Judging Clause).

585.  *See* U.S. CONST. art. I, § 2, cl. 2.

586.  *Cf.* THE FEDERALIST NO. 53, at 303 (James Madison) (Clinton Rossiter ed., Mentor 1999) (1961) (suggesting that the votes of an "illegitimate member" of Congress would be valid before that member is "dispossessed" of his or her seat).

*ELECTORAL COUNT ACT*

persons voted for, signed and certified by the electors as a whole.[587] The votes of individual electors are not to be known in order to preserve the independence of the electors and the President. Senator Pinckney put these points brilliantly in the specific context of the elector ineligibility problem:

> [H]ow are [sic] Congress . . . to proceed to find how these unduly or disqualified Electors voted, particularly if they should belong to a State having a number of Electors? As the Constitution directs they are to vote by ballot, the votes of the election ought to be secret. You have no right to require from an Elector how he voted, nor will you be able to know for whom he did vote, particularly if in the return from that State different candidates have been voted for. In this dilemma, I ask, what is to be done? You cannot discover for whom this disqualified or improperly returned Elector voted; and you would not certainly, in a State having sixteen or twenty-one votes, reject the whole, because one or two illegal votes have been supposed to be given.[588]

Of course, it is possible to determine the persons voted for by a constitutionally-ineligible elector in a case of mathematical certainty—when all of the electoral votes for President or Vice President are given for the same person. But, as we have seen, there is no constitutional requirement that all electoral votes must be given for the same person.[589]  A non-constitutional common practice of "winner-take-all" voting in the electoral colleges that makes mathematical certainty the norm and not the exception does not change the answer to this constitutional question.

---

587. U.S. CONST. amend. XII states that:
> The Electors shall meet in their respective States and *vote by ballot* for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their *ballots* the person voted for as President, and in distinct *ballots* the person voted for as Vice-President, and they shall make distinct *lists* of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which *lists* they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate.

*Id.* (emphasis added).

588. 10 ANNALS OF CONG. 144 (1800).  During the Electoral Count Act debates, Senator Sherman also discussed the elector ineligibility problem and the consequent difficulty of rejecting a "part" of the electoral votes contained in an authentic electoral certificate.  *See* 17 CONG. REC. 815–16 (1886).

589. *See supra* note 570.

*NORTH CAROLINA LAW REVIEW* [Vol. 80

### 2. The Problems of the Electoral Vote

The problems of the electoral vote share two distinguishing characteristics: they are problems subsequent to the problems of the electoral certificate and they require knowledge of the persons for whom the votes are cast. These problems relate to judging the acts of electors.

#### a. The Faithless Elector Problem

Suppose that an electoral vote is faithless—that is, in contravention of the known popular vote. Recall the Bailey Incident of 1969.[590] The result would be that the votes of faithless electors must be counted.

Again, the joint convention may not judge the acts of electors. Moreover, there is no constitutional requirement of faithfulness.[591] Frankly, it is shameful that 174 Representatives (including future Presidents George H.W. Bush and Gerald R. Ford) and thirty-three Senators who took an oath or affirmation to support the Constitution voted not to count Dr. Bailey's faithless vote. The answer to the faithless elector problem does not depend on whether state laws purporting to bind electors to vote in accordance with the popular vote are constitutional.[592] Once the faithless vote is transmitted in the electoral certificate, that vote is final and must be counted.

---

590. *See supra* notes 176–91 and accompanying text.

591. *See* Ray v. Blair, 343 U.S. 214, 232 (1952) (Jackson, J., dissenting) (explaining that the original understanding is that electors "would be free agents, to exercise an independent and nonpartisan judgment as to the men best qualified for the Nation's highest offices"); THE FEDERALIST NO. 68, *supra* note 246, at 380 (Alexander Hamilton); Amar, *supra* note 10, at 230 ("The Constitution plainly contemplates that, at least formally, the electors must themselves decide upon their votes."). It is an open question whether the original understanding of 1787–1788 is the right original understanding on the requirement of faithfulness. The Twelfth Amendment significantly rewrote the Electoral College Clauses and that amendment was adopted in part with the intention of vindicating majoritarian popular will. *See* Lolabel House, Twelfth Amendment of the Constitution of the United States 20–40 (1901) (unpublished Ph.D. dissertation, University of Pennsylvania). More importantly, it does not follow that if there is no constitutional requirement of faithfulness that there is a constitutional requirement of faithlessness (that is, absolute discretion). It is an open question whether state laws that purport to bind electors to vote in accordance with the popular vote are constitutional. *Compare, e.g.,* Amar, *supra* note 10, at 219 ("[T]he constitutionality of [elector-binding] laws seems highly dubious if we consult constitutional text, history, and structure."), *with* Vikram David Amar, *The People Made Me Do It: Can the People of the States Instruct and Coerce Their State Legislatures in the Article V Constitutional Amendment Process?*, 41 WM. & MARY L. REV. 1037, 1089 n.233 (2000) (describing the question as an "open one").

592. *See* Ross & Josephson, *supra* note 7, at 690–91 (providing examples of elector-binding laws).

### b.    The Presidential or Vice Presidential Ineligibility Problem

Suppose that an electoral vote is for a dead person—that is, in violation of the Presidential or Vice Presidential Eligibility Clauses.[593] Recall the Greeley incident of 1873.[594]  The result would be that the votes for a dead presidential or vice presidential candidate must be counted.[595]

The joint convention may not judge the acts of electors.  This answer applies with equal force to the other qualifications of the Presidential and Vice Presidential Eligibility Clauses—natural born citizen, thirty-five years of age, and fourteen years a resident within the United States.[596]  The presidential or vice presidential ineligibility problem is perhaps the thorniest problem of the electoral count.

### c.    The Inhabitants of the Same State Problem

Suppose that an elector votes for inhabitants of her state for both President and Vice President—that is, in violation of the Twelfth Amendment.[597]  This is the hypothetical Bush-Bentsen problem— recall that Republican Vice President George H.W. Bush and Democrat Senator Lloyd Bentsen were both inhabitants of the State of Texas in the presidential election of 1988.[598]  The Bush-Bentsen

---

593. *See* U.S. CONST. art. II, § 1, cl. 5 ("No Person except a natural born Citizen . . . shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States."); U.S. CONST. amend. XII ("But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States.").

594. *See supra* notes 143–48 and accompanying text.

595. As a prudential matter, Professor Amar has stated that "[Congress] should simply count the votes of a dead man as if he were alive."  Akhil Reed Amar, *Presidents Without Mandates (With Special Emphasis on Ohio)*, 67 U. CIN. L. REV. 375, 388 (1999).

596. U.S. CONST. art. II., § 1, cl. 6; U.S. CONST. amend. XII; *see also* Ross & Josephson, *supra* note 7, at 706–07 (suggesting that Greeley precedent applies to entirety of Presidential Eligibility Clause).

597. *See* U.S. CONST. amend. XII ("The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves.").

598. Senator Ross misstated the problem in the Sixth Congress when he asked, "Suppose they should vote . . . for two persons who were both citizens of the same State . . . ?" 10 ANNALS OF CONG. 29 (1800); *see also* COUNTING ELECTORAL VOTES, *supra* note 3, at 451 (remarks of Sen. Frelinghuysen) (making same mistake).  There is no constitutional requirement that an elector shall not vote for two persons of the same state—the constitutional requirement is that an elector shall not vote for two persons of the same state as herself.  Translated into the recent past: Electors from forty-nine states could constitutionally vote for both George Bush as President and Lloyd Bentsen as Vice President; only Texas electors could not.

The Bush-Bentsen problem resurfaced in the presidential election of 2000. *See*

*NORTH CAROLINA LAW REVIEW*      [Vol. 80

problem appears to have actually occurred once in our history—in the presidential election of 1872—but was discovered too late in the electoral count for any debate.[599]  During the Wisconsin Incident of 1857, Representative Humphrey Marshall pointed to the Bush-Bentsen problem as the paradigm case for congressional power to exclude unconstitutional electoral votes.  The Bush-Bentsen problem is undoubtedly the least discussed problem of the electoral count in the Electoral Count Act debates or in the legal academy, and yet the trickiest problem of all.

There are only four possible answers for the joint convention to deal with the Bush-Bentsen problem during the electoral count: (1) count both votes, (2) reject both votes, (3) count the vote for President and reject the vote for Vice President, or (4) count the vote for Vice President and reject the vote for President.  It is not at all difficult to winnow the set of answers by eliminating answer number four—the Office of President is simply more important than the Office of Vice President.[600]  This argument, however, would have been impossible before the adoption of the Twelfth Amendment which requires electors to cast "distinct ballots" for President and Vice President and to prepare "distinct lists" of the persons voted for as President and Vice President.[601]  Assuming that the Twelfth Amendment did not expand the range of possible answers to the Bush-Bentsen problem, we may further winnow the set of answers by eliminating answer number three.  This leaves us with the rather

---

Jones v. Bush, 122 F. Supp. 2d 713, 715 (N.D. Tex. 2000), *aff'd*, 2000 U.S. App. LEXIS 34148 (5th Cir. Tex. Dec. 7, 2000), *cert. denied*, 531 U.S. 1062 (2001) (dismissing suit by three registered voters in Texas who alleged that Richard B. Cheney was an "inhabitant" of Texas and that, under the Twelfth Amendment, Texas electors were prohibited from voting for both George W. Bush and Richard B. Cheney).  For two recent discussions in the legal literature of this (putative) problem, see Ho, *supra* note 195, *passim*, and Levinson & Young, *supra* note 195, at 932–54.

  599. *See* text accompanying *supra* note 154.

  600. Under our Constitution, we are *never* without a President, but we may be without a Vice President. *See* U.S. CONST. amend. XXV, §§ 1–2. Moreover, the President, unlike the Vice President, wields the power of an entire branch of Government. *See* U.S. CONST. art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United States of America."). At least two commentators seem to agree that electoral votes for President are to be preferred to those for Vice President. Levinson and Young argue that:

> Common-sensically, the correct outcome is most certainly [to count the electoral votes for President and throw out the electoral votes for the Vice President], since it would seem obvious that preferences for President should be preferred over preferences for Vice President. . . . But this answer is hardly the only plausible resolution, and it is certainly not derived from the barebones text [of the Twelfth Amendment].

Levinson & Young, *supra* note 195, at 935 n.37.

  601. *See* U.S. CONST. amend. XII.

binary choice of counting both electoral votes for Bush and Bentsen or rejecting both electoral votes for Bush and Bentsen. Which is the correct answer?

The Bush-Bentsen problem is not different in kind than the other two problems of the electoral vote. The joint convention must count both votes for Bush and Bentsen. The joint convention may not judge the acts of electors—period. There are two additional points to consider. First, the anonymity principle of the Electoral College Clauses indicates that the Bush-Bentsen problem is uniquely directed to electors, not to the joint convention.[602] It would be impossible for the joint convention to even detect the Bush-Bentsen problem, except in rarest cases of mathematical certainty. Second, the Presidential and Vice Presidential Eligibility Clauses do not require that the President and Vice President be inhabitants of different states. The command of the Electoral College Clauses is violated the moment a *Texas* elector votes for both Bush and Bentsen, but the Presidential and Vice Presidential Eligibility Clauses are not violated if Bush becomes President and Bentsen becomes Vice President. We might therefore think about the Bush-Bentsen problem in a broader context, just as we might think about presidential impeachment in a broader context.[603] The command of the Electoral College Clauses probably was inserted to enhance the legitimacy of presidential election by lessening the probability that the ultimate choice would be made by the House of Representatives, but the Framers thought that most presidential elections would be decided by the House anyway.[604]

---

602. *See supra* notes 587–88 and accompanying text (discussing anonymity principle of Electoral College Clauses).

603. *See, e.g.*, Akhil Reed Amar, *An(Other) Afterword on the Bill of Rights*, 87 GEO. L.J. 2347, 2358–59 (1999) (criticizing application of "blinkered textualism" to standard for presidential impeachment and arguing that presidential impeachment requires a higher standard than that for judges or cabinet officers, although the Constitution lumps presidential impeachment with all other impeachments).

604. *See, e.g.*, 2 FARRAND, *supra* note 35, at 500 (remarks of George Mason) ("[N]ineteen times in twenty the President would be chosen by the Senate."); *id.* at 512 (remarks of George Mason) ("[I]t will rarely happen that a majority of the whole votes will fall on any one candidate."); THE FEDERALIST NO. 66, *supra* note 432, at 372 (Alexander Hamilton) ("The same house [House of Representatives] will be the umpire in all elections of the President which do not unite the suffrages of the majority of the whole number of electors; a case which it cannot be doubted will sometimes, if not frequently happen."). *But see* 2 FARRAND, *supra* note 35, at 501 (remarks of Abraham Baldwin) ("The increasing intercourse among the people of the States, would render important characters less & less unknown; and the Senate [under the Constitution as adopted and amended, the House of Representatives] would consequently be less & less likely to have the eventual [presidential] appointment thrown into their hands."). History has proved Mr. Baldwin to be correct.

Alexander Hamilton, for his part, probably did not think the Bush-Bentsen

*NORTH CAROLINA LAW REVIEW* [Vol. 80

### 3. Conclusions

What shall we make of this rearrangement of the deck chairs on the Titanic? The problems of the electoral certificate relate to judging the authenticity of the acts of electors, whereas the problems of the electoral vote relate to judging the acts of electors. The Constitution trusts the joint convention to do the former, but not the latter.

The counting function inherently requires some sort of a rule of recognition for deciding what is to be counted and what is not (this is the "thinnest" conception of judging). The President of the Senate receives a lot of mail, and the joint convention must be able to decide what mail contains an authentic electoral certificate and must be counted, and what mail contains the legal equivalent of a Publishers Clearinghouse sweepstakes entry and must be discarded. The Constitution specifies the criteria for authenticity and trusts the joint convention to judge the authenticity of the acts of electors. Moreover, the problems of the electoral certificate may be resolved without any knowledge of the persons receiving votes. We should therefore be less suspicious of undue interference or manipulation by the joint convention because the joint convention could (and should) be behind a veil of ignorance as to the problems of authenticity of the acts of electors.

The problems of the electoral vote are of a fundamentally different order. The rule of recognition does not address these problems which require knowledge of the persons voted for in the presidential election in order to be solved. The threat of undue interference or manipulation by the joint convention is hence more pressing. The Constitution does not trust the joint convention to judge the acts of electors, but plainly contemplates that the electors shall have the last word on *who* shall receive votes.

### B. *The Twentieth Amendment*

Although the joint convention may not solve problems of the electoral vote, we are not resigned to the possibility of unconstitutional Presidents or Vice Presidents (if electors do truly go bananas). It turns out that We the People remedied (without really knowing it) the thorniest problem of the electoral count—the

---

requirement to be all-important. His private, unadopted draft of the Constitution contains a provision providing that electors "shall proceed to vote by ballot for a President, who shall not be one of their own number, *unless the Legislature upon experiment should hereafter direct otherwise.*" 3 FARRAND, *supra* note 35, at 622–23 (emphasis added).

presidential or vice presidential ineligibility problem—with the adoption of the Twentieth Amendment in 1933. Section 3 of that amendment provides:

> If, at the time fixed for the beginning of the term of the President, the President elect shall have died, the Vice President elect shall become President. If a President shall not have been chosen before the time fixed for the beginning of his term, *or if the President shall have failed to qualify*, then the Vice President elect shall act as President until a President shall have qualified; *and the Congress may by law provide for the case wherein neither a President elect nor a Vice President elect shall have qualified*, declaring who shall then act as President, or the manner in which one who is to act shall be selected, and such person shall act accordingly until a President or Vice President shall have qualified.[605]

Section 3 contains a "textually demonstrable commitment"[606] of power to Congress to remedy the situation when electors go bananas: "Congress may by law provide for the case wherein neither a President elect nor a Vice President elect shall have qualified . . . ."[607] The text of this section of the Twentieth Amendment does not declare who decides whether the President-elect or Vice President-elect have failed to qualify or when they shall have qualified. Constitutional structure strongly suggests that neither the President nor Congress makes these determinations.[608] These determinations seem very much like judicial ones subject to the province of the judicial department.[609] These determinations are surely no less

---

605. U.S. CONST. amend. XX, § 3 (emphasis added).

606. Baker v. Carr, 369 U.S. 186, 217 (1962).

607. U.S. CONST. amend. XX, § 3. Section 3 of the Twentieth Amendment embarrassingly does not specify who shall act as Vice President when electors go bananas. The Twenty-fifth Amendment only complicates this problem: "Whenever there is a vacancy in the office of the Vice President, the President shall nominate a Vice President who shall take office upon confirmation by a majority vote of both Houses of Congress." U.S. CONST. amend. XXV, § 2. The spirit of section 3 of the Twentieth Amendment suggests that this person is to act as Vice President until a Vice President shall have qualified.

608. *See supra* notes 400–24 and accompanying text (presenting intratextual argument of House Judging Clause); *supra* notes 447–56 and accompanying text (presenting structural argument of anti-Congress principle of presidential election); *supra* notes 457–59 and accompanying text (presenting structural argument of anti-President principle of presidential election).

609. *See also* Amar, *supra* note 10, at 222–23 & 231 n.22 (noting that question of whether presidential or vice presidential candidate dies or becomes incapacitated shortly before election day is a judicial question).

justiciable than deciding whether a Representative-elect has met all of the qualifications set forth in Article I, Section 2, Clause 2.[610]

The Twentieth Amendment provides a constitutional solution to the presidential or vice presidential ineligibility problem of the electoral vote. The Twentieth Amendment guarantees that we will not be without a constitutionally-qualified President when electors go bananas.[611] What does the Twentieth Amendment mean for the counting of electoral votes? The Twentieth Amendment "preempts" the joint convention in judging the acts of electors. The joint convention must count electoral votes contained in authentic electoral certificates.

There is an important difference between the constitutional solution provided by the Twentieth Amendment and any rough-and-ready solution that may be provided by the joint convention. Take a much less silly case than Professor Paulsen's Gus-the-Dog hypothetical.[612] Imagine that in the next presidential election a majority of the whole number of electors appointed vote for presidential candidate Smith. Smith is exactly thirty-four years of age as of noon on January 20, 2005, the date fixed by the Constitution for the beginning of the next presidential term,[613] and is therefore not constitutionally-qualified to be President.[614] If the joint convention rejected these electoral votes for thirty-four year old Smith as not "regularly given," the joint convention would trigger a contingency election in the House of Representatives, and Smith would be excluded from the Office of President for the next four years. But if these unconstitutional electoral votes were counted, then Smith's running-mate (who we will assume is constitutionally-qualified to be Vice President) would simply act as President, until Smith shall have qualified for the Office of President on January 20, 2006. To be sure,

---

610. *See* Powell v. McCormack, 395 U.S. 486, 516–49 (1969).

611. There is one truly exceptional situation that the Twentieth Amendment solves that the joint convention could not. Imagine that all of persons voted for by the electors for President and Vice President were unconstitutional. Even though the joint convention could pursuant to the Electoral Count Act reject enough of these unconstitutional votes to trigger contingency elections for President in the House of Representatives and for Vice President in the Senate, the House and the Senate would be required to choose the President and Vice President, respectively, from a list of unconstitutional candidates.

612. *See* Paulsen, *supra* note 555, at 222.

613. *See* U.S. CONST. amend. XX, § 1 ("The terms of the President and Vice President shall end at noon on the 20th day of January, and the terms of Senators and Representatives at noon on the 3d day of January, of the years in which such terms would have ended if this article had not been ratified; and the terms of their successors shall then begin.").

614. *See* U.S. CONST. art. II, § 1, cl. 5.

this hypothetical situation could never apply to the cases when electors really go bananas—when they vote for dead persons or law professors' dogs as President or Vice President. The important point for present purposes is that the joint convention must count electoral votes contained in authentic electoral certificates because the Twentieth Amendment carefully prescribes the result when the electors shall have made an unconstitutional choice.

## C.  *Revising the Electoral Count Act*

Assume that Congress may by law bind the joint convention and future joint conventions in counting electoral votes, and that Congress has the font of implied power to enact such a law. In other words, assume that *some* electoral count act is constitutional. If we are to revise the Electoral Count Act to make it constitutional (and better), what should it look like?[615]

The Electoral Count Act should be revised in the following ways. First, some Senator or Representative then and there present at the electoral count shall be the presiding officer of the joint convention, not the Vice President as the President of the Senate. Second, the quorum for the joint convention shall be two-thirds of the total number of Senators and Representatives, keeping in spirit with the Constitution's requirement that a quorum in the House of Representatives for choosing the President be a Member or Members from two-thirds of the states.[616] Third, the phrase not "regularly given" shall be narrowly construed only to include problems of the electoral certificate and to exclude problems of the electoral vote, clarifying that the joint convention may judge the authenticity of the electors' acts, but not the electors' acts themselves. Fourth, any and all objections in counting electoral votes shall be addressed by the joint convention voting on a per capita basis, thereby avoiding the presentment problem of the Electoral Count Act. Fifth, the proceedings of the joint convention shall be public. Sixth, in the event the electors fail to make a choice for President or Vice President, the choice of the President by the House of

---

615. Other commentators have taken initial stabs at this question. *See* Glennon, *supra* note 517; L. Kinvin Wroth, *Election 2000: The Disease and the Cure*, VT. B.J. 53, 53–54 (2001); L. Kinvin Wroth, *Congress Can Clean Up Its Electoral Act*, CHI. SUN-TIMES, Jan. 5, 2001, at 31.

616. *See* U.S. CONST. amend. XII; *see also* 2 FARRAND, *supra* note 35, at 518 (describing James Madison's motion at the Philadelphia Convention that a quorum in the Senate for choosing the President in a contingent election be two-thirds of the Members).

Representatives and the choice of the Vice President by the Senate shall be made in the presence of the joint convention.

CONCLUSION

Just because a certain constitutional problem is peculiar and rare is no reason to ignore it—especially when the stakes are an entire branch of government.  To borrow the words of Senator Morton describing the Twenty-second Joint Rule, the Electoral Count Act is a "a torpedo planted in the straits with which the ship of state may at some time come into fatal collision."[617]  When this happens, it will happen, by definition, at a worse time.  We should be thinking about the constitutionality of the Electoral Count Act now—well in advance of a constitutional crisis—when the political facts of the moment are least likely to distort our considered legal judgment.  Both Houses of Congress should immediately hold hearings on the constitutionality of the Electoral Count Act and perhaps on the desirability of the electoral college mode of presidential election more generally.

Consider that we came perilously close to facing the constitutionality of 3 U.S.C. § 15 head on just a short while ago. Imagine the following hypothetical:

The Supreme Court does not intervene in *Bush v. Gore* on December 10, 2000 or on December 12, 2000.  The recount in Florida proceeds.  A slate of Bush-Cheney electors, appointed by the Florida Legislature on December 12, 2000, gives its votes on December 18, 2000.  This electoral certificate is certified by Florida Secretary of State Katherine Harris.  The recount in Florida proceeds.  Vice President Gore and Senator Lieberman are declared the winners of the popular vote for President and Vice President respectively.  A slate of Gore-Lieberman electors, appointed under Florida election law, gives its votes on some day after December 18, 2000, but before January 6, 2001.   And now the important twist—this electoral certificate is also certified by Florida Secretary of State Katherine Harris.

The joint convention convenes on January 6, 2001 for the purpose of counting the electoral votes.  The electoral count proceeds smoothly until Vice President Gore opens both certificates from the State of Florida and hands them to the teller for reading, when the joint convention borders on disorder.  Objections are made, received, and read before the joint convention by Vice President Gore.  Some objections state that this is a case of single returns, and pointing to 3

---

617. COUNTING ELECTORAL VOTES, *supra* note 3, at 525.

U.S.C. § 5, state that the electoral votes contained in the Bush-Cheney electoral certificate must be counted, unless both Houses concur in rejecting them. Some objections state that this is a case of single returns, and pointing to the precedent of Hawaii in 1961, state that the electoral votes contained in the Gore-Lieberman electoral certificate must be counted unless both Houses concur in rejecting them. Some objections state that this is a case of double returns, and pointing to § 15, state that none of the electoral votes contained in either the Bush-Cheney or Gore-Lieberman electoral certificates must be counted unless the two Houses concur in accepting one of them. Both Houses will likely not concur, with the House controlled by the Republicans and the Senate evenly split among Republicans and Democrats (put aside, for the moment, the legal fiction of Vice President Gore breaking any tie in the Senate in favor of himself and the Democrats). If none of Florida's electoral votes are counted, the result of the electoral count will likely be 268 votes for Vice President Gore and Senator Lieberman and 246 votes for Governor Bush and Mr. Cheney. Gore and Lieberman will not have a majority of the whole number of electors appointed if Florida's twenty-five electors are counted as properly appointed electors, but will comfortably have more than a majority of the whole number of electors appointed if Florida's twenty-five electors are not counted. The Senate and House immediately withdraw to decide on the objections not at all knowing what will happen when they reconvene. What result?

We need not wait for the Supreme Court to decide the constitutionality of the Electoral Count Act in a moment of constitutional crisis. Members of Congress take an oath or affirmation to support the Constitution. A conscientious legislator should vote to repeal the Electoral Count Act and a conscientious President should sign such legislation. This will not be enough. The problems of the electoral count are festering sores in our Constitution. A very conscientious legislator should vote to propose a constitutional amendment to solve the problems of the electoral count once and for all.