# Exhibit H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Wisconsin Voters Alliance, et al.,                    Case No. _____

                        Plaintiffs,

v.

Vice President Michael Richard Pence, et al.,

                        Defendants.

**Plaintiffs' Memorandum in Support of Motion for Preliminary Injunctive Relief**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

A.    Defendants, except the constitutionally-required state legislatures, are involved in post-election certification of Presidential votes and of Presidential electors or counting of their ballots to elect the President and Vice President. ........................................................ 3

B.    None of the Presidential Electors certified by the Governors of the Defendant States received state legislative post-election certification; their votes should not be counted by Congress and the Vice President on January 6, 2021. ................................................. 7

C.    Federal and state court post-election Presidential election contests and recounts preclude state legislative post-election certification of Presidential votes and Presidential electors. ................................................................................................... 8

      1.    The U.S. Supreme Court and Florida Supreme Court decisions in *Bush v. Gore* are examples of federal court and state court interference conflicting with a state legislature's Article II post-election certification prerogatives. ................................... 8

      2.    The Defendant States have election contest or recount laws, which apply to Presidential elections. ............................................................................................ 9

      3.    In 2020, approximately thirty post-election lawsuits are filed in Defendants States regarding election official errors and improprieties. ................................................. 9

      4.    In 2020, Texas sued Pennsylvania, Michigan, Wisconsin and Georgia in the U.S. Supreme Court to adjudicate election irregularities and improprieties. ..................... 9

D.    The Defendants violate the Plaintiffs' constitutionally-protected voting rights by certifying Presidential electors who have not received state legislative post-election certification and by counting their votes. ................................................................... 10

E.    This motion for preliminary injunction is filed to avoid a constitutional crisis ................ 11

ARGUMENT ......................................................................................................................... 12

I.    The D.C. Circuit applies a four-part test for granting a preliminary injunction. ................ 13

II.    The Plaintiffs are likely to succeed on the merits. ..................................................... 13

      A.    Federal law—3 U.S.C. §§ 5, 6, 15—and the state laws—Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann. § 21-2-499 (B), Mich. Comp. Laws. § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat. § 3166—are constitutionally unauthorized and they violate voters' rights to state legislative post-election certifications. ......................... 14

1.  Voter rights are guaranteed under Article II to the state legislatures' post-election certifications of their votes and of Presidential electors..................................14

2.  Article II's imperative sentence regarding Presidential elections requires that only the votes of Presidential electors who have received state legislative post-election certification count toward election of President and Vice President. ..............15

3.  3 U.S.C. §§ 5, 6 and 15 fail to constitutionally guarantee state legislative post-election certifications of votes and of Presidential electors...............................16

4.  Congress lacks Congressional authority to enact 3 U.S.C. §§ 5, 6 and 15 which preempt constitutionally-mandated state legislative post-election certification of Presidential votes and of Presidential electors, violating voting rights related thereto..........................................................................................................18

     a.  The textualist argument supports that the state legislatures, not Governors must conduct post-election certification of Presidential votes and of post-election certification of Presidential electors...........................18

     b.  The textual argument supports that 3 U.S.C. §§ 5, 6 and 15 are unconstitutional.........................................................................................22

     c.  Structuralist arguments also support that 3 U.S.C. §§ 5, 6 and 15 are unconstitutional.........................................................................................26

          1)  The Anti-Congress Principle............................................................27

          2)  The Anti-Governors Principle..........................................................28

          3)  The Pro-State Legislatures Principle ...............................................29

          4)  Conclusion .......................................................................................30

5.  The Defendant States violate Article II by their respective constitution and their respective state laws—Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann. § 21-2-499 (B), Mich. Comp. Laws. § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat.  § 3166—by cancelling state legislatures out of post-election certifications of Presidential votes and of Presidential electors. ......................31

     a.  The Arizona Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights. ........................................................................................................32

     b.  The Georgia Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights. ........................................................................................................33

    c.    The Michigan Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights. ....................................................................................................... 33

    d.    The Pennsylvania Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights. ....................................................................................................... 34

    e.    The Wisconsin Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights. ....................................................................................................... 35

    6.    The Presidential post-election court proceedings—like *Bush v. Gore,* the Texas original action and the thirty post-election lawsuits in Defendant States—are in constitutional error and unnecessarily politicize the federal and state courts. ............... 36

III.    The Plaintiffs have standing as voters because the Defendants are violating their voting rights to state legislative post-election certifications of their votes and of Presidential electors and to only the votes of Presidential electors so certified being counted toward the election of President and Vice President. .................................................................... 36

IV.    The Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief. ............ 42

V.    The balance of equities and the public interest tips in the Plaintiffs' favor. ................................. 43

CONCLUSION .................................................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama*, 742 F.3d 1023 (D.C.Cir.2014) ................................................................. 13

*Anderson v. Celebrezze,* 460 U.S. 780 (1983) .................................................................... 41

*Arizona* v. *California*, 589 U. S. ___ (Feb. 24, 2020) ........................................................ 10

*Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815 (D.C. Cir. 2009) ........................... 43

*Baker v. Carr*, 369 U.S. 186 (1962) ................................................................................. 37

*\*Baten v. McMaster*, 967 F.3d 345 (4th Cir. 2020) .................................................... 14, 37

*Burdick v. Takushi,* 504 U.S. 428 (1992) ......................................................................... 39

*\*Bush v. Gore*, 531 U.S. 98 (2000) ............................................................................ 8, 36

*Clapper v. Amnesty Int'l USA,* 568 U.S. 398 (2013) ........................................................ 36

*Davis v. Pension Ben. Guar. Corp.,* 571 F.3d 1288 (D.C.Cir.2009) ................................. 13

*Dumonde v. U.S.,* 87 Fed. Cl. 651 (Fed. Cl. 2009) ........................................................... 39

*Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528 (1985) ................. 18

*\*Gill v. Whitford,* 138 S. Ct. 1916 (2018) ........................................................... 37, 38, 40

*Guttenberg v. Emery,* 26 F.Supp.3d 88 (D.D.C. 2014) ................................................... 42

*Johnson v. FCC,* 829 F.2d 157 (D.C. Cir. 1987) ............................................................. 38

*Lane County v. Oregon,* 74 U.S. 71 (1869) ..................................................................... 18

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ..................................................... 36

*Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137 (1803) .................................................. 39

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ................................................................. 13

*McCulloch v. Maryland,* 17 U.S. 316 (1819) ................................................................. 18

*Mdewakanton Sioux Indians of Minn. v. Zinke*, 255 F.Supp.3d 48 (D.D.C. 2017) ......... 42

*New York v. U.S.,* 505 U.S. 144 (1992) .......................................................................... 18

*Newman v. U.S. of America ex rel Frizzell*, 238 U.S. 537 (1915) ........................... 2, 11, 44

*Perez v. United States,* 402 U.S. 146 (1971) ................................................................................18

*Purcell v. Gonzalez,* 549 U.S. 1 (2006) .......................................................................................38

*Reynolds v. Sims,* 377 U.S. 533 (1964) .......................................................................................38

*Sherley v. Sebelius,* 644 F.3d 388 (D.C.Cir.2011) .....................................................................13

*Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014) ..........................................................37

*Timmons v. Twin Cities Area New Party,* 520 U.S. 351 (1997) ..................................................39

*United States v. Darby,* 312 U.S. 100 (1941) .............................................................................18

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841 (D.C.Cir.1977) ...........13

*Wesberry v. Sanders,* 376 U.S. 1 (1964) .....................................................................................39

*Winter v. NRDC, Inc.,* 555 U.S. 7 (2008) ............................................................................. 42, 43

**Constitutional Provisions**

U.S. Constitution, Article I .............................................................................................23, 24, 26

U.S. Constitution, Article II .................................................................................................passim

U.S. Constitution, Article III............................................................................................... 36, 37

Georgia Constitution of 1798 (http://founding.com/founders-library/government-
documents/american-state-and-local-government-documents/state-constitutions/georgia-
constitution-of-1798/) (last visited: December 18, 2020)...................................................7, 29

**Statutes**

3 U.S.C. § 5, 6 and 15 ..........................................................................................................passim

Ariz. Rev. Stat. § 16-212 (B) ...............................................................................................passim

Ariz. Rev. Stat. § 16-672............................................................................................................9, 36

D.C. Code § 16-3501 ...........................................................................................2, 11, 43, 44

Ga. Code Ann. § 21-2-499 (B) .............................................................................................passim

Ga. Code Ann.§ 21-2-521 ...........................................................................................................9, 36

Mich. Comp. Laws § 168.46 .................................................................................................passim

Mich. Comp. Laws § 168.862...................................................................................................9, 36

25 Pa. Cons. Stat. § 3166 ...................................................................................................... passim

25 Pa. Cons. Stat. § 3312 ...................................................................................................... 9, 36

25 Pa. Cons. Stat. § 3351 ...................................................................................................... 9, 36

Wis. Stat. § 7.70 (5) (b) ...................................................................................................... passim

Wis. Stat. § 9.01 ...................................................................................................... 9, 36

# INTRODUCTION

The Plaintiffs move for a preliminary injunction enjoining the federal Defendants and state Defendants from Pennsylvania, Michigan, Wisconsin, Georgia and Arizona (Defendant States) from certifying Presidential electors and counting their votes where the Presidential electors did not receive state legislative post-election certification as required by Article II.

Article II contains an imperative sentence regarding Presidential elections that state legislatures, every four years, may direct the manner of state appointment of Presidential electors:

> He shall hold his office during the term of four years, and, together with the Vice President, chosen for the same term, be elected, as follows: Each state shall appoint, in such manner as the Legislature thereof may direct, a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or person holding an office of trust or profit under the United States, shall be appointed an elector.

Specifically, the challenged federal and state laws[1] requiring Governor post-election certification of Presidential electors, currently considered as having full legal force and effect, have the legal consequence that the state legislatures, every four years, "may" NOT "direct" the "manner" of "appointing" the Presidential electors. Under this one constitutional imperative sentence, the state legislatures, not the Governors, have the constitutional prerogative to post-election certification. Absent the state legislative post-election certification of the Presidential electors, the federal Defendants cannot constitutionally count the votes of the Presidential electors from the Defendant States.

The Plaintiffs are voters who have constitutionally-protected voting rights to state legislative post-election certification regarding their votes for Presidential electors and constitutionally-protected voting rights that only the votes of Presidential electors who have received state legislative

---

[1] 3 U.S.C. § 5, 6 and 15 and Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat. § 3166.

post-election certification be counted by the federal Defendants to elect the President and Vice President.

A preliminary injunction is necessary to avoid a constitutional crisis. The constitutional crisis may be caused, after the January 20, 2021 inauguration of the President and Vice President, by a Presidential candidate or Presidential electors filing a post-inaugural civil action for writ of quo warranto to oust the President and Vice President.[2] The U.S. District Court has jurisdiction over a post-inaugural ouster of the United States President and Vice President. Specifically, D.C. Code § 16-3501, et seq., authorizes the U.S. District Court for the District of Columbia, in proper cases, instituted by proper officers or persons, to post-inaugural ouster of national officers of the United States including the President and Vice President of the United States. *Newman v. U.S. of America ex rel Frizzell*, 238 U.S. 537 (1915).

The Presidential candidate or Presidential electors could make two constitutional arguments against the votes the federal Defendants counted in the election of President and Vice President. First, U.S.C. § 5, 6 and 15 are unconstitutional because Congress does not have constitutional authority to assign post-election certification to the Governors as executives of the Defendant States and to direct Congress and the Vice President to count votes of Presidential electors who have not received state legislative post-election certification. Second, the Defendant States' state legislatures have unconstitutionally acquiesced to the federal laws by enacting state laws transferring post-election certification from the state legislatures to state executive branch officials: Ariz. Rev. Stat. § 16-212 (B) (Arizona Secretary of State), Ga. Code Ann.§ 21-2-499 (B) (Georgia Secretary of State and Governor), Mich. Comp. Laws § 168.46 (Michigan State Board of Canvassers and Governor),

---

[2] The Epoch Times, "Electors in 7 states cast dueling votes for Trump" at
https://www.theepochtimes.com/mkt_app/electors-in-7-states-cast-dueling-votes-for-trump_3620059.html (last visited: Dec. 18, 2020).

Wis. Stat. § 7.70 (5) (b) (Wisconsin Elections Commission); and 25 Pa. Cons. Stat.  § 3166 (Secretary of Commonwealth and Governor).

The Plaintiffs agree with these constitutional arguments, but disagree about the wisdom of using the post-inaugural ouster procedure to litigate them. Waiting for the post-inaugural ouster creates an unnecessary constitutional crisis. Instead, the post-inaugural ouster should be the option of last resort.

Plaintiffs' motion for preliminary injunction is a better vehicle for this Court to adjudicate these constitutional claims in a timely way so that the constitutional provisions of the U.S. Constitution regarding Presidential electors, Article II and the Twelfth Amendment, are followed and a President and a Vice President are lawfully inaugurated on January 20, 2021.

## BACKGROUND

### A. Defendants, except the constitutionally-required state legislatures, are involved in post-election certification of Presidential votes and of Presidential electors or counting of their ballots to elect the President and Vice President.

Under 3 U.S.C. §§ 5, 6 and 15, each of the Defendants, except the state legislative leaders and their state legislatures, have a role to play in state post-election certification of Presidential votes, state post-election certification of a state's Presidential electors or counting of the Presidential Electors' votes. Under 3 U.S.C. § 15, "Congress shall be in session on the sixth day of January succeeding every meeting of electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day." Under 3 U.S.C. § 15, Vice President Michael Richard Pence is the presiding officer on January 6, 2021: "and the President of the Senate shall be their presiding officer."

Vice President Pence, the U.S. Senate and the U.S. House of Representatives are Defendants who presume under 3 U.S.C. §§ 5 and 6, that each state's Presidential elector votes can be counted

because they are designated by the Governor of each Defendant State —even without state

legislative post-election certification. 3 U.S.C. § 5 provides:

> If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.

3 U.S.C. § 6 provides:

> It shall be the duty of the executive of each State, as soon as practicable after the conclusion of the appointment of the electors in such State by the final ascertainment, under and in pursuance of the laws of such State providing for such ascertainment, to communicate by registered mail under the seal of the State to the Archivist of the United States a certificate of such ascertainment of the electors appointed, setting forth the names of such electors and the canvass or other ascertainment under the laws of such State of the number of votes given or cast for each person for whose appointment any and all votes have been given or cast; and it shall also thereupon be the duty of the executive of each State to deliver to the electors of such State, on or before the day on which they are required by section 7 of this title to meet, six duplicate-originals of the same certificate under the seal of the State; and if there shall have been any final determination in a State in the manner provided for by law of a controversy or contest concerning the appointment of all or any of the electors of such State, it shall be the duty of the executive of such State, as soon as practicable after such determination, to communicate under the seal of the State to the Archivist of the United States a certificate of such determination in form and manner as the same shall have been made; and the certificate or certificates so received by the Archivist of the United States shall be preserved by him for one year and shall be a part of the public records of his office and shall be open to public inspection; and the Archivist of the United States at the first meeting of Congress thereafter shall transmit to the two Houses of Congress copies in full of each and every such certificate so received at the National Archives and Records Administration.

The Plaintiffs claim that the Federal Defendants' presumption is constitutionally incorrect;

under Article II's imperative sentence regarding Presidential elections, Defendants Vice President

Pence, the U.S. House of Representatives and the United States Senate can only open up and count

Presidential elector ballots if the state legislature has affirmatively voted post-election to certify the

Presidential electors; otherwise, the votes of the Presidential electors cannot be counted. The

Plaintiffs claim that the Vice President and U.S. Congress act unconstitutionally in this Presidential election and future Presidential elections when they count votes of Presidential electors where the respective state legislature has not affirmatively voted in favor of post-election certification.

Similarly, the Defendant States' executives, Governor Tom Wolf of Pennsylvania, Governor Gretchen Whitmer of Michigan, Governor Tony Evers of Wisconsin, Governor Brian Kemp of Georgia, and Governor Doug Ducey of Arizona under 3 U.S.C. § 6 and their respective state's laws, have designated the Presidential electors based on the assumption that state executive branch certification is all that is required.

But, Governor Tom Wolf of Pennsylvania, Governor Gretchen Whitmer of Michigan, Governor Tony Evers of Wisconsin, Governor Brian Kemp of Georgia, and Governor Doug of Arizona are constitutionally mistaken because the designation by the Governor of each Defendant State cannot cure that the Presidential electors are without state legislative post-election certification. Until the state legislature certifies the Presidential votes and the Presidential electors, the respective Governor's designation under 3 U.S.C. § 6 and their respective state's laws have no legal effect. Absent the state legislative post-election certification required by Article II's imperative sentence regarding Presidential elections, the Governor's designation of Presidential electors has no legal effect because their votes cannot be counted by the Vice President, U.S. Senate and U.S. House of Representatives.

Finally, Article II's imperative sentence regarding Presidential elections requires the Defendants' state legislative leaders to act to vote on post-election certification of the Presidential electors. But, instead, the state legislatures unconstitutionally defer because of their respective state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as has been done in Ariz. Rev. Stat. § 16-212 (B) (Arizona Secretary of State), Ga. Code Ann.§ 21-2-499 (B) (Georgia Secretary of State and Governor), Mich. Comp. Laws § 168.46

(Michigan State Board of Canvassers and Governor), Wis. Stat. § 7.70 (5) (b) (Wisconsin Elections Commission); and 25 Pa. Cons. Stat. § 3166 (Secretary of Commonwealth and Governor).

The Plaintiffs claim that Article II's imperative sentence regarding Presidential elections, and its non-delegation doctrine, permanently left it to the state legislatures to "direct" post-election certification of Presidential electors, not to delegate post-election certification, perpetually and in a wholesale fashion, to state executive branch officials as a ministerial duty.

In this way, the Defendant States' legislative leaders, including Speaker Bryan Carter of the Pennsylvania House of Representatives, Senate Majority Leader Jake Corman of the Pennsylvania Senate, Speaker Lee Chatfield of the Michigan House of Representatives, Senate Majority Leader Mike Shirkey of the Michigan Senate, Speaker Robin Vos of the Wisconsin State Assembly, Senate Majority Leader Howard Marklein of the Wisconsin Senate, Speaker David Ralston of the Georgia House of Representatives, Senate President Pro Tempore Butch Miller of the Georgia Senate, Speaker Russell Bowers of the Arizona House of Representatives, and Senate Majority Leader Rick Gray of the Arizona Senate are violating their duties under the federal Constitution by not voting on post-election certification of the Presidential electors so their votes can constitutionally count.

State legislative post-election certification of Presidential electors is a part of federally-guaranteed voting rights.

Further, the state constitutions of the Defendant States fail to require the state legislature to meet for post-election certification of the Presidential electors in violation of state legislative constitutional duties under Article II's imperative sentence regarding Presidential elections of the U.S. Constitution. Arizona's, Georgia's and Pennsylvania's Constitutions have the state legislature adjourned until January 2021 subject to special sessions called by the Governor or state legislature. Arizona Const.; Georgia Const.; Pennsylvania Const. Michigan's and Wisconsin's Constitutions permit the state legislature to be in session, but do not require a joint session of the state legislature

to affirmatively vote for post-election certification of Presidential electors. Michigan Const.;

Wisconsin Const. By contrast, for example, the Georgia Constitution of 1798, Article IV, section 2,

subsequently repealed, had clear procedures for state legislative certification of Presidential electors:

> Sec. 2. All elections by the general assembly shall be by joint ballot of both branches of the legislature; and when the senate and house of representatives unite for the purpose of electing, they shall meet in the representative chamber, and the president of the senate shall in such cases preside, receive the ballots, and declare the person or persons elected. In all elections by the people the electors shall vote viva voce until the legislature shall otherwise direct.[3]

Each voter who votes—distinguishable from those who don't—has a constitutionally-

protected interest in state legislative post-election certification of their vote and of their state's

Presidential electors. The federal Defendants violate those voting rights by counting ballots of

Presidential electors without the constitutionally-required state legislative post-election certifications.

The state Defendants violate those voting rights by not complying with constitutionally-required

state legislative post-election certifications of Presidential votes and of Presidential electors.

**B.     None of the Presidential Electors certified by the Governors of the Defendant States received state legislative post-election certification; their votes should not be counted by Congress and the Vice President on January 6, 2021.**

On December 14, the Presidential electors for Biden and Trump met and voted in their

Defendant States.  The Presidential electors for Biden in the Defendant States are certified by state

executive branch officials under 3 U.S.C. § 6 and the respective states' election certification laws.

Ariz. Rev. Stat. § 16-212 (B) (Arizona Secretary of State), Ga. Code Ann.§ 21-2-499 (B) (Georgia

Secretary of State and Governor), Mich. Comp. Laws § 168.46 (Michigan State Board of Canvassers

and Governor), Wis. Stat. § 7.70 (5) (b) (Wisconsin Elections Commission); and 25 Pa. Cons. Stat.

§ 3166 (Secretary of Commonwealth and Governor). The Presidential electors for Trump are not

---

[3] Georgia Constitution of 1798 (http://founding.com/founders-library/government-documents/american-state-and-local-government-documents/state-constitutions/georgia-constitution-of-1798/) (last visited: December 18, 2020).

certified in this way. But, neither the Presidential electors for Biden nor the Presidential electors for

Trump in the Defendant States received a state legislative post-election affirmative vote for

certification. The Presidential electors for Biden in the Defendant States voted for Biden as

President and Harris as Vice President.[4] The Presidential electors for Trump in the Defendant States

voted for Trump as President and Pence as Vice President. But, under Article II, none of these

votes count because no Presidential electors have received state legislative post-election certification.

**C.**     **Federal and state court post-election Presidential election contests and recounts preclude state legislative post-election certification of Presidential votes and Presidential electors.**

Federal and state court post-election Presidential election contests and recounts preclude the

state legislatures' post-election certifications of Presidential votes and of Presidential electors.  Under

the Plaintiffs' interpretation of Article II, pre-election judicial proceedings are not a constitutional

problem, but judicial post-election Presidential election contests and recounts conflict with the state

legislatures' post-election certifications under Article II.

   **1.**    **The U.S. Supreme Court and Florida Supreme Court decisions in *Bush v. Gore* are examples of federal court and state court interference conflicting with a state legislature's Article II post-election certification prerogatives.**

The court decisions in *Bush v. Gore* reflect examples of federal court and state court

proceedings conflicting with a state legislature's Article II post-election certification prerogatives.

On December 12, 2000, the U.S. Supreme Court issued a decision in *Bush v. Gore*, 531 U.S. 98

(2000), settling a state court recount dispute in Florida's 2000 presidential election between George

W. Bush and Al Gore.  The U.S. Supreme Court decision allowed the previous vote certification

made by Florida Secretary of State Katherine Harris to stand for George W. Bush, who thereby won

---

[4]The Epoch Times, "Electors in 7 states cast dueling votes for Trump" at
https://www.theepochtimes.com/mkt_app/electors-in-7-states-cast-dueling-votes-for-
trump_3620059.html (last visited: Dec. 18, 2020).

Florida's 25 electoral votes—and the Presidential election. Neither the court decisions, nor Florida law, included the Florida state legislature conducting post-election certifications of the Presidential vote and of the Presidential electors.

### 2. The Defendant States have election contest or recount laws, which apply to Presidential elections.

Similarly, the Defendant States have election contest or recount laws, which apply to Presidential elections—like Florida's laws did in 2000: Ariz. Rev. Stat. § 16-672; Ga. Code Ann.§ 21-2-521; Mich. Comp. Laws § 168.862; Wis. Stat. § 9.01; and 25 Pa. Cons. Stat. § 3351. The Defendant States' laws do not provide for the state legislatures to engage in post-election certifications. Interestingly, the Pennsylvania laws have a state legislative post-election certification process for its Governor and Lieutenant Governor elections. 25 Pa. Cons. Stat. § 3312, et seq.

### 3. In 2020, approximately thirty post-election lawsuits are filed in Defendants States regarding election official errors and improprieties.

Approximately thirty post-election lawsuits regarding Pennsylvania, Michigan, Wisconsin, Georgia and Arizona election official errors and improprieties were filed.[5] The Complaint and its citations to the appendix detail allegations of Pennsylvania, Michigan, Wisconsin, Georgia and Arizona election official errors and improprieties. In Defendants' states, voter allegations exists which are the election officials' errors and improprieties exceed the razor-thin margins of Presidential contests.

### 4. In 2020, Texas sued Pennsylvania, Michigan, Wisconsin and Georgia in the U.S. Supreme Court to adjudicate election irregularities and improprieties.

On December 7, 2020, Texas filed an original action in the U.S. Supreme Court, Case No. 22O155, against Pennsylvania, Michigan, Wisconsin and Georgia for election irregularities and

---

[5] *See "*Postelection lawsuits related to the 2020 United States presidential election," found at *https://en.wikipedia.org/wiki/Postelection_lawsuits_related_to_the_2020_United_States_presidential_election#Wood_v._Raffensperger* (last visited: Dec. 15, 2020).

improprieties.  On December 9, Missouri and 16 other states filed a motion for leave to file an amicus curiae brief in support of Texas. On December 10, U.S. Representative Mike Johnson and 105 other members submitted a motion for leave to file amicus brief in support of Texas. On December 11, the U.S. Supreme Court dismissed the original action in a text order:

> The State of Texas's motion for leave to file a bill of complaint is denied for lack of standing under Article III of the Constitution. Texas has not demonstrated a judicially cognizable interest in the manner in which another State conducts its elections. All other pending motions are dismissed as moot. Statement of Justice Alito, with whom Justice Thomas joins: In my view, we do not have discretion to deny the filing of a bill of complaint in a case that falls within our original jurisdiction. See *Arizona* v. *California*, 589 U. S. ___ (Feb. 24, 2020) (Thomas, J., dissenting). I would therefore grant the motion to file the bill of complaint but would not grant other relief, and I express no view on any other issue.[6]

**D.    The Defendants violate the Plaintiffs' constitutionally-protected voting rights by certifying Presidential electors who have not received state legislative post-election certification and by counting their votes.**

The Defendants violate the Plaintiffs' constitutionally-protected voting rights by recognizing Presidential electors who have not received state legislative post-election certification and by counting their votes. Under Article II's imperative sentence regarding Presidential elections, Defendants can only certify Presidential electors and count their votes if they have received state legislative post-election certification—which none have.

The federal laws regarding the Presidential electors, 3 U.S.C. §§ 5, 6 and 15, are constitutionally unauthorized. Article II and the Twelfth Amendment of the Constitution establish a non-delegable process where at least state legislative post-election certification of the state's Presidential electors is constitutionally required for Presidential elector votes to be counted in the election of the President and Vice President. In contradiction, the federal laws, 3 U.S.C. §§ 5, 6 and

---

[6] Plaintiffs agree that the State of Texas lacked standing, but the original action itself begs the question, "Is the U.S. Supreme Court the final adjudicator for certification of Presidential electors?" The Plaintiffs' answer is no; the respective state legislatures are the final determiner of certification of Presidential electors—and, in a non-delegable way.

15, establish a different process where Presidential electors are designated by the Governor of each Defendant State without state legislative post-election certification—and, then, their votes are counted to elect the President and Vice President.

The Defendant States have legally acquiesced to the federal laws by enacting statutes transferring post-election certification from the state legislatures to state executive branch officials: Ariz. Rev. Stat. § 16-212 (B) (Arizona Secretary of State), Ga. Code Ann.§ 21-2-499 (B) (Georgia Secretary of State and Governor), Mich. Comp. Laws § 168.46 (Michigan State Board of Canvassers and Governor), Wis. Stat. § 7.70 (5) (b) (Wisconsin Elections Commission); and 25 Pa. Cons. Stat. § 3166 (Secretary of Commonwealth and Governor). These state laws also violate Article II which establishes the state legislative prerogative to post-election certification of Presidential electors.

**E.     This motion for preliminary injunction is filed to avoid a constitutional crisis.**

The Plaintiffs file this complaint to avoid a constitutional crisis that would be involved in a post-inaugural ouster of the United States President and Vice President under D.C. Code § 16-3501, et seq., which authorizes the U.S. District Court for the District of Columbia, in proper cases, instituted by proper officers or persons, to oust national officers of the United States post-election, including the President and Vice President of the United States. *Newman v. U.S. of America ex rel. Frizzell*, 238 U.S. 537 (1915).

Instead, to avoid that post-inaugural constitutional crisis, the Plaintiffs as voters file this preliminary injunction motion against federal officials in the District of Columbia and Governors and state legislative leaders in Arizona, Georgia, Michigan, Pennsylvania and Wisconsin ("Defendant States") requiring a constitutionally-compliant process for state-by-state post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

# ARGUMENT

The Plaintiffs as voters file this motion for preliminary injunction against federal officials in the District of Columbia and Governors and state legislative leaders in Arizona, Georgia, Michigan, Pennsylvania and Wisconsin ("Defendant States") seeking a constitutionally-compliant process for state legislative post-election certification of Presidential electors and counting of their votes prior to the Presidential and Vice Presidential inaugural on January 20, 2021.

Under Article II's imperative sentence regarding Presidential elections, Congress lacks legal authority to enact laws interfering with the state-by-state state legislative post-election certification of Presidential electors as it has done with 3 U.S.C. §§ 5, 6 and 15.  Analogously, under Article II's imperative sentence regarding Presidential elections, the state legislatures lack legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as they have done in Ariz. Rev. Stat. § 16-212 (B) (Arizona Secretary of State), Ga. Code Ann.§ 21-2-499 (B) (Georgia Secretary of State and Governor), Mich. Comp. Laws § 168.46 (Michigan State Board of Canvassers and Governor), Wis. Stat. § 7.70 (5) (b) (Wisconsin Elections Commission); and 25 Pa. Cons. Stat.   § 3166 (Secretary of Commonwealth and Governor). Article II's imperative sentence regarding Presidential elections, and its non-delegation doctrine, left it to the state legislatures to "direct" post-election certification of Presidential electors, not to delegate post-election certification, perpetually and in a wholesale fashion, to state executive branch officials as a ministerial duty. Under Article II's imperative sentence regarding Presidential elections, if there is no state legislative post-election certification of Presidential electors in the Defendant States, then those Defendant States' Presidential electors' votes, not so certified, cannot

12

be counted by the federal Defendants for the election of President and Vice President. So, the preliminary injunction should issue to require constitutional compliance.[7]

## I.  The D.C. Circuit applies a four-part test for granting a preliminary injunction.

A party seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C.Cir.2014) (*quoting Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C.Cir.2011)) (emphasis in text deleted). A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*quoting* 11A C. Wright, A. Miller, & M. Kane, Federal Practice And Procedure § 2948 (2d ed.1995)) (emphasis in original).

## II.  The Plaintiffs are likely to succeed on the merits.

The Plaintiffs are likely to succeed on the merits. The D.C. Circuit has, in the past, followed the "sliding scale" approach to success on the merits, where "a court, when confronted with a case in which the other three factors strongly favor interim relief may exercise its discretion to grant a stay if the movant has made a substantial case on the merits." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977). Under the sliding scale approach, "if the movant makes a very strong showing of irreparable harm and there is no substantial harm to the nonmovant, then a correspondingly lower standard can be applied for likelihood of success." *Davis v. Pension Ben. Guar. Corp.,* 571 F.3d 1288, 1292 (D.C.Cir.2009).

---

[7] For a review of the constitutional convention's deliberations on selecting the president, see Neal R. Peirce and Lawrence D. Longley, *The People's President: The Electoral College in American History and the Direct Vote Alternative* (1968; New Haven, 1981) at 10-30.

**A. Federal law—3 U.S.C. §§ 5, 6, 15—and the state laws—Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann. § 21-2-499 (B), Mich. Comp. Laws. § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat. § 3166—are constitutionally unauthorized and they violate voters' rights to state legislative post-election certifications.**

The plaintiffs have voting rights under Article II guaranteeing state legislative post-election certification of their votes and of Presidential electors. *See Baten v. McMaster*, 967 F.3d 345, 352–53 (4th Cir. 2020) (voters who vote in Presidential elections have standing on claims of government causing disenfranchisement). 3 U.S.C. §§ 5, 6, 15, Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat. § 3166 are constitutionally unauthorized. The federal and state laws violate voters' rights by preempting state legislative post-election certification of their Presidential votes and post-election certification of the Presidential electors. 3 U.S.C. §§ 5, 6, 15 also unconstitutionally allow counting of votes of Presidential electors who have not received the constitutionally-required state legislative post-election certification.

**1. Voter rights are guaranteed under Article II to the state legislatures' post-election certifications of their votes and of Presidential electors.**

Article II guarantees to voters that the state legislature will vote on post-election certification of votes and post-election certification of Presidential electors and that only ballots of legislatively-certified Presidential electors will be counted for the election of President and Vice President. *See Baten v. McMaster*, 967 F.3d at 352–53 (4th Cir. 2020). It is part of the social contract embedded in the Constitution.

Specifically, Article II provides that the state legislature—not Congress, nor the Governors—shall be the deciding body for Presidential electors:

> He shall hold his office during the term of four years, and, together with the Vice President, chosen for the same term, be elected, as follows: Each state shall appoint, in such manner as the Legislature thereof may direct, a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled

in the Congress: but no Senator or Representative, or person holding an office of trust or profit under the United States, shall be appointed an elector.

Under Article II and the Tenth Amendment, the state legislatures' power to determine the manner of appointment of Presidential electors includes the power of post-election certification. Moreover, the state legislatures' choice for elections as the manner to appoint Presidential electors does not abrogate nor diminish the state legislatures' constitutional obligations to conduct post-election certification of their respective Presidential electors.

> **2.    Article II's imperative sentence regarding Presidential elections requires that only the votes of Presidential electors who have received state legislative post-election certification count toward election of President and Vice President.**

The purpose of Article II's imperative sentence regarding Presidential elections is for state legislatures to certify voters' Presidential votes in order to certify Presidential electors who cast ballots for President and Vice President—which are opened and counted by the federal Defendants. The voters in the Presidential elections are constitutionally-guaranteed that the state legislature, after the election, will certify their vote and, based on the Presidential vote returns, certify the Presidential electors. All Presidential election contests are to be heard by the state legislatures—not the federal courts nor the state courts. The constitutional protection of the state legislatures' constitutional prerogatives over selection of Presidential electors is that the Federal Defendants can only count the votes of the Presidential electors who have state legislative post-election certification; otherwise, constitutionally, the votes of Presidential electors without state legislative post-election certification do not count.

3 U.S.C. §§ 5, 6, 15, Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat.   § 3166 are also constitutionally unauthorized because the Federal Defendants count votes of Presidential electors who do not have state legislative post-election certification. The federal laws and state laws authorize

an unconstitutional method for electing the President and Vice President.  Because the federal laws are not constitutionally authorized, the threat of a post-inaugural ouster under D.C. Code 16-3501, et seq., is legally imminent.

> **3.** **3 U.S.C. §§ 5, 6 and 15 fail to constitutionally guarantee state legislative post-election certifications of votes and of Presidential electors.**

3 U.S.C. §§ 5, 6 and 15 constitute significant federal regulation of the state appointment of Presidential electors and counting their votes for President and Vice President. Meanwhile, these federal laws fail to guarantee state legislative certifications of votes and of Presidential electors. Sections 5 and 6 set a deadline for the state executive branch officials and judges of December 8, 2020, to determine election controversies as to appointment of electors and designates the Governor of each state to communicate the appointment of the Presidential electors to the federal government. Section 5 sets the deadline as six days before the Electors meet to vote which was December 14, 2020:

> If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.

Section 6 designates the Governors, the executives of the states, to be the public officials to exclusively communicate the list of Presidential electors and their votes to the federal government:

> It shall be the duty of the executive of each State, as soon as practicable after the conclusion of the appointment of the electors in such State by the final ascertainment, under and in pursuance of the laws of such State providing for such ascertainment, to communicate by registered mail under the seal of the State to the Archivist of the United States a certificate of such ascertainment of the electors appointed, setting forth the names of such electors and the canvass or other ascertainment under the laws of such State of the number of votes given or cast for each person for whose appointment any and all votes have been given or cast; and it shall also thereupon be the duty of the

executive of each State to deliver to the electors of such State, on or before the day on which they are required by section 7 of this title to meet, six duplicate-originals of the same certificate under the seal of the State; and if there shall have been any final determination in a State in the manner provided for by law of a controversy or contest concerning the appointment of all or any of the electors of such State, it shall be the duty of the executive of such State, as soon as practicable after such determination, to communicate under the seal of the State to the Archivist of the United States a certificate of such determination in form and manner as the same shall have been made; and the certificate or certificates so received by the Archivist of the United States shall be preserved by him for one year and shall be a part of the public records of his office and shall be open to public inspection; and the Archivist of the United States at the first meeting of Congress thereafter shall transmit to the two Houses of Congress copies in full of each and every such certificate so received at the National Archives and Records Administration.

Section 15 contains procedures for the Vice President of the United States as President of the Senate, the U.S. Senate and the U.S. House of Representatives to meet on January 6 following the Presidential election and for counting the Presidential electors' votes from the respective states. There is nothing in section 15 stating that only the ballots of Presidential electors who have received state legislative post-election certification will be counted:

Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer. Two tellers shall be previously appointed on the part of the Senate and two on the part of the House of Representatives, to whom shall be handed, as they are opened by the President of the Senate, all the certificates and papers purporting to be certificates of the electoral votes, which certificates and papers shall be opened, presented, and acted upon in the alphabetical order of the States, beginning with the letter A; and said tellers, having then read the same in the presence and hearing of the two Houses, shall make a list of the votes as they shall appear from the said certificates; and the votes having been ascertained and counted according to the rules in this subchapter provided, the result of the same shall be delivered to the President of the Senate, who shall thereupon announce the state of the vote, which announcement shall be deemed a sufficient declaration of the persons, if any, elected President and Vice President of the United States, and, together with a list of the votes, be entered on the Journals of the two Houses.

Thus, none of these federal laws—3 U.S.C. §§ 5, 6 and 15—guarantee state legislative post-election certification of Presidential electors before their votes are counted.

4. **Congress lacks Congressional authority to enact 3 U.S.C. §§ 5, 6 and 15 which preempt constitutionally-mandated state legislative post-election certification of Presidential electors, violating voting rights related thereto.**

Two legal standards cover cases challenging Congress's constitutional authority to enact statutes. The first legal standard applies when the party claims an Act of Congress is not authorized by one of the powers delegated to Congress in Article I of the Constitution. See, *e.g., Perez v. United States,* 402 U.S. 146 (1971); *McCulloch v. Maryland,* 17 U.S. 316 (1819).

The second legal standard applies when the party claims an Act of Congress invades the province of state sovereignty granted by an express constitutional provision or reserved by the Tenth Amendment. See, *e.g., Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528 (1985); *Lane County v. Oregon,* 74 U.S. 71 (1869). "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. U.S.,* 505 U.S. 144, 156 (1992) (citations omitted). It is in this sense that the Tenth Amendment "states but a truism that all is retained which has not been surrendered." *United States v. Darby,* 312 U.S. 100, 124 (1941).

The Plaintiffs here assert that the 3 U.S.C. §§ 5, 6, 15 is both constitutionally unauthorized and 3 U.S.C. §§ 5, 6, 15 invades the state legislature's power to post-election certifications of Presidential votes and Presidential electors granted by Article II and reserved by the Tenth Amendment. So, both legal standards apply.

a. **The textualist argument supports that the state legislatures, not Governors must conduct post-election certifications of Presidential votes and of Presidential electors.**

One Congressional researcher has defined judicial textualism:

Textualism is a mode of interpretation that focuses on the plain meaning of the text of a legal document. Textualism usually emphasizes how the terms in the Constitution would be understood by people at the time they were ratified, as well as the context in

which those terms appear. Textualists usually believe there is an objective meaning of the text, and they do not typically inquire into questions regarding the intent of the drafters, adopters, or ratifiers of the Constitution and its amendments when deriving meaning from the text.[8]

The textualist argument supports that the state legislatures, not Governors, must conduct post-election certification of Presidential votes and post-election certification of Presidential electors.

The textualist argument in this memorandum is based on one sentence in Article II of the U.S. Constitution. The sentence has eighty-five words. The constitutional sentence provides:

> He shall hold his office during the term of four years, and, together with the Vice President, chosen for the same term, be elected, as follows: Each state shall appoint, in such manner as the Legislature thereof may direct, a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or person holding an office of trust or profit under the United States, shall be appointed an elector.

The Plaintiffs claim, based on this sentence, that post-election certification of Presidential votes and post-election certification of Presidential electors are state legislative decisions. In turn, the Plaintiffs claim that 3 U.S.C. § 5, 6 and 15 and state laws (such as Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat.   § 3166) eviscerating these state legislative prerogatives, every four years, are unconstitutional.

Several textualist interpretative keys open up the relevant meanings of the constitutional text as interpreted by Plaintiffs. First, the constitutional sentence is an imperative sentence. Second, the imperative sentence requires the election of President and Vice President every "four years." Third, every four years, the "state" appoints the Presidential electors. Fourth, every four years, "the legislature may "direct" the "manner" of appointing.

The constitutional sentence is an imperative sentence requiring that the President and Vice President "be elected" "every four years."   The sentence phrase "as follows" provides specific

---

[8]Brandon J. Murrill, "Modes of Constitutional Interpretation" at 2, Congressional Research Service (Mar. 15, 2018).

directions on how the Presidential election is to occur. This imperative sentence is an instruction to all constitutional actors identified—President, Vice President, U.S Congress, Presidential electors, states and state legislatures—and those not identified—Governors, federal judiciary and state judiciaries.

The Plaintiffs focus on the imperative nature of the constitutional sentence to make their texualist interpretation. To begin, the imperative sentence, in relevant part, requires that the all the constitutionally-identified actors—President, Vice President, U.S Congress, Presidential electors, states and state legislatures— conduct an election of President and Vice President every "four years." This interpretation can hardly be disputed since that is what the text says. And, ever since its adoption, the United States has conducted, every four years, an election for President and Vice President. Consistently, the challenged federal and state laws—3 U.S.C. § 5, 6 and 15 and Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat.  § 3166)—all presume a Presidential election every four years.

Next, the imperative constitutional section requires that, every four years, the "state" appoints the Presidential electors. This interpretation also can also hardly be disputed since that is what the text says. And, ever since its adoption, the states, every four years, have appointed Presidential electors for the purpose of electing a President and Vice President. Consistently, the challenged federal and state laws--3 U.S.C. § 5, 6 and 15 and Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat.  § 3166)—presume that the states, every four years, appoint Presidential electors for the purpose of electing a President and Vice President.

Finally, the imperative constitutional section requires that, every four years, "the legislature" may "direct" the "manner" of appointing of the Presidential electors. Plaintiffs claim that it is this aspect of the constitutional imperative sentence that is violated when the challenged federal and

state laws--3 U.S.C. § 5, 6 and 15 and Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat.   § 3166)—legally preclude state legislative post-election certification of Presidential votes and post-election certification of Presidential electors.  Plaintiffs claim that, every four years, "the legislature must be involved in such post-election certification so that it may "direct" the "manner" of "appoint[ing]" of the Presidential electors—as the constitutional imperative sentence requires.

To be sure, in the previous sentence of this memorandum, the "-ing" at the end of "appoint[ing]" is in brackets because the word "appoint" is in the constitutional text not the word "appointing."  To explain, please engage in a thought experiment sympathetic to Plaintiffs' position.  Substitute "engage in appointing" for "appoint" in the constitutional sentence. Such substitution does not change the meaning of that part of the constitutional sentence.  The phrase "every four years, the state shall appoint" has the same meaning as "every four years, the state shall engage in appointing."  However, such a substitution does confirm Plaintiffs' constitutional argument.  The substitution does not contradict any other part of the constitutional imperative sentence. The state legislature, every four years, may direct the manner of the state engaging in appointing the Presidential electors.  So, the state legislatures, every four years, applies their respective parliamentary rules to the state appointments of Presidential electors. The federal laws and state laws which contradict with the state legislatures' quadrennial prerogatives are constitutionally unauthorized.

To be balanced, a similar thought experiment sympathetic to the opposition should be tried.  Now, substitute the phrase "have laws regarding appointment" for "appointment" in the constitutional sentence.  Quickly, two contradictions arise.  First, the first part of sentence "[The President] shall hold his office during the term of four years, and, together with the Vice President, chosen for the same term, be elected, as follows." So, state laws contradict with the phrase that the

states "have laws regarding appointment." The contradiction is that the constitutional imperative sentence is the exclusive law requiring that every four years the Presidential elections shall occur "as follows"; so, state laws "directing" the "manner" of "appointing" the Presidential electors are constitutionally unauthorized. Second, the later part of the sentence "in such manner as the Legislature thereof may direct" contradicts "have laws regarding appointment." The contradiction is that the constitutional imperative sentence is the exclusive law requiring that every four years the Presidential elections shall occur "as follows" including the state legislature "may" "direct" the "manner" of "appointing" the Presidential electors. So, state laws "directing" the "manner" of "appointing" the Presidential electors are constitutionally unauthorized. Specifically, the challenged federal laws and state laws requiring Governor post-election certification of Presidential electors, currently considered as having full legal force and effect, have the legal consequence that the state legislatures, every four years, "may" NOT "direct" the "manner" of "appointing" the Presidential electors. Again, the state legislatures, not the Governors, have the constitutional prerogatives for post-election certification.

**b. The textual argument supports that 3 U.S.C. §§ 5, 6 and 15 are unconstitutional.**

The textual argument for unconstitutionality of 3 U.S.C. §§ 5, 6 and 15 is straightforward.[9] Under textualism, the Constitution's text supports that the unconstitutionality of 3 U.S.C. §§ 5, 6 and 15 because they fail to guarantee voter's rights to the state legislature's post-election certifications of Presidential votes and of Presidential electors to vote for President and Vice President.

Congress neither has express constitutional authority nor implied constitutional authority to enact 3 U.S.C. §§ 5, 6 and 15. Further, the federal laws violate voter's rights in Presidential elections

---

[9] *See, generally,* Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1696-1759 (2002).

because they interfere with state legislative post-election certifications of Presidential votes and Presidential electors and that only the votes of such certified Presidential electors may be counted in the election of President and Vice President.

First, Congress has no express constitutional authority to enact 3 U.S.C. §§ 5, 6 and 15 which regulate state appointment of Presidential electors and regulate counting Presidential elector votes to elect a President and Vice President. Article II puts state appointment of Presidential electors in the exclusive hands of the state legislatures every four years, "Each state shall appoint, in such manner as the Legislature thereof may direct." By contrast, Article II lacks the express grant of authority to Congress in Article I's Elections Clause for Congressional elections:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

There, the Constitution provides a power to Congress "to make or alter such [state] Regulations" by state in Article I. But, that Constitutionally-conferred power is absent in Article II.

Lacking express constitutional authority in Article II's imperative sentence regarding Presidential elections, the only alternative for Congressional authority is an implied constitutional authority. The only candidates for the government's implied constitutional authority would be Article I's the Necessary and Proper Clause and Article II itself.

The first candidate for implied Congressional authority is the Necessary and Proper Clause. The Necessary and Proper Clause provides that Congress shall have power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." A careful parsing of the Necessary and Proper Clause reveals that there are three prongs of power. Under the Clause, Congress has power for carrying into execution (1) "the foregoing Powers," (2) "all other Powers vested by this Constitution in the Government of the

United States," and (3) "all other Powers vested by this Constitution... in any Department or Officer thereof." None of these prongs support the constitutionality of 3 U.S.C. §§ 5, 6 and 15.

First, the phrase "foregoing Powers" refers to the enumerated powers of Article I. None of the enumerated Congressional powers in Article I cover the appointment of and voting by Presidential electors—which is covered by Article II. So, the "foregoing powers" requirement is not satisfied.

Second, the phrase "all other Powers vested by this Constitution... in any Department or Officer thereof" does not include Congress or Congressional members. Congress is not a Department. Members of Congress are not Officers. In fact, Congressional members are subject to impeachment by the House of Representatives and conviction by the Senate because they are not "civil Officers of the United States." *See* U.S. Const., art. II, § 4 ("The President, Vice President, and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."). Furthermore, the Ineligibility Clause of Article I, Section 6 provides that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." So the phrase "all other Powers vested by this Constitution... in any Department or Officer thereof" is not satisfied.

Third, the phrase "all other Powers vested by this Constitution... in any Department or Officer thereof" does not apply because the U.S. Congress is not a Department or Officer. The text of Article II's imperative sentence regarding Presidential elections does not employ the word "power" referencing to Congress. Article II's imperative sentence regarding Presidential elections does not vest "power" in Congress over state legislatures' express power to determine the manner of appointment of Presidential electors every four years, including the post-election certification of

Presidential electors. Therefore, the phrase "all other Powers vested by this Constitution... in any Department or Officer thereof" is not satisfied.

The second candidate for implied constitutional authority is Article II itself. But, similarly, Article II supports that it is the state legislatures' exclusive constitutional prerogative to determine the state's appointment of Presidential electors, including post-certification of the Presidential electors to vote for President and Vice President. Article II's imperative sentence regarding Presidential elections and the Twelfth Amendment do not grant Congress any "power" over the state legislatures' constitutional prerogatives over Presidential electors. Instead, these constitutional texts define a very limited and specific role for the Vice President, U.S. Senate and U.S. House of Representatives.

Congress's enactment of 3 U.S.C. §§ 5, 6 and 15 goes far beyond the constitutionally-prescribed roles for Vice President, U.S. Senate and the U.S. House of Representatives in Article II's imperative sentence regarding Presidential elections and the Twelfth Amendment. So, Article II's imperative sentence regarding Presidential elections and the Twelfth Amendment do not provide an implied constitutional authority for 3 U.S.C. §§ 5, 6 and 15.

Additionally, there is a textualist argument based on the negative implication. When the Constitution provides Congressional power regarding the Presidency, it says so—twice. First, Article II, Section 1, Clause 4 which provides that "[t]he Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." Second, the Presidential Succession Clause of Article II provides that:

> [i]n Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.

In both of these instances, the Constitution provides Congress with express authority over a limited, narrowly-prescribed aspect of Presidential elections. By negative implication, then, Article II's imperative sentence regarding Presidential elections and selection of Presidential electors every four years does not provide implied constitutional authority for Congress to regulate the state legislatures' post-election certifications of Presidential votes and of Presidential electors.

Finally, the constitutional text also provides an intertextual argument. When the Constitution provides a Congressional role in election, the Constitution says so. First, Article I's Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Second, The House Judging Clause provides that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members." In both instances, the Constitution provides Congress with express constitutional authority regarding elections involving Congress. However, regarding Presidential electors, there is constitutional silence—no express power is granted to Congress—because Article II empowers the state legislatures, exclusively, to govern the states' appointments of Presidential electors.

### c. Structuralist arguments also support that 3 U.S.C. §§ 5, 6 and 15 are unconstitutional.

The interpretivist's structuralist arguments[10] also support the unconstitutionality of 3 U.S.C. §§ 5, 6 and 15.[11] One Congressional researcher has defined judicial structuralism:

> Another mode of constitutional interpretation draws inferences from the design of the Constitution: the relationships among the three branches of the federal government (commonly called separation of powers); the relationship between the federal and state

---

[10] *See, generally,* Charles L. Black, Jr., Structure And Relationship In Constitutional Law (1969); Philip Bobbit, Constitutional Fate: Theory Of The Constitution 74-92 (1982).

[11] *See, generally,* Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1759-1793 (2002).

governments (known as federalism); and the relationship between the government and the people.[12]

The structure of Article II is to empower the state legislatures, not Congress or the state's Governors, to appoint the Presidential electors. 3 U.S.C. §§ 5, 6 and 15 violate Article II's structure because they empower Congress and the state's Governors in the Presidential elector process— excluding the state legislatures from the Presidential elector certification process.

The structure of the Article II for Presidential elections is anti-Congress, anti-Governors and pro-state legislatures. Article II's imperative sentence regarding Presidential elections puts the state legislatures in exclusive control of a state's appointment of Presidential electors. The state legislatures, who enact the state elections law applicable to federal elections, are identified to choose the manner of appointment of the Presidential electors. Congress and the Governors are to have no substantive role in the procedures of certifying Presidential electors to vote for President and Vice President. The Federal Defendants are just there to count the Presidential electors' votes of the Presidential electors who have received state legislative post-election certification.

Article II contains an anti-Congress principle, anti-Governors principle and a pro-state legislatures principle. These principles should be brought to bear on any interpretation of Article II and 3 U.S.C. §§ 5, 6 and 15. If these principles are applied, 3 U.S.C. §§ 5, 6 and 15 is constitutionally unauthorized.

### 1)   The Anti-Congress Principle

The Constitution mistrusts Congress in Presidential elections. This is the anti-Congress principle of Article II. Congress is to have a limited, narrowly-prescribed role in Presidential

---

[12] Brandon J. Murrill, "Modes of Constitutional Interpretation" at 2, Congressional Research Service (Mar. 15, 2018).

elections. Congress is not to interfere with the state legislature directing the appointment of Presidential electors. Congress is not trusted in Article II.

First, Article II's electoral college method of selecting a President and Vice President is a rejection of Congressional decision-making. The Constitution replaced the Articles of Confederation which authorized Congress to elect a President of the United States in Congress assembled— parliamentary style. Under the Articles of Confederation, John Hanson was the first President of the United States in Congress Assembled and served from November 5, 1781 to November 4, 1782. The Constitution replaced that parliamentary system with the Electoral College based on the anti-Congress principle of Article II. Article II prohibits Congress selecting the President.

Second, Article II's Elector Incompatibility Clause, stating that "no Senator or Representative, or Person holding an Office or Trust of Profit under the United States, shall be appointed as an Elector," is a rejection of Congressional decision-making. The relevant purpose of the Elector Incompatibility Clause is to absolutely separate the Presidential electors from Congress. The Presidential electors are to be independent from Congress.

### 2) The Anti-Governors Principle

The Constitution mistrusts Governors in Presidential elections. This is the anti-Governors principle of Article II. The Governors are to have no role in Presidential selection. The states' Governors are not trusted in Article II. Article II's electoral college method of selecting a President and Vice President empowers the state legislatures, not the Governors.

First, Article II's imperative sentence regarding Presidential elections specifies "state legislatures"—not Governors nor "state executives'—to have the power over the appointment of Electors:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress…

So, one of the purposes of Article II's imperative sentence regarding Presidential elections was to exclude the states' Governors from having a role in Presidential elections.

Second, the Electors Clause specifies that the Presidential electors are to vote in their states and the Vice President and Congress, not the State's Governors, would open and count the Presidential electors' ballots for President and Vice President:

> The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted.

One of the purposes of the Electors Clause was also to exclude the states' Governors from having a role in opening and counting the Presidential electors' ballots.

### 3) The Pro-State Legislatures Principle

The Constitution trusts state legislatures in Presidential elections. This is the pro-state legislatures principle of Article II. The state legislatures, not Congress nor the states' Governors, are to direct the selection of Presidential electors. Article II trusts state legislatures to choose Presidential electors—even trusting them to directly elect them as was done by some state in the 1800's.[13]

First, Article II's imperative sentence regarding Presidential elections empowers "state legislatures"—not Congress, nor the State's Governors—to have the power over the appointment of Presidential electors:

> He shall hold his office during the term of four years, and, together with the Vice President, chosen for the same term, be elected, as follows:  Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to

---

[13] *See, e.g.,* Georgia Constitution of 1798, Art. IV, sec. 2 (http://founding.com/founders-library/government-documents/american-state-and-local-government-documents/state-constitutions/georgia-constitution-of-1798/) (last visited: Dec. 18, 2020).

the whole Number of Senators and Representatives to which the State may be entitled in the Congress…

So, one of the purposes of Article II's imperative sentence regarding Presidential elections was to empower state legislatures to appoint the Presidential electors.

Second, the Electors Clause specifies that the Presidential electors are to vote in their states and specifies the Vice President and Congress will have limited, defined roles of opening and counting the Presidential electors' ballots for the election of President and Vice President:

> The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted.

One of the purposes of the Electors Clause was to limit and define the Vice President's and Congress's role in the Electoral College process to ensure that the state legislature would have the exclusive power to appoint the Presidential electors.

### 4) Conclusion

Structuralist arguments based on Article II support the unconstitutionality of 3 U.S.C. §§ 5, 6 and 15. Article II contains an anti-Congress principle, an anti-Governors principle and a pro-state legislatures principle. The structure of Article II is to empower the state legislatures, not Congress or the Governors, to appoint the Presidential electors. 3 U.S.C. §§ 5, 6 and 15 violate Article II's structure because they empower Congress and the state's Governors in the Presidential elector certification and counting process—cancelling the state legislatures out of the Presidential certification and subsequent counting process.

5.   **The Defendant States violate Article II by their respective constitution and their respective state laws—Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann. § 21-2-499 (B), Mich. Comp. Laws. § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat.  § 3166—by cancelling state legislatures out of post-election certifications of Presidential votes and of Presidential electors.**

Under Article II's imperative sentence regarding Presidential elections, the Defendant States lack congressional authority to enact state laws which cancel their respective state legislatures out of post-election certifications of Presidential votes and of Presidential electors—as they have done. Arizona in Ariz. Rev. Stat. § 16-212 (B) has delegated post-election certifications to the Arizona Secretary of State. Georgia in Ga. Code Ann.§ 21-2-499 (B) has delegated post-election certifications to the Georgia Secretary of State and Governor. Michigan in Mich. Comp. Laws § 168.46 has delegated post-election certifications to the Michigan State Board of Canvassers and the Governor. Wisconsin in Wis. Stat. § 7.70 (5) (b) has delegated post-election certifications to the Wisconsin Elections Commission. Pennsylvania in 25 Pa. Cons. Stat.   § 3166 has delegated post-election certifications to the Secretary of Commonwealth and the Governor.

But, Article II's imperative sentence regarding Presidential elections, and its non-delegation doctrine, empowers the state legislatures, every four years, to "direct" post-election certification of Presidential electors, not to delegate post-election certification, perpetually and in a wholesale fashion, to state executive branch officials as a ministerial duty. As detailed above, there are textual and structural arguments for these state statutes being unconstitutional. Therefore, the Court should hold Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b), 25 Pa. Cons. Stat.   § 3166 as an unconstitutional delegation of the state legislative prerogative of post-election certification of Presidential voters.

Notably, even the current state constitutions of the Defendant States fail to require the state legislature to meet for post-election certification of the Presidential electors in violation of state legislative constitutional duties under Article II's imperative sentence regarding Presidential

elections. Arizona's, Georgia's and Pennsylvania's Constitutions have the state legislature adjourned until January 2021. Arizona Const.; Georgia Const.; Pennsylvania Const. Michigan's and Wisconsin's Constitutions permit the state legislature to be in session, but do not require a joint session of the state legislature to affirmatively vote for post-election certification of Presidential electors. Michigan Const.; Wisconsin Const.

a. **The Arizona Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights.**

The Arizona Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights. Under Article II's imperative sentence regarding Presidential elections, Arizona lacks legal authority to enact laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done. Arizona in Ariz. Rev. Stat. § 16-212 (B) has delegated certification of Presidential electors to the Arizona Secretary of State—and has deferred to the Arizona Governor's certification of Presidential electors under 3 U.S.C. § 6.

But, Article II's imperative sentence regarding Presidential elections, and its non-delegation doctrine, empowers the Arizona state legislature to "direct" post-election certification of Presidential electors, not to delegate post-election certification, perpetually and in a wholesale fashion, to state executive branch officials as a ministerial duty. As detailed above, there are textual and structural arguments for these state statutes being unconstitutional. Therefore, the Court should find that the Arizona Constitution and Arizona laws, including Ariz. Rev. Stat. § 16-212 (B), are an unconstitutional delegation of the Article II state legislative prerogatives of post-election certification of Presidential votes and post-election certification of Presidential electors.

32

**b. The Georgia Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights.**

The Georgia Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights. Under Article II's imperative sentence regarding Presidential elections, Georgia lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done. Georgia in Ga. Code Ann.§ 21-2-499 (B), has delegated certification of Presidential electors to the Georgia Secretary of State and the Georgia Governor—consistent with the Georgia Governor's certification of Presidential electors under 3 U.S.C. § 6.

But, Article II's imperative sentence regarding Presidential elections, and its non-delegation doctrine, empowers the Georgia state legislature to "direct" post-election certification of Presidential electors, not to delegate post-election certification, perpetually and in a wholesale fashion, to state executive branch officials as a ministerial duty. As detailed above, there are textual and structural arguments for these state statutes being unconstitutional. Therefore, the Court should find that the Georgia Constitution and Georgia laws, including Ga. Code Ann.§ 21-2-499 (B), are an unconstitutional delegation of the Article II state legislative prerogatives of post-election certification of Presidential votes and post-election certification of Presidential electors.

**c. The Michigan Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights.**

The Michigan Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights. Under Article II's imperative sentence regarding Presidential elections, Michigan lacks legal authority to enact state laws which are a perpetual and wholesale delegation of

post-election certification to state executive branch officials—as it has done. Michigan in Mich. Comp. Laws § 168.46 has delegated certification of Presidential electors to Michigan State Board of Canvassers and Michigan Governor—consistent with the Michigan Governor's certification of Presidential electors under 3 U.S.C. § 6.

But, Article II's imperative sentence regarding Presidential elections, and its non-delegation doctrine, empowers the Michigan state legislature to "direct" post-election certification of Presidential electors, not to delegate post-election certification, perpetually and in a wholesale fashion, to state executive branch officials as a ministerial duty. As detailed above, there are textual and structural arguments for these state statutes being unconstitutional. Therefore, the Court should find that the Michigan Constitution and Michigan laws, including Mich. Comp. Laws § 168.46, are an unconstitutional delegation of the Article II state legislative prerogatives of post-election certification of Presidential votes and post-election certification of Presidential electors.

   d. **The Pennsylvania Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights.**

The Pennsylvania Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights. Under Article II's imperative sentence regarding Presidential elections, Pennsylvania lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done. Pennsylvania in 25 Pa. Cons. Stat. § 3166 has delegated certification of Presidential electors to the Secretary of Commonwealth and the Pennsylvania Governor—consistent with the Pennsylvania Governor's certification of Presidential electors under 3 U.S.C. § 6.

But, Article II's imperative sentence regarding Presidential elections, and its non-delegation doctrine, empowers the Pennsylvania state legislature to "direct" post-election certification of

Presidential electors, not to delegate post-election certification, perpetually and in a wholesale fashion, to state executive branch officials as a ministerial duty. As detailed above, there are textual and structural arguments for these state statutes being unconstitutional. Therefore, the Court should find that the Pennsylvania Constitution and Pennsylvania laws, including 25 Pa. Cons. Stat. § 3166, are an unconstitutional delegation of the Article II state legislative prerogatives of post-election certification of Presidential votes and post-election certification of Presidential electors.

e. **The Wisconsin Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights.**

The Wisconsin Constitution and laws do not require state legislative post-election certification of Presidential electors so their votes can be constitutionally counted by the federal Defendants—violating voters' rights. Under Article II's imperative sentence regarding Presidential elections, Wisconsin lacks legal authority to enact state laws which are a perpetual and wholesale delegation of post-election certification to state executive branch officials—as it has done. Wisconsin in Wis. Stat. § 7.70 (5) (b) has delegated certification of Presidential electors to the Wisconsin Elections Commission—and has deferred to the Arizona Governor's certification of Presidential electors under 3 U.S.C. § 6.

But, Article II's imperative sentence regarding Presidential elections, and its non-delegation doctrine, empowers the Wisconsin state legislature to "direct" post-election certification of Presidential electors, not to delegate post-election certification, perpetually and in a wholesale fashion, to state executive branch officials as a ministerial duty. As detailed above, there are textual and structural arguments for these state statutes being unconstitutional. Therefore, the Court should find that the Wisconsin Constitution and Wisconsin laws, including Wis. Stat. § 7.70 (5) (b), are an unconstitutional delegation of the Article II state legislative prerogatives of post-election certification of Presidential votes and post-election certification of Presidential electors.

6. **The Presidential post-election court proceedings—like *Bush v. Gore,* the Texas original action and the thirty post-election lawsuits in Defendant States—are in constitutional error and unnecessarily politicize the federal and state courts.**

The Presidential post-election court proceedings—like *Bush v. Gore,* the Texas original action and the thirty post-election lawsuits in Defendant States—are in constitutional error and unnecessarily politicize the federal and state courts. Under Article II, all of those cases should be dismissed for lack of jurisdiction—and the plaintiffs should be instructed to file their election contests with their respective state legislatures. The Defendant States have election contest or recount laws, which apply to Presidential elections, but preclude state legislative certifications: Ariz. Rev. Stat. § 16-672; Ga. Code Ann.§ 21-2-521; Mich. Comp. Laws § 168.862; Wis. Stat. § 9.01; and 25 Pa. Cons. Stat. § 3351. Interestingly, the Pennsylvania laws have a state legislative post-election certification process for its Governor and Lieutenant Governor elections—but not for President and Vice President. 25 Pa. Cons. Stat. § 3312, et seq. The Defendant States' laws precluding state legislative post-election certification in Presidential election contests and recounts violates Article II.

III. **The Plaintiffs have standing as voters because the Defendants are violating their voting rights to state legislative post-election certifications of their votes and of Presidential electors and to only the votes of Presidential electors so certified being counted toward the election of President and Vice President.**

As voters, the Plaintiffs have legal standing to bring these constitutional claims to ensure that Presidential elections are constitutionally conducted by Defendants. Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., Art. III, § 2. The doctrine of standing gives meaning to these constitutional limits by "identify[ing] those disputes which are appropriately resolved through the judicial process."[5] *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 408 (2013). To establish Article III standing, a

plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision." *Lujan, supra,* at 560–561 (internal quotation marks omitted). Pre-enforcement constitutional challenges must meet the same standing requirements. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014).

The U.S. Court of Appeals for the Fourth Circuit recognized standing in *Baten v. McMaster*, 967 F.3d 345, 352–53 (4th Cir. 2020) for Plaintiffs alleging their votes for Democratic presidential candidates were, in effect, discarded under South Carolina's winner-take-all process. *Id, citing Gill v. Whitford*, ––– U.S. ––––, 138 S. Ct. 1916, 1920–21 (2018) (citing *Baker v. Carr*, 369 U.S. 186, 206 (1962)) (contrasting the individual harm felt by a voter who casts his ballot in a gerrymandered district with the "generalized grievance" of one who disapproves of gerrymandering in his state but does not live in a gerrymandered district). The Fourth Circuit held this type of disenfranchisement "is the type of concrete, particularized injury that Article III contemplates." *Id.* at 353.

Similarly, the Plaintiffs claim they have been disenfranchised. The Plaintiffs claim that Article II of the U.S. Constitution provides a voter a constitutional right to the voter's Presidential vote being certified as part of the state legislature's post-election certification of Presidential electors. Absence such certification, the Presidential electors' votes from that state cannot be counted by the federal Defendants toward the election of President and Vice President. Because the Plaintiffs' votes are not counted as part of the constitutionally-required state legislative post-election certification of Presidential electors, the Plaintiffs are disenfranchised.

The Defendants' disenfranchisement of the Plaintiffs' voting rights is that the Plaintiffs' votes are never properly certified by the state legislature, which based on that certification, certifies the Presidential electors whose votes are counted by the federal Defendants to elect the President and Vice President. The Defendants' disenfranchisement of the Plaintiffs' voting rights is caused by

3 U.S.C. §§ 5, 6, 15, and the Defendants' state constitutions and state laws including Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat. § 3166.

When Defendants violate the Constitution as it relates to Presidential elections in the Defendant States, all voters in Presidential elections suffer an injury-in-fact caused by the Defendants. Voters in a Presidential election, in this instance, have an injury-in-fact different than the public because they voted and they thus had an interest that the election in which they voted is constitutionally-conducted. The same is true of future elections. Finally, the Court can redress the Plaintiffs' injuries by issuing a declaratory judgment and accompanying injunction to enjoin the Defendants' unconstitutional conduct.

Furthermore, as voters, each Plaintiff has a fundamental right to vote.[14] Thus, each Plaintiff has a recognized protectable interest in voting. As the U.S. Supreme Court has long recognized, a person's right to vote is "individual and personal in nature."[15] Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage.[16] "Safeguarding the integrity of the electoral process is a fundamental task of the Constitution, and [the courts] must be keenly sensitive to signs that its validity may be impaired."[17] "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."[18]

By federal and state election laws, the federal and state governments have agreed to protect the fundamental right to vote by maintaining the integrity of an election contest as fair, honest, and

---

[14] *Reynolds v. Sims,* 377 U.S. 533, 554–55, 562 (1964).
[15] *Id.* 377 U.S. at 561.
[16] *Gill v. Whitford,* 138 S. Ct. 1916, 1929 (2018).
[17] *Johnson v. FCC*, 829 F.2d 157, 163 (D.C. Cir. 1987).
[18] *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006).

unbiased to maintain the structure of the democratic process.[19] The voters, in turn, agree to accept the government's announcement of the winner of an election contest, including Presidential elections, to maintain the integrity of the democratic system of the United States. "'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.'[20] But the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system."[21]

This constitutional arrangement constitutes a "social contract" between the voter and the government as an agreement among the people of a state about the rules that will define their government.[22] Social contract theory provided the background against which the Constitution was adopted. "Because of this social contract theory, the Framers and the public at the time of the revolution and framing conceived governments as resulting from an agreement among people to provide a means for enforcing existing rights."[23] "The aim of a social contract theory is to show that members of some society have reason to endorse and comply with the fundamental social rules, laws, institutions, and principles of that society. Put simply, it is concerned with public justification, i.e., 'of determining whether or not a given regime is legitimate and therefore worthy of loyalty.'"[24]

State legislative post-election certifications of Presidential votes and of Presidential electors is part of the social contract to protect the right to vote. Hence, the right to vote is intertwined with

---

[19] *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 364 (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials."). *See also, e.g.* Plts Amended Compl. ¶¶37–45.

[20] *Burdick v. Takushi,* 504 U.S. 428, 441 (1992) *quoting Wesberry v. Sanders,* 376 U.S. 1, 17 (1964).

[21] *Id.* (citations omitted). *See also, e.g.* Plts Amended Compl. ¶¶46–49.

[22] *Dumonde v. U.S.,* 87 Fed. Cl. 651, 653 (Fed. Cl. 2009) ("Historically, the Constitution has been interpreted as a social contract between the Government and people of the United States," *citing Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 176 (1803). *See e.g.* Plts Amended Compl. ¶50.

[23] Greg Serienko, *Social Contract Neutrality and the Religion Clauses of the Federal Constitution*, 57 Ohio St. L. J. 1263, 1269.

[24] *Contemporary Approaches to the Social Contract,* https://plto.stanford.edu/entries/contractarianism-contemporary/ (last visited Dec. 8, 2020).

the integrity of an election process. The loss of the integrity of the election process renders the right to vote meaningless.[25] Here, the Defendant States' election irregularities and improprieties, including no state legislative post-election certification of Presidential votes and of Presidential electors, so exceed the razor-thin margins in the Defendant States to cast doubt on the razor-thin margins of victory and, thus, threaten the social contract itself.

The Article II social contract with the voters is, in part, the assurance of their state legislatures voting, based on voters' Presidential votes in that state, for post-election certification of Presidential electors. Arising from the social contract is the integrity of the election process to protect the voter's right to vote.

In the Defendant States enacting constitutions and state laws cancelling state legislatures out of post-election certifications of Presidential votes and of Presidential electors, the Defendant states have breached the social contract of Article II.

This social contract, protecting the individual right to vote, is what is personally at risk for the Plaintiffs in the outcome of this controversy. [26] As much as the government has a compelling interest in fair and honest elections with accompanying laws and regulations to ensure that objective to preserve the democratic system of government, so too the voter has an interest against state and local election officials violating the election laws in favor of a pre-determined result. Under the social contract, state legislative post-election certification of the Presidential vote is the voters' remedy against state and local election officials' shenanigans. The Defendant States have unconstitutionally deprived their voters of that remedy in their respective state legislatures.

---

[25] "Legitimacy is the crucial currency of government in our democratic age. Only elections that are transparent and fair will be regarded as legitimate…But elections without integrity cannot provide the winners with legitimacy, the losers with security and the public with confidence in their leaders and institutions."https://www.kofiannanfoundation.org/supporting-democracy-and-elections-with-integrity/uganda-victory-without-legitimacy-is-no-victory-at-all/ (Last visited Dec. 8, 2020).
[26] *Gill,* 138 S.Ct. at 1923.

Furthermore, the voter has a compelling interest in the maintenance of a democratic system of government under the Ninth Amendment through the election process, beyond controversies regarding governmental attempts to interfere with the right to vote. Here, the voter did not enter into a social contract with the Governors and the state and local election officials to give them discretion for state election irregularities and improprieties—and to cancel post-election certifications by the state legislatures—regardless of how benign the public officials might be.

Instead, the voters' social contract is with the state legislatures—which must under Article II conduct post-election certification of all Presidential votes and of the Presidential electors. The Article II requirement of the state legislature casting post-election certification votes is the voters' constitutional "insurance policy" against the risk of Governors and state and local election officials engaging in election irregularities and improprieties in favor of a pre-determined outcome.

The voters have been willing to accept federal and state laws and regulations imposed upon a Presidential election process to serve the government's compelling interest in the integrity of that process. So, while it is fair for the government to create public governmental regulatory schemes to promote the compelling interests to protect the right to vote, and therefore, to protect a voter's right of associational choices under the First Amendment,[27] those rights are infringed when the Defendant States cancel the state legislatures out of post-election certifications of Presidential votes and of the Presidential electors.[28]

For Presidential elections, the Defendant States under Article II have no legal authority to cancel state legislatures out of post-election certifications of Presidential votes and of Presidential electors. Yet, they did. That is the harm for the voters. Article II's imperative sentence regarding Presidential elections that gives voters the right to have their respective state legislatures engage in

---

[27] *Anderson v. Celebrezze,* 460 U.S. 780, 788–89 (1983).
[28] *Id.*

41

post-election certifications of Presidential votes and of Presidential electors—not Governors nor state or local election officials.

This lawsuit is not about voter fraud. The harm from the federal law—3 U.S.C. §§ 5, 6, 15—and the state laws—including Ariz. Rev. Stat. § 16-212 (B), Ga. Code Ann.§ 21-2-499 (B), Mich. Comp. Laws § 168.46, Wis. Stat. § 7.70 (5) (b) and 25 Pa. Cons. Stat.  § 3166—is the loss of a voter remedy of state legislative post-election certifications required as a core *governmental* function under Article II.

In turn, the Federal Defendants' acceptance of the Presidential electors' votes without state legislative post-election certification of Presidential electors breaches the social contract between the voter and the government—causing more injury to the voter.

Finally, these injuries to the voters are redressable by the Court. For example, the Court could grant the requested preliminary injunction requiring that the federal Defendants on January 6, 2021, only count the votes of Presidential electors if they have received state legislative post-election certification. Otherwise, the votes don't count toward the election of President and Vice President.

## IV.     The Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief.

"Plaintiffs here must at least 'demonstrate that irreparable injury is likely in the absence of an injunction.'" *Guttenberg v. Emery*, 26 F.Supp.3d 88, 101 (D.D.C. 2014)(quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008)). "Under *Winter*, even a 'strong likelihood of prevailing on the merits' cannot make up for a deficient showing of irreparable injury." *Id.* (quoting *Winter*, 555 U.S. at 21–22). "Regardless of how the other three factors are analyzed, it is required that the movant demonstrate an irreparable injury." *Mdewakanton Sioux Indians of Minn. v. Zinke*, 255 F.Supp.3d 48, 51, n.3 (D.D.C. 2017).

The Plaintiffs' irreparable injury here is the disenfranchisement of Plaintiffs' vote when the Presidential electors' votes are counted without constitutionally-required state legislative post-

election certifications of the Plaintiffs' votes and of the Presidential electors. The federal and state

constitutions and laws are a violation of Article II's imperative sentence regarding Presidential

elections. Further, without state legislative post-election certification, Plaintiffs will never have their

votes counted in the state legislature.

Further, the Plaintiffs will never have the same opportunity to challenge in their state

legislatures the election officials' irregularities and illegalities associated with the November 3, 2020

election. Allegedly, the election officials' irregularities and illegalities exceed the razor-thin margins in

the Defendant States. Absent the injunction, the Plaintiffs will never have their proverbial "day" in

the state legislature to challenge the Presidential election results.

In turn, the Plaintiffs will be subjected to an unlawfully-elected President because none of

the Presidential electors received a state legislative post-election certification—as Article II requires.

In the absence of the preliminary injunction, the Plaintiffs and the nation will be subjected to

a post-inaugural ouster of the sitting President and Vice President under D.C. Code § 16-3501, et

seq. That proceeding and subsequent ouster will cause irreparable injury to the Plaintiffs—and the

nation.

**V.      The balance of equities and the public interest tips in the Plaintiffs' favor.**

The final two factors that the Court must consider are the balance of equities and the

public's interest in the issuance of an injunction. *See Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of

Agric.*, 573 F.3d 815, 821 (D.C. Cir. 2009). When "balanc[ing] the competing claims of injury," the

Court must "consider the effect on each party of the granting or withholding of the requested

relief." *Winter*, 555 U.S. at 24, 129 S.Ct. 365 (citations omitted). Additionally, "courts of equity

should [have] particular regard for the public consequences in employing the extraordinary remedy

of injunction." *Id.* (internal quotation marks and citations omitted).

The Plaintiffs file this preliminary injunction motion to avoid a constitutional crisis that would be involved in a post-inaugural ouster of the United States President and Vice President. D.C. Code § 16-3501, et seq., authorizes this Court, in proper cases, instituted by proper officers or persons, to post-election ouster of national officers of the United States including the President and Vice President of the United States. *Newman v. U.S. of America ex rel Frizzell*, 238 U.S. 537 (U.S. 1915).

Instead, to avoid that post-inaugural constitutional crisis, the Plaintiffs as voters file this preliminary injunction motion against federal officials in the District of Columbia and Governors and state legislative leaders in Arizona, Georgia, Michigan, Pennsylvania and Wisconsin requiring a constitutionally-compliant process for state-by-state post-election certification of Presidential electors and counting of their votes for the November 3, 2020 Presidential election and future elections.

The balancing of equities favors the Plaintiffs. Granting a preliminary injunction in this proceeding is better for everyone than a post-inaugural ouster. If the preliminary injunction is denied, the Plaintiffs lose something real and concrete: their voting rights are disenfranchised by an unconstitutional post-election certification process. The Plaintiffs also lose their post-election opportunity in their respective state legislatures to seek election integrity and protect their vote. On the other hand, the Defendants lose nothing by doing what the law requires: following Article II's imperative sentence regarding Presidential elections and obtaining state legislative post-election certifications prior to counting the Presidential electors' votes for President and Vice President on January 6, 2021.

The public interest favors granting the preliminary injunction too. The constitutional crisis of post-inaugural ouster should be avoided. The United States, the federal government and the states, should operate in every subject area in a constitutional way. State legislative post-election

certifications of Presidential votes and Presidential electors is constitutionally-required. So, the federal government and the states are legally obligated to honor that constitutional authority.

State legislative post-election certification of Presidential electors is an important way to develop public acceptance of close Presidential election results. State legislative post-election certification would help build public confidence in the states' voting systems too. Every four years, the state legislatures would be authorized to examine Presidential voters and voters' complaints as part of their post-election certifications—and would make electoral reforms accordingly. Consequently, the state legislatures' direct involvement in election integrity would build public confidence in the voting system reducing the amount of Presidential election litigation which now seems to be occurring in a cycle of every four years. It is far better to have the state legislatures hear election disputes state-by-state, as intended in Article II, then the United States Supreme Court hear all the states' election disputes as proposed in the Texas original action against Pennsylvania, Michigan, Wisconsin and Georgia—which was supported by Missouri and sixteen other states and U.S. Representative Mike Johnson and 105 other Congressional members.

## CONCLUSION

The Court should issue the preliminary injunction prior to January 6, 2021, when federal Defendants meet to count the Presidential electors to elect a President and Vice President, because the Plaintiffs have met the factors required.

Dated: December 22, 2020

*/s/ Erick G. Kaardal*
Erick G. Kaardal (WI0031)
Special Counsel for Amistad Project of
Thomas More Society
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: (612) 341-1074
Facsimile: (612) 341-1076
Email: kaardal@mklaw.com
*Attorneys for Plaintiffs*

# Exhibit I

Case 1:20-cv-03791-JEB   Document 22-8   Filed 02/05/21   Page 56 of 110

Arthur S. WEST, Plaintiff-Appellant, v. Loretta E. LYNCH,..., 2016 WL 4942829...

2016 WL 4942829 (C.A.D.C.) (Appellate Brief)
United States Court of Appeals,
District of Columbia Circuit.

Arthur S. WEST, Plaintiff-Appellant,
v.
Loretta E. LYNCH, et al., Defendants-Appellees.

No. 15-5107.
September 16, 2016.

On Appeal from the United States District Court for the District of Columbia
Oral Argument Not Yet Scheduled

**Brief for Court-Appointed Amicus Curiae Supporting Reversal**

Robert A. Long, Jr., David M. Zions, Covington & Burling LLP, One CityCenter, 850 Tenth St. NW, Washington, DC 20001, (202) 662-6000, dzionts @cov.com.

**\*ii** TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..................................................................................... 1

STATEMENT OF ISSUES ............................................................................................. 1

STATUTES AND REGULATIONS ................................................................................... 2

STATEMENT OF THE CASE .......................................................................................... 2

A. Washington's Marijuana Initiative And The Federal Response ........................................ 2

B. New Regulation Of Medical Marijuana ........................................................................ 5

C. Procedural History ................................................................................................... 7

SUMMARY OF ARGUMENT .......................................................................................... 9

STANDARD OF REVIEW .............................................................................................. 14

ARGUMENT ............................................................................................................... 14

I. The District Court Had Personal Jurisdiction Over Defendant Inslee ................................. 14

A. Defendant Inslee's Extensive Contacts With The District Of Columbia On Official State Business Satisfy The D.C. Long-Arm Statute ........................................................ 14

B. The Judicially Created "Government Contacts" Exception To Personal Jurisdiction Is Inapplicable ..... 19

II. Plaintiff Has Standing ............................................................................................. 25

A. Plaintiff Has Standing Based On Personal Harms From The Increased Availability Of Recreational Marijuana ............................................................................................. 26

Case 1:20-cv-03791-JEB    Document 22-8    Filed 02/05/21    Page 57 of 110

Arthur S. WEST, Plaintiff-Appellant, v. Loretta E. LYNCH,..., 2016 WL 4942829...

B. Plaintiff Has Standing Based On Personal Harms From The Decreased Availability Of Medical Marijuana ................................................................................................................................ 34

III. The District Court's Analysis Of The Merits Of Plaintiff's Claims Was Incomplete ................. 41

A. The District Court's Analysis Of Plaintiff's NEPA Claim Failed To Account For The Nature Of The Challenged Federal Action ................................................................................................... 41

*iii B. The District Court's Analysis Of Plaintiff's Constitutional Claims Was Incomplete ............ 45

CONCLUSION .................................................................................................................................. 48

CERTIFICATE OF COMPLIANCE ................................................................................................. 49

CERTIFICATE OF SERVICE .......................................................................................................... 50

ADDENDUM ..................................................................................................................................... A-1

*iv TABLE OF AUTHORITIES

Cases

*Abdelfattah v. U.S. Dep't of Homeland Sec.,* 787 F.3d 524 (D.C. Cir. 2015) ................................................. 14, 25, 46

*Animal Legal Def. Fund, Inc. v. Glickman,* 154 F.3d 426 (D.C. Cir. 1998) ......................................................... 30

*Appalachian Power Co. v. EPA,* 208 F.3d 1015 (D.C. Cir. 2000) ...................................................................... 46

*Brunson v. Kalil & Co.,* 404 F. Supp. 2d 221 (D.D.C. 2005) ..... 18

*Bunch v. Hodel,* 793 F.2d 129 (6th Cir. 1986) .......................... 43

*Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508 (1972) ......................................................................... 24

*Cellutech, Inc. v. Centennial Cellular Corp.,* 871 F. Supp. 46 (D.D.C. 1994) ................................................................. 18, 19

*Clapper v. Amnesty Int'l USA,* 133 S. Ct. 1138 (2013) ........... 27, 28

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.,* 717 F.3d 1269 (Fed Cir. 2013), *aff'd,* 134 S. Ct. 2347 (2014) ...................................... 23

*Companhia Brasileira Carbureto de Calcio v. Applied Indus. Materials Corp.,* 35 A.3d 1127 (D.C. 2012) ....................... 22

*Consumer Fed'n of Am. v. FCC,* 348 F.3d 1009 (D.C. Cir. 2003) ............................................................................... 36

Case 1:20-cv-03791-JEB   Document 22-8   Filed 02/05/21   Page 58 of 110

Arthur S. WEST, Plaintiff-Appellant, v. Loretta E. LYNCH,..., 2016 WL 4942829...

*v  *Defenders of Wildlife v. Andrus,* 627 F.2d 1238 (D.C. Cir. 1980) ............................................ 43

*Dynalantic Corp. v. Dep't of Defense,* 115 F.3d 1012 (D. C. Cir. 1997) ............................................ 30

*Ehrenfeld v. Mahfouz,* 489 F.3d 542 (2d Cir. 2007) ............... 16

*Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.,* 355 A.2d 808 (D.C. 1976) ... (en banc) ............................ 22, 23, 24

*First Chicago Int'l v. United Exchange Co.,* 836 F.2d 1375 (D.C. Cir. 1988) ............................................ 15

*Fla. Audobon Soc'y v. Bentsen,* 94 F.3d 658 (D.C. Cir. 1996) ............................................ 31

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167 (2000) ............................................ 27

*Fund for Animals v. Clark,* 27 F. Supp. 2d 8 (D.D.C. 1998) ............................................ 43

*Gonzales v. Raich,* 545 U.S. 1 (2005) ............................ 3

*Heath v. Alabama,* 474 U.S. 82 (1985) ........................ 22

*Humane Soc'y of the United States v. Vilsack,* 797 F.3d 4 (D.C. Cir. 2015) ............................................ 14

*Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261 (1997) ............................................ 14

*Kulhmann v. Wilson,* 477 U.S. 436 (1986) ...................... 23

*Mouzavires v. Baxter,* 434 A.2d 988 (D.C. 1981) ............ 17, 18

*vi  *Naartex Consulting Corp. v. Watt,* 722 F.2d 779 (D.C. Cir. 1983) ............................................ 22

*National Wrestling Coaches Association v. Department of Education,* 366 F.3d 930 (D.C. Cir. 2004) ...................... 31, 32, 33

*Pleasant Grove City, Utah v. Summum,* 555 U.S. 460 (2009) ............................................ 21

*Rochon v. FBI,* 691 F. Supp. 1548 (D.D.C. 1988) .............. 17, 20

Case 1:20-cv-03791-JEB   Document 22-8   Filed 02/05/21   Page 59 of 110

Arthur S. WEST, Plaintiff-Appellant, v. Loretta E. LYNCH,..., 2016 WL 4942829...

*_Rose v. Silver,_ 394 A.2d 1368 (D.C. 1978) .............................. 20, 21, 22, 23, 24

_Schultz v. Szott,_ No. 3:08-CV-02718, 2009 WL 2392912 (N.D. Ohio July 31, 2009) ...................... 16

*_Sierra Club v. FERC,_ 827 F.3d 36 (D.C. Cir. 2016) .............. 27, 28

_Sierra Club v. FERC,_ 827 F.3d 59 (D.C. Cir. 2016) ............... 34

_Simon v. Eastern Kentucky Welfare Rights Organization,_ 426 U.S. 26 (1976) ...................... 30

_South Carolina v. Katzenbach,_ 383 U.S. 301 (1966) .............. 21

_Spokeo, Inc. v. Robins,_ 136 S. Ct. 1540 (2016) ........................ 26

*_Steinberg v. Int'l Criminal Police Org.,_ 672 F.2d 927 (D.C. Cir. 1981) ...................... 15, 16, 17, 18

_Stroman Realty, Inc. v. Wercinski,_ 513 F.3d 476 (5th Cir. 2008) ...................... 16

_United States v. Ferrara,_ 54 F.3d 825 (D.C. Cir. 1995) ......... 15

*vii _United States v. Marlinga,_ No. Crim. 04-80372, 2006 WL 2086030 (E.D. Mich. June 9, 2006) ............... 17

_United States v. McIntosh,_ __ F.3d __, 2016 WL 4363168 (9th Cir. Aug. 16, 2016) ...................... 36

_United States v. S. Florida Water Mgmt. Dist.,_ 28 F.3d 1563 (11th Cir. 1994) ...................... 43

Statutes and Regulations

5 U.S.C. § 702 ...................... 1

5 U.S.C. § 704 ...................... 1

21 U.S.C. § 812 ...................... 2

28 U.S.C. § 1291 ...................... 1

28 U.S.C. § 1331 ...................... 1

28 U.S.C. § 1346 ...................... 1

28 U.S.C. § 1367 ...................... 1

42 U.S.C § 4331 ...................... 1

Case 1:20-cv-03791-JEB    Document 22-8    Filed 02/05/21    Page 60 of 110

Arthur S. WEST, Plaintiff-Appellant, v. Loretta E. LYNCH,..., 2016 WL 4942829...

42 U.S.C. § 4332 ......................................................... 45

Cannabis Patient Protection Act, 2015 Wash. Legis. Serv. Ch. 70.................................................................................... 5, 6, 35

D.C. Code § 13-423(a)(1) ........................................... 15

Wash. Rev. Code §§ 69.50.301 *et seq.* ......................... 2

2013 Wash. Sess. Laws 28-67 ..................................... 2

2014 Wash. Sess. Laws 434-44 .................................... 2

2015 Wash. Sess. Laws 1012-15................................... 2

28 C.F.R. § 61.4 ......................................................... 41

**\*viii** Other Authorities

*Black's Law Dictionary* (10th ed. 2014) ..................... 16

Genny Kiley, *Overhaul of WA Medical Marijuana Program* (Apr. 27, 2016), http://emergelawgroup.com/overhaul-of-wa-medical-marijuana-program/................................................................... 7

*Conflicts Between State and Federal Marijuana Laws: Hearing Before the S. Comm. on the Judiciary,* 113th Cong. (Sept. 10, 2013)........................................................... 5, 29

Zachary S. Price, *Enforcement Discretion and Executive Duty,* 67 Vand. L. Rev. 671, 757-58 (2014) .............................. 47

\*        Authorities upon which *amicus* chiefly relies are marked with asterisks.


## \*1 JURISDICTIONAL STATEMENT

Plaintiff filed this action in the district court asserting jurisdiction under 28 U.S.C. §§ 1331, 1346, 1367; 5 U.S.C. §§ 702, 704; and 42 U.S.C § 4331 *et seq.* The district court dismissed all claims against the state defendants on August 5, 2014, and against the federal defendants on February 9, 2015. App. 55-63, 78-88. On March 27, 2015, Plaintiff filed a motion for reconsideration. While that motion was pending, Plaintiff timely filed a notice of appeal on April 1, 2015, and an amended notice of appeal on April 9, 2015. App. 98. This Court stayed the appeal pending resolution of Plaintiff's motion in the district court. On June 16, the district court denied the motion for reconsideration. App. 111-21. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the district court had personal jurisdiction over Defendant Inslee.

2. Whether Plaintiff has standing to assert claims against the federal defendants for actions relating to the state of Washington's legalization of recreational marijuana.

3. Whether the district court's grounds for dismissing Plaintiff's claims under the National Environmental Policy Act ("NEPA") were sufficient.

**\*2** 4. Whether the district court's grounds for dismissing Plaintiff's claims as based on an unreviewable exercise of prosecutorial discretion were sufficient.

### STATUTES AND REGULATIONS

The relevant statutes and regulations are reproduced in an addendum to this brief.

### STATEMENT OF THE CASE

#### A. Washington's Marijuana Initiative And The Federal Response

On November 6, 2012, the voters of the State of Washington approved Ballot Initiative 502 ("Initiative 502" or "I-502"), which legalized the possession and recreational use of marijuana. The initiative and associated regulation authorized the State's liquor control board, since renamed the Washington State Liquor and Cannabis Board, to license marijuana growers, processors, and retailers. *See* 2013 Wash. Sess. Laws 28-67; 2014 Wash. Sess. Laws 434-44; 2015 Wash. Sess. Laws 1012-15 (codified as amended at Wash. Rev. Code §§ 69.50.301 *et seq.*). Together with Colorado, which enacted a similar ballot measure in the same election, Washington was the first State in the Nation to legalize recreational marijuana.

As a matter of federal law, however, marijuana remains a Schedule I drug. 21 U.S.C. § 812(c). Consequently, "the manufacture, distribution, or possession of marijuana [is] a criminal offense" under federal law, "with the sole exception being use of the drug as part of a Food and Drug Administration preapproved study." **\*3** *Gonzales v. Raich,* 545 U.S. 1, 14 (2005) (citing 21 U.S.C. §§ 823(f), 841(a)(1), 844 (a)).

The passage of Initiative 502 led to a series of interactions between state and federal officials. In January 2013, Defendant Jay Inslee, the Governor of Washington, traveled to Washington, D.C. for meetings with U.S. Attorney General Eric Holder and White House officials concerning implementation of marijuana legalization in Washington State. *See* App. 27, 39, 47-52. A key objective of these meetings was to receive "assurance" that the Justice Department "will not affect federal preemption of state implementation of I-502, or pursue enforcement of federal criminal laws in [Washington] for those acting legally under [Washington] law." App. 47. Following these meetings, Defendant Inslee addressed a detailed letter to Attorney General Holder to "update [him] on the strategies under consideration to ensure the development of a highly regulated [marijuana] system." App. 27.

These efforts culminated in a series of memoranda and announcements issued on August 29, 2013. Attorney General Holder held a telephone conversation with Defendant Inslee and transmitted a letter informing him that "the Department will not at this time seek to challenge your state's law." App. 42. On the same date, Deputy Attorney General James M. Cole issued a memorandum to all United States Attorneys entitled, "Guidance Regarding Marijuana Enforcement" (the **\*4** "Cole Memorandum"). App. 43. The Cole Memorandum listed eight law enforcement "priorities" with respect to marijuana enforcement, including preventing distribution to minors, preventing funding for criminal enterprises and gangs, and diversion of marijuana to states where it is not legal under state law. App. 43-44. It continued that "conduct in compliance with" state legalization of marijuana is "less likely to threaten ... federal priorities" if the state has "implemented strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale, and possession of marijuana." App. 45. Provided those regulations are sufficiently "robust," state and local enforcement of state law "should remain the primary means of addressing marijuana-related activity." *Id.* By contrast, "[i]f state enforcement efforts are not sufficiently robust," then "the federal government may seek to challenge the regulatory structure itself." *Id.* In its final paragraph, the Cole Memorandum states that it is "intended solely as a guide to the exercise of investigative and prosecutorial discretion." App.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

46.

Defendant Inslee and Washington State Attorney General Ferguson immediately issued a joint statement thanking the Justice Department for "allow[ing] our initiative to move forward." Press Release, Joint Statement from Gov. Inslee and AG Ferguson Regarding Update from AG Eric Holder on Implementation of **\*5** Washington's Voter-Approved Marijuana Law (Aug. 29, 2013), App. 40-41.[1] Shortly thereafter, Defendant Inslee testified before the Senate Judiciary Committee, where he again thanked federal officials for "allowing us to move forward with implementation of Initiative 502." *Conflicts Between State and Federal Marijuana Laws: Hearing Before the S. Comm. on the Judiciary,* 113th Cong. (Sept. 10, 2013) (written testimony of Washington Governor Jay Inslee and Washington Attorney General Bob Ferguson), App. 35-38.

[1]    The record includes the text of the joint statement pasted in an e-mail. App. 4041. The official statement is also available at the following website: http://www.atg.wa.gov

## B. New Regulation Of Medical Marijuana

The State of Washington's system of medical marijuana has also undergone changes since the implementation of Initiative 502. Since passage of a ballot initiative in 1998, Washington has "allow[ed] qualifying patients to use limited amounts of marijuana for medicinal purposes." House Bill Report, S.S.S.B. 5052, App. 100. Patients were allowed to possess twenty-four ounces of useable marijuana. Cannabis Patient Protection Act, 2015 Wash. Legis. Serv. Ch. 70 (S.S.S.B. 5052) (West), § 2. Patients were further allowed to participate in "collective gardens which consist of up to 10 qualifying patients who share in the responsibilities of producing and processing marijuana for medical use." House Bill Report, S.S.S.B. 5052, App. 100.

**\*6** This system for medical marijuana was generally regarded as loosely regulated. In the aftermath of the Cole Memorandum, the United States Attorney for the Western District of Washington described that system as "untenable." App. 27. The State convened a "workgroup" to develop recommendations for new medical marijuana regulations "to address the concerns outlined by U.S. Attorney General Eric Holder in his August 2013 message to state leaders." Press Release, Washington State Liquor Control Board, Three Agencies Issue Draft Recommendations on Medical Marijuana (Oct. 21, 2013), App. 34. Based on these recommendations, the State of Washington developed and ultimately passed more stringent regulations through the Cannabis Patient Protection Act. The bill was enacted (except for a few provisions with respect to which the Governor exercised his partial veto authority) on April 24, 2015, and its provisions took full effect on July 1, 2016.[2]

[2]    Plaintiff's complaint and, to a greater extent, his briefing have relied on aspects of Washington's new system of medical marijuana regulation, although aspects of that system have only taken effect recently. As noted below, a remand for opportunity to amend the complaint may be appropriate in light of the newly effective portions of the Cannabis Patient Protection Act.

The stated purpose of the legislation was to "adopt a comprehensive act that uses the regulations in place for the recreational market to provide regulation for the medical use of marijuana." Cannabis Patient Protection Act, 2015 Wash. Legis. Serv. Ch. 70 (S.S.S.B. 5052) (West), § 2. Under the new law, patients are limited to three ounces of useable marijuana. House Bill Report, S.S.S.B. 5052, **\*7** App. 99. The law also repeals the provisions authorizing "collective gardens," replacing them with a more restrictive system of "cooperatives." App. 105.[3]

[3]    Although outside the record, a helpful summary of the recent changes to Washington's medical marijuana laws is available at Genny Kiley, *Overhaul of WA Medical Marijuana Program* (Apr. 27, 2016), http://emergelawgroup.com/overhaul-of-wa-medical-marijuana-program/.

### C. Procedural History

Plaintiff Arthur West, proceeding *pro se,* filed this action in the U.S. District Court for the District of Columbia on January 22, 2014, and an amended complaint on April 17, 2014. As defendants, he named U.S. Attorney General Eric Holder, Deputy Attorney General James Cole, the U.S. Department of Justice, Washington Governor Jay Inslee, and Washington State Liquor Control Board Chairperson Sharon Foster. App. 10-11, Am. Compl. ¶¶ 3.2-3.6.[4]

[4]     Attorney General Loretta E. Lynch and Deputy Attorney General Sally Quillian Yates have been substituted for Defendants Holder and Cole.

Plaintiff is a resident of Olympia, Washington, a holder of a medical marijuana authorization, and an independent consultant in the field of nonprofit state medical marijuana authorization. App. 9-10, Am. Compl. ¶ 3.1. He objects to the State's implementation of Initiative 502, and in particular the federal response and influence on the State's implementation, in two principal respects. First, Plaintiff objects to the environmental and aesthetic consequences of increased public marijuana consumption associated with legalization for recreational use. He alleges **\*8** that public areas he frequents "have and will be further degraded" by the incidents of increased recreational drug use. App. 19, Am. Compl. ¶ 4.41; *see also* App. 68. Second, Plaintiff objects to the heightened regulation of medical marijuana, which he claims has "significantly impact[ed] medical marijuana patients' access to medicine." App. 20, Am. Compl. ¶ 4.49. Plaintiff claims relief under the National Environmental Policy Act ("NEPA"), 📄 42 U.S.C. § 4332, contending that the Cole Memorandum and associated federal decisions constituted a "major federal action" for which an Environmental Impact Statement was required. App. 22, Am. Compl. ¶ 5.1. He further claims that the Justice Department unlawfully "authorize[d] or condone[d]" the State of Washington's violations of the Controlled Substances Act, and violated the constitutional anti-commandeering principle by directing the State's implementation of its marijuana laws. App. 14, 22, Am. Compl. ¶¶ 4.13, 6.1.

The district court (Bates, J.) dismissed the case. The court first issued an opinion dismissing the claims against the state defendants, holding that it lacked personal jurisdiction. The district court concluded that the D.C. long-arm statute's provision authorizing jurisdiction based on "transacting any business" in the District of Columbia was limited to commercial contacts. App. 59. Because the state defendants' contacts with the District were not commercial in nature, personal jurisdiction was unavailable. App. 60. To the extent the state defendants were sued **\*9** in their official capacity, moreover, personal jurisdiction was unavailable because the long-arm statute does not reach states. App. 61-62.

In a separate opinion, the district court dismissed the claims against the remaining federal defendants for lack of standing. The court found that Plaintiff's claims of injury were "speculative predictions," and that he could not satisfy causation and redressability because any injuries were caused by Initiative 502, not the Cole Memorandum. App. 82-85. The court further held that Plaintiff's claims should be dismissed because the Cole Memorandum constituted an unreviewable exercise of prosecutorial discretion. App. 85-87. Finally, with respect to Plaintiff's NEPA claims, the district court concluded that they were precluded by a Justice Department regulation rendering NEPA inapplicable to " 'action taken ... within the framework of judicial or administrative enforcement proceedings or civil or criminal litigation' or 'the rendering of legal advice.' " App. 88 (quoting 28 C.F.R. § 61.4). Plaintiff moved for reconsideration, which the district court denied.

Following an initial round of briefing on appeal, this Court appointed David M. Zionts as *amicus curiae* to present arguments in support of Plaintiff.

### SUMMARY OF ARGUMENT

1. a. The district court erred in construing the D.C. long-arm statute. Under D.C. law, personal jurisdiction is available based on "transacting any business" in the District. Although this Court and the D.C. Court of Appeals interpret that provision **\*10** broadly, the district court narrowed it to reach only "commercial" business. A decision of this Court strongly suggests that "transacting any business" is not so limited, and other courts have squarely held that it is not. As a matter of ordinary usage and an accepted definition in Black's Law Dictionary, it is common to refer to non-commercial affairs as "business." Because Plaintiff has alleged that Governor Inslee engaged in extensive contacts with the District on state business relevant to his

Case 1:20-cv-03791-JEB   Document 22-8   Filed 02/05/21   Page 64 of 110

Arthur S. WEST, Plaintiff-Appellant, v. Loretta E. LYNCH,..., 2016 WL 4942829...

claims, the long-arm statute is satisfied.

b. Although not reached by the district court, the state defendants have argued that personal jurisdiction is foreclosed by the District's "government contacts" exception. As interpreted by the D.C. Court of Appeals, however, that exception does not cover all contacts involving the federal government, but only those contacts that implicate the First Amendment right to petition the government. Contacts involving state/federal negotiations do not implicate that right and therefore are not covered by the government contacts exemption.

2. Plaintiff has standing to pursue his claims, based on two distinct claims of injury and chains of causation.

a. Plaintiff adequately alleges injury in fact based on unwanted exposure to marijuana from increased public recreational consumption. The district court considered this merely a "speculative prediction," but the complaint alleges that Plaintiff has already suffered this injury. Moreover, even if the complaint is read as a **11** statement of what "will" happen, this Court's precedents permit such an allegation to satisfy injury-in-fact, provided they are credible and supported. Here, Plaintiff credibly alleged that implementation of a legalization initiative will increase use of the legalized product, and that his personal proximity to venues where marijuana is both sold and consumed will expose him to increased environmental and aesthetic harm.

The district court further held that any injury Plaintiff suffered was caused by the State of Washington's ballot initiative, not the challenged actions of the federal defendants, and for similar reasons is not redressable. The court relied on cases finding no causation or redressability when the injury was caused by a third party acting independently. Here, however, Plaintiff alleges facts (and provides support) indicating that state and federal actions were not independent. Rather, high-level Washington state officials have stated that the challenged federal action "allowed" and "permitted" their state to proceed with the implementation of Initiative 502. These allegations satisfy the standard for causation and redressability.

b. Plaintiff has separately alleged injury as a medical marijuana user and consultant in the field of medical marijuana authorizations. He alleges that as a medical marijuana user, he has faced heightened regulation, new taxes, and moratoria on collective gardens. More recently, the State of Washington has enacted and begun to implement new legislation seeking to merge what was previously a **12** loosely regulated medical marijuana system to the more stringently regulated recreational system. The new legislation reduces the amount of marijuana a patient may possess, and replaces Washington's system of collective gardens with a more restrictive form of cooperative. Because certain aspects of this legislation have only recently come into effect, the Court could appropriately remand to provide Plaintiff with an opportunity to amend his complaint.

Plaintiff has also alleged causation and redressability. Although the district court focused on the State's independent role in changing the regulation of medical marijuana, it disregarded Plaintiff's allegations of federal influence driving the process. Plaintiff has offered several pieces of evidence supporting his claim that heightened regulation of medical marijuana in Washington was driven by federal mandates, including the statement of the U.S. Attorney for the Western District of Washington that the system then in place was "untenable." These allegations of a federal role in the state's regulatory decisions establish causation and redressability.

3. The district court's treatment of Plaintiff's claims on the merits was incomplete and should be vacated.

a. The district court rejected Plaintiff's NEPA claims on the basis of a Justice Department regulation excluding from NEPA review "enforcement proceedings" and "litigation." That regulation on its face has no application - the Cole **13** Memorandum did not involve any proceedings or litigation, or even a decision to forbear from enforcement in a particular case. Rather, Plaintiff challenges what he alleges is a more categorical decision effectively setting marijuana policy in the State of Washington. The district court should have considered the nature of Plaintiff's claims rather than assume the Justice Department's "enforcement proceedings" exclusion applies. The district court also failed to consider whether Plaintiff's allegations of federal influence and control over Washington's implementation of marijuana legalization overcomes the rule that federal inaction, without an "overt act," does not fall within NEPA.

b. The district court also held that the Cole Memorandum and related federal actions were unreviewable exercises of prosecutorial discretion. The court found that Plaintiff had not argued that the Cole Memorandum constituted an abdication of the Justice Department's responsibilities. Construed liberally, however, Plaintiff does make such an allegation. On the

Case 1:20-cv-03791-JEB    Document 22-8    Filed 02/05/21    Page 65 of 110

Arthur S. WEST, Plaintiff-Appellant, v. Loretta E. LYNCH,..., 2016 WL 4942829...

merits, the district court held that the Cole Memorandum only constituted guidance to prosecutors, but its sole basis for that conclusion was the Memorandum's self-characterization. This Court has held that a federal agency's boilerplate description of its own guidance is not dispositive. This Court should remand for a more complete analysis.

## *14 STANDARD OF REVIEW

Review of a decision granting a motion to dismiss is *de novo. Humane Soc'y of the United States v. Vilsack,* 797 F.3d 4, 8 (D.C. Cir. 2015). The Court "accept [s] facts alleged in the complaint as true and draw[s] all reasonable inferences from those facts in the plaintiffs' favor." *Id.* Because Plaintiff filed his complaint *pro se,* it "is to be liberally construed." *Abdelfattah v. U.S. Dep't of Homeland Sec.,* 787 F.3d 524, 533 (D.C. Cir. 2015) (quoting *Erickson v. Pardus,* 551 U.S. 89, 94 (2007)).

## ARGUMENT

### I. The District Court Had Personal Jurisdiction Over Defendant Inslee.

### A. Defendant Inslee's Extensive Contacts With The District Of Columbia On Official State Business Satisfy The D.C. Long-Arm Statute.

Plaintiff's claims against Governor Inslee are best understood as being brought against him in his individual capacity. *See* App. 7-8, Am. Compl. ¶ 2.2 (referring to Inslee as an "*Ex Parte Young* defendant[]"); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 269 (1997) (characterizing *Ex Parte Young* suits as claims "against state officers in their individual capacity"). The district court correctly considered this framing as one available interpretation of the Complaint, recognizing that the court may have personal jurisdiction if Defendant Inslee's actions place him within the District of Columbia's long-arm statute. App. 58-59. In construing the long-arm statute, however, the district court erred.

**\*15** The District of Columbia's long-arm statute authorizes courts to exercise personal jurisdiction "over a person, who acts directly or by an agent, as to a claim for relief arising from the person's," *inter alia,* "transacting any business in the District of Columbia." D.C. Code § 13-423(a)(1). This Court has described the "transacting any business" provision of the long-arm statute as "broad," *United States v. Ferrara,* 54 F.3d 825, 831 (D.C. Cir. 1995), and "coextensive with the Constitution's due process limit," *First Chicago Int'l v. United Exchange Co.,* 836 F.2d 1375, 1377 (D.C. Cir. 1988).

The district court, however, construed it narrowly. In the district court's view, "contacts falling under the 'transacting any business' provision usually must be commercial." App. 59. Because Plaintiff "does not allege that Inslee's coordination with federal officials constituted commercial activity or that Inslee was transacting any business within the District," the court held that it lacked personal jurisdiction. App. 60.

That was incorrect. Although this Court has not squarely resolved the question, it has expressed skepticism about the argument that "business" under the D.C. long-arm statute excludes "noncommercial" activities. *Steinberg v. Int'l Criminal Police Org.,* 672 F.2d 927, 931 n.7 (D.C. Cir. 1981). In response to such an argument, this Court emphasized the breadth of the "transacting any business" language. *Id.* It then approvingly quoted the holding of the highest court in Maryland **\*16** that " 'transacting business' as a basis for long-arm jurisdiction is *not* confined to commercial ventures." *Id.* (quoting *Van Wagenberg v. Van Wagenberg,* 241 Md. 154, 170, 215 A.2d 812, 820-21 (1966)) (emphasis added). Other courts have reached the same conclusion. The Second Circuit, for example, has observed that "[c]ourts interpreting [the New York long-arm statute] have held that noncommercial activity may qualify as the 'transaction of business.' " *Ehrenfeld v. Mahfouz,* 489 F.3d 542, 548 (2d Cir. 2007); *see also Schultz v. Szott,* No. 3:08-CV-02718, 2009 WL 2392912, at \*5 (N.D. Ohio July 31, 2009) ("Ohio courts have held that non-commercial activities can constitute the transaction of business.").[5]

[5]     The similarly-worded Texas long-arm statute, by contrast, has been interpreted more restrictively to focus on a

"business enterprise," which the Fifth Circuit concluded requires a narrower commerce-based standard. *Stroman Realty, Inc. v. Wercinski,* 513 F.3d 476, 483 (5th Cir. 2008). D.C. courts construe the "transacting any business" provision broadly and include no analog to Texas' focus on "business enterprise."

Interpreting "business" to include commercial and non-commercial activities alike comports with the ordinary usage of the term. Black's Law Dictionary specifically provides a definition of "business" that includes "transactions or matters of a noncommercial nature." *Black's Law Dictionary* (10th ed. 2014) (West). As one court observed in interpreting "business" for purposes of a federal criminal statute, the Black's definition, "extending the term 'business' to 'transactions or matters of a noncommercial nature,' is so broadly accepted as to be an 'ordinary **\*17** and natural meaning.' Police, prosecutors and judges routinely employ the terms 'police business,' 'government business,' and 'court business' .... Such terminology is widely employed and understood." *United States v. Marlinga,* No. 04-80372, 2006 WL 2086030, at \*4-5 (E.D. Mich. June 9, 2006), *report and recommendation adopted in part,* No. 04-80372, 2006 WL 2086027 (E.D. Mich. July 25, 2006). As one court in this Circuit has recognized, limiting the long-arm statute to cases "where th[e] business is commercial in nature" would "fly in the face of the actual language of the long-arm statute - which speaks of 'transacting *any* business.' " *Rochon v. FBI,* 691 F. Supp. 1548, 1560 (D.D.C. 1988) (observing that limiting the provision to commercial matters is also inconsistent with this Court's decision in *Steinberg*).

This Court should expressly hold what it has previously suggested: the phrase "transacting any business" may not be artificially narrowed to "commercial" business. Such an interpretation is especially appropriate in light of the D.C. Court of Appeals' instruction to interpret the phrase broadly. Since there is an available and accepted understanding of "business" that sweeps more broadly than commerce, that is the interpretation this Court should follow.

The authorities cited by the district court do not support the contrary conclusion it reached. The court primarily relied on the D.C. Court of Appeals' decision in *Mouzavires v. Baxter,* 434 A.2d 988 (D.C. 1981). But while the district court **\*18** cited *Mouzavires* for the proposition that "contacts ... must be commercial," all it quoted in support was language recognizing that the long-arm statute "embraces those contractual activities of a nonresident defendant which cause a consequence here." App. 59 (quoting *Mouzavires,* 434 A.2d at 992). That is a statement of activities that are "embraced" by the "transacting business" provision; it does not purport to limit personal jurisdiction to *only* such "contractual" activities. Tellingly, this Court cited *Mouzavires* in the course of *doubting* the view that noncommercial activities were excluded. *See Steinberg,* 672 F.2d at 931 n.7.

The district court also cited two district court decisions. Both of those decisions found that on the facts presented, there were insufficient contacts with the District to satisfy the "transacting any business" provision. But they reached that decision not because the contacts at issue were noncommercial, but *despite* the fact that they were *commercial. See Brunson v. Kalil & Co.,* 404 F. Supp. 2d 221, 234 (D.D.C. 2005) (no personal jurisdiction in case concerning brokerage agreement because contacts with District were limited and "arose out [of] a desire to be paid for services rendered" outside the District); *Cellutech, Inc. v. Centennial Cellular Corp.,* 871 F. Supp. 46, 49-50 (D.D.C. 1994) (contract negotiations involving "mail and wire into the District of Columbia," but where "none of the principals ... were present in the District at any time," did "not rise to the level of transacting business within the District that is necessary to invoke the jurisdiction of our **\*19** courts"). These decisions offer no support to the district court's exclusion of noncommercial business from the D.C. long-arm statute.

Properly interpreted, "transacting business" is a fair description of Governor Inslee's contacts with the District of Columbia. According to the complaint and the supporting material Plaintiff has attached, Inslee had extensive interactions with federal officials in the District relating to the implementation of recreational marijuana legalization. Unlike *Cellutech,* where the district court specifically noted the absence of in-person meetings in the District, here Plaintiff has shown that Governor Inslee personally traveled to the District to engage in meetings relating to actions challenged in this case. App. 27, 39, 47-52. Inslee's extensive contacts with the District involved government business, and the government business he transacted brings him within the D.C. long-arm statute.[6]

[6]     Plaintiff alleges that Defendant Foster engaged in "regular and systemic contacts" with federal officials in Washington, D.C., without supplying the same level of detail as in his allegations concerning Defendant Inslee. App.

Case 1:20-cv-03791-JEB   Document 22-8   Filed 02/05/21   Page 67 of 110

Arthur S. WEST, Plaintiff-Appellant, v. Loretta E. LYNCH,..., 2016 WL 4942829...

8, Am. Comp. ¶ 2.3. To the extent the Court does not consider the allegations specific to Foster sufficiently detailed, it may be appropriate to afford Plaintiff an opportunity to amend his complaint, particularly if the Court remands in contemplation of an amendment in other respects.

### B. The Judicially Created "Government Contacts" Exception To Personal Jurisdiction Is Inapplicable.

Because the district court erroneously limited the "transacting any business" provision of the long-arm statute, it did not reach the state defendants' argument that personal jurisdiction was foreclosed by the "government contacts" exception. **\*20** If the Court elects to reach this issue rather than remanding for the district court to consider it in the first instance, it should hold that the doctrine does not apply to government contacts that are not protected by the First Amendment.

The " 'government contacts' principle" is a doctrine created by the D.C. courts, which "exempts one from assertions of personal jurisdiction in the District, if the 'sole contact with the District consists of dealing with a federal instrumentality.' " *Rose v. Silver,* 394 A.2d 1368, 1372-73 (D.C. 1978) (quoting *Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.,* 355 A.2d 808, 813 (D.C. 1976) (en banc)). The D.C. Court of Appeals has held that "the First Amendment provides the only principled basis for exempting a foreign defendant from suit in the District of Columbia." *Id.* at 1374. The doctrine "protect[s] one's right to petition the government for a redress of grievances, without fear of the threat of suit if their contacts were limited to asserting that constitutional right." *Id.* (citing *Environmental Research,* 355 A.2d at 813 n.11). Accordingly, application of the government contacts exception requires a showing that the contacts at issue are protected by the Petition Clause of the First Amendment. *See id.; see also Rochon,* 691 F. Supp. at 1559-60 ("The 'government contacts' doctrine is an outgrowth of the First Amendment right to petition the federal government, and it insulates those persons whose only contact with the District of Columbia is such a petition. The doctrine **\*21** does not provide a blanket exception for all governmental contacts ...." (citation omitted)).

Governor Inslee's contacts with the District of Columbia, performing the business of the State of Washington, fall outside the zone of protected First Amendment petition activity. As the Supreme Court has long held, "[t]he word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union." *South Carolina v. Katzenbach,* 383 U.S. 301, 323 (1966). The same interpretation naturally applies to the right "to petition the government for a redress of grievances," which is similarly directed to "the people." U.S. Const. amdt. 1; *cf. Pleasant Grove City, Utah v. Summum,* 555 U.S. 460, 467 (2009) ("The Free Speech Clause [of the First Amendment] ... does not regulate government speech."). Because Governor Inslee's contacts with the District did not involve petitioning the Government within the meaning of the First Amendment's protections for "the people," those contacts do not exempt him from personal jurisdiction in the District.

While this result follows from the D.C. Court of Appeals' decision in *Rose,* both that court and this Court have recognized some uncertainty in the scope of the District's "government contacts" exemption from personal jurisdiction. Two years before deciding *Rose,* the Court of Appeals described the exception somewhat **\*22** more broadly, without identifying an express limitation to contacts implicating the First Amendment right to petition the government. *See Environmental Research,* 355 A.2d at 813. Shortly after those two decisions, this Court described an "apparent conflict" between them, but did not need to resolve it, because all the contacts at issue "implicate the first amendment guarantee 'to petition the Government for redress of grievances.' " *Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 786-87 (D.C. Cir. 1983). More recently, the D.C. Court of Appeals referred to this "uncertainty," without "attempt[ing] to resolve it," while the substance of its analysis continued to focus on First Amendment principles. *Companhia Brasileira Carbureto de Calcio v. Applied Indus. Materials Corp.,* 35 A.3d 1127, 1133 & n.5 (D.C. 2012).

If the Court reaches the question of the "government contacts" doctrine, it should conclude that *Environmental Research* and *Rose* are reconcilable, and that *Rose*'s clear limitation on the judge-made exception to personal jurisdiction is controlling. The Court of Appeals in *Environmental Research* stated that the "source" of the exception is the "need for unfettered access

Case 1:20-cv-03791-JEB   Document 22-8   Filed 02/05/21   Page 68 of 110

Arthur S. WEST, Plaintiff-Appellant, v. Loretta E. LYNCH,..., 2016 WL 4942829...

to federal departments and agencies for the entire *national citizenry.*" 355 A.2d at 813 (emphasis added). States are not "citizens" of the national government - they are "separate sovereigns." *Heath v. Alabama,* 474 U.S. 82, 89 (1985). And far from ignoring the First Amendment underpinnings of the government contacts exception, *Environmental *23 Research* noted that if the exception were not read into the long-arm statute, Congress "would have been placing an impermissible burden on the First Amendment 'right of the people ... to petition the Government for a redress of grievances.'" 355 A.2d at 813 n.11. The Court of Appeals did not in that case expressly limit the exception to contacts implicating the First Amendment, but neither did it hold that the doctrine was broader. *Rose* is best read as a *sub silentio* departure from the *en banc* decision in *Environmental Research* (which it cited extensively), but as a clarification that the exception's constitutional underpinnings necessarily cabin its application.

An approach that deviates from *Rose,* moreover, would stretch the government contacts exception beyond what could be justified. As the Court of Appeals noted in *Environmental Research,* the exception "does not hinge upon the wording of the statute." 355 A.2d at 813. When courts deviate from the plain text of a statute, they rightly do so in as narrow a manner as possible. *See Kuhlmann v. Wilson,* 477 U.S. 436, 465 n.3 (1986) ("judicially created exceptions to federal jurisdiction conferred by Congress" are "narrow exception [s] to the 'virtually unflagging obligation' to exercise that jurisdiction" (quoting *Colo. River Water Conserv. Dist. v. United States,* 424 U.S. 800, 817 (1976)); *CLS Bank Int'l v. Alice Corp. Pty. Ltd.,* 717 F.3d 1269, 1303 (Fed Cir. 2013) ("[J]udge-made exceptions to properly enacted statutes are to be narrowly construed. Indeed, the Supreme Court has cautioned *24 that, to avoid improper narrowing by courts of congressional enactments, resort to judge-made exceptions to statutory grants must be rare."), *aff'd,* 134 S. Ct. 2347 (2014). As long as the government contacts exception to personal jurisdiction is narrowly construed as a protection for First Amendment petition activity, as the Court of Appeals held in *Rose,* it is an ordinary application of constitutional avoidance principles. If, on the other hand, the extra-textual doctrine is granted a sweep that is broader than its constitutional underpinnings, it would be much more difficult to justify.

Moreover, the policy concerns the D.C. Court of Appeals has expressed are not threatened by limiting the government contacts exception to protected First Amendment activity. In *Environmental Research,* the Court of Appeals warned that without the exception, there would be "a threat to free public participation in government," and "to convert the District of Columbia into a national judicial forum." 355 A.2d at 813. Private citizens' participation in government is amply protected by a government contacts exception based on the Petition Clause, which "extends to all departments of the Government." *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 612 (1972). To the extent the Court of Appeals would have similar concerns about chilling state governments from lobbying the federal government, it seems unlikely that the prospect of infrequent litigation in the District would deter a sophisticated state government from pursuing its interests *25 in the nation's capital. Similarly, the facts of the case, involving allegations of extensive federal negotiations over the implementation of a state policy, are sufficiently unique that recognizing personal jurisdiction is unlikely to convert the courts of the District into a broad "national judicial forum."

## II. Plaintiff Has Standing.

Plaintiff's complaint can be understood as pleading two distinct types of injury and chains of causation. *See Abdelfattah,* 787 F.3d at 533 (*pro se* complaint should be liberally construed). In broad terms, Plaintiff objects to (i) the broader availability and use of recreational marijuana, which he claims has interfered with his enjoyment of the environment, and (ii) the restricted availability of medical marijuana, which he claims harms his interests as a patient and a medical marijuana consultant. Although the district court did not distinguish between these injuries and their associated causal chains, they relate to distinct legal claims and raise somewhat different standing issues. Plaintiff's objection to the increased availability of recreational marijuana is the basis of his standing to challenge the federal government's actions as violations of NEPA, and as a failure to enforce the Controlled Substances Act. Plaintiff's objection to the decreased availability of medical marijuana is the basis of his standing to claim that the federal government improperly "commandeered" the state of Washington into heightening its regulations of that product.

*26 Plaintiff's standing to pursue these respective legal claims turns on distinct claims of injury and chains of causation. For

each, Plaintiff must establish that he "suffered an injury in fact," that the injury "is fairly traceable to the challenged conduct of the defendant," and that it "is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016). Plaintiff has adequately alleged these elements for both of his overarching theories. Moreover, to the extent the flaws identified by the district court do defeat Plaintiff's claim to standing, they may be curable by an amended complaint, which Plaintiff should be granted leave to file.

### A. Plaintiff Has Standing Based On Personal Harms From The Increased Availability Of Recreational Marijuana.

1. *Injury-in-Fact.* Plaintiff alleges environmental and aesthetic harms as a consequence of the implementation of Initiative 502. His complaint alleges, for example, that the increased prevalence of recreational marijuana "has impacted ... his esthetic and recreational enjoyment of parks and other areas of the urban environment." App. 19, Am. Compl. ¶ 4.41. Plaintiff specifically highlights Sylvester Park in Olympia, which he "frequents," and which he claims is "suffering under the impacts of ... casual recreational drug use." App. 9, Am. Compl. ¶ 3.1. According to the complaint, the environmental quality of Sylvester Park "ha[s] and will be further degraded by the increase of recreational drug use." App. 19, Am. Compl. ¶ 4.41. Plaintiff also represented to the district court that a recreational **\*27** marijuana retail store has been licensed across from the Eastside Olympia Food Co-op he regularly visits, an area that includes an outdoor space where Plaintiff sits. App. 68.

Whether characterized as air pollution or an aesthetic objection, unwanted exposure to marijuana smoke in a public space is a cognizable injury in fact. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.' " *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)); *see also Sierra Club v. FERC,* 827 F.3d 36, 44 (D.C. Cir. 2016) ("exposure to increased noise" is a constitutionally sufficient "aesthetic injury").

The district court declined to recognize this injury on the ground that it was nothing more than a "speculative prediction," emphasizing that Plaintiff merely asserted what "*will*" happen. App. 82 (emphasis in original). As an initial matter, the district court misapprehended the complaint. Plaintiff did not only state what "will" happen; he claimed that the environmental conditions in Sylvester Park "*have* [been] and will be further degraded." App. 19, Am. Compl. ¶ 4.41 (emphasis added). Far from being a "speculative prediction," a statement of deteriorating conditions that "have" already happened is a claim of "actual" injury. **\*28** *Clapper v. Amnesty Int'l USA,* 133 S. Ct. 1138, 1147 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms,* 130 S. Ct. 2743, 2752 (2010)).

Even if that aspect of the complaint were ignored, the district court erred in treating Plaintiff's allegation of what "will" happen as unduly speculative. In this Court's recent decision in *Sierra Club v. FERC,* the Court found standing based on the plaintiff's allegation that "the additional noise made during construction" of a facility "*will* ... hinder [her] enjoyment of [her] home." 827 F.3d at 4 (emphasis added) (omission and alterations in original) (citation omitted). Because this was a "credible claim[] of exposure to increased noise" if the planned construction project went forward, supported by "specific factual representations," the Court found it sufficient, without suggesting that a future-oriented "will" statement is impermissibly speculative. *Id.* Here too, Plaintiff's claims are credible: just as increased noise is a natural byproduct of construction, increased public consumption of recreational marijuana is a natural consequence of implementation of a legalization initiative. Plaintiff's injury concerning the marijuana retail store licensed across from his food co-op is especially clear; it is hardly speculative to expect increased public marijuana consumption in the immediate vicinity of a sales hub for marijuana.

2. *Causation.* The district court concluded that even if Plaintiff had alleged a cognizable injury, he could not establish causation. Observing that "Washington **\*29** enacted I-502 well before the Department of Justice issued its memo," the court found it "doubtful" that the federal defendants, rather than the State of Washington, caused Plaintiff's injuries. App. 83. The court concluded that establishing the "requisite causal link" would require "more than a few speculative inferences regarding the thought processes of state decision-makers." *Id.*

But the thought processes of Washington state officials are not so "speculative." The same day the Justice Department released the Cole Memorandum, Governor Inslee and Washington Attorney General Ferguson issued a joint statement

thanking the federal government for "confirmation [that] Washington's voter-approved marijuana law *will be implemented.*" Press Release, Joint Statement from Gov. Inslee and AG Ferguson Regarding Update from AG Eric Holder on Implementation of Washington's Voter-Approved Marijuana Law (Aug. 29, 2013) App. 40-41 (emphasis added). The joint statement specifically stated that the federal action "*allows* our initiative to move forward." *Id.* (emphasis added). Shortly thereafter, Governor Inslee and Attorney General Ferguson testified before the Senate Judiciary Committee and again thanked the President and U.S. Attorney General "for *allowing* us to move forward with implementation of Initiative 502." *Committee Hearing on Conflicts Between State and Federal Marijuana Laws*: *Hearing Before the S. Comm. on the Judiciary,* 113th Cong. (Sept. 10, 2013) **\*30** (written testimony of Washington Governor Jay Inslee and Washington Attorney General Bob Ferguson), App. 38.

In rejecting Plaintiff's theory of causation, the district court relied on *Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26 (1976). Simon* held that Article III standing is not available when the plaintiff's injury "results from the *independent* action of some third party not before the court." *Id.* at 41-42 (emphasis added). It recognized, however, that causation is established when the injurious third-party conduct was "made possible only by the challenged action of the defendant federal official." *Id.* at 45 n.25. "This circuit's case law confirms the proposition that a plaintiff satisfies the causation prong of constitutional standing by establishing that the challenged agency rule permitted the activity that allegedly injured her, when that activity would allegedly have been illegal otherwise." *Animal Legal Def. Fund, Inc. v. Glickman, 154 F.3d 426, 118-19 (D.C. Cir. 1998). The Governor of Washington's own characterization of the Cole Memorandum as "allow[ing] our [legalization] initiative to move forward" is a sufficient basis to conclude that the harms experienced by Plaintiff were "made possible" by that federal action.

3. *Redressability.* "Typically, redressability and traceability [*i.e.,* causation] overlap as two sides of a causation coin." *Dynalantic Corp. v. Dep't of Defense,* 115 F.3d 1012, 1017 (D. C. Cir. 1997). In other words, when the defendant has **\*31** caused the plaintiff's injury, and the court has authority to award relief to reverse the challenged action, redressability is satisfied. *See Fla. Audobon Soc'y v. Bentsen,* 94 F.3d 658, 664 (D.C. Cir. 1996) ("Causation may thus be said to focus on whether a particular party is appropriate; redressability, on whether the forum is.").

The district court erred in finding a lack of redressability for essentially the same reason it erred in finding a lack of causation. Viewing Washington's action in implementing Initiative 502 as independent of the federal action permitting the marijuana initiative to move forward, the court faulted Plaintiff for not explaining how "declaratory and injunctive relief against the federal defendants would modify Washington's (or Olympia's) allegedly harmful marijuana policies." App. 85. The problem, again, is that the federal and state actions at issue are not independent. Plaintiff has alleged, and the Governor and Attorney General of Washington have indicated, that federal action was necessary to "allow" the state to proceed with implementation of its recreational marijuana initiative.

In finding that Plaintiff's injury was not redressable, the district court analogized this case to *National Wrestling Coaches Association v. Department of Education, 366 F.3d 930 (D.C. Cir. 2004). National Wrestling Coaches Association* concerned a challenge to regulations implementing Title IX of the Education Amendments of 1972, which devised a test for assessing discrimination in federally-funded **\*32** athletic programs. *Id.* at 933. The plaintiffs objected to universities' "independent decisions ... choos[ing] to eliminate or reduce the size of men's wrestling teams in order to comply with Title IX." *Id.* As this Court found, however, Title IX and its implementing regulations "provide[] ... flexibility and choice" regarding how universities comply; "nothing" in the challenged regulation "requires schools to eliminate or cap men's wrestling or any other athletic program." *Id.* at 935, 939. In fact, the record revealed that two universities at issue had "maintained their men's wrestling programs for decades after the adoption of the" challenged regulation. *Id.* at 939 (emphasis added). Moreover, since the plaintiffs only challenged a regulation implementing Title IX, even if they prevailed schools would still have to comply with the statute itself, and "would remain free to eliminate or cap men's wrestling teams." *Id.* at 940. The plaintiffs, in short, "offered nothing to indicate that the schools will act any differently than they have in the past regarding decisions to comply with Title IX," regardless of the outcome of the lawsuit. *Id.* at 943.

This case is different. The implementation of a legal recreational marijuana regime is not an equally available policy choice irrespective of whether the Cole Memorandum stands or falls. To the contrary, Washington officials treated that federal

action as a prerequisite that "allowed" the State to "move forward." The natural inference from Washington officials' attitude toward the Cole Memorandum **33** is that without it, the State would *not* move forward. Consequently, Plaintiff has provided sufficient grounds to conclude that if the Cole Memorandum were vacated, Washington would act differently with respect to Initiative 502 and recreational marijuana legalization. In the words of *National Wrestling Coaches Association,* "the intervening choices of [the State of Washington] are not truly independent of [federal] government policy." 366 F.3d at 941.

Moreover, one aspect of the federal action challenged by Plaintiff is the Justice Department's determination that it "will not at this time seek to challenge [Washington's] law." App. 42. Governor Inslee devoted resources to securing this outcome, engaging the U.S. Attorney General and a White House official with the specific objective of "receiv[ing] assurance" that the Attorney General "will not affect federal preemption." App. 47-52. Again, the reasonable inference from the Governor's actions is that the Justice Department's forbearance from pursuing preemption was material to Washington's decisions. If the Court were to vacate the Justice Department's assurance, it should not lightly assume that Washington would nonetheless proceed with its recreational marijuana initiative, in contravention of federal law. *Cf. National Wrestling Coaches Ass'n,* 366 F.3d at 941 (standing satisfied where third parties' intervening choices "could only preclude redress if those third parties took the extraordinary measures of continuing their injurious conduct in violation of the law").

**34** Finally, with respect to Plaintiff's NEPA claim, it is not necessary for him to establish that further environmental review would cause the Justice Department to reach a different substantive result with respect to the Cole Memorandum and associated federal actions. *See Sierra Club v. FERC,* 827 F.3d 59, 65 (D.C. Cir. 2016) ("[I]n a NEPA procedural injury case, the petitioner need demonstrate only that 'the procedural step was connected to the substantive result,' not that 'the agency would have reached a different substantive result' but for the alleged procedural error." (quoting *WildEarth Guardians v. Jewell,* 738 F.3d 298, 306 (D.C. Cir. 2013))).

## B. Plaintiff Has Standing Based On Personal Harms From The Decreased Availability Of Medical Marijuana.

1. *Injury-in-Fact.* Plaintiff also alleges a distinct injury stemming from decreased availability of medical marijuana in Washington. According to his complaint, Plaintiff held a medical marijuana authorization under Washington state laws as they existed prior to the changes to which he objects. App. 9-10, Am. Compl. ¶ 3.1. He claims to have been directly impacted by new taxes on medical marijuana, which was previously untaxed. App. 18-19, Am. Compl. ¶¶ 4.35-4.36. Plaintiff further alleges that new regulations on medical marijuana have made access to the product more difficult, noting in particular "bans on medical marijuana and collective gardens" by various cities, including the City of Olympia where he resides. App. 17, Am. Compl. ¶ 4.26.

**35** After the district court's decision, the state of Washington passed additional legislation to merge the preexisting, loosely regulated medical marijuana system into the new recreational system. In passing the Cannabis Patient Protection Act of 2015, the legislature stated its intent to "adopt a comprehensive act that uses the regulations in place for the recreational market to provide regulation for the medical use of marijuana." 2015 Wash. Legis. Serv. Ch. 70 (S.S.S.B. 5052) (West), § 2. Among other restrictions on access to medical marijuana, the law lowered the limit on possession of useable medical marijuana from 24 ounces to 3 ounces. *Id.*; App 104. The law also eliminates "collective gardens," replacing them with a much more restrictive system of "cooperatives" that may involve fewer patients and require entry into a database of medical marijuana users. App. 105.

Like its analysis of Plaintiff's alleged injuries stemming from increased recreational marijuana, the district court considered Plaintiff's claims concerning decreased access to medical marijuana unduly "speculative." App. 82. Again emphasizing the complaint's use of the word "will" ("will ... make medical patients' ... access to cannabis difficult or non-existent and more expensive"), the district court considered this a mere "conjectural" prediction. *Id.* Again, the district court did not consider Plaintiff's additional allegation that he "has [already] been impacted" by new restrictions on medical marijuana, including by the moratorium on collective gardens in his city. App. 18, Am. Compl. ¶ 4.36.

**36** Moreover, in his motion for reconsideration in the district court, Plaintiff relied on new legislation (at that time pending but since enacted) that plainly does restrict access to medical marijuana. Far from being a speculative prediction, it is now

Case 1:20-cv-03791-JEB   Document 22-8   Filed 02/05/21   Page 72 of 110

Arthur S. WEST, Plaintiff-Appellant, v. Loretta E. LYNCH,..., 2016 WL 4942829...

clear as a matter of law that medical marijuana is less accessible, including a lower cap on possession and an inability to participate in the type of collective gardens Plaintiff formerly utilized. The ability to possess only three ounces of a product when prior law allowed twenty-four is plainly an injury, as is the elimination of a convenient means for pooling efforts toward the production of that product.

The fact that recreational marijuana may be available does not change the analysis. "[T]he inability of consumers to buy a desired product may constitute injury-in-fact 'even if they could ameliorate the injury by purchasing some alternative product.' " *Consumer Fed'n of Am. v. FCC,* 348 F.3d 1009, 1012 (D.C. Cir. 2003) (quoting *Cmty. Nutrition Inst. v. Block,* 698 F.2d 1239, 1247 (D.C. Cir. 1983)). That is particularly true given that the federal law currently prohibits the use of federal funds to prosecute medical marijuana users authorized by the state of Washington, but not recreational marijuana users. *See United States v. McIntosh,* __ F.3d __, 2016 WL 4363168, at *9 (9th Cir. Aug. 16, 2016) ("[Section] 542 [of the Consolidated Appropriations Act of 2016] prohibits DOJ from spending funds from relevant appropriations acts for the prosecution of individuals who engaged in *37 conduct permitted by the State Medical Marijuana Laws and who fully complied with such laws.").

Finally, to the extent these harms are not clear on the face of the new laws, it would be appropriate to grant Plaintiff leave to amend his complaint to account for developments since the laws have come into effect. Such leave would be especially appropriate in light of Plaintiff's representation in this Court that he has been directly and personally impacted as "several collectives he participated in" have been "regulated ... out of existence." Appellant's Original Br. 28 (Nov. 30, 2015). Moreover, to the extent Plaintiff's business as an "independent consultant in the field of nonprofit state medical marijauna" (App. 9, Am. Compl. ¶ 3.1) has been hampered by the recently implemented changes in the law, that may be another further ground for amending the complaint to better articulate a cognizable injury.

2. *Causation.* As with Plaintiff's injuries concerning recreational marijuana, the district court concluded that Plaintiff's claim to decreased access to medical marijuana was not caused by the challenged federal action. In the district court's view, the State of Washington was the true source of Plaintiff's injuries, and the only allegation concerning the federal defendants was that they "allowed" Washington's marijuana initiative to go forward. As explained above, if Plaintiff is correct that the federal government wielded an effective veto power over *38 Washington's implementation of Initiative 502 but nonetheless permitted it to move forward, case law supports treating that federal action as causally responsible for Plaintiff's injuries.

More fundamentally, however, Plaintiff's allegation concerning heightened regulation of medical marijuana is not that the federal government "allowed" it - it is that the federal government *mandated* it. If Plaintiff's allegations are correct, and federal officials are responsible for compelling the state of Washington to increase its regulation of medical marijuana, there is a clear causal link between the challenged action and Plaintiff's injuries.

The allegations in the complaint and supporting material in the district court record are sufficient, at this stage of proceedings, to show the causal role played by federal officials. The Cole Memorandum itself threatens "to challenge the regulatory structure itself" if it is not "sufficiently robust." App. 45. The House Bill Report for the Washington legislation that imposed new regulations on medical marijuana specifically noted, as relevant background, the "Federal Response to State Marijuana Regulations," including the Cole Memorandum. App. 100-01. More pointedly, the U.S. Attorney for the Western District of Washington (the district covering Seattle) declared Washington's preexisting medical marijuana system "untenable." App. 18, Am. Compl. ¶ 4.36; *see also* App. 32 (internal document from Governor Inslee's office pointing to the U.S. Attorney's characterization *39 of the medical marijuana system as "untenable" as a reason why the state needed to place it "within a regulated market").

Plaintiff has pointed to additional evidence supporting his claim that Washington adopted more stringent regulation of medical marijuana, to his detriment, because of pressure from the federal government. He alleges that he personally witnessed a state legislator, advocating for a precursor to the laws that ultimately adopted strict medical marijuana regulation, invoke the Cole Memorandum as a "federal mandate." App. 18, Am. Compl. ¶ 4.34. Plaintiff has further identified an in-court statement by a Washington State Assistant Attorney General stating that a medical marijuana workgroup's recommendations, which formed the basis for the legislation, were the result of federal directives: "[The workgroup acted] pursuant to some issues that the federal government pinpointed and said we need you - the federal government said, 'We need you to address these issues, Legislature.' ... [I]t's up to the legislature to make the final determinations of what to do with respect to these issues that the federal government has pointed out." Hearing of January 3, 2014 Cause No. 45508-1-II

(Wash. Ct. App. Div. II), App. 75-76; *see also* Press Release, Washington State Liquor Control Board, Three Agencies Issue Draft Recommendations on Medical Marijuana (Oct. 21, 2013), App. 34 ("The recommendations reflect Washington State's commitment to address the concerns **\*40** outlined by U.S. Attorney General Eric Holder in his August 2013 message to state leaders.").

The treatment of medical marijuana in the ballot initiative itself is further support for Plaintiff's view that federal mandates, not independent state decisionmaking, caused the heightened regulation of medical marijuana. Initiative 502 provided that "nothing in this act shall be construed" to allow the liquor control board, newly empowered to regulate recreational marijuana, to "seize, confiscate, [or] destroy" marijuana products "produced, processed, sold, offered for sale, or possessed in compliance with the Washington state medical use of cannabis act, chapter 69.51A RCW." I-502, § 9(12). The Initiative said nothing else about medical marijuana. It is reasonable to infer that the Washington voters who enacted the ballot initiative expected the state's preexisting system for medical marijuana to be left largely in place, and that it was federal intervention that spurred the State to change course.

3. *Redressability.* Redressability again follows from causation. If Plaintiff can prove that Washington's decision to more tightly regulate the medical marijuana market was caused by a directive of the federal government, a judicial invalidation of that federal directive would likely change the state's approach as well. *See supra* § II.A.3.

### **\*41 III. The District Court's Analysis Of The Merits Of Plaintiff's Claims Was Incomplete.**

#### **A. The District Court's Analysis Of Plaintiff's NEPA Claim Failed To Account For The Nature Of The Challenged Federal Action.**

The district court's sole ground for dismissing Plaintiff's NEPA claim on the merits is that the Justice Department interprets the statute as not applying to "action taken ... within the framework of judicial or administrative enforcement proceedings or civil or criminal litigation." App. 88 (quoting 28 C.F.R. § 61.4). The district court's analysis was incomplete and should be vacated.[7]

[7] It is not clear whether the district court intended to hold that Plaintiff had standing to bring his NEPA claim. In its initial decision, the court specified that the NEPA claim "fail[s] under Rule 12(b)(6) for failure to state a claim, and not under Rule 12(b)(1) for lack of jurisdiction," which suggests that standing was satisfied. App. 88. On Plaintiff's motion for reconsideration, however, the district court stated that "even if NEPA applied, that would not excuse West's failure to otherwise meet the standing requirements of Article III." App. 119. If the district court intended to dismiss Plaintiff's NEPA claim under Rule 12(b)(1) for lack of standing, that decision was incorrect for the reasons discussed above. *See supra* § II.A.

Although the district court relied on an interpretation of NEPA that excludes "enforcement proceedings" and "litigation," 28 C.F.R. § 61.4, it did not explain its conclusion that the Cole Memorandum and the related federal actions Plaintiff challenges fall within this rubric. On its face, the Cole Memorandum is not clearly either of these things: it was not filed in the course of any "criminal or civil litigation," and it was not the basis for any "judicial or administrative enforcement proceeding." 28 C.F.R. § 61.4. The district court relied on a decision holding that a **\*42** decision to forbear from enforcement was exempt from NEPA. App. 88 (citing *United States v. Glenn-Colusa Irr. Dist.,* 788 F. Supp. 1126, 1134-35 (E.D. Cal. 1992)). But the Cole Memorandum is not a decision to decline prosecution of any individual for a marijuana offense. It was accompanied, moreover, by an action much more programmatic than any enforcement action - an announcement that the federal government would allow a state law to come into effect without seeking to enjoin it. App. 42.

To the extent the Cole Memorandum is nothing more than a directive for how enforcement discretion ought to be exercised in a category of criminal cases, it arguably comes within a broad view of the Justice Department's exclusion of "enforcement proceedings." But the complaint alleges, and at least some evidence identified by Plaintiff supports, that the Cole Memorandum and related federal actions accomplished more than that. According to various state officials' internal documents, the challenged federal actions were both necessary to allowing the state's recreational marijuana initiative to go

Case 1:20-cv-03791-JEB   Document 22-8   Filed 02/05/21   Page 74 of 110

Arthur S. WEST, Plaintiff-Appellant, v. Loretta E. LYNCH,..., 2016 WL 4942829...

forward, and an instruction for how that initiative should be implemented. An action that effectively guides what drug policy will be in a state fits within a natural understanding of the statutory phrase "major federal action," much more so than a case-by-case decision to prosecute or not prosecute an individual found to possess marijuana. Prior to applying the Justice Department's "enforcement" exception to NEPA, the district court should have **43** considered the more systematic nature of the federal policy that the Cole Memorandum announced and that Plaintiff challenged.

Defendants have also argued that NEPA is inapplicable because this case involves not a major federal action but "inaction." Again, this view turns on a contestable understanding of the Cole Memorandum that should be assessed in the first instance by the district court. In *Defenders of Wildlife v. Andrus*, 627 F.2d 1238 (D.C. Cir. 1980), this Court held that the federal government's decision not to block a "wolf kill" program implemented by the State of Alaska was "inaction" not governed by NEPA. *Id.* at 1241, 1243-47. *Defenders of Wildlife* did not, however, hold that federal inaction may *never* trigger NEPA. Rather, it recognized that where "the federal government undertakes some 'overt act' in furtherance of [a third party's] project," its " 'approval' of another party's action" can constitute a major federal action under NEPA. *Id.* at 1244. A quintessential such overt act is a "license" or "permit." *Id.* at 1244-45. As one of this Court's sister circuits has explained, "a federal agency's authority to influence nonfederal activity" is the "touchstone" of whether NEPA applies. *United States v. S. Florida Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994); *see also Bunch v. Hodel*, 793 F.2d 129, 135 (6th Cir. 1986) (emphasizing that NEPA did not apply in *Defenders of Wildlife* because "the federal government could do absolutely nothing and the wolf kill could still occur"); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 13 (D.D.C. 1998) **44** (NEPA applies to third-party program in which federal officials were "intimately involved in the discussion and planning").

On Plaintiff's view - one which, according to their public statements, senior Washington officials appear to share - affirmative federal action was necessary to allow the state's marijuana initiative to move forward. *See supra* pp. 29-30. In effect, the Cole Memorandum and related federal communications operated as a permit, authorizing state action that could not otherwise be taken. Moreover, these actions were not strictly limited to forbearance from enforcement. Rather, according to Plaintiff's allegations and supporting evidence, the Justice Department has significantly informed the way marijuana will be regulated in the state of Washington. *See supra* pp. 38-40. These allegations bring this case a significant distance from an ordinary case of prosecutorial discretion, where the government simply elects not to bring an enforcement action while undertaking no "overt act" to shape the third party's conduct.

*Amicus* takes no position on whether NEPA should be held to apply in the final analysis. Application of NEPA to a case straddling the line between case-by-case enforcement and blanket policy, as well as federal action and inaction, should be assessed in the first instance by the district court on a full consideration of the relevant facts. Further analysis may also be warranted to determine whether a "significant[]" effect on the human environment has been alleged, an issue not addressed **45** by the district court. 42 U.S.C. § 4332(C). Simply reciting the Justice Department's exemption of enforcement proceedings from NEPA, however, is not a sufficient basis to dispose of this case.

### B. The District Court's Analysis Of Plaintiff's Constitutional Claims Was Incomplete.

The district court further rejected Plaintiff's claims on the ground that the Cole Memorandum is an unreviewable exercise of prosecutorial discretion. App. 85-87. The court held that "[a] decision to adopt a non-enforcement policy" is "presumptively unreviewable in the federal courts." App. 85-86. In its analysis, however, the court did not give due consideration to two aspects of Plaintiff's case.

1. The district court recognized that while a non-enforcement policy is *presumptively* unreviewable, Plaintiff "could have tried to rebut this presumption." App. 86. In particular, the court noted that Plaintiff might have argued that "the Cole Memo amounted to a 'general policy ... so extreme as to amount to an abdication of [the Department's] statutory responsibilities.' " App. 86 (quoting *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985) (alteration in original). The court considered such an argument (i) not presented, and (ii) meritless because "the Cole Memo makes clear that it 'is intended solely as a guide to the exercise of ... prosecutorial discretion." App. 87 (quoting Cole Memorandum at 4). This analysis was insufficient.

**\*46** The complaint alleged that the Justice Department lacked "discretionary authority" to "authorize or condone broad State violations of the [Controlled Substances] Act." App. 14, Am. Compl. 4.13; *see also* App. 92 ("[T]he underlying action in this case set national marijuana policy in a manner that ... abdicated statutory responsibilities in a wholesale manner."). Plaintiff's pleadings in this case must be liberally construed. *See* *Abdelfattah,* 787 F.3d at 533 ("A document filed *pro se* is to be liberally construed." (quoting *Erickson v. Pardus,* 551 U.S. 89, 94 (2007)). Read in light of that standard, the complaint makes apparent Plaintiff's view that the Cole Memorandum and associated federal actions constitute an abdication of federal law enforcement responsibilities.

The district court further indicated that it would have rejected such an argument because the Cole Memorandum expressly stated that it was merely a "guide" to prosecutors for purposes of exercising their prosecutorial discretion. App. 87. Standing alone, the Justice Department's characterization of its own memorandum is not enough. In other administrative law contexts, this Court has looked beyond "boilerplate" disclaimers that a document is "intended solely as guidance," conducting its own independent analysis of the nature of the challenged material. *Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1023 (D.C. Cir. 2000). Rather than accept the Cole Memorandum's self-characterization and stop there, the district court should have undertaken a more complete analysis.

**\*47** *Amicus* takes no position on the ultimate merits of Plaintiff's claim that federal officials have effectively abdicated their responsibility to enforce the law. Such a view is not, however, frivolous. *See, e.g.,* Zachary S. Price, *Enforcement Discretion and Executive Duty,* 67 Vand. L. Rev. 671, 757-58 (2014) (concluding that the Justice Department's 2013 response to Washington's recreational marijuana initiative "creeps close[] to an express promise of nonenforcement" but "can just barely be reconciled with an appropriate understanding of executive-branch responsibilities"). Dismissal of Plaintiff's claims for the reasons given by the district court, without additional analysis, was incorrect.

2. The district court further declined to consider Plaintiff's "commandeering" objections, under which he complains that the federal government has impermissibly directed the state of Washington to regulate marijuana in a particular way. Such a claim presents various challenges, including whether a private plaintiff has standing to object to an alleged act of "commandeering" to which the state itself does not object. But it was insufficient for the district court not to consider the merits of that claim at all. If a commandeering claim could otherwise be stated and proved, it would not suffice to dismiss it on grounds of prosecutorial discretion. Whatever a traditional exercise of prosecutorial discretion entails, it does not include dictating to a sovereign state government how it ought to amend and enforce its own laws.

## *\*48 CONCLUSION

For the foregoing reasons, the judgment of the district court should be vacated and remanded.

**Appendix not available.**

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit J



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Speaker Robin Vos Wisconsin

960 Rock Ridge Road

Burlington, WI 53105 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145425259 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $8.63 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $18.13 |
| Label Quantity | 1 |
| Total Cost | $18.13 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Governor Tony Evers

P.O. Box 7863

Madison, WI 53707 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145424115 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $8.63 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $18.13 |
| Label Quantity | 1 |
| Total Cost | $18.13 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Josh Kaul

114 State St

Madison, WI 53703 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145422951 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $8.63 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $18.13 |
| Label Quantity | 1 |
| Total Cost | $18.13 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Senate Majority Leader Howard Marklein

PO Box 7882

Madison, WI 53707 US

| REFERENCE | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145425686 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $8.63 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |
| | Subtotal | $18.13 |
| | Label Quantity | 1 |
| | Total Cost | $18.13 |



# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Attorney General Josh Shapiro

Strawberry Square

Harrisburg, PA 17120 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145429455 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Vice President Michael Pence

1600 Pennsylvania Avenue, N.W.

Washington, DC 20500 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145441594 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



**UNITED STATES
POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Russell Bowers

1700 West Washington St Ste H

Phoenix, AZ 85007 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145470846 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $12.55 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |
| | |
| Subtotal | $22.05 |
| Label Quantity | 1 |
| Total Cost | $22.05 |



# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Doug Ducey

700 E Washington Street

Phoenix, AZ 85034 US

| **REFERENCE** | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145472604 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| **SERVICE** | **UNIT PRICE** |
|---|---|
| Priority Mail ® Package/Thick Envelope | $12.55 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |
| | |
| Subtotal | $22.05 |
| Label Quantity | 1 |
| Total Cost | $22.05 |



# Receipt

Print Date: Feb 01, 2021

**UNITED STATES POSTAL SERVICE**

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

U.S. House of Representatives

0 U.S. Capitol Rm Ht-1

Washington, DC 20515 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145474745 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Electoral College

700 Pennsylvania Ave NW

Washington, DC 20408 US

| REFERENCE | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145475452 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Governor Brian Kemp

111 State Capitol SW

Atlanta, GA 30334 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145476626 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Arizona Attorney General

2005 N Central Ave

Phoenix, AZ 85004 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145477975 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $12.55 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $22.05 |
| Label Quantity | 1 |
| Total Cost | $22.05 |



# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Senate Leader Rick Gray

1700 West Washington St Ste S

Phoenix, AZ 85007 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145478897 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $12.55 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $22.05 |
| Label Quantity | 1 |
| Total Cost | $22.05 |



# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

U.S. Senate

US Capitol First St SE

Washington, DC 20004 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145479542 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |
| | |
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



# Receipt

Print Date: Feb 01, 2021

**UNITED STATES POSTAL SERVICE**

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Governor Tom Wolf Pennsylvania

508 Main Capitol Building

Harrisburg, PA 17120 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145490073 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | | |
|---|---|---|
| | Subtotal | $19.44 |
| | Label Quantity | 1 |
| | Total Cost | $19.44 |



# Receipt

Print Date: Feb 01, 2021

**UNITED STATES POSTAL SERVICE**

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Attorney General Dana Nasell

525 W Ottawa St

Lansing, MI 48933 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145490943 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $8.99 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $18.49 |
| Label Quantity | 1 |
| Total Cost | $18.49 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Senate Majority Leader Mike Shirkey

S102 Capitol Building

Lansing, MI 48933 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145492152 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $8.99 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $18.49 |
| Label Quantity | 1 |
| Total Cost | $18.49 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Pres. Pro Tem of the Senate Butch Miller

321 State Capitol SW

Atlanta, GA 30334 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145493944 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



# Receipt

Print Date: Feb 01, 2021

**UNITED STATES POSTAL SERVICE**

| | |
|---|---|
| **RETURN TO** | **REFERENCE** |
| Mohrman | Ship Date: Dec 23, 2020 |
| 150 South Fifth Street, Suite 3100 | Ship from ZIP: 55402 |
| Minneapolis, MN 55402 | Weight: 2 lbs. 8 oz. |
| | User: mohrman |
| **SHIP TO** | Cost Code: Thomas |
| Attorney General Chris Carr | Refund Type: E-refund |
| 40 Capitol Square, SW | Reference #: |
| Atlanta, GA 30334 US | Printed on: Shipping label |
| | Tracking #: 9465911699000145494767 |
| | Carrier Acceptance Date: Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Speaker Lee Chatfield

124 N Capitol Avenue Fl 2

Lansing, MI 48933 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145495184 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $8.99 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $18.49 |
| Label Quantity | 1 |
| Total Cost | $18.49 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Governor Grethen Whitmer

111 S Capitol Avenue

Lansing, MI 48933 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145495221 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $8.99 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $18.49 |
| Label Quantity | 1 |
| Total Cost | $18.49 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Attorney General Josh Shapiro

Strawberry Square

Harrisburg, PA 17120 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145496327 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |
| | |
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Senate Majority Leader Jake Corman Pennsylvania Senate

Senate Box 203034

Harrisburg, PA 17120 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145497478 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Brian Carter

P.O. Box 202100

Harrisburg, PA 17120 US

| REFERENCE | |
|---|---|
| Ship Date: | Dec 22, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145497713 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

David Rolston

332 State Capitol SW

Atlanta, GA 30334 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000145499816 |
| Carrier Acceptance Date: | Dec 23, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Civil Process Clerk

555 Fourth Street, N.W.

Washington, DC 20001 US

| REFERENCE | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000142710006 |
| Carrier Acceptance Date: | Dec 24, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |
| | |
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



# Receipt

Print Date: Feb 01, 2021

## UNITED STATES POSTAL SERVICE

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Civil Process Clerk

555 Fourth Street, N.W.

Washington, DC 20001 US

| REFERENCE | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000142710747 |
| Carrier Acceptance Date: | Dec 24, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |
| | |
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



# Receipt

Print Date: Feb 01, 2021

**UNITED STATES**
**POSTAL SERVICE**

| | |
|---|---|
| **RETURN TO** | **REFERENCE** |
| Mohrman | Ship Date: Dec 23, 2020 |
| 150 South Fifth Street, Suite 3100 | Ship from ZIP: 55402 |
| Minneapolis, MN 55402 | Weight: 2 lbs. 8 oz. |
| | User: mohrman |
| **SHIP TO** | Cost Code: Thomas |
| Civil Process Clerk | Refund Type: E-refund |
| 555 Fourth Street, N.W. | Reference #: |
| Washington, DC 20001 US | Printed on: Shipping label |
| | Tracking #: 9465911699000142715742 |
| | Carrier Acceptance Date: Dec 24, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |
| | |
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



# UNITED STATES POSTAL SERVICE

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Civil Process Clerk

555 Fourth Street, N.W.

Washington, DC 20001 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000142717821 |
| Carrier Acceptance Date: | Dec 24, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



**UNITED STATES
POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Attorney General William Barr

950 Pennsylvania Avenue NW

Washington, DC 20530 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000142728445 |
| Carrier Acceptance Date: | Dec 24, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



**UNITED STATES POSTAL SERVICE**

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Attorney General William Barr

950 Pennsylvania Avenue NW

Washington, DC 20530 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000142743233 |
| Carrier Acceptance Date: | Dec 24, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



# Receipt

Print Date: Feb 01, 2021

### UNITED STATES POSTAL SERVICE

| **RETURN TO** | **REFERENCE** | |
|---|---|---|
| Mohrman | Ship Date: | Dec 23, 2020 |
| 150 South Fifth Street, Suite 3100 | Ship from ZIP: | 55402 |
| Minneapolis, MN 55402 | Weight: | 2 lbs. 8 oz. |
| | User: | mohrman |
| **SHIP TO** | Cost Code: | Thomas |
| Attorney General William Barr | Refund Type: | E-refund |
| 950 Pennsylvania Avenue NW | Reference #: | |
| Washington, DC 20530 US | Printed on: | Shipping label |
| | Tracking #: | 9465911699000142744896 |

| **SERVICE** | **UNIT PRICE** |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



# Receipt

Print Date: Feb 01, 2021

**UNITED STATES POSTAL SERVICE**

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Attorney General William Barr

950 Pennsylvania Avenue NW

Washington, DC 20530 US

| REFERENCE | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000142745558 |
| Carrier Acceptance Date: | Dec 24, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |

| | |
|---|---|
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |



# UNITED STATES POSTAL SERVICE

# Receipt

Print Date: Feb 01, 2021

**RETURN TO**

Mohrman

150 South Fifth Street, Suite 3100

Minneapolis, MN 55402

**SHIP TO**

Attorney General William Barr

950 Pennsylvania Avenue NW

Washington, DC 20530 US

**REFERENCE**

| | |
|---|---|
| Ship Date: | Dec 23, 2020 |
| Ship from ZIP: | 55402 |
| Weight: | 2 lbs. 8 oz. |
| User: | mohrman |
| Cost Code: | Thomas |
| Refund Type: | E-refund |
| Reference #: | |
| Printed on: | Shipping label |
| Tracking #: | 9465911699000142711195 |
| Carrier Acceptance Date: | Dec 24, 2020 |

| SERVICE | UNIT PRICE |
|---|---|
| Priority Mail ® Package/Thick Envelope | $9.94 |
| Tracking | $0.00 |
| Insurance (N/A) | |
| Return Receipt Cost | $2.85 |
| Subtotal | $19.44 |
| Label Quantity | 1 |
| Total Cost | $19.44 |