# Exhibit L

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| Wisconsin Voters Alliance, et al. | ) |
| *Plaintiff* | ) |
| v. | ) |
| Vice President Michael Richard Pence, et al. | ) |
| *Defendant* | ) |

Civil Action No.   20-cv-03791-JEB

## WAIVER OF THE SERVICE OF SUMMONS

To:   Erick G. Kaardal, plaintiffs' attorney
*(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____12/23/2020_____, the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date:   12/29/2020

*Governor Gretchen Whitmer*
*Printed name of party waiving service of summons*

*Heather S. Meingast*
*Signature of the attorney or unrepresented party*

Heather S. Meingast
*Printed name*

P.O. Box 30736
Lansing, MI 48909

*Address*

meingasth@michigan.gov
*E-mail address*

(517) 335-7659
*Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| Wisconsin Voters Alliance, et al. | ) |
| *Plaintiff* | ) |
| v. | ) |
| Vice President Michael Richard Pence, et al. | ) |
| *Defendant* | ) |

Civil Action No.   20-cv-03791-JEB

## WAIVER OF THE SERVICE OF SUMMONS

To:   Erick G. Kaardal, plaintiffs' attorney
*(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____12/23/2020_____ , the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date:   12/29/2020

                                                        *Heather S. Meingast*
                                                        *Signature of the attorney or unrepresented party*

Speaker Lee Chatfield                                   Heather S. Meingast
*Printed name of party waiving service of summons*       *Printed name*

                                                        P.O. Box 30736
                                                        Lansing, MI 48909

                                                        *Address*

                                                        meingasth@michigan.gov
                                                        *E-mail address*

                                                        (517) 335-7659
                                                        *Telephone number*

---

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| Wisconsin Voters Alliance, et al. | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.   20-cv-03791-JEB |
| Vice President Michael Richard Pence, et al. | ) |
| *Defendant* | ) |

## WAIVER OF THE SERVICE OF SUMMONS

To:   Erick G. Kaardal, plaintiffs' attorney
*(Name of the plaintiff's attorney or unrepresented plaintiff)*

     I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

     I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

     I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

     I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from     12/23/2020    , the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date:    12/29/2020

                      *Heather S. Meingast*
              *Signature of the attorney or unrepresented party*

        Senator Mike Shirkey                      Heather S. Meingast
*Printed name of party waiving service of summons*             *Printed name*
                                         P.O. Box 30736
                                         Lansing, MI 48909

                                            *Address*

                            meingasth@michigan.gov
                                       *E-mail address*

                               (517) 335-7659
                                      *Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

     Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

     "Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

     If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

     If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
### for the
## District of Columbia

Wisconsin Voters Alliance et al.,

_____
Plaintiff )
v. )
Vice President Michael Richard Pence, et al., )
_____
Defendant )

Civil Action No. 20-CV-03791-JEB

## WAIVER OF THE SERVICE OF SUMMONS

To: Erick G. Kaardal
_____
*(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____, the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: 1/5/21

SEN. RICK GRAY
_____
*Printed name of party waiving service of summons*

_____
*Signature of the attorney or unrepresented party*

GREG JERNIGAN
_____
*Printed name*

ARIZONA STATE SENATE
1700 W. WASHINGTON
PHOENIX, AZ 85007
_____
*Address*

gjernigan@azleg.gov
_____
*E-mail address*

602-926-4731
_____
*Telephone number*

---

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

# Exhibit M



**Twin City Process Service, LLC**

5416 Jefferson Court
St. Paul, MN  55110

Phone:  651.251.8078
www.tcprocess.net

January 11, 2021

Mohrman & Kaardal, P.A.
150 S. 5th St., #3100
Minneapolis, MN 55402
Ordered By: Erick Kaardal

**Firm File#**  Wisconsin Voters Alliance USDC                    Invoice#28140

**Billing Information:**
1/5/21

Rush Service, Printing, Address Research

Arizona Governor Doug Ducey

Speaker Russell Bowers

Senate Majority Rick Gray


**Total: $425.00**


Thank You for Using Twin City Process Service, LLC for your Legal Support Needs.  We look forward to working with you further.



# Twin City Process Service, LLC

5416 Jefferson Court
St. Paul, MN  55110

Phone:  651.251.8078
www.tcprocess.net

---

December 27, 2020

Mohrman & Kaardal, P.A.
150 S. 5th St., #3100
Minneapolis, MN 55402
Ordered By: Erick Kaardal

Invoice#28138

**Firm File#**  Wisconsin Voters Alliance USDC

**Billing Information:**
12/22/20

Service on Vice President Pence as President of the US Senate through the U.S Attorney.
12/23/20

Service on U.S. House of Representatives through the U.S Attorney. 12/23/20

Service on the Electoral College through the U.S Attorney. 12/23/20

Service on  the U.S Attorney. 12/23/20

Rush

**Total: $405.00**

Thank You for Using Twin City Process Service, LLC for your Legal Support Needs.  We look
forward to working with you further.

**Maddox & Harding, LLC**
113 E. Solomon Street
Griffin, Georgia 30223
United States
(770) 229-4578

# Maddox & Harding, LLC

**DC Suit**

| | |
|---|---|
| **Balance** | $400.00 |
| **Invoice #** | 01378 |
| **Invoice Date** | January 12, 2021 |
| **Payment Terms** | |
| **Due Date** | |

**DC Suit**

**Securely pay online with your credit card**

 https://maddox-harding-llc.mycase.com/x5jpfcm6

## Expenses

| DATE | EE | ACTIVITY | DESCRIPTION | COST | QUANTITY | LINE TOTAL |
|---|---|---|---|---|---|---|
| 12/28/2020 | SN | Service Fee | DC Suit - Service Fee - Allison Cain | $400.00 | 1.0 | $400.00 |
| | | | | | Expense Total: | **$400.00** |

| | |
|---|---|
| Expense Sub-Total: | $400.00 |
| **Sub-Total:** | $400.00 |
| **Total:** | $400.00 |
| **Amount Paid:** | $0.00 |
| **BALANCE DUE:** | **$400.00** |

**CSI**
Investigation
Risk Management

3045 BRODHEAD ROAD
MONACA, PA 15061
PHONE:    (724) 775-3577
FAX:      (724) 775-3599
www.csiinvestigators.com

December 30, 2020

Dillon McCandless King Coulter & Graham L.L.P. -Butler Offic
128 West Cunningham Street
Butler, PA 16001
ATTN Jordan P. Shuber

CASE #2020-1686 Wisc. Votors Alliance, et al. v VP Pence, et al.
(To ensure proper credit, please reference our case #2020-1686 on your check)

Invoice #59716

Professional Services

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 12/23/2020<br>NLS | Coordinate service upon AG Shapiro, Gov. Wolf and the PA HOR and Senate; discuss with investigators and client, prepare documents for service | 1.00<br>95.00/hr | 95.00 |
| 12/24/2020<br>JS | Attempted calls/messages placed to offices of Shapiro, Cutler, and Corman to obtain service details; Comprehensive database reports compiled on Shapiro, Cutler, and Corman for home addresses; Telephone correspondence with General Attorney office; Email update to lead investigator regarding service for Shapiro; Research to locate additional contact information, emails for Cutler and Corman; Email placed to office of Cutler; Correspondence with lead investigator for research update; Prepare documents to ship to Attorney General Civil Law Division on behalf of Shapiro | 2.50<br>95.00/hr | 237.50 |
| NLS | Inquiries to government offices; email service documents to Attorney General Shapiro and Governor Wolf; updates with field investigators; updates to client | 1.50<br>95.00/hr | 142.50 |
| WDH | Coordinate service, assistance to Inv. Stanec, discuss with client | 1.50<br>95.00/hr | 142.50 |
| NLS | FEE: Copy and administrative fees |  | 180.00 |
| 12/29/2020<br>JS | Proofs of service for Wolf and Shapiro | 0.50<br>95.00/hr | 47.50 |
| NLS | Proofs of service, email to clients | 0.25<br>95.00/hr | 23.75 |
| NLS | FEE: Personally serve AG Shapiro; Cutler; and Corman |  | 210.00 |

Dillon McCandless King Coulter & Graham L.L.P. -Butler Offic

Page    2

|  | Hrs/Rate | Amount |
|---|---|---|
| 12/29/2020 FEE: Additional printing fees<br>NLS |  | 176.00 |
| TOTAL AMOUNT OF THIS INVOICE | 7.25 | $1,254.75 |
| BALANCE DUE UPON RECEIPT |  | $1,254.75 |

*WE ACCEPT MASTERCARD AND VISA CREDIT CARD PAYMENTS*

**Please place our case and/or invoice number on your check and make check payable to
CSI Corporate Security & Investigations, LLC**

For questions, contact Linda Battisti  (724) 775-3577.
Federal ID #25-1699532.

**Finance charge of 1.5% per month, which is an Annual Percentage Rate of 18% is charged on all past due
accounts. Payment is due 30 days upon Invoice Date.**



## Twin City Process Service, LLC

5416 Jefferson Court
St. Paul, MN  55110

Phone:  651.251.8078
www.tcprocess.net

---

December 27, 2020

Mohrman & Kaardal, P.A.
150 S. 5th St., #3100
Minneapolis, MN 55402
Ordered By: Erick Kaardal

Invoice#28139

**Firm File#**  Wisconsin Voters Alliance USDC

**Billing Information:**
12/22/20

Rush
Service on Tony Evers Gov. of Wisconsin through the Wisconsin Attorney General
12/23/20

Service on Speaker Robin Vos of the Wisconsin State Assembly through the Wisconsin
Attorney General 12/23/20

Service on Senate Majority Leader Howard Marklein of the Wisconsin Senate through the
Wisconsin Attorney General 12/23/20

**Total: $245.00**

Thank You for Using Twin City Process Service, LLC for your Legal Support Needs.  We look
forward to working with you further.



## Twin City Process Service, LLC

5416 Jefferson Court
St. Paul, MN  55110

Phone:  651.251.8078
www.tcprocess.net

January 4, 2021

Mohrman & Kaardal, P.A.
150 S. 5th St., #3100
Minneapolis, MN 55402
Ordered By: Erick Kaardal

Invoice#28148

**Firm File#**  Wisconsin Voters Alliance USDC

**Billing Information:**
1/4/21

Service on Governor Tony Evers by email per instructions from his office.1/4/21

**Total: $65.00**

Thank You for Using Twin City Process Service, LLC for your Legal Support Needs.  We look forward to working with you further.



# Twin City Process Service, LLC

5416 Jefferson Court
St. Paul, MN  55110

Phone:  651.251.8078
www.tcprocess.net

January 12, 2021

Mohrman & Kaardal, P.A.
150 S. 5th St., #3100
Minneapolis, MN 55402
Ordered By: Erick Kaardal

Invoice#28149

**Firm File#**  Wisconsin Voters Alliance USDC

**Billing Information:**
1/4/21

Service on Senate Majority Leader Howard Marklein 12/31/20

**Total: $250.00**

Thank You for Using Twin City Process Service, LLC for your Legal Support Needs.  We look forward to working with you further.



**Twin City Process Service, LLC**

5416 Jefferson Court
St. Paul, MN  55110

Phone:  651.251.8078
www.tcprocess.net

January 12, 2021

Mohrman & Kaardal, P.A.
150 S. 5th St., #3100
Minneapolis, MN 55402
Ordered By: Erick Kaardal

Invoice#28157

**Firm File#**  Wisconsin Voters Alliance USDC

**Billing Information:**
12/22/20

Rush, Printing, Address Research

Service on Tony Evers Gov. of Wisconsin

Service on Speaker Robin Vos of the Wisconsin State Assembly

**Total: $350.00**

Thank You for Using Twin City Process Service, LLC for your Legal Support Needs.  We look
forward to working with you further.

# Exhibit N

Copyright 2015 by Michael T. Morley

Printed in U.S.A.
Vol. 109, No. 3

# THE INTRATEXTUAL INDEPENDENT "LEGISLATURE" AND THE ELECTIONS CLAUSE[†]

*Michael T. Morley*

**ABSTRACT**—Many states have delegated substantial authority to regulate federal elections to entities other than their institutional legislatures, such as independent redistricting commissions empowered to determine the boundaries of congressional districts. Article I's Elections Clause and Article II's Presidential Electors Clause, however, confer authority to regulate federal elections specifically upon State "legislatures," rather than granting it to States as a whole. An intratextual analysis of the Constitution reveals that the term "legislature" is best understood as referring solely to the entity within each state comprised of representatives that has the general authority to pass laws. Thus, state constitutional provisions or laws creating independent redistricting commissions that purport to limit a state legislature's power to draw congressional districts or otherwise regulate federal elections violate the Elections Clause.

**AUTHOR**—Assistant Professor, Barry University School of Law. Climenko Fellow and Lecturer on Law, Harvard Law School, 2012–2014; J.D., Yale Law School, 2003; A.B., Princeton University, 2000. Special thanks to Dr. Ryan Greenwood of the University of Minnesota Law Library, as well as Louis Rosen of the Barry Law School library, for their invaluable assistance in locating historical sources. I also am grateful to Terri Day, Dean Leticia Diaz, Frederick B. Jonassen, Derek Muller, Eang Ngov, Richard Re, Seth Barrett Tillman, and Franita Tolson for their comments and suggestions. I was invited to present some of the arguments from this Essay in an amicus brief on behalf of the Coolidge-Reagan Foundation in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, No. 14-1314 (U.S. 2014). I appreciate the superb editing of the staffs of the *Northwestern University Law Review* and *Northwestern University Law Review Online*.

[†] This Essay was originally published in the *Northwestern University Law Review Online* on January 19, 2015, 109 NW. U. L. REV. ONLINE 131 (2015), http://www.northwesternlawreview.org/online/intratextual-independent-"legislature"-and-elections-clause-0 [http://perma.cc/PWD8-AJWY].

NORTHWESTERN UNIVERSITY LAW REVIEW

INTRODUCTION ........................................................................................................ 848

I.   IN DEFENSE OF AN INTRATEXTUAL APPROACH .......................................... 852

II.  INTRATEXTUALISM AND THE ELECTIONS CLAUSE .......................................... 855

     A.   Discussions of Legislatures ................................................................. 855

     B.   Provisions That Distinguish Between Legislatures and Other State
          Personnel and Entities........................................................................ 857

     C.   References to Quasi-Legislative or Nonlegislative Powers ........................... 857

     D.   References to Legislative Authority ............................................... 860

III. CONFIRMING THE INTRATEXTUAL CONCLUSION ...................................... 863

     A.   Original Understanding ..................................................................... 863

     B.   The Independent State Legislature Doctrine ................................. 866

CONCLUSION ......................................................................................................... 868

INTRODUCTION

The Elections Clause of the U.S. Constitution is the Swiss army knife of federal election law. Ensconced in Article I, it provides, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof; but the Congress may at any time by Law make or alter such Regulations."[1] Its Article II analogue, the Presidential Electors Clause, similarly specifies that "[e]ach State shall appoint, in such Manner as the *Legislature* thereof may direct, a Number of Electors" to select the President.[2] The concise language of these clauses performs a surprisingly wide range of functions implicating numerous doctrines and fields beyond voting rights, including statutory interpretation,[3] state separation of powers and other areas of state constitutional law,[4] federal court deference to state court rulings,[5]

_____

[1] U.S. CONST. art. I, § 4, cl. 1 (emphasis added).

[2] *Id.* art. II, § 1, cl. 2 (emphasis added).

[3] Bush v. Gore, 531 U.S. 98, 112–13 (2000) (Rehnquist, C.J., concurring) (concluding that, because the Constitution delegates plenary authority over presidential elections to state legislatures, "the text of [an] election law itself . . . takes on independent significance"); *id.* at 130 (Souter, J., dissenting) ("The issue is whether . . . the law as declared by the [state] court [is] different from the provisions made by the [state] legislature, to which the National Constitution commits responsibility for determining how each State's Presidential electors are chosen[.]").

[4] *See* McPherson v. Blacker, 146 U.S. 1, 25 (1892) (holding that the Presidential Electors Clause "operat[es] as a limitation upon the State in respect of any attempt to circumscribe the legislative power" to regulate federal elections, including through "any provision in the state constitution in that regard"); *cf. Bush*, 531 U.S. at 112 (Rehnquist, C.J., concurring) (recognizing that the Presidential Electors Clause is among the "few exceptional cases in which the Constitution imposes a duty or confers a power on a particular branch of a State's government").

[5] Bush v. Palm Beach Cnty. Canvassing Bd., 531 U.S. 70, 76 (2000) (per curiam) ("As a general

848

administrative discretion,[6] and preemption.[7]

States lack inherent power to regulate federal elections. Thus, when a state does so, it is acting "by virtue of a direct grant of authority" under the Elections Clause or Presidential Electors Clause.[8] These constitutional provisions are "express delegations of power"[9] that confer upon state legislatures the authority to "provide a complete code" for federal elections, including but not limited to laws concerning "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns."[10]

At first blush, the meaning of the term "legislature" in the Elections Clause and Presidential Electors Clause appears quite clear: it refers to the entity within each state comprised of elected representatives that enacts statutes. The Supreme Court, however, has taken a somewhat different view. In *Ohio ex rel. Davis v. Hildebrant*, the Court held that the Elections Clause allows a state's citizens to use the referendum process established by the state constitution to nullify a law enacted by the legislature concerning federal redistricting.[11] It tersely rejected the argument that the state legislature had exclusive power under the Elections Clause to enact or repeal laws governing congressional elections, dismissing it as "plainly without substance."[12] *Hildebrant* permits a state to enact laws concerning congressional elections through any process that the state constitution includes within the state's "legislative power," even if the state legislature

---

rule, this Court defers to a state court's interpretation of a state statute. But in the case of a [state] law . . . applicable . . . to the selection of Presidential electors, the legislature is . . . acting . . . by virtue of a direct grant of authority made under [the Presidential Electors Clause] of the United States Constitution.").

[6] *See* Libertarian Party of Ohio v. Brunner, 567 F. Supp. 2d 1006, 1012 & n.2 (S.D. Ohio 2008) (holding that a directive from the Ohio Secretary of State concerning minor party candidates was unconstitutional because it "purport[ed] to create new law" and, under the Elections Clause, "the Secretary of State, a member of the executive branch of government, has no authority independent of the Ohio General Assembly to direct the method of the appointment of . . . federal officials").

[7] Arizona v. Inter Tribal Council of Ariz., Inc., 133 S. Ct. 2247, 2253–54 (2013) (holding that federal laws passed under the Elections Clause are not subject to the traditional presumption against preemption).

[8] *Palm Beach*, 531 U.S. at 76; *accord* Cook v. Gralike, 531 U.S. 510, 523 (2001) ("[T]he States may regulate the incidents of [congressional] elections . . . only within the exclusive delegation of power under the Elections Clause.").

[9] U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 805 (1995).

[10] Smiley v. Holm, 285 U.S. 355, 366 (1932). For a compelling discussion of the debates in the Constitutional Convention concerning the Elections Clause, as well as the Supreme Court's history of interpreting it, see Franita Tolson, *Reinventing Sovereignty?: Federalism as a Constraint on the Voting Rights Act*, 65 VAND. L. REV. 1195, 1220–33 (2012).

[11] 241 U.S. 565, 569–70 (1916).

[12] *Id.* at 569.

NORTHWESTERN UNIVERSITY LAW REVIEW

itself is not involved.[13]

The Supreme Court explored the issue in greater depth in *Smiley v. Holm*, in which it permitted a state governor to veto a federal redistricting bill passed by the state legislature because the state constitution included vetoes as part of the legislative process.[14] It explained that a legislature's exercise of its power under the Elections Clause to enact laws governing congressional elections "must be in accordance with the method which the State has prescribed for legislative enactments."[15] The Court added, "We find no suggestion in the [Elections Clause] of an attempt to endow the legislature of the State with power to enact laws in any manner other than that in which the constitution of the State has provided that laws shall be enacted."[16]

The scope of the Elections Clause is again before the Supreme Court in *Arizona State Legislature v. Arizona Independent Redistricting Commission*.[17] Arizona voters passed a state constitutional amendment through the initiative process to "remove[] congressional redistricting authority from the Legislature and vest[] that authority in a new entity, the Arizona Independent Redistricting Commission ('IRC')."[18] A three-judge panel of the U.S. District Court for the District of Arizona upheld the IRC's constitutionality because "*Hildebrant* and *Smiley* . . . demonstrate that the word 'Legislature' in the Elections Clause refers to the legislative process used in [a] state, determined by that state's own constitution and laws,"[19] rather than the institutional legislature itself. The Elections Clause therefore "does not prohibit a state from vesting the power to conduct congressional districting" in an entity other than the state legislature, such as Arizona's redistricting commission.[20]

*Arizona Independent Redistricting Commission* is poised to be the Supreme Court's first holding about whether a state's institutional legislative body may be wholly stripped of its powers concerning federal redistricting, if not federal elections altogether.[21] The immediate effects of

---

[13] *Id.* at 568–69.

[14] 285 U.S. 355, 368.

[15] *Id.* at 367.

[16] *Id.* at 367–68.

[17] 997 F. Supp. 2d 1047 (D. Ariz. 2014), *cert. granted*, 135 S. Ct. 46 (2014).

[18] *Id.* at 1048.

[19] *Id.* at 1054.

[20] *Id.* at 1056.

[21] The Court has already stated in dicta that a state may permit entities other than the legislature itself to redraw congressional districts. Chapman v. Meier, 420 U.S. 1, 27 (1975) ("[R]eapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court."); *see also* Growe v. Emison, 507 U.S. 25, 34 (1993).

850

its ruling will reverberate far beyond Arizona, as six other states have transferred authority to determine congressional district boundaries to an entity other than the institutional legislature[22] More broadly, this case will revisit the meaning of the term legislature as used in the Elections Clause (and, by extension, Article II's Presidential Electors Clause), confirming whether it actually refers to: the legislature alone; the legislature *plus* whatever other processes or entities a state constitution includes within the lawmaking process; or any process or entity that a state constitution vests with legislative power over federal elections, to the potential exclusion of the institutional legislature.

This Essay contends that the term legislature should be interpreted in accordance with its plain meaning, as referring solely and exclusively to the multimember body of representatives within each state generally responsible for enacting its laws.[23] This conclusion becomes especially clear through an intratextual approach to the Elections Clause.

Part I of this Essay introduces the intratextual method of constitutional interpretation, explaining how the Constitution's repeated use of a term often provides a wealth of context from which a court may discern the term's meaning. Part II offers an intratextual interpretation of the Elections Clause, examining how each of the other contexts in which the Constitution uses the term legislature demonstrates that it refers to a specific institution. In fact, the Supreme Court itself employed an intratextual analysis in *Hawke v. Smith* to conclude that Article V permits a state to ratify a constitutional amendment only through a vote of its institutional legislature (or a specially called convention), not a public referendum.[24]

Part III shows that this understanding is confirmed by both a traditional textualist approach to the term, as well as the "independent state

---

[22] *Redistricting Commissions and Alternatives to the Legislature Conducting Redistricting*, NAT'L CONF. ST. LEGISLATURES, http://www.ncsl.org/research/redistricting/redistricting-commissions.aspx [http://perma.cc/R298-YKDT]; *see also* CAL. CONST. Art. XXI.

[23] Much academic debate on this issue has focused on whether the Presidential Electors Clause allows a state's citizens to change the state's method for allocating presidential electors from winner-take-all to a proportional system through a public initiative. *See, e.g.*, Vikram David Amar, *Direct Democracy and Article II: Additional Thoughts on Initiatives and Presidential Elections*, 35 HASTINGS CONST. L.Q. 631 (2008) (defending the use of ballot initiatives to change state laws governing presidential elections); Richard L. Hasen, *When "Legislature" May Mean More Than "Legislature": Initiated Electoral College Reform and the Ghost of* Bush v. Gore, 35 HASTINGS CONST. L.Q. 599, 629 (2008) ("A strict textual view suggests that initiated reform is unconstitutional; case law and policy arguments show the question is more uncertain. Reasonable judges could reach opposite conclusions on the question."); Nicholas P. Stabile, Comment, *An End Run Around a Representative Democracy? The Unconstitutionality of a Ballot Initiative to Alter the Method of Distributing Electors*, 103 NW. U. L. REV. 1495 (2009) (arguing that the debates in the Constitutional Convention and historical practice establish that institutional legislatures have sole power to determine the manner in which a state will allocate its presidential electors among various candidates).

[24] 253 U.S. 221, 227–28 (1920).

legislature" doctrine.[25] This Essay briefly concludes that adopting an intratextual approach to the term legislature—one informed by both traditional textualism and the independent state legislature doctrine—would help the *Arizona Independent Redistricting Commission* Court reach the most accurate understanding of the Elections Clause.

## I. IN DEFENSE OF AN INTRATEXTUAL APPROACH

Intratextualism counsels that the Constitution's use of "strongly parallel language [in different places] is a strong (presumptive) argument for parallel interpretation" of that language.[26] This approach urges a reader interpreting "a contested word or phrase that appears in the Constitution" to consider its meaning as it appears in other passages.[27] "[T]extually nonadjoining clauses" of the Constitution should be placed "side by side for careful analysis," to ensure that a proposed interpretation of a term makes sense in the various contexts in which the Constitution deploys it.[28]

Akhil Amar identifies three main types of intratextual arguments. First, when attempting to determine the meaning of a word in a particular clause, other constitutional provisions can "serve[] a basic dictionary function" by "illustrat[ing] [its] usage."[29] Second, a reader also may arrive at the "best" interpretation of a term by determining the meaning that would fit best with its usage throughout the Constitution.[30] Finally, when entire clauses are structured identically to each other, with only one or two key words changed, they generally should be read *in pari materia* and interpreted consistently.[31]

Amar contends that the "greatest virtue of intratextualism" is that "it takes seriously the document as a whole rather than as a jumbled grab bag of assorted clauses."[32] He explores the Court's long legacy of intratextual analysis,[33] including Chief Justice John Marshall's use of intratextualism in *McCulloch v. Maryland*[34] and Justice Joseph Story's use of it in *Martin v.*

---

[25] The independent state legislature doctrine provides that a state legislature is not bound by substantive restrictions or limits contained in a state constitution when exercising its power under the Elections Clause or Presidential Electors Clause to regulate federal elections. *See infra* Part III.B.

[26] Akhil Reed Amar, *Intratextualism*, 112 HARV. L. REV. 747, 789 (1999).

[27] *Id.* at 748.

[28] *Id.* at 788.

[29] *Id.* at 791.

[30] *Id.* at 792–94.

[31] *Id.* at 794–95.

[32] *Id.* at 795.

[33] *Id.* at 755–58, 760–63.

[34] 17 U.S. (4 Wheat.) 316, 412 (1819).

852

*Hunter's Lessee*.[35] As mentioned earlier, in *Hawke v. Smith*, the Court adopted an intratextual approach to determine the meaning of the term legislature as it appears in Article V.[36] Academic commentators have also applied this technique to various constitutional provisions.[37]

Intratextual interpretation is not a mechanical process, however, as "certain chameleon words should sensibly mean different things in different clauses."[38] When the Constitution uses a word differently in different contexts, intratextualism can lead to misleading results.[39] Moreover, "[c]arried to extremes, intratextualism may lead to readings that are too clever by half—cabalistic overreadings conjuring up patterns that were not specifically intended and that are upon deep reflection not truly sound."[40] Thus, intratextualism should be used to "suggest possible readings" or "generate interpretative leads and clues" that must be assessed through "other tools of interpretation," not to "dictate results."[41]

Adrian Vermeule and Ernest A. Young offer a powerful critique of intratextualism, questioning its premise that the Constitution should be given a consistent, uniform interpretation. They point out that the document may lack internal consistency because its "component provisions were enacted at different times, in different circumstances, and for different reasons."[42] Even the text of the original, unamended Constitution is the result of numerous "tradeoffs, political battles won and lost, and

---

[35]  14 U.S. (1 Wheat.) 304, 328–34 (1816). For a more recent example of the Court applying intratextual analysis, see *District of Columbia v. Heller*, 554 U.S. 570, 579 (2008), in which the Court interpreted the phrase "right of the people" as used in the Second Amendment to protect an individual right to bear arms, because the Constitution's three other uses of that phrase "unambiguously refer to individual rights."

[36]  253 U.S. 221, 227–28 (1920).

[37]  *E.g.*, Steven G. Calabresi & Gary Lawson, *The Unitary Executive, Jurisdiction Stripping, and the* Hamdan *Opinions: A Textualist Response to Justice Scalia*, 107 COLUM. L. REV. 1002, 1021–22 (2007) (applying intratextualism to interpret the words "inferior" and "supreme" with regard to courts); Bradford R. Clark, *Federal Lawmaking and the Role of Structure in Constitutional Interpretation*, 96 CALIF. L. REV. 699, 725 (2008) (same for the word "treaties"); Vasan Kesavan, *Is the Electoral Count Act Unconstitutional?*, 80 N.C. L. REV. 1653, 1757–58 (2002) (same for congressional authority to regulate Presidential elections); Saikrishna Prakash, *Our Three Commerce Clauses and the Presumption of Intrasentence Uniformity*, 55 ARK. L. REV. 1149, 1172 (2003) (applying an intratextual comparison of the Interstate, Foreign, and Indian Commerce Clauses). For articles where intratextualism was deemed insufficient to support a particular interpretation, see Calvin Massey, *Federalism and the Rehnquist Court*, 53 HASTINGS L.J. 431, 493–94 (2002), and Michael Stokes Paulsen, *The Plausibility of Personhood*, 74 OHIO ST. L.J. 13, 39 (2013).

[38]  Amar, *supra* note 26, at 793; *accord id.* at 799.

[39]  *E.g.*, Adrian Vermeule, *Three Commerce Clauses? No Problem*, 55 ARK. L. REV. 1175, 1181 (2003); Adrian Vermeule & Ernest A. Young, *Hercules, Herbert, and Amar: The Trouble with* Intratextualism, 113 HARV. L. REV. 730, 767–68 (2000).

[40]  Amar, *supra* note 26, at 799.

[41]  *Id.*

[42]  Vermeule & Young, *supra* note 39, at 731; *accord* Clark, *supra* note 37, at 723.

compromised ideals."[43] Rather than an integrated document springing from a single author, it is the product of a body of people disagreeing, compromising, and amending each other's work. It is highly unlikely that the dozens of men who contributed to its writing all used important terms consistently.[44]

Moreover, because intratextualism requires judges to interpret a term as it appears in numerous constitutional provisions, this approach may unduly tax their "time, information, and expertise;" lead to more errors; and allow for more subjectivity than a clause-bound method of interpretation.[45] Intratextualism is more indeterminate and manipulable than clause-bound textualism, because it does not offer interpretive guidance when a term's apparent meaning based on a single clause in isolation differs from its apparent meaning based on other clauses in which it appears. Thus, a reader still must choose among competing interpretations using a theory or process other than intratextualism itself.[46] William Treanor, further critiquing intratextualism from an originalist perspective, adds that it is "unreliable" because it "privileges a small subset of contemporaneous usages (those in the constitutional document) over the larger body of relevant contemporaneous usages."[47]

At a minimum, intratextualism provides a useful data point for courts to consider in determining the meaning of a disputed term, and would be especially useful for the Supreme Court in interpreting the meaning of legislature in the Elections Clause and Presidential Electors Clause. The term is concrete and reasonably susceptible of only a limited number of definitions. Moreover, it does not appear to lend itself to the type of compromise or mutually inconsistent understandings to which other, more general language might be subject.

Additionally, the original, unamended Constitution uses legislature on several different occasions, thereby avoiding the issue of whether subsequent constitutional amendments employ it in the same manner. As

---

[43] Vermeule & Young, *supra* note 39, at 742.

[44] *See* Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539, 610 (1842) (contending that because many of the Constitution's provisions "were matters of compromise of opposing interests and opinions[,] . . . no uniform rule of interpretation can be applied to it").

[45] Vermeule & Young, *supra* note 39, at 731; *see also* Cass R. Sunstein & Adrian Vermeule, *Interpretation and Institutions*, 101 MICH. L. REV. 885, 941 (2003).

[46] Michael J. Gerhardt, *The Utility and Significance of Professor Amar's Holistic Reasoning*, 87 GEO. L.J. 2327, 2330 (1999) (book review) (concluding that intratextualism "provides an almost limitless array of possible interpretations or readings and posits no standard for measuring or choosing among plausible interpretations").

[47] William Michael Treanor, *Taking Text Too Seriously: Modern Textualism, Original Meaning, and the Case of Amar's* Bill of Rights, 106 MICH. L. REV. 487, 523–24 (2007).

Part II demonstrates, the numerous other constitutional clauses that use the term all refer to a state's sole lawmaking body comprised of elected representatives, rather than some broader conception of the word. This consistent pattern of usage creates a strong presumption that the Elections Clause and Presidential Electors Clause employ it in the same fashion. And, as discussed in Part III, the results of this intratextual analysis can be corroborated by both a plain meaning interpretation as well as the longstanding independent state legislature doctrine. Even if the constraints under which many judges operate may prevent them from using intratextualism effectively, the Supreme Court can devote sufficient time and attention to a case such as *Arizona Independent Redistricting Commission* to make intratextualism an appropriate and useful strategy.

## II.   Intratextualism and the Elections Clause

The Constitution contains numerous references to state legislatures that may be used to elucidate that term's meaning as it appears in the Elections Clause (and, by extension, the Presidential Electors Clause). These references may be divided into four groups: (i) those that discuss features of a legislature; (ii) those that distinguish between a state legislature and other state personnel or entities; (iii) those that confer quasi-legislative or nonlegislative powers upon legislatures; and (iv) those, such as the Elections Clause and Presidential Electors Clause, that confer legislative authority over certain subjects upon the legislature.

The text, context, original understanding, and consistent history of interpretation of the Constitution's first three types of references to the term legislature demonstrate that it is best understood as referring to a state's general lawmaking body of elected representatives, rather than a broader legislative power[48] or other entities upon which a state's constitution may attempt to confer a portion of that legislative power. These provisions create a strong, and ultimately insurmountable, presumption that the same meaning should be attributed to the term as it appears in the fourth category of clauses: those such as the Elections Clause and Presidential Electors Clause that grant state legislatures the power to enact certain types of laws.

### A.   Discussions of Legislatures

Several constitutional provisions' usage of the term legislature reveals that a legislature contains certain characteristics. For example, Article VI's Oath Clause requires that "Members of the several State Legislatures . . . be

---

[48] *Cf.* Ohio *ex rel.* Davis v. Hildebrant, 241 U.S. 565, 568–69 (1916).

bound by Oath or Affirmation, to support th[e] Constitution."[49] This provision contemplates that a state legislature will have members. And its requirement that such members pledge to uphold the federal Constitution is best understood as referring to individuals who belong to a particular lawmaking institution within a state, rather than members of some overarching legislative power that conceivably encompasses the entire voting public.

Similarly, Article I's Qualifications Clause provides that a person may vote for the U.S. House of Representatives if he possesses "the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."[50] This provision treats the legislature as an entity that presumptively features multiple branches and is comprised of representatives chosen by voters.

Article I's Senate Vacancies Clause (which has been superseded by the Seventeenth Amendment) states that, if a vacancy occurs in the U.S. Senate "during the Recess of the Legislature of any State," the state executive may make a temporary appointment "until the next Meeting of the Legislature."[51] Yet again, this provision contemplates the existence of an institutional legislature whose members periodically meet and which may be called into recess. Finally, the Domestic Violence Clause in Article IV provides that, "on Application of the [state] Legislature, or of the [state] Executive (when the Legislature cannot be convened)," the federal government shall protect a state against "domestic Violence."[52] This further corroborates the constitutional image of a legislature as a multimember body that periodically convenes and adjourns.

Thus, every clause that gives some insight into the nature of a legislature uses the term to refer to a particular institution within each state that contains members, is presumptively comprised of multiple branches, periodically convenes and meets for limited periods of time, and then enters into recess.

---

[49] U.S. CONST. art. VI, cl. 3. The Fourteenth Amendment contains similar references. Section 2 imposes penalties on states that deny the right to vote, including in elections for "members of the legislature." *Id.* amend. XIV, § 2. Section 3 prohibits a person from serving as a federal official who, while "a member of any state legislature," engages in "insurrection or rebellion" against the United States unless Congress removes the disability by a two-thirds vote. *Id.* amend. XIV, § 3.

[50] *Id.* art. I, § 2, cl. 1. The Seventeenth Amendment contains identical language concerning U.S. Senate elections. *Id.* amend. XVII, § 1.

[51] *Id.* art. I, § 3, cl. 2.

[52] *Id.* art. IV, § 4.

### B.  *Provisions That Distinguish Between Legislatures and Other State Personnel and Entities*

Several other constitutional provisions expressly distinguish between legislatures (and their members) and other state officials and entities. For example, as discussed above, the Oath Clause requires "Members of the several State Legislatures, and all executive and judicial Officers . . . of the several States" to take an oath or affirmation to support the Constitution.[53] Likewise, the Senate Vacancies Clause provides that, if a vacancy occurs while the "Legislature of any State" is in recess, "the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies."[54] And the Domestic Violence Clause requires the federal government to protect a state "against domestic Violence" upon "Application of the Legislature, or of the Executive (when the Legislature cannot be convened)."[55] These provisions all distinguish between the state legislature and the state executive (or state executive officials). This juxtaposition of different branches suggests that, just as references to a state's executive are best construed as referring to its governor, references to a state's legislature are best construed as referring to its main lawmaking body comprised of elected representatives.

Even more telling is Article V, which specifies that a proposed constitutional amendment may be ratified either by "the Legislatures" or "Conventions" in three-fourths of the States, depending on the mode of ratification authorized by Congress.[56] This clause demonstrates that, when the Framers wished to authorize action by the people independent of their institutional legislatures, they knew how to do so. Article V further bolsters the conclusion that the term legislature refers exclusively to the particular institution within a state that exercises its general lawmaking authority.

### C.  *References to Quasi-Legislative or Nonlegislative Powers*

Numerous constitutional provisions confer authority on state legislatures other than the power to enact certain types of laws. The Constitution grants them the power to choose U.S. Senators (since repealed by the Seventeenth Amendment);[57] "fill" Senate vacancies;[58] "call" for a

---

[53] *Id.* art. VI, cl. 3. Provisions of the Fourteenth Amendment discussed above reprise this list of State officials. *See supra* note 49.

[54] *Id.* art. I, § 3, cl. 2. The Seventeenth Amendment's vacancy provisions likewise distinguish between the state legislature and the state's "executive authority." *Id.* amend. XVII, § 2.

[55] *Id.* art. IV, § 4.

[56] *Id.* art. V.

[57] *Id.* art. I, § 3, cl. 1.

[58] *Id.* art. I, § 3, cl. 2; *cf. id.* amend. XVII, § 2.

convention for proposing amendments to the Constitution;[59] "[a]ppl[y]" for the federal government's "protect[ion] . . . against domestic Violence;"[60] "ratif[y]" proposed amendments to the Constitution;[61] and "[c]onsent" to the formation of new states,[62] or to the federal government's purchase and exercise of exclusive authority over land within the state for the erection of military facilities, docks, and other "needful Buildings."[63]

For most, if not all, of these provisions, the Framers' debates over the Constitution further confirm that they exclusively empower institutional legislatures to perform the specified acts. For example, as originally enacted, the Constitution directed state legislatures, rather than the electorate, to choose U.S. senators.[64] During the Constitutional Convention, John Dickinson moved that senators be elected by state legislatures for two reasons:

> 1. because the sense of the States would be better collected through their Governments; than immediately from the people at large. 2. because he wished the Senate to consist of the most distinguished characters . . . and he thought such characters more likely to be selected by the State Legislatures, than in any other mode.[65]

He later added that granting legislatures this power would help preserve the states as distinct entities and "produce that collision" between the federal and state governments, "which should be wished for in order to check each other."[66]

Throughout the ensuing debate, all delegates used the term legislature consistently, referring to a particular, well-understood entity within each

---

[59] *Id.* art. V.

[60] *Id.* art. IV, § 4.

[61] *Id.* art. V. Consistent with this provision, various constitutional amendments specify that they would not take effect unless ratified by a sufficient number of state "legislatures" within a specified period of time. *Id.* amend. XVIII, § 3; *id.* amend. XX, § 6; *id.* amend. XXII, § 2.

[62] *Id.* art. IV, § 3, cl. 1.

[63] *Id.* art. I, § 8, cl. 17.

[64] *Id.* art. I, § 3, cl. 1 (amended 1913). This provision's reference to legislatures was specifically intended to preclude the electorate from playing a direct role in selecting U.S. Senators. *See* U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 884 (1995) (Thomas, J., dissenting) ("In the context of congressional elections, the Framers obviously saw a meaningful difference between direct action by the people of each State and action by their state legislatures."); 2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION § 701, at 182 (Boston, Hilliard, Gray, & Co. 1833) (observing that the Framers unanimously voted for the Senate to be "chosen by the legislature of each state" rather than "by the people thereof"); *see also* THE FEDERALIST NO. 63, at 323 (James Madison) (Ian Shapiro ed., 2009) (distinguishing, in its discussion of the U.S. Senate, between "the State legislatures" and "the people at large").

[65] 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 150 (Max Farrand ed., 1911) [hereinafter FARRAND'S RECORDS] (Madison's Notes, Jun. 7, 1787) (statement of John Dickinson).

[66] *Id.* at 153 (Madison's Notes, Jun. 7, 1787) (statement of John Dickinson).

state.[67] Later in the convention, James Wilson reiterated:

> [O]ne branch of the Genl.—Govt. (the Senate or second branch) was to be appointed by the State Legislatures. The State Legislatures, therefore, by this participation in the Genl. Govt. would have an opportunity of defending their rights. . . . The States having in general a similar interest, in case of any proposition in the National Legislature to encroach on the State Legislatures, he conceived a general alarm [would] take place in the National Legislature itself, that it would communicate itself to the State Legislatures, and [would] finally spread among the people at large.[68]

Thus, in commenting on the selection of senators, Wilson expressly distinguished among a "State" as a whole, state legislatures, and "the people at large."[69]

Likewise, in discussing the Senate Vacancies Clause, the Framers' debates unmistakably concerned institutional legislatures: they discussed the relative frequency with which various states' legislatures met and the power of certain legislatures to select the state's governor.[70] The same is true of Article V's delegation of authority to state legislatures to call for a new constitutional convention and to ratify amendments to the Constitution.[71] As the Supreme Court recognized in *Hawke v. Smith*, legislature was "not a term of uncertain meaning when incorporated into the Constitution. What it meant when adopted it still means for the purpose of interpretation. A legislature was then the representative body which made the laws of the people."[72] The debates at the Constitutional Convention also confirm that the power to request federal assistance under the Domestic Violence Clause lies specifically in the institutional legislature.[73]

---

[67] For example, Roger Sherman urged that "elections by the people" are not as likely "to produce such fit men as elections by the State Legislatures." *Id.* at 154 (Madison's Notes, June 7, 1787) (statement of Roger Sherman). Elbridge Gerry similarly contended that allowing the people to select Senators directly would give the "landed interest" an advantage and leave commercial interests with "no security." *Id.* at 152 (Madison's Notes, June 7, 1787) (statement of Elbridge Gerry). Conferring that power on state legislatures, in contrast, would "be most likely to provide some check in favor of the commercial interest [against] the landed; without which oppression will take place." *Id.*

[68] *Id.* at 355–56 (Madison's Notes, June 21, 1787) (statement of James Wilson); *see also id.* at 366 (King's Notes, June 21, 1787) (statement of James Wilson).

[69] *Id.* at 355–56 (Madison's Notes, June 7, 1787) (statement of James Wilson).

[70] 2 The Records of the Federal Convention of 1787, at 231 (Max Farrand ed., 1911) (Madison's Notes, Aug. 9, 1787) (statement of James Wilson).

[71] U.S. Const. art. V.

[72] 253 U.S. 221, 227 (1920). The Court elaborated, "When [the Framers] intended that direct action by the people should be had they were no less accurate in the use of apt phraseology to carry out such purpose." *Id.* at 228; *see also* Nat'l Prohibition Cases, 253 U.S. 350, 386 (1920) ("The referendum provisions of state constitutions and statutes cannot be applied, consistently with the Constitution of the United States, in the ratification or rejection of amendments to it.").

[73] 2 Farrand's Records, *supra* note 65, at 316–17, 466–67 (Madison's Notes, Aug. 17, 1787,

### D.  References to Legislative Authority

The text, context, and Framers' original understanding of the numerous constitutional provisions referring to legislatures discussed above confirm that they uniformly refer to the specific institution within each state that is comprised of elected representatives and exercises general lawmaking authority. Compelling evidence is therefore necessary to conclude that the term has a different, unique, and unusual meaning as used in the Elections Clause and Presidential Electors Clause.

The Supreme Court previously held that the term legislature should be accorded a different meaning in the Elections Clause (and, by extension, the Presidential Electors Clause) because those provisions—unlike the Constitution's other references to legislatures—confer a type of traditionally *legislative* authority on state legislatures: the ability to enact laws regulating federal elections.[74] The Court never explained, however, why this somewhat different context requires a unique definition of legislature that differs from its use throughout the rest of the Constitution.

In *Ohio ex rel. Davis v. Hildebrant*, the Court held that the Elections Clause permitted Congress to enact a law authorizing states to draw or alter congressional districts through either state legislation or public referenda.[75] It rejected as "plainly without substance" a challenge to a state referendum that nullified a redistricting plan enacted by the Ohio legislature.[76] Despite the Court's single passing reference to the Elections Clause, however, it assumed that any constitutional challenge to the use of public referenda to regulate federal elections must arise under the Guarantee Clause.[77]

According to the Court, the Petitioners were arguing that a public referendum "introduce[s] a virus" that "annihilates representative government and causes a State . . . to be not republican in form."[78] It summarily rejected that argument on the grounds that Guarantee Clause

---

Aug. 30, 1787).

[74] Smiley v. Holm, 285 U.S. 355, 367 (1932) (holding that the language of the Elections Clause "aptly points to the making of laws"); *see also* Bush v. Gore, 531 U.S. 98, 123 n.1 (2000) (Stevens, J., dissenting) (stating that the Elections Clause and Presidential Electors Clause "call upon legislatures to act in a lawmaking capacity whereas [the Ratification Clause] simply calls on the legislative body to deliberate upon a binary decision"); Seth Barrett Tillman, *Betwixt Principle and Practice: Tara Ross's Defense of the Electoral College*, 1 N.Y.U. J. L. & LIBERTY 922, 925–26 (2005) (book review) (contending that the term legislature can "have a variety of meanings depending on context"). The Seventeenth Amendment also may be read in part as authorizing the enactment of legislation concerning the temporary appointment of U.S. Senators to fill vacancies. U.S. CONST. amend. XVII, § 2.

[75] 241 U.S. 565, 569 (1916).

[76] *Id.*

[77] *Id.* (discussing U.S. CONST. art. IV, § 4).

[78] *Id.*

claims are nonjusticiable.[79] Thus, while *Hildebrant* mentioned the Elections Clause, it neither held nor purported to explain why the electorate or a public referendum qualifies as a legislature under the Elections Clause. Rather, the *Hildebrant* Court failed to recognize that a distinct Elections Clause claim existed, and instead transmuted the plaintiff's claim under that provision into a nonjusticiable Guarantee Clause argument.

In *Hawke v. Smith*, the Court held that the term legislature in the Article V Amendment Clause refers exclusively to "the representative body which ma[kes] the laws of the people."[80] The Court distinguished *Hildebrant* by contending that the case held the Elections Clause "plainly gives authority to the State to *legislate*" concerning federal elections through public referenda.[81] Congress therefore could recognize a "referendum as part of the legislative authority of the State" under constitutional provisions dealing with the enactment of laws.[82] "Such legislative action," the Court reasoned, "is entirely different from the requirement of the Constitution as to the expression of assent or dissent to a proposed amendment to the Constitution. In such expression no legislative action is authorized or required."[83]

*Hawke*'s premise—that *Hildebrant* purported to interpret the Elections Clause—is an overstatement. As discussed above, *Hildebrant* misinterpreted or avoided the Elections Clause issue by transmuting it into a Guarantee Clause claim.[84] In any event, *Hawke* never explained why the term legislature should be given different meanings under the Elections Clause and Article V (or the other constitutional provisions it surveyed). The Court pointed out that enacting statutes under the Elections Clause to regulate federal elections is a traditional legislative activity, while ratifying constitutional amendments under Article V is a quasi- or nonlegislative act.[85] It did not explain, however, why this distinction requires or justifies attributing a different and unusual meaning to the term legislature. In light of the Constitution's consistent usage of that term throughout the rest of the document, there is a strong presumption that the Elections Clause and Presidential Electors Clause use it in the same manner—a presumption that neither *Hildebrant* nor *Hawke* overcomes.

The Court gestured toward these issues in *Smiley v. Holm*, in which it

---

[79] *Id.*

[80] 253 U.S. 221, 227 (1920).

[81] *Id.* at 231 (emphasis added).

[82] *Id.* at 230.

[83] *Id.* at 231.

[84] *See supra* notes 76–79 and accompanying text.

[85] *Hawke*, 253 U.S. at 231.

considered whether the Elections Clause permits a state's governor to veto a state law regulating federal elections that the state's institutional legislature enacted.[86] *Smiley* reiterated that, unlike most other constitutional provisions referring to legislatures, the Elections Clause grants them lawmaking authority.[87] The Court held, "As the authority is conferred for the purpose of making laws for the State, it follows, in the absence of an indication of a contrary intent, that the exercise of the authority must be in accordance with the method which the State has prescribed for legislative enactments."[88] *Smiley* never held that the term legislature should mean something other than a state's institutional, representative lawmaking body. Rather, it concluded only that when such an entity exercises authority under the Elections Clause, it must do so subject to the standard lawmaking process set forth in the state constitution, including a gubernatorial veto.[89]

Thus, the holdings of both *Hawke* and *Smiley* are consistent with an intratextual reading of the term legislature as used in the Elections Clause and Presidential Electors Clause, and *Hildebrant* does not actually address the issue. The Supreme Court never identified any evidence that the Framers intended to use the term differently in those provisions than throughout the rest of the Constitution. Nor did it provide a persuasive explanation as to why the word should mean something different when referring to the exercise of a traditionally legislative power rather than a quasi- or nonlegislative power.

*The Federalist Papers* confirm that the term legislature bears the same meaning in the Elections Clause as it does in Article I, Section Three, which permitted state legislatures to select U.S. senators. Federalist No. 59 explains that state legislatures seeking to undermine the national government are more likely to do so by abusing their power under the Elections Clause by refusing to hold House elections, than by refusing to appoint Senators.[90] The Elections Clause itself alleviates this risk by permitting Congress to impose its own rules for congressional elections if states fail to act.[91] The early *Commentaries* of both St. George Tucker[92] and

---

[86] 285 U.S. 355, 365–66 (1932).

[87] *Id.* at 367.

[88] *Id.*

[89] *Id.* at 372–73.

[90] THE FEDERALIST NO. 59, at 302–04 (Alexander Hamilton) (Ian Shapiro ed., 2009).

[91] *Id.* at 302.

[92] 1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE, TO THE CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES; AND OF THE COMMONWEALTH OF VIRGINIA, app. Note D, pt. 2, at 143–44 (Philadelphia, William Young Birch & Abraham Small 1803).

Chancellor Kent[93] likewise discuss legislatures under Article I, Section Three and under the Elections Clause—often in the same sentence— without suggesting any potential differences in the term's meaning. Kent also distinguished between having the legislature select presidential electors and allowing the "people at large" to do so, confirming that a power vested in a "legislature" may not be exercised directly by the electorate as a whole.[94]

Thus, the best reading of the word legislature as it appears throughout the Constitution, including in the Elections Clause and Presidential Electors Clause, is that it refers solely and exclusively to a state's general lawmaking body comprised of elected representatives and cannot extend to other entities such as independent redistricting commissions.

### III. CONFIRMING THE INTRATEXTUAL CONCLUSION

Even compelling intratextual arguments can be further bolstered through outside confirmation.[95] Here, an intratextual interpretation of the term legislature is confirmed by the original understanding of that term in the Founding Era, as well as the independent state legislature doctrine that courts applied for well over a century and a half following the Constitution's enactment.

#### A. Original Understanding

An intratextual interpretation of the term legislature is consistent with a clause-bound approach that focuses on how that term was generally understood in the Founding Era. Any such textual analysis must begin with dictionaries from that period.[96] Matthew Hale's 1713 *The History of the Common Law of England* defines the British legislature as comprised of three parts: the King of the Realm and the two Houses of Parliament.[97] Citing Hale's work, Samuel Johnson's mid-1700s dictionary defines legislature as "the power that makes laws."[98] Several other Founding Era dictionaries utilized Johnson's definition verbatim.[99] James Barclay's

---

[93] 1 JAMES KENT, COMMENTARIES ON AMERICAN LAW, pt. 2, lecture XI, at 210–12 (New York, O. Halsted 1826).

[94] *Id.*, pt. 2, lecture XIII, at 232.

[95] *See* Amar, *supra* note 26, at 799.

[96] *See, e.g.*, NLRB v. Noel Canning, 134 S. Ct. 2550, 2561 (2014); District of Columbia v. Heller, 554 U.S. 570, 584 (2008).

[97] MATTHEW HALE, THE HISTORY OF THE COMMON LAW OF ENGLAND 2 (London, J. Nutt 1713).

[98] 2 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE 32 (London, W. Strahan 1755).

[99] *E.g.*, CALEB ALEXANDER, THE COLUMBIAN DICTIONARY OF THE ENGLISH LANGUAGE 285 (Boston, Isaiah Thomas & Ebenezer T. Andrews 1800); THOMAS SHERIDAN, A COMPLETE

NORTHWESTERN UNIVERSITY LAW REVIEW

dictionary both incorporates Johnson's definition and, in its accompanying discussion, explains that the legislature is comprised of the House of Lords and the House of Commons.[100]

Entities such as the Arizona Independent Redistricting Commission would not qualify as legislatures under the prevailing definition from the Founding Era for at least three reasons. First, those definitions' use of the definite article "the" implies the existence of a single legislature within each sovereign entity. They appear to preclude recognition of multiple entities within a state as legislatures. Second, the definitions refer to the exercise of a general lawmaking power. An entity specifically empowered only to enact certain kinds of laws or perform certain narrow functions (i.e., drawing congressional districts) would not qualify as a legislature. Third, drawing congressional districts arguably does not even qualify as "mak[ing] laws."

Perhaps more importantly, every state constitution from the Founding Era that used the term legislature defined it as a distinct multimember entity comprised of representatives with the authority to enact laws,[101] and most other references to legislatures throughout those documents are consistent with that understanding.[102] If the Elections Clause and

---

DICTIONARY OF THE ENGLISH LANGUAGE 360 (London, Charles Dilly, 2d ed. 1789).

[100] JAMES BARCLAY, A COMPLETE AND UNIVERSAL ENGLISH DICTIONARY ON A NEW PLAN, at xli–xlii, 603 (London, J.F. and C. Rivington, 1792).

[101] DEL. CONST. of 1776, art. 2 ("The legislature shall be formed of two distinct branches; they shall meet once or oftener in every year, and shall be called, 'The general assembly of Delaware.'"); GA. CONST. of 1777, art. II ("The legislature of this State shall be composed of the representatives of the people . . . and the representatives shall be elected yearly . . . ."); MD. CONST. of 1776, art. I ("THAT the Legislature consist of two distinct branches, a Senate and House of Delegates, which shall be styled, *The General Assembly of Maryland*."); MASS. CONST. pt. II, ch. I, § II, art. II; pt. II, ch. I, § III, art. I ("The Senate shall be the first branch of the legislature . . . . There [also] shall be, in the legislature of this commonwealth, a representation of the people, annually elected . . . ."); N.Y. CONST. of 1777, art. II ("[T]he supreme legislative power within this State shall be vested in two separate and distinct bodies of men . . . who together shall form the legislature . . . ."); VA. CONST. of 1776, para. 2 ("The legislative shall be formed of two distinct branches, who, together, shall be a complete Legislature."); *see also* N.H. CONST. of 1776, para. 4 (discussing "both branches of the legislature"); N.J. CONST. of 1776, art. VI (establishing the Council as "a free and independent branch of the Legislature of this Colony"); N.C. CONST. of 1776, declaration XVIII ("[T]he people have a right to assemble together, to consult for their common good, to instruct their Representatives, and to apply to the Legislature, for redress of grievances."); PA. CONST. of 1776, art. XVI ("[T]he people have a right to assemble together, to consult for their common good, to instruct their representatives, and to apply to the legislature for redress of grievances . . . ."); S.C. CONST. of 1778, art. IX (providing that the "journal shall be laid before the legislature when required by either house"). The organic documents of Connecticut and Rhode Island did not refer to a legislature. CHARTER OF CT. of 1662; GOVERNMENT OF NEW HAVEN COLONY of 1643; CONST. OF THE COLONY OF NEW-HAVEN of 1639; FUNDAMENTAL ORDERS OF CT. of 1639; R.I. & PROVIDENCE PLANTATIONS CHARTER of 1663. *See generally* FRANCIS NEWTON THORPE, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA (1909) (collecting historical state and colony constitutions).

[102] DEL. CONST. of 1776, art. 3, 5, 12–13, 16, 24–25, 29; GA. CONST. of 1777, art. XII, XXXV, LI,

Presidential Electors Clause used the term legislature in a broader capacity, they would apparently be the only provisions in any organic document from the Founding Era to do so—not a single precedent in any state constitution supports a more expansive interpretation.

*The Federalist Papers* and Justice Story's *Commentaries on the Constitution* reinforce this interpretation. Federalist No. 59 and Section 814 of Story's *Commentaries*, which focus specifically on the Elections Clause, contend that there "were only three ways" in which the power to regulate federal elections could have been allotted: "[I]t must either have been lodged wholly in the national legislature, or wholly in the State legislatures, or primarily in the latter and ultimately in the former."[103] They explain that the Elections Clause embodies the final alternative.[104] These passages' contrast of the "national legislature," which refers exclusively to Congress, with "state legislatures" strongly suggests that the latter refers to a state's analogue to Congress: its institutional legislature, comprised of elected representatives, which exercises general lawmaking authority.

William Rawle's *A View of the Constitution* likewise states that the Elections Clause permits Congress to "make or alter" regulations governing federal elections, "except as to the *place* of choosing senators," to "guard against a refractory disposition, should it ever arise in the legislatures of the states," concerning such elections.[105] He explains that the Elections Clause's exception concerning the place of choosing senators "was proper, as congress ought not to have the power of convening the state legislature at any other than its usual place of meeting."[106] Thus, Rawle also treated the entity empowered to select senators as the same one delegated sole constitutional authority to regulate federal elections (subject only to congressional override).

---

LIV–LV, LXII; Mass. Const. pt. II, ch. II, § III, art. V; *id.* pt. II, ch. II, § III, art. VII, *superseded by* Mass. Const. amend. XXV; *id.* pt. II, ch. III, art. I–II; *id.* pt. II, ch. VI, art. II; *id.* pt. II, ch. VI, art. X, *annulled by* Mass. Const. amend. XLVIII; Md. Const. of 1776, declarations III, V, VII–XII, XX, XXVI, XXVIII, XXX, XXXIII–XXXV, XLII; *id.* art. II, XV, XVIII, XXVI, XLIII, LVI; N.J. Const. of 1776, art. XIX; N.Y. Const. of 1777, art. III, V–VI, XII, XV, XVIII; N.C. Const. of 1776, declaration XXV; *id.* art. XLIII; Pa. Const. of 1776, §§ 9, 30–31, 33, 35, 37, 47; S.C. Const. of 1778, art. II, XII–XXIV, XXXIV, XXXVIII.

[103] The Federalist No. 59, at 301 (Alexander Hamilton) (Ian Shapiro ed., 2009); *see also* 2 Story, *supra* note 64, § 814, at 281.

[104] The Federalist No. 59, at 301–02 (Alexander Hamilton) (Ian Shapiro ed., 2009); 2 Story, *supra* note 64, § 814, at 281–82.

[105] William Rawle, A View of the Constitution of the United States of America 42 (Philadelphia, H.C. Carey & I. Lea 1825).

[106] *Id.*

### B. The Independent State Legislature Doctrine

Finally, the independent state legislature doctrine, which has been embraced by the Supreme Court, state courts, and both houses of Congress,[107] further confirms the accuracy of an intratextual interpretation of legislature. This doctrine recognizes that a state legislature's authority to regulate federal elections comes directly from the U.S. Constitution.[108] Consequently, a state constitution may neither impose substantive limits on the scope of a legislature's authority to regulate the time, place, or manner of federal elections, nor strip the legislature of its prerogative to do so. Arizona's Independent Redistricting Commission flatly violates the independent state legislature doctrine because the state constitutional amendment that created it purports to strip the legislature, as a matter of state constitutional law, of authority it derives directly from the U.S. Constitution.

In 1892, the Supreme Court recognized the independent state legislature doctrine in dicta in *McPherson v. Blacker*.[109] It stated that the Presidential Electors Clause "operat[es] as a limitation upon the State in respect of any attempt to circumscribe the legislative power" concerning presidential elections, including through "any provision in the state constitution in that regard."[110] This reasoning applies with equal force to congressional elections and the Elections Clause.

The Court went even further in *Leser v. Garnett*, in which it held that the doctrine also applies to a state legislature's role in ratifying constitutional amendments under Article V.[111] It ruled that a legislature's "function . . . in ratifying a proposed amendment to the Federal Constitution . . . is a federal function derived from the Federal Constitution; and it transcends any limitations sought to be imposed by the people of a State."[112] A state constitutional provision purporting to prevent the legislature from ratifying certain amendments to the U.S. Constitution is therefore unenforceable.[113]

Several state courts have relied on the independent state legislature doctrine as an essential component of their holdings concerning the

---

[107] *See* Michael T. Morley, *Rethinking the Right to Vote Under State Constitutions*, 67 VAND. L. REV. EN BANC 189, 198–204 (2014).

[108] Cook v. Gralike, 531 U.S. 510, 523 (2001) ("[T]he States may regulate the incidents of [federal] elections . . . only within the exclusive delegation of power under the Elections Clause.").

[109] 146 U.S. 1 (1892).

[110] *Id.* at 25.

[111] 258 U.S. 130, 135 (1922).

[112] *Id.* at 137.

[113] *Id.* at 136–37.

Elections Clause and Presidential Electors Clause. For example, the Supreme Court of Rhode Island held in *In re Plurality Elections* that the state constitution may not "impose a restraint upon the power of prescribing the manner of holding [federal] elections which is given to the legislature by the constitution of the United States without restraint."[114] The court enforced a state law providing that a candidate had to receive only a plurality of votes to win a federal election, despite a state constitutional provision specifying that all candidates had to receive an absolute majority to prevail.[115]

Likewise, the Nebraska Supreme Court held that it was "unnecessary . . . to consider whether or not there is a conflict between the method of appointment of presidential electors directed by the Legislature" and a particular provision of the state constitution.[116] It explained that a state constitution may not "'circumscribe the legislative power' granted by the Constitution of the United States" to regulate the selection of presidential electors.[117] Other courts have reached the same conclusion.[118]

The U.S. House of Representatives adopted the independent state legislature doctrine in resolving an election challenge in *Baldwin v. Trowbridge*.[119] The House upheld the validity of votes cast in a congressional election pursuant to a state law that authorized voting by military members who were absent from their districts on Election Day, despite a state constitutional provision requiring that all votes be cast in person.[120] Similarly, in a report on the Electoral College, the U.S. Senate Committee on Privileges and Elections concluded that a state legislature's power under the Presidential Electors Clause to regulate presidential elections cannot be:

---

[114] 8 A. 881, 882 (R.I. 1887).

[115] *Id.*

[116] State *ex rel.* Beeson v. Marsh, 34 N.W.2d 279, 287 (Neb. 1948).

[117] *Id.* (quoting McPherson v. Blacker, 146 U.S. 1, 25 (1892)).

[118] *See, e.g.*, *In re* Opinion of Justices, 45 N.H. 595, 601 (1864) (holding that, because a State legislature's "authority . . . to prescribe the time, place and manner of holding elections for representatives in Congress" is derived from the Elections Clause, "[t]he constitution and laws of this State are entirely foreign to the question"); Commonwealth *ex rel.* Dummit v. O'Connell, 181 S.W.2d 691, 695 (Ky. Ct. App. 1944). Modern courts also occasionally apply the independent state legislature doctrine. *See, e.g.*, PG Publ'g Co. v. Aichele, 902 F. Supp. 2d 724, 747–48 (W.D. Pa. 2012) (noting that the Pennsylvania legislature's authority to regulate the manner in which congressional and presidential elections are conducted stems from the U.S. Constitution and "is not circumscribed by the Pennsylvania Constitution"), *aff'd* 705 F.3d 91 (3d Cir. 2013).

[119] D.W. BARTLETT, DIGEST OF ELECTION CASES, H.R. MISC. DOC. NO. 41-152, at 46–47 (1870).

[120] 2 ASHER C. HINDS, HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, § 856 (1907); *see also In re* Holmes, 1 *id.* § 525.

N O R T H W E S T E R N   U N I V E R S I T Y   L A W   R E V I E W

taken from [state legislatures] or modified by their State constitutions any more than can their power to elect Senators of the United States. Whatever provisions may be made by statute, or by the State constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated.[121]

Numerous commentators have embraced the independent state legislature doctrine,[122] while others have rejected it.[123] Its longstanding history and acceptance by state and federal courts, as well as both houses of Congress, however, confirm the validity of an intratextual interpretation of the Elections Clause and Presidential Electors Clause. The legislature, as referenced in those provisions, is the state's general lawmaking body, and its power under the federal Constitution to regulate federal elections may not be reduced or withdrawn by state constitutions.

CONCLUSION

Because of the Constitution's numerous references to state legislatures, an intratextual approach sheds compelling light on the term's proper meaning in the Elections Clause and Presidential Electors Clause. The text, context, drafting history, contemporaneous interpretations, and history of subsequent judicial interpretation of the numerous other constitutional provisions referring to legislatures collectively confirm that the term refers exclusively to the elected body of representatives within each state that exercises general lawmaking authority. Neither the Supreme

---

[121] S. REP. NO. 43-395, at 9 (1874).

[122] *See, e.g.*, Walter Clark, *The Electoral College and Presidential Suffrage*, 65 U. PA. L. REV. 737, 741 (1917) ("[T]he exercise of such power [to regulate presidential elections] is given to the state legislature subject to no restriction from the state constitution."); Richard D. Friedman, *Trying to Make Peace with* Bush v. Gore, 29 FLA. ST. U. L. REV. 811, 835 (2001) ("Suppose, then, that the state constitution forbade felons to vote. If the legislature, operating under the authority granted it by Article II rather than by the state constitution, decided that this limitation should not apply in voting for presidential electors, the legislative choice should prevail."); James C. Kirby, Jr., *Limitations on the Power of State Legislatures over Presidential Elections*, 27 LAW & CONTEMP. PROBS. 495, 504 (1962) ("[S]tate legislatures are limited by constitutional provisions for veto, referendum, and initiative in prescribing the manner of choosing presidential electors, but . . . state constitutional provisions concerning suffrage qualifications and the manner of choosing electors do not limit the substantive terms of legislation.").

[123] *See, e.g.*, Hayward H. Smith, *History of the Article II Independent State Legislature Doctrine*, 29 FLA. ST. U. L. REV. 731, 783–84 (2001) (arguing that the Founders did not construe the Presidential Electors Clause as authorizing state legislatures to act independently of state constitutions); *see also* Richard H. Pildes, *Judging "New Law" in Election Disputes*, 29 FLA. ST. U. L. REV. 691, 727–28 (2001) (accepting Smith's conclusion that, "as a matter of historical practice, state legislatures were not understood at the time to be more 'independent' by virtue of Article II of the constraints and conditions on their power than they were when acting pursuant to any other source of authority"); David A. Strauss, Bush v. Gore*: What Were They Thinking?*, 68 U. CHI. L. REV. 737, 748 (2001) ("It is far from clear what the relationship is between a state's constitution and the power that a state 'legislature' may exercise under Article II, Section 1 to 'direct' the 'manner' in which electors are appointed.").

868

*Intratextual Legislatures*

Court nor academic commentators have provided a persuasive reason for concluding that, despite the consistent usage of the term throughout most of the Constitution, it should be given a different and unusual construction solely for purposes of the Elections Clause and Presidential Electors Clause.

     In particular, there is no basis for concluding that the word legislature as used in the Elections Clause and Presidential Electors Clause refers broadly to a state's "lawmaking authority," allowing a state's voters to directly regulate federal elections through public initiatives or referenda. Likewise, because the Constitution specifically empowers the state legislature to regulate the "Time, Place and Manner" of federal elections, attempts to allow outside entities such as the Arizona Independent Redistricting Commission to determine the boundaries of congressional districts violate the U.S. Constitution.

N O R T H W E S T E R N   U N I V E R S I T Y   L A W   R E V I E W

# Exhibit O



# Modes of Constitutional Interpretation

**Brandon J. Murrill**
Legislative Attorney

March 15, 2018

**Congressional Research Service**

7-5700

www.crs.gov

R45129

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

When exercising its power to review the constitutionality of governmental action, the Supreme Court has relied on certain "methods" or "modes" of interpretation—that is, ways of figuring out a particular meaning of a provision within the Constitution. This report broadly describes the most common modes of constitutional interpretation; discusses examples of Supreme Court decisions that demonstrate the application of these methods; and provides a general overview of the various arguments in support of, and in opposition to, the use of such methods of constitutional interpretation.

***Textualism.*** Textualism is a mode of interpretation that focuses on the plain meaning of the text of a legal document. Textualism usually emphasizes how the terms in the Constitution would be understood by people at the time they were ratified, as well as the context in which those terms appear. Textualists usually believe there is an objective meaning of the text, and they do not typically inquire into questions regarding the intent of the drafters, adopters, or ratifiers of the Constitution and its amendments when deriving meaning from the text.

***Original Meaning.*** Whereas textualist approaches to constitutional interpretation focus solely on the text of the document, originalist approaches consider the meaning of the Constitution as understood by at least some segment of the populace at the time of the Founding. Originalists generally agree that the Constitution's text had an "objectively identifiable" or public meaning at the time of the Founding that has not changed over time, and the task of judges and Justices (and other responsible interpreters) is to construct this original meaning.

***Judicial Precedent.*** The most commonly cited source of constitutional meaning is the Supreme Court's prior decisions on questions of constitutional law. For most, if not all Justices, judicial precedent provides possible principles, rules, or standards to govern judicial decisions in future cases with arguably similar facts.

***Pragmatism.*** Pragmatist approaches often involve the Court weighing or balancing the probable practical consequences of one interpretation of the Constitution against other interpretations. One flavor of pragmatism weighs the future costs and benefits of an interpretation to society or the political branches, selecting the interpretation that may lead to the perceived best outcome. Under another type of pragmatist approach, a court might consider the extent to which the judiciary could play a constructive role in deciding a question of constitutional law.

***Moral Reasoning.*** This approach argues that certain moral concepts or ideals underlie some terms in the text of the Constitution (e.g., "equal protection" or "due process of law"), and that these concepts should inform judges' interpretations of the Constitution.

***National Identity (or "Ethos").*** Judicial reasoning occasionally relies on the concept of a "national ethos," which draws upon the distinct character and values of the American national identity and the nation's institutions in order to elaborate on the Constitution's meaning.

***Structuralism.*** Another mode of constitutional interpretation draws inferences from the design of the Constitution: the relationships among the three branches of the federal government (commonly called separation of powers); the relationship between the federal and state governments (known as federalism); and the relationship between the government and the people.

***Historical Practices.*** Prior decisions of the political branches, particularly their long-established, historical practices, are an important source of constitutional meaning. Courts have viewed historical practices as a source of the Constitution's meaning in cases involving questions about the separation of powers, federalism, and individual rights, particularly when the text provides no clear answer.

# Contents

Introduction ................................................................................................................ 1

Textualism ................................................................................................................... 5

Original Meaning ......................................................................................................... 7

Judicial Precedent...................................................................................................... 10

Pragmatism ................................................................................................................ 12

Moral Reasoning ........................................................................................................ 15

National Identity or "National Ethos" ...................................................................... 17

Structuralism .............................................................................................................. 18

Historical Practices.................................................................................................... 22

# Contacts

Author Contact Information ....................................................................................... 25

# Introduction

Early in the history of the United States, the Supreme Court began to exercise the power that it is most closely and famously associated with—its authority of judicial review. In its 1803 decision in *Marbury v. Madison*,[1] the Supreme Court famously asserted and explained the foundations of its power to review the constitutionality of federal governmental action.[2] During the two decades following its holding in *Marbury*, the Court decided additional cases that helped to establish its power to review the constitutionality of state governmental action.[3] If a challenged governmental action is unconstitutional, the Court may strike it down, rendering it invalid.[4] When performing the function of judicial review,[5] the Court must necessarily ascertain the meaning of a given provision within the Constitution, often for the first time, before applying its interpretation of the Constitution to the particular governmental action under review.

The need to determine the meaning of the Constitution through the use of methods of constitutional interpretation and, perhaps, construction,[6] is apparent from the text of the document itself.[7] While several parts of the Constitution do not lend themselves to much debate about their preferred interpretation,[8] much of the Constitution is broadly worded, leaving ample room for the Court to interpret its provisions before it applies them to particular legal and factual circumstances.[9] For example, the Second Amendment reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[10] The text of the Amendment alone does not squarely resolve whether the "right of the people to keep and bear arms" extends to all citizens or merely is related to, or perhaps conditioned on, service in a militia. This ambiguity prompted a closely divided 2008 decision of the Supreme Court that ruled in favor of the former interpretation.[11]

---

[1] 5 U.S. (1 Cranch) 137 (1803).

[2] *Id.* at 180.

[3] *See, e.g.*, Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 430 (1821); Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 362 (1816); Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 139 (1810).

[4] *Id.* The Court first struck down an action of the executive branch of the federal government as unconstitutional in Little v. Barreme, 6 U.S. (2 Cranch) 170, 177–79 (1804). The Court first struck down a state law as unconstitutional in *Fletcher v. Peck*. *See* 10 U.S. at 139.

[5] The term "judicial review" refers to "a court's power to review the actions of other branches or levels of government[, and especially] the courts' power to invalidate legislative and executive actions as being unconstitutional." BLACK'S LAW DICTIONARY 976 (10th ed. 2014).

[6] Professor Keith Whittington has distinguished between the concepts of "constitutional interpretation" and "constitutional construction." In an influential book on the subject, he wrote that both interpretation and construction of the Constitution "seek to elaborate a meaning somehow already present in the text." However, constitutional interpretation relies on traditional legal tools that look to internal aspects of the Constitution (e.g., text and structure) to ascertain meaning, whereas constitutional construction supplements the meaning derived from such traditional interpretive methods with materials outside of the text (e.g., moral principles or pragmatic considerations) "where the text is so broad or so undetermined as to be incapable of faithful but exhaustive reduction to legal rules." KEITH WHITTINGTON, CONSTITUTIONAL CONSTRUCTION: DIVIDED POWERS AND CONSTITUTIONAL MEANING 1, 5–7 (1999).

[7] ERWIN CHEMERINSKY, CONSTITUTIONAL LAW 11 (4th ed. 2013).

[8] For example, the Constitution provides a clear, bright-line rule that individuals who have not yet "attained to the Age of thirty five Years" are ineligible to be President. *See* U.S. CONST. art. II, § 1, cl. 5.

[9] Chemerinsky, *supra* note 7, at 11; CASS R. SUNSTEIN, THE PARTIAL CONSTITUTION 93–94 (1993).

[10] U.S. CONST. amend. II.

[11] *See* District of Columbia v. Heller, 554 U.S. 570, 573–619, 635–36 (2008) (examining historical sources to determine the original meaning of the Second Amendment).

The text of the Constitution is also silent on many fundamental questions of constitutional law, including questions that its drafters and those ratifying the document could not have foreseen or chose not to address.[12] For example, the Fourth Amendment, ratified in 1791, does not on its face resolve whether the government may perform a search of the digital contents of a cell phone seized incident to arrest without obtaining a warrant.[13] Thus, interpretation is necessary to determine the meaning of ambiguous provisions of the Constitution or to answer fundamental questions left unaddressed by the drafters. Some commentators have also noted the practical need for constitutional interpretation to provide principles, rules, or standards to govern future conduct of regulated parties, as well as political institutions, branches of government, and regulators.[14]

When deriving meaning from the text of the Constitution, the Supreme Court has relied on certain "methods" or "modes" of interpretation—that is, ways of figuring out a particular meaning of a provision within the Constitution.[15] There is significant debate over which sources and methods of construction the Court should consult when interpreting the Constitution—a controversy closely related to more general disputes about whether and how the Court should exercise the power of judicial review.

Judicial review at the Supreme Court, by its very nature, can involve unelected judges[16] overturning the will of a democratically elected branch of the federal government or popularly elected state officials. Some scholars have argued that in striking down laws or actions, the Court has decided cases according to the Justices' own political preferences.[17] In response to these concerns, constitutional scholars have constructed theories designed to ensure that the Justices following them would be able to reach principled judgments in constitutional adjudication. In 1987, Professor Richard Fallon of Harvard Law School divided "interpretivists," or those purporting to prioritize the specific text and plain language of the Constitution above all else, into two basic camps: "On one side stand 'originalists,'" whom he characterized as taking "the rigid view that only the original understanding of the language and the framers' specific intent ought to count. On the other side, 'moderate interpretivists' allow contemporary understandings and the framers' general or abstract intent to enter the constitutional calculus."[18] Whether or not Professor Fallon's precise description at the time was accurate, those regarding themselves as originalists have clarified that the Court should rely on the fixed meaning of the Constitution as understood

---

[12] LAURENCE H. TRIBE, THE INVISIBLE CONSTITUTION 1–4 (Geoffrey R. Stone ed., 2008).

[13] The Court resolved this question in *Riley v. California*, holding that a warrant is needed to search the contents of a cell phone incident to an individual's arrest. *See* 573 U.S. ___, No. 13-132, slip op. at 28 (2014).

[14] HARRY H. WELLINGTON, INTERPRETING THE CONSTITUTION: THE SUPREME COURT AND THE PROCESS OF ADJUDICATION 3 (1990).

[15] Professor Philip Bobbitt defines a modality for interpreting the Constitution as "the way in which we characterize a form of expression as true." PHILIP BOBBITT, CONSTITUTIONAL INTERPRETATION 11 (1991). *See also* Richard H. Fallon, Jr., *Stare Decisis and the Constitution: An Essay on Constitutional Methodology*, 76 N.Y.U. L. REV. 570, 592 (2001) ("The power to say what the Constitution means or requires—recognized since *Marbury v. Madison*—implies a power to determine the sources of authority on which constitutional rulings properly rest.").

[16] The President appoints the Justices of the Supreme Court, who serve for life terms unless impeached and removed from office. U.S. CONST. art. II, § 2, cl. 2; *id.* art. III, § 1.

[17] *See, e.g.*, HON. ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 37–41, 44–47 (Amy Gutmann ed., 1997) [hereinafter SCALIA, A MATTER OF INTERPRETATION] ("The ascendant school of constitutional interpretation affirms the existence of what is called the Living Constitution, a body of law that . . . grows and changes from age to age, in order to meet the needs of a changing society. And it is the judges who determine those needs and 'find' that changing law.").

[18] Richard H. Fallon, Jr., *A Constructivist Coherence Theory of Constitutional Interpretation*, 100 HARV. L. REV. 1189, 1211 (1987).

by at least the public at the time of the Founding.[19] This has become known as the original public meaning of the Constitution.

On the other hand, still other commentators have questioned the legitimacy of fixating on what the Framers, ratifiers, or members of their generation might have considered the core meaning of a particular provision of the Constitution, and have instead suggested interpretive methods that ensure the Court's decisions allow government to function properly, protect minority rights, and safeguard the basic structure of government from majoritarian interference.[20] Although the debate over the proper sources of the Constitution's meaning remains unresolved, several key methods of constitutional interpretation have guided the Justices in their decisionmaking and, more broadly, have influenced constitutional dialogue.[21]

It is possible to categorize the various methods that have been employed when interpreting the Constitution.[22] This report broadly describes the most common modes of constitutional interpretation; discusses examples of Supreme Court decisions that demonstrate the application of these methods; and provides a general overview of the various arguments in support of, and in opposition to, the use of such methods by the Court. The modes discussed in detail in this report are (1) textualism; (2) original meaning; (3) judicial precedent; (4) pragmatism; (5) moral reasoning; (6) national identity (or "ethos"); (7) structuralism; and (8) historical practices.

In explaining these modes, this report is merely describing the most common methods on which the Justices (and other interpreters) have relied to argue about the meaning of the Constitution.[23] Depending on the mode of interpretation, the Court may rely upon a variety of materials that include, among other things, the text of the Constitution; constitutional and ratification convention debates; prior Court decisions; pragmatic or moral considerations; and long-standing congressional or legislative practices.[24] It is important to note that the Court may use more than one source in deciding a particular case, and the Justices must exercise some discretion in

---

[19] SCALIA, A MATTER OF INTERPRETATION, *supra* note 17, at 44–47.

[20] *E.g.*, PAUL BREST ET AL., PROCESSES OF CONSTITUTIONAL DECISIONMAKING: CASES AND MATERIALS 54–55 (2006) (discussing the argument that the Constitution should "be interpreted to facilitate the performance of government functions"); Hon. William J. Brennan, Jr., *The Constitution of the United States: Contemporary Ratification*, 27 S. TEX. L. REV. 433, 436 (1986) ("A position that upholds constitutional claims only if they were within the specific contemplation of the Framers in effect establishes a presumption of resolving textual ambiguities against the claim of constitutional right. . . . Those who would restrict claims of right to the values of 1789 specifically articulated in the Constitution turn a blind eye to social progress and eschew adaption of overarching principles to changes of social circumstance."); HON. STEPHEN BREYER, ACTIVE LIBERTY 25 (2008) ("[O]ur constitutional history has been a quest for . . . workable democratic government protective of individual personal liberty. . . . And . . . this constitutional understanding helps interpret the Constitution—in a way that helps to resolve problems related to *modern* government.").

[21] *See* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW: VOLUME ONE 32 (3d ed. 2000) ("[T]he subject and substance of constitutional law in the end remains the language of the United States Constitution itself and the decisions and opinions of the United States Supreme Court. Modes of interpretation are means—however intricate—of explicating this subject and substance."). As discussed below, whether any particular source of meaning may serve as a proper basis for interpreting the Constitution is subject to debate.

[22] PHILIP BOBBITT, CONSTITUTIONAL FATE: THEORY OF THE CONSTITUTION 6–7 (1982). This report does not examine the potential role of politics in judicial decisionmaking. *See, e.g.*, LEE EPSTEIN & THOMAS G. WALKER, CONSTITUTIONAL LAW FOR A CHANGING AMERICA: RIGHTS, LIBERTIES, AND JUSTICE 22 (8th ed. 2013).

[23] This report does not provide an exhaustive list of the modes of interpretation. There is unlikely to be agreement on which methods such a list would include. *See* BOBBITT, *supra* note 22, at 8.

[24] *See also* Fallon, *supra* note 15, at 592; SUNSTEIN, *supra* note 9, at 95 ("It is impossible to interpret any written text without resort to principles external to that text.").

choosing or coordinating the sources and materials they will consult in making sense of those sources.[25]

Understanding these methods of interpretation may assist Members of Congress in observing the oath they take to uphold the Constitution when performing their legislative functions and fulfilling Congress's role as a coequal branch of government.[26] For example, Members of Congress may interpret the Constitution when considering whether to vote for proposed legislation[27] or when a dispute arises regarding the boundaries between Congress's own constitutional authority and that of the executive branch (e.g., a dispute over the reach of Congress's oversight power or the scope of Executive privilege).[28] And knowledge of the most common methods for elaborating on the Constitution's meaning may aid Senators and the Senate Judiciary Committee in examining the judicial philosophy of individuals the President nominates to serve on the federal courts.[29] It may also assist Members and congressional committees in evaluating executive branch officials' interpretations of the Constitution.[30]

---

[25] For example, in *New York v. United States*, the Court held that Congress could not directly compel states to participate in a federal regulatory program. 505 U.S. 144, 188 (1992). In so holding, the majority opinion relied upon the text of the Tenth Amendment; historical sources; the structural relationship that the Constitution establishes between the federal government and states; and judicial precedent, among other sources. *Id.* at 174–83.

[26] *See* U.S. CONST. art. VI ("The Senators and Representatives before mentioned, and the Members of the several State legislatures, and all executive and judicial Officers, both of the United States and of the several states, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."). Fulfilling this oath requires Members of Congress to read and understand the nation's founding document. *See also* Nixon v. United States, 506 U.S. 224, 228–29 (1993) (holding that the Constitution gave the Senate alone the power to determine whether it had properly "tried" an impeachment); Edwin Meese III, *The Law of the Constitution*, 61 TUL. L. REV. 979, 985–86 (1987) ("The Supreme Court, then, is not the only interpreter of the Constitution. Each of the three coordinate branches of government created and empowered by the Constitution—the executive and legislative no less than the judicial—has a duty to interpret the Constitution in the performance of its official functions.").

[27] *See, e.g.,* Russ Feingold, *The Obligation of Members of Congress to Consider Constitutionality While Deliberating and Voting: The Deficiencies of House Rule XII and A Proposed Rule for the Senate,* 67 VAND. L. REV. 837, 846–49, 856 (2014) ("While members should vote upon legislation based on their own constitutional interpretations, which may be at odds with the Court's, they should not vote for legislation without any thought whatsoever regarding its constitutionality.").

[28] *See, e.g.,* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least, as a practical matter, enable, if not invite, measures on independent presidential responsibility.").

[29] *See, e.g.,* *The Nomination of Elena Kagan to Be an Associate Justice of the Supreme Court of the United States: Hearing Before the S. Comm. on the Judiciary Part 1*, 111th Cong. 62 (2010) (statement of Elena Kagan in response to a question from Senator Patrick Leahy) ("And I think that [the Framers] laid down—sometimes they laid down very specific rules. Sometimes they laid down broad principles. Either way we apply what they say, what they meant to do. So in that sense, we are all originalists.").

[30] *See, e.g.,* Letter from Jefferson B. Sessions III, Attorney General, U.S. Dep't of Justice, to Elaine C. Duke, Acting Sec'y, Dep't of Homeland Sec. (Sept. 4, 2017), https://www.dhs.gov/sites/default/files/publications/ 17_0904_DOJ_AG-letter-DACA.pdf (advising the Department of Homeland Security that, in the opinion of the Attorney General, the Deferred Action for Childhood Arrivals (DACA) immigration policy is unconstitutional, stating, "As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress.").

# Textualism

Textualism is a mode of legal interpretation that focuses on the plain meaning of the text of a legal document. Textualism usually emphasizes how the terms in the Constitution would be understood by people at the time they were ratified, as well as the context in which those terms appear.[31] Textualists usually believe there is an objective meaning of the text, and they do not typically inquire into questions regarding the intent of the drafters, adopters, or ratifiers of the Constitution and its amendments when deriving meaning from the text.[32] They are concerned primarily with the plain, or popular, meaning of the text of the Constitution. Textualists generally are not concerned with the practical consequences of a decision; rather, they are wary of the Court acting to refine or revise constitutional texts.[33]

The Justices frequently rely on the text in conjunction with other methods of constitutional interpretation.[34] The Court will often look to the text *first* before consulting other potential sources of meaning to resolve ambiguities in the text or to answer fundamental questions of constitutional law not addressed in the text.[35] For example, in *Trop v. Dulles*, a plurality of the Court held that the Eighth Amendment prohibited the government from revoking the citizenship of a U.S. citizen as a punishment.[36] When determining that a punishment that did not involve physical mistreatment violated the Constitution, the Court first looked briefly to the text of the Amendment, noting that the "exact scope" of the phrase "cruel and unusual punishment" in the Eighth Amendment had not been "detailed by [the] Court."[37] The plurality then turned to other modes of interpretation, such as moral reasoning and historical practices, in deciding the case.[38]

The *Trop* plurality's use of textualism in combination with other interpretive methods is distinguishable from a stricter textualist approach espoused most famously by Justice Hugo Black.[39] Consistent with his view that those interpreting the Constitution should look no further than the literal meaning of its words, Justice Black contended that the text of the First Amendment, which states, "Congress shall make no law . . . abridging the freedom of speech, or of the press" absolutely forbids Congress from enacting any law that would curtail these rights.[40]

---

[31] *See* SCALIA, A MATTER OF INTERPRETATION, *supra* note 17, at 23–38.

[32] *See id.*

[33] *See id.* at 23.

[34] EPSTEIN & WALKER, *supra* note 22, at 26. For additional examples of the Court's use of a textualist approach, see "Original Meaning" below.

[35] CHEMERINSKY, *supra* note 7, at 16; TRIBE, *supra* note 12, at 2–4; SOTIRIOS A. BARBER, ON WHAT THE CONSTITUTION MEANS 9 (1984).

[36] 356 U.S. 86, 100–04 (1958) (plurality opinion). Justice William Brennan, providing the fifth and deciding vote in *Trop*, did not base his decision on the Eighth Amendment, instead concluding that denationalization exceeded Congress's war powers. *Id.* at 105–14 (Brennan, J., concurring).

[37] *Id.* at 99–101 (plurality opinion).

[38] *Id.* at 100–03 (stating that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society").

[39] EPSTEIN & WALKER, *supra* note 22, at 25–26.

[40] Justice Black once wrote that the First Amendment's statement that "Congress shall make no law . . . abridging the freedom of speech, or of the press" amounted to an "absolute command . . . that no law shall be passed by Congress abridging freedom of speech or the press." HON. HUGO L. BLACK, A CONSTITUTIONAL FAITH 45–46 (1968). This form of textualism is sometimes referred to as *pure textualism* or *literalism*. EPSTEIN & WALKER, *supra* note 22, at 26. Justice Antonin Scalia, who was both a textualist and an originalist, criticized this sort of "strict constructionist" approach to textualism. He wrote that a "text should not be construed strictly, and it should not be construed leniently; it should be construed reasonably, to contain all that it fairly means." SCALIA, A MATTER OF INTERPRETATION, *supra* note 17, at 23.

An example of Justice Black's use of textualism in a First Amendment case is his dissent in *Dennis v. United States*.[41] In that case, the Court held that Congress could, consistent with the First Amendment's guarantee of freedom of speech, criminalize the conspiracy to advocate the forcible overthrow of the United States government.[42] The Court determined that the severity of potential harm to the government from the speech in question justified Congress's restrictions on First Amendment rights.[43] In accordance with his views that the text of the Constitution should serve as the sole source of its meaning, Justice Black dissented on the grounds that the Court should not have applied a balancing test to uphold the law against First Amendment challenge.[44] He wrote, "I cannot agree that the First Amendment permits us to sustain laws suppressing freedom of speech and press on the basis of Congress' or our own notions of mere 'reasonableness.' Such a doctrine waters down the First Amendment so that it amounts to little more than an admonition to Congress."[45]

Another classic example of a self-consciously textualist opinion is Justice Black's dissent in *Griswold v. Connecticut*.[46] In *Griswold*, the majority struck down as unconstitutional a Connecticut law that criminalized the furnishing of birth control to married couples based on a view that the Due Process Clause of the Fourteenth Amendment provides a general right to privacy.[47] Justice Black criticized the majority for straying too far from the text of the Bill of Rights and relying on "nebulous" natural law principles to find a "right to privacy in marital relations" in the Constitution that—at least in his view—did not exist.[48] Adhering to his preference for interpreting the Constitution in line with its text, Justice Black wrote, "I like my privacy as well as the next one, but I am nevertheless compelled to admit that government has a right to invade it unless prohibited by some specific constitutional provision."[49]

Proponents of textualism point to the simplicity and transparency of an approach that focuses solely on the objectively understood meaning of language independent of ideology and politics.[50] They argue that textualism prevents judges from deciding cases in accordance with their personal policy views, leading to more predictability in judgments.[51] Proponents also argue that textualism promotes democratic values because it adheres to the words of the Constitution adopted by the "people" as opposed to what individual Justices think or believe.[52]

---

[41] 341 U.S. 494 (1951).

[42] *Id.* at 509, 513–17.

[43] *Id.*

[44] *Id.* at 580 (Black, J., dissenting) ("At least as to speech in the realm of public matters, I believe that the 'clear and present danger' test does not 'mark the furthermost constitutional boundaries of protected expression,' but does 'no more than recognize a minimum compulsion of the Bill of Rights.'") (citation omitted).

[45] *Id.*

[46] 381 U.S. 479 (1965).

[47] *Id.* at 485–86.

[48] *Id.* at 507–27 (Black, J., dissenting).

[49] *Id.* at 510.

[50] EPSTEIN & WALKER, *supra* note 22, at 26. However, some textualist approaches may allow for consideration of contemporary values. For example, approaches based on present textual meaning may allow for consideration of these values to the extent that they have become incorporated in modern understandings of phrases in the Constitution (e.g., "cruel and unusual punishment"). *Trop*, 356 U.S. at 100–03; BOBBITT, *supra* note 22, at 36.

[51] EPSTEIN & WALKER, *supra* note 22, at 26; SCALIA, A MATTER OF INTERPRETATION, *supra* note 17, at 37–41, 44–47.

[52] *See* Hon. William H. Rehnquist, *The Notion of a Living Constitution*, 54 TEX. L. REV. 693, 695–97 (1976) ("The ultimate source of authority in this Nation, Marshall said, is not Congress, not the states, not for that matter the Supreme Court of the United States. The people are the ultimate source of authority; they have parceled out the (continued...)

Opponents of a strict reliance solely on the text in interpreting the Constitution suggest that judges and other interpreters may ascribe different meanings to the Constitution's text depending on their background[53]—a problem compounded by textual provisions that are broadly worded[54] or fail to answer fundamental constitutional questions.[55] In addition, opponents argue that judges should consider values not specifically set forth in the text, such as those based on moral reasoning, practical consequences, structural relationships, or other considerations.[56] In other words, establishing textual meaning may not be straightforward, and a more flexible approach that does not bind the Court and policymakers to words written 300 years ago may, in the view of those who argue against textualism, be necessary to ensure preservation of fundamental constitutional rights or guarantees.[57]

# Original Meaning

Whereas textualist approaches to constitutional interpretation focus solely on the text of the document, originalist approaches consider the meaning of the Constitution as understood by at least some segment of the populace at the time of the Founding. Though this method has generally been called "originalism," constitutional scholars have not reached a consensus on what it means for a judge to adopt this methodology for construing the Constitution's text.[58] Disagreements primarily concern which sources scholars should consult when determining the fixed meaning of the Constitution.[59] Originalists, however, generally agree that the Constitution's text had an "objectively identifiable" or public meaning at the time of the Founding that has not changed over time, and the task of judges and Justices (and other responsible interpreters) is to construct this original meaning.[60]

For many years, some prominent scholars (such as Robert Bork) argued that in interpreting the Constitution, one should look to the *original intent* of the people who drafted, proposed, adopted, or ratified the Constitution to determine what those people wanted to convey through the text.[61] According to this view, original intent may be found in sources outside of the text, such as debates in the Constitutional Convention or the Federalist Papers.[62] For example, in *Myers v. United States*,[63] Chief Justice William Howard Taft, writing for the majority, held that the

---

(...continued)

authority that originally resided entirely with them by adopting the original Constitution and by later amending it.").

[53] BOBBITT, *supra* note 22, at 37.

[54] McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407 (1819) ("A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind"); EPSTEIN & WALKER, *supra* note 22, at 26.

[55] BOBBITT, *supra* note 22, at 38; TRIBE, *supra* note 12, at 1–4.

[56] *Cf.* BOBBITT, *supra* note 22, at 26.

[57] *Id.* at 24, 37–38.

[58] GREGORY E. MAGGS & PETER J. SMITH, CONSTITUTIONAL LAW: A CONTEMPORARY APPROACH 39 (3d ed. 2015).

[59] *Id.*

[60] *Id.*

[61] *Id.* at 17; ROBERT H. BORK, TRADITION AND MORALITY IN CONSTITUTIONAL LAW: THE FRANCIS BOYER LECTURES ON PUBLIC POLICY 10 (1984) ("[T]he framers' intentions with respect to freedoms are the sole legitimate premise from which constitutional analysis may proceed.").

[62] Myers v. United States, 272 U.S. 52, 136 (1926); Hon. Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. CIN. L. REV. 849, 852 (1989) [hereinafter Scalia, *Originalism*].

[63] 272 U.S. 52 (1926).

President did not need legislative approval to remove an executive branch official who was performing a purely executive function.[64] The Court sought the original meaning of the President's removal power by looking at English common law, the records of the Constitutional Convention, and the actions of the first Congress, among other sources.[65] Relying on these various sources, in his opinion for the Court, Chief Justice Taft wrote that "the debates in the Constitutional Convention indicated an intention to create a strong Executive."[66] Notably, in *Myers* the Court did not look at sources that would likely indicate what ordinary citizens living at the time of the Founding thought about the President's removal power.

Over the course of Justice Antonin Scalia's near thirty-year tenure on the Supreme Court, he and several prominent scholars explained that, as originalists, they were committed to seeking to understand *original public meaning* of the Constitution.[67] This method considers the plain meaning of the Constitution's text as it would have been understood by the general public, or a reasonable person, who lived at the time the Constitution was ratified.[68] This approach has much in common with textualism, but is not identical. The original public meaning approach to understanding the Constitution is not based solely on the text, but, rather, draws upon the original public meaning of the text as a broader guide to interpretation. Justice Scalia's majority opinion in *District of Columbia v. Heller*[69] illustrates the use of original public meaning in constitutional interpretation. In that case, the Court held that the Second Amendment, as originally understood by ordinary citizens, protected an individual's right to possess firearms for private use unconnected with service in a militia.[70] Justice Scalia's opinion examined various historical sources to determine original public meaning, including dictionaries in existence at the time of the Founding and comparable provisions in state constitutions.[71]

Those in favor of the use of original meaning as an interpretive approach point to its long historical pedigree[72] and its adherence to the democratic will of the people who originally framed and ratified the Constitution.[73] They point as well to the basic logic that a law, in order to function as law, has to have a fixed or settled meaning until it is formally amended or discarded.[74]

---

[64] *Id.* at 176.

[65] *Id.* at 109–21.

[66] *Id.* at 116.

[67] SCALIA, A MATTER OF INTERPRETATION, *supra* note 17, at 17, 44–45.

[68] *Id.*

[69] 554 U.S. 570 (2008).

[70] *Id.* at 635–36.

[71] *Id.* at 573–619.

[72] MAGGS & SMITH, *supra* note 58, at 18.

[73] Paul Brest, *The Misconceived Quest for the Original Understanding*, 60 B.U. L. REV. 204, 204 (1980) (discussing arguments made by supporters of originalism). Proponents of original meaning generally oppose the use of foreign law to establish the original meaning of the Constitution unless it is English common law that predates the founding era. *See* Knight v. Florida, 528 U.S. 990, 990 (1999) (Thomas, J., concurring in denial of cert.); Thompson v. Oklahoma, 487 U.S. 815, 868 n.4 (1988) (Scalia, J., dissenting) ("But where there is not first a settled consensus among our own people, the views of other nations, however enlightened the Justices of this Court may think them to be, cannot be imposed upon Americans through the Constitution."*);* Myers v. United States, 272 U.S. 52, 118 (1926) (discussing when English common law could be relevant to original meaning). Treaties to which the United States is party (or customary international law that is incorporated into domestic law) might be cited by a proponent of original meaning when interpreting the Constitution. *See* Ganesh Sitaraman, *The Use and Abuse of Foreign Law in Constitutional Interpretation*, 32 HARV. J. L. & PUB. POL'Y 653, 689 (2009) ("In cases where the fundamental rights that a court seeks to protect are described in a treaty or convention or are a matter of customary international law, the question is merely whether those rights are incorporated by domestic law.").

[74] MAGGS & SMITH, *supra* note 58, at 17.

Proponents of originalism also argue that the approach limits judicial discretion, preventing judges from deciding cases in accordance with their own political views.[75] Some originalists argue that changes to the Constitution's meaning should be left to further action by Congress and the states to amend the Constitution in accordance with Article V.[76] Proponents also credit the approach with ensuring more certainty and predictability in judgments.[77]

Those who are skeptical of this mode of interpretation underscore the difficulty in establishing original meaning. Scholars cannot always agree on original meaning, and, perhaps, people living at the time of the Constitution's adoption may not have agreed on a particular meaning either.[78] As such, critics argue, originalists will have merely constructed a meaning that had never actually been approved by the people who drafted or ratified the actual text being construed.[79] Such a view may stem from the potentially wide variety of sources of such meaning; conflicting statements by these sources; conflicting understandings of statements in these sources; and gaps in historical sources.[80] Thus, because of this lack of consensus on the original meaning of the Constitution, judges may simply choose the original view that supports their political beliefs.[81] Opponents also argue that originalism requires judges to act as historians—a role for which they may not be well suited—as opposed to as decisionmakers.[82]

While Justice Elena Kagan, for example, has conceded that "we [the Justices] are all originalists,"[83] many critics question the extent to which originalism is a workable theory of constitutional interpretation. They argue that originalism is an inflexible, flawed method of constitutional interpretation,[84] contending that the Constitution's contemporaries could not have conceived of some of the situations that would arise in modern times.[85] They argue further that

---

[75] Epstein & Walker, *supra* note 22, at 27; Scalia, *Originalism*, *supra* note 62, at 852, 862–64. A textualist approach based on the original meaning may allow for consideration of contemporary values to the extent that a court finds the original meaning counsels for an application of contemporary values to modern factual circumstances. Maggs & Smith, *supra* note 58, at 36.

[76] Scalia, *Originalism*, *supra* note 62, at 852, 862–64.

[77] Maggs & Smith, *supra* note 58, at 39.

[78] Epstein & Walker, *supra* note 22, at 28; Maggs & Smith, *supra* note 58, at 40. Furthermore, opponents argue that original meaning is of little use when the provision of the Constitution to be interpreted and applied is broadly worded and open to several meanings, or when the Constitution is silent on an issue. *Id.* at 20. Arguably, the "original meaning" of some provisions of the Constitution (e.g., the Ninth Amendment) contemplates constitutional rights that exist independent of the text, and thus the drafters contemplated that interpreters of the Constitution would consider sources of meaning outside of the text and historical sources from the time of the Founding. *See* John Hart Ely, Democracy and Distrust: A Theory of Judicial Review 14, 33–40 (1980).

[79] *See* Maggs & Smith, *supra* note 58, at 40–41.

[80] Bobbitt, *supra* note 22, at 7, 10–12. Justice Scalia acknowledged the limits of historical sources. Scalia, *Originalism*, *supra* note 62, at 856–57.

[81] Maggs & Smith, *supra* note 58, at 40–41.

[82] Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 Yale L.J. 852, 935 (2013) ("Judges are not historians, and so, in addition to the risk that they will not understand the materials they are charged to consult, there is the additional risk that they will not conduct a dispassionate examination of the historical evidence and will simply marshal historical anecdotes to achieve what they have already decided is the preferred outcome.").

[83] *The Nomination of Elena Kagan to Be an Associate Justice of the Supreme Court of the United States: Hearing Before the S. Comm. on the Judiciary Part 1*, 111th Cong. 62 (2010) (statement of Elena Kagan in response to a question from Senator Patrick Leahy) ("And I think that [the Framers] laid down—sometimes they laid down very specific rules. Sometimes they laid down broad principles. Either way we apply what they say, what they meant to do. So in that sense, we are all originalists.").

[84] Maggs & Smith, *supra* note 58, at 21.

[85] Sunstein, *supra* note 9, at 103.

interpreting the Constitution based on original meaning may thus fail to protect minority rights because women and minorities did not have the same rights at the time of the Founding (or ratification of the Civil War Amendments) as they do today.[86] In addition, some skeptics of originalism challenge the view that Article V should be the exclusive vehicle for constitutional change,[87] as that article requires a two-thirds majority vote of the House of Representatives and Senate to propose an amendment,[88] and ratification by three-fourths of the states for the amendment to become part of the Constitution.[89] The high threshold the Constitution creates for formal amendment has prompted arguments that the Constitution's meaning should not be fixed in time, but, rather, should accommodate modern needs.[90]

# Judicial Precedent

The most commonly cited source of constitutional meaning is the Supreme Court's prior decisions on questions of constitutional law.[91] For most, if not all Justices, judicial precedent provides possible principles, rules, or standards to govern judicial decisions in future cases with arguably similar facts.[92] Although the Court routinely purports to rely upon precedent,[93] it is difficult to say with much precision how often precedent has actually constrained the Court's decisions[94] because the Justices plainly have latitude in how broadly or narrowly they choose to construe their prior decisions.[95]

In some cases, however, a single precedent may play a particularly prominent role in the Court's decisionmaking. For example, a plurality of Justices relied on *Roe v. Wade* as controlling precedent in their opinion in *Planned Parenthood v. Casey*.[96] In that case, the plurality reaffirmed *Roe*'s holding that a woman has a protected liberty interest in terminating her pregnancy prior to

---

[86] Brennan, *supra* note 20, at 436–37; SOTIRIOS A. BARBER, THE CONSTITUTION OF JUDICIAL POWER 7 (1993). For example, it seems possible that many of the ratifiers of the Fourteenth Amendment would have favored segregation by race and gender. SUNSTEIN, *supra* note 9, at 121.

[87] C. HERMAN PRITCHETT, CONSTITUTIONAL LAW OF THE FEDERAL SYSTEM 37 (1984).

[88] Under Article V, two-thirds of the states' legislatures may also call a constitutional convention to propose amendments. *See* U.S. CONST. art. V.

[89] *Id.*

[90] PRITCHETT, *supra* note 87, at 37.

[91] MICHAEL J. GERHARDT, THE POWER OF PRECEDENT 147–48 (2008) ("[I]t is practically impossible to find any modern Court decision that fails to cite at least some precedents in support."). This report's concept of "judicial precedent" is limited to prior decisions of the Supreme Court. However, the concept of "precedent" is arguably much broader, encompassing "norms," "historical practices," and "traditions." *Id.* at 3. For a discussion of the use of historical practices in interpreting the Constitution, see "Historical Practices" below.

[92] BOBBITT, *supra* note 22, at 7. BLACK'S LAW DICTIONARY 1366 (10th ed. 2014) (defining "precedent" as "a decided case that furnishes a basis for determining later cases involving similar facts or issues"). The Court may also rely on commentary on these cases by academics and judges. *Id.* This report does not examine in any detail reliance on such commentary or the precedents of state courts or foreign tribunals in constitutional interpretation. *See* BREST ET AL., *supra* note 20, at 56.

[93] EPSTEIN & WALKER, *supra* note 22, at 29.

[94] *See* Michael J. Gerhardt, *The Role of Precedent in Constitutional Decisionmaking and Theory*, 60 GEO. WASH. L. REV. 68, 76 (1991) ("Precedents commonly are regarded as a traditional source of constitutional decisionmaking, despite the absence of any clear evidence that they ever have forced the Court into making a decision contrary to what it would rather have decided.").

[95] GERHARDT, *supra* note 91, at 34–35.

[96] 505 U.S. 833 (1992) (plurality opinion).

fetal viability, stating that the essential holding of *Roe* "should be retained."[97] Another example of the heightened role that precedent can play in constitutional interpretation is the Court's decision in *Dickerson v. United States*, which addressed the constitutionality of a federal statute governing the admissibility of statements made during police interrogation, a law that functionally would have overruled the 1966 case of *Miranda v. Arizona*.[98] In striking down the statute, the majority declined to overrule *Miranda*, noting that the 1966 case had "become embedded in routine police practice to the point where the warnings have become part of our national culture."[99]

More often, the Court reasons from the logic of several precedents in rendering its decisions. An example is *Arizona State Legislature v. Arizona Independent Redistricting Commission*, which held that the voters of Arizona could remove from the state legislature the authority to redraw the boundaries for legislative districts and vest that authority in an independent commission.[100] In so holding, the Court examined the Elections Clause, which states that the "Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."[101] The Court determined that the term "Legislature" encompassed the voters of a state making law through a referendum.[102] In reaching this determination, the Court relied on three cases from the early twentieth century to support a more expansive view of the term "Legislature,"[103] including one case from 1916, *Ohio ex rel. Davis v. Hildebrant*, which the Court described as holding that a state referendum was "part of the legislative power" and could be "exercised by the people to disapprove the legislation creating congressional districts."[104]

Proponents of the primacy of precedent as a source of constitutional meaning point to the legitimacy of decisions that adhere to principles set forth in prior, well-reasoned written opinions.[105] They contend that following the principle of stare decisis[106] and rendering decisions grounded in earlier cases supports the Court's role as a neutral, impartial, and consistent decisionmaker.[107] Reliance on precedent in constitutional interpretation is said to provide more predictability, consistency, and stability in the law for judges, legislators, lawyers, and political branches and institutions that rely on the Court's rulings;[108] prevent the Court from overruling all

---

[97] *Id.* at 845–46 ("After considering the fundamental constitutional questions resolved by *Roe*, principles of institutional integrity, and the rule of stare decisis, we are led to conclude this: the essential holding of *Roe v. Wade* should be retained and once again reaffirmed."). Although the plurality in *Casey* declined to overrule the core aspects of *Roe*, it discarded *Roe*'s "trimester approach" to evaluating the constitutionality of a state's restrictions on abortion in favor of a balancing test that considers whether such restrictions impose an "undue burden" on a woman's privacy interests protected by the Fourteenth Amendment. *Id.* at 872–77.

[98] 530 U.S. 428, 431–32 (2000).

[99] *Id.* at 443; *see also id.* at 432 ("We hold that *Miranda*, being a constitutional decision of this Court, may not be in effect overruled by an Act of Congress, and we decline to overrule *Miranda* ourselves. We therefore hold that *Miranda* and its progeny in this Court govern the admissibility of statements made during custodial interrogation in both state and federal courts.").

[100] 576 U.S. ___, No. 13-1314, slip op. at 3 (2015).

[101] U.S. CONST. art. I, § 4, cl. 1.

[102] *Ariz. State Leg.*, slip op. at 35.

[103] *Id.* at 15 ("Three decisions compose the relevant case law: *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916); *Hawke v. Smith (No. 1)*, 253 U.S. 221 (1920); and *Smiley v. Holm*, 285 U.S. 355 (1932).").

[104] *Id.* at 16.

[105] BOBBITT, *supra* note 22, at 42.

[106] "Stare decisis" refers to the "doctrine of precedent, under which a court must follow earlier judicial decisions when the same points arise again in litigation." BLACK'S LAW DICTIONARY 1626 (10th ed. 2014).

[107] *See* Gerhardt, *supra* note 94, at 70–71 (discussing arguments in support of the use of precedent).

[108] EPSTEIN & WALKER, *supra* note 22, at 29; Gerhardt, *supra* note 94, at 85–87.

but the most misguided decisions;[109] and allow constitutional norms to evolve slowly over time.[110]

Some argue that judicial overreliance on precedent can be problematic. For one thing, certain precedents might have been wrongly decided, in which case relying on them merely perpetuates their erroneous construction of the Constitution.[111] Indeed, critics argue that, if the Court strictly adheres to precedent, once a precedent has been established on a question of constitutional law, the only way to alter that ruling is to amend the Constitution.[112] This inflexibility is particularly problematic when those outside the Court begin to disagree about general background principles underlying a precedent; as such, disagreements arguably cause that precedent to lose its authority.[113] For example, when precedent offends basic moral principles (e.g., *Plessy v. Ferguson*),[114] the power of the Court's precedent may necessarily be weakened.[115] Other commentators argue that "consistency," "predictability," "stability," and "neutrality" are not actually benefits of reliance on precedent, as judges may choose among precedents and, to some extent, interpret precedents in accordance with their own views in order to overrule them implicitly; to expand them; or to narrow them.[116] In addition, some proponents of original meaning as a method of constitutional interpretation object to the use of judicial precedent that conflicts with original meaning, because it favors the views of the Court over the views of those who ratified the Constitution, thereby allowing mistaken interpretations of the Constitution to persist.[117]

# Pragmatism

In contrast to textualist and some originalist approaches to constitutional interpretation, which generally focus on the words of the Constitution as understood by a certain group of people, pragmatist approaches consider the likely practical consequences of particular interpretations of the Constitution.[118] That is, pragmatist approaches often involve the Court weighing or balancing

---

[109] Henry P. Monaghan, *Stare Decisis and Constitutional Adjudication*, 88 COLUM. L. REV. 723, 749–50 (1988); Fallon, *supra* note 15, at 585.

[110] MAGGS & SMITH, *supra* note 58, at 19.

[111] Raoul Berger, *Original Intent and Boris Bittkey*, 66 IND. L.J. 723, 747 (1991) (citation omitted).

[112] *See, e.g.*, Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 406–10 (1932) (Brandeis, J., dissenting) ("[I]n cases involving the Federal Constitution, where correction through legislative action is practically impossible, this Court has often overruled its earlier decisions."); Smith v. Allwright, 321 U.S. 649, 665 (1944) ("[W]hen convinced of former error, this Court has never felt constrained to follow precedent. In constitutional questions, where correction depends upon amendment and not upon legislative action this Court throughout its history has freely exercised its power to reexamine the basis of its constitutional decisions.").

[113] BOBBITT, *supra* note 22, at 52.

[114] 163 U.S. 537 (1896). In *Plessy*, the Court upheld the constitutionality of a Louisiana law mandating racial segregation in railway cars, determining that "separate but equal" public accommodations did not violate Thirteenth or Fourteenth Amendment guarantees. *Id.* at 542, 550–51.

[115] GERHARDT, *supra* note 91, at 35–36.

[116] *Id.* at 34–35 ("Applying precedents requires interpreting them, interpreting them frequently entails modifying them, and modifying them often entails extending or contracting them."); EPSTEIN & WALKER, *supra* note 22, at 30.

[117] *See* Monaghan, *supra* note 109, at 769–70 ("In the interpretation of this written Constitution, we may assume that the founding generation was much attached to the original, publicly shared understanding of the document. Thus, one can make a good case that, as historically understood, the written Constitution was intended to trump not only statutes but case law. This argument is reinforced if one recalls that to the founding generation it was not clear that judicial opinions would need to play such a dominant role in establishing the meaning of the Constitution.").

[118] HON. RICHARD A. POSNER, THE PROBLEMS OF JURISPRUDENCE 31 (1990).

the probable practical consequences of one interpretation of the Constitution against other interpretations.[119] One flavor of pragmatism weighs the future costs and benefits of an interpretation to society or the political branches,[120] selecting the interpretation that may lead to the perceived best outcome.[121] For example, in *United States v. Leon*, the majority held that the Fourth Amendment does not necessarily require a court to exclude evidence obtained as a result of the law enforcement's good faith reliance on an improperly issued search warrant.[122] Justice Byron White's majority opinion in *Leon* took a pragmatic approach, determining that "the [exclusionary] rule's purposes will only rarely be served" by applying it in the context of a good faith violation of the Fourth Amendment.[123] Notably, the Court determined that adoption of a broader exclusionary rule would result in significant societal costs by undermining the ability of the criminal justice system to obtain convictions of guilty defendants.[124] Such costs, the Court held, outweighed the "marginal or nonexistent benefits."[125]

Another case in which the Supreme Court accorded weight to the likely practical consequences of a particular interpretation of the Constitution is *United States v. Comstock*.[126] In *Comstock*, the Court considered whether Congress had the power under Article I, Section 8 of the Constitution to enact a civil commitment law authorizing the Department of Justice to cause to be detained indefinitely convicted sex offenders who had already served their criminal sentences but were deemed "mentally ill" and "sexually dangerous."[127] Such a power is not among those specifically enumerated in Article I, Section 8 of the Constitution, but the Court held that Congress could enact the law under a combination of (1) its implied constitutional powers to, among other things, legislate criminal offenses, provide for the imprisonment of offenders, and regulate prisons and prisoners; and (2) Article I, Section 8, Clause 18 of the Constitution, which provides Congress the power to "make all Laws which shall be necessary and proper for carrying into Execution . . . all other Powers vested by this Constitution in the Government of the United States."[128] Justice Stephen Breyer, writing for the Court, listed several factors that weighed in favor of the Court's

---

[119] *See* HON. RICHARD A. POSNER, CARDOZO: A STUDY IN REPUTATION 28 (1990) (discussing Justice Benjamin Cardozo's views on pragmatism, as reflected in his jurisprudence, as contemplating a method "in which social interests behind competing legal principles are identified and (roughly speaking) weighed against each other to determine how a case lying at the intersection of those principles should be decided"); Hon. Richard A. Posner, *What Has Pragmatism to Offer Law?*, 63 S. CAL. L. REV. 1653, 1670 (1990) ("All that a pragmatic jurisprudence really connotes . . . is a rejection of a concept of law as grounded in permanent principles and realized in logical manipulations of those principles, and a determination to use law as an instrument for social ends.").

[120] Justice Byron White often argued that the Court should adopt a functionalist approach in separation-of-powers cases by considering the extent to which a particular reading of the Constitution would promote a workable government. *See, e.g.*, INS v. Chadha, 462 U.S. 919, 984 (White, J., dissenting) ("It is long settled that Congress may 'exercise its best judgment in the selection of measures, to carry into execution the constitutional powers of the government,' and 'avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances.'") (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 415–16, 420 (1819)) (internal quotation marks omitted); William J. Wagner, *Balancing as Art: Justice White and the Separation of Powers*, 52 CATH. U. L. REV. 957, 962 (2003) ("Where he encountered silence in the constitutional text, Justice White consistently deferred to congressional judgments on the best structure and functioning of government. The judiciary's role in these cases was simply to unmask any congressional attempts to deprive another branch of its constitutional power, not to apply formulaic rules.").

[121] BREST ET AL., *supra* note 20, at 54–55.

[122] 468 U.S. 897, 926 (1984).

[123] *Id.*

[124] *Id.* at 907–08, 922.

[125] *Id.*

[126] 560 U.S. 126 (2010).

[127] *Id.* at 129–32.

[128] *Id.* at 135–37.

determination that Congress possessed the authority to enact the civil commitment law.[129] One of these factors rested primarily on pragmatic concerns about the potential detriment to society of releasing dangerous offenders into the community.[130] The Court held that the civil commitment law represented a rational means of implementing Congress's implied criminal justice powers "in light of the Government's custodial interest in safeguarding the public from dangers posed by those in federal custody."[131]

Using another type of pragmatist approach, a court might consider the extent to which the judiciary could play a constructive role in deciding a question of constitutional law.[132] According to this approach, a judge might observe the "passive virtues" by declining to rule on the constitutional issues in a case by adhering to certain doctrines, including those under which a judge will avoid ruling on political or constitutional questions.[133] This may allow the Court to avoid becoming frequently embroiled in public controversies, preserving the Court's institutional capital for key cases and giving more space for the democratic branches to address the issue and reach accommodations on questions about the meaning of the Constitution.[134] The Supreme Court's decision in *Baker v. Carr*[135] illustrates the application of this second type of pragmatism. In that case, Justice William Brennan, writing for the majority, debated a dissenting Justice Felix Frankfurter about whether the Court was the proper actor to review the constitutionality of a state's apportionment of voters among legislative districts, or whether the plaintiffs should have sought remedies from the state legislature.[136] Justice Brennan's majority opinion in *Baker* ultimately concluded that a state's apportionment decisions are properly justiciable matters, as an alternative holding would require those harmed by malapportionment to seek redress from a political process that was skewed against such plaintiffs.[137]

Those who support pragmatism in constitutional interpretation argue that such an approach takes into account the "political and economic circumstances" surrounding the legal issue before the Court and seeks to produce the optimal outcome.[138] Such an approach may allow the Court to issue decisions reflecting contemporary values to the extent that the Court considers these values relevant to the costs and benefits of a particular interpretation.[139] On this view, pragmatism posits a view of the Constitution that is adaptable to changing societal circumstances, or that at least reflects the proper role of the judiciary.[140]

---

[129] *Id.* at 149–50. The factors included "(1) the breadth of the Necessary and Proper Clause, (2) the long history of federal involvement in this arena, (3) the sound reasons for the statute's enactment in light of the Government's custodial interest in safeguarding the public from dangers posed by those in federal custody, (4) the statute's accommodation of state interests, and (5) the statute's narrow scope." *Id.*

[130] *Id.* at 142–43, 149–50.

[131] *Id.*

[132] Bobbitt, *supra* note 22, at 7. Brest et al., *supra* note 20, at 55.

[133] Alexander M. Bickel, The Least Dangerous Branch: The Supreme Court at the Bar of Politics 199–201 (1962). Alternatively, the court could rule on the merits on narrow grounds. Cass R. Sunstein, One Case at a Time: Judicial Minimalism on the Supreme Court ix–xiv (2001).

[134] Brest et al., *supra* note 20, at 55.

[135] 369 U.S. 186 (1962).

[136] *Id.* at 231–37, 266–68. The majority opinion announced a standard to determine when a case presents a political question not suitable for resolution by the courts. *See id.* at 217.

[137] *See id.* at 208–09.

[138] Bobbitt, *supra* note 22, at 61; Brest et al., *supra* note 20, at 54–55.

[139] Breyer, *supra* note 20, at 11–12.

[140] *Id.*

Critics of pragmatism argue that consideration of costs and benefits unnecessarily injects politics into judicial decisionmaking.[141] They argue that judges are not politicians. Rather, a judge's role is to say what the law is and not what it should be.[142] In addition, some opponents of the pragmatic approach have argued that when the Court observes the "passive virtues" by dismissing a case on jurisdictional grounds, it fails to provide guidance to parties for the future and to fulfill the Court's duty to decide important questions about constitutional rights.[143]

# Moral Reasoning

Another approach to constitutional interpretation is based on moral or ethical reasoning—often broadly called the "ethos of the law."[144] Under this approach, some constitutional text employs or makes reference to terms that are infused with (and informed by) certain moral concepts or ideals, such as "equal protection" or "due process of law."[145] The moral or ethical arguments based on the text often pertain to the limits of government authority over the individual (i.e., individual rights).[146] The Court has derived general moral principles from the broad language of the Fourteenth Amendment in cases involving state laws or actions affecting individual rights.[147] For example, in *Lawrence v. Texas*, the Court struck down a Texas law that banned private, consensual same-sex sexual activity as violating the Due Process Clause of the Fourteenth Amendment.[148] That clause provides, in relevant part, that states shall not "deprive any person of . . . liberty . . . without due process of law."[149] The Court held that the concept of liberty "presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct."[150] Notably, the text of the Fourteenth Amendment does not define "liberty," and the Court's holding in *Lawrence* is more broadly grounded in general views about the proper role of government in not punishing behavior that provides no discernible harm to the public at large.[151]

A particularly famous example of an argument based on the "ethos of the law" is contained in the Court's decision in *Bolling v. Sharpe*.[152] The Court decided *Bolling* on the same day it decided *Brown v. Board of Education*, which held that a state, in segregating its public school systems by race, violated the Fourteenth Amendment.[153] Specifically, the Court held that the practice of "separate but equal" as applied to schools violated the Equal Protection Clause, a provision that prohibits state governments from depriving their citizens of the equal protection of the law.[154]

---

[141] *See* SCALIA, A MATTER OF INTERPRETATION, *supra* note 17, at 45–47.

[142] *See id.*

[143] Gerald Gunther, *The Subtle Vices of the "Passive Virtues": A Comment on Principle and Expediency in Judicial Review*, 64 COLUM. L. REV. 1, 15–16, 21–23 (1964).

[144] Some scholars refer to the general moral or ethical principles underlying the text of the Constitution as the "ethos of the law." BOBBITT, *supra* note 22, at 142.

[145] *Id.* at 126.

[146] *Id.* at 162.

[147] *Id.* at 142.

[148] 539 U.S. 558, 578 (2003).

[149] U.S. CONST. amend. XIV, § 1.

[150] *Lawrence*, 539 U.S. at 562.

[151] *See id.* at 578.

[152] 347 U.S. 497 (1954).

[153] *Id.* at 498–99 (citing Brown v. Bd. of Educ., 347 U.S. 483 (1954)).

[154] *Id.*

*Bolling*, however, involved the District of Columbia school system, which was not subject to the Fourteenth Amendment because the District of Columbia is not a state, but rather a federal enclave.[155] Furthermore, the Fifth Amendment, which applies to the actions of the federal government, provides that no person shall "be deprived of life, liberty, or property, without due process of law" but does not explicitly contain an Equal Protection Clause.[156] Nevertheless, the Court struck down racial segregation in DC public schools as a violation of the Fifth Amendment's Due Process Clause, determining that due process guarantees implicitly include a guarantee of equal protection.[157] The Court's reasoning was based on the Due Process Clause being derived "from our American ideal of fairness," ultimately holding that the Fifth Amendment prohibited the federal government from allowing segregation in public schools.[158]

Proponents of using moral or ethical reasoning as an approach for making sense of broad constitutional text, such as the Due Process Clause of the Fourteenth Amendment, argue that general moral principles underlie much of the text of the Constitution.[159] Thus, arguments about what the Constitution means based on moral reasoning produce "more candid opinions," as judges often rely upon moral arguments but disguise them as textual arguments or arguments based on precedent.[160] Some also argue that the Framers designed the Constitution as an instrument that would grow over time.[161] Thus, supporters of moral reasoning in constitutional interpretation contend that its use appropriately leads to more flexibility for judges to incorporate contemporary values when deriving meaning from the Constitution.[162] Ethical arguments can also fill in gaps in the text to address situations unforeseen at the time of the Founding,[163] consistent with the understanding of the Bill of Rights as a starting point for individual rights.[164]

Critics of using moral reasoning in constitutional interpretation have argued that courts should not be "moral arbiters."[165] They argue that ethical arguments are based on principles that are not objectively verifiable[166] and may require a judge to choose between "competing moral conventions."[167] Courts may thus be ill-equipped to discern established moral principles. Judges using this mode of constitutional interpretation may therefore decide cases according to their own policy views, and opponents believe that overturning acts of the political branches based on such considerations is undemocratic.[168] Some opponents argue that moral considerations may be better left to the political branches.[169]

---

[155] *Id.*; *see also* U.S. CONST. art. I, § 8, cl. 17.

[156] U.S. CONST. amend. V; *Bolling*, 347 U.S. at 498–500.

[157] *Id.*

[158] *Id.* at 499–500.

[159] HADLEY ARKES, BEYOND THE CONSTITUTION 19 (1990).

[160] BOBBITT, *supra* note 22, at 106.

[161] BARBER, *supra* note 35, at 40 (discussing the view that the Constitution "marks out 'lines of growth' toward the real values of the framers and away from those of their views and attitudes that were inconsistent with their aspirations" (citing John Hart Ely, *Constitutional Interpretivism: Its Allure and Impossibility*, 53 IND. L.J. 399, 410–14 (1978))).

[162] ELY, *supra* note 78, at 1.

[163] BOBBITT, *supra* note 22, at 102.

[164] ARKES, *supra* note 159, at 60–62.

[165] BOBBITT, *supra* note 22, at 137.

[166] *Id.* at 138.

[167] *Id.* at 139; ELY, *supra* note 78, at 59.

[168] *Id.* at 5.

[169] *See id.*

# National Identity or "National Ethos"

Another approach to interpretation that is closely related to but conceptually distinct from moral reasoning is judicial reasoning that relies on the concept of a "national ethos." This national ethos is defined as the unique character of American institutions, the American people's distinct national identity, and "the role within [the nation's public institutions] of the American people."[170] An example of the "national ethos" approach to ethical reasoning is found in *Moore v. City of East Cleveland*, in which the Court struck down as unconstitutional a city zoning ordinance that prohibited a woman from living in a dwelling with her grandson.[171] In its decision, the Court surveyed the history of the family as an institution in American life and stated, "Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural."[172] Thus, the Court struck down the zoning ordinance, at least in part, because it interfered with the American institution of the family by preventing a grandmother from living with her grandson.[173]

Another example of the Court's reliance on national ethos as a rationale is *West Virginia State Board of Education v. Barnette*.[174] In that case, the Court held that the First Amendment prohibited a state from enacting a law compelling students to salute the American flag.[175] Writing for the majority, Justice Robert Jackson noted that, in contrast to authoritarian regimes such as the Roman Empire, Spain, and Russia, the United States' unique form of constitutional government eschews the use of government coercion as a means of achieving national unity.[176] The Court invoked the nation's character as reflected in the Constitution, writing that, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."[177]

Many of the arguments in the debate over reliance on the "national ethos" in constitutional interpretation share similarities with arguments made about the use of moral reasoning as a mode of interpretation. Some proponents of using the distinct character of the American national identity and the nation's institutions as a method for elaborating on the Constitution's meaning argue that the "national ethos" underlies the text of the Constitution, and that the use of this method allows more flexibility for judges to incorporate contemporary American values when deriving meaning from the Constitution.[178] Moreover, unlike approaches that discern meaning from general moral or ethical principles, the "national ethos" approach arguably has added legitimacy as a mode of interpretation because it is specifically tied to the identity and values of the United States and those aspects of the Constitution that are distinctly American.[179] As noted,

---

[170] BOBBITT, *supra* note 22, at 94.

[171] 431 U.S. 494, 506 (1977).

[172] *Id.* at 499–504.

[173] *Id.*

[174] 319 U.S. 624 (1943).

[175] *Id.* at 642.

[176] *Id.* at 640–41.

[177] *Id.*

[178] *Cf. supra* notes 159, 162.

[179] *Cf.* Thompson v. Oklahoma, 487 U.S. 815, 869 n.4 (1988) (Scalia, J., dissenting) ("The plurality's reliance upon Amnesty International's account of what it pronounces to be civilized standards of decency in other countries . . . is totally inappropriate as a means of establishing the fundamental beliefs of this Nation. . . . We must never forget that it (continued...)

ethical arguments can also fill in gaps in the text to address situations unforeseen at the time of the Founding.[180]

On the other hand, as with moral reasoning, critics of an approach to constitutional interpretation based on the "national ethos" have argued that such an approach involves unelected judges determining the meaning of the Constitution based on principles that are not objectively verifiable—determinations that critics argue should be made by the political branches.[181]

# Structuralism

One of the most common modes of constitutional interpretation is based on the structure of the Constitution. Indeed, drawing inferences from the design of the Constitution gives rise to some of the most important relationships that everyone agrees the Constitution establishes—the relationships among the three branches of the federal government (commonly called separation of powers or checks and balances); the relationship between the federal and state governments (known as federalism); and the relationship between the government and the people.[182] Two basic approaches seek to make sense of these relationships.

The first, known as formalism, posits that the Constitution sets forth all the ways in which federal power may be shared, allocated, or distributed.[183] An example of the use of this form of structuralism as a mode of interpretation is found in *Immigration and Naturalization Service v. Chadha*.[184] In that case, the Court held that one house of Congress could not by resolution unilaterally curtail the statutory authority of the executive branch to allow a deportable alien to remain in the United States.[185] The Court examined the structure of the Constitution and noted that under the Bicameralism and Presentment Clauses in Article I, Sections 1 and 7, laws with subject matter that is "legislative in character or effect" require passage by a majority in both houses and presentment to the President for his signature or veto.[186] Viewing the exercise of the one-house veto in *Chadha* to be of a legislative nature, the Court concluded that the structural relationships that the Constitution established between the legislative and executive branches forbid the "one-House legislative veto."[187]

An example of the Court's use of formalist structural reasoning in the context of federalism is *U.S. Term Limits, Inc. v. Thornton*.[188] In that case, the Court considered whether the State of

---

(...continued)

is a Constitution for the United States of America that we are expounding.").

[180] *See supra* notes 163-64.

[181] *Cf. supra* notes 165-69.

[182] CHARLES L. BLACK, JR., STRUCTURE AND RELATIONSHIP IN CONSTITUTIONAL LAW 7 (1969) [hereinafter BLACK, STRUCTURE AND RELATIONSHIP].

[183] John F. Manning, *Separation of Powers as Ordinary Interpretation*, 124 HARV. L. REV. 1939, 1942–44 (2011); Peter L. Strauss, *Formal and Functional Approaches to Separation-of-Powers Questions—A Foolish Inconsistency?*, 72 CORNELL L. REV. 488, 489 (1987) ("The Supreme Court has vacillated over the years between using a formalistic approach to separation-of-powers issues grounded in the perceived necessity of maintaining three distinct branches of government (and consequently appearing to draw rather sharp boundaries), and a functional approach that stresses core function and relationship, and permits a good deal of flexibility when these attributes are not threatened.").

[184] 462 U.S. 919 (1983).

[185] *Id.* at 923, 946.

[186] *Id.* at 952, 54–55.

[187] *Id.*

[188] 514 U.S. 779 (1995).

Arkansas could prohibit the names of otherwise-qualified candidates for congressional office from appearing on the state's general election ballot if the candidates had served three terms in the House of Representatives or two terms in the Senate.[189] In striking down an amendment to the Arkansas State Constitution, the Court relied heavily on its view of the formal structural relationships that the Constitution established among the people of the United States, the states, and the federal government.[190] In particular, the Court determined that the Founding Fathers established a single, national legislature representing "the people of the United States" rather than a "confederation of sovereign states."[191] Thus, allowing states to adopt a patchwork of distinct qualifications for congressional service would "erode the structure envisioned by the Framers."[192] Notably, the Court in *Thornton* adhered closely to its view of how the Constitution allocates power between the federal and state governments, and did not employ a balancing test to examine the degree to which the states' power to set qualifications for congressional office would interfere with the federal government's constitutional prerogatives.

A second form of structural reasoning, known as functionalism, treats the Constitution's text as having firmly spelled out the relationship among the three federal branches only at their apexes, but otherwise left it to be worked out in practice how power may be distributed or shared below the apexes.[193] Whereas formalism purports to hew closely to original meaning and regards historical practices as basically irrelevant or illegitimate, functionalism uses a balancing approach that weighs competing governmental interests as one of its principal methodologies.[194] One early example of functionalism is *McCulloch v. Maryland*.[195] In that case, the Court held that Congress had the power to create the Second Bank of the United States.[196] While Congress's enumerated powers in Article I, Section 8 of the Constitution do not specifically include the power to create a central bank, the Court considered whether Congress had such authority under its enumerated powers when viewed in conjunction with Article I, Section 8, Clause 18, which provides Congress the power "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States."[197] The Court determined that Congress had an implied power to create the bank under the Necessary and Proper Clause in order to implement its express powers to tax and spend, concluding that the terms "necessary" and "proper" should not have a

---

[189] *Id.* at 783. The Constitution imposes qualifications regarding minimum age, citizenship, and residency of a Member of the House or Senate, but it does not contain language expressly imposing term limits on Members. U.S. CONST. art. I, § 2, cl. 2 (qualifications for Members of the House of Representatives); *id.* art. I, § 3, cl. 3 (qualifications for Senators).

[190] *U.S. Term Limits*, 514 U.S. at 783.

[191] *Id.* at 783, 822, 837–38; Kathleen M. Sullivan, Comment, *Dueling Sovereignties:* U.S. Term Limits, Inc. v. Thornton, 109 HARV. L. REV. 78, 88 (1995) ("The majority and the dissent deduced opposite formal structural axioms from the founding. To the majority, the founding was a 'revolutionary' act that replaced a confederation of sovereign states with a 'National Government' in which the 'representatives owe primary allegiance not to the people of a State, but to the people of the Nation.'").

[192] *U.S. Term Limits*, 514 U.S. at 783, 822, 837–38. The Court also determined that the sovereign powers possessed by the states prior to the American Revolution did not include the power to establish additional qualifications for congressional service. *Id.* at 802.

[193] Michael C. Dorf, *Interpretive Holism and the Structural Method*, 92 GEO. L.J. 833, 837 (2004); Strauss, *supra* note 183, at 489.

[194] *See* Manning, *supra* note 183, at 1942–44.

[195] 17 U.S. (4 Wheat.) 316 (1819).

[196] *Id.* at 425.

[197] *Id.* at 411–12.

restrictive meaning on Congress's power.[198] In so holding, the Court examined the structure of the Constitution's text, noting that the Constitution located the Necessary and Proper Clause in the section of the Constitution that grants powers to Congress (Article I, Section 8), instead of the section of the Constitution that restricts the powers of the federal government (Article I, Section 9).[199] Moreover, the *McCulloch* Court noted that a more restrictive reading of Congress's powers would impair its ability to "perform[] its functions," as a narrow reading of the Necessary and Proper Clause would impose "some difficulty in sustaining the authority of Congress to pass other laws for the accomplishment of the same objects."[200]

As is evident, a threshold debate among structuralists is whether to use a formalist or functionalist approach when interpreting the Constitution. This debate is founded partly in concerns about which approach demonstrates greater fidelity to the Constitution, which is closest to the original meaning of the Constitution, and which best protects liberty in cases raising questions about the proper allocation of power between the branches of the federal government; federal government and states; government institutions; or citizens and government.[201]

*Formalism* focuses on the structural divisions in the Constitution with the idea that close adherence to these rules is required in order to achieve the preservation of liberty.[202] An example is the Court's opinion in *Chadha*, which, as noted, held that structural relationships that the Constitution established between the legislative and executive branches forbid the "one-House legislative veto."[203] The Court rested its holding in part on a close adherence to the structural divisions established in the Constitution, stating, "It emerges clearly that the prescription for legislative action in [Article I, Sections 1 and 7 of the Constitution] represents the Framers' decision that the legislative power of the Federal Government be exercised in accord with a single, finely wrought and exhaustively considered, procedure."[204] As demonstrated in *Chadha*, a formalist approach to separation-of-powers questions rejects not only looking to postratification historical practices as a guide for determining constitutional meaning, but also eschews balancing tests that weigh the degree of interference with one branch's powers.

By contrast, *functionalism* takes a more flexible approach, emphasizing the core functions of each of the branches, and asking whether an overlap in these functions upsets the equilibrium that the Framers sought to maintain.[205] An example is the Court's opinion in *Zivotofsky v. Kerry*.[206] In that case, the Court held that the President has the exclusive power to recognize formally a foreign sovereign and its territorial boundaries, and that Congress could not effectively require the State Department to issue a formal statement contradicting the President's policy on recognition.[207] In so holding, the Court stated that the President should have such an exclusive power because the nation must have a "single policy" on which governments are legitimate, and that additional

---

[198] *Id.* at 419–21.

[199] *Id.*

[200] *Id.* at 409.

[201] *See* Manning, *supra* note 183, at 1942–44, 1950–52, 1958–60. *See also* Myers v. United States, 272 U.S. 52, 116 (1926).

[202] Manning, *supra* note 183, at 1958–60.

[203] 462 U.S. 919, 952, 54–55 (1983).

[204] *Id.* at 951.

[205] Manning, *supra* note 183, at 1950–52.

[206] 576 U.S. __, No. 13-628, slip op. at 1 (2015).

[207] *Id.* at 29.

pronouncements from Congress on the issue could result in confusion.[208] The Court thus adopted a functionalist approach by considering the practical consequences of allocating the power of recognition between the legislative and executive branches, ultimately concluding that the President alone should exercise that power.

A further illustration of the distinction between formalism and functionalism in a separation-of-powers case is *Morrison v. Olson*.[209] In *Morrison*, the Court upheld against constitutional challenge provisions in the Ethics in Government Act of 1978 that allowed for appointment of an "independent counsel to investigate and, if appropriate, prosecute certain high-ranking Government officials for violations of federal criminal laws."[210] The Attorney General could remove the independent counsel only for "good cause,"[211] a legal standard that provided the special prosecutor with significant independence from the President and his officers.[212] In a 7-1 decision, the Court employed a functionalist approach and held that the act did not violate constitutional separation-of-powers principles by sufficiently interfering with the President's executive authority under Article II.[213] The Court determined the limited nature of the special prosecutor's jurisdiction and authority meant that the position did not "interfere impermissibly with [the President's] constitutional obligation to ensure the faithful execution of the laws."[214] Justice Scalia, the sole dissenter, adopted a formalist approach, arguing that the majority failed to adhere to the strict allocations of power that the Constitution establishes among the branches of government.[215] Justice Scalia wrote that the independent counsel provisions deprived the President of "exclusive control" over the exercise of "purely executive powers" (e.g., investigation and prosecution of crimes) by vesting them in the independent counsel, who was not removable at will by the President.[216]

Proponents of structuralism note that it is a method of interpretation that considers the entire text of the Constitution rather than a particular part of it.[217] As a consequence, some proponents argue that structuralist methods produce clearer justifications for decisions that require interpretation of vague provisions of the Constitution and their application to particular factual circumstances than textualism alone.[218] Some argue that structuralism provides a firmer basis for personal rights than other modes of interpretation like textualism or moral reasoning.[219] For example, in *Crandall v. Nevada*, the Court struck down a state law imposing a tax on people leaving or passing through the state.[220] The Court inferred an individual right to travel among the states from the structural relationship the Constitution establishes between citizens and the federal and state governments.[221] While the Constitution does not specifically provide for a right to travel among

---

[208] *Id.* at 11.

[209] 487 U.S. 654 (1988).

[210] *Id.* at 659–60.

[211] *Id.* at 663.

[212] *Cf.* Humphrey's Ex'r v. United States, 295 U.S. 602, 629 ("We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers [subject to removal 'for cause'].").

[213] *Id.* at 689–97.

[214] *Id.*

[215] *Id.* at 699, 703–04 (Scalia, J., dissenting).

[216] *Id.* at 705–10.

[217] BOBBITT, *supra* note 22, at 74.

[218] BLACK, STRUCTURE AND RELATIONSHIP, *supra* note 182, at 13, 22.

[219] *Id.* at 46.

[220] 73 U.S. 35, 39, 49 (1868).

[221] *Id.*

the states, because citizens of the United States might need to travel among the states to exercise other constitutional rights, the Court inferred a right to travel from the Constitution viewed in its entirety.[222] As a result, some structuralists argue that the method of interpretation provides a more firm basis to establish key constitutional rights, like the right to travel, than other modes of constitutional interpretation.[223]

Some scholars maintain, however, that structuralism does not always lead to a clear answer.[224] More specifically, critics argue that it is more difficult for judges to apply and for citizens to understand interpretations based on structuralism than arguments based on other modes of interpretation.[225] In addition, many believe that determinations about the proper structure established by the Constitution are often subjective. While the eminent Professor Charles Black argued that structure was the most important mode of constitutional interpretation, at least one other prominent commentator has argued that the approach provides "no firm basis for personal rights" because personal rights are considered to derive from the "structure of citizenship" and are therefore "vulnerable to the [government's] desire for power and its ability to manipulate the relation between citizen and state."[226]

# Historical Practices

Judicial precedents are not the only type of precedents that are arguably relevant to constitutional interpretation. Prior decisions of the political branches, particularly their long-established, historical practices, are an important source of constitutional meaning to many judges, academics, and lawyers.[227] Indeed, courts have viewed historical practices as a source of the Constitution's meaning in cases involving questions about the separation of powers, federalism, and individual rights, particularly when the text provides no clear answer.[228]

An example of judicial reliance on historical practices—sometimes described as tradition—in constitutional interpretation is the Court's decision in *National Labor Relations Board v. Canning*.[229] When determining, among other things, that the President lacked authority to make a recess appointment during a Senate recess of fewer than ten days, the Court cited long-settled historical practices showing an absence of a settled tradition of such recess appointments as being relevant to the resolution of a separation-of-powers question not squarely addressed by the Constitution.[230] Another example of the influence of historical practices on constitutional interpretation is the Court's decision in *Zivotofsky v. Kerry*.[231] As noted above, in that case the

---

[222] BLACK, STRUCTURE AND RELATIONSHIP, *supra* note 182, at 27.

[223] *Id.* at 13, 22.

[224] BOBBITT, *supra* note 22, at 84; SUNSTEIN, *supra* note 9, at 120.

[225] BOBBITT, *supra* note 22, at 85.

[226] *Id.* at 85–86; ALEXANDER M. BICKEL, THE MORALITY OF CONSENT 53 (1975).

[227] BREST ET AL., *supra* note 20, at 56.

[228] *E.g.*, McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 401 (1819) ("[A] doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned, but the respective powers of those who are equally the representatives of the people, are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice."); *see also* PHH Corp. v. Consumer Fin. Prot. Bureau, 839 F.3d 1, 21–25 (D.C. Cir. 2016) (summarizing Supreme Court cases using historical practices as a method of constitutional interpretation in separation-of-powers cases).

[229] 573 U.S. __, No. 12-1281, slip op. at 1 (2014).

[230] *Id.* at 21.

[231] 576 U.S. __, No. 13-628, slip op. at 1 (2015).

Court held that the President had the exclusive power to recognize formally a foreign sovereign and its territorial boundaries, and that Congress could not effectively require the State Department to issue a formal statement contradicting the President's policy on recognition.[232] In deciding the case, the Court relied in part on the long-standing historical practice of the President in recognizing foreign sovereigns without congressional consent.[233]

An example of the use of historical practices as a method of constitutional interpretation in a case involving the limits of government power is *Marsh v. Chambers*.[234] In *Marsh*, the Court considered whether the First Amendment's Establishment Clause, which prohibits laws "respecting an establishment of religion," forbade the State of Nebraska from paying a chaplain with public funds to open each legislative session with a prayer in the Judeo-Christian tradition.[235] The Court held that the state's chaplaincy practice did not violate the Establishment Clause, attaching significance to the long-standing practices of Congress (including the Congress that adopted the First Amendment as part of the Bill of Rights) and some states in funding chaplains to open legislative sessions with a prayer.[236] The Court wrote, "The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom."[237]

The debate over historical practices as a mode of interpretation echoes many of the elements of debates over original meaning, judicial precedent, and arguments based on a "national ethos."[238] Functionalists, for example, attach considerable importance to historical practices as a source of constitutional meaning, while formalists generally regard them as irrelevant.[239] Those employing this method often argue that, when the text of the Constitution is ambiguous, the use of historical practices has legitimacy as an interpretive tool.[240] They also contend that such an approach provides an objective and neutral basis for decisionmaking, leading to more predictability and stability in the law upon which parties can rely.[241] Moreover, according interpretive significance to historical practices in cases concerning the allocation of power among the branches of government may help to preserve settled expectations that have resulted from long-standing compromises among the branches regarding such allocations.[242]

---

[232] *Id.* at 29.

[233] *Id.* at 20–21.

[234] 463 U.S. 783 (1983).

[235] *Id.* at 784.

[236] *Id.* at 788–89.

[237] *Id.* at 786.

[238] The arguments in the following three paragraphs draw heavily from the sections *supra* on "Original Meaning," "Judicial Precedent," and "Moral Reasoning."

[239] Jonathan Turley, *Constitutional Adverse Possession: Recess Appointments and the Role of Historical Practice in Constitutional Interpretation*, 2013 WIS. L. REV. 965, 969 ("[Functionalism] is a model of interpretation that invites the use of historical practice as self-affirming support for meaning.").

[240] *Cf.* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring) ("The Constitution is a framework for government. Therefore the way the framework has consistently operated fairly establishes that it has operated according to its true nature. Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them."); *see also* Turley, *supra* note 239, at 969.

[241] *Cf.* Gerhardt, *supra* note 94, at 70–71, 86–87 (discussing similar arguments in support of the use of judicial precedent in constitutional interpretation).

[242] Curtis A. Bradley & Neil S. Siegel, *After Recess: Historical Practice, Textual Ambiguity, and Constitutional* (continued...)

Those opposing reliance on historical practices as a source of constitutional meaning argue that it may be difficult to establish definitively what the relevant historical practices are in order to interpret the Constitution properly.[243] They suggest that not all practices are authorized by the written text and that historical sources may differ and thus might not be helpful in illuminating patterns in historical practices.[244] They also warn that this methodology could allow judges to engage in a form of what is called "law office history"—simply choosing the sources that support the historical practices they wish to ratify or reject.[245] Thus, it could be argued that historical practices may not lend themselves to easy or clear interpretation. Moreover, they can lead to results inconsistent with the original meaning of the Constitution.[246] Another possible problem with reliance on historical practices in constitutional interpretation, according to its critics, is that courts could end up legitimizing long-standing historical practices, such as slavery or segregation, that offend modern moral principles. Indeed, giving historical practices special place in constitutional interpretation could lead courts to fail to protect minority rights[247] or to preserve the basic structure of government established by the Constitution.[248] At the same time, reliance on historical practices might undermine the political branches when they are attempting to be innovative or opt for novel solutions to old problems.[249]

Deriving the Constitution's meaning from long-established, historical practices of the political branches is one of several methods of constitutional interpretation the Court has relied upon when exercising the power of judicial review. In explaining the meaning of the provisions of the Constitution, courts and commentators often refer to these modes of interpretation. An understanding of these methods, which are not mutually exclusive, will aid congressional staff in understanding the development of the constitutional doctrines that guide the Justices, government officials, and other individuals when they interpret the Constitution.

---

(...continued)

*Adverse Possession*, 2014 SUP. CT. REV. 1, 40 ("[I]nterests in stability and related rule-of-law considerations, such as consistency, predictability, reliance, and transparency, also can be advanced by adhering to long-standing practices, regardless of whether they date to the early post-Founding period.").

[243] *Cf.* EPSTEIN & WALKER, *supra* note 22, at 28 (reciting arguments made against original meaning as a method of constitutional interpretation).

[244] Bradley & Siegel, *supra* note 242, at 41–44; BOBBITT, *supra* note 22, at 11 (summarizing arguments made against original meaning).

[245] Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 SUP. CT. REV. 119, 122 & n.13 (defining "law office history" as "the selection of data favorable to the position being advanced without regard to or concern for contradictory data or proper evaluation of the relevance of the data proffered").

[246] Bradley & Siegel, *supra* note 242, at 27–29.

[247] *Cf.* Brennan, *supra* note 20, at 436–37.

[248] NLRB v. Canning, 573 U.S. __, No. 12-1281, slip op. at 4–5 (2014) (Scalia, J., concurring in the judgment) ("[P]olicing the 'enduring structure' of constitutional government when the political branches fail to do so is 'one of the most vital functions of this Court.'") (citation omitted); *id.* at 47–48 ("Even if the Executive could accumulate power through adverse possession by engaging in a *consistent* and *unchallenged* practice over a long period of time, the oft-disputed practices at issue here would not meet that standard. Nor have those practices created any justifiable expectations that could be disappointed by enforcing the Constitution's original meaning. There is thus no ground for the majority's deference to the unconstitutional recess-appointment practices of the Executive Branch.").

[249] *See* Manning, *supra* note 183, at 1943 ("[F]unctionalists believe that Congress has substantially free rein to innovate, as long as a particular scheme satisfies the functional aims of the constitutional structure, taken as a whole.").

## Author Contact Information

Brandon J. Murrill
Legislative Attorney
bmurrill@crs.loc.gov, 7-8440

# Exhibit P

Yale Law School
LILLIAN GOLDMAN LAW LIBRARY
*in memory of Sol Goldman*

THE AVALON PROJECT *Documents in Law, History and Diplomacy*

| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |

## The Federalist Papers : No. 68

| Previous Document | Contents | Next Document |

**The Mode of Electing the President**
**From the New York Packet.**
**Friday, March 14, 1788.**

### HAMILTON

To the People of the State of New York:

THE mode of appointment of the Chief Magistrate of the United States is almost the only part of the system, of any consequence, which has escaped without severe censure, or which has received the slightest mark of approbation from its opponents. The most plausible of these, who has appeared in print, has even deigned to admit that the election of the President is pretty well guarded.[1] I venture somewhat further, and hesitate not to affirm, that if the manner of it be not perfect, it is at least excellent. It unites in an eminent degree all the advantages, the union of which was to be wished for.

It was desirable that the sense of the people should operate in the choice of the person to whom so important a trust was to be confided. This end will be answered by committing the right of making it, not to any preestablished body, but to men chosen by the people for the special purpose, and at the particular conjuncture.

It was equally desirable, that the immediate election should be made by men most capable of analyzing the qualities adapted to the station, and acting under circumstances favorable to deliberation, and to a judicious combination of all the reasons and inducements which were proper to govern their choice. A small number of persons, selected by their fellow-citizens from the general mass, will be most likely to possess the information and discernment requisite to such complicated investigations.

It was also peculiarly desirable to afford as little opportunity as possible to tumult and disorder. This evil was not least to be dreaded in the election of a magistrate, who was to have so important an agency in the administration of the government as the President of the United States. But the precautions which have been so happily concerted in the system under consideration, promise an effectual security against this mischief. The choice of SEVERAL, to form an intermediate body of electors, will be much less apt to convulse the community with any extraordinary or violent movements, than the choice of ONE who was himself to be the final object of the public wishes. And as the electors, chosen in each State, are to assemble and vote in the State in which they are chosen, this detached and divided situation will expose them much less to heats and ferments, which might be communicated from them to the people, than if they were all to be convened at one time, in one place.

Nothing was more to be desired than that every practicable obstacle should be opposed to cabal, intrigue, and corruption. These most deadly adversaries of republican government might naturally have been expected to make their approaches from more than one querter, but chiefly from the desire in foreign powers to gain an improper ascendant in our councils. How could they better gratify this, than by raising a creature of their own to the chief magistracy of the Union? But the convention have guarded against all danger of this sort, with the most provident and judicious attention. They have not made the appointment of the President to depend on any preexisting bodies of men, who might be tampered with beforehand to prostitute their votes; but they have referred it in the first instance to an immediate act of the people of America, to be exerted in the choice of persons for the temporary and sole purpose of making the appointment. And they have excluded from eligibility to this trust, all those whom from situation might be suspected of too great devotion to the President in office. No senator, representative, or other person holding a place of trust or profit under the United States, can be of the numbers of the electors. Thus without corrupting the body of the people, the immediate agents in the election will at least enter upon the task free from any sinister bias. Their transient existence, and their detached situation, already taken notice of, afford a satisfactory prospect of their continuing so, to the conclusion of it. The business of corruption, when it is to embrace so considerable a number of men, requires time as well as means. Nor would it be found easy suddenly to embark them, dispersed as they would be over thirteen States, in any combinations founded upon motives, which though they could not properly be denominated corrupt, might yet be of a nature to mislead them from their duty.

Another and no less important desideratum was, that the Executive should be independent for his continuance in office on all but the people themselves. He might otherwise be tempted to sacrifice his duty to his complaisance for those whose favor was necessary to the duration of his official consequence. This advantage will also be secured, by making his re-election to depend on a special body of representatives, deputed by the society for the single purpose of making the important choice.

All these advantages will happily combine in the plan devised by the convention; which is, that the people of each State shall choose a number of persons as electors, equal to the number of senators and representatives of such State in the national government, who shall assemble within the State, and vote for some fit person as President. Their votes, thus given, are to be transmitted to the seat of the national government, and the person who may happen to have a majority of the whole number of votes will be the President. But as a majority of the votes might not always happen to centre in one man, and as it might be unsafe to permit less than a majority to be conclusive, it is provided that, in such a contingency, the House of Representatives shall select out of the candidates who shall have the five highest number of votes, the man who in their opinion may be best qualified for the office.

The process of election affords a moral certainty, that the office of President will never fall to the lot of any man who is not in an eminent degree endowed with the requisite qualifications. Talents for low intrigue, and the little arts of popularity, may alone suffice to elevate a man to the first honors in a single State; but it will require other talents, and a different kind of merit, to establish him in the esteem and confidence of the whole Union, or of so considerable a portion of it as would be necessary to make him a successful candidate for the distinguished office of President of the United States. It will not be too strong to say, that there will be a constant probability of seeing the station filled by characters pre-eminent for ability and virtue. And this will be thought no inconsiderable recommendation of the Constitution, by those who are able to estimate the share which the executive in every government must necessarily have in its good or ill administration. Though we cannot acquiesce in the political heresy of the poet who says: "For forms of government let fools contest That which is best administered is best," yet we may safely pronounce, that the true test of a good government is its aptitude and tendency to produce a good administration.

The Vice-President is to be chosen in the same manner with the President; with this difference, that the Senate is to do, in respect to the former, what is to be done by the House of Representatives, in respect to the latter.

The appointment of an extraordinary person, as Vice-President, has been objected to as superfluous, if not mischievous. It has been alleged, that it would have been preferable to have authorized the Senate to elect out of their own body an officer answering that description. But two considerations seem to justify the ideas of the convention in this respect. One is, that to secure at all times the possibility of a definite resolution of the body, it is necessary that the President should have only a casting vote. And to take the senator of any State from his seat as senator, to place him in that of President of the Senate, would be to exchange, in regard to the State

from which he came, a constant for a contingent vote. The other consideration is, that as the Vice-President may occasionally become a substitute for the President, in the supreme executive magistracy, all the reasons which recommend the mode of election prescribed for the one, apply with great if not with equal force to the manner of appointing the other. It is remarkable that in this, as in most other instances, the objection which is made would lie against the constitution of this State. We have a Lieutenant-Governor, chosen by the people at large, who presides in the Senate, and is the constitutional substitute for the Governor, in casualties similar to those which would authorize the Vice-President to exercise the authorities and discharge the duties of the President.

PUBLIUS.

1 Vide FEDERAL FARMER.



© 2008 Lillian Goldman Law Library
127 Wall Street, New Haven, CT 06511.

Avalon Statement of Purpose | Accessibility at Yale | Contact Us | Yale Law Library | University Library | Yale Law School | Search Morris | Search Orbis

# Exhibit Q



# COMMENTARIES ON
# THE CONSTITUTION OF
# THE UNITED STATES
## IN THREE VOLUMES (1833)

## JOSEPH STORY, LL. D.

WITH A PRELIMINARY REVIEW OF
THE CONSTITUTIONAL HISTORY OF THE COLONIES AND STATES,
BEFORE THE ADOPTION OF THE CONSTITUTION



Footnotes have been converted to chapter endnotes
Spelling has been modernized

This electronic edition
© Copyright 2003, 2005 Lonang Institute
*www.lonang.com*

conjuncture, instead of persons, selected for the general purposes of legislation. Another motive was, to escape from those intrigues and cabals, which would be promoted in the legislative body by artful and designing men, long before the period of the choice, with a view to accomplish their own selfish purposes. The very circumstance, that the body entrusted with the power, was chosen long before the presidential election, and for other general functions, would facilitate every plan to corrupt, or manage them. It would be in the power of an ambitious candidate, by holding out the rewards of office, or other sources of patronage and honor, silently; but irresistibly to influence a majority of votes; and, thus, by his own bold and unprincipled conduct, to secure a choice, to the exclusion of the highest, and purest, and most enlightened men in the country. Besides; the very circumstance of the possession of the elective power would mingle itself with all the ordinary measures of legislation. Compromises and bargains would be made, and laws passed, to gratify particular members, or conciliate particular interests; and thus a disastrous influence would be shed over the whole policy of the government. The president would, in fact, become the mere tool of the dominant party in congress; and would, before he occupied the seat, be bound down to an entire subserviency to their views. No measure would be adopted, which was not, in some degree, connected with the presidential election; and no presidential election made, but what would depend upon artificial combinations, and a degrading favoritism. There would be ample room for the same course of intrigues, which has made memorable the choice of a king in the Polish diet, of a chief in the Venetian senate, and of a pope in the sacred college of the Vatican.

**Sec. 1451.** Assuming that the choice ought not to be confided to the national legislature, there remained various other modes, by which it might be effected; by the people directly; by the state legislatures; or by electors, chosen by the one, or the other. The latter mode was deemed most advisable; and the reasoning, by which it was supported, was to the following effect. The immediate election should be made by men, the most capable of analyzing the qualities adapted to the station, and acting under circumstances favorable to deliberation, and to a judicious combination of all the inducements, which ought to govern their choice. A small number of persons, selected by their fellow citizens from the general mass for this special object, would be most likely to possess the information, and discernment, and independence, essential for the proper discharge of the duty. It is also highly important to afford as little opportunity, as possible, to tumult and disorder. These evils are not unlikely to occur in the election of a chief magistrate directly by the people, considering the strong excitements and interests, which such an occasion may naturally be presumed to produce. The choice of a number of persons, to form an intermediate body of electors, would be far less apt to convulse the community with any extraordinary or violent movements, than the choice of one, who was himself the final object of the public wishes. And as the electors chosen in each state are to assemble, and vote in the state, in which they are chosen, this detached and divided situation would expose them much less to heats and ferments, which might be communicated from them to the people, than if they were all convened at one time in one place. The same circumstances would naturally lessen the dangers of cabal, intrigue, and corruption, especially, if congress should, as they undoubtedly would, prescribe the same day for the choice of the electors, and for giving their votes throughout the United States. The scheme, indeed, presents every reasonable guard against these fatal evils to republican governments. The appointment of the president is not made to depend upon any preexisting body of men, who might be tampered with beforehand to prostitute their votes; but is delegated to persons chosen by the immediate act of the people, for that sole and temporary purpose. All those persons, who, from their situation, might be suspected of too great a devotion to the president in office, such as senators, and representatives, and other persons holding offices of

© Copyright 2003, 2005 Lonang Institute

trust or profit under the United States, are excluded from eligibility to the trust. Thus, without corrupting the body of the people, the immediate agents in the election may be fairly presumed to enter upon their duty free from any sinister bias. Their transitory existence, and dispersed situation would present formidable obstacles to any corrupt combinations; and time, as well as means, would be wanting to accomplish, by bribery or intrigue of any considerable number, a betrayal of their duty. The president, too, who should be thus appointed, would be far more independent, than if chosen by a legislative body, to whom he might be expected to make correspondent sacrifices, to gratify their wishes, or reward their services. And on the other hand, being chosen by the voice of the people, his gratitude would take the natural direction, and sedulously guard their rights.[11]

**Sec. 1452.** The other parts of the scheme are no less entitled to commendation. The number of electors is equal to the number of senators and representatives of each state; thus giving to each state as virtual a representation in the electoral colleges, as that, which it enjoys in congress. The votes, when given, are to be transmitted to the seat of the national government, and there opened and counted in the presence of both houses. The person, having a majority of the whole number of votes, is to be president. But, if no one of the candidates has such a majority, then the house of representatives, the popular branch of the government, is to elect from the five highest on the list the person, whom they may deem best qualified for the office, each state having one vote in the choice. The person, who has the next highest number of votes after the choice of president, is to be vice president. But, if two or more shall have equal votes, the senate are to choose the vice president. Thus, the ultimate functions are to be shared alternately by the senate and representatives in the organization of the executive department.[12]

**Sec. 1453.** "This process of election," adds the Federalist, with a somewhat elevated tone of satisfaction, "affords a moral certainty, that the office of president will seldom fall to the lot of a man, who is not in an eminent degree endowed with the requisite qualifications. Talents for low intrigue, and the little arts of popularity, may alone suffice to elevate a man to the first honors of a single state. But it will require other talents, and a different kind of merit to establish him in the esteem, and confidence of the whole Union, or of so considerable a portion of it, as will be necessary to make him a successful candidate for the distinguished office of president of the United States. It will not be too strong to say, that there will be a constant probability of seeing the station filled by characters preeminent for ability and virtue. And this will be thought no inconsiderable recommendation of the constitution by those, who are able to estimate the share, which the executive in every government must necessarily have in its good or ill administration."

**Sec. 1454.** The mode of election of the president thus provided for has not wholly escaped censure, though the objections have been less numerous, than those brought against many other parts of the constitution, touching that department of the government.

**Sec. 1455.** One objection was, that he is not chosen directly by the people, so as to secure a proper dependence upon them. And in support of this objection it has been urged, that he will in fact owe his appointment to the state governments; for it will become the policy of the states, which cannot directly elect a president, to prevent his election by the people, and thus to throw the choice into the house of representatives, where it will be decided by the votes of states. Again, it was urged, that, this very mode of choice by states in the house of representatives is most unjust and unequal. Why, it has been said, should Delaware, with her single representative, possess the same vote with

© Copyright 2003, 2005 Lonang Institute

of the original text is, that the house shall elect "from the five highest on the list." Suppose there were six candidates, three of whom had an equal number; who are to be preferred? The amendment is, that the house shall elect "from the persons having the highest numbers, not exceeding three." Suppose there should be four candidates, two of whom should have an equality of votes; who are to be preferred? Such a case is quite within the range of probability; and may hereafter occasion very serious dissensions. One object in lessening the number of the persons to be balloted for from five to three, doubtless was, to take away the chance of any person few votes from being chosen president having very against the general sense of the nation. Yet it is obvious now, that a person having but a very small number of electoral votes, might, under the present plan, be chosen president, if the other votes were divided between two eminent rival candidates; the friends of each of whom might prefer any other to such rival candidate. Nay, their very hostility to each other might combine them in a common struggle to throw the final choice upon the third candidate, whom they might hope to control, or fear to disoblige.

**Sec. 1466.** It is observable, that the language of the constitution is, that "each state shall appoint in such manner, as the legislature thereof may direct," the number of electors, to which the state is entitled. Under this authority the appointment of electors has been variously provided for by the state legislatures. In some states the legislature have directly chosen the electors by themselves; in others they have been chosen by the people by a general ticket throughout the whole state; and in others by the people in electoral districts, fixed by the legislature, a certain number of electors being apportioned to each district. No question has ever arisen, as to the constitutionality of either mode, except that of a direct choice by the legislature. But this, though often doubted by able and ingenious minds, has been firmly established in practice, ever since the adoption of the constitution, and does not now seem to admit of controversy, even if a suitable tribunal existed to adjudicate upon it. At present, in nearly all the states, the electors are chosen either by the people by a general ticket, or by the state. legislature. The choice in districts has been gradually abandoned; and is now persevered in, but by two states. The inequality of this mode of choice, unless it should become general throughout the Union, is so obvious, that it is rather matter of surprise, that it should not long since have been wholly abandoned. In case of any party divisions in a state, it may neutralize its whole vote, while all the other states give an unbroken electoral vote. On this account, and for the sake of uniformity, it has been thought desirable by many statesmen to have the constitution amended so, as to provide for an uniform mode of choice by the people.

**Sec. 1467.** The remaining part of the clause, which precludes any senator, representative, or person holding an office of trust or profit under the United States, from being an elector, has been already alluded to, and. requires little comment. The object is, to prevent persons holding public stations under the government of the United States, from any direct influence in the choice of a president. In respect to persons holding office, it is reasonable to suppose, that their partialities would all be in favor of the reelection of the actual incumbent, and they might have strong inducements to exert their official influence in the electoral college. In respect to senators and representatives, there is this additional reason for excluding them; that they would be already committed by their vote in the electoral college; and thus, if there should be no election by the people, they could not bring to the final vote either the impartiality, or the independence, which the theory of the constitution contemplates.

**Sec. 1468.** The next clause is, "The congress may "determine the time of choosing the electors, and

© Copyright 2003, 2005 Lonang Institute

# Exhibit R

Yale Law School
LILLIAN GOLDMAN LAW LIBRARY
in memory of Sol Goldman

THE AVALON PROJECT *Documents in Law, History and Diplomacy*

Search Avalon

| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |

## The Federalist Papers : No. 66

| Previous Document | Contents | Next Document |

**Objections to the Power of the Senate To Set as a Court for Impeachments Further Considered**
**From the New York Packet.**
**Tuesday, March 11, 1788.**

### HAMILTON

To the People of the State of New York:

A REVIEW of the principal objections that have appeared against the proposed court for the trial of impeachments, will not improbably eradicate the remains of any unfavorable impressions which may still exist in regard to this matter.

The FIRST of these objections is, that the provision in question confounds legislative and judiciary authorities in the same body, in violation of that important and wellestablished maxim which requires a separation between the different departments of power. The true meaning of this maxim has been discussed and ascertained in another place, and has been shown to be entirely compatible with a partial intermixture of those departments for special purposes, preserving them, in the main, distinct and unconnected. This partial intermixture is even, in some cases, not only proper but necessary to the mutual defense of the several members of the government against each other. An absolute or qualified negative in the executive upon the acts of the legislative body, is admitted, by the ablest adepts in political science, to be an indispensable barrier against the encroachments of the latter upon the former. And it may, perhaps, with no less reason be contended, that the powers relating to impeachments are, as before intimated, an essential check in the hands of that body upon the encroachments of the executive. The division of them between the two branches of the legislature, assigning to one the right of accusing, to the other the right of judging, avoids the inconvenience of making the same persons both accusers and judges; and guards against the danger of persecution, from the prevalency of a factious spirit in either of those branches. As the concurrence of two thirds of the Senate will be requisite to a condemnation, the security to innocence, from this additional circumstance, will be as complete as itself can desire.

It is curious to observe, with what vehemence this part of the plan is assailed, on the principle here taken notice of, by men who profess to admire, without exception, the constitution of this State; while that constitution makes the Senate, together with the chancellor and judges of the Supreme Court, not only a court of impeachments, but the highest judicatory in the State, in all causes, civil and criminal. The proportion, in point of numbers, of the chancellor and judges to the senators, is so inconsiderable, that the judiciary authority of New York, in the last resort, may, with truth, be said to reside in its Senate. If the plan of the convention be, in this respect, chargeable with a departure from the celebrated maxim which has been so often mentioned, and seems to be so little understood, how much more culpable must be the constitution of New York?[1]

A SECOND objection to the Senate, as a court of impeachments, is, that it contributes to an undue accumulation of power in that body, tending to give to the government a countenance too aristocratic. The Senate, it is observed, is to have concurrent authority with the Executive in the formation of treaties and in the appointment to offices: if, say the objectors, to these prerogatives is added that of deciding in all cases of impeachment, it will give a decided predominancy to senatorial influence. To an objection so little precise in itself, it is not easy to find a very precise answer. Where is the measure or criterion to which we can appeal, for determining what will give the Senate too much, too little, or barely the proper degree of influence? Will it not be more safe, as well as more simple, to dismiss such vague and uncertain calculations, to examine each power by itself, and to decide, on general principles, where it may be deposited with most advantage and least inconvenience?

If we take this course, it will lead to a more intelligible, if not to a more certain result. The disposition of the power of making treaties, which has obtained in the plan of the convention, will, then, if I mistake not, appear to be fully justified by the considerations stated in a former number, and by others which will occur under the next head of our inquiries. The expediency of the junction of the Senate with the Executive, in the power of appointing to offices, will, I trust, be placed in a light not less satisfactory, in the disquisitions under the same head. And I flatter myself the observations in my last paper must have gone no inconsiderable way towards proving that it was not easy, if practicable, to find a more fit receptacle for the power of determining impeachments, than that which has been chosen. If this be truly the case, the hypothetical dread of the too great weight of the Senate ought to be discarded from our reasonings.

But this hypothesis, such as it is, has already been refuted in the remarks applied to the duration in office prescribed for the senators. It was by them shown, as well on the credit of historical examples, as from the reason of the thing, that the most POPULAR branch of every government, partaking of the republican genius, by being generally the favorite of the people, will be as generally a full match, if not an overmatch, for every other member of the Government.

But independent of this most active and operative principle, to secure the equilibrium of the national House of Representatives, the plan of the convention has provided in its favor several important counterpoises to the additional authorities to be conferred upon the Senate. The exclusive privilege of originating money bills will belong to the House of Representatives. The same house will possess the sole right of instituting impeachments: is not this a complete counterbalance to that of determining them? The same house will be the umpire in all elections of the President, which do not unite the suffrages of a majority of the whole number of electors; a case which it cannot be doubted will sometimes, if not frequently, happen. The constant possibility of the thing must be a fruitful source of influence to that body. The more it is contemplated, the more important will appear this ultimate though contingent power, of deciding the competitions of the most illustrious citizens of the Union, for the first office in it. It would not perhaps be rash to predict, that as a mean of influence it will be found to outweigh all the peculiar attributes of the Senate.

A THIRD objection to the Senate as a court of impeachments, is drawn from the agency they are to have in the appointments to office. It is imagined that they would be too indulgent judges of the conduct of men, in whose official creation they had participated. The principle of this objection would condemn a practice, which is to be seen in all the State governments, if not in all the governments with which we are acquainted: I mean that of rendering those who hold offices during pleasure, dependent on the pleasure of those who appoint them. With equal plausibility might it be alleged in this case, that the favoritism of the latter would always be an asylum for the misbehavior of the former. But that practice, in contradiction to this principle, proceeds upon the presumption, that the responsibility of those who appoint, for the fitness and competency of the persons on whom they bestow their choice, and the interest they will have in the respectable and prosperous administration of affairs, will inspire a sufficient disposition to dismiss from a share in it all such who, by their conduct, shall have proved themselves unworthy of the confidence reposed in them. Though facts may not always correspond with this presumption, yet if it be, in the main, just, it must destroy the supposition that the Senate, who will merely sanction the choice of the Executive, should feel a bias, towards the objects of that choice, strong enough to blind them to the evidences of guilt so extraordinary, as to have induced the representatives of the nation to become its accusers.

If any further arguments were necessary to evince the improbability of such a bias, it might be found in the nature of the agency of the Senate in the business of appointments.

It will be the office of the President to NOMINATE, and, with the advice and consent of the Senate, to APPOINT. There will, of course, be no exertion of CHOICE on the part of the Senate. They may defeat one choice of the Executive, and oblige him to make another; but they cannot themselves CHOOSE, they can only ratify or reject the choice of the President. They might even entertain a preference to some other person, at the very moment they were assenting to the one proposed, because there might be no positive ground of opposition to him; and they could not be sure, if they withheld their assent, that the subsequent nomination would fall upon their own favorite, or upon any other person in their estimation more meritorious than the one rejected. Thus it could hardly happen, that the majority of the Senate would feel any other complacency towards the object of an appointment than such as the appearances of merit might inspire, and the proofs of the want of it destroy.

A FOURTH objection to the Senate in the capacity of a court of impeachments, is derived from its union with the Executive in the power of making treaties. This, it has been said, would constitute the senators their own judges, in every case of a corrupt or perfidious execution of that trust. After having combined with the Executive in betraying the interests of the nation in a ruinous treaty, what prospect, it is asked, would there be of their being made to suffer the punishment they would deserve, when they were themselves to decide upon the accusation brought against them for the treachery of which they have been guilty?

This objection has been circulated with more earnestness and with greater show of reason than any other which has appeared against this part of the plan; and yet I am deceived if it does not rest upon an erroneous foundation.

The security essentially intended by the Constitution against corruption and treachery in the formation of treaties, is to be sought for in the numbers and characters of those who are to make them. The JOINT AGENCY of the Chief Magistrate of the Union, and of two thirds of the members of a body selected by the collective wisdom of the legislatures of the several States, is designed to be the pledge for the fidelity of the national councils in this particular. The convention might with propriety have meditated the punishment of the Executive, for a deviation from the instructions of the Senate, or a want of integrity in the conduct of the negotiations committed to him; they might also have had in view the punishment of a few leading individuals in the Senate, who should have prostituted their influence in that body as the mercenary instruments of foreign corruption: but they could not, with more or with equal propriety, have contemplated the impeachment and punishment of two thirds of the Senate, consenting to an improper treaty, than of a majority of that or of the other branch of the national legislature, consenting to a pernicious or unconstitutional law, a principle which, I believe, has never been admitted into any government. How, in fact, could a majority in the House of Representatives impeach themselves? Not better, it is evident, than two thirds of the Senate might try themselves. And yet what reason is there, that a majority of the House of Representatives, sacrificing the interests of the society by an unjust and tyrannical act of legislation, should escape with impunity, more than two thirds of the Senate, sacrificing the same interests in an injurious treaty with a foreign power? The truth is, that in all such cases it is essential to the freedom and to the necessary independence of the deliberations of the body, that the members of it should be exempt from punishment for acts done in a collective capacity; and the security to the society must depend on the care which is taken to confide the trust to proper hands, to make it their interest to execute it with fidelity, and to make it as difficult as possible for them to combine in any interest opposite to that of the public good.

So far as might concern the misbehavior of the Executive in perverting the instructions or contravening the views of the Senate, we need not be apprehensive of the want of a disposition in that body to punish the abuse of their confidence or to vindicate their own authority. We may thus far count upon their pride, if not upon their virtue. And so far even as might concern the corruption of leading members, by whose arts and influence the majority may have been inveigled into measures odious to the community, if the proofs of that corruption should be satisfactory, the usual propensity of human nature will warrant us in concluding that there would be commonly no defect of inclination in the body to divert the public resentment from themselves by a ready sacrifice of the authors of their mismanagement and disgrace.

PUBLIUS.

1 In that of New Jersey, also, the final judiciary authority is in a branch of the legislature. In New Hampshire, Massachusetts, Pennsylvanis, and South Carolina, one branch of the legislature is the court for the trial of impeachments.



| | Previous Document | | Contents | | Next Document | |

| Avalon Home | Document Collections | Ancient 4000bce - 399 | Medieval 400 - 1399 | 15th Century 1400 - 1499 | 16th Century 1500 - 1599 | 17th Century 1600 - 1699 | 18th Century 1700 - 1799 | 19th Century 1800 - 1899 | 20th Century 1900 - 1999 | 21st Century 2000 - |

© 2008 Lillian Goldman Law Library
127 Wall Street, New Haven, CT 06511.

Avalon Statement of Purpose   Accessibility at Yale   Contact Us   Yale Law Library   University Library   Yale Law School   Search Morris   Search Orbis

# Exhibit S

Case 1:20-cv-03791-JEB    Document 22-1    Filed 02/05/21    Page 83 of 124

# GEORGIA CONSTITUTION OF 1798

1798

The constitution of the State of Georgia, as revised, amended, and compiled by the convention of the State, at Louisville, on the 30th day of May, 1798

ARTICLE I

SECTION 1. The legislative, executive, and judiciary departments of government shall be distinct, and each department shall be confided to a separate body of magistracy; and no person or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

Sec. 2. The legislative power shall be vested in two separate and distinct branches, to wit: A senate and house of representatives, to be styled " The general assembly."

Sec. 3. The senate shall be elected annually, on the first Monday in November, until such day of election be altered by law; and shall be composed of one member from each county, to be chosen by the electors thereof.

Sec. 4: No person shall be a senator who shall not have attained to the age of twenty-five years, and have been nine years a citizen of the United States, and three years an inhabitant of this State, and shall have usually resided within the county for which he shall be returned, at least one year immediately preceeding his election, (except persons who may have been absent, on public business of tins State or of the United States, ) and is and shall have been possessed, in his own right, of a settled freehold estate of the value of five hundred dollars, or taxable property to the amount of one thousand dollars, within the county, for one year preceding his election, and whose estate shall on a reasonable estimation, be fully competent to the discharge of his just debts over and above that sum.

Sec. 5. The senate shall elect, by ballot, a president of their own body.

Sec. 6. The senate shall have the sole power to try all impeachments. When sitting for that purpose, they shall be on oath or affirmation; and no person shall be convicted without the concurrence of two-thirds of the members present. Judgment in cases of impeachment shall not extend further than removal from office and disqualification to hold and enjoy any office of honor, trust, or profit within this State; but, the party convicted shall, nevertheless, be subject to indictment, trial, judgment, and punishment according to law.

Sec. 7. The house of representatives shall be composed of members from all the counties which now are, or hereafter may be, included within this State, according to their respective numbers of free white persons, and including three-fifths of all the people of color. The actual enumeration shall be made within two years, and within every subsequent term of seven years thereafter , at such time and in such manner as this convention may direct. Each county containing three thousand persons, agreeably to the foregoing plan of enumeration, shall be entitled to two members; seven thousand, to three members; and twelve thousand, to four members; but each county shall have at least one and not more than four members. The representatives shall be chosen annually, on the first Monday in November, until such day of election be altered by law. Until the aforesaid enumeration shall be made, the several counties shall be entitled to the following number of representatives, respectively: Camden, two; Glynn, two; Liberty, three; M'Intosh, two; Bryan, one; Chatham, four; Effingham two; Striven, two; Montgomery, two; Burke, three; Bullock, one; Jefferson, three; Lincoln, two; Elbert, three; Jackson, two; Richmond, three, Wilkes, four; Columbia, three; Warren, three; Washington, three; Hancock, four; Greene, three; Oglethorpe, three; and Franklin, two.

Sec. 8. No person shall be a representative who shall not have attained to the age of twenty-one years, and have been seven years a citizen of the United States, three years an inhabitant of this State, and have usually resided in the county in which he shall be chosen one year immediately preceding his election, (unless he shall have been absent on public business of this State or of the United States,) and shall be possessed in his own right of a settled freehold estate of he value of two hundred and fifty dollars, or of taxable property to the amount of five hundred dollars within the county, for one year preceding his election, and whose estate shall, on a reasonable estimation, be competent to the discharge of his just debts, over and above that sum.

Sec. 9. The house of representatives shall choose their speaker and other officers.

Sec. 10. They shall have solely the power to impeach all persons who have been or may be in office.

Sec. 11. No person holding any military commission or other appointment, having any emolument annexed thereto, under this State or the United States, or either of them, except justices of the Inferior court, justices of the peace, and officers of the militia, nor any person who has had charge of public moneys belonging to the State, unaccounted for and unpaid, or who has not paid all legal taxes or contributions to the government required o him, shall have a seat in either branch of the general assembly; nor shall any senator or representative be elected to any office or appointment by the legislature, having any emoluments or compensation annexed thereto, during the time for which he shall have been elected, with the above exception, unless he shall decline accepting his seat, by notice to the executive within twenty days after he shall have been elected; nor shall any member, after having taken his seat, be eligible to any of the aforesaid offices or appointments during the time for which he shall have been elected.

Sec. 12. The meeting of the general assembly shall be annually, on the second Tuesday in January, until such day of meeting be altered by law; a majority of each branch shall, be authorized to proceed to business; but a smaller number may adjourn from day to day, and compel the attendance of their members in such manner as each house may- prescribe,

SEC. 13. Each house shall be the judges of the elections, returns, and qualifications of its own members; with powers to expel or punish, by censuring, fining and imprisoning, or either, for behavior; and may expel any person convicted of any felonies or disorderly infamous offence ; each house may punish by imprisonment, during session, any person, not a member , who shall be guilty of disrespect by any disorderly or contemptuous behavior in its presence, or who, during session, shall threaten harm to the body or estate of any member, for anything said or done in either house, or who shall assault or arrest any witness in going to or returning therefrom, or who shall rescue any person arrested by order of either house.

Sec. 14. No Senator or representative shall be liable to be arrested during his attendance on the general assembly, or for ten days previous to its sitting, or for ten days after the rising thereof, except for treason, felony, Or breach of the peace; nor shall any member be liable to answer for anything spoken in debate in either house in any court or place elsewhere; but shall nevertheless be bound to answer for perjury, bribery, or corruption.

SEC. 15. Each house shall keep a journal of its proceedings, and publish them immediately after their adjournment; and the yeas and nays of the members on any question shall, at the desire of any two members,

be entered on the Journals.

SEC. 16. All bills for raising revenue or appropriating moneys shall originate in the house of representatives, but the senate shall propose or concur with amendments, as in other bills.

Sec. 17. Every bill shall be read three times and on three separate days, in each branch of the general assembly, before it shall pass, unless in cases of actual invasion or insurrection; nor shall any law or ordinance pass , containing any matter different from what is expressed in the title thereof; and all acts shall he signed by the president in the senate, and Speaker in the house of representatives. No bill or ordinance which shall have been rejected by either house shall be brought in again during the session, under the same or any other title, without the consent Of two-thirds of each branch.

Sec. 18. Each senator and representative, before he be permitted to take his seat, shall take an oath, or make affirmation not practised any unlawful means, either directly or indirectly, to procure his election ; and every person Shall be disqualified from serving as a senator or representative, for the term for which he Shall have been elected, who shall be convicted of having given or offered any bribe or treat, or canvassed for such election; and every candidate employing like means, and not elected, shall, on conviction, be ineligible to hold a seat in either house, or to hold any office of honor or profit for the term of one year, and to such other disabilities or penalties as may be prescribed by law.

Sec. 19. Every member of the senate or house of representatives shall, before he takes his Seat, take the following oath or affirmation. to wit: " I, A B, do solemnly swear (or affirm, as the case may be) that I have not obtained my election by bribery, treats, canvassing, or other undue or unlawful means, used by myself, or others by my desire or approbation, for that purpose; that I consider myself constitutionally qualified as a senator, (or representative,) and that, on all questions and measures which may come before me, I will give my Vote and so conduct myself as may, in my judgment, appear most conductive to the interest and prosperity of this State; and that I will bear true faith and allegiance to the same; and to the utmost of my power and ability observe, conform to, support, and defend the constitution thereof ."

Sec. 20. NO person who hath been or may be convicted of felony before any court of this State, or any of the United States, shall be eligible to any office or appointment of honor, profit, or trust within this State.

founding.com/founders-library/government-documents/american-state-and-local-government-documents/state-constitutions/georgia-constitution-of-1…    4/15

Sec. 21. Neither house, during the session of the general assembly, shall, without the consent of the other, adjourn for more than three days, nor to any other place than that at which the two branches shall be sitting; and in case of disagreement between the senate and house of representatives, with respect to their adjournment, the governor may adjourn them.

Sec. 22. The general assembly shall have power to make all laws and ordinances which they shall deem necessary and proper for the good of the State, which shall not be repugnant to this constitution.

Sec. 23. They shall have power to alter the boundaries of the present counties, and to lay off new ones, as well out of the counties already laid off as out of the other territory belonging to the State; but the property of the soil, in a free government, being one of the essential rights of a free people, it is necessary, in order to avoid disputes, that the limits of this State should be ascertained with precision and exactness; and this convention, composed of the immediate representatives of the people, chosen by them to assert them rights, to revise the - powers given. by them to the government, and from whose will all ruling authority of right flows, cloth assert and declare the boundaries of this State shall be as follows, that is to say: The limits, boundaries, jurisdictions, and authority of the State of Georgia do, and did, and of right ought to, extend from the sea or mouth of the river Savannah, along the northern branch or stream thereof, to the fork or confluence of the rivers now called Tugalo and Keowee, and from thence along the most northern branch or stream of the said river Tugalo, till it intersect the northern boundary-line of South Carolina, if the said branch or stream of Tugalo extends so far north, reserving all the islands in the said rivers Savannah and Tugalo to Georgia; but, if the head spring or source of any branch or stream of the said river Tugalo does not extend to the north boundary-line of South Carolina, then a west line to the Mississippi, to be drawn from the head spring or source of the said branch or stream of Tugalo River, which extends to the highest northern latitude; thence, down the middle of the said river Mississippi, until it shall intersect the northernmost part of the thirty-first degree of north latitude; south, by a line drawn due east from the termination of the line last mentioned, in the latitude of thirty-one degrees north of the equator, to the middle of the river Apalachicola, Or Chatahoochee; thence, along the middle thereof, to its junction with Flint River; thence straight to the head of Saint Mary's River; and thence, along the middle of Saint Mary's River, to the Atlantic Ocean, and from thence to the mouth or inlet of Savannah River, the place of beginning; including and comprehending all the lands and waters within the said limits, boundaries, and jurisdictional rights; and also all the islands within twenty leagues of the sea-coast. And this convention doth further declare and assert that all the territory without the present temporary line, and within

the limits aforesaid, is now, of right, the property of the free citizens of this State, and held by them in sovereignty, inalienable but by their consent: *Provided, nevertheless*, That nothing herein contained shall construed so as to prevent a sale to, or contract with, the, United States, by the legislature of this State, of and for all or any part of the western territory of this State lying westward of the river Chatahoochee, on such terms as may be beneficial to both parties; and may procure an extension of settlement and extinguishment of Indian claims in and to the vacant territory of this State to the east and north of the said river Chatahoochee, to which territory such power of contract or sale, by the legislature, shall not extend: *And provided also*, The legislature may give its consent to the establishment of one or more governments westward thereof; but monopolies of land by individuals being contrary to the spirit of our free government, no sale of territory of this State, or any part thereof, shall take place to individuals or private companies, unless a county or counties shall have been first laid off, including such territory, and the Indian rights shall have been extinguished thereto.

Sec. 24. The foregoing section of this article having declared the common rights of the free citizens of this State in and to all the territory without the present temporary boundary-line, and within the limits of this State thereby defined, by which the contemplated purchases of certain companies of a considerable portion thereof are become constitutionally void, and justice and good faith require that the State should not detain a consideration for a contract which has failed, the legislature, at their next session, shall make provision by law for returning to any person or persons who has or have *bona fide* deposited moneys for such purposes in the treasury of this State:*Provided*, That the same shall not have been drawn therefrom in terms of the act passed the thirteenth day of February, one thousand seven hundred and ninety-six, commonly called the rescinding act, or the appropriation laws Of the years one thousand seven hundred and ninety-six and one thousand seven hundred and ninety-seven ; nor shall the moneys paid for such purchases ever be deemed a part of the funds of this State, or be liable to appropriation as such; but until such moneys be drawn from the treasury, they shall be considered altogether at the risk of the persons who have deposited the same. No money shall be drawn out of the treasury or from the public funds Of this State, except by appropriation made by law; and a regular statement and account of the receipts and expenditures of all public moneys shall be published from time to time. No vote, resolution, law, or order Shall pass the general assembly panting a donation or gratuity in favor of any person whatever but by the concurrence of two-thirds of the general assembly.

Sec. 25. It shall be the duty of the justices of the inferior court, or any three Of them, in each county respectively, within sixty days after the adjournment of this convention, to appoint one or more fit persons in each county, not exceeding one for each battalion district, whose duty it shall be to take a full and accurate census or enumeration of all free white persons and people of color residing therein, distinguishing, in separate columns, the free white persons from persons of color, and return the Same to the clerks of the superior courts of the several counties, certified under their hands, on or before the first day of December next; the person so appointed being first severally sworn before the said justices, or either of them, duly and faithfully to perform the trust reposed in them; and it shall be the duty of the said clerks to transmit all such returns, under seal, directed to the speaker of the house of representatives, at the first session of the legislature thereafter. And it shall be the duty of the general assembly, at their said first session, to apportion the members of the house of representatives among the several counties, agreeably to the plans prescribed by this constitution, and to provide an adequate compensation abode shall be in any family on the first Monday in July next shall be returned as of such family; and every person occasionally absent at the time of taking the enumeration, as belonging to that place in which he usually resides. The general assembly shall, by law, direct the manner of taking such census or enumeration, within every subsequent term of seven years, in conformity to this constitution. And it is declared to be the duty of all officers, civil and military, throughout the State, to be aiding and assisting in the true and faithful execution thereof. In case the justices of the inferior courts should fail to make such appointments, or if there should not be a sufficient number of such justices in any county, then the justices of the peace, or any three of them, shall have and exercise like powers and authority respecting the said census; and if the census or enumeration of any county shall not, be so taken and returned, then, and in that case, the general assembly shall apportion the representation of such county according to the best evidence in their power, relative to its population.

Sec. 26. The Legislature shall have no power to change names, nor to Legitimate persons, nor to make or change Precincts, nor to establish Bridges or Ferries, but shall, by law, prescribe the manner in which said powers shall be exercised by the Superior or Inferior courts, and the privileges to be enjoyed.

ARTICLE II

SECTION 1. The executive power shall be vested in a governor, who shall bold his office during the term of two years, and until such time as a successor shall be chosen and qualified. He shall have a competent salary, established by law, which shall not be increased or diminished during the period for which be shall have been

elected; neither shall he receive, within that period, any other emolument from the united States, or either of them, or from any foreign power.

Sec. 2. The governor shall be elected by the general assembly, at their second annual session after the rising of this convention, and at every second annual session thereafter, on the second day after the two houses shall be organized and competent to proceed to business.

Sec. 3. No person shall be eligible to the office of governor who shall not have been a citizen of the United States twelve years, and an inhabitant of this State six years, and who hath not attained to the age of thirty years, and who does not possess five hundred acres of land, in his own right, within this State, and other property to the amount of four thousand dollars, and whose estate shall not, on a reasonable estimation be competent to the discharge of his debts, over and above that sum.

Sec. 4. In case of the death, resignation, or disability of the governor, the president of the senate shall exercise the executive powers of government until such disability be removed, or until the next meeting of the general assembly.

Sec. 5. The governor shall, before he enters on the duties of his office, take the following Oath or affirmation: " I do solemnly swear (or affirm, as the case may be) that I will faithfully execute the office of governor of the State of Georgia; and will, to the best of my abilities, preserve, protect , and defend the said State, and cause justice to be executed in mercy therein, according to the constitution and laws thereof.'"

Sec. 6. He shall be commander-in-chief of the army and navy of this State, and of the militia thereof.

Sec. 7. He shall have power to grant reprieves for offences against the State, except in cases of impeachment , and to grant pardons or to remit any part of a sentence, in all cases after conviction, except for treason or murder, in which cases he may respite the execution, and make report thereof to the next general assembly, by whom a pardon may be granted.

Sec. 8. He Shall issue writs of election to fill up all vacancies that happen in the senate or house of representatives; and shall have power to convene the general assembly on extraordinary occasions; and shall give them, from time to time, information of the state of the republic, and recommend to their consideration such measures as he may deem necessary and expedient.

Sec. 9. When any office shall become vacant by death, resignation, or otherwise, the governor shall have the power to till such vacancy; and persons SO appointed shall continue in office until a successor is appointed, agreeable to the mode pointed out by this constitution or by the legislature.

Sec. 10. He shall have the revision of all bills passed by both houses before the same shall become laws; but two-thirds of both houses may pass it law notwithstanding his dissent; and if any bill should not be returned by the governor within five days after it hath been presented to him, the same shall be a law, unless the general assembly, by their adjournment, shall prevent its return.

Sec. 11. Every vote, resolution, or order, to which the concurrence of both houses may necessary, except on a question of adjournment, Shall be presented to the governor; and, before it shall take effect, be approved by him; or, being disapproved, may be repassed by two-thirds of both houses , according to the rules and limitations prescribed in case of a bill.

Sec. 12. There shall be a secretary of the State, a treasurer, and A Surveyor-general, appointed in the same manner and at the same session of the legislature, and they shall hold their offices for the like period as the governor, and shall have a competent salary, including such emoluments as may be established by law, which shall not be increased or diminished during the period for which they shall have been elected.

Sec. 13. The great seal of the State shall be deposited in the office of the secretary of state, and shall not be affixed to an instrument of writing but by order of the governor or general assembly; and the general assembly shall, at their first session after the rising of this convention, cause the great seal to be altered by law.

Sec. 14. The governor shall have power to appoint his own secretaries.

Article III

SECTION 1. The judicial powers of this state shall be vested in a superior courts, and in such inferior jurisdictions as the legislature shall, from time to time, ordain and establish. The judges of the superior court shall be elected for the term of three years, removable by the governor, on the address of two-thirds of both houses for that purpose, or by impeachment and conviction thereon. The superior court shall have exclusive and final jurisdiction in all criminal cases which shall be tried in the county wherein the crime was committed, and in all cases respecting titles to land, which shall be tried in the county where the land lies; and shall have

power to correct errors in inferior judicatories by writs of certiorari, as well as errors in the superior courts, and to order new trials on proper and legal grounds: *Provided*, That such new trials shall be determined, and such errors corrected, in the superior court of the county in which such action originated. And the said court shall also have appellate jurisdiction in such other cases as the legislature may by law direct, which shall in no case tend to remove the cause from the county in which the action originated; and the judges thereof in all cases of application for new trials, or correction of errors? shall enter their opinions on the minutes of the court. The inferior courts shall have cognizance of all other civil cases, which shall be tried in the county wherein the defendant resides, except in cases of joint obligors, residing in different counties, which may be commenced in either county and a copy of the petition and process, served on the party or parties residing out of the county in which the suit may be commenced, shall be deemed sufficient service, under such rules and regulations as the legislature may direct; but the legislature may, by law, to which two-thirds of each branch shall concur, give concurrent jurisdiction to the superior courts. The superior and inferior courts shall sit in each county twice in every year, at such stated times as the legislature shall appoint.

Sec. 2. The judges shall have salaries adequate to their services, established by law, which shall not be increased or diminished during their continuance in office; but shall not receive any other perquisites or emoluments whatever, from parties or others, on account of any duty required of them.

Sec. 3. There shall be a State's attorney and solicitors appointed by the legislature, and commissioned by the governor, who shall hold their offices for the term of three years, unless removed by sentence on impeachment, or by the governor on the address of two-thirds of each branch of the general assembly. They shall have Salaries adequate to their services established by law, which shall not be increased or diminished during their continuance in office.

Sec. 4. Justices of the inferior courts shall be appointed by the general assembly, and be commissioned by the governor, and shall hold their commissions during good behavior, or as long as they respectively reside in the county for which they shall he appointed, unless removed by sentence on impeachment, or by the governor on the address of two-thirds of each branch of the general assembly They may be compensated for their services in such manner as the legislature may by law direct.

Sec. 5. The justices of the peace shall be nominated by the inferior courts of the several counties, and commissioned by the governor; and there shall be two justices of the peace in each captain's district, either or

both of whom shall have power to try all cases of a civil nature within their district, where the debt or litigated demand does not exceed thirty dollars, in such manner as the legislature may by law direct. They shall hold their appointments during good behavior, or until they shall be removed by conviction on indictment in the superior court, for malpractice in office, or for any felonious or infamous crime, or by the governor on the address of two-thirds of each branch of the legislature.

Sec. 6. The powers of a court of ordinary, or register of probates, shall be invested in the inferior courts of each county, from whose decision there may be an appeal to the superior court, under such restrictions and regulations as the general assembly may by law direct; but the inferior court shall have power to vest the care of the records, and other proceedings therein, in the clerk, or such other person as they may appoint, and any one or more Justices of the said court, with such clerk or other person, may issue citations and grant temporary letters, in time of vacation, to hold until the next meeting of the said court; and such clerk or other person may grant marriage-licenses.

Sec. 7. The judges of the superior courts, or any one of them. shall have power to issue writs of mandamus, prohibition, scire facias, and all other writs which may be necessary for carrying their powers fully into effect.

Sec. 8. Within five years after the adoption of this constitution, the body of our laws, civil and criminal, shall be revised, digested, and arranged under proper heads, and promulgated in such manner as the legislature may direct; and no person shall be debarred from advocating or defending his cause before any court or tribunal, either by himself or counsel, or both.

Sec. 9. Divorces shall not be granted by the legislature until the parties shall have had a fair trial before the superior court, and a verdict shall have been obtained authorizing a divorce upon legal principles. And in such cases two-thirds of each branch of the legislature may pass acts of divorce accordingly.

Sec. 10. The clerks of the superior and inferior courts shall be appointed in such manner as the legislature may by law direct; shall be commissioned by the governor, and shall continue in office during good behavior.

Sec. 11. Sheriffs shall be appointed in such manner as the general assembly may by law direct, and shall hold their appointments for the term of two years, unless sooner removed by sentence on impeachment, or by the governor on the address of two-thirds of the justices of the inferior court and of the peace in the county; but no

person shall be twice elected sheriff within any term of four years; and no county officer after the next election shall be chosen at the time of electing a senator or representative.

ARTICLE IV

Section 1. The electors of members of the general assembly shall be citizens and inhabitants of this state, and shall have attained the age of twenty-one years, and have paid all taxes which may have been required of them , and which they may have had an opportunity of paying, agreeably to law, for the year preceding the election, and shall have resided six months within the county: Provided, That in case of an invasion, and the inhabitants shall he driven from any county, so as to prevent an election therein, such refugee inhabitants, being a majority of the voters of such county, may meet under the direction of any three justices of the peace thereof, in the nearest county not in a state of alarm , and proceed to all election without having paid such tax so required of electors; and the persons elected thereat shall be entitled to their seats.

Sec. 2. All elections by the general assembly shall be by joint ballot of both branches of the legislature; and when the senate and house of representatives unite for the purpose of electing, they shall meet in the representative chamber, and the president of the senate shall in such cases preside, receive the ballots , and declare the person or persons elected. In all elections by the people the electors shall vote *viva voce* until the legislature shall otherwise direct.

SEC. 3. The general officers of the militia shall be elected by the general assembly , and shall be commissioned by the governor. ill other officers o the militia shall be elected in such manner as the legislature may direct , and shall be commissioned by the governor; and all militia officers now in commission, and those which may be hereafter commissioned, shall hold their commissions during their usual residence within the division, brigade, regiment, battalion, or company to which they belong , unless removed by sentence of a court-martial, or by the governor, on the address of two-thirds of each branch of the general assembly.

Sec. 4. All persons appointed by the legislature to fill vacancies shall continue in office only so long as to complete the time for which their predecessors were appointed.

Sec. 5. Freedom of the press, and trial by jury, as heretofore used in this State, shall remain inviolate; and no ex post facto law shall be pissed. "

SEC. 6. No person who heretofore hath been, or hereafter may be a collector, or holder of public moneys, shall be eligible to any office in this State until such person shall have acounted for and into the treasury all sums for which he may be accountable or liable.

SEC. 7. The person of a debtor, where there is not a strong presumption of fraud, shall not be detained in prison after delivering up, bona fide, all his estate, real and personal, for the use of his creditors, in such manner as shall he hereafter regulated by law.

Sec . 8. Convictions on impeachments which have heretofore taken place are hereby released, and persons lying under such convictions restored to citizenship.

SEC. 9. The writ of habeas corpus shall not be suspended, unless when in case of rebellion or invasion the public safety may require it.

SEC. 10. No person within this State shall, upon any pretence, be deprived of the inestimable privilege of worshipping God in a manner agreeable to his own conscience, nor be compelled to attend any place of worship contrary to his own faith and judgment; nor shall he ever be obliged to pay tithes, taxes, or any other rate, for building Or repairing any place of worship, or for the maintenance of any minister or ministry, contrary to what he believes to he right, or hath voluntarily engaged to do. No one religious society shall ever be established in this State, in preference to another; nor shall any person be denied the enjoyment of any civil right merely on account of his religious principles.

Sec. 11. There shall be no future importation of Slaves into this State, from Africa or any foreign place , after the first day of October next. The legislature shall have no power to pass laws for the emancipation of slaves without the consent of each of their respective owners, previous to such emancipation. They shall have no power to prevent emigrants from either of the United States to this State from bringing with them such persons as may be deemed slaves by the laws of any one of the United States.

SEC. 12. Any person who shall maliciously dismember or deprive a slave of life shall suffer such punishment as would be inflicted in case the like offence had been Committed on a free white person, and on the like proof, except in case of insurrection by such slave, and unless such death should happen by accident in giving such slave moderate correction.

SEC. 13. The arts and sciences shall be promoted, in one or more seminaries of learning; and the legislature shall, as soon as conveniently may he, give such further donations and privileges to those already established as may be necessary to secure the objects of their institution; and it shall be the duty of the general assembly, at their next session, to provide effectual measures for the improvement and permanent security of the funds and endowments of such institutions.

SEC. 14. All civil officers shall continue in the exercise of the duties of their several offices during the periods for which they were appointed, or until they shall be superseded by appointments made in conformity to this constitution ; and all laws now in force shall continue to operate, so far as they are compatible with this constitution, until repealed; and it shall be the duty of the general assembly to pass all necessary laws and regulations for carrying this constitution into full effect.

Sec. 15. No part of this constitution shall be altered, unless a bill for that purpose , specifying the alterations intended to be made, shall have been read three times in the house of representatives, and three times in the senate, three several days in each house, and agreed to by two-thirds Of each house respectively; and when ANY such bill shall be passed in manner aforesaid, the same shall be published at least six months previous to the next ensuing annual election for members of the general assembly; and if such alterations, or any of them, so proposed, shall be agreed to in their first session thereafter, by two-thirds of each branch of the general assembly, after the Same Shall have been read three times, on three separate days, in each respective house, then, and not otherwise, the same shall become a part of this constitution.

We, the underwritten delegates of the people of the State of Georgia, chosen and authorized by them to revise, alter, or amend the powers and principles of their government, do declare, ordain, and ratify the several articles and sections contained in the six pages hereunto prefixed, as the constitution of this State; and the same shall be in operation from the date hereof.

In testimony whereof we? and each of us, respectively, have hereunto set our hands, at Louisville, the seat of government, this thirtieth day of May, in the year of our Lord one thousand seven hundred and ninety-eight, and in the twenty-second year of the Independence of the United States of America; and have caused the great seal of the State to be affixed thereto.

Article 4, section 11, and the first line, the following words being interlined, to wit, "after the first day of October next."

JARED IRWIN, President.

JAMES M. SIMMONS, Secretary.

# Exhibit T

**CONSTITUTIONAL AND APPELLATE COURT PARTICIPATION
MOHRMAN, KAARDAL & ERICKSON, P.A.
AND ITS ATTORNEYS (1997-2018)**

1.    **Minnesota Voters Alliance v. Mansky, 138 S.Ct. 1876 (2018)**

      First Amendment free speech case against Secretary of State and local election officials. Minnesota statute barring the wearing of political insignia inside polling place violated First Amendment's Free Speech Clause.

2.    **Hoban v. United States Food and Drug Administration, 2018 WL 3122341 (D. Minn. 2018)**

      Appointments Clause case against FDA. Defendants moved to transfer this case pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the District of Columbia. Plaintiffs opposed the motion. The Court granted the motion.

3.    **Collegians for a Constructive Tomorrow v. University of Minnesota, Board of Regents, 2018 WL 2293341 (Minn. Ct. App. 2018)**

      Respondent University of Minnesota (the University) collects a fee from its students to fund student groups on its campus. Relator is a student group called Collegians for a Constructive Tomorrow (CFACT) that requested student-fee funding. The University partially granted CFACT's funding request and CFACT appealed to the University's appeals. The Court of Appeals affirmed the University's funding decisions.

4.    **Otto v. Wright County, Supreme Court of Minnesota, 910 N.W.2d 446 (Minn. 2018)**

      Statute permitting counties to choose to have audit performed by an accounting firm rather than by State Auditor did not violate separation of powers. Minnesota Supreme Court affirmed decision of Court of Appeals.

5.    **Irv's Boomin' Fireworks, LLC v. Muhar, 2018 WL 1702862 (Mn. Ct. App. 2018)**

      Appellants Irving Seelye and Irv's Boomin' Fireworks, LLC, challenged the district court's denial of their motion for temporary injunctive relief to preclude respondent Itasca County Attorney's Office and its officers from enforcing Minnesota's fireworks law, codified at Minnesota Statutes sections 624.20 to 624.25 (2016), against appellants. Court of Appeals affirmed district court decision.

6.    **Watso v. Piper, United States District Court, D. Minnesota, 2018 WL 1512059 (D. Minn. 2018)**

      Civil rights action based on U.S. Constitution and Indian Child Welfare Act. Parent and grandparent challenge state policies regarding transferring non-reservation children to tribal governments.

7.      **Peterson v. Martinez, 2017 WL 6418224 (Mn. Ct. App. 2017)**

Appellant doctor argues that the district court (1) improperly granted summary judgment on his claims that respondent medical board and other respondents violated his rights under the Minnesota Government Data Practices Act (MGDPA) and (2) abused its discretion by denying his motions to amend his complaint and to compel production of documents. Court of Appeals affirmed district court decision.

8.      **Linert v. MacDonald, 901 N.W.2d 664 (Mn. Ct. App. 2017)**

First amendment case.  Campaign statute violated by State Supreme Court candidate, who falsely claimed that a judicial-election committee endorsed her, was not overbroad.

9.      **Mdewakanton Sioux Indians of Minnesota v. Zinke, 264 F.Supp.3d 116 (Mn. Ct. App. 2017)**

Native American case involving federal tribal recognition. Putative Indian tribe and individuals allegedly belonging to tribe failed to show failure to exhaust administrative remedies should have been waived.

10.     **County of Isanti v. Kiefer, 2017 WL 3469521 (Mn. Ct. App. 2017),  2016 WL 4068197 (Mn. Ct. App. 2016)**

Following a bench trial on respondent county's complaint alleging violations of its solid-waste and zoning ordinances, the district court ordered appellant to remove certain items that were stored outdoors on his property and rejected his constitutional takings claim. Appellant challenges the district court's order, arguing that the outdoor storage ordinance was misinterpreted.  Court of Appeals reversed lower court decision and remanded with instructions.

11.     **Nilsson v. Ball, 2017 WL 3378874 (Mn. Ct. App. 2017)**

In this boundary dispute, the district court granted summary judgment in respondent's favor declaring that he is the exclusive owner of the disputed property, finding no issues of material fact on his trespass and ejectment claims, and awarding damages on the trespass claim. The appeal followed.

12.     **United States ex rel. Tingley v. PNC Financial Services Group, Inc.,705 Fed.Appx. 342 (6th Cir. 2017)**

Litigation-sanctions. Relator was not deprived of his due process right to fair notice of the imposition, under district court's inherent authority, of sanctions.

13.   **Douglas v. Stillwater Area Public Schools, Independent School District 834, 899 N.W.2d 546 (Mn. Ct. App. 2017)**

Education - Finance. School district's use of bond proceeds for heating, ventilation, and air conditioning upgrades at school was within bond referendum's broad purpose.

14.   **Minnkota Architectural Products Co., Inc. v. Rice Lake Construction Group,  2017 WL 2628048 (Mn. Ct. App. 2017)**

After respondent-subcontractor Minnkota Architectural Products Co., Inc., demanded arbitration, seeking payment for a 2012 construction job in Des Moines, Iowa, appellant-contractor Rice Lake Construction Group counterclaimed that Minnkota performed defective work on a 2009 construction job in St. Peter, Minnesota.

15.   **Calgaro v. St. Louis County, 2017 WL 2269500 (D. Minn. 2017)**

Civil rights—parental substantive and procedural due process claims.  Parent brought claims against county, school district and medical service provider for providing benefits and services to minor child without parental consent.

16.   **City of Orono v. Nygard, 2017 WL 1548628 (Mn. Ct. App. 2017)**

REAL PROPERTY - Contempt. City could recover attorney's fees incurred in prosecuting contempt action against landowners regarding wind turbine removal.

17.   **Collegians for a Constructive Tomorrow v. University of Minnesota, 2017 WL 1436075 A16-1147 (Mn. Ct. App. 2017)**

Relator-student-group challenges respondent University's final decision regarding relator's student-services-fee allocation. The Court of Appeals concluded that respondent's proceedings were regular and respondent allocated fees in a viewpoint-neutral manner.

18.   **Go Green Energy, LLC v. City of Orono, 2017 WL 1316137 (Mn. Ct. App. 2017)**

Appellant challenges the summary-judgment dismissal, on statutory-immunity grounds, of its tort claims arising out of respondent City of Orono's passage of an ordinance regulating small-wind-energy-conversion systems (SWECS). Because the district court did not err in concluding that the city is entitled to immunity as a matter of law, we affirm.

**19.   Bryant Avenue Baptist Church v. City of Minneapolis, 892 N.W.2d 852 (Mn. Ct. App. 2017)**

GOVERNMENT - Public Improvements. Church was not exempt under state constitution from special assessments which city imposed for street resurfacing.

**20.   In re Guardianship of Dorosh, 2017 WL 74303 (Mn. Ct. App. 2017)**

On appeal from the district court's approval of the annual accounts of a ward, appellant, the ward's daughter, argues that (1) the district court abused its discretion in denying her discovery; and (2) her due process rights were violated because the district court failed to provide the required notice and a hearing on the second annual...

**21.   Minnesota Voters Alliance v. Simon, 885 N.W.2d 660 (Minn. 2016)**

GOVERNMENT - Jurisdiction. Exercise of Supreme Court's jurisdiction over petition challenging election officials' misconduct was not warranted.

**22.   Tichich v. City of Bloomington, 835 F.3d 856 (8th Cir. 2016)**

GOVERNMENT - Records. Driver's license holder stated claims alleging governmental entities violated Driver's Privacy Protection Act (DPPA).

**23.   Eggenberger v. West Albany Tp.,  820 F.3d 938 (8th Cir. 2016)**

LITIGATION - Declaratory Judgment. Denial of access to government information was no basis for declaratory judgment action.

**24.   Krupicka v. Hassinger, 2016 WL 1290937 (Mn. Ct. App. 2016)**

Appellant challenges the district court's order denying his motion to modify or vacate a harassment restraining order (HRO) issued against him. We affirm. In February 2014, the district court issued an ex parte order for protection (OFP) on behalf of respondent

Shauna Marie Krupicka against appellant Paul John Hassinger. After a hearing on March 5,...

**25.   Abrahamson v. St. Louis County School Dist, 2016 WL 1290905 (Minn. 2016)**

The present appeal arises from the second formal complaint filed by two constituents in the St. Louis County School District who have accused the school district of violating campaign-finance reporting laws. After the first appeal, the school district filed a campaign-finance report of its 2009 expenditures used to promote one side of a ballot...

**26.   Nygard v. Walsh, 2016 WL 596606 (Mn. Ct. App. 2016)**

Appellants, husband and wife, challenge district court orders dismissing their petitions seeking ex parte harassment restraining orders (HRO) against a neighbor, arguing that they are entitled to a hearing under Minn.Stat. § 609.748 (2014) and due-process guarantees. Because appellants' due-process rights were vindicated and because appellants...

**27.   Rexine v. Rexine, 2015 WL 6442560 (Minn. 2015)**

In this marital dissolution proceeding, appellant mother argues that the district court erred by: (1) awarding sole legal custody to respondent father; (2) declining to order the parties to take their children to Catholic Mass on a weekly basis; (3) dividing marital property in an inequitable manner; and (4) ordering the parties to share their...

**29.   Dean v. City of Winona, 868 N.W.2d 1 (Mn. Ct. App. 2015)**

REAL PROPERTY - Appeals. Exceptions to mootness doctrine did not permit review of challenge to zoning ordinance following sale of property at issue.

**30.   Hebert v. Winona County, 111 F.Supp.3d 970 (D. Minn. 2015)**

LABOR AND EMPLOYMENT - Public Employment. Under Minnesota law, former county employee's claims against county for defamation and breach of contract could only be asserted in certiorari proceeding.

**31.   Minnesota Voters Alliance v. Anoka-Hennepin School Dist., 868 N.W.2d 703 (Mn. Ct. App. 2015)**

EDUCATION - School Districts. Brochure published by school district did not

"promote" levy ballot questions so as to subject district to campaign-finance-reporting requirements.

**32.    Centennial Fire Fighters Relief Ass'n v. City of Lino Lakes,  2015 WL 2468727 (Mn. Ct. App. 2015)**

Appellants challenge the district court's denial of their request for a writ of mandamus. We affirm. The cities of Centerville, Circle Pines, and respondent Lino Lakes entered into a Joint Powers Agreement (JPA) in January 1990 pursuant to their authority under Minn.Stat. § 471.59, subd. 1 (1990).

**33.    Minnesota Voters Alliance v. State, 2015 WL 2457010 (Mn. Ct. App. 2015)**

Appellants challenge the district court's denial of their request for attorney fees under the Minnesota Equal Access to Justice Act (MEAJA), Minn.Stat. §§ 15.471–.474 (2014), after successfully obtaining a writ of quo warranto requiring respondents to discontinue online voter registration, arguing that the district court erred by...

**34.    State v. Turner, 864 N.W.2d 204 (Mn. Ct. App. 2015)**

CIVIL RIGHTS - Free Speech. Criminal defamation statute, which did not include truth as absolute bar or incorporate actual malice standard for public issues, was unconstitutionally overbroad.

**35.    Smith v. Department of Employment and Economic Development, 2015 WL 1128509 (Mn. Ct. App. 2015)**

Relator Eunice Smith challenges a Minnesota Department of Employment and Economic Development (DEED) unemployment law judge's (ULJ) decision that she owes a debt recoverable under the Minnesota Revenue Recapture Act. Affirmed

**36.    In re Harry Inge Baker and Jeanne C. Baker Trust Dated August 9, 1988, 2015 WL 1013662 (Mn. Ct. App. 2015)**

In this appeal after remand in a trust-administration dispute, appellant asserts that the district court erred in the way in which it applied a stipulated payment that was made before the first appeal in this matter to the final judgment as amended after remand. Affirmed.

**37.** **In re Contest of Special Election held on November 4, 2014, 2015 WL 1014155 A14-2167 (Mn. Ct. App. 2015)**

Appellant Nathan Kranz challenges the district court's dismissal of his challenge to the results of a special election held by respondent school district on a bonding proposal. Because the district court found that the school district's errors were not the result of bad faith and did not have an impact on the election, and those findings are affirmed.

**38.** **Save Mille Lacs Sportsfishing, Inc. v. Minnesota Dept. of Natural Resources, 859 N.W.2d 845 (Mn. Ct. App. 2015)**

ADMINISTRATIVE PRACTICE - Rulemaking. Absence of citation to relevant constitutional or common-law principle was not grounds for declaring rule invalid.

**40.** **Annex Medical, Inc. v. Burwell, United States Court of Appeals, Eighth Circuit. September 05, 2014 --- F.3d ---- 2014 WL 4378763 13-1118**

Background: Employer that sponsored employees' group health insurance plan, and its controlling shareholder, brought action challenging contraceptive mandate under the Patient Protection and Affordable Care Act (ACA). The United States District Court for the District of Minnesota, David S. Doty, J., 2013 WL 203526, denied plaintiffs' motion for a...

...District Court for the District of Minnesota—Minneapolis Erick G. Kaardal , argued, Minneapolis, MN ( Kaylan Lytle Phillips , and Noel Johnson , Plainfield...

**41.** **281 Care Committee v. Arneson, United States Court of Appeals, Eighth Circuit. September 02, 2014 --- F.3d ---- 2014 WL 4290372 13-1229**

CIVIL RIGHTS - Free Speech. Minnesota statute criminalizing making false statements about ballot initiatives violated First Amendment.

...District Court for the District of Minnesota—Minneapolis William F. Mohrman , argued, Minneapolis, MN ( Erick G. Kaardal and James V.F. Dickey , on the brief), for appellants. John...

**42.** **Maple Bank v. St. Louis Park Public School Dist. No. 283, Court of Appeals of Minnesota. June 30, 2014 Not Reported in N.W.2d 2014 WL 2921941 A13-2102**

On appeal from summary judgment in this commercial-lease dispute, appellant argues that the district court erred by concluding that Rea Properties materially breached its lease with respondents. Appellant also argues that the district court abused its discretion by denying its motion to strike some of respondents' evidence and by denying its motion...

...District Court, File No. 27–CV–13–1813. William F. Mohrman James V.F. Dickey , Mohrman & Kaardal, P.A., Minneapolis, MN, for appellant. Jessica E. Schwie , Jardine,

Logan...

**43.    Walker v. Jesson, Court of Appeals of Minnesota. May 05, 2014 Not Reported in
N.W.2d 2014 WL 1758210 A13-0986**

We affirm the district court's dismissal of appellant's challenge to the department of
human services' expenditure of public funds to provide indigent women with abortions
because appellants fail to establish taxpayer standing by alleging conduct that constitutes
an unlawful expenditure. In November 2012, appellants Denise and Brian Walker sued
the...

...amicus curiae American Civil Liberties Union of Minnesota. Erick G. Kaardal James
R. Magnuson , Mohrman & Kaardal, PA, Minneapolis, MN; and Teresa S. Collett (pro
hac vice...

**44.    Dean v. City of Winona, Court of Appeals of Minnesota. February 24, 2014 843
N.W.2d 249 2014 WL 684689 A13-1028**

REAL PROPERTY - Zoning and Planning. Ordinance capping at 30% number of lots on
any block eligible for rental certification was not unconstitutional.

...MN, for amicus curiae League of Minnesota Cities. Erick G. Kaardal , Mohrman &
Kaardal, P.A., Minneapolis, MN. Daniel E. Frank , (pro hac vice), Sutherland...

**45.    Minnesota Voters Alliance v. Anoka Hennepin School Dist., Court of Appeals of
Minnesota. December 23, 2013 Not Reported in N.W.2d 2013 WL 6725847 A13-
0769**

Relators challenge a decision of an administrative-law judge (ALJ) dismissing as
untimely their complaint against respondent school district that alleged violations of the
Minnesota Campaign Financial Reports Act, Minn.Stat. §§ 211A.01–.14 (2012), and the
Minnesota Fair Campaign Practices Act, Minn.Stat. §§...

...of Administrative Hearings, File No. 8–0325–030140. Erick G. Kaardal , Mohrman &
Kaardal, P.A., Minneapolis, MN, for relators. Lori Swanson , Attorney General, St...

**46.    In re Morath, Court of Appeals of Minnesota. December 16, 2013 Not Reported in
N.W.2d 2013 WL 6569964 A13-0786**

We affirm the district court's denial of a motion requesting declaratory judgment that the
work of the Wabasha County Government Study Commission was void because
appellants do not contest the district court's finding that the motion was moot. In
December 2011, the Wabasha County Board of Commissioners abolished its county
administrator position....

...District Court, File No. 79–CV–11–1269. Erick G. Kaardal , Mohrman & Kaardal,

P.A., Minneapolis, MN, for appellants Norman and Snow. James Nordstrom...

**47.   Buffets, Inc. v. Leischow, United States Court of Appeals, Eighth Circuit. October 21, 2013 732 F.3d 889 2013 WL 5677038 12-2804**

BANKRUPTCY - Jurisdiction. Diversity provided basis for jurisdiction over action removed on basis of "related to" bankruptcy jurisdiction.

...presented argument on behalf of the appellant was William F. Mohrman, of Minneapolis, MN. The following attorney(s) appeared on the...

**48.   Wolfchild v. U.S., United States Court of Appeals, Federal Circuit. September 27, 2013 731 F.3d 1280 2013 WL 5405505 2012-5035, 2012-5036, 2012-5043**

NATIVE AMERICANS - Lands. Descendants of tribe members did not show that legislation was money-mandating.

...original tribal relations, with lack of unitary organization. Erick G. Kaardal , Mohrman & Kaardal, P.A., of Minneapolis, MN, argued for plaintiffs-cross appellants, Sheldon...

**49.   Minnesota Voters Alliance v. Ritchie, United States Court of Appeals, Eighth Circuit. August 02, 2013 720 F.3d 1029 2013 WL 3958348 12-2946**

GOVERNMENT - Elections. Voters failed to state a §1983 claim challenging the Minnesota election procedure for verifying election day registrants.

...5–120(14) 524.5–313(c)(8) Erick G. Kaardal , argued, Minneapolis, MN, for Appellants. Nathan J. Hartshorn , AAG, argued...

**50.   InCompass IT, Inc. v. XO Communications Services, Inc., United States Court of Appeals, Eighth Circuit. June 26, 2013 719 F.3d 891 2013 WL 3198183 12-2868, 12-2829**

COMMERCIAL LAW - Jury. Equitable nature of promissory estoppel claim against lessee foreclosed lessor's right to jury trial.

...of the unenforceable agreement. M.S.A. §513.05 Erick G. Kaardal , argued and on the brief, Minneapolis, MN, for appellants/cross...

**51.   Slaven v. Engstrom, United States Court of Appeals, Eighth Circuit. March 22, 2013 710 F.3d 772 2013 WL 1164433 12-1457**

CIVIL RIGHTS - Municipal Liability. There was no evidence that county policy caused alleged due process violations against parents during child protection case.

...violations. U.S.C.A. Const.Amend. 14 42 U.S.C.A. §1983 Erick G. Kaardal , argued, Minneapolis, MN, for Appellant. Daniel Patrick Rogan , argued, Minneapolis...

52. **Minnesota Majority v. Mansky, United States Court of Appeals, Eighth Circuit. March 06, 2013 708 F.3d 1051 2013 WL 811728 11-2125**

CIVIL RIGHTS - Free Speech. Minnesota statute prohibiting display of political materials at polling place did not facially violate right to free speech.

...delegating discretion to election judges. U.S.C.A. Const.Amend. 14 Erick G. Kaardal , argued, Minneapolis, MN, for appellants. Daniel Patrick Rogan , argued, Minneapolis...

53. **Annex Medical, Inc. v. Sebelius, United States Court of Appeals, Eighth Circuit. February 01, 2013 Not Reported in F.3d 2013 WL 1276025 13-1118**

Appellants Annex Medical, Inc. and Stuart Lind have moved for a preliminary injunction pending appeal against enforcement of certain mandatory coverage provisions of the Patient Protection and Affordable Care Act of 2010. In their complaint filed in the district court, the appellants challenged provisions of the statute and implementing regulations...

...Kaylan Lytle Phillips , Actright Legal Foundation, Plainfield, IN, Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for Plaintiffs-Appellants. Kaylan Lytle Phillips , U.S...

54. **Limmer v. Ritchie, Supreme Court of Minnesota. August 27, 2012 819 N.W.2d 622 2012 WL 3642681 A12-1258, A12-1149**

GOVERNMENT - Elections. Secretary exceeded his authority by providing titles for proposed constitutional amendment ballot questions.
...1 (2010) , is the title designated by the Legislature Erick Kaardal , Mohrman Kaardal, P.A., Minneapolis, MN, Austin R. Nimocks Jordan Lorence , Alliance Defending...

55. **League of Women Voters Minnesota v. Ritchie, Supreme Court of Minnesota. August 27, 2012 819 N.W.2d 636 2012 WL 3643840 A12-0920**

GOVERNMENT - Elections. Ballot question for proposed "voter identification" amendment to State Constitution did not itself violate the Constitution.

...PLLC, Alexandria, VA, for amicus curiae Minnesota Majority. Erick G. Kaardal William F. Mohrman , Mohrman & Kaardal, P.A., Minneapolis, MN, for amici curiae State Senator Scott J...

56. **Abrahamson v. St. Louis County School Dist., Supreme Court of Minnesota. August 10, 2012 819 N.W.2d 129 2012 WL 3236801 A10-2162**

EDUCATION - Finance. School district was a corporation within the meaning of the Campaign Financial Reports Act and Fair Campaign Practices Act.

...prima facie violation of Minn.Stat. §211B.06 Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for respondents Abrahamson and Kotzian. Stephen M...


57. **State v. Fellegy, Court of Appeals of Minnesota. July 11, 2012 819 N.W.2d 700 2012 WL 2849606 A11-1097**

CRIMINAL JUSTICE - Selective Prosecution. Defendant charged with taking fish out of season failed to establish equal protection based claim of selective prosecution.

...Smith, Assistant County Attorney, Aitkin, MN, for respondent. Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN, for appellant. Considered and decided by WRIGHT...

58. **State v. Wendorf, Court of Appeals of Minnesota. March 19, 2012 814 N.W.2d 359 2012 WL 896358 A11-838**

CRIMINAL JUSTICE - Traffic Offenses. Seat belt statute allowed officer to stop motorist solely for seat belt violation.

...the City of Anoka, Anoka, MN, for respondent. Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN, for appellant. Considered and decided by KALITOWSKI...


59. **Rechtzigel v. Commissioner of Public Safety, Court of Appeals of Minnesota. January 23, 2012 Not Reported in N.W.2d 2012 WL 177368 A11-1123**

On appeal from the district court's decision sustaining the revocation of appellant's driver's license under the implied-consent law, appellant argues that (1) his statements to the police officer should be suppressed because he was in custody at the time he made the statements, but the requisite Miranda warning was not given; (2) the officer's...

...2012. Dakota County District Court; File No. 19AVCV10669. Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for appellant. Lori Swanson , Attorney General, Kristi...


60. **McCaughtry v. City of Red Wing, Supreme Court of Minnesota. December 28, 2011 808 N.W.2d 331 2011 WL 6783813 A10-0332**

CIVIL RIGHTS - Declaratory Judgment. Challenge to constitutionality of rental inspection ordinance presented justiciable controversy.

...amicus curiae St. Paul Association of Responsible Landlords. Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for amici curiae legal scholars Ryan Scott...

**61.   McGrath v. Minnesota Secretary of State, Court of Appeals of Minnesota. November 21, 2011 Not Reported in N.W.2d 2011 WL 5829345 A11-613**

GOVERNMENT - Elections. Counties' delay of inputting voter registration data into statewide system did not establish that secretary of state had violated Help America Vote Act (HAVA).

...Administrative Hearings, File No. 15–3500–21801–HV. Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for relators. Lori Swanson , Attorney General, Nathan...

**62.   R.C. Smith Co. v. Commercial Environments, Inc., Court of Appeals of Minnesota. August 29, 2011 Not Reported in N.W.2d 2011 WL 3795149 A11-363**

In this contract dispute, appellant challenges the district court's orders denying its motion for summary judgment on an unjust-enrichment claim, dismissing the claim, and imposing sanctions for pursuing the claim to judgment. By notice of related appeal, respondent argues that the court abused its discretion by declining to adopt respondent's...

...Terry , Messerli & Kramer, P.A., Minneapolis, MN, for appellant. William F. Mohrman James R. Magnuson , Mohrman & Kaardal, P.A., Minneapolis, MN, for respondent. Considered and decided by HALBROOKS...

**63.   Storms v. Schneider, Court of Appeals of Minnesota. August 08, 2011 802 N.W.2d 824 2011 WL 3426034 A10-1876**

COMMERCIAL LAW - Replevin. Action seeking to recover religious statue from its creator was a replevin action for which a right to jury trial applied.

...Pugh , Bassford Remele, P.A., Minneapolis, MN, for respondent. Erick G. Kaardal William F. Mohrman , Mohrman & Kaardal, P.A., Minneapolis, MN, for appellant. Considered and decided by JOHNSON...

**64.   Abrahamson v. St. Louis County School Dist., Court of Appeals of Minnesota. August 01, 2011 802 N.W.2d 393 2011 WL 3241873 A10-2162**

EDUCATION - School Districts. School district expenditures to promote ballot referendum were subject to campaign finance reporting requirements.

...constitute "disbursements" under Minnesota Statutes, chapter 211 A. Erick G. Kaardal, Mohrman & Kaardal P.A., Minneapolis, MN, for relators. Stephen M. Knutson Michelle D...

**65.   American Civil Liberties Union of Minnesota v. Tarek ibn Ziyad Academy,**

**United States Court of Appeals, Eighth Circuit. July 07, 2011 643 F.3d 1088 2011 WL 2637701 10-2326**

EDUCATION - Parties. Parents' motion to intervene was untimely in action alleging charter school's methods violated Establishment Clause.

...its decision. Michael W. McConnell , argued, Stanford, CA, Erick G. Kaardal , on the brief, Minneapolis, MN, for appellant. Peter McCreery Lancaster...

**66.   S.R. Wiedema, Inc. v. Sienna Corp., Court of Appeals of Minnesota. June 06, 2011 Not Reported in N.W.2d 2011 WL 2201084 A10-750**

Appellant challenges the district court's summary-judgment determination that respondent's mortgage takes priority over appellant's mechanic's lien. Appellant argues that the undisputed evidence establishes that respondent had actual notice of appellant's lien or that the actual and visible beginning of the improvement to the land preceded the...

...P.A., Minneapolis, Minnesota (for respondent Village Bank). Vincent J. Fahnlander , Mohrman & Kaardal, P.A., Minneapolis, Minnesota (for appellant Pioneer Engineering, P.A.). Considered and...

**67.   281 Care Committee v. Arneson, United States Court of Appeals, Eighth Circuit. April 28, 2011 638 F.3d 621 2011 WL 1584724 10-1558**

GOVERNMENT - Elections. Knowingly false campaign speech is not categorically outside protection of First Amendment.

...meet a compelling government interest. U.S.C.A. Const.Amend. 1 Erick G. Kaardal, argued, William F. Mohrman, on the brief, Minneapolis, MN, for appellant. Jean Burdorf, argued...

**68.   A.L.S. ex rel. J.P. v. E.A.G., Court of Appeals of Minnesota. October 26, 2010 Not Reported in N.W.2d 2010 WL 4181449 A10-443**

FAMILY LAW - Assisted Reproduction. Surrogate was the legal and biological mother

of a child under Minnesota's Parentage Act.

...Court, File No. 27-PA-FA-07-909. William F. Mohrman , Mohrman & Kaardal, P.A., Minneapolis, MN; and Samantha J. Gemberling , Gemberling Law Office...

**69.   In re Teacher Licensures at Tarek IBN Ziyad Academy, Court of Appeals of Minnesota. August 17, 2010 Not Reported in N.W.2d 2010 WL 3220117 A09-2267**

The commissioner of education assessed a penalty against relator under Minn.Stat. § 127A.42 (2008) for noncompliance with teacher-licensure requirements. Relator challenges the penalty, asserting multiple claims of error. We affirm. Relator Tarek ibn Ziyad Academy (TiZA), a Minnesota public charter school, is required to abide by all...

...2267. Aug. 17, 2010. Minnesota Department of Education Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for relator. Lori A. Swanson , Attorney General...

**70.   In re North Shore Pines Trust Agreement, Court of Appeals of Minnesota. April 27, 2010 Not Reported in N.W.2d 2010 WL 1657566 A09-1159**

Appellant argues that the district court erred by granting summary judgment to respondents based on a determination that certain amendments to a trust agreement are valid and enforceable. Because there are no genuine issues of material fact and because the district court did not err in its application of the law, we affirm. This dispute relates to...

...Court, File No. 27-TR-CV-08-139. Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for appellant Ronald Smith. Matthew T. Boos...

**71.   Barry v. St. Anthony-New Brighton Independent School Dist. 282,**

**Court of Appeals of Minnesota. April 20, 2010 781 N.W.2d 898 2010 WL 1541307 A09-1093**

EDUCATION - School Districts. Complaint against school district and school board failed to allege prima facie campaign finance violation.

...a violation of chapter 211A or 211 B. Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for relators. James E. Knutson , Knutson Flynn...

**72.   Paulownia Plantations de Panama Corp. v. Rajamannan, Supreme Court of Minnesota. November 05, 2009 793 N.W.2d 128 2009 WL 3644186 A07-2199**

Background: Corporation created for purposes of investing in tree lumber business

owner's operations in Panama brought action against owner and his Panamanian businesses, asserting breach of contract and other claims. Defendants filed motion to dismiss under doctrine of forum non conveniens. The District Court, Anoka County, Barry A....

...protected by an order making the dismissal conditional. William F. Mohrman Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for respondent. Gary Hansen Aaron Mills Scott...

73. **Faegre & Benson, LLP v. R & R Investors, Court of Appeals of Minnesota. September 29, 2009 772 N.W.2d 846 2009 WL 3077629 A08-1899**

BUSINESS ORGANIZATIONS - Partnerships. Tucker Act claim remained property of partnership following dissolution and subsequent continuation of the business.

...without need for separate devise of that property. Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for appellants R & R Investors, et al...

74. **City of Ramsey v. Kiefer, Court of Appeals of Minnesota. August 25, 2009 Not Reported in N.W.2d 2009 WL 2595890 A08-1714**

In this certiorari appeal, relator challenges respondent city's notice to relator to abate a nuisance based on its conclusion that a vehicle is parked on relator's property in violation of a city ordinance. Because the city's decision is not supported by evidence in the record and is based on an error of law, we reverse. Relator Keith A. Kiefer is...

...Sonsalla , Kennedy & Graven, Chtd., Minneapolis, MN, for respondent. Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for relator. Considered and decided by BJORKMAN...

75. **Citizens for Rule of Law v. Senate Committee on Rules & Admin.**

**Court of Appeals of Minnesota. July 28, 2009 770 N.W.2d 169 2009 WL 2225635 A08-1343**

GOVERNMENT - Public Officials. Increase in legislators' per diem allowances did not violate state constitution.

...section's prohibition against same-term increases to compensation. Erick G. Kaardal , Mohrman & Kaardal, P.A.; Daniel J. Biersdorf , Biersdorf & Associates, Minneapolis, MN, for appellants...

76. **Minnesota Voters Alliance v. City of Minneapolis, Supreme Court of Minnesota.**

**June 11, 2009 766 N.W.2d 683 2009 WL 1617771 A09-182**

GOVERNMENT - Elections. Instant runoff voting, as adopted by city residents through referendum, was not facially unconstitutional.

...Smallwood, 130 Minn. 492, 153 N.W. 953 (1915) Erick Gregg Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for appellants. Susan Lee Segal , Minneapolis City...


77.   **Wolfchild v. U.S., United States Court of Appeals, Federal Circuit. March 10, 2009 559 F.3d 1228 2009 WL 592459 2008-5018**

NATIVE AMERICANS - Lands. Appropriations Acts did not create trust for benefit of loyal Mdewakanton and their lineal descendants.

...temporary use and occupancy rights. U.S.C.A. Const.Amend. 5 Erick G. Kaardal , Mohrman & Kaardal P.A., of Minneapolis, MN, argued for all plaintiffs-appellees Sheldon...


78.   **Paulownia Plantations de Panama Corp. v. Rajamannan, Court of Appeals of Minnesota. December 09, 2008 757 N.W.2d 903 2008 WL 5136819 A07-2199**

LITIGATION - Jurisdiction. Panama was not available forum for suit, such that dismissal under doctrine of forum non conveniens was improper.

...balancing of the public- and private-interest factors. William F. Mohrman Erick G. Kaardal Tona T. Dove , Mohrman & Kaardal, P.A., Minneapolis, MN, for appellant. Gary Hansen Aaron Mills Scott...


79.   **Houston County v. Solum, Court of Appeals of Minnesota. September 16, 2008 Not Reported in N.W.2d 2008 WL 4224493 A07-1408, A07-2115**

In these consolidated appeals, appellant-relator Matthew Solum challenges (1) the district court's determination that his property does not conform with Houston County's zoning ordinance and (2) the county's subsequent denial of his application for a conditional-use permit. We affirm. In October 2005, Solum purchased a house and approximately eight...

...Houston County and Houston County Board of Commissioners. Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for appellant Matthew Solum and relators Matthew...


80.   **Shepherd v. Stade, Court of Appeals of Minnesota. June 03, 2008 Not Reported in N.W.2d 2008 WL 2246259 A07-1220**

Appellant challenges the district court's denial of her motion to dismiss respondent's complaint on the ground that it is barred by the doctrine of sovereign immunity. Appellant asserts that the Shakopee Mdewakanton Sioux Community (the tribe) is an indispensable party to the suit and that, because the tribe cannot be joined, the suit must be...

...District Court, File No. 70-CV-07-6059. Erick G. Kaardal William F. Mohrman , Mohrman & Kaardal, P.A., Minneapolis, MN, for respondent. Kevin J. Wetherille Dennis Patrick...

81. **Evelyn I. Rechtzigel Trust ex rel. Rechtzigel v. Fidelity Nat. Title Ins. Co. of New York**

**Court of Appeals of Minnesota. May 06, 2008 748 N.W.2d 312 2008 WL 1971976 A07-0645**

INSURANCE - Title. Title insurance did not cover losses incurred arising out of bankruptcy of qualified intermediary in like-kind exchange.

...duty to defend under a title insurance policy. Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for appellant. Ryan R. Dreyer Eric Nasstrom...

82. **. Johnson v. City of Shorewood, Court of Appeals of Minnesota. February 19, 2008 Not Reported in N.W.2d 2008 WL 434680 A06-2353**

Appellant Ronald Johnson challenges the district court's grant of summary judgment in favor of all named respondents. Appellant argues that the district court erred by (1) denying his request for a declaratory judgment and an additional takings proceeding under Minn.Stat. § 117.045 (2006), based on "[r]espondents' future, continued and increased...

...District Court, File No. 27-CV-04-016195. Erick G. Kaardal , Mohrman & Kaardal, P.A., Minneapolis, MN, for appellant. George C. Hoff Kimberly B...

83. **Star Windshield Repair, Inc. v. Western Nat. Ins. Co., Court of Appeals of Minnesota. February 05, 2008 744 N.W.2d 237 2008 WL 314457 A07-216, A07-217, A07-830**

INSURANCE - Automobile. Anti-assignment clauses validly applied to post-loss assignments of right to payment for windshield repairs.

...MN, for respondent Western National Insurance Co. Steven R. Kluz , Mohrman & Kaardal, P.A., Minneapolis, MN, for respondent Austin Mutual Insurance Company. Leatha...

**84.   State v. Otterstad, Supreme Court of Minnesota. July 12, 2007 734 N.W.2d 642 2007 WL 2003314 A05-178, A05-179**

CRIMINAL JUSTICE - Nuisance. State did not prove defendants maintained condition that endangered public safety when they displayed political signs.

...defense to the ordinance they allegedly violated. Charles R. Shreffler , Mohrman & Kaardal, P.A., Minneapolis, MN, Alan E. Untereiner Daniel R. Walfish , Robbins...

**85.   Glass Service Co., Inc. v. Illinois Farmers Ins. Co., Court of Appeals of Minnesota. June 26, 2007 Not Reported in N.W.2d 2007 WL 1815781 A06-1074**

On appeal from the district court order confirming the arbitrators' awards of damages in multiple, individual, consolidated claims under the no-fault law, in which respondent sought additional payments for automobile windshield glass repair and replacement work it had performed for appellant's insureds, appellant argues that the arbitrators...

...Morgan , Minneapolis, MN; and Steven R. Kluz, Jr. Gregory Erickson Mohrman & Kaardal, P.A. , Minneapolis, MN, for appellant. Considered and decided by RANDALL...

**86.   In re GlaxoSmithKline plc, Supreme Court of Minnesota. June 07, 2007 732 N.W.2d 257 2007 WL 1630190 A04-2150**

LITIGATION - Discovery. Trial court may issue protective order to prevent chill on First Amendment association rights.

...B. Civello , St. Paul, MN, for Respondent. Charles R. Shreffler Mohrman & Kaardal , Minneapolis, MN, Elizabeth B. McCallum Howrey LLP Margaret M. Zwisler...

**87.   State ex rel. Sviggum v. Hanson, Court of Appeals of Minnesota. May 22, 2007 732 N.W.2d 312 2007 WL 1470300 A06-840**

GOVERNMENT - Budget. Quo warranto could not be used to challenge the constitutionality of completed disbursements of public funds.

...is capable of resolution through the judicial process. Erick G. Kaardal William F. Mohrman Mohrman & Kaardal, P.A. , Minneapolis, MN, for appellants. Lori Swanson , Attorney General, Kenneth...

**88.   Mellby v. Cass County, Court of Appeals of Minnesota. April 03, 2007 Not**

**Reported in N.W.2d 2007 WL 968633 A06-80, A06-299**

In these consolidated land-use appeals, relators argue that (1) the county's findings under the zoning ordinance are inadequate to allow review of the county's grant of a preliminary conditional use permit and planned unit development; (2) the planning commission misunderstood aspects of the zoning ordinance, including misunderstanding it to...

...Falls, MN, for respondent Cass County Planning Commission. William F. Mohrman Gregory M. Erickson Mohrman & Kaardal, P.A. , Minneapolis, MN, for respondent Bryan Walker. Considered and decided...

89. **In re Charges of Unprofessional Conduct Involving File No. 17139, Supreme Court of Minnesota. September 07, 2006 720 N.W.2d 807 2006 WL 2564384 A05-1955**

LEGAL SERVICES - Discipline. Request for identity of attorney's sources for statement about judge was reasonable.

...St Paul MN, for Lawyers Professional Responsibility Board. William F. Mohrman Charles R. Shreffler Mohrman & Kaardal, P.A. , Minneapolis MN, for Respondent Attorney in File No. 17139...

90. **Republican Party of Minn. v. White, United States Court of Appeals, Eighth Circuit. June 20, 2006 456 F.3d 912 2006 WL 1687468 99-4021, 99-4025, 99-4029**

JUDICIAL ADMINISTRATION - Judges. Attorney fees in excess of $1.5 million were awarded in challenge to judicial canons regulating political activity.

...Thomas J. Marzen Bopp & Coleson , Terre Haute, IN, Erick G. Kaardal Mohrman & Kaardal, P.A. , Minneapolis, MN, Tony P. Trimble Matthew Wayne Haapoja Trimble & Associates , Minnetonka, MN, for Plaintiffs-Appellants. William F. Mohrman Mohrman & Kaardal, P.A. , Minneapolis, MN, for Plaintiff. Mark Bernard Levinger Thomas Campion...

91. **Riley v. Jankowski, Court of Appeals of Minnesota. April 26, 2006 713 N.W.2d 379 2006 WL 1147945 A05-1125**

GOVERNMENT - Elections. Statute requiring a disclaimer on campaign literature was overbroad and unconstitutionally restricted pure speech.

...Paul, MN, for respondent Office of Administrative Hearings. Erick G. Kaardal William F. Mohrman Mohrman & Kaardal, P.A. , Minneapolis, MN, for relators Stephen Jankowski, et al. Considered...

**92.** **In re GlaxoSmithKline plc, Court of Appeals of Minnesota. April 18, 2006 713 N.W.2d 48 2006 WL 997450 A04-2150**

ANTITRUST - Discovery. Pharmaceutical company documents, sought by Attorney General, were not confidential.

...Steen & Hamilton, Washington, D.C., for respondent GlaxoSmithKline plc. William F. Mohrman Mohrman & Kaardal , Minneapolis, MN, for amicus curiae Pharmaceutical Research and Manufacturers of...

**93.** **Peterson v. BASF Corp., Supreme Court of Minnesota. March 30, 2006 711 N.W.2d 470 2006 WL 799218 C3-02-857**

ENVIRONMENTAL LAW - Pesticides. Farmers' claims of deceptive herbicide marketing were not preempted by FIFRA.

...Reform Association and Amicus American Tort Reform Association. William F. Mohrman Mohrman & Kaardal , P. A., Minneapolis, MN, for Amicus Washington Legal Foundation. Scott...

**94.** **Ellingson v. Burlington Northern and Santa Fe Ry. Co., Court of Appeals of Minnesota. March 21, 2006 Not Reported in N.W.2d 2006 WL 696315 A05-650**

Background: Motorist's husband brought a negligence action against railroad after motorist died after being involved in a collision with a train. The District Court, Isanti County, granted railroad summary judgment. Motorist and railroad appealed. Holding: The Court of Appeals, Wright, P.J., held that negligence claim asserted by motorist's husband...

...County District Court, File No. C7-02-712. William F. Mohrman Erick G. Kaardal Charles R. Shreffler Mohrman & Kaardal, P.A. , Minneapolis, MN, for appellant. Julius W. Gernes JoAnn C...

**95.** **State v. Otterstad, Court of Appeals of Minnesota. December 27, 2005 Not Reported in N.W.2d 2005 WL 3527236 A05-178, A05-179**

In these consolidated appeals from their convictions for creating a public nuisance and violating a city sign ordinance, appellants argue that they did not act intentionally or "maintain a condition" that would violate the nuisance statute; as applied to them and facially, the nuisance statute is an unconstitutional content-based......J. Scott , Anoka, MN, for respondent. Charles R. Shreffler, Jr. Mohrman & Kaardal, P.A. , Minneapolis, MN, for appellants. Considered and decided by WILLIS...

**96.   Republican Party of Minnesota v. White, United States Court of Appeals, Eighth Circuit. August 02, 2005 416 F.3d 738 2005 WL 1802507 99-4021, 99-4025, 99-4029**

JUDICIAL ADMINISTRATION - Judges. Restricting political activities of candidates for judicial office violated First Amendment.

...Jud. Conduct, Canon 5 , subd. B(1)(a). William F. Mohrman Mohrman & Kaardal, P.A. , argued, Minneapolis, MN, for Gregory Wersal, Campaign for Justice...

**97.   In re GlaxoSmithKline PLC, Supreme Court of Minnesota. July 14, 2005 699 N.W.2d 749 2005 WL 1645638 A04-2150, A04-2151**

LITIGATION - Discovery. Order addressing confidentiality of documents produced on Civil Investigative Demand was appealable.

...Gottlieb Steen & Hamilton , Washington, D.C., for Respondent. Charles R. Shreffler Mohrman & Kaardal , Minneapolis, MN, Margaret M. Zwisler Elizabeth B. McCallum , Washington, D.C...

**98.   Jerome Cheese Co. v. Equinox Enterprises, Inc., Court of Appeals of Minnesota. June 28, 2005 Not Reported in N.W.2d 2005 WL 1514452 A04-1960**

Appellant Jerome Cheese Company asserts that the district court clearly erred by finding that the parties entered into a valid brokerage agreement as part of a settlement agreement placed on the record. Despite the finding, the district court granted appellant's motion to dismiss this action with prejudice under the terms of the settlement...

...L.L.P ., New Ulm, MN, for appellant. Charles R. Shreffler, Jr. Mohrman & Kaardal, P.A. , Minneapolis, MN, for respondents. Considered and decided by STONEBURNER...

**99.   Forest Park II v. Hadley, United States Court of Appeals, Eighth Circuit. May 24, 2005 408 F.3d 1052 2005 WL 1214328 04-2599**

REAL PROPERTY - Subsidized Housing. Government actors did not violate low-income landlord's right to prepay its federal mortgage.

...as Preempted Minn.Stat. Ann. §§471.9997 504B.255 William F. Mohrman , argued, Minneapolis, MN, for appellant. Amy V. Kvalseth , AAG, argued...

**100.   Twin City Pipe Trades Service Ass'n, Inc. v. Peak Mechanical, Inc., Court of Appeals of Minnesota. December 07, 2004 689 N.W.2d 549 2004 WL 2796039 A04-356**

REAL PROPERTY - Liens. Employment-benefit fund trustee could file mechanic's lien

statements on behalf of union employees.

...labor of the employees. Vincent J. Fahnlander Eric L. Lipman Mohrman & Kaardal, P.A. , Minneapolis, MN, for respondent. John M. Koneck Brian S...

**101.    Republican Party of Minn., Third Congressional Dist. v. Klobuchar, United States Court of Appeals, Eighth Circuit. August 26, 2004 381 F.3d 785 2004 WL 1900318 03-2801**

GOVERNMENT - Elections. As-applied challenges to campaign statute were mooted when prosecution of candidate was dismissed.

...as Unconstitutional M.S.A. §211B.06, subd. 1 William F. Mohrman , argued, Minneapolis, MN ( Erick G. Kaardal and Eric L. Lipman of Minneapolis, MN, on the brief...

**102.    Republican Party of Minnesota v. White, United States Court of Appeals, Eighth Circuit. March 16, 2004 361 F.3d 1035 2004 WL 503674 99-4025, 99-4021, 99-4029**

CIVIL RIGHTS - Appeals. Remand by Supreme Court necessitated Court of Appeals' remand for further proceedings on affected issues.

...Const.Amend. 1 James Bopp , argued, Terre Haute, IN ( William F. Mohrman , Minneapolis, MN of counsel), for appellant. Alan I. Gilbert , argued...

**103.    Johnson v. City of Shorewood, Minnesota, United States Court of Appeals, Eighth Circuit. March 05, 2004 360 F.3d 810 2004 WL 405692 03-2023, 02-4081, 02-3562**

LITIGATION - Jurisdiction. Rooker–Feldman doctrine deprived court of jurisdiction over property owners' claims.

...federal claims. 28 U.S.C.A. §1367(c)(3) Erick G. Kaardal , argued, Minneapolis, Minnesota, for appellants/cross-appellees. George C. Hoff...

**104.    Peterson v. BASF Corp., Supreme Court of Minnesota. February 19, 2004 675 N.W.2d 57 2004 WL 307317 C3-02-857**

COMMERCIAL LAW - Consumer Protection. Evidence supported $52,058,931.51 damages award in class action against herbicide maker.

...Francisco, CA, for Amicus Curiae Minnesota Farmers Union. William F. Mohrman Mohrman & Kaardal , Minneapolis, MN, Daniel J. Popeo Richard A. Samp Washington Legal...

**105.  In re Conservatorship of Kimel, Court of Appeals of Minnesota. December 09, 2003 Not Reported in N.W.2d 2003 WL 22889998 A03-35**

In an order on an account in a conservatorship, the district court surcharged conservator Louise Bouta and her surety for breach of a fiduciary duty in Bouta's management of Thomas Kimel's estate. Bouta appeals on three grounds: that inadequate notice of the nature of the alleged breach and potential personal liability violated her...

...District Court, File No. P6001276; Thorwald Anderson , Judge. Erick G. Kaardal Mohrman & Kaardal, P.A. , Minneapolis, MN, for appellant Louise Bouta. Stephen C. Fiebiger...

**106.  Forest Park II v. Hadley, United States Court of Appeals, Eighth Circuit. July 17, 2003 336 F.3d 724 2003 WL 21664818 02-2445, 02-2609**

REAL PROPERTY - Subsidized Housing. State statutes imposing extra requirements on federally subsidized housing landlord's prepayment were preempted.

...Minn.Stat. Ann. §504B.255 Minn.Stat. Ann. §471.9997 William F. Mohrman , argued, Minneapolis, MN, for appellant. Ann Marie Norton , argued, St...

**107.  Peterson v. BASF Corp., Court of Appeals of Minnesota. March 11, 2003 657 N.W.2d 853 2003 WL 943659 C3-02-857**

COMMERCIAL LAW - Consumer Protection. FIFRA did not preempt farmers' consumer fraud action against herbicide manufacturer.

...Minneapolis, MN, for amicus Product Liability Advisory Council. William F. Mohrman Morhman & Kaardal , Minneapolis, MN, for amicus Washington Legal Foundation. Considered and decided...

**108.  Walser Auto Sales, Inc. v. City of Richfield, Supreme Court of Minnesota. May 23, 2002 644 N.W.2d 425 2002 WL 1033814 C4-01-694**

Based upon all the files, records and proceedings herein, and upon an evenly divided court, IT IS HEREBY ORDERED that the decision of the court of appeals filed November 13, 2001, be, and the same is, affirmed without opinion. BY THE COURT: Kathleen A. Blatz Chief Justice

...Amicus Curiae Minnesota Institute of Public Finance, Inc. Erick G. Kaardal (#229647), Minneapolis, MN, William H. Mellor Dana Berliner (#447686), Robert...

**109.  Republican Party of Minnesota v. Kelly, United States Court of Appeals, Eighth Circuit. April 30, 2001 247 F.3d 854 2001 WL 434484 99-4021, 99-4025, 99-4029**

GOVERNMENT - Elections. Restrictions on judicial candidate's partisan activity did

not violate First Amendment.

...Code of Jud.Conduct, Canon 5 , subd. B(2). William R. Mohrman, Minneapolis, Minnesota, argued, for appellants Gregory Wersal and Campaign for Justice. Tony P. Trimble , Minnetonka, Minnesota, argued ( Erick G. Kaardal and Robert S. Halagan , on the brief), for appellants Muslim...

**110. Brewster v. Kriz, Court of Appeals of Minnesota. September 19, 2000 Not Reported in N.W.2d 2000 WL 1341472 C5-00-614**

James J. Kriz, Jr., appeals the district court's denial of his motion for relief under Minn.R.Civ.P. 60.02 from an order establishing an attorney's lien on behalf of respondent Fredrikson & Byron, P.A. We affirm. In April 1996, appellant James J. Kriz, Jr., retained respondent Fredrikson & Byron, P.A., as his counsel in connection with post-decree...

...Respondent. No. C5-00-614. Sept. 19, 2000. William F. Mohrman Mohrman & Kaardal, P.A. , Minneapolis, MN, for appellant. Jay Quam Judy Sally Engel...

**111. Funchess ex rel. Haynes v. Cecil Newman Corp., Minnesota Supreme Court. 632 N.W.2d 666 August 23, 2001 632 N.W.2d 666 2001 WL 952827 C8-00-90.**

REAL PROPERTY - Landlord and Tenant. Tenant's murder was not foreseeable result of landlord's alleged failure to maintain lock on back door of tenant's building. Court of Appeals reversed.

...A. LaNave Murrin Law Firm , Edina, for respondents. William F. Mohrman, Mohrman & Kaardal, P.A. , Minneapolis, for appellant.

**112. Pietsch v. Darling, Court of Appeals of Minnesota. April 11, 2000 Not Reported in N.W.2d 2000 WL 369388 C0-99-1632**

After a dispute arose involving the balance due on a contract for deed between appellant Michael J. Darling and respondent Rory J. Pietsch, Darling served notice of cancellation under Minn.Stat. § 559.21 (1996). Ultimately, at a pretrial hearing at which Darling represented himself, the parties entered into a settlement agreement on the record....

...Defendants. No. C0-99-1632. April 11, 2000. William F. Mohrman Mohrman Co. , P.A., Minneapolis, MN, for respondent. David J. Van House...

**113. Nevis Lumber, Inc. v. Walker Bldg. Center, Court of Appeals of Minnesota. September 21, 1999 Not Reported in N.W.2d 1999 WL 732436 CX-99-407**

In this appeal from a judgment denying its claim for specific performance of a purchase agreement, appellant Nevis Lumber, Inc., argues that the district court erred by concluding that the purchase agreement was rescinded by the parties' mutual agreement

to abandon it and that the purchase agreement also failed for lack of consideration. We affirm....

...Respondents. No. CX-99-407. Sept. 21, 1999. Erick G. Kaardal Trimble & Associates, Ltd. , 11700 Wayzata Boulevard, Minnetonka, MN 55305 (for...

## 114.   In re Trusteeship Created by City of Sheridan, Court of Appeals of Minnesota. May 05, 1999 593 N.W.2d 702 1999 WL 289247 C4-98-1722, C9-98-1702, C6-98-1673

COMMERCIAL LAW - Jurisdiction. Trial court had jurisdiction over trust administered in state even though assets were not in state.

...indicate that the exercise of jurisdiction is appropriate. William F. Mohrman Mohrman & Co., P.A. , Minneapolis, for appellants Colorado Farm Bureau Mutual Insurance...

## 115.   Pietsch v. Darling, Court of Appeals of Minnesota. December 22, 1998 Not Reported in N.W.2d 1998 WL 894717 C2-98-987

On appeal from a summary judgment, appellant Rory Pietsch challenges the district court's order dismissing this action to have himself declared the fee owner of property. The district court concluded that, pursuant to Minn.Stat. § 559.21, subds. 2a, 3 (1996), Pietsch had no legal interest in the property because he failed to either cure the default...

...County District Court, File No. CX-97-1458. William F. Mohrman Mohrman & Co., P.A. Multifoods Tower , Minneapolis, MN, for Appellant. Mark E...

## 116.   Stark v. Independent School Dist., No. 640, United States Court of Appeals, Eighth Circuit. August 21, 1997 123 F.3d 1068 1997 WL 473963 96-3250

Taxpayers brought action against school district, seeking to close elementary school on basis that school's creation and operation violated First Amendment's guarantee against establishment of religion. The United States District Court for the District of Minnesota, Michael J. Davis, J., 938 F.Supp. 544, entered injunction permanently...

...DC, argued ( C. Hunter Wiggins , Washington, DC, and Erick G. Kaardal , Minnetonka, MN, on the brief), for Appellant. Robert J. Bruno...

## 117.   In re Medworth, Court of Appeals of Minnesota. April 22, 1997 562 N.W.2d 522 1997 WL 191826 C8-96-2030

Conservator petitioned to relocate conservatee from her home to out-of-state congregate-living apartment. The District Court, Hennepin County, Ann L. Alton, J., granted petition. Conservatee appealed. The Court of Appeals, Short, J., held that trial court abused its discretion in granting relocation petition. Reversed.

...extent necessary to provide needed care and services. Erick G. Kaardal Trimble &

Associates, Ltd. , Minnetonka, for appellant Elvira Medworth. Timothy R...